## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF DAVID M. DUNN IN SUPPORT
## OF THE CHAPTER 11 FILING AND FIRST DAY PLEADINGS

I, David M. Dunn, hereby submit this declaration (the "**Declaration**") under penalty of perjury that the following is true to the best of my knowledge and belief:

1.    I am the Chief Restructuring Officer of Peer Street, Inc., a Delaware corporation ("**PSI**" and, together with the above-captioned affiliates as debtors and debtors in possession "**Peer Street**" or the "**Debtors**").    I am also a Principal of Province, LLC ("**Province**"), a nationally recognized financial advisory firm focusing on restructurings, growth opportunities, and fiduciary-related services.

2.    Based on my work with the Debtors, my oversight of the work that Province has performed for the Debtors, my review of relevant documents, and my discussions with members of the Company's management team, I am generally familiar with the Debtors' day-to-day operations, business, and financial affairs.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485).  The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn:  David Dunn, Chief Restructuring Officer.

3.      Except as otherwise indicated, all facts herein are based upon my personal knowledge, my discussions with other members of the Debtors' management team, board of directors, and representatives of Province and other of the Debtors' advisors (including legal counsel), my review of relevant documents and information concerning Peer Street's operations, financial affairs, restructuring efforts, or my personal experience and knowledge.

4.      I am a seasoned corporate restructuring professional with over twenty (20) years of experience in high-profile board, buyside, and advisory roles.  My background includes large and complex financial restructurings, operational transformations, mergers and acquisitions, interim management, distressed financings, and litigation-orientated investments.

5.      Over the course of my twenty-year career, I have served as a chief restructuring officer, financial advisor to debtors, advisor to or member of boards of directors, litigation and liquidation trustee, and plan administrator.  Before joining Province, I executed principal investments in distressed debt and equity instruments across a diverse range of industries, first at Arrowgrass Capital Partners and then at Cross Sound Management, a corporate distressed investment firm that I co-founded.  I began my career practicing law within the financial restructuring departments of Sidley Austin LLP and then Akin Gump Strauss Hauer & Feld LLP.

6.      My experience includes global engagements across a broad range of industries, including power, upstream E&P, E&P services, metals and mining, monoline and mortgage insurance, media, gaming, and retail.

7.      I am over the age of 18 and am authorized by the Debtors to submit this Declaration.  If called upon as a witness, I would testify competently to the facts set forth in this Declaration.

30439422.10

KL2 3306866.3

8.     On the date hereof (the "**Petition Date**"), each of the Debtors filed petitions for relief under chapter 11 of title 11 of the United Sates Code, §§ 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

9.     I submit this Declaration to provide an overview of the Debtors' business and the Chapter 11 Cases and support for the Debtors' "first-day" motions (collectively, the "**First Day Motions**").  To familiarize the Court with the Debtor and the relief sought in the First Day Motions filed in this chapter 11 case, this Declaration is organized into four parts as follows:

(a) Part I provides background on the Debtors, their history, corporate structure, and business operations;

(b) Part II provides an overview of the Debtors' prepetition capital structure;

(c) Part III provides a description of the circumstances leading to the commencement of these Chapter 11 Cases, including a description of the Debtors' prepetition restructuring efforts; and

(d) Part IV provides an overview of the First Day Motions.

## I.     THE DEBTORS' BUSINESS

10.     Founded in 2013, Peer Street is a platform for online investing in real-estate debt.  Peer Street's headquarters are located in El Segundo, California.  Peer Street enables accredited investors, funds, and institutions to access certain real estate-related debt investments that were historically difficult to invest in, and permits lenders and borrowers to access capital that has been historically difficult for them to access.

11.     Peer Street introduced the first and largest two-sided online marketplace for investing in and funding real estate debt.  On one side of the marketplace, Peer Street provides individual investors with access to an alternative asset class that was previously

difficult to access, while on the other side of the marketplace, it provides capital to real estate lending businesses and their borrowers.

