## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105(a), 363, AND 364 OF THE BANKRUPTCY CODE, (A) AUTHORIZING PAYMENT OF PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY COURSE OF BUSINESS IN CONNECTION WITH INSURANCE PROGRAMS, INCLUDING PAYMENT OF POLICY PREMIUMS AND BROKER FEES, (B) AUTHORIZING BANKS TO HONOR AND PROCESS CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO, AND (C) SCHEDULING A FINAL HEARING**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (this "**Motion**") for the entry of interim and final orders, substantially in the form attached hereto as **Exhibit C** (the "**Proposed Interim Order**") and **Exhibit D** (the "**Proposed Final Order**," and together with the Proposed Interim Order, the "**Proposed Orders**"), pursuant to sections 105(a), 363(b), and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), (a) authorizing, but not directing, the Debtors to continue and, to the extent necessary, renew, liability, property, and other insurance programs and pay policy premiums and broker fees arising thereunder or in connection therewith, including prepetition obligations arising in the ordinary course of business, (b) authorizing, but not

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485).  The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn:  David Dunn, Chief Restructuring Officer.

directing, the Debtors to continue their insurance premium financing programs and renew or enter into new premium financing programs, as necessary, under substantially similar terms, (c) authorizing banks and other financial institutions (collectively, the "**Banks**") to honor and process check and electronic transfer requests related to the foregoing, and (d) scheduling a final hearing with respect to the foregoing.   In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of David M. Dunn in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"),[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105(a), 363(b), and 364 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

## BACKGROUND

### I.    General

2.    Today (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

3.    Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the First Day Declaration.

### II.    Insurance Programs[3]

4.    In connection with the operation of their business, the Debtors maintain, among others, insurance programs for directors and officers, employment practices and fiduciary liability, general liability, property, automobile, crime, cyber, umbrella, financial bond liability, as well as homeowners insurance on real estate owned ("**REO**") properties, as described below (collectively, the "**Insurance Programs**"), through several different insurance carriers (each, an "**Insurance Carrier**," and collectively, the "**Insurance Carriers**"), including under the insurance

---

[3]    The descriptions of the Insurance Programs provided herein are intended only as a summary, and the actual terms of the foregoing shall govern in the event of any inconsistency with the descriptions set forth herein.  To the extent there are other Insurance Programs inadvertently not identified herein, the Debtors intend for the relief sought herein to apply to any other such Insurance Programs.

contracts listed on **Exhibit A** attached hereto.[4]  As of the Petition Date, approximately $60,000 is accrued but not yet owing on account of the Insurance Programs, all of which the Debtors expect to come due within the thirty day period after the Petition Date.

### A.    Directors and Officers Liability Insurance Program

5.    As is common with businesses of this kind, the Debtors maintain primary and excess insurance coverage for all of their directors and officers that covers, among other things, defense costs, settlements, and court awards from claims brought by third parties alleging that an insured is liable for an error, misstatement, misleading statement, improper act, omission, neglect, or breach of duty (collectively, the "**Directors and Officers Liability Insurance Program**").  The Directors and Officers Liability Insurance Program also includes employed lawyers professional insurance and mortgage company professional liability coverage.

6.    Prior to the Petition Date, the policies underlying the Directors and Officers Liability Insurance Program were renewed until February 4, 2024.  The annual premiums for the Directors and Officers Liability Insurance Program are approximately $413,018 in the aggregate. The Debtors believe that there are no outstanding amounts under any of the policies comprising the Directors and Officers Liability Insurance Program as of the Petition Date.

---

[4]    In addition to the Insurance Programs discussed herein, the Debtors maintain an insurance policy with respect to the Debtors' workers' compensation program (the "**Workers' Compensation Program**"), which is listed on **Exhibit A** attached hereto.  This policy is described in further detail in the *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Accrued Prepetition Employee Wages, Salaries, and Other Compensation; (II) Payment of Accrued Prepetition Obligations Owed to Independent Contractors; (III) Continuation of Bonus Obligations to be Paid in the Ordinary Course; (IV) Payment of Prepetition Employee Business Expenses; (V) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (VI) Payment of Severance Obligations; (VII) Payment of Workers' Compensation Obligations; (VIII) Payments for Which Prepetition Payroll Deductions Were Made; (IX) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (X) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto* (the "**Employee Wage Motion**") filed contemporaneously herewith.  Any relief requested with respect to the Workers' Compensation Program is requested in the Employee Wage Motion.

**B.      General Liability, Umbrella, Property, and Automobile Insurance Programs**

7.      The Debtors maintain a general commercial liability insurance policy, which insures the Debtors for, among other things, products, accident, premises, and personal injury liability (the "**General Liability Insurance Program**").  Prior to the Petition Date, the General Liability Insurance Program was renewed until February 3, 2024.  The annual premium for the General Liability Insurance Program is approximately $3,660.  The Debtors believe that there are no outstanding amounts under the General Liability Insurance Program as of the Petition Date.

8.      The Debtors also maintain a property insurance policy that insures the Debtors for, among other things, certain losses related to damages to the Debtors' personal and real property (the "**Property Insurance Program**").  Prior to the Petition Date, the Property Insurance Program was renewed until July 12, 2023.  The annual premium for the Property Insurance Program was waived by the respective Insurance Carrier.  Accordingly, the Debtors believe that there are no outstanding amounts under the Property Insurance Program as of the Petition Date.

9.      The Debtors also maintain a cyber-liability insurance policy that insures the Debtors for, among other things, certain losses related to damages caused by information technology system failures or breaches and other security or privacy violations (the "**Cyber Insurance Program**").  Prior to the Petition Date, the Cyber Insurance Program was renewed until February 4, 2024.  The annual premium for the Cyber Insurance Program is approximately $37,413.  The Debtors believe that there are no outstanding amounts under the Cyber Insurance Program as of the Petition Date.

10.      The Debtors also maintain an umbrella insurance policy that insures the

Debtors for certain losses in excess of the coverage provided by the Debtors' primary insurance policies (the "**Umbrella Insurance Program**").  Prior to the Petition Date, the Umbrella Insurance Program was renewed until February 3, 2024.  The annual premium for the Umbrella Insurance Program is included in the General Liability Insurance Program.  The Debtors believe that there are no outstanding amounts under the Umbrella Insurance Program as of the Petition Date.

11.     The Debtors also maintain an employed lawyers professional insurance policy that insures the Debtors for, among other things, proceedings related to the licensing and eligibility of employed lawyers (the "**Employed Lawyers Professional Insurance Program**"). Prior to the Petition Date, the Employed Lawyers Professional Insurance Program was renewed until February 4, 2024.  The annual premium for the Employed Lawyers Professional Insurance Program is $5,618.  The Debtors believe that there are no outstanding amounts under the Employed Lawyers Professional Insurance Program as of the Petition Date.

12.     The Debtors also maintain automobile insurance (the "**Automobile Insurance Program**").  Prior to the Petition Date, the Automobile Insurance Program was renewed until February 3, 2024.  The annual premium for the Automobile Insurance Program is included in the Umbrella Insurance Program.  The Debtors believe that there are no outstanding amounts under the Automobile Insurance Program as of the Petition Date.

13.     The Debtors also maintain financial institution bond insurance policy that insures the Debtor for, among other things, losses related to employee dishonesty, burglary, theft, or other crime-related exposures (the "**Financial Institution Bond Insurance Program**").  Prior to the Petition Date, the Financial Institution Bond Insurance Program was renewed until February 4, 2024.  The annual premium for the Financial Institution Bond Insurance Program is $54,235.  The Debtors believe that there are no outstanding amounts under the Financial Institution

Bond Insurance Program as of the Petition Date.

### C.     The REO Homeowners Insurance Program

14.     As set forth in the First Day Declaration, the Debtors own several REO properties and sell such properties in the ordinary course of business.  In order to ensure that the REO properties are marketed and sold in a manner designed to maximize the value of such properties, the Debtors maintain homeowners insurance to protect and preserve the value of the REO properties (the "**REO Insurance Program**").  The REO Insurance Program is comprised of several insurance policies through one Insurance Carrier and insures the REO properties from destruction and damage, personal liability for harm to others, as well as other customary protections offered in standard homeowner's insurance policies.  Specific REO properties are added or released as insured properties, as needed.  The annual premiums for the REO Insurance Program in the aggregate are approximately $720,000 and the Debtors paid approximately $50,000 on account of the REO Insurance Program in May 2023.  The Debtors believe that there are no outstanding amounts owed under the REO Insurance Program as of the Petition Date.

