# **EXHIBIT C**

## **Retention Agreement**

**PIPER | SANDLER**

**Piper Sandler Loan Strategies, LLC**

3400 PLAYERS CLUB PKWY, SUITE 150, MEMPHIS, TN  38125
TEL: 901 682-5656
FAX: 901 682-6119

July 7, 2023

Peer Street Inc.
PS Funding, Inc
PSF REO LLC
2121 Park Pl. Ste 250
El Segundo, CA 90245

Attention:    Ms. Mary Ann Thomas
              Head of Capital Markets & Portfolio Management

Reference is hereby made to the letter agreement, dated as of April 14, 2023 (the "Original Engagement Letter" and, the date of its execution, the "Original Execution Date"), by and among PS Funding, Inc. ("PSF"), PSF REO LLC ("PSFR"), and Piper Sandler Loan Strategies, LLC ("Piper Sandler"). The Original Engagement Letter is hereby amended and restated in its entirety as set forth herein and shall hereafter be of no further force and effect. Notwithstanding the foregoing, the fees earned and expenses incurred under the Original Engagement Letter that are due and payable prior to the date hereof shall remain due and payable.

This letter agreement (this "Agreement") will confirm your acknowledgment and understanding that Piper Sandler has been retained as exclusive introducing broker by Peer Street Inc. ("PSI"), PSF, and PSFR (together with PSI, PSF, and their respective subsidiaries and affiliates, the "Seller") to facilitate the sale, assignment or other transfer of those certain loans, real property and/or assets owned by the Seller as specifically listed on Exhibit A, attached hereto, which may be updated from time to time by mutual written agreement between Seller and Piper Sandler (each, an "Asset" and, collectively, the "Assets"), to one or more third parties (each, a "Third Party"). Any sale, assignment or other transfer of the Asset(s) will be subject to a definitive agreement (each, a "Definitive Agreement") executed between the Seller and the Third Party.

SECTION 1.  MARKETING SERVICES

Piper Sandler expects to work closely with the Seller's management, its staff and systems personnel to complete the analysis, qualification and sale, assignment and/or other transfer of the Assets. Piper Sandler anticipates that its services will include, as appropriate and as reasonably requested by the Seller, the following (the "Services"):

1.      coordinating with the Seller in the preparation of the information required for the portfolio analysis and Asset selection;

2.      assisting the Seller in determining the universe of Assets to be sold, assigned or transferred and advising as to the marketability and sale price targets of the Assets;

3.      assisting the Seller in qualifying any Third Party;

4.      assisting the Seller in the coordination and oversight of due diligence by the Third Party(ies);

5.      assisting the Seller with marketing, arranging, negotiating and closing the execution of the Definitive Agreement(s) and the sale, assignment or other transfer of the Assets; and

6.      in the event the Seller becomes subject to a Bankruptcy Proceeding (as defined below), and if requested by the Seller, participating in hearings before the court in which such Bankruptcy Proceeding is commenced (the "Bankruptcy Court") and providing relevant testimony with respect to the matters described herein.

SECTION 2.  COMPANY SUPPORT SERVICES

In connection with Piper Sandler providing the Services outlined above, and the due diligence of the Assets to be performed by a Third Party (which due diligence the Seller agrees will be performed at a location and/or through a process mutually acceptable to the Seller and the Third Party at no expense to Piper Sandler), the Seller will ensure Piper Sandler and any Third Party the following forms of timely, direct or indirect, assistance:

1.      a designated representative from the Seller will be available to authorize certain representations and warranties regarding the Assets; *provided*, that the decision as to whether or not to make such representation or warranty shall be solely at the discretion of the Seller;

2.      loan files and all documentation regarding the Assets as is necessary to complete a sale, assignment or other transfer of the Assets as contemplated in this Agreement; and

3.      designated representatives to address and resolve missing/incomplete Asset documentation, promptly providing updated documentation and payment/resolution activity for the Assets, and promptly addressing questions generated by Piper Sandler, any Third Party and, if applicable, the third party Asset due diligence provider.

SECTION 3.  FEES AND EXPENSES

(a)      In consideration of the Services to be provided by Piper Sandler hereunder, the Seller has paid Piper Sandler a non-refundable retainer fee in an amount equal to $100,000 (the "Retainer Fee").  The Seller and Piper Sandler agree that the Retainer Fee will be credited towards any Broker Fee or Restructuring Fee (each as defined below) becoming due and payable to Piper Sandler pursuant to the terms in this Section 3.

(b)      In the event a Bankruptcy Proceeding is commenced and Piper Sandler's retention

2

is approved, and to the extent approved by the Bankruptcy Court, in consideration of the Services to be provided by Piper Sandler hereunder, the Seller shall pay Piper Sandler a non-refundable monthly fee, whether or not a transfer of the Assets is consummated, in an amount equal to $100,000 (the "Monthly Fee"), which shall be due and payable 30 days from the date the Bankruptcy Proceeding is commenced and each month thereafter until such time as Piper Sandler's engagement is completed.  The Seller and Piper Sandler agree that 100% of the Monthly Fees actually paid to Piper Sandler shall be credited towards any Broker Fee or Restructuring Fee becoming due and payable to Piper Sandler pursuant to the immediately following paragraph.

