**Bidding Procedures**

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| | ) |
| **In re:** | ) |
| | ) |
| **US Real Estate Equity Builder, LLC, and** | ) **Case No. 20-21358-11** |
| **US Real Estate Equity Builder Dayton, LLC,** | ) |
| | ) **(Jointly Administered)** |
| **Debtors.** | ) |

---

### BID PROCEDURES

On _____, 2022, Trustee filed his Motion to Approve (a) Sale of Real Property Free and Clear of All Liens, Interests, Claims and Encumbrances, and Related Procedures and Bid Protection Pursuant to 11 U.S.C. § 363, (b) the Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11 U.S.C. § 365, and (c) Related Relief Pursuant to 11 U.S.C. §§ 102 and 105 [Docket No. _____] (the "**Motion**"), pursuant to which Trustee requested authority to sell certain real property to the highest and best bidders subject to the process outlined herein (the "**Transaction**"). On _____, 2022, Trustee entered into a Purchase and Sale Agreement (the "**Stalking Horse Contract**") with Dutton Ranch, LLC, or its assigns (the "**Stalking Horse Purchaser**") pursuant to which the Stalking Horse Purchaser proposes to acquire from Trustee the Property (as defined in the Stalking Horse Contract). These Bid Procedures have been approved and authorized pursuant to the Order Approving Procedures for the Solicitation of Offers for (a) the Sale of Real Property Free and Clear of Liens, Claims, Encumbrances, and Interests, (b) the Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (c) Related Relief [Docket No. [____]] (the "**Bid Procedures Order**") entered by the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**") on [____], 2022.

### A. The Bidding Process

1. Subject to the conditions set forth herein, at any time on or before *[10 days after entry of Bidding Order]*, at 5:00 p.m. (prevailing Central Time) (the "**Bid Deadline**"), Trustee will (i) engage in discussions and negotiations regarding a sale transaction with any entity (a "**Potential Bidder**")[1] that has made inquiry with the Trustee or Trustee's broker, within the past 12 months regarding the sale of the Property or that the Trustee reasonably believes could lead to a bona fide written offer relating to a Transaction that would meet the requirements of these Bid Procedures

---

[1] Excluding the Stalking-Horse Purchaser who shall not be subject to any Potential Purchaser requirements hereunder.

(the "**Proposal**"), (ii) furnish to such Potential Bidder and its Representatives,[2] and to any other party that has made a request therefor in connection with its consideration of making an offer or proposal relating to a Transaction (each a "**Bid**"), public and non-public information relating to the Property that is reasonably available to the Trustee.

2. Trustee shall provide these Bid Procedures,[3] together with a copy of the Stalking Horse Contract to each Potential Bidder.

3. Prior to the selection of a Bid as the highest or best offer for the Property (the "**Successful Bid(s)**"), Trustee may: (a) receive Bids from Potential Bidders, (b) request information from Potential Bidders and engage in discussions with Potential Bidders and take such other actions to determine whether any Bid constitutes or could lead to a superior Proposal, (c) evaluate any Bid made by a Potential Bidder, (d) engage in discussions and negotiations with any Potential Bidder with respect to any Bid submitted by a Potential Bidder, and (e) take any other actions contemplated under these Bid Procedures (collectively, the "**Bidding Process**").

### B. Due Diligence for Potential Bidders

4. To obtain due diligence access or additional information, a Potential Bidder must first advise Trustee of the nature and extent of additional due diligence such Potential Bidder may wish to conduct. Trustee shall coordinate all requests for additional information and due diligence access by such Potential Bidders with Debtor, and prior to granting any due diligence access or information to any Potential Bidder. No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline, except as otherwise agreed to by Trustee in writing, or as otherwise is contained in the Stalking Horse Contract.

### C. Submission by Bid Deadline

5. A Potential Bidder who desires to make a Bid must deliver a written copy of its written purchase and sale agreement (the "Competing Contract") to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the Competing Contract submitted and the Stalking Horse Contract) on or before [*10 days after Entry of Bidding Procedures Order*] **5:00 p.m., prevailing Central time,** to counsel for Trustee, Andrea M. Chase, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, achase@spencerfane.com and Elizabeth M. Lally, Spencer Fane LLP, 13520 California Street, Suite 290, Omaha, NE 68154, elally@spencerfane.com. The Trustee may extend the Bid Deadline, but Trustee shall promptly notify all Potential Bidders of any such extension.

### D. Determination of "Qualified Bid" Status

6. A Bid received from a Potential Bidder by the Bid Deadline (other than the Stalking Horse Purchaser) will constitute a "**Qualified Bid**" only if it includes all of the following

---

[2] **Representatives**" means, with respect to any person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such person, when acting in such capacity on behalf of such person.

[3] Unless otherwise defined herein, capitalized terms shall have the same meaning as set forth in the Motion.

documents (the compliance of which shall be determined by Trustee) (collectively, the "**Required Bid Documents**") and a Good Faith Deposit as described below and meets all of the Bid Requirements (as defined below):

    a.    A written Competing Contract duly executed by the Potential Bidder in substantially the same form as the Stalking Horse Contract with changes only regarding the Property and contracts being purchased and changes acceptable to Trustee, together with a copy of such agreement marked to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the written Competing Contract submitted and the Stalking Horse Contract). The Competing Contract submitted by a Potential Bidder shall:

        i.    identify each and every executory contract and unexpired lease that is to be assumed and assigned to the Potential Bidder, if any;

        ii.    not contain any financing or due diligence contingencies to closing on the proposed Transaction (other than what is already contained in the Stalking Contract);

        iii.    not contain any condition to closing of the Transaction on the receipt of any third party approvals (excluding required Bankruptcy Court approval); and

        iv.    provide that the offer of the Potential Bidder is irrevocable through 90 days after the entry of an Order approving the Sale Motion and subject to the backup bidder provisions herein.

    b.    A good faith deposit (the "**Good Faith Deposit**") in the form of a wire transfer to Trustee or a certified or bank check payable to the order of Trustee (or other form acceptable to Trustee) in the amount of $10,000.00.

7. Each Potential Bidder that makes a Qualified Bid shall be referred to as a "**Qualified Bidder.**" Notwithstanding anything to the contrary herein, the Stalking Horse Purchaser shall be deemed a Qualified Bidder, and the Stalking Horse Contract shall be deemed a Qualified Bid.

### E. Bid Requirements

8. All Bids must also satisfy all of the following requirements, all solely as determined by Trustee:

    a.    The Bid must provide for consideration under the Competing Contract for the Property.

CORE/3525081.0002/173591745.1

KC 18398980.6

KC 18649932.1

b.  The Bid must provide for the purchase of the Property and for consideration that exceeds the cash portion of the consideration offered by the Stalking Horse Purchaser by at least $10,000 (the "**Initial Minimum Overbid**").

c.  The Bid must be in cash unless Trustee consents otherwise, except for any allowed credit bids.

d.  The Bid must be accompanied by satisfactory evidence of committed financing or other financial ability to consummate the Transaction in a timely manner.

e.  If a Bid indicates that a Potential Bidder will seek the assumption and assignment of executory contract(s) or unexpired lease(s), the Bid must include sufficient information to permit Trustee, if necessary, to timely file a motion to assume and assign such executory contract(s) or unexpired lease(s) to determine the proposed assignee's ability to comply with Code § 365 (to the extent applicable).

f.  The Bid (other than the Stalking Horse Contract) cannot be conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment.

g.  The Bid must expressly acknowledge and represent that the Potential Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and the assets and businesses of Debtor in making its Bid, and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business or assets of Debtor or the Transaction, or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Competing Contract ultimately accepted and executed by Trustee, and (iii) has authority to make the Bid, execute any documents to close on the Transaction and proceed to closing on the Transaction.

h.  The Bid must be received by the Bid Deadline.

### F.  Auction

9.  If a Qualified Bidder (other than the Stalking Horse Purchaser) has been identified for the Property, the Trustee shall conduct an auction (the "**Auction**") with respect to such Qualified Bids in order to determine, in the business judgment of Trustee, the Successful Bid(s). **If no Qualified Bid (other than the Stalking Horse Contract) or Credit Bid has been submitted by the Bid Deadline or aggregated by the Trustee, the Stalking Horse Contract shall be deemed the Successful Bid and no Auction shall be conducted.**

10.  The Auction, if required, will commence at 9:30 a.m. (prevailing Central Time) on *[13 days after the Bidding Deadline]* at the offices of Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, Missouri 64106 or at such later time or other place as designated by Trustee, or approved by Order of the Bankruptcy Court, and of which Trustee will notify all Qualified Bidders who have submitted Qualified Bids (collectively, the "**Auction Participants**").

11.  Prior to the Auction, Trustee shall evaluate the Qualified Bids and select the Qualified Bid(s), Trustee determines in his business judgment to be the highest or best Qualified Bid(s) (the "**Initial Highest Bid**") for a sale of the Property. In making this determination, Trustee may consider, among other things, the amount of cash to be paid or delivered, and the other terms and conditions of the Qualified Bid(s). Trustee shall give each of the Auction Participants notice of the Initial Highest Bid and a copy of such Bid prior to the scheduled start of the Auction.

12.  Only the Trustee, the Auction Participants, potential financing sources of the Auction Participants, and their respective Representatives will be entitled to attend, participate and be heard at the Auction. In order to participate and be heard at the Auction, a party must actually attend the Auction.

13.  The Auction will occur in two phases.

   a.  Phase 1 of the Auction will be between Qualified Bidders other than the Stalking Horse Purchaser. All Qualified Bids in Phase I will be based on and increased from the Initial High Bid, and thereafter made in minimum increments higher than the previous Qualified Bid by at least $10,000.[4] Phase 1 of the auction will continue until the Phase 1 high bid has not been topped. The winning Phase 1 bid will be declared the Successful Phase 1 Bid. The last bid made by the unsuccessful Phase 1 bidder will be determined to be its final qualified bid under the auction procedures and for back up bidder purposes.

   b.  Phase 2 of the Auction will be between the Successful Phase 1 Bidder and the Stalking Horse Purchaser. Phase 2 of the Auction will begin by allowing the Stalking Horse Purchaser to match the Successful Phase 1 Bid[5]. If the Successful Phase 1 Bid is not matched, then it will be declared the final Qualified Bid, and the auction will be adjourned so the Trustee may assess whether such bid will be determined the overall Successful Bid.

   c.  If the Stalking Horse matches the Successful Phase 1 Bid, then the Successful Phase 1 Bidder will have the ability to top the Stalking Horse matching bid by the minimum $10,000 bid increment. Phase 2 will continue until either the Stalking Horse Purchaser fails to match a Phase 2 topping

---

[4]  Minimum bid increments must consist solely of cash consideration unless otherwise authorized by Trustee or constitute an increase in a Lien Holder's credit bid.

[5]  At all times, during Phase 2 of the Auction, a successful "match" by the Stalking Horse Purchaser may consist of matching the economic and non-economic terms of the Successful Phase 1 Bidder contract, or offering a combination of economic and non-economic terms that Trustee determines to be equal or better than the economic and non-economic terms of the Successful Phase 1 Bidder contract.

bid, or the Successful Phase 1 Bidder fails to top the Stalking Horse matching bid. If the Stalking Horse Purchaser successfully matches, then the Trustee will support that the Stalking Horse Purchaser be declared as the higher bidder. If the Stalking Horse Purchaser fails to match the final Phase 2 high bid, then the auction will be adjourned so the Trustee may assess whether such bid will be determined to be the overall Successful Bid.

d.      Trustee shall have the right to adopt such other rules for the Auction which Trustee believes in his business judgment will promote the goals of the Auction.

14. The Trustee may determine which qualified bid, if any, is the highest or otherwise best offer and reject any bid that the Trustee determines is insufficient or inadequate, not in conformity with the requirements of the Bankruptcy Code or the bid procedures, or contrary to the best interests of the debtors' estates and their creditors.

15. Each Auction Participant shall be deemed to have agreed to keep its final Qualified Bid made at or prior to the Auction open through 90 days after the entry of an Order approving the Motion. Bidding at the Auction will continue until such time as the highest or otherwise best Qualified Bid(s) are determined in the business judgment of Trustee. To facilitate a deliberate and orderly consideration of competing Qualified Bids submitted at the Auction, Trustee may adjourn the Auction at any time and from time-to-time and may conduct multiple rounds of bidding. Upon conclusion of the Auction, Trustee will (a) review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (b) identify the Successful Bid(s). In making this determination, Trustee may consider, among other things, the amount of cash to be paid or delivered and the other terms or conditions of the Qualified Bid(s), and the determination by Trustee shall be final for the purposes of these Bid Procedures.

### G.  Buyer's Premium

16. A six percent (6%) buyer's premium will be added to the final bid on the Property and paid to the Auctioneer.  For example, if a buyer bids $705,000, the total sales price will be $750,000.  The buyer's premium will be used to pay the commission owed to the Trustee's broker, and any buyer's agent.

### H.  Credit Bid Right

17. The Property shall be sold without reserve, but subject to the credit bid rights set forth herein (the "**Credit Bid Right**"). The holder of a Credit Bid Right will participate in Phase I The right to credit bid under section 363(k) of the Bankruptcy Code is specifically preserved as to each Lender with a mortgage or deed of trust applicable to the Property ("**Lien Holder**") as provided herein, but only to the extent that such lien holder has timely filed a proof of claim.  A Lien Holder must pay in cash: closing costs, senior liens (including real estate, transfer and/or ad valorem taxes), applicable surcharges and real estate taxes, and any agreed upon carve outs associated with its collateral in cash. All disputes as to the applicable cash portion of the Lien Holder's bid will be determined at the sale hearing. Lien Holders shall not be required to submit a Good Faith Deposit,

but will be required to tender the required cash portion and enter into a sale contract within 14 days of the Sale Order, and close within 14 days after execution of a sale contract.

18. If a Lien Holder ultimately is found to be a successful purchaser by credit bid and its claim or lien is ultimately determined to be invalid or transferred to the bankruptcy estate pursuant to 11 U.S.C. § 510(c), in whole or in part, then such Lien Holder will be obligated to pay cash to the bankruptcy estates to make up the difference between its valid/non-transferred lien and claim and its credit bid, or as otherwise set forth in any agreement with the Trustee or ordered by the Court.

19. A party asserting a Credit Bid Right must make a Credit Bid by the Bid Deadline, but will otherwise be considered a Qualified Bidder. The initial Credit Bid shall be in the form of a written Competing Contract duly executed by the Lien Holder in substantially the same form as the Stalking Horse Contract with changes only regarding the Property and contracts being purchased, the form of consideration, and changes acceptable to Trustee, together with a copy of such agreement marked to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the written Competing Contract submitted and the Stalking Horse Contract).

### I.  Sale Hearing

20. A hearing to consider the Sale Motion for the Property and approval of the Successful Bid will be held on _____, 2022 at _:00 _.m. prevailing Central time (the "**Sale Hearing**"). The Sale Hearing will be a virtual hearing unless otherwise designated by the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court without further notice to creditors and parties in interest other than by announcement by the Trustee of the adjourned date at the Sale Hearing. The Trustee may also request that the Bankruptcy Court set the Sale Hearing as an evidentiary hearing in order to determine any factual matters that may need to be established in order for the Court to approve the Sale.

