**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Peer Street, Inc., *et al*.,[1]<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 23-10815 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Nos. 18, 11, 31**<br>**Obj. Deadline: Extended for the Pacific Creditors to August 2, 2023, at 4:00 p.m. (ET)**<br>**Hearing Date: August 4, 2023, at 3:00 p.m. (ET)**<br>**(Status Conference Only)** |

**OMNIBUS OBJECTION OF PACIFIC FUNDING TRUST 1002 AND PACIFIC RBLF
FUNDING TRUST TO THE MOTIONS OF THE DEBTORS TO (A) APPROVE
A SALE OF THE DEBTORS' ASSETS AND BID PROCEDURES
AND (B) APPROVE CASH MANAGEMENT AND RELATED RELIEF**

Pacific Funding Trust 1002 and Pacific RBLF Funding Trust (the "Pacific Creditors") respectfully object (this "Objection") to the Debtors' (1) *Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (II) Approving Certain Bid Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, and (III) Granting Related Relief* [Docket No. 18] (the "Bid Procedures Motion"), and (2) *Motion Regarding Chapter 11 First Day Motions Debtors Motion for Interim and Final Orders, Pursuant to Sections 105(a), 345, 363, 503(b), 1107(a) and*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485). The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn: David Dunn, Chief Restructuring Officer.

{1397.001-W0071900.}

*1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Authorizing Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims and Intercompany Loans, (D) Waiving the Requirements of Section 345(b) on an Interim Basis, and (E) Granting Certain Related Relief Filed By Peer Street, Inc.* [Docket No. 11] (the "<u>Cash Management Motion</u>")[2] and state as follows:

## INTRODUCTION

1. The Bid Procedures Motion should be denied for the following reasons:

   - The bid procedures propose selling participation interests in mortgages that the Debtors do not own an equitable interest in, and thus the sale proceeds are not property of their estates pursuant to section 541(d) of the Bankruptcy Code. The participation interests are held exclusively in PSFLLC, which the Debtors maintain is "a bankruptcy-remote entity that is separate from our primary corporate entity [PSI]." In addition, the Debtors continue to assure MPDN holders on their website that "[i]n the unlikely event PeerStreet no longer remains in business, a third-party "special member" will step in to manage pending loan investments and ensure that investors continue to receive interest and principal payments."[3]

   - Rather than permitting bidders to bid on individual Mortgage Loans, the bid procedures propose commingling the Mortgage Loans into six Asset Pools for sale in multiple rounds of bidding. The Debtors will use the allocation ascribed by Winning Bidders as the amount owed to each MDPN holder. However, the allocation that a bidder attributes to a particular Mortgage Loan in an Asset Pool is not necessarily determinative of its value. Bidders may have several reasons to ascribe a particular value to a Mortgage Loan within an Asset Pool, such as setting a new tax basis. Allowing Winning Bidders to allocate a Mortgage Loan's value to MPDNs may lead to an inequitable result that is contrary to the bedrock principle of providing individual creditors with recoveries that correspond to the value of their individual claims. The amount a Winning Bidder allocates to an Asset within an Asset Pool should not be indicative for claims distribution purposes.

---

[2] Capitalized terms used in this Objection not otherwise defined herein shall have the meaning ascribed to them in the Bid Procedures Motion or the Cash Management Motion, as applicable.

[3] https://info.peerstreet.com/faqs/what-investor-protections-does-peerstreet-have-in-place/.

- The Debtors propose paying the top two *losing* Qualified Round Two Bidders for each of the six Asset Pools an expense reimbursement. That is extraordinary relief that is not justified in these cases.

- Approval of the Bid Procedures Motion and Cash Management Motion in their current form at this early stage is effectively case dispositive and will inevitably lead to substantive consolidation of PSFLLC with some or all of the other Debtors.

