**<u>EXHIBIT A</u>**

**REO APA**

30612606.1

**[_____]**

**Purchaser**

**[PEER STREET REO SELLERS]**

**Sellers**

**and**

**PS FUNDING, INC.**

**Interim Servicer**

**REO PROPERTY SALE AND INTERIM SERVICING AGREEMENT**

**Dated as of _____, 2023**

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...............................................................................1

    Section 1.01.  Definitions..............................................................................1

ARTICLE II AGREEMENT TO PURCHASE; CONVEYANCE OF REO PROPERTY; PURCHASE PRICE; BOOKS AND RECORDS; CLOSING CONDITIONS; COSTS .......................................................................................4

    Section 2.01.  Agreement to Purchase; Conveyance of REO Property; Purchase Price. ...4

    Section 2.02.  Books and Records. ..............................................................4

    Section 2.03.  Closing Conditions................................................................5

    Section 2.04.  Costs.......................................................................................6

    Section 2.05.  "As Is Where Is" Transaction. ..............................................7

ARTICLE III REPRESENTATIONS AND WARRANTIES.........................7

    Section 3.01.  Sellers Representations and Warranties.................................7

    Section 3.02.  Interim Servicer Representations and Warranties...................8

    Section 3.03.  Purchaser Representations and Warranties. ...........................9

ARTICLE IV TRANSFER OF SERVICING..............................................9

    Section 4.01.  Assumption of Responsibilities at Transfer Date. ................9

ARTICLE V SELLERS TO COOPERATE .................................................11

    Section 5.01.  Provision of Information; Right to Examine Sellers Records. .................11

ARTICLE VI MISCELLANEOUS PROVISIONS .....................................12

    Section 6.01.  No Recourse..........................................................................12

    Section 6.02.  Amendment...........................................................................12

    Section 6.03.  Survival.................................................................................12

    Section 6.04.  Governing Law. ....................................................................12

    Section 6.05.  Venue and Retention of Jurisdiction.....................................12

    Section 6.06.  Notices. .................................................................................13

## TABLE OF CONTENTS

**Page**

Section 6.07.    Severability of Provisions. ........................................................................14

Section 6.08.    Relationship of Parties. .............................................................................15

Section 6.09.    Successors and Assigns..............................................................................15

Section 6.10.    Further Agreements. ..................................................................................15

Section 6.11.    Confidential Information. ..........................................................................15

Section 6.12.    Information Security and Privacy. .............................................................17

Section 6.13.    Counterparts. .............................................................................................18

Section 6.14.    Exhibits. ....................................................................................................18

Section 6.15.    General Interpretive Principles. ................................................................18

Section 6.16.    Reproduction of Documents. .....................................................................18

<u>EXHIBITS</u>

Exhibit A        REO PROPERTY

## REO PROPERTY SALE AND INTERIM SERVICING AGREEMENT

This is an REO Property Sale and Interim Servicing Agreement for residential and commercial real property, dated and effective as of _____, 2023, by and among (i) [PEER STREET REO SELLERS], each, a Delaware limited liability company, as sellers (each, individually, a "Seller" and, collectively, the "Sellers"), (ii) PS Funding, Inc., a Delaware corporation as interim servicer (the "Interim Servicer"), and (iii) [BUYER], a _____ [corporation/limited liability company], as purchaser (the "Purchaser" and collectively with the Sellers, and the Interim Servicer, collectively, the "Parties").

W I T N E S S E T H

WHEREAS, on June 26, 2023, the Filing Entities (as defined herein) filed voluntary petitions for relief (the "Bankruptcy Cases") under chapter 11 of title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any court having proper jurisdiction with respect to the Bankruptcy Cases, the "Bankruptcy Court");

WHEREAS, the Purchaser has agreed to purchase from the Sellers and the Sellers have agreed to sell to the Purchaser certain REO Property (as defined herein); and

WHEREAS, the Purchaser, the Sellers, and the Interim Servicer wish to prescribe the manner of purchase of the REO Property and the conveyance and interim servicing of the REO Property.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Purchaser and the Sellers agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.    Definitions.    Whenever used herein, the following words and phrases, unless the content otherwise requires, shall have the following meanings:

Agreement:    This REO Property Sale and Interim Servicing Agreement and all amendments hereof and supplements hereto.

Bankruptcy Cases:  As defined in the Recitals.

Bankruptcy Code:  As defined in the Recitals.

Bankruptcy Court:  As defined in the Recitals.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking or savings and loan institutions in the State of New York or the state in which the

Interim Servicer's servicing operations are located are authorized or obligated by law or executive order to be closed.

Closing Date:  Within five Business Days of satisfaction of all the conditions to closing in Section 2.03, or such other date that the Parties agree to in writing.

Confidential Information:  As defined in Section 6.11(b).

Customer Information:  As defined in Section 6.11(c).

Cut-off Date:  With respect to each REO Property, the close of business on _____, 2023.

Discloser:  As defined in Section 6.11(b).

Filing Entities:  Peer Street, Inc.; PS Funding, Inc.; PeerStreet Licensing, Inc.; Peer Street Opportunity Fund GP, LLC; Peer Street Funding LLC; PSF REO LLC; PS Options LLC; PS Warehouse, LLC; PS Warehouse II, LLC; Peer Street Opportunity Investors II, LP; PS Portfolio-ST1, LLC; PSF Ohio, LLC; PSF TX 1, LLC; PSF TX 2, LLC; PSF TX 4 LLC.

