# **<u>EXHIBIT A</u>**

1

```
 1                      UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 2

 3   IN RE:                        .  Chapter 11
                                   .  Case No. 23-10815 (LSS)
 4   PEER STREET, INC.,            .
     et al.,                       .  (Joint Administration Requested)
 5                                 .
                                   .  Courtroom No. 6
 6                                 .  824 Market Street
                         Debtors.  .  Wilmington, Delaware 19801
 7                                 .
                                   .  Wednesday, June 28, 2023
 8   . . . . . . . . . . . . . .   2:03 p.m.

 9                         TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                 CHIEF UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:            Joseph M. Barry, Esquire
                                 Shella Borovinskaya, Esquire
13                               YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                 Rodney Square
14                               1000 North King Street
                                 Wilmington, Delaware 19801
15

16   For Magnetar:              Marc E. Hirschfield, Esquire
                                 ROYER COOPER COHEN BRAUNFIELD, LLC
17                               1120 Avenue of the Americas
                                 4th Floor
18                               New York, New York 10036

19   (APPEARANCES CONTINUED)

20   Audio Operator:            Brandon J. McCarthy, ECRO

21   Transcription Company:     Reliable
                                 The Nemours Building
22                               1007 N. Orange Street, Suite 110
                                 Wilmington, Delaware 19801
23                               Telephone: (302)654-8080
                                 Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:      Joseph F. Cudia, Esquire
                              UNITED STATES DEPARTMENT OF JUSTICE
3                             OFFICE OF THE UNITED STATES TRUSTEE
                              J. Caleb Boggs Federal Building
4                             844 King Street
                              Suite 2207, Lockbox 35
5                             Wilmington, Delaware 19801

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2    MOTIONS:                                                     PAGE

3    Agenda
     Item 3:    Debtors' Motion for an Order, Pursuant to          53
4               Bankruptcy Rule 1015 and Local Rule 1015-1,
                Authorizing the Joint Administration of the
5               Debtors' Chapter 11 Cases
                [Docket No. 4; 6/26/23]
6
                Court's Ruling:                                    54
7
     Agenda
8    Item 4:    Debtors' Application for the Retention and         54
                Appointment of Stretto, Inc. as Claims and
9               Noticing Agent [Docket No. 5; 6/26/23]

10              Court's Ruling:                                    55

11   Agenda
     Item 5:    Debtors' Motion for Interim and Final Orders,      56
12              Pursuant to Sections 105(a), 363, and 364
                of the Bankruptcy Code, (A) Authorizing
13              Payment of Prepetition Obligations Incurred in
                the Ordinary Course of Business in Connection
14              with Insurance Programs, Including Payment of
                Policy Premiums and Broker Fees, (B)
15              Authorizing Banks to Honor and Process Check
                and Electronic Transfer Requests Related
16              Thereto, and (C) Scheduling a Final Hearing
                [Docket No. 6; 6/26/23]
17
                Court's Ruling:                                    56
18
     Agenda
19   Item 6:    Debtors' Motion for Interim and Final Orders,      56
                Pursuant to Sections 105(a), 363(b), 507(a)(8)
20              541, 1107(a), and 1108 of the Bankruptcy Code,
                (A) Authorizing the Debtors to Pay Certain
21              Prepetition Taxes and Fees and Related
                Obligations, (B) Authorizing Banks to Honor
22              and Process Check and Electronic Transfer
                Requests Related Thereto, and (C) Scheduling a
23              Final Hearing [Docket No. 7; 6/26/23]

24              Court's Ruling:                                    58

25

1                              INDEX

2   MOTIONS:                                                     PAGE

3   Agenda
    Item 7:    Debtors' Motion for Interim and Final Orders,      58
4              Pursuant to Sections 105(a) and 366 of the
               Bankruptcy Code, (A) Prohibiting Utility
5              Companies From Altering, Refusing, or
               Discontinuing Utility Services, (B) Deeming
6              Utility Companies Adequately Assured of Future
               Payment, (C) Establishing Procedures for
7              Determining Additional Adequate Assurance of
               Payment, and (D) Setting a Final Hearing
8              Related Thereto [Docket No. 8; 6/26/23]

9              Court's Ruling:                                    59

10  Agenda
    Item 8:    Motion of Debtors for Entry of Interim and         51
11             Final Orders (I) Authorizing Debtors to Pay
               Certain Prepetition Wages, Salaries, and Other
12             Compensation, (II) Authorizing Continuation of
               Employee Benefit Programs, (III) Authorizing
13             Banks to Honor and Process Checks and
               Transfers Related to Such Employee
14             Obligations, and (IV) Granting Related Relief
               [Docket No. 9; 6/26/23]
15
               Court's Ruling:                                    52
16
    Agenda
17  Item 9:    Debtors' Motion for Entry of Interim and Final     60
               Orders (A) Authorizing the Debtors to Pay
18             Certain Prepetition Claims of Critical
               Vendors; (B) Authorizing Banks to Honor and
19             Process Check and Electronic Transfer Requests
               Related Thereto; and (C) Granting Related
20             Relief [Docket No. 10, 6/26/23]

21             Court's Ruling:                                    61

22

23

24

25

1                              INDEX

2  MOTIONS:                                            PAGE

3  Agenda
   Item 10:   Debtors' Motion for Interim and Final Orders,      32
4             Pursuant to Sections 105(a), 345, 363, 503(b),
              1107(a) and 1108 of the Bankruptcy Code,
5             Bankruptcy Rule 2015, and Local Rule 2015-2,
              (A) Authorizing and Approving Continued Use of
6             Cash Management System, (B) Authorizing Use of
              Prepetition Bank Accounts and Business Forms,
7             (C) Authorizing Continued Performance of
              Intercompany Transactions in the Ordinary
8             Course of Business and Granting Administrative
              Expense Status for Post-petition Intercompany
9             Claims and Intercompany Loans, (D) Waiving the
              Requirements of Section 345(b) on an Interim
10            Basis, and (E) Granting Certain Related Relief
              [Docket No. 11; 6/26/23]

11

12            Court's Ruling:                               41

13 Agenda
   Item 11:   Debtors' Motion for Entry of Interim and Final     43
14            Orders (A) Authorizing the Debtors' Use of
              Cash Collateral; (B) Granting Adequate
15            Protection to the Prepetition Secured Parties;
              (C) Scheduling a Final Hearing, and (D)
16            Granting Related Relief
              [Docket No. 12; 6/26/23]

17
              Court's Ruling:                               49
18

19                            EXHIBITS

20 DECLARATIONS:                                        PAGE

21 1) Declaration of David M. Dunn                          50

22 Transcriptionists' Certificate                           64

23

24

25

1          (Proceedings commenced at 2:03 p.m.)

2                THE CLERK:  Please rise.

3                THE COURT:  Please be seated.

4                MR. BARRY:  Good afternoon, Your Honor.  For the

5   record, Joe Barry of Young Conaway, on behalf of Peer Street,

6   Inc. and its affiliates.  At the top, Your Honor, I wanted to

7   thank Your Honor and your chambers' staff for agreeing to

8   hear us today.  I know there's a lot of burdens on Your

9   Honor's calendar, so we do appreciate you making the time to

10  fit us in.

11               Before I get to some introductions, Your Honor, I

12  wanted to note that about two weeks ago we sent draft papers

13  to Mr. Cudia at the U.S. Trustee's Office and in that time,

14  we've been able to work through all of the U.S. Trustee's

15  issues in connection with our papers.  So, at least as to the

16  U.S. Trustee's Office, I believe we're appearing before you

17  on an uncontested basis.

18               THE COURT:  All right.

19               MR. BARRY:  We appreciate Mr. Cudia's work,

20  working with us so that we could deliver what, again, is

21  hopefully uncontested papers today.

22               Your Honor, appearing with me today from my firm

23  are my colleagues Ryan Bartley and Shella --

24               MS. BOROVINSKAYA:  Borovinskaya.

25               MR. BARRY:  -- Borovinskaya.  I practiced that.

1  That's the thing I practiced the most is Borovinskaya.

2          THE COURT:  Keep practicing.

3      (Laughter)

4          MR. BARRY:  Your Honor, appearing by Zoom is our

5  co-counsel at Kramer Levin, Brad O'Neill.  We also have, Your

6  Honor, in the courtroom with us, our first day declarant,

7  David Dunn from Province.  Mr. Dunn was appointed as the

8  company's CRO a couple of months ago.  We also have, again by

9  Zoom, observing, the company's chief executive officer and

10 president, Brewster Johnson, and chief financial officer

11 Ellen Conway -- Coleman -- excuse me.

12          Notably, Your Honor, I just wanted to highlight

13 for the Court -- they're not here and present -- but the

14 company has a four-person board.  Mr. Johnson occupies one

15 seat.  The other three seats are occupied by three very well-

16 known, very well-regarded independent fiduciaries.  One is

17 Freddie Reese (phonetic).  Mr. Reece founded the

18 restructuring group at PricewaterhouseCoopers and spent the

19 balance of his career as a senior management director at FTI

20 Consulting.  Ivona Smith, who was a director at Drivetrain.

21 She's a 25-year financial services industry professional who

22 sat on many a public and private boards as independent

23 fiduciaries.  She's acted as plan administrator, plan trustee

24 in many bankruptcy cases, including in this jurisdiction.

25 And we also have David Eaton.  Mr. Eaton is a very well-known

1  and very well-regarded, 30-year veteran of the restructuring

2  industry, mostly as a senior partner at Kirkland & Ellis.

3  So, Your Honor, I just wanted to let the Court know that

4  these cases, with Mr. Dunn and the independent directors,

5  are, I think, under premier stewardship for this bankruptcy

6  case.

7          A little background on the company, Your Honor.

8  I'll try not to be too repetitive.

9          THE COURT:  You can be repetitive, because I

10  found -- I may have a lot of questions.

11          MR. BARRY:  Okay.  Very well.

12          THE COURT:  Financial service industry bankruptcy

13  cases, I find, to be challenging.

14          MR. BARRY:  They can be, Your Honor.

15          So, Peer Street was founded in 2013.  It was

16  introduced, the first and largest two-sided online

17  marketplace for investing in and funding real estate debt.

18  On one side of the platform, Peer Street provides individual

19  investors with access to an alternative asset class that was

20  previously difficult for them to access.  And on the other

21  side of the marketplace, it provided capital to real estate

22  lenders and their borrowers.

23          Historically, Peer Street sourced loans from a

24  nationwide network of private lenders and brokers.  The loans

25  were either offered for sale to institutional investors or

1  posted on Peer Street's online platform, which is an

2  investing platform at PEERSTREET.COM, where investors could

3  go on.  They could browse and select from investments based

4  on multiple risk criteria and the like, and analyze their

5  investment risks and what they wanted to choose to invest in

6  on a fractional basis in a streamlined platform.

7          Peer Street also acts as master servicer for -- it

8  manages the loans on behalf of the institutional and

9  individual lenders -- excuse me -- investors.

10          Structurally, Your Honor, Peer Street, Inc. is the

11  parent company for all of the Peer Street entities.  So this

12  is the entity that employs all the employees, performs the

13  payroll and accounting functions.  It raises capital.  And it

14  offers general management services.

15          Peer Street, Inc. founded -- established Peer

16  Street Funding, Inc. in 2015.  Funding, Inc. is a California-

17  licensed mortgage lender under California financing law, as

18  well as the servicer.  The operations Funding, Inc.,

19  historically, included purchasing previously funded mortgage

20  loans from third-party lenders, table-funding mortgage loans

21  for third-party lenders or brokers, originating its own

22  mortgage loans, selling mortgage loans to third-party

23  institutional buyers, and acting as a master servicer on the

24  mortgage loans.

25          This entity, Funding, Inc., holds legal title to

1  all of the debtors' underlying mortgage assets, of which

2  there's approximately roughly 900.

3              THE COURT:  There are 900 mortgages?

4              MR. BARRY:  Correct, Your Honor.

5              THE COURT:  And what's it doing now, this entity?

6              MR. BARRY:  Well, its business is largely

7  service -- master servicing the funds.  It also engages in

8  REO sales.  So in the course of its business, some of the

9  properties that were subject to the mortgages or subject to

10 foreclosure, they then, become quote, unquote, real estate

11 owned, or "REO properties."

12             So in the ordinary course of business, the company

13 will -- it will advance fees to maintain those properties.

14 Those are referred to as the "servicing advances" in

15 Mr. Dunn's declaration.  It advances those servicing -- those

16 fees and then once it sells the REO property, which again,

17 selling the property is part of its ordinary course of

18 business, it recovers those servicing advances, in addition

19 to whatever the value of the underlying property is at the

20 given time.

21             THE COURT:  So those advances, being like taxes

22 and insurance and stuff like that?

23             MR. BARRY:  Utilities.  You got it, Your Honor.

24             THE COURT:  Okay.  And is it originating any

25 mortgages now?

1    MR. BARRY:  It is no longer originating any

2  mortgages.

3    And, Your Honor, preparing for the hearing, I'll

4  acknowledge it was not clear in the papers and we probably

5  should have made it more clear that it is no longer offering

6  any of its investment products on its online platform.  So it

7  simply holds the mortgages, against which there's

8  approximately 10,600 investor claims, unsecured payment-

9  dependent note claims.  It has the technology platform.  It's

10  still active in the sense that investors can go on, they can

11  look at their investments, see how they're doing, understand,

12  like, what their investments are realizing, et cetera.  But

13  through that platform, the company is no longer offering any

14  new investment products.

15    THE COURT:  Okay.

16    MR. BARRY:  The company also -- excuse me -- let

17  me get back to where I was -- the company also, historically,

18  had engaged in loan sales.  Peer Street originated and sold

19  mortgages to third-party institutional and other purchasers.

20  Since the end of 2021, that business line has substantially

21  diminished.  Again, I mentioned, Your Honor, servicing was a

22  substantial component of the company's ongoing business,

23  which as I'll get to in a minute, once the mortgages are

24  sold, which will be part of the bankruptcy case, that

25  servicing piece will obviously come to a conclusion.

1          The company is subject to an existing funded --

2     senior, secured, funded debt obligation that sits at Peer

3     Street, Inc.  Debtors, Peer Street Funding, Inc. and Peer

4     Street Licensing, Inc., are guarantors on that debt.  The

5     lender there is Magnetar Financial.  The outstanding on that

6     is about $27.2 million and, to be clear, Your Honor, that

7     debt is siloed at those three entities.  So we have 15

8     debtors and of those 15 debtors, 3 of them are obligors or

9     guarantors on the Magnetar facility.

10          Magnetar has a blanket lien on substantially all

11     the assets of those entities, except for the mortgage loans,

12     which are owned by or held in the name of Peer Street

13     Funding, Inc.

14          THE COURT:  So what does that leave it?  What is

15     its collateral?

16          MR. BARRY:  So, essentially, everything else,

17     including the technology platform, accounts -- the typical

18     list of assets.  There's cash that would be -- there's

19     accounts, cash, technology, pretty much -- that's pretty much

20     it.  It has a lien on servicing advances.  When those are

21     refunded, so when the REO properties are sold and servicing

22     advances are repaid, it would get a lien on that cash.

23          One of --

24          THE COURT:  Okay.  But it has no -- it does not

25     have a security interest in the principal and interest

1  payments that are made on the mortgages?

2         MR. BARRY:  Correct.  Correct.

3         THE COURT:  So, where does the cash come from that

4  they have a security interest in?

5         MR. BARRY:  So it comes from loan sales.  It comes

6  from servicing advance recoupments.  Those are the two

7  predominate sources.  I'll look over to Mr. Hirschfield who

8  is just confirming those are the two predominate sources.

9      (Pause)

10         THE COURT:  Okay.

11         MR. BARRY:  The company also has an unsecured,

12  funded debt, due to the SBA on a PPP loan it took out during

13  the COVID-19 pandemic.  As we set forth in our papers, one of

14  the precipitating factors for the bankruptcy filing was the

15  company had applied for forgiveness of that loan with the SBA

16  and the SBA denied the forgiveness on the basis of its belief

17  that the company was technically a lender and apparently

18  lender's don't qualify for forgiveness under the SBA PPP

19  program.

20         That decision was appealed and the appeal was very

21  recently denied.  But the SBA won't take any enforcement

22  action to collect after the denial of the appeal after 30

23  days, and we're within that 30-day period.  So one of the

24  precipitating factors for the filing, Your Honor, was that

25  unsecured debt, due to the SBA and the likelihood that they

1   would start collecting.

2          So, Your Honor, sort of what happened here is

3   since the second quarter of 2021, the mortgage industry faced

4   significant adverse conditions, including market rate

5   volatility.  Mortgage rates have decreased dramatically from

6   an average of 3.2 percent or -- or increased -- excuse me --

7   from 3.2 in January 2022 to an average of 6 and a half today,

8   which caused demand for mortgages to significantly drop.

9   Also, institutional buyers have largely halted purchasing

10  below current market rate levels.

11         So, as you can see, Your Honor, if the mortgage

12  loans that we're selling are at rates that were historically

13  low compared to today, it makes them less attractive than

14  purchasing loans today and we are no longer originating those

15  products.

16         So these market conditions, obviously, impaired

17  Peer Street's business significantly.  Before 2022, Peer

18  Street originated and sold a significant volume of mortgages

19  and after 2021 -- after 2022, that precipitously declined.

20  In 2021, Peer Street originated $695 million in mortgages.

21  In 2022, originations fell to $385 million.  And in 2023,

22  Peer Street originated only $5.4 million in mortgages.

23         In addition to that, Your Honor, one of Peer

24  Street's historical sources of funding had been venture

25  capital.  That largely dried up and the venture capital

1  market largely declined around the same time.

2       In 2022, Peer Street defaulted on its credit

3  facility with Magnetar; thereafter, the debtor and Magnetar

4  worked collaboratively to try to come up with alternatives to

5  a potential bankruptcy case, a potential refinancing, or sale

6  or recapitalization strategies.  During this time, Magnetar

7  continued to forbear and grant waivers of the existing

8  defaults under the credit facility.

9       At the same time, the debtor went out and

10 attempted to raise new capital to attempt to recapitalize

11 itself to stave off a potential shutdown and liquidation,

12 but, ultimately, was unsuccessful.  So, ultimately, we've now

13 agreed with Magnetar on the use of cash collateral as the

14 strategy for these cases.  The company, for the last year,

15 has undergone a number of, first, furloughs, and then

16 reductions in force.  It went from 281 employees about a year

17 or so ago, to about 28 employees today.  The remaining staff

18 will be used to assist with the sale of the mortgage

19 portfolios, after which, it's likely that we will take up the

20 sale of the technology platform, wind-down any residual

21 assets, and hopefully get to a Chapter 11 liquidating plan.

22       To that end, the company has retained Piper

23 Sandler as their broker.  Piper has done a significant amount

24 of work toward pooling the mortgages, sort of, in like kinds.

25 They've pooled them into six mortgage pools and, yesterday,

1  launched a marketing-and-sale process for the sale of the

2  mortgage assets.  Yesterday, we filed a companion bidding

3  procedures motion.

4           THE COURT:  So, explain to me how that works.  And

5  I took a look and tried to understand the four different

6  products --

7           MR. BARRY:  Uh-huh.

8           THE COURT:  -- that the debtors offered on their

9  platform or not on their platform.

10          MR. BARRY:  Right.

11          THE COURT:  And a couple of them I understood;

12 they seemed pretty straightforward and some of them not so

13 much.  But one of the overarching questions -- I have several

14 overarching questions -- but one of them is:  Were the

15 underlying mortgages -- and I shouldn't use that term,

16 because there were at least four different terms used in the

17 first day declaration --

18          MR. BARRY:  Uh-huh.

19          THE COURT:  -- for different pools, I thought, of

20 underlying -- of mortgages.  And one was the underlying

21 mortgages, which I think went with the fractional notes.

22          MR. BARRY:  Right.

23          THE COURT:  And then the pocket, underlying loans.

24 And then the portfolio, underlying assets.  And then the opt

25 fund, underlying loans.

1       MR. BARRY:  Right.

2       THE COURT:  Are those different pools of assets,

3  of mortgage loans?  What are they?

4       MR. BARRY:  Yes.  So there's essentially four

5  different products.  The retail products, which are available

6  on the online platform, they're different, but they're not.

7  I'll describe them generically, as follows, which is that one

8  of the debtors issued what are referred to as "payment-

9  dependent notes" --

10       THE COURT:  Uh-huh.

11       MR. BARRY:  -- which would use the funds from the

12  raising of the payment-dependent notes to essentially fund

13  the acquisition from one of the other entities of the

14  mortgage assets.  It would either acquire mortgages or it

15  would originate mortgages.

16       THE COURT:  See, it didn't seem that way from the

17  papers.  I wondered where the original money came from,

18  because at least as I read the declaration, it looked like PS

19  Funding, Inc., acquired or originated the loans and then Peer

20  Street Funding, LLC, went out and issued mortgage payment-

21  dependent notes, so that the party could look and say, Yeah,

22  I want the mortgage on that house or I want the mortgage on

23  that building.  So it seemed somewhat backwards to me.

24       MR. BARRY:  Yeah, directly or indirectly, the

25  funds were raised through the issuance of the payment-

1  dependent notes to actually acquire the mortgage assets.  And

2  so each of the investors, when they would put in their funds

3  in the different product, would decide what fractional

4  portion of the product they wanted.  So, with respect to the

5  fractional notes, those were directly in the actual mortgage

6  products.  With the pocket product, it was in the warehouse

7  financing that was used to fund the mortgage notes at PSFI.

8          THE COURT:  Uh-huh.  And did -- when -- if a loan

9  or a mortgage is in one of these products, is it only in that

10 product?

11         MR. BARRY:  I don't believe they are in any other

12 product; I think they're in a single product.  I can't say

13 with 100 percent certainty that that's the case, Your Honor,

14 but I believe that a mortgage can only be in one product.

15         THE COURT:  Okay.  Then I'm still sort of

16 wondering where the funds to purchase certain of the products

17 came from.

18         MR. BARRY:  It's all from the noteholder

19 investors.  So all the funds used were raised by, again, in

20 the pocket and in the retail, through the payment-dependent

21 notes.

22         And in the opt fund, it was raised by the sale of

23 the fractional, limited partnership interests.

24         THE COURT:  But that would suggest that the money

25 came first and the purchase of the note came afterwards.

1              MR. BARRY:  Right.

2              THE COURT:  And if that's the case, how does an

3    investor pick what they want to invest in?

4              MR. BARRY:  They raise enough -- I think they

5    raise enough funds in the -- like, there's the -- we'll get

6    into talking about the FBO accounts.  The investors put their

7    money in.  I think the money is deployed to acquire the

8    mortgages.  And then from there, they get to select exactly

9    which product they want to invest in.

10             THE COURT:  Okay.  So they're blind when they go

11   in?

12             MR. BARRY:  I can't say for sure, Your Honor.

13             THE COURT:  Well, that's what I was trying to

14   figure out is how this company works.

15             MR. BARRY:  Right.

16             THE COURT:  Okay.  So I understand, I think, some

17   of the different products --

18             MR. BARRY:  Right.

19             THE COURT:  -- like the mortgage payment-dependent

20   notes, which are the fractional product.

21             So, when it says in the declaration that there are

22   $205 million in notes outstanding of those mortgage payment-

23   dependent notes, associated with $220 million in face amount

24   of the underlying loans --

25             MR. BARRY:  Uh-huh.

1           THE COURT:  -- and of that, approximately $92.4

2    million are performing, is the banker taking them out of

3    these pools and putting them in different pools to sell them?

4           MR. BARRY:  The banker is going to take them and

5    put them in a pool of like-kind mortgages.  So, they'll

6    characterize them as, for example, "REO" or they'll

7    characterize them as "performing" or they'll characterize

8    them as "sub-performing" and they'll take all those

9    particular loans and they'll put them together and sell them

10   in a pool, because the buyer will want to buy the same,

11   something that's a similar thing.

12          And it makes the sale -- the marketing-and-sale

13   process a lot easier for a buyer to understand what their

14   risk profile is and what they're interested in.

15          THE COURT:  Uh-huh.

16          MR. BARRY:  And then the cash will then come back

17   into the estate and we'll distribute the cash through a plan,

18   in accordance with the claims of the payment-dependent

19   noteholders.  And the payment-dependent notes, each of them,

20   the redeemable and the non-redeemable, all provide that the

21   recovery is dependent on the issuer actually receiving

22   payment on account of the mortgage notes.

23          So there'll be a plan that will have a proposed

24   *pro rata* distribution based on the actual claims of the

25   noteholders, based on their holdings of the mortgage payment-

1  dependent notes or the redeemable notes.

2          THE COURT:  Okay.  So it -- and will the six

3  pools, then, cross back and forth over these different

4  products?

5          MR. BARRY:  Again, standing here today, I honestly

6  don't know.  Your Honor.  I think if a mortgage or warehouse

7  funding is in a product, it's in that product.  I just, for

8  some reason, can't say with 100 percent certainty that that

9  is the case.  But I don't think it's the same product.

10          So I think -- I don't know that they're going to

11  be commingling the assets.  We can certainly answer that

12  question when we get to the bid procedures hearing, but the

13  idea was that we're going to take all of the mortgages and

14  put them with the same or similar kind of mortgages so buyers

15  can say, This is my risk profile.  I don't want to buy any

16  REO properties; I only want to buy performing loans and I'm

17  going to pay a premium for that.  I don't want a pool that's

18  got some performing, some sub-performing, some REO, because

19  that's hard to price and, you know, maybe it's not going to

20  maximize value.

21          THE COURT:  Well, I do understand that, but from a

22  purchaser perspective, I'm trying to understand it from an

23  investor perspective or a noteholder perspective in terms of

24  their interest or their right to be paid on a particular

25  note.

1          MR. BARRY:  And that's very meticulously traced by

2    the company.  What product an investor has put its money is

3    very meticulously traced by the company.

4          I can't answer the question for you whether or not

5    there's some sort of cross-pollination amongst the products;

6    I just don't know the answer to that standing here before

7    you, Your Honor.

8          THE COURT:  When funds came into, I guess it would

9    be PS Funding, Inc., for payment on the notes, on the

10   mortgages, where did those funds go?  Did they all get

11   commingled together?

12         MR. BARRY:  No.

13         THE COURT:  Okay.

14         MR. BARRY:  We're going to talk about that --

15         THE COURT:  Okay.

16         MR. BARRY:  -- when we talk about the cash

17   management system because that's all sort of specifically

18   laid out in the cash management motion.

19         When we talk about the cash management motion,

20   Your Honor, I'm going to emphasize the detailed treasury

21   functions that is the reason why there's so many accounts in

22   the system.  And I'm prepared to sort of walk Your Honor

23   through each one of the accounts:  what they do, what their

24   function is.  And, again, with the different kinds of

25   accounts, it's all intended to trace the investors'

1 investment to the products to the specific mortgage, if

2 that's what they're investing in, and back through, back up

3 to the investor.  There's a very detailed and sequenced

4 treasury function that this company has used and it's baked

5 into the cash management motion and I'm prepared to walk Your

6 Honor through.

7          THE COURT:  Okay.

8          MR. BARRY:  And there's no intention, and there

9 will be no quote, unquote, pooling of investments or pooling

10 of assets.  The mortgage payment-dependent noteholders will

11 get a distribution on account of what they're entitled to

12 under their notes because, again, it traces to the product.

13 If the product is -- if payment on account of the product is

14 received by PSF, LLC, then that is the money that the

15 noteholders are entitled to under the terms of their note and

16 the PPM that they lent or invested on.  So, again, there's

17 this very careful tracing component to this business.

18          THE COURT:  Well, that's why I'm trying to

19 understand it, because -- I guess I'm not surprised to hear

20 that.  I guess I just don't understand how it works, and

21 maybe I don't need to, but it seems to me that if you take

22 things outside of their pools and you sell them, then how do

23 you know what you've got on account of each note if you sell

24 it in the aggregate?  How do you know that this mortgage, you

25 got X for and this mortgage you got Y for when you're selling

1  them in a pool?

2          MR. BARRY:  What they're going to receive, though,

3  is going to be dependent on the terms of the mortgage

4  payment-dependent note.

5          THE COURT:  Uh-huh.

6          MR. BARRY:  It's not necessarily dependent upon a

7  pool that they may be put in, in connection with our sale

8  process; it's going to be governed by whatever the payment

9  terms of their mortgage payment-dependent note are, which,

10  again, is governed by whatever PSF, LLC, receives on account

11  of the product that they've invested in.

12          THE COURT:  Well, they seem to me to be slightly

13  different, the notes.  I don't have the notes, so I don't

14  know the exact terms.

15          MR. BARRY:  Yep.

16          THE COURT:  But as I read it in the declaration,

17  it seems to me that they're somewhat different.

18          MR. BARRY:  They are.  So the difference is,

19  there's the fractional notes and, again -- I'll make this

20  up -- 10 people can invest in a specific mortgage product and

21  receive, you know, the principal and interest from those

22  through the system, you know, over the course of the life of

23  the underlying loan.  As I understand it, the maturity on

24  each mortgage payment-dependent note is concurrent with the

25  underlying mortgage product, right.  So the person, when they

1  invest in that, they understand what the maturity is going to

2  be.  The pocket product is a little bit different.  It has

3  a -- one product has a one-month redemption feature.  One

4  product has a three-month redemption feature.

5       So that's -- I mean, that's largely the difference

6  in the repayment is that this redemption option allows the

7  noteholders to request redemption of the payments, either

8  after a month or after three months.  Again, as we set forth

9  in the first day declaration, redemptions were halted, based

10  on a liquidation trigger that, again, was well-known in the

11  investment thesis and the private-placement memorandum and in

12  the notes, that those redemptions were halted.  That is, you

13  know, a risk that the investors took and now we're at the

14  process of we're going to start liquidating the loan

15  portfolios.

16       THE COURT:  Okay.

17       MR. BARRY:  Your Honor, this is not the -- this is

18  not manufacturing widgets or, you know, selling retail, but,

19  like, this is a very, I think this is a very complicated --

20       THE COURT:  Yeah, which is why I was trying to

21  understand it and how the products work so that I could

22  really, in particular, with respect to cash management and

23  cash collateral usage, understand.  The motions themselves

24  are, you know, routine.

25       I didn't spend a lot of time on those, but I was

1  trying to understand the business so that I understood what

2  is appropriate on first day, and what debtor should be paying

3  for what, and whether there should be intercompany loans, and

4  how those would work, and how those, if they do -- how it

5  works among these entities.  That is what I'm trying to

6  understand and maybe when we get to them you will explain it

7  better.  That is the difficulty here in understanding that

8  it's not the requests per say.

9         MR. BARRY:  I think the important -- again, from

10  my perspective, I think the important thing about the notes

11  and the noteholders is that these are unsecured payment

12  dependent notes that are issued by one of the debtors.  The

13  mortgage assets are actually held in the name of another

14  debtor.

15         Again, not to repeat myself, but the mortgage

16  payment feature of them is that to the extent the noteholders

17  receive a payment on account of the notes, only and if to the

18  extent PSF LLC receives payment of the principal in interest

19  to it.  So, in other words, whatever PSF LLC gets that is

20  what the noteholders are entitled to.  Again, they are

21  unsecured.

22         THE COURT:  They are, and I don't know how this

23  should work, but, for example, I know there's cash sitting in

24  different entities.

25         MR. BARRY:  Right.

1          THE COURT:  I don't know if that cash would

2   normally flow to PSF LLC or not.

3          MR. BARRY:  Right.

4          THE COURT:  If we're stopping it or sending it

5   elsewhere that is kind of an interesting question, right.

6   So, I am trying to -- that is what I'm trying to understand.

7   There is cash, at least, according to the declaration, in six

8   different entities.  So, I would like to understand if cash

9   is going to be moving around to those entities what it's

10  doing and what its moving around for.  We can talk about

11  that.

12         Yes, you are right. This isn't widget, so it isn't

13  easy to pick up and just understand this business and

14  understand how things are supposed to flow.  What are we

15  doing to change the way they are supposed to flow.  And are

16  we changing people's rights when we're the way things are

17  supposed to flow if we're doing that. I don't know any of

18  that from what I was able to understand.

19         MR. BARRY:  Right.  Again, when we talk about

20  changing what people are supposed to get payment dependent

21  notes are dependent upon --

22         THE COURT:  I get that, but if funds are held now,

23  for example, in a warehouse and it would have gone, if you

24  hadn't halted things, to -- I hate these acronyms, it's not

25  my thing -- Peer Street Funding LLC, I don't know quite what

1  to do with that.

2         MR. BARRY:  Let me explain to you what is

3  contemplated by -- if your concern is the potential for

4  debtors funding debtors let me, sort of, explain what we mean

5  by that which is we, obviously, have, setting aside for the

6  moment, the three Magnetar obligors, right.  They are going

7  to use cash collateral pursuant to a cash collateral

8  stipulation that we will get to in a minute, and then we have

9  the other debtors.  So, the other debtors, essentially, have

10 either cash or they have cash and assets or they have assets,

11 right.

12         THE COURT:  Do some of them have nothing?

13         MR. BARRY:  I think there's one entity that

14 doesn't have cash and we're not aware of what assets it has.

15 I can't remember what entity it is.  If it's licensing,

16 licensing is a Magnetar borrower, so it's irrelevant.

17         The idea, Your Honor, here is that, and we say

18 this in the motion, if an entity has assets but no cash it

19 will -- its allocated portion of the budget will be funded by

20 the entities that have cash and when that entity liquidates

21 the assets, because its currently liquid, those funds will be

22 credited back to the lending debtors.

23         THE COURT:  And how is the allocation?  That was

24 another question I had: how is the allocation being

25 determined?

1          MR. BARRY:  So, the allocation has a couple of

2   parts.  So, first, the costs are being allocated across

3   entities based on a 2019 transfer pricing study that was done

4   by Armanino LLP.  This report allocates the cost between PSI

5   and PSFI based upon the time spent by management and

6   corporate personnel, and whether those benefited one entity

7   or the other.  Then non-operating costs, professional fees

8   and restructuring costs, are allocated based on the total

9   distributable value at each entity.

10          Then there is a, secondly, allocation that is done

11  by party.  So, costs are allocated proportionally based on

12  each party, i.e., the investor, Magnetar, other general

13  unsecured creditors based on each party's share of the total

14  distributable value.  Again, an allocation across multiple

15  entities in a corporate organization and even in debtors is

16  not uncommon.

17          THE COURT:  No, it's not uncommon and I'm not

18  blessing that today, the allocation.

19          MR. BARRY:  We're not asking you to.

20          THE COURT:  I am just trying to understand because

21  we have borrowers with cash, borrowers, I guess, with assets.

22  I don't know what any of these lower tier PSF Ohio, PSF

23  TX 1, 2, 3, 4; those weren't mentioned, as I don't recall

24  them, in the declaration.  So, I don't know what they have or

25  what they do.

1        MR. BARRY:  Those are REO owning SPE's.  So, they

2   each own -- each of those owns one property, some of them own

3   two properties.  Then the other REO entity owns the remaining

4   which would be maybe 40, 45, 46 properties.

5        THE COURT:  Okay.

6        MR. BARRY:  So, again, the idea wasn't just having

7   debtors fund debtors, the idea was have journal entries that

8   say this entity's allocated portion of the case or the cost

9   of running this are X, but it doesn't currently have any cash

10  to pay that.  So, it got to do two, and when it sells its

11  assets then the balance sheet or the ledger will be marked to

12  reflect that that cash goes back over to any debtor that lent

13  its disproportionate allocated share of the cost of the

14  bankruptcy case.

15       Candidly, Your Honor, this is a means of -- well,

16  it was a means of avoiding DIP financing, number one, because

17  I think it would be problematic where we have so much

18  unencumbered cash to start encumbering it and getting a DIP

19  lender in here with its tenacles into this investor cash.  We

20  did have some discussions with Magnetar about using more of

21  its cash collateral to fund the other, you know, encumbered

22  estates, but, obviously, you would imagine a lender being

23  asked to do that is going to say, well, I want some

24  protections in regards to the assets of those entities.

25       So, our view of this was doing this was the most

 1  efficient and, sort of, fairest way to fund these bankruptcy

 2  cases because I think the only other alternative is to put a

 3  DIP lender in at some of these entities.  We have assets, but

 4  no cash.  We will sell the assets and we will repay the

 5  debtors.

 6          THE COURT:  It might be the appropriate way to do

 7  it, I just am trying to understand it from the investor

 8  perspective.  But I take it PS Funding Inc., will not be a

 9  lender debtor.

10          MR. BARRY:  PSFI is a lender debtor.

11          THE COURT:  They are?

12          MR. BARRY:  Yes.

13          THE COURT:  How is that going to work because the

14  money that is sitting there, the investors have some interest

15  in.

16          MR. BARRY:  I'm sorry, Your Honor, what did you

17  just ask me?  You said PSFI is not a Magnetar?

18          THE COURT:  No, it is Magnetar.

19          MR. BARRY:  Yeah.

20          THE COURT:  So, I have got the three as Peer

21  Street, Inc., PS Funding, Inc., and Peer Street

22  Licensing, Inc.

23          MR. BARRY:  Yeah, those are all the three

24  Magnetars.  There's the Magnetar obligor, the Magnetar

25  guarantor is all obligated using cash collateral.

1          THE COURT:  Yeah, they're using -- I have

2  questions about that, but they are using cash collateral.

3          Okay.  Peer Street Funding LLC, is it going to be

4  a lending debtor?

5          MR. BARRY:  No.

6          THE COURT:  Okay.  I'm sure I have other

7  questions, but --

8          MR. BARRY:  I was going to ask Your Honor, this

9  may be -- I was going to ask this anyway, but can we actually

10  get into cash management and cash collateral.  Part of it is

11  due to the fact that we have a 5 o'clock wire, but I want to

12  make sure that we are covering all of Your Honor's questions.

13  I thought as long as I'm up here we might as well cover cash

14  management.  As I said, I want to get into the specifics of

15  the accounts.

16          THE COURT:  Okay.

17          MR. BARRY:  So, we covered one thing, which I was

18  going to cover with Your Honor, which is, number one, the

19  cash management motion talks a lot about the intercompany

20  loans as a historical basis, but, obviously, we're not

21  originating new investments.  So, that is largely, sort of,

22  historical background so that Your Honor understands why we

23  have the treasury function.

24          We just talked about, Your Honor, the allocation

25  and the proposal in the cash management motion.  Again, that

1  is intended to simply be debtors that have the current

2  wherewithal, the actual liquidity to fund a budget, those

3  with assets and not the liquidity will later, sort of, refund

4  the journal entries noting that they paid their

5  disproportionate share of the budget.

6         So, I said I would get into specifics on the

7  treasury functions and the specific accounts that constitute

8  the cash management system because, again, this is a

9  significant treasury control mechanism.  So, there's seven

10 operating accounts.  I am going to walk through all of the

11 accounts, not one by one, but in categories to explain

12 exactly what happens with all of these accounts.

13        So, there are seven operating accounts to start.

14 These are used for, you know, ordinary course operations,

15 vendor payments, payroll and the like. One of those is used

16 to receive funds from REO sales, so when the debtor owns a

17 property and it sells it those funds come in to that REO

18 property sale account.  Another is used to fund the servicing

19 advances that we talked about before, as Your Honor noted

20 taxes, utilities and the like.  So, they go out and when they

21 sell the property the servicing advancements and any

22 incremental value goes into the REO property sale account.

23        So, then there is three clearing accounts.  I am

24 told that the use of clearing accounts in this way is best

25 practices in the treasury field.  So, one of these clearing

1  accounts was used for loan purchases in order to track which

2  of the debtors' products investors were purchasing from what

3  loans.  Another is used for rehab loans.  So, when a borrower

4  is borrowing on a rehab loan to rehabilitate a property, at

5  the closing the borrower doesn't get all the funds, right,

6  they get a portion of the funds and then there's a graduated

7  inspection.

8          So, Peer Street can go out and say, okay, you've

9  put the roof on, we will give you more of the money.  It's

10  just to ensure their actually following the plan for rehab

11  for the properties.  So, this clearing account is for when

12  the money is being disbursed to the borrower after its proven

13  to Peer Street that its achieved the rehab milestone for the

14  next slug of borrower.

15          Then there is the sales clearing account.  Like

16  the purchasing account this enables the debtors to precisely

17  track when loans are sold, what product the funds should go

18  to and what investor the products should go to.

19          Then the source of capital accounts; so, there's,

20  for each of these, four of the products that its offered.

21  Once an investment decision is made by an investor the money

22  goes from one of the FBO accounts, which I will talk about in

23  a minute, transferred into this clearing account.  Again,

24  this is a means of tracing exactly who is invested in what

25  product and in what particular mortgage.

1          Then we have the accounts labeled FBO.  FBO

2    designates for the benefit of.  And there's a few different

3    kinds of these FBO accounts.  So, there is the FBO

4    institutional investor accounts.  So, what these are, are for

5    the company's institutional investors as opposed to the

6    retail customer, a credited investor, investors.  When funds

7    are received on the investments that they have made they go

8    directly into their, sort of, dedicated FBO account and the

9    name of that institutional lender.

10          THE COURT:  Okay.

11          MR. BARRY:  There is two, what are in, effect,

12   receipt accounts labeled as FBO. These collect payments from

13   borrowers on both the fractional product and the portfolio

14   product.  So, when borrowers remit their payment on account

15   of their principal in interest every month they go into this

16   account for those two products.

17          There is a lender account labeled --

18          THE COURT:  I'm sorry, say that one again for me.

19          MR. BARRY:  So, if I'm a Peer Street borrower, and

20   I am paying my mortgage, I pay it into -- all the borrowers

21   pay into this clearing account on account of -- then from

22   there it goes into the FBO which I will get to in a second.

23          THE COURT:  So, would that be all for one

24   particular product or just any mortgage across all the

25   products?

1          MR. BARRY:  This is just for the fractional retail

2    product.

3          THE COURT:  Okay.

4          MR. BARRY:  And then the FBO lender account, Your

5    Honor, so sometimes originating lenders keep a fractional

6    percentage of the mortgage.  So, if they have originated the

7    mortgage, but then sold it to Peer Street they will retain a

8    fractional percentage of it.  This FBO account is where the

9    percentage -- the borrower's payment that is attributable to

10   that fractional percentage that the originating lender has

11   retained goes into this account.

12         THE COURT:  That happens on a monthly basis?

13         MR. BARRY:  Yeah.

14         THE COURT:  Okay.

15         MR. BARRY:  There is a construction holdback FBO

16   account.  So, I talked a minute ago about the rehab clearing

17   accounts.  So, when a rehab or construction loan is actually

18   closed, I said in connection with the clearing account they

19   have to apply for an additional slug of funds that go into

20   the clearing account to be disbursed to the borrower.

21         When those loans are actually closed the totality

22   of the funds go into this construction holdback account.  So,

23   all the funds are sitting in this holdback account and then

24   when the borrower, again, applies for and says I have

25   completed the kitchen rehab that I've done on this property

1  the funds are sitting here and then they go into the rehab

2  holdback clearing account and then to the borrower.  Again,

3  this is a treasury means of precisely tracing where all these

4  funds are going.

5         Lastly, Your Honor, there is the FBO retail client

6  account.  So, this is where the retail accredited individual

7  customers put their money before they decide where it's going

8  to be invested.  So, as we've said in the motion, there is --

9  we have -- the customers have the capability prepetition to

10 pull this money out.  We have turned that feature off only

11 because we want to come back before Your Honor.  We want a

12 committee to get appointed.

13        We want to come back before Your Honor and make a

14 determination as to where those funds should go.  They are

15 not going to be used.  We are not proposing to spend them.

16 We won't touch them.  They are going to be sitting.

17 Ultimately, the disposition will be decided by Your Honor,

18 but we thought that since those are funds that haven't been

19 invested in anything, you know, and they're being held for

20 the benefit of the investor the outcome is likely, we think

21 that they should be returned to those investors.

22        THE COURT:  How much is in that account?

23        MR. BARRY:  $30 million.  $40 million.  Your

24 Honor, we didn't think -- to be clear, we didn't think coming

25 before Your Honor, before a committee was formed saying

1  please let us release this money was a particularly great

2  idea; although, you know, that may be the result that we get

3  to.  We just thought it was prudent to have a committee come

4  in, take a look at this, agree with us, and then decide what

5  to do with the funds.  Again, as we said in the motion, we

6  turned off the capabilities of customers to pull those monies

7  out, but we're not proposing to use them for any purpose.

8                 THE COURT:  Okay.

9                 MR. BARRY:  I guess relatedly, Your Honor, of

10  course, we turn that feature off so customers can't pull that

11  money out.  Obviously, I have just described all of the

12  accounts.  Some of the FBO accounts don't have anything to do

13  with customers or their capability to pull them out.  So, the

14  construction holdback FBO, for example, that will continue to

15  function as normal.

16                 So, again, the point of this, Your Honor, and the

17  point of the cash management system was this was usually a

18  motion that doesn't get a ton of attention.  Here, its, sort

19  of, painstaking on how the company traces funds and how they

20  set up these accounts including, you know, the FBO accounts

21  to ensure there is proper tracing of all the cash.  We are

22  not going to be touching the customer FBO cash until we get

23  in front of you, perhaps, at a second day motion.

24                 Let me pause and see if Your Honor has any other

25  questions, at least, on the cash management piece of this.

1        THE COURT:  I think, and in particular with the

2   investor cash, that was a question that I had.  In terms then

3   of cash going back and forth between and among debtors, which

4   accounts are we really talking about then.  It's not going to

5   be, is it, the --

6        MR. BARRY:  Functionally, money is not actually

7   going to be moving between debtors.  It's just going to be

8   journal entry.

9        THE COURT:  Journal entries.

10       MR. BARRY:  Yeah.

11       THE COURT:  But among these accounts.  Among which

12  accounts? Is it going to be among the -- it wouldn't be among

13  the FBO accounts, would it?

14       MR. BARRY:  None of the FBO accounts.

15       THE COURT:  None of the FBO accounts.

16       MR. BARRY:  Yeah.

17       THE COURT:  So, it would just be --

18       MR. BARRY:  Just the operating accounts, Your

19  Honor.

20       THE COURT:  Those are either Peer Street, Inc.,

21  PSI or Peer Street Funding, Inc., PSFI, Peer Street

22  Funding LLC, and then REO account.  So, those are the

23  Magnetar borrowers, aren't they?

24       MR. BARRY:  Sorry, Your Honor, it's the warehouse

25  source of capital accounts would be the predominant funder of

1   the "borrowing" debtors.

2            THE COURT:  The lender debtors, right, because

3   warehouse has $37.1 million. Is that where that money is in

4   this source of capital account?

5            MR. BARRY:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MR. BARRY:  Your Honor, we do have one -- we had

8   one of our significant creditors that we have been talking to

9   over the past of weeks asked us about the allocation on cash

10  collateral.  Now might be an appropriate time to -- we agreed

11  to a reservation of rights on the record.  Their counsel is

12  in the courtroom, so I think Mr. Neier is on the phone.  We

13  agreed to the following, if I may.

14           THE COURT:  Yes.

15           MR. BARRY:  Pacific RBLF LLC and Pacific Funding

16  Trust 1002 are two institutional investor creditors that have

17  asserted claims of not less than $38 million against debtor

18  Peer Street Funding LLC. These entities and their affiliates

19  have been in discussions with the debtors for a number of

20  weeks.  They do not oppose the debtors' request for the use

21  of cash collateral, Docket No. 12.  And the relief sought in

22  the cash management motion at Docket No. 11.

23           Their position is not prejudicial to their rights

24  as a creditor and they reserve all their respective rights

25  regarding the debtors' allocation of unencumbered cash of

 1  debtor Peer Street Funding LLC.  The debtors will discuss the

 2  cost allocation and any issues raised with these entities in

 3  the coming weeks.  So --

 4          THE COURT:  So, I don't need to worry about that

 5  issue.  Somebody else is already on it.

 6          MR. BARRY:  I should've led with that, Your Honor.

 7          THE COURT:  Okay.  Does anyone wish to be heard

 8  with respect to the cash management motion, or have any

 9  questions, or comments?

10       (No verbal response)

11          THE COURT:  Okay.  Other than Pacific, which we

12  just heard from.

13       (No verbal response)

14          THE COURT:  Well, as you can see, I have a lot of

15  questions with respect to the inter relationships between the

16  debtor entities.  On this interim basis, which is what it is,

17  I will approve the cash management motion as requested with

18  the understanding that I am not blessing the allocation, and

19  that the appropriate bookkeeping will be made which I really

20  have no doubt of given the nature of these companies which

21  had to meticulously account for things pre-bankruptcy.  So,

22  on an interim basis I will approve this.

23          MR. BARRY:  Thank you, Your Honor.  One note, we

24  did submit a slightly revised order to Chambers.  When we had

25  originally proposed the intercompany "loans" we had suggested

1  they be on superpriority administrative expense basis.

2  Mr. Cudia asked that they be on, sort of, ordinary

3  administrative expense status.  We agreed to that, but there

4  is, sort of, a bust in the order.  We forgot to take out

5  the 507(b) reference.  So, the order we submitted to Chambers

6  before the hearing merely deletes the references to a 507(b)

7  which, frankly, I don't even think is applicable to an

8  unsecured intercompany loan.

9          THE COURT:  Well, it may not be.

10      (Pause)

11          THE COURT:  Okay, on an interim basis.  There

12  needs to be some type of different way, once parties with

13  more knowledge of the financial industry than me are taking a

14  look at this, then I will expect to receive something for me

15  to look at, but on an interim basis, I will approve it.

16          MR. BARRY:  And, Your Honor, for clarity, this is

17  all a journal entry that can --

18          THE COURT:  Right.

19          MR. BARRY:  -- be undone.  So, if we are appearing

20  before you on the second day hearing, a committee has been

21  formed, Your Honor has different views, this, in my opinion

22  and I think consistent with our local rules on the interim

23  nature of first day orders, we can revisit the allocation.

24  If things need to be reallocated, that's what will occur.

25          THE COURT:  Right.  And I'm also just thinking

1  about the ability for the borrowing lenders to repay --

2          MR. BARRY:  Right.

3          THE COURT:  -- and how that might or might not

4  impact, but I am certainly hopeful that we're going to have a

5  committee in this case.

6      (Laughter)

7          MR. BARRY:  Me too.

8      (Laughter)

9          THE COURT:  You too, actually, yes.

10         MR. BARRY:  No, we actually --

11         THE COURT:  Yes --

12         MR. BARRY:  -- we actually do --

13         THE COURT:  -- you do want one.

14         MR. BARRY:  -- we actually do --

15         THE COURT:  Yes.

16         MR. BARRY:  -- we think it will be helpful.

17         All right, Your Honor, could we take up cash

18  collateral per chance --

19         THE COURT:  Uh-huh.

20         MR. BARRY:  -- as long as I'm here?

21         THE COURT:  Sure.

22         MR. BARRY:  So Your Honor is getting more and more

23  familiar with the parties here.  Obviously, Peer Street, Inc.

24  is the borrower; Peer Street Licensing and PS Funding, Inc.

25  are the guarantors.   This is a facility of about

1  $27.2 million.  The use of Magnetar's cash collateral, again,

2  is limited to these three entities and will obviate the need

3  for DIP financing.

4        My views, such as they are, is that this is a very

5  straightforward cash collateral stipulation, and I appreciate

6  Mr. Hirschfield sort of keeping it pretty straightforward and

7  simple.  Customary budgeting, reporting various milestone

8  carveouts.  The adequate protection is very straightforward:

9  Magnetar gets replacement liens on repaid servicing advances.

10        To the extent of diminution, we used Your Honor's

11  definition of diminution in value.

12        THE COURT:  I have one?

13        MR. BARRY:  You supposedly do.  It's to the extent

14  permitted by applicable law is the definition of diminution

15  in value, at least that's what I've heard, but we've used

16  that definition in the cash collateral order.  They're

17  getting 507(b) claims with recourse to prepetition collateral

18  and payment of professional fees.  So, you know, the budget,

19  as you've seen it, I do have one clarifying point, which is

20  the order that we submitted -- the budget that we attached to

21  the cash collateral order relates only to the use needs of

22  the three borrowers.

23        There's a footnote in the cash collateral order

24  that says what's attached is the whole budget.  That was a

25  negotiation at the very last second, what are we attaching,

1  the full budget, just the cash collateral budget.  We

2  attached the cash collateral budget; we neglected to omit the

3  footnote.  Again, the footnote simply says, for illustrative

4  purposes, we've attached the full budget, but what's actually

5  attached is just the cash collateral budget.  So --

6           THE COURT:  Okay, I did wonder about that.

7           MR. BARRY:  The --

8           THE COURT:  So this is an allocable share --

9           MR. BARRY:  Correct.  And I'm happy to share --

10          THE COURT:  -- of everything?

11          MR. BARRY:  -- with Your Honor the full budget.

12  We do have a full budget, I'm happy to hand that up, if you'd

13  like to see it, but it was just -- we were going back and

14  forth on the cash collateral order and Magnetar had suggested

15  can't we just attach the budget that just shows what we're

16  allowing you to use, and we said, well, why don't we just use

17  the whole budget.

18          And we just had a back-and-forth and we dropped

19  the footnote in that said we're going to put the full budget

20  for illustrative purposes only, and we ended up agreeing to

21  just the cash collateral budget and, candidly, Your Honor, we

22  neglected to omit the footnote.  But if you see the budget,

23  it's the same -- it's the same things, it's payroll,

24  insurance, servicing advances, taxes.  The professional fee

25  line is obviously accruing; it's not being paid because we

1  haven't been retained, there's been no interim comp.

2          So it's truly, in the first four weeks of the case

3  truly what's needed to actually run the company and nothing

4  that could be considered, in my view, sort of surplusage,

5  just the basics.

6          THE COURT:  Well, what was notable about the

7  budget is that the cash position increases; it doesn't

8  decrease, it increases substantially over the course of the

9  20 weeks that this budget covers.

10          MR. BARRY:  Correct.

11          THE COURT:  So is there any diminution?  And maybe

12  I don't need to figure that out now and I didn't know I had a

13  definition of it.  What I know is that --

14      (Laughter)

15          THE COURT:  -- what I know is that I don't think

16  there needs to be a definition that people make up and decide

17  what it is because the Code says you get it for diminution in

18  value.  So there has to be that and, thank goodness, I've

19  never had to have an evidentiary hearing on whether there's

20  been diminution.

21          MR. BARRY:  I think in a hundred percent of

22  bankruptcy cases that is an issue for another day, right,

23  whether there's actually been or will be any diminution, who

24  knows and if there's some cataclysmic event.  I just had a

25  case where our stalking horse bidder, you know, doubled

1  their -- you know, the final bidder doubled the stalking

2  horse bidder.  So, obviously, our point would be there'd be

3  no diminution there.

4       So there's no point, in my view, I don't think we

5  need to decide today whether there will be or won't be

6  diminution under the cash collateral order.  We'll fight

7  later if things turn out to be different whether or not there

8  was actually diminution and thus --

9       THE COURT:  Okay.  Let me ask a question on the

10 budget.  What is the Peer Street spread, that top 47,000 a

11 week?

12      MR. BARRY:  It's the servicing advance, it's the

13 servicing fees that Peer Street earns, as opposed to what is

14 paid to the sub-servicer.

15      THE COURT:  So those are the servicing fees it

16 gets.  What are the servicing recoveries then?

17      MR. BARRY:  Those are what it receives on account

18 on the servicing advances.

19      THE COURT:  Servicing advances?

20      MR. BARRY:  Bear with me one moment.

21      THE COURT:  Uh-huh.

22    (Pause)

23      MR. BARRY:  Yeah, yeah, I was right, Your Honor.

24    (Laughter)

25      MR. BARRY:  The -- I mentioned -- again, Your

1   Honor said taxes, utilities on the REO properties, we advance

2   those when we sell the properties, we recover the servicing

3   advances that we've paid.  So that's our recovery on those

4   servicing advances.

5           THE COURT:  Recovery on the servicing advances.

6   Okay.

7           MR. BARRY:  So you see the line item --

8           THE COURT:  And so --

9           MR. BARRY:  -- on disbursement, it says servicing

10  advances, those are being paid out on the REO properties.

11          THE COURT:  Those are being paid out, right.

12          MR. BARRY:  And then the servicing recoveries is a

13  projection of what we're going to recovery when we sell these

14  properties.

15          THE COURT:  Okay.  So the Magnetar -- so Magnetar

16  is getting a lien on, I thought it said servicing advances,

17  but maybe it says servicing recoveries?

18          MR. BARRY:  It's the -- in the cash collateral

19  order it says repaid -- they're getting a lien on repaid

20  servicing advances, so it would be servicing recoveries.

21          THE COURT:  Okay.

22          MR. BARRY:  We probably should have trued those

23  terms up, but yes.

24          THE COURT:  Okay.

25      (Pause)

1       THE COURT:  Okay.  I agree with you that I think

2  this was a very straightforward cash collateral order, which

3  I, too, appreciated.  The only difficulty I had was trying

4  to, again, put it into this business construct and what it

5  was doing, but it's not -- it's straightforward, it's not

6  overreaching, which I appreciate, and the only comment I

7  had -- let me just re-read -- was to paragraph 5, amendments.

8  I want to make sure that anything that's a material amendment

9  is filed with the Court and noticed out.  And I don't think

10 that -- I think right now it just goes to the committee and

11 the U.S. Trustee, but I think, if it's material, it needs to

12 be filed and noticed.

13      MR. BARRY:  Okay.

14      THE COURT:  I think the other questions that I had

15 have been answered through the discussions that we've had.

16      So let me hear, if anyone would like to be heard,

17 with respect to the cash collateral usage.

18      MR. HIRSCHFIELD:  Good afternoon, Your Honor, Marc

19 Hirschfield from Royer Cooper Cohen Braunfeld on behalf of

20 Magnetar.  Thank you for approving my pro hac vice motion

21 (indiscernible) set forth (indiscernible) --

22      THE COURT:  Thank you.  Anyone else?

23      (No verbal response)

24      THE COURT:  Okay.  Well, I will approve it on an

25 interim basis on the terms that are set forth with the one

1  caveat I had.  If you need to have this order entered, you

2  could just mark it up here, if we need to get it entered

3  before 5:00, or you're comfortable drawing on my approval

4  from the bench, I'm fine with that too.

5          MR. BARRY:  My Catholic schoolboy handwriting

6  isn't what it used to be --

7          THE COURT:  Okay.

8          MR. BARRY:  -- but I'll give it the college try,

9  Your Honor.

10          THE COURT:  Okay.  As I said, I've reviewed the

11  order, it was very straightforward.  It's an interesting

12  budget in terms of the increase in the cash, but I'm not

13  making any determinations about whether there's any

14  diminution.  And given how straightforward it was and not

15  overreaching in terms of the terms, I'm content to issue it

16  on an interim basis.

17          MR. BARRY:  Thank you, Your Honor, we appreciate

18  that.

19          Before I forget, could we move into evidence

20  Mr. Dunn's declaration at this time?

21          THE COURT:  We can.  I did read it and I am

22  relying on with respect to my rulings at this hearing.

23        (Dunn declaration received in evidence)

24          MR. BARRY:  Thank you, Your Honor.  I will cede

25  the podium to Ms. Borovinskaya.

1       MS. BOROVINSKAYA:  Good afternoon, Your Honor,

2   Shella Borovinskaya from Young Conaway Stargatt & Taylor.  As

3   always, it is a pleasure and a privilege to be before Your

4   Honor today.  I'm glad that we let Mr. Barry take all the

5   hard punches this morning.

6       THE COURT:  Uh-huh, smart move.

7       MS. BOROVINSKAYA:  So, as Mr. Barry mentioned, the

8   debtors do have a 5:00 p.m. deadline to get their payroll

9   funded.  So, if it's okay with Your Honor, I think we'll take

10  the agenda a little bit out of order and start with the wage

11  motion at Number 8 on the agenda.

12      THE COURT:  Okay.

13      MS. BOROVINSKAYA:  Your Honor, the debtors

14  currently employ 28 full-time employees throughout

15  California, New York, North Carolina, and also work with an

16  international staffing agency pursuant to which they employ

17  the services of one independent contractor out of Canada.

18      As with any business, the debtors' workforce knows

19  this business better than anyone in this room, which is

20  probably evident after this afternoon, but their workforce is

21  criminal to their continued operations and through the wages

22  motion we're seeking to pay their prepetition accrued payroll

23  and expenses associated with their payroll.  None of the

24  employees are going to be paid above the statutory cap in 507

25  of the Bankruptcy Code.

1           The debtors' payroll that's due today at 5:00 p.m.

2   is approximately $190,000, and they also have a payment due

3   tomorrow to their staffing agency in the amount of $11,000.

4           Your Honor, in this motion we've described the

5   debtors' kind of standard benefits, their reimbursement of

6   related business expenses for their employees, their workers'

7   compensation program, and the like.

8           We submit that the debtors' payment of employee

9   wages and the other relief sought in our motion is necessary

10  to avoid immediate and irreparable harm within the confines

11  of Rule 6003 and, unless Your Honor has any questions in

12  connection with the wages motion, we'll ask that Your Honor

13  enter the order authorizing the interim relief.

14          THE COURT:  I do not have any questions.  Does

15  anyone wish to be heard with respect to the employee wages

16  and benefits motion?

17      (No verbal response)

18          THE COURT:  Okay, I hear no one.

19          I've read it.  The 28 employees and the contractor

20  should be paid their prepetition wages and benefits, it's

21  necessary to keep them on board while this company goes

22  through a sales process, so I will permit it.

23          I note in doing so that I -- that there's, I

24  assume, an allocation issue here that is governed by the

25  agreement that was entered into in 2019.  And I'm not

1  commenting with respect to the allocation issue, nor am I on

2  any of the other first day motions, but I think this is

3  appropriate and it meets the Rule 6003 necessity.

4           MS. BOROVINSKAYA:  Thank you, Your Honor.

5           If it's okay with Your Honor, I want to take the

6  agenda back in numerical order.

7           THE COURT:  That's fine.

8           MS. BOROVINSKAYA:  Item Number 3 on today's agenda

9  is the debtors' motion to jointly administer the Chapter 11

10 cases.

11          Your Honor, as you can see from our corporate org

12 chart, all of the debtors are affiliates within the meaning

13 of the Bankruptcy Code and we seek joint administration

14 solely for procedural purposes and not for any substantive

15 consolidation.

16          We believe that this relief is warranted under

17 Rule 1015 and 1015-1 under our local rules.  Joint

18 administration is going to promote administrative efficiency

19 for the Court, for all parties in interest, including the

20 Office of the United States Trustee.

21          So, unless Your Honor has any questions, we'll

22 respectfully request entry of the joint administration order.

23          THE COURT:  I do not have any questions.  Does

24 anyone wish to be heard with respect to the joint

25 administration motion?

1          (No verbal response)

2               THE COURT:  I hear no one.  I've reviewed it, it

3    is appropriate, and I will sign it.

4               MS. BOROVINSKAYA:  Thank you, Your Honor.

5               Moving down to Item Number 4 on the agenda is the

6    debtors' application to retain Stretto, Inc. as its claims

7    and noticing agent in these Chapter 11 cases, pursuant to

8    Section 156(c) of the Bankruptcy Code.

9               As Your Honor has seen from our creditor matrix

10   and has heard today, the debtors have well in excess of 200

11   creditors and are thus required to have a claims and noticing

12   agent under Local Rule 2002-1(f).  The debtors have complied

13   with this Court's protocol in soliciting claim agent

14   proposals, including from Stretto, prior to choosing Stretto

15   for its competitive rates and its experience.

16              In support of this application, we've submitted

17   the declaration of Sheryl Betance, a senior managing director

18   at Stretto, as well as Mr. Dunn's first day declaration,

19   which has just been admitted into evidence.

20              Unless Your Honor has questions with respect to

21   Stretto's retention, we'll respectfully request entry of the

22   order allowing the debtors to employ Stretto as their claims

23   and noticing agent.

24              THE COURT:  Thank you.  I do not have any

25   questions.

1          Does anyone wish to be heard with respect to the

2     retention of Stretto?

3          (No verbal response)

4          THE COURT:  I hear no one.

5          I've reviewed the motion and the declaration that

6     was filed with it, and I note that the debtors followed the

7     appropriate protocol, and I will approve it as requested.

8          MS. BOROVINSKAYA:  Thank you, Your Honor.

9          Item Number 5 on today's agenda is the debtors'

10    motion to pay prepetition accrued insurance premiums and to

11    continue their insurance programs and their insurance premium

12    finance agreement with First Insurance Funding.

13         Your Honor, just with any other business, the

14    debtors have a slew of insurance policies, which Your Honor

15    can see attached to our motion as Exhibit A.  In connection

16    with the debtors' insurance policies, they do also maintain a

17    master insurance policy for the REO properties that Your

18    Honor has heard about today.  Certain of the debtors'

19    premiums are also financed, as I just mentioned, with First

20    Insurance Funding.

21         We submit that the approval of the insurance

22    motion is necessary to avoid immediate and irreparable harm.

23    Not only is the failure to maintain insurance cause for

24    conversion under Section 1112 of the Bankruptcy Code, but

25    it's also -- some of their policies are required by the

1  United States Trustee's guidelines.  Without the ability to

2  pay the debtors' premiums, the debtors would be exposed to

3  significant liability, to the detriment of their estates and

4  their creditors, especially at a time where the debtors are

5  working to protect and preserve their assets.

6          For those reasons, Your Honor, and unless you have

7  any questions, we'll respectfully request entry of the

8  interim order.

9          THE COURT:  Thank you.  I do not have any

10  questions.

11          Does anyone wish to be heard with respect to the

12  insurance motion?

13      (No verbal response)

14          THE COURT:  I hear no one.

15          I've reviewed it.  I believe it is necessary for

16  the debtors to continue to make appropriate payments to keep

17  their insurance in place for the reasons that Counsel has

18  stated.  And I note that the interim order is capped at

19  $60,000 --

20          MS. BOROVINSKAYA:  Correct.

21          THE COURT:  -- so I will approve it as necessary

22  to avoid immediate and irreparable harm.

23          MS. BOROVINSKAYA:  Thank you, Your Honor.

24          The next item on the agenda is the debtors' motion

25  seeking to pay prepetition accrued taxes and fees.

1           Your Honor, in the ordinary course of business,

2    the debtors pay various Federal, state, local taxes, as well

3    as fees in connection with business permits and licenses.

4    We've also described in our taxes motion the debtors' payment

5    of property taxes on the REO properties that we keep

6    mentioning today; however, we're not seeking interim relief

7    to pay the property taxes on the REO properties at this time.

8           The debtors believe that the authority to pay

9    prepetition taxes is necessary to avoid immediate and

10   irreparable harm.  The failure to pay taxes could subject

11   their directors to personal liability, would damage the

12   debtors' relationships with their taxing authorities, and

13   would also inhibit their ability to close on the REO

14   properties, but we'll save that argument for another day.

15          To the extent that certain taxes and fees are

16   entitled to payment of 507, we'll submit that payment now

17   certainly just affects the timing of the payment and not the

18   actual payment that's being made.

19          And of note and as the United States Trustee had

20   pointed out to us, we do not seek any authority to pay any

21   past due taxes in connection with this motion.

22          I'm happy to answer any questions Your Honor has

23   and, if not, we will respectfully request entry of the

24   interim order.

25          THE COURT:  No, I do not have any questions.

1          Does anyone wish to be heard with respect to the

2   taxes motion?

3        (No verbal response)

4          THE COURT:  I hear no one.

5          I reviewed it and, for the reasons that Counsel

6   has stated, I will approve it.  I note, again, it's interim

7   and there is a cap of $10,000.

8          MS. BOROVINSKAYA:  Correct.  Thank you, Your

9   Honor.

10          Item Number 7 is the debtors' motion to prohibit

11  utility services from discontinuing or altering their

12  services, and to establish adequate assurance procedures so

13  that utility companies can have a streamlined process in

14  which way to request adequate assurance from the debtors.

15          In connection with the debtors' ownership of their

16  REO properties, the debtors do maintain various utilities on

17  said properties.  The debtors' utility spend is quite low,

18  it's approximately $1400 per month, and that's because the

19  majority, if not all of the REO properties are foreclosed on

20  and vacant.  So the debtors do try and keep that cost low.

21          The termination or the cessation of utility

22  services at the properties where we do continue to maintain

23  the utility services would cause disruption in the debtors'

24  ability to sell those properties and could cause potential

25  property damage to those properties.

1          The debtors, as a means of their adequate

2  assurance, are proposing to deposit half their monthly spend

3  in a segregated account in order to provide their utility

4  companies with adequate assurance of payment and, as I

5  mentioned, to the extent that that's inadequate to any of the

6  insure -- sorry, I keep saying insurance -- utility

7  companies, they will come and seek adequate assurance from us

8  pursuant to our procedures.

9          Accordingly, the debtors request entry of the

10  utility order as necessary to avoid immediate and irreparable

11  harm.

12          THE COURT:  Thank you.  I'm not sure I appreciated

13  that the utility companies were providing services at REO

14  properties --

15          MS. BOROVINSKAYA:  Right.

16          THE COURT:  -- but I did kind of wonder at some of

17  the addresses.  So that explains that.

18          Does anyone wish to be heard with respect to the

19  utilities motion?

20      (No verbal response)

21          THE COURT:  I hear no one.

22          I reviewed it, it conforms to the practice in this

23  district, and I will approve it as necessary to avoid

24  immediate and irreparable harm.

25          MS. BOROVINSKAYA:  Thank you, Your Honor.

1         The last item on today's agenda, I believe, is the

2    debtors' critical vendors motion.

3         Your Honor, the debtors, in consultation with

4    their advisers, have used stringent criteria, as explained in

5    our critical vendors motion to identify those vendors that

6    are truly critical to the debtors' continuing operations.

7    The debtors believe that the inability to pay prepetition

8    critical vendor claims will severely damage the debtors'

9    relationships with their critical vendors and could cause the

10   critical vendors to halt their services to the debtors.

11        As Your Honor has heard today, the debtors are an

12   online real estate investment platform and certain of these

13   vendors provide services for the operation of the debtors'

14   Peer Street platform.  In addition, certain of these vendors

15   provide loan servicing services to allow the debtors to

16   collect and make servicing advances.

17        As of the petition date, the debtors believe

18   approximately $10,000 is currently outstanding; however, not

19   all prepetition invoices have been submitted yet, and the

20   debtors estimate their prepetition critical vendor claims to

21   be approximately $100,000, which is the amount we're seeking

22   in our interim order.

23        Unless Your Honor has any questions, we'll

24   respectfully request entry of the critical vendors interim

25   order.

1          THE COURT:  I don't recall this, but I might have

2  missed it in the filings, can you give me a sense of the

3  total unsecured creditor vendor pool?

4       (Pause)

5          MS. BOROVINSKAYA:  Around a million dollars.

6          THE COURT:  Okay.

7       (Pause)

8          MS. BOROVINSKAYA:  Final answer, a million answer.

9          THE COURT:  Or a final answer?  Okay.

10      (Laughter)

11         THE COURT:  Okay, so this is about ten percent --

12         MS. BOROVINSKAYA:  Correct.

13         THE COURT:  -- of the pool.  Okay, that was the

14  only question I had.

15         Would anyone like to be heard with respect to the

16  critical vendor motion?  And I'll treat the million as a best

17  guess.

18         MS. BOROVINSKAYA:  Don't hold us to it.

19      (No verbal response)

20         THE COURT:  Okay, I hear no one.

21         I've reviewed the motion and the declaration of

22  Mr. Dunn supports that the debtors have gone through a

23  process to identify their critical vendors.  So, on an

24  interim basis, I will approve that.

25         I would ask that those bills be paid as they come

1  due, unless the debtors really feel there's some reason

2  otherwise to do so during this interim period.  So I will

3  find it necessary to avoid immediate and irreparable harm,

4  and approve this motion.

5          MS. BOROVINSKAYA:  Thank you, Your Honor.  I think

6  that's all we have for our presentation today.

7          THE COURT:  Okay.

8          MS. BOROVINSKAYA:  Thank you and your staff so

9  much for your time -- unless Joe Barry has more to say.

10          MR. BARRY:  Sorry, yes.

11          THE COURT:  Mr. Barry.

12          MR. BARRY:  I think we did obtain from Your Honor

13  a hearing date for our bidding procedures in about three

14  weeks --

15          THE COURT:  Okay.

16          MR. BARRY:  -- just for bidding procedures, and

17  then we're -- I think we're going to have an omnibus hearing

18  about a week later so we can get our retentions on file.  We

19  just wanted to have a hearing on the bidding procedures, just

20  to sort of -- Piper is already doing the launch and the

21  works, so we wanted to get that underway, obviously.

22          In that time, a committee will be appointed, and

23  we'll start collaborating with them and get their views on

24  the bidding procedures and timing and all of that, so --

25          THE COURT:  Mr. Cudia, do you know when

1  applications will be sent out?

2          MR. CUDIA:  Applications were sent out already.

3          THE COURT:  Okay.

4          MR. CUDIA:  I anticipate formation of the

5  committee by late next week; if not, latest Monday of the

6  following week.

7          THE COURT:  Okay.  Okay, good.  Hopefully, that

8  will give the committee time to review and get up to speed on

9  what they need to do.  And I was serious that I hope there is

10  a committee formed in this case.  I think it will be helpful

11  to have someone else who can look at the debtors' business.

12          Thank you very much.

13          MR. BARRY:  Thank you again for your time, Your

14  Honor, we appreciate it.

15          THE COURT:  We're adjourned.

16      (Proceedings concluded at 3:27 p.m.)

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2          We certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of our

5  knowledge and ability.

6

7  /s/ William J. Garling                June 29, 2023

8  William J. Garling, CET-543

9  Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                June 29, 2023

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17  /s/ Mary Zajaczkowski                 June 29, 2023

18  Mary Zajaczkowski, CET-531

19  Certified Court Transcriptionist

20  For Reliable

21

22

23

24

25