Chief Judge Laurie Selber Siverstein
U.S Bankruptcy Court
824 North Market Street 6th Floor
Wilmington, DE  19804



FILED

2023 AUG 11  AM 9:49

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

Re:  To assist the court in understanding, how so many creditors made, to
them, large deposits with Peersteet and its affiliates:  Case # 23-10815:

Honorable Judge Silverstein:

Let me first state, I am not a lawyer, or a member of the bar in any state.  I
am providing this document, to both provide you guidance on why you are
receiving so much correspondence from concerned creditors.  And to place
this document in the public record.

I am a creditor for this bankruptcy.  Although from what I can tell by reading
much of the correspondence I see by being subscribed to the
correspondence to the court docket, one of the smaller ones.

I decided to provide you this document after reading the transcript that was
included in "NOTICE OF FILING EXHIBIT TO OMNIBUS OBJECTION OF
PACIFIC FUNDING TRUST 1002 AND PACIFIC RBLF FUNDING TRUST
TO THE MOTIONS OF THE DEBTORS TO (A) APPROVE A SALE OF
THE DEBTORS' ASSETS AND BID PROCEDURES AND (B) APPROVE
CASH MANAGEMENT AND RELATED RELIEF ".  Two things concerned
me.  First, it appears that the debtors were seeking approval to combine
and sell mortgages that the creditor currently are the "owners" of.  Second,
I did not believe that you were receiving a clear picture of what Peerstreet
clients, and now creditors, had been communicated to by the debtor.

The two attached sheets are meant to give you a better understanding of
how so many investors became involved with the debtor. As you likely have

read, many of the clients of Peer Street were not sophisticated investors in the real estate industry.  And PeerStreet, in their marketing material, such as their website, presented:

- Their platform would allow investors to invest in real estate mortgages without being  real estate professionals.

- That all investments made by Peerstreet clients would be secured by real estate mortgages.   As most of the clients had their own residential mortgages, they likely thought that Peer Street mortgages would be similarly collateralized by property.  ( I am not sure that the "promissory notes" that the Peer Street investors received actually did this. )

- That investing in Peerstreet would be safe.  As PeerStreet investors had not had a default.  (I do believe that they removed that from their literature over the years.)  And would allow for a regular, and safe, income stream.

As we now know, much of this is not true.  I know personally over the years, when I tried to ascertain from Peer Street's support site the status of various "investments" they both tried to confuse me with real estate terminology, as well as downplay the true status of the various investments.

In my personal situation, my loss in Peer Street is not material to my personal financial situation.  Sadly, after reading much of the correspondence in the public record,  it appears that is not true for many of their investors.

In summary, I urge you to not allow the debtors, to use funds received, directly, or indirectly by investors to be used to either pay "non-investor" creditors, or the staff of Peerstreet.

I also would strongly suggest that pooling or REO property, or mortgages held, would not be of the best interest of many of the "investor class" creditors.

I hope you find this note, and the attached useful in your decision making.

Regards

Jonathan Newman

Peerstreet investor with account ending

What the typical retail investor thought they were doing
(Based on Peerstreet Marketing, and Website)

1. The Retail Investor placed an initial deposit into a holding fund @ Peerstreet

2. Retail Investors would select how much of their holding fund would be allocated to specific mortgages tied to specific properties.  Once selected, the amount selected would be withdrawn from the holding fund

3. if there were more investors wanting a portion of the mortgage it would be "over subscribed"., Investor funds would be allocated. "First come  first served." to a specific mortgage that a borrower wanted to borrow.

4. After selection of investors, Funds would be supplied to borrowers, and mortgages would be created.. Mortgages would be short term. Generally less than 24 months to maturity.

5. Investors would receive a portion of the monthly mortgage  payment based upon the percentage of the amount lended.

6. All mortgages would be secured by the underlying property that the mortgage was secured by.   Retail investors' investments would be secured by these mortgages.

7. After the loan matured, The mortgage would be fully paid, and the funds would go back to the holding fund

What actually happened to Peerstreet Retail Investors

1. Funds from the retail investor were placed into a holding fund

2. The investor would select how much of their holding fund would be allocated to specific mortgages tied to specific properties

3. The investor received a "Promissory Note" from a subsidiary of Peer Street. (Peer Street Funding, LLC)  The note  was written  quite unclearly for the average non real estate focused investor. .  Nothing was collateralized or secured by property.   The note stated that if Peerstreet did not receive payments from the corresponding mortgage, no payment was required to be made on the note.

4. Peerstreet, collected all funds from Investors, and issued a corresponding  mortgage to the borrower. Likely the holder of the mortgage was a subsidiary of PeerStreet.

5. Frequently, payments by the borrower were overdue.  Peerstreet, communicated to investors that this was nothing to be concerned about, and typical for this type of lending.

6. Mortgages would frequently not be paid on maturity.   Again, Peerstreet management communicated  this was not a major issue, and they would proceed actions on the borrower. Again, no payment was made to the retail investor, on the note, as the mortgage had also not been paid.

7. Peerstreet offered a new product, with a marketing name "Pocket".  It was marketed  to the  Peer Street retail Investor to earn interest on money not yet allocated to mortgages on their site.  It was marketed as a  short term place to hold funds, and still collect interest.

8. In actuality, Pocket funds were not being held by Peerstreet, but were re-invested, in a market that became illiquid. Peerstreet froze all assets in the Pocket Fund, but did eventually release a small portion of the funds to investors. The rest continue to be frozen.

9. Peerstreet, and its subsidiaries  filed for chapter 11 bankruptcy, freezing all of the retail investor's assets.

Pam & Jon Newman
45 Wildwood Rd
Andover MA  01810



U.S.M.S.
X-RAY

Chief Judge Laurie Selber Siverstein
U.S Bankruptcy Court
824 North Market Street 6th Floor
Wilmington, DE  19804

