IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (LSS) |
| Debtors. | (Jointly Administered) |
| | Ref Docket No. 18 |

### DECLARATION OF CHARLES K. SMITH IN SUPPORT OF THE DEBTORS' MOTION FOR APPROVAL OF BID PROCEDURES

I, Charles K. Smith, hereby declare pursuant to 28 U.S.C § 1746, under penalty of perjury, to the best of my knowledge and belief, that:

1. I am a Managing Director and the Head of Loan Strategies at Piper Sandler Loan Strategies, LLC ("**Piper Sandler**"), the proposed exclusive introducing broker to the above- captioned debtors and debtors in possession (collectively, the "**Debtors**") in the chapter 11 cases (the "**Chapter 11 Cases**").[2] I am duly authorized to make this declaration (this "**Declaration**") on behalf of Piper Sandler.

2. My career in the mortgage banking industry spans thirty-eight (38) years. Under my guidance, from 1996 to 2022, Piper Sandler has advised on over 2,300 loan portfolio transactions with an aggregate principal amount in excess of $70.4 billion. My expertise involves advising clients for the securitization, sale, and acquisition of performing, sub- performing, and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485). The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn: David Dunn, Chief Restructuring Officer.

[2] On July 28, 2023, the Court entered an order authorizing the Debtors' retention of Piper Sandler. [D.I. 146].

30592557.10

non-performing residential, multifamily, commercial, and consumer loans. I oversee and assist with constructing asset valuations consistent with FASB/GAAP[3] and asset bid price levels to support asset acquisitions and portfolio restructurings involving multibillion-dollar loan and servicing portfolios. In connection with my role at Piper Sandler, I was responsible for overseeing and contributing to Piper Sandler's development of an asset-valuation generation model to support portfolio valuations and open bank acquisitions, among other things. As a result of my experience in the mortgage banking industry, I am inherently familiar with the Debtors' asset classes and the sale processes necessary to successfully market and sell the Assets (as defined below) to attempt to maximize their value.

3. I submit this Declaration in support of the Debtors' request, as set forth in the *Debtors' Motion for Entry of (A) an Order (I) Scheduling a Hearing on the Approval of the Sale of all or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (II) Approving Certain Bid Procedures and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) an Order (I) Approving Asset Purchase Agreement, (II) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of all Encumbrances, and (III) Granting Related Relief* [D.I. 18] (the "**Bidding Procedures Motion**"),[4] that the Court enter the Bidding Procedures Order approving the Bid Procedures to govern the sale (the "**Sale**") of all or substantially all of the Debtors' mortgage loan assets, including, but not limited to, any related participations, if any, post-foreclosure real estate owned ("**REO**") property, and the loan servicing rights related to the foregoing (the "**Assets**").

---

[3] "FASB" means the Financial Accounting Standards Board and "GAAP" means Generally Accepted Accounting Principles.

[4] Capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures Motion.

4. I am over the age of eighteen (18) years and authorized to submit this Declaration on behalf of the Debtors.

5. Except as otherwise set forth herein, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals, management and employees, my discussions with other members of the Piper Sandler team working on this engagement, including Piper Sandler's restructuring team, and my extensive personal knowledge and experience. If I were called upon to testify, I could and would testify to each of the facts set forth below.

**A. Qualifications**

6. Piper Sandler is an affiliate of Piper Sandler & Co ("**PSC**"), an independent and full-service global investment banking firm with a leading financial services practice. Through its affiliation with PSC, Piper Sandler has a strong nexus to the community, regional, and super-regional banks and credit unions throughout the United States.

7. Piper Sandler is an industry leading broker specializing in performing and classified asset portfolio transactions. The firm executes asset sales across sectors and has extensive relationships with banks and non-bank asset buyers. Piper Sandler has offices in New York, Connecticut, and Tennessee and employs sixteen (16) full time individuals with an average tenure of more than eighteen (18) years and average mortgage finance experience of more than thirty (30) years. In 2022, Piper Sandler acted as broker in 372 closed transactions, representing approximately $5.9 billion in aggregate unpaid principal balance.

8. Piper Sandler's professionals have considerable expertise and experience in sales of distressed mortgage assets. Since 2006, Piper Sandler has closed eighty-five (85) transactions in sub/non-performing loans, representing approximately $4.9 billion in aggregate

unpaid principal balance. Notably, in 2018, Piper Sandler acted as broker for one of the largest national insurance companies in connection with the liquidation of all the deposits and assets of their bank. Over an eight-month period, Piper Sandler successfully placed $3.0 billion of deposits and $3.6 billion of performing and sub-non-performing loans and mortgage servicing rights.

9. Recently, Piper Sandler advised the United States Federal Deposit Insurance Corp. on its sale of all deposits and loans of the failed Silicon Valley Bank to First- Citizens Bank & Trust Company and on its sale of the failed Signature Bank New York to New York Community Bank.

**B.    Piper Sandler's Engagement and Prepetition Involvement with the Debtors**

10. The Debtors selected Piper Sandler because of its extensive experience and expertise in sales of distressed mortgage assets, for its reputation for conducting efficient, fair, and balanced marketing processes that maximize bidder participation, and for its relationships with depository and non-depository asset buyers. The Debtors and Piper Sandler originally executed an engagement agreement on April 14, 2023, pursuant to which Piper Sandler was to assist with running a sale and marketing process for the Sale of the Assets which would maximize value for the Debtors' estates and all stakeholders.

11. Following its engagement, Piper Sandler has committed significant resources to ensure that the sale process for the Assets is designed to maximize value for the Debtors' estates and stakeholders. As part of its mandate, Piper Sandler worked with the Debtors to analyze the Assets to be sold and advised the Debtors as to the marketability and potential price targets of the Assets. In furtherance of obtaining a value- maximizing sale, Piper Sandler has access to over 1,350 investor parties with interest in acquiring assets of the same or similar type the Debtors are selling that have executed non-disclosure agreements ("**NDA**"). Piper Sandler also

developed a transaction strategy and preparation of a bid package, which includes preparation of highly detailed loan-level data and establishment of a virtual data room (the "**Data Room**").

12. Working with the Debtors and their professional advisors, Piper Sandler pooled the Assets based on similar characteristics (*e.g.,* "residential," "commercial," "multi-family," "performing, current, non- mature," "sub- performing, non-performing, or matured," or "REO" (the "**Asset Pools**")). The Debtors, working together with Piper Sandler, determined that it was necessary to group the Assets in the Asset Pools based on their similar characteristics because, based on Piper Sandler's experience, parties who bid on assets like the Assets are interested in purchasing loan portfolios that have similar features and risk factors (*e.g.,* bidders who are interested in purchasing performing loans may not simultaneously be interested in purchasing REO loans). Accordingly, placing the Assets in the Asset Pools was done to maximize bidder participation and interest.

13. Notably, the "pooling" of the Assets has no effect or impact on the separate nature or character of the individual Assets and, I have been advised, will not constitute a "pooling" of claims or recoveries to creditors in these Chapter 11 Cases as a result.

C.   **The Development of the Bid Procedures**

14. The Debtors, working with Piper Sandler (including with input from colleagues in Piper Sandler's investment banking and restructuring team) and their professional advisors, crafted the Bid Procedures to be industry standard for the mortgage loan sale industry while also ensuring that the Bid Procedures accounted for the transparency and oversight necessary in a chapter 11 case. While there may be certain aspects of the Bid Procedures that, I have been advised, may be non-standard in a chapter 11 bankruptcy marketing and sale process, these aspects are no less critical to achieving maximum value for the Assets. In order to maximize bidder interest

and participation from buyers in this market, it is of the utmost importance that the bidding process appear familiar to them and that they can navigate it as nimbly as they can in an industry-standard process. Balancing this key element of the Bid Procedures with important bankruptcy-specific protections – such as the Committee's consultation rights and flexibility to modify the bidding rules – was a major focus in the development of the Bid Procedures.

15. Notably, the Bid Procedures do not contemplate a live, in-person or virtual auction. Buyers of this type of asset simply do not compete to acquire assets in a live auction setting. Requiring them to do so here will be a foreign concept and requiring them to do so will, I believe, result in modest to little interest in participating in the process. Accordingly, attempting to sell the Assets in a live auction format would chill bidder participation and in my opinion decrease value recoveries.

16. The Bid Procedures are also designed to account for the fluctuating value of the Assets and to provide the Debtors with flexibility in their ability to solicit proposals, negotiate transactions, evaluate loan-level pricing, and ultimately consummate a transaction or transactions for the highest or best value. Because the main Asset Pools consist of mortgage loans, they are susceptible to value fluctuations that the Bid Procedures account for. Market events, such as bank failures, and diligence discovery issues, such as unanticipated liens or tax deficiencies, among others, affect the value of the Assets. Moreover, over time, borrowers pay down or pay off their mortgages, borrowers re-finance with different lenders, loans can go from performing to non-performing or vice versa, and REO property values can fluctuate up or down based on a variety of factors. Because of the fluctuating nature of the value of the Assets, obtaining a stalking horse bidder is unrealistic if not impossible – no prospective buyer would commit to a stalking horse bid knowing that the value of the asset it is buying will be different – and possibly materially different

30592557.10

– when the sale process concludes 60-75 days later. For this same reason, there must be as short a period as is reasonably practicable between announcing the Winning Bidders, Court approval, and closing, all of which is by-design in the Bid Procedures.

17. Instead, the Bid Procedures contemplate two rounds of bidding where Qualified Bidders are given the opportunity conduct the diligence necessary to make a First Round Bid in furtherance of becoming a Qualified Round Two Bidder. Qualified Round Two Bidders will consist of the three (3) highest or best bids on each Asset Pool and may qualify for an Expense Reimbursement (defined and discussed below). Limiting Bid Round Two to three (3) bidders per Asset Pool signals to bidders in the First Round Bid that their bids must be competitive, if not at the higher end of their best. Otherwise, they will not qualify for the Second Round Bid and will have therefore spent time and diligence with no outcome. Within five (5) days of the Second Round Bid Deadline, the Bid Procedures require the Debtors to determine (in consultation with the Consultation Parties), which Second Round Qualifying Bid or combination of Second Round Qualifying Bids is the highest or best bid for the Assets, which will be determined by a multitude of non-binding factors as set forth in detail in the Bid Procedures. Thereafter, the Debtors and the Winning Bidder(s) will execute an asset purchase agreement and, shortly thereafter, close on the sale(s). As explained above, this rapid, sealed bid process is what bidders for these Assets will expect and the need for rapid closure is necessary due to the fluctuating nature of the value of the Assets.

18. Importantly, while the Bid Procedures group the Assets in their respective Asset Pools, the Bid Procedures require Qualified Round Two Bidders to submit loan-level pricing for their First Round Qualifying Bid within three (3) days of being notified that they are a Qualified Round Two Bidder. The loan-level pricing requirement established by the Bid Procedures ensures

that the Debtors are able to easily track the price paid for each and every loan that is sold and to which set of mortgage payment dependent notes those funds are traceable.

19. The Bid Procedures are designed with the overall goal of ensuring a competitive and value-maximizing sale process that balances the hallmarks of a section 363 sale and the expectations buyers in the mortgage loan industry. Based on the interest expressed to date, as more fully described below, it is apparent that the Assets are generating attention. Piper Sandler believes that the process contemplated by the Bid Procedures will provide the most value for the Assets available under the circumstances.

20. It is my opinion that the Bidding Procedures and the Debtors' proposed sale timeline (the "**Sale Timeline**") will allow the Debtors to obtain the highest or otherwise best value for the Assets under the circumstances of the Chapter 11 Cases.[5] The Debtors, with Piper Sandler's assistance, are extensively marketing the Assets and have received substantial positive feedback about, and interest in, the Assets. The Sale Timeline provides sufficient time for potentially interested parties to formulate bids and to conduct the diligence that is required. To date, nearly 130 parties have conducted and are conducting diligence on the Assets, and forthcoming interested parties will have sufficient time to do so in accordance with the Sale Timeline.

**D.    The Expense Reimbursement**

21. The Bid Procedures provide for a per-loan expense reimbursement (the "**Expense Reimbursement**") for Qualified Bidders that submit good faith Second Round Qualifying Bids. The Debtors, working with Piper Sandler and their professional advisors, designed the Expense Reimbursement such that losing Qualified Round Two Bidders who submit

---

[5] The Sale Timeline, as originally proposed, was within a typical market timeline to close on a sale of assets like the Assets. The unanticipated delay in approval of the Bid Procedures may have an unpredictable negative impact on the Sale. Accordingly, I believe it is with the utmost importance that the Bid Procedures are approved as expeditiously as possible.

actual out-of-pocket costs may receive up to $350 per loan for residential loans, and up to $800 per loan for commercial loans. The Expense Reimbursement is, in my view, below the market rate for most third party diligence firms and is appropriate under the circumstances. Given the diversity of the bidding entity size, I do not believe a meaningful number of bidders participating in the marketing and sale process will incur the time and expense necessary to fully diligence the assets that would lead to maximum bid price without the proposed Expense Reimbursement. Moreover, for each loan diligence, the Qualified Round Two Bidder's actual out-of-pocket costs may total less than $350 per residential loan and $800 per commercial loan, in which case the maximum Expense Reimbursement will be limited to the lesser of the actual diligence costs or the Expense Reimbursement amounts as explained above.

22. The ultimate decision as to whether to pay the Expense Reimbursement is solely within the Debtors' discretion. Given that the Bid Procedures contemplate up to three (3) Qualified Round Two Bidders on each Asset Pool, twelve (12) Qualified Round Two Bidders, at a maximum, may qualify for the Expense Reimbursement (i.e. two losing bidders times six Asset Pools). The maximum amount payable on account of the Expense Reimbursement is currently estimated to be only approximately $250,000 assuming the maximum Expense Reimbursement is paid to all losing bidders.[6] Further, the Bid Procedures require anyone seeking the Expense Reimbursement to submit a good faith Second Round Bid as determined by the Debtors. This feature ensures that a bidder moving into the Second Bid Round cannot incur expenses, subsequently decide not to participate further or submit a "low ball" bid, and claim an entitlement to the Expense Reimbursement.

---

[6] Notably, when REO mortgage loans are paid off, the REO Asset Pools decrease, thereby reducing the maximum Expense Reimbursement.

30592557.10

23. Given the nature of the Assets, it is Piper Sandler's experience that prospective bidders will be reluctant to invest the resources necessary after the First Round Bid Deadline without assurance that, if they proceed to the second round of bidding and are not ultimately deemed to be the Winning Bidder, their out-of-pocket costs will be partially reimbursed. Moreover, the sheer volume of Assets require a significant dedication of time to diligence and such expenditure of time and resources further warrants the approval of the Expense Reimbursement.

24. In fact, it is Piper Sandler's experience that potential bidders will either not participate at all or will offer depressed bid values in the absence of the Expense Reimbursement. Conducting diligence about the Assets is a time-consuming, expensive undertaking and potential bidders will not commit their resources to such undertaking without the potential of being reimbursed. As noted, paying the Expense Reimbursement is entirely within the Debtors' sole discretion and will require Qualified Bidders who submit a Second Round Bid and are not ultimately deemed the Winning Bidder to demonstrate, through documentation, that their actual out-of-pocket costs relate to diligence in the second round of bidding.

25. I believe that the Expense Reimbursement is necessary to ensure maximum interest in the Assets and that it will result in greater participation in both rounds of bidding. In Piper Sandler's experience, approval of the Expense Reimbursement will result in a more competitive and value-maximizing sale process and therefore is in the best interests of the Debtors, their estates, and their stakeholders.

E.  **The Postpetition Marketing Process**

26. Piper Sandler launched the marketing process upon the filing of the Chapter 11 Cases. As further discussed below, given Piper Sandler's preparation in anticipation of

launching the marketing process, Piper Sandler, working with the Debtors and their professionals, has generated a great amount of interest in the Assets.

27. Since June 26, 2023 (the "**Petition Date**"), Piper Sandler has contacted over seven hundred investors within its existing network of potential buyers to gauge interest in the Assets. To date, approximately 761 parties have asked for Piper Sandler's teaser (the "**Teaser**"). The Teaser contains detailed descriptions of the Assets, the sale opportunities available with respect to the Assets, the Bid Requirements, and the Sale Timeline. Additionally, 127 parties have executed NDAs and have access to the Data Room, and another 12 parties are currently in the process of signing NDAs. Parties with access to the Data Room can review confidential materials related to the Assets in furtherance of considering whether to propose a bid in accordance with the Bid Procedures. Upon the Court's approval of the Bid Procedures, Piper Sandler, with the assistance of the Debtors' professionals, will continue to market the Assets and ensure a robust and competitive sale process that increases value for the Debtors' stakeholders.

**F.  The Debtors' Bid Procedures and Sale Process Is Intended to Maximize Value and Should Be Approved**

28. In conclusion, for the reasons described above, I believe that approval of the proposed Bid Procedures and the Expense Reimbursement will enable the Debtors to obtain the highest or otherwise best offers for the Assets under the circumstances thereby maximizing value for the benefit of all stakeholders in the Chapter 11 Cases.

Dated:  August 17, 2023

/s/ Charles K. Smith

Charles K. Smith
Managing Director, Head of Loan Strategies
Piper Sandler Loan Strategies, LLC