### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (LSS) |
| Debtors. | (Joint Administration Requested) |
| | **Ref. Docket Nos. 18, 71, 107, 135 & 189** |

### DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO BIDDING PROCEDURES AND CASH MANAGEMENT MOTIONS: <u>DOCKET NUMBERS 11 AND 18</u>

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")[2] hereby submit this omnibus reply (the "**Reply**") to the objections filed by Pacific Funding Trust 1002 and Pacific RBLF Funding Trust (together, "**Colchis**") (the "**Colchis Objection**") [Docket No. 189],[3] Sean Banchik ("**Banchik**") [Docket No. 182] (the "**Banchik Joinder**"),[4] Jax SFH Properties, LLC ("**Jax**") (the "**Jax Objection**") [Docket No. 71], Sean Quinn [Docket No. 107] (the "**Quinn Objection**") and Sean Tarpenning [Docket No. 135] (the "**Tarpenning Objection**," and collectively with the Colchis, Jax and Quinn Objections and the Banchik Joinder, the "**Objections**") to the Debtors motion seeking approval of, inter alia,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485).  The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn:  David Dunn, Chief Restructuring Officer.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the glossary attached hereto as <u>**Exhibit A**</u> (the "**Glossary**").  The exhibits referenced in this Reply are listed in the Glossary.

[3]    This reply also replies to those aspects of the Colchis Objection that object to the Cash Management Motion (as defined in the Colchis Objection.).

[4]    To the extent any other joinders are filed joining any of the Objections that merely join in the objections already lodged, the arguments set forth in this Reply shall be applicable to such joinders.

bidding and sale procedures (the "**Bid Procedures Motion**") [Docket No. 18].  In support of this

Reply, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      As a threshold matter, the Court can and should approve the Bid Procedures

Motion so the Debtors can formally launch the marketing and sale process for the Underlying

Loans.  Colchis's "you can't sell what you don't own" argument fails to disclose to the Court that

the underlying contractual agreements between the Debtors and Colchis (and all of the

noteholders) expressly allow the Debtors to do so without the consent of Colchis or any other

noteholder.  All of the Debtors' promissory note products tied to the Underlying Loans contain

substantively identical sale provisions:

> Company may sell, convey, assign or otherwise transfer (a) all or
> any part of the corresponding mortgage loan or (b) any interest in
> the corresponding mortgage loan, whether any such sale,
> conveyance, assignment or other transfer occurs directly or
> indirectly, voluntarily or involuntarily or by operation of law,
> ***without the prior written consent of the Investor***.

Thus, at the time of its investment, Colchis and all the other Investors agreed that the Debtors could

do precisely what is proposed in the Bid Procedures Motion without the need to obtain their

consent.  Neither the bankruptcy filing nor the caselaw cited by Colchis changes that.[5]

2.      Colchis, with its affiliates, is a highly sophisticated specialist alternative

investment firm that "has invested approximately $6 billion in more than 500,000 digital loans

since 2011, according to its website."[6]  Colchis has transacted hundreds of millions of dollars

---

[5]    If anything, the bankruptcy filing enhanced the Debtors' rights to do so.  As noted by the Debtors' counsel at the
August 4th status conference in these cases, 11 U.S.C. § 363 permits the Debtors to sell the Underlying Loans
despite Colchis's unresolved participation claim.

[6]    Lawrence Delevingne, *Exclusive: Eyeing defaults, U.S. direct lender Colchis Capital to shut funds*, Reuters (Apr.
7, 2023), https://www.reuters.com/article/us-health-coronavirus-colchiscapital-exc/exclusive-eyeing-defaults-u-
s-direct-lender-colchis-capital-to-shut-funds-idUSKBN21P21X

($100,000,000s) with the Debtors.  Notwithstanding, Colchis frames its objection almost entirely around three non-specific statements quoted from FAQ responses on the Debtors' website (two of which describe the notes and one of which describe the Debtors' corporate structure) rather than the dozens and dozens of pages of actual legal documents governing the Debtors' financial commitments to Colchis, which Colchis affirmed it read, understood and agreed to.  Nowhere in the Colchis Objection does Colchis quote any of the documents, let alone the Peer Street Notes themselves,[7] or offer the Court copies thereof, because the clear and unambiguous language set forth therein demonstrates the opposite of what it wants the Court to believe.  Simply stated, the Peer Street Notes are unsecured promissory notes.  The MPDNs expressly state what they are, what each party *is* receiving thereunder, and what each party is *not* getting, including the absence of any secured claim, property interest, trust rights, etc.

3.      Nor does Colchis reveal its complex, extensive and long-time commercial relationship with the Debtors as a substantial investor, whole-loan purchaser, and warehouse financier.  Instead, this sophisticated, multi-billion dollar commercial actor wants the Court to believe its "aw shucks" argument that it looked at the Debtors' website, liked what it saw, and gave them $38 million.

4.      Colchis's motivation in attempting to "blow up" the Debtors' sale process must be scrutinized.  Since April of 2023, the Debtors and Colchis have been in on-again, off-again discussions regarding a potential transaction that would be an alternative to the pending marketing and sale of the underlying mortgage assets and REO properties.  As Colchis puts it, it has "proposed various plan structures to the Debtors" to be sponsored by Colchis.  As plan sponsor,

---

[7]     Colchis holds no RWNs, yet gratuitously argues that they, too, are something other than redeemable limited recourse promissory notes.  *See* Colchis Obj. at 8, n.5.

Colchis is positioned to ensure maximum value for its investments, while extracting management fees from the Debtors' loan portfolio at the expense of all of the Debtors' other creditors. In those discussions, Colchis has ***never*** expressed the view that the MPDNs constitute participations. Indeed, the "plan structures" Colchis refers to ***depend*** on the Debtors actually owning the Underlying Loans and, despite Colchis's complaints to the contrary, ***require*** a chapter 11 bankruptcy. Thus far, no actionable transaction has emerged, much less one that the Debtors believe will yield a greater recovery than a thorough marketing process overseen by an expert in the industry, Piper Sandler. And forcing a delay in the sale process may jeopardize the Debtors' ability to expeditiously exit chapter 11 in a value maximizing way and leave the Colchis-sponsored plan as the Debtors' only alternative, putting Colchis in prime position to set its price and extract as much value out of the Debtor's loan portfolio for itself as possible and to the detriment of all other holders.

5.      Prior to filing its objection – and in an effort to avoid the disruption it would cause – the Debtors repeatedly informed Colchis of three critical points. First, should an actionable transaction emerge (including from Colchis) that would yield a greater return to creditors than the pending Piper Sandler-run sale process, the Debtors are more than willing to pivot to such a transaction. Second, if such a transaction emerges, the Piper Sandler-run marketing and sale process is still beneficial to demonstrate that the value proposed by such a transaction is the best recovery possible for creditors. Without it, the Court will have nothing with which to compare such a transaction. And finally, there's the possibility that such an actionable alternative transaction never emerges, in which case, unless the Debtors proceed with sale process now, they will have squandered their time in chapter 11 making little progress.

6.      The Debtors believe that under any scenario, the proposed sale process is necessary.  Whether the Debtors sell their underlying mortgage loan assets to a highest bidder or utilize the sale process results to demonstrate the value of an alternative sale transaction, the sale process offers significant benefits to the Debtors and all of their stakeholders.  It should therefore be approved.

## THE DEBTORS' BUSINESS

### I.      THE PEER STREET BUSINESS

7.      Peer Street's business focused on enabling ***accredited investors, funds, and institutions*** to access certain real estate-related debt investments that were historically difficult to invest in, and permits lenders and borrowers to access capital that has been historically difficult for them to access.[8]  To be an accredited investor, individuals must have a net worth exceeding $1 million (excluding the value of their primary residence) or have earned income of over $200,000 (or $300,000 if including a spouse of partner) for the current and prior two years.  For entities to qualify as accredited investors, they must hold assets totaling over $5 million.  Peer Street introduced the first and largest two-sided online marketplace for investing in and funding real estate debt.[9]  On one side of the marketplace, Peer Street provided individual investors with access to an alternative asset class (investments in mortgage loans) that was previously difficult to access, while on the other side of the marketplace, it provided capital to real estate lending businesses and their borrowers (through funding or acquisition of mortgage loans).[10]

8.      Prior to the Petition Date, Debtor PSFI originated or acquired mortgage loans itself or through a network of lenders and brokers by (i) purchasing loans or participations

---

[8]    Exhibit 1, Dunn Decl., [Docket No. 3] ¶ 10.

[9]    *Id.* ¶ 11.

[10]   *Id.*

in loans originated by the third-party lenders and brokers, (ii) table funding loans[11] on behalf of the third-party lenders and brokers, or (iii) funding loans directly to borrowers sourced through the third-party lenders and brokers (*i.e.,* the Underlying Loans).[12]

9.      In the early stages of PSFI's existence, the capital to fund or acquire the Underlying Loans came from one of two sources:  (a) warehouse financing provided by third-party lenders, including Colchis; or (b) the purchase of (or commitment to purchase) participation interests in the Underlying Loans from PSFI by its affiliate, Debtor Funding LLC.[13]  The cash Funding LLC used to purchase these participations was raised through the issuance of MPDNs, as discussed in more detail below.[14]  Where MPDNs were the source of capital for the initial origination or acquisition, Underlying Loans may not have been originated or acquired if Funding LLC was unable to timely issue sufficient MPDNs to fully fund the origination or acquisition before the anticipated closing.[15]

10.     Later, the capital sources available to PSFI to originate or acquire Underlying Loans were expanded to include (a) cash provided to PSFI by Debtor Warehouse I LLC and Debtor Warehouse II LLC, as warehouse financing,[16] (b) cash lent to PSFI from its

---

[11]  "Table funding" means a transaction in which the loan originator conducts a mortgage loan closing in the loan originator's name, but does not use its own cash to fund the loan. At loan closing, a third-party capital provider provides funds for the loan, the loan originator automatically assigns the mortgage loan to the third party. *See* 12 CFR § 1024.2(b); *see also* Candice Sparks, *Guide to Table Funding*, Peer Street (2021).

[12]  Exhibit 1, Dunn Decl. ¶ 15. The average Underlying Loan is a short-term, high-yield loan, predominantly business purpose loans that are bridge loans, fix-to-rent, or fix-to-flip. The Underlying Loan is a first lien mortgage loan generally with a term of one to three years.  The properties covered by the Underlying Loans are all commercial properties or residential non-owner occupied properties.  None of the Underlying Loans involve owner-occupied, long-term residential loans.

[13]  *Id.*  ¶¶ 15-18; Exhibit 2, Portfolio LLC Loan Mgmt. Agreement § 6 at 4.

[14]  *See infra*, Part III.A.

[15]  *See infra*, Part III.A.

[16]  While structured as the purchase of participation interests, rather than loans issued to PSFI, the Warehouse Entities were intended to provide short term liquidity to PFSI.  For Warehouse I LLC, participations owned by the Warehouse Entities would be sold or repurchased by PSFI within 90 days.  *See* Exhibit 3, Pocket 1 Month RWN Suppl. at 4; Exhibit 4, Warehouse I LSA at 5 (definition of "Disposition Deadline").  For Warehouse II LLC, at

affiliate Debtor Opp Fund, as warehouse financing,[17] and (c) cash provided to PSFI by Debtor Portfolio LLC that was used to purchase Underlying Loans, or participations therein, from PSFI. The cash from Portfolio LLC was raised through the issuance of PDNs, as discussed more fully below. The cash from the Warehouse Entities came from credit facilities between each Warehouse Entity and Funding LLC.[18] The cash used by Funding LLC to fund those credit facilities was raised through the issuance of RWNs, as discussed more fully below.[19] The cash used by Opp Fund to honor borrowing requests from PSFI came from cash on Opp Fund's balance sheet raised from the sale of limited partnership interests in Opp Fund, as discussed more fully below.[20]

11.    Where PSFI purchased Underlying Loans using warehouse financing (either from third-party financiers, Opp Fund or the Warehouse Entities), PSFI would seek to (a) sell the Underlying Loans to third-parties, (b) offer Funding LLC the opportunity to acquire a 100% participation interest in the Underlying Loan (or a series thereof), or (c) offer Portfolio LLC the opportunity to acquire a participation interest in or outright purchase the Underlying Loan.[21] The proceeds from these Underlying Loans would then be available to acquire additional Underlying Loans or to repay the applicable warehouse financing, including the Warehouse Entities and Opp Fund, as required by the terms of the underlying credit facilities.[22]

---

least 50% of the participation interests were required to be disposed of within 120 days. Exhibit 5, Warehouse II LSA at 5 (definition of "Disposition Deadline").

[17]    In some instances Opp Fund would invest alongside PSFI by purchasing participations in, or outright purchasing portions of, Underlying Loans PSFI was acquiring. *See* Exhibit 14, Opp Fund PPM at 2-3.

[18]    *See id.*

[19]    *See infra*, Part III.B

[20]    Exhibit 14, Opp Fund PPM at 4-5; *see infra*, Part III.B.

[21]    Exhibit 6, Warehouse I Participation Agreement at 1; Exhibit 7, Warehouse II Participation Agreement at 1.

[22]    *See generally id.*

12.     PSFI is the master servicer for all of the loans owned or participated in by the various Debtors.[23]  As of August 14, 2023, there are approximately 334 Underlying Loans in which the Debtors have an interest.

- Portfolio LLC only has an interest in a single loan that it wholly-owns and has not participated interests in.

- The remaining 333 are legally owned by PSFI.

- Funding LLC has participation interests in 315 of 333 Underlying Loans owned by PSFI.   Of these 315 loans, for 276, Funding LLC is the only Debtor with participation interests in such loans.

- Warehouse I LLC has participation interests in 9 Underlying Loans.

- Warehouse II LLC has no interests in any Underlying Loans.

13.     PSFI's rights as servicer and owner of the Underlying Loans and participations therein is discussed more fully in Part IV of this section below.

## II.     BECOMING A PEER STREET INVESTOR

14.     Peer Street provided access to its investment products through an online marketplace (*i.e.*, the Platform).[24]  The investor experience began by visiting www.PeerStreet.com, where prospective investors could click the "Get Started" button at the top of the homepage (and displayed in various other parts of the website)[25] to create an account.  Once users successfully created an account (such a user referred to herein as an Investor), including verifying that they met the financial requirements to be accredited investors, they gained access to the Platform.  The

---

[23]   *See generally* Exhibit 19, Funding LLC Participation Agreement; Exhibit 9, Portfolio LLC Participation Agreement; Exhibit 6, Warehouse I Participation Agreement; Exhibit 7, Warehouse II Participation Agreement.

[24]   Peer Street also offered investments in the limited partnership interests of Opp Fund.  These investments were not in the Form of Notes and were not offered through the Platform.  A discussion of Opp Fund is included in the Appendix.

[25]   The link is www.PeerStreet.com/users/sign_up.  New account creation has been suspended since the chapter 11 cases were commenced.  Peer Street stopped accepting deposits on the Platform on May 3, 2023.

Platform was used to communicate offers to Investors to invest in Peer Street's various products and allows Investors to manage their investments made through the Platform.[26]

15.    When creating an account, each Investor was required to agree to Peer Street's terms of service[27] which, among other things, state:

> In addition to these Terms, you are bound to the terms of each other agreement to which you agree as a user of the Site and the Services, including, without limitation, the terms of the ***Investor Agreement***, the ***Private Placement Memorandum for the Notes***, the Consent to Electronic Transactions and Disclosures, your Representations Regarding Use of the Platform, and any ***Series Note Listing*** (as defined in the Private Placement Memorandum) for a series of Notes in which you invest.[28]

16.    Investors began the investment process by depositing funds into the Platform. For most Investors, those funds were deposited into the Retail FBO Account, a "for the benefit of" account maintained, by Peer Street, at Wells Fargo for all individual Investors.[29] Each Investor would then be able to use their funds on deposit in the respective Retail FBO Account to invest in Peer Street's investment products.[30] The Retail FBO Account was also the account where the proceeds of the Peer Street Notes (the payment of interest or return of principal) were deposited.[31] Prior to the Petition Date, Investors were freely able to withdraw their own funds on

---

[26]    Exhibit 1, Dunn Decl. ¶¶ 12-16.

[27]    Peer Street's terms of service are specifically linked from the new user sign-up page and available from a link appearing at the bottom of the site. The terms of service are accessible at www.peerstreet.com/content/terms.

[28]    Terms of Service, Peer Street, https://www.peerstreet.com/content/terms (last visited Aug. 16, 2023) (emphasis added).

[29]    Cash Mgmt. Motion, [Docket No. 11] ¶ 5(c). Certain institutional Investors were offered Institutional FBO Accounts that were opened for the sole benefit of such Investor and into which proceeds of their Peer Street Notes were deposited. For these institutional Investors, they directly funded investments to Peer Street contemporaneous with the closing of the acquisition of their Peer Street Notes. Exhibit 22, Colchis Framework Agreement, Article 2 at 8.

[30]    *See* Cash Mgmt. Motion [Docket No. 11] ¶ 5(c).

[31]    *Id.*

deposit in the Retail FBO Accounts, although that ability has been suspended since the commencement of these chapter 11 cases.[32]

17.     To make an investment in Peer Street Notes, Investors were required to agree to Peer Street's Investor Agreement.[33]  Investors were required to review and affirmatively confirm their understanding of, and agreement to, the Investor Agreement through the Platform.[34]

18.     The Peer Street Notes are also governed by the PPM.[35]  Each specific Peer Street Note type (*i.e.*, MPDNs, RWNs and PDNs) issued after December 2, 2019 is subject to its own Supplement to the PPM.[36]  In the Investor Agreement, each Investor agreed that it had read, understood, and was bound by the applicable PPM and Supplement in connection with the purchase of any Peer Street Note.[37]

---

[32]  Exhibit 1, Dunn Decl. ¶ 22.

[33]  An initial Investor Agreement was prepared in 2014, and a revised Investor Agreement was published in 2019. The 2014 Investor Agreement (Exhibit 10) is only with Debtors PSI and Funding LLC and governs MPDNs issued by Funding LLC before December 2, 2019.  The 2019 Investor Agreement (Exhibit 11) applies to each "PS Issuer," which is Funding LLC for the MPDNs and RWNs, and Portfolio LLC for the PDNs.

[34]  *See* Exhibit 10, 2014 Investment Agreement, Recital ("Each time you submit a purchase order through the PeerStreet Platform, you are (a) accepting and agreeing to the following terms, (b) accepting and agreeing to the PeerStreet.com Terms of Use and PPM, (c) agreeing to transact business with us and receive communications relating to the Notes electronically, and (d) agreeing to have any dispute with us resolved by binding arbitration."); Exhibit 11, 2019 Investor Agreement ("Each time you deposit funds or invest through the PeerStreet Platform (including through the Automated Investing program, as defined below), you are, without limitation, (a) agreeing to the terms of this Agreement, (b) accepting and agreeing to the PeerStreet.com Terms of Use and PPM, (c) agreeing to transact business with us and receive communications relating to the Notes electronically, and (d) agreeing to have any dispute with us resolved by binding arbitration.").

The 2014 Investor Agreement includes an acknowledgement that the investor has reviewed and understood the applicable offering documents, including the Investor Agreement.  *See* Exhibit 10, 2014 Investor Agreement, Recital ("You acknowledge that this Investor Agreement, along with the PPM has been delivered to you via the Platform, and that you have read and understood each document."); Exhibit 11, 2019 Investor Agreement ¶ 6(a) ("You represent, warrant, and covenant, as of the date of this Investor Agreement, that: (a) You have received, read and understand all of the Offering Materials (including the Transaction Documents and the risk factors set forth in the PPM and the PPM Supplement(s) for the types of Real Estate Securities in which you seek to invest).").

[35]  The PPM was initially issued in 2014, and that version applies only to the MPDNs issued before December 2, 2019, and a revised PPM was issued in 2019 and applies to all Peer Street Notes issued after December 2, 2019.

[36]  *See generally* Exhibit 12, 2019 PPM.

[37]  *See supra*, note 34.

30664905.11

III.    **THE PEER STREET NOTES OFFERED ON THE PLATFORM**

19.     Once an Investor was registered with the Platform and had deposited funds into the applicable Retail FBO Account, the Investor was able to invest its funds in any of three separate types of Peer Street Notes offered through the Platform.[38]  Peer Street Notes were offered in principal amounts as small as $1,000 (and in certain instances, investments in individual MPDNs could be less than that), and more than 68,000 Peer Street Notes are outstanding (just under 67,000 of those being MPDNs) with more than 8,000 unique Investors as noteholders.[39]

20.     As reflected in the Investor Agreement, each of the Peer Street Notes is a limited recourse, unsecured promissory notes conveying no ownership interest in Underlying Loan:

> You also agree and acknowledge that you do not have any direct interest in the Underlying Investments, and that, unless explicitly provided otherwise, you do not have any voting rights and/or decision-making authority beyond your decision to invest or not invest in the Real Estate Securities. Without limiting the generality of the foregoing, any borrower or lender partner who receives a loan or funds from PeerStreet has a legal relationship with PeerStreet only and obligations only to us.  Although payments on your Real Estate Securities depend on the performance of the Underlying Investments, you do not own any direct, secured, and/or recorded interest in the Underlying Investment itself.[40]

21.     The terms of the MPDNs are summarized herein and the terms of the RWNs and PDNs are summarized in appendix attached hereto (the "**Appendix**").

---

[38]    *See supra*, note 34.

[39]    *See generally* Exhibit 13, MPDN Suppl.; Exhibit 14, Opp Fund PPM.

[40]    Exhibit 11, 2019 Investor Agreement ¶ 21.

A.      **Mortgage Payment Dependent Notes Issued by Funding LLC**

22.      Peer Street, through Funding LLC, offered mortgage payment dependent notes (or MPDNs) to Investors through the Platform.[41]   The terms of the MPDNs are set forth in the applicable PPM, MPDN Supplement (if applicable), the MPDN itself and the Series Listing for the Underlying Loan with which each MPDN was associated, which were each required to be accepted and agreed to as condition to the purchase of any MPDN.[42]

23.      Each MPDN is associated with a particular Underlying Loan, which Underlying Loan may have been offered for investment on the Platform in Series.[43]   For example, PSFI may have originated an Underlying Loan on 123 Main Street with a principal balance of $750,000 using warehouse financing.   Peer Street then may have placed an initial Series corresponding to $500,000 of principal amount on the Platform for fractional investors to invest in.  If sufficient funding was raised, Funding LLC would issue $500,000 of 123 Main Street-Series 1 MPDNs, and use those funds to purchase from PSFI a participation interest in $500,000 of principal balance of the Underlying Loan (referred to as 123 Main Street-Series 1) and the applicable warehouse financing entity would retain a participation interest in $250,000 of principal balance of the Underlying Loan (referred to as 123 Main Street Series 2).  In the future, Peer Street may have placed some or all of 123 Main Street Series 2 on the Platform for fractional investors to invest in, and would have issued 123 Main Street Series 2 (and Series 3, Series 4, et c.) MPDNs once each offering was fully committed.

---

[41]   Exhibit 11, 2019 Investor Agreement ¶ 21; Exhibit 1, Dunn Decl. ¶ 16.

[42]   *See supra,* note 34.

[43]   The MPDN Supplement defines an Underlying Loan as "a specific mortgage loan that one or more lenders requested to be funded and/or that is originated, purchased or co-invested in by PeerStreet. Such loans may be senior, junior, tranched, or otherwise vary in priority, term, and other conditions."  Exhibit 13, MPDN Suppl. at 2.

24.     Underlying Loans (or series thereof) were placed on the Platform to solicit investments in MPDNs associated with the particular loan/series through a Listing that provided various information concerning the Underlying Loan and MPDN, such as (a) the aggregate amount of the Underlying Loan, (b) whether there were multiple series for the Underlying Loan and the amount in the applicable series, (c) the interest rate paid to Peer Street on the Underlying Loan, (d) the interest rate being offered for the investment, (e) the priority of the Underlying Loan, (f) information about the originating lender or broker and the borrower, and (g) other information that may be relevant to an Investor's assessment of the risk associated with the Underlying Loan and MPDN.[44] A particular Underlying Loan could have multiple series associated with it.  Importantly, different series associated with the same Underlying Loan can have different yields and priorities, thus MPDN holders with interest in the same Underlying Loan can earn different returns from one another and from the Underlying Loan.[45]  MPDNs were only issued once the applicable series for the associated Underlying Loan was fully subscribed.[46]  MPDNs were made available to the respective Investors in electronic form through the Platform.[47]

25.     As noted above, the funds raised by Funding LLC through the issuance of MPDNs were used by Funding LLC to purchase from PSFI participation interests in individual Underlying Loans.[48]  In economic terms, payment of principal or interest on the MPDNs was

---

[44]   Example Listings are attached as Exhibit 15.  *See* Exhibit 13, MPDN Suppl. at 2 ("Each time we offer a Series of MPDNs, we will also prepare a Listing—which will be posted to the PeerStreet Website—with specific terms for and relevant information about that Series of MPDNs, the terms of the Underlying Loan, the lender and the borrower, the priority of the Underlying Loan, and the nature of any security interest (if any) in the Underlying Loan.); *see also id.* at 2-9 (indicating various matters that will be disclosed in the Listing).

[45]   Exhibit 13, MPDN Suppl. at 13-14.

[46]   *Id.* at 2-3.

[47]   The form MPDN is an exhibit to the MPDN Supplement.  An exemplar MPDN note, with borrower name redacted, is attached as Exhibit 16.

[48]   Exhibit 16, Exemplar MPDN Note; *see supra*, note 34.

dependent on the performance of the specific Underlying Loan associated with the MPDN, a fact that was clearly disclosed in the offering materials for the MPDNs.[49]  While the holders of MPDNs are paid from proceeds of the Underlying Loan received by Funding LLC, Funding LLC also had the right to make "advances when, in its sole and absolute discretion, it determines in good faith that making these advances will ultimately be the most effective course of action with respect to the returns on an Underlying Loan" and "[Funding LLC] shall be entitled to recover such advances prior to any payments being made to Investors."[50]

26.     The offering documents for the MPDNs make clear that Investors purchasing MPDNs were purchasing ***promissory notes*** from Funding LLC and that those notes are ***special***, ***limited***, ***unsecured*** obligations of Funding LLC ***only***.[51]  Nothing in the offering documents for the MPDNs purport to convey any property interests, as security or otherwise, in

---

[49] *See* Exhibit 13, MPDN Suppl. at  4 ("Neither PSFLLC nor PeerStreet has any obligation to make any payments on MPDNs, unless, and only to the extent that, PeerStreet has received payments from the applicable borrower on that Underlying Loan, net of any applicable fees and expenses."); *see also* Exhibit 11, 2019 PPM I at 14; Exhibit 18, 2014 PPM at ii, 9; Exhibit 13, MPDN Suppl. at 5, 6, 10-11, 20 (Form of Note: Master Mortgage Dependent Note, § 1), 21 (Form of Note § 4), 23 (Form of Note § 15).

[50] *See* Exhibit 13, MPDN Suppl. at 8; *see also id.* at 21 (Form of Note § 3.2) ("[Funding LLC] Company will, at its sole discretion, advance any and all amounts necessary to protect its interest in the corresponding mortgage loan, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs Company deems necessary to protect its position in the corresponding mortgage loan (the "Company Advances") . . . . Any amounts paid to the Company under the corresponding mortgage loan shall be payable as follows: (1) to the Company, to recoup the Company's Advances, (2) to the Company or third parties for any fees and costs allowed to be charged under the Memorandum and the MPDN Supplement to the Memorandum and (3) the balance, if any, pro rata to the Investors of the Notes.").

[51] *See id.* at 13 ("MPDNs will not represent an obligation of the borrower, original lender or any other third party except PSFLLC."), 20 (Form of Note § 1) ("This Note represents a special limited obligation of the Company, and (1) no payments of principal and interest on this Note shall be payable unless the Company has received payments relating to the corresponding mortgage loan, and then only to the extent of the amount of such payments received by the Company (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum), and (2) no Investor of this Note shall have any recourse against the Company unless, and then only to the extent that, the Company has received payment relating to the corresponding mortgage loan and has failed to pay such Investor their pro rata share of the payments that the Company actually received under the corresponding mortgage loan (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum)"); *see also supra,* note [15]; Exhibit 12, 2019 PPM at 14; Exhibit 13, MPDN Suppl. at 6, 23 (Form of Note); Exhibit 10, 2014 PPM at ii, 2, 6, 11-12, 26.

connection with issuing the MPDNs.  To the contrary, the offering documents clearly state that no property interest in the Underlying Loans (or any assets of any Peer Street entity) are created by issuance of the MPDNs.[52]  Moreover, the form MPDN makes clear that (x) Funding LLC can sell an Underlying Loan (or interest therein) associated with an MPDN at any time and (y) the MPDN holder's consent to make such a sale is not required.[53]

27.    In practice, as described below, Funding LLC acquired interests in Underlying Loans by purchasing a 100% participation interest in Underlying Loans from its affiliate PSFI, with PSFI – and not Funding LLC or the MPDN holders – retaining the rights to administer the Underlying Loans.[54]  The MPDN holders had no contractual privity with the borrowers of the Underlying Loans, nor with PSFI as the legal owner and servicer of the Underlying Loans.[55]  The MPDNs also make clear on their face that the right to payment thereon is wholly dependent on Funding LLC receiving payments for the associated Underlying Loan.[56]

---

[52]  Exhibit 13,  MPDN Suppl. at 5 ("Investors in MPDNs will not have any security interest in the assets of PSFLLC, PSFI, PeerStreet, any borrower or lender, any Underlying Loan, any proceeds from any Underlying Loan or in the assets of any borrower or lender (including any PSI affiliate acting as lender) associated with any Underlying Loan."), 9 ("MPDNs will be limited, unsecured obligations of PSFLLC only and are not obligations of any borrower or lender (including any PSI affiliate acting as lender) associated with any Underlying Loan"), 13; Exhibit 12, 2019 PPM at 14 ("Returns on the Real Estate Securities are special, limited, **unsecured** obligations of the PS Issuer that depend entirely on the performance of one or more Underlying Investments . . . . Although your investment in a given Series may be tied to the performance of a secured real estate loan (such as a mortgage) or another equity or debt investment, the Real Estate Securities you purchase are derivative investment product that do not grant you actual, legal, recorded or unrecorded, interests in the Underlying Investment itself."(emphasis in original)); Exhibit 18, 2014 PPM at 6 ("Holders of Notes will not have a security interest in the assets of PeerStreet or any of its PSI affiliates, the corresponding loan investment, the proceeds of that investment or of any underlying assets of the Borrower."), 44 ("Our payment obligations under the Notes are unsecured, and Investors do not have a security interest in the corresponding loans."); *see also* Exhibit 11, 2019 Investor Agreement ¶ 21.

[53]  Exhibit 13, MPDN Suppl. at 22 (Form of Note § 6) ("Subject to compliance with the Act and applicable securities laws and regulations, Company may sell, convey, assign or otherwise transfer (a) all or any part of the corresponding mortgage loan or (b) any interest in the corresponding mortgage loan, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of the Investor."); *see also id.* at 6, 9.

[54]  *Id.* at 3, 6; *see also infra*, Part IV.A ¶¶ 23-24 (describing Funding LLC Participation Agreement).

[55]  Exhibit 13, MPDN Suppl. at 19.

[56]  *Id.* at 3, 4 ("**Neither PSFLLC nor PeerStreet has any obligation to make any payments on MPDNs, unless, and only to the extent that, PeerStreet has received payments from the applicable borrower on that**

IV.    THE PEER STREET ENTITIES' INTEREST IN UNDERLYING LOANS

28.    In the ordinary course of Peer Street's business, Underlying Loans were generally acquired, in the first instance, by PSFI.  However, as described in this Part, PSFI would seek to sell the Underlying Loans or participations therein to other Peer Street entities to the extent such Underlying Loans or interests therein were consistent with the investment strategy of those Peer Street entities.

A.    Underlying Loans Associated with MPDNs

29.    Funding LLC acquired participation interests from PSFI in two ways.  First, if PSFI acquired an Underlying Loan using warehouse financing, it may offer to sell an express 100% participation interest in an Underlying Loan (or a series representing a portion of the principal balance thereof) to Funding LLC.  Funding LLC would purchase that participation using funds raised from Investors who received MPDNs associated with the Underlying Loan (or series thereof).[57]  In other instances, PSFI may not have acquired loans using warehouse financing and, instead, relied on proceeds made available by Funding LLC at the closing of a loan origination or acquisition transaction.[58]  In that scenario, Funding LLC would purchase a 100% participation interest contemporaneous with closing of the Underlying Loan and the funds would be used to fund the loan at origination (including table funding) or pay the purchase price for an already-originated loan.  Funding LLC's acquisition of participations in the Underlying Loans was

---

Underlying Loan, net of any applicable fees and expenses. Neither PSFLLC nor PeerStreet guarantees Investors will receive payments on MPDNs or that borrowers will pay PeerStreet amounts due on Underlying Loans, in accordance with the applicable Listing." (emphasis in original)).  *Id.* at 6, 14-15, 19 ("If PeerStreet does not receive all or part of the payments on the Underlying Loans relating to your MPDNs, you will not receive the full principal and interest payments that you expect to receive on your MPDNs, and you may not recover your original investment.").

[57]    *Id.* at 4-5.

[58]    *Id.* at 2.

30664905.11

dependent on demand from the MPDN buyers.[59]  If an offering of a series of MPDNs for a specific Underlying Loan was not fully subscribed, Funding LLC would not acquire any participation interest in that loan.[60]

30.    In all of these instances, Funding LLC expressly acquired its 100% participation interest in the Underlying Loan from PSFI pursuant to the Funding LLC Participation Agreement.[61]  That agreement provides for PSFI to "irrevocably sell[], assign[], transfer[], and convey[] to" Funding LLC a 100% portion in the Underlying Loan[62] with a right to "sell, assign, convey, pledge or make any transfer of its Participations at any time without the consent of" PSFI.[63]  The relative rights of Funding LLC and PSFI under this participation agreement are discussed more fully below.[64]  In contrast to its express participation agreement with PSFI, Funding LLC is party to no other express participation agreement and or any other agreements by which it purported to transfer its participations in the Underlying Loans to holders of Peer Street Notes.[65]

---

[59]  *See* Exhibit 18, 2014 PPM at 2; *see generally* Exhibit 8, Funding LLC Participation Agreement.

[60]  Exhibit 18, 2014 PPM at 2.

[61]  *See* Exhibit 8, Funding LLC Participation Agreement at Exhibit A; *see also* Exhibit 13, MPDN Suppl. at 3 ("Though PSFLLC may directly hold Underlying Loans tied to MPDNs, it may alternatively enter into participation agreements with affiliated entities, who in turn hold those loans.  For example, after PSFLLC receives investors' investments, it may transfer those investments to its affiliate, including PSFI, in consideration for a whole participation interest in the Underlying Loan.").

[62]  *See* Exhibit 8, Funding LLC Participation Agreement § 2.

[63]  *See id.* § 8.4.

[64]  *See infra*, Part IV.B.

[65]  *See infra*, Part IV.B.

### B. The Terms of the Participation Agreements

31. The various express participation agreements between PSFI, on the one hand, and Funding LLC, Portfolio LLC, and the Warehouse Entities, on the other hand, were similar in many key respects.

32. As noted above, and in the Appendix, each of these participation agreements included an express conveyance and acknowledgment of the grant of a participation interest and conveyance of ownership from PSFI to its respective counterpart. [66] Likewise, they each expressly provide that PFSI "shall hold the Note, the Mortgage and the other Loan Documents for the benefit of all Participants." [67] And further they obligated PSFI to collect and distribute to the participants all funds paid by the borrowers on the Underlying Loans:

> Subject to Section 7.3 below, [PSFI] shall receive all sums due or received from Borrower under the Note and the other Loan Documents and hold the same in trust for the ratable benefit of all Participants. Subject to Section 7.3 hereof, to the extent such payments are made by Borrower, [PSFI] shall accept and distribute such payments in accordance with Section 3.3 of this Agreement.[68]

33. Under each of them, PSFI retained the right to "perform all of the functions of the lender under the Loan Documents," including "the right, power and authority to take any action, or to refrain from taking any action, as [PSFI] may deem necessary or appropriate in its discretion to satisfy the obligations, enforce the rights, exercise the remedies and pursue any other benefits available under the Loan Documents or any title insurance or other insurance policy

---

[66] *See* Exhibit 8, Funding LLC Participation Agreement § 2; Exhibit 9, Portfolio LLC Participation Agreement § 2; Exhibit 6, Warehouse I Participation Agreement § 2; Exhibit 7, Warehouse II Participation Agreement § 2.

[67] *See* Exhibit 8, Funding LLC Participation Agreement § 3.1; Exhibit 9, Portfolio LLC Participation Agreement § 3.2; Exhibit 6, Warehouse I Participation Agreement § 3.2; Exhibit 7, Warehouse II Participation Agreement § 3.2.

[68] Exhibit 8, Funding LLC Participation Agreement § 3.2(a); *see also* Exhibit 9, Portfolio LLC Participation Agreement § 3.3(a) (providing substantially same mechanics for PFSI to collect and distribute for ratable benefit of participants); Exhibit 6, Warehouse I Participation Agreement § 3.3(a) (same); Exhibit 7, Warehouse II Participation Agreement § 3.3(a) (same).

delivered or maintained in connection with the Loans" and "upon the occurrence of an Event of Default by Borrower under any Loan Document, [PSFI]'s exercise (or forbearance from any exercise) of any of its rights and remedies under the Loan Documents shall be within [PSFI]'s sole authority and discretion."[69]

34.    The participations conveyed to each party, were subject to Funding LLC's, Portfolio LLC's, and the Warehouse Entities' payment of their "Proportionate Share" of:

> All losses, costs and expenses incurred by [PSFI] (including, without limitation, attorneys' fees and expenses) in connection with (a) the purchase of the Loans, (b) the administration (including any servicing fees or costs paid to any third party) or collection of the Loans, (c) enforcement of any obligations of Borrower or rights or remedies of [PSFI] under the Loan Documents, (d) any claim on any insurance policy, lawsuit, collection activity, receivership action, foreclosure, acceptance of a conveyance in lieu thereof, or (e) any other exercise of any of its rights or remedies under the Loan Documents (individually, an "Enforcement Action"), and all amounts advanced by [PSFI] (except [PSFI]'s Proportionate Share of any such advances) in accordance with this Agreement, the Loan Documents or any Enforcement Action[.][70]

Funding LLC, Portfolio LLC, and the Warehouse Entities were also responsible for their "Proportionate Share" of expenses incurred by PSFI in the event that PSFI acquired title to any real property through the exercise of remedies.[71]

35.    Funding LLC and the Warehouse Entities were obligated to "promptly upon demand made by PSFI, . . . pay to [PSFI] such Participant's Proportionate Share of any reasonable

---

[69]    *See* Exhibit 8, Funding LLC Participation Agreement § 3.2; Exhibit 9, Portfolio LLC Participation Agreement § 3.3; Exhibit 6, Warehouse I Participation Agreement § 3.3; Exhibit 7, Warehouse II Participation Agreement § 3.3.  Where Portfolio LLC owned a majority of the participation interest in an Underlying Loan, it held certain administrative rights pursuant to the Portfolio LLC Loan Management Agreement.  *See* Exhibit 9, Portfolio LLC Participation Agreement § 3.3(b).

[70]    *See* Exhibit 8, Funding LLC Participation Agreement § 4.2; Exhibit 9, Portfolio LLC Participation Agreement § 4.2; Exhibit 6, Warehouse I Participation Agreement § 4.2; Exhibit 7, Warehouse II Participation Agreement § 4.2.

[71]    *See* Exhibit 8, Funding LLC Participation Agreement § 5; Exhibit 9, Portfolio LLC Participation Agreement § 5; Exhibit 6, Warehouse I Participation Agreement § 5; Exhibit 7, Warehouse II Participation Agreement § 5.

expense, cost, advance or other amount incurred by PSF in connection with the administration or collection of the Loans or any Enforcement Action."[72]  Other than a reasonableness requirements, the participation agreements place no limitation on the amounts payable to PSFI thereunder.  Under each participation agreement, PSFI also had the "right to deduct sums for expenses, advances and liabilities referred to [in the applicable participation agreement], including, without limitation, expenses for and of loan servicers and other agents engaged by [PSFI]" from "any payment or credit to a Participant." [73]  After recovering its fees, costs and expenses from principal and interest collected on each Underlying Mortgage, PFSI was obligated to pay the remainder to each participant in accordance with their Proportionate Share.[74]

## V.    THE PEER STREET NOTES ISSUERS AND THEIR CHAPTER 11 FILINGS

36.    Funding LLC is a Delaware limited liability company.  Upon information and belief, Funding LLC's only third-party creditors are the holders of MPDNs and RWNs.  As Colchis alleges, Funding LLC was formed with the intention that Funding LLC's assets— participations in the Underlying Notes associated with the MPDNs and the loans issued to the two Warehouse Entities—would remain separate from the assets of the other Peer Street entities and, accordingly, beyond the reach of the creditors of  the other Peer Street entities.  While Funding LLC was thus set up as a "bankruptcy remote" entity, it was never a "bankruptcy proof" entity.

---

[72]   *See* Exhibit 8, Funding LLC Participation Agreement § 4.2; Exhibit 6, Warehouse I Participation Agreement § 4.2; Exhibit 7, Warehouse II Participation Agreement § 4.2.  Portfolio LLC has similar provisions in its participation agreement, but the Portfolio LLC Loan Servicing Agreement imposed additional restrictions on PSFI's costs.  *See also* Exhibit 9, Portfolio LLC Participation Agreement § 4.2; Exhibit 2, Portfolio LLC Loan Mgmt. Agreement §§ 2 and 5(a).

[73]   *See* Exhibit 8, Funding LLC Participation Agreement § 3.3(a); Exhibit 9, Portfolio LLC Participation Agreement § 3.4(a); Exhibit 6, Warehouse I Participation Agreement § 3.4(a); Exhibit 7, Warehouse II Participation Agreement § 3.4(a).

[74]   *See* Exhibit 8, Funding LLC Participation Agreement § 3.3(a), Exhibit 9, Portfolio LLC Participation Agreement § 3.4(a); Exhibit 6, Warehouse I Participation Agreement § 3.4(a); Exhibit 7, Warehouse II Participation Agreement § 3.4(a).

Indeed, the limited liability company agreement for Funding LLC expressly provides that Funding LLC may seek chapter 11 protection so long as it obtains the consent of its Special Member.[75]

37.     Portfolio LLC is a Delaware limited liability company.  Upon information and belief, Portfolio LLC's only third-party creditors are the holders of PDNs.  Like Funding LLC, Portfolio LLC was intended to be a bankruptcy remote (but, again, not bankruptcy proof) entity. Like Funding LLC, its governing documents authorize Portfolio LLC to seek chapter 11 protection, again with the consent of its Special Member. [76]

38.     Furthermore, the PPM expressly cautioned Investors in the Platform that both of the issuers of Peer Street Notes (Funding LLC and Portfolio LLC) could be the subject of bankruptcy proceedings, and in more than a page of single spaced text, highlighted the risks that the holders of Peer Street Notes would face in such a bankruptcy.[77]  The Supplements also include additional bankruptcy risks specific to each type of Peer Street Note.[78]

39.     The respective Members and Special Members of Funding LLC and Portfolio LLC authorized, in writing, chapter 11 filings of each entity, as required by the respective limited liability company agreements of each entity.[79]

---

[75]   *See* Exhibit 19, Funding LLC Operating Agreement § 9(j)(iv)(F) ("So long as any Investor Obligation is outstanding, the Member shall not cause or permit the Company to take or consent to any of the following actions . . . file, or consent to the filing of, a bankruptcy or insolvency petition . . . without the affirmative vote of the Company's [Special Member].").

[76]   *See* Exhibit 20, Portfolio LLC Operating Agreement, § 9(d)(iv) ("The Company shall not be permitted, without the prior, written, unanimous consent of the Special Member(s), to file for protection under bankruptcy laws, make an assignment for the benefit of creditors, appoint a receiver or trustee over its property, or file a petition under any bankruptcy.").

[77]   *See* Exhibit 12, 2019 PPM at 21-22.

[78]   *See* Exhibit 13, MPDN Suppl. at 13; Exhibit 3, Pocket 1 Month RWN Suppl. at 15; Exhibit 21, PDN Suppl. at 20-23.

[79]   *See* Case No. 23-10818, Docket No. 1 (Chapter 11 Petition with and authorizing resolutions for Funding LLC); Case No. 23-10825, Docket No. 1 (Chapter 11 Petition with and authorizing resolutions for Portfolio LLC).

30664905.11

21

40.    Colchis alleges that Funding LLC both has no creditors and should not be a debtor because it is not insolvent.  Colchis is wrong on both fronts.  First, as demonstrated in Part V above and the Appendix, Funding LLC's creditors are the holders of both the MPDNs and the RWNs.[80]  Second, insolvency is not a requirement to be a chapter 11 debtor.[81]  In any event, however, Funding LLC is insolvent because, at a minimum, it was not honoring redemptions on the RWNs that were demanded prepetition.[82]  As Mr. Dunn explained in his declaration, there were RWNs outstanding of $41.4 million and the cash assets associated with those RWNs were less than $40 million.  Funding LLC's failure to pay its debts as they come due is one of three commonly accepted tests for insolvency.[83]

41.    Furthering its attacks on the Debtors' decision to pursue chapter 11 protection, Colchis points to an FAQ response on the Debtors' website that "'[i]n the unlikely event PeerStreet no longer remains in business, a third-party "special member" will step in to manage pending loan investments and ensure that investors continue to receive interest and principal payments.'"[84]  The point of this is unclear; the Debtors remain in business and are actively managing their loan portfolio.  And Colchis's complaint that "Investors have every reason to believe that they were investing their money in an entity (PSFLLC) that had no likelihood of

---

[80]    Colchis contradicts itself on this front, as well.  *Compare* Colchis Obj. ¶ 14 ("as a special purpose entity, PSFLLC has no creditors") *with* Colchis Obj. ¶ 12 (Colchis alleging that it holds ". . . not less than $38 million in ***claims*** against PFLLC on account of MPDNs . . ." (emphasis added)).

[81]    *See In re LTL Management, LLC*, 64 F.4th 84 (3d. Cir. 2023).

[82]    *See* Exhibit 1, Dunn Decl. ¶ 22 (describing Funding LLC declaring a Liquidation Trigger for the RWNs and halting redemptions).

[83]    *See In re Opus E. LLC*, 698 F. App'x 711, 715 (3d Cir. 2017) ("There are three tests for determining whether an organization is insolvent at a given point in time: the balance sheet test, the cash flow test, and the inadequate capital test . . . . A debtor is cash flow insolvent if, at the time a transfer is made, the debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due.").

[84]    Colchis Obj. ¶ 1 (quoting an FAQ response from the Peer Street website).

filing bankruptcy[,]"[85] is directly contradicted by the extensive, pages-long discussion of that exact possibility in the Memorandum and MPDN Supplement, as discussed above.[86]

## VI.   COLCHIS'S RELATIONSHIP WITH PEER STREET

42.    Pacific Funding Trust 1002 and Pacific RBLF Funding Trust (*i.e.,* the Pacific Funds) are investment funds managed by Colchis Cap Colchis Capital Management, L.P. Colchis describes itself as a "technology and data driven alternative investment firm"[87] and touts itself as "a pioneer and first significant institutional investor in the technology-enabled lending ecosystem, Colchis invested over $7 Billion in more than 500,000 digital consumer loans since 2011."[88]

43.    The Debtors and Colchis have had significant business dealings over the years.  For instance, in 2019, Colchis led and completed a $60 million Series C funding round for the Debtors.[89]  Colchis also currently owns 3.22% of the equity of Debtor PSI, the ultimate parent of the Debtors.

44.    Colchis has also provided significant amounts of debt financing to the Debtors.  For instance, Colchis is a substantial holder of Peer Street Notes and alleges that its owns $38 million of MPDNs.[90]  Those, at least in part, result from the Colchis Framework Agreement, which dates back to 2017, under which Colchis agreed to make investments or purchases

---

[85]   *Id.*  ¶ 11.

[86]   *See supra*, Part III.

[87]   Colchis Capital, https://www.colchiscapital.com (last visited Aug. 17, 2023).

[88]   *Specialty Finance*, Colchis Capital, https://www.colchiscapital.com/strategies/specialty-finance (last visited Aug. 17, 2023).

[89]   *PeerStreet Raises $60 Million in Funding and $4.25 in New Capital Commitments*, Peer Street, https://www.peerstreet.com/blog/peerstreet-raises-60-million-in-funding-and-4-25-billion-in-new-capital-commitments (last visited Aug. 17, 2023).

[90]   Colchis Obj. ¶ 12.

representing 20% of Peer Street's loan inventory, up to the point of $200 million in investments.[91]

These investments included both whole-loan purchases and Notes purchases.[92]  In furtherance of

the Colchis Framework Agreement, PSFI and Colchis entered into the Colchis Master Loan Sale

Agreement for the purchase of loans from the Debtors.[93]  Specific language was included in the

Colchis Master Loan Sale Agreement to make it clear that Colchis was purchasing whole loans,

and not participation interests.[94]

45.    Moreover, in addition to the Colchis Framework Agreement, Colchis and

PSFI, through a former subsidiary, were parties to the Colchis Warehouse Financing Facility,

pursuant to which Colchis provided warehouse financing to PSFI's subsidiary to allow that

subsidiary to purchase participation interests in Underlying Loans originated or purchased by PSFI

(similar to the manner in which the Warehouse Entities providing funding to PSFI).[95]  Through

various amendments, Colchis ultimately increased its financing commitment to $100 million.[96]

46.    And as touched on in paragraph 4 above and paragraphs 82 and 92 below,

starting in or around April, Colchis has sought to expand on this extensive commercial relationship

with certain "plan structures" proposed to the Debtors.  As noted herein, the Colchis Objection

---

[91]  Exhibit 22, Amended & Restated Colchis Framework Agreement, Article 2 at 8.

[92]  *Id.*

[93]  *See generally* Exhibit 34, Colchis MLSA.

[94]  *Id.* at 8 ("***Each Loan Document for each Loan and the contents of the related Servicing File shall be vested in Owner [Colchis]***, and the ownership of Servicing File and all related records and documents with respect to the related Loan prepared by or which come into the possession or control of Servicer ***shall immediately vest in Owner and shall be retained and maintained, in trust on behalf of and for the benefit of Owner, by Servicer [Peer Street] in a custodial capacity only*** . . . ***Servicer shall mark its records to reflect ownership of the Loans by Owner*** or, as otherwise directed by Owner . . . Record title to each Loan and the related Promissory Note, to the extent applicable, shall remain in the name of Owner." (emphasis added)).

[95]  *See generally* Exhibit 23, Colchis – PSFI LSA.

[96]  Exhibit 23, Colchis Warehouse Financing Facility at 12; 2d Amend. at 1 ("[C]ommitment of Lender [Colchis] to make or otherwise fund Term Loans in an amount not to exceed $75,000,000 in the aggregate."); Colchis – PSFI LSA 3d Amend. at 13 ("The Borrower [PSFI] hereby requests . . . it receive a Term Loan under the Loan Agreement in an aggregate principal amount of [] $25,000,000.").

appears to be a tactic in furtherance of these "plan structures" to extract as much value out of the Debtors' estates for itself at the expense of other creditor.

<u>**REPLY TO THE OBJECTIONS**</u>

I.    COLCHIS

47.    Colchis' objection to the Bidding Procedures Motion centers on its contention that the MPDNs are somehow "subparticipations" in the Underlying Loan in which PSFI had granted participations to PSFLLC under the Funding LLC Participation Agreement and that this purported interest bars the Debtors from selling the Underlying Loans. This contention is defective for numerous reasons: (i) it ignores that the Peer Street Notes expressly authorize the Debtors to sell the Underlying Loans without the consent of the noteholders, (ii) it ignores or violates the plain language of the MPDNs, which each state that they are unsecured notes; (iii) it ignores the clear description of the rights granted by the MPDNs that are laid out in detail the PPMs and the Investor Agreement, and flatly negate any participation interest; (iv) the structure of each transaction underlying the Peer Street Notes involved an express participation agreement, which contained very different terms and patently bely that the MPDNs conveyed a participation interest; (v) under Colchis's cited caselaw, the MPDNs do not satisfy the criteria for a participation, and (vi) Colchis's argument is unsupported by section 541(d) of the Bankruptcy Code and any controlling legal authority.

A.    **The MPDNs, RWNs and PDNs All Expressly Permit the Debtors to Sell the Underlying Loans Without the Consent of the Investors**

48.    The Peer Street Notes all contain virtually identical sale provisions that expressly permit the Debtors to sell, convey, assign or otherwise transfer the Underlying Loans without the consent of corresponding noteholder. Specifically, the promissory note documents all state in nearly identical terms that the applicable Debtor, "may _**sell**_, convey, assign or otherwise

transfer (a) **_all_** or any part **_of the corresponding mortgage loan_** or (b) **_any interest in the corresponding mortgage loan_**, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, **_without the prior written consent of the Investor_**."[97]    Thus, Colchis's incorrect assertion that the MPDNs and RWNs created participations in Funding LLC's interest in the Underlying Loans is irrelevant because Colchis and all the other noteholders have expressly consented to the Debtors' sale of the Underlying Loan or "any interest" therein even without the holders' consent.  Colchis single handedly stalled out the Debtors' ongoing marketing and sale process by casting a cloud over the ownership interests in the Underlying Loans knowing full well whatever that interest may be is irrelevant to the Debtors' right to sell them.

49.    The Debtors' unilateral power to sell the Peer Street Notes with our without the consent of the noteholders makes perfect sense.  As discussed above and below, the noteholders enjoy no contractual privity with PSFI (the loan servicer), have no right to appoint a replacement loan servicer and have no collateral rights in the Underlying Loans or any other assets.  The MPDNs provide no guidance on how the respective rights in the Underlying Loans should be balanced between holders of different series of MPDNs in the same Underlying Loans.

50.    Moreover, given the absence of clear guidance in the MPDNs and lack of authority for collective action, it will be virtually, if not entirely, impossible outside of the tools in a chapter 11 case to obtain unanimous consensus from a nearly 7,000 person Investor body that collectively holds 67,000 competing claims across more than 300 loans, many of which claims barely eclipse $1,000, to wind-up the Peer Street Notes.  In the event of an outright Peer Street

---

[97]    Exhibit 13, MPDN Suppl. ¶ 6; Exhibit 3, Pocket 1 Month RWN Suppl. (Form of Note ¶ 6); Exhibit 21, PDN Suppl. ¶ 7.

failure and absent any available alternative transaction, the Debtors must have the power – which was granted here – to liquidate the Underlying Loans and distribute the proceeds because there would simply be no other way for those nearly 7,000 investors to determine how to "service" their nearly 7,000 individual fractional interests in hundreds of mortgages.[98]   And even if they could agree – which seems to be a practical impossibility – who would direct the servicer on key ownership decisions such as loan modifications, loss mitigation, foreclosure and myriad other issues.  Such a result would be disastrous for the noteholders and Colchis's theory ignores the calamity of it actually being correct.  A sale of the Underlying Loans – absent the emergence of another actionable proposal (which does not yet exist) – is the only currently available outcome here.

B.    The MPDNs are Not "Sub-Participations"

51.    Colchis now claims that the participations in the Underlying Loan sold by PSFI to PSFLLC under the Funding LLC Participation Agreement have somehow been "sub-participated" to the unsecured creditors that hold the MPDNs and that the estates only hold bare legal title.  Specifically, Colchis claims:  "Like the 100% loan participations sold by PSFI to PSFLLC, the MPDNs sold by PSFLLC to the MPDN Participants, also constitute 100% participations, or really sub-participations."[99]   Colchis cites no legal authority establishing the legal framework or test for determining when a participation has, itself, been so-called "sub-participated" and none of the cases cited involve a situation where the parties agreed to the issuance of an unsecured note and one party later claimed it was conveyed an actual property interest.

---

[98]    Even if all 7,000 investors had the power (which they do not) to agree on the same servicer and they each individually agreed to the same servicer and related fee structures (which, again, seems virtually impossible), servicing still cannot be transferred unless and until PSFI recovers the approximately $15.5 million outstanding servicing advances and deferred servicing fees owed to it.

[99]    Colchis Obj. ¶ 17.

30664905.11

27

     *a.   The Peer Street Note Documents are Clearly and Unambiguously Unsecured Notes*

52.     Under Delaware law, "courts are required to give unambiguous contract terms their plain meaning, without regard to extrinsic evidence." *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *6 (Del. Ch. Nov. 30, 2017).  *See also W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza*, LLC, 2007 WL 3317551, at *1 (Del. Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del. 2009), *as corrected* (Nov. 30, 2009) ("[Judges] . . . are instructed . . . not to consider extrinsic evidence unless the contract is ambiguous-reasonably susceptible of two (or more) plausible interpretations.  In addition, extrinsic evidence may not be used in determining whether the contract is ambiguous.").

53.     "The characterization of the participation interest should, of course, turn in large part on the language used in the participation agreement itself and upon any documentation which may accompany the participation agreement."  Bradford Anderson, *Loan Participations and the Borrower's Bankruptcy*, 64 Am. Bankr. L.J. 39, 40 (1990) ("**Anderson**").  The Court must first look solely within the four corners of the agreement between the parties – here, the Peer Street Notes, Investor Agreements, Memoranda and Supplements – and determine if an ambiguity exists; extrinsic evidence cannot be considered if the document is unambiguous, and, importantly, extrinsic evidence cannot be used to create an ambiguity.  *Id.*

54.     It is because the underlying agreements among Colchis and the Debtors are so clear and unambiguous, that Colchis has specifically quoted ***none*** of them, and only resorts to two non-legal snippets from the Debtors' website.  The "documents" in this case are the MPDNs, RWNs and PDNs (depending on the product), as well as the Investor Agreement, Memorandum and Supplements.

55.     First, each Peer Street Note is titled a "Note" and refers to itself throughout as a "Promissory Note" or "this Note."[100]  .  The Peer Street Notes refer to the obligation thereunder as a "promise[] to pay" rather than the conveyance of any interest or participation.[101]  Indeed, the Peer Street Notes contain no reference to the words "participation" or "subparticipation."  Nor do any of the offering documents refer to conveying any property interest.  In fact, they expressly refute that any property interest is being conveyed to the holders.[102]    And all of the Peer Street Notes specifically provide that the issuing Debtor (PSFLLC or Portfolio, as applicable) can sell the Underlying Loans without the prior written consent of the respective note holders.[103]    The Peer Street Notes all have identical or nearly identical provisions requiring each holder to agree to treat the Peer Street Notes as **_debt_** of PSFLLC (for the MPDNs and RWNs) or of Portfolio (for the PDNs) for tax purposes and prohibits them from taking a position they are anything but.[104]

56.     If the outright clarity of the Peer Street Notes needs further support, an abundance of it is found in the other documents governing the noteholders' relationship to the Debtors.  As detailed above, the 2014 Memorandum (a) refers to the sale of "certain promissory notes of PeerStreet [defined as PSFLLC]....[,]" (b) throughout describes the product as a "Note," (c) describes the MPDNs repeatedly as unsecured obligations without any security or property interest in any assets, including the Underlying Loans.[105]    Significantly, while the 2014

---

[100]  *See, e.g.*, Exhibit 13, MPDN Suppl. ¶ 1; Exhibits 3 and 24, RWN Suppl. ¶ 1; Exhibit 21, PDN Suppl. ¶ 1.

[101]  *See, e.g.*, Exhibit 13, MPDN Suppl. at 1; Exhibits 3 and 24, RWN Suppl. at 1; Exhibit 21, PDN Suppl. at 1.

[102]  *See, e.g.*, Exhibit 13, MPDN Suppl. ¶ 1 (providing that the "Note represents a special limited obligation of [PSFLLC]").

[103]  *See, e.g.*, *id*. ¶ 6.

[104]  Exhibit 13, MPDN Suppl. ¶ 17; Exhibits 3 and 24, RWN Suppl. ¶ 17; Exhibit 21, PDN Suppl. ¶ 17.

[105]  Exhibit 18, 2014 PPM at i; *see also id.* at ii, 2, 6, 11-12, 26, 44 (all referring to the unsecured nature of the Notes without any security interest in any assets, including the Underlying Loans).

30664905.11

Memorandum discusses the potential for a Peer Street bankruptcy, nowhere does it suggest that the Underlying Loans would be excluded from the bankruptcy estate under such a filing.[106]

57.    The 2019 Memorandum – provided to all holders of Peer Street Notes – similarly refers to the Peer Street Notes throughout as the "special, limited, unsecured obligations of the PS Issuer" and clearly specifies that the Peer Street Notes "do not grant [noteholders] actual, legal, recorded or unrecorded, interests in the Underlying Investment itself . . . ."[107]    Contrary to Colchis's argument, the Memorandum clearly provides that the noteholders have no "privity of contract or any other legal relationship with any borrower, owner, sponsor or other third party involved…or any direct interest in the Underlying Investment."[108]

58.    It further expressly warns that Peer Street's affiliates may not be "bankruptcy proof" and that noteholders' promissory note claims may only entitle them to be treated "the same as other general unsecured creditors…and thus be required to share the proceeds of the Underlying Investments with those creditors" in the event of a Peer Street bankruptcy.[109]

59.    The MPDN Supplement likewise refers to the MPDNs throughout as unsecured limited obligations of Funding LLC and that they are not coupled with any collateral or security interest.[110]    Importantly, the MPDN Supplement clearly states that the MPDNs are "not obligations of any borrower or lender (***including any PSI affiliate acting as lender*** [such as PSFI]) associated with any Underlying Loan."[111]    The MPDN Supplement also specifies that "While Underlying Loans may be secured by a mortgage, deed of trust, security agreement, legal title,

---

[106]    *See id.* at 11-12, 26.

[107]    Exhibit 12, 2019 PPM at 13-14.

[108]    *Id.* at 19.

[109]    *Id.* at 14, 21.

[110]    Exhibit 13, MPDN Suppl. at 5, 9, 13.

[111]    *Id.* at 9 (emphasis added).

30664905.11

personal guarantee or other mechanism, MPDNs will not represent an obligation of the borrower, original lender or any other third party except PSFLLC. ***Investors may look only to PSFLLC for interest payments on MPDNs.***"[112]

60.     The RWN Supplement and PDN Supplement likewise describes the RWNs and PDNs as limited unsecured obligations of PSFLLC without any security interest in the assets of any PeerStreet entity or the Underlying Loans.[113]

61.     The 2014 Investor Agreement – which is incorporated by reference into the 2014 MPDN "for all purposes" – describes the "opportunity through the PeerStreet web platform . . . to purchase Notes . . . ."[114]   The 2014 Investor Agreement goes on to provide that the MPDN holders "and PeerStreet agree that the Notes are intended to be indebtedness of PeerStreet for U.S. federal income tax purposes.  You agree that you will not take any position inconsistent with such treatment of the Notes for tax, accounting, or other purposes, unless required by law."[115]

62.     The Investor Agreement,[116] the terms of which are expressly incorporated into each Peer Street Note "for all purposes", provides that, although their payment rights indirectly depend on the performance of the Underlying Loan, the Peer Street Note holders do not have any direct interest in those loans:

> [A]gree and acknowledge that ***you do not have privity of contract or any other legal relationship with any third party that provides services with respect to the Real Estate Securities in which you invest,*** or is otherwise directly or indirectly related to or involved with the Underlying Investments, and that you have no right of recourse to any such third party, including without limitation any

---

[112]   *Id.* at 13 (emphasis added).

[113]   *See* Exhibit 3, Pocket 1 Month RWN Suppl. at 6, 7, 13, 14-15; Exhibit 21, PDN Suppl. at 26.

[114]   Exhibit 10, 2014 Investor Agreement at 1.

[115]   *Id.* ¶ 7.

[116]   Each MPDN holder must acknowledge that the "Investor Agreement, along with the PPM has been delivered to you via the Platform, ***and that you have read and understood each document***."  Exhibit F ¶ 3 (emphasis added).

borrower, servicer, or lender partner of PeerStreet. ***You also agree and acknowledge that you do not have any direct interest in the Underlying Investments,*** and that, unless explicitly provided otherwise, you do not have any voting rights and/or decision-making authority beyond your decision to invest or not invest in the Real Estate Securities. ***Without limiting the generality of the foregoing, any borrower or lender partner who receives a loan or funds from PeerStreet has a legal relationship with PeerStreet only and obligations only to us. Although payments on your Real Estate Securities depend on the performance of the Underlying Investments, you do not own any direct, secured, and/or recorded interest in the Underlying Investment itself. PeerStreet is the only entity you have a legal relationship with in relation to the Real Estate Securities or the Underlying Investments and is the only entity with which you have any contractual privity.***

Investor Agreement, ¶ 21 (emphasis added).  It goes on to state:

> If an Underlying Investment is held by or transferred to a PS Issuer (or affiliated entity), ***the holding entity alone shall have an interest in the Underlying Investment***. If an Underlying Investment is transferred to a PS Issuer due to default or similar circumstances, distributions to you, if any, will be dependent on (i) the PS Issuer's ability to sell the Underlying Investment and recover any fees, costs, and charges due to it and/or third-parties, and (ii) the other terms provided for in the Transaction Documents. PeerStreet reserves the right not to disclose specific, itemized, or otherwise cataloged financial information regarding the management of an Underlying Investment.

*Id.* (emphasis added).

63.    Here, the Peer Street Notes and incorporated documents clearly and repeatedly described the limited recourse, unsecured nature of the liability and never – not once – grant the noteholders any participation right, conveyance or ownership of any kind.  Indeed, the documents agreed to between the Debtors and the noteholders expressly state that the noteholders are ***not*** getting any interest in the Underlying Loans, security of any kind, contractual privity with any non-issuing party, or anything more than a limited recourse, unsecured promissory note.  Where the contractual arrangements among the parties are so extensive and clear, the Court must find that the Notes and related documents granted to the noteholders nothing more than an

unsecured, limited recourse promissory note. *See Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, 2017 WL 5956877, at *1 (Del. Ch. Nov. 30, 2017) ("The words parties use to bind themselves together in a contractual relationship matter.").

> b. *Even if the Debtors' Note Products are Incorrectly Deemed Participations, That Does Not Automatically Convey a Property Interest in the Underlying Loans*

64.    "Participation agreements…come in all kinds of shapes and sizes." *Cent. Bank and Est. Owned, LLC v. Hogan*, 891 N.W. 2d 197, 205 (Iowa 2017). "Loan participations are contractual arrangements usually evidenced by a participation agreement between the 'lead lender' and one or more 'participants.'" Anderson, at 40.

> There are two basic analytical classifications [of loan participations], and the rights of the participant will vary dramatically depending on the characterization chosen. One treats the participation as a loan by the participant to the lead lender; the other one classifies the participation as a complete transfer of ownership interest in the loan and collateral to the participant. Additionally, if the participation is classified as one involving a transfer of ownership interest in the loan and collateral, it may also (depending on the intent of the parties) create a trust in which the participant, as beneficiary of the trust relationship, holds an equitable interest in the loan, to be administered by the lead lender as trustee. The characterization of the participation interest should, of course, turn in large part on the language used in the participation agreement itself and upon any documentation which may accompany the participation agreement.

*Id.* (footnote omitted). "[I]f the participation agreement merely creates a debtor–creditor relationship between the originating bank and the participating bank, the participating bank has no ownership interest in the rights of the originating bank in underlying collateral … [and] the participant must have a security interest in the underlying collateral or will be reduced to a general creditor of the originating bank in any bankruptcy or liquidation proceeding." *Hogan*, 891 N.W. at 205 (*citing* Jeffrey D. Hutchins, *What Exactly Is a Loan Participation*, 9 Rutgers-Camden L.J. 447, 458-59 (1978)).

30664905.11

> If financial institutions generally intended to structure participations as loans, therefore, these sophisticated commercial entities would regularly file financing statements or record other documents. The record seems to indicate, however, that evidence of participations is not regularly filed or recorded….The better-supported characterization of a loan participation thus seems to be that of a sale of an undivided fractional interest in an asset held by the lead lender. Many financial institutions believe that the characterization of a participation as a sale of ownership interest is the preferable characterization.

Anderson, at 41, 43 (footnotes omitted).    Accordingly, a "participation" is not limited to a transaction resulting in the transfer or conveyance of a property interest; a "participation" ***can*** also be a loan.

65.    "Participation agreements frequently provide that the lead lender has "assigned, transferred and conveyed" an undivided fractional interest in the underlying loan. This language creates, in effect, a partial assignment, usually coupled with either an agency or trust to collect and remit the loan proceeds." *Id.* at 40, n.5 (*citing* 3 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS § 441 (3d ed. 1960)).

66.    If what the parties intended to convey in a participation agreement "is regarded as a sale or assignment of a fractional interest in the underlying loan, then the participant is deemed to 'own' a portion of the loan and acquire by assignment all rights associated with the loan." *Hogan*, 891 N.W. at 205.  When what's intended is a sale with the lead lender retaining the underlying note documents, the participation agreement documents "often state that the documents are held 'in trust'" by the lead lender for the benefit of the participants. *Id.*

67.    "[T]here are a number of factors that are often considered in determining whether a participation agreement amounts to a sale of an undivided interest in the total loan package or merely establishes a debtor–creditor relationship . . . ." *Id.*

- "The words 'sale,' 'transfer,' and 'assignment' are often associated with a sale." *Id.* (*citing* Richard E. Weiner, *Rights of a Participant Bank Against a Lead Bank in a Participation Loan Agreement*, 104 Banking L.J. 529, 529-530 (1987)).

- "Use of the phrase 'undivided fractional interest' suggests an obligation on the part of the originating bank to monitor the loan in the best interest of the participants and suggests a sale." *Id.* (*citing* Anderson*,* at 40, n.5).

- "[U]se of the word "trust" tends to cut against a mere debtor–creditor relationship in a participation agreement. Trust language in a participation agreement may obligate the originating bank to hold the debt, the security instruments, and all payments in trust for the participant." *Id.* (*citing* Kevin B. Fisher, *Loan Participations and Bank Failures: The Penn Square Decisions*, 44 Sw. L.J. 753, 774-776 (1990); Patrick J. Ledwidge, *Loan Participation Among Commercial Banks*, 51 Tenn. L. Rev. 519, 526-527 (1984)).

- "In cases involving a failed originating institution, when possession of property is impressed with a trust, the trustee in bankruptcy holds such property subject to the outstanding interests of the beneficiaries." *Id.* (*citing* 2 Michael T. Madison, *et al.*, *Law of Real Estate Financing* § 11.27, Westlaw (Nov. 2016 update); Weiner, 104 Banking L.J. at 531).

"As a general proposition, participants wishing to ensure that their interest is treated as an ownership interest and not a mere loan should use the language of ownership, undivided fractional interest, and trust, and avoid risk dilution devices that might persuade a court that true ownership is not present." *Id.* at 208. According to *Hogan*, at least one expert "has declared that a participation agreement 'should always convey to the participant an undivided ownership interest in the loan, loan documents and collateral, using typical language of purchase and sale.'" *Id.* (*citing* Marvin Rau, *Beyond the Handshake and a Prayer: Documenting the Modern Loan Participation*, 59-Jun. J. Kan. B. Ass'n 19, 20 (1990) (additional citation omitted)).

68.    Here, none of these hallmarks of a true ownership-type participation are present. None of the Peer Street Notes, Memoranda, Supplements or Investor Agreements use any ownership, sale, assignment or conveyance language; none of them use any "trust" language; and none of them purport to grant an "undivided ownership interest" in the Underlying Loans. To the contrary, the agreements:

- expressly state that the noteholders are not receiving an ownership interest;[117]

- not only contain no _**current**_ sale, transfer, ownership or conveyance language, but only "promise" to _**later**_ do something (*i.e.* pay);

- expressly provide that no trustee relationship is created and disclaim any fiduciary role on the Debtors' part;[118]

- and nowhere purport to convey an "undivided ownership interest" in the Underlying Loans.

69.    That the Peer Street Notes were not intended to convey participation interests is further confirmed by the presence of an express participation agreement in the structure underlying each form of Peer Street Note.   In the structure underlying the MPDNs, PSFI granted Funding LLC 100% participations in the underlying loans pursuant the Funding LLC Participation Agreement.  In the Pocket Structure, PSFI granted the PS Warehouse entities a 100% participation interest in the relevant loans under the Warehouse I and II Participation Agreements.  Clearly, the parties understood how to grant an express participation interest.   That noteholders under these structures instead received promissory notes with a promise of payment belies any suggestion that they were intended to receive participation interests.

70.    This is borne out when the Court compares the Funding LLC Participation Agreement to the Peer Street Notes.  The Funding LLC Participation Agreement provides that PSFI "as seller, hereby irrevocably sells, assigns, transfers and conveys to PSFLLC, as buyer, the Participations …."[119]  It also provides that PSFI "shall hold the Note, the Mortgage and the other

---

[117]  *See, e.g.*, Exhibit 11, Investor Agreement ¶ 21 ("You also agree and acknowledge that you do not have any direct interest in the Underlying Investments.").

[118]  *See, e.g.*, Exhibit 13, MPDN Suppl. at 17 ("[T]here is no trustee involved in the structure of the MPDNs, Investors in the MPDNs will not have the protection of a trustee . . . ."); Exhibit 3, Pocket 1 Month RWN Suppl. at 17; ("None of PSFLLC, Warehouse LLC, PSFI, PSI, other PeerStreet entities, or the Special Members are fiduciaries or owe fiduciary obligations to Investors."); Exhibit 24, Pocket 3 Month RWN Suppl. at 20 (same).

[119]  Exhibit 8, Funding LLC Participation Agreement ¶ 2; *see also* Exhibit 6, Warehouse I Participation Agreement, ¶ 2 ("each Participant owns…the Loans…"); Exhibit 7, Warehouse II Participation Agreement, ¶ 2 (same).

Loan Documents for the benefit of" the participant, here PSFLLC.[120]  And the funds PSFI receives

on the Underlying Loans are "h[e]ld in trust for the ratable benefit of" PSFLLC.[121]  Finally, the

Funding LLC Participation Agreement provides that if PSFI "acquires title to any Collateral…each

Participant shall be deemed to have an ***undivided interest in such Collateral*** equal to the

Participant's proportionate share therein."[122]  By contrast, the Peer Street Notes have no ownership

conveyance, sale or assignment language whatsoever and instead refer to a mere "promise[] to

pay."[123]  The Peer Street Note documents also make no reference to funds or assets being held "in

trust" for the benefit of the noteholders and instead expressly warn that loans and collections will

be pooled thereby subjecting those assets to various risks, including bankruptcy.[124]

71.     Note holders were fully informed of the existence of these express

participation agreements and were thus on notice that the Peer Street Notes they purchased did not

expressly conveyance such an interest.  The Peer Street Note Supplements discuss the nature,

extent and existence of the underlying intra-Debtor participations.  For example, the MPDN

Supplement specifically describes the participations PSFI grants to PSFLLC under the Funding

LLC Participation Agreement described above:

> PSFLLC is the issuer of the MPDNs, but PSFLLC may not itself
> purchase or hold any Underlying Loans tied to MPDNs. Though
> PSFLLC may directly hold Underlying Loans tied to MPDNs, ***it***

---

[120]   Exhibit 8, Funding LLC Participation Agreement, ¶ 3.1; *see also* Exhibit 6, Warehouse I Participation Agreement, ¶ 3.2 (same); Exhibit 7, Warehouse II Participation Agreement, ¶ 3.2 (same).  And the funds PSFI receives on the Underlying Loans are "h[e]ld in trust for the ratable benefit of" PSFLLC.  *Id.* ¶ 3.2(a); *see also* Exhibit 6, Warehouse I Participation Agreement, ¶ 3.3(a) (all funds "received…for the…benefit of all Participants…"); Exhibit 7, Warehouse II Participation Agreement, ¶ 3.3(a) (same).

[121]   Exhibit 8, Funding LLC Participation Agreement ¶ 3.2(a); *see also* Exhibit 6, Warehouse I Participation Agreement, ¶ 3.3(a) (all funds "received…for the…benefit of all Participants…"); Exhibit 7, Warehouse II Participation Agreement, ¶ 3.3(a) (same).

[122]   Funding LLC Participation Agreement ¶ 5 (emphasis added); *see also* Exhibit 6, Warehouse I Participation Agreement ¶ 5 (same); Exhibit 7, Warehouse II Participation Agreement ¶ 5 (same).

[123]   *See, e.g.*, Exhibit 13, MPDN Suppl., at 19.

[124]   *See id.* at 13.

*may alternatively enter into participation agreements with affiliated entities, who in turn hold those loans*. For example, after PSFLLC receives investors' investments, it may transfer those investments to its affiliate, including PSFI, in consideration for a whole participation interest in the Underlying Loan. *These participation interests would grant PSFLLC the right to, among other things, receive payments from the borrower payable on the Underlying Loan and/or engage in collections or related efforts in the case of default*. Under this structure, *PSFI retains title, legal ownership, and some servicing rights with respect to the Underlying Loan*. Information related to which entity holds the loans and whether PSFLLC has collections or foreclosure rights will be provided in the applicable Listing.

As holder of or participant in the Underlying Loans, PSFI receives payments from borrowers on the Underlying Loans. As payments are received by PSFI, PSFI first uses these funds to pay out fees and expenses, including, without limitation, PeerStreet's own fees, and then transfers the remainder, if any, to PSFLLC under the terms of the participation. Investors in MPDNs are, in turn, entitled to receive these net payments from PSFLLC.  In situations where PSFLLC directly holds legal title to the Underlying Loan, in addition to the rights it would hold if it held a whole participation in the Underlying Loan, it may still retain PSFI as master servicer and payments may first flow through PSFI in that capacity.  Section 3 below provides greater insights into fees, costs, and priority of payment.

*While PeerStreet generally uses the participation structure to lower PSFLLC's exposure to certain bankruptcy risks, you should note that PSFLLC will not have entered into a contract with the lender directly and PSFI is not a bankruptcy-remote entity.* In situations where PSFLLC holds legal title to the Underlying Loans, it may still retain PSFI to perform certain servicing-related functions.[125]

72.    The holders of the MPDNs were thus advised that this structuring—issuance of participation interests to Funding LLC—was a means to "to lower [Funding LLC's] exposure to certain bankruptcy risks" and, in particular, that of "PSFI, who, is not a bankruptcy-remote entity."[126]  On the other hand, Funding LLC did not tout the structuring of the MPDNs as

---

[125] *Id.* at 3 (emphasis added).

[126] *Id.*

lowering any risk the MPDNs holders may have had in the event of Funding LLC's bankruptcy; it said the exact opposite.

73.    Here, the applicable documents clearly demonstrate that no ownership conveyance, sale, assignment or transfer of any interest in the Underlying Loans occurred.  And, in fact, both the Debtors and the noteholders agreed that no such conveyance occurred.[127] Accordingly, even if the Court were to conclude that some sort of "participation" was granted, that "participation" is merely an unsecured, non-priority claim against PSFLLC and no actual ownership interest was conveyed with such "participation."

> *c.  Even if the Court Applies the Tests Colchis Proffers to the Facts, No Ownership was Conveyed.*

74.    As a threshold matter, Colchis's reliance on the cases cited in the Colchis Objection is misplaced for a few reasons.  First, none of the cases address, much less establish the circumstances in which, a "subparticipation" may be created.  Furthermore, Colchis's claim that "[i]t is notable that there is no requirement in the *Coronet Capital* factors that the participant directly advance funds to the lead lender, rather than, as here, through an intermediary participant" (*i.e.,* PSFLLC) is entirely unsupported by any of the cases discussed.[128]  None of them address Colchis's "intermediary participant" theory and what are the legal requirements to conclude that a party that was granted an undisputed participation under a document called a "participation agreement" has "participated out" its undisputed  participation to third parties under a document titled "Promissory Note".  Also, importantly, none of the cited cases involve a court analyzing what the parties styled as an unsecured promissory note but was deemed to be a true participation.

---

[127]    Exhibit 11, 2019 Investor Agreement ¶ 21 ("You also agree and acknowledge that you do not have any direct interest in the Underlying Investments . . . .").

[128]    Colchis Obj. ¶ 21.

Instead, every case where the Court found a true participation to exist began with a form of agreement described by the court as a participation agreement. Colchis hasn't cited to a single case – and the Debtors have found none – where a court recharacterized an unsecured, limited recourse promissory note as the conveyance of an ownership interest or participation. None, moreover, do so where the purchasers of the notes were repeatedly informed in in writing before their purchase that the notes were purely unsecured obligations and conferred no collateral or other direct interest in the underlying loans.

75.     But even under its own caselaw, Colchis's theory fails. The caselaw cited by Colchis defines a participation as a "contractual agreement between a lender and a third party, in which the third-party, or participant, provides funds to the lender. The lender, in turn, uses the funds from the participants to make loans to the borrower."[129] According to Colchis, "[a] true participation agreement is one that: a) money is advanced by participant to a lead lender; b) a participant's right to repayment only arises when a lead lender is paid; c) only the lead lender can seek legal recourse against the borrower; and, d) the document is evidence of the parties true intentions." *In re Coronet Capital Company*, 142 B.R. 78, 82 (Bankr. S.D.N.Y. 1992) (citation omitted). Under Colchis's theory, PSFI is the "lead lender" under this test and the noteholders are the putative "participants" or "subparticipants."[130]

76.     Colchis cannot identify a "contractual arrangement between a lender and a third party."[131] There exists no contract between Colchis's alleged "lead lender" (PSFI) and any note holders. Indeed, the Peer Street Note documents specifically state that the holders have no

---

[129]    Colchis Obj. ¶ 19 (quoting *Rothenberg v. Oak Rock Fin., LLC,* 2015 WL 10663413, at *6 (E.D.N.Y. Mar. 31, 2015).

[130]    *See id.* ¶ 21 (referring to PSFLLC as an "intermediary participant"); ¶ 23 ("[t]he lead lender, Peer Street Funding, Inc….").

[131]    *Id.* ¶ 19. (quoting *Rothenberg*, 2015 WL 10663413, at *6 (E.D.N.Y. Mar. 31, 2015)).

contractual privity other than with the issuer of the respective Peer Street Notes:  Funding LLC.  *See Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386-87 (Del. Super. Ct. 1990) (explaining that unless there is an intention to "confer a benefit upon [] a third-party," only the contracting parties have an enforceable right under the contract); *Am. Fin. Corp. v. Comput. Sci. Corp.*, 558 F. Supp. 1182, 1185 (D. Del. 1983) (same).

77.    Colchis also supports its argument by claiming: "As set forth in each MPDN, the name of the participant is set forth under the name of the lead lender."[132]  This is flatly wrong – none of the MPDNs or RWNs name PSFI as the issuer.  Instead, they all name PSFLLC as the issuer.[133]

78.    Of the four *Coronet* factors, three fail on the face of the MPDNs.  First, no money was advanced by the putative participants (the MPDN holders) to the lead lender (PSFI).  Instead, the MPDN holders gave money to PSFLLC in exchange for promissory notes.[134]  Second, the MPDN holders' right to repayment does not arise when PSFI is paid; it arises only when PSFLLC is paid.  All of the MPDNs have nearly identical provisions in this regard and state that: "This Note represents a special limited obligation of [PSFLLC], and (1) no payments of principal and interest on this Note shall be payable unless [PSFLLC] has received payments relating to the corresponding mortgage loan, and then only to the extent of the amount of such payments received by [PSFLLC] . . . ."[135]  Nothing in the MPDNs suggest that the holders' right to receive payment

---

[132]    Colchis Obj. ¶ 21.

[133]    *See, e.g.*, Exhibit 13, MPDN Suppl. at 1; Exhibit 21, PDN Suppl, at 1; Exhibit 3, Pocket 1 Month RWN Suppl. at 1.

[134]    Colchis does not even seem to argue that the RWN holders hold any participations in the Underlying Loans—*i.e.* the assets they contend the Debtors cannot sell.  Instead, Colchis argues they are the "beneficial owners of the pledge the warehouse Borrowers made to PSFLLC to secure the loans RWN holders funded by purchasing RWNs from PSFLLC."  Colchis Obj. ¶ 5, n.14.  Colchis does not even attempt to support this contrived "participation-in-a-participation-in-a-participation" theory, which is likely why its relegated to a footnote.

[135]    Exhibit 13, MPDN Suppl. ¶ 1; *see* Exhibit 3, Pocket 1 Month RWN Suppl. (Form of Note), ¶ 1.

arises when PSFI is paid by the borrower on the Underlying Loan. Indeed, as noted above, the contractual arrangements among the parties clearly provide that the noteholders have no contractual privity with PSFI, so no rights **_ever_** arise vis-à-vis PSFI, much less a right to payment.

79.     The third *Coronet* factor—"only the lead lender can seek legal recourse against the borrower"—likewise weighs against finding a true participation. While it is true that only PSFI can seek legal recourse against the borrowers on the Underlying Loans that fact is meaningless to the holders of the Peer Street Notes because – unlike the cases cited – they have no contractual privity or other contractual rights in the collateral in the event PSFI were to seek legal recourse against a borrower.

80.     Finally, as set forth exhaustively above, "the document is evidence of the parties['] true intentions," *In re Coronet*, 142 B.R. at 82,[136] and the Court need not look beyond the actual contractual arrangement between the Debtors and Colchis to conclude that the Peer Street Notes are, in fact, promissory notes and not participations-in-participations. Yet, even if the Court is inclined to consider proof outside of the Peer Street Note documents, there is no contrary conclusion. For example, and most telling, as explained above, the Debtors clearly knew how to draft an express participation agreement – and did so as part of the structuring around each note issuance. Nonetheless, the noteholders were offered and acquired only unsecured promissory notes, which did not purport to convey title or grant ownership in the Underlying Loans

81.     Colchis also does not reveal it to the Court, but it has an extensive and long standing commercial relationship with the Debtors in which it has not only purchased tens of millions of dollars in MPDNs, but also transacted hundreds of millions of dollars in other

---

[136]    Colchis cites the *Coronet* factors as "determining whether an interest in a loan is a true participation[.]" Colchis Obj. ¶ 20. The *Coronet* decision instead dealt with a participation agreement that was determined to be a loan.

capacities, as a whole loan buyer, warehouse lender, and equity investor.   Clearly when Colchis wanted to invest equity, it knew how to do that; when it wanted to purchase loans to be serviced by the Debtors, it new how to do that; when it wanted to lend to the Debtors, it knew how to do that.  For such an entity to claim that it had misunderstood the nature of the interests it acquired though the MPDNs is simply not credible.

82.    Colchis, moreover, has every reason to be disingenuous in its objection.   As noted above and in the Colchis Objection, starting in April, Colchis continued to build on this extensive and long-standing commercial relationship by "propos[ing] various plan structures to the Debtors…."[137].  These "plan" structures would allow Colchis to collect millions of dollars in fees and charges that will otherwise not be available to it if the Debtors instead sell the Underlying Loans.  Colchis, in other words, stands to gain enormously from its attempted recharacterization of MPDNs.  If it can derail the sale process based on its meritless claims to own the Underlying Loans, Colchis would be the only game in town, and well-positioned to extract terms that are not advantageous to the estates or their other Peer Street Note holders.   And the "plan structures" Colchis referred to in the Colchis Objection – including the one proposed weeks before the Petition Date and one the day it filed the Colchis Objection – expressly require the Debtors to own the Underlying Mortgages and contemplate the transactions occurring in a chapter 11 bankruptcy.  The "plan structures" would be entirely unviable if Colchis's new legal theory that it acquired "participations" is correct.  This is completely at odds with the "plan structures" Colchis hopes the Debtors will yield to.  So Colchis is taking a position with this Court that is completely at odds with the "plan structures" its proposed.

---

[137] *Id.* ¶ 22.

83.     Accordingly, even applying Colchis's own caselaw to the facts here does not support Colchis's legal theory.

*d.    Colchis's Application of Section 541(d) and Caselaw is Flawed.*

84.     Section 541(d) of the Bankruptcy Code provides, in its entirety, that:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

As stated by the Court in *Sprint Mortgage Banker,* "[s]ection 541(d) is a codification of the law in many states, including New York, which exempts secondary mortgage market participants from compliance with State recording laws regarding perfection of the interests of assignment purchasers."  164 B.R. 224, 228 (Bankr. E.D.N.Y. Feb. 17, 1994).  The Peer Street Notes do not meet the plain language of the statute to exclude the Underlying Loans from property of the estate for several reasons.

85.     First, the PPMs expressly provided that the Peer Street Notes do not "grant [Investors] actual, legal, recorded or ***unrecorded***, ***interests*** in the Underlying [Loan] itself."[138] Colchis's argument then is that the Court should apply a statutory carve-out applicable to certain property interest (unrecorded interests in mortgage loans) to a transaction that the parties expressly agreed did not create such a property interest.

86.     Second, Funding LLC, with whom the holders of MPDNs and RWNs have commercial relationships, does not hold "legal title" to any Underlying Loans.  Instead, Funding

---

[138]    *See* Exhibit 12, 2019 PPM at 18; Exhibit 18, 2014 PPM at 13-14 (emphasis added).

LLC holds only a participation interest in the Underlying Loans, with respect to Underlying Loans associated with the MPDNs, or a security interest in participation interests in the Underlying Loans, with respect to Underlying Loans associated with the RWNs.  At most then, holders of the MPDNs were sold a right to payment based on Funding LLC's realizations from its beneficial interest in an Underlying Loan.  The RWNs are even further attenuated since Funding LLC does not even have a beneficial interest in the Underlying Loans associated with them.  At most, Funding LLC has a claim against the applicable Warehouse Entity owning the Underlying Loans. Further, Funding LLC did not retain anything for purposes of servicing or supervising the servicing of any Underlying Loans.  The retention of title for purposes of servicing has always been with PSFI.   As described to investors in MPDNs:

> For example, after PSFLLC receives investors' investments, it may transfer those investments to its affiliate, including PSFI, in consideration for a whole participation interest in the Underlying Loan. These participation interests would grant PSFLLC the right to, among other things, receive payments from the borrower payable on the Underlying Loan and/or engage in collections or related efforts in the case of default. ***Under this structure, PSFI retains title, legal ownership, and some servicing rights with respect to the Underlying Loan.***[139]

87.     Third, nothing in the Peer Street Notes effectuates, purports to effectuate, or even evidences an intent to effectuate a sale of any mortgage or interest in a mortgage by Funding LLC to the holders of MPDNs or RWNs.  Indeed, the Peer Street Note offering documents expressly refute that such a sale occurred, advising parties that the Peer Street "holding entity alone shall have an interest in the Underlying Investment" [140] and repeatedly stating that holders "will not have any security interest in the assets of [the Peer Street entity], any borrower or lender, any

---

[139]   Exhibit 13, MPDN Suppl. at 3.

[140]   *See* Exhibit 11, 2019 Investor Agreement, ¶ 21.

Underlying Loan, any proceeds from any Underlying Loan or in the assets of any borrower or lender (including any PSI affiliate acting as lender) associated with any Underlying Loan."[141] Thus, there was no predicate "sale" of a mortgage or an interest in a mortgage as would be required for section 541(d) to apply.[142]

88.      Colchis also urges the Court to read the cases it cites for the following proposition: no matter what else is stated in the document, if the *Coronet* factors are sufficiently present in a transaction and would weigh in favor of finding a transaction to have created a true participation, the Court must conclude a participation exists. As Colchis would have it, no matter what else a document says, if it arguably touches on the four *Coronet* hallmarks, it must be a participation, even if the parties made it abundantly clear that they only intended to create a debtor-creditor relationship.

89.      But Colchis bends those cases beyond their holding to the point of breaking. None of the cases appear to involve extensive and unambiguous agreements such as those outlined above, where the parties not only agreed to what each party was getting, but expressly agreed to what they were "not" getting – a participation. Instead, the cases involved a document or agreement that was called one thing, but whose features evidenced the parties' intent to transact something different. That is simply not the case here.

---

[141]   Exhibit 13, MPDN Suppl. at 11.  *See also* Exhibit 3, Pocket 1 Month RWN Suppl. p. 7; Exhibit 24, Pocket 3 Month RWB Suppl. at 9; Exhibit 21, PDN Suppl. at 5 (including substantively similar disclaimers).

[142]   This analysis is largely the same as it relates to the Underlying Loans participated to Portfolio LLC and the PDNs issued by it.  The PDNs are also distinguishable because they were associated with an entire, undistinguished pool of loans, and the PDN payment rights were not dependent on the performance of any particular Underlying Loan.  Moreover, the liquidation of particular Underlying Loans did not give rise to specific payment rights of any particular PDN holder, thus refuting any suggestion that a PDN holder had rights in an Underlying Loan.  For that reason, even where Portfolio LLC outright owned an Underlying Loan, section 541(d) does not exclude that from property of its estate.

90.     Virtually all of Colchis's authority is irrelevant to the question before the Court here:  whether what the parties clearly stated was a debt transaction was, in fact, the conveyance of a property interest.  Of the authority Colchis relies on, only *Sprint Mortgage Bankers Corp.* involved a transaction that the parties styled as a secured loan (albeit one coupled with an assignment of mortgages) and the Court found **_no_** "true participation" was created.  164 B.R. at 229.  Here, no security interest was coupled with any of the Peer Street Notes and, instead, they all expressly disclaimed any such interest being granted.[143]  The remaining cases all involved a determination of whether a transaction that purported on its face to grant a participation interest was effective to create a "true participation." *See Coronet Capital*, 142 B.R. at 79 (describing the agreement in question as an "Assignment, Participation and Servicing Agreement" but concluding it was not a true participation and was a disguised loan); *Corporate Financing*, 221 B.R. at 674 (describing the agreements in question as "Joint Venture Agreements" that provided, among other things, that "all monies received are to be held in trust until distributed in accordance with this *participation agreement*" and concluding that the agreements "more closely resemble a mortgage participation," but refusing to "mechanically apply 541(d) due to fraud (emphasis added and internal quotations omitted)); *Rothenberg*, 2015 WL 10663413, at *1, *17 (describing "financing agreements with the Debtor labeled as 'participation agreements'" and (i) reversing grant of summary judgment that certain participation agreements were true participations due to ambiguity created by conflicting contractual terms that could not be resolved at summary judgment and (ii) reversing grant of summary judgment and finding that a separate participation agreement was a true participation); *In re Sackman Mortg. Corp.*, 158 B.R. at 933-935, 938 (describing the agreement in question as a "Construction Loan Participation Agreement" and stating that the

---

[143]   *See* Part II above.

"transaction loudly hints that the parties intended to structure a lending relationship and not a participation" but declining to grant summary judgment due to unresolved factual issues).[144]

### C.    The Bidding and Auction Procedures Should Be Approved

91.    Colchis complains about the pooling of the Underlying Loans for purposes of the Bid Procedures because, among other reasons, it means it cannot bid on the loans it invested in.  As Colchis knows, the "pooling" of the Underlying Loans for purposes of the Bid Procedures is merely putting like-kind assets with like-kind assets as a means to maximize the value of the entire pool.  Bidders are more likely to be attracted to a specific asset subclass (*i.e.,* performing, non-performing, REO, etc.) rather than a "mixed bag."  Pooling of the Underlying Loans is also necessary because the Debtors simply won't have the resources to close on dozens of sales – they simple lack the human resources to do so.  Pooling of mortgage assets as a means of maximizing value has been utilized in this Court in other mortgage sale cases.  *See In re American Home Mortgage*, Case No. 07-11047 (CSS) (April 10, 2009) [D.I. 7258] (approving bidding procedures that pooled mortgage loans and REO properties into four asset pools and required bid submissions on entire asset pools on a loan-by-loan basis).[145]  And, the same multi-pool process is used by the Government National Mortgage Association, Bank of America, N.A., the Federal National Mortgage Association, and the Federal Housing Administration, when selling large distressed pools of mortgage assets.[146]

---

[144]   In *Lendvest Mortgage,* the issue was whether a transaction whereby the "note [made to the debtor by a mortgagor was] assigned as security for the loan" was a loan and not a sale.  119 B.R. 199, 201 (B.A.P. 9th Cir. Aug. 3, 1990).  There was no suggestion by the Court or the parties that the collateral assignment of the mortgage note created a participation in the mortgage.

[145]   In *American Home Mortgage*, the debtors similarly explained that selling the asset pools would create the greatest likelihood of obtaining the maximum return.  The *American Home Mortgage S*ale Order is attached hereto as Exhibit 25.

[146]   *See* Laurie Goodman & Dan Magder, Selling HUD's Nonperforming Loans: A Win-Win for Borrowers, Investors, and HUD, Urban Institute: Housing Finance Policy Center, 2, 4 (2016) https://www.urban.org/sites/default/files/publication/76626/2000568-Selling-HUD-s-Nonperforming-Loans-A-Win-Win-for-Borrowers-Investors-and-HUD.pdf (explaining how the sale of distressed pools of mortgages

92.     Colchis's complaint that the pooling prevents individual MPDN holders from bidding on the Underlying Loans it has invested in makes little sense.  First, as discussed in detail above, all of the MPDNs allow the Debtors to sell the Underlying Loans without the MPDN holders' consent; there was never any assurances the MPDN holders would even have an opportunity to bid on the Underlying Loans.  But more fundamentally, the Debtors believe Colchis has ulterior motives here.  Colchis is not looking out for the interests of the individual investors by raising this point.  As Colchis is aware, it has a fractional interest in many of the Underlying Loans.  There are other fractional investors in those same Underlying Loans.  Colchis – a multi-billion dollar financial firm – wants the right to use its economic might to bid on all of the Underlying Loans in which it has a fractional interest and to pay as little as possible for those Underlying Loans at the expense of the other fractional investors in those Underlying Loans.  This is antithetical to maximizing value and the Court should reject it.

93.     The Debtors have set forth a comprehensive bidding process that was designed pursuant to the advice of a leading expert in this industry with the goal of maximizing the value of the assets.  Placing the assets in asset pools is not unique to these chapter 11 cases and has proven to be successful in other large mortgage loan sale cases.  Colchis may not agree with the Debtors' proposed process, but the crux of the objection on this front – commingling of assets – is entirely without merit, is not founded in reality, and should be overruled on the merits.

**D.     The Expense Reimbursement Should Be Approved**

94.     In support of the proposed Expense Reimbursement, the Debtors have filed *Declaration of Charles K. Smith in Support of the Debtors' Motion for Approval of Bid Procedures*

---

maximized returns for the Department of Housing and Urban Development, parent agency of the Federal Housing Administration);.

(the "**Smith Declaration**") [Docket No. 256] and rely thereon as the evidentiary support for the Expense Reimbursement.  The Debtors note that Colchis appears not to understand the Expense Reimbursement.  Colchis claims the Debtors are offering "expense reimbursement to 15+ second round bidders . . ." and that it would "likely be far less expensive for the Debtors to retain a due diligence firm upon which bidders could rely . . . ."[147]  There would not be "15+" Expense Reimbursements.  There are 6 asset pools, with 3 second round bidders per pool and the Expense Reimbursement will be available to the 2 losing bidders.  That is a maximum of 12 potential Expense Reimbursements.  Colchis has not proffered how much a third-party due diligence firm would cost, but the Debtors estimate the maximum Expense Reimbursements paid, assuming all of them are allowed at the maximum amount, would be approximately $256,000.  Furthermore, unlike a typical Expense Reimbursement approved in a chapter 11, the Debtors will retain discretion to approve them, will require documentary evidence of said expenses, and the Bid Procedures require anyone claiming the Expense Reimbursement to have submitted a good faith Round 2 Bid as determined by the Debtors.  These protections will ensure that any Expense Reimbursement that is actually paid has been properly vetted and scrutinized.  They were also approved by the bidding procedures order cited above in *In re American Home Mortgage*, Case No. 07-11047 (CSS) (April 10, 2009) [D.I. 7258].

E.    **Colchis's Other Arguments**

95.    Colchis's remaining arguments can be addressed in short order.  First, Colchis makes a bold accusation that the Debtors' proposed Bid Procedures somehow inevitably lead to substantive consolidation of PSFLLC with the other Debtors.  Not only is there zero mention of substantive consolidation in the Bid Procedures, but the Debtors and their counsel have

---

[147]   Colchis Obj. ¶ 36-37.

repeatedly explained to Colchis that there is no intent to substantively consolidate the Debtors. To the extent Colchis believes the Debtors have an ulterior motive, Colchis's concerns can be put to rest on this front.

96.     Second, Colchis complains that "only a fraction of the loan files have been made available to bidders for due diligence."[148] The Debtors, working together with Piper Sandler, have placed loan files into the data room that are appropriate for the first round of bidding. The Debtors are working within their operational limits given a recent prepetition reduction in force, and used their business judgment as well as relied on the advice of counsel and Piper Sandler to ensure that the appropriate loan files are in the data room for purposes of round one bidding. Colchis's complaints on this front are without any basis; notably, Colchis does not attempt to explain what other files it seeks or needs access to in order to put forth a qualified bid (to the extent it chooses to do so).

97.     Third, Colchis's concerns with respect to the sale of loans on an "as is-where is" basis are unclear. Instead, the Debtors are expressly and unambiguously selling the mortgage loans on an as is-where is basis, and bidders will be fully apprised of this when bidding. The only claims the Underlying Loans are being sold free and clear of are claims against the Debtors or their assets.

98.     Fourth, the Debtors have not yet posted qualified bid forms because the Bid Procedures have not yet been approved. A qualified bid form has been prepared, reviewed with the Creditors' Committee advisors, and will be made available promptly upon the approval of the Bid Procedures. Lastly, Colchis's complaint about the asset purchase agreements not yet being

---

[148]  *Id.* ¶ 1.

available are moot, given that the Debtors posted those asset purchase agreements and filed a notice

to that effect on August 2, 2023 [Docket No. 172 & 173].

      **F.**     **The Remaining Bid Procedures Objections**[149]

        *a. Jax*

      99.     The Jax Objection is moot because the properties and loans at issue therein

are not a part of the pending sale process.

        *b. Mr. Quinn*

      100.    Mr. Quinn's Motion to Appoint Counsel to Serve Interests of Secured Note

Holders and Delay Hearing on Debtors' Motion to Schedule a Hearing on the Approval of Sale

[Docket No. 107] (the "**Quinn Objection**") raises several issues directly related to the Debtors'

Bid Procedures.[150]  Mr. Quinn takes issue with the fact that the Debtors' Bid Procedures "call for

a sale of notes only, and do not even contemplate the Servicer Solution . . . ."[151]  In other words,

Mr. Quinn believes that the Debtors' best opportunity to maximize value for the MPDN holders is

not through a sale, but through an alternative transaction, such as a sale of PSFI's mortgage

servicing business to another skilled loan servicer in exchange for consideration to the Debtors'

estates (the "**Servicer Solution**").

      101.    Mr. Quinn and the Debtors share a similar goal – to maximize value for the

Debtors' estates.  While the Debtors' Bid Procedures do contemplate a sale of the Underlying

Loans, the Debtors are also considering alternative transactions on a parallel track to ensure that

---

[149]   The Debtors believe that the issues raised by the letters retail investors submitted on the Court's docket, listed in the chart attached hereto as Exhibit 26, are addressed herein.

[150]   Mr. Quinn's arguments with respect to the appointment of counsel to represent retail account holders will be addressed by the Debtors' response to Mr. Quinn's motion for the appointment of a "Secured Creditor Committee," filed at D.I. 187, which will be filed at a later date. The Debtors reserve all rights with respect to Mr. Quinn's request for the appointment of counsel.

[151]   Quinn Obj. at 2.

all potential sale options are considered.  Upon its conclusion, the Debtors' sale process will have tested the market and yielded an opportunity, whether as a sale through the Bid Procedures or via an alternative transaction that maximizes value for all stakeholders, including the MPDN holders. Accordingly, if the Debtors receive a value-maximizing proposal that is superior to a sale of the mortgage loans, the Debtors will consider any such proposal received and choose the option that realizes the highest and best value for the Debtors' estates and their stakeholders, in consultation with the committee.

102.    Mr. Quinn also argues that the Debtors' approach in the Chapter 11 Cases will be harmful to MPDN holders and other similarly situated parties.  One of the paramount goals in the Chapter 11 Cases is to safeguard and protect the rights of the MPDN holders and all other stakeholders.  The Debtors' efforts on this front have been (and continue to be) extensive.  The Debtors have continued to service the loans underlying the MPDNs in the ordinary course of their business and have preserved value in any REO properties that have been acquired.  The Debtors are confident that the interests of the MPDN holders are protected not only by the Debtors' own efforts, but also by the Committee's supervision over the Debtors' operations during the Chapter 11 Cases.  Accordingly, the value of the underlying mortgage loans – and the collateral securing them – is being preserved such that the MPDN holders will be minimally prejudiced by these proceedings.

103.    Mr. Quinn also makes reference to the MPDN holders being "secured" creditors and argues that the Debtors have not explained which section of 363(f) the proposed sale will satisfy.  As articulated above, the MPDN holders are unsecured creditors and, accordingly, any sale "free and clear" will not affect the MPDN holders.  To the extent necessary, the Debtors intend to address the section 363(f) requirements when they seek approval of the sale.

104.    Lastly, Mr. Quinn alludes to the fact that PSFLLC's Special Member has

not advocated for the Servicer Solution.  The Debtors have addressed these issues above.

105.    For the foregoing reasons, the Debtors respectfully request that the Court

overrule the Quinn Objection.

### c.  Mr. Tarpenning

106.    Mr. Tarpenning is a serial litigant against the Debtors.  He is not a customer

or investor of the Debtors.  Rather, Mr. Tarpenning is a guarantor of certain mortgage loans under

which certain of his affiliated entities were or are borrowers.

107.    His objection appears to relate to property located at 440 East 63rd Street,

Kansas City, Missouri (the "**Kansas City Property**") previously owned by US Real Estate Equity

Building LLC, whose principal was formerly Mr. Tarpenning.    On October 2, 2020,

Mr. Tarpenning filed chapter 11 bankruptcy petitions for US Real Estate Equity Building  LLC

and its affiliate, US Real Estate Equity Builder Dayton LLC (together, "**USREEB**"), in the District

of Kansas (Case No. 20-21358) (the "**USREEB Bankruptcy**").    On November 23, 2020, the

Office of the United States Trustee moved to remove Mr. Tarpenning as USREEB's principal and

appoint a chapter 11 trustee.  Among the bases for the U.S. Trustee's request were (a) that

Mr. Tarpenning was co-mingling debtor and non-debtor funds, (b) under Mr. Tarpenning's

management, the debtors were using the lender's cash collateral without consent of the lender or

court approval, (c) the debtors were facing federal and state securities investigations based on

misstatements Mr. Tarpenning may have made, and (d) "Tarpenning's corporate connections and

insider dealings cast doubt on his trustworthiness and capabilities as a fiduciary and manager.

Relevant assets and items are not disclosed on the debtors' schedules, which Tarpenning signed

under penalty of perjury.  And at the § 341 meeting of creditors, Tarpenning was unable or

unwilling to explain his interests in and dealings with other companies, some of which are owned

or controlled by insiders or close associates."[152]   The U.S. Trustee's motion was joined by the creditors' committee and individual creditors.   On December 1, 2020, the Court granted the U.S. Trustee's motion over USREEB's objection and on December 2, 2020, Eric L. Johnson was appointed chapter 11 trustee.[153]

108.    The Debtors acquired the Kansas City Property free and clear of all liens, claims, and encumbrances in the USREEB Bankruptcy over Mr. Tarpenning's objection in July 2022.[154]  Attached as Exhibit L to the Tarpenning Objection is the trustee's deed pursuant to which Mr. Johnson, the chapter 11 trustee, conveyed the Kansas City Property to Debtor PSF Texas 1, LLC pursuant to the USREEB Sale Order.   The Kansas City Property constitutes one of the Debtors real estate owned (REO) properties that, as described in the Dunn Declaration, the Debtors continue to market and sell in the ordinary course of their business.[155]  The Kansas City Property is currently under contract for sale and will likely close before the proposed sale process is completed, rendering Mr. Tarpenning's objection to the Bid Procedures Motion moot.

109.    On or about July 24, 2023, Mr. Tarpenning filed a *lis pendens* against the Kansas City Property in Missouri state court thereby clouding titled in clear violation of the automatic stay and the provisions of the USREEB Sale Order.   The Debtors have demanded that Mr. Tarpenning remove the *lis pendens* but to date, he has ignored the Debtors' demands.

---

[152]   Exhibit 27, U.S. Trustee Motion at 2, ¶ 4.

[153]   One of Mr. Tarpenning's other entities – 1 Big Red LLC – separately filed chapter 11 in Kansas on January 15, 2021 (the "**Big Red Bankruptcy**").  The subsequently appointed chapter 7 trustee in the USREEB Bankruptcy moved to convert the Big Red Bankruptcy to a chapter 7 arguing, "it appears the real purpose for filing a liquidating plan and disclosure statement was not to conduct an orderly liquidation but in fact to allow the statute of limitations to expire so any causes of action for preferences would be extinguished by the debtor's manipulation of the delay in filing the disclosure statement and liquidating plan." *In re: 1 Big Red, LLC*, Ch. 11 Case No. 21-20044 (Bankr. D. Kansas) [Docket No. 457], at 3.  On December 28, 2022, the court granted the conversion motion.

[154]   A copy of the applicable sale order is annexed hereto (without exhibits) as Exhibit 28 (the "**USREEB Sale Order**").

[155]   Exhibit 1, Dunn Decl. ¶ 33.

## REPLY TO THE COLCHIS OBJECTION TO CASH MANAGEMENT MOTION

110.    The Peer Street Notes and applicable participation agreements make clear that the costs incurred by Peer Street in connection with liquidating the Underlying Loans can be paid from the proceeds of the Underlying Loans.  First, under each participation agreement, PSFI is entitled to deduct from any payments payable to Funding LLC, Portfolio LLC and the Warehouse Entities on account of the participation interests they own all of its "reasonable expense, cost, advance or other amount incurred by [PSFI] in connection with the administration or collection of the Loans."[156]

111.    Second, under the terms of the MPDNs and RWNs, the holders agreed that prior to payment on the applicable notes, the issuers would be entitled to receive payment of amounts advanced by the issuer "when, in its sole and absolute discretion, it determines in good faith that making these advances will ultimately be the most effective course of action,"[157] including "with respect to the returns on an Underlying Loan."  And the holders of the PDNs agreed, that Portfolio LLC would "be entitled to reimbursement from any proceeds of the Underlying Loans and Underlying Participations for all fees, costs and expenses actually incurred by the Company or any of its affiliates in connection with the management of the Company's assets and its operations, except for the Standard Fee."[158]

---

[156]   *See* Exhibit 8, Funding LLC Participation Agreement § 4.2; Exhibit 9, Portfolio LLC Participation Agreement § 4.2; Exhibit 6, Warehouse I Participation Agreement § 4.2; Exhibit 7, Warehouse II Participation Agreement § 4.2.

[157]   Exhibit 21, PDN Suppl. at Cover Page 6; *see also id.* at Exhibit A (Form of Note § 3.6) ("As set forth in the Memorandum and the PDN Supplement, the Company may, at its sole discretion, advance any and all amounts necessary to protect its interest in the Underlying Loans, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs the Company deems necessary to protect its position in the Underlying Loans (the "Company's Advances"). Any amounts paid to the Company under the Underlying Loans shall be payable first to the Company to recoup the Company's Advances and any fees and costs allowed to be charged under the Memorandum and the PDN Supplement.").

[158]   *Id.*. at Cover Page 6.

112.    Thus, Colchis's argument that the Debtors cannot allocate costs incurred in liquidating the loan portfolio to proceeds received from the Underlying Loans is doubly-wrong. Colchis's arguments concerning the determination of the quantum of those costs also lacks any support in underlying documents.  PSFI is entitled to charge all of its "reasonable" costs, and the notes issuers (*i.e.,* Funding LLC and Portfolio LLC) are entitled to collect any amount that they expend for what they determine in good faith, but otherwise in their sole and absolute discretion, to be the most effective course of action for the issuers, including with respect to returns on the Underlying Loans.  In the absence of any actionable alternative, and Colchis has not come forward with any such proposal, the notes issuers concluded that these chapter 11 cases were the most-effective course of action to realize the value of the Underlying Loans and satisfy the claims of the noteholders. Colchis's repeated references to bankruptcy remoteness are also a red-herring. Bankruptcy remoteness is a tool designed to insulate assets from the claims of creditors of other entities.  It is not a means to insulate creditors of so-called bankruptcy remote entities to pay for the costs of administering and reducing to cash the assets that such creditors are to be paid from. Indeed, the language from Peer Street's website that Colchis relies on only goes far enough to make the point that the assets and creditor bodies are separate[159]—and Peer Street has not proposed any relief that would require the Court to disregard that separateness. Peer Street, however, is amenable to the following two modifications to the Cash Management Order:

    i.    First, no cash held in Funding LLC's bank accounts or held by PSFI from the collection of principal and interest associated with the Underlying Loans will be used absent further order of the court.  While this cash is owned by the Debtors, and not by the holders MPDNs as Colchis erroneously contends, the Debtors are prepared to fund the chapter 11 cases using other cash on-hand.

---

[159]    *Cf.* Colchis Obj. ¶¶ 1, 6, 11 (quoting Peer Street's website as stating in an FAQ response: "Investments in loans are held in a bankruptcy-remote entity that is separate from our primary corporate entity.").

ii.    Second, the allocation and settlement of claims arising from post-petition, intercompany transactions will be subject to final Court-approval following a motion or pursuant to a chapter 11 plan.  At bottom, Colchis does not deny that the cost of liquidating the Underlying Loans (whatever manner that is) should be paid from the amounts collected thereon.   It just takes issue with what the Debtors believe is an appropriate amount of costs, including the allocation of common costs.  Colchis, however, fails to acknowledge that at this stage of the Debtors' existence, substantially all of the Debtors' business activities involve administering the Underlying Loans.  Giving effect to this reality totally refutes the suggestion by Colchis that the costs of the Debtors' bankruptcies, which were commenced to liquidate the Underlying Loans, wind-down the Platform, and provide recoveries to investors in Peer Street's products (the overwhelming amount of which are dollars invested in MPDNs), are being disproportionately allocated to amounts recovered by Funding LLC.  However, the manner in which those amounts are charged can be finally adjudicated at the conclusion of these cases.

## CONCLUSION

WHEREFORE, the Debtors request that the Court overrule the Objections and enter the Bidding Procedures Order and Final Cash Management Order, granting the relief requested in the Bid Procedures Motion, the Cash Management Motion and such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 17, 2023

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Joseph Barry
Joseph Barry (Del. Bar No. 4221)
Ryan M. Bartley (Del. Bar No. 4985)
S. Alexander Faris (Del. Bar No. 6278)
Shella Borovinskaya (Del. Bar No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  jbarry@ycst.com
          rbartley@ycst.com
          afaris@ycst.com
          sborovinskaya@ycst.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
P. Bradley O'Neill (admitted *pro hac vice*)
Caroline Gange (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9511
Facsimile:  (212) 715-8000
Email:  boneill@kramerlevin.com
          cgange@kramerlevin.com

*Co-Counsel to the Debtors and Debtors in Possession*