12. Peer Street sources loans from a nationwide network of private lenders and brokers (covering over forty-five (45) states). These loans are either (i) offered for sale to institutional investors, and/or (ii) posted on Peer Street's online investing platform located at www.peerstreet.com (the "**Peer Street Platform**"), where investors may browse and select from investments offering different yields, terms, and loan-to-value ("**LTV**") ratios, across either residential or multifamily properties that are non-owner occupied, and elect to invest in various real estate-related debt investments through the Peer Street Platform. The Peer Street Platform provides multiple data points for investors to analyze in a streamlined manner. Additionally, Peer Street acts as master servicer and manages loans on behalf of individual and institutional investors.

13. Peer Street determines whether to list an investment opportunity on the Peer Street Platform based on its evaluation of the features and risk factors associated with the investment, including, but not limited to, the lenders, borrowers or other key persons sponsoring such investment. Peer Street may, in some cases, structure proprietary investment vehicles that pool underlying investments. In other cases, real estate securities offered through the Peer Street Platform will track a single underlying investment.

14. Peer Street offers three (3) principal investment products through the Peer Street Platform: (i) Fractional Notes; (ii) Pocket; and (iii) Portfolio (as defined herein). In addition, Peer Street offers another investment product, OppFund (as defined herein), separately from its online platform.

15.    *Fractional Notes*.   In the ordinary course of business, a Peer Street affiliate, PS Funding, Inc., a Delaware corporation ("**PSFI**") originates loans itself through a network of lenders and brokers by (i) purchasing loans or participations in loans originated by the third-party lenders and brokers, (ii) table funding loans on behalf of the third-party lenders and brokers, or (iii) funding loans directly to borrowers sourced through the third party lenders and brokers (the "**Underlying Loans**").

16.    Thereafter, another Peer Street affiliate, Peer Street Funding LLC, a Delaware limited liability company ("**PSFLLC**"), offers investors the opportunity to purchase unsecured mortgage payment dependent notes ("**MPDNs**") through the Peer Street Platform. PSFLLC then uses those investor funds to purchase participation interests in certain of the Underlying Loans.  Holders of MDPNs are entitled to payments equal to fractional interests in the net principal and interest payments collected on the Underlying Loans funded with their investments, net of expenses.

17.    To be more specific, once sufficient MDPNs have been purchased, PSFLLC transfers funds sufficient to PSFI in return for a 100% participation interest in a specified Underlying Loan, entitling PSFLLC to all payments of principal and interest (net of fees, expenses, charges, and other amounts) collected on the Underlying Loan.  Under the terms of the participation agreement, PSFI performs the functions of the lender on the Underlying Loan, among other things, collecting payments (through a subservicer), making distributions, and enforcing the Lender's rights and remedies.  The MPDNs are limited obligations of PSFLLC that entitle holders to payment of principal and interest from PSFLLC only to the extent that PSFLLC has received payments of principal and interest on the Underlying Loan from PSFI.

18.      On the Petition Date, approximately $205.0 million in MPDNs were outstanding.  These notes are associated with approximately $220.2 million in face amount of Underlying Loans.  Approximately $92.4 million of these loans were performing as of the Petition Date.[2]  PSFI also holds cash of approximately $18.5 million.  In addition, another Peer Street affiliate, PSF REO LLC holds $1.2 million in cash and parcels of real estate that had previously secured approximately $37.1 million in Underlying Loans on the retail platform that have been foreclosed.

19.      ***Pocket***.  PSFLLC is also party to a warehouse loan agreement (the "**Pocket 1-Month Warehouse Loan Agreement**") with PS Warehouse, LLC, a Delaware limited liability company ("**Warehouse**"), a wholly-owned subsidiary of PSFI.  Under the Pocket Warehouse Loan Agreement, PSFLLC advances funds to Warehouse.  Warehouse, in turn, advances those funds as needed to PSFI to allow PSFI to close loans PSFI originates or purchases (the "**Pocket Underlying Loans**").  In return, PSFI grants Warehouse a participation interest (the "**Warehouse Participation Interests**") in the Pocket Underlying Loans. Warehouse has pledged the Warehouse Participation Interests to PSFLLC to secure the amounts PSFLLC advanced to it under the Pocket 1-Month Warehouse Loan Agreement.  In addition, PSFI has provided PSFLLC with a guarantee of Warehouse's obligations under the Pocket 1-Month Warehouse Loan Agreement.  To secure its obligations under the guarantee, PSFI also pledged to PSFLLC (i) the mortgage loans underlying the participations granted to Warehouse, and (ii) its membership interest in Warehouse.

20.      To fund the amounts it delivers to Warehouse under the Pocket 1-Month Warehouse Loan Agreement, PSFLLC sells unsecured redeemable warehouse notes

---

[2]    Loans are considered non-performing after thirty (30) days of delinquency.  The $92.4 million performing Underlying Loans translates to 42% of the total $220.2 million face amount of the Underlying Loans.

(the "**RWNs**") to participating investors on the Peer Street Platform ("**Pocket 1-Month**").
Holders of the RWNs are entitled to interest in an amount equal to their pro rata share of the
interest earned by PSFLLC under the Pocket 1-Month Warehouse Loan Agreement.  Interest that
accrues on the RWNs is not paid in cash but is instead capitalized into the outstanding principal
amount of the RWNs.  No cash payments are made on account of the RWNs unless (a) the
maturity date (i.e., December 31, 2029) occurs, or (b) an earlier timely redemption request is
made by the holder of an RWN, in which case payments may be made on the first day of the
month following the end of the redemption period.  The RWNs are limited obligations of
PSFLLC.  Holders of the RWNs are entitled to payment of principal and interest from PSFLLC
only to the extent that PSFLLC has received payments of principal and interest from Warehouse
under the terms of the Pocket 1-Month Warehouse Loan Agreement.

21.    In late 2022, the Debtors launched a second "Pocket" product, Pocket 3-
Month.  This product differs from the Pocket 1-Month product only in that redemptions may be
made every quarter, rather than every month.  It is otherwise structured with a separate, but
parallel, (i) warehouse loan agreement (the "**Pocket 3-Month Warehouse Loan Agreement**"
and, together with the Pocket 1-Month Warehouse Loan Agreement, the "**Pocket Warehouse
Loan Agreements**") between PSFLLC and PS Warehouse II, LLC, a Delaware limited liability
company ("**Warehouse II**"), and (ii) participation agreement between PSFI and Warehouse II.

22.    On January 31, 2023, PSFLLC exercised a "Liquidation Trigger" based on
its good faith determination to halt redemptions to allow for an orderly liquidation of the Pocket
Warehouse Loan Agreements.  Following the Liquidation Trigger, Warehouse and Warehouse II
may not use proceeds of the Pocket Warehouse Loan Agreements to fund additional loans or
purchase any additional Pocket Warehouse Participation Interests.

23.     On the Petition Date, approximately $41.4 million in RWNs were outstanding.  On the Petition Date, Warehouse held (i) cash associated with Pocket 1-Month investments totaling $37.1 million; and (ii) participations in Pocket Underlying Loans and other related assets with a face value of approximately $393,000, title to which was held by PSFI.  On the same date, Warehouse II held cash totaling $1.3 million.

24.     ***Portfolio.***  PS Portfolio – ST1, LLC, a Delaware limited liability company ("**Portfolio**"), managed by its sole member, PSFI, issues payment dependent promissory notes ("**PDNs**") to participating investors on the Peer Street Platform.  Portfolio uses the net proceeds from the issuance of PDNs to purchase mortgage loans and participations in mortgage loans from PSFI (collectively, the "**Portfolio Underlying Assets**") that meet specified credit guidelines.  PSFI services the Portfolio Underlying Assets in return for a standard fee.

25.     The PDNs are unsecured, special, limited obligations of Portfolio.  Holders of the PDNs are entitled to receive monthly interest payments equal to their pro rata portion of any interest payments *actually received* by Portfolio in respect of its portfolio of Portfolio Underlying Assets during the preceding month, less PSFI's standard fee and other fees, costs and expenses incurred by Portfolio for services in respect of the underlying loans and participations.  Portfolio is obligated to make principal and interest payments on the PDNs only to the extent that it has received payments on the underlying mortgage loans and participations in excess of PSFI's standard fee and other issuer expenses.

26.     On the Petition Date, approximately $2.1 million in face amount of PDNs were outstanding.  As of the Petition Date, the net asset value of the Portfolio Underlying Assets was approximately 99.56% of face value.

27.    ***OppFund***.  Peer Street Opportunity Investors II, LP is a Delaware limited partnership ("**OppFund**").  It is managed by its general partner, Peer Street Opportunity Fund GP, LLC, a Delaware limited liability company (the "**General Partner**") and is administered by Crestbridge Fund Services US, LLC.  The General Partner is wholly-owned by PSI, and receives a quarterly management fee.

28.    OppFund makes real estate-related investments in accordance with its investment strategy of providing attractive returns on invested capital while maintaining a materially reduced risk profile due to the secured nature of the investments.  As of the Petition Date, OppFund's sole investment is the OppFund Loan (described herein).

29.    Individual investors in OppFund receive limited partnership interests (the "**Limited Partnership Interests**").  OppFund used the proceeds of these investments to provide a revolving warehouse credit facility to PSFI to fund the purchase or origination of loans (collectively, the "**OppFund Underlying Loans**").

30.    On the Petition Date, approximately $23.6 million in Limited Partnership Interests in OppFund had been sold.  On the Petition Date, OppFund held (i) cash totaling $10.7 million, (ii) security interests in OppFund Underlying Loans, and (iii) other related assets with a face value of $13.9 million, title to which was held by PSFI.

31.    **Loan Sales**.  In addition to these four product offerings, in the past, Peer Street originated and sold mortgage loans to third party institutional and other purchasers.  Since the end of 2021, this segment of its business has diminished substantially.  In 2021, the Debtors collected net premiums from sales of servicing released mortgage loans of $97,000.[3]  In 2022, the Debtors' net premiums from sales of servicing released mortgage loans were negative $4.4

---

[3]    Net premiums are equal to sales less losses.

million.  In 2023, the Debtors' net premiums on account of servicing released mortgage loans were negative $2 million.

32.    **Loan Servicing**.  Through PSFI, the Debtors act as master servicer of the mortgage loans in their various product offerings and also loans sold, servicing-retained, to third parties under loan servicing agreements.  For these loans, the Company has retained a subservicer that collects and tracks payments from mortgage borrowers.  The Company directly manages the servicing of non-performing loans including foreclosure and sale of collateral.  The Company advances funds to preserve the value of non-performing loans and the collateral that secures them, recovering these advances from the ultimate revenues collected on the mortgages.

33.    **REO Sales**.  In the ordinary course of business, the Debtors sell real estate owned ("**REO**") properties, typically acquired through the foreclosure of the underlying mortgage loan.  REO properties are typically sold through a real estate broker local to the location of the specific REO properties.  In 2021, the Debtors sold approximately 38 REO properties and in 2022 they sold approximately 41.  Thus far in 2023, the Debtors have sold approximately 25 REO properties.  The Debtors will continue to sell their REO properties (including those acquired post-petition) in the ordinary course of business post-petition.

34.    **Debtors' Workforce.**  As of the Petition Date, the Debtors' workforce consists of approximately 28 full-time, salaried employees and 1 contractor all of which are employed by PSI.

35.    **Prepetition Revenue.**  For the twelve-month period that ended December 31, 2022, the Debtors total revenue was approximately $37.4 million, down approximately 23.2% from the year prior.

36.     As of the Petition Date, PSI has approximately $4.4 million and PSFI has approximately $18.5 million in cash on hand.

## II.     DESCRIPTION OF THE DEBTORS' CAPITAL STRUCTURE

### A.  Corporate Structure

37.     PSI is the parent company for all Peer Street entities which are organized under the laws of the State of Delaware.[4]  PSI employs all of the employees, performs payroll and accounting functions, capital raising, and general management.  PSI owns the Debtors' intellectual property rights and owns and operates Peer Street's technology, including the Peer Street Platform.

38.     PSI established PSFLLC in July 2014, to issue securities to retail and other investors on the Peer Street Platform.  PSFLLC also owns a 100% equity interest in PSF REO LLC, which holds title to real estate that previously secured non-performing mortgage loans owned by PSFI, which were acquired through foreclosure or other exercise of PSFI's rights in the relevant mortgages.

39.     PSI established PSFI in 2015.  PSFI is a California licensed mortgage lender under the California Financing Law as well as a servicer.  PSFI (i) purchases previously funded mortgage loans from third-party lenders pursuant to master loan sale agreements ("**MLSAs**"), (ii) table-funds mortgage loans for third-party lenders or brokers pursuant to master loan origination agreements ("**MLOAs**"), (iii) originates its own mortgage loans, (iv) sells mortgage loans to third-party institutional buyers pursuant to master loan purchase agreements, and (v) acts as master servicer for mortgage loans it to which it holds title and services certain loans it has sold to third-party institutional buyers pursuant to master loan servicing agreements with institutional loan purchasers.  PSFI holds legal title to substantially all of the Debtors'

---

[4]     A chart summarizing the corporate structure is attached hereto as **Exhibit A**.

underlying mortgage loans, participations and other related assets (collectively, the "**PSFI Mortgage Assets**").

40.     PSFI also owns 100% of the equity interests in Warehouse, Warehouse II, and Portfolio.

41.     Debtor PeerStreet Licensing, Inc. ("**PSLI**") is wholly owned by PSI.  PSLI was formed to manage technology licensing opportunities, but has yet to engage in any business activity.

42.     In December 2015, PSI established Peer Street Opportunity Fund GP, LLC, a wholly owned subsidiary of PSI ("**PSOFGP**").  On May 25, 2018, PSOFGP became the general partner of OppFund.  OppFund was created to make approved investments in various real-estate and financial products, including primarily (1) loans or participation interests in such loans secured by real estate (the "**Loans**"), (2) mezzanine debt in warehouse lending facilities utilized by Peer Street, Inc. or its affiliates, and (3) subordinated loan positions held or sold by Peer Street, Inc. or its affiliates.

**B.  Prepetition Secured Debt**

43.     ***The Magnetar Credit Agreement***.  PSI is party to a Credit Agreement dated October 12, 2021 (as may be amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**"), by and among PSI, as borrower (the "**Magnetar Borrower**"), PSFI and PSLI, as guarantors (the "**Magnetar Guarantors**" and, together with the Magnetar Borrower, the "**Magnetar Obligors**"), on the one hand, and Magnetar Financial LLC ("**Magnetar**"), as the Paying Agent (the "**Magnetar Agent**"), and certain of Magnetar's affiliates and managed funds party thereto, as lenders (the "**Magnetar Lenders**"), on the other.  The Prepetition Credit Agreement provides

for convertible secured term loans in an aggregate principal amount not to exceed $30 million (the "**Magnetar Term Loans**").  Including accrued PIK interest at a rate of 6%, as of the Petition Date, $27,239,167 was outstanding under the Prepetition Credit Agreement.  The Magnetar Term Loans are secured by a lien on substantially all of the Magnetar Obligors' assets, including all cash held at PSI, but expressly excluding, among other things, any asset of an Obligor encumbered by a lien securing a permitted debt facility or otherwise pledged to third-party investors in accordance with the Obligor's ordinary course of business (the "**Magnetar Collateral**").  Generally speaking, the Magnetar Collateral excludes the PSFI Mortgage Assets.

44.     *The OppFund Loan*.  OppFund, as lender, and PSFI, as borrower and servicer, are parties to a Loan and Security Agreement dated October 1, 2019 (as may be amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**OppFund Loan Agreement**").  Under the OppFund Loan Agreement, the OppFund provides a revolving credit facility for the benefit of PSFI in an amount up to $25 million (the "**OppFund Loan**").  The OppFund Loan Agreement is secured by the loans acquired or originated by PSFI using the proceeds of the OppFund Loan.  PSFI's obligations under the OppFund Loan Agreement are guaranteed by PSI.

45.     As of the Petition Date, approximately $24.2 million is outstanding under the OppFund Loan Agreement.

46.     *The Pocket Warehouse Loans*.  As of the Petition Date, $39.9 million is outstanding under the Pocket 1-Month Warehouse Loan Agreement.  The Pocket 1-Month Warehouse Loan Agreement is secured by substantially all the assets of Warehouse and guaranteed by PSFI.  PSFI's guarantee is secured by PSFI's equity interests in Warehouse and the mortgages in which Warehouse purchased participation interests.

47.     As of the Petition Date, $1.3 million is outstanding under the Pocket 3-Month Warehouse Loan Agreement.   The Pocket 3-Month Warehouse Loan Agreement is secured by substantially all the assets of Warehouse II and guaranteed by PSFI.   PSFI's guarantee is secured by PSFI's equity interests in Warehouse II and the mortgages in which Warehouse II purchased participation interests.

### C.  Prepetition Unsecured Debt

48.     ***PPP Loan***.  On May 2, 2020, PSI received a loan (the "**PPP Loan**") from a private lender as part of the U.S. Small Business Administration's (the "**SBA**") Paycheck Protection Program (the "**PPP**").   As of the Petition Date, approximately $3.7 million is outstanding under the PPP Loan, which is accruing interest at an annual rate of 1%.  PSI used the proceeds of the PPP Loan for the purposes contemplated by the PPP and the Coronavirus Aid, Relief, and Economic Security Act.  Thereafter, PSI applied for forgiveness of the balance of the PPP Loan.  The SBA, however, denied this application.  PSI first unsuccessfully appealed, and has since moved for reconsideration of the SBA determination.  On June 8, 2023, the SBA Office of Hearings and Appeals issued an initial decision denying the motion for reconsideration. The initial decision will become final 30 days after service.  Until then, no payments are due on the loan.

49.     ***B Pieces***.  In a number of instances, when PSFI acquired mortgage loans from third party originators, the third party originator retained a subordinated percentage interest in the loan, called a "B Piece," payable only after PSFI has received full payment of its interest The aggregate face amount of these B Pieces is approximately $2.2 million.  Whether individual B Pieces have value, however, depends on, among other things, the extent to which the market

value of or remaining payments under the applicable loan exceed the amount of PSFI's interest in the loan.

## III.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A. Macroeconomic Issues

50.    Since the second quarter of 2021, the mortgage lending industry has faced adverse market conditions, including historical market-rate volatility.  Following years of historically low interest rates and inflation before the COVID-19 pandemic, the markets experienced sharp rate increases as part of the Federal Reserve's effort to curb inflation and control price growth.  Mortgage rates have increased from an average of 3.222% in January 2022 to an average of over 6.5% today, which caused demand for mortgages to drop significantly.  In addition, institutional buyers have largely halted purchases of below current market rate loans.  Mortgage originations dropped significantly during the first quarter of 2022 from record highs in 2021, and ended the year roughly 50% lower than they had been in the fourth quarter of 2021.

51.    These market conditions severely impacted Peer Street's business.  Before 2022, Peer Street originated and sold a significant volume of whole mortgage loans to third party institutional purchasers, earning substantial premiums on these transactions.  After 2021, the volume of these originations dropped precipitously.  In 2021, Peer Street originated approximately $695.8 million in mortgages.  In 2022, originations fell to $385 million.  In 2023, Peer Street has originated only $5.4 million in such mortgages.  As described above, this decline has significantly reduced the revenues Peer Street received from this line of business.

52.    In addition, in 2022, one of Peer Street's historic sources of funding – venture capital – declined markedly.  As a result, Peer Street was not able to access material funding to mitigate the loss of revenue caused by market conditions.

## B.  Cost Saving and Restructuring Efforts

53.    Beginning in the Spring of 2022, the Debtors implemented a series of staff reductions.  Through a series of furloughs and layoffs, in May, July, and October of 2022 and February of 2023, a staff that had totaled 281 at the beginning of May 2022 was reduced to approximately 28 as of the Petition Date.

54.    The Debtors also reviewed their vendors and other business relationships, aggressively seeking to renegotiate or cancel contracts to reflect the reductions in staff and reductions in operating requirements.

55.    In July 2022, the Debtors retained Kramer Levin Naftalis & Frankel ("**Kramer Levin**") to assist it with potential restructuring options.

56.    In August 2022, Peer Street informed Magnetar of certain potential events of default (the "**Events of Default**") under the Prepetition Credit Agreement, including alleged breaches of certain minimum tangible net worth and net operating loss covenants.  On August 17, 2022, Peer Street and Magnetar entered into that certain Waiver Letter Agreement (the "**Waiver**") pursuant to which Magnetar agreed to waive the Events of Default through August 24, 2022.  The Waiver has since been extended 33 times.

57.    During the period of the Waiver, the Debtors and Magnetar engaged in good faith negotiations to address the Events of Default and evaluate an array of potential strategic alternatives in an effort to avoid the need to commence these Chapter 11 Cases, exchanging formal and informal proposals.  Ultimately, however, these discussions did not produce a long-term solution to the Debtors' business and financial issues.

58.    At the same time, Peer Street sought to attract additional capital from third-party investors to, among other things, continue servicing advances with respect to loans it

holds.[5]  Despite identifying multiple potential sources of capital, as of the Petition Date, the Debtors have not received proposals for new financing sufficient to avoid these Chapter 11 Cases.

59.     In March 2023, Peer Street retained Young Conaway Stargatt & Taylor, LLP as co-restructuring counsel.

60.     In mid-April 2023, the Company engaged Province to provide a Chief Restructuring Officer and supporting advisory personnel.  Province designated me as Chief Restructuring Officer.

61.     In late 2022 and 2023, certain members of the Debtors' board of directors resigned.  To replace them, during the first two quarters of 2023, the Debtors retained Ivona Smith of Drivetrain, LLC and M. Freddie Reiss, formerly a member of the restructuring practices at FTI Consulting and PricewaterhouseCoopers International Limited (PwC), to serve as independent directors.  The Board also appointed an additional independent director, David Eaton, formerly a partner in the restructuring practice at Kirkland & Ellis LLP.  The independent directors constitute a majority of the Debtors' board.

## C.  Objectives of the Chapter 11 Cases

62.     The Debtors commenced these Chapter 11 Cases to monetize their assets, preserve liquidity, and maximize value for all stakeholders.

63.     Before the Petition Date, the Debtors retained Piper Sandler Companies ("**Piper Sandler**"), a recognized broker, to sell the great majority of the PSFI Mortgage Assets. Around the Petition Date, Piper Sandler will launch a marketing process for these assets.

64.     Although the Debtors are not seeking first day relief relating to the sale of the PSFI Mortgage Assets, they have today filed a motion to establish procedures for the

---

[5]     As of the Petition Date, the Debtors estimate they have $12.8 million servicing advances outstanding.

postpetition marketing and sale of these assets, including the approval of bidding protections for the stalking horse bidders, as well as to approve the sale of those assets.

## IV.    FIRST DAY MOTIONS

65.    Concurrently with this Declaration, the Debtors have filed the First Day Motions seeking various forms of relief designed to ensure a smooth transition between the Debtor's prepetition and postpetition business operations and minimize any disruptions to the Debtor's operation.

### A.  Administrative Motions

(a) *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

(b) *Debtors' Application for the Retention and Appointment of Stretto, Inc. as Claims and Noticing Agent*

### B.  Substantive Motions

(a) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (A) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Companies Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (D) Setting a Final Hearing Related Thereto*

(b) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (A) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing*

(c) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1108 of the Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing*

30439422.10

KL2 3306866.3

(d) *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Wages, Salaries, and Other Compensation, (II) Authorizing Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (IV) Granting Related Relief*

(e) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 345, 363, 503(b), 1107(a) and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Authorizing Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims, (D) Waiving the Requirements of Section 345(b) on an Interim Basis, and (E) Granting Certain Related Relief*

(f) *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors' Use of Cash Collateral; (B) Granting Adequate Protection to the Prepetition Secured Parties; (C) Scheduling a Final Hearing, and (D) Granting Related Relief (the "**Cash Collateral Motion**")*

(g) *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief*

66.     The Debtors have narrowly tailored the relief requested in the First Day Motions to: (i) continuing their business operations during these Chapter 11 Cases with minimal disruptions, (ii) maintaining the confidence and support of their vendor, customer, employee, and other key constituencies, and (iii) establishing the framework for an efficient administration of these Chapter 11 Cases.

67.     I have reviewed each of the First Day Motions, and I believe that the relief requested in the First Day Motions is necessary to enable the Debtor to operate with minimal disruption during the pendency of the Chapter 11 Cases and approval of the relief sought therein will be critical to the Debtor's efforts to restructure and reorganize its business in a manner that preserves and maximizes value for all stakeholders.

68.     It is further my belief that, with respect to First Day Motions that request the authority to pay specific prepetition claims or continue prepetition programs, the relief requested is essential to the maintenance of the Debtors' operations and is necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

69.     Through the Cash Collateral Motion, certain of the Debtors intend to request entry of interim and final orders, authorizing those Debtors' use of cash collateral and granting adequate protection to the Magnetar Lenders.  Importantly, the Debtors have obtained the consent of the Magnetar Lenders to use cash collateral subject to the terms set forth in the Cash Collateral Motion.

70.     The Debtors require immediate access to liquidity to ensure they are able to continue operating their businesses during these Chapter 11 Cases, preserve the value of the estates for the benefit of all parties in interest, and administer a value-maximizing sale process. However, without prompt access to cash collateral, the Debtors would be unable to, *inter alia*, satisfy ordinary course of business obligations, preserve and maximize the value of their estates, and fund the administration of these Chapter 11 Cases, which would cause immediate and irreparable harm to the value of the Debtors' estates, to the detriment of all stakeholders.

71.     I have worked closely with the Debtors' management and professional advisors to ensure that the use of cash collateral includes those amounts that will be necessary to preserve and maximize the value of the Debtors' estates.  The Cash Collateral Motion only seeks authority to expend amounts in the budget during the period prior to a final hearing on the motion that will avoid any immediate and irreparable harm to the Debtors and their businesses from a failure to have access to the necessary services used to operate the businesses.

72.     Accordingly, I respectfully request that all of the relief requested in the Cash Collateral Motion and other First Day Motions, and such other and further relief as may be just and proper, be granted.

73.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  June 26, 2023                    */s/  David Dunn*
_____
                                        David M. Dunn

30439422.10

KL2 3306866.3

## **EXHIBIT A**

### **Organizational Chart**