### III.    Broker Fees

15.     In connection with the Insurance Programs, the Debtors obtain brokerage and risk management services from Lee & Mason Financial Services, Inc. and Heffernan Insurance Brokers (the "**Brokers**").  The Brokers assist the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the design and development of the Insurance Programs, and the procurement and negotiation of the Insurance Programs, and enabling the Debtors to obtain those policies on advantageous terms at competitive rates.  The Brokers are paid from commissions earned from the Insurance Carriers, not directly by the Debtors.  Accordingly, while the Debtors do not believe that any amounts are owed to the

30185959.6

Brokers as of the Petition Date, the Debtors seek authority, out of an abundance of caution, to satisfy amounts, if any, due to the Brokers and to continue to utilize the services of the Brokers during the Chapter 11 Cases.

**IV.    The Debtors' Prepetition Insurance Premium Financing Agreements**

16.    The Debtors finance certain of their insurance premiums pursuant to two insurance premium finance agreements (the "**Finance Agreements**"), which are attached hereto as **Exhibits B-1** and **B-2**, with FIRST Insurance Funding (the "**PFA Lender**").  Under the first Finance Agreement with the PFA Lender, the PFA Lender has agreed to pay the insurance premiums due under the Insurance Programs financed thereunder in exchange for an upfront payment of $69,002.46, followed by ten (10) monthly payments from the Debtors, each in the amount of $40,156.14.  Under the second Finance Agreement with the PFA Lender, the PFA Lender has agreed to pay the insurance premiums due under the Insurance Program financed thereunder in exchange for an upfront payment of $14,427.36, followed by six (6) monthly payments from the Debtors, each in the amount of $7,219.07.  The Debtors are current on amounts due under the Finance Agreements, having made their first installment payment on March 4, 2023, and May 31, 2023, respectively, and every installment payment thereafter.  The Debtors' obligations under the Finance Agreements are secured by sums due under the Insurance Programs, including any unearned premiums or other sums that may become payable under the Insurance Programs.  The Insurance Programs are essential to the Debtors' business during the Chapter 11 Cases.

17.    In the Debtors' business judgment, the terms of the Finance Agreements represent fair and reasonable terms for financing the premiums of the Insurance Programs under the circumstances, and the Debtors' estates will benefit by maintaining this low-cost financing

from the PFA Lender.  Moreover, any interruption of payments might adversely affect the Debtors'

ability to obtain financing for future policies on favorable terms, to the extent needed.  In some

cases, the coverage is required by regulations, laws, or contracts that govern the Debtors' business

obligations.   Thus, the Debtors request the authority to continue honoring their obligations

pursuant to the Finance Agreements and to continue the grant of security interests to the PFA

Lender.

## **RELIEF REQUESTED**

18.     By this Motion, the Debtors request that the Court enter the Proposed

Orders, (a) authorizing, but not directing, the Debtors to continue and, to the extent necessary,

renew, extend, revise, supplement, or change the Insurance Programs and, as needed, to pay policy

premiums, and Broker Fees arising thereunder or in connection therewith, including such

prepetition obligations arising in the ordinary course of business, (b) continue their insurance

premium financing program, honor obligations incurred under the Financing Agreement, and

renew or enter into new premium financing programs, as necessary, under substantially similar

terms, (c) authorizing the Banks to honor and process check and electronic transfer requests related

thereto, and (d) scheduling a final hearing with respect to the foregoing.

## BASIS FOR RELIEF

I. **The Court Should Authorize, But Not Direct, the Debtors, in Their Discretion, to Make Necessary Payments Related to the Insurance Programs to Maintain Existing Insurance Coverage**

19. Maintaining the Debtors' insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction.  Authority to pay any prepetition amounts that may be due and owing related to the Insurance Programs—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits, or proceeds provided under the Insurance Programs—is necessary, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtors' assets and, in most cases, such coverage is required by the various contracts and state and federal laws that govern the Debtors. *See, e.g.*, 28 U.S.C. § 959(b) (stating that a chapter 11 debtor is obligated under federal law to operate chapter 11 business according to the laws of the states where business and properties are located).  Further, under the chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain during these chapter 11 cases certain types of insurance coverage, which coverage is provided by certain of the policies included in the Insurance Programs.

20. In addition, the Debtors may need to renew or replace certain of their Insurance Programs during the pendency of these chapter 11 cases.  The nonpayment of any premiums, deductibles, or related fees under any of the Insurance Programs could result in one or more of the Insurance Carriers increasing future insurance premiums, declining to renew the insurance policies or refusing to enter into new insurance agreements with the Debtors.  If the Insurance Programs lapse without renewal, the Debtors may be exposed to substantial liability for first party property claims and third party liability claims, to the detriment of all parties in interest.

30185959.6

21.     Similarly, the services provided by the Brokers are critical to ensuring that the Debtors obtain the necessary insurance coverage on advantageous terms at competitive rates, and the Brokers have a significant amount of institutional knowledge regarding the Debtors' insurance needs.  If the Debtors were forced to replace the Brokers, the Debtors would necessarily be required to spend time, energy, and resources getting new insurance brokers up to speed on the Debtors' insurance needs.

22.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  A bankruptcy court may use its equitable powers under section 105 of the Bankruptcy Code to permit a debtor in possession to pay prepetition claims when payment is necessary to effectuate a debtor's bankruptcy goals and essential to the continued operation of the business.  *See Miltenberger v. Logansport. C. & S.W.R. Co.*, 106 U.S. 286 (1882); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (under necessity of payment doctrine prepetition claims may be paid if essential to the continued operation of the business during reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (recognizing that necessity of payment doctrine authorizes payment of prepetition claims when "such payment is essential to the continued operation of the business").

23.     In addition, the Court may authorize the Debtors to pay prepetition premiums to maintain insurance coverage under section 363(b) of the Bankruptcy Code.  In particular, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Thus, under this section, a court may authorize a debtor to pay certain prepetition claims.

*See Ionosphere Clubs*, 98 B.R. 174, 175-77 (S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code); *In re UAL Corp.*, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code as an out-of-the-ordinary-course transaction); *In re Jillian's Entm't Holdings, Inc.*, Case No. 04-33192 (DTS) (Bankr. W.D. Ky. June 22, 2004).

24.     Furthermore, reflecting the recognition that payment of prepetition claims associated with a debtor's insurance program is critical to a debtor's chapter 11 efforts, courts in this District have routinely granted the relief requested herein in other chapter 11 cases.

## II.     The Court Should Authorize, but Not Direct, the Debtors, in Their Discretion, to Make Any Necessary Payments Under the Finance Agreements and Renew the Finance Agreements and/or Enter Into New Finance Agreements in the Ordinary Course of Business

25.     The Debtors request authority, but not direction, to pay amounts outstanding in connection with the Finance Agreements.  If the Debtors are unable to make any payments that arise under the Finance Agreements, the PFA Lender may be permitted to terminate the Insurance Programs.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost.  If the Debtors are required to obtain replacement insurance, the premium may be the same or greater than what the Debtors are currently obligated to pay.  The Debtors may be required to pay the premium for such new policy in a lump sum, and losing the benefit of financing under the Finance Agreements will further strain the Debtors' limited liquidity.  Thus, in view of the importance of maintaining the related insurance coverage and preserving their cash flow by financing their insurance premiums, the Debtors believe that it is in the best interest of their estates and creditors for the Court to authorize the Debtors to honor their obligations under the Finance Agreements.  Any other alternative would likely require

considerable cash expenditures and would be detrimental to the Debtors' chapter 11 efforts.

26.     The Finance Agreements grant the PFA Lender a security interest in the respective Insurance Programs, including any unearned premiums or other sums that may become payable under the Insurance Policies.  Security interests created by premium finance arrangements are generally recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements.  *See TIFCO, Inc. v. U.S. Repeating Arms Co. (In re U.S. Repeating Arms Co.)*, 67 B.R. 990, 994–95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp. (In re Auto-Train Corp.)*, 9 B.R. 159, 164–66 (Bankr. D.D.C. 1981).  Moreover, section 361 of the Bankruptcy Code specifically contemplates providing adequate protection to the extent of the diminution in value of a secured creditor's collateral, and security interests such as those under the Finance Agreements warrant adequate protection in the form of periodic payments pursuant to the Finance Agreements' terms.  *See, e.g.*, *In re Waverly Textile Processing, Inc.*, 214 B.R. 476, 480 (Bankr. E.D. Va. 1997); *TIFCO, Inc. v. U.S. Repeating Arms Co.*, 67 B.R. 990, 1000 (Bankr. D. Conn. 1986).

27.     Therefore, if the Debtors are unable to continue making payments under the Finance Agreements, the PFA Lender could seek relief from the automatic stay to cancel applicable Insurance Programs in accordance with the terms of the Finance Agreements or to seek adequate protection of its respective investment.  *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr. W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting decline in value of the unearned premiums justified relief from the automatic stay).  The Debtors then would be required to obtain replacement insurance on an expedited basis and at significant cost to the estates.  If the Debtors are required to obtain replacement insurance and to pay a lump-sum premium for such insurance in advance, this payment may be the same or greater

than what the Debtors currently pay to the PFA Lender under the Finance Agreements.  Even if the PFA Lender is not permitted to terminate the Insurance Programs, any interruption of payments would severely and adversely affect the Debtors' ability to finance premiums for future policies, as needed.  Accordingly, the Debtors submit that the practical solution is to continue making the premium financing payments.

28.     In addition, the Debtors submit that the Court should also authorize the Debtors to renew or enter into new premium finance agreements postpetition in the ordinary course of business and consistent with the Debtors' past practice.

29.     Section 363(c)(1) of the Bankruptcy Code provides that "the trustee [or a debtor in possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee [or debtor in possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

30.     The Debtors submit that the renewal of the Finance Agreements and/or the execution of new premium finance agreements constitute transactions in the ordinary course of business, within the meaning of section 363(c)(1) of the Bankruptcy Code, that do not require prior bankruptcy court approval.

31.     Neither the Bankruptcy Code nor its legislative history provides a framework for analyzing whether a transaction is in the ordinary course of business.  The Third Circuit, however, has developed a two-part inquiry, including a "horizontal dimension" test and a "vertical dimension" test, for determining whether a transaction is in the ordinary course of

business under section 363(c)(1).  *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see, e.g.*, *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 791 (Bankr. D. Del. May 24, 2007); *Braunstein v. McCabe*, 571 F. 3d 108, 124–25 (1st Cir. 2009).  The horizontal dimension test focuses on whether, from an industry wide perspective, the transaction is "of the sort commonly undertaken by companies in that industry."  *In re Roth Am., Inc.*, 975 F.2d 202 at 953.  The vertical dimension test (or creditor's expectation test) focuses on the vantage point of a hypothetical creditor and inquires whether the transaction subjects the creditor to economic risks of a nature different from those the creditor accepted when it decided to extend credit to the debtor.  *Id.*

32.     The Debtors believe that the renewal of the Finance Agreements and/or the execution of new premium finance agreements satisfies the "horizontal dimension" test because maintaining insurance coverage and entering into related premium financing agreements is a common industry practice.  *Drabkin*, 800 F.2d at 1154 (finding such a premium financing agreement to be a "common commercial arrangement.").  The "vertical dimension" test is also satisfied because the Debtors' maintenance of insurance under premium finance agreements does not subject the Debtors' creditors to any economic risk, but rather, serves to protect the Debtors' creditors from economic risk.  Accordingly, the renewal of the Finance Agreements and/or the execution of new premium finance agreements constitute "ordinary course" uses of estate property under section 363(c)(1) of the Bankruptcy Code.  *See In re Roth American*, 975 F.2d at 952 n.4 (citing *U.S. v. Estate of Deutscher*, 115 B.R. 592, 598-99 (M.D. Tenn. 1990), for the proposition that "trustee's use of fund to . . . reinstate insurance was in ordinary course of business").

33.     Indeed, the Debtors submit that it may be outside the ordinary course of business for them to fail to renew the Finance Agreements.  *See In re Lavigne*, 114 F.3d 379, 383-84 (2d Cir. 1994) (cancellation of insurance policy was not in the ordinary course of business).

Nevertheless, out of an abundance of caution, the Debtors have filed this Motion seeking entry of the Proposed Orders approving, under section 363 of the Bankruptcy Code, the Debtors' postpetition renewal of the Finance Agreements and/or the execution of new premium finance agreements.

34.     The Debtors also request authority to enter into new premium finance agreements pursuant to section 364(c)(2) of the Bankruptcy Code, consistent with their ordinary course practices.  Section 364(c)(2) authorizes, after notice and a hearing, a debtor in possession to obtain debt secured by a lien on property of the estate.  11 U.S.C. § 364(c)(2).  Under any new premium finance agreement, the counterparty would likely require that the Debtors grant a security interest in the unearned premiums under the financed policies.  *See generally In re Schwinn Bicycle Co.*, 200 B.R. 980, 982 (Bankr. N.D. Ill. 1996) (describing insurance premium financing agreements).

35.     Section 364(c) authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates.  *See, e.g.*, *In re General Growth Props., Inc.*, 412 B.R. 122, 125-26 (Bankr. S.D.N.Y. May 14, 2009) (granting motion for postpetition financing upon finding that (a) "no comparable credit [was] available on more favorable terms"; (b) the debtors needed postpetition financing to "to preserve [their] assets and continue their operations"; and (c) the terms and conditions of the DIP Documents had been negotiated in good faith); *In re Budget Grp., Inc.*, Case No. 02-12152, 2002 Bankr. LEXIS 1050 (Bankr. D. Del. Aug, 1, 2002) (authorizing funding of acquisition of property on a secured basis where acquired property was necessary to maintain operations and debtor could not obtain such funding on an unsecured basis); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit

debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties").  Because borrowing to maintain essential insurance coverage is in the best interests of the Debtors' estates, the Debtors submit that the Court should authorize them to renew the Finance Agreements and/or execute new premium finance agreements postpetition, as appropriate.

III.    **The Court Should Authorize the Banks to Honor and Process the Debtors' Payments Related to the Insurance Programs and the Broker Fees**

        36.    The Debtors also request the Court to authorize the Banks, when requested by the Debtors, in their discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

**SATISFACTION OF BANKRUPTCY RULE 6003(b)**

        37.    Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one (21) days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  As set forth throughout this Motion, any disruption of the Insurance Programs and the related services received by the Debtors from the Broker would substantially diminish or impair the Debtors' efforts in these chapter 11 cases to preserve and maximize the value of their estates.

        38.    For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied, and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

39.    Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As provided herein, and to implement the foregoing successfully, the Debtors request that the Proposed Orders include a finding that the Debtors have established cause to exclude such relief from the fourteen (14)-day stay period under Bankruptcy Rule 6004(h).

40.    For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14)-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

## RESERVATION OF RIGHTS

41.    Nothing in the Proposed Orders or this Motion: (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; or (c) shall be construed as a promise to pay a claim.

## NOTICE

42.    Notice of this Motion has been provided to: (a) the Office of the United States Trustee for the District of Delaware (Attn: Joseph Cudia (joseph.cudia@usdoj.gov)); (b) the Debtors' thirty (30) largest unsecured creditors; (c) counsel to Magnetar Financial LLC (i) Royer Cooper Cohen Braunfeld LLC, 1120 Avenue of the Americas, 4th Floor, New York, NY 10036, (Attn: Marc E. Hirschfield (mhirschfield@rccblaw.com)) and (ii) Richards, Layton & Finger,

P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn:  Russell C. Silberglied (silberglied@rlf.com)), as agent for the prepetition secured lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Office of the United States Attorney for the District of Delaware; (g) the Banks; (h) the Insurance Carriers; and (i) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally left blank]*

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request entry of the Proposed Orders, granting the

relief requested herein and such other and further relief as is just and proper.

Dated: June 26, 2023

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Joseph Barry (Del. Bar No. 4221)
Ryan M. Bartley (Del. Bar No. 4985)
S. Alexander Faris (Del. Bar No. 6278)
Shella Borovinskaya (Del. Bar No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  jbarry@ycst.com
           rbartley@ycst.com
           afaris@ycst.com
           sborovinskaya@ycst.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**
P. Bradley O'Neill (*pro hac vice* pending)
Caroline Gange (*pro hac vice* pending)
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9511
Facsimile:  (212) 715-8000
Email:  poneill@kramerlevin.com
           cgange@kramerlevin.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

## **EXHIBIT A**

**List of Insurance Contracts**

| INSURANCE CARRIER | INSURANCE PROGRAM | POLICY NUMBER | EFFECTIVE DATE; MONTHS COVERED | APPROXIMATE ANNUAL PREMIUM |
|---|---|---|---|---|
| Lloyd's of London (K2 Financial Ltd) | Directors and Officers Liability Insurance (including Employment Practices Liability) | B1230FC20042A23 | 2/4/2023; 12 | $413,019 |
| The Hartford Insurance Co. | Business Owners Insurance (including Umbrella/ General Liability/ Automobile) | 72 SBA BA0539 | 2/3/2023; 12 | $3,660 |
| Lloyd's of London | Property/Flood Insurance | B123021LMF1027 | 7/12/2022; 12 | $100[1] |
| Chubb Group of Insurance Companies | Employed Lawyers Professional Insurance | 6805-2505 | 2/4/2023; 12 | $5,618 |
| Lloyd's of London | Financial Institution Bond Insurance | B1230FC20831A23 | 5/31/2023; 8 months, 4 days | $54,235 |
| North American Capacity Insurance Co./Arch Specialty Insurance Co. | Cyber Liability | C-4LR2-168566-CYBER-2023 | 2/4/2023; 12 | $37,414 |
| Lloyd's of London | Property Protection (REO Insurance Program) | 211027078.P/2022 | 7/12/2022; 12 | $100[2] |
| Lloyd's of London | Commercial General Liability (REO Insurance Program) | 211027079.L/2022 | 7/12/2023; 12 | $100[2] |

---

[1]    Lloyds of London waived premium payments for the Debtors' property and flood insurance and the $100 represents the policy fee.

[2]    Premiums on account of this policy are on a per-REO basis, on top of the rates quoted in the policy.

| Lloyd's of London | Excess Property (REO Insurance Program) | 384DX22007 | 2/1/2023; 12 | $6,756 |

# EXHIBIT B-1

**Premium Financing Agreement**

**(E&O and Professional Liability)**

**LENDER:**

450 Skokie Blvd, Ste 1000
Northbrook, IL 60062-7917
P:(800) 837-3707 F:(800) 837-3709
www.firstinsurancefunding.com

# PREMIUM FINANCE AGREEMENT

☐ Personal  ☑ Commercial  ☐ Additional Premium

**FIRST INSURANCE** FUNDING
A WINTRUST COMPANY

**Quote #: 45910155**

| **INSURED/BORROWER** | Customer ID: | **AGENT or BROKER** |
|---|---|---|
| (Name and Address as shown on Policy) | PEERSTR-01 | (Name and Business Address) |
| Peer Street, Inc. | | Heffernan Insurance Brokers |
| 2121 Park Place | | 757 S Alameda Street |
| Suite 250 | | Suite 350 |
| El Segundo, CA 90245 | | Los Angeles, CA 90021 |

## LOAN DISCLOSURE

| Total Premiums, Taxes, and Fees | Down Payment | Unpaid Balance | Documentary Stamp Tax (only applicable in Florida) | Amount Financed (amount of credit provided on your behalf) | FINANCE CHARGE (dollar amount the credit will cost you) | Total of Payments (amount paid after making all scheduled payments) | ANNUAL PERCENTAGE RATE (cost of credit as a yearly rate) |
|---|---|---|---|---|---|---|---|
| 456,049.70 | 69,002.46 | 387,047.24 | 0.00 | 387,047.24 | 14,514.16 | 401,561.40 | 8.100 % |

*YOUR PAYMENT SCHEDULE WILL BE:*  *Mail Payments to: FIRST INSURANCE Funding, PO Box 7000, Carol Stream, IL 60197-7000*

| Number of Payments | Amount of Each Payment | First Installment Due | 3/4/2023 |
|---|---|---|---|
| 10 | 40,156.14 | Installment Due Dates | 4th (Monthly) |

Certain information contained in the Loan Disclosure section may change in accordance with Section 19 of this Agreement.

**INSURED'S AGREEMENT:**

**1. SECURITY INTEREST.** INSURED/BORROWER ("Insured") grants and assigns FIRST Insurance Funding, A Division of Lake Forest Bank & Trust Company, N.A. ("LENDER") a first priority lien on and security interest in the financed policies and any additional premium required under the financed policies listed in the Schedule of Policies, including (a) all returned or unearned premiums, (b) all additional cash contributions or collateral amounts assessed by the insurance companies in relation to the financed policies and financed by LENDER hereunder, (c) any credits generated by the financed policies, (d) dividend payments, and (e) loss payments which reduce unearned premiums (collectively, the "Financed Policies"). If any circumstances exist in which premiums related to any Financed Policy could become fully earned in the event of loss, LENDER shall be named a loss-payee with respect to such policy.

**2. FINANCE CHARGE.** The finance charge begins accruing on the earliest effective date of the Financed Polices. The finance charge is computed using a 365-day calendar year.

**3. LATE PAYMENT.** For commercial loans, a late charge will be assessed on any installment at least 5 days in default, and the late charge will equal 5% of the delinquent installment or the maximum late charge permitted by law, whichever is less. For personal loans, a late charge will be assessed on any installment 10 days in default, and the late charge will be the lesser of $10 or 5% of the delinquent installment.

**4. PREPAYMENT.** If Insured prepays the loan in full, Insured is entitled to a refund of the unearned finance charge computed according to the Rule of 78s.

## SCHEDULE OF POLICIES

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| B1230FC20042A23 | C01651-CERTAIN UNDERWRITERS AT LLOYDS, LONDON | E&O | 12 | 2/4/2023 | 399,950.00 |
| | G00041-SOCIUS INSURANCE SERVICES | | | ERN TXS/FEES | 350.00 |
| | [ME:15.000 %, CX:0]    [PR] | | | FIN TXS/FEES | 12,718.41 |
| 6805-2505 | C00948-FEDERAL INSURANCE COMPANY | PROF | 12 | 2/4/2023 | 5,618.00 |
| | G00041-SOCIUS INSURANCE SERVICES | | | ERN TXS/FEES | 0.00 |
| | [ME:15.000 %, CX:0]    [PR] | | | FIN TXS/FEES | 0.00 |
| (Policies continued on next page.) | | | | TOTAL | 456,049.70 |

Q# 45910155, PRN: 020923, CFG: 15/10-10-NON NV, RT: 0Internal - Base, DD: N/A, BM: Invoice, Qtd For: A18203 Original, Memo 2

**5. PROMISE TO PAY.** In consideration of the premium payment by LENDER to the insurance companies listed in the Schedule of Policies (or their authorized representative) or the Agent or Broker listed above, Insured unconditionally promises to pay LENDER, the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, subject to all the provisions of this Agreement.

**6. POWER OF ATTORNEY.** INSURED IRREVOCABLY APPOINTS LENDER AS ITS "ATTORNEY-IN-FACT" with full power of substitution and full authority, in the event of default under this Agreement, to (a) cancel the Financed Policies in accordance with the provisions contained herein, (b) receive all sums assigned to LENDER, and (c) execute and deliver on behalf of Insured all documents relating to the Financed Policies in furtherance of this Agreement. This right to cancel will terminate only after all of Insured's indebtedness under this Agreement is paid in full. Insured is responsible for repayment of the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, irrespective of whether LENDER exercises this right to cancel the Financed Policies.

**7. SIGNATURE & ACKNOWLEDGEMENT.** Insured has received, reviewed, and signed a copy of this Agreement. By signing below, you certify that you have the requisite authority to (a) enter into this Agreement on behalf of Insured (if applicable, including as agent, trustee, executor, or otherwise in a representative capacity) and any other insureds named on the Financed Policies, and (b) jointly and severally agree on behalf of all insureds named on the Financed Policies to all provisions set forth in this Agreement. **Insured acknowledges and understands that entry into this financing arrangement is not required as a condition for obtaining insurance coverage.**

**NOTICE TO INSURED: (1) Do not sign this Agreement before you read both pages of it, or if it contains any blank space. (2) You are entitled to a completely filled-in copy of this Agreement. (3) You have the right prepay the loan in full and receive a refund of any unearned finance charge. (4) Keep a copy of this Agreement to protect your legal rights. (5) See last page of Agreement for your consent to electronic statement and notice delivery.**

| DocuSigned by: | | | DocuSigned by: | | |
|---|---|---|---|---|---|
| *Ellen Coleman* | | 2/9/2023 | *Jake Cozzens* | | 2/13/2023 |
| 52B4312375EA4CB... | | Date | 38DCB58CE8634B1... | | Date |
| Signature of Insured or Authorized Agent | | | Signature of Agent | | |

FIF1122NBP

## ADDITIONAL PROVISIONS OF PREMIUM FINANCE AGREEMENT

**8. APPLICATION OF PAYMENTS.** (a) Payments received by LENDER from Insured shall be applied first to installments, then to any unpaid fees. The payment of installments is prioritized over the payment of fees, which means when LENDER receives partial payments or overpayments of any installment(s), amounts previously applied to fees may be reallocated to enable a full installment(s) to be paid. This payment application method may cause fees to reappear as unpaid and owing after the payment period in which the fees were originally assessed and paid, but does not increase or otherwise change the amount of fees that Insured may be required to pay under this Agreement. (b) Any returned premium received by LENDER from the Financed Policies will be applied to reduce the total unpaid balance under this Agreement, which shall not relieve Insured of its obligation to pay any remaining installments due but may reduce the amount of such installments.

**9. EFFECTIVE DATE.** This Agreement will not become effective until it is accepted in writing by LENDER. LENDER will send a Notice of Acceptance to Insured to confirm this Agreement is effective.

**10. DEFAULT/CANCELLATION.** Insured is in default under this Agreement if (a) the Down Payment, if to be collected by LENDER, or any payment is not received by LENDER when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against Insured, or (c) Insured fails to comply with any of the terms of this Agreement. If Insured is in default, LENDER has no further obligation under this Agreement to pay premiums on Insured's behalf, and LENDER may pursue any of the remedies provided in this Agreement or by law. If a default by Insured results in a cancellation of the Financed Policies, Insured agrees to pay a cancellation charge for commercial loans, which will be the maximum permitted by law. No cancellation charge shall apply to personal loans. If cancellation or default occurs, Insured agrees to pay interest on the unpaid balance due at the contract rate until the balance is paid in full.

**11. LIMITATION OF LIABILITY.** Insured understands and agrees that LENDER or its assignee is not liable for any losses or damages to Insured or any person or entity upon the exercise of LENDER's right of cancellation, except in the event of willful or intentional misconduct by LENDER.

**12. INSUFFICIENT FUNDS CHARGE.** If Insured's payment is dishonored for any reason and if permitted by law, Insured will pay LENDER an insufficient funds charge equal to the maximum fee permitted by law for commercial loans and $10 for personal loans.

**13. LENDER'S RIGHTS AFTER THE POLICIES ARE CANCELLED.** After any Financed Policy is cancelled by any party or if a credit is otherwise generated, LENDER has the right to receive all unearned premiums and other funds assigned to LENDER as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between Insured and LENDER. Receipt of unearned premiums does not constitute payment of installments to LENDER, in full or in part. Any amounts received by LENDER after cancellation of the Financed Policies will be credited to the balance due with any excess paid to the Insured; the minimum refund is $1.00. Any deficiency shall be immediately paid by Insured to LENDER. Insured agrees that insurance companies may rely exclusively on LENDER's representations about the Financed Policies.

**14. ASSIGNMENT.** Insured may not assign any Financed Policy or this Agreement without LENDER's prior written consent. LENDER may transfer its rights under this Agreement without the consent of Insured.

**15. AGENT OR BROKER.** Insured agrees that the Agent or Broker issuing the Financed Policies or through whom the Financed Policies were issued is not the agent of LENDER, except for any action taken on behalf of LENDER with the express authority of LENDER, and LENDER is not bound by anything the Agent or Broker represents to Insured, orally or in writing, that is not contained in this Agreement. The Agent or Broker will receive from LENDER 0.05 % of the Amount Financed stated on page 1 for aiding in the administration of this Agreement relating to the Financed Policies. In NY, the Agent or Broker may assess a fee to Insured for obtaining and servicing the Financed Policies pursuant to NY CLS Ins § 2119. Any questions regarding this payment should be directed to the Agent or Broker.

**16. COLLECTION COSTS.** Insured agrees to pay reasonable attorney fees, court costs, and other collection costs to LENDER to the extent permitted by law if this Agreement is referred to an attorney or collection agent who is not a salaried employee of LENDER to collect money that Insured owes.

**17. GOVERNING LAW.** The loan terms subject to this Agreement are governed by applicable federal law and Illinois law (to the extent not preempted by federal law), without regard to principles of conflicts of law or choice of law. If any court finds any term herein to be invalid, such finding will not affect the remaining provisions.

**18. WARRANTY OF ACCURACY.** Insured represents and warrants that to the best of its knowledge: (a) the Financed Policies are in full force and effect and that the Insured has not and will not assign any interest in the Financed Policies except for the interest of mortgagees and loss payees, (b) the Down Payment and any past due payments have been paid in full to the Agent or Broker or Lender in cash or other immediately available funds, (c) all information provided herein or in connection with the Agreement is true, correct, and not misleading, (d) Insured is not insolvent nor presently involved in any insolvency proceeding, (e) Insured has no indebtedness to the insurance companies issuing the Financed Policies, (f) there is no provision in the Financed Policies that would require LENDER to notify or obtain consent from any other party to effect cancellation of the Financed Policies, and (g) Insured has disclosed if he or she is a covered member of the armed forces or a dependent of a covered member as defined in the Military Lending Act.

**19. ADDITIONAL PREMIUMS.** (a) Insured expressly agrees to (i) fully and timely comply with all audits by the insurance companies issuing the Financed Policies, (ii) timely provide complete and accurate payroll information, if applicable, and (iii) pay to the insurance companies any additional amount due in connection with the Financed Policies. The Amount Financed shall be applied to the Financed Policies' premium amounts and Insured shall be responsible for any additional premiums or other sums. (b) Insured, or Agent or Broker, may request that LENDER finance additional policies and/or additional premiums (the "Additional Premiums") for Insured during the term of this Agreement. If LENDER agrees, LENDER will send a Notice of Acceptance to Insured to confirm its approval to finance the Additional Premiums. For commercial loans, this Agreement shall be deemed amended on the date of the Notice of Acceptance to consolidate the Additional Premiums with Financed Policies into a single and indivisible loan transaction subject to this Agreement (with applicable changes to the payment schedule), and the Additional Premiums shall be "Financed Policies" on the date of the Notice of Acceptance. For personal loans, LENDER (or Agent or Broker on LENDER's behalf) will provide a separate Premium Finance Agreement to Insured for any Additional Premiums.

**20. CORRECTIONS.** LENDER may insert the names of insurance companies or policy numbers in the Schedule of Policies, if this information is not known at the time Insured signs this Agreement. LENDER is authorized to correct patent errors or omissions in this Agreement.

**21. NON-WAIVER.** Not Applicable.

**22. ELECTRONIC STATEMENT AND NOTICE DELIVERY. By executing this Agreement, Insured agrees to receive all billing statements, notices, and other communications via electronic delivery in PDF format as permitted by applicable law. It is Insured's responsibility to provide LENDER with true, accurate, and complete e-mail and contact information related to this Agreement and to maintain and update promptly any changes to this information. If Insured wishes to (i) opt out of electronic statement and notice delivery, or (ii) update contact information, Insured can log into Insured's account on www.firstinsurancefunding.com or call (800) 837-3707.**

## AGENT OR BROKER REPRESENTATIONS AND WARRANTIES

Unless previously disclosed in writing to LENDER or specified in the Schedule of Policies, the Agent or Broker executing this Agreement expressly represents, warrants, and agrees as follows: (1) Insured has received a copy of this Agreement and has authorized this transaction, the signer of this Agreement (whether Insured or its agent) has valid authority to bind Insured and any other insureds named under the Financed Policies to the terms of this Agreement, including the Power of Attorney provision, Insured's signature is genuine, and the Down Payment has been received from Insured (unless the Down Payment was made to Lender), (2) the information contained in the Schedule of Policies including the premium amount is correct and accurately reflects the necessary coverage, (3) the Financed Policies (a) are in full force and effect, (b) are cancellable by Insured or LENDER (or its successors or assigns), (c) will generate unearned premiums which will be computed on the standard short rate or pro rata basis, and (d) do not contain any provisions which affect the standard short rate or pro rata premium computation, including but not limited to direct company bill, audit, reporting form, retrospective rating, or minimum or fully earned premium, (4) the Agent or Broker is either the insurer's authorized policy issuing agent or the broker placing the coverage directly with the insurer, except where the name of the Issuing Agent or General Agent is listed in the Schedule of Policies, (5) to the best of the Agent or Broker's knowledge, there are no bankruptcy, receivership, or insolvency proceedings affecting Insured, (6) Agent or Broker will hold harmless and indemnify LENDER and its successors and assigns against any loss or expense (including attorney's fees, court costs, and other costs) incurred by LENDER and resulting from Agent or Broker's violations of these Representations and Warranties or from Agent or Broker's errors, omissions, or inaccuracies in preparing this Agreement, and will promptly reimburse LENDER for any loss or expense incurred in connection with any incidence of fraud or lack of valid authority on behalf of Insured or any other named insureds with respect to the terms of this transaction, the Agreement, or the Financed Policies, (7) Agent or Broker will (a) hold in trust for LENDER any payments made or credited to Insured through or to Agent or Broker by the insurance companies or LENDER, and (b) pay these monies and the unearned commissions to LENDER upon demand to satisfy the outstanding indebtedness under this Agreement, and (8) to fully and timely assist with all payroll audits.

SCHEDULE OF POLICIES

Insured:  Peer Street, Inc.

Quote #: 45910155

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| C-4LR2-168566-CYBER-2023 | C00169-ARCH SPECIALTY INSURANCE CO<br>G00041-SOCIUS INSURANCE SERVICES<br>    [ME:15.000 %, CX:0]         [PR] | CY LIAB | 12 | 2/4/2023<br>ERN TXS/FEES<br>FIN TXS/FEES | 35,921.00<br>350.00<br>1,142.29 |

**FIF0214P-SCH**

## **EXHIBIT B-2**

**Premium Financing Agreement**

**(Crime Policy)**

LENDER:

450 Skokie Blvd, Ste 1000

**PREMIUM FINANCE AGREEMENT**

☐ Personal   ☑ Commercial   ☐ Additional Premium

Northbrook, IL 60062-7917
P:(800) 837-3707 F:(800) 837-3709
www.firstinsurancefunding.com

**First Insurance** FUNDING
A WINTRUST COMPANY

Quote #: 50169440

| INSURED/BORROWER | Customer ID: N/A | AGENT or BROKER |
|---|---|---|
| (Name and Address as shown on Policy)<br>Peer Street, Inc.<br>c/o Ellen Coleman<br>2121 Park Place<br>Suite 250<br>El Segundo, CA 90245 | | (Name and Business Address)<br>Heffernan Insurance Brokers<br>757 S Alameda Street<br>Suite 350<br>Los Angeles, CA 90021 |

## LOAN DISCLOSURE

| Total Premiums, Taxes, and Fees | Down Payment | Unpaid Balance | Documentary Stamp Tax (only applicable in Florida) | Amount Financed (amount of credit provided on your behalf) | FINANCE CHARGE (dollar amount the credit will cost you) | Total of Payments (amount paid after making all scheduled payments) | ANNUAL PERCENTAGE RATE (cost of credit as a yearly rate) |
|---|---|---|---|---|---|---|---|
| 56,458.90 | 14,427.36 | 42,031.54 | 0.00 | 42,031.54 | 1,282.88 | 43,314.42 | 10.390 % |

YOUR PAYMENT SCHEDULE WILL BE: Mail Payments to: FIRST INSURANCE Funding, PO Box 7000, Carol Stream, IL 60197-7000

| Number of Payments | Amount of Each Payment | First Installment Due | 6/30/2023 |
|---|---|---|---|
| 6 | 7,219.07 | Installment Due Dates | 30th (Monthly) |

Certain information contained in the Loan Disclosure section may change in accordance with Section 19 of this Agreement.

INSURED'S AGREEMENT:

1. SECURITY INTEREST. INSURED/BORROWER ("Insured") grants and assigns FIRST INSURANCE Funding, A Division of Lake Forest Bank & Trust Company, N.A. ("LENDER") a first priority lien on and security interest in the financed policies and any additional premium required under the financed policies listed in the Schedule of Policies, including (a) all returned or unearned premiums, (b) all additional cash contributions or collateral amounts assessed by the insurance companies in relation to the financed policies and financed by LENDER hereunder, (c) any credits generated by the financed policies, (d) dividend payments, and (e) loss payments which reduce unearned premiums (collectively, the "Financed Policies"). If any circumstances exist in which premiums related to any Financed Policy could become fully earned in the event of loss, LENDER shall be named a loss-payee with respect to such policy.

2. FINANCE CHARGE. The finance charge begins accruing on the earliest effective date of the Financed Polices. The finance charge is computed using a 365-day calendar year.

3. LATE PAYMENT. For commercial loans, a late charge will be assessed on any installment at least 5 days in default, and the late charge will equal 5% of the delinquent installment or the maximum late charge permitted by law, whichever is less. For personal loans, a late charge will be assessed on any installment 10 days in default, and the late charge will be the lesser of $10 or 5% of the delinquent installment.

4. PREPAYMENT. If Insured prepays the loan in full, Insured is entitled to a refund of the unearned finance charge computed according to the Rule of 78s.

## SCHEDULE OF POLICIES

| Policy Number | Full Name of Insurance Company and Name of General Agent or Company Office to Which Premium is Paid | Coverage | Policy Term | Effective Date | Premiums, Taxes and Fees |
|---|---|---|---|---|---|
| TBD | C00005-LLOYDS OF LONDON<br>G00040-SOCIUS INSURANCE SERVICES<br>[ME:25.000 %, CX:0]    [PR] | CRME | 8 | 5/31/2023<br>ERN TXS/FEES<br>FIN TXS/FEES | 54,234.25<br>2,224.65<br>0.00 |
| | | | | TOTAL | 56,458.90 |

Q# 50169440, PRN: 052423, CFG: 15/10-10-NON NV, RT: A05762-30D, DD: N/A, BM: Invoice, Qtd For: A18203 Original, Memo 0

5. PROMISE TO PAY. In consideration of the premium payment by LENDER to the insurance companies listed in the Schedule of Policies (or their authorized representative) or the Agent or Broker listed above, Insured unconditionally promises to pay LENDER, the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, subject to all the provisions of this Agreement.

6. POWER OF ATTORNEY. INSURED IRREVOCABLY APPOINTS LENDER AS ITS "ATTORNEY-IN-FACT" with full power of substitution and full authority, in the event of default under this Agreement, to (a) cancel the Financed Policies in accordance with the provisions contained herein, (b) receive all sums assigned to LENDER, and (c) execute and deliver on behalf of Insured all documents relating to the Financed Policies in furtherance of this Agreement. This right to cancel will terminate only after all of Insured's indebtedness under this Agreement is paid in full. Insured is responsible for repayment of the Amount Financed plus interest and other charges permitted under this Agreement, including the Down Payment if owed and payable directly to LENDER, irrespective of whether LENDER exercises this right to cancel the Financed Policies.

7. SIGNATURE & ACKNOWLEDGEMENT. Insured has received, reviewed, and signed a copy of this Agreement. By signing below, you certify that you have the requisite authority to (a) enter into this Agreement on behalf of Insured (if applicable, including as agent, trustee, executor, or otherwise in a representative capacity) and any other insureds named on the Financed Policies, and (b) jointly and severally agree on behalf of all insureds named on the Financed Policies to all provisions set forth in this Agreement. Insured acknowledges and understands that entry into this financing arrangement is not required as a condition for obtaining insurance coverage.

NOTICE TO INSURED: (1) Do not sign this Agreement before you read both pages of it, or if it contains any blank space. (2) You are entitled to a completely filled-in copy of this Agreement. (3) You have the right prepay the loan in full and receive a refund of any unearned finance charge. (4) Keep a copy of this Agreement to protect your legal rights. (5) See last page of Agreement for your consent to electronic statement and notice delivery.

DocuSigned by:
*Ellen Coleman*
1B578B258E954D0...
Signature of Insured or Authorized Agent

5/24/2023
Date

DocuSigned by:
*Arda Slick*
CBEB79B4AD20441...
Signature of Agent

5/26/2023
Date

FIF1122NBP

DocuSign Envelope ID: 9987D1F9-96E5-4BB4-AEB9-414FFD4A1C58

Case 23-10815-LSS    Doc 6    Filed 06/26/23    Page 30 of 40    Insured:  Peer Street, Inc.

ADDITIONAL PROVISIONS OF PREMIUM FINANCE AGREEMENT    Quote #: 50169440

8. APPLICATION OF PAYMENTS. (a) Payments received by LENDER from Insured shall be applied first to installments, then to any unpaid fees. The payment of installments is prioritized over the payment of fees, which means when LENDER receives partial payments or overpayments of any installment(s), amounts previously applied to fees may be reallocated to enable a full installment(s) to be paid. This payment application method may cause fees to reappear as unpaid and owing after the payment period in which the fees were originally assessed and paid, but does not increase or otherwise change the amount of fees that Insured may be required to pay under this Agreement. (b) Any returned premium received by LENDER from the Financed Policies will be applied to reduce the total unpaid balance under this Agreement, which shall not relieve Insured of its obligation to pay any remaining installments due but may reduce the amount of such installments.

9. EFFECTIVE DATE.  This Agreement will not become effective until it is accepted in writing by LENDER. LENDER will send a Notice of Acceptance to Insured to confirm this Agreement is effective.

10. DEFAULT/CANCELLATION.  Insured is in default under this Agreement if (a) the Down Payment, if to be collected by LENDER, or any payment is not received by LENDER when it is due, (b) a proceeding in bankruptcy, receivership, insolvency or similar proceeding is instituted by or against Insured, or (c) Insured fails to comply with any of the terms of this Agreement. If Insured is in default, LENDER has no further obligation under this Agreement to pay premiums on Insured's behalf, and LENDER may pursue any of the remedies provided in this Agreement or by law. If a default by Insured results in a cancellation of the Financed Policies, Insured agrees to pay a cancellation charge for commercial loans, which will be the maximum permitted by law. No cancellation charge shall apply to personal loans. If cancellation or default occurs, Insured agrees to pay interest on the unpaid balance due at the contract rate until the balance is paid in full.

11. LIMITATION OF LIABILITY. Insured understands and agrees that LENDER or its assignee is not liable for any losses or damages to Insured or any person or entity upon the exercise of LENDER's right of cancellation, except in the event of willful or intentional misconduct by LENDER.

12. INSUFFICIENT FUNDS CHARGE. If Insured's payment is dishonored for any reason and if permitted by law, Insured will pay LENDER an insufficient funds charge equal to the maximum fee permitted by law for commercial loans and $10 for personal loans.

13. LENDER'S RIGHTS AFTER THE POLICIES ARE CANCELLED.  After any Financed Policy is cancelled by any party or if a credit is otherwise generated, LENDER has the right to receive all unearned premiums and other funds assigned to LENDER as security herein and to apply them to Insured's unpaid balance under this Agreement or any other agreement between Insured and LENDER. Receipt of unearned premiums does not constitute payment of installments to LENDER, in full or in part. Any amounts received by LENDER after cancellation of the Financed Policies will be credited to the balance due with any excess paid to the Insured; the minimum refund is $1.00. Any deficiency shall be immediately paid by Insured to LENDER. Insured agrees that insurance companies may rely exclusively on LENDER's representations about the Financed Policies.

14. ASSIGNMENT.  Insured may not assign any Financed Policy or this Agreement without LENDER's prior written consent.  LENDER may transfer its rights under this Agreement without the consent of Insured.

15. AGENT OR BROKER.  Insured agrees that the Agent or Broker issuing the Financed Policies or through whom the Financed Policies were issued is not the agent of LENDER, except for any action taken on behalf of LENDER with the express authority of LENDER, and LENDER is not bound by anything the Agent or Broker represents to Insured, orally or in writing, that is not contained in this Agreement. The Agent or Broker will receive from LENDER 0.31 % of the Amount Financed stated on page 1 for aiding in the administration of this Agreement relating to the Financed Policies. In NY, the Agent or Broker may assess a fee to Insured for obtaining and servicing the Financed Policies pursuant to NY CLS Ins § 2119.  Any questions regarding this payment should be directed to the Agent or Broker.

16. COLLECTION COSTS.  Insured agrees to pay reasonable attorney fees, court costs, and other collection costs to LENDER to the extent permitted by law if this Agreement is referred to an attorney or collection agent who is not a salaried employee of LENDER to collect money that Insured owes.

17. GOVERNING LAW.  The loan terms subject to this Agreement are governed by applicable federal law and Illinois law (to the extent not preempted by federal law), without regard to principles of conflicts of law or choice of law. If any court finds any term herein to be invalid, such finding will not affect the remaining provisions.

18. WARRANTY OF ACCURACY.  Insured represents and warrants that to the best of its knowledge: (a) the Financed Policies are in full force and effect and that the Insured has not and will not assign any interest in the Financed Policies except for the interest of mortgagees and loss payees, (b) the Down Payment and any past due payments have been paid in full to the Agent or Broker or Lender in cash or other immediately available funds, (c) all information provided herein or in connection with the Agreement is true, correct, and not misleading, (d) Insured is not insolvent nor presently involved in any insolvency proceeding, (e) Insured has no indebtedness to the insurance companies issuing the Financed Policies, (f) there is no provision in the Financed Policies that would require LENDER to notify or obtain consent from any other party to effect cancellation of the Financed Policies, and (g) Insured has disclosed if he or she is a covered member of the armed forces or a dependent of a covered member as defined in the Military Lending Act.

19. ADDITIONAL PREMIUMS.  (a) Insured expressly agrees to (i) fully and timely comply with all audits by the insurance companies issuing the Financed Policies, (ii) timely provide complete and accurate payroll information, if applicable, and (iii) pay to the insurance companies any additional amount due in connection with the Financed Policies. The Amount Financed shall be applied to the Financed Policies' premium amounts and Insured shall be responsible for any additional premiums or other sums. (b) Insured, or Agent or Broker, may request that LENDER finance additional policies and/or additional premiums (the "Additional Premiums") for Insured during the term of this Agreement. If LENDER agrees, LENDER will send a Notice of Acceptance to Insured to confirm its approval to finance the Additional Premiums. For commercial loans, this Agreement shall be deemed amended on the date of the Notice of Acceptance to consolidate the Additional Premiums with Financed Policies into a single and indivisible loan transaction subject to this Agreement (with applicable changes to the payment schedule), and the Additional Premiums shall be "Financed Policies" on the date of the Notice of Acceptance. For personal loans, LENDER (or Agent or Broker on LENDER's behalf) will provide a separate Premium Finance Agreement to Insured for any Additional Premiums.

20. CORRECTIONS. LENDER may insert the names of insurance companies or policy numbers in the Schedule of Policies, if this information is not known at the time Insured signs this Agreement. LENDER is authorized to correct patent errors or omissions in this Agreement.

21. NON-WAIVER. Not Applicable.

22. ELECTRONIC STATEMENT AND NOTICE DELIVERY.  By executing this Agreement, Insured agrees to receive all billing statements, notices, and other communications via electronic delivery in PDF format as permitted by applicable law. It is Insured's responsibility to provide LENDER with true, accurate, and complete e-mail and contact information related to this Agreement and to maintain and update promptly any changes to this information. If Insured wishes to (i) opt out of electronic statement and notice delivery, or (ii) update contact information, Insured can log into Insured's account on www.firstinsurancefunding.com or call (800) 837-3707.

## AGENT OR BROKER REPRESENTATIONS AND WARRANTIES

Unless previously disclosed in writing to LENDER or specified in the Schedule of Policies, the Agent or Broker executing this Agreement expressly represents, warrants, and agrees as follows: (1)  Insured has received a copy of this Agreement and has authorized this transaction, the signer of this Agreement (whether Insured or its agent) has valid authority to bind Insured and any other insureds named under the Financed Policies to the terms of this Agreement, including the Power of Attorney provision, Insured's signature is genuine, and the Down Payment has been received from Insured (unless the Down Payment was made to Lender), (2) the information contained in the Schedule of Policies including the premium amount is correct and accurately reflects the necessary coverage, (3) the Financed Policies (a) are in full force and effect, (b) are cancellable by Insured or LENDER (or its successors or assigns), (c) will generate unearned premiums which will be computed on the standard short rate or pro rata basis, and (d) do not contain any provisions which affect the standard short rate or pro rata premium computation, including but not limited to direct company bill, audit, reporting form, retrospective rating, or minimum or fully earned premium, (4) the Agent or Broker is either the insurer's authorized policy issuing agent or the broker placing the coverage directly with the insurer, except where the name of the Issuing Agent or General Agent is listed in the Schedule of Policies, (5) to the best of the Agent or Broker's knowledge, there are no bankruptcy, receivership, or insolvency proceedings affecting Insured, (6) Agent or Broker will  hold harmless and indemnify LENDER and its successors and assigns  against any loss or expense (including attorney's fees, court costs, and other collection costs) incurred by LENDER and resulting from Agent or Broker's violations of these Representations and Warranties or from Agent or Broker's errors, omissions, or inaccuracies in preparing this Agreement, and will promptly reimburse LENDER for any loss or expense incurred in connection with any incidence of fraud or lack of valid authority on behalf of Insured or any other named insureds with respect to the terms of this transaction, the Agreement, or the Financed Policies, (7) Agent or Broker will (a) hold in trust for LENDER any payments made or credited to Insured through or to Agent or Broker by the insurance companies or LENDER, and (b) pay these monies and the unearned commissions to LENDER upon demand to satisfy the outstanding indebtedness under this Agreement, and (8) to fully and timely assist with all payroll audits.

FIF1122NBP

**<u>EXHIBIT C</u>**

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (___) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER, PURSUANT TO SECTIONS 105(a), 363(b), AND 364
OF THE BANKRUPTCY CODE, (A) AUTHORIZING PAYMENT
OF PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY COURSE
OF BUSINESS IN CONNECTION WITH INSURANCE PROGRAMS,
INCLUDING PAYMENT OF POLICY PREMIUMS AND BROKER FEES; (B)
AUTHORIZING BANKS TO HONOR AND PROCESS
CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO;
AND (C) SCHEDULING A FINAL HEARING**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors

and debtors in possession (collectively, the "**Debtors**") for the entry of interim and final orders,

pursuant to sections 105(a), 363(b), and 364 of the Bankruptcy Code, (a) authorizing, but not

directing, the Debtors to continue and, to the extent necessary, renew the Insurance Programs and

pay policy premiums and broker fees arising thereunder or in connection therewith, including

prepetition obligations arising in the ordinary course of business, (b) authorizing, but not directing,

the Debtors to continue their insurance premium financing programs and renew or enter into new

premium financing programs, as necessary, under substantially similar terms, and (c) authorizing

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485).  The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn:  David Dunn, Chief Restructuring Officer.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

30185959.6

the Banks to honor and process check and electronic transfer requests related to the foregoing; and

upon consideration of the First Day Declaration; and due and proper notice of the Motion having

been given; and it appearing that no other or further notice of the Motion is required except as

otherwise provided herein; and it appearing that this Court has jurisdiction to consider the Motion

in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing

that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this

proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing

that the relief requested in the Motion and provided for herein is in the best interest of the Debtors,

their estates, and their creditors; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.       The Motion is GRANTED on an interim basis as set forth herein.

2.       A final hearing on the relief sought in the Motion shall be conducted on

_____, 2023 at _____ (ET) (the "**Final Hearing**").  Any party objecting to

the relief sought at the Final Hearing or the Proposed Final Order shall file and serve a written

objection, which objection shall be served upon proposed counsel for the Debtors, in each case so

as to be received no later than _____, 2023 at 4:00 p.m. (ET).  If no objections

to the entry of the Proposed Final Order are timely filed, this Court may enter the Proposed Final

Order without further notice or a hearing.

3.       The Debtors are authorized to maintain the Insurance Programs without

interruption, and to renew, supplement, modify, or extend (including through obtaining "tail"

coverage) the Insurance Programs, or enter into new insurance policies, and to incur and pay policy

premiums, claims, deductibles, retentions, retrospective adjustments, administrative fees, broker

fees (including, without limitation, the Broker Fees), and any other obligations arising thereunder

30185959.6

or in connection therewith,, in accordance with the same practices and procedures as were in effect prior to the Petition Date.

4.      The Debtors are authorized, but not directed, in their discretion, to pay, honor, or otherwise satisfy premiums, claims, deductibles, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), and any other obligations that were due and payable or related to the period prior to the Petition Date on account of the Insurance Programs and the Finance Agreements up to an aggregate amount of $60,000.

5.      Nothing in this Order:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; or (c) shall be construed as a promise to pay any claim.

6.      The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Interim Order.

7.      The Debtors are authorized to take any and all actions necessary to

effectuate the relief granted herein.

8.      The requirements of Bankruptcy Rule 6003(b) are satisfied.

9.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

10.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

30185959.6

## **EXHIBIT D**

**Proposed Final Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (___) |
| Debtors. | (Joint Administration Requested) |

**FINAL ORDER, PURSUANT TO SECTIONS 105(a), 363(b),
AND 364 OF THE BANKRUPTCY CODE, (A) AUTHORIZING PAYMENT
OF PREPETITION OBLIGATIONS INCURRED IN THE ORDINARY
COURSE OF BUSINESS IN CONNECTION WITH INSURANCE
PROGRAMS, INCLUDING PAYMENT OF POLICY PREMIUMS AND
BROKER FEES; AND (B) AUTHORIZING BANKS TO HONOR AND PROCESS
CHECK AND ELECTRONIC TRANSFER REQUESTS RELATED THERETO**

Upon consideration of the motion (the "**Motion**")[2] of the above-captioned debtors

and debtors in possession (collectively, the "**Debtors**") for the entry of interim and final orders,

pursuant to sections 105(a), 363(b), and 364 of the Bankruptcy Code, (a) authorizing, but not

directing, the Debtors to continue and, to the extent necessary, renew the Insurance Programs and

pay policy premiums and broker fees arising thereunder or in connection therewith, including

prepetition obligations arising in the ordinary course of business, (b) authorizing, but not directing,

the Debtors to continue their insurance premium financing programs and renew or enter into new

premium financing programs, as necessary, under substantially similar terms, and (c) authorizing

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485).  The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn:  David Dunn, Chief Restructuring Officer.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

30185959.6

the Banks to honor and process check and electronic transfer requests related to the foregoing; and

upon consideration of the First Day Declaration; and due and proper notice of the Motion having

been given; and it appearing that no other or further notice of the Motion is required except as

otherwise provided herein; and it appearing that this Court has jurisdiction to consider the Motion

in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing

that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this

proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing

that the relief requested in the Motion and provided for herein is in the best interest of the Debtors,

their estates, and their creditors; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized to maintain the Insurance Programs without

interruption, and to renew, supplement, modify, or extend (including through obtaining "tail"

coverage) the Insurance Programs, or enter into new insurance policies, and to incur and pay policy

premiums, claims, deductibles, retentions, retrospective adjustments, administrative fees, broker

fees (including, without limitation, the Broker Fees), and any other obligations arising thereunder

or in connection therewith,, in accordance with the same practices and procedures as were in effect

prior to the Petition Date; *provided*, *however*, that the Debtors shall provide notice of any such

modifications to, or cancellation of, their existing insurance coverage to the Office of the United

States Trustee for the District of Delaware and any official committee appointed in the chapter 11

cases within ten (10) days of the effective date of such modification and/or cancellation.

3.      The Debtors are authorized, but not directed, in their discretion, to pay,

honor, or otherwise satisfy premiums, claims, deductibles, retrospective adjustments,

administrative fees, broker fees (including, without limitation, the Broker Fees), and any other obligations that were due and payable or related to the period prior to the Petition Date on account of the Insurance Programs.

4.      The Debtors are authorized, but not directed, in their discretion, to pay, honor, or otherwise satisfy premiums, claims, deductibles, retrospective adjustments, administrative fees, broker fees (including, without limitation, the Broker Fees), and any other obligations that were due and payable or related to the period prior to the Petition Date on account of the Insurance Programs and the Finance Agreements up to an aggregate amount of $125,000.

5.      Nothing in this Order:  (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates; or (c) shall be construed as a promise to pay any claim.

6.      The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process checks or electronic fund transfers drawn on the Debtors' bank accounts to pay prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Banks may rely on the representations of the Debtors with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Interim Order, and any such Bank shall not have any liability to any party for relying on such representations by the Debtors, as provided for in this Final Order.

30185959.6

3

7.      The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

8.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

9.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

30185959.6

4