(c)    In consideration of the Services to be provided by Piper Sandler hereunder, if, (i) during the period Piper Sandler is retained by the Seller hereunder, the Seller enters into a Definitive Agreement with a Third Party or (ii) within eighteen (18) months after the termination of this Agreement (the "Tail Period"), the Seller enters into a Definitive Agreement with a Third Party identified by Piper Sandler on a schedule to be provided by Piper Sandler to the Seller on a rolling basis through the completion of the first round bid process (and, to the extent this Agreement is terminated before the completion of such first round bid process, any additional parties identified within five business days of such termination), in each case, regarding a sale, assignment or other transfer of any Assets (pursuant to section 363 of the Bankruptcy Code, a chapter 11 plan, or otherwise), the Seller agrees to pay Piper Sandler a fee (the "Broker Fee") in an amount equal to (x) in the case of Assets that are loans that are performing, current, non-matured or delinquent 30 days or less, 37.5 basis points (0.375%) multiplied by the aggregate unpaid principal balance of such Assets sold, assigned or otherwise transferred as of the cutoff date specified in the Definitive Agreement, (y) in the case of Assets that are scratch and dent loans or loans that are delinquent more than 30 days, sub-performing, non-performing or matured, 150 basis points (1.50%) multiplied by the aggregate gross proceeds of such Assets sold, assigned or otherwise transferred as of the cutoff date specified in the Definitive Agreement and (z) in the case of Assets that are real property, 300 basis points (3.00%) multiplied by the aggregate sale value of such Assets sold, assigned or otherwise transferred.  In addition, if an Asset is sold, assigned or otherwise transferred to a Third Party identified by Piper Sandler during the period specified above, the Seller agrees to pay Piper Sandler the Broker Fee with respect to any additional Assets sold, assigned or otherwise transferred to such Third Party within eighteen (18) months from the closing of the first sale, assignment or other transfer of Assets to such Third Party.  It is understood that the Broker Fee is due and payable in immediately available funds upon closing of the sale, assignment or other transfer of the Assets from the Seller to the Third Party.  In the event that any of the Assets are sold, assigned or transferred for consideration that is not in the form of cash, the value ascribed to such Assets shall be (i) if any letters of intent ("LOI") were previously submitted by any Third Party with respect thereto, the highest valuation amongst such LOIs or (ii) if no LOIs were submitted for such Assets, the valuation agreed to by the Seller and Piper Sandler in good faith.  For the avoidance of doubt, the Broker Fee shall be due and payable to Piper Sandler until the expiration of the periods specified above with respect to a Third Party without regard to any termination or expiration of this Agreement.

If during the term of this Agreement or during the Tail Period, the Seller pursues a transaction under a chapter 11 plan that results in the Seller (or a successor to the Seller created under a chapter 11 plan, such as a liquidating trust) owning all or substantially all of the Assets,

the Seller shall pay Piper Sandler a "<u>Restructuring Fee</u>" (in lieu of any Broker Fee) equal to $1 million upon the consummation of such transaction.

Promptly upon the closing of a transaction for which Piper Sandler is entitled to a Broker Fee hereunder, the Seller will provide Piper Sandler with a copy of the executed Definitive Agreement and all supporting exhibits, including, but not limited, to the final list of loans and funding schedules, in an e-mail stating that such documents are the final prevailing documents for the transaction.  The Seller shall also provide any other documentation as may be requested by Piper Sandler's auditors from time to time.

(d)     In addition to any fees that may be payable to Piper Sandler under this Agreement, the Seller agrees to reimburse Piper Sandler, upon request made from time to time, for its reasonable out-of-pocket expenses, including expenses related to a virtual data room, and in the event a Bankruptcy Proceeding is commenced, the reasonable fees, disbursements and other charges of Piper Sandler's counsel (without the requirement that the retention of such counsel be, or such counsel's fees, disbursement or other charges be, approved by the Bankruptcy Court) incurred in connection with Piper Sandler's activities under this Agreement or the Original Engagement Letter, provided such expenses (i) prior to the commencement of a Bankruptcy Proceeding shall not exceed $5,000 without the Seller's prior approval, not to be unreasonably withheld and (ii) after the commencement of a Bankruptcy Proceeding, shall be pre-approved by Seller, in writing (such approval not to be unreasonably withheld), before such out-of-pocket expenses become reimbursable.  The Seller acknowledges such limitations on expense reimbursement in no way limit or impair the provisions contained in the "Indemnification and Contribution" section hereunder.  If a Bankruptcy Proceeding is commenced, consistent with and subject to any applicable orders of the Bankruptcy Court, the Seller shall promptly reimburse Piper Sandler for such expenses under the section titled "Retention of Piper Sandler" upon presentation of an invoice or other similar documentation with reasonable detail. If a Bankruptcy Proceeding is commenced, it is understood that Piper Sandler's reimbursable counsel fees may include, without limitation, reasonable and documented fees incurred in representing Piper Sandler's interests during the pendency and following the conclusion of any Bankruptcy Proceeding, including, without limitation, counsel fees incurred in connection with Piper Sandler's retention and payment hereunder and thereunder.

<u>SECTION 4.  USE AND DISCLOSURE OF SERVICES AND INFORMATION</u>

The Seller hereby acknowledges that the Services provided by Piper Sandler hereunder and under the Original Engagement Letter are intended solely for the benefit and use of the Seller in its consideration of a potential sale, assignment, or other transfer of the Assets and the Seller agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose without the prior written consent of Piper Sandler, and does not constitute a recommendation to any stakeholder of the Seller that such stakeholder might or should take in connection with any transaction. The Seller will furnish Piper Sandler with such information as Piper Sandler reasonably believes appropriate to its assignment (all such information so furnished being the "<u>Information</u>") and hereby represents and warrants to Piper Sandler that the Information will be true and correct, to Seller's knowledge, in all material respects and not misleading; provided,

4

however, Piper Sandler agrees and acknowledges that the Information provided by third-parties has not been verified by Seller to be true and/or correct and, therefore, Seller cannot provide such representation or warranty in relation to that subset of information. Piper Sandler agrees to use all reasonable efforts to keep confidential Information confidential. The Seller recognizes and confirms that Piper Sandler (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated hereunder without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information, (c) will be entitled to assume and rely upon the accuracy and completeness of the Information and such other information, and (d) will not act in the official capacity of an appraiser of specific assets or liabilities of the Seller or any other party.

SECTION 5.  CERTAIN ACKNOWLEDGEMENTS AND REPRESENTATIONS

(a)      The Seller acknowledges that Piper Sandler's engagement hereunder is as an independent contractor and not in any other capacity.  Piper Sandler may, to the extent it deems appropriate, render the Services hereunder through one or more of its affiliates.  In that regard, to the extent that any of the Assets that are marketed, sold, assigned and/or otherwise transferred consist of real property, the Services to be provided by Piper Sandler hereunder with respect to such Assets shall be rendered by Piper Sandler Real Estate Services, LLC ("PS-RES"), an affiliate of Piper Sandler (the "Real Property Services").  It is understood that the Real Property Services will be performed by PS-RES in the State of New York.

(b)      The Seller further acknowledges that nothing in this Agreement is intended to create duties owed to the Seller beyond those expressly provided for in this Agreement. The Seller and Piper Sandler specifically disclaim the creation of any fiduciary or agent relationship between, or the imposition of any fiduciary or agency duties on, either party. Neither this Agreement, nor the delivery of any advice in connection with this Agreement, is intended to confer rights upon any persons not a party hereto (including security holders, employees or creditors of the Seller) as against Piper Sandler or its affiliates or its or their respective partners, directors, officers, agents or employees.  Piper Sandler may, with the Seller's prior approval (not to be unreasonably withheld), and at its own expense, place announcements or advertisements in financial newspapers, journals and marketing materials describing its services hereunder.  The Seller hereby agrees that it will not use Piper Sandler's name or make reference to Piper Sandler's Services hereunder in any press release or announcement related to the transactions contemplated hereby without the prior written consent and approval of Piper Sandler.

(c)      To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business. This means Piper Sandler may ask the Seller and its significant shareholders or equityholders for certain identifying information and documents, including a government-issued identification number (e.g., a U.S. taxpayer identification number) and copies of documents containing personal identifying information, and such other information or documents that Piper Sandler and its counsel consider appropriate to verify the bona fide existence of the Seller (e.g., certified articles of incorporation, a government-issued business license, a partnership agreement or a trust

instrument) and the identities of its significant shareholders or equityholders.

(d)     The Seller acknowledges that it is not relying on the advice of Piper Sandler for tax, legal or accounting matters, it is seeking and will rely on the advice of its own professionals and advisors for such matters and it will make an independent analysis and decision regarding any sale, assignment or transfer of the Assets or alternative transaction based upon such advice.

(e)     The Seller acknowledges and agrees that (i) Piper Sandler is acting as the Seller's exclusive introducing broker in connection with the transactions contemplated herein; (ii) Piper Sandler expects to introduce the Seller to one or more Third Parties; and (iii) any such Third Party may be a customer of, or have other business relationships with, Piper Sandler.  The Seller acknowledges and agrees that any information provided to the Seller by Piper Sandler regarding the identity of a Third Party is confidential.

(f)     The Seller acknowledges, and Piper Sandler agrees, that Piper Sandler will use all reasonable efforts to procure a Third Party; *provided*, however, that nothing contained in this Agreement is intended to constitute a commitment or warranty by Piper Sandler that the Assets can be sold, assigned or transferred to any third party on terms acceptable to the Seller.

(g)     The Seller hereby represents and warrants to Piper Sandler that there is no other person or entity that is or will be (i) providing the Services contemplated hereunder or (ii) entitled to any fee or any type of commission in connection with the transactions contemplated by this Agreement as a result of any agreement or understanding with it. The Seller hereby further represents and warrants to Piper Sandler that during the term of this Agreement, the Seller will not engage in any discussions with any person other than representatives of Piper Sandler for the purpose of engaging, or considering the engagement of, such person as a finder, advisor or broker in connection with the sale, assignment or other transfer by the Seller of the Assets covered by this Agreement.

(h)     The Seller represents and warrants that it has all requisite power and authority to enter into and carry out the terms and provisions of this Agreement, the execution, delivery and performance of this Agreement does not breach or conflict with any agreement, document or instrument to which it is a party or bound and this Agreement has been duly authorized, executed and delivered by the Seller.

## SECTION 6.  RETENTION OF PIPER SANDLER

In the event a Bankruptcy Proceeding (as defined below) is commenced under the Bankruptcy Code (as defined below), the Seller shall apply promptly to the Bankruptcy Court pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of (a) this Agreement and (b) Piper Sandler's retention by the Seller under the terms of this Agreement (including, without limitation, the reimbursement of the fees, disbursements and other charges of Piper Sandler's counsel pursuant to this section without the requirement that the retention of such counsel be, or such counsel's fees, disbursement or other charges be, approved by the Bankruptcy

Court), *nunc pro tunc* to the date the Bankruptcy Proceeding was commenced, and shall use best efforts to obtain Bankruptcy Court authorization thereof, subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in section 328(a) of the Bankruptcy Code, and not subject to the standard of review set forth in section 330 of the Bankruptcy Code. The Seller shall supply Piper Sandler and its counsel with a draft of such application and any proposed order authorizing Piper Sandler's retention sufficiently in advance of the filing of such application and proposed order to enable Piper Sandler and its counsel to review and comment thereon. If a final order of the Bankruptcy Court reasonably acceptable to Piper Sandler approving Piper Sandler's retention under this Agreement is not obtained within 45 days following the filing of a voluntary chapter 11 case or the entry of an order for relief in any involuntary chapter 11 case, or such order is later reversed, vacated, stayed or set aside for any reason, Piper Sandler may terminate this Agreement, and the Seller shall reimburse Piper Sandler for all fees owing and expenses incurred prior to the date of termination, subject to the requirements of the Bankruptcy Code and applicable rules, guidelines and Bankruptcy Court orders, and Piper Sandler shall be entitled to a claim with respect to any fees that become payable under the "Fees and Expenses" section of this Agreement. Prior to the commencement of a Bankruptcy Proceeding, the Seller shall pay all undisputed amounts due and payable to Piper Sandler under this Agreement in full in cash.

The Seller agrees that Piper Sandler's post-petition compensation as set forth herein and obligations incurred and payments made pursuant to the expense reimbursements and indemnification provisions of this Agreement (including, without limitation, the indemnification provisions of Annex A hereto) shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing and/or cash collateral orders entered by the Bankruptcy Court (which carve-outs shall be adequate to enable the Seller to pay promptly Piper Sandler's fees and expenses contemplated hereby taking into account the Seller's obligations to other professionals entitled to the benefit of the carve-out), provided, however, that while Piper Sandler's Monthly Fees will be funded as part of any such carve-out, any Broker Fee will be funded exclusively out of proceeds resulting from a sale to a Third Party. The Seller also agrees to assist Piper Sandler in preparing, filing and serving all required fee statements, interim fee applications, and final fee applications. The Seller agrees to support Piper Sandler's fee applications during any Bankruptcy Court hearing on such fee applications, so long as the fees and expenses sought by Piper Sandler therein are consistent with this Agreement. The Seller agrees to use its best efforts to ensure that any cash collateral order, debtor-in-possession financing order and/or similar order entered in the Bankruptcy Proceeding permits the use of cash collateral and financing proceeds for the full and prompt payment of Piper Sandler's fees and expenses contemplated under this Agreement.

The Seller shall use its commercially reasonable efforts to ensure that, to the fullest extent permitted by law, any confirmed plan of reorganization, liquidation or other similar transaction in the Bankruptcy Proceeding contains typical and customary releases (from the Seller, its bankruptcy estates and from third parties) and exculpation provisions releasing, waiving, and forever discharging Piper Sandler, its divisions, affiliates, any person controlling Piper Sandler or any of its affiliates, and their respective current and former directors, officers, partners, members, agents, attorneys, advisors, representatives and employees from any and all claims, obligations, suits,

judgments, damages, demands, debts, rights, causes of action, and liabilities related to the Seller or the engagement described in this Agreement, except claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities incurred which have been finally judicially determined to have resulted primarily from actions taken or omitted to be taken by Piper Sandler due to Piper Sandler's gross negligence, willful misconduct or bad faith.

Piper Sandler acknowledges that in the event that the Bankruptcy Court in a Bankruptcy Proceeding commenced under the Bankruptcy Code approves its retention by the Seller pursuant to the application process described in this section, payment of Piper Sandler's fees and expenses shall be subject to (x) the jurisdiction and approval of the Bankruptcy Court under section 328(a) of the Bankruptcy Code (and not subject to the standard of review set forth in section 330 of the Bankruptcy Code) and any order approving Piper Sandler's retention, (y) any applicable fee and expense guidelines and/or orders and (z) any requirements governing interim and final fee applications. In the event that Piper Sandler's engagement hereunder is approved by the Bankruptcy Court, the Seller shall pay all fees and expenses of Piper Sandler hereunder as promptly as practicable in accordance with the terms hereof and any applicable orders of the Bankruptcy Court.

In agreeing to seek Piper Sandler's retention under section 328(a) of the Bankruptcy Code, the Seller acknowledges and agrees that Piper Sandler's loan and asset sales experience and expertise, its knowledge of the industry in which the Seller operates and the brokering capabilities will inure to the benefit of the Seller, that the value to the Seller of Piper Sandler's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees and expense reimbursement provided for herein are reasonable regardless of the number of hours expended by Piper Sandler's professionals in performance of the services provided hereunder. The Seller also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Piper Sandler and its professionals hereunder over the life of the engagement, and in light of the fact that such commitment may foreclose other opportunities for Piper Sandler and that the actual time and commitment required of Piper Sandler and its professionals to perform its services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for the firm. In addition, given the numerous issues which Piper Sandler may be required to address in the performance of its services hereunder, Piper Sandler's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Piper Sandler's services for engagements of this nature in an out-of-court context, the Seller agrees that the fee arrangements hereunder (including the Monthly Fee(s) and Broker Fee(s)) are reasonable under the standards set forth section 328(a) of the Bankruptcy Code.

As used herein, the term "<u>Bankruptcy Proceeding</u>" shall mean any proceeding under title 11 of the United States Code §§ 101 et seq. (the "<u>Bankruptcy Code</u>") or the bankruptcy, insolvency or similar law of any other jurisdiction.

The Seller and Piper Sandler acknowledge and agree that (x) the hours worked, (y) the results achieved and (z) the ultimate benefit to the Seller of the work performed, in each case, in

connection with this engagement, may be variable, and that the Seller and Piper Sandler have taken such factors into account in setting the fees hereunder.

## SECTION 7.  NON-CIRCUMVENTION

The Seller acknowledges and agrees that, during the term of this Agreement, neither the Seller, nor any of its officers, agents or representatives will, directly or indirectly, effect or seek to effect a sale, assignment or other transfer of the Assets other than through Piper Sandler.

## SECTION 8.  INDEMNIFICATION AND CONTRIBUTION

The Seller agrees to the provisions of Annex A hereto which provide for indemnification by the Seller of Piper Sandler and certain related persons.  Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference as if fully stated herein. Such indemnification and the other provisions in Annex A shall survive any termination, expiration or completion of this Agreement or Piper Sandler's engagement hereunder.  For the avoidance of doubt, the indemnification and other provisions set forth on Annex A are deemed to have been in effect since the Original Execution Date.

## SECTION 9.  TERMINATION

The term of Piper Sandler's engagement shall commence as of the Original Execution Date and shall extend until the consummation of a sale, assignment, or other transfer of Assets owned by the Seller and payment of all fees and expenses hereunder that are due and payable unless terminated in accordance with this section.

Piper Sandler's engagement hereunder may be terminated by the Seller or by Piper Sandler upon thirty (30) days' written notice to that effect, it being expressly understood that the provisions relating to the payment of fees and expenses (including during the Tail Period), non-circumvention, and the provisions contained under the captions "Certain Acknowledgements and Representations," "Retention of Piper Sandler," "Indemnification and Contribution" and "Miscellaneous" will survive any such termination.

If this Agreement is terminated, Piper Sandler shall be entitled to (a) reimbursement of any and all expenses incurred on or before the effective date of termination and (b) payment of any and all fees that are due and owing to Piper Sandler upon the effective date of termination.

## SECTION 10.  MISCELLANEOUS

The Seller acknowledges that Piper Sandler may at its option and expense, after announcement of a transaction with respect to the Assets, place announcements and advertisements or otherwise publicize such transaction on its corporate website and in such financial and other newspapers and journals as it may choose (such as a customary "tombstone" advertisement, including the Seller's logo or other identifying marks), stating that Piper Sandler acted as introducing broker to the Seller in connection with such transaction.   The Seller further consents to Piper Sandler's use of the Seller's name and logo as part of Piper Sandler's general marketing

materials.  In any press release or other public announcement made by the Seller regarding any transaction that references the services hereunder, the Seller shall refer to Piper Sandler unless otherwise directed by Piper Sandler.

This Agreement and the legal relationships between the parties herein shall be governed and construed in accordance with the laws of the State of New York without giving effect to the conflicts of law principles thereof. Regardless of any present or future domicile or principal place of business of the parties hereto, each such party hereby irrevocably consents and agrees that any and all claims or disputes between the parties hereto pertaining to this Agreement or to any matter arising out of or related to this Agreement shall be brought in (a) so long as Seller is not a debtor in a Bankruptcy Proceeding, any state or federal court of competent jurisdiction in the state and county of New York or (b) if Seller is a debtor in a Bankruptcy Proceeding, the Bankruptcy Court or any court having appellate jurisdiction over the Bankruptcy Court regardless of where such court is located.  The Seller and Piper Sandler hereby waive all rights to a trial by jury in any action, proceeding, or counterclaim (whether based upon contract, tort or otherwise) in connection with any dispute arising out of this Agreement or any matters contemplated by this Agreement. This Agreement embodies the entire agreement and understanding between the Seller and Piper Sandler and supersedes all prior agreements and understandings relating to the subject matter of this Agreement, including the Original Engagement Letter. This Agreement may be executed in any number of counterparts. Such counterparts may be delivered by one party to the other by facsimile or other electronic transmission, and such counterparts will be valid for all purposes. The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provisions of this Agreement, which will remain in full force and effect. This Agreement is solely for the benefit of the Seller and Piper Sandler, and no other person (other than the Indemnified Persons (as defined below)) will acquire or have any rights by virtue of this Agreement.

The provisions of this Agreement (including, without limitation, the provisions relating to the payment of fees and expenses and the provisions contained in Annex A) shall be binding on and inure to the benefit of any of (i) the Seller's successors or assigns, (ii) each Indemnified Person (as defined in Annex A), and (iii) any successor or assign of any substantial portion of the Seller's or any Indemnified Person's business and/or assets.

If the Seller enters into any agreement or arrangement with respect to, or effects, any proposed sale, exchange, dividend or other distribution or liquidation of all or substantially all of its assets in one or a series of transactions, the Seller shall provide for the assumption of the Seller's obligations set forth in this Agreement (including, without limitation, the provisions relating to the payment of fees and expenses and the provisions contained in Annex A) by the purchaser or transferee of such assets or another party reasonably satisfactory to Piper Sandler.

This Agreement, including the annex(es) and exhibit(s) hereto, embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein.  No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless in writing and signed by each party hereto.  Except as otherwise expressly provided for in this Agreement, if any term, provision, covenant or restriction contained in this Agreement or Annex A is held by

a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement and Annex A shall all remain in full force and effect and shall in no way be affected, impaired or invalidated.

Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement (including Annex A attached hereto) and the transactions contemplated hereby. Each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms.

Any notice given pursuant to, or relating to, this Agreement shall be in writing and shall be mailed or delivered by courier (a) if to the Seller, at c/o Province, LLC, 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn: David Dunn, Chief Restructuring Officer, and (b) if to Piper Sandler, to Piper Sandler Loan Strategies, LLC, 3400 Players Club Parkway, Ste. 150, Memphis, TN 38125, Attention: Charles K. Smith, Managing Director.

[*Signature page follows*]

11

Please confirm that the foregoing correctly sets forth our agreement by signing in the space provided below and returning to Piper Sandler the duplicate copy of this Agreement enclosed herewith to our offices.

PIPER SANDLER LOAN STRATEGIES, LLC

By: _____
Name:  Charles K Smith
Title:    Managing Director

PIPER SANDLER REAL ESTATE SERVICES, LLC

By: _____
Name: Thomas Howland
Title:   Managing Director

Accepted and agreed to as of the date first written above:

PEER STREET INC

By: _____
Name:      Mary Ann Thomas
Title:      Head of Capital Markets & Portfolio Management

PS FUNDING, INC

By: _____
Name:      Mary Ann Thomas
Title:      Head of Capital Markets & Portfolio Management

PSF REO LLC

By: _____
Name:      Mary Ann Thomas
Title:      Head of Capital Markets & Portfolio Management

Please confirm that the foregoing correctly sets forth our agreement by signing in the space provided below and returning to Piper Sandler the duplicate copy of this Agreement enclosed herewith to our offices.

PIPER SANDLER LOAN STRATEGIES, LLC

By: _____
Name:   Charles K Smith
Title:    Managing Director

PIPER SANDLER REAL ESTATE SERVICES, LLC

By: _____
Name: Thomas Howland
Title:   Managing Director

Accepted and agreed to as of the
date first written above:

PEER STREET INC

By: _____
Name:      Mary Ann Thomas
Title:      Head of Capital Markets & Portfolio Management

PS FUNDING, INC

By: _____
Name:      Mary Ann Thomas
Title:      Head of Capital Markets & Portfolio Management

PSF REO LLC

By: _____
Name:      Mary Ann Thomas
Title:      Head of Capital Markets & Portfolio Management

## Annex A

The Seller hereby agrees to (i) indemnify and hold harmless Piper Sandler, its counsel and other professionals, its affiliates (within the meaning of the Securities Act of 1933), and each of Piper Sandler's and its affiliates' respective past, present and future partners, managers, members, directors, officers, agents, consultants, employees and controlling persons (within the meaning of the Securities Act of 1933, as amended or Section 20 of the Securities Exchange Act of 1934, as amended) (each of Piper Sandler and such other person or entity is hereinafter referred to as an "Indemnified Person"), to the fullest extent lawful from and against any losses, claims, damages, liabilities, judgments, costs, fines, penalties, awards, and expenses (collectively, "Losses"), whether joint or several, directly or indirectly in connection with, arising out of, based upon, or in any way related to Piper Sandler's engagement under, or any matter referred to in the agreement to which this Annex A is attached and of which this Annex A forms a part (whether occurring before, at, or after the date hereof) (including this Annex A, this "Agreement"), regardless of whether any of such Indemnified Persons is a party thereto, and (ii) periodically reimburse an Indemnified Person for such person's legal and other expenses as may be incurred in connection with investigating, preparing, pursuing, defending, paying, settling or compromising any action, inquiry, investigation, or other proceeding   (whether formal or informal) or threat thereof (including, without limitation, any expenses incurred in connection with any response to a subpoena or similar request for documents and/or testimony), whether or not in connection with pending or threatened litigation or arbitration, whether or not initiated or brought by the Seller, its creditors or stockholders, or any other person and whether or not any Indemnified Person is a party (each, an "Action"). The Seller is not responsible under the foregoing sentence to the extent that such Loss has been finally judicially determined by a court of competent jurisdiction to have resulted primarily and directly from actions taken or omitted to be taken by such Indemnified Person due to such person's gross negligence, willful misconduct or bad faith.  To the extent that any prior payment by the Seller made to an Indemnified Person is determined to have been improper by reason of such Indemnified Person's gross negligence, willful misconduct or bad faith, such Indemnified Person will promptly reimburse such amounts.

If the indemnity or reimbursement referred to above is, for any reason whatsoever, unenforceable, unavailable or otherwise insufficient to hold any Indemnified Person harmless, the Seller shall pay to or on behalf of such Indemnified Person contributions for Losses or Expenses so that each Indemnified Person ultimately bears only a portion of such Losses and Expenses as is appropriate (i) to reflect the relative benefits received by each such Indemnified Person, respectively, on the one hand and the Seller on the other hand in connection with the transactions contemplated by this Agreement, or (ii) if the allocation on that basis is not permitted by applicable law, to reflect not only the relative benefits referred to in clause (i) but also the relative fault of each such Indemnified Person, respectively, and the Seller as well as any other relevant equitable considerations; provided, however, that in no event will the aggregate contribution of all Indemnified Persons to all Losses and Expenses pursuant to this paragraph exceed the amount of the fees actually received by Piper Sandler pursuant to this Agreement.

Promptly after its receipt of notice of the commencement of any Action, any Indemnified Person will, if a claim in respect thereof is to be made against the Seller pursuant to this

Agreement, notify the Seller in writing of the commencement thereof, but omission to so notify the Seller will not relieve the Seller from any liability which the Seller may have to any Indemnified Person, except to the extent that the Seller suffers actual prejudice as a result of such failure; provided, however, under no circumstances will such omission relieve the Seller from its obligations to indemnify any Indemnified Person pursuant to applicable statutory law, common law, or contractual obligations otherwise than hereunder.  If the Seller so elects, the Seller may assume the defense of such Action in a timely manner, including the employment of counsel (reasonably satisfactory to Piper Sandler) and payment of expenses, provided the Seller permits an Indemnified Person and counsel retained by an Indemnified Person at its expense to participate in such defense.  Notwithstanding the foregoing, in the event (i) the Seller fails to promptly assume the defense and employ counsel reasonably satisfactory to Piper Sandler, (ii) the Indemnified Person has been advised by counsel that there exist actual or potential conflicting interests between the Seller or the Seller's counsel and such Indemnified Person, or (iii) the actual or potential defendants in, or targets of, any such action or proceeding include both the Seller and an Indemnified Person, and Piper Sandler shall have reasonably concluded that there may be legal defenses available to the Indemnified Person which are different from or additional to those available to the Seller, the Seller shall not have the right to assume the defense of such action or proceeding on the Indemnified Person's behalf and the Indemnified Person may employ separate counsel (in addition to local counsel) to represent or defend such Indemnified Person in such Action and the Seller shall pay the fees and disbursements of such separate counsel as incurred; provided, however, that the Seller will not, in connection with any one such Action or separate but substantially similar actions or proceedings arising out of the same general allegations, be liable for fees and expenses of more than one separate firm of attorneys (in addition to any local counsel).

The Seller will not, without Piper Sandler's prior written consent, settle or compromise or consent to the entry of any judgment or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Person is a party thereto), unless such settlement, compromise, termination, or consent includes an express, complete and unconditional release of Piper Sandler and each other Indemnified Person from all liability and obligations arising therefrom and the engagement of Piper Sandler under this Agreement and does not include any admission of fault, culpability, or failure to act by or on behalf of Piper Sandler or any other Indemnified Person. Without the Seller's prior written consent, which will not be unreasonably withheld, delayed or conditioned, no Indemnified Person will settle or compromise any claim for which indemnification or contribution may be sought hereunder. Notwithstanding the foregoing sentence, if at any time an Indemnified Person requests that the Seller reimburse the Indemnified Person for fees and expenses as provided in this Agreement, the Seller will be liable for any settlement of any proceeding effected without the Seller's prior written consent if (i) such settlement is entered into more than 30 days after receipt by the Seller of the request for reimbursement, and (ii) the Seller has not reimbursed the Indemnified Person in accordance with such request prior to the date of such settlement.

If any party to this Agreement brings an action directly or indirectly based on the Seller's obligations under this Annex A, the prevailing party (as determined in a final judgment by a court of competent jurisdiction) shall be entitled to recover, in addition to any other appropriate

amounts, its reasonable costs and expenses in connection with such dispute, claim, or controversy, including, without limitation, its reasonable attorney fees and court costs.

The provisions of this Annex A shall apply to any modifications of this Agreement and shall be in addition to any liability that the Seller may otherwise have.  The Seller shall use its best efforts to cause any purchaser of all or substantially all of the Seller's assets to assume the Seller's obligations under this Agreement.  The provisions of this Annex A shall survive the consummation of any sale, assignment or other transfer of Assets, as well as any termination, expiration, or completion of this Agreement or the relationship established by this Agreement, and shall remain operative and in full force and effect.  Nothing, however, in this Annex A is intended to confer any right or remedy on any person or entity other than the parties to this Agreement and their respective successors and assigns, other than the Indemnified Persons.

In the event any insolvency proceeding is commenced by or against the Seller, the Seller shall use its commercially reasonable efforts to require, as a condition of the Seller releasing from liability any creditor or other party-in-interest in the case, that such creditor or other party-in-interest release all Indemnified Persons from all claims or other liabilities directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of Piper Sandler under this Agreement or any transaction or conduct in connection therewith; provided that Seller shall not be required to obtain such release with respect to the gross negligence, willful misconduct or bad faith of any Indemnified Person.

The Seller also agrees that no Indemnified Person will have any liability (whether direct or indirect, in contract, tort or otherwise) to it or its affiliates, directors, officers, employees, agents, creditors or stockholders related to or arising out of the Agreement, the transactions contemplated thereby or any Indemnified Person's actions or inactions in connection with any such advice, services or transactions, except Losses such person or entity incurs which have been finally judicially determined by a court of competent jurisdiction to have resulted primarily and directly from actions taken or omitted to be taken by such Indemnified Person due to such person's gross negligence, willful misconduct or bad faith. In no event, regardless of the legal theory advanced, will any Indemnified Person be liable for any consequential, indirect, incidental or special damages of any nature. The indemnification, reimbursement, exculpation and contribution obligations in this Annex A will be in addition to any rights that any Indemnified Person may have at common law, by statute or otherwise.

Capitalized terms used, but not defined in this Annex A, have the meanings assigned to such terms in the Agreement.

**Exhibit A**

The term "Assets" as used in the Agreement to which this Exhibit A is attached shall, include all of the mortgage loan assets, including, but not limited to, any related participations, if any, post-foreclosure real estate owned property, and the loan servicing rights related to the foregoing, owned by the Seller (collectively, the "Seller Mortgage Assets") and specifically included in the file provided to Piper Sandler titled PS_data_tape-03.31.2023.xlsx (the "Asset File").  To the extent the Seller discovers that certain Seller Mortgage Assets were excluded from the Asset File (by, for example, inadvertence or mistake) but were intended by the Seller to be included in the Asset File, such Seller Mortgage Assets shall be deemed to be included in the Asset File and covered by this Agreement upon written agreement of the Seller and Piper Sandler, which written agreement can be in the form of an exchange of emails.  Any such addition shall not change the compensation to which Piper Sandler may be entitled under the Agreement.