21. The Trustee's presentation to the Bankruptcy Court for approval of the Successful Bid does not constitute the Trustee's acceptance of the Bid. The Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court. Distribution of the sale proceeds will be taken up at the Sale Hearing(s) or such other date and time as may be directed by the Court and/or upon the agreement of the impacted parties.

### J.  Objections

22. Objections, if any, to the Sale Motion shall be filed on the docket of the Bankruptcy Court on or before **5:00 p.m., prevailing Central time on _____, 2022, or such other time as the Trustee may agree or as the Court may order** (the "**Objection Deadline**").

23. Objections to the Stalking Horse Contract shall be made on or before the hearing to approve the Bidding Procedures. If no objections to the Stalking Horse Contract are received prior to the hearing on Bidding Procedures, then the Stalking Horse Contract shall not be subject to further objection, but will remain subject to higher bids and the auction process, if additional Qualified Bids are received by the Bid Deadline.

## MODIFICATIONS

The Trustee, after consultation with the applicable Lenders and the Committee, may (a) reject at any time before entry of an Order of the Bankruptcy Court approving the successful bid(s), any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtor's estates and its creditors, and (b) impose such other terms and conditions upon bidders as the Trustee determines to be in the best interests of the Debtor's estate in this case. Notwithstanding anything to the contrary herein, the procedures related to the Credit Bid Right may only be modified with the consent of the impacted Lien Holders. To the extent that any Lien Holder(s) consent is required under these Bid Procedures and such consent is withheld, Trustee shall have the right to pursue, and the Lien Holder(s) may oppose, approval from the Bankruptcy Court without the consent of the Lien Holder(s). Additionally, in those instances where consent is not required, but only consultation, nothing herein shall prohibit a Lender from seeking immediate Court intervention to the extent that after consultation with the Trustee, the Lender disagrees with the Trustee's proposed course of action.

## Back-Up Bidders

If any Auction Participant whose Qualified Bid is a Successful Bid (a "**Successful Bidder**") fails to consummate the Transaction because of a breach or failure to perform on the part of such Successful Bidder, or for any reason other than the failure of the Bankruptcy Court to approve the terms of the Transaction, the Auction Participant that had submitted the next highest or otherwise best Qualified Bid for the same asset or assets of the estates at the Auction or prior to the Auction (the "**Back-Up Bidder**")[6] will be deemed to be the Successful Bidder, and Trustee will be authorized to consummate the Transaction with such Auction Participant without further order of the Bankruptcy Court, and such Qualified Bid shall thereupon be deemed the Successful Bid; provided that upon being notified that its Qualified Bid has become the Successful Bid, the Auction Participant submitting such Qualified Bid shall within three (3) business days after such notification provide a Good Faith Deposit (unless such Auction Participant previously shall have provided a Good Faith Deposit that shall not have been returned as described below). Upon providing such Good Faith Deposit, such Auction Participant shall be deemed the Successful Bidder. If any Auction Participant fails to consummate the Transaction because of a breach or failure to perform on the part of such Auction Participant (including, without limitation, the failure to timely deposit the Good Faith Deposit), the process described above may continue with other Auction Participants in decreasing order of the Qualified Bids as determined by Trustee, until an Auction Participant shall consummate the Transaction.

## Disposition of Good Faith Deposit

24. Except as otherwise provided in the Stalking Horse Contract, the Good Faith Deposit of the Successful Bidder(s), or a Back-Up Bidder that consummates a transaction in place of a Successful Bidder as provided for herein, shall be retained by Trustee and applied toward the payment of the Successful Bid(s) at the closing of the Transaction. If any Successful or Back-Up Bidder fails, for any reason other than Bankruptcy Court denial of the Transaction, to close a

---

[6] Including the Stalking Horse Purchaser as provided in the Stalking Horse Contract

Transaction, then the Good Faith Deposit shall be retained by Debtor's estate as partial damages for the failure to consummate the Transaction (the "**Forfeited Good Faith Deposit**"). The Good Faith Deposit of all Qualified Bidders (other than the Successful Bidder(s), a Back-Up Bidder that consummates a Transaction in place of a Successful Bidder as provided for herein, or a Successful Bidder or a Back-Up Bidder that forfeits its deposit as liquidated damages as provided for herein) will be returned, without interest, to each such Qualified Bidder within ten (10) business days after the closing of all proposed Transactions approved by the Bankruptcy Court at the Sale Hearing. For the avoidance of doubt, any Forfeited Good Faith Deposit shall be deemed property of the Debtor's bankruptcy estate and not subject to any liens.

CORE/3525081.0002/173591745.1

KC 18398980.6

KC 18649932.1

# PURCHASE AND SALE AGREEMENT

between

## DUTTON RANCH, LLC
(as purchaser)

and

## ERIC L. JOHNSON, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE OF US REAL ESTATE EQUITY BUILDER LLC
(as seller)

CORE/3525081.0002/173591745.1

KC 18398980.6

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**"), is made and entered into as of April 14ᵗʰ, 2022 ("**Effective Date**"), by and between Dutton Ranch, LLC, a Missouri limited liability company (the "**Purchaser**"), and Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**").

**WHEREAS**, US Real Estate Equity Builder LLC, a Missouri limited liability company ("**USREEB**") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined below) on October 2, 2020. On December 10, 2020, Seller was appointed as the Chapter 11 Trustee of USREEB's estate. The USREEB case is pending before the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**") styled *In re US Real Estate Equity Builder LLC*, Case No. 20-21358 (the "**Bankruptcy Case**"); and

**WHEREAS**, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, the Property (this and other capitalized terms used and not otherwise defined herein have the meanings given them terms in Section 1 below), subject to and upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the Seller and the Purchaser intending to be legally bound agree as follows:

### SECTION I. DEFINITIONS

Capitalized terms used in this Agreement have the meanings set forth below or in the section of this Agreement referred to below:

1.1.    "**Agreement**" has the meaning given such term in the Preamble to this Agreement.

1.2.    "**Alternative Transaction**" shall mean a transaction or series of transactions pursuant to which Seller sells, transfers, leases, or otherwise disposes of all or any material portion of the Property to a person other than Purchaser.

1.3.    "**Apportioned Items**" has the meaning given such term in Section 9.1(a).

1.4.    "**Assumed Contracts**" means any contracts, leases, licenses, or other agreements with respect to the operation or occupancy of Property, or any portion thereof, and identified on Exhibit A.

1.5.    "**Auction**" shall mean the auction conducted by Seller pursuant to the Bidding Procedures Order for the Property.

1.6.    "**Back-up Bidder**" has the meaning given such term in Section 12.5.

-1-

1.7.    "**Bankruptcy Case**" has the meaning given such term in the Recitals of this Agreement.

1.8.    "**Bankruptcy Code**" means Title 11 and applicable portions of Titles 18 and 28 of the United States Code.

1.9.    "**Bankruptcy Court**" has the meaning given such term in the Recitals of this Agreement.

1.10.    "**Bidding Procedures**" shall mean the rules, processes, bidding procedures and other matters set forth on Exhibit F.

1.11.    "**Bidding Procedures Order**" shall mean a final order from the Bankruptcy Court, in a form and substance reasonably acceptable to Seller and Purchaser, approving the Bidding Procedures and certain other matters in connection with the potential Auction. The Bidding Procedures Order will also approve this Agreement subject to higher Qualified Bids (as defined in the Bidding Procedures) being submitted and the notice procedure set forth in the Bidding Procedure.

1.12.    "**Business Day**" means any day other than a Saturday, Sunday or any day that is a "Legal Holiday" as defined in Bankruptcy Rule 9006(a)(6).

1.13.    "**Closing**" has the meaning given such term in Section 2.2.

1.14.    "**Closing Date**" has the meaning given such term in Section 2.2.

1.15.    "**Closing Documents**" has the meaning given such term in Section 4.1.

1.16.    "**Competing Offer**" has the meaning given such term in Section 12.3.

1.17.    "**Deposit**" has the meaning given such term in Section 2.4.

1.18.    "**Due Diligence Period**" has the meaning given such term in Section 3.1(a).

1.19.    "**Effective Date**" has the meaning given such term in the Preamble to this Agreement.

1.20.    "**Environmental Law**" means any and all federal, state and municipal statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or to emissions, discharges or releases of Hazardous Substances into the environment including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances or the cleanup or other remediation thereof.

1.21.    "**Excluded Property**" means the property specifically listed on Schedule 1.21.

KC 18398980.6

Exhibit 9

1.22.  "**Fixtures**" means all fixtures, furniture, equipment, machinery, systems and other items of personal property owned by the Seller and attached or appurtenant to, located on, and used in connection with the ownership, use, operation or maintenance of the Land and Improvements (including but not limited to all alarm systems, and all plumbing, heating, air conditioning and lighting fixtures and equipment, cabinets and awnings), other than the Excluded Property.

1.23.  "**Hazardous Substances**" means and include any oils, petroleum products, asbestos, radioactive, biological, medical or infectious wastes or materials, and any other toxic or hazardous wastes, materials and substances that are defined, determined or identified as such in any Environmental Laws, or in any judicial or administrative interpretation of Environmental Laws.

1.24.  "**Improvements**" means the buildings and other improvements located on the Land.

1.25.  "**Land**" means that certain parcel of land commonly known and numbered as 440 E. 63rd St., Kansas City, Missouri 64110, which land is more particularly described on Exhibit B, together with all rights and appurtenances thereto, including all right, title and interest of Seller in and to any water and mineral rights and adjacent streets, alleys or rights of way.

1.26.  **Omitted**.

1.27.  "**Licenses and Permits**" means any certificates of occupancy and other licenses, permits, registrations, authorizations, use agreements, orders, or approvals of governmental or quasi-governmental agencies and authorities (whether federal, state, local, municipal, or foreign) or private parties relating to the construction, use, operation, or enjoyment of the Property, in each case to the extent transferable.

1.28.  "**Lien**" means any lien, mortgage, pledge, claim, charge, security interest, hypothecation or encumbrance of any nature whatsoever.

1.29.  "**Matching Right**" has the meaning given such term in Section 12.3.

1.30.  "**Outside Back-up Date**" has the meaning given such term in Section 12.5.

1.31.  "**Property**" means, collectively, the Land, the Improvements, the Fixtures, the Licenses and Permits, and any Assumed Contracts, but does not include the Excluded Property.

1.32.  "**Purchase Price**" has the meaning given such term in Section 2.3.

1.33.  "**Purchaser**" has the meaning given such term in the Preamble to this Agreement.

1.34.  "**Prevailing Bidder**" has the meaning given such term in Section 12.5.

1.35.  "**Sale Order**" means the order to be entered by the Bankruptcy Court in form and substance reasonably acceptable to Seller and Purchaser pursuant to Sections 105, 363 or 365, as

-3-

KC 18398980.6

applicable, of the Bankruptcy Code (i) authorizing the sale of the Property to the Purchaser or Successful Bidder (as defined in the Bidding Procedures) at any Auction; (ii) approving this Agreement or, if there is an Auction, the successful contract, and the transactions contemplated therein; (iii) approving, with specific findings of fact in support thereof, the sale of the Property to Purchaser or Successful Bidder free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code; (iv) finding, with specific findings of fact in support thereof, that Purchaser or Successful Bidder is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (v) authorizing and approving the results of any Auction; and (vi) finding that the order is final upon entry by the Bankruptcy Court.

1.36.    "**Seller**" has the meaning given such term in the Preamble to this Agreement.

1.37.    "**Survey**" has the meaning given such term in <u>Section 3.2</u>.

1.38.    "**Tenant**" means each tenant under any Assumed Contract, which includes any leases as further set forth in <u>Exhibit A</u>.

1.39.    "**Title Commitment**" has the meaning given such term in <u>Section 3.3</u>.

1.40.    "**Title Company**" means National Secured Title or such other title company as mutually agreed to in writing by the Seller and Purchaser.

1.41.    "**Title Objection Notice**" has the meaning given such term in <u>Section 3.4(a)</u>.

1.42.    "**Title Policy**" has the meaning given such term in <u>Section 3.3</u>.

1.43.    "**USREEB**" has the meaning given such term in the Recitals of this Agreement.

### SECTION II. PURCHASE AND SALE; CLOSING

2.1.    **Purchase and Sale**.  On the terms and subject to the conditions contained in this Agreement and the Sale Order, the Seller agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Seller, the Property for the Purchase Price, subject to and in accordance with the terms and conditions of this Agreement and the Sale Order. Notwithstanding anything to the contrary contained in this Agreement, at Closing, Seller shall not transfer, convey, sell or assign to Purchaser any Excluded Property.

2.2.    **Closing**.  The purchase and sale of the Property will be consummated at a closing (the "**Closing**") through an escrow with the Title Company, or at such other location as the Seller and the Purchaser may agree, on or before the later of (a) July 1, 2022, (b) 14 days after the expiration of the Due Diligence Period; or (c) such date mutually agreed to by the Parties (the "**Closing Date**").  The Closing will be deemed to have occurred at 12:01 a.m. local time for the Property on the Closing Date.

2.3.    **Purchase Price**. The purchase price to be paid for the Property is Seven Hundred Seven Thousand Five Hundred and 00/100 DOLLARS ($707,500.00), plus Forty-Two Thousand Four Hundred Fifty and 00/100 DOLLARS ($42,450.00) for the six percent (6%) buyer's

-4-

KC 18398980.6

premium, for the total purchase price of $749,950.00 (the "**Purchase Price**"). The Purchase Price will be payable in U.S. Dollars by certified funds. At Closing, the Title Company will deliver the Purchase Price by certified check to the Seller, and required by the Sale Order.

      2.4.    **Earnest Money Deposit**. On the Bidding Deadline (as defined in the Bidding Procedures), Purchaser shall deliver to the Title Company an earnest money deposit in the amount of Ten Thousand and 00/100 DOLLARS ($10,000.00) (the "**Deposit**"), which shall be held in escrow by the Title Company and disposed of in accordance with the terms hereof. In the event the sale of the Property as contemplated hereunder is consummated, at the Closing, the Deposit shall be credited against the Purchase Price.

## SECTION III. DILIGENCE

      3.1.    **Due Diligence Period**.

      (a)    Purchaser shall have a period of sixty (60) days from the date the Court issues a final and unappealable approval of this Agreement (the "**Due Diligence Period**") to conduct such physical inspections of the Property and other feasibility studies as it deems necessary; provided, however, Purchaser shall not conduct any physically invasive inspections without first obtaining Seller's written approval in each instance, which shall not be unreasonably withheld or delayed.

      (b)    Purchaser shall provide Seller reasonable advance notice (considered to be not less than 48 hours) of the timing and scope of its inspection activities by calling Robert Mayo, with Mayo Auction and Realty. Seller shall have the right to promptly have a representative present during all of Purchaser's inspection activities at the Property. Prior to any entry by Purchaser or its agents, Purchaser shall provide to Seller evidence of commercial general liability coverage in an amount not less than $500,000 per occurrence and $1,000,000 in the aggregate.

      (c)    Purchaser and its agents shall conduct its inspections, tests, inquiries and examinations in a safe and workmanlike manner and shall, at Purchaser's sole cost and expense, promptly restore the Property to substantially the same condition it was in before Purchaser's inspection activities, which obligation shall survive the expiration or earlier termination of this Agreement. Purchaser and its agents shall conduct all activities in compliance with any and all applicable laws at Purchaser's sole cost and expense. Purchaser shall not disclose to Seller any of the results of such inspections, tests, inquiries or examinations unless specifically requested to do so in writing by Seller.

      (d)    Purchaser shall assume liability for any damages or claims caused by Purchaser or its contractors, consultants, or agents, arising from its performance of inspections.

      (e)    If Purchaser determines, in its sole and absolute discretion, that the Property is not suitable for Purchaser's intended purposes, Purchaser shall have the right to terminate this Agreement by giving written notice to Seller on or before the end of the Due Diligence Period. If such a notice of termination is not given by Purchaser to Seller by the end of the Due Diligence Period, the contingency set forth in this subsection shall be deemed satisfied or waived by

-5-

KC 18398980.6

Purchaser. If this Agreement is terminated by Purchaser during the Due Diligence Period in accordance with this paragraph, the Deposit shall be immediately returned to Purchaser.

       3.2.   **Survey Matters**.  Purchaser may, at its sole expense, commission and have performed a current survey of the Property (the "**Survey**") by a surveyor licensed in the state in which the Property is located. Seller does not represent or warrant the area of the Land or any structures on the Land, it being agreed and understood that Purchaser shall rely solely on its own due diligence to determine such area.

       3.3.   **Title Insurance**.  Seller shall, within fourteen (14) Business Days after the Effective Date, request the Title Company to furnish to Purchaser and Seller a preliminary title insurance commitment (the "**Title Commitment**") issued by the Title Company pursuant to which the Title Company agrees to issue to Purchaser an ALTA owner's policy of standard title insurance (collectively, the "**Title Policy**"), in the amount of the Purchase Price, insuring fee simple title to the Land and Improvements in Purchaser, subject only to real estate taxes and assessments for the current year and subsequent years, not yet due and payable, and any encumbrances of record or other exceptions on the Title Commitment which are expressly approved in writing by Purchaser or which are deemed approved by Purchaser as provided in this Agreement ("**Permitted Encumbrances**"). The premium for the Title Policy shall be at the sole cost of Seller; provided, however, that any endorsements to the Title Policy requested by Purchaser, as well as any lender's policy of title insurance, shall be at the sole cost of Purchaser.

       3.4.   **Title Defects**.

       (a)    If Purchaser's title investigation discloses material title defects objectionable to Purchaser, Purchaser will notify Seller in writing of the title defects which are unacceptable on or before 5:00 p.m. CST on the date that is ten (10) Business Days after Purchaser receives the Title Commitment (the "**Title Objection Notice**"); provided, however, that Purchaser shall have no obligation to provide a Title Objection Notice for any Liens, and Seller shall convey the Property to Purchaser at Closing free and clear of any Liens as provided herein. Seller shall have the right, but not the obligation, to endeavor to remedy such title defects as are susceptible of being remedied prior to the Closing Date to the reasonable satisfaction of Purchaser, though Seller shall have no obligation to expend any monies or incur any expenses (directly or indirectly) to do so. Seller shall, within five (5) Business Days after Seller received the Title Objection Notice, notify Purchaser whether Seller will attempt to cure title defects and identify which ones Seller will try to cure. If Seller elects to attempt to cure any title defects identified in the Title Objection Notice pursuant to this Section, Seller may, with the express written approval of Purchaser, elect to extend the Closing Date by up to thirty (30) days by providing written notice of the same to Purchaser at least five (5) Business Days prior to the Closing Date.

       (b)    In the event Seller is unable or unwilling to cure any title defect, Seller shall notify Purchaser of such fact in writing and Purchaser shall have ten (10) Business Days after receipt of such notice to either terminate this Agreement, cure the defect, or waive the uncured title defect in question and proceed to Closing (in which event such uncured title defects shall be considered Permitted Encumbrances hereunder). If Purchaser elects to terminate this Agreement with or without having tried to cure title defects, Purchaser shall be entitled to a return of the

-6-

KC 18398980.6

Deposit and Purchaser and Seller shall not be liable for any costs or damages except as otherwise provided herein (provided that Purchaser is not in breach of this Agreement at the time of issuing a cancellation notice pursuant to this Section).

(c)     In the event Purchaser does not provide notice of title defects as provided and within the time period set forth in Section 3.4(a) above, Purchaser shall have effectively waived its right to object to such matters and to terminate this Agreement based on such matters.

3.5.     **Seller's Title Documents**.  Seller agrees to execute, acknowledge and deliver to the Title Company, on or before the Closing Date, such documents, instruments and other information as the Title Company shall reasonably require as a condition to issuance of the Title Policy to the extent it is in the Seller's power to deliver such documents.  Seller shall make reasonable efforts to attempt to compel USREEB to execute any documents.

## SECTION IV. CONDITIONS TO THE PURCHASER'S OBLIGATION TO CLOSE

The obligation of the Purchaser to acquire the Property is subject to the satisfaction of the following conditions precedent on and as of the Closing Date such that if any condition fails, and is not waived in writing by the Purchaser, the Purchaser may terminate this Agreement and receive a prompt return of the Deposit:

4.1.     **Closing Documents**.  The Seller shall have delivered to the Title Company or Purchaser the following (collectively, the "**Closing Documents**"), duly executed by Seller and, where applicable, acknowledged by notary:

(a)     A trustee's deed for transfer of the Land and Improvements, in substantially the form of Exhibit C (the "**Deed**");

(b)     If applicable, an Assignment and Assumption Agreement for assignment and assumption of any Assumed Contracts, in substantially the form of Exhibit D (the "**Assignment and Assumption Agreement**");

(c)     A Quit Claim Bill of Sale and General Assignment for transfer of the Fixtures and Licenses and Permits, in substantially the form of Exhibit E;

(d)     A settlement statement prepared by the Title Company, together with any other affidavits and agreements reasonably required by the Title Company in order to issue the Title Policy, and

(e)     Such other documents, instruments, certificates and assurances as are reasonably required to consummate the transactions contemplated by this Agreement.

4.2.     **Condition of Property**.  The Property, including all improvements located thereon, is in substantially the same physical condition on the Closing Date as on the Effective Date, ordinary wear and tear and damage by casualty or condemnation excepted (subject to the terms of, and except as otherwise provided pursuant to, this Agreement).

-7-

4.3.    **Seller's Representations and Warranties**. All representations and warranties of the Seller herein shall remain true, correct and complete in all material respects on and as of the Closing Date and the Seller shall have performed all covenants and obligations required to be performed by the Seller on or before the Closing Date.

4.4.    **Bankruptcy Court Approval**. The Bankruptcy Court shall have entered the Sale Order.

4.5.    **Title Policy**. The Title Company shall have committed to the issuance of the Title Policy, subject only to the Permitted Encumbrances.

## SECTION V.  CONDITIONS TO THE SELLER'S OBLIGATION TO CLOSE

The obligation of the Seller to convey the Property to the Purchaser is subject to the satisfaction of the following conditions precedent on and as of the Closing Date such that if any condition fails, and is not waived in writing by the Seller, the Seller may terminate this Agreement:

5.1.    **Purchase Price**. The Purchaser shall have delivered to the Title Company or Seller the Purchase Price payable hereunder.

5.2.    **Closing Documents**. The Purchaser shall have delivered to the Title Company or the Seller a duly executed counterpart of the Assignment and Assumption Agreement, the settlement statement prepared by the Title Company, and such other documents, instruments, certificates and assurances as are reasonably required to consummate the transactions contemplated by this Agreement.

5.3.    **Representations**. All representations and warranties of the Purchaser herein shall remain true, correct and complete in all material respects on and as of the Closing Date and the Purchaser shall have performed all covenants and obligations required to be performed by the Purchaser on or before the Closing Date.

5.4.    **Bankruptcy Court Approval**. The Bankruptcy Court shall have entered the Sale Order.

## SECTION VI.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

6.1.    **Representations of the Seller**. To induce the Purchaser to enter into this Agreement, the Seller represents and warrants to the Purchaser as follows:

(a)    **Status and Authority of Seller**. Subject to approval by the Bankruptcy Court, the Seller has all requisite power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

(b)    **Use and Operation**. To the best of Seller's knowledge, there are no governmental actions pending against the Property and there is no existing eminent domain or similar proceeding which would materially affect the Property, and neither Seller nor any of its agents, representatives or employees has received a written notice from any governmental agency

-8-

CORE/3525081.0002/173591745.1

KC 18398980.6

or office or from any other third party alleging the Property's violation or alleged violation of applicable law.

(c)   **Foreign Person**. Seller is not a "Foreign Person" within the meaning of Section 1445 of the Internal Revenue Code, as amended.

(d)   **Knowledge Definition**. The phrase "*to the best of Seller's knowledge*" means the actual knowledge, without investigation, of the Seller.

6.2.   **Non-Survival of Representations and Warranties**. The representations and warranties made by the Seller herein or pursuant hereto will expire with, and be terminated and extinguished by, the Closing, and thereafter neither the Seller nor any agent, contractor, director, officer, creditor or shareholder of the Seller will have any liability whatsoever with respect to any such representations or warranties.

6.3.   **DISCLAIMER OF SELLER'S WARRANTIES.**

(a)   GENERAL. PURCHASER HEREBY EXPRESSLY ACKNOWLEDGES THAT, PRIOR TO THE END OF THE DUE DILIGENCE PERIOD, PURCHASER WILL HAVE THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE PURCHASE OF THE PROPERTY. PURCHASER IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS AND PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF AS PURCHASER DEEMS APPROPRIATE AND NECESSARY. UPON CLOSING, PURCHASER WILL ASSUME THE RISK OF ANY ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS THAT MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER IS ACQUIRING THE PROPERTY ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT. PURCHASER HEREBY WAIVES AND RELINQUISHES ALL RIGHTS AND PRIVILEGES ARISING OUT OF, OR WITH RESPECT OR IN RELATION TO, ANY REPRESENTATIONS, WARRANTIES OR COVENANTS, WHETHER EXPRESS OR IMPLIED, WHICH MAY HAVE BEEN MADE OR GIVEN, OR WHICH MAY HAVE BEEN DEEMED TO HAVE BEEN MADE OR GIVEN, BY SELLER OR ITS AGENTS OR REPRESENTATIVES, EXCEPT FOR THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT AND THE DEED. UPON THE CLOSING, PURCHASER AGREES TO ASSUME ALL FUTURE RISK AND LIABILITY (AND AGREES THAT SELLER WILL NOT BE LIABLE FOR ANY FUTURE SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL OR OTHER DAMAGES) RESULTING OR ARISING FROM OR RELATING TO PURCHASER'S OWNERSHIP, USE, CONDITION, LOCATION, MAINTENANCE, REPAIR OR OPERATION OF THE PROPERTY.

-9-

(b)    SPECIFIC.  WITHOUT LIMITING THE GENERAL PROVISIONS OF SECTION 6.3(a), BUT SUBJECT TO THE PROVISIONS OF SECTION 6.3(c), EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, AS TO MATTERS OF ZONING, COMPLIANCE WITH STATUTES, LAWS, REGULATIONS, ORDINANCES, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION: (I) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY AND (II) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES THAT SELLER HAS NOT WARRANTED, AND DOES NOT HEREBY WARRANT, THE PROPERTY NOW OR IN THE FUTURE WILL MEET OR COMPLY WITH THE REQUIREMENTS OF ANY SAFETY, BUILDING, ZONING OR PLATTING CODES, ENVIRONMENTAL LAW OR LAWS OF THE COUNTRY, STATE, COUNTY OR CITY IN WHICH THE PROPERTY IS LOCATED OR ANY OTHER AUTHORITY OR JURISDICTION.

### SECTION VII.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

7.1.    **Representations of the Purchaser**. To induce the Seller to enter in this Agreement, the Purchaser represents and warrants to the Seller as follows:

(a)    **Status and Authority of the Purchaser**.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Missouri, and has all requisite power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

(b)    **Action of the Purchaser**.  The Purchaser has taken all necessary action to authorize the execution, delivery and performance of this Agreement, and upon the execution and delivery of any document to be delivered by the Purchaser on or prior to the Closing Date, this Agreement and such documents will constitute the valid and binding obligation and agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general application affecting the rights and remedies of creditors.

(c)    **No Violations of Agreements**.  Neither the execution, delivery or performance of this Agreement by the Purchaser, nor compliance with the terms and provisions hereof, will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under, or result in the creation of any Lien upon any property or assets of the Purchaser pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness or any other agreement or instrument by which the Purchaser is bound.

(d)    **Litigation**.  No investigation, action or proceeding is pending and, to the Purchaser's knowledge, no action or proceeding is threatened and no investigation looking toward

-10-

KC 18398980.6

Exhibit 4

such an action or proceeding has begun, that questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

(e) **Financing**.  The Purchaser has sufficient available funds to pay the Purchase Price at the Closing.

(f) **Bid Required Representations**.  Purchaser (i) has relied solely upon its own independent review, investigation and/or inspection of the Property in submitting this Agreement, (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property or the transaction contemplated herein, or the completeness of any information provided in connection therewith, except as expressly stated herein, and (iii) has authority to enter into this Agreement, execute any necessary documents to close on the transactions contemplated herein, and proceed to Closing.

(g) **Adequate Assurance of Future Performance**.  Purchaser is and will be capable of providing to counterparties to any Assumed Contracts adequate assurances of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code.

## SECTION VIII. COVENANTS OF THE SELLER

The Seller hereby covenants with the Purchaser between the date of this Agreement and the Closing Date as follows:

8.1. **Actions Without Purchaser's Consent**.  Subject to the terms and provisions of this Agreement, Seller shall not, without the prior consent of Purchaser, which consent shall not be unreasonably withheld, conditioned, or delayed, (a) enter into any lease, concession agreement, license agreement, easement agreement or other agreement relating to the Property or any part thereof that will continue past Closing; (b) amend, modify, terminate, or renew any Assumed Contract; or (c) sell, transfer, assign, or otherwise convey any of the Property to anyone other than Purchaser.

8.2. **Notice of Material Changes or Untrue Representations**.  Upon learning of any material change in any condition with respect to the Property or of any event or circumstance that makes any representation or warranty of the Seller under this Agreement untrue in any material respect, promptly to notify the Purchaser thereof.

8.3. **Operation of Property**.  To continue to operate the Property in a fashion consistent with past practices; provided, however, that Seller will terminate, effective as of the Closing Date, all employment contracts with employees at the Property.

## SECTION IX. APPORTIONMENTS

9.1. **Real Property Apportionments**.

(a) The following items will be apportioned at the Closing as of 12:01 a.m. local time for the Property on the Closing Date (the "**Apportioned Items**"):

-11-

       (i)      amounts owed or owing under any Assumed Contract;

       (ii)     all other items of income and expense normally apportioned in sales of property in similar situations;

       (iii)    if applicable, monthly rents and other fixed charges payable under any Assumed Contract;

       (iv)    if applicable, percentage rents and other unfixed charges payable under any Assumed Contract;

       (v)     gas, electric, water and other utility costs;

       (vi)    municipal assessments and governmental license and permit fees;

       (vii)   real estate taxes and assessments, based on the rates and assessed valuation applicable in the fiscal year for which assessed; and

       (viii)  personal property taxes and assessments, if any, based on the rates and assessed valuation applicable in the fiscal year for which assessed.

       (b)     For the avoidance of doubt, the Apportioned Items shall be apportioned to Seller prior to the Closing Date, and Apportioned Items shall be apportioned to Purchaser on and after the Closing Date. If any of the foregoing cannot be apportioned at the Closing because of the unavailability of the amounts that are to be apportioned, such items will be apportioned on the basis of a good faith written estimate by the parties and reconciled as soon as practicable after the Closing Date. To the extent granted in the Sale Order, the sale, transfer, assignment and conveyance of the Property to the Purchaser will be entitled to the protections afforded under Section 1146(c) of the Bankruptcy Code.

       (c)     If there are water, gas or electric meters located at the Property, the Seller will obtain readings thereof to a date not more than thirty (30) days prior to the Closing Date and the unfixed water rates and charges, sewer taxes and rents and gas and electricity charges, if any, based thereon for the intervening time will be apportioned on the basis of the last readings. If readings are not obtainable by the Closing Date, then, at the Closing, any water rates and charges, sewer taxes and rents and gas and electricity charges that are based on the readings will be prorated based upon the *per diem* charges obtained by using the most recent period for which readings are then available.

       (d)     If any refunds of real property taxes or assessments, water rates and charges or sewer taxes and rents will be made after the Closing, the same will be held in trust by the Seller or the Purchaser, as the case may be, and will first be applied to the unreimbursed costs incurred in obtaining the same, then to any required refunds to Tenants, and the balance, if any, will be paid to the Seller (for the period prior to the Closing Date) and to the Purchaser (for the period commencing with the Closing Date).

-12-

(e)     No insurance policies of the Seller are to be transferred to the Purchaser, and no apportionment of the premiums therefor will be made.

(f)     Tenant security deposits, if any, will be transferred to the Purchaser, and Purchaser shall become responsible for all claims related to the refund of Tenant security deposits.

(g)     If a net amount is owed by the Seller to the Purchaser pursuant to this Section 9.1, then such amount will be credited against the Purchase Price. If a net amount is owed by the Purchaser to the Seller pursuant to this Section 9.1, then such amount will be paid together with the Purchase Price.

(h)     If there is a dispute between the parties with respect to amounts under this Section 9.1, undisputed amounts will be paid at Closing. With respect to disputed amounts, a proper adjustment will be determined after the Closing Date by the Bankruptcy Court.

The provisions of this Section 9.1 will survive the Closing.

9.2.     **Closing Costs**.

(a)     The Purchaser will pay (i) all charges related to any endorsements to the Title Policy requested by Purchaser, and any lender's policy of title insurance, (ii) all applicable excise, sales, use, value added, registration, stamp, recording, documentary, conveyance, franchise, transfer, gains and similar taxes and impositions incurred in connection with the transactions contemplated by this Agreement, (iii) all charges for any Survey and (iv) all recording charges for the Deed.

(b)     The Seller will pay all charges for the Title Commitment (including search and exam fees) and Title Policy other than those costs identified in Section 9.2(a).

(c)     Each party will pay the fees and expenses of its attorneys and other consultants. Any charges and expenses incurred by Title Company in effecting Closing will be shared equally by the parties.

(d)     Purchaser shall be solely responsible to provide to counterparties to any Assumed Contracts adequate assurances of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code.

### SECTION X. DAMAGE TO OR CONDEMNATION OF PROPERTY

10.1.     **Casualty**. If, prior to the Closing, all or any part of the Property is destroyed or damaged by fire or other casualty, then the Seller will promptly notify the Purchaser of this fact. If any such casualty damages all or any material portion of the Property, then the Purchaser may terminate this Agreement by giving notice thereof to the Seller not later than ten (10) Business Days after the date on which the Purchaser receives the Seller's notice as aforesaid. If the Purchaser elects to terminate this Agreement as aforesaid, then the Title Company will return the Deposit to the Purchaser, and, upon the Purchaser's receipt of the Deposit, this Agreement will terminate and be of no further force and effect and neither party will have any liability to the other hereunder

-13-

KC 18398980.6

(except for Purchaser's obligations under Section 3.1(c), which shall survive such termination). If any such casualty damages less than a material portion of the Land or Improvements or if the Purchaser elects not to terminate this Agreement as aforesaid, then there will be no abatement of the Purchase Price and the Seller will assign to the Purchaser at the Closing all of the Seller's rights to the insurance proceeds, if any, under the Seller's insurance policies covering the Land and Improvements with respect to such damage or destruction and there will be credited against the Purchase Price the following: (a) the amounts of any applicable insurance deductibles; and (b) the amounts of any proceeds previously received by Seller for the damage or destruction to the Land or Improvements.

10.2.  **Condemnation**.  If, prior to the Closing, all or any part of the Land or Improvements is taken by eminent domain (or is the subject of a pending taking that has not yet been consummated), then the Seller will promptly notify the Purchaser of this fact. If such taking affects all or any material portion of the Land or Improvements, then the Purchaser may terminate this Agreement by giving notice to the Seller not later than ten (10) Business Days after receipt of the Seller's notice.  If the Purchaser elects to terminate this Agreement as aforesaid, then the Deposit will be returned to the Purchaser, and, upon the Purchaser's receipt of the Deposit, this Agreement will terminate and be of no further force and effect and neither party will have any liability to the other hereunder (except for Purchaser's obligations under Section 3.1(c), which shall survive such termination).  If less than a material portion of the Land or Improvements is affected by a taking or if the Purchaser elects not to terminate this Agreement as aforesaid, then the sale of the Property will be consummated as herein provided without any adjustment to the Purchase Price (except to the extent of any condemnation award received by the Seller prior to the Closing) and the Seller will assign to the Purchaser at the Closing all of the Seller's right, title and interest in and to all awards, if any, for the taking, and the Purchaser will be entitled to receive and keep all awards for the taking of the Land or Improvements or portion thereof.

10.3.  **Survival**.  The parties' obligations, if any, under this Section X will survive the Closing.

### SECTION XI. TERMINATION

11.1.  **Default by the Seller**.  If the Seller has made any representation or warranty herein that is untrue in any material respect, or if the Seller fails to perform any of the material covenants and agreements contained herein to be performed by the Seller, then the Purchaser may, as its sole and exclusive remedy, elect prior to the Closing to terminate this Agreement and receive a refund of the Deposit.

11.2.  **Default by the Purchaser**.  If the Purchaser has made any representation or warranty herein that is untrue in any material respect, or if the Purchaser fails to perform any of the covenants and agreements contained herein to be performed by it, then the Seller may, as its sole and exclusive remedy, elect prior to the Closing to terminate this Agreement and retain the Deposit, as liquidated damages and not as a penalty.

11.3.  **Offer Open Date**. Pursuant to the Bid Procedures approved by the Bankruptcy Court, Purchaser may not revoke, withdraw or otherwise terminate the offer reflected in this

-14-

KC 18398980.6

Agreement until thirty (30) days after the entry of the Sale Order except as otherwise provided herein.

## SECTION XII.  COURT APPROVAL PROCESS

12.1.  **Court Approval**. This Agreement is subject to approval by the Bankruptcy Court, pursuant to the Sale Order. Following the execution of this Agreement, Seller will submit to the Bankruptcy Court a motion for approval of the sale of the Property and approval of the Bidding Procedures (as defined herein).  In the event (a) the Bankruptcy Case is terminated, (b) Seller is removed as Trustee for USREEB's estate, such that Seller no longer holds possession and control of the Property, or (c) the Bankruptcy Court does not approve and authorize this Agreement and the transactions contemplated herein pursuant to the Sale Order, then this Agreement shall automatically terminate, the Deposit shall be returned to Buyer, and neither party hereto shall have any further obligation to the other hereunder except as expressly otherwise provided herein.

12.2.  **Other Bids**. Seller may solicit bids from other prospective Purchasers for the sale of the Property, on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Seller). No other offers or bids for the Property shall be allowed after the entry of the Sale Order unless this Agreement is terminated pursuant to Section XI. If other bids are received pursuant to the Bidding Procedures, then Seller shall conduct an Auction.

12.3.  **Matching Rights**. In return for Purchaser's commitments and undertakings hereunder, Purchaser shall have the right and option, in its sole discretion, to match ("**Matching Right**") any competing offer or bid for the Property or any related asset ("**Competing Offer**") that may be submitted by any person other than Purchaser before or after the Bid Deadline (as defined in the Bidding Procedures) and up to the close of the Auction in accordance with the Bidding Procedures, and to the extent Purchaser successfully exercises the Matching Right pursuant to the Bidding Procedures, Seller shall support that Purchaser be declared by the Bankruptcy Court as the high bidder.

12.4.  **Omitted.**

12.5.  **Purchaser as Prevailing Bidder.** If (i) Purchaser is the Prevailing Bidder (as defined herein) at the Auction or (ii) Purchaser is deemed the Prevailing Bidder under the Bidding Procedures Order, then the Seller shall use commercially reasonable efforts to consummate the transactions contemplated by this Agreement as soon as possible and pursuant to this Agreement.

12.6.  **Purchaser as Back-up Bidder.** If an Auction is conducted, and Purchaser is not the prevailing Party at the conclusion of such Auction (such prevailing Party, the "**Prevailing Bidder**"), Purchaser may, in Purchaser's sole discretion, agree to serve as the back-up bidder (the "**Back-up Bidder**") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until 11:59 p.m. on the date of closing of an Alternative Transaction with the Prevailing Bidder (the "**Outside Back-up Date**"). Following the Sale Hearing (as defined in the Bidding Procedures) and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder will be deemed to have the

-15-

KC 18398980.6

new prevailing bid, and Seller shall be required, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder pursuant to the procedures set forth in the Bidding Procedures Order.

12.7.  **Failure to Obtain Bankruptcy Court Approval**.  Either party may terminate this Agreement if the Bankruptcy Court has not entered the Bidding Procedures Order on or before May 20, 2022.

## SECTION XIII.  MISCELLANEOUS

13.1.  **Continuing Jurisdiction**.  The Bankruptcy Court will retain jurisdiction over the enforcement of this Agreement including the performance of the obligations and transactions contemplated hereunder.

13.2.  **Brokers**.  Mayo Auction and Realty represents the Seller, Range Realty Partners represents the Purchaser. In the event that Purchaser is successful in closing on the purchase of the Property, the parties agree that the six percent (6%) buyer's premium will be paid at Closing to such brokers in equal three percent (3%) shares.

13.3.  **Notices**.  Any notice, request or demand hereunder may be given or furnished to or served upon a party by email, hand delivery, certified mail, return receipt requested, or express overnight delivery to the following addresses. Notice shall be deemed given three (3) Business Days after notice is deposited with the U.S. Mail, the next Business Day following timely deposit with an express overnight delivery service and at the time of hand delivery or email delivery.

if to the Seller, to:

> Eric L. Johnson, Trustee
> Spencer Fane LLP
> 1000 Walnut Street, Suite 1400
> Kansas City, Missouri 64106
> Email: ejohnsontrustee@spencerfane.com

with a copy to:

> Elizabeth Lally
> Spencer Fane LLP
> 13520 California Street, Suite 290
> Omaha, NE 68154
> Email: elally@spencerfane.com

If to the Purchaser, to:

> Dutton Ranch, LLC
> Attn: Miles McCune
> 11150 Overbrook Rd Suite 325

-16-

CORE/3525081.0002/173591745.1

KC 18398980.6

Leawood, KS 66211
Email: miles.mccune@range-rp.com

with a copy to:

Stinson LLP
1201 Walnut, Suite 2900
Kansas City, Missouri 64106
Attn: Karl R. Phares
Email: karl.phares@stinson.com

By notice given as herein provided, the parties and their respective successors and permitted assigns may from time to time and at any time change their respective addresses effective upon receipt by the other party of such notice and each may specify as its address any other address within The United States of America.

13.4.  **Waivers**.  Any waiver of any term or condition of this Agreement, or of the breach of any covenant, representation or warranty contained herein, in any one instance, will not operate as or be deemed to be or construed as a further or continuing waiver of any other breach of such term, condition, covenant, representation or warranty or any other term, condition, covenant, representation or warranty, nor will any failure at any time or times to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such party's right at a later time to enforce or require performance of such provision or any other provision hereof. This Agreement may not be amended, nor will any waiver, change, modification, consent or discharge be effected, except by (a) an instrument in writing executed by or on behalf of the party against whom enforcement of any amendment, waiver, change, modification, consent or discharge is sought, and (b) if the amendment, modification, consent, or discharge is of a material term of this Agreement, a final order of the Bankruptcy Court after appropriate notice and opportunity for a hearing to all parties in interest.

13.5.  **Assignment; Successors and Assigns**.  This Agreement and all rights and obligations hereunder may not be assigned by any party without the written consent of the other party.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement is not intended and may not be construed to create any rights in or to be enforceable in any part by any other persons.

13.6.  **Severability**.  If any provision of this Agreement is held or deemed to be, or in fact becomes, invalid, inoperative or unenforceable as applied to any particular case in any jurisdiction or jurisdictions, or in all jurisdictions or in all cases, because of the conflict of any provision with any constitution or statute or rule of public policy or for any other reason, such circumstance will not have the effect of rendering the provision or provisions in question invalid, inoperative or unenforceable in any other jurisdiction or in any other case or circumstance or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement will be reformed and construed in any such jurisdiction or case as if such invalid, inoperative or unenforceable provision had never been contained herein

-17-

and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such jurisdiction or in such case.

13.7.  **Counterparts**. This Agreement may be executed in counterparts and delivered by facsimile, portable document format (.pdf) transmission or other electronic format, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.

13.8.  **Entire Agreement**. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes and takes the place of any other instruments purporting to be an agreement of the parties hereto relating to the subject matter hereof.

13.9.  **Performance on Business Days**. If the date on which performance or payment of any obligation of a party required hereunder is other than a Business Day, the time for payment or performance will automatically be extended to the next Business Day following such date.

13.10.  **Attorneys' Fees**. Notwithstanding anything contained herein to the contrary, if any lawsuit or arbitration or other legal proceeding arises in connection with the interpretation or enforcement of this Agreement, the prevailing party therein will be entitled to receive from the other party the prevailing party's costs and expenses, including reasonable attorneys' fees incurred in connection therewith, in preparation therefor and on appeal therefrom, which amounts will be included in any judgment therein.

13.11.  **Time of Essence**. Time is of the essence with respect to the performance of each and every covenant and obligation, and the giving of all notices, under this Agreement.

13.12.  **Governing Law**. This Agreement is governed by, and is to be construed in accordance with, the laws of the State of Missouri.

13.13.  **Certain Interpretive Matters**. In construing this Agreement, it is the intent of the parties that:

(a)    no consideration may be given to the section headings, all of which are inserted for convenience in locating the provisions of this Agreement and not as an aid in its construction;

(b)    no consideration may be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement;

(c)    examples are not to be construed to limit, expressly or by implication, the matter they illustrate;

(d)    the word "includes" and its derivatives means "includes, but is not limited to," and corresponding derivative expressions;

-18-

KC 18398980.6

(e)     a defined term has its defined meaning throughout this Agreement and each exhibit and schedule to this Agreement, regardless of whether it appears before or after the place where it is defined;

(f)     the meanings of the defined terms are applicable to both the singular and plural forms thereof;

(g)     all references to prices, values or monetary amounts refer to United States dollars;

(h)     accounting terms not defined in this Agreement, and accounting terms partly defined to the extent not defined, have the respective meanings given to them under generally accepted accounting principles;

(i)     all references to sections, subsections, paragraphs, clauses, exhibits or schedules refer to sections, subsections, paragraphs and clauses of this Agreement, and to exhibits or schedules attached to this Agreement, unless expressly provided otherwise;

(j)     each exhibit and schedule to this Agreement is a part of this Agreement and references to the term "Agreement" are deemed to include each such exhibit and schedule to this Agreement except to the extent that the context indicates otherwise, but if there is any conflict or inconsistency between the main body of this Agreement and any exhibit or schedule, the provisions of the main body of this Agreement will prevail;

(k)     the words "this Agreement," "herein," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular article, section, subsection or other subdivision, unless expressly so limited;

(l)     the word "or" is disjunctive but not necessarily exclusive; and

(m)     all references to agreements or laws are deemed to refer to such agreements or laws as amended or as in effect at the applicable time.

*[Remainder of Page Intentionally Left Blank – Signature Page to Follow]*

-19-

The parties have caused this Purchase and Sale Agreement to be executed as of the date first above written.

**SELLER:**

By: _Eric L. Johnson_

Eric L. Johnson, in his capacity as Chapter 11
Trustee of US Real Estate Equity Builder LLC,
and not individually

**PURCHASER:**

Dutton Ranch, LLC, a Missouri limited liability
company

By: _6A5E271A458B481..._
Name: Miles McCune
Title: President

-20-

KC 18398980.6

## EXHIBIT A

### ASSUMED CONTRACTS

Lease Agreement dated May 1, 2020 by and between USREEB LLC, as landlord, and Alpha One PM limited liability company, as tenant.

A-1

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

## EXHIBIT B

### LAND

Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri.

.

B-1

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

## EXHIBIT C

### FORM OF DEED

_____

(Space above reserved for Recorder of Deeds certification)

### COVER PAGE FOR RECORDING

| | | |
|---|---|---|
| 1. | Title of Document: | Trustee's Deed |
| 2. | Date of Document: | _____, 2022 |
| 3. | Grantor: | Eric L. Johnson, as Chapter 11 Trustee of US Real Estate Equity Builder LLC |
| 4. | Grantee Name/Address: | _____<br>_____<br>_____<br>_____ |
| 5. | Legal Description: | See Exhibit A |
| 6. | Book and Page Reference: | N/A |

C-1

KC 18398980.4<br>KC 18398980.6

CORE/3525081.0002/173591745.1

### TRUSTEE'S DEED

**THIS INDENTURE** is made this _____ day of _____, 2022, between Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company, as Grantor, and Dutton Ranch, LLC, a Missouri limited liability company, as Grantee.

**WHEREAS**, Grantor, by virtue of the Order Approving (a) One or More Potential Sale(s) of All Assets Free and Clear of all Liens, Interests, Claims and Encumbrances, and Related Procedures and Bid Protection Pursuant to 11 U.S.C. §363, and (b) The Potential Assumption and Assignment, or Rejection, of Certain Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11 U.S.C. §365, and (c) Related Relief Pursuant to 11 U.S.C. §105 (the "**Sale Order**") issued out of the U.S. Bankruptcy Court for the District of Kansas , in Case No. 20-21358, and dated _____ _____, 2022, does by these presents grant, bargain, sell and convey unto Grantee, its successors and assigns, all right, title and interest of Grantor "as is, where is" with no representations or warranty, in and to all of the real property situated in Jackson County, Missouri and legally described on Exhibit A attached hereto.

Subject to (i) all exceptions, easements, covenants, restrictions, reservations, rights of way and other matters of record, (ii) any matters that would be disclosed by a current accurate survey or physical inspection of said real property, and (iii) real estate taxes and assessments for 2022 and thereafter.

**TO HAVE AND TO HOLD** the above granted premises, together with the appurtenances and hereditaments and every part thereof, unto Grantee, its successors and assigns.

*[Signature and Acknowledgement on Following Page]*

C-2

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

**IN WITNESS WHEREOF**, Grantor has signed this Trustee's Deed as of the date first above written.

> _____
> Eric L. Johnson, as Chapter 11 Trustee for the
> Bankruptcy Estate of US Real Estate Equity Builder
> LLC, and not individually

STATE OF MISSOURI )
                     ) ss.
COUNTY OF _____ )

On this _____ day of _____, 2022, before me, a Notary Public in and for said state, personally appeared Eric L. Johnson as Trustee for the Bankruptcy Estate of US Real Estate Equity Builder LLC, a Missouri limited liability company, known to me to be the person who executed the within Trustee's Deed in behalf of the Bankruptcy Estate of US Real Estate Equity Builder LLC, and acknowledged to me that he executed the same for the purposes therein stated.

> _____
> Notary Public

My commission expires:

C-3

## Exhibit A

Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri

C-4

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

## EXHIBIT D

### ASSIGNMENT AND ASSUMPTION OF CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS (this "**Assignment**") is made and entered into as of _____, 2022, by and between Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**"), and _____, a _____ (the "**Purchaser**").

WHEREAS, the Seller and the Purchaser are parties to that certain Purchase and Sale Agreement, dated as of [_____], 2022 (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, and the Purchaser has agreed to purchase, certain land and other property as described in the Purchase Agreement; and

WHEREAS, in connection with the closing of the sale contemplated by the Purchase Agreement, the Seller has agreed to assign, and the Purchaser has agreed to assume, among other things, the Assumed Contracts (as such term is defined in the Purchase Agreement and as set forth on Exhibit A, subject to and upon the terms and conditions hereinafter set forth).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the Seller and the Purchaser agree as follows:

1.    Capitalized terms used and not otherwise defined herein have the meanings given them in the Purchase Agreement.

2.    The Seller hereby assigns to the Purchaser all of the Seller's right, title and interest in and to the Assumed Contracts. The Purchaser hereby assumes, as of the date hereof, all of the Seller's obligations under the Assumed Contracts accruing from and after the date hereof. The Purchaser hereby agrees to perform all of the Seller's obligations arising under the Assumed Contracts from and after the date hereof.

3.    This Assignment is binding on, and will inure to the benefit of, the parties hereto, their respective successors in interest, and their respective assigns.

4.    This Assignment is governed by, and is to be construed in accordance with, the laws of the State of Missouri.

5.    Neither party will record this Assignment.

6.    This Assignment may be executed in counterparts and delivered by facsimile, portable document format (.pdf) transmission or other electronic format, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.

[Signature page follows]

D-1

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

The parties have executed this Assignment and Assumption of Contracts as of the date first hereinabove written.

**SELLER**:

By: _____
             Eric L. Johnson, in his capacity as
             Chapter 11 Trustee of US Real Estate
             Equity Builder LLC, and not individually

**PURCHASER:**

Dutton Ranch, LLC,
a Missouri limited liability company

By: _____
          8A5E271A458B481
Name: Miles McCune
Title: President

D-2

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

## Exhibit A

### Assumed Contracts

[TBD]

D-3

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

**EXHIBIT E**

**QUIT CLAIM BILL OF SALE AND GENERAL ASSIGNMENT**

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**"), effective as of the _____ day of _____, 2022, does hereby REMISE, RELEASE AND FOREVER QUIT CLAIM to _____, a _____ (the "**Purchaser**"), and its successors and assigns, all of Seller's right, title and interest, if any, in and to all Fixtures, as such term is defined in that certain Purchase and Sale Agreement, dated as of [_____], 2022 between Seller and Purchaser (the "**Purchase Agreement**").

EXCEPT AS OTHERWISE PROVIDED IN THE PURCHASE AGREEMENT, SELLER HAS NOT MADE AND DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER WITH RESPECT TO THE FIXTURES, INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, DESIGN OR CONDITION, COMPLIANCE WITH THE REQUIREMENTS OF ANY RULE, LAW, REGULATION, ORDINANCE, SPECIFICATION OR CONTRACT, OR LATENT DEFECT. EXCEPT AS OTHERWISE PROVIDED IN WRITTEN AGREEMENT BETWEEN SELLER AND PURCHASER, THE FIXTURES ARE SOLD "AS IS" AND "WITH ALL FAULTS."

If any taxes are assessed against the Fixtures, such taxes shall be prorated between Seller and Purchaser as of the date of conveyance.

FURTHERMORE, Seller does hereby assign, transfer, set over and deliver unto Purchaser all of Seller's right, title, and interest in and to all Licenses and Permits (as defined in the Purchase Agreement) to the extent any such Licenses and Permits are assignable. Except as otherwise provided in the Purchase Agreement, this conveyance of Licenses and Permits is made on an "AS-IS", "WHERE-IS" basis, without any representations or warranties express or implied from Seller.

[Remainder of page intentionally left blank; signature page follows]

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

Exhibit E

Seller has executed this Quit Claim Bill of Sale and General Assignment effective as of the date first above-written.

**SELLER**:

By: _____

  Eric L. Johnson, in his capacity as
  Chapter 11 Trustee of US Real Estate
  Equity Builder LLC, and not individually

E-2

KC 18398980.4
KC 18398980.6

CORE/3525081.0002/173591745.1

**EXHIBIT F**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| **US Real Estate Equity Builder, LLC, and** | ) **Case No. 20-21358-11** |
| **US Real Estate Equity Builder Dayton, LLC,** | ) |
| | ) **(Jointly Administered)** |
| **Debtors.** | ) |

**BID PROCEDURES**

On _____, 2022, Trustee filed his Motion to Approve (a) Sale of Real Property
Free and Clear of All Liens, Interests, Claims and Encumbrances, and Related Procedures and Bid
Protection Pursuant to 11 U.S.C. § 363, (b) the Potential Assumption and Assignment of Certain
Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11 U.S.C. § 365,
and (c) Related Relief Pursuant to 11 U.S.C. §§ 102 and 105 [Docket No. _____] (the "**Motion**"),
pursuant to which Trustee requested authority to sell certain real property to the highest and best
bidders subject to the process outlined herein (the "**Transaction**"). On _____, 2022, Trustee
entered into a Purchase and Sale Agreement (the "**Stalking Horse Contract**") with Dutton Ranch,
LLC, or its assigns (the "**Stalking Horse Purchaser**") pursuant to which the Stalking Horse
Purchaser proposes to acquire from Trustee the Property (as defined in the Stalking Horse
Contract). These Bid Procedures have been approved and authorized pursuant to the Order
Approving Procedures for the Solicitation of Offers for (a) the Sale of Real Property Free and
Clear of Liens, Claims, Encumbrances, and Interests, (b) the Possible Assumption and Assignment
of Certain Executory Contracts and Unexpired Leases, and (c) Related Relief [Docket No. [___]]
(the "**Bid Procedures Order**") entered by the United States Bankruptcy Court for the District of
Kansas (the "**Bankruptcy Court**") on [___], 2022.

**A. The Bidding Process**

1. Subject to the conditions set forth herein, at any time on or before *[10 days after entry
of Bidding Order]*, at 5:00 p.m. (prevailing Central Time) (the "**Bid Deadline**"), Trustee will (i)
engage in discussions and negotiations regarding a sale transaction with any entity (a "**Potential
Bidder**")[1] that has made inquiry with the Trustee or Trustee's broker, within the past 12 months
regarding the sale of the Property or that the Trustee reasonably believes could lead to a bona fide

---

[1] Excluding the Stalking-Horse Purchaser who shall not be subject to any Potential Purchaser requirements hereunder.

F-1

written offer relating to a Transaction that would meet the requirements of these Bid Procedures (the "**Proposal**"), (ii) furnish to such Potential Bidder and its Representatives,[2] and to any other party that has made a request therefor in connection with its consideration of making an offer or proposal relating to a Transaction (each a "**Bid**"), public and non-public information relating to the Property that is reasonably available to the Trustee.

2. Trustee shall provide these Bid Procedures,[3] together with a copy of the Stalking Horse Contract to each Potential Bidder.

3. Prior to the selection of a Bid as the highest or best offer for the Property (the "**Successful Bid**(s)"), Trustee may: (a) receive Bids from Potential Bidders, (b) request information from Potential Bidders and engage in discussions with Potential Bidders and take such other actions to determine whether any Bid constitutes or could lead to a superior Proposal, (c) evaluate any Bid made by a Potential Bidder, (d) engage in discussions and negotiations with any Potential Bidder with respect to any Bid submitted by a Potential Bidder, and (e) take any other actions contemplated under these Bid Procedures (collectively, the "**Bidding Process**").

### B. Due Diligence for Potential Bidders

4. To obtain due diligence access or additional information, a Potential Bidder must first advise Trustee of the nature and extent of additional due diligence such Potential Bidder may wish to conduct. Trustee shall coordinate all requests for additional information and due diligence access by such Potential Bidders with Debtor, and prior to granting any due diligence access or information to any Potential Bidder. No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline, except as otherwise agreed to by Trustee in writing, or as otherwise is contained in the Stalking Horse Contract.

### C. Submission by Bid Deadline

5. A Potential Bidder who desires to make a Bid must deliver a written copy of its written purchase and sale agreement (the "Competing Contract") to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the Competing Contract submitted and the Stalking Horse Contract) on or before *[10 days after Entry of Bidding Procedures Order]* **5:00 p.m., prevailing Central time,** to counsel for Trustee, Andrea M. Chase, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, achase@spencerfane.com and Elizabeth M. Lally, Spencer Fane LLP, 13520 California Street, Suite 290, Omaha, NE 68154, elally@spencerfane.com. The Trustee may extend the Bid Deadline, but Trustee shall promptly notify all Potential Bidders of any such extension.

### D. Determination of "Qualified Bid" Status

---

[2] "**Representatives**" means, with respect to any person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such person, when acting in such capacity on behalf of such person.

[3] Unless otherwise defined herein, capitalized terms shall have the same meaning as set forth in the Motion.

F-2

6. A Bid received from a Potential Bidder by the Bid Deadline (other than the Stalking Horse Purchaser) will constitute a "**Qualified Bid**" only if it includes all of the following documents (the compliance of which shall be determined by Trustee) (collectively, the "**Required Bid Documents**") and a Good Faith Deposit as described below and meets all of the Bid Requirements (as defined below):

    a.    A written Competing Contract duly executed by the Potential Bidder in substantially the same form as the Stalking Horse Contract with changes only regarding the Property and contracts being purchased and changes acceptable to Trustee, together with a copy of such agreement marked to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the written Competing Contract submitted and the Stalking Horse Contract). The Competing Contract submitted by a Potential Bidder shall:

        i.    identify each and every executory contract and unexpired lease that is to be assumed and assigned to the Potential Bidder, if any;

        ii.    not contain any financing or due diligence contingencies to closing on the proposed Transaction (other than what is already contained in the Stalking Contract);

        iii.    not contain any condition to closing of the Transaction on the receipt of any third party approvals (excluding required Bankruptcy Court approval); and

        iv.    provide that the offer of the Potential Bidder is irrevocable through 90 days after the entry of an Order approving the Sale Motion and subject to the backup bidder provisions herein.

    b.    A good faith deposit (the "**Good Faith Deposit**") in the form of a wire transfer to Trustee or a certified or bank check payable to the order of Trustee (or other form acceptable to Trustee) in the amount of $10,000.00.

7. Each Potential Bidder that makes a Qualified Bid shall be referred to as a "**Qualified Bidder.**" Notwithstanding anything to the contrary herein, the Stalking Horse Purchaser shall be deemed a Qualified Bidder, and the Stalking Horse Contract shall be deemed a Qualified Bid.

### E. Bid Requirements

8. All Bids must also satisfy all of the following requirements, all solely as determined by Trustee:

    a.    The Bid must provide for consideration under the Competing Contract for the Property.

CORE/3525081.0002/173591745.1

KC 18398980.6

b.     The Bid must provide for the purchase of the Property and for consideration that exceeds the cash portion of the consideration offered by the Stalking Horse Purchaser by at least $10,000 (the "**Initial Minimum Overbid**").

c.     The Bid must be in cash unless Trustee consents otherwise, except for any allowed credit bids.

d.     The Bid must be accompanied by satisfactory evidence of committed financing or other financial ability to consummate the Transaction in a timely manner.

e.     If a Bid indicates that a Potential Bidder will seek the assumption and assignment of executory contract(s) or unexpired lease(s), the Bid must include sufficient information to permit Trustee, if necessary, to timely file a motion to assume and assign such executory contract(s) or unexpired lease(s) to determine the proposed assignee's ability to comply with Code § 365 (to the extent applicable).

f.     The Bid (other than the Stalking Horse Contract) cannot be conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment.

g.     The Bid must expressly acknowledge and represent that the Potential Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and the assets and businesses of Debtor in making its Bid, and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business or assets of Debtor or the Transaction, or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Competing Contract ultimately accepted and executed by Trustee, and (iii) has authority to make the Bid, execute any documents to close on the Transaction and proceed to closing on the Transaction.

h.     The Bid must be received by the Bid Deadline.

### F. Auction

9. If a Qualified Bidder (other than the Stalking Horse Purchaser) has been identified for the Property, the Trustee shall conduct an auction (the "**Auction**") with respect to such Qualified Bids in order to determine, in the business judgment of Trustee, the Successful Bid(s). **If no Qualified Bid (other than the Stalking Horse Contract) or Credit Bid has been submitted by the Bid Deadline or aggregated by the Trustee, the Stalking Horse Contract shall be deemed the Successful Bid and no Auction shall be conducted.**

F-4

KC 18398980.6

CORE/3525081.0002/173591745.1

10. The Auction, if required, will commence at 9:30 a.m. (prevailing Central Time) on *[13 days after the Bidding Deadline]* at the offices of Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, Missouri 64106 or at such later time or other place as designated by Trustee, or approved by Order of the Bankruptcy Court, and of which Trustee will notify all Qualified Bidders who have submitted Qualified Bids (collectively, the "**Auction Participants**").

11. Prior to the Auction, Trustee shall evaluate the Qualified Bids and select the Qualified Bid(s), Trustee determines in his business judgment to be the highest or best Qualified Bid(s) (the "**Initial Highest Bid**") for a sale of the Property. In making this determination, Trustee may consider, among other things, the amount of cash to be paid or delivered, and the other terms and conditions of the Qualified Bid(s). Trustee shall give each of the Auction Participants notice of the Initial Highest Bid and a copy of such Bid prior to the scheduled start of the Auction.

12. Only the Trustee, the Auction Participants, potential financing sources of the Auction Participants, and their respective Representatives will be entitled to attend, participate and be heard at the Auction. In order to participate and be heard at the Auction, a party must actually attend the Auction.

13. The Auction will occur in two phases.

    a.    Phase 1 of the Auction will be between Qualified Bidders other than the Stalking Horse Purchaser. All Qualified Bids in Phase I will be based on and increased from the Initial High Bid, and thereafter made in minimum increments higher than the previous Qualified Bid by at least $10,000.[4] Phase 1 of the auction will continue until the Phase 1 high bid has not been topped. The winning Phase 1 bid will be declared the Successful Phase 1 Bid. The last bid made by the unsuccessful Phase 1 bidder will be determined to be its final qualified bid under the auction procedures and for back up bidder purposes.

    b.    Phase 2 of the Auction will be between the Successful Phase 1 Bidder and the Stalking Horse Purchaser. Phase 2 of the Auction will begin by allowing the Stalking Horse Purchaser to match the Successful Phase 1 Bid[5]. If the Successful Phase 1 Bid is not matched, then it will be declared the final Qualified Bid, and the auction will be adjourned so the Trustee may assess whether such bid will be determined the overall Successful Bid.

    c.    If the Stalking Horse matches the Successful Phase 1 Bid, then the Successful Phase 1 Bidder will have the ability to top the Stalking Horse matching bid by the minimum $10,000 bid increment. Phase 2 will continue

---

[4] Minimum bid increments must consist solely of cash consideration unless otherwise authorized by Trustee or constitute an increase in a Lien Holder's credit bid.

[5] At all times, during Phase 2 of the Auction, a successful "match" by the Stalking Horse Purchaser may consist of matching the economic and non-economic terms of the Successful Phase 1 Bidder contract, or offering a combination of economic and non-economic terms that Trustee determines to be equal or better than the economic and non-economic terms of the Successful Phase 1 Bidder contract.

F-5

KC 18398980.6

Exhibit 4

until either the Stalking Horse Purchaser fails to match a Phase 2 topping bid, or the Successful Phase 1 Bidder fails to top the Stalking Horse matching bid. If the Stalking Horse Purchaser successfully matches, then the Trustee will support that the Stalking Horse Purchaser be declared as the higher bidder. If the Stalking Horse Purchaser fails to match the final Phase 2 high bid, then the auction will be adjourned so the Trustee may assess whether such bid will be determined to be the overall Successful Bid.

d.    Trustee shall have the right to adopt such other rules for the Auction which Trustee believes in his business judgment will promote the goals of the Auction.

14. The Trustee may determine which qualified bid, if any, is the highest or otherwise best offer and reject any bid that the Trustee determines is insufficient or inadequate, not in conformity with the requirements of the Bankruptcy Code or the bid procedures, or contrary to the best interests of the debtors' estates and their creditors.

15. Each Auction Participant shall be deemed to have agreed to keep its final Qualified Bid made at or prior to the Auction open through 90 days after the entry of an Order approving the Motion. Bidding at the Auction will continue until such time as the highest or otherwise best Qualified Bid(s) are determined in the business judgment of Trustee. To facilitate a deliberate and orderly consideration of competing Qualified Bids submitted at the Auction, Trustee may adjourn the Auction at any time and from time-to-time and may conduct multiple rounds of bidding. Upon conclusion of the Auction, Trustee will (a) review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (b) identify the Successful Bid(s). In making this determination, Trustee may consider, among other things, the amount of cash to be paid or delivered and the other terms or conditions of the Qualified Bid(s), and the determination by Trustee shall be final for the purposes of these Bid Procedures.

### G.  Buyer's Premium

16. A six percent (6%) buyer's premium will be added to the final bid on the Property and paid to the Auctioneer.  For example, if a buyer bids $705,000, the total sales price will be $750,000. The buyer's premium will be used to pay the commission owed to the Trustee's broker, and any buyer's agent.

### H.  Credit Bid Right

17. The Property shall be sold without reserve, but subject to the credit bid rights set forth herein (the "**Credit Bid Right**"). The holder of a Credit Bid Right will participate in Phase I The right to credit bid under section 363(k) of the Bankruptcy Code is specifically preserved as to each Lender with a mortgage or deed of trust applicable to the Property ("**Lien Holder**") as provided herein, but only to the extent that such lien holder has timely filed a proof of claim. A Lien Holder must pay in cash: closing costs, senior liens (including real estate, transfer and/or ad valorem taxes), applicable surcharges and real estate taxes, and any agreed upon carve outs associated with

F-6

its collateral in cash. All disputes as to the applicable cash portion of the Lien Holder's bid will be determined at the sale hearing. Lien Holders shall not be required to submit a Good Faith Deposit, but will be required to tender the required cash portion and enter into a sale contract within 14 days of the Sale Order, and close within 14 days after execution of a sale contract.

18. If a Lien Holder ultimately is found to be a successful purchaser by credit bid and its claim or lien is ultimately determined to be invalid or transferred to the bankruptcy estate pursuant to 11 U.S.C. § 510(c), in whole or in part, then such Lien Holder will be obligated to pay cash to the bankruptcy estates to make up the difference between its valid/non-transferred lien and claim and its credit bid, or as otherwise set forth in any agreement with the Trustee or ordered by the Court.

19. A party asserting a Credit Bid Right must make a Credit Bid by the Bid Deadline, but will otherwise be considered a Qualified Bidder. The initial Credit Bid shall be in the form of a written Competing Contract duly executed by the Lien Holder in substantially the same form as the Stalking Horse Contract with changes only regarding the Property and contracts being purchased, the form of consideration, and changes acceptable to Trustee, together with a copy of such agreement marked to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the written Competing Contract submitted and the Stalking Horse Contract).

## I. Sale Hearing

20. A hearing to consider the Sale Motion for the Property and approval of the Successful Bid will be held on _____, 2022 at _:00 _.m. prevailing Central time (the "**Sale Hearing**"). The Sale Hearing will be a virtual hearing unless otherwise designated by the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court without further notice to creditors and parties in interest other than by announcement by the Trustee of the adjourned date at the Sale Hearing. The Trustee may also request that the Bankruptcy Court set the Sale Hearing as an evidentiary hearing in order to determine any factual matters that may need to be established in order for the Court to approve the Sale.

21. The Trustee's presentation to the Bankruptcy Court for approval of the Successful Bid does not constitute the Trustee's acceptance of the Bid. The Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court. Distribution of the sale proceeds will be taken up at the Sale Hearing(s) or such other date and time as may be directed by the Court and/or upon the agreement of the impacted parties.

## J. Objections

22. Objections, if any, to the Sale Motion shall be filed on the docket of the Bankruptcy Court on or before **5:00 p.m., prevailing Central time on _____, 2022, or such other time as the Trustee may agree or as the Court may order** (the "**Objection Deadline**").

23. Objections to the Stalking Horse Contract shall be made on or before the hearing to approve the Bidding Procedures. If no objections to the Stalking Horse Contract are received prior

F-7

to the hearing on Bidding Procedures, then the Stalking Horse Contract shall not be subject to further objection, but will remain subject to higher bids and the auction process, if additional Qualified Bids are received by the Bid Deadline.

## MODIFICATIONS

The Trustee, after consultation with the applicable Lenders and the Committee, may (a) reject at any time before entry of an Order of the Bankruptcy Court approving the successful bid(s), any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtor's estates and its creditors, and (b) impose such other terms and conditions upon bidders as the Trustee determines to be in the best interests of the Debtor's estate in this case. Notwithstanding anything to the contrary herein, the procedures related to the Credit Bid Right may only be modified with the consent of the impacted Lien Holders. To the extent that any Lien Holder(s) consent is required under these Bid Procedures and such consent is withheld, Trustee shall have the right to pursue, and the Lien Holder(s) may oppose, approval from the Bankruptcy Court without the consent of the Lien Holder(s). Additionally, in those instances where consent is not required, but only consultation, nothing herein shall prohibit a Lender from seeking immediate Court intervention to the extent that after consultation with the Trustee, the Lender disagrees with the Trustee's proposed course of action.

## Back-Up Bidders

If any Auction Participant whose Qualified Bid is a Successful Bid (a "**Successful Bidder**") fails to consummate the Transaction because of a breach or failure to perform on the part of such Successful Bidder, or for any reason other than the failure of the Bankruptcy Court to approve the terms of the Transaction, the Auction Participant that had submitted the next highest or otherwise best Qualified Bid for the same asset or assets of the estates at the Auction or prior to the Auction (the "**Back-Up Bidder**")[6] will be deemed to be the Successful Bidder, and Trustee will be authorized to consummate the Transaction with such Auction Participant without further order of the Bankruptcy Court, and such Qualified Bid shall thereupon be deemed the Successful Bid; provided that upon being notified that its Qualified Bid has become the Successful Bid, the Auction Participant submitting such Qualified Bid shall within three (3) business days after such notification provide a Good Faith Deposit (unless such Auction Participant previously shall have provided a Good Faith Deposit that shall not have been returned as described below). Upon providing such Good Faith Deposit, such Auction Participant shall be deemed the Successful Bidder. If any Auction Participant fails to consummate the Transaction because of a breach or failure to perform on the part of such Auction Participant (including, without limitation, the failure to timely deposit the Good Faith Deposit), the process described above may continue with other Auction Participants in decreasing order of the Qualified Bids as determined by Trustee, until an Auction Participant shall consummate the Transaction.

## Disposition of Good Faith Deposit

---

[6] Including the Stalking Horse Purchaser as provided in the Stalking Horse Contract

F-8

KC 18398980.6

24. Except as otherwise provided in the Stalking Horse Contract, the Good Faith Deposit of the Successful Bidder(s), or a Back-Up Bidder that consummates a transaction in place of a Successful Bidder as provided for herein, shall be retained by Trustee and applied toward the payment of the Successful Bid(s) at the closing of the Transaction. If any Successful or Back-Up Bidder fails, for any reason other than Bankruptcy Court denial of the Transaction, to close a Transaction, then the Good Faith Deposit shall be retained by Debtor's estate as partial damages for the failure to consummate the Transaction (the "**Forfeited Good Faith Deposit**"). The Good Faith Deposit of all Qualified Bidders (other than the Successful Bidder(s), a Back-Up Bidder that consummates a Transaction in place of a Successful Bidder as provided for herein, or a Successful Bidder or a Back-Up Bidder that forfeits its deposit as liquidated damages as provided for herein) will be returned, without interest, to each such Qualified Bidder within ten (10) business days after the closing of all proposed Transactions approved by the Bankruptcy Court at the Sale Hearing. For the avoidance of doubt, any Forfeited Good Faith Deposit shall be deemed property of the Debtor's bankruptcy estate and not subject to any liens.

F-9

**SCHEDULE 1.21**

**List of Excluded Property**

1.    Servers and other computer equipment for which the Seller has an interest.

CORE/3525081.0002/173591745.1

KC 18398980.6

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re: | ) |
| | ) |
| **US Real Estate Equity Builder, LLC, and** | ) **Case No. 20-21358-11** |
| **US Real Estate Equity Builder Dayton, LLC,** | ) |
| | ) **(Jointly Administered)** |
| **Debtors.** | ) |

## NOTICE OF THE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND RELATED RELIEF

**TO ALL PERSONS RECEIVING THIS NOTICE, PLEASE TAKE NOTICE OF THE FOLLOWING:**

On April 15, 2022, Eric L. Johnson, Chapter 11 Trustee ("Trustee") filed his Motion For Entry Of Order (I) (A) Establishing Bidding Procedures For The Sale Of Debtors' Assets, (B) Authorizing The Debtors' Entry Into A Stalking Horse Agreement And Approving The Reimbursable Expenses (C) Establishing Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Approving The Form And Manner Of Related Notices, and (E) Scheduling A Hearing To Consider The Proposed Sale; (II) (A) Authorizing And Approving The Sale Of Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests, (B) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (III) Granting Related Relief Pursuant To 11 U.S.C. § 105 [Docket No. ____] (the "**Motion**").

In the Motion, among other things, Trustee seeks an order of the Bankruptcy Court authorizing it to sell, pursuant to Bid Procedures set forth in Exhibit A to the Motion, outside the ordinary course of business and free and clear of all liens, claims, encumbrances, and interests, all of Debtors' right, title and interest in certain real property owned by Debtors (the "**Property**") to the Successful Bidder[1] and otherwise granting all necessary and appropriate related relief.

A copy of the Motion, the Bid Procedures Order identified below and other pleadings in the bankruptcy case can be obtained upon written request to counsel for Trustee (i) Andrea M. Chase, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, achase@spencerfane.com, or (ii) Elizabeth M. Lally, Spencer Fane LLP, 13520 California Street, Suite 290, Omaha, NE 68154, elally@spencerfane.com.

### The Sale Process

The Bid Procedures Order sets forth the following dates in connection with the transactions contemplated in the Motion:

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Motion and Bid Procedures.

KC 18425537.1

| Event | Date and Time (if applicable) |
|---|---|
| Transaction Notice | Within 7 days of the entry of the Procedures Order. |
| Bid Deadline | 10 days after entry of the Procedures Order at 5:00 p.m. prevailing Central Time. |
| Auction | **13 days after the entry of the Procedures Order at 9:30 a.m. prevailing Central Time provided, however, if no Qualified Bid (other than the Stalking Horse) or Credit Bid has been submitted by the Bid Deadline, the Stalking Horse shall be deemed the Successful Bid and no Auction shall be conducted.** |
| Sale Objection Deadline | If Qualified Bids are received by the Bid Deadline, objections, if any, to the Sale Motion shall be filed on the docket of the Bankruptcy Court on or **before 5:00 p.m., prevailing Central time on June 13, 2022,** or such other time as the Trustee may agree or as the Court may order. |
| Sale Hearing | **June 23, 2022 at 1:30 p.m. prevailing Central time or such other date and time as Court may order.** |
| Closing | The Closing sale occur on or before the later of (a) July 1, 2022; (b) 14 days after the expiration of the Due Diligence Period; or (c) such date mutually agreed to by the Parties.  The Closing will be deemed to have occurred at 12:01 a.m. Central Standard Time on the Closing Date, even though adjustments hereunder will be made as of 7:00 a.m. local time at the Property on the Closing Date. |

An initial hearing on the Motion, focusing on approval of the bid procedures and was held on [_____ ____, 2022]. Thereafter, the Bankruptcy Court entered that certain Order Approving Bidding Procedures For The Sale Of Debtors' Assets Free And Clear Of Liens, Claims, Encumbrances, And Interests, (B) Authorizing The Debtors' Entry Into A Stalking Horse Agreement, (C) Establishing Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Approving The Form And Manner Of Related Notices, And (E) Scheduling A Hearing To Consider The Proposed Sale, And (F) Related Relief Pursuant To 11 U.S.C. § 105 [Docket No. _____] (the "**Bid Procedures Order**")

Pursuant to the Bid Procedures Order, an auction for the Property will commence at [ _:00 _.m. prevailing Central time on _____ ____, 2022], however, if no Qualified Bid (other than the Stalking Horse) or Credit Bid has been submitted by the Bid Deadline, the Stalking Horse shall be deemed the Successful Bid and no Auction shall be conducted. Bidders seeking to participate as a bidder at the Auction must comply with the Bid Procedures.

2

KC 18425537.1

The Sale Hearing on the Sale Motion with respect to Property shall be held **on June 23, 2022 at 1:30 p.m. prevailing Central time or such other date and time as Court may order**. The Sale will be [in person / virtual].

### Additional Information Regarding Any Objection

Objections, if any, to all or any part of the Motion shall be filed on the docket of the Bankruptcy Court and served such that each objection is actually received by the following parties on or before the relevant objection deadline specified above: (a) to counsel for Trustee (i) Andrea M. Chase, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, achase@spencerfane.com, and (ii) Elizabeth M. Lally, Spencer Fane LLP, 13520 California Street, Suite 290, Omaha, NE 68154, elally@spencerfane.com; and (b) the Office of the United States Trustee, Richard Kear, 301 N. Main Street, Suite 1150, Wichita, KS 67202, richard.kear@usdoj.gov.

Any person failing to timely file an objection to the Motion shall be barred from objecting to the Motion, including the sale of the free and clear of any and all liens, claims, encumbrances, and interests and will be deemed to consent to the Transaction(s), including the sale of the Properties free and clear of any and all liens, claims, encumbrances, and interests.

### The Unexpired Lease and Executory Contract Process

In connection with the Transaction, Trustee may seek to assume certain executory contracts and unexpired leases (collectively, the "**Assumed Contracts**") and rights thereunder and assign such executory contracts and unexpired leases and rights thereunder to a Successful Bidder. Alternatively, the Trustee may seek to reject any unexpired leases or executory contracts that are not Assumed Contracts. You may be receiving this notice because you are identified as a party to one or more unexpired leases or executory contracts that may be rejected, or may be assumed by the Debtors and assigned to a Successful Bidder. IF YOU BELIEVE YOU ARE RECEIVING THIS NOTICE AS A PARTY TO ONE OR MORE OF THE DEBTORS' UNEXPIRED LEASES OR EXECUTORY CONTRACTS, YOU SHOULD LOOK AT THE PROPOSED CURE SCHEDULE ATTACHED AS EXHIBIT B.

The Proposed Cure Schedule in Exhibit B (the "**Cure Schedule**")[2] lists the maximum amount that the trustee believes that a Successful Bidder may be required to pay to cure all monetary defaults with respect to each of the Assumed Contracts that may be sought to be assumed and assigned pursuant to the Sale Motion (the "**Cure Amounts**"). The inclusion of any Assumed Contracts in the Cure Schedule shall not be deemed to be an admission by the trustee that such Assumed Contract is an "executory contract" or "unexpired lease" for purposes of Section 365 of the Bankruptcy Code, and the trustee reserves all rights in connection with same. The trustee proposes to require the Successful Bidder to pay such Cure Amounts directly to the listed Assumed Contracts counterparties to cure all defaults related to the Assumed Contracts as a condition to assumption and assignment of the applicable Assumed Contract(s). The Trustee believes that the Successful Bidder will provide adequate assurance of future performance under each respective Assumed Contract.

The trustee may amend the Cure Schedule by sending a new or amended Cure Schedule at any time prior to the Sale Hearing solely to the counterparties affected. Any party to an unexpired lease or executory contract that desires to receive electronic notice of any amendment to the Cure Schedule must deliver a written request for such electronic notice, including an appropriate electronic address, to counsel for trustee

---

[2] Trustee reserves the right to supplement the Cure Schedule.

3

no later than 5:00 p.m., prevailing Central time on [_____ _____, 2022, or such other time as the Trustee may agree or as the Court may order.

After the assumption and assignment of any Assumed Contracts and rights thereunder, the trustee and the Successful Bidder will be relieved of any liability to any Assumed Contracts counterparties or other third parties that accrued or arose before the date of assumption. Further, each such Assumed Contracts will remain in full force and effect for the benefit of any Successful Bidder in accordance with its terms, notwithstanding any provision in any such Assumed Contracts which prohibits, restricts or conditions such assignment or transfer thereof or its rights thereunder.

IF NO PARTY OBJECTS TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF AN ASSUMED CONTRACT AND RIGHTS THEREUNDER OR THE CURE AMOUNT OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE BEFORE THE OBJECTION DEADLINE: (I) SUCH ASSUMED CONTRACT(S) AND RIGHTS THEREUNDER MAY BE ASSUMED AND ASSIGNED, IN WHICH CASE ALL COUNTERPARTIES THERETO WILL BE DEEMED TO HAVE CONSENTED AND WILL BE BOUND BY ORDER OF THE COURT TO SUCH ASSUMPTION AND ASSIGNMENT; (II) ANY SUCCESSFUL BIDDER WILL ENJOY ALL OF THE RIGHTS AND BENEFITS UNDER SUCH ASSUMED CONTRACT(S) WITHOUT THE NECESSITY OF OBTAINING ANY COUNTERPARTY'S WRITTEN CONSENT TO THE ASSUMPTION AND ASSIGNMENT THEREOF; (III) SUCH COUNTERPARTIES WILL BE FOREVER BARRED AND ESTOPPED FROM ASSERTING OR CLAIMING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, ANY SUCCESSFUL BIDDER, OR AN ASSIGNEE THAT ANY ADDITIONAL AMOUNTS, OTHER THAN THE CURE AMOUNT, ARE DUE OR DEFAULTS EXIST UNDER SUCH ASSUMED CONTRACT(S), OR THAT CONDITIONS TO ASSIGNMENT MUST BE SATISFIED UNDER SUCH ASSUMED CONTRACT(S) FOR THE PERIOD PRIOR TO THE EFFECTIVE DATE; AND (IV) ANY CLAIMS THAT HAVE BEEN FILED ON ACCOUNT OF SUCH ASSUMED CONTRACT(S) SHALL BE DISALLOWED AND EXPUNGED IN THESE CASES AS TO THE DEBTORS' ESTATES.

Respectfully submitted,

SPENCER FANE LLP

By: /s/ Elizabeth M. Lally

Elizabeth M. Lally (*pro hac vice*)
13815 FNB Parkway, Suite 290
Omaha, NE 68154
Phone: (402) 800-2299
Facsimile: (402) 965-8601
Email: elally@spenerfane.com

and

Eric L. Johnson                    KS #20542
Andrea M. Chase                    KS #26307
1000 Walnut St., Suite 1400
Kansas City, Missouri 64106-2140
Phone: 816-474-8100

4

KC 18425537.1

Facsimile: 816-474-3216
Email: ejohnson@spencerfane.com
        achase@spencerfane.com

COUNSEL FOR CHAPTER 11 TRUSTEE

5

KC 18425537.1

## EXHIBIT A

## BID PROCEDURES

Bidding Procedures

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| | ) | |
| **In re:** | ) | |
| | ) | |
| **US Real Estate Equity Builder, LLC, and** | ) | **Case No. 20-21358-11** |
| **US Real Estate Equity Builder Dayton, LLC,** | ) | |
| | ) | **(Jointly Administered)** |
| **Debtors.** | ) | |

## BID PROCEDURES

On _____, 2022, Trustee filed his Motion to Approve (a) Sale of Real Property Free and Clear of All Liens, Interests, Claims and Encumbrances, and Related Procedures and Bid Protection Pursuant to 11 U.S.C. § 363, (b) the Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11 U.S.C. § 365, and (c) Related Relief Pursuant to 11 U.S.C. §§ 102 and 105 [Docket No. _____] (the "**Motion**"), pursuant to which Trustee requested authority to sell certain real property to the highest and best bidders subject to the process outlined herein (the "**Transaction**"). On _____, 2022, Trustee entered into a Purchase and Sale Agreement (the "**Stalking Horse Contract**") with Dutton Ranch, LLC, or its assigns (the "**Stalking Horse Purchaser**") pursuant to which the Stalking Horse Purchaser proposes to acquire from Trustee the Property (as defined in the Stalking Horse Contract). These Bid Procedures have been approved and authorized pursuant to the Order Approving Procedures for the Solicitation of Offers for (a) the Sale of Real Property Free and Clear of Liens, Claims, Encumbrances, and Interests, (b) the Possible Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (c) Related Relief [Docket No. [___]] (the "**Bid Procedures Order**") entered by the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**") on [___], 2022.

### A. The Bidding Process

1. Subject to the conditions set forth herein, at any time on or before *[10 days after entry of Bidding Order]*, at 5:00 p.m. (prevailing Central Time) (the "**Bid Deadline**"), Trustee will (i) engage in discussions and negotiations regarding a sale transaction with any entity (a "**Potential Bidder**")[1] that has made inquiry with the Trustee or Trustee's broker, within the past 12 months regarding the sale of the Property or that the Trustee reasonably believes could lead to a bona fide written offer relating to a Transaction that would meet the requirements of these Bid Procedures

---

[1] Excluding the Stalking-Horse Purchaser who shall not be subject to any Potential Purchaser requirements hereunder.

(the "**Proposal**"), (ii) furnish to such Potential Bidder and its Representatives,[2] and to any other party that has made a request therefor in connection with its consideration of making an offer or proposal relating to a Transaction (each a "**Bid**"), public and non-public information relating to the Property that is reasonably available to the Trustee.

2. Trustee shall provide these Bid Procedures,[3] together with a copy of the Stalking Horse Contract to each Potential Bidder.

3. Prior to the selection of a Bid as the highest or best offer for the Property (the "**Successful Bid(s)**"), Trustee may: (a) receive Bids from Potential Bidders, (b) request information from Potential Bidders and engage in discussions with Potential Bidders and take such other actions to determine whether any Bid constitutes or could lead to a superior Proposal, (c) evaluate any Bid made by a Potential Bidder, (d) engage in discussions and negotiations with any Potential Bidder with respect to any Bid submitted by a Potential Bidder, and (e) take any other actions contemplated under these Bid Procedures (collectively, the "**Bidding Process**").

### B. Due Diligence for Potential Bidders

4. To obtain due diligence access or additional information, a Potential Bidder must first advise Trustee of the nature and extent of additional due diligence such Potential Bidder may wish to conduct. Trustee shall coordinate all requests for additional information and due diligence access by such Potential Bidders with Debtor, and prior to granting any due diligence access or information to any Potential Bidder. No conditions relating to the completion of due diligence will be permitted to exist after the Bid Deadline, except as otherwise agreed to by Trustee in writing, or as otherwise is contained in the Stalking Horse Contract.

### C. Submission by Bid Deadline

5. A Potential Bidder who desires to make a Bid must deliver a written copy of its written purchase and sale agreement (the "Competing Contract") to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the Competing Contract submitted and the Stalking Horse Contract) on or before **[*10 days after Entry of Bidding Procedures Order*] 5:00 p.m., prevailing Central time,** to counsel for Trustee, Andrea M. Chase, Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, MO 64106, achase@spencerfane.com and Elizabeth M. Lally, Spencer Fane LLP, 13520 California Street, Suite 290, Omaha, NE 68154, elally@spencerfane.com. The Trustee may extend the Bid Deadline, but Trustee shall promptly notify all Potential Bidders of any such extension.

### D. Determination of "Qualified Bid" Status

6. A Bid received from a Potential Bidder by the Bid Deadline (other than the Stalking Horse Purchaser) will constitute a "**Qualified Bid**" only if it includes all of the following

---

[2] "**Representatives**" means, with respect to any person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such person, when acting in such capacity on behalf of such person.

[3] Unless otherwise defined herein, capitalized terms shall have the same meaning as set forth in the Motion.

documents (the compliance of which shall be determined by Trustee) (collectively, the "**Required Bid Documents**") and a Good Faith Deposit as described below and meets all of the Bid Requirements (as defined below):

      a.    A written Competing Contract duly executed by the Potential Bidder in substantially the same form as the Stalking Horse Contract with changes only regarding the Property and contracts being purchased and changes acceptable to Trustee, together with a copy of such agreement marked to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the written Competing Contract submitted and the Stalking Horse Contract). The Competing Contract submitted by a Potential Bidder shall:

           i.    identify each and every executory contract and unexpired lease that is to be assumed and assigned to the Potential Bidder, if any;

           ii.    not contain any financing or due diligence contingencies to closing on the proposed Transaction (other than what is already contained in the Stalking Contract);

           iii.    not contain any condition to closing of the Transaction on the receipt of any third party approvals (excluding required Bankruptcy Court approval); and

           iv.    provide that the offer of the Potential Bidder is irrevocable through 90 days after the entry of an Order approving the Sale Motion and subject to the backup bidder provisions herein.

      b.    A good faith deposit (the "**Good Faith Deposit**") in the form of a wire transfer to Trustee or a certified or bank check payable to the order of Trustee (or other form acceptable to Trustee) in the amount of $10,000.00.

7. Each Potential Bidder that makes a Qualified Bid shall be referred to as a "**Qualified Bidder.**" Notwithstanding anything to the contrary herein, the Stalking Horse Purchaser shall be deemed a Qualified Bidder, and the Stalking Horse Contract shall be deemed a Qualified Bid.

### E. Bid Requirements

8. All Bids must also satisfy all of the following requirements, all solely as determined by Trustee:

      a.    The Bid must provide for consideration under the Competing Contract for the Property.

b.     The Bid must provide for the purchase of the Property and for consideration that exceeds the cash portion of the consideration offered by the Stalking Horse Purchaser by at least $10,000 (the "**Initial Minimum Overbid**").

c.     The Bid must be in cash unless Trustee consents otherwise, except for any allowed credit bids.

d.     The Bid must be accompanied by satisfactory evidence of committed financing or other financial ability to consummate the Transaction in a timely manner.

e.     If a Bid indicates that a Potential Bidder will seek the assumption and assignment of executory contract(s) or unexpired lease(s), the Bid must include sufficient information to permit Trustee, if necessary, to timely file a motion to assume and assign such executory contract(s) or unexpired lease(s) to determine the proposed assignee's ability to comply with Code § 365 (to the extent applicable).

f.     The Bid (other than the Stalking Horse Contract) cannot be conditioned upon the Bankruptcy Court's approval of any bid protections, such as a break-up fee, termination fee, expense reimbursement, working fee or similar type of payment.

g.     The Bid must expressly acknowledge and represent that the Potential Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and the assets and businesses of Debtor in making its Bid, and (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the business or assets of Debtor or the Transaction, or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Competing Contract ultimately accepted and executed by Trustee, and (iii) has authority to make the Bid, execute any documents to close on the Transaction and proceed to closing on the Transaction.

h.     The Bid must be received by the Bid Deadline.

### F.  Auction

9. If a Qualified Bidder (other than the Stalking Horse Purchaser) has been identified for the Property, the Trustee shall conduct an auction (the "**Auction**") with respect to such Qualified Bids in order to determine, in the business judgment of Trustee, the Successful Bid(s). **If no Qualified Bid (other than the Stalking Horse Contract) or Credit Bid has been submitted by the Bid Deadline or aggregated by the Trustee, the Stalking Horse Contract shall be deemed the Successful Bid and no Auction shall be conducted.**

10. The Auction, if required, will commence at 9:30 a.m. (prevailing Central Time) on *[13 days after the Bidding Deadline]* at the offices of Spencer Fane LLP, 1000 Walnut, Suite 1400, Kansas City, Missouri 64106 or at such later time or other place as designated by Trustee, or approved by Order of the Bankruptcy Court, and of which Trustee will notify all Qualified Bidders who have submitted Qualified Bids (collectively, the "**Auction Participants**").

11. Prior to the Auction, Trustee shall evaluate the Qualified Bids and select the Qualified Bid(s), Trustee determines in his business judgment to be the highest or best Qualified Bid(s) (the "**Initial Highest Bid**") for a sale of the Property. In making this determination, Trustee may consider, among other things, the amount of cash to be paid or delivered, and the other terms and conditions of the Qualified Bid(s). Trustee shall give each of the Auction Participants notice of the Initial Highest Bid and a copy of such Bid prior to the scheduled start of the Auction.

12. Only the Trustee, the Auction Participants, potential financing sources of the Auction Participants, and their respective Representatives will be entitled to attend, participate and be heard at the Auction. In order to participate and be heard at the Auction, a party must actually attend the Auction.

13. The Auction will occur in two phases.

    a.    Phase 1 of the Auction will be between Qualified Bidders other than the Stalking Horse Purchaser. All Qualified Bids in Phase I will be based on and increased from the Initial High Bid, and thereafter made in minimum increments higher than the previous Qualified Bid by at least $10,000.[4] Phase 1 of the auction will continue until the Phase 1 high bid has not been topped. The winning Phase 1 bid will be declared the Successful Phase 1 Bid. The last bid made by the unsuccessful Phase 1 bidder will be determined to be its final qualified bid under the auction procedures and for back up bidder purposes.

    b.    Phase 2 of the Auction will be between the Successful Phase 1 Bidder and the Stalking Horse Purchaser. Phase 2 of the Auction will begin by allowing the Stalking Horse Purchaser to match the Successful Phase 1 Bid[5]. If the Successful Phase 1 Bid is not matched, then it will be declared the final Qualified Bid, and the auction will be adjourned so the Trustee may assess whether such bid will be determined to be the overall Successful Bid.

    c.    If the Stalking Horse matches the Successful Phase 1 Bid, then the Successful Phase 1 Bidder will have the ability to top the Stalking Horse matching bid by the minimum $10,000 bid increment. Phase 2 will continue until either the Stalking Horse Purchaser fails to match a Phase 2 topping

---

[4] Minimum bid increments must consist solely of cash consideration unless otherwise authorized by Trustee or constitute an increase in a Lien Holder's credit bid.

[5] At all times, during Phase 2 of the Auction, a successful "match" by the Stalking Horse Purchaser may consist of matching the economic and non-economic terms of the Successful Phase 1 Bidder contract, or offering a combination of economic and non-economic terms that Trustee determines to be equal or better than the economic and non-economic terms of the Successful Phase 1 Bidder contract.

bid, or the Successful Phase 1 Bidder fails to top the Stalking Horse matching bid. If the Stalking Horse Purchaser successfully matches, then the Trustee will support that the Stalking Horse Purchaser be declared as the higher bidder. If the Stalking Horse Purchaser fails to match the final Phase 2 high bid, then the auction will be adjourned so the Trustee may assess whether such bid will be determined to be the overall Successful Bid.

d.   Trustee shall have the right to adopt such other rules for the Auction which Trustee believes in his business judgment will promote the goals of the Auction.

14. The Trustee may determine which qualified bid, if any, is the highest or otherwise best offer and reject any bid that the Trustee determines is insufficient or inadequate, not in conformity with the requirements of the Bankruptcy Code or the bid procedures, or contrary to the best interests of the debtors' estates and their creditors.

15. Each Auction Participant shall be deemed to have agreed to keep its final Qualified Bid made at or prior to the Auction open through 90 days after the entry of an Order approving the Motion. Bidding at the Auction will continue until such time as the highest or otherwise best Qualified Bid(s) are determined in the business judgment of Trustee. To facilitate a deliberate and orderly consideration of competing Qualified Bids submitted at the Auction, Trustee may adjourn the Auction at any time and from time-to-time and may conduct multiple rounds of bidding. Upon conclusion of the Auction, Trustee will (a) review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale, and (b) identify the Successful Bid(s). In making this determination, Trustee may consider, among other things, the amount of cash to be paid or delivered and the other terms or conditions of the Qualified Bid(s), and the determination by Trustee shall be final for the purposes of these Bid Procedures.

## G.  Buyer's Premium

16. A six percent (6%) buyer's premium will be added to the final bid on the Property and paid to the Auctioneer.  For example, if a buyer bids $705,000, the total sales price will be $750,000.  The buyer's premium will be used to pay the commission owed to the Trustee's broker, and any buyer's agent.

## H.  Credit Bid Right

17. The Property shall be sold without reserve, but subject to the credit bid rights set forth herein (the "**Credit Bid Right**"). The holder of a Credit Bid Right will participate in Phase I The right to credit bid under section 363(k) of the Bankruptcy Code is specifically preserved as to each Lender with a mortgage or deed of trust applicable to the Property ("**Lien Holder**") as provided herein, but only to the extent that such lien holder has timely filed a proof of claim.  A Lien Holder must pay in cash: closing costs, senior liens (including real estate, transfer and/or ad valorem taxes), applicable surcharges and real estate taxes, and any agreed upon carve outs associated with its collateral in cash. All disputes as to the applicable cash portion of the Lien Holder's bid will be determined at the sale hearing. Lien Holders shall not be required to submit a Good Faith Deposit,

but will be required to tender the required cash portion and enter into a sale contract within 14 days of the Sale Order, and close within 14 days after execution of a sale contract.

18. If a Lien Holder ultimately is found to be a successful purchaser by credit bid and its claim or lien is ultimately determined to be invalid or transferred to the bankruptcy estate pursuant to 11 U.S.C. § 510(c), in whole or in part, then such Lien Holder will be obligated to pay cash to the bankruptcy estates to make up the difference between its valid/non-transferred lien and claim and its credit bid, or as otherwise set forth in any agreement with the Trustee or ordered by the Court.

19. A party asserting a Credit Bid Right must make a Credit Bid by the Bid Deadline, but will otherwise be considered a Qualified Bidder. The initial Credit Bid shall be in the form of a written Competing Contract duly executed by the Lien Holder in substantially the same form as the Stalking Horse Contract with changes only regarding the Property and contracts being purchased, the form of consideration, and changes acceptable to Trustee, together with a copy of such agreement marked to show the specific changes to the Stalking Horse Contract that the Potential Bidder requires (which marked copy may be an electronic comparison of the written Competing Contract submitted and the Stalking Horse Contract).

## I.   Sale Hearing

20. A hearing to consider the Sale Motion for the Property and approval of the Successful Bid will be held on _____, 2022 at _:00 _.m. prevailing Central time (the "**Sale Hearing**"). The Sale Hearing will be a virtual hearing unless otherwise designated by the Bankruptcy Court. The Sale Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court without further notice to creditors and parties in interest other than by announcement by the Trustee of the adjourned date at the Sale Hearing. The Trustee may also request that the Bankruptcy Court set the Sale Hearing as an evidentiary hearing in order to determine any factual matters that may need to be established in order for the Court to approve the Sale.

21. The Trustee's presentation to the Bankruptcy Court for approval of the Successful Bid does not constitute the Trustee's acceptance of the Bid. The Trustee will be deemed to have accepted a Bid only when the Bid has been approved by Order of the Bankruptcy Court. Distribution of the sale proceeds will be taken up at the Sale Hearing(s) or such other date and time as may be directed by the Court and/or upon the agreement of the impacted parties.

## J.   Objections

22. Objections, if any, to the Sale Motion shall be filed on the docket of the Bankruptcy Court on or before **5:00 p.m., prevailing Central time on _____, 2022, or such other time as the Trustee may agree or as the Court may order** (the "**Objection Deadline**").

23. Objections to the Stalking Horse Contract shall be made on or before the hearing to approve the Bidding Procedures. If no objections to the Stalking Horse Contract are received prior to the hearing on Bidding Procedures, then the Stalking Horse Contract shall not be subject to further objection, but will remain subject to higher bids and the auction process, if additional Qualified Bids are received by the Bid Deadline.

## MODIFICATIONS

The Trustee, after consultation with the applicable Lenders and the Committee, may (a) reject at any time before entry of an Order of the Bankruptcy Court approving the successful bid(s), any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtor's estates and its creditors, and (b) impose such other terms and conditions upon bidders as the Trustee determines to be in the best interests of the Debtor's estate in this case. Notwithstanding anything to the contrary herein, the procedures related to the Credit Bid Right may only be modified with the consent of the impacted Lien Holders. To the extent that any Lien Holder(s) consent is required under these Bid Procedures and such consent is withheld, Trustee shall have the right to pursue, and the Lien Holder(s) may oppose, approval from the Bankruptcy Court without the consent of the Lien Holder(s). Additionally, in those instances where consent is not required, but only consultation, nothing herein shall prohibit a Lender from seeking immediate Court intervention to the extent that after consultation with the Trustee, the Lender disagrees with the Trustee's proposed course of action.

## Back-Up Bidders

If any Auction Participant whose Qualified Bid is a Successful Bid (a "**Successful Bidder**") fails to consummate the Transaction because of a breach or failure to perform on the part of such Successful Bidder, or for any reason other than the failure of the Bankruptcy Court to approve the terms of the Transaction, the Auction Participant that had submitted the next highest or otherwise best Qualified Bid for the same asset or assets of the estates at the Auction or prior to the Auction (the "**Back-Up Bidder**")[6] will be deemed to be the Successful Bidder, and Trustee will be authorized to consummate the Transaction with such Auction Participant without further order of the Bankruptcy Court, and such Qualified Bid shall thereupon be deemed the Successful Bid; provided that upon being notified that its Qualified Bid has become the Successful Bid, the Auction Participant submitting such Qualified Bid shall within three (3) business days after such notification provide a Good Faith Deposit (unless such Auction Participant previously shall have provided a Good Faith Deposit that shall not have been returned as described below). Upon providing such Good Faith Deposit, such Auction Participant shall be deemed the Successful Bidder. If any Auction Participant fails to consummate the Transaction because of a breach or failure to perform on the part of such Auction Participant (including, without limitation, the failure to timely deposit the Good Faith Deposit), the process described above may continue with other Auction Participants in decreasing order of the Qualified Bids as determined by Trustee, until an Auction Participant shall consummate the Transaction.

## Disposition of Good Faith Deposit

24. Except as otherwise provided in the Stalking Horse Contract, the Good Faith Deposit of the Successful Bidder(s), or a Back-Up Bidder that consummates a transaction in place of a Successful Bidder as provided for herein, shall be retained by Trustee and applied toward the payment of the Successful Bid(s) at the closing of the Transaction. If any Successful or Back-Up Bidder fails, for any reason other than Bankruptcy Court denial of the Transaction, to close a

---

[6] Including the Stalking Horse Purchaser as provided in the Stalking Horse Contract

Transaction, then the Good Faith Deposit shall be retained by Debtor's estate as partial damages for the failure to consummate the Transaction (the "**Forfeited Good Faith Deposit**"). The Good Faith Deposit of all Qualified Bidders (other than the Successful Bidder(s), a Back-Up Bidder that consummates a Transaction in place of a Successful Bidder as provided for herein, or a Successful Bidder or a Back-Up Bidder that forfeits its deposit as liquidated damages as provided for herein) will be returned, without interest, to each such Qualified Bidder within ten (10) business days after the closing of all proposed Transactions approved by the Bankruptcy Court at the Sale Hearing. For the avoidance of doubt, any Forfeited Good Faith Deposit shall be deemed property of the Debtor's bankruptcy estate and not subject to any liens.

CORE/3525081.0002/173591745.1

KC 18398980.6

KC 18649932.1

## **EXHIBIT B**

Contract Description

Lease Agreement dated May 1, 2020 by and
between USREEB LLC, as landlord, and
Alpha One PM limited liability company, as
tenant.

Cure Amount

N/A

7

KC 18425537.1