- There are additional issues with the Bid Procedures Motion, including that (i) lumping of Mortgage Loans into Asset Pools precludes individuals from having any ability to purchase their own MPDNs; (ii) to date, only a fraction of the loan files have been made available to bidders for due diligence; and (iii) the Mortgage Loans are apparently being sold free and clear of representations and warranties that would otherwise be sold with the Mortgage Loans from brokers, lenders, title companies, etc., which the Debtors received when purchasing the Mortgage Loans.

2. In addition, the Cash Management Motion should also be denied for the following reasons:

- The Debtors propose to use cash from Peer Street Funding, LLC ("PSFLLC"), which the Debtors maintain is a bankruptcy remote special purpose entity, to fund the majority of costs for the chapter 11 cases for its affiliated Debtors that are not Magnetar borrowers. PSFLLC is a bankruptcy remote special purpose entity with no employees or operations that holds participations in the Mortgage Loans of the Debtors' customers. Because it has no employees or operations and is a cash flowing investment vehicle, it is solvent and has no reason to be in bankruptcy. The Debtors have not demonstrated why PSFLLC's investors should pay for the Debtors' chapter 11 cases when the Mortgage Loans can be serviced or sold outside of bankruptcy at far lower costs and with the prospect of far greater recoveries than in a bankruptcy fire sale.

- The cash at PSFLLC consists of (a) investor money that has yet to be invested by the applicable investor (the "Investor Cash"), (b) cash that has been paid to it by PS Warehouse, LLC and PS Warehouse II, LLC (together, the "Warehouse Borrowers"), and (c) cash that has been paid to PSFLLC by its affiliates on account of participation interests that PSFLLC owns bare legal title in (the "Participated Cash Payments"). As discussed above and herein, PSFLLC owns bare legal title to the Participated Cash Payments, and therefore, such amounts are not property of PSFLLC's estate pursuant to section 541(d) of the Bankruptcy Code. Thus, PSFLLC may not use Participated Cash to fund the chapter 11 case of any Borrowing Debtor.

- Even if the Participated Cash Payments were property of PSFLLC's estate—which they are not—the Debtors should not use PSFLLC to fund the Borrowing Debtors' chapter 11 cases. The Borrowing Debtors' assertion that the loan terms will be limited to fifteen days and that PSFLLC (and any other Lending Debtor) will receive an administrative claim for any amounts loaned is illusory. There is no limitation on the amount being borrowed, nothing to prevent the Borrowing Debtors from continuously renewing the fifteen-day loan terms for each loan, and no interest being paid on such loans. Theoretically the loans will last the entire case. The sale of the Borrowing Debtors' assets will not result in enough cash to repay PSFLLC or the other Lending Debtors; rather, it will be the costs that the Borrowing Debtors charge PSFLLC that will be used to offset the loans made to them by PSFLLC. Even at this stage, the groundwork is being laid for a liquidating plan in which all intercompany claims are disallowed, and the Debtors are substantively consolidated.

- Counsel for the Debtors stated at the first day hearing that the allocation of cash from PSFLLC to the other Debtors is based on a 2019 transfer pricing study that was done by Armanino LLP. *See* Tr. 29:1-9.[4] The Debtors should not be allocating their postpetition costs based on a pricing study from four years ago.

3. For these reasons and as more fully explained *infra*, the Bid Procedures Motion and the Cash Management Motion should be denied.

## BACKGROUND

### A. The Debtors and Their Chapter 11 Cases

4. On June 26, 2023, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[4] References to "Tr." shall refer to the Transcript of Hearing, dated June 28, 2023, a copy of which is attached hereto as Exhibit A.

5.	On July 14, 2023, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors in these cases (the "Committee") pursuant to section 1102 of the Bankruptcy Code.

**B.	The Mortgage Participations Proposed to Be Sold Under the Bid Procedures**

6.	PS Funding, Inc. ("PSFI") originated the Underlying Loans. PSFI is party to an Amended and Restated Participation Agreement, dated as of November 1, 2019 (the "Participation Agreement"), with PSFLLC, which is a bankruptcy remote special purpose entity. According to the Debtors' website:



> Investments in loans are held in a bankruptcy-remote entity that is separate from our primary corporate entity. In the unlikely event PeerStreet no longer remains in business, a third-party "special member" will step in to manage pending loan investments and ensure that investors continue to receive interest and principal payments. Additionally, from the time funds are received in an investor account until an investment closes (but not while funds are invested), investor funds are held in an Investors Trust Account with Wells Fargo and FDIC insurance of up to $250,000.

https://info.peerstreet.com/faqs/what-investor-protections-does-peerstreet-have-in-place/.

7.	Under the Participation Agreement, PSFLLC purchases a *100% participation interest* in each of the Underlying Loans. To fund its purchase of participations in the Underlying Loans from PSFI, PSFLLC typically sells a *100% sub-participation interest* in each Underlying Loan to institutional and retail individual investors in the form of Mortgage Payment Dependent Notes ("MPDNs"). According to the Debtors' website:



> A mortgage-dependent promissory note, or "MDPN," is a note in which an investor receives stated interest and principal, provided the borrower makes payment on the underlying loans. PeerStreet issues an MDPN to investors, meaning they have a direct interest in the underlying loan and indirect interest in the underlying property.

https://info.peerstreet.com/glossary/mortgage-dependent-promissory-note/.

8. The result—when the dust clears—is that PSFI and PSFLLC own only bare legal title to the Underlying Loans under section 541(d) of the Bankruptcy Code, whereas equitable title is owned by the holders of the MPDNs (the "MPDN Participants").

9. Significantly, PSFLLC primarily sold MPDNs that tracked a *single* underlying investment (or fractional interest in a single underlying investment). Thus, MPDN Participants are entitled to payments equal to fractional interests in the net principal and interest payments collected on the *specific* underlying mortgage funded with their investment, net of expenses. Some investors have participation interests in high-quality performing loans, and others do not.

10. The bid procedures propose commingling the Mortgage Loans into six Asset Pools for sale. Importantly, the bid procedures provide a bidder must purchase all of the Assets within an Asset Pool, and that the Winning Bidder gets to allocate the amount attributable to each Asset within an Asset Pool for any reason (or even no reason).

### C. PSFLLC and the Investors

11.     PSFLLC is a bankruptcy remote special purpose entity. "Although a 'bankruptcy remote entity' is not defined in the Bankruptcy Code or any other statute, it is commonly recognized in the business world and literature as a structure designed to hold a defined group of assets and to protect those assets from being administered as property of a bankruptcy estate in the event of a bankruptcy filing." *Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*, 2013 Bankr. LEXIS 3074, at *389 (Bankr. N.D. Ill. July 17, 2013) (*citing*, *Comm. Bankr. & Corp. Reorganization of Ass'n of Bar of N.Y.C., Structured Financing Techniques*, 50 Bus. Law. 527, 528-29 (1995)). The goal "is to separate the credit quality of identified assets upon which financing is based from the credit and bankruptcy risks of any entity involved in the financing." *Paloian*, 2013 Bankr. LEXIS, at *389.

12.     PSFLLC was the Debtor entity that faced the more than 10,000 retail and institutional investors (the "Investors") who purchased MPDNs on the Peer Street platform, including the Pacific Creditors, which hold not less than $38 million in claims against PFLLC on account of MPDNs they purchased from it. The Debtors' website (which is still operating as of the date of this Objection) includes a page called "[w]hat investor protections does PeerStreet have in place," that states:

> **Investments in loans are held in a bankruptcy-remote entity that is separate from our primary corporate entity. In the unlikely event PeerStreet no longer remains in business, a third-party "special member" will step in to manage pending loan investments and ensure that investors continue to receive interest and principal payments**. Additionally, from the time funds are received in an investor account until an investment closes (but not while funds are invested), investor funds are held in an Investors Trust Account with Wells Fargo and FDIC insurance of up to $250,000.

See https://info.peerstreet.com/faqs/what-investor-protections-does-peerstreet-have-in-place/ (emphasis added).

13. As evidenced by the Debtors' website, Investors have every reason to believe that they were investing their money in an entity (PSFLLC) that had no likelihood of filing for bankruptcy. Even if PSI filed for bankruptcy, Investors were expressly advised that there was no risk that PSFLLC's assets would be substantively consolidated or otherwise used to satisfy the claims of its parent company.

**D. PSFLLC's Proposed Intercompany Loans to Fund These Chapter 11 Cases**

14. Upon information and belief, PSFLLC is solvent and does not need to be in bankruptcy. It functions as a cash flowing investment fund, with no employees or operations of its own. In addition, as a special purpose entity, PSFLLC has no creditors; rather, each investment is charged by affiliates of PSFLLC for services, such as servicing and collection costs, and those charges are netted from individual investments in the MPDNs. Indeed, PSFLLC has obtained all of its cash through Investor Cash deposits, the sale of MPDNs or unsecured redeemable warehouse notes (the "RWNs") to the Investors.[5] *See Decl. of David M. Dunn* ¶16-17; 20. PSFLLC no longer sells MPDNs or RWNs. The servicing of the Underlying Loans (which Debtors hold no equitable interest in) can be accomplished at far lower cost outside of bankruptcy.

---

[5] PSFLLC is party as the lender to two warehouse loan agreements with affiliates, PS Warehouse, LLC and PS Warehouse II, LLC (together, the "Warehouse Borrowers"). To obtain the capital to lend to the Warehouse Borrowers, much like it did with the MPDNs, PSFLLC sold the RWNs to Investors on the Peer Street on-line platform. See *Decl. of David M. Dunn* ¶20. PSFLLC loaned the proceeds to the Warehouse Borrowers, which, in turn, "advanced those funds as needed to PSFI to allow PSFI to close loans PSFI originated or purchased (the 'Pocket Underlying Loans'). In return, PSFI granted [each Warehouse Borrower], as applicable, a participation interest (the "Warehouse Participation Interests") in the Pocket Underlying Loans. [The Warehouse Borrowers] pledged the Warehouse Participation Interests to PSFLLC to secure the amounts PSFLLC advanced to [them] under the Warehouse Loan Agreements." *See Cash Collateral Motion*, ¶15. Like the MPDNs, the holders of the RWN's are the equitable beneficial owners of the pledge the Warehouse Borrowers made to PSFLLC to secure the loans RWN holders funded by purchasing RWNs from PSFLLC.

**ARGUMENT**

**A. The Debtors Do Not Own an Equitable Interest in the Mortgage Participations That They are Seeking to Sell Under the Bid Procedures Motion.**

15. Upon information and belief, the Pacific Creditors are MPDN Participants that own approximately 22% to 24% of the outstanding participations. Upon information and belief, the Pacific Creditors are the largest creditor of PSFLLC (and indeed the largest creditor in these Chapter 11 Cases). Affiliates of the Pacific Creditors are also reluctant participants in the bidding process and have proposed various plan structures to the Debtors, as these may be the only way they can maximize recoveries on their participation interests if the Bid Procedures Motion and Cash Management Motion are approved.

16. As set forth above, PSFLLC, a bankruptcy remote special purpose entity, used funds garnered from the sale of MPDNs to purchase 100% sub-participation interests in specific Underlying Loans, "entitling PSFLLC to all payments of principal and interest (net of fees expenses, charges, and other amounts) collected on [such] Underlying Loan[]." *See Decl. of David M. Dunn* ¶17.

17. Like the 100% loan participations sold by PSFI to PSFLLC, the MPDNs sold by PSFLLC to the MPDN Participants also constitute 100% participations, or really sub-participations.

18. The Debtors' estates have no equitable interest in the MPDNs. Property of the bankruptcy estate generally includes all legal or equitable interests of the debtor in property at the time of a case's commencement. 11 U.S.C. § 541. "However, '[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate only to the extent of the debtor's legal title to such property, ***but not to the extent of any equitable interest in such property that the debtor does not hold***." *Krohn*

*v. Burton (In re Swift)*, 496 B.R. 89, 96 (Bankr. E.D.N.Y. 2013) (*quoting* 11 U.S.C. § 541(d)) (emphasis added); *see also*, *e.g.*, *Corp. Fin., Inc v. Fidelity Nat. Title Ins. (In re Corp. Fin., Inc.)*, 221 B.R. 671, 678 (Bankr. E.D.N.Y. 1998) ("the threshold inquiry is whether the…defendants purchased true mortgage participations and if so, whether such interests are to be excluded from the plaintiff's bankruptcy estate").

19. In accordance with section 541(d) of the Bankruptcy Code, loan participants hold the equitable interest in their participation distributions even where it is the debtor who holds legal title to the property. *See In re Corp. Fin., Inc.*, 221 B.R. 671, 677-78 (Bankr. E.D.N.Y. 1998) (participations in mortgage loans fall within the §541(d) exception for equitable property interests). "If the agreements are 'true participations,' and thus sales rather than loans, 'then the funds are effectively removed from the *res* of the estate.'" *Ratto v. Sims (In re Lendvest Mortgage, Inc.)*, 119 B.R. 199, 200 (B.A.P. 9th Cir. 1990) (*citing Fireman's Fund Insurance Companies v. Grover (In re Woodson Co)*, 813 F.2d 266, 271 (9th Cir. 1987))." As summarized in *Rothenberg v. Oak Rock Fin., LLC*, No. 14-CV-3700, 2015 U.S. Dist. LEXIS 44032, 2015 WL 10663413 (E.D.N.Y. Mar. 31, 2015)):

> 'Participation agreements are a form of multiple lender transaction[s].' *In re Okura & Co. (Am.). Inc.*, 249 B.R. 596, 607 (Bankr. S.D.N.Y. 2000). 'A participation agreement is a commonly used financing device for splitting a loan between two or more lenders—the lead lender and the participants. Some of the primary reasons for participation agreements are the allocation of risk for the lead bank, the participant's passive role in negotiations with the borrower, and diversification of a bank's portfolio.' *In re Sackman Mortgage Corp.*, 158 B.R. 926, 931 (Bankr. S.D.N.Y. 1993). 'Participations are not loans; they are contractual arrangements between a lender and a third party, in which the third party, or participant, provides funds to the lender. The lender, in turn, uses the funds from the participant to make loans to the borrower.' *In re ACRO Bus. Fin. Corp.*, 357 B.R. 785, 787-88 (Bankr. D. Minn. 2006) (*citing Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics)*, 269 F.3d 726, 736 (6th Cir. 2001)). 'Under a participation agreement, the participant agrees to pay the lead lender for the lead lender's promise to transfer to the participant a like percentage of the underlying loan. In the typical participation, the lead lender transfers to the participant not only the benefits to be received from a share in the underlying loan (*i.e.*, a pro rata share in the principal and interest payments) but also the

risk of the borrower's default. The lead lender makes no warranties or guarantees about the borrower's ability to repay the loan or about the worth of the collateral in the event of default. If the borrower does default, the participant is entitled to a pro rata share of any monies received upon liquidation of the collateral, but it has no right of recourse against the lead lender.' *In re Sackman Mortgage Corp.*, 158 B.R. at 932. If the agreements are 'true participations,' and thus sales rather than loans, '*then the funds are effectively removed from the res of the estate.*' *In re Lendvest Mortgage, Inc.*, 119 B.R, 199 200 (B.A.P. 9th Cir. 1990) (*citing Fireman's Fund Insurance Companies v. Grover (In re Woodson Co.)*, 813 F.2d 266, 271 (9th Cir. 1987)).

*Id.* at *23-25 (emphasis added).

20. Courts have articulated four factors (the "Coronet Capital factors") for determining whether an interest in a loan is a true participation:

(a) money is advanced by a participant to a lead lender;

(b) a participant's right to repayment only arises when a lead lender is paid;

(c) only the lead lender can seek legal recourse against the borrower; and

(d) the document evidences the parties' true intentions.

*In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr. S.D.N.Y. 1992)); *see also Rothenberg*, 2015 U.S. Dist. LEXIS 44032 at *25-29.

21. Applying the *Coronet Capital* factors here demonstrates that the MPDN Participants plainly purchased true participation interests. First, it cannot be questioned that each MPDN Participant advanced money to a lead lender. It is notable that there is no requirement in the *Coronet Capital* factors that the participant directly advance the funds to the lead lender, rather than, as here, through an intermediary participant. As set forth in each MPDN, the name of the participant is set forth underneath the name of the lead lender.

22. Second, each MPDN Participant only has a right to repayment when the lead lender is repaid. According to the Debtors' website:



https://info.peerstreet.com/faqs/am-i-investing-directly-in-a-property/.

23. Third, only the lead lender, Peer Street Funding, Inc., can seek legal recourse against a borrower, and not PSFLLC. Because the MPDN Participants purchase their rights from PSFLLC, no MPDN Participant can have any greater rights against a borrower than PSFLLC.

24. Finally, the MPDN plainly evidences the parties' true intention that PSFLLC is selling a sub-participation in an Underlying Loan to the MPDN Participant. Courts have found evidence of a lender's and participant's intention to enter a true participation regarding a specific mortgage loan when there is a specific borrower and loan in which the participation is sold. *See Coronet Capital*, 142 B.R. at 79-80 (describing a purported participation in a consolidated mortgage loan to SSD Properties Corp.); *Rothenberg*, 2015 U.S. Dist. LEXIS 44032, 2015 WL 10663413, at *2-3 (describing a participation in a revolving credit line to Merchants Advance, LLC and AmeriMerchant LLC); *Lendvest*, 119 B.R. at 199 (describing a purported participation in a promissory note of borrowers R.B. Hawkinson and Beth L. Hawkinson secured by a deed of trust on certain property); *Sackman*, 158 B.R. at 930-32 (describing a purported participation in notes and mortgages to a partnership called YPH Associates); *Corp. Fin. Inc.*, 221 B.R. at 674 ("Each agreement provided that the investor and the plaintiff were entering into a joint venture for

the purpose of funding *a particular mortgage loan* made or to be made by the plaintiff.") (emphasis added).

25.    Here, each MPDN plainly sets forth: (a) the Mortgage Note Number, (b) the company selling the participation, (c) the company buying the participation, (d) the corresponding mortgage loan, (e) the stated principal amount of the mortgage note, (f) the yield to maturity, (h) the original issue date, and (i) the initial maturity date.  Moreover, the MPDN sets forth the responsibilities of each party, which are in line with what is commercially expected of a loan participation.  "The most determinative factor of all of these [*Coronet Capital* factors] is the risk allocation involved in the transaction.  If the participant does not bear the same risk of loss as the seller, or if the seller has made a guarantee of payment to the participant, the transaction is generally considered to be a loan and not a sale of a mortgage interest." *In re Corp. Fin*, 221 B.R. at 679.  Thus, it is without question that each MPDN sells a participation in a known and specific borrower and mortgage loan, and thus, a true participation exists.

26.    Courts have also found true participations to exist even where the purported participation is entered into to facilitate general lending operations, but loan proceeds are segregated and traceable to the underlying loans.  Therefore, even if a participant does not always know the exact object of the credit extension the participant facilitates, such a transaction may still qualify as a true participation.  For example, in *Ryan v. Zinker (In re Sprint Mortgage Bankers Corp.)*, 164 B.R. 224 (Bankr. E.D.N.Y. 1994), the Court noted that the specific properties to be mortgaged were unidentified at the time that the parties entered into the purported mortgage participations but found that to be a true participation where the funds must be segregated, and the participant must be able "to track his or her portion of the proceeds to any identifiable funds." *Id.*

at 225-29. Here, each MPDN Participant can track their participations to identifiable funds through monthly online account statements and an on-line portal.

### B. Selling the Mortgages in Pools Leads to Inequitable Results.

27. Rather than conduct an auction in a simpler manner whereby each Asset may be bid upon individually, the bid procedures propose commingling the Assets into six pools for sale. During the first round of bidding, a bidder must submit a single bid for each Asset Pool it is bidding on. Therefore, at the close of the first round of bidding, there will be no way to tell what amount a bidder is attributing to a particular Asset within an asset pool. Moreover, retail MPDN Participants will be shutout of the process completely.

28. If the bidder is selected to be one of three Qualified Round Two Bidders for any Asset Pool, then the bidder must reveal the loan-level pricing it used for its First Round Qualifying Bid. The asset allocation that a bidder used in connection with a bid for an Asset Pool, however, is not necessarily determinative of each separate Asset's value. Bidders may have several reasons to ascribe a particular value to an Asset such as setting a new tax basis—or may have no rational at all for the allocation of their purchase price. There is no requirement in the bidding procedures that there be a corollary between a Mortgage Loan's true value and the value ascribed to an Asset Pool by a bidder. Rather, the Debtors are only under an obligation to accept the highest and best bid offered for an Asset Pool. Allowing bidders to allocate an Asset's value, however, does not assure that the Debtors are receiving the highest and best offer for that particular Asset. Such an inequitable result is contrary to the bedrock principle of providing individual creditors with recoveries on their claims that correspond to the value of their individual claims. For this reason, the amount a Winning Bid attributes to a specific Asset within an Asset Pool should not be dispositive for claim distribution purposes.

### C. PSFLLC Should Not be Forced to be a Lending Debtor.

29. Upon information and belief, PSFLLC is a solvent entity that should not be a debtor in these chapter 11 cases. As discussed above, PSFLLC is a bankruptcy remote special purpose entity, which was a consideration Investors were expressly advised of when investing with PSFLLC. The Debtors are now attempting to use the Cash Management Motion to effectively force PSFLLC to fund a surreptitious DIP Loan to certain of the Debtors with Investors' funds that would otherwise be off limits. This stealth DIP has no maturity date, no limit on the amount borrowed, no interest being earned, and, most importantly, there is no limitation on the number of times that the fifteen-day maturity date of each loan can be renewed. Moreover, the Debtors have provided no evidence that the Borrowing Debtors' assets that effectively collateralize the DIP will sell for enough money to repay PSFLLC and the other Lending Debtors along with the Borrowing Debtors' other administrative creditors.

30. By requiring PSFLLC to fund the Borrowing Debtors' chapter 11 cases, the Debtors are effectively substantively consolidating PSFLLC's assets and liabilities with those of the Borrowing Debtors. This was precisely the outcome that the Debtors asserted to Investors there was only a minimal risk. To the extent that PSFLLC remains a Debtor, it should only be responsible for paying for its own chapter 11 case and not funding the cases of its affiliated Debtors.

31. Further, except in rare circumstances, Underlying Loans that are performing should not be subject to servicing advances. Currently, Investors are inexplicably not being paid on performing loans, nor are they receiving updates on when Underlying Loans are paid off or are not performing.

**D. Losing Bidders Should Not Receive Expense Reimbursement.**

32. Under the bid procedures, the Debtors propose to pay the top two *losing* Qualified Round Two Bidders for each of the six Asset pools an expense reimbursement at the expense of unsecured creditors. This is extraordinary relief that is not justified in these cases. Expense reimbursements should not be necessary to entice bidders who have already reached the second round of bidding and will only further deplete the estates and any recovery for unsecured creditors.

33. Notably, the Debtors have not cited a single case in support of their request. The Debtors cite to *In re Integrated Ress.*, 147 B.R. 650 (S.D.N.Y. 1992) and *In re Hupp Indus.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992) – neither of which address expense reimbursements (or break-up fees) to multiple bidders and neither of which is controlling Third Circuit law.

34. Under Third Circuit case law, a break-up fee (or termination provision) and expense reimbursements are evaluated as an administrative expense under section 503(b). *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re Energy Future Hldgs. Corp.*, 904 F.3d 298, 313 (3d Cir. 2018). A debtor must provide some evidence that the "expense provide[s] some benefit to the debtor's estate" such that the "bid served as a catalyst to higher bids." *O'Brien*, 181 F.3d at 536, 537.

35. Under *O'Brien* and *Reliant*, there are three scenarios where a bid protection could benefit the estate: (1) to promote more competitive bidding; (2) "to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely[;]" and (3) "assuring that a bidder adhered to its bid rather than abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction for the sale of the relevant asset." *Energy Future Hldgs.*, 904 F.3d at 313-14. Ultimately, whether a bid protection confers a benefit on the

estate is "within a bankruptcy court's discretion to approve or deny a termination fee based on the totality of the circumstances of the particular case." *Energy Future Hldgs.*, 904 F.3d at 314.

36. Here, the Debtors have not provided any evidence to demonstrate that providing expense reimbursements to 15+ second round bidders will benefit the estate or otherwise promote more competitive bidding, induce those bidders to submit bids (presumably they've already done research if they have made it to the second round), or that the expense reimbursement is necessary to prevent the second round bidders from abandoning their bids.

37. Indeed, it likely would be far less expensive for the Debtors to retain a due diligence firm upon which bidders could rely to examine each loan file and create a grid as to whether the documents are present and correct (*e.g.*, title policy, mortgage note, personal guaranty, etc.), rather than to have each of the bidders participating in the second round conduct their own diligence and receive a "work fee" type expense reimbursement.

### E. The Hearing on the Bid Procedures Motion Should be Adjourned.

38. Approval of these bid procedures at this early stage is effectively case dispositive, as the Debtors are unlikely to discern what each MPDN Participant should be paid based on their individual participation interests. The Cash Management Motion and the Bid Procedures Motion inevitably lead to substantive consolidation of (at a minimum) the non-Magnetar entities and all creditors of those entities.

### F. Additional Issues Require that the Bid Procedures Motion be Adjourned or Denied.

39. There are additional issues with the Bid Procedures Motion and the process contemplated thereby, including that (a) to date, only a fraction of the loan files have been made available to bidders for due diligence; (b) the loans are apparently being sold free and clear of representations and warranties that would otherwise be sold with the loans from brokers, lenders,

title companies, etc., that the Debtors received when purchasing the loans; (c) there is still no qualified bid form despite bids being due by August 7, 2023; and (d) the form Asset Purchase Agreement was removed from the data room and no REO Asset Purchase Agreement has been produced, even though markups of these documents are required for submission of a bid by the bid deadline on August 7, 2023.

40.     Assuming, *arguendo*, the Court determines that the MPDN Participants' interests are property of the estate, and the Bid Procedures Motion can be heard, these issues should be considered to modify the bid procedures.

## RESERVATION OF RIGHTS

41.     The Pacific Creditors reserve the right to amend this Objection and to make additional arguments at the hearing on the Bid Procedures Motion.

**WHEREFORE**, the Pacific Creditors respectfully request that the Court deny the Bid Procedures Motion and grant such other relief as the Court deems appropriate under the circumstances.

Dated: August 2, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
brown@lrclaw.com
robertson@lrclaw.com

and

**WINSTON & STRAWN LLP**
David Neier (admitted *pro hac vice*)
James T. Bentley (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700
Email: dneier@winston.com
jbentley@winston.com

*Counsel to the Pacific Creditors*