GAAP:  Generally accepted accounting principles, consistently applied.

Interim Servicer:  PS Funding, Inc.

Interim Servicing:  The same or similar post-foreclosure property maintenance services currently provided by Interim Servicer in connection with each REO Property, including the payment of taxes and insurance.

Interim Servicing Fee:  With respect to each REO Property, a non-refundable, non-pro-ratable servicing fee in the amount of $_____ payable in advance on the Closing Date.[1]

Mortgage Loan:  Each mortgage loan pursuant to which Sellers' foreclosure resulted in Sellers' acquisition of REO Property.

OCC:  The Office of the Comptroller of the Currency.

Parties:  As defined in the introductory paragraph.

Permitted Encumbrances:  With respect to any REO Property, any and all covenants of record, rights of way of record, easements of record, conditions of record, and other restrictions of record.

Person:  Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

Privacy Laws:  As defined in Section 6.11.

_____

[1] Please see fee schedule contained in Piper Sandler virtual data room.

Purchase Price:  The purchase price paid by Purchaser for the REO Properties listed on Exhibit A.

Purchaser:  As defined in the introductory paragraph, and any Person succeeding thereto in accordance with the provisions of this Agreement.

Quitclaim Deed:  A deed in recordable form sufficient under the laws of the jurisdiction wherein the related REO Property is located to reflect the sale and conveyance of the REO Property to the Purchaser.

Recipient:  As defined in Section 6.10(b).

REO Property:  Each property acquired by a Seller through foreclosure, acceptance of a deed in lieu of foreclosure, or otherwise in connection with the default or imminent default of a Mortgage Loan.

REO Property File:  The file in a Seller's possession relating to the REO Property.

Sale Notice:  The notice of Sellers' intent to sell the REO Properties listed in Exhibit A pursuant to the terms of this Agreement and the sale procedures approved by the Bankruptcy Court.

Sellers:  As defined in the introductory paragraph, and any Person succeeding thereto in accordance with the provisions of this Agreement.

Servicing Advances:  All customary, reasonable and necessary "out of pocket" costs and expenses (including, but not limited to, (i) reasonable attorneys' fees and disbursements, (ii) the payment of taxes and insurance, (iii) the cost of the preservation and protection of the REO Property, and (iv) the cost of any enforcement or judicial proceedings, including foreclosures) incurred in the performance by Interim Servicer of its servicing obligations in connection with the REO Property.

Servicing Transfer Date:  The date on which the responsibility for the servicing of the REO Property transfers from the Interim Servicer to the successor servicer, which date shall be the Closing Date[, or such other date as the Parties may agree, provided that such date shall not be greater than thirty (30) days following the Closing Date].

Transfer Deed:  The sheriff's deed, deed-in-lieu of foreclosure or other instrument pursuant to which the Seller or Sellers acquired titled to each REO Property.

## ARTICLE II

## AGREEMENT TO PURCHASE; CONVEYANCE OF REO PROPERTY; PURCHASE PRICE; BOOKS AND RECORDS; CLOSING CONDITIONS; COSTS

Section 2.01.      Agreement to Purchase; Conveyance of REO Property; Purchase Price.

(a)      Agreement to Purchase; Conveyance of REO Property

In exchange for the payment of the Purchase Price on the Closing Date, the Sellers agree to sell and the Purchaser agrees to purchase, without recourse, but subject to the terms of this Agreement, on a servicing released basis, all of the right, title and interest of the Sellers in and to the REO Properties listed on Exhibit A.  The Sellers shall deliver to the Purchaser a Quitclaim Deed (or an assignment of an unrecorded Transfer Deed and a Quitclaim Deed in recordable form, if the Transfer Deed has not yet been recorded) for each REO Property on the Closing Date.  The Purchase Price for the REO Properties being purchased by Purchaser shall be _____ Dollars ($_____) and shall be allocated among the REO Properties as set forth on Exhibit A.  If at any time prior to the Closing Date any REO Property listed on Exhibit A becomes subject to a contract for sale, the Sellers shall have the right to remove such REO Property from the pool of REO Properties being sold pursuant to this Agreement, and upon removal of such REO Property from the pool, the Purchase Price shall be reduced by the purchase price of the removed REO Property, as set forth on Exhibit A.

(b)      Flood Zone Service Contract and Tax Service Contract; Hazard Insurance Claims.

With respect to each REO Property, the Sellers shall assign or cause to be assigned to the Purchaser any flood zone service contract in Sellers' possession, and assign or cause to be assigned to the Purchaser any existing life of loan Tax Service Contract in Sellers' possession. With respect to each REO Property that suffers material damage after the Cut-off Date, the Sellers will assign to the Purchaser any hazard insurance claims that Sellers have against any applicable hazard insurer, and the Sellers shall deliver to the Purchaser any amounts that are delivered to Sellers under such insurance; provided, however, that the Sellers shall have no obligation to assign any hazard insurance claims for which the proceeds thereof have already been used for the repair or restoration of any material damage related to such hazard insurance claim with respect to such REO Property.

Section 2.02.      Books and Records.

The sale of each REO Property owned by a Seller shall be reflected on each Seller's balance sheet and other financial statements, tax returns, and business records as a sale of assets by such Seller.

Section 2.03.       Closing Conditions.

The closing for the purchase and sale of the REO Property shall take place on the Closing Date.  The closing shall be either: by telephone or electronic mail, confirmed by letter or wire as the parties shall agree; or conducted in person, at such place as the parties may agree.

The closing for each REO Property shall be subject to the satisfaction of each of the following conditions:

(a)       with respect to the Purchaser's obligations to close:

(i)       For each REO Property, the Sellers shall have delivered to the Purchaser (x) a Quitclaim Deed, or (y) an assignment of the Transfer Deed and a Quitclaim Deed in recordable form, if the Transfer Deed has not yet been recorded;

(ii)      all of the representations and warranties of the Sellers under this Agreement shall be true and correct as of the Closing Date (or such other date specified herein) in all material respects;

(iii)     Sellers shall have delivered to Purchaser a copy of any master listing agreement for the REO Properties (the "Master Listing Agreement");

(iv)      to Sellers' knowledge, there are no undisclosed liens, leases or Permitted Encumbrances on the REO Property; and

(v)       all other terms and conditions of this Agreement to be satisfied by the Sellers shall have been complied with in all material respects.

(b)       with respect to the Sellers' obligations to close:

(vi)      all of the representations and warranties of the Purchaser under this Agreement shall be true and correct as of the Closing Date (or such other date specified herein) in all material respects;

(vii)     all terms and conditions of this Agreement to be satisfied by the Purchaser shall have been complied with in all material respects; and

(viii)    the REO Property is not subject to a contract for sale that entitles a broker to a commission under the Master Listing Agreement.

(c)       The Purchaser and the Sellers acknowledge that (i) the Sellers may be unable to deliver a Transfer Deed (or assignment thereof) for a REO Property and (ii) REO Property may become subject to a lien prior to the Closing Date (each such REO Property satisfying the criteria in either subparagraph (i) or (ii), a "Withdrawn REO Property").  The Sellers acknowledge that an event described in either subparagraph (i) or (ii) would be grounds for the Purchaser to refuse to purchase such Withdrawn REO Property.  The Purchaser hereby agrees to purchase each Withdrawn REO Property nevertheless at a price mutually agreed to by Purchaser and the Sellers.  If Purchaser and the Sellers cannot mutually agree to a price for a

Withdrawn REO Property, Purchaser shall have no obligation to purchase such Withdrawn REO Property.

(d)      Upon satisfaction of the foregoing conditions, the Purchaser shall pay to the Sellers on the Closing Date the Purchase Price for the REO Property, together with any fees payable by Purchaser that are contemplated by this Agreement by wire transfer of immediately available funds to an account or accounts designated by the Sellers in writing to the Purchaser. The Purchaser shall pay any deboarding fees set forth in <u>Section 2.04</u> for the REO Properties sold pursuant to this Agreement directly to the Interim Servicer on the Closing Date.

(e)      On the Closing Date, Sellers agree to provide the Interim Servicer with notice of the REO Properties transferred to the Purchaser pursuant to this Agreement.

Section 2.04.      <u>Costs</u>.

Each Seller shall pay any commissions due its salesmen, and the legal fees and expenses of its attorneys associated with the sale of the REO Property.  Additionally, to the extent any taxes are due and payable on the REO Property and have not been paid by the Interim Servicer through Servicing Advances, and provided that the Purchaser has provided to the Sellers a request for such payment on a loan-level basis prior to the Closing Date, the Sellers shall be responsible for paying to the Purchaser on the Closing Date the amount of real estate taxes accruing through the Closing Date as a deduction on the Purchase Price and following the Closing Date the Purchaser shall be responsible for any and all real estate taxes relating to each REO Property.  All other costs and expenses specified herein or incurred in connection with the transfer and delivery of the REO Property, including, without limitation, recording fees, deboarding fees charged by the Interim Servicer in the amount of $____ per REO Property (such deboarding fees being exclusive of all costs and expenses of deboarding), Servicing Advances, fees for preparing and recording Quitclaim Deeds, realty transfer taxes, all outstanding or assessed property or other taxes with respect to any REO Property, fees for title policy endorsements and continuations, fees for recording Quitclaim Deeds, and the Purchaser's attorney's fees, shall be paid by the Purchaser.

The Interim Servicer may delegate its duties with one or more vendors (including any affiliate of the Interim Servicer) to perform a portion of the servicing functions on behalf of the Interim Servicer; provided, that the Interim Servicer shall remain obligated and be liable for servicing and administering the REO Properties in accordance with this Agreement without diminution of such obligation and liability by virtue of the delegation of such duties, to the same extent and under the same terms and conditions as if the Interim Servicer alone were servicing and administering the REO Properties.  The fees and expenses of any vendor, subcontractor or subservicer that the Interim Servicer has delegated duties thereto shall be agreed between the Interim Servicer and such vendor, and neither the Purchaser nor the Sellers will have any responsibility therefor whatsoever.  All actions of a vendor taken pursuant to such delegation of duties will be taken as agent of the Interim Servicer with the same force and effect as though performed by the Interim Servicer.

Section 2.05.        "As Is Where Is" Transaction.

Purchaser hereby acknowledges and agrees that, notwithstanding anything to the contrary herein, except as expressly set forth in this Agreement, the Sellers and the Interim Servicer make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the REO Property.  Without in any way limiting the foregoing, the Sellers and the Interim Servicer each hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the REO Property.  Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions of the REO Property and all such other matters relating to or affecting REO Property as Purchaser deemed necessary or appropriate and that in proceeding with its acquisition of the REO Property, Purchaser is doing so based solely upon such independent inspections and investigations.  Accordingly, except as expressly set forth in the Agreement, Purchaser will accept the REO Property on the Closing Date "AS IS" and "WHERE IS."

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES

Section 3.01.        Sellers Representations and Warranties.

The Sellers represent and warrant to Purchaser as of the date hereof and as of the Closing Date as follows:

(a)        Status, Authority, Authorization.  Except as a result of the commencement of the Bankruptcy Cases, each Seller (i) has been duly incorporated or formed and is validly existing in good standing as a corporation or limited liability company under the laws of its jurisdiction of incorporation or formation, (ii) subject to the authority of the Bankruptcy Court, has the power and authority to execute and deliver, and perform its obligations under, this Agreement, and (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement.

(b)        No Prohibitions or Violations.  Each Seller's execution and delivery of, and performance of its obligations under, this Agreement, are not prohibited by and do not violate (i) such Seller's certificate of incorporation or bylaws, certificate of formation, limited liability company agreement, or other organic documents, as applicable or (ii) any judgment or order entered against such Seller in an action or proceeding to which such Seller is a party by any court or administrative agency.

(c)        No Litigation Pending.  Excepting any action, suit, proceeding or investigation related to the Bankruptcy Cases or otherwise disclosed to the Purchaser, there is no action, suit, proceeding or investigation pending or, to the Sellers' knowledge, threatened against Sellers that, if determined adversely to such Seller either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or that Seller's ability to perform its obligations under this Agreement.

30516426.6

(d)     No Consent Required.  No consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for each Seller's execution, delivery and performance of their obligations under this Agreement, other than the approval of the Bankruptcy Court.

(e)     Right to Transfer.  As to each REO Property, the Sellers hereby represent and warrant to the Purchaser that, upon payment of the Purchase Price to the Sellers in accordance with this Agreement, the Sellers shall have full right to transfer and sell such REO Property to Purchaser free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest other than Permitted Encumbrances with respect to any REO Property, provided that no party objects to the Sale Notice, or if there are objections, provided that the objections are resolved or the Bankruptcy Court approves the sale of the REO Properties to Purchaser.

Section 3.02.     Interim Servicer Representations and Warranties.

The Interim Servicer represents and warrants to Purchaser as of the date hereof and as of the Closing Date as follows:

(a)     Status, Authority, Authorization; Licensing.  The Interim Servicer (i) has been duly incorporated and is validly existing in good standing as a corporation under the laws of its jurisdiction of incorporation, (ii) has the corporate power and authority to execute and deliver, and perform its obligations under, this Agreement, (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement, (iv) is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it (after taking into account its duties hereunder) or properties owned, or leased or serviced by it requires such qualification (except where there is an applicable statutory exemption applicable to the Interim Servicer), and (v) has all material licenses necessary to carry on its business as now being conducted (after taking into account its duties hereunder) and to perform all of its obligations hereunder and is in material compliance with state laws requiring licensing to the extent necessary to permit the servicing of the REO Property in accordance with this Agreement.

(b)     No Prohibitions or Violations; Due Execution.  The Interim Servicer's execution and delivery of, and performance of its obligations under, this Agreement are not prohibited by and do not violate (i) the Interim Servicer's certificate of incorporation or bylaws or (ii) any judgment or order entered against the Interim Servicer in an action or proceeding to which the Interim Servicer is a party by any court or administrative agency, and (iii) shall not constitute a breach of any mortgage, indenture, contract or other agreement to which the Interim Servicer is a party or by which the Interim Servicer may be bound.  When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Interim Servicer enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

(c)     No Consent Required.  No consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for the Interim

30516426.6

Servicer's execution, delivery and performance of their obligations under this Agreement, other than the approval of the Bankruptcy Court.

(d)   Ordinary Course of Business.   The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of the Interim Servicer.

(e)

Section 3.03.   Purchaser Representations and Warranties.

Purchaser represents and warrants to the Sellers as of the date hereof and as of the Closing Date as follows:

(a)   Status, Authority, Authorization.   Purchaser (i) has been duly incorporated or formed and is validly existing in good standing under the laws of its jurisdiction of incorporation or formation, (ii) has the power and authority to execute and deliver, and perform its obligations under, this Agreement, and (iii) has duly authorized its execution and delivery, and performance of its obligations under, this Agreement.

(b)   No Prohibitions or Violations.   Purchaser's execution and delivery of, and performance of its obligations under, this Agreement, are not prohibited by and do not violate (i) Purchaser's certificate of incorporation or bylaws, certificate of formation, limited liability company agreement, or other organic documents, as applicable, or (ii) any judgment or order entered against Purchaser in an action or proceeding to which Purchaser is a party by any court or administrative agency.

(c)   No Litigation Pending.   There is no action, suit, proceeding or investigation pending or, to the best of Purchaser's knowledge, threatened against Purchaser that, if determined adversely to Purchaser either in any one instance or in the aggregate, would materially adversely affect the validity of this Agreement or Purchaser's ability to perform its obligations under this Agreement.

(d)   No Consent Required.   No consent, approval, authorization or order of any court or governmental agency or body is required to be obtained, made, or given for the Purchaser's execution, delivery and performance of its obligations under this Agreement.

(e)   Funding.  Purchaser has all funds in cash necessary to consummate the Sale.

**ARTICLE IV**

**TRANSFER OF SERVICING**

Section 4.01.   Assumption of Responsibilities at Transfer Date.From the Closing Date until the Servicing Transfer Date, the Interim Servicer shall provide the Purchaser with Interim Servicing in exchange for the Interim Servicing Fee. Such Interim Servicing responsibilities shall include the payment of taxes and insurance from Servicing Advances. On the Servicing Transfer Date, the Purchaser, or its designee, shall assume all servicing responsibilities related to, and the Interim Servicer will cease all servicing responsibilities

(except as expressly set forth herein) related to, the REO Property. On or prior to the Servicing Transfer Date (or in the case of (b) below, within three (3) Business Days from and after the Servicing Transfer Date or by such other date as may be specified in this Agreement or as may be otherwise agreed), the Interim Servicer will take such steps in accordance with accepted mortgage servicing practices as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the REO Property to the Purchaser, or its designee, including but not limited to the following:

(a)    Notice to Insurance Companies. The Interim Servicer shall transmit to the applicable insurance companies and their agents, notification of the transfer of the servicing of the REO Property to the Purchaser, or its designee, and instructions to deliver all insurance statements to the Purchaser, or its designee, from and after the Servicing Transfer Date. The Interim Servicer shall provide the Purchaser with copies of all such notifications no later than fifteen (15) calendar days from and after the Servicing Transfer Date.

(b)    Delivery of Servicing Records.   The Interim Servicer shall forward to the Purchaser, or its designee, all servicing records and the REO Property Files in the Interim Servicer's possession relating to each REO Property and related Mortgage Loan, and shall make any such records available to the Purchaser, or its designee, during normal business hours.

(c)    IRS Forms.  The Interim Servicer shall file all IRS forms required to be filed in relation to the servicing and ownership of the REO Property on or before the Servicing Transfer Date.

(d)    Insurance Policies.  For thirty (30) calendar days after the Servicing Transfer Date, the Interim Servicer shall deliver such insurance policies or renewals and invoices as Interim Servicer may receive with respect to the REO Property to Purchaser within five (5) Business Days of Interim Servicer's receipt of same, and thereafter the Interim Servicer shall exercise commercially reasonable efforts to deliver such insurance policies or renewals and invoices as Interim Servicer may receive with respect to the REO Property to Purchaser within a reasonable time of Interim Servicer's receipt of same.

(e)    Transfer of Servicing.  On the Servicing Transfer Date, the Interim Servicer shall transfer servicing of the related REO Property to the Purchaser or its designee pursuant to the terms of this Agreement and the procedures reasonably agreed to by the Interim Servicer, the Sellers, the Purchaser and the Purchaser's designee, if any.

(f)    Termination of Listing Agreement.  On the Servicing Transfer Date, the Interim Servicer shall terminate any listings of REO Property pursuant to the terms of the Master Listing Agreement without any cost to the Purchaser.

(g)    Reimbursement for Servicing Advances.  Following the Servicing Transfer Date, the Interim Servicer shall be reimbursed by the Purchaser for any unreimbursed and properly made Servicing Advances made or incurred (including, without limitation, professional fees that have been incurred for services rendered but not yet billed for) after the Cut-off Date with respect to any related REO Property; provided that the Purchaser shall not be liable for any such Servicing Advances to the extent the Interim Servicer's invoice (and detail of such Servicing

Advances) is received by the Purchaser more than sixty (60) calendar days following the Servicing Transfer Date.  Such reimbursement shall be paid by the Purchaser or its designee to the Interim Servicer following the delivery to the Purchaser of invoice(s), in form and substance in accordance with Accepted Practices, including, but not limited to, reasonable detail of the Servicing Advances or other evidence of such amounts.  For the avoidance of doubt, Purchaser shall not be required to make any reimbursements or any other type of payment whatsoever in respect of Servicing Advances that were made or incurred on or prior to the Cut-off Date.  The Sellers are responsible for reimbursing the Interim Servicer for any unreimbursed Servicing Advances made or incurred (including, without limitation, professional fees that have been incurred for services rendered but not yet billed for) prior to or on the Cut-off Date with respect to any related REO Property.  Such reimbursement shall be paid by the Sellers to the Interim Servicer following the delivery to the Sellers of invoice(s), in form and substance in accordance with Accepted Practices, including, but not limited to, reasonable detail of the Servicing Advances or other evidence of such amounts.  The Interim Servicer is not obligated to make any Servicing Advances, and shall make Servicing Advances only to the extent it reasonably believes that it will be promptly reimbursed for such Servicing Advances.  Any Servicing Advances made by the Interim Servicer shall be restricted to such minimal Servicing Advances as are necessary for preserving and administering the REO Property on a temporary basis, it being agreed and understood that the servicing of the REO Property is intended to be transferred to the Purchaser or the Purchaser's designee on or before the Servicing Transfer Date. This paragraph shall survive the termination of this Agreement.

**ARTICLE V**

**SELLERS TO COOPERATE**

Section 5.01.          <u>Provision of Information; Right to Examine Sellers Records</u>.

During the term of this Agreement, the Sellers shall furnish to the Purchaser such periodic, special, or other reports or information as the Purchaser may reasonably request, and copies or originals of any documents contained in the REO Property File for each REO Property provided for herein.  All periodic, special or other reports or information not provided for in this Agreement as shall be necessary, reasonable, or appropriate with respect to the Purchaser or any regulatory agency will be provided at the Purchaser's expense after delivery to Purchaser of invoices with reasonable detail or other evidence of such amounts.  All such reports, documents or information shall be provided by and in accordance with all reasonable instructions and directions that the Purchaser may give.  In addition, during the term of this Agreement, the appropriate Seller shall provide to the OCC and to comparable regulatory authorities supervising the Purchaser or any of Purchaser's assigns and the examiners and supervisory agents of the OCC and such other authorities, access to the documentation required by applicable regulations of the OCC and other authorities with respect to the REO Property or related Mortgage Loans. Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices designated by the Sellers.

Each Seller shall execute and deliver all such instruments and take all such action as the Purchaser may reasonably request from time to time, in order to effectuate the purposes and to carry out the terms of this Agreement.

30516426.6

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.01.    <u>No Recourse</u>.  The Purchaser agrees that the obligations of the Sellers and the Interim Servicer to the Purchaser under this Agreement are non-recourse obligations of the Sellers and the Interim Servicer and, except to the extent set forth in this Article VI, the Purchaser shall have no recourse to the Sellers or to the Interim Servicer for any obligations of the Sellers or the Interim Servicer under this Agreement.

Section 6.02.    <u>Amendment</u>.

This Agreement may be amended from time to time by written agreement signed by the Sellers, the Interim Servicer and the Purchaser.

Section 6.03.    <u>Survival</u>.

The respective representations and warranties of the Parties contained herein and in any other agreement, certificate, instrument or other document associated therewith or herewith shall not survive and shall expire upon the closing on the Closing Date, except for the representations and warranties of the Interim Servicer in <u>Section 3.02</u>, which shall expire on the Servicing Transfer Date.

Section 6.04.    <u>Governing Law</u>.

THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH (A) THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO RULES GOVERNING THE CONFLICT OF LAWS AND, (B) TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

Section 6.05.  <u>Venue and Retention of Jurisdiction</u>.

(a)    WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, (I) THE BANKRUPTCY COURT SHALL RETAIN EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND TO DECIDE ANY CLAIMS OR DISPUTES THAT MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT, ANY BREACH OR DEFAULT HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND (II) ANY AND ALL PROCEEDINGS RELATED TO THE FOREGOING SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO AND SUBMIT TO THE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT AND SHALL RECEIVE NOTICES AT SUCH LOCATIONS AS INDICATED IN <u>SECTION 6.06</u> HEREOF; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY CASES HAVE CLOSED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE SITTING IN NEW CASTLE COUNTY OR THE STATE COURTS OF THE STATE OF DELAWARE SITTING IN NEW CASTLE COUNTY AND ANY APPELLATE

30516426.6

COURT FROM ANY COURT THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE.  THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.  EACH OF THE PARTIES HERETO AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    EACH OF THE PARTIES HERETO HEREBY CONSENTS TO PROCESS BEING SERVED BY ANY PARTY OF THIS AGREEMENT IN ANY SUIT, ACTION OR PROCEEDING BY DELIVERY OF A COPY THEREOF IN ACCORDANCE WITH THE PROVISIONS OF SECTION 6.06 HEREOF.

(c)    EACH OF THE SELLERS, THE INTERIM SERVICER AND THE PURCHASER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OR ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE SELLERS OR THE PURCHASER.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PURCHASER TO ENTER INTO THIS AGREEMENT.

Section 6.06.    Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or delivered by overnight courier as follows:

(a)    if to the Sellers:

PS Funding, Inc.
c/o Province, LLC
2360 Corporate Circle, Suite 340
Henderson, NV 89074
Attn:  David Dunn, Chief Restructuring Officer
Email: ddunn@provincefirm.com

With a copy (that will not constitute notice) to:

Young Conaway Stargatt & Taylor, LLP
1000 N. King Street
Wilmington, DE 19810
Attn:  Joseph Barry, Esquire
Email: jbarry@ycst.com

or such other address as may hereafter be furnished to the Purchaser and the Interim Servicer in writing by the Sellers in accordance with this <u>Section 6.06</u>;

(b)    if to the Interim Servicer:

    PS Funding, Inc.
    c/o Province, LLC
    2360 Corporate Circle, Suite 340
    Henderson, NV 89074
    Attn:  David Dunn, Chief Restructuring Officer
    Email:  ddunn@provincefirm.com

    With a copy (that will not constitute notice) to:

    Young Conaway Stargatt & Taylor, LLP
    1000 N. King Street
    Wilmington, DE 19810
    Attn:  Joseph Barry, Esquire
    Email:  jbarry@ycst.com


or such other address as may hereafter be furnished to the Purchaser and the Sellers in writing by the Interim Servicer in accordance with this <u>Section 6.06</u>; and

(c)    if to the Purchaser:

    _____
    _____
    _____
    _____
    Email:_____
    Telephone:_____


or such other address as may hereafter be furnished to the Sellers and the Interim Servicer in writing by the Purchaser in accordance with this <u>Section 6.06</u>.

Section 6.07.    <u>Severability of Provisions</u>.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

Section 6.08.    Relationship of Parties.

Nothing herein contained shall be deemed or construed to create a partnership or joint venture among the parties hereto and the services of the Sellers and the Interim Servicer shall be rendered as an independent contractor and not as agent for the Purchaser.

Section 6.09.    Successors and Assigns.

This Agreement shall bind and inure to the benefit of and be enforceable by the Sellers, Interim Servicer and the Purchaser and the respective permitted successors and assigns of the Sellers, the Interim Servicer and the Purchaser.  After the Closing Date, this Agreement shall not be assigned, pledged or hypothecated by any of the Purchaser, the Sellers, or the Interim Servicer to a third party without the prior written consent of the Purchaser, the Sellers, or the Interim Servicer, as applicable, which consent may be withheld by the Purchaser in its sole discretion.

Section 6.10.    Further Agreements.

The Purchaser, the Sellers, and the Interim Servicer each agree to execute and deliver to the other such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 6.11.    Confidential Information.

(a)    The Purchaser, the Sellers, and the Interim Servicer hereby acknowledge that certain information including, without limitation, the Mortgage Loans, is confidential, sensitive, or proprietary in nature.  Any of the Purchaser, the Sellers, or the Interim Servicer may also designate information disclosed in connection with the transaction contemplated by this Agreement as "Confidential Information" by written notice to the other party at the time of initial disclosure of such information.  Each of the Purchaser, the Sellers, and the Interim Servicer agrees that it shall use such Confidential Information solely for the purpose of fulfilling the terms and conditions of this Agreement and shall disclose such Confidential Information only to its affiliates and its affiliates' directors, officers, employees, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), controlling persons (collectively, its "Representatives") to the extent reasonably necessary or expedient for the performance of its obligations under this Agreement.  Such Representatives shall use commercially reasonable safeguards to maintain the confidentiality of such Confidential Information and to prevent its disclosure to any person not authorized to receive such information.

(b)    The term "Confidential Information" shall mean this Agreement and all proprietary information, data, trade secrets, business information and other information of any kind whatsoever that: (a) a party hereto ("Discloser") discloses, in writing, to the other party ("Recipient") or to which Recipient obtains access in connection with the negotiation and performance of this Agreement, and that (b) relates to: (i) a party hereto or its customers, or (ii) third-party vendors or licensors who have made confidential or proprietary information available to a party hereto.  Confidential Information shall include Customer Information (as defined below).

30516426.6

(c)     The Sellers and the Interim Servicer acknowledge that the Purchaser has a responsibility to its customers to keep information about its customers and their customers and their accounts ("Customer Information") strictly confidential.  In addition to the other requirements set forth in this Section 6.11 regarding Confidential Information, Customer Information shall also be subject to the additional restrictions set forth in this Subsection.  The Sellers and the Interim Servicer shall not disclose or use Customer Information other than to carry out the purposes for which such Customer Information has been disclosed to the Sellers or the Interim Servicer.  The Sellers and the Interim Servicer shall not disclose any Customer Information other than on a "need to know" basis and then only to: (a) affiliates of the Purchaser; (b) its and its affiliates' Representatives; (c) affiliates of the Sellers and the Interim Servicer provided that such affiliates shall be restricted in use and redisclosure of the Customer Information to the same extent as the Sellers or the Interim Servicer; (d) to subcontractors provided that such subcontractors shall have entered into a confidentiality agreement no less restrictive than the terms hereof; (e) to independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section 6.11; or (f) pursuant to the exceptions set forth in 15 U.S.C. § 6802(e) and accompanying regulations that disclosures are made in the ordinary course of business.  In addition, each party further agrees that any Customer Information transmitted electronically by either party must be encrypted.  The restrictions set forth herein shall apply during the term and after the termination of this Agreement.

(d)     Each of the Purchaser, the Sellers and the Interim Servicer, as the Recipient, hereby agrees on behalf of itself and its employees, officers, affiliates and subcontractors that it will not disclose Confidential Information to any person for any reason whatsoever, other than on a "need to know basis" and then only to: (a) its employees and officers; (b) subcontractors and other third parties specifically permitted under this Agreement, provided that all such persons agree to the provisions of this Agreement applicable to such persons or are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section 6.11; (c) independent contractors, agents, experts and consultants hired or engaged by the Purchaser, provided that all such persons are subject to a confidentiality agreement that shall be no less restrictive than the provisions of this Section 6.11; and (d) as required by law or regulation, including in connection with the Bankruptcy Cases, or as otherwise permitted by this Agreement, either during the term of this Agreement or after the termination or expiration of this Agreement. Prior to any disclosure of Confidential Information as required by law or regulation, the party making such disclosure (except as may be prohibited by law or regulations) shall use its commercially reasonable efforts to: (i) notify the other party of any actual or threatened legal compulsion of such disclosure, and any actual or asserted legal obligation of disclosure promptly upon learning thereof, and (ii) cooperate with the other party's (and at the other party's sole expense) reasonable, lawful efforts to resist, limit or delay disclosure.

(e)     Upon the termination or expiration of this Agreement, the Recipient shall (except as may be required to be maintained by law or regulation) as promptly as practicable destroy  or return, in its sole discretion, all Confidential Information, including Customer Information, in the possession of the Recipient or in the possession of any third party over which Recipient has or may exercise control to the extent such Confidential Information is not required for legal and compliance, audit or record keeping purposes, including compliance with any bona fide records retention policy; provided that Customer Information that is also Customer Information of the

Recipient (independent of the transactions contemplated by this Agreement) shall not be required to be returned or destroyed.

(f)    With the exception of the obligations related to Customer Information, the obligations of confidentiality in this Section 6.11 shall not apply to any information that any of the Purchaser, the Sellers, or the Interim Servicer rightfully has in its possession when disclosed to it by the other party, information that any of the Purchaser, the Sellers or the Interim Servicer independently develops, information that is or becomes known to the public other than by breach of this Section 6.11, or information rightfully received by any of the Purchaser, the Sellers or the Interim Servicer from a third party without the obligation of confidentiality.

(g)    None of the Purchaser, the Sellers, nor the Interim Servicer shall issue any media releases, public announcements and public disclosures relating to this Agreement or use the name or logo of the other party, including, without limitation, for or in connection with any promotional or marketing material, or customer lists; provided, however, that this restriction shall not apply to any disclosure required in connection with the Bankruptcy Cases or by legal, accounting or regulatory requirements beyond the reasonable control of such party.

(h)    Notwithstanding anything set forth to the contrary in this Agreement, subject to Applicable Law, the provisions of Section 6.11 (other than Section 6.11(g)) shall expire and be of no further force and effect on the Closing Date.

Section 6.12.    Information Security and Privacy.

The Sellers and the Interim Servicer acknowledge that the Purchaser is required to comply with the information security standards required by the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801, 6805(b)(1)), as amended, and the regulations issued thereunder (12 C.F.R. Part 40) (collectively, the "GLB Act") and with other statutory and regulatory requirements (collectively, "Privacy Laws") as well as its internal information security program for information protection.    If applicable, the Sellers and the Interim Servicer shall make commercially reasonable efforts to assist the Purchaser to so comply and to conform to its own policies for information protection with applicable Privacy Laws, as amended from time to time. At the Purchaser's request, the Sellers and the Interim Servicer shall make commercially reasonable modifications to their information security program or to the procedures and practices thereunder to conform to the Purchaser's security requirements as they exist from time to time.

(a)    Within thirty (30) calendar days of the Purchaser's written request, the Sellers and the Interim Servicer shall deliver to the Purchaser's information protection department a copy of its written information security program.    The program shall be designed to:

(i)    Ensure the security, integrity and confidentiality of Confidential Information;

(ii)    Protect against any anticipated threats or hazards to the security or integrity of such Confidential Information;

(iii)    Protect against unauthorized access to or use of such Confidential Information that could result in substantial harm or inconvenience to the person that is the subject of such information; and

(iv)    Ensure the proper disposal of such Confidential Information.

Section 6.13.    Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 6.14.    Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 6.15.    General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

(c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)    the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)    the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 6.16.    Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information

30516426.6

18

previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process.  The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 6.17.    <u>Indemnification.</u>

To the fullest extent permitted by law, Purchaser shall indemnify, defend and hold harmless Interim Servicer and its affiliates or any vendor performing Interim Servicing functions on behalf of the Interim Servicer, and their respective officers, directors, members, managers, partners, equityholders, representatives, agents and successors and assigns (collectively, the "Indemnified Parties") from and against any and all claims, actions, damages, expenses (including reasonable attorneys' fees), losses or liabilities incurred by or asserted against the Indemnified Parties that result from, arise out of, relate to, or are caused by, any damage or destruction to REO Property and any and all fees, costs or penalties incurred by the Indemnified Parties, to the extent that such claims, actions, damages, expenses, losses, liabilities, fees, costs or penalties are caused by or arise out of the Interim Servicing provided by any of the Indemnified Parties, including, without limitation, any Interim Servicing or any other servicing obligations related to the REO Properties that occur after the Closing Date or the Servicing Transfer Date; provided that Purchaser shall not be required to indemnify the Indemnified Parties for any loss or claim to the extent such loss or claim is due to the negligence or willful misconduct of such Indemnified Parties.

*Signature Page Follows*

IN WITNESS WHEREOF, the Sellers, the Purchaser, and the Interim Servicer have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

Purchaser:                                                      Sellers:

[_____]                [PEER STREET REO SELLER]


By:_____                By:_____
    Name:                                                          Name:
    Title:                                                            Title:


Interim Servicer:

**PS FUNDING, INC.**                              [PEER STREET REO SELLER]


By:_____                By:_____
    Name:                                                          Name:
    Title:                                                            Title:

[SIGNATURE PAGE TO REO PROPERTY SALE AND INTERIM SERVICING AGREEMENT]

EXHIBIT A

REO PROPERTY

| Mortgage Loan Number | Purchase Price |
|---|---|
| | |
| | |
| | |