## **EXHIBIT 1**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF DAVID M. DUNN IN SUPPORT
## OF THE CHAPTER 11 FILING AND FIRST DAY PLEADINGS

I, David M. Dunn, hereby submit this declaration (the "**Declaration**") under penalty of perjury that the following is true to the best of my knowledge and belief:

1.      I am the Chief Restructuring Officer of Peer Street, Inc., a Delaware corporation ("**PSI**" and, together with the above-captioned affiliates as debtors and debtors in possession "**Peer Street**" or the "**Debtors**").   I am also a Principal of Province, LLC ("**Province**"), a nationally recognized financial advisory firm focusing on restructurings, growth opportunities, and fiduciary-related services.

2.      Based on my work with the Debtors, my oversight of the work that Province has performed for the Debtors, my review of relevant documents, and my discussions with members of the Company's management team, I am generally familiar with the Debtors' day-to-day operations, business, and financial affairs.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485).  The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn:  David Dunn, Chief Restructuring Officer.

3.     Except as otherwise indicated, all facts herein are based upon my personal knowledge, my discussions with other members of the Debtors' management team, board of directors, and representatives of Province and other of the Debtors' advisors (including legal counsel), my review of relevant documents and information concerning Peer Street's operations, financial affairs, restructuring efforts, or my personal experience and knowledge.

4.     I am a seasoned corporate restructuring professional with over twenty (20) years of experience in high-profile board, buyside, and advisory roles.  My background includes large and complex financial restructurings, operational transformations, mergers and acquisitions, interim management, distressed financings, and litigation-orientated investments.

5.     Over the course of my twenty-year career, I have served as a chief restructuring officer, financial advisor to debtors, advisor to or member of boards of directors, litigation and liquidation trustee, and plan administrator.  Before joining Province, I executed principal investments in distressed debt and equity instruments across a diverse range of industries, first at Arrowgrass Capital Partners and then at Cross Sound Management, a corporate distressed investment firm that I co-founded.  I began my career practicing law within the financial restructuring departments of Sidley Austin LLP and then Akin Gump Strauss Hauer & Feld LLP.

6.     My experience includes global engagements across a broad range of industries, including power, upstream E&P, E&P services, metals and mining, monoline and mortgage insurance, media, gaming, and retail.

7.     I am over the age of 18 and am authorized by the Debtors to submit this Declaration.  If called upon as a witness, I would testify competently to the facts set forth in this Declaration.

8.    On the date hereof (the "**Petition Date**"), each of the Debtors filed petitions for relief under chapter 11 of title 11 of the United Sates Code, §§ 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

9.    I submit this Declaration to provide an overview of the Debtors' business and the Chapter 11 Cases and support for the Debtors' "first-day" motions (collectively, the "**First Day Motions**").  To familiarize the Court with the Debtor and the relief sought in the First Day Motions filed in this chapter 11 case, this Declaration is organized into four parts as follows:

(a) Part I provides background on the Debtors, their history, corporate structure, and business operations;

(b) Part II provides an overview of the Debtors' prepetition capital structure;

(c) Part III provides a description of the circumstances leading to the commencement of these Chapter 11 Cases, including a description of the Debtors' prepetition restructuring efforts; and

(d) Part IV provides an overview of the First Day Motions.

## I.    THE DEBTORS' BUSINESS

10.    Founded in 2013, Peer Street is a platform for online investing in real-estate debt.  Peer Street's headquarters are located in El Segundo, California.  Peer Street enables accredited investors, funds, and institutions to access certain real estate-related debt investments that were historically difficult to invest in, and permits lenders and borrowers to access capital that has been historically difficult for them to access.

11.    Peer Street introduced the first and largest two-sided online marketplace for investing in and funding real estate debt.  On one side of the marketplace, Peer Street provides individual investors with access to an alternative asset class that was previously

difficult to access, while on the other side of the marketplace, it provides capital to real estate lending businesses and their borrowers.

12.     Peer Street sources loans from a nationwide network of private lenders and brokers (covering over forty-five (45) states).  These loans are either (i) offered for sale to institutional investors, and/or (ii) posted on Peer Street's online investing platform located at www.peerstreet.com (the "**Peer Street Platform**"), where investors may browse and select from investments offering different yields, terms, and loan-to-value ("**LTV**") ratios, across either residential or multifamily properties that are non-owner occupied, and elect to invest in various real estate-related debt investments through the Peer Street Platform.  The Peer Street Platform provides multiple data points for investors to analyze in a streamlined manner.   Additionally, Peer Street acts as master servicer and manages loans on behalf of individual and institutional investors.

13.     Peer Street determines whether to list an investment opportunity on the Peer Street Platform based on its evaluation of the features and risk factors associated with the investment, including, but not limited to, the lenders, borrowers or other key persons sponsoring such investment.  Peer Street may, in some cases, structure proprietary investment vehicles that pool underlying investments.  In other cases, real estate securities offered through the Peer Street Platform will track a single underlying investment.

14.     Peer Street offers three (3) principal investment products through the Peer Street Platform: (i) Fractional Notes; (ii) Pocket; and (iii) Portfolio (as defined herein).   In addition, Peer Street offers another investment product, OppFund (as defined herein), separately from its online platform.

15.    ***Fractional Notes***.  In the ordinary course of business, a Peer Street affiliate, PS Funding, Inc., a Delaware corporation ("**PSFI**") originates loans itself through a network of lenders and brokers by (i) purchasing loans or participations in loans originated by the third-party lenders and brokers, (ii) table funding loans on behalf of the third-party lenders and brokers, or (iii) funding loans directly to borrowers sourced through the third party lenders and brokers (the "**Underlying Loans**").

16.    Thereafter, another Peer Street affiliate, Peer Street Funding LLC, a Delaware limited liability company ("**PSFLLC**"), offers investors the opportunity to purchase unsecured mortgage payment dependent notes ("**MPDNs**") through the Peer Street Platform. PSFLLC then uses those investor funds to purchase participation interests in certain of the Underlying Loans.  Holders of MDPNs are entitled to payments equal to fractional interests in the net principal and interest payments collected on the Underlying Loans funded with their investments, net of expenses.

17.    To be more specific, once sufficient MDPNs have been purchased, PSFLLC transfers funds sufficient to PSFI in return for a 100% participation interest in a specified Underlying Loan, entitling PSFLLC to all payments of principal and interest (net of fees, expenses, charges, and other amounts) collected on the Underlying Loan.  Under the terms of the participation agreement, PSFI performs the functions of the lender on the Underlying Loan, among other things, collecting payments (through a subservicer), making distributions, and enforcing the Lender's rights and remedies.  The MPDNs are limited obligations of PSFLLC that entitle holders to payment of principal and interest from PSFLLC only to the extent that PSFLLC has received payments of principal and interest on the Underlying Loan from PSFI.

18.     On the Petition Date, approximately $205.0 million in MPDNs were outstanding.  These notes are associated with approximately $220.2 million in face amount of Underlying Loans.  Approximately $92.4 million of these loans were performing as of the Petition Date.[2]  PSFI also holds cash of approximately $18.5 million.  In addition, another Peer Street affiliate, PSF REO LLC holds $1.2 million in cash and parcels of real estate that had previously secured approximately $37.1 million in Underlying Loans on the retail platform that have been foreclosed.

19.     ***Pocket***.    PSFLLC is also party to a warehouse loan agreement (the "**Pocket 1-Month Warehouse Loan Agreement**") with PS Warehouse, LLC, a Delaware limited liability company ("**Warehouse**"), a wholly-owned subsidiary of PSFI.   Under the Pocket Warehouse Loan Agreement, PSFLLC advances funds to Warehouse.   Warehouse, in turn, advances those funds as needed to PSFI to allow PSFI to close loans PSFI originates or purchases (the "**Pocket Underlying Loans**").   In return, PSFI grants Warehouse a participation interest (the "**Warehouse Participation Interests**") in the Pocket Underlying Loans. Warehouse has pledged the Warehouse Participation Interests to PSFLLC to secure the amounts PSFLLC advanced to it under the Pocket 1-Month Warehouse Loan Agreement.  In addition, PSFI has provided PSFLLC with a guarantee of Warehouse's obligations under the Pocket 1-Month Warehouse Loan Agreement.  To secure its obligations under the guarantee, PSFI also pledged to PSFLLC (i) the mortgage loans underlying the participations granted to Warehouse, and (ii) its membership interest in Warehouse.

20.     To fund the amounts it delivers to Warehouse under the Pocket 1-Month Warehouse Loan Agreement, PSFLLC sells unsecured redeemable warehouse notes

---

[2]     Loans are considered non-performing after thirty (30) days of delinquency.  The $92.4 million performing Underlying Loans translates to 42% of the total $220.2 million face amount of the Underlying Loans.

(the "**RWNs**") to participating investors on the Peer Street Platform ("**Pocket 1-Month**"). Holders of the RWNs are entitled to interest in an amount equal to their pro rata share of the interest earned by PSFLLC under the Pocket 1-Month Warehouse Loan Agreement.  Interest that accrues on the RWNs is not paid in cash but is instead capitalized into the outstanding principal amount of the RWNs.  No cash payments are made on account of the RWNs unless (a) the maturity date (i.e., December 31, 2029) occurs, or (b) an earlier timely redemption request is made by the holder of an RWN, in which case payments may be made on the first day of the month following the end of the redemption period.  The RWNs are limited obligations of PSFLLC.  Holders of the RWNs are entitled to payment of principal and interest from PSFLLC only to the extent that PSFLLC has received payments of principal and interest from Warehouse under the terms of the Pocket 1-Month Warehouse Loan Agreement.

21.     In late 2022, the Debtors launched a second "Pocket" product, Pocket 3-Month.  This product differs from the Pocket 1-Month product only in that redemptions may be made every quarter, rather than every month.  It is otherwise structured with a separate, but parallel, (i) warehouse loan agreement (the "**Pocket 3-Month Warehouse Loan Agreement**" and, together with the Pocket 1-Month Warehouse Loan Agreement, the "**Pocket Warehouse Loan Agreements**") between PSFLLC and PS Warehouse II, LLC, a Delaware limited liability company ("**Warehouse II**"), and (ii) participation agreement between PSFI and Warehouse II.

22.     On January 31, 2023, PSFLLC exercised a "Liquidation Trigger" based on its good faith determination to halt redemptions to allow for an orderly liquidation of the Pocket Warehouse Loan Agreements.  Following the Liquidation Trigger, Warehouse and Warehouse II may not use proceeds of the Pocket Warehouse Loan Agreements to fund additional loans or purchase any additional Pocket Warehouse Participation Interests.

23.    On the Petition Date, approximately $41.4 million in RWNs were outstanding.  On the Petition Date, Warehouse held (i) cash associated with Pocket 1-Month investments totaling $37.1 million; and (ii) participations in Pocket Underlying Loans and other related assets with a face value of approximately $393,000, title to which was held by PSFI.  On the same date, Warehouse II held cash totaling $1.3 million.

24.    ***Portfolio.***  PS Portfolio – ST1, LLC, a Delaware limited liability company ("**Portfolio**"), managed by its sole member, PSFI, issues payment dependent promissory notes ("**PDNs**") to participating investors on the Peer Street Platform.  Portfolio uses the net proceeds from the issuance of PDNs to purchase mortgage loans and participations in mortgage loans from PSFI (collectively, the "**Portfolio Underlying Assets**") that meet specified credit guidelines.  PSFI services the Portfolio Underlying Assets in return for a standard fee.

25.    The PDNs are unsecured, special, limited obligations of Portfolio.  Holders of the PDNs are entitled to receive monthly interest payments equal to their pro rata portion of any interest payments *actually received* by Portfolio in respect of its portfolio of Portfolio Underlying Assets during the preceding month, less PSFI's standard fee and other fees, costs and expenses incurred by Portfolio for services in respect of the underlying loans and participations.  Portfolio is obligated to make principal and interest payments on the PDNs only to the extent that it has received payments on the underlying mortgage loans and participations in excess of PSFI's standard fee and other issuer expenses.

26.    On the Petition Date, approximately $2.1 million in face amount of PDNs were outstanding.  As of the Petition Date, the net asset value of the Portfolio Underlying Assets was approximately 99.56% of face value.

27.    ***OppFund***.  Peer Street Opportunity Investors II, LP is a Delaware limited partnership ("**OppFund**").  It is managed by its general partner, Peer Street Opportunity Fund GP, LLC, a Delaware limited liability company (the "**General Partner**") and is administered by Crestbridge Fund Services US, LLC.  The General Partner is wholly-owned by PSI, and receives a quarterly management fee.

28.    OppFund makes real estate-related investments in accordance with its investment strategy of providing attractive returns on invested capital while maintaining a materially reduced risk profile due to the secured nature of the investments.  As of the Petition Date, OppFund's sole investment is the OppFund Loan (described herein).

29.    Individual investors in OppFund receive limited partnership interests (the "**Limited Partnership Interests**").  OppFund used the proceeds of these investments to provide a revolving warehouse credit facility to PSFI to fund the purchase or origination of loans (collectively, the "**OppFund Underlying Loans**").

30.    On the Petition Date, approximately $23.6 million in Limited Partnership Interests in OppFund had been sold.  On the Petition Date, OppFund held (i) cash totaling $10.7 million, (ii) security interests in OppFund Underlying Loans, and (iii) other related assets with a face value of $13.9 million, title to which was held by PSFI.

31.    **Loan Sales**.  In addition to these four product offerings, in the past, Peer Street originated and sold mortgage loans to third party institutional and other purchasers.  Since the end of 2021, this segment of its business has diminished substantially.  In 2021, the Debtors collected net premiums from sales of servicing released mortgage loans of $97,000.[3]  In 2022, the Debtors' net premiums from sales of servicing released mortgage loans were negative $4.4

---

[3]    Net premiums are equal to sales less losses.

million.  In 2023, the Debtors' net premiums on account of servicing released mortgage loans were negative $2 million.

32.    **Loan Servicing**.  Through PSFI, the Debtors act as master servicer of the mortgage loans in their various product offerings and also loans sold, servicing-retained, to third parties under loan servicing agreements.  For these loans, the Company has retained a subservicer that collects and tracks payments from mortgage borrowers.  The Company directly manages the servicing of non-performing loans including foreclosure and sale of collateral.  The Company advances funds to preserve the value of non-performing loans and the collateral that secures them, recovering these advances from the ultimate revenues collected on the mortgages.

33.    **REO Sales**.  In the ordinary course of business, the Debtors sell real estate owned ("**REO**") properties, typically acquired through the foreclosure of the underlying mortgage loan.  REO properties are typically sold through a real estate broker local to the location of the specific REO properties.  In 2021, the Debtors sold approximately 38 REO properties and in 2022 they sold approximately 41.  Thus far in 2023, the Debtors have sold approximately 25 REO properties.  The Debtors will continue to sell their REO properties (including those acquired post-petition) in the ordinary course of business post-petition.

34.    **Debtors' Workforce.**  As of the Petition Date, the Debtors' workforce consists of approximately 28 full-time, salaried employees and 1 contractor all of which are employed by PSI.

35.    **Prepetition Revenue.**  For the twelve-month period that ended December 31, 2022, the Debtors total revenue was approximately $37.4 million, down approximately 23.2% from the year prior.

36.     As of the Petition Date, PSI has approximately $4.4 million and PSFI has approximately $18.5 million in cash on hand.

## II.    DESCRIPTION OF THE DEBTORS' CAPITAL STRUCTURE

### A.  Corporate Structure

37.     PSI is the parent company for all Peer Street entities which are organized under the laws of the State of Delaware.[4]  PSI employs all of the employees, performs payroll and accounting functions, capital raising, and general management.  PSI owns the Debtors' intellectual property rights and owns and operates Peer Street's technology, including the Peer Street Platform.

38.     PSI established PSFLLC in July 2014, to issue securities to retail and other investors on the Peer Street Platform.  PSFLLC also owns a 100% equity interest in PSF REO LLC, which holds title to real estate that previously secured non-performing mortgage loans owned by PSFI, which were acquired through foreclosure or other exercise of PSFI's rights in the relevant mortgages.

39.     PSI established PSFI in 2015.  PSFI is a California licensed mortgage lender under the California Financing Law as well as a servicer.  PSFI (i) purchases previously funded mortgage loans from third-party lenders pursuant to master loan sale agreements ("**MLSAs**"), (ii) table-funds mortgage loans for third-party lenders or brokers pursuant to master loan origination agreements ("**MLOAs**"), (iii) originates its own mortgage loans, (iv) sells mortgage loans to third-party institutional buyers pursuant to master loan purchase agreements, and (v) acts as master servicer for mortgage loans it to which it holds title and services certain loans it has sold to third-party institutional buyers pursuant to master loan servicing agreements with institutional loan purchasers.  PSFI holds legal title to substantially all of the Debtors'

---

[4]     A chart summarizing the corporate structure is attached hereto as **Exhibit A**.

underlying mortgage loans, participations and other related assets (collectively, the "**PSFI Mortgage Assets**").

40.     PSFI also owns 100% of the equity interests in Warehouse, Warehouse II, and Portfolio.

41.     Debtor PeerStreet Licensing, Inc. ("**PSLI**") is wholly owned by PSI.  PSLI was formed to manage technology licensing opportunities, but has yet to engage in any business activity.

42.     In December 2015, PSI established Peer Street Opportunity Fund GP, LLC, a wholly owned subsidiary of PSI ("**PSOFGP**").  On May 25, 2018, PSOFGP became the general partner of OppFund.  OppFund was created to make approved investments in various real-estate and financial products, including primarily (1) loans or participation interests in such loans secured by real estate (the "**Loans**"), (2) mezzanine debt in warehouse lending facilities utilized by Peer Street, Inc. or its affiliates, and (3) subordinated loan positions held or sold by Peer Street, Inc. or its affiliates.

### B.  Prepetition Secured Debt

43.     ***The Magnetar Credit Agreement***.  PSI is party to a Credit Agreement dated October 12, 2021 (as may be amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**"), by and among PSI, as borrower (the "**Magnetar Borrower**"), PSFI and PSLI, as guarantors (the "**Magnetar Guarantors**" and, together with the Magnetar Borrower, the "**Magnetar Obligors**"), on the one hand, and Magnetar Financial LLC ("**Magnetar**"), as the Paying Agent (the "**Magnetar Agent**"), and certain of Magnetar's affiliates and managed funds party thereto, as lenders (the "**Magnetar Lenders**"), on the other.  The Prepetition Credit Agreement provides

for convertible secured term loans in an aggregate principal amount not to exceed $30 million (the "**Magnetar Term Loans**").  Including accrued PIK interest at a rate of 6%, as of the Petition Date, $27,239,167 was outstanding under the Prepetition Credit Agreement.  The Magnetar Term Loans are secured by a lien on substantially all of the Magnetar Obligors' assets, including all cash held at PSI, but expressly excluding, among other things, any asset of an Obligor encumbered by a lien securing a permitted debt facility or otherwise pledged to third-party investors in accordance with the Obligor's ordinary course of business (the "**Magnetar Collateral**").  Generally speaking, the Magnetar Collateral excludes the PSFI Mortgage Assets.

44.    *The OppFund Loan*.  OppFund, as lender, and PSFI, as borrower and servicer, are parties to a Loan and Security Agreement dated October 1, 2019 (as may be amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "**OppFund Loan Agreement**").  Under the OppFund Loan Agreement, the OppFund provides a revolving credit facility for the benefit of PSFI in an amount up to $25 million (the "**OppFund Loan**").  The OppFund Loan Agreement is secured by the loans acquired or originated by PSFI using the proceeds of the OppFund Loan.  PSFI's obligations under the OppFund Loan Agreement are guaranteed by PSI.

45.    As of the Petition Date, approximately $24.2 million is outstanding under the OppFund Loan Agreement.

46.    *The Pocket Warehouse Loans*.  As of the Petition Date, $39.9 million is outstanding under the Pocket 1-Month Warehouse Loan Agreement.  The Pocket 1-Month Warehouse Loan Agreement is secured by substantially all the assets of Warehouse and guaranteed by PSFI.  PSFI's guarantee is secured by PSFI's equity interests in Warehouse and the mortgages in which Warehouse purchased participation interests.

47.    As of the Petition Date, $1.3 million is outstanding under the Pocket 3-Month Warehouse Loan Agreement.  The Pocket 3-Month Warehouse Loan Agreement is secured by substantially all the assets of Warehouse II and guaranteed by PSFI.  PSFI's guarantee is secured by PSFI's equity interests in Warehouse II and the mortgages in which Warehouse II purchased participation interests.

### C. Prepetition Unsecured Debt

48.    ***PPP Loan***.  On May 2, 2020, PSI received a loan (the "**PPP Loan**") from a private lender as part of the U.S. Small Business Administration's (the "**SBA**") Paycheck Protection Program (the "**PPP**").  As of the Petition Date, approximately $3.7 million is outstanding under the PPP Loan, which is accruing interest at an annual rate of 1%.  PSI used the proceeds of the PPP Loan for the purposes contemplated by the PPP and the Coronavirus Aid, Relief, and Economic Security Act.  Thereafter, PSI applied for forgiveness of the balance of the PPP Loan.  The SBA, however, denied this application.  PSI first unsuccessfully appealed, and has since moved for reconsideration of the SBA determination.  On June 8, 2023, the SBA Office of Hearings and Appeals issued an initial decision denying the motion for reconsideration. The initial decision will become final 30 days after service.  Until then, no payments are due on the loan.

49.    ***B Pieces***.  In a number of instances, when PSFI acquired mortgage loans from third party originators, the third party originator retained a subordinated percentage interest in the loan, called a "B Piece," payable only after PSFI has received full payment of its interest The aggregate face amount of these B Pieces is approximately $2.2 million.  Whether individual B Pieces have value, however, depends on, among other things, the extent to which the market

value of or remaining payments under the applicable loan exceed the amount of PSFI's interest in the loan.

## III.    EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.  Macroeconomic Issues

50.    Since the second quarter of 2021, the mortgage lending industry has faced adverse market conditions, including historical market-rate volatility.  Following years of historically low interest rates and inflation before the COVID-19 pandemic, the markets experienced sharp rate increases as part of the Federal Reserve's effort to curb inflation and control price growth.  Mortgage rates have increased from an average of 3.222% in January 2022 to an average of over 6.5% today, which caused demand for mortgages to drop significantly.  In addition, institutional buyers have largely halted purchases of below current market rate loans. Mortgage originations dropped significantly during the first quarter of 2022 from record highs in 2021, and ended the year roughly 50% lower than they had been in the fourth quarter of 2021.

51.    These market conditions severely impacted Peer Street's business.  Before 2022, Peer Street originated and sold a significant volume of whole mortgage loans to third party institutional purchasers, earning substantial premiums on these transactions.  After 2021, the volume of these originations dropped precipitously.   In 2021, Peer Street originated approximately $695.8 million in mortgages.  In 2022, originations fell to $385 million.  In 2023, Peer Street has originated only $5.4 million in such mortgages.  As described above, this decline has significantly reduced the revenues Peer Street received from this line of business.

52.    In addition, in 2022, one of Peer Street's historic sources of funding – venture capital – declined markedly.  As a result, Peer Street was not able to access material funding to mitigate the loss of revenue caused by market conditions.

**B. Cost Saving and Restructuring Efforts**

53.     Beginning in the Spring of 2022, the Debtors implemented a series of staff reductions.  Through a series of furloughs and layoffs, in May, July, and October of 2022 and February of 2023, a staff that had totaled 281 at the beginning of May 2022 was reduced to approximately 28 as of the Petition Date.

54.     The Debtors also reviewed their vendors and other business relationships, aggressively seeking to renegotiate or cancel contracts to reflect the reductions in staff and reductions in operating requirements.

55.     In July 2022, the Debtors retained Kramer Levin Naftalis & Frankel ("**Kramer Levin**") to assist it with potential restructuring options.

56.     In August 2022, Peer Street informed Magnetar of certain potential events of default (the "**Events of Default**") under the Prepetition Credit Agreement, including alleged breaches of certain minimum tangible net worth and net operating loss covenants.  On August 17, 2022, Peer Street and Magnetar entered into that certain Waiver Letter Agreement (the "**Waiver**") pursuant to which Magnetar agreed to waive the Events of Default through August 24, 2022.  The Waiver has since been extended 33 times.

57.     During the period of the Waiver, the Debtors and Magnetar engaged in good faith negotiations to address the Events of Default and evaluate an array of potential strategic alternatives in an effort to avoid the need to commence these Chapter 11 Cases, exchanging formal and informal proposals.  Ultimately, however, these discussions did not produce a long-term solution to the Debtors' business and financial issues.

58.     At the same time, Peer Street sought to attract additional capital from third-party investors to, among other things, continue servicing advances with respect to loans it

holds.[5]  Despite identifying multiple potential sources of capital, as of the Petition Date, the Debtors have not received proposals for new financing sufficient to avoid these Chapter 11 Cases.

59.     In March 2023, Peer Street retained Young Conaway Stargatt & Taylor, LLP as co-restructuring counsel.

60.     In mid-April 2023, the Company engaged Province to provide a Chief Restructuring Officer and supporting advisory personnel.  Province designated me as Chief Restructuring Officer.

61.     In late 2022 and 2023, certain members of the Debtors' board of directors resigned.  To replace them, during the first two quarters of 2023, the Debtors retained Ivona Smith of Drivetrain, LLC and M. Freddie Reiss, formerly a member of the restructuring practices at FTI Consulting and PricewaterhouseCoopers International Limited (PwC), to serve as independent directors.  The Board also appointed an additional independent director, David Eaton, formerly a partner in the restructuring practice at Kirkland & Ellis LLP.  The independent directors constitute a majority of the Debtors' board.

**C.  Objectives of the Chapter 11 Cases**

62.     The Debtors commenced these Chapter 11 Cases to monetize their assets, preserve liquidity, and maximize value for all stakeholders.

63.     Before the Petition Date, the Debtors retained Piper Sandler Companies ("**Piper Sandler**"), a recognized broker, to sell the great majority of the PSFI Mortgage Assets.  Around the Petition Date, Piper Sandler will launch a marketing process for these assets.

64.     Although the Debtors are not seeking first day relief relating to the sale of the PSFI Mortgage Assets, they have today filed a motion to establish procedures for the

---

[5]     As of the Petition Date, the Debtors estimate they have $12.8 million servicing advances outstanding.

postpetition marketing and sale of these assets, including the approval of bidding protections for the stalking horse bidders, as well as to approve the sale of those assets.

## IV.    FIRST DAY MOTIONS

65.    Concurrently with this Declaration, the Debtors have filed the First Day Motions seeking various forms of relief designed to ensure a smooth transition between the Debtor's prepetition and postpetition business operations and minimize any disruptions to the Debtor's operation.

### A.  Administrative Motions

(a) *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

(b) *Debtors' Application for the Retention and Appointment of Stretto, Inc. as Claims and Noticing Agent*

### B.  Substantive Motions

(a) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (A) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Companies Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (D) Setting a Final Hearing Related Thereto*

(b) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (A) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing*

(c) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1108 of the Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing*

(d) *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Wages, Salaries, and Other Compensation, (II) Authorizing Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (IV) Granting Related Relief*

(e) *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 345, 363, 503(b), 1107(a) and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Authorizing Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims, (D) Waiving the Requirements of Section 345(b) on an Interim Basis, and (E) Granting Certain Related Relief*

(f) *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors' Use of Cash Collateral; (B) Granting Adequate Protection to the Prepetition Secured Parties; (C) Scheduling a Final Hearing, and (D) Granting Related Relief (the "**Cash Collateral Motion**")*

(g) *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief*

66.    The Debtors have narrowly tailored the relief requested in the First Day Motions to: (i) continuing their business operations during these Chapter 11 Cases with minimal disruptions, (ii) maintaining the confidence and support of their vendor, customer, employee, and other key constituencies, and (iii) establishing the framework for an efficient administration of these Chapter 11 Cases.

67.    I have reviewed each of the First Day Motions, and I believe that the relief requested in the First Day Motions is necessary to enable the Debtor to operate with minimal disruption during the pendency of the Chapter 11 Cases and approval of the relief sought therein will be critical to the Debtor's efforts to restructure and reorganize its business in a manner that preserves and maximizes value for all stakeholders.

68.     It is further my belief that, with respect to First Day Motions that request the authority to pay specific prepetition claims or continue prepetition programs, the relief requested is essential to the maintenance of the Debtors' operations and is necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

69.     Through the Cash Collateral Motion, certain of the Debtors intend to request entry of interim and final orders, authorizing those Debtors' use of cash collateral and granting adequate protection to the Magnetar Lenders.  Importantly, the Debtors have obtained the consent of the Magnetar Lenders to use cash collateral subject to the terms set forth in the Cash Collateral Motion.

70.     The Debtors require immediate access to liquidity to ensure they are able to continue operating their businesses during these Chapter 11 Cases, preserve the value of the estates for the benefit of all parties in interest, and administer a value-maximizing sale process. However, without prompt access to cash collateral, the Debtors would be unable to, *inter alia*, satisfy ordinary course of business obligations, preserve and maximize the value of their estates, and fund the administration of these Chapter 11 Cases, which would cause immediate and irreparable harm to the value of the Debtors' estates, to the detriment of all stakeholders.

71.     I have worked closely with the Debtors' management and professional advisors to ensure that the use of cash collateral includes those amounts that will be necessary to preserve and maximize the value of the Debtors' estates.  The Cash Collateral Motion only seeks authority to expend amounts in the budget during the period prior to a final hearing on the motion that will avoid any immediate and irreparable harm to the Debtors and their businesses from a failure to have access to the necessary services used to operate the businesses.

72.     Accordingly, I respectfully request that all of the relief requested in the Cash Collateral Motion and other First Day Motions, and such other and further relief as may be just and proper, be granted.

73.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  June 26, 2023                    */s/  David Dunn*
                                         David M. Dunn

30439422.10

KL2 3306866.3

## EXHIBIT A

**Organizational Chart**





## **EXHIBIT 2**

## LOAN MANAGEMENT AGREEMENT

This Loan Management Agreement (this "**Management Agreement**"), is entered into as of September 21, 2022, by and between PS Portfolio – ST1, LLC, a Delaware limited liability company (the "**Owner**"), and PS Funding, Inc., a Delaware corporation (the "**Seller**").

### RECITALS

A.  The Owner has acquired and/or will acquire certain Loans from the Seller (or one of its affiliates), through either the purchase of (i) the whole Loan, pursuant to the terms of a certain Master Loan Sale Agreement of even date between the  Seller (or one of its affiliates) and the  Owner (as amended, restated, supplemented or otherwise modified from time to time, the "**Purchase Agreement**"); or (ii) a certain participation interest ("**Participation Interest**") in a Loan(s) pursuant to the terms of that certain Participation Agreement of even date between Owner and Seller (as amended, restated, supplemented or otherwise modified from time to time, the "**Participation Agreement**").

B.  Upon purchasing Loans from Seller (either as a whole Loan or through Participation Interest), Owner wishes to engage Seller to assist with performing certain loan monitoring and administration activities more particularly described in this Management Agreement relating to the Loans.

C.  It assist Seller in such "Loan Administration," Seller (or its affiliate) and FCI Lender Services, Inc. a California corporation (the "**Servicer**"), are or may become parties to one or more Loan Servicing Agreements with respect to the Loans (as amended, restated, supplemented or otherwise modified from time to time, collectively, the "**Servicing Agreements**"), pursuant to which Seller (or its affiliate) may engage Servicer, and Servicer will agree, to service, from time to time, the Loans on behalf of Seller (and its affiliates).

D.  The parties hereto desire to enter into this Management Agreement to provide the terms and condition of such services by Seller.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.      **Defined Terms**.  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

2.      **Administration of Loans**. Owner hereby appoints Seller as its loan manager to assist Owner with providing certain loan monitoring and administration activities with respect to the Loans acquired by Owner from Seller (or one of its affiliates). Seller hereby accepts such appointment upon the terms and conditions set forth herein.  Seller shall act as the administrator of the Loans and, in such capacity, shall administer the Loans from and after the related Closing Date. For all Loans where Owner owns at less than 51% Participation Interest in the Loan, Seller shall have full power and authority, acting alone or through the utilization of third party service providers including Servicer, to do any and all things in connection with such administration which Seller may deem necessary or desirable (including, without limiting the generality of the foregoing, to (i) waive, modify or vary any term of any Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Borrower, including any waiver, modification, amendment or change of any material term of a Loan (including without limitation any reduction in the principal of the Loan or forgiveness of any amounts

under the Loan or acceptance of any payment under the Loan other than in US Dollars, reduction of the interest rate of the Loan, extension of the maturity date or any payment date or release, substitution or release of any collateral or guarantees of the Loan or change in any default provisions in any Loan Documents) (collectively, "**Loan Modifications**"), (ii) make any Loan Management Advance or advance or disbursement in respect of any Commitment Funded Amounts or other amounts (collectively, "**Loan Advances**"), and (iii) pursue loss mitigation and default recovery collection efforts, which may include foreclosure or deed in lieu of foreclosure and the administration of any resulting property acquired thereby), including allowing a short sale or short payoff with respect to a Loan and/or acquiring title to any Property in foreclosure or by deed in lieu of foreclosure or commencing any legal action with respect to any Loan or any Property (collectively, "**Foreclosures**") in each case in accordance with the terms of this Management Agreement and Accepted Servicing Practices (collectively, the "**Services**"). For all loans where Owner owns 51% or more of a Loan, either owning the whole Loan or at least 51% Participation Interest in the Loan, Seller must first obtain Owner's written consent and approval to perform Loan Modifications, Loan Advances, Foreclosures or any other Services where Seller is materially changing the terms of the Loan or the servicing activities for the Loan, whereby Owner shall have sole discretion to withhold, delay or condition such approval. It is understood that Servicer is acting as sub-servicer pursuant to the terms of the Servicing Agreements and, accordingly, Seller shall be responsible for Servicer to perform its duties under the term of the Serving Agreement and this Management Agreement, where applicable. Seller shall perform all of its duties and obligations under this Management Agreement in accordance with Accepted Servicing Practices and the terms of the Management Agreement. Seller shall, and shall cause the Servicer to, at all times maintain all required permits and licenses and comply with all applicable laws and regulations.

Notwithstanding anything to the contrary herein, Seller shall be permitted to take the following actions with respect to any Loan or any applicable Property, as applicable, without the prior written approval from the Owner (it being understood that Servicer shall be entitled to rely upon any direction it receives from Seller, without any independent verification thereof): (i) approving any mezzanine or subordinate financing with respect to any Loan, if approval is required under the applicable Loan Documents; or (ii) preparing or delivering any instruments of satisfaction, cancellation, partial or full release, or discharge and all other comparable instruments with respect to any Loans pursuant to the terms of this Management Agreement and Accepted Servicing Practices.

Seller shall be required to pay all expenses incurred by it in connection with its activities hereunder and shall not be entitled to reimbursement thereof except for Loan Management Advances (as provided herein) or as otherwise provided herein.

Owner agrees that it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or appropriate, or Seller may reasonably request, in order to enable Seller to exercise or enforce any of its rights hereunder. Without limiting the generality of the foregoing, Seller shall execute and file (or cause to be executed and filed) such real estate filings, financing or continuation statements, or amendments thereto or assignments thereof, and such other instruments or notices, as may be necessary or appropriate. Owner shall furnish Seller with executed copies of powers of attorney and other documents necessary or appropriate to enable Seller to carry out its duties under this Management Agreement. Upon full repayment and satisfaction of all obligations with respect to a Loan, Owner agrees that Seller is hereby authorized and empowered to prepare, execute and deliver, on behalf of itself and Owner, such documents as may be reasonably necessary in connection with a customary assignment of the applicable mortgage, and Owner shall take such action and execute such documents as may be reasonably requested by Seller in furtherance of the foregoing.

3.    **Reserved**.

4.    **Loan Management Advances.**

(a)    The Seller may elect in its sole discretion to advance (but shall not be required to advance) money to cover customary, reasonable and necessary costs and expenses incurred on behalf of Owner after the related Closing Date in accordance with this Management Agreement and Accepted Servicing Practices, including without limitation such amounts which are needed to fund (i) utility costs, taxes, special assessments and hazard, flood and earthquake insurance premiums and comparable items; (ii) costs, expenses and fees occasioned by a Borrower bankruptcy, foreclosure or deed in lieu of foreclosure, including any enforcement or judicial proceedings; (iii) costs of preservation and protection of any Property in order to maintain insurance or guarantees; (iv) costs, expenses and fees of conveying any Property to the Owner, insurer or a third party; (v) costs, expenses and fees to inspect, protect, manage, secure or repair any Property, including property management fees and payments required under service contracts; and (vi) such other costs and expenses as Owner may approve in writing (collectively, "**Loan Management Advances**").  In the event the Seller makes a Loan Management Advance during a Collection Period, then upon the request of the Owner, the Seller will provide a report to the Owner, identifying for each Loan Management Advance, the date and amount of the Loan Management Advance, the person paid, the source of funds, the reason for the Loan Management Advance, and copies of corresponding invoices, to the extent applicable. Any Loan Management Advances made in violation of the foregoing shall not be subject to reimbursement.  Owner shall not be required to reimburse Seller for any Loan Management Advance or other expenditure made in violation of the terms of this Management Agreement (including without limitation any failure to obtain any required approvals).

(b)    Any Loan Management Advances incurred by the Seller in accordance with the terms of this Management Agreement on or after the applicable Closing Date will be the responsibility of, and be reimbursed by, the Owner. Owner will fund (or will authorize Seller to remit any payment due to Owner net of such amount) any such reimbursement with respect to Loan Management Advances, at Seller's option, on any Remittance Date or upon the repayment or liquidation of the applicable Loan. For the avoidance of doubt, any advances made by Servicer that would constitute Loan Management Advances if made directly by Seller shall be reimbursable as Loan Management Advances under the terms of this Management Agreement.

5.    **Compensation; Payments.**

(a)    As consideration for performing the Services hereunder, Seller shall be entitled to a fee with respect to each Loan (including any resulting property acquired through foreclosure or by deed in lieu of foreclosure) (the "**Seller Spread**") equal to (i) an annual servicing fee in accordance with the terms of each Loan Purchase Certificate based on a percentage of the outstanding principal balance of each Loan payable on a monthly basis for the term of such Loan, plus (ii) fifty percent (50%) of all ancillary servicing income (excluding the fees set forth in clause (i) hereof) derived from such Loan after the Closing Date, including, but not limited to, insufficient fund fees, wire fees, assumption fees, default interest, exit fees, modification fees, extension fees, prepayment penalties, inspection fees, title/survey update fees, and other customary servicing fees with respect to the Loan, plus (iii) all late charges and fees. For the avoidance of doubt, following a foreclosure sale or the acceptance of a deed in lieu of foreclosure, Seller shall continue to provide the Services with respect to the property acquired thereby, and to accrue its Seller Spread at the same rate based on the unpaid principal balance existing at the time of such foreclosure or deed in lieu of foreclosure. In the event that the seller of a Loan pursuant to the Purchase Agreement is not Seller (but is an affiliate of Seller), Seller confirms that the Seller Spread payable to Seller constitutes full and fair consideration for the services to be performed hereunder, it being acknowledged that Seller obtains direct and indirect benefits from the payment of such Seller Spread by virtue of its relationship with the seller of the Loan.

(b)      Seller shall, on each Remittance Date with respect to the related Collection Period, remit to Owner (to such account(s) which Owner may designate in writing) any collections required to be remitted to Seller pursuant to the terms of the Servicing Agreements, net of the Seller Spread, unreimbursed Loan Management Advances (which may at Seller's option be deferred for any Remittance Date and reimbursed, together with interest thereon from the date of such Loan Management Advance, upon the repayment or liquidation of the applicable Loan), any retained interest spread due to any third party, and any incremental subservicer or special servicing fees due to any person. As used herein, (i) "**Remittance Date**" shall mean the fifth (5th) calendar day of each month (or if such day is not a Business Day, the next following Business Day), or such other day as is mutually agreed to by Owner and Seller; and (ii) "**Collection Period**" shall mean (x) in the case of the first Remittance Date, the period from the Closing Date to and including the last calendar day of the month immediately preceding such Remittance Date, and (y) in the case of any subsequent Remittance Date, the calendar month immediately preceding such Remittance Date.

6.      **Commitment Funded Loans.**

(a)      In the event that any Loan purchased under the Purchase Agreement is identified in the Loan Purchase Certificate as a Commitment Funded Loan, the funding and disbursements of Commitment Funded Amounts with regard to each applicable Commitment Funded Loan shall be governed by this Section 6.  For purposes of this Management Agreement the term "**Commitment Funded Loan**" shall mean each Loan with respect to which the full loan amount has not been disbursed to or on behalf of the related Borrower, with such undisbursed portion (the "**Commitment Funded Amount**") to be disbursed to the related Borrower upon the satisfaction of certain conditions relating to construction, rehabilitation, leasing or other matters with respect to the related Property.

(b)      Seller shall monitor the progress of the repairs, rehabilitation or reconstruction of the related Property contemplated in the statement of work or other final plans and specifications approved by Seller as each stage is completed and promptly respond to Owner's reasonable requests for updates on such progress.  Seller shall keep and maintain, in an electronic format acceptable to Owner, an accounting, on a Loan by Loan basis, of the disbursement of any Commitment Funded Amount, in addition to all supporting documents for each Commitment Funded Amount. Seller shall hold all Commitment Funded Amounts in a segregated holdback account and shall disburse such Commitment Funded Amounts in accordance with the Loan Documents, subject to this Management Agreement and Accepted Servicing Practices.

7.      **Servicing Agreement**.  Seller and Servicer represent and warrant that (a) the form of Loan Servicing Agreement (the "**Form Agreement**") annexed hereto and made a part hereof as Exhibit A is true, accurate and complete in all respects as of the date hereof, and (b) each Servicing Agreement will be substantially in the form of the Form Agreement.  Seller acknowledges that it is solely responsible for payment of amounts owed under the Servicing Agreements and that in no event will Owner have any responsibility to Servicer for (i) payment of any amounts owed thereunder (provided that Owner shall be required to reimburse Seller for any and all incremental subservicing and special servicing costs attributable to any Loan that has been delinquent for thirty (30) or more days) or (ii) for any act or omission of Seller or its personnel or agents.  For avoidance of doubt, Servicer retains all rights under the Servicing Agreements and nothing herein modifies the same.

8.      **Reports and Records**.  Any and all correspondence, records, information, data and other documentation relating to the Loans in the possession of Seller shall be held solely for the benefit of Owner; it being understood and agreed that Seller shall promptly deliver copies thereof to Servicer and Owner. Seller, upon request of Owner, shall provide copies of all letters, notices and correspondence used by it (or any designee thereof) with any reference to Owner by name or that provides any contact

information with respect to Owner. Owner shall have the ability to review such letters, notices and correspondence prior to delivery and the parties hereto shall work in good faith to make any changes deemed necessary or appropriate by Owner. Seller shall provide to Owner copies of all reports and notices supplied by Servicer within five Business Days of Seller's receipt thereof.

9. **Exculpatory Provisions; Indemnification.**

(a)     Seller will be entitled to rely upon any notice, document, correspondence, request, directives or other communication received by it from the Owner that the Seller reasonably believes to be genuine and to have been signed or presented by an authorized officer or representative of the Owner, and will not be obligated to inquire as to the authority or power of any Person so executing or presenting any notice, document, correspondence, request, directive or other communication or as to the truthfulness of any statements therein.

(b)     Seller shall indemnify, hold harmless, and defend Owner and its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, the "**Owner Indemnified Parties**") from and against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorney fees, fees and the costs of enforcing any right to indemnification under this Management Agreement, incurred by any Owner Indemnified Party, relating to, arising out of or resulting from any third-party claim, demand or proceeding involving: (i) breach or non-fulfillment of any representation, warranty or covenant under of this Management Agreement by the Seller or any of its representatives or subcontractors or any of their respective affiliates or representatives; or (ii) any gross negligence or willful misconduct of Seller or any of its affiliates or any of their respective representatives, in each case as determined by a court of competent jurisdiction in a final, non-appealable judgment. The indemnification rights contained in this Section 9 shall be cumulative of and in addition to any and all other rights, remedies and recourses to which any Owner Indemnified Party shall be entitled, whether pursuant to some other provisions of this Management Agreement, at law or in equity. This Section 9 shall survive termination of this Management Agreement.

(c)     Owner shall indemnify, hold harmless, and defend Seller and its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, the "**Seller Indemnified Parties**") from and against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorney fees, fees and the costs of enforcing any right to indemnification under this Management Agreement, incurred by any Seller Indemnified Party, relating to, arising out of or resulting from any third-party claim, demand or proceeding involving: (i) breach or non-fulfillment of any representation, warranty or covenant under of this Management Agreement by the Owner or any of its representatives or subcontractors or any of their respective affiliates or representatives; (ii) any gross negligence or willful misconduct of Owner or any of its affiliates or any of their respective representatives; or (iii) Seller's compliance with any consent, directive, request or instructions of Owner, in each case as determined by a court of competent jurisdiction in a final, non-appealable judgment. The indemnification rights contained in this Section 9 shall be cumulative of and in addition to any and all other rights, remedies and recourses to which any Seller Indemnified Party shall be entitled, whether pursuant to some other provisions of this Management Agreement, at law or in equity. Serller and any Seller Indemnified Party may rely in good faith on (i) Owner's consents, directives, requests or instructions and (ii) any document of any kind prima facie properly executed and submitted by any Person relating to any matters arising hereunder. This Section 9 shall survive termination of this Management Agreement.

(d)    All claims of liability between the parties shall, regardless of the form or cause of action, be limited to direct damages and in no event shall either party be liable to the other party for any indirect, incidental, special, consequential (including, without limitation, damages attributed to lost profits, loss of goodwill, business interruption, or loss of data) punitive and exemplary damages, even if the other party has been advised of the possibility of such damages.

10.    **Termination**.

(a)    This Management Agreement may be terminated, as a whole or with respect to any Loan, upon the occurrence of any of the following: (i) any failure on the part of Seller or Servicer to abide by Accepted Servicing Practices, or any failure of Seller to abide by the terms of this Management Agreement or the Purchase Agreement, in each case, in any material respect, which is not cured within thirty (30) days after the date on which written notice of such failure has been given to Seller by Owner, (ii) any termination of a Servicing Agreement while any Loan subject to such Servicing Agreement is still outstanding, (iii) the entry into any material amendment of a Servicing Agreement that is entered into without Owner's prior written approval, (iv) in the event that Servicer does not agree to provide servicing for such Loan pursuant to a Servicing Agreement or ceases to provide servicing for such Loan pursuant to a Servicing Agreement, or (v) in the event of the occurrence of any event that would permit Seller to terminate a Servicing Agreement (in whole or with respect to such Loan) unless Owner and Seller jointly agree in writing to continue the Servicing Agreement, or agree in writing for Seller to cause the Loan to be serviced by a mutually agreeable third party servicer.

(b)    Upon early termination of this Management Agreement with respect to any outstanding Loan, and only to the the extent such early termination was not caused by Seller's or Servicer's default of this Management Agreement or the Servicing Agreement, Seller will still be entitled to collect (i) the Seller Spread with respect to such Loan for the remainder of the term of such Loan, (ii) all costs and expenses of Seller relating to such termination, (iii) any special servicing costs and expenses due to Servicer, and (iv) the costs of transferring servicing to any successor servicer. Owner shall pay or reimburse Seller for all accrued and unpaid Seller Spread, unreimbursed Loan Management Advances and any other amounts due Seller under this Management Agreement prior such termination.

(c)    This Management Agreement and Seller's obligations hereunder with respect to the Loans shall terminate upon the distribution of the final payment or liquidation proceeds on the last Loan to Owner and the full satisfaction and release of such last Loan.

(d)    The expiration or termination of this Management Agreement will not release any Party from liability for its own misrepresentation or for any breach by it prior to such expiration or termination of any covenant or agreement contained herein.

11.    **Notices**.  All notices, consents, approvals or other communications required or permitted to be provided by this Management Agreement shall be in writing and shall be sent (i) by first-class certified United States mail, postage prepaid, return receipt requested; (ii) by a nationally recognized overnight delivery service, marked for next business day delivery; or (iii) by email transmission.  All notices shall be addressed to the Party to whom such notice is to be given at the following addresses:

> If to Owner:    PS Portfolio – ST1, LLC
> 2121 Park Place, Suite #250
> El Segundo, California 90245
> Attention: Legal Department
> Email: legal@peerstreet.com
>
> If to Seller:    PS Funding, Inc.
> 2121 Park Place, Suite #250

El Segundo, California 90245
Attention: Legal Department
Email: legal@peerstreet.com

or to such other address as a party may designate by written notice to the other.  All notices shall be deemed effective on the earliest of (A) actual receipt; if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing (B) if sent by overnight delivery service, on the next day on which such service makes next business day deliveries after the day of sending or (C) if sent by email, on the day in which such email is sent (unless an automated delivery failure notice is received by the sender immediately following the sending of the email).

12.    **Severability**.  Any provision of this Management Agreement which shall be held by a court of competent jurisdiction to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and such other provisions or terms shall remain in full force and effect.

13.    **Assignment**.  This Management Agreement may not be assigned by Seller or Owner without the prior written consent of the other party, which consent may be granted or withheld in such other party's sole and absolute discretion; provided, however, that Owner shall have the right to assign this Management Agreement without Seller's consent to any entity controlled by, controlling or under common control with Owner. Seller will cooperate with Owner's reasonable requests in connection with Owner's future financing arrangements, provided Owner pays Seller's reasonable out-of-pocket costs, if any, in connection with such cooperation. Seller will cooperate with Owner's reasonable requests in connection with a future securitization by or on behalf of Owner, provided that (i) any such requests for cooperation are reasonable and do not adversely impact the regular operation of Seller's business, and (ii) Owner pays all reasonable out-of-pocket costs incurred by Seller in connection with such cooperation.

14.    **Binding Effect**.  This Management Agreement shall be binding upon and inure to the benefit of each of Seller and Owner and, subject to the terms of this Management Agreement, their respective permitted heirs, legal representatives, successors and assigns, subject to the limitations set forth in this Management Agreement.

15.    **Governing Law**.  This Management Agreement shall be governed by and construed in accordance with the laws of the State of California.

16.    **Jurisdiction**.  Each of the parties hereto hereby consents to the exclusive jurisdiction and venue of the Federal and State Courts located in the State of California, with respect to any matter relating to this Management Agreement and performance of the parties' obligations hereunder, and each of the parties hereto hereby consents to the personal jurisdiction of such courts and shall subject itself to such personal jurisdiction.

17.    **WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO VOLUNTARILY, KNOWINGLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED ON, ARISING FROM, OR RELATED TO THIS MANAGEMENT AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS MANAGEMENT AGREEMENT, IN ANY ACTION, PROCEEDING, OR OTHER LITIGATION OF ANY TYPE BROUGHT BY EITHER PARTY AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM, OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS MANAGEMENT AGREEMENT.  THIS WAIVER SHALL APPLY TO ANY FUTURE AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS MANAGEMENT AGREEMENT.

18.    **No Waiver; Cumulative Rights**.    The rights, powers and remedies of the parties hereunder are cumulative and in addition to all rights, powers and remedies provided under any and all agreements between the parties relating hereto, at law, in equity or otherwise.  No waiver under this Management Agreement is effective unless it is in writing and signed by the party waiving its right. Any waiver authorized on one occasion is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion. None of the following constitutes a waiver or estoppel of any right, remedy, power, privilege or condition arising hereunder: (i) any failure or delay in exercising any right, remedy, power or privilege or in enforcing any condition under this Management Agreement; or (ii) any act, omission or course of dealing between the parties.

19.    **Reserved**.

20.    **Further Assurance and Acts**.    From time to time, each party shall (i) execute and deliver to the requesting party such additional documents, (ii) provide such additional information and (iii) do such further acts, as said party may reasonably require to effectuate the intent and purposes of, and to carry out the terms of, this Management Agreement, and any agreements executed in connection herewith or therewith.

21.    **Counterparts**. This Management Agreement may be executed in one or more counterparts, each of which shall be an original but all of which, taken together, shall constitute one and the same instrument. The exchange of signature pages by facsimile or portable document format (PDF) transmission or other electronic transmission shall constitute effective delivery of those signature pages and may be used in lieu of the original signature pages for all purposes. Signatures of the parties transmitted by facsimile or portable document format (PDF) shall be deemed original signatures for all purposes.

22.    **Protecting Customer Information**. Each party agrees that it shall comply with all applicable laws and regulations regarding the privacy or security of Customer Information and shall maintain appropriate administrative, technical and physical safeguards designed to protect the security, confidentiality and integrity of Customer Information, including, if applicable, maintaining security measures designed to meet the Interagency Guidelines Establishing Standards for Safeguarding Customer Information, 66 Fed. Reg. 8616, and complying with the privacy regulations under Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., and the rules promulgated thereunder.  As used in this Section, "**Customer Information**" means any personal information concerning a Borrower that is disclosed by one party to the other party.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS THEREOF, the parties hereto have caused this Management Agreement to be executed as of the date set forth above.

**SELLER:**

**PS FUNDING, INC.**

By: _____
Name: Brewster Johnson
Title: President

**OWNER:**

**PS PORTFOLIO – ST1, LLC**

By:     PS FUNDING, INC.,
        a Delaware corporation,
        its Sole Member

By: _____
Name: Brewster Johnson
Title: President

EXHIBIT A

Form of Loan Servicing Agreement

(see attached)

**EXHIBIT 3**

**FOR OFFERINGS OF REAL ESTATE SECURITIES THROUGH THE**

# PeerStreet Platform's Pocket Product

### RWN SUPPLEMENT:
### REDEEMABLE WAREHOUSE NOTES ("RWN")
### OFFERED BY PEER STREET FUNDING, LLC

---

1.  **About this RWN Supplement**

This RWN Supplement provides information on the Redeemable Warehouse Notes, or RWNs, that PeerStreet intends to offer, and issue through its affiliate Peer Street Funding, LLC, or PSFLLC, from time to time as part of its Pocket product initiative, and describes the specific risks associated with RWNs.  In general, as described in more detail below, the RWNs provide investors indirect fractional interests in a loan (the "Warehouse Loan") made by PSFLLC to PS Warehouse, LLC ("Warehouse LLC").

When Investors purchase RWNs from PSFLLC, proceeds from the sale of the RWNs are lent by PSFLLC to Warehouse LLC. The funds lent by PSFLLC to Warehouse LLC are called Warehouse Funds. Investors are then entitled to their pro rata share of the interest earned by PSFLLC from the Warehouse Loan. ***Interest on the RWNs is automatically capitalized in the RWN and reinvested in Pocket, until the earliest of the RWN's Maturity Date or the Investor's Redemption date***.

Warehouse LLC is a subsidiary of PeerStreet's lending entity, PS Funding, Inc. ("PSFI") and will use Warehouse Funds to purchase participations in Mortgage Loans at the time that they are originated or acquired by PSFI. PSFI is a guarantor on the Warehouse Loan.

**Pocket is not a checking account, savings account, CD, or other banking product; it is an investment product that provides Investors with the indirect right to payments that are made on the Warehouse Loan.**

**RWNs are not FDIC or SIPC insured; their performance and repayment is not guaranteed and depends on a variety of factors including, without limitation, Warehouse LLC's solvency, PSFI's solvency, and the Financed Loans' value.**

In this RWN Supplement, unless otherwise specified or required by context, we use the following terms:

-   "**Investors**" are holders of RWNs;

-   "**Financed Loans**" are Mortgage Loans acquired by PSFI, in which Warehouse LLC acquires Participation Interests;

-   "**Form Instrument**" refers to the form RWN issued to Investors who invest in Pocket, a copy of which is available as an exhibit following this RWN Supplement;

- "**Lender**" is any third-party or PeerStreet-affiliated lender, broker, or real estate company that requests funding for Mortgage Loans;

- "**Mortgage Loan**" is a specific mortgage loan that is originated or purchased by PSFI;

- "**Participation Interests**" are participation interests, assignments of security instrument, whole loan purchases, or other similar interests in Mortgage Loans that Warehouse LLC acquires with the use of Warehouse Funds;

- "**PeerStreet**" refers collectively to PSFLLC, PSI, PSFI, Warehouse LLC, and any PSI affiliate;

- "**PeerStreet Platform**" is the investing platform sponsored by PeerStreet that is described in the PPM;

- "**Pocket**" is the marketing name of the investment product for which RWNs are issued;

- "**PPM**" is the private placement memorandum, dated December 2, 2019, associated with this RWN Supplement that summarizes the terms and conditions for various offerings of Real Estate Securities, including RWNs, through the PeerStreet Platform;

- "**PSFLLC**" is Peer Street Funding, LLC, a Delaware limited liability company, and is the issuer of RWNs offered under the PPM and this RWN Supplement;

- "**PSFI**" is PS Funding, Inc., a Delaware corporation in the business of originating, purchasing, and selling loans secured by real property. For purposes this RWN Supplement, any reference to PSFI shall also include other PSI Affiliates whose role and structure will be similar to PS Funding, Inc.'s;

- "**PSI**" is Peer Street, Inc., a Delaware corporation;

- "**PSI Affiliate**" is any affiliate of PSI, PSFLLC or PSFI;

- "**RWNs**" are debt securities issued by PSFLLC that provide Investors with the indirect right to receive certain payments made by Warehouse LLC to PSFLLC;

- "**RWN Supplement**" is this supplement to the PPM for RWNs that summarizes the terms and conditions of the RWNs and describes the specific risk factors that apply to RWNs;

- "**Special Member**" refers to a third-party, independent member who does not directly own any equity interest in Warehouse LLC and does not have any day-to-day management authority, but will have some limited oversight authority over the affairs of Warehouse LLC;

- "**Warehouse Funds**" are the monies lent by PSFLLC to Warehouse LLC pursuant to the Warehouse Loan, which monies may be used by Warehouse LLC to acquire Participation Interests;

- "**Warehouse LLC**" is PS Warehouse, LLC, a Delaware limited liability company, whose sole equity member is PSFI; and

- "**Warehouse Loan**" refers to, in the aggregate, the Warehouse Funds, together with the terms and agreements governing the extension of Warehouse Funds from PSFLLC to Warehouse LLC (including the guaranty from PSFI and other loan documents), which terms may supplement, but not contradict (without prior notice to Investors) the terms set forth in this RWN Supplement or on the Pocket Dashboard.

Any capitalized term not defined in this RWN Supplement shall have the same meaning as in the PPM. RWNs will be offered for sale, from time to time, on the PeerStreet Website, with specific terms such as the interest rate, amount being offered, and other relevant terms, if any, on a page (the "**Pocket Dashboard**") specific to Pocket and the RWNs. In the event of a conflict between the terms of this RWN Supplement and the PPM, the terms of the RWN Supplement shall control. In the event of a conflict between the terms of this RWN Supplement and that of the Pocket Dashboard, the terms of the Pocket Dashboard shall control.

All summaries in this PPM are qualified in their entirety by reference to the other offering materials. Please refer to "<u>Where to Find Additional Information</u>" in the PPM for information on how to contact PeerStreet for additional information.  You should consult the Pocket Dashboard and Form Instrument for the RWNs in order to review and evaluate the specific terms and conditions that apply to the RWNs.

## 2.   <u>About the RWNs We May Offer</u>

Pocket is an investment product developed and offered by PeerStreet that aims to allow Investors to act as a lender or capital provider to Warehouse LLC, and by extension to PeerStreet's lending entity (PSFI), through the issuance of RWNs by PSFLLC. The RWNs are notes issued by PSFLLC that provide Investors the indirect right to interest payments that are made by Warehouse LLC to PSFLLC, under the terms of the Warehouse Loan.

*Background on Warehouse LLC and PSFI's Business*

Warehouse LLC is a wholly-owned subsidiary of PSFI formed for the purpose of purchasing Participation Interests in Mortgage Loans at or near the time that those loans are funded by PSFI. PSFI works with numerous Lenders that source Borrowers and lending opportunities. Lenders may fund Mortgage Loans independently and then sell them to PSFI, or request that PSFI fund the Mortgage Loans at origination. On some occasion, Borrowers may directly request funding from PSFI. Based on its review of certain loan attributes, PSFI may originate, purchase, or participate in a loan.

In order to fund these loans, PSFI typically uses financing arrangements, known as warehouse financing, provided by multi-national banks and other credit providers. Under warehouse financing arrangements, banks, hedge funds, and other credit providers provide PSFI with the monies necessary to fund its origination or purchase of loans. After funding Mortgage Loans, PSFI endeavors to sell those loans, or interests therein, to investors on the PeerStreet Platform or to institutional whole loan purchasers. If and when PSFI can complete the sale of a given Mortgage Loan, it uses sale proceeds to pay back its warehouse financing sources.

*Pocket and PSFLLC*

Pocket is a product initiative designed to give Investors on the PeerStreet Platform an opportunity to invest in a warehouse capital provider-like function, by purchasing RWNs from PSFLLC, a Delaware limited liability company that provides Warehouse LLC with Warehouse Funds, while also offering Investors the ability to redeem their RWN investment at certain intervals.

Warehouse LLC's sole equity member is PSFI, but Warehouse LLC also has a Special Member. While PSFI, as sole equity member, has most decision-making authority over Warehouse LLC's management, the Special Member has limited oversight rights and can assume management of the entity in the event that PSFI become insolvent or otherwise ceases to be able to discharge its management duties.

*PSFLLC's Warehouse Credit Facility*

As PSFI decides to fund certain Mortgage Loans, Warehouse LLC may acquire Participation Interests in those loans through the use of Warehouse Funds. Mortgage Loans in which Warehouse LLC purchases Participation Interests with the use of Warehouse Funds are referred to herein as Financed Loans. Warehouse LLC will typically retain Participation Interests in each Financed Loan until PSFI sells the Financed Loan to an end-buyer or investor. Upon the disposition of a Financed Loan or PSFI's repurchase of the Participation Interests, Warehouse LLC will receive its pro rata proceeds (which may be the entirety of sale proceeds, if Warehouse LLC purchases Participation Interests representing 100% of the Financed Loan) and may use the proceeds to acquire new Participation Interests.

Although PSFLLC may advance the entirety of Warehouse Funds in advance of Warehouse LLC purchasing any Participation Interests, Warehouse LLC shall not be permitted to use Warehouse Funds for any purpose other than acquiring Financed Loans (or Participation Interests therein) and making servicing advances for such loans if necessary. Under the terms of the Warehouse Loan, PSFI shall have ninety (90) days, from the day that Warehouse LLC acquires Participation Interests, to sell or assign any given Financed Loan to another investor or to otherwise repurchase Warehouse LLC's Participation Interests therein. When not used to acquire and hold Participation Interests, Warehouse Funds advanced to Warehouse LLC shall be held in cash.

It is important to note that while PSFLLC serves as a capital provider, it does not itself underwrite the loans originated or acquired by Warehouse LLC or PSFI. PeerStreet operates a marketplace and decisions to fund a loan is neither indicative of that loan's or borrower's creditworthiness nor a recommendation to invest in that loan or a corresponding security.

*RWNs*

PSFLLC is the issuer of the RWNs, which represent special limited obligations of PSFLLC and whose payment are dependent on Warehouse LLC's payments to PSFLLC pursuant to the Warehouse Loan.

For example, after PSFLLC receives Investors' investments via the sale of RWNs, it may advance those funds (as Warehouse Funds) to Warehouse LLC, who may then use those funds to acquire Participation Interests. While PSFI will typically retain title, legal ownership, and some servicing rights with respect to the Financed Loans, Warehouse LLC's Participation Interests will serve as security or collateral for the Warehouse Funds. In return for PSFLLC providing Warehouse Funds, Warehouse LLC shall pay to PSFLLC interest, on a monthly basis, although this interest may be allowed to accrue until the Warehouse Loan's Maturity Date, Warehouse LLC's repayment of the Warehouse Loan, Investor Redemption, or other events requiring Warehouse LLC to pay back sums due under the Warehouse Loan.

Warehouse LLC, and PSFI as guarantor, will be responsible for making payments to PSFLLC regardless of the performance of the underlying Financed Loans. The foregoing notwithstanding, it is important for Investors to note that investing in RWNs carries some loan-level risks, as (among other risks) loan non-performance might affect Warehouse LLC's ability to make payments on the Warehouse Loan and impairment of the Financed Loans' value might decrease the value of PSFLLC's collateral. Similarly, PSFI's primary revenue source comes from the servicing of loans on the PeerStreet Platform and a sudden drop in servicing revenues could impact its ability to fulfill its obligations under the guaranty.

In the event that Warehouse LLC or PSFI fail to make interest payments or principal repayments to PSFLLC, or otherwise default under the terms of the Warehouse Loan, PSFLLC shall have the right to take ownership of the Financed Loans. In situations where PSFLLC holds or takes legal title to the Financed Loans, it may retain PSFI to perform certain servicing-related functions.

So long as Warehouse LLC and PSFI are not in default under the Warehouse Loan, they shall be entitled to all income from the Financed Loans.  Warehouse LLC and PSFI may use those funds, or funds from other sources (such as corporate funds), to pay the interest it owes to PSFLLC. Investors in RWNs are, in turn, entitled to receive their pro rata interest payments from PSFLLC at the rate listed in the Pocket Dashboard.

PSFI is not a bankruptcy-remote entity and is the sole equity member of Warehouse LLC, but Warehouse LLC has a Special Member with the authority to dispose of the Financed Loans securing PSFLLC's warehouse facility and pay back PSFLLC in the event that PSFI files for bankruptcy. Warehouse LLC itself cannot voluntarily file for bankruptcy without the Special Member's consent.

Although Warehouse Funds, and by extension Investors' monies invested in RWNs, are expected to always be held in cash or to be collateralized by interests in Financed Loans, investing in RWNs can result in the loss of some or all of Investors' investment in RWNs if, without limitation, PSFI were to become insolvent or the value of the Financed Loans were to become materially impaired. PSFI, Warehouse LLC's sole equity member, is a guarantor on the Warehouse Loan. PSFI's revenue sources come primarily from lending and servicing activities. Peer Street, Inc. ("PSI"), PSFI's venture-backed parent entity, is not an obligor or guarantor under the Warehouse Loan and does not guarantee repayment of Warehouse Funds or of RWNs.

**3.   Summary of Terms**

*This summary provides key terms of the RWNs and highlights selected information contained elsewhere in or incorporated by reference into this RWN Supplement.  It does not contain all of the information that you should consider before making an investment decision.  For a more complete understanding of the applicable offering of RWNs, you should read the entirety of this RWN Supplement, the PPM, the Pocket Dashboard and Form Instrument for the RWNs, and the Investor Agreement.  Please read this RWN Supplement and the PPM in their entirety (including the risk factors described in the "Risk Factors Related to the RWNs" section of this RWN Supplement and the "General Risk Factors" section of the PPM for more information about important factors you should consider before investing in the RWNs).*

| Issuer | Peer Street Funding, LLC, a Delaware limited liability company, or PSFLLC. |
|---|---|

| | |
|---|---|
| **RWNs Offered** | RWNs, to be issued from time to time via the Pocket Dashboard, corresponding to a dollar-for-dollar portion of the Warehouse Loan extended by PSFLLC to Warehouse LLC. |
| | Investors are entitled to receive their pro rata share of interest payments made by Warehouse LLC to PSFLLC. |
| | **The RWNs represent a limited obligation of PSFLLC. Interest and principal distributions on the RWNs are dependent on Warehouse LLC's payment of principal and interest to PSFLLC. PSFI, Warehouse LLC's sole member primarily engaged in lending and servicing activities, is a guarantor on the Warehouse Loan. PSI, PSFI's venture-backed parent entity, is neither a borrower nor guarantor under the Warehouse Loan.** |
| | **In the event that Warehouse LLC defaults under the terms of the Warehouse Loan, and unless PSFLLC grants Warehouse LLC a temporary forbearance, distributions may be indefinitely delayed as PSFLLC takes legal ownership of the Financed Loans serving as collateral for the Warehouse Funds and either collects interest on those loans or liquidates them. In such an event, Investors in the RWNs will be entitled to their pro rata proceeds from payments on, or liquidation of, the Financed Loans, net of servicing fees and other customary advances, fees, and costs incurred in the servicing, management, and disposition of the Financed Loans.** |
| **Amount of RWNs Issued** | The RWNs you purchase through the Pocket Dashboard will represent an indirect dollar-for-dollar interest in the Warehouse Loan extended by PSFLLC to Warehouse LLC. PSFLLC initially intends to sell $20,000,000 of RWNs although it may increase or decrease this amount in its sole and absolute discretion, at any time and without notice, depending on Investors' demand for RWNs, on Warehouse LLC and PSFI's demand for Warehouse Funds, and on other factors that PSFLLC deems appropriate. |
| | Unless stated otherwise on the Pocket Dashboard, the minimum initial RWN investment will be $1,000. Subsequent investments may have different or no minimums. PSFLLC reserves the right to modify these amounts at any time. |
| | The RWNs, and your rights as an investor in the RWNs, are at all times subject to the Investor Agreement, which will also be available on the Platform for your reference and review. In the event of conflict between the terms of the Investor Agreement and this RWN Supplement, the terms of the RWN Supplement shall govern. At the time you commit to purchase an RWN, you must have sufficient funds in your account with PeerStreet to complete the purchase. |
| **Mortgage Loans, Use of PSFLLC Funds, and PSFLLC's Collateral** | Warehouse LLC shall only be permitted to use Warehouse Funds to acquire Participation Interests and service Financed Loans (if necessary) prior to PSFI's resale of such loans or repurchase of Participation Interests. Each Financed Loan must be secured by a deed of trust, mortgage, security agreement, or a participation in similar instruments, granting PSFI or Warehouse LLC a senior, first-position interest in that instrument. Financed Loans may either be originated by third-party |

|  | lenders and purchased (in whole or in part) by PSFI (or an affiliate) or originated by PSFI itself.

PSFLLC itself will not own the Participation Interests in Financed Loans. In the event of Warehouse LLC's default under the Warehouse Loan, however, PSFLLC shall have the right to take possession of the Participation Interest (or economic interests therein), in which case PSFLLC may first need to record assignments of security instruments or follow other legal procedures prior to taking full control and ownership of the Financed Loans.

Warehouse LLC and PSFI holds the first risk of loss in the Financed Loans relative to PSFLLC and, by extension, RWN holders. In other words, interest owed by Warehouse LLC (and PSFI as guarantor) to PSFLLC accrues as scheduled, regardless of the performance of the Financed Loans. In the event that Warehouse LLC defaults under the terms of the Warehouse Loan and that the Financed Loans then-held by PSFI are also in default, PSFLLC may need to foreclose on the underlying real estate or sell the Financed Loans, potentially at a loss, and such risk of loss would then be borne by you, as an Investor in the RWNs. PSFLLC's ability to foreclose and collect payments may then be dependent on third parties, and you may incur losses based on that third party's efforts or lack thereof.  Payment to Investors in any RWN is entirely dependent on PSFLLC receiving payment from Warehouse LLC and PSFI or, in the event of Warehouse LLC's default, on the performance and/or sale of the Financed Loans. Investors are bound by PSFLLC's good faith decision-making regarding the management of the Warehouse Loan and the servicing, managing, and disposition of any Financed Loan (if applicable). |
|---|---|
| **No Security Interest Held by Investors in RWNs** | Investors in RWNs will have a claim to their share of funds held by PSFLLC, but will not have any security interest in the assets of PSFLLC, PSFI, PeerStreet, any borrower or lender, any Financed Loan, any proceeds from any Financed Loan or in the assets of any borrower or lender (including any PSI affiliate acting as lender) associated with any Financed Loan.  RWNs will be unsecured special, limited obligations of PSFLLC. Warehouse LLC and PSFI are liable to make payments to PSFLLC, but are not directly liable to RWN holders. Accordingly, in the event of Warehouse LLC's default under the Warehouse Loan, Investors in RWNs will not be capable of enforcing the terms of the Warehouse Loan against Warehouse LLC themselves and will instead need to rely on PSFLLC's collection efforts. |
| **Interest** | Subject to the limitations described in this RWN Supplement or as stated otherwise on the Pocket Dashboard, the amount of interest an Investor will receive will be 2.00% (annualized) (the "RWN Rate").  RWNs will begin accruing interest on the day following an Investor's purchase of such RWN. Interest is computed on an Actual/Actual basis and accrues in arrears.

**The RWN rate is variable and may change on thirty (30) days notice. Accrued interest on the RWNs is automatically capitalized and reinvested on the first day of each calendar month.**

If the RWN Rate changes, PeerStreet will notify investors either via email, the Pocket Dashboard, or elsewhere on the PeerStreet Platform. Investors desiring to |

| | |
|---|---|
| | redeem their investment in RWNs due to a change to the RWN Rate, or for any other reason, can do so upon the Redemption terms described further below. |
| **Interest Payment Dates and Reinvestment** | Subject to the limitations described in this RWN Supplement or as stated otherwise on the Pocket Dashboard, RWNs will accrue interest daily, beginning on the day after each such investment is made. Interest payments to Investors will be payable and capitalized by PSFLLC monthly, in arrears, on the first day of each month. |
| | ***Interest payments on the RWNs will be automatically capitalized and reinvested in RWNs, on the first day of each month. Investors desiring to withdraw their funds from Pocket can do so in accordance with the Redemption terms below.*** |
| | Daily accrual means that Investors will be entitled to interest for each day that their RWN is outstanding, but the monthly in arrears payment schedule means that interest will not be capitalized (and thus begin accruing its own interest) until the first day of the following month. |
| | Withdrawal of interest payments to Investors' PeerStreet account will be governed by the Redemption rules outlined below and the terms of the Investor Agreement. |
| | Notwithstanding the foregoing, PSFLLC shall only be obligated to make interest payments on the RWNs to the extent that PSFLLC receives a corresponding payment from Warehouse LLC or PSFI relating to the Warehouse Loan. |
| **RWN Maturity Date** | RWNs mature, and repayment of Investors' principal and accrued interest will be due in full, on December 31, 2029 (the "Maturity Date"). The foregoing notwithstanding, Investors may redeem their RWN investment at an earlier date, in accordance with the Redemption rules outlined below. |
| | RWNs may be paid off by PSFLLC, in full or in part, without penalty, at any time prior to Maturity Date, in which case interest on the RWNs will only be payable through such payoff date. In such scenarios, Investors may not receive as much interest as if the RWNs remained outstanding through the Maturity Date. |
| **Redemptions and Limitations on Payments of Interest and Principal** | Subject to the terms of this RWN Supplement, Investors will have the right to redeem and withdraw part or all of their RWNs (each withdrawal, a "Redemption") prior to the Maturity Date. |
| | Investors desiring to redeem their RWN must request a Redemption through the Pocket Dashboard no later than the 15th day of the month prior to the date of their desired Redemption (or, if such day is on a weekend or bank holiday, the preceding |

business day) (the "Redemption Cutoff Date"). For illustrative purposes, an Investor desiring to redeem their RWN on November 1st of a given year must provide notice no later than October 15th of that year, unless that October 15th is a weekend or bank holiday, in which case notice must be given on the preceding business day.

Barring any Liquidation Trigger (as described below in this section), Redemption requests will be processed, and monies returned to Investors' PeerStreet account, no later than the 1st day of the month following the Redemption request (or, if such day is on a weekend or bank holiday, on the next business day); provided, however, that requests received after the Redemption Cutoff Date of the previous month will not be processed until the 1st day of the subsequent month. Monies invested in RWNs will not be investable in other PeerStreet investment products or withdrawable to Investors' bank accounts until the earlier to occur of (i) the Maturity Date or (ii) Redemptions being processed. PeerStreet may in the future enable Investors to immediately transfer funds from RWNs to other investment products or to withdraw directly to their bank accounts (bypassing the need to first go to Investors' regular PeerStreet account), but those features do not yet exist and may never be developed.

While PSFLLC endeavors to timely meet all Redemption requests, the availability of cash to be redeemed depends on a number of factors including, without limitation, how much of the Warehouse Funds are being held in cash (as opposed to in Financed Loans) at any given time. Warehouse LLC is not obligated to keep any cash reserves and may invest all Warehouse Funds into Participation Interests at any given time.

As PSFLLC receives Redemption requests, it will make similar requests to Warehouse LLC under the terms of the Warehouse Loan. Subject to the conditions below, Warehouse LLC will be required to make the corresponding payment to PSFLLC, who will then use such funds to remit payments to Investors. If there aren't sufficient Warehouse Funds held in cash to meet a given month's request, Warehouse LLC will be responsible for selling its Participation Interests or finding other capital sources (including, without limitation, PSFI as guarantor) to remit payment to PSFLLC.

In order to protect Investors' interest in RWNs and the value of the collateral for the Warehouse Funds, as well as to allow for the orderly distribution of Investor principal and interest and the orderly sale of Participation Interests or Financed Loans (if necessary), PSFLLC may (in its sole and absolute discretion) elect to temporarily halt Redemptions upon the occurrence of any of the following events:

- If more than 25% of then outstanding principal due on all RWNs issued by PSFLLC is redeemed within a single calendar month (a "Material Aggregate Redemption") and Warehouse LLC fails to timely pay back the corresponding sums to PSFLLC;

- If Warehouse LLC defaults under the terms of the Warehouse Loan;

- If Warehouse LLC or PSFI make an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, files a petition or answer seeking for itself any reorganization,

arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or seeks or consents to the appointment of a trustee, receiver or liquidator for itself or of all or any substantial part of its assets; or

- If reasonably necessary in the good faith opinion of PSFLLC to allow for the orderly liquidation of the Pocket program and the return of Investors' monies.

A halt in Redemptions shall be considered a "Liquidation Trigger." Upon a Liquidation Trigger occurring, the Warehouse Loan shall be suspended and Warehouse LLC shall be barred from using any Warehouse Funds then held in cash for the acquisition of additional Participation Interests.

In the event of a Material Aggregate Redemption, Warehouse LLC shall have ninety ("90") days, from the day that PSFLLC notifies it of such an event, to pay back to PSFLLC all sums due under the Warehouse Loan. In the event that Warehouse LLC fails to pay back all sums within this time period, PSFLLC shall be entitled to exercise its rights and remedies against Warehouse LLC and PSFI to their fullest extent, including, without limitation, taking title to the Financed Loans or Participation Interests and disposing of such loans or interests as it deems fit in order to return sums owed to RWN holders.

In the event of a Liquidation Trigger, PSFLLC is under no obligation to immediately liquidate Financed Loans, but will proceed with the liquidation of Finance Loans in its discretion. The timing of post-Liquidation Trigger distributions of principal and interest to Investors may vary greatly, depending on prevailing market conditions, the payment status of Financed Loans, and other factors. In these circumstances, PSFLLC will endeavor to distribute cash to Investors as it becomes available, but may elect (in its sole and absolute discretion) to retain some cash as reserves to cover third-party fees and costs (such as, without limitation, servicing fees, legal fees, servicing advances, etc.) associated with the Liquidation Trigger and subsequent disposition of Financed Loans.

All payments made to Investors after a Liquidation Trigger will be net of any fees and expenses, charges or other reimbursements payable to PSFLLC and third-party service providers. If the post-Liquidation Trigger sale of Financed Loans by PSFLLC generates greater returns than was owed to holders of RWNs prior to the Liquidation Trigger, the Investors will be entitled to all excess returns. Conversely, however, if the post-Liquidation Trigger sale of Financed Loans does not generate sufficient cash to pay all expenses and return all sums owed to Investors, and neither Warehouse LLC nor PSFI can cover the shortfall, Investors may lose some or all of their RWN investment. While Warehouse LLC and PSFI may be liable to PSFLLC for any shortfall, PSFLLC's obligations to Investors is limited to monies actually received from Warehouse LLC and PSFI and/or the sale of Financed Loans.

| | |
|---|---|
| **Fees** | PSFLLC does not charge Investors fees in connection with the sale of, and distribution of payments under, the RWNs.<br><br>The foregoing notwithstanding, upon a Liquidation Trigger, PSFLLC may incur fees, costs, and charges, in connection with the servicing or liquidation of Financed Loans, the enforcement of its rights against Warehouse LLC and PSFI, and other similar circumstances. In such an event, PSFLLC shall be entitled to full reimbursement of such fees, costs, and charges, prior to proceeds being distributed to Investors. PSFLLC may engage affiliates to perform the aforementioned services, provided that such services are performed at prevailing, fair, arm's length rates.<br><br>Other examples of advances that PSFLLC may elect to make in the event that it takes legal title to Financed Loans after a Liquidation Trigger include, without limitation: (i) foreclosure related fees and costs (such as attorneys' and property management fees), (ii) property taxes, (iii) property maintenance and/or repairs, (iv) broker fees, (v) miscellaneous legal or other professional fees and expenses, (vi) other encumbrances, etc.  In order of make advances, PSFLLC may need to take loans from third-parties or related entities, in which case these loans may have priority in repayment over funds to be distributed to Investors.<br><br>PSFLLC may make these advances when, in its sole and absolute discretion, it determines in good faith that making these advances will ultimately be the most effective course of action. PSFLLC is under no obligation to make any advance and PSFLLC's decisions regarding when to make an advance may differ from what an individual Investor would do. PSFLLC may also, in its sole and absolute discretion, reduce or waive some fees and costs. When PSFLLC elects to make advances, it shall be entitled to recover such advances prior to any payments being made to Investors. Advances will be reimbursed prior to any funds being distributed on RWNs. If the Financed Loans cannot be sold and go into default, PSFLLC may need to foreclose on such loans and take title to the underlying property (each, an "REO"), in which case additional expenses may be incurred. |
| **Defaults and Deferrals** | Pursuant to the terms of the Warehouse Loan, Warehouse LLC and PSFI may have grace periods to cure potential defaults.  If Warehouse LLC and PSFI fail to timely cure a default, PSFLLC may exercise its discretion in the timing of the filing of any legal action or contractual remedy and may also exercise its discretion in the timing of any foreclosure under the power of sale contained in the security instrument (if any) for each Financed Loan, including granting temporary forbearances for borrowers to cure defaults, based on PSFLLC's overall assessment of the default and market conditions generally. |
| **Extensions** | Upon the Maturity Date, PSFLLC and Warehouse LLC may elect to enter into an extension agreement, extending the term of the Warehouse Loan. In such an event, an Investor's RWN will continue accruing interest until the earliest of (i) Redemption by the Investor or (ii) the end of the extension term. |
| **Ranking** | RWNs will be limited, unsecured obligations of PSFLLC only and are not direct obligations of any borrower, lender, or PSFLLC affiliate, including PSFI and PSI. PSFLLC is the Investors' only counter-party and PSFLLC's obligations are limited to passing through payments received from Warehouse LLC and PSFI, if any. |

| No Sinking Fund | RWNs will not benefit from any sinking fund, which is a means of repaying debt through the issuance of a debt instrument requiring periodic payments to a trustee who retires part of that debt by purchasing the debt in the open market. |
|---|---|
| **Denomination** | Each RWN will be denominated in U.S. dollars. |
| **Issuance, Form and Registration of Ownership** | Investors in Pocket will receive a single RWN, which will be issued in electronic form on the PeerStreet Platform as soon as practicable following a given investment or interest reinvestment. As Investors invest more monies into, or redeem funds from, Pocket, the electronic RWN will be adjusted to reflect the new outstanding principal. Similarly, as the RWN Rate varies, each Investor's RWN on the PeerStreet Platform will be automatically updated.<br><br>RWN holders will not receive physical notes. |

### 4.    The Diligence Process

PeerStreet does not provide investment advice or make any representation as to any particular investment's desirability. While Warehouse Funds are made available to Warehouse LLC to acquire Participation Interests, PSFLLC does not independently underwrite these Loans. PSFI itself will typically fund loans based on its own investors' demand and generally limits its role to reviewing mortgage loan files associated with the borrower on the loan, obtaining some background information for the borrower, obtaining third-party opinions of value for any underlying real estate, and obtaining title insurance or coverage protection letters. Warehouse LLC will typically purchase Participations Interests on demand from PSFI. PSFLLC cannot guarantee accuracy, absence of mistakes, and/or outcomes.

Investors should perform their own respective due diligence on warehouse financing risks and RWNs, and should not rely on any evaluation or analysis performed by PeerStreet.  Investors should independently assess the risks associated with any investment, including, without limitation, repayment risk associated with RWNs, borrowers on Financed Loans, market risk associated with the property, and regulatory, casualty and environmental risks.

### 5.    Risk Factors Related to RWNs

*Investing in the RWNs involves a high degree of risk.  In deciding whether to purchase RWNs, you should carefully consider the following risk factors **in addition to those risk factors provided in the "General Risk Factors" section of the PPM**.  Any of the following risks could have a material adverse effect on the value of the RWNs you purchase and could cause you to lose all or part of your purchase price or could adversely affect future payments you expect to receive on the RWNs.  Only investors who can bear the loss of their entire investment should purchase RWNs.*

**Consider carefully the following risks related to the structure of the RWNs specifically:**

- You May Not Recover Principal or Interest.  Warehouse LLC (and PSFI as guarantor) are liable on the Warehouse Loan regardless of the performance of the Financed Loans. If Warehouse LLC and PSFI default on the Warehouse Loan, or PSFLLC otherwise does not receive all or part of the payments due thereunder, you will not receive the full principal and interest payments that you expect to receive on your RWNs, and you may not recover your original investment.  Although PSFLLC will seek to protect its interest in Warehouse Funds through various strategies, those strategies may not provide RWN holders with full protection of their principal, if any.

RWNs are limited obligations of PSFLLC, representing an indirect interest in PSFLLC's rights in the Warehouse Loan. As such, payments on the RWNs are dependent on Warehouse LLC's and PSFI's performance and solvency. PSFI engages in real estate lending and servicing operations, which are regulated, cyclical businesses with high costs of capital and where the use of debt and leverage is prevalent. Many factors could affect PSFI's solvency and, should PSFI become insolvent, payments to RWN holders may be indefinitely delayed and impaired. If PSFI or Warehouse LLC file for bankruptcy or otherwise becomes insolvent, this could also impact PSFLLC's ability to take legal ownership of Financed Loans, to liquidate those loans, or even to seize or distribute that portion of Warehouse Funds then-advanced to and held in cash by, Warehouse LLC.

Although Warehouse LLC and PSFI are liable regardless of the performance of Financed Loans, those loans' performance (or lack thereof) may affect Warehouse LLC and PSFI's ability to timely make payments on the Warehouse Loan. For example, if the borrower on an underlying Financed Loan fails to make payments due thereunder or such loan otherwise goes into default before the ninety (90) days PSFI has to sell its interest in such loan,  PSFI may need to extend the borrower's time to payoff the loan, structure alternative settlements and resolutions, and/or enter into foreclosure proceedings (where it has foreclosure rights) against the relevant borrower. The missing interest income and the impaired value of a Financed Loan may negatively impact PSFI's ability to make payments under the Warehouse Loan.

These same risks may also apply to PSFLLC directly if PSFLLC has to take over legal title to the Financed Loans due to a PSFI default or for other reasons. This means that, despite the fact that Warehouse LLC and PSFI are the expected primary sources of payments for the RWNs, Investors are also exposed to underlying real estate risk. In certain cases, PSFLLC may not be able to recover any of the Warehouse Funds.  As a result, an Investor that purchased an RWN may receive little, if any, of the unpaid principal and interest on that RWN.

- Security on, or Participation in, Financed Loans Does Not Eliminate Risk of Default.  The Participation Interest collateral for Warehouse funds do not ensure timely repayment or remove the risk of loss.  PSFLLC may have to follow certain procedural and/or legal measures to take title to Financed Loans in the event of a default under the Warehouse Loan. This could delay PSFLLC's disposition of the Financed Loans in the event of a Liquidation Trigger and, in turn, indefinitely delay PSFLLC's distributions to Investors.

- RWNs are Exposed to Real Estate Risk.  While Warehouse LLC is expected to make payments under the Warehouse Loan regardless of Financed Loans' performance, and that payments on RWNs are thus not exclusively reliant on the Financed Loans' performance, the impairment or non-performance of the Financed Loans may negatively affect Warehouse LLC's ability to make payments to PSFLLC and may also negative affect the value of the collateral for the Warehouse Funds. For these reasons, while payments on RWNs are not directly linked to the performance of underlying Financed Loans, Investors nonetheless have exposure to the underlying real estate and borrower risk. Investors are highly encouraged to familiarize themselves with the risks associated with real estate finance prior to investing in RWNs. Below are some, but not all of the risks to consider.

If a Financed Loan becomes past due or is otherwise in default, PSFI or a third-party may need to foreclose on any property tied to that loan at a foreclosure sale unless the property is purchased by a third-party bidder at the foreclosure sale.  If PSFI cannot quickly sell such property and the property does not produce any significant income, the cost of owning, maintaining, and selling

the property would reduce any proceeds gained through the sale. If the foreclosed property cannot be sold for net proceeds that can fully return the outstanding amount of the RWNs and Warehouse LLC is unable to pay the shortfall, RWN holders may lose all or part of their investment.

Foreclosure statutes vary widely from state to state. Properties tied to defaulted Financed Loans will need to be foreclosed upon in compliance with the laws of the state where any underlying property is located. Many states require lengthy processing periods or the obtaining of a court decree before a mortgaged property may be sold or otherwise foreclosed upon. Further, statutory rights to redemption and the effects of anti-deficiency and other laws may limit the ability for PSWFI or a third party to timely recover the value of the Financed Loan in the event that a borrower defaults on a Financed Loan. A bankruptcy of the borrower will prevent PSFI from exercising its foreclosure remedy promptly.

Bankruptcy courts have broad powers to permit a sale of the real property free of PSFI's lien, to compel PSFI to accept an amount less than the balance due under the Financed Loan and to permit the borrower to repay the loan over a term which may be substantially longer or at different interest rates than the original terms of the Financed Loan.

While PSFI may have security interests in the Financed Loans, those security interests may decline in value. The value of a security interest will be subject to the risks generally incident to the ownership of improved and unimproved real estate, including changes in general or local economic conditions, increases in interest rates for real estate financing, physical damage that is not covered by insurance, zoning, entitlements and other risks. Many real estate companies expect to use resale proceeds to repay their loans. A decline in property values could result in loan amounts being greater than the associated property value, which could increase the likelihood of the borrower failing to make payments on the Financed Loan. Factors negatively impacting the property, such as, without limitation, deferred maintenance, upkeep costs, lack of occupancy, etc., may completely eradicate the value of the security interest and/or the property itself.

Issues with title to the underlying property or loan may affect recovery. For example, without limitation, borrowers may acquire title to the underlying via fraud or forgery, which may invalidate any security interest that borrower has granted. As another common example, without limitation, there may be prior liens against the property that PSFI believed to be paid off and which may foreclose out PSFI's lien. Generally, PSFI will procure title insurance policies to protect against these types of risks, but title insurance companies may refuse to disburse insurance proceeds, may disburse a smaller amount than the Financed Loan, and/or may take years to issue payment on a policy. Some title insurance policies may also be issued fraudulently by purported title agents.

- All RWNs Offered Are Unsecured. While the Warehouse Loan itself is at all times collateralized by cash and/or Participation Interests, the RWNs offered under this RWN Supplement are special, limited obligations of PSFLLC only and are not themselves secured by any collateral or guaranteed or insured by any governmental agency or instrumentality of any third party. Pocket is not a checking account, savings account, CD, or other bank product and the RWNs are not insured by the FDIC or SIPC. While Financed Loans may be secured by a mortgage, deed of trust, security agreement, legal title, personal guarantee or other mechanism, RWNs will not represent an obligation of the borrower, original lender or any other third party except PSFLLC, through which payments (if any) from Warehouse LLC will flow. Investors may look only to PSFLLC for interest payments on RWNs. If Warehouse LLC and PSFI default under the

Warehouse Loan and PSFLLC cannot recover any or part of Investors' monies invested in RWNs, Investors may not receive any or part of their investment.  Investors will not be able to pursue collection against Warehouse LLC, PSFI or borrowers on Financed Loans.

- <u>PSFI Pools Acquired Mortgage Loans Which Creates Risks</u>.  PSFI may hold many Mortgage Loans at any given time, including Mortgage Loans that are not Financed Loans. While Warehouse LLC will have Participation Interests, other borrowers, creditors, or third-parties may assert claims against PSFI and may try to reach the totality of PSFI's assets, including, without limitation, the Financed Loans. Similarly, if PSFI were to become bankrupt it or its creditors may assert claims against the entirety of the loans in which PSFI has legal or beneficial interest. While the Warehouse Loan seeks to mitigate such risks, there are no guarantees that the mitigation tools will be successful and that the Financed Loans will not become commingled with other assets and subject to judgments, liens, or other judicial or non-judicial proceeding. If a court commingles PSFI's assets, creditors may make claims against assets that would otherwise have been used to make payments to Investors. If this were to occur, you may be unable to recover all or part of your investment in RWNs. If PSFI becomes bankrupt, PSFLLC may be unable to recover payments from PSFI and, in turn, would be unable to make payments to Investors in RWNs unless it could both perfect its interest in the Financed Loans and have them payoff in full or sell them for amounts sufficient to repay Investors.

- <u>PSFLLC Pools Funds Invested in RWNs and Other Products</u>.  PSFLLC pools proceeds it receives from PSFI with respect to Financed Loans and it sells RWNs (and other products, such as MPDNs) to multiple investors. In the event of litigation regarding any specific Financed Loan, RWN, or MPDN, the entirety of assets held by PSFLLC could end up subject to a judgment, bankruptcy court determination, or other event that would impair recovery of Investors' investment. Namely, but without limitation, such judgment could result in other creditors seizing assets to which Investors would otherwise be entitled.

- <u>Other Investors May Receive Better Terms</u>.  PSFLLC does not anticipate offering different terms to different Investors, but reserves the right to do so, as well as to offer incentives to individuals or classes of individuals on a discretionary basis. These incentives may increase the rate of return for Investors who receive them.

**Although payment on the RWNs is not tied to the performance of Financed Loans, the impairment of Financed Loans and their non-performance can affect Warehouse LLC's (and PSFI's, as guarantor) ability to make its scheduled payments to PSFLLC, thus also affecting payments to RWN holders. Consider carefully the following risks related to the borrowers of Financed Loans:**

- <u>Defaulting Borrowers</u>.  Warehouse LLC must make payments (when due) on the Warehouse Loan regardless of the performance of Financed Loans or of cash flows on its Participation Interests. Financed Loans' performance, however, may affect Warehouse LLC's ability to timely meet its obligations. If a borrower remains in default on any Financed Loan and fails to cure that default after a reasonable period of time, then PSFI may foreclose on the real estate corresponding with that Financed Loan, in cases where PSFI has such rights.  PSFI might have difficultly enforcing its foreclosure rights, however.  Some states have far longer and costlier foreclosure processes than others. It is the Investors' responsibility to familiarize themselves with various states' foreclosure laws and other risks relating to real estate lending prior to making an investment in RWNs. Even if PSFI, or another PeerStreet entity or third-party participant, can successfully foreclose on a property, it may not be able to then sell the collateral for prolonged periods of time or to recover all (if any) funds back from such a sale.

- <u>PSFI May Advance Funds to Borrowers</u>. PSFI may determine to advance funds to a borrower if it finds such an advance to be necessary and prudent to protect the interests of Investors. For example, PSFI might do so upon finding that a borrower's casualty insurance was cancelled or expired or that a borrower is delinquent on paying property taxes. These advances will be added to the amount of the Financed Loan and may bear interest at reasonable rates (not to exceed the maximum rate allowed by law). Advances at these rates may be significantly more expensive for the borrower than if that borrower had paid for those expenses originally. These advances will also need to be repaid by borrowers before any existing balance of the Financed Loan is paid down, which, as a result if Warehouse LLC and PSFI default and PSFLLC must take over legal title to the Financed Loans, reduce the proceeds ultimately provided to Investors.

- <u>Borrowers Face Insurance Risks</u>. PSFI may, in its sole and absolute discretion, require certain borrowers to obtain insurance against risks faced by the Financed Loan. This insurance may prove costly or could become unavailable for borrowers altogether. Real estate properties are typically insured against risk of fire damage and certain other property casualties, but these casualties are sometimes not covered by severe weather or natural disaster events such as landslides, earthquakes or floods. Changes in the conditions affecting the economic environment in which insurance companies do business could affect the borrower's ability to continue insuring any underlying property at a reasonable cost or could result in insurance being unavailable altogether. Moreover, any hazard losses not then covered by the borrower's insurance policy would result in the Financed Loan becoming significantly under secured.

- <u>Lenders and Borrowers May Provide False Information</u>. PSFI relies on information provided to it by lenders and borrowers. That information may be incomplete, inaccurate or intentionally false. For example, borrowers provide a variety of information to us regarding their management of properties that PSFI may take a security interest in. Information provided by third parties may be incomplete, inaccurate, intentionally false or may misrepresent the intentions of the third parties. PSFI may make attempts to verify some of the information provided to it by third parties, but, as a practical matter, it cannot verify all of it.

- <u>Lenders Are Subject to Regulation</u>. The lending industry is a highly regulated industry. The lenders PSFI work with (e.g., banks and private lenders) are responsible for their compliance with applicable state and federal lending laws, and we have no control over their compliance. Although PSFI may purchase Mortgage Loans from lenders and then act as lender to the borrowers associated with those loans, PSFI has no control over their compliance with applicable federal or state law. These lenders may be subject to licensing requirements in one or more states. PSFI does not and cannot guarantee their compliance with applicable laws, including with respect to their compliance with applicable licensing requirements.

  In the event that a lender fails to comply with applicable laws, it is possible that the loans originated by the lender would be deemed void in full or in part or would be otherwise unenforceable. Similarly, any Financed Loan provided to a borrower by that lender that PSFI subsequently funded and purchased may prove unenforceable as a result of lender's non-compliance with applicable laws.

- <u>Federal Regulation of Financed Loans</u>. Some of the Financed Loans may also be subject to certain provisions of the Truth-In-Lending Act of 1968, the Home Ownership and Equity Protection Act, or other applicable laws and rules concerning loans. These regulations may impose additional disclosure and other requirements on creditors.

**Consider the following risks regarding the absence of trustees and fiduciary obligations:**

- <u>There Will Be No Trustee for RWNs</u>.  Because there is no trustee involved in the structure of the RWNs, Investors in the RWNs will not have the protection of a trustee, an indenture or the provisions of the Trust Indenture Act of 1939, which would require a trustee to represent your interests and the interests of other Investors in RWNs.

- <u>There is No Fiduciary Relationship Created between PeerStreet and RWN Holders</u>. None of PSFLLC, Warehouse LLC, PSFI, PSI, other PeerStreet entities, or the Special Members are fiduciaries or owe fiduciary obligations to Investors. While Warehouse LLCs has Special Members to add layers of control over its operations, those Special Members are not fiduciaries, make no representations and warranties to Investors, do not have any privity with Investors, and are not in any way liable to Investors.

## 6.  **Material U.S. Federal Income Tax Considerations**

Investing in RWNs issued under this RWN Supplement may carry significant tax implications. You should not regard the contents of this RWN Supplement or any other communication from PeerStreet as a substitute for careful and independent tax and financial planning.  You are encouraged to consult with your own independent accountants, financial planners, attorneys and other professionals with respect to the legal and tax aspects of an investment in the RWNs with specific reference to your own tax situation before investing in any RWNs. PeerStreet makes no representations as to any tax implication of investing in the RWNs offered on its Platform.

## 7.  **Limited Liquidity, Restrictions on Transfer, and Restricted Security**

RWNs are "restricted securities" and may not be resold or otherwise disposed of unless a registration statement under the Securities Act covering disposition of the RWNs is then in effect or an exemption for the transfers is available.  Accordingly, the RWNs are subject to restrictions on transferability and resale and may not be transferred or resold without PSFLLC's prior written consent, and only then as permitted under the Securities Act and applicable state securities laws.

There is no public market for the RWNs, and none is expected to develop in the future.  The RWNs offered through the PPM and the RWN Supplement should be purchased only by investors who have no need for liquidity in their investment, as investors will have to bear the financial risks of an investment in the RWN for an indefinite period of time.

---

End of RWN Supplement Document

# FORM INSTRUMENT

## REDEEMABLE WAREHOUSE NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THIS NOTE UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY (AS DEFINED BELOW) THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. SEE THE PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") ISSUED BY COMPANY, DATED AS OF DECEMBER 2, 2019, THE INVESTOR AGREEMENT BETWEEN THE COMPANY AND THE INVESTOR, AND THE RWN SUPPLEMENT FOR THE POCKET INVESTMENT PRODUCT AND REDEEMABLE WAREHOUSE NOTES FOR MORE DETAILS.

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") BECAUSE PAYMENTS ON THIS NOTE ARE DEPENDENT ON PAYMENTS ON THE CORRESPONDING WAREHOUSE LOAN (AS DEFINED IN THE MEMORANDUM). THIS NOTE'S ISSUE PRICE IS THIS NOTE'S STATED PRINCIPAL AMOUNT, AND THE ISSUE DATE IS THE ORIGINAL ISSUE DATE. FOR FURTHER INFORMATION REGARDING THE AMOUNT OF OID AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT THE COMPANY AT 2121 PARK PL., SUITE 250, EL SEGUNDO, CA 90245.

Company: Peer Street Funding, LLC
Investor: **_____**
Outstanding Principal Amount of this RWN: U.S. **_____**
Current Interest Rate (as of [date]): **_____**
Original Issue Date: **_____**
Initial Maturity Date: December 31, 2029

This Redeemable Warehouse Note ("RWN") contains the terms that shall apply to the investments (the "Pocket Investment") made by **_____** ("Investor") via the platform located at www.peerstreet.com (the "PeerStreet Website") in accordance with the Investor Agreement, the Memorandum, and the RWN Supplement. Capitalized terms that are not defined herein shall have the meaning prescribed to them in the Memorandum, the RWN Supplement to the Memorandum, or Investor Agreement. If any terms conflict among the aforementioned documents, the terms of the RWN Supplement will govern. Company will issue RWNs in electronic form only. This means that each RWN will be stored on the PeerStreet Website. Pocket investors can view this RWN online and print copies of the RWN for its records by visiting your secure, password-protected webpage in the "Pocket" section of the PeerStreet Website. Company will not issue certificates for the RWNs. As stated in the RWN Supplement, a single RWN will be issued for each Pocket

investor; the Interest Rate and outstanding principal amounts will be adjusted if and when the interest rate changes and Investor makes additional investments or redeems all or part of its investment.

FOR VALUE RECEIVED, the undersigned, Peer Street Funding, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay Investor the principal sum(s) of its Pocket investment on the PeerStreet Platform, together with accrued interest on the unpaid principal balance thereon in accordance with the terms contained herein:

1.    **Special Limited Obligation.**

This Note represents a special limited obligation of the Company, and (1) no payments of principal and interest on this Note shall be payable unless the Company has received payments relating to the corresponding warehouse loan (the "Warehouse Loan") it has extended of PS Warehouse, LLC ("Warehouse LLC"), and then only to the extent of the amount of such payments received by the Company (as provided for in the RWN Supplement), and (2) no Investor of this Note shall have any recourse against the Company unless, and then only to the extent that, the Company has received payment relating to the corresponding Warehouse Loan and has failed to pay such Investor their pro rata share of the payments that the Company actually received thereunder when the Redemption (as defined in the RWN Supplement) was requested by the Investor. The principal and interest accrued hereunder will be paid to the party in whose name this Note is registered, at the Maturity Date or on Redemption date, whichever comes first.

2.    **Interest.**

Interest on the unpaid principal balance will accrue, in arrears, at an annual rate equal to the Interest Rate identified in a particular on the first page of this Note. As further described in the RWN Supplement, interest accrues at a variable rate and is automatically capitalized and reinvested in the RWN.

3.    **Payment of Principal and Interest.**

**3.1 Payments.** Payments shall accrue daily in arrears in accordance with the terms of the RWN Supplement and the Pocket Dashboard. Interest payments will be automatically capitalized and reinvested in Pocket and the RWN. Upon distribution events (including, PSFLLC paying off the RWN or processing the Investor's Redemption request), all corresponding payments of principal and interest due to the Investor shall be made in U.S. dollars, in immediately available funds, by intra-institution book entry transfer to the Investor's designated account indicated through the Company's online platform. Notwithstanding any payment schedule, the Company shall only be obligated to make any payment on this Note if and only if, and only to the extent that, Company receives a corresponding payment from Warehouse LLC relating to the Warehouse Loan. Should the Company not receive any payments relating to the Warehouse Loan, Company will not owe anything to Investor. The Note will mature on the Initial Maturity Date; provided, however, that if on the Initial Maturity Date any principal or interest payments with respect to the Warehouse Loan remain due and payable to the Company, the Maturity Date of this Note will be extended until all amounts due thereunder are fully paid, the corresponding

Financed Loans are liquidated, or similar events, as further described in the RWN Supplement.

**3.2 Amounts Advanced by Company**. As set forth in the Memorandum and the RWN Supplement, the Company may, at its sole discretion, advance any and all amounts necessary to protect its interest in the Warehouse Loan or the Financed Loans, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs Company deems necessary to protect its position in the corresponding mortgage loan (the "Company's Advances"). Any amounts paid to the Company under the Warehouse Loan or from the liquidation of the Financed Loans shall be payable as follows: (1) to the Company, to recoup the Company's Advances, (2) to the Company or third parties for any fees and costs allowed to be charged under the Memorandum and the RWN Supplement and (3) the balance, if any, pro rata to the Investors of the Notes.

**3.3 Withholding**. If any withholding tax is imposed on any payment made by the Company to an Investor pursuant to this Note, such tax shall reduce the amount otherwise payable with respect to such payment. Upon request of the Company, an Investor shall provide the Company with an Internal Revenue Service Form W-9, W-BEN, W-8ECI, W-8IMY or other similar withholding certificate of a state, local or foreign governmental authority such that the Company may make payments under the Note without deduction for, or at a reduced rate of deduction for, any tax.

**4.  Events of Default.**

On (a) the Company's failure to pay any installment or other sum due under this Note when due and payable when the Company has received the same from Warehouse LLC, (b) the Company has become subject to a voluntary or involuntary proceeding of bankruptcy, insolvency, or otherwise subject to receivership and remains so for a period of 60 days, or (c) any breach of any other promise or obligation in this Note or in any other instrument now or hereafter securing the indebtedness evidenced by this Note (collectively, "Default"), then after upon sixty (60) days from the date of receiving written notice of such default from the Investor, and if the Company fails thereafter to cure said default, the Investor may, at its option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the applicable Maturity Date. The Company must receive notice of the exercise of this option. For the purposes of this paragraph, shall be deemed to receive Investor's notice if Investor follows the notice provisions in paragraph 8 of this Note.

**5.  Prepayment.**

Company may prepay this Note in whole or in part at any time without any penalty.

**6.  Sale Clause.**

Subject to compliance with the Act and applicable securities laws and regulations, Company may sell, convey, assign or otherwise transfer all or any part of the corresponding Warehouse Loan or any interest in the underlying Financed Loans, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of the Investor.

**7.  Waiver.**

The Company, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the security given for this Note, any acceptance of additional security of any kind and any release of any party liable under this Note.

**8.  Notice.**

Any notice required to be provided in this Note shall be given and received via electronic mail, unless applicable law requires that such notice be given in writing. All notices shall be addressed to the party to whom such notice is to be given at (i) investor-relations@peerstreet.com or such other email address the Company may provide to Investor via the PeerStreet Website, if the recipient is the Company or (ii) the electronic mail address used by Investor when registering online at the Company's investment platform if the recipient is the Investor; subject to the parties updating such addresses by providing notice pursuant to this Section 8.

**9.  Forbearance Not a Waiver.**

If the Investor delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any the Investor rights or of any breach, default, or failure of condition under this Note. No waiver by the Investor of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Investor.

**10.  Assignment.**

This Note inures to and binds the heirs, legal representatives, successors, and assigns of the parties; *provided* that the Investor may only assign or transfer this Note in connection with the terms outlined in the Investor Agreement and this Note, and under no circumstances may Investor assign or transfer this Note in violation of the Act.

**11.  Governing Law.**

This Note shall be construed and enforceable according to the laws of the State of Delaware (without giving effect to its conflicts of laws principles) for all purposes.

**12.  Time Is of the Essence.**

Time is of the essence with respect to all obligations of the Company under this Note.

**13.  No Modifications or Amendments; No Waiver.**

Except as specified herein or the Investor Agreement, this Note may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change,

modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

**14.  Severability.**

Any provision of this Note which shall be held by a court of competent jurisdiction to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and all other provisions or terms hereof shall remain in full force and effect.

**15.  Nonrecourse Generally.**

(i) The Company shall not be personally liable, and Investor shall not commence or prosecute any action against the Company, for the nonpayment or non- performance of any obligation on this Note (the "Loan Obligations") due to failure or default of the Warehouse Loan; (ii) Investor shall not seek, obtain, or enforce a deficiency judgment against the Company; (iii) Investor's recourse for the Company's payment obligations shall be limited to the payments and amounts, if any, received by Company relating to the Warehouse Loan; (iv) the Investor shall not be entitled to obtain specific performance or any other similar order, remedy, or relief against the Company relating to any claim arising from the Note; and (v) the Investor waives any right to exercise any lenders' right of set-off arising from the Note, against any funds of the Company in the Investor's custody, control, or possession. No recourse under or upon any obligation, covenant or agreement contained in this Note, or because of any indebtedness evidenced thereby, shall be had against any past, present or future shareholder, officer, director or agent, as such, of the Company, either directly or through the Company, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or penalty or otherwise, all such personal liability of every such incorporator, shareholder, officer, director or agent, as such, being expressly waived and released by the acceptance hereof and as a condition of and as part of the consideration for the issuance of this Note.

**16.  Note Series Limitation.**

Investor understands and agrees that each Note is part of a pool of many Notes issued by PSFLLC, which pool of Notes is held in the aggregate by multiple holders. The Investor shall not assert any right of action, including (without limitation) any arbitration, lawsuit or otherwise, except in conjunction or aggregation with other holders of the Notes as set forth in the Investor Agreement.

**17.  Tax Matters.**

Each Investor, by acceptance of a Note, shall be deemed to have agreed to treat, and shall treat, such Note as debt of the Company for United States federal income tax purposes and shall refrain from taking any action inconsistent with such treatment.

**18.  Incorporation by Reference.**

The terms contained in the Memorandum, RWN Supplement, and Investor Agreement are hereby incorporated herein by this reference for all purposes. In the event any provisions of this Note conflict with provisions of the Investor Agreement or Memorandum, the provisions of this Note

shall control. The provisions of the RWN Supplement shall govern in case of conflict with this Note.

**IN WITNESS WHEREOF,** Peer Street Funding, LLC has caused this instrument to be signed by its duly authorized officer.

Dated: _____

/s/ Brewster Johnson
Peer Street Funding, LLC
By: Brewster Johnson, Chief Executive Officer

**EXHIBIT 4**

**LOAN AND SECURITY AGREEMENT**

By and Among

**PS WAREHOUSE, LLC**
as Borrower,

**PS FUNDING, INC.**
as Guarantor and Servicer,

and

**PEER STREET FUNDING, LLC** as Lender

Doc ID: d615246145704fcac0ba092613b75b9b9c81b3d7

This **LOAN AND SECURITY AGREEMENT** is made as of February 1, 2021 by and among PS WAREHOUSE, LLC, a Delaware limited liability company (in its capacity as borrower, "Borrower"), PS FUNDING, INC., a Delaware corporation ("Guarantor" and in its capacity as master servicer, "Servicer"), and PEER STREET FUNDING, LLC, a Delaware limited liability company (the "Lender").

## RECITALS

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, Borrower may from time to time purchase Participation Interests in certain Mortgage Loans from PS Funding, Inc. pursuant to the Participation Agreement;

**WHEREAS,** to fund its purchases of Participation Interests, Borrower has requested that the Lender provide a credit facility under which Lender may loan funds to Borrower, at once or progressively, in each case on the terms and conditions of this Agreement and the Note;

**WHEREAS,** Borrower has agreed to grant a security interest in all of its asset, including the Participation Interests, to Lender pursuant to the terms of this Agreement; and

**WHEREAS,** Guarantor has agreed to guarantee the obligations of Borrower hereunder.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1.  Certain Definitions. The terms defined in this Section 1.1, whenever used and capitalized in this Agreement, shall, unless the context otherwise requires, have the respective meanings herein specified.

 "Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

 "Agreement" means this Loan and Security Agreement and all exhibits and schedules hereto, as the same may be amended, modified or supplemented from time to time.

 "Anti-Terrorism Laws" means any laws relating to terrorism or money laundering, such as the USA PATRIOT Act and other laws administered by the U.S. Department of the Treasury Financial Crimes Enforcement Network.

Doc ID: d615246145704fcac0ba092613b75b9b9c81b3d7

"<u>Backup Servicer</u>" means any commercially reasonable, independent third-party selected by Lender who will perform servicing, collections, and/or monitoring functions with respect to the Mortgage Loans.

"<u>Backup Servicing Agreement</u>" means with respect to each Mortgage Loan, a servicing agreement by and between Servicer, Lender and Backup Servicer for such Mortgage Loan, as may be amended, modified or supplemented from time to time.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code as now constituted or hereafter amended and any similar statute or law affecting the rights of debtors.

"<u>Books and Records</u>" means all of Credit Parties' original ledger cards, payment schedules, credit applications, contracts, lien and security instruments, guarantees relating in any way to the Collateral and other books and records or transcribed information of any type, whether expressed in electronic form in tapes, discs, tabulating runs, programs and similar materials now or hereafter in existence relating to the Collateral.

"<u>Borrower</u>" has the meaning assigned to that term in the preamble.

"<u>Business Day</u>" means any day except a Saturday, Sunday or other day on which national banks are authorized by law to close including, without limitation, United States federal government holidays.

"<u>Cash Equivalents</u>" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency or instrumentality of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state, territory or commonwealth of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state, territory or commonwealth of the United States, (d) any dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state, territory or commonwealth thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"<u>Change of Control</u>" means the occurrence of any of the following:

(1)     the direct or indirect sale, conveyance, transfer, lease or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of any Credit Party, to any "person" (as such term is used in Sections

13(d) and 14(d) of the Exchange Act);

(2)    the adoption of a plan relating to the liquidation or dissolution of any Credit Party; or

(3)    the first day on which Guarantor ceases to own 100% of the outstanding Stock in Borrower.

"Closing Date" means February 1, 2021.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and regulations with respect thereto in effect from time to time.

"Collateral" means "Collateral" as defined in Article 9.

"Consumer Finance Laws" means all applicable laws, regulations, interpretations and guidance, federal, state and local, relating to the extension of consumer credit, and the creation of a security interest in personal property in connection therewith, as the case may be, and laws with respect to protection of consumers' interests in connection with such transactions, including without limitation, any usury laws, any privacy laws, the Electronic Signatures in Global and National Commerce Act, the Federal Consumer Credit Protection Act, the Federal Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission's Rules and Regulations and Regulations B, E and Z of the Consumer Financial Protection Bureau, as any of the foregoing may be amended from time to time.

"Contractual Obligation" means, as to any Person, any provision of any security (whether in the nature of Stock or otherwise) issued by such Person or of any written agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Credit Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"Credit Date" means the date Lender makes any advance under the Note.

"Credit Documents" means this Agreement, the Note, the Guaranty and any and all additional documents, instruments, agreements and other writings executed and delivered pursuant to or in connection with this Agreement, as each may be amended, modified, restated or extended from time to time.

"Credit Party" means each of Borrower and Guarantor.

"Default" means an event, condition or circumstance which, with the giving of notice or the passage of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default under this Agreement or the Note.

"Delinquent" means a Mortgage Loan for which any scheduled payment remains unpaid for more than sixty (60) calendar days from the original due date for such payment, in whole or in part.

"Disposition Date" means, for each Financed Loan, the date on which Borrower sells,

assigns, or otherwise disposes of its Participation Interest therein.

"Disposition Deadline" means the day by which Borrower must sell, assign, or otherwise dispose of its Participation Interest in any given Financed Loan and return the Loan proceeds used to acquire such Participation Interests to its bank account. For each Financed Loan, the Disposition Deadline shall be ninety (90) days after Borrower has acquired the corresponding Participation Interests. Upon the disposition of Participation Interests, Borrower shall be allowed to re-use the corresponding Loan proceeds to acquire Participation Interests in other Mortgage Loans.

"Environmental Control Statutes" means any applicable federal, state, county, regional or local laws governing the control, storage, removal, spill, release or discharge of Hazardous Substances, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Hazardous Materials Transportation Act, the Emergency Planning and Community Right to Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, any similar or implementing state law, and in each case including all amendments thereto, all binding rules and regulations promulgated thereunder and requirements in permits issued in connection therewith.

"EPA" means the United States Environmental Protection Agency, or any successor thereto.

"Event of Default" has the meaning assigned to that term in Article 7.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) taxes imposed on or measured by net income (in each case, however denominated), franchise taxes, and branch profits taxes, in each case, (i) imposed as a result of such Person being organized under the laws of, or having its principal office or, in the case of Lender, its applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect its interest in the Loans pursuant to a law in effect on the date on which Lender acquired its interest in the Loans; (c) taxes attributable to such Person's failure to comply with Section 11.15 and (d) any U.S. federal withholding taxes imposed under FATCA.

"FATCA" means (a) Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any current or future regulations or official interpretations thereof, (b) any treaty, law, regulation or other official guidance enacted in any non-U.S. jurisdiction, or relating to an intergovernmental agreement between the U.S. and any other jurisdiction, which (in either case) directly relates to the implementation of (a) above, and (c) any agreement pursuant to the implementation of clauses (a) or (b) above with the U.S. Internal Revenue Service, the U.S. government or any governmental or taxation authority in any other jurisdiction.

"Financed Loan" means any Mortgage Loan in which Borrower acquires Participation Interests.

"Fiscal Year" means any of the annual accounting periods of Borrower ending on December 31 of each year.

"GAAP" means generally accepted accounting principles applied on a consistent basis, in the United States of America. The requirement that such principles be applied on a consistent basis shall mean that the accounting principles observed in a current period are comparable in all material respects to those applied in a preceding period, or, in the event of a material change in any accounting principle from that observed in any previous period (i) financial reports covering preceding periods during the term of this Agreement are restated to reflect such change and provide a consistent basis for comparison among periods and (ii) the financial covenants set forth in Section 5.4 shall be adjusted as determined by Lender to reflect similar performance standards as those measured by the existing covenants using the previously observed accounting principles.

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing. The term "Governmental Authority" shall further include any institutional review board, ethics committee, data monitoring committee, or other committee or entity with defined authority to oversee regulatory matters.

"Guarantor" means PS FUNDING, INC., a Delaware corporation and any other Persons from time to time that are parties to the Guaranty in the capacity of a guarantor.

"Guaranty" means that certain Guaranty dated on or about the date hereof by Guarantor in favor of Lender, as may be amended, modified, restated or extended from time to time.

"Hazardous Substance" means any toxic, reactive, corrosive, carcinogenic, flammable or hazardous pollutant or other substance regulated under Environmental Control Statutes due to its dangerous or deleterious properties or characteristics, including without limitation petroleum and items defined in Environmental Control Statutes as "hazardous substances," "hazardous wastes," "pollutants" or "contaminants."

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment (or amount payable) made by or on account of any obligation of the Borrower under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interest" means the interest rate calculated in accordance with Note.

"Lender" has the meaning assigned to that term in the preamble.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses (including those incurred upon any appeal or in connection with the

preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"Lien" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, including without limitation any conditional sale or title retention arrangement, and any collateral assignment, deposit arrangement or lease intended as, or having the effect of, security but excluding the interests of a lessor under operating leases.

"Liquidity" means with respect to any Person, the sum of (i) its unrestricted cash, plus (ii) its unrestricted Cash Equivalents.

"Loan" means a credit facility in the aggregate unpaid principal amount of up to twenty-five million dollars ($25,000,000).

"Loan Amount" means, at any time, the aggregate unpaid principal amount of the Loan outstanding at such time.

"Local Authorities" means individually and collectively the state and local governmental authorities which govern the business and operations owned or conducted by Borrower.

"Material Adverse Change" means any event, obligation, liability or circumstance or set of events, obligations, liabilities or circumstances which:

> (a)    has a material adverse effect upon or material adverse change in (i) the legality, validity or enforceability of this Agreement or any other Credit Document, (ii) the status, perfection or priority of any Lien granted to Lender, under any of the Credit Documents, (iii) the value, validity, enforceability or collectability of the Collateral or, (iv) the rights and remedies of the Lender under the Credit Documents, or (v) the business, properties, assets, operations, the Collateral, results of operations, or financial condition of Borrower or Guarantor; or

> (b)    has materially impaired or reasonably could be expected to materially impair the ability of Borrower or Guarantor to perform any of the Obligations or the ability of any party to the Credit Documents to perform its obligations under, or to consummate the transactions contemplated under, the Credit Documents.

"Maturity Date" shall have the meaning ascribed to such term in the Note.

"Monthly Summary Report" has the meaning assigned to that term in Section 5.3(b).

"Mortgage" means with respect to a Mortgage Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first Lien on a fee simple non-owner occupied single-family residential, multi-family residential, or commercial real property securing the Mortgage Note.

"Mortgage File" means, with respect to each Mortgage Loan, the Mortgage Note, the

Mortgage, all other documents related to the Mortgage Loan, and related information contained on a data tape or similar database information maintained in the ordinary course of business.

"Mortgage Loan" means a loan, originated or purchased by PS Funding, Inc., secured by a Mortgage, security agreement, or a participation in similar instruments, granting PS Funding, Inc. a senior, first-position interest in that instrument.

"Mortgage Note" shall mean the original executed promissory note or other evidence of the indebtedness of a mortgagor with respect to a Mortgage Loan.

"Note" means that certain Third Amended and Restated Promissory Note executed by Borrower in favor of Lender, evidencing the obligation of Borrower to repay the Loan Amount, and any and all amendments, renewals, replacements or substitutions therefor.

"Obligations" means each and every draft, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender arising under this Agreement, the Notes or any other Credit Document (whether such debt, liability or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving Lender or in a transaction involving other creditors of Borrower, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several).

"OFAC" has the meaning specified in Section 4.15.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between such Person and the jurisdiction imposing such Tax (other than connections arising solely from such Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in the Loans or Credit Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, but excluding any Excluded Taxes and any Taxes that are Other Connection Taxes attributable to the sale of an assignment or grant of a participation by Lender hereunder.

"Participation Interests" are participation interests, assignments of security instrument, whole loan purchases, or other similar interests in Mortgage Loans that Warehouse LLC acquires

with the use of Warehouse Funds;

"Persons" means all natural persons, corporations, limited partnerships, general partnerships, joint stock companies, limited liability companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and federal and state governments and agencies or regulatory authorities and political subdivisions thereof, or any other entity.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"PS Debt Facility" means the following financing arrangements that Borrower or its affiliates have or may enter into from time to time: (i) the Master Loan and Security Agreement dated as of July 9, 2019, between PSF Sub 3, LLC, as a borrower thereunder and JPMorgan Chase Bank, N.A., as lender, (ii) the Loan and Security Agreement dated as of July 12, 2019 among PSF Sub 5, LLC, as a borrower thereunder, PS WAREHOUSE, LLC, as guarantor and servicer, and U.S. Real Estate Credit Holdings III-A, LP, as lender, (iii) the Loan and Security Agreement dated as of February 28, 2018, among PSF Sub 4, LLC, as borrower, PS WAREHOUSE, LLC, as guarantor and servicer, and Pacific Funding Trust 1002, as lender, (iv) any and all amendments to the debt facilities described in (i)-(iii) entered into subsequent to the date hereof, and (v) any subsequent loan and security agreement entered into by Borrower or any of Borrower's wholly owned subsidiaries, existing now or in the future, which have been created for the sole purpose of being a borrower under a warehouse facility, in which the loan proceeds of said warehouse facility are intended to be used by Borrower or its affiliate to purchase loan assets in the ordinary course of Borrower's business.

"Regulatory Trigger Event" means (a) the Guarantor, the Borrower, or any Subsidiaries of Guarantor becomes the subject of any investigation, stay, order, ruling or judgment, issued by any Governmental Authority involving the legality or regulatory compliance of its business which is not satisfied, released, stayed, vacated or discharged within thirty (30) days of such Person's knowledge thereof and, in either case, the effect, outcome or resolution of such action listed above would reasonably be expected to result in (i) in the case of Borrower, a Material Adverse Change, or (ii) in the case of Guarantor, any such direct or indirect parent or any such Subsidiary, a material adverse change in the business, properties, assets, operations, the collateral, results of operations, or financial condition of any such Person; or (b) the enactment of a usury cap applicable to the Collateral or the passage of any applicable State or Federal statute or regulation restricting the offering or sale of the Collateral which, in either case, would reasonably be expected to result in a Material Adverse Change in the sole discretion of Lender.

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor and other consultants and agents of or to such Person or any of its Affiliates.

"Requirements of Law" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or products or to which such Person or any of its Property or products is subject.

"<u>Secured Obligations</u>" means all the Obligations and all other obligations and liabilities of the Borrower under this Agreement.

"<u>Servicer</u>" has the meaning assigned to that term in the preamble.

"<u>Stock</u>" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, limited liability company interests or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"<u>Subservicer</u>" means FCI Lender Services, Inc. or any other commercially reasonable, independent third-party sub-servicer selected by Borrower and approved by Lender who will perform servicing, collections, and/or monitoring functions with respect to the Mortgage Loans.

"<u>Sub-Servicing Agreement</u>" means with respect to each Mortgage Loan, a servicing agreement by and between Servicer and Subservicer for such Mortgage Loan, as may be amended, modified or supplemented from time to time.

"<u>Subsidiary</u>" of any entity means any corporation, limited liability company, partnership or other legal entity of which such entity directly or indirectly owns or controls at least a majority of the outstanding stock or other equity interest having general voting power. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Tax</u>" or "<u>Taxes</u>" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>UCC</u>" means the Uniform Commercial Code as in effect in the State of California from time to time.

"<u>Underlying Real Property Collateral</u>" means non-owner occupied improved residential, multi-family residential, or commercial real property that secures repayment of a Mortgage Loan.

"<u>USA PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"<u>Warehouse Line of Credit</u>" means any and all of the PS Debt Facilities and Repurchase Agreements, whether existing now or in the future.

Section 1.2.    <u>Rules of Construction</u>.

(a)    <u>Accounting Terms</u>. Except as otherwise provided herein, financial and accounting terms used in the foregoing definitions or elsewhere in this Agreement shall be defined in accordance with GAAP.

(b)    <u>Uniform Commercial Code</u>. Except as otherwise provided herein, terms used in the foregoing definitions or elsewhere in this Agreement that are defined in the Uniform Commercial Code, including without limitation, "<u>Accounts</u>", "<u>Account Debtor</u>", "<u>Certificated Security</u>", "<u>Commercial Tort Claim</u>", "<u>Deposit Accounts</u>", "<u>Documents</u>", "<u>Instruments</u>", "<u>Investment Property</u>", "<u>General Intangibles</u>", "<u>Chattel Paper</u>", "<u>Inventory</u>", "<u>Goods</u>", "<u>Equipment</u>", "<u>Fixtures</u>", "<u>Supporting Obligations</u>", "<u>Proceeds</u>", "<u>Record</u>", "<u>Securities Account</u>", "<u>Security</u>", and "<u>Letter of Credit Rights</u>" shall have the respective meanings given to such terms in Division 9 of the UCC, if defined therein, and otherwise as defined elsewhere in the UCC.

## ARTICLE 2
## THE LOAN FACILITY

Section 2.1.    <u>Loan</u>.

(a)    Provided that no Event of Default shall have occurred and be continuing, the Lender may, from time to time, on the terms and conditions of this Agreement, make one or more advances to Borrower in an aggregate principal amount up to twenty-five million dollars ($25,000,000). The Loan will be funded by Lender through the issuance of securities and Lender may progressively advance loan funds to Borrower as securities are sold.

(b)    Principal and Interest due on the Loan shall be due in accordance with the terms of the Note.

(c)    So long as no Event of Default is continuing, payments or prepayments of the Loan may be reborrowed without penalty or premium from time to time prior to the Maturity Date.

Section 2.2    <u>Evidence of Debt; Lenders' Books and Records; the Note</u>.

(a)    <u>Lenders' Evidence of Debt</u>. Lender shall maintain in its internal records an account or accounts evidencing the Obligations of Borrower to Lender, including the amounts of the outstanding principal balance of the Loan and each advance date (if more than one), repayment and prepayment in respect thereof. Any such recordation by Lender shall be conclusive and binding upon Borrower, absent manifest error.

(b)    <u>Note</u>. Borrower shall execute and deliver to Lender on the Closing Date the Note.

Section 2.3. <u>Repayment of the Loans</u>. Borrower shall make all payments of principal and Interest in accordance with the terms of the Note.

Section 2.4. <u>Use of Proceeds</u>. The Loan proceeds shall be used by Borrower solely to acquire Participation Interests in senior, performing Mortgage Loans insured by a title insurance

policy and to pay its pro rata portion of servicing advances for Financed Loans (where necessary) prior to the earliest of (i) the Disposition Date and (ii) the Disposition Deadline. When not used for, and secured by, Participation Interests, Loan proceeds shall at all times be held in cash by Borrower.

## ARTICLE 3
## CONDITIONS PRECEDENT

Section 3.1.    Conditions to Advance. The obligation of Lender to make the Loan on the Closing Date or any subsequent advance is subject to the satisfaction (or waiver), of the following conditions on or before the Closing Date or the date of such advance, as applicable:

(a)    Lender shall have successfully raised sufficient funds, through the sale of securities, to make advances;

(b)    Lender shall have received all payments (if any) due and payable or reimbursable to Lender on or prior to the Closing Date and the date of each subsequent advance;

(c)    No Event of Default shall exist under the terms of this Agreement and other Credit Documents, and both Borrower and Guarantor shall be in compliance with all Requirements of Law, except to the extent noncompliance could not reasonably be expected to result in a Material Adverse Change;

(d)    Non-occurrence of any Regulatory Trigger Event or other regulatory event, regulatory change or pending or threatened (in writing) proceeding that could reasonably be expected to have a material adverse effect on Borrower's or Guarantor's ability to fulfill their respective obligations under this Agreement or the Credit Documents or which would reasonably be expected to affect either such Person's ability to remain a going concern; and

(e)    such other documents and items as Lender deems necessary, in its sole discretion.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

As of the Closing Date and the date of each subsequent advance, each of Borrower and Guarantor represents and warrants to Lender as follows:

Section 4.1. Representations and Warranties as to Mortgage Loans. Borrower has sole ownership of the Participation Interests, free and clear of all prior assignments, claims, liens encumbrances and security interests, and has the right to pledge and grant Lender a security interest in the Participation Interests. Guarantor has good and valid title to the Financed Loans, free and clear of all prior assignments, claims, liens encumbrances and security interests, and has the right to sell Participation Interests to Borrower.

Section 4.2.  <u>Organization and Good Standing</u>. Each of Borrower and Guarantor is duly organized and validly existing in good standing under the laws of the State of Delaware and has the power and authority to engage in the business it conducts and is qualified and in good standing in those states wherein the nature of business or property owned by it requires such qualification, is not required to be qualified in any other state; or if not so qualified, no adverse effect on Borrower's or Guarantor's business would result therefrom.

Section 4.3.  <u>Perfection of Security Interest</u>. Upon the filing of financing statements in all places as are necessary to perfect the security interests and disclosing Borrower as debtor and Lender as secured party, Lender will have a perfected security interest in the Participation Interests (other than Underlying Real Property Collateral) which can be perfected by the filing of UCC-1 financing statements in Borrower's state of organization. Lender's security interest in the Financed Loans shall not be subordinate to any other interests and neither Borrower nor Guarantor shall be permitted to further encumber or pledge interests in the Financed Loans, even where such interests would be subordinate to Lender's interest.

Section 4.4.  <u>No Violations</u>. The making and performance of this Agreement or the Note does not and will not violate any provisions of any law, rule, regulation, judgment, order, writ, decree, determination or award or breach any provisions of the certificate of formation, operating agreement or other Organization Documents of Borrower or Guarantor, or constitute a default or result in the creation or imposition of any security interest in, or lien or encumbrance upon, any assets of Borrower or Guarantor (immediately or with the passage of time or with the giving of notice and passage of time, or both) under any other contract, agreement, indenture or instrument to which Borrower or Guarantor is a party or by which Borrower or Guarantor or their respective property is bound where such violation, breach, default, creation of any security interest in or lien or encumbrance upon will result in a material adverse change for Borrower or Guarantor.

Section 4.5.  <u>Power and Authority</u>.

(a)      Each of Borrower and Guarantor has full power and authority under the law of the state of its organization and under its Organization Documents to enter into, execute and deliver and perform the Credit Documents; to borrow monies hereunder, to incur the obligations herein provided for and to pledge and grant to Lender, a security interest in the Collateral; and

(b)      All actions (corporate or otherwise) necessary or appropriate for Borrower's and Guarantor's, execution, delivery and performance of the Credit Documents have been taken.

Section 4.6.  <u>Validity of Agreements</u>. Each of the Credit Documents is, or when delivered to Lender will be, duly executed and constitute valid and legally binding obligations of Borrower and Guarantor enforceable against Borrower and Guarantor, in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

Section 4.7.  <u>Compliance</u>. To Borrower's and Guarantor's knowledge, respectively, each of Borrower and Guarantor is in compliance in all material respects with all applicable laws and regulations, federal, state and local (including all Consumer Finance Laws (including being in

compliance with privacy notice requirements under the Gramm-Leach-Bliley Act)), material to the conduct of its business and operations; each of Borrower and Guarantor possesses all the franchises, permits, licenses, certificates of compliance and approval and grants of authority necessary or required in the conduct of its business and the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with Borrower's and Guarantor's execution and performance of the Credit Documents.

Section 4.8. <u>Accuracy of Information; Full Disclosure</u>. None of the representations or warranties made by Borrower or Guarantor in the Credit Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party in connection with the Credit Documents, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

Section 4.9. <u>Taxes</u>. Each of Borrower and Guarantor has filed and will file all tax returns which are required to be filed and all such tax returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations, and has paid or will pay when due all taxes, license and other fees (whether or not shown on any tax return) of Borrower or Guarantor except taxes contested in good faith for which adequate reserves in accordance with GAAP have been established by Borrower or Guarantor on its books and records.

Section 4.10. <u>Foreign Assets Control Regulations and Anti-Money Laundering</u>. To its knowledge, each of the Borrower and Guarantor is in compliance in all material respects with all applicable U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  Neither Borrower nor Guarantor (i) is a Person designated by the U.S. government on OFAC's list of Specially Designated Nationals and Blocked Persons (the "<u>SDN List</u>"), (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Credit Document would be prohibited under U.S. law.

Section 4.16. <u>USA PATRIOT Act</u>. Each of Borrower and Guarantor is in compliance in all material respects with (a) the Trading with the Enemy Act, and each of OFAC's foreign assets control regulations and any other enabling legislation or executive order relating thereto, (b) the USA PATRIOT Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations. No part of the proceeds of the Loans will be used directly or indirectly for any payments to any government official or employee,

political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

## ARTICLE 5
## AFFIRMATIVE COVENANTS

In addition to the covenants contained in Article 9 of this Agreement relating to the Collateral, until all Obligations (other than unasserted contingent indemnification obligations) have been satisfied in full, each of Borrower and Guarantor covenants and agrees as follows:

Section 5.1. Reporting Requirements. Borrower will deliver, or cause to be delivered, to Lender:

(a)        within five (5) Business Days after the end of each calendar month, a summary report providing aggregate information for cash flow reconciliation and outstanding collateral statistics for the Collateral, including Loan level information and credit attributes for all Mortgage Loans constituting the Collateral at the end of such month (the "Monthly Summary Report");

(b)        within forty-five (45) days after the end of each calendar quarter, commencing with the quarter ending March 31, 2021, the unaudited financial statements of Borrower and Guarantor.

Section 5.2. Books and Records and Lender Audit Rights. Borrower and Guarantor will keep accurate and complete Books and Records concerning the Collateral and all transactions with respect thereto consistent with sound business practices (including, without limitation, accurately account for insurance commissions) and will comply with Lender's reasonable requirements, from time to time in effect, including those concerning the submission of reports on all items of Collateral including those which are deemed to be delinquent.

Section 5.3.    Borrower Notices. Borrower shall promptly, and in any event within ten (10) Business Days after Borrower or any other Credit Party obtaining knowledge of the occurrence thereof, notify Lender in writing of (i) any actual or threatened in writing litigation, action, suit, arbitration, dispute, resolution, proceeding, inquiry or investigation at law or in equity or before or by any court, public board or body against or affecting any Credit Party or any of its property or assets that questions or challenges the validity or enforceability of this Agreement or any of the other Credit Documents or any action to be taken in connection with the transactions contemplated hereby or thereby, (ii) any Default or Event of Default under this Agreement or any other Credit Document, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iii) any matter(s) in existence that Borrower becomes aware of affecting in any material respect the value, enforceability or collectability of Collateral taken as a whole, (iv) any action taken or threatened in writing to be taken by any Governmental Authority (or any notice of any of the foregoing) with respect to any Credit Party or any Collateral, and (v) the commencement of any proceedings by or against any Credit Party under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for any Credit Party.

Section 5.4.    <u>Compliance With Applicable Law</u>.  Each of Borrower and Guarantor shall comply in all material respects with all local, state and federal laws and regulations applicable to its business including without limitation the Consumer Finance Laws (including complying with privacy notice requirements under the Gramm-Leach- Bliley Act), Anti-Terrorism Laws, Environmental Control Statutes, and all laws and regulations of the Local Authorities, and the provisions and requirements of all franchises, permits, certificates of compliance and approval issued by regulatory authorities and other like grants of authority held by Borrower and Guarantor; and notify Lender promptly (and in any event, within five (5) Business Days) (and in reasonable detail) of any actual or alleged failure to materially comply with or perform, breach, violation or default under any such laws or regulations or under the terms of any of such franchises or licenses, grants of authority, or of the occurrence or existence of any facts or circumstances which with the passage of time, the giving of notice or otherwise could create such a breach, violation or default or could occasion the termination of any of such franchises or grants of authority.

Section 5.5. <u>Other Information</u>. From time to time upon reasonable request of Lender, Borrower and Guarantor will furnish to Lender such additional information and reports regarding the Collateral and the operations, businesses, affairs, prospects and financial condition of the Credit Parties.

Section 5.6. <u>Notices</u>. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement shall be given by (a) delivering it or by mailing it by first class mail to Borrower and/or Servicer, as applicable, at 2121 Park Place, Suite 250, El Segundo, California, 90245 or at a different address if Borrower gives the Lender a notice of its different address; or (b) by email to <u>legal@peerstreet.com</u>. Any notice that must be given to Lender under this Agreement shall be given by (a) delivering it or by mailing it by first class mail to Lender at 2121 Park Place, Suite 250, El Segundo, California, 90245 or at a different address if Lender gives the Borrower and/or Servicer a notice of its different address; or (b) by email to <u>lnees@peerstreet.com</u>.

Section 5.7. <u>Operations</u>. Guarantor and Borrower shall maintain, or cause to be maintained on their behalf, satisfactory credit underwriting and operating standards, including, with respect to each obligor of each Mortgage Loan, the completion of an adequate investigation of such obligor and a determination that the credit history and anticipated performance of such obligor is and will be satisfactory and meets the standards generally observed by reasonable finance companies in the business of making private money loans secured by non-owner occupied residential or commercial real property.

Section 5.8. <u>Further Assurances</u>. Borrower and Guarantor shall from time to time execute and deliver to Lender such other documents and shall take such other action as may be reasonably requested by Lender in order to implement or effectuate the provisions of, or more fully perfect the rights granted or intended to be granted by Borrower and Guarantor to Lender pursuant to the terms of this Agreement, the Notes or any other Credit Documents.

# ARTICLE 6
# NEGATIVE COVENANTS

Borrower covenants and agrees with Lender that until all Obligations (other than unasserted contingent indemnification obligations) have been satisfied in full, Borrower, Servicer nor Guarantor will do or permit any of the following:

Section 6.1. Payments to and Transactions with Affiliates. With respect to the Credit Parties (a) make any loan, advance, extension of credit or payment to any Affiliate, officer, employee, member, manager, equity holder or director of Borrower, Guarantor or any of their respective Affiliates or (b) enter into any other transaction, including, without limitation, the purchase, sale, lease or exchange of property, or the rendering or any service, to or with any Affiliate or any equity holder, officer, or employee of Borrower, Guarantor or any of their respective Affiliates except for transactions with or services rendered to any Affiliate of Borrower or Guarantor in the ordinary course of business and pursuant to the reasonable requirements of the business of such Affiliate and upon terms no less favorable to Borrower or Guarantor than Borrower or Guarantor would obtain in a comparable arms' length transaction with a Person not affiliated with Borrower or Guarantor. Notwithstanding this Section 6.1 or anything else in this Agreement, Borrower may enter into participation agreements with Affiliates on terms that are similar to other participation agreements involving Guarantor, Borrower, or their Affiliates.

Section 6.2. Sale of Assets/Negative Pledge.  With respect to the Borrower, sell, assign, discount, pledge, grant a Lien in, encumber or otherwise dispose of any Participation Interests, except as otherwise provided herein and except for the dispositions of real property in the ordinary course of business made when the related Financed Loan has been satisfied in full.

Section 6.3. Nature of Business. With respect to Borrower  and  Guarantor, engage in any business other than the business in which Borrower or Guarantor currently is engaged or make any material change in the nature of the financings which Borrower or Guarantor is permitted to extend hereunder (including without limiting the generality of the foregoing, matters relating to size, type, term, nature and dollar amount).

Section 6.4. Use of Proceeds. With respect to Borrower, use the proceeds of the Loans or any other advance made by Lender hereunder for purposes other than as permitted herein or in the Note.

Section 6.5. Ownership and Management. With respect to the Credit Parties, allow any Change of Control.

Section 6.6. Changes in Accounting. With respect to the Borrower, make any significant change in accounting treatment or reporting practices, except as required by GAAP.

Section 6.7. OFAC; USA PATRIOT Act.  With respect to the Credit Parties, fail to comply in any material respect with the laws, regulations and executive orders referred to in Section 4.15 and Section 4.16.

## ARTICLE 7
## EVENTS OF DEFAULT

Each of the following events shall constitute an "Event of Default" under this Agreement:

Section 7.1. Failure to Make Payments. The failure of Borrower to timely make any

payments due under the Note, within two (2) Business Days of becoming due, or (iii) any other payment due hereunder or in respect of any other Obligation within five (5) Business Days of becoming due.

Section 7.2.  Information, Representations and Warranties.  Any representation or warranty made by any Credit Party herein or in any certificate or instrument delivered by any Credit Party in connection herewith or any other Credit Document shall be false, misleading or incorrect in any material respect at the time made or deemed made or furnished, which remains uncured for thirty (30) days after notice thereof.

Section 7.3.  Covenants.  Failure or neglect of Borrower, Servicer, or Guarantor to perform, keep or observe any term, provision, condition, covenant contained in this Agreement, or contained in any other Credit Document in any material respect, which remains uncured for ten (10) Business Days after notice thereof.

Section 7.4.  Collateral.  At any time after the grant to Lender of a security interest in or Lien upon any Collateral or a UCC filing on the Borrower's assets, Lender's interest therein shall for any reason cease to be a valid and subsisting Lien in favor of Lender and/or a valid and perfected security interest in and to the Collateral purported to be covered thereby having the priority set forth therein.

Section 7.5.  Certain Events.  The occurrence of any of the following with respect to Borrower or Guarantor:

(a)    Voluntary Proceedings.  It shall (i) apply for or consent to the appointment of a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) be generally not paying its debts as such debts become due as defined in the Bankruptcy Code, (iii) make a general assignment for the benefit of its creditors, (iv) commence a voluntary case under the Bankruptcy Code, (v) fail to controvert in a timely or appropriate manner, or acquiesce in writing to, any petition filed against it in any involuntary case under the Bankruptcy Code, or (vi) take any corporate action for the purpose of effecting any of the foregoing.

(b)    Involuntary Proceeding.  A proceeding or case shall be commenced against it without its application or consent in any court of competent jurisdiction, seeking (i) the liquidation, reorganization, dissolution, winding up, or composition or readjustment of debts, of it, (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for it or of all or any substantial part of its assets, or (iii) similar relief in respect of it under any law providing for the relief of debtors, and such proceeding or case shall continue undismissed or unstayed and in effect, for a period of sixty (60) days, or an order for relief against it shall be entered in an involuntary case under the Bankruptcy Code.

(c)    Suspension of Activities.  Either Borrower or Guarantor liquidates, dissolves, terminates or suspends its business operations or otherwise fails to operate its business in the ordinary course whether done voluntarily or pursuant to a court, regulatory or other order or directive.

(d)    Servicer Default.  A Default with respect to the Servicer or Subservicer occurs and such Default has not been cured or the Servicer and/or Subservicer has not been replaced by a Backup Servicer (or another successor servicer reasonably

acceptable to Lender), in either case, within thirty (30) days after the date on which such Default occurred.

Section 7.6.    <u>Guarantor and Limited Guarantor</u>.  Guarantor shall repudiate, purport to revoke or fail to perform Guarantor's obligations under the Guaranty, or any other Credit Document to which it is party or a petition shall be filed by or against Guarantor under the Bankruptcy Code naming Guarantor as a debtor.

Section 7.8. <u>Credit Documents</u>. An event of default following the expiration of any cure period (however defined) shall occur under any Credit Document other than this Agreement or any material provision of any Credit Document shall at any time for any reason be declared to be null and void or the validity or enforceability thereof shall be contested by any Credit Party. Any Credit Party shall in writing rescind or repudiate any Credit Document or any of its obligations under any Credit Document or any material term thereof shall cease to be, or is asserted any Credit Party not to be, a legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms.

Section 7.9.    <u>Change of Control</u>. The occurrence of a Change of Control.

Section 7.10.    <u>Insolvency</u>. Any Credit Party shall become insolvent.

Section 7.11. <u>Cure Period</u>. The cure periods, if any, set forth above shall run from the earlier of (x) the date on which such violation shall first become known to any officer of Borrower or Guarantor or (y) the date on which written notice thereof is given to Borrower or Guarantor by Lender.

## ARTICLE 8
## <u>REMEDIES OF LENDER AND WAIVER</u>

Section 8.1. <u>Lender's Remedies</u>. Upon the occurrence and during the continuance of an Event of Default, Lender may (i) immediately terminate this Agreement and/or (ii) declare the Obligations immediately due and payable without presentment, notice of dishonor, protest or further notice of any kind, all of which Borrower and Guarantor hereby expressly waive. Upon such occurrence and/or declaration, Lender shall have, in addition to the rights and remedies given to it by the Note, this Agreement and the other Credit Documents, all the rights and remedies of a secured party as provided in the UCC (regardless of whether such Uniform Commercial Code has been adopted in the jurisdiction where such rights and remedies are asserted) and without limiting the generality of the foregoing, and without demand of performance and without other notice (except as specifically required by the Note, this Agreement or the documents executed in connection herewith) or demand whatsoever to any Credit Party, all of which are hereby expressly waived, Lender may, in addition to all the rights conferred upon it by law, exercise one or more of the following rights successively or concurrently: (a) to take possession of the Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which Borrower and Guarantor hereby expressly waive), (b) to lawfully dispose of the whole or any part of the Collateral, or any other Property, instrument or document pledged as security for any Obligation at public or private sale, with the right on the part of Lender or its nominees to become the purchaser thereof as provided by law absolutely freed and discharged from any equity of redemption, and all trusts and other claims whatsoever; (c) after

Doc ID: d615246145704fcac0ba092613b75b9b9c81b3d7

deduction of all legal and other costs and expenses permitted by law, including attorneys' fees, to apply the Collateral or all or any portion of proceeds thereof on account of, or to hold as a reserve against, all Obligations; and (d) to exercise any other rights and remedies available to it by law or agreement. Any remainder of the proceeds after satisfaction in full of the Obligations shall be distributed as required by applicable law. Notice of any sale or disposition of Collateral shall be given to Borrower and Guarantor at least ten (10) days before any intended public sale or the time after which any intended private sale or other disposition of the Collateral is to be made, which Borrower and Guarantor agree shall be reasonable notice of such sale or other disposition.

Section 8.2.  <u>Waiver and Release by Borrower</u>. To the extent permitted by applicable law, each of Borrower and Guarantor: (a) waives (i) presentment and protest of the Notes and this Agreement held by Lender on which Borrower or Guarantor is any way liable and notice and opportunity to be heard, after acceleration in the manner provided in <u>Article 8</u> of this Agreement, before exercise by Lender of the remedies of self-help or set-off permitted by law or by any agreement with Borrower or Guarantor, and except where required hereby or by law, notice of any other action taken by Lender; and (b) releases Lender and its officers, attorneys and employees from all claims for loss or damage caused by any act or omission on the part of Lender or its officers, attorneys, and employees, except willful misconduct or gross negligence.

Section 8.3.  <u>No Waiver</u>.  Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege under the Note or this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other further exercise of any right, power or privilege.

## ARTICLE 9
## SECURITY AGREEMENT

Section 9.1.  <u>Grant of Security Interest</u>. The Borrower (and Guarantor) hereby grants, pledges, transfers and collaterally assigns to Lender, as collateral security for all Obligations, a security interest in, and a continuing Lien upon all of Borrower's right, title and interest in, to and under, the following loan assets (collectively referred to as the "<u>Collateral</u>"):

(a)      any and all Participation Interests or Financed Loans held, owned, or otherwise belonging to Borrower;

(b)      any other loan assets financed by Lender in accordance with the terms of this Agreement;

(c)      to the extent not already included, Borrower's right, title, and interest in the proceeds of any of the foregoing;

(d)      any other assets of Borrower, upon which Lender may record financing statements or other similar liens or security instruments; and

(e)      Guarantor pledges any and all of its membership interests, including, without limitation, any financial, management, and other rights and interests, therein, to Lender and shall deliver to Lender a duly executed assignment of membership interest, which Lender may record in its sole and absolute discretion upon the occurrence

of any Event of Default.

Section 9.2    <u>Representations and Warranties</u>.

To induce the Lender to enter into the Credit Documents, the Borrower hereby represents and warrants each of the following to the Lender:

(a)    <u>Title; No Other Liens</u>.  Except for the Lien granted to the Lender herein, the Borrower owns each item of the pledged Collateral free and clear of any and all Liens.  The Borrower (a) is the beneficial owner of the Collateral pledged by it hereunder constituting instruments or certificates and (b) has rights in or the power to transfer each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien.

(b)    <u>Instruments and Tangible Chattel Paper Formerly Accounts</u>.  No amount payable to the Borrower under or in connection with any account is evidenced by any document, instrument or tangible chattel paper that has not been delivered to the Lender, properly endorsed for transfer, to the extent delivery is required by this Agreement.

(c)    <u>Commercial Tort Claims</u>.  Borrower has no commercial tort claims existing on the Closing Date.

(d)    <u>Enforcement</u>.  No permit, notice to or filing with any Governmental Authority or any other Person or any consent from any Person is required for the exercise by the Lender of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except (a) any approvals that may be required to be obtained from any bailees or landlords to collect the Collateral, or (b) other notice required by non-waivable provisions of the UCC or (c) as may be required under the Bankruptcy Code.

Section 9.3    <u>Covenants</u>.  The Borrower agrees with the Lender to the following, as long as any Obligation or commitment to extend credit remains outstanding (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted):

(a)    <u>Maintenance of Security Interest; Further Documentation and Consents</u>.

(i)    The Borrower shall not use or knowingly permit any Collateral to be used in violation of any provision of any Credit Document.

(ii)    Except as otherwise permitted in the Credit Documents or to the extent perfection actions are not required with respect to this Agreement, the Borrower shall maintain the security interest created by this Agreement and shall use commercially reasonable efforts to defend such security interest against the material claims and demands of all Persons (except to the extent that the Lender and the Borrower agree that the cost of such defense is excessive in relation to the benefit to the Lender of the security interest and priority), in each case, other than assets of the Borrower subject to a disposition permitted by <u>Section 6.2</u>.

(iii)    The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as the Lender may reasonably

request, all in reasonable detail and in form and substance reasonably satisfactory to the Lender.

(iv)    At any time and from time to time, upon the written request of the Lender, the Borrower will, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing) of any financing statement or amendment under the UCC (or other filings under similar Requirements of Law) in effect in any jurisdiction with respect to the security interest created hereby and (ii) take such further action as the Lender may reasonably request.

(v)    At the Lender's discretion, the Borrower will arrange, at the Borrower's sole expense and where consistent with the kind of interest held by the Borrower, for Lender's security interest to be noted on the documentation evidencing the Collateral as of the date hereof and from time to time.

(b)    Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper.

(i)    The Borrower will (a) upon request of the Lender following the occurrence of an Event of Default, deliver to the Lender or its designee all such Collateral; and (b) execute and deliver to the Lender, such assignments, endorsements and alloges to promissory notes or to membership interests in form reasonably satisfactory to the Lender, and such additional agreements, documents or instruments as the Lender may, from time to time, reasonably require to evidence, perfect and continue to perfect the Lender's liens and security interests granted hereunder.

(ii)    The Borrower shall not grant "control" (within the meaning of such term under Article 9-106 of the UCC) over any investment property to any Person other than the Lender.

(iii)    If any amount payable under or in connection with any Collateral owned by the Borrower shall be or become evidenced by electronic chattel paper, the Borrower shall, take all steps necessary to grant the Lender control of all such electronic chattel paper for the purposes of Section 9-105 of the UCC (or any similar section under any equivalent UCC) and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

(c)    Notices. The Borrower shall promptly (but in any event, within twenty (20) days) notify the Lender in writing of its acquisition of any interest hereafter in property that is of a type where a security interest or lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation.

Section 9.4    Remedial Provisions.

(a)    Code and Other Remedies.

(i)     <u>UCC Remedies</u>.  During the continuance of an Event of Default, the Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the UCC or any other applicable law.

(ii)     <u>Disposition of Collateral</u>.  Without limiting the generality of the foregoing, the Lender may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), after the occurrence of and during the continuance of any Event of Default (personally or through its Lenders or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving the Borrower or any other Person notice or opportunity for a hearing on the Lender's claim or action except as may be required by applicable Requirements of Law, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) sell, assign, convey, transfer, grant option or options to purchase and deliver any Collateral (enter into Contractual Obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Lender shall have the right, upon any such public sale or sales and, to the extent permitted by the UCC and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of the Borrower, which right or equity is hereby waived and released.

(iii)     <u>Management of the Collateral</u>.  The Borrower further agrees, that, upon the occurrence and during the continuance of any Event of Default, (i) at the Lender's request, it shall assemble the Collateral and make it available to the Lender at places that the Lender shall reasonably select, whether at the Borrower's premises or elsewhere, (ii) without limiting the foregoing, the Lender also has the right to require that the Borrower store and keep any Collateral pending further action by the Lender and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Lender is able to sell, assign, convey or transfer any Collateral, the Lender shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Lender and (iv) the Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Lender's remedies with respect to such appointment without prior notice or hearing as to such appointment or directly take possession of the Borrower itself through an assignment of membership interest duly executed by Guarantor or by Lender under power of attorney from Guarantor.  The Lender shall not have any obligation to the Borrower to maintain or preserve the rights of the Borrower or Guarantor as against third parties with respect to any Collateral while such Collateral is in the possession of the Lender.

(iv)    <u>Application of Proceeds</u>.  The Lender shall apply the cash proceeds of any action taken by it pursuant to this <u>Section 9.4</u>, after deducting all reasonable and documented out-of-pocket costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of the Lender hereunder, including reasonable and documented attorneys' fees and disbursements, and, in each case, subject to the limitations on reimbursement of costs and expenses in Section 11.7, to the payment in whole or in part of the Secured Obligations, as set forth herein, and only after such application and after the payment by the Lender of any other amount required by any Requirement of Law, need the Lender account for the surplus, if any, to the Borrower. Notwithstanding anything to the contrary in this Agreement or other Credit Documents, in the event of a Borrower or Guarantor default resulting in Lender taking possession of the Collateral, the Financed Loans, Borrower, or of Lender's exercise of other rights and remedies, where such event of default extends beyond the cure period and no forbearance agreement remains in effect, Lender shall be entitled to the full economic benefit of any Financed Loans and Borrower and Guarantor's rights therein shall be deemed fully extinguished.

(v)    <u>Direct Obligation</u>.  The Lender shall not be required to make any demand upon, or pursue or exhaust any right or remedy against, the Borrower or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Lender under any Credit Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirement of Law.  To the extent it may lawfully do so, the Borrower absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by applicable Requirements of Law, to the extent permitted by applicable Requirements of Law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(vi)    <u>Commercially Reasonable</u>.  To the extent that applicable Requirements of Law impose duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is not commercially unreasonable for the Lender to do any of the following:

(a)    fail to incur significant costs, expenses or other Liabilities reasonably deemed as such by the Lender to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(b)    fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(c)    fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(d)    advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature, or to contact other Persons, whether or not in the same business as the Borrower, for expressions of interest in acquiring any such Collateral;

(e)    exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature, or, to the extent deemed appropriate by the Lender, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(f)    dispose of assets in wholesale rather than retail markets;

(g)    disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(h)    purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of any Collateral or to provide to the Lender a guaranteed return from the collection or disposition of any Collateral.

The Borrower acknowledges that the purpose of this Section 9.4 is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 9.4.  Without limitation upon the foregoing, nothing contained in this Section 9.4 shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 9.4.

(b)    Accounts and Payments in Respect of General Intangibles.

(i)    In addition to, and not in substitution for, any similar requirement in this Agreement, if required by the Lender at any time during the continuance of an Event of Default, any payment of accounts or payment in respect of general intangibles, when collected by the Borrower, shall be promptly (and, in any event, within two (2) Business Days) deposited by the Borrower in the exact form

received, duly indorsed by the Borrower to the Lender) in a cash collateral account, subject to withdrawal by the Lender as provided in this Agreement. Until so turned over, when such Event of Default is continuing, such payment shall be held by the Borrower for the Lender, segregated from other funds of the Borrower.

(ii)    At any time during the continuance of an Event of Default, the Borrower shall, upon the Lender's request, deliver to the Lender all documents evidencing, and relating to, the Contractual Obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all orders, invoices and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Lender and that payments in respect thereof shall be made directly to the Lender; and

(iii)    Anything herein to the contrary notwithstanding, the Borrower shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. The Lender shall not have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Credit Document or the receipt by the Lender of any payment relating thereto, nor shall the Lender be obligated in any manner to perform any obligation of the Borrower under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

(c)    <u>Proceeds to be Turned over to and Held by the Lender</u>. During the continuance of an Event of Default, unless otherwise provided in this Agreement and unless Lender elects a superseding, mutually-exclusive remedy, all proceeds of any Collateral received by the Borrower hereunder in cash or Cash Equivalents shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower, and shall, promptly upon receipt by the Borrower, be turned over to the Lender in the exact form received (with any necessary endorsement).

(d)    <u>Deficiency</u>. The Borrower shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations in full.

Section 9.5    <u>Lender</u>.

(a)    <u>Lender's Appointment as Attorney-in-Fact</u>.

(i)    Anything in this Section 9.5(a)(i) to the contrary notwithstanding, the Lender agrees that it will not exercise any rights under the power of attorney and proxy provided for in this Section 9.5(a)(i) unless an Event of Default shall have occurred and be continuing. The Borrower hereby irrevocably constitutes and appoints the Lender and any related person thereof, with full power of

substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, for the purpose of carrying out the terms of the Credit Documents, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of the Credit Documents, and, without limiting the generality of the foregoing, the Borrower hereby gives the Lender and its related persons the power and right, on behalf of the Borrower, without notice to or assent by the Borrower, to do any of the following after an Event of Default has occurred and is continuing:

(a)    in the name of the Borrower, in its own name or otherwise, take possession of and indorse and collect any Collateral consisting of a check, draft, note, acceptance or other instrument for the payment of moneys due under any account or general intangible or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any such moneys due under any Collateral consisting of an account or general intangible or with respect to any other Collateral whenever payable;

(b)    pay or discharge taxes and Liens levied or placed on or threatened against any Collateral, effect any repair or pay any insurance called for by the terms of this Agreement (including all or any part of the premiums therefor and the costs thereof);

(c)    execute, in connection with any sale provided for in Section 9.4(a), any document to effect or otherwise necessary or appropriate in relation to evidence the sale of any Collateral or for Lender to take legal, record title of any or all Financed Loan(s); or

(d)    (A) direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to the Lender or as the Lender shall direct, (B) ask or demand for, and collect and receive payment of and receipt for, any moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice and other document in connection with any Collateral, (D) commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral, (E) defend any actions, suits, proceedings, audits, claims, demands, orders or disputes brought against the Borrower with respect to any Collateral, (F) settle, compromise or adjust any such actions, suits, proceedings, audits, claims, demands, orders or disputes and, in connection therewith, give such discharges or releases as the Lender may deem appropriate, and (G) generally, sell, assign, convey, transfer or grant a Lien on, make any Contractual Obligation with respect to and otherwise deal with, any Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes and do, at the Lender's option, at any time or from time to time, all acts and things that the Lender

deems necessary to protect, preserve or realize upon any Collateral and its security interests therein and to effect the intent of the Credit Documents, all as fully and effectively as the Borrower might do.

(e)    If the Borrower fails to perform or comply with any Contractual Obligation contained herein, the Lender, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such Contractual Obligation.

(ii)    The reasonable and documented out of pocket costs and expenses of the Lender, in each case subject to the limitations set forth in Section 11.7, incurred in connection with actions undertaken as provided in this Section 9.5, together with interest thereon at the default rate set forth herein, from the date of payment by the Lender to the date reimbursed by the Borrower, if applicable, shall be payable by the Borrower to the Lender promptly (but in no event later than thirty (30) days) following written demand therefore by the Lender to the Borrower.

(iii)    During the effectiveness of this Agreement, the Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue of this Section 9.5.    All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

(b)    Authorization to File Financing Statements. The Borrower authorizes the Lender and its related persons, at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as the Lender reasonably determines appropriate to perfect, or continue or maintain perfection of, the security interests of the Lender under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets of the debtor," "all assets of the debtor whether now existing or hereafter arising" or words of similar import. The Borrower also hereby ratifies its authorization for the Lender to have filed any initial financing statement or amendment thereto under the UCC (or other similar laws) in effect in any jurisdiction if filed prior to the date hereof.  The Borrower hereby (i) waives any right under the UCC or any other Requirement of Law to receive notice and/or copies of any filed or recorded financing statements, amendments thereto, continuations thereof or termination statements and (ii) releases and excuses the Lender from any obligation under the UCC or any other Requirement of Law to provide notice or a copy of any such filed or recorded documents.

(c)    Duty; Obligations and Liabilities.

(i)    Duty of Lender.  The Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Lender deals with similar property for its own account.  The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any such powers.  The Lender shall be accountable only for amounts that it receives as a result of the exercise of such powers, and neither it nor any of its Related Persons shall be responsible to the Borrower for any act or failure to act hereunder,

except for their own gross negligence or willful misconduct as determined by a court of competent jurisdiction. In addition, the Lender shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by the Lender in good faith.

(ii)    Obligations and Liabilities with respect to Collateral. Neither the Lender nor any Related Person thereof shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Borrower or any other Person or to take any other action whatsoever with regard to any Collateral.

Section 9.6    Reinstatement. The Borrower agrees that, if any payment made by the Borrower or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by the Lender to the Borrower, its estate, trustee, receiver or any other party, including the Borrower, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, (a) any Lien or other Collateral securing the Borrower's liability hereunder shall have been released or terminated by virtue of the foregoing or (b) any provision of the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of the Borrower in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

Section 9.7.    Release of Collateral.

(a)    So long as no Default or Event of Default has occurred and is continuing, upon request of Borrower, Lender shall release any Lien granted to or held by Lender upon any Collateral being sold or disposed of in compliance with the provisions of the Credit Documents, as determined by Lender in its sole discretion, subject to the conditions precedent that: (i) before and after giving effect to such release, no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) after giving effect to such release, the Loan Amount shall not exceed the Loan Limit, (iii) the sale or disposing of the Collateral generates enough proceeds to repay Lender for the financing of the specific Collateral to be released, (iv) on or prior to such release, Borrower shall have delivered a certificate to Lender certifying that the foregoing conditions described in clauses (i) through (iii).

(b)    Upon the indefeasible payment to Lender of all Secured Obligations, the Collateral shall be released from the Lien created hereby and this Agreement and all guaranties and other obligations (other than those expressly stated to survive such termination) of the Lender and the Borrower hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Borrower. The Borrower is hereby authorized to file UCC amendments, termination statements and such other documents as may be necessary or appropriate at

such time evidencing the termination of the Liens so released. At the request of the Borrower following any such termination, the Lender shall promptly deliver to the Borrower any Collateral of the Borrower held by the Lender hereunder and execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination.

(c)     If the Lender shall be directed or permitted pursuant to herein to release any Lien or any Collateral, such Collateral shall be released from the Lien created hereby to the extent provided under, and subject to the terms and conditions set forth in herein. In connection therewith, the Lender, at the request of the Borrower, shall execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such release.

## ARTICLE 10
## INTENTIONALLY OMITTED

## ARTICLE 11
## MISCELLANEOUS

Section 11.1. <u>Indemnification and Release Provisions</u>. Borrower and Guarantor hereby agree to defend Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents employees and attorneys from, and hold each of them harmless against, any and all losses, liabilities (including without limitation settlement costs and amounts), claims, damages, interests, judgments, costs, or expenses, including without limitation, reasonable and documented fees and disbursements of attorneys, incurred by any of them arising out of or in connection with or by reason of this Agreement, the making of the Loans or any Collateral, or any other Credit Document, or related transaction, including without limitation, any and all losses, liabilities, claims, damages, interests, judgments, costs or expenses relating to or arising under any Consumer Finance Laws or Environmental Control Statute or the application of any such statute to Borrower's or Guarantor's properties or assets (<u>provided, however</u>, that the indemnification in this <u>Section 11.1</u> shall not extend to any Taxes, however denominated, or any costs attributable to any Taxes, including without limitation penalties and interest), other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim). Borrower and Guarantor hereby release Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents employees and attorneys from any and all claims for loss, damages, costs or expenses caused or alleged to be caused by any act or omission on the part of any of them, other than such loss, damage cost or expense which has been determined by a court of competent jurisdiction to have been caused by the gross negligence or willful misconduct of Lender. All obligations provided for in this <u>Section 11.1</u> shall survive any termination of this Agreement and the repayment of the Loans.

Section 11.2. <u>Amendments</u>.  Neither the amendment or waiver of any provision of this Agreement or any other Credit Document, nor the consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and each Credit Party thereto, and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 11.3. <u>APPLICABLE LAW</u>. THIS AGREEMENT AND ALL DOCUMENTS EXECUTED IN CONNECTION HEREWITH SHALL BE DEEMED TO HAVE BEEN MADE AND TO BE PERFORMABLE IN THE STATE OF CALIFORNIA AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

Section 11.5. <u>Termination and Release</u>. This Agreement shall not terminate until all amounts due under the Notes, this Agreement and any other Credit Document and other Obligations (other than unasserted contingent obligations), together with all interest and costs due, shall have been paid in full. Upon such termination and payment of amounts owing under this Agreement, the Collateral securing the Loans, the Notes, this Agreement and the other Obligations shall be released from the provisions of this Agreement and any right, title and interest of Lender in or to the same shall cease. Thereafter, Lender agrees to deliver to Borrower and Guarantor such documents as Borrower and Guarantor request to release of record any security interest or lien of Lender in the Collateral.

Section 11.6. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart. Signature by facsimile or electronic transmission shall bind the parties hereto.

Section 11.7. <u>Costs, Expenses and Taxes</u>. In any calendar year, the Lender shall be permitted to conduct audits and inspections in accordance with this Agreement and any other Credit Documents. The Borrower shall reimburse the Lender for up two (2) such audits or inspections in any calendar year, and any additional audits or inspections will be conducted at the sole expense of the Lender; provided and notwithstanding the foregoing, upon the occurrence of an Event of Default, any such audit or inspection will be conducted at the sole expense of the Borrower without regard to such reimbursement cap. Borrower shall also pay promptly (and in any event, within three (3) Business Days) upon demand therefor all reasonable out-of-pocket fees (including without limitation, legal fees and expenses), costs and other expenses incurred by Lender in connection with collection of the Loans, the maintenance or preservation of the security interest in the Collateral, the sale, disposition or other realization on the Collateral, or the enforcement of Lender's rights hereunder, under this Agreement or under any Credit Document, including, without limitation, such fees, costs and expenses incurred by Lender which Lender, in its reasonable business judgment, deems reasonably necessary to preserve or protect the business conducted by Borrower, the Guarantor, the Collateral, or any portion thereof. In addition, Borrower shall also pay any and all Other Taxes or filing fees payable or determined to be payable in connection with the execution and delivery of the Notes and this Agreement, the Collateral and other documents to be delivered hereunder, and agrees to save Lender harmless from and against any and all liabilities with respect to or resulting from any delay in payment or omission to pay such Taxes.

Section 11.8 <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of each signatory, its successors and assigns; <u>provided</u>, however that, Borrower and Guarantor shall not have the right to assign or delegate their obligations and duties under this Agreement or any other Credit Documents or any interest therein except with the prior written consent of Lender.

Section 11.9. <u>Effectiveness of Agreement</u>. Anything to the contrary in this Agreement notwithstanding, the provisions hereof shall not be effective until this Agreement is: (a) duly executed, and delivered by authorized officers of Borrower to the Lender; and (b) duly signed by an authorized officer of the Lender.

Section 11.10. <u>Expenses</u>. Whether or not the transactions contemplated hereby shall be consummated, Borrower agrees to pay promptly (a) all Lender's actual and reasonable third-party costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the reasonable fees, expenses and disbursements of counsel to Lender in connection with the negotiation, preparation and execution of the Credit Documents; (c) all the actual third-party costs and reasonable expenses of creating and perfecting Liens in favor of Lender, including filing and recording fees, expenses and taxes, stamp or documentary taxes, and search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to Lender providing any opinions that Lender may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (d) all Lender's actual third-party costs and reasonable fees, expenses for, and disbursements of any of Lenders, auditors, accountants, consultants or appraisers, and all reasonable attorneys' fees incurred by Lender; (e) all the actual third-party costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Lender and its counsel) in connection with the custody or preservation of any of the Collateral; provided, that such fees, costs or expenses described in clauses (a) – (e) up to and including the Closing Date herein shall in no event be greater than $75,000 in the aggregate, and (f) after the occurrence of a Default or an Event of Default, all actual third-party costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by Lender in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

Section 11.11. <u>JURISDICTION AND VENUE</u>. IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY CREDIT DOCUMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, BORROWER AND GUARANTOR HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN LOS ANGELES COUNTY, STATE OF CALIFORNIA AND AGREE NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH JURISDICTION. BORROWER AND GUARANTOR AGREE THAT SERVICE OF PROCESS IN ANY SUCH PROCEEDING MAY BE DULY EFFECTED UPON THEM BY MAILING A COPY THEREOF, BY REGISTERED MAIL, POSTAGE PREPAID, TO BORROWER AND GUARANTOR.

Section 11.12. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO AND THE GUARANTOR HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATED TO

THIS AGREEMENT OR ANY CREDIT DOCUMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT.

Section 11.13. <u>USA PATRIOT Act Notice</u>. Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act, Lender is required to obtain, verify and record information that identifies Borrower, including its legal names, address, tax ID numbers and other information that will allow Lender to identify Borrower in accordance with the USA PATRIOT Act. Lender will also require information regarding Guarantor, if any, and may require information regarding Borrower's and Guarantor's management and owners, such as legal name, address, social security number and date of birth.

Section 11.14. <u>Acknowledgment of Receipt</u>. Borrower and Guarantor acknowledge receipt of a copy of this Agreement and each other Credit Document.

Section 11.15. <u>Taxes</u>.

(a) Any and all payments by or on account of any obligation of the Borrower under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding Lender) requires the deduction or withholding of any Tax from any such payment by a withholding Lender, then the applicable withholding Lender shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 11.16</u>), the applicable recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) The Borrower shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 11.16</u>) payable or paid by such Person or required to be withheld or deducted from a payment to such Person and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to the Borrower by Lender (with a copy to Lender), or by Lender shall be conclusive absent manifest error. Failure or delay on the part of Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 11.16</u> shall not constitute a waiver of such Person's right to demand such compensation.

Section 11.16. <u>Confidentiality</u>.

(a) Lender shall hold all non-public information regarding the Credit Parties and their respective businesses identified as such by the Credit Parties and obtained by Lender pursuant to the requirements hereof in accordance with Lender's customary procedures for handling confidential information of such nature, it being understood and

Doc ID: d615246145704fcac0ba092613b75b9b9c81b3d7

agreed by the Credit Parties that, in any event, Lender may make (i) disclosures of such information to Affiliates of Lender and to their agents and advisors (and to other persons authorized by Lender to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 11.17), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by Lender of any Loans or any participations therein, (iii) to Lender's financing sources, provided that prior to any disclosure, such financing source is informed of the confidential nature of the information, and (iv) disclosures required or requested by any Governmental Authority or representative thereof or pursuant to legal or judicial process; provided, unless specifically prohibited by applicable law or court order, Lender shall make reasonable efforts to notify the Credit Parties of any request by any Governmental Authority or representative thereof for disclosure of any such non-public information prior to disclosure of such information. Neither Lender nor any Credit Party shall issue any trade announcement relating to this transaction without the prior written consent of the other parties except (i) disclosures required by applicable law, regulation, legal process or the rules of the Securities and Exchange Commission. The foregoing notwithstanding, it is expressly understood by Lender, Borrower, and Guarantor that Lender intends to raise funds for the Loan through the issuance of securities on peerstreet.com, that, as part of these efforts, Lender may generally discuss this Agreement, and that such communications shall not be deemed violations of this Agreement.

[SIGNATURES FOLLOW ON NEXT PAGE.]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto and is to be effective as of the date first written above.

**LENDER**

PEER STREET FUNDING, LLC,
a Delaware limited liability company

By: _Louis A. Nees_ _____
Name:  Louis Nees
Title:    Authorized Signatory

**BORROWER**

PS WAREHOUSE, LLC,
a Delaware limited liability company

By: PS FUNDING, INC.
Its:  Member

By: _Ellen Coleman_ _____
Name:   Ellen Coleman
Title:    Treasurer

**GUARANTOR/SERVICER**

PS FUNDING, INC.,
a Delaware corporation

By: _Ellen Coleman_ _____
Name:  Ellen Coleman
Title:    Treasurer



Audit Trail

| | |
|---|---|
| **TITLE** | Loan and Security Agreement - PSWLLC PSFLLC (PS Pocket)... |
| **FILE NAME** | Loan and Security...ecution copy).pdf |
| **DOCUMENT ID** | d615246145704fcac0ba092613b75b9b9c81b3d7 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**
**02 / 02 / 2021**
09:13:27 UTC-8

Sent for signature to Ellen Coleman
(ecoleman@peerstreet.com) and Louis Nees
(lnees@peerstreet.com) from mkay@peerstreet.com
IP: 172.90.219.10

**VIEWED**
**02 / 02 / 2021**
10:02:05 UTC-8

Viewed by Ellen Coleman (ecoleman@peerstreet.com)
IP: 70.187.225.168

**SIGNED**
**02 / 02 / 2021**
10:02:22 UTC-8

Signed by Ellen Coleman (ecoleman@peerstreet.com)
IP: 70.187.225.168

**VIEWED**
**02 / 02 / 2021**
10:09:28 UTC-8

Viewed by Louis Nees (lnees@peerstreet.com)
IP: 47.155.8.42

**SIGNED**
**02 / 02 / 2021**
10:09:43 UTC-8

Signed by Louis Nees (lnees@peerstreet.com)
IP: 47.155.8.42

**COMPLETED**
**02 / 02 / 2021**
10:09:43 UTC-8

The document has been completed.

**EXHIBIT 5**

**LOAN AND SECURITY AGREEMENT**

By and Among

**PS WAREHOUSE, LLC and PS WAREHOUSE II,
LLC**
as Borrower(s),

**PS FUNDING, INC.**
as Guarantor and Servicer,

and

**PEER STREET FUNDING, LLC**
as Lender

This **LOAN AND SECURITY AGREEMENT** is made effective as of October 10, 2022 ("Effective Date"), by and among PS WAREHOUSE, LLC, a Delaware limited liability company and PS WAREHOUSE II, LLC, a Delaware limited liability company, as well as any similar Warehouse Entity (defined below) (in their respective capacity as borrower, "Borrower"), PS FUNDING, INC., a Delaware corporation ("PSFI" and in its capacity as a guarantor, "Guarantor" and in its capacity as master servicer, "Servicer"), and PEER STREET FUNDING, LLC, a Delaware limited liability company (the "Lender").

## RECITALS

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, PSFI is in the business of originating, purchasing, selling and servicing Mortgage Loans;

**WHEREAS**, as of the Effective Date, Lender has a credit facility (defined as the "Loan") below) whereby Lender will use funds received from investors to fund the the Loan and investors will receive Redeemable Warehouse Notes ("RWNs" or defined below as "RWN Securities") from Lender, in return, that represent the investor's pro rata interest in the Loan;

**WHEREAS**, Lender will make the Loan Funds (defined below) available to Borrowers, at once or progressively, and Borrowers may use those funds to: (i) purchase Financed Loans (defined below), (ii) purchase Participation Interests in Financed Loans from PSFI; (iii) lend funds to PSFI to fund Servicing Advances (as defined below); (iv) acquire interests in Servicing Advance Receivables (defined below) from PSFI; (v) make payments or prepayments on the Warehouse Loan(s), and/or (vi) invest in Permitted Investments (defined below) (each, an "Eligible Activity" and collectively, "Eligible Activities").

**WHEREAS,** Borrowers have agreed to grant a security interest in all of their respective assets, including the Participation Interests, Financed Loans, Servicing Advances and Servicing Advance Receivables, to Lender pursuant to the terms of this Agreement; and

**WHEREAS,** Guarantor has agreed to guarantee the obligations of Borrowers hereunder.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1. Certain Definitions. The terms defined in this Section 1.1, whenever used and capitalized in this Agreement, shall, unless the context otherwise requires, have the respective meanings herein specified.

"Affiliate" of any specified Person means any other Person directly or indirectly

2

controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Agreement" means this Loan and Security Agreement and all exhibits and schedules hereto, as the same may be amended, modified or supplemented from time to time.

"Anti-Terrorism Laws" means any laws relating to terrorism or money laundering, such as the USA PATRIOT Act and other laws administered by the U.S. Department of the Treasury Financial Crimes Enforcement Network.

"Backup Servicer" means any commercially reasonable, independent third-party selected by Lender who will perform servicing, collections, and/or monitoring functions with respect to the Mortgage Loans.

"Bankruptcy Code" means the United States Bankruptcy Code as now constituted or hereafter amended and any similar statute or law affecting the rights of debtors.

"Books and Records" means all of Credit Parties' original ledger cards, payment schedules, credit applications, contracts, lien and security instruments, guarantees relating in any way to the Collateral and other books and records or transcribed information of any type, whether expressed in electronic form in tapes, discs, tabulating runs, programs and similar materials now or hereafter in existence relating to the Collateral.

"Borrower" has the meaning assigned to that term in the preamble.

"Business Day" means any day except a Saturday, Sunday or other day on which national banks are authorized by law to close including, without limitation, United States federal government holidays.

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency or instrumentality of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state, territory or commonwealth of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state, territory or commonwealth of the United States, (d) any dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by any commercial bank that is (A) organized under the laws of the United States, any state, territory or commonwealth thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause

(a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"Change of Control" means the occurrence of any of the following:

(1)    the direct or indirect sale, conveyance, transfer, lease or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of any Credit Party, to any "person" (as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended));

(2)    the adoption of a plan relating to the liquidation or dissolution of any Credit Party; or

(3)    the first day on which Guarantor ceases to own 100% of the outstanding Stock in Borrower.

"Closing Date" means October 10, 2022.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and regulations with respect thereto in effect from time to time.

"Collateral" has the meaning assigned to that term in Article 9.

"Consumer Finance Laws" means all applicable laws, regulations, interpretations and guidance, federal, state and local, relating to the extension of consumer credit, and the creation of a security interest in personal property in connection therewith, as the case may be, and laws with respect to protection of consumers' interests in connection with such transactions, including without limitation, any usury laws, any privacy laws, the Electronic Signatures in Global and National Commerce Act, the Federal Consumer Credit Protection Act, the Federal Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission's Rules and Regulations and Regulations B, E and Z of the Consumer Financial Protection Bureau, as any of the foregoing may be amended from time to time.

"Contractual Obligation" means, as to any Person, any provision of any security (whether in the nature of Stock or otherwise) issued by such Person or of any written agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Credit Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"Credit Documents" means this Agreement, the Note, the Guaranty and any and all additional documents, instruments, agreements and other writings executed and delivered pursuant to or in connection with this Agreement or the Loan, as each may be amended, modified, restated or extended from time to time.

"Credit Party" means each Borrower and Guarantor.

"Default" means an event, condition or circumstance which, with the giving of notice or

the passage of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default under this Agreement or the Note.

"Delinquent" means a Mortgage Loan for which any scheduled payment remains unpaid for more than eighty-nine (89) calendar days from the original due date for such payment, in whole or in part.

"Disposition Date" means, for each Eligible Activity, the date on which Borrower sells, assigns, or otherwise disposes of its interest therein.

"Disposition Deadline" means the day, if any, by which Borrower must sell, assign, or otherwise dispose of its interest in each Eligible Activity and return the Loan proceeds used to acquire such interest to its bank account. At any time, Financed Loans comprising at least fifty percent (50%), in the aggregate, of the unpaid principal balance of all outstanding Financed Loans shall have a Disposition Deadline of not more than one hundred twenty (120) days after Borrower has acquired the corresponding Participation Interests, as designated by Borrower at the time of such acquisition. Upon the disposition of Participation Interests, Borrower shall be allowed to re-use the corresponding Loan proceeds to acquire Participation Interests in other Mortgage Loans or for other purposes permitted hereunder.

"Eligible Activity" or "Eligible Activities" has the meaning assigned to those terms in the Recitals.

"Eligible Activity Interest(s)" is any ownership interest, participation interests, assignments of security instrument, whole loan purchases, or other similar interests each Borrower has in any Eligible Activity where Mortgage Loans that a Borrower Warehouse LLCBorrower acquires with the use of Warehouse FundsLoan proceeds, causing such Mortgage Loan to be a "Financed Loan" as defined above

"Environmental Control Statutes" means any applicable federal, state, county, regional or local laws governing the control, storage, removal, spill, release or discharge of Hazardous Substances, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Hazardous Materials Transportation Act, the Emergency Planning and Community Right to Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, any similar or implementing state law, and in each case including all amendments thereto, all binding rules and regulations promulgated thereunder and requirements in permits issued in connection therewith.

"EPA" means the United States Environmental Protection Agency, or any successor thereto.

"Event of Default" has the meaning assigned to that term in Article 7.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) taxes imposed on or measured by net income (in each case, however denominated), franchise taxes, and branch profits taxes, in

each case, (i) imposed as a result of such Person being organized under the laws of, or having its principal office or, in the case of Lender, its applicable lending office located in, the jurisdiction imposing such tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect its interest in the Loans pursuant to a law in effect on the date on which Lender acquired its interest in the Loans, (c) taxes attributable to such Person's failure to comply with Section 11.15 and (d) any U.S. federal withholding taxes imposed under FATCA.

"FATCA" means (a) Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any current or future regulations or official interpretations thereof, (b) any treaty, law, regulation or other official guidance enacted in any non-U.S. jurisdiction, or relating to an intergovernmental agreement between the U.S. and any other jurisdiction, which (in either case) directly relates to the implementation of (a) above, and (c) any agreement pursuant to the implementation of clauses (a) or (b) above with the U.S. Internal Revenue Service, the U.S. government or any governmental or taxation authority in any other jurisdiction.

"Financed Loan(s)" means any Mortgage Loan or interest in Mortgage Loan that is acquired or originated by PSFI in which a Borrower acquires in whole or via a Participation Interest. After origination, Financed Loans are retained by PSFI (either in whole or assigned in whole, or in part, to a PSI Affiliate) and serviced by PSFI.

"GAAP" means generally accepted accounting principles applied on a consistent basis in the United States of America.

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing. The term "Governmental Authority" shall further include any institutional review board, ethics committee, data monitoring committee, or other committee or entity with defined authority to oversee regulatory matters.

"Guarantor" means PS Funding, Inc., a Delaware corporation, and any other Persons from time to time that are parties to the Guaranty in the capacity of a guarantor.

"Guaranty" means that certain Guaranty and Indemnification Agreement dated on or about the date hereof by Guarantor in favor of Lender, as may be amended, modified, restated or extended from time to time.

"Hazardous Substance" means any toxic, reactive, corrosive, carcinogenic, flammable or hazardous pollutant or other substance regulated under Environmental Control Statutes due to its dangerous or deleterious properties or characteristics, including without limitation petroleum and items defined in Environmental Control Statutes as "hazardous substances," "hazardous wastes,"

"pollutants" or "contaminants."

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment (or amount payable) made by or on account of any obligation of the Borrower under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interest" means the interest rate calculated in accordance with Note.

"Lender" has the meaning assigned to that term in the preamble.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses (including those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"Lien" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, including without limitation any conditional sale or title retention arrangement, and any collateral assignment, deposit arrangement or lease intended as, or having the effect of, security but excluding the interests of a lessor under operating leases.

"Loan" means the credit facility made available by the Lender to the Borrowers hereunder.

"Loan Amount" means, at any time, the aggregate unpaid principal amount of the Loan outstanding at such time.

"Loan Funds" are the monies lent by Lender to Borrower(s) from the Loan, which monies may be used by Borrower(s) for Eligible Activities.

"Loan Limit" means the lesser of (a) the net proceeds received by Lender through the issuance of RWN Securities (including the amount of capitalized interest which has been added to the principal balance of such RWN Securities) which have not been redeemed or otherwise repaid or prepaid, and (b) an amount equal to the sum of (i) one hundred percent (100%) of the available cash of the Borrower, plus (ii) one hundred percent (100%) of the unpaid principal balance of Eligible Activity funds that are not Delinquent, plus (iii) seventy-five percent (75%) of the unpaid principal balance of Eligibility Activity funds that are Delinquent; provided that, with respect to any Eligible Activity funds, the percentages set forth in clauses (b)(ii) and (b)(iii) shall be reduced to zero following the Disposition Deadline for such Eligible Activity.

"Local Authorities" means individually and collectively the state and local governmental authorities which govern the business and operations owned or conducted by Borrower.

"<u>Material Adverse Change</u>" means any event, obligation, liability or circumstance or set of events, obligations, liabilities or circumstances which:

(a)    has a material adverse effect upon or material adverse change in (i) the legality, validity or enforceability of this Agreement or any other Credit Document, (ii) the status, perfection or priority of any Lien granted to Lender under any of the Credit Documents, (iii) the value, validity, enforceability or collectability of the Collateral, (iv) the rights and remedies of the Lender under the Credit Documents, or (v) the business, properties, assets, operations, Collateral, results of operations, or financial condition of Borrower or Guarantor; or

(b)    has materially impaired or reasonably could be expected to materially impair the ability of Borrower or Guarantor to perform any of the Obligations or the ability of any party to the Credit Documents to perform its obligations under, or to consummate the transactions contemplated under, the Credit Documents.

"<u>Maturity Date</u>" shall have the meaning ascribed to such term in the Note.

"<u>Monthly Loan Limit Report</u>" has the meaning assigned to that term in <u>Section 5.3(b)</u>.

"<u>Mortgage</u>" means with respect to a Mortgage Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first Lien on a fee simple non-owner occupied single-family residential, multi-family residential, or commercial real property securing the Mortgage Note.

"<u>Mortgage File</u>" means, with respect to each Mortgage Loan, the Mortgage Note, the Mortgage, all other documents related to the Mortgage Loan, and related information contained on a data tape or similar database information maintained in the ordinary course of business.

"<u>Mortgage Loan(s)</u>" means Financed Loans and Non-Financed Loans, secured by a Mortgage, security agreement, or a participation in similar instruments, granting the lender a senior, first-position interest in that instrument.

"<u>Mortgage Note</u>" shall mean the original executed promissory note or other evidence of the indebtedness of a mortgagor with respect to a Mortgage Loan.

"<u>Non-Financed Loans</u>" shall mean specific mortgage loans or interests in mortgage loans that are originated or purchased by PSFI in which a Borrower does not acquire Participation Interests. Non-Financed Loans are either: (i) owned and serviced by PSFI or (ii) owned by a third party and serviced by PSFI.

"<u>Note</u>" means that certain Promissory Note (Callable Warehouse Credit Facility) executed by Borrower in favor of Lender, evidencing the obligation of Borrower to repay the Loan Amount, and any and all amendments, renewals, replacements or substitutions therefor.

"<u>Obligations</u>" means each and every draft, liability and obligation of every type and description which Borrower or Guarantor may now or at any time hereafter owe to Lender arising under this Agreement, the Note or any other Credit Document (whether such debt, liability or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving

8

Lender or in a transaction involving other creditors of Borrower or Guarantor, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several).

"OFAC" has the meaning specified in Section 4.10.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between such Person and the jurisdiction imposing such Tax (other than connections arising solely from such Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in the Loans or Credit Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, but excluding any Excluded Taxes and any Taxes that are Other Connection Taxes attributable to the sale of an assignment or grant of a participation by Lender hereunder.

"Participation Agreement" means that certain Participation Agreement dated on or about the date hereof between PSFI and Borrower, as may be amended, modified, restated or extended from time to time.

"Participation Interests" are participation interests, assignments of security instrument, whole loan purchases, or other similar interests in Mortgage Loans that a Borrower Borrower acquires with the use of Loan proceeds, causing such Mortgage Loan to be a "Financed Loan" as defined above.

"Permitted Investment(s)" means (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof, (ii) commercial paper maturing no more than one year from the date of creation thereof and currently having a rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (iii) certificates of deposit issued by any bank headquartered in the United States maturing no more than one year from the date of investment therein,  (iv) money market accounts, and (v) any other instruments substantially similar to the foregoing; provided that such instruments mature or are subject to redemption or withdrawal no more than one year from the date of investment therein.

9

"Persons" means all natural persons, corporations, limited partnerships, general partnerships, joint stock companies, limited liability companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and federal and state governments and agencies or regulatory authorities and political subdivisions thereof, or any other entity.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Regulatory Trigger Event" means (a) the Guarantor, the Borrower, or any Subsidiaries of Guarantor becomes the subject of any investigation, stay, order, ruling or judgment, issued by any Governmental Authority involving the legality or regulatory compliance of its business which is not satisfied, released, stayed, vacated or discharged within thirty (30) days of such Person's knowledge thereof and, in either case, the effect, outcome or resolution of such action listed above would reasonably be expected to result in (i) in the case of Borrower, a Material Adverse Change, or (ii) in the case of Guarantor or any such Subsidiary, a material adverse change in the business, properties, assets, operations, the collateral, results of operations, or financial condition of any such Person; or (b) the enactment of a usury cap applicable to the Collateral or the passage of any applicable State or Federal statute or regulation restricting the offering or sale of the Collateral which, in either case, would reasonably be expected to result in a Material Adverse Change in the sole discretion of Lender.

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor and other consultants and agents of or to such Person or any of its Affiliates.

"Requirements of Law" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or products or to which such Person or any of its Property or products is subject.

"RWN Securities" means securities issued by Lender, the proceeds of which are used to fund the Loan.

"Secured Obligations" means all the Obligations and all other obligations and liabilities of the Borrower and the Guarantor under this Agreement and the other Credit Documents.

"Servicer" has the meaning assigned to that term in the preamble.

"Servicing Advances" generally represent payments that are required to be made (or "advanced") by PSFI, as a servicer, including (A) in cases where borrowers fail to make timely payments under a Mortgage Loan, including, but not limited to, any form of "protective advance" (made to for the purpose of preserving and protecting the mortgaged property), payments of principal or interest, and payments in respect of real estate taxes and assessments or hazard, flood or primary insurance premiums required to be paid under the terms of the Mortgage Loan, and (B) the costs and expenses incurred in foreclosing upon (or undertaking similar action), preserving and selling the real property securing the Mortgage Loan, including but not limited to attorneys' and

other professional fees and expenses incurred in connection with foreclosure and liquidation or other proceedings arising in the course of servicing the Mortgage Loan, which payments are reimbursable to the servicer, generally from late payments and other collections and recoveries with respect to the Mortgage Loan for which the advance was made.

"<u>Servicing Advance Receivable(s)</u>" the contractual right to receive any and all funds due and owing to PSFI for providing Servicing Advances on behalf of borrowers of Non-Financed Loans which right is an asset which can be transferred or pledged.

"<u>Stock</u>" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, limited liability company interests or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Securities Exchange Act of 1934, as amended).

"<u>Subservicer</u>" means FCI Lender Services, Inc. or any other commercially reasonable, independent third-party sub-servicer selected by Borrower and approved by Lender who will perform servicing, collections, and/or monitoring functions with respect to the Mortgage Loans.

"<u>Sub-Servicing Agreement</u>" means with respect to each Mortgage Loan, a servicing agreement by and between Servicer and Subservicer for such Mortgage Loan, as may be amended, modified or supplemented from time to time.

"<u>Subsidiary</u>" of any entity means any corporation, limited liability company, partnership or other legal entity of which such entity directly or indirectly owns or controls at least a majority of the outstanding stock or other equity interest having general voting power. For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Tax</u>" or "<u>Taxes</u>" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" means the Uniform Commercial Code as in effect in the State of California from time to time.

"<u>Underlying Real Property Collateral</u>" means non-owner occupied single-family residential, multi-family residential, or commercial real property that secures repayment of a Mortgage Loan.

"<u>USA PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"<u>Warehouse Entity</u>" or "<u>Warehouse Entities</u>" refers to PS Warehouse, LLC, PS Warehouse II, LLC, or similar entities, either individually or collectively. The sole equity member of the Warehouse Entities is PSFI.

Section 2.1.          <u>Rules of Construction</u>.

(a)     <u>Accounting Terms</u>. Except as otherwise provided herein, financial and accounting terms used in the foregoing definitions or elsewhere in this Agreement shall be defined in accordance with GAAP.

(b)     <u>Uniform Commercial Code</u>. Except as otherwise provided herein, terms used in the foregoing definitions or elsewhere in this Agreement that are defined in the Uniform Commercial Code, including without limitation, "<u>Accounts</u>", "<u>Account Debtor</u>", "<u>Certificated Security</u>", "<u>Commercial Tort Claim</u>", "<u>Deposit Accounts</u>", "<u>Documents</u>", "<u>Instruments</u>", "<u>Investment Property</u>", "<u>General Intangibles</u>", "<u>Chattel Paper</u>", "<u>Inventory</u>", "<u>Goods</u>", "<u>Equipment</u>", "<u>Fixtures</u>", "<u>Supporting Obligations</u>", "<u>Proceeds</u>", "<u>Record</u>", "<u>Securities Account</u>", "<u>Security</u>", and "<u>Letter of Credit Rights</u>" shall have the respective meanings given to such terms in Division 9 of the UCC, if defined therein, and otherwise as defined elsewhere in the UCC.

## ARTICLE 2
## THE LOAN FACILITY

Section 2.1.   <u>Loan</u>.

(a)     Provided that no Event of Default shall have occurred and be continuing and subject to satisfaction of the conditions precedent set forth in <u>Article 3</u>, the Lender may, from time to time up to five (5) Business Days prior to the Maturity Date, on the terms and conditions of this Agreement, make one or more advances to Borrower in an aggregate principal amount not to exceed the Loan Limit. The Loan will be funded by Lender through the issuance of RWN Securities and Lender may progressively advance loan funds to Borrower as RWN Securities are sold.

(b)     Principal and Interest on the Loan shall be due and payable in accordance with the terms of the Note.

(c)     Payments or prepayments of the Loan may not be reborrowed; provided that, so long as no Event of Default is continuing and subject to satisfaction of the conditions precedent set forth in <u>Article 3</u>, the Lender may from time to time up to five (5) Business Days prior to the Maturity Date progressively advance loan funds to Borrower as RWN Securities are sold by it, and all such advances shall constitute part of the Loan hereunder.

Section 2.2   <u>Evidence of Debt; Lenders' Books and Records; the Note</u>.

(a)     <u>Lenders' Evidence of Debt</u>. Lender shall maintain in its internal records an account or accounts evidencing the Obligations of Borrower to Lender, including the amounts of the outstanding principal balance of the Loan and each advance date (if more than one), repayment and prepayment in respect thereof. Any such recordation by Lender shall be conclusive and binding upon Borrower, absent manifest error.

12

(b)    Note. Borrower shall execute and deliver to Lender on the Closing Date the Note.

Section 2.3. Repayment of the Loans. Borrower shall make all payments of principal and Interest in accordance with the terms of the Note.

Section 2.4. Use of Proceeds. The Loan proceeds shall be used by Borrower solely to acquire interest in or fund Eligible Activities. When not used for Eligible Activities, Loan proceeds shall at all times be held in cash by Borrower.

2.5. Loan Limit. If the Loan Amount exceeds the Loan Limit as calculated pursuant to any Monthly Loan Limit Report, Borrower shall, within thirty (30) Business Days, take such action as it may determine in its reasonable discretion (including, without limitation, disposing of Borrowers interest in certain Eligible Activities) to cause the Loan Amount to be less than or equal to the Loan Limit.

## ARTICLE 3
## CONDITIONS PRECEDENT

Section 3.1.    Conditions to Advance. The making of the Loan by Lender on the Closing Date or any subsequent advance is subject to the satisfaction (or waiver), of the following conditions on or before the Closing Date or the date of such advance, as applicable:

(a)    the Loan Amount shall not exceed the Loan Limit;

(b)    Lender shall have received all payments (if any) due and payable or reimbursable to Lender on or prior to the Closing Date and the date of each subsequent advance;

(c)    No Event of Default shall exist under the terms of this Agreement and the other Credit Documents, and both Borrower and Guarantor shall be in compliance with all Requirements of Law, except to the extent noncompliance could not reasonably be expected to result in a Material Adverse Change;

(d)    There shall not have occurred any Regulatory Trigger Event or other regulatory event, regulatory change or pending or threatened (in writing) proceeding that could reasonably be expected to have a material adverse effect on Borrower's or Guarantor's ability to fulfill their respective obligations under this Agreement or the Credit Documents or which would reasonably be expected to affect either such Person's ability to remain a going concern; and

(e)    Lender's receipt of such other documents and items as Lender deems necessary, in its sole discretion.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

As of the Closing Date and the date of each subsequent advance, each of Borrower and Guarantor represents and warrants to Lender as follows:

Section 4.1. <u>Representations and Warranties as to Mortgage Loans</u>. Borrower has sole ownership of the Eligible Activity Interest, free and clear of all prior assignments, claims, liens encumbrances and security interests, and has the right to pledge and grant Lender a security interest in the Eligible Activity Interests, to the extent possible. Guarantor has used the Loan Funds for the Eligible Activity and has good and valid title/ownership in the Eligible Activities funded by the Loan Funds, free and clear of all prior assignments, claims, liens encumbrances and security interests, and has the right to sell Eligible Activity Interest to Borrower.

Section 4.2. <u>Organization and Good Standing</u>. Each of Borrower and Guarantor is duly organized and validly existing in good standing under the laws of the State of Delaware and has the power and authority to engage in the business it conducts and is qualified and in good standing in those states wherein the nature of business or property owned by it requires such qualification, and is not required to be qualified in any other state; or if not so qualified, no adverse effect on Borrower's or Guarantor's business would result therefrom.

Section 4.3. <u>Perfection of Security Interest</u>. Upon the filing of financing statements in all places as are necessary to perfect the security interests and disclosing Borrower as debtor and Lender as secured party, Lender will have a perfected security interest in the Eligible Activity Interests (other than Underlying Real Property Collateral) which can be perfected by the filing of UCC-1 financing statements in Borrower's state of organization. Lender's security interest in the Eligible Activity Interests shall not be subordinate to any other interests and neither Borrower nor Guarantor shall be permitted to further encumber or pledge interests in the Eligible Activity Interests or the Financed Loans, as applicable, except where such interests would be subordinate to Lender's interest.

Section 4.4. <u>No Violations</u>. The making and performance of this Agreement or the Note does not and will not violate any provisions of any law, rule, regulation, judgment, order, writ, decree, determination or award or breach any provisions of the certificate of formation, operating agreement or other Organization Documents of Borrower or Guarantor, or constitute a default or result in the creation or imposition of any security interest in, or lien or encumbrance upon, any assets of Borrower or Guarantor (immediately or with the passage of time or with the giving of notice and passage of time, or both) under any other contract, agreement, indenture or instrument to which Borrower or Guarantor is a party or by which Borrower or Guarantor or their respective property is bound where such violation, breach, default, creation of any security interest in or lien or encumbrance upon will result in a material adverse change for Borrower or Guarantor.

Section 4.5. <u>Power and Authority</u>.

(a) Each of Borrower and Guarantor has full power and authority under the law of the state of its organization and under its Organization Documents to enter into, execute and deliver and perform the Credit Documents; to borrow monies hereunder, to incur the obligations herein provided for and to pledge and grant to Lender, a security interest in the Collateral; and

(b) All actions (corporate or otherwise) necessary or appropriate for Borrower's and Guarantor's, execution, delivery and performance of the Credit Documents have been taken.

Section 4.6. <u>Validity of Agreements</u>. Each of the Credit Documents is, or when delivered to Lender will be, duly executed and constitute valid and legally binding obligations of Borrower and Guarantor enforceable against Borrower and Guarantor in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

Section 4.7. <u>Compliance</u>. To Borrower's and Guarantor's knowledge, respectively, each of Borrower and Guarantor is in compliance in all material respects with all applicable laws and regulations, federal, state and local (including all Consumer Finance Laws (including being in compliance with privacy notice requirements under the Gramm-Leach-Bliley Act)), material to the conduct of its business and operations; each of Borrower and Guarantor possesses all the franchises, permits, licenses, certificates of compliance and approval and grants of authority necessary or required in the conduct of its business and the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with Borrower's and Guarantor's execution and performance of the Credit Documents.

Section 4.8. <u>Accuracy of Information; Full Disclosure</u>. None of the representations or warranties made by Borrower or Guarantor in the Credit Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party in connection with the Credit Documents, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

Section 4.9. <u>Taxes</u>. Each of Borrower and Guarantor has filed and will file all tax returns which are required to be filed and all such tax returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations, and has paid or will pay when due all taxes, license and other fees (whether or not shown on any tax return) of Borrower or Guarantor except taxes contested in good faith for which adequate reserves in accordance with GAAP have been established by Borrower or Guarantor on its books and records.

Section 4.10. <u>Foreign Assets Control Regulations and Anti-Money Laundering</u>. To its knowledge, each of the Borrower and Guarantor is in compliance in all material respects with all applicable U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. Neither Borrower nor Guarantor (i) is a Person designated by the U.S. government on OFAC's list of Specially Designated Nationals and Blocked Persons (the "SDN List"), (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on

15

the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Credit Document would be prohibited under U.S. law.

Section 4.11. <u>USA PATRIOT Act</u>. Each of Borrower and Guarantor is in compliance in all material respects with (a) the Trading with the Enemy Act, and each of OFAC's foreign assets control regulations and any other enabling legislation or executive order relating thereto, (b) the USA PATRIOT Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations. No part of the proceeds of the Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

## ARTICLE 5
## <u>AFFIRMATIVE COVENANTS</u>

In addition to the covenants contained in <u>Article 9</u> of this Agreement relating to the Collateral, until all Obligations (other than unasserted contingent indemnification obligations) have been satisfied in full, each of Borrower and Guarantor covenants and agrees as follows:

Section 5.1. <u>Reporting Requirements</u>. Borrower will deliver, or cause to be delivered, to Lender:

    (a)    within five (5) Business Days after the end of each calendar month, a summary report providing aggregate information for cash flow reconciliation and outstanding collateral statistics for the Collateral, including loan level information and credit attributes for all Eligible Activityat the end of such month;

    (b)    within five (5) Business Days after the end of each calendar month, a calculation of the Loan Limit, in reasonable detail and in form satisfactory to Lender (the "Monthly Loan Limit Report");

    (c)    within forty-five (45) days after the end of each calendar quarter, commencing with the quarter ending December 31, 2022, the unaudited financial statements of Borrower and Guarantor.

Section 5.2. <u>Books and Records and Lender Audit Rights</u>. Borrower and Guarantor will keep accurate and complete Books and Records concerning the Collateral and all transactions with respect thereto consistent with sound business practices  and will comply with Lender's reasonable requirements, from time to time in effect, including those concerning the submission of reports on all items of Collateral including those which are deemed to be delinquent.

Section 5.3.    <u>Borrower Notices</u>. Borrower shall promptly, and in any event within ten (10) Business Days after Borrower or any other Credit Party obtaining knowledge of the occurrence thereof, notify Lender in writing of (i) any actual or threatened in writing litigation, action, suit, arbitration, dispute, resolution, proceeding, inquiry or investigation at law or in equity or before or by any court, public board or body against or affecting any Credit Party or any of its property or assets that questions or challenges the validity or enforceability of this Agreement or any

16

of the other Credit Documents or any action to be taken in connection with the transactions contemplated hereby or thereby, (ii) any Default or Event of Default under this Agreement or any other Credit Document, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iii) any matter(s) in existence that Borrower becomes aware of affecting in any material respect the value, enforceability or collectability of Collateral taken as a whole, (iv) any action taken or threatened in writing to be taken by any Governmental Authority (or any notice of any of the foregoing) with respect to any Credit Party or any Collateral, and (v) the commencement of any proceedings by or against any Credit Party under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for any Credit Party.

Section 5.4. <u>Compliance With Applicable Law</u>. Each of Borrower and Guarantor shall comply in all material respects with all local, state and federal laws and regulations applicable to its business including without limitation the Consumer Finance Laws (including complying with privacy notice requirements under the Gramm-Leach- Bliley Act), Anti-Terrorism Laws, Environmental Control Statutes, and all laws and regulations of the Local Authorities, and the provisions and requirements of all franchises, permits, certificates of compliance and approval issued by regulatory authorities and other like grants of authority held by Borrower and Guarantor; and notify Lender promptly (and in any event, within five (5) Business Days) (and in reasonable detail) of any actual or alleged failure to materially comply with or perform, breach, violation or default under any such laws or regulations or under the terms of any of such franchises or licenses, grants of authority, or of the occurrence or existence of any facts or circumstances which with the passage of time, the giving of notice or otherwise could create such a breach, violation or default or could occasion the termination of any of such franchises or grants of authority.

Section 5.5. <u>Other Information</u>. From time to time upon reasonable request of Lender, Borrower and Guarantor will furnish to Lender such additional information and reports regarding the Collateral and the operations, businesses, affairs, prospects and financial condition of the Credit Parties.

Section 5.6. <u>Notices</u>. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement shall be given by (a) delivering it or by mailing it by first class mail to Borrower at 2121 Park Place, Suite 250, El Segundo, California, 90245 or at a different address if Borrower gives the Lender a notice of its different address; or (b) by email to <u>legal@peerstreet.com</u>. Any notice that must be given to Lender under this Agreement shall be given by (a) delivering it or by mailing it by first class mail to Lender at 2121 Park Place, Suite 250, El Segundo, California, 90245 or at a different address if Lender gives the Borrower a notice of its different address; or (b) by email to <u>mathomas@peerstreet.com</u>.

Section 5.7. <u>Operations</u>. Guarantor and Borrower shall maintain, or cause to be maintained on their behalf, satisfactory credit underwriting and operating standards, including, with respect to each obligor of each Mortgage Loan, the completion of an adequate investigation of such obligor and a determination that the credit history and anticipated performance of such obligor is and will be satisfactory and meets the standards generally observed by reasonable finance companies in the business of making private money loans secured by non-owner occupied residential or commercial real property.

17

Section 5.8. <u>Further Assurances</u>. Borrower and Guarantor shall from time to time execute and deliver to Lender such other documents and shall take such other action as may be reasonably requested by Lender in order to implement or effectuate the provisions of, or more fully perfect the rights granted or intended to be granted by Borrower and Guarantor to Lender pursuant to the terms of this Agreement, the Note or any other Credit Documents.

**ARTICLE 6**
**NEGATIVE COVENANTS**

Borrower covenants and agrees with Lender that until all Obligations (other than unasserted contingent indemnification obligations) have been satisfied in full, none of Borrower, Servicer nor Guarantor will do or permit any of the following:

Section 6.1. <u>Payments to and Transactions with Affiliates</u>. With respect to the Credit Parties (a) make any loan, advance, extension of credit or payment to any Affiliate, officer, employee, member, manager, equity holder or director of Borrower, Guarantor or any of their respective Affiliates or (b) enter into any other transaction, including, without limitation, the purchase, sale, lease or exchange of property, or the rendering or any service, to or with any Affiliate or any equity holder, officer, or employee of Borrower, Guarantor or any of their respective Affiliates <u>except</u> for transactions with or services rendered to any Affiliate of Borrower or Guarantor in the ordinary course of business and pursuant to the reasonable requirements of the business of such Affiliate and upon terms no less favorable to Borrower or Guarantor than Borrower or Guarantor would obtain in a comparable arms' length transaction with a Person not affiliated with Borrower or Guarantor. Notwithstanding this <u>Section 6.1</u> or anything else in this Agreement, (i) Borrower may enter into participation agreements with Affiliates on terms that are similar to other participation agreements involving Guarantor, Borrower, or their Affiliates, and (ii) Borrower may make distributions to Guarantor from time to time in its capacity as owner of the outstanding Stock in Borrower; provided that Borrower shall not make any such distribution if, in its reasonable determination, it would not be able to satisfy its Obligations under the Credit Documents after giving effect to such distribution.

Section 6.2. <u>Sale of Assets/Negative Pledge</u>. With respect to the Borrower(s), sell, assign, discount, pledge, grant a Lien in, encumber or otherwise dispose of any Eligible Activity Interests, except as otherwise provided herein or in the other Credit Documents and except for the dispositions of real property in the ordinary course of business made when the related Mortgage Loan has been satisfied in full.

Section 6.3. <u>Nature of Business</u>. With respect to Borrower and Guarantor, engage in any business other than the business in which Borrower or Guarantor currently is engaged or make any material change in the nature of the financings which Borrower or Guarantor is permitted to extend hereunder (including without limiting the generality of the foregoing, matters relating to size, type, term, nature and dollar amount).

Section 6.4. <u>Use of Proceeds</u>. With respect to Borrower, use the proceeds of the Loan or any other advance made by Lender hereunder for purposes other than as permitted herein or in the Note.

Section 6.5. <u>Ownership and Management</u>. With respect to the Credit Parties, allow any Change of Control.

Section 6.6. <u>Changes in Accounting</u>. With respect to the Borrower, make any significant change in accounting treatment or reporting practices, except as required by GAAP.

Section 6.7. <u>OFAC; USA PATRIOT Act</u>. With respect to the Credit Parties, fail to comply in any material respect with the laws, regulations and executive orders referred to in <u>Section 4.10</u> and <u>Section 4.11</u>.

**ARTICLE 7**
**EVENTS OF DEFAULT**

Each of the following events shall constitute an "<u>Event of Default</u>" under this Agreement:

Section 7.1. <u>Failure to Make Payments</u>. The failure of Borrower to timely make (i) any payments due under the Note, within two (2) Business Days of becoming due, or (ii) any other payment due hereunder or in respect of any other Obligation within five (5) Business Days of becoming due.

Section 7.2. <u>Information, Representations and Warranties</u>. Any representation or warranty made by any Credit Party herein or in any certificate or instrument delivered by any Credit Party in connection herewith or any other Credit Document shall be false, misleading or incorrect in any material respect at the time made or deemed made or furnished, which remains uncured for thirty (30) days after notice thereof.

Section 7.3. <u>Covenants</u>. Failure or neglect of Borrower, Servicer, or Guarantor to perform, keep or observe any term, provision, condition or covenant contained in this Agreement, or contained in any other Credit Document in any material respect, which remains uncured for ten (10) Business Days after notice thereof.

Section 7.4. <u>Collateral</u>. At any time after the grant to Lender of a security interest in or Lien upon any Collateral and the making of a UCC filing on the Borrower's assets, Lender's interest therein shall for any reason cease to be a valid and subsisting Lien in favor of Lender and/or a valid and perfected security interest in and to the Collateral purported to be covered thereby having the priority set forth therein.

Section 7.5. <u>Certain Events</u>. The occurrence of any of the following with respect to Borrower or Guarantor:

(a) <u>Voluntary Proceedings</u>. It shall (i) apply for or consent to the appointment of a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) be generally not paying its debts as such debts become due as defined in the Bankruptcy Code, (iii) make a general assignment for the benefit of its creditors, (iv) commence a voluntary case under the Bankruptcy Code, (v) fail to controvert in a timely or appropriate manner, or acquiesce in writing to, any petition filed against it in any involuntary case under the Bankruptcy Code, or (vi) take any corporate action for the purpose of effecting any of the foregoing.

(b) <u>Involuntary Proceeding</u>. A proceeding or case shall be commenced

19

against it without its application or consent in any court of competent jurisdiction, seeking (i) the liquidation, reorganization, dissolution, winding up, or composition or readjustment of debts, of it, (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for it or of all or any substantial part of its assets, or (iii) similar relief in respect of it under any law providing for the relief of debtors, and such proceeding or case shall continue undismissed or unstayed and in effect, for a period of sixty (60) days, or an order for relief against it shall be entered in an involuntary case under the Bankruptcy Code.

(c)    Suspension of Activities. Either Borrower or Guarantor liquidates, dissolves, terminates or suspends its business operations or otherwise fails to operate its business in the ordinary course whether done voluntarily or pursuant to a court,  regulatory or other order or directive.

(d)    Servicer Default. A Default with respect to the Servicer or Subservicer occurs and such Default has not been cured or the Servicer and/or Subservicer has not been replaced by a Backup Servicer (or another successor servicer reasonably acceptable to Lender), in either case, within thirty (30) days after the date on which such Default occurred.

Section 7.6.    Guarantor.  Guarantor shall repudiate, purport to revoke or fail to perform Guarantor's obligations under the Guaranty, or any other Credit Document to which it is party or a petition shall be filed by or against Guarantor under the Bankruptcy Code naming Guarantor as a debtor.

Section 7.8. Credit Documents. An event of default following the expiration of any cure period (however defined) shall occur under any Credit Document other than this Agreement or any material provision of any Credit Document shall at any time for any reason be declared to be null and void or the validity or enforceability thereof shall be contested by any Credit Party. Any Credit Party shall in writing rescind or repudiate any Credit Document or any of its obligations under any Credit Document or any material term thereof shall cease to be, or is asserted any Credit Party not to be, a legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms.

Section 7.9.    Change of Control. The occurrence of a Change of Control.

Section 7.10.    Insolvency. Any Credit Party shall become insolvent.

Section 7.11. Liquidation Trigger. The occurrence of a "Liquidation Trigger" under and as defined in the documentation governing the RWN Securities.

Section 7.12    Cure Period. The cure periods, if any, set forth above shall run from the earlier of (x) the date on which such violation shall first become known to any officer of Borrower or Guarantor or (y) the date on which written notice thereof is given to Borrower or Guarantor by Lender.

## ARTICLE 8
## REMEDIES OF LENDER AND WAIVER

Section 8.1. Lender's Remedies. Upon the occurrence and during the continuance of an Event of Default, Lender may (i) immediately terminate this Agreement and/or (ii) declare

the Obligations immediately due and payable without presentment, notice of dishonor, protest or further notice of any kind, all of which Borrower and Guarantor hereby expressly waive. Upon such occurrence and/or declaration, Lender shall have, in addition to the rights and remedies given to it by the Note, this Agreement and the other Credit Documents, all the rights and remedies of a secured party as provided in the UCC (regardless of whether such Uniform Commercial Code has been adopted in the jurisdiction where such rights and remedies are asserted) and without limiting the generality of the foregoing, and without demand of performance and without other notice (except as specifically required by the Note, this Agreement or the documents executed in connection herewith) or demand whatsoever to any Credit Party, all of which are hereby expressly waived, Lender may, in addition to all the rights conferred upon it by law, exercise one or more of the following rights successively or concurrently: (a) to take possession of the Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which Borrower and Guarantor hereby expressly waive), (b) to lawfully dispose of the whole or any part of the Collateral, or any other Property, instrument or document pledged as security for any Obligation at public or private sale, with the right on the part of Lender or its nominees to become the purchaser thereof as provided by law absolutely freed and discharged from any equity of redemption, and all trusts and other claims whatsoever; (c) after deduction of all legal and other costs and expenses permitted by law, including attorneys' fees, to apply the Collateral or all or any portion of proceeds thereof on account of, or to hold as a reserve against, all Obligations; and (d) to exercise any other rights and remedies available to it by law or agreement. Any remainder of the proceeds after satisfaction in full of the Obligations shall be distributed as required by applicable law. Notice of any sale or disposition of Collateral shall be given to Borrower and Guarantor at least ten (10) days before any intended public sale or the time after which any intended private sale or other disposition of the Collateral is to be made, which Borrower and Guarantor agree shall be reasonable notice of such sale or other disposition.

Section 8.2. <u>Waiver and Release by Borrower</u>. To the extent permitted by applicable law, each of Borrower and Guarantor: (a) waives presentment and protest of the Note and this Agreement and notice and opportunity to be heard, after acceleration in the manner provided in <u>Article 8</u> of this Agreement, before exercise by Lender of the remedies of self-help or set-off permitted by law or by any agreement with Borrower or Guarantor, and except where required hereby or by law, notice of any other action taken by Lender; and (b) releases Lender and its officers, attorneys and employees from all claims for loss or damage caused by any act or omission on the part of Lender or its officers, attorneys, and employees, except willful misconduct or gross negligence.

Section 8.3. <u>No Waiver</u>. Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege under the Note or this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other further exercise of any right, power or privilege.

### ARTICLE 9
### SECURITY AGREEMENT

Section 9.1.    <u>Grant of Security Interest</u>. Each Borrower and Guarantor hereby grants, pledges, transfers and collaterally assigns to Lender, as collateral security for all Obligations of such Credit Party, a security interest in, and a continuing Lien upon all of such Credit Party's right, title and interest in, to and under, the following loan assets of such Credit

Party (collectively referred to as the "Collateral"):

      (a)     as to the Borrower,

          (i) any and all Participation Interests or Financed Loans held, owned, or otherwise belonging to Borrower;

          (ii) any other loan assets financed by Lender in accordance with the terms of this Agreement;

          (iii) to the extent not already included, Borrower's right, title, and interest in the proceeds of any of the foregoing; and

          (iv) all other assets of Borrower, including any rights, title and interest to the Eligible Activities financed by Loan Funds; and

      (b)     as to Guarantor, any and all of its membership interests in the Borrower, including, without limitation, any financial, management, and other rights and interests therein.

      (c)     In furtherance of the foregoing, (i) Lender may record financing statements or other similar liens or security instruments listing each Credit Party, as debtor, and the Lender, as secured party, and covering the Collateral of such Credit Party, and (ii) Guarantor shall deliver to Lender a duly executed assignment of membership interest, which Lender may record in its sole and absolute discretion upon the occurrence of any Event of Default.

Section 9.2   Representations and Warranties.

To induce the Lender to enter into the Credit Documents, the Borrower hereby represents and warrants each of the following to the Lender:

      (a)    Title; No Other Liens.  Except for the Lien granted to the Lender herein, the Borrower owns each item of the pledged Collateral free and clear of any and all Liens.  The Borrower (a) is the beneficial owner of the Collateral pledged by it hereunder constituting instruments or certificates and (b) has rights in or the power to transfer each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien.

      (b)    Instruments and Tangible Chattel Paper Formerly Accounts.  No amount payable to the Borrower under or in connection with any account is evidenced by any document, instrument or tangible chattel paper that has not been delivered to the Lender, properly endorsed for transfer, to the extent delivery is required by this Agreement.

      (c)    Commercial Tort Claims.  Borrower has no commercial tort claims existing on the Closing Date.

      (d)    Enforcement.  No permit, notice to or filing with any Governmental Authority or any other Person or any consent from any Person is required for the exercise by the Lender of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except (a) any approvals that may be required to be obtained

from any bailees or landlords to collect the Collateral, (b) other notice required by non-waivable provisions of the UCC or (c) as may be required under the Bankruptcy Code.

Section 9.3    <u>Covenants</u>.  The Borrower agrees with the Lender to the following, as long as any Obligation remains outstanding (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted):

(a)    <u>Maintenance of Security Interest; Further Documentation and Consents</u>.

(i)    The Borrower shall not use or knowingly permit any Collateral to be used in violation of any provision of any Credit Document.

(ii)    Except as otherwise permitted in the Credit Documents or to the extent perfection actions are not required with respect to this Agreement, the Borrower shall maintain the security interest created by this Agreement and shall use commercially reasonable efforts to defend such security interest against the material claims and demands of all Persons (except to the extent that the Lender and the Borrower agree that the cost of such defense is excessive in relation to the benefit to the Lender of the security interest and priority), in each case, other than assets of the Borrower subject to a disposition permitted by <u>Section 6.2</u>.

(iii)    The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as the Lender may reasonably request, all in reasonable detail and in form and substance reasonably satisfactory to the Lender.

(iv)    At any time and from time to time, upon the written request of the Lender, the Borrower will, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing) of any financing statement or amendment under the UCC (or other filings under similar Requirements of Law) in effect in any jurisdiction with respect to the security interest created hereby and (ii) take such further action as the Lender may reasonably request.

(v)    At the Lender's discretion, the Borrower will arrange, at the Borrower's sole expense and where consistent with the kind of interest held by the Borrower, for Lender's security interest to be noted on the documentation evidencing the Collateral as of the date hereof and from time to time.

(b)    <u>Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper</u>.

(i)    The Borrower will (a) upon request of the Lender following the occurrence of an Event of Default, deliver to the Lender or its designee all such Collateral constituting instruments and tangible chattel paper; and (b) execute and deliver to the Lender, such assignments, endorsements and allonges to promissory notes or to membership interests in form reasonably satisfactory to the Lender, and

such additional agreements, documents or instruments as the Lender may, from time to time, reasonably require to evidence, perfect and continue to perfect the Lender's liens and security interests granted hereunder.

(ii)    The Borrower shall not grant "<u>control</u>" (within the meaning of such term under Article 9-106 of the UCC) over any investment property to any Person other than the Lender.

(iii)    If any amount payable under or in connection with any Collateral owned by the Borrower shall be or become evidenced by electronic chattel paper, the Borrower shall, take all steps necessary to grant the Lender control of all such electronic chattel paper for the purposes of Section 9-105 of the UCC (or any similar section under any equivalent UCC) and all "<u>transferable records</u>" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

(c)    <u>Notices</u>. The Borrower shall promptly (but in any event, within twenty (20) days) notify the Lender in writing of its acquisition of any interest hereafter in property that is of a type where a security interest or lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation.

Section 9.4    <u>Remedial Provisions</u>.

(a)    <u>Code and Other Remedies</u>.

(i)    <u>UCC Remedies</u>.    During the continuance of an Event of Default, the Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the UCC or any other applicable law.

(ii)    <u>Disposition of Collateral</u>.    Without limiting the generality of the foregoing, the Lender may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), after the occurrence of and during the continuance of any Event of Default (personally or through its Lenders or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving the Borrower or any other Person notice or opportunity for a hearing on the Lender's claim or action except as may be required by applicable Requirements of Law, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) sell, assign, convey, transfer, grant option or options to purchase and deliver any Collateral (enter into Contractual Obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Lender shall have the right, upon any such public sale or sales and, to the extent permitted by the UCC and other applicable Requirements of Law, upon any such

private sale, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of the Borrower, which right or equity is hereby waived and released.

(iii)    <u>Management of the Collateral</u>.  The Borrower further agrees, that, upon the occurrence and during the continuance of any Event of Default, (i) at the Lender's request, it shall assemble the Collateral and make it available to the Lender at places that the Lender shall reasonably select, whether at the Borrower's premises or elsewhere, (ii) without limiting the foregoing, the Lender also has the right to require that the Borrower store and keep any Collateral pending further action by the Lender and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Lender is able to sell, assign, convey or transfer any Collateral, the Lender shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Lender and (iv) the Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Lender's remedies with respect to such appointment without prior notice or hearing as to such appointment or directly take possession of the Borrower itself through an assignment of membership interest duly executed by Guarantor or by Lender under power of attorney from Guarantor.  The Lender shall not have any obligation to the Borrower to maintain or preserve the rights of the Borrower or Guarantor as against third parties with respect to any Collateral while such Collateral is in the possession of the Lender.

(iv)    <u>Application of Proceeds</u>.  The Lender shall apply the cash proceeds of any action taken by it pursuant to this <u>Section 9.4</u>, after deducting all reasonable and documented out-of-pocket costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of the Lender hereunder, including reasonable and documented attorneys' fees and disbursements, and, in each case, subject to the limitations on reimbursement of costs and expenses in Section 11.7, to the payment in whole or in part of the Secured Obligations, as set forth herein, and only after such application and after the payment by the Lender of any other amount required by any Requirement of Law, need the Lender account for the surplus, if any, to the Borrower. Notwithstanding anything to the contrary in this Agreement or other Credit Documents, in the event of a Borrower or Guarantor default resulting in Lender taking possession of the Collateral, the Financed Loans, Borrower, or of Lender's exercise of other rights and remedies, where such event of default extends beyond the cure period and no forbearance agreement remains in effect, Lender shall be entitled to the full economic benefit of any Financed Loans and Borrower and Guarantor's rights therein shall be deemed fully extinguished.

(v)    <u>Direct Obligation</u>.  The Lender shall not be required to make any demand upon, or pursue or exhaust any right or remedy against, the Borrower or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Lender under any Credit Document shall be cumulative, may be exercised individually or concurrently

25

and not exclusive of any other rights or remedies provided by any Requirement of Law.  To the extent it may lawfully do so, the Borrower absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by applicable Requirements of Law, to the extent permitted by applicable Requirements of Law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(vi)    <u>Commercially Reasonable</u>.    To the extent that applicable Requirements of Law impose duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is not commercially unreasonable for the Lender to do any of the following:

(a)    fail to incur significant costs, expenses or other Liabilities reasonably deemed as such by the Lender to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(b)    fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(c)    fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(d)    advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature, or to contact other Persons, whether or not in the same business as the Borrower, for expressions of interest in acquiring any such Collateral;

(e)    exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature, or, to the extent deemed appropriate by the Lender, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(f)    dispose of assets in wholesale rather than retail markets;

(g)     disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(h)     purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of any Collateral or to provide to the Lender a guaranteed return from the collection or disposition of any Collateral.

The Borrower acknowledges that the purpose of this Section 9.4 is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 9.4.  Without limitation upon the foregoing, nothing contained in this Section 9.4 shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section 9.4.

(b)     Accounts and Payments in Respect of General Intangibles.

(i)     In addition to, and not in substitution for, any similar requirement in this Agreement, if required by the Lender at any time during the continuance of an Event of Default, any payment of accounts or payment in respect of general intangibles, when collected by the Borrower, shall be promptly (and, in any event, within two (2) Business Days) deposited by the Borrower in the exact form received, duly endorsed by the Borrower to the Lender in a cash collateral account, subject to withdrawal by the Lender as provided in this Agreement.  Until so turned over, when such Event of Default is continuing, such payment shall be held by the Borrower for the Lender, segregated from other funds of the Borrower.

(ii)     At any time during the continuance of an Event of Default, the Borrower shall, upon the Lender's request, deliver to the Lender all documents evidencing, and relating to, the Contractual Obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all orders, invoices and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Lender and that payments in respect thereof shall be made directly to the Lender; and

(iii)     Anything herein to the contrary notwithstanding, the Borrower shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  The Lender shall not have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Credit Document or the receipt by the Lender of any payment relating thereto, nor shall the Lender be obligated in any manner to perform any obligation of the Borrower under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any

27

claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

(c)     Proceeds to be Turned over to and Held by the Lender.  During the continuance of an Event of Default, unless otherwise provided in this Agreement and unless Lender elects a superseding, mutually-exclusive remedy, all proceeds of any Collateral received by the Borrower hereunder in cash or Cash Equivalents shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower, and shall, promptly upon receipt by the Borrower, be turned over to the Lender in the exact form received (with any necessary endorsement).

(d)     Deficiency.  The Borrower shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations in full.

Section 9.5     Lender.

(a)     Lender's Appointment as Attorney-in-Fact.

(i)     Anything in this Section 9.5(a)(i) to the contrary notwithstanding, the Lender agrees that it will not exercise any rights under the power of attorney and proxy provided for in this Section 9.5(a)(i) unless an Event of Default shall have occurred and be continuing.  The Borrower hereby irrevocably constitutes and appoints the Lender and any related person thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, for the purpose of carrying out the terms of the Credit Documents, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of the Credit Documents, and, without limiting the generality of the foregoing, the Borrower hereby gives the Lender and its related persons the power and right, on behalf of the Borrower, without notice to or assent by the Borrower, to do any of the following after an Event of Default has occurred and is continuing:

(a)     in the name of the Borrower, in its own name or otherwise, take possession of and indorse and collect any Collateral consisting of a check, draft, note, acceptance or other instrument for the payment of moneys due under any account or general intangible or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any such moneys due under any Collateral consisting of an account or general intangible or with respect to any other Collateral whenever payable;

(b)     pay or discharge taxes and Liens levied or placed on or threatened against any Collateral, effect any repair or pay any insurance called for by the terms of this Agreement (including all or any part of the premiums therefor and the costs thereof);

(c)     execute, in connection with any sale provided for in Section 9.4(a), any document to effect or otherwise necessary or appropriate in relation to evidence the sale of any Collateral or for Lender to take legal, record title of any or all Financed Loan(s); or

(d)     (A) direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to the Lender or as the Lender shall direct, (B) ask or demand for, and collect and receive payment of and receipt for, any moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice and other document in connection with any Collateral, (D) commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral, (E) defend any actions, suits, proceedings, audits, claims, demands, orders or disputes brought against the Borrower with respect to any Collateral, (F) settle, compromise or adjust any such actions, suits, proceedings, audits, claims, demands, orders or disputes and, in connection therewith, give such discharges or releases as the Lender may deem appropriate, and (G) generally, sell, assign, convey, transfer or grant a Lien on, make any Contractual Obligation with respect to and otherwise deal with, any Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes and do, at the Lender's option, at any time or from time to time, all acts and things that the Lender deems necessary to protect, preserve or realize upon any Collateral and its security interests therein and to effect the intent of the Credit Documents, all as fully and effectively as the Borrower might do.

(e)     If the Borrower fails to perform or comply with any Contractual Obligation contained herein, the Lender, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such Contractual Obligation.

(ii)     The reasonable and documented out of pocket costs and expenses of the Lender, in each case subject to the limitations set forth in Section 11.7, incurred in connection with actions undertaken as provided in this Section 9.5, together with interest thereon at the default rate set forth herein, from the date of payment by the Lender to the date reimbursed by the Borrower, if applicable, shall be payable by the Borrower to the Lender promptly (but in no event later than thirty (30) days) following written demand therefore by the Lender to the Borrower.

(iii)     During the effectiveness of this Agreement, the Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue of this Section 9.5.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

(b)     Authorization to File Financing Statements. The Borrower authorizes the Lender and its related persons, at any time and from time to time, to file or record

29

financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as the Lender reasonably determines appropriate to perfect, or continue or maintain perfection of, the security interests of the Lender under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets of the debtor," "all assets of the debtor whether now existing or hereafter arising" or words of similar import. The Borrower also hereby ratifies its authorization for the Lender to have filed any initial financing statement or amendment thereto under the UCC (or other similar laws) in effect in any jurisdiction if filed prior to the date hereof. The Borrower hereby (i) waives any right under the UCC or any other Requirement of Law to receive notice and/or copies of any filed or recorded financing statements, amendments thereto, continuations thereof or termination statements and (ii) releases and excuses the Lender from any obligation under the UCC or any other Requirement of Law to provide notice or a copy of any such filed or recorded documents.

(c)     Duty; Obligations and Liabilities.

(i)     Duty of Lender. The Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Lender deals with similar property for its own account. The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it receives as a result of the exercise of such powers, and neither it nor any of its Related Persons shall be responsible to the Borrower for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as determined by a court of competent jurisdiction. In addition, the Lender shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by the Lender in good faith.

(ii)     Obligations and Liabilities with respect to Collateral. Neither the Lender nor any Related Person thereof shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Borrower or any other Person or to take any other action whatsoever with regard to any Collateral.

Section 9.6     Reinstatement. The Borrower agrees that, if any payment made by the Borrower or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by the Lender to the Borrower, its estate, trustee, receiver or any other party, including the Borrower, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, (a) any Lien or other Collateral securing the Borrower's liability hereunder shall have been released or terminated by virtue of the foregoing or (b) any provision of the Guaranty shall have been terminated, canceled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish,

release, discharge, impair or otherwise affect the obligations of the Borrower in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

Section 9.7.  Release of Collateral.

(a)    So long as no Default or Event of Default has occurred and is continuing, Lender shall automatically release any Lien granted to or held by Lender upon any Collateral being sold or disposed of in compliance with the provisions of the Credit Documents, subject to the conditions precedent that: (i) before and after giving effect to such release, no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) after giving effect to such release, the Loan Amount shall not exceed the Loan Limit, and (iii) the sale or disposing of the Collateral generates enough proceeds for the financing of the specific Collateral to be released.

(b)    Upon the indefeasible payment to Lender of all Secured Obligations, the Collateral shall be released from the Lien created hereby and this Agreement and all guaranties and other obligations (other than those expressly stated to survive such termination) of the Lender and the Borrower hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Borrower. The Borrower is hereby authorized to file UCC amendments, termination statements and such other documents as may be necessary or appropriate at such time evidencing the termination of the Liens so released. At the request of the Borrower following any such termination, the Lender shall promptly deliver to the Borrower any Collateral of the Borrower held by the Lender hereunder and execute and deliver to the Borrower such documents as the Borrower shall reasonably request, to evidence such termination.

(c)    If the Lender shall be directed or permitted herein to release any Lien or any Collateral, such Collateral shall be released from the Lien created hereby to the extent provided hereunder, and subject to the terms and conditions set forth herein. In connection therewith, the Lender, at the request of the Borrower, shall execute and deliver to the Borrower such documents as the Borrower shall reasonably request, to evidence such release.

## ARTICLE 10
## INTENTIONALLY
## OMITTED

## ARTICLE 11
## MISCELLANEOUS

Section 11.1. Indemnification and Release Provisions. Borrower and Guarantor hereby agree to defend Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents employees and attorneys from, and hold each of them harmless against, any and all losses, liabilities (including without limitation settlement costs and amounts), claims, damages, interests, judgments, costs, or expenses, including without limitation, reasonable and documented fees and disbursements of attorneys, incurred by any of them arising out of or in connection with or by reason of this Agreement, the making of the Loan or any Collateral, or any

other Credit Document, or related transaction, including without limitation, any and all losses, liabilities, claims, damages, interests, judgments, costs or expenses relating to or arising under any Consumer Finance Laws or Environmental Control Statute or the application of any such statute to Borrower's or Guarantor's properties or assets (provided, however, that the indemnification in this Section 11.1 shall not extend to any Taxes, however denominated, or any costs attributable to any Taxes, including without limitation penalties and interest, other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim). Borrower and Guarantor hereby release Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents employees and attorneys from any and all claims for loss, damages, costs or expenses caused or alleged to be caused by any act or omission on the part of any of them, other than such loss, damage cost or expense which has been determined by a court of competent jurisdiction to have been caused by the gross negligence or willful misconduct of Lender. All obligations provided for in this Section 11.1 shall survive any termination of this Agreement and the repayment of the Loan.

Section 11.2. Amendments. Neither the amendment or waiver of any provision of this Agreement or any other Credit Document, nor the consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and each Credit Party thereto, and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 11.3. APPLICABLE LAW. THIS AGREEMENT AND ALL DOCUMENTS EXECUTED IN CONNECTION HEREWITH SHALL BE DEEMED TO HAVE BEEN MADE AND TO BE PERFORMABLE IN THE STATE OF CALIFORNIA AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.

Section 11.4. Reserved.

Section 11.5. Termination and Release. This Agreement shall not terminate until all amounts due under the Note, this Agreement and any other Credit Document and other Obligations (other than unasserted contingent obligations), together with all interest and costs due, shall have been paid in full. Upon such termination and payment of amounts owing under this Agreement, the Collateral securing the Loan, the Note, this Agreement and the other Obligations shall be released from the provisions of this Agreement and any right, title and interest of Lender in or to the same shall cease. Thereafter, Lender agrees to deliver to Borrower and Guarantor such documents as Borrower and Guarantor request to release of record any security interest or lien of Lender in the Collateral.

Section 11.6. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart. Signature by facsimile or electronic transmission shall bind the parties hereto.

Section 11.7. Costs, Expenses and Taxes. In any calendar year, the Lender shall be permitted to conduct audits and inspections in accordance with this Agreement and any other Credit Documents. The Borrower shall reimburse the Lender for up two (2) such audits or inspections in any calendar year, and any additional audits or inspections will be conducted at the sole expense of the Lender; provided and notwithstanding the foregoing, upon the occurrence of

an Event of Default, any such audit or inspection will be conducted at the sole expense of the Borrower without regard to such reimbursement cap. Borrower shall also pay promptly (and in any event, within three (3) Business Days) upon demand therefor all reasonable out-of-pocket fees (including without limitation, legal fees and expenses), costs and other expenses incurred by Lender in connection with collection of the Loan, the maintenance or preservation of the security interest in the Collateral, the sale, disposition or other realization on the Collateral, or the enforcement of Lender's rights hereunder, under this Agreement or under any Credit Document, including, without limitation, such fees, costs and expenses incurred by Lender which Lender, in its reasonable business judgment, deems reasonably necessary to preserve or protect the business conducted by Borrower, the Guarantor, the Collateral, or any portion thereof. In addition, Borrower shall also pay any and all Other Taxes or filing fees payable or determined to be payable in connection with the execution and delivery of the Note and this Agreement, the Collateral and other documents to be delivered hereunder, and agrees to save Lender harmless from and against any and all liabilities with respect to or resulting from any delay in payment or omission to pay such Taxes.

Section 11.8 <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of each signatory, its successors and assigns; <u>provided</u>, however that, Borrower and Guarantor shall not have the right to assign or delegate their obligations and duties under this Agreement or any other Credit Documents or any interest therein except with the prior written consent of Lender.

Section 11.9. <u>Effectiveness of Agreement</u>. Anything to the contrary in this Agreement notwithstanding, the provisions hereof shall not be effective until this Agreement is: (a) duly executed and delivered by authorized officers of Borrower and Guarantor to the Lender; and (b) duly signed by an authorized officer of the Lender.

Section 11.10. <u>Expenses</u>. Whether or not the transactions contemplated hereby shall be consummated, Borrower agrees to pay promptly (a) all Lender's actual and reasonable third-party costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the reasonable fees, expenses and disbursements of counsel to Lender in connection with the negotiation, preparation and execution of the Credit Documents; (c) all the actual third-party costs and reasonable expenses of creating and perfecting Liens in favor of Lender, including filing and recording fees, expenses and taxes, stamp or documentary taxes, and search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to Lender providing any opinions that Lender may request in respect of the Collateral or the Liens created pursuant to the Credit Documents; (d) all Lender's actual third-party costs and reasonable fees, expenses for, and disbursements of any of Lenders, auditors, accountants, consultants or appraisers, and all reasonable attorneys' fees incurred by Lender; (e) all the actual third-party costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Lender and its counsel) in connection with the custody or preservation of any of the Collateral; provided, that such fees, costs or expenses described in clauses (a) – (e) up to and including the Closing Date herein shall in no event be greater than $75,000 in the aggregate, and (f) after the occurrence of a Default or an Event of Default, all actual third-party costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by Lender in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any

33

Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

Section 11.11. <u>JURISDICTION AND VENUE</u>. IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY CREDIT DOCUMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, BORROWER AND GUARANTOR HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN LOS ANGELES COUNTY, STATE OF CALIFORNIA AND AGREE NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH JURISDICTION. BORROWER AND GUARANTOR AGREE THAT SERVICE OF PROCESS IN ANY SUCH PROCEEDING MAY BE DULY EFFECTED UPON THEM BY MAILING A COPY THEREOF, BY REGISTERED MAIL, POSTAGE PREPAID, TO BORROWER AND GUARANTOR.

Section 11.12. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO AND THE GUARANTOR HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY CREDIT DOCUMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT.

Section 11.13. <u>USA PATRIOT Act Notice</u>. Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act, Lender is required to obtain, verify and record information that identifies Borrower, including its legal names, address, tax ID numbers and other information that will allow Lender to identify Borrower in accordance with the USA PATRIOT Act. Lender will also require information regarding Guarantor, if any, and may require information regarding Borrower's and Guarantor's management and owners, such as legal name, address, social security number and date of birth.

Section 11.14. <u>Acknowledgment of Receipt</u>. Borrower and Guarantor acknowledge receipt of a copy of this Agreement and each other Credit Document.

Section 11.15. <u>Taxes</u>.

(a)     Any and all payments by or on account of any obligation of the Borrower under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding Lender) requires the deduction or withholding of any Tax from any such payment by a withholding Lender, then the applicable withholding Lender shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 11.15</u>), the applicable recipient

34

receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      The Borrower shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 11.15</u>) payable or paid by such Person or required to be withheld or deducted from a payment to such Person and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant governmental authority. A certificate as to the amount of such payment or liability delivered to the Borrower by Lender shall be conclusive absent manifest error. Failure or delay on the part of Lender to demand compensation pursuant to the foregoing provisions of this <u>Section 11.15</u> shall not constitute a waiver of such Person's right to demand such compensation.

Section 11.16. <u>Confidentiality</u>.

(a) Lender shall hold all non-public information regarding the Credit Parties and their respective businesses identified as such by the Credit Parties and obtained by Lender pursuant to the requirements hereof in accordance with Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by the Credit Parties that, in any event, Lender may make (i) disclosures of such information to Affiliates of Lender and to their agents and advisors (and to other persons authorized by Lender to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 11.16), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by Lender of the Loan or any participations therein, (iii) to Lender's financing sources, provided that prior to any disclosure, such financing source is informed of the confidential nature of the information, and (iv) disclosures required or requested by any Governmental Authority or representative thereof or pursuant to legal or judicial process; provided, unless specifically prohibited by applicable law or court order, Lender shall make reasonable efforts to notify the Credit Parties of any request by any Governmental Authority or representative thereof for disclosure of any such non-public information prior to disclosure of such information. Neither Lender nor any Credit Party shall issue any trade announcement relating to this transaction without the prior written consent of the other parties except disclosures required by applicable law, regulation, legal process or the rules of the Securities and Exchange Commission. The foregoing notwithstanding, it is expressly understood by Lender, Borrower, and Guarantor that Lender intends to raise funds for the Loan through the issuance of securities on peerstreet.com, that, as part of these efforts, Lender may generally discuss this Agreement, and that such communications shall not be deemed violations of this Agreement.

[SIGNATURES FOLLOW ON NEXT PAGE.]

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto and is to be effective as of the date first written above.

**LENDER**

PEER STREET FUNDING, LLC,
a Delaware limited liability company

By:    Peer Street, Inc.,
        a Delaware corporation, its Member


By: _____
        Brewster Johnson, President


**BORROWER**

PS WAREHOUSE, LLC,
a Delaware limited liability company

By: PS FUNDING, INC.
Its: Member


By: _____
Name:   Brewster Johnson
Title:    President


PS WAREHOUSE II, LLC,
a Delaware limited liability company

By: PS FUNDING, INC.
Its: Member


By: _____
Name:   Brewster Johnson
Title:    President

**GUARANTOR/SERVICER**

PS FUNDING, INC.,
a Delaware corporation

By: _____
Name:  Brewster Johnson
Title:    President

## **EXHIBIT 6**

*Execution Version*

## PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT (this "**Agreement**") is dated as of February 1, 2021, by and between PS Funding, Inc., a Delaware corporation ("**PS Funding**") and PS Warehouse, LLC, a Delaware limited liability company ("**PS Warehouse**").

### RECITALS

This Agreement is made on the basis of the following facts:

A.      PS Funding buys loans and interests in loans (each a "**Loan**" and collectively the "**Loans**") evidenced by, among other things, a promissory note (each a "**Note**") executed by the borrower (each a "**Borrower**"), and secured by, among other things, a mortgage or deed of trust of even date therewith (the "**Mortgage**") granted by Borrower encumbering certain real and personal property more particularly described therein (the "**Property**").

B.      Each Note, Mortgage, and all other documents now or hereafter evidencing, securing and/or executed in connection with each Loan, are referred to herein, collectively, as the "Loan Documents"; the Property and all other collateral now or hereafter pledged under any of the Loan Documents or as collateral for the Loan is referred to herein as the "Collateral".

C.      PS Funding and PS Warehouse (each a "**Participant**," and collectively, the "**Participants**") collectively fund the Loan purchases in the relative percentages set forth in Exhibit A attached hereto, and PS Funding and PS Warehouse hereby desire to set forth their respective rights and obligations concerning the Loans and the Loan Documents.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      Recitals. The Recitals are incorporated into and made a part of this Agreement.

2.      Proportionate Share. As of the date hereof, each Participant owns that portion of the Loans set forth in Exhibit A attached hereto; the ratio of each Participant's share of the total amount of the Loans as set forth in Exhibit A shall be referred to herein as its "Proportionate Share."

3.      PS Funding's Covenants.

3.1.      Eligible Loans. Each Loan subject to this Agreement shall be an "Eligible Loan" as such term is defined in Exhibit B attached hereto, on the date of funding for such Loan (the "**Participation Date**").

3.2.      Loan Documents.  Subject to Section 7.3 below, PS Funding shall hold each Note, Mortgage and other Loan Documents for the benefit of all Participants.

3.3.    Performance of Loan Documents. Subject to Section 7.3 below, PS Funding shall perform all of the functions of the lender under the Loan Documents (including administering, or causing to be administered, all accounts and other amounts held by PS Funding under any Loan Document, and all other escrow or reserve accounts created or established pursuant to the Loan Documents) including, without limitation, the following functions:

(a)    Receipt of Payments. Subject to Section 7.3 below, PS Funding shall receive all sums due or received from Borrower under the Note and the other Loan Documents for the ratable benefit of all Participants. Subject to Section 7.3 hereof, to the extent such payments are made by Borrower, PS Funding shall accept and distribute such payments in accordance with Section 3.4 of this Agreement.

(b)    Enforcement of the Loan Documents. Subject to Section 7.3 below, PS Funding shall have and retain the right, power and authority to take any action, or to refrain from taking any action, as PS Funding may deem necessary or appropriate in its discretion to satisfy the obligations, enforce the rights, exercise the remedies and pursue any other benefits available under the Loan Documents or any title insurance or other insurance policy delivered or maintained in connection with the Loans.

(i)    Notices to Participants. PS Funding shall give prompt notice to the other Participants at the address set forth herein of the occurrence of any of the following events: (A) PS Funding has notified Borrower in writing of a Default or Event of Default under any of the Loan Documents; (B) Borrower has notified PS Funding in writing of a Default or Event of Default under any of the Loan Documents; (C) any event which, in PS Funding's judgment, has a material adverse effect on the value of the Collateral; and (D) any event which, in PS Funding's judgment, has a material effect on Borrower's ability to repay the Loan in accordance with the provisions of the Loan Documents. Notwithstanding anything in this Section, PS Funding shall not be responsible for reporting to any Participant on the economy, business climate or other general economic factors which may affect the Collateral or the economic viability of the properties being financed by the Loan.

(ii)    Borrower's Default. Subject to Section 7.3 below, upon the occurrence of an Event of Default by Borrower under any Loan Document, PS Funding's exercise (or forbearance from any exercise) of any of its rights and remedies under the Loan Documents shall be within PS Funding's sole authority and discretion.

(c)    PS Funding shall not assign, grant a security interest, collaterally assign or otherwise encumber Loan Documents, any rights of PS Funding to exercise remedies with respect to the Loan Documents, or any proceeds of the foregoing.

3.4.    Distribution.

(a)    Subject to the provisions of Sections 3.4(b) and 7.3 below, PS Funding shall promptly pay to each Participant such Participant's Proportionate Share of all payments of principal and interest made by Borrower under the Note, but excluding any amounts held in escrow or otherwise applied by PS Funding in accordance with the terms of the Loan Documents. Any payment or credit to a Participant shall be subject to PS Funding's right to deduct

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

sums for expenses, advances and liabilities referred to herein, including, without limitation, expenses for and of loan servicers and other agents engaged by PS Funding.

(b)    If any payment, prepayment or other amount received by PS Funding under the Note or the other Loan Documents must be returned or released for any reason, each Participant shall promptly upon demand therefor remit to PS Funding such Participant's Proportionate Share of the amount to be returned by PS Funding.

3.5.    <u>Maintenance of Records</u>. PS Funding shall keep proper books of account and records reflecting the interests of each Participant in the Loans, which books and records shall be available for inspection and copying by any Participant upon reasonable notice during normal business hours. Upon request, any Participant may demand and receive an accounting of all monies received and Collateral held by PS Funding in connection with the Loans.

3.6.    <u>Repurchase Obligation</u>. PS Funding shall repurchase any Loan for which any of the statements in <u>Section 3.1</u> was not true and correct as of its related Participation Date. PS Funding shall repurchase any such Loan on the date mutually agreed to by PS Funding and the other Participants, which date shall be within a commercially reasonable time period, not to exceed five (5) Business Days, after PS Funding receives written notice of the circumstance giving rise to repurchase. On that date, automatically and without further action, upon payment to the other Participants of the Repurchase Price for such Loan pursuant to <u>Section 3.7</u>, such other Participants shall be deemed to have sold to PS Funding, without recourse, representation or warranty other than as provided under <u>Section 3.7</u>, all of such Participant's right, title and interest in, to, and under such Loan and all subsequent proceeds thereof. Each party shall execute all agreements and other documents, and shall take all other actions, reasonably requested by the other to effect any required repurchase.

3.7.    <u>Repurchase Price</u>. For each repurchase of a Loan under <u>Section 3.6</u>, the "Repurchase Price" to be paid by PS Funding to each other Participant with respect to such Loan shall be equal to such Participant's Proportionate Share of (i) the outstanding principal balance of such Loan as of the date of such repurchase (without giving effect to any adjustments thereof for charge-offs or otherwise), plus (ii) all accrued and unpaid regular contract interest on such outstanding principal balance up to and including the date of such repurchase, minus (iii) all accrued and unpaid Servicing Fees with respect to such Loan up to and including the date of such repurchase. Upon receipt of such Repurchase Price, such Participant shall transfer its interest in such repurchased Loan to PS Funding on an "AS-IS," "WHERE-IS" basis, without any recourse, representations or warranties other than with respect to such Participant's clear and marketable title to such repurchased Loan, to the extent clear and marketable title was transferred to such Participant by PS Funding hereunder. Any payment of the Repurchase Price by PS Funding pursuant to this <u>Section 3.7</u> shall be made by the wire transfer of immediately available funds to the bank account designated by such Participant.

4.    <u>Necessary Advances and Expenses</u>.

4.1.    <u>Necessary Advances</u>. Subject to Section 7.3 below, PS Funding may advance such funds as may be necessary for insurance premiums, real estate taxes, other taxes and assessments or such funds as may be reasonably necessary for the preservation, maintenance,

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

repair or completion of improvements or renovations of the Collateral, when in the judgment of PS Funding (as exercised under Section 6 below) such advances are reasonably necessary to preserve and protect the Collateral or the interests of the Participants under the Loan Documents.

4.2.    Expenses Shared by Participants. All losses, costs and expenses incurred by PS Funding (including, without limitation, attorneys' fees and expenses) in connection with (a) the purchase of the Loans, (b) the administration (including any servicing fees or costs paid to any third party) or collection of the Loans, (c) enforcement of any obligations of Borrower or rights or remedies of PS Funding under the Loan Documents, (d) any claim on any insurance policy, lawsuit, collection activity, receivership action, foreclosure, acceptance of a conveyance in lieu thereof, or (e) any other exercise of any of its rights or remedies under the Loan Documents (individually, an "**Enforcement Action**"), and all amounts advanced by PS Funding (except PS Funding's Proportionate Share of any such advances) in accordance with this Agreement, the Loan Documents or any Enforcement Action, shall be shared by PS Funding and the Participants based upon their respective Proportionate Shares. Promptly upon demand made by PS Funding, each Participant shall pay to PS Funding such Participant's Proportionate Share of any reasonable expense, cost, advance or other amount incurred by PS Funding in connection with the administration or collection of the Loans or any Enforcement Action. PS Funding shall have the right to deduct each Participant's Proportionate Share of such costs, expenses or advances from any distributions described in Section 3.4.

5.    Acquisition of Collateral. If PS Funding (or its designee) acquires title to any Collateral, this Agreement shall continue in full force and effect with respect to such Collateral, and each Participant shall be deemed to have an undivided interest in such Collateral equal to the Participant's proportionate share therein. Each Participant shall pay its proportionate share of expenses for maintenance and operation of the Collateral, including but not limited to all expenses related to the ownership, management, and/or sale or other disposition of such Collateral (the decisions with respect thereto to be made by PS Funding as part of its rights and authority under Section 3.3 above). If, as result of any Enforcement Action, PS Funding recovers any monies available for repayment of the Loan, then PS Funding shall remit to each Participant such Participant's proportionate share of such proceeds, subject to PS Funding's right to deduct sums for expenses, advances and liabilities referred to herein.

6.    Duty of Care. In discharging its responsibilities under this Agreement in connection with the Loans, PS Funding shall endeavor to exercise the same care and judgment as it ordinarily exercises in the performance of its own business affairs; provided, however, that PS Funding shall be liable to the other Participants for any losses incurred in relation to the Loans only if such incurrence is due to the gross negligence or willful misconduct of PS Funding or its agents. Notwithstanding the foregoing, in no event shall PS Funding have any liability to any Participant for any act done or not done if such action or inaction is authorized pursuant to the terms of this Agreement or has otherwise been given such Participant's consent. The foregoing limitations on PS Funding's liability shall apply to all obligations undertaken by PS Funding under all provisions of this Agreement. Nothing contained in this Agreement or in any Loan Document shall be deemed or construed to create a partnership or joint venture between the Participants.

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

7. <u>Miscellaneous</u>.

7.1. <u>Other Arrangements</u>. Nothing contained in this Agreement shall prohibit PS Funding from entering into new credit arrangements or continuing existing credit arrangements with any Borrower, guarantor or any other party in any way related to a Borrower or the Loans.

7.2. <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of California without reference to choice of law rules, and shall be subject to all applicable laws and official orders, rules and regulations governing the Participants. If any provision of this Agreement, or the transactions contemplated hereby, are found to be inconsistent with or contrary to any law, official order, rule or regulation, this Agreement shall be deemed modified in accordance with such law, order, rule or regulation and, as so modified, shall continue in full force and effect.

7.3. <u>Assignment and Termination of PS Funding's Duties</u>. With the exception of PS Funding being a named lender (whether in fact, by participation or as successor by assignment) for each Loan, all of the rights and obligations delegated to PS Funding in this Agreement are terminable at any time for any reason in the sole discretion of PS Funding by written notice to PS Warehouse given in accordance with Section 7.8 hereof. Subject to the terms contained herein, PS Funding is permitted to delegate its duties hereunder to any loan servicer, document custodian or other agent chosen by PS Funding in its reasonable discretion and acceptable to Lender. PS Funding shall be permitted to make assignments of the Loans at the direction of PS Warehouse in its sole discretion.

7.4. <u>Permitted Assigns; Binding Effect</u>. Any Participant (other than PS Funding) desiring to sell, assign, convey, pledge or make any transfer of such Participant's interest in the Loan or any part thereof shall give prior, written notice to PS Funding of such desire.  Subject to Section 7.3 above, PS Funding shall have the right to approve or disapprove any such transfer in its sole discretion. This Agreement shall be binding upon and inure to the benefit of the Participants and their respective successors and permitted assigns.

7.5. <u>Integration; Survival</u>. This Agreement sets forth the entire agreement between the Participants with respect to the subject matter hereof and shall survive the foreclosure of any lien created under the Loan Documents or acquisition by the Participants of all Collateral securing the Loans.

7.6. <u>Counterparts</u>.  This Agreement may be executed in counterparts and/or electronically.

7.7. <u>No Representations by PS Funding</u>. PS Funding makes no  representation or warranty as to: (a) the legality, collectability, due execution, sufficiency, validity, genuineness or enforceability of the Loan Documents; (b) the accuracy or completeness of matters disclosed, represented or warranted by Borrower or any guarantor; (c) the value of the Collateral; (d) the performance of any obligation of Borrower or any guarantor; or (e) the financial condition of Borrower or any guarantor.

7.8. <u>Notices</u>. Any notice required or permitted to be given under this Agreement shall be in writing and will be deemed given (a) upon personal delivery or via email, (b) on the

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

first business day after recepted delivery to a courier service which guarantees next-business-day delivery, or (c) on the third business day after mailing, by registered or certified United States mail, postage prepaid, in any case to the appropriate party at its address set forth below:

> If to PS Funding:
>
> c/o Peer Street, Inc.
> 2121 Park Place, Suite 250, El Segundo, CA 90245
> Attention: Legal Department
> E-Mail: legal@peerstreet.com
>
> If to PS Warehouse:
>
> c/o Peer Street, Inc.
> 2121 Park Place, Suite 250, El Segundo, CA 90245
> Attention: Legal Department
> E-Mail: legal@peerstreet.com

Any party may change such party's address for notices or copies of notices by giving notice to the other parties in accordance with this Section.

      7.9.    <u>Third Party Beneficiary</u>. For as long as the Loan and Security Agreement, dated the date hereof, by and among PS Warehouse, PS Funding, Inc., and Peer Street Funding, LLC, a Delaware limited liability company (the "**Lender**"), as amended, restated, supplemented or otherwise modified, from time to time, is in effect, Lender shall be an intended third party beneficiary of this Agreement with the right to enforce provisions pursuant to this Agreement, and this Agreement shall not be amended without Lender's consent.

[SIGNATURE FOLLOW ON NEXT PAGE.]

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

IN WITNESS HEREOF, the parties have executed this Agreement as of the date written above.

**PS FUNDING, INC.**
a Delaware corporation

By: *Ellen Coleman*
Name: Ellen Coleman
Its:     Treasurer

**PS WAREHOUSE, LLC,**
a Delaware limited liability company

By:  PS Funding, Inc.
Its:   Member

By: *Ellen Coleman*
Name: Ellen Coleman
Its:     Treasurer

[Signature Page to Participation Agreement]

# **EXHIBIT A**

|  | Percentage |
|---|---|
| PS Funding, Inc. | 0% |
| PS Warehouse, LLC | 100% |

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

## **EXHIBIT B**

"Eligible Loan" means, as of the related Participation Date, a Loan which meets PS Funding's internal credit, pricing and operational policy guidelines and, if applicable, complies with the underwriting guidelines of any commercial partner or bank partner to the extent that PS Funding is using such partner to originate the Loans and with respect to which the following eligibility criteria are satisfied as of such date of determination:

(a)      does not have a payment default with respect to any scheduled payment of the principal aggregate amount owed or interests accrued as of the related Participation Date and no other known default, breach, violation or event permitting acceleration under the terms of such Loan; and

(b)      is supplemented by a title insurance policy insuring PS Funding that its security interest is not junior or subordinate to any other security interest.

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | PeerStreet Pocket Documents |
| **FILE NAME** | Guaranty - ...n copy).pdf and 4 others |
| **DOCUMENT ID** | 15ae68e0846420a1193ea2628a1b735a80a05c7b |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **02 / 01 / 2021**<br>14:56:13 UTC-8 | Sent for signature to Ellen Coleman (ecoleman@peerstreet.com) and Louis Nees (lnees@peerstreet.com) from mkay@peerstreet.com<br>IP: 172.90.219.10 |
| **VIEWED** | **02 / 01 / 2021**<br>14:58:00 UTC-8 | Viewed by Louis Nees (lnees@peerstreet.com)<br>IP: 47.155.8.42 |
| **SIGNED** | **02 / 01 / 2021**<br>14:58:34 UTC-8 | Signed by Louis Nees (lnees@peerstreet.com)<br>IP: 47.155.8.42 |
| **VIEWED** | **02 / 01 / 2021**<br>16:50:37 UTC-8 | Viewed by Ellen Coleman (ecoleman@peerstreet.com)<br>IP: 70.187.225.168 |
| **SIGNED** | **02 / 01 / 2021**<br>16:50:52 UTC-8 | Signed by Ellen Coleman (ecoleman@peerstreet.com)<br>IP: 70.187.225.168 |
| **COMPLETED** | **02 / 01 / 2021**<br>16:50:52 UTC-8 | The document has been completed. |

**EXHIBIT 7**

## PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT (this "**Agreement**") is dated as of October 10, 2022, by and between PS Funding, Inc., a Delaware corporation ("**PS Funding**"), and PS Warehouse II, LLC, a Delaware limited liability company ("**PS Warehouse II**").

### RECITALS

This Agreement is made on the basis of the following facts:

A.    PS Funding buys loans and interests in loans (each a "**Loan**" and collectively the "**Loans**") evidenced by, among other things, a promissory note (each a "**Note**") executed by the borrower (each a "**Borrower**"), and secured by, among other things, a mortgage or deed of trust of even date therewith (the "**Mortgage**") granted by Borrower encumbering certain real and personal property more particularly described therein (the "**Property**").

B.    Each Note, Mortgage, and all other documents now or hereafter evidencing, securing and/or executed in connection with each Loan, are referred to herein, collectively, as the "**Loan Documents**"; the Property and all other collateral now or hereafter pledged under any of the Loan Documents or as collateral for the Loan is referred to herein as the "**Collateral**".

C.    PS Funding and PS Warehouse II (each a "**Participant**," and collectively, the "**Participants**") collectively fund the Loan purchases in the relative percentages set forth in Exhibit A attached hereto, and PS Funding and PS Warehouse II hereby desire to set forth their respective rights and obligations concerning the Loans and the Loan Documents.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Recitals. The Recitals are incorporated into and made a part of this Agreement.

2.    Proportionate Share. As of the date hereof, each Participant owns that portion of the Loans set forth in Exhibit A attached hereto; the ratio of each Participant's share of the total amount of the Loans as set forth in Exhibit A shall be referred to herein as its "**Proportionate Share**."

3.    PS Funding's Covenants.

3.1.    Eligible Loans. Each Loan subject to this Agreement shall be an "Eligible Loan" as such term is defined in Exhibit B attached hereto, on the date of funding for such Loan (the "**Participation Date**").

3.2.    Loan Documents. Subject to Section 7.3 below, PS Funding shall hold each Note, Mortgage and other Loan Documents for the benefit of all Participants according to their Proportionate Share.

3.3.    Performance of Loan Documents. Subject to Section 7.3 below, PS Funding shall perform all of the functions of the lender under the Loan Documents (including administering, or causing to be administered, all accounts and other amounts held by PS Funding under any Loan Document, and all other escrow or reserve accounts created or established pursuant to the Loan Documents) including, without limitation, the following functions:

(a)    <u>Receipt of Payments</u>. Subject to Section 7.3 below, PS Funding shall receive all sums due or received from Borrower under the Note and the other Loan Documents for the ratable benefit of all Participants. Subject to Section 7.3 below, to the extent such payments are made by Borrower, PS Funding shall accept and distribute such payments in accordance with Section 3.4 of this Agreement.

(b)    <u>Enforcement of the Loan Documents</u>. Subject to Section 7.3 below, PS Funding shall have and retain the right, power and authority to take any action, or to refrain from taking any action, as PS Funding may deem necessary or appropriate in its discretion to satisfy the obligations, enforce the rights, exercise the remedies and pursue any other benefits available under the Loan Documents or any title insurance or other insurance policy delivered or maintained in connection with the Loans.

(i)    <u>Notices to Participants</u>. PS Funding shall give prompt notice to the other Participants at the address set forth herein of the occurrence of any of the following events: (A) PS Funding has notified Borrower in writing of a Default or Event of Default under any of the Loan Documents; (B) Borrower has notified PS Funding in writing of a Default or Event of Default under any of the Loan Documents; (C) any event which, in PS Funding's judgment, has a material adverse effect on the value of the Collateral; and (D) any event which, in PS Funding's judgment, has a material effect on Borrower's ability to repay the Loan in accordance with the provisions of the Loan Documents. Notwithstanding anything in this Section, PS Funding shall not be responsible for reporting to any Participant on the economy, business climate or other general economic factors which may affect the Collateral or the economic viability of the properties being financed by the Loan.

(ii)    <u>Borrower's Default</u>. Subject to Section 7.3 below, upon the occurrence of an Event of Default by Borrower under any Loan Document, PS Funding's exercise (or forbearance from any exercise) of any of its rights and remedies under the Loan Documents shall be within PS Funding's sole authority and discretion.

(c)    <u>No Assignment</u>. PS Funding shall not assign, grant a security interest, collaterally assign or otherwise encumber Loan Documents, any rights of PS Funding to exercise remedies with respect to the Loan Documents, or any proceeds of the foregoing.

3.4.    <u>Distribution</u>.

(a)    Subject to the provisions of Sections 3.4(b) and 7.3 below, PS Funding shall promptly pay to each Participant such Participant's Proportionate Share of all payments of principal and interest made by Borrower under the Note, but excluding any amounts held in escrow or otherwise applied by PS Funding in accordance with the terms of the Loan Documents. Any payment or credit to a Participant shall be subject to PS Funding's right to deduct sums for expenses, advances and liabilities referred to herein, including, without limitation, expenses for and of loan servicers and other agents engaged by PS Funding.

(b)    If any payment, prepayment or other amount received by PS Funding under the Note or the other Loan Documents must be returned or released for any reason, each Participant shall promptly upon demand therefor remit to PS Funding such Participant's Proportionate Share of the amount to be returned by PS Funding.

3.5.    <u>Maintenance of Records</u>. PS Funding shall keep proper books of account and records reflecting the interests of each Participant in the Loans, which books and records shall be available for inspection and copying by any Participant upon reasonable notice during normal business hours. Upon request, any Participant may demand and receive an accounting of all monies received and Collateral held by PS Funding in connection with the Loans.

3.6.  <u>Repurchase</u>.

(a)  PS Funding shall repurchase any Loan for which any of the statements in <u>Section 3.1</u> was not true and correct as of its related Participation Date. PS Funding shall repurchase any such Loan on the date mutually agreed to by PS Funding and the other Participants, which date shall be within a commercially reasonable time period, not to exceed five (5) Business Days, after PS Funding receives written notice of the circumstance giving rise to repurchase.

(b)  PS Funding shall repurchase any Loan on the date, if any, specified by PS Warehouse II at the time PS Warehouse II acquires its Proportionate Share in such Loan (the "Repurchase Deadline"). At any time, Loans comprising at least fifty percent (50%), in the aggregate, of the unpaid principal balance of all outstanding Loans shall have a Repurchase Deadline of not more than one hundred twenty (120) days after PS Warehouse II has acquired its Proportionate Share therein.

(c)  Upon written notice to PS Funding from PS Warehouse II given by the first (1st) day of any month (or if such day is not a business day, the preceding business day), PS Funding shall repurchase any Loan identified in such notice by the first (1st) day of the month (and if such day does not fall on a business day, then the immediately following business day) immediately following such notice.

(d)  PS Funding may repurchase any Loan without premium or penalty on any date.

(e)  On the date of any repurchase, automatically and without further action, upon payment to the other Participants of the Repurchase Price for such Loan pursuant to <u>Section 3.7</u>, such other Participants shall be deemed to have sold to PS Funding, without recourse, representation or warranty other than as provided under <u>Section 3.7</u>, all of such Participant's right, title and interest in, to, and under such Loan and all subsequent proceeds thereof. Each party shall execute all agreements and other documents, and shall take all other actions, reasonably requested by the other to effect any repurchase.

3.7.  <u>Repurchase Price</u>. For each repurchase of a Loan under <u>Section 3.6</u>, the **"Repurchase Price"** to be paid by PS Funding to each other Participant with respect to such Loan shall be equal to such Participant's Proportionate Share of (i) the outstanding principal balance of such Loan as of the date of such repurchase (without giving effect to any adjustments thereof for charge-offs or otherwise), plus (ii) all accrued and unpaid regular contract interest on such outstanding principal balance up to and including the date of such repurchase, minus (iii) all accrued and unpaid servicing fees with respect to such Loan up to and including the date of such repurchase. Upon receipt of such Repurchase Price, such Participant shall transfer its interest in such repurchased Loan to PS Funding on an "AS-IS," "WHERE-IS" basis, without any recourse, representations or warranties other than with respect to such Participant's clear and marketable title to such repurchased Loan, to the extent clear and marketable title was transferred to such Participant by PS Funding hereunder. Any payment of the Repurchase Price by PS Funding pursuant to this <u>Section 3.7</u> shall be made by the wire transfer of immediately available funds to the bank account designated by such Participant.

4.  <u>Necessary Advances and Expenses</u>.

4.1.  <u>Necessary Advances</u>. Subject to Section 7.3 below, PS Funding may advance such funds as may be necessary for insurance premiums, real estate taxes, other taxes and assessments or such funds as may be reasonably necessary for the preservation, maintenance,

repair or completion of improvements or renovations of the Collateral, when in the judgment of PS Funding (as exercised under Section 6 below) such advances are reasonably necessary to preserve and protect the Collateral or the interests of the Participants under the Loan Documents.

4.2.  <u>Expenses Shared by Participants</u>. All losses, costs and expenses incurred by PS Funding (including, without limitation, attorneys' fees and expenses) in connection with (a) the purchase of the Loans, (b) the administration (including any servicing fees or costs paid to any third party) or collection of the Loans, (c) enforcement of any obligations of Borrower or rights or remedies of PS Funding under the Loan Documents, (d) any claim on any insurance policy, lawsuit, collection activity, receivership action, foreclosure, acceptance of a conveyance in lieu thereof, or (e) any other exercise of any of its rights or remedies under the Loan Documents (individually, an **"Enforcement Action"**), and all amounts advanced by PS Funding (except PS Funding's Proportionate Share of any such advances) in accordance with this Agreement, the Loan Documents or any Enforcement Action, shall be shared by PS Funding and the Participants based upon their respective Proportionate Shares. Promptly upon demand made by PS Funding, each Participant shall pay to PS Funding such Participant's Proportionate Share of any reasonable expense, cost, advance or other amount incurred by PS Funding in connection with the administration or collection of the Loans or any Enforcement Action. PS Funding shall have the right to deduct each Participant's Proportionate Share of such costs, expenses or advances from any distributions described in Section 3.4.

5.  <u>Acquisition of Collateral</u>. If PS Funding (or its designee) acquires title to any Collateral, this Agreement shall continue in full force and effect with respect to such Collateral, and each Participant shall be deemed to have an undivided interest in such Collateral equal to the Participant's Proportionate Share therein. Each Participant shall pay its Proportionate Share of expenses for maintenance and operation of the Collateral, including but not limited to all expenses related to the ownership, management, and/or sale or other disposition of such Collateral (the decisions with respect thereto to be made by PS Funding as part of its rights and authority under Section 3.3 above). If, as result of any Enforcement Action, PS Funding recovers any monies available for repayment of the Loan, then PS Funding shall remit to each Participant such Participant's Proportionate Share of such proceeds, subject to PS Funding's right to deduct sums for expenses, advances and liabilities referred to herein.

6.  <u>Duty of Care</u>. In discharging its responsibilities under this Agreement in connection with the Loans, PS Funding shall endeavor to exercise the same care and judgment as it ordinarily exercises in the performance of its own business affairs; provided, however, that PS Funding shall be liable to the other Participants for any losses incurred in relation to the Loans only if such incurrence is due to the gross negligence or willful misconduct of PS Funding or its agents. Notwithstanding the foregoing, in no event shall PS Funding have any liability to any Participant for any act done or not done if such action or inaction is authorized pursuant to the terms of this Agreement or has otherwise been given such Participant's consent. The foregoing limitations on PS Funding's liability shall apply to all obligations undertaken by PS Funding under all provisions of this Agreement. Nothing contained in this Agreement or in any Loan Document shall be deemed or construed to create a partnership or joint venture between the Participants.

7.  <u>Miscellaneous</u>.

7.1.  <u>Other Arrangements</u>. Nothing contained in this Agreement shall prohibit PS Funding from entering into new credit arrangements or continuing existing credit arrangements with any Borrower, guarantor or any other party in any way related to a Borrower or the Loans.

7.2.  <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of California without reference to choice of law rules, and

shall be subject to all applicable laws and official orders, rules and regulations governing the Participants. If any provision of this Agreement, or the transactions contemplated hereby, are found to be inconsistent with or contrary to any law, official order, rule or regulation, this Agreement shall be deemed modified in accordance with such law, order, rule or regulation and, as so modified, shall continue in full force and effect.

7.3.    Assignment and Termination of PS Funding's Duties.

(a)    With the exception of PS Funding being a named lender (whether in fact, by participation or as successor by assignment) for each Loan, all of the rights and obligations delegated to PS Funding in this Agreement are terminable at any time for any reason in the sole discretion of PS Funding by written notice to PS Warehouse II given in accordance with Section 7.8 hereof. Subject to the terms contained herein, PS Funding is permitted to delegate its duties hereunder to any loan servicer, document custodian or other agent chosen by PS Funding in its reasonable discretion and acceptable to Lender (as defined below). PS Funding shall be permitted to make assignments of the Loans at the direction of PS Warehouse II in its sole discretion.

(b)    All of the rights and obligations delegated to PS Funding in this Agreement are, with respect to any Loan, terminable at any time for any reason in the sole discretion of PS Warehouse II by written notice to PS Funding given in accordance with Section 7.8 hereof.

(c)    Upon termination pursuant to this Section 7.3, all legal title to the underlying Loans shall be deemed to have been conveyed to PS Warehouse II such that PS Warehouse II shall be the sole legal, beneficial and record owner of the Loans (including, without limitation, the related servicing rights appurtenant thereto) and PS Funding shall cooperate with PS Warehouse II in effectuating such transfer, including without limitation, by agreeing to execute and deliver to PS Warehouse II such reasonable and appropriate documents, instruments or agreements as may be necessary or appropriate to effectuate such transfer (including without limitation, all assignments and endorsements of the Loan Documents to the benefit of PS Warehouse II).

7.4.    Permitted Assigns; Binding Effect. Any Participant (other than PS Funding) desiring to sell, assign, convey, pledge or make any transfer of such Participant's interest in the Loan or any part thereof shall give prior, written notice to PS Funding of such desire. Subject to Section 7.3 above, PS Funding shall have the right to approve or disapprove any such transfer in its sole discretion. This Agreement shall be binding upon and inure to the benefit of the Participants and their respective successors and permitted assigns.

7.5.    Integration; Survival. This Agreement sets forth the entire agreement between the Participants with respect to the subject matter hereof and shall survive the foreclosure of any lien created under the Loan Documents or acquisition by the Participants of all Collateral securing the Loans.

7.6.    Counterparts.    This Agreement may be executed in counterparts and/or electronically.

7.7.    No Representations by PS Funding. PS Funding makes no representation or warranty as to: (a) the legality, collectability, due execution, sufficiency, validity, genuineness or enforceability of the Loan Documents; (b) the accuracy or completeness of matters disclosed, represented or warranted by Borrower or any guarantor; (c) the value of the Collateral; (d) the performance of any obligation of Borrower or any guarantor; or (e) the financial condition of Borrower or any guarantor.

7.8.    Notices. Any notice required or permitted to be given under this Agreement shall be in writing and will be deemed given (a) upon personal delivery or via email, (b) on the first business day after receipted delivery to a courier service which guarantees next-business-day delivery, or (c) on the third business day after mailing, by registered or certified United States mail, postage prepaid, in any case to the appropriate party at its address set forth below:

If to PS Funding:

c/o Peer Street, Inc.
2121 Park Place, Suite 250, El Segundo, CA 90245
Attention: Legal Department
E-Mail: legal@peerstreet.com

If to PS Warehouse II:

c/o Peer Street, Inc.
2121 Park Place, Suite 250, El Segundo, CA 90245
Attention: Legal Department
E-Mail: legal@peerstreet.com

Any party may change such party's address for notices or copies of notices by giving notice to the other parties in accordance with this Section.

7.9.    Third Party Beneficiary. PS Funding acknowledges and agrees that Lender has received a pledge of 100% of PS Warehouse II's Proportionate Share of the Loans pursuant to the Loan and Security Agreement, dated the date hereof (the "**Loan Agreement**"), by and among PS Warehouse, LLC, PS Warehouse II, PS Funding, Inc., and Peer Street Funding, LLC, a Delaware limited liability company (the "**Lender**"), as amended, restated, supplemented or otherwise modified, from time to time. For so long as the Loan Agreement is in effect, Lender shall be an intended third-party beneficiary of this Agreement with the right to enforce provisions pursuant to this Agreement, and this Agreement shall not be amended without Lender's consent. Upon receipt by PS Funding of a notice from Lender of the occurrence and continuation of an Event of Default under the Loan Agreement or the other Credit Documents (as defined in the Loan Agreement), Lender may, in addition to any other remedies it may have, assume all of the rights of PS Warehouse II under this Agreement.

[SIGNATURES FOLLOW ON NEXT PAGE.]

IN WITNESS HEREOF, the parties have executed this Agreement as of the date written above.

**PS FUNDING, INC.**
a Delaware corporation


By: _____
Name: Brewster Johnson
Its:   President


**PS WAREHOUSE II, LLC,**
a Delaware limited liability company

By: PS Funding, Inc.
Its: Member

By: _____
Name: Brewster Johnson
Its:   President

**<u>EXHIBIT A</u>**

<u>Percentage</u>

PS Funding, Inc.                          0%

PS Warehouse II, LLC                100%

## EXHIBIT B

"Eligible Loan" means, as of the related Participation Date, a Loan which meets PS Funding's internal credit, pricing and operational policy guidelines and, if applicable, complies with the underwriting guidelines of any commercial partner or bank partner to the extent that PS Funding is using such partner to originate the Loans (the foregoing, the "**Eligibility Criteria**"); provided that, notwithstanding the Eligibility Criteria, a Loan for which any scheduled payment remains unpaid for more than eighty-nine (89) calendar days from the original due date for such payment, in whole or in part (any such Loan, a "Delinquent Loan"), may constitute an Eligible Loan so long as all such Delinquent Loans do not exceed, in the aggregate, ten percent (10%) of the unpaid principal balance of all outstanding Loans.

**EXHIBIT 8**

## AMENDED AND RESTATED
## PARTICIPATION AGREEMENT

THIS AMENDED AND RESTATED PARTICIPATION AGREEMENT ("**Agreement**") is dated as of November 1, 2019, by and between PS FUNDING, INC., a Delaware corporation ("**PSF**"), and PEER STREET FUNDING, LLC, a Delaware limited liability company ("**PSLLC**").

### Recitals

This Agreement is made on the basis of the following facts:

A.  PSF buys loans and interests in loans (each a "**Loan**" and collectively the "**Loans**") evidenced by, among other things, a promissory note (each a "**Note**") executed by the borrower (each a "**Borrower**"), and (2) secured by, among other things, a mortgage or deed of trust of even date therewith (the "**Mortgage**") granted by Borrower encumbering certain real and personal property more particularly described therein (the "**Property**").

B.  The Note, Mortgage and all other documents now or hereafter evidencing, securing and/or executed in connection with the Loan, are referred to herein, collectively, as the "**Loan Documents**"; the Property and all other collateral now or hereafter pledged under any of the Loan Documents or as collateral for the Loan is referred to herein as the "**Collateral**".

C.  PSF and PSLLC (each a "**Participant**," and collectively, the "**Participants**") collectively fund the Loan purchases in the relative percentages set forth in Exhibit A attached hereto.

D.  Pursuant to this Agreement, in exchange for PSLLC's funding of the purchases of Loans held by PSF, PSF desires to irrevocably sell, assign, transfer and convey to PSLLC, and PSLLC desires to purchase from PSF, participations in the Loans in the percentage set forth in Exhibit A attached hereto, which shall be sold at par (the "**Participations**").

### Agreement

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  Recitals.    The Recitals are incorporated into and made a part of this Agreement.

2.  Conveyance of Participations. As of the date hereof, and in exchange for PSLLC's funding of the purchases of the Loans held by PSF, PSF, as seller, hereby irrevocably sells, assigns, transfers, and conveys to PSLLC, as buyer, the Participations such that each Participant now owns that portion of the Loans set forth in Exhibit A attached hereto. The ratio of each Participant's share of the total amount of the Loans as set forth in Exhibit A shall be referred to herein as its "**Proportionate Share**."

3.  PSF's Covenants.

3.1  Loan Documents. Subject to Section 7.3 below, PSF shall hold the Note, the Mortgage and the other Loan Documents for the benefit of all Participants.

3.2  Performance of Loan Documents. Subject to Section 7.3 below, PSF shall perform all of the functions of the lender under the Loan Documents (including administering, or causing to be administered, all accounts and other amounts held by PSF under any Loan Document, and all other escrow or reserve accounts created or established pursuant to the Loan Documents) including, without limitation, the following functions:

(a)  Receipt of Payments. Subject to Section 7.3 below, PSF shall receive all sums due or received from Borrower under the Note and the other Loan Documents and hold the same in trust for the ratable benefit of all Participants. Subject to Section 7.3 hereof, to the extent such payments are made by Borrower, PSF shall accept and distribute such payments in accordance with Section 3.3 of this Agreement.

(b)  Enforcement of the Loan Documents. Subject to Section 7.3 below, PSF shall have and retain the right, power and authority to take any action, or to refrain from taking any action, as PSF may deem necessary or appropriate in its discretion to satisfy the obligations, enforce the rights, exercise the remedies and pursue any other benefits available under the Loan Documents or any title insurance or other insurance policy delivered or maintained in connection with the Loans.

(i)  Notices to Participants. PSF shall give prompt notice to the other Participants at the address set forth herein of the occurrence of any of the following events: (A) PSF has notified Borrower in writing of a Default or Event of Default under any of the Loan Documents; (B) Borrower has notified PSF in writing of a Default or Event of Default under any of the Loan Documents; (C) any event which, in PSF's judgment, has a material adverse effect on the value of the Collateral; and (D) any event which, in PSF's judgment, has a material effect on Borrower's ability to repay the Loan in accordance with the provisions of the Loan Documents. Notwithstanding anything in this Section, PSF shall not be responsible for reporting to any Participant on the economy, business climate or other general economic factors which may affect the Collateral or the economic viability of the properties being financed by the Loan.

(ii)  Borrower's Default. Subject to Section 7.3 below, upon the occurrence of an Event of Default by Borrower under any Loan Document, PSF's exercise (or forbearance from any exercise) of any of its rights and remedies under the Loan Documents shall be within PSF's sole authority and discretion.

3.3  Distribution.

(a)  Subject to the provisions of Sections 3.3(b) and 7.3 below, PSF shall promptly pay to each Participant such Participant's Proportionate Share of all payments of principal and interest made by Borrower under the Note, but excluding any

amounts held in escrow or otherwise applied by PSF in accordance with the terms of the Loan Documents. Any payment or credit to a Participant shall be subject to PSF's right to deduct sums for expenses, advances and liabilities referred to herein, including, without limitation, expenses for and of loan servicers and other agents engaged by PSF.

(b) If any payment, prepayment or other amount received by PSF under the Note or the other Loan Documents must be returned or released for any reason, each Participant shall promptly upon demand therefor remit to PSF such Participant's Proportionate Share of the amount to be returned by PSF.

3.4 <u>Maintenance of Records</u>. PSF shall keep proper books of account and records reflecting the interests of each Participant in the Loans, which books and records shall be available for inspection and copying by any Participant upon reasonable notice during normal business hours. Upon request, any Participant may demand and receive an accounting of all monies received and Collateral held by PSF in connection with the Loans.

4. <u>Necessary Advances and Expenses</u>.

4.1 <u>Necessary Advances</u>. Subject to <u>Section 7.3</u> below, PSF may advance such funds as may be necessary for insurance premiums, real estate taxes, other taxes and assessments or such funds as may be reasonably necessary for the preservation, maintenance, repair or completion of improvements or renovations of the Collateral, when in the judgment of PSF (as exercised under <u>Section 6</u> below) such advances are reasonably necessary to preserve and protect the Collateral or the interests of the Participants under the Loan Documents.

4.2 <u>Expenses Shared by Participants</u>. All losses, costs and expenses incurred by PSF (including, without limitation, attorneys' fees and expenses) in connection with (a) the purchase of the Loans, (b) the administration (including any servicing fees or costs paid to any third party) or collection of the Loans, (c) enforcement of any obligations of Borrower or rights or remedies of PSF under the Loan Documents, (d) any claim on any insurance policy, lawsuit, collection activity, receivership action, foreclosure, acceptance of a conveyance in lieu thereof, or (e) any other exercise of any of its rights or remedies under the Loan Documents (individually, an "**Enforcement Action**"), and all amounts advanced by PSF (except PSF's Proportionate Share of any such advances) in accordance with this Agreement, the Loan Documents or any Enforcement Action, shall be shared by PSF and the Participants based upon their respective Proportionate Shares. Promptly upon demand made by PSF, each Participant shall pay to PSF such Participant's Proportionate Share of any reasonable expense, cost, advance or other amount incurred by PSF in connection with the administration or collection of the Loans or any Enforcement Action. PSF shall have the right to deduct each Participant's Proportionate Share of such costs, expenses or advances from any distributions described in <u>Section 3.3</u>.

5. <u>Acquisition of Collateral</u>. If PSF (or its designee) acquires title to any Collateral, this Agreement shall continue in full force and effect with respect to such Collateral, and each Participant shall be deemed to have an undivided interest in such Collateral equal to the Participant's proportionate share therein. Each Participant shall pay its proportionate share of expenses for maintenance and operation of the Collateral, including but not limited to all expenses related to the ownership, management, and/or sale or other disposition of such Collateral (the decisions with respect thereto to be made by PSF as part of its rights and authority under <u>Section 3.2</u> above). If, as result of any Enforcement Action, PSF recovers any monies available for repayment of the Loan, then PSF shall remit to each Participant such Participant's

proportionate share of such proceeds, subject to PSF's right to deduct sums for expenses, advances and liabilities referred to herein.

6. Duty of Care. In discharging its responsibilities under this Agreement in connection with the Loans, PSF shall endeavor to exercise the same care and judgment as it ordinarily exercises in the performance of its own business affairs; provided, however, that PSF shall be liable to the other Participants for any losses incurred in relation to the Loans only if such incurrence is due to the gross negligence or willful misconduct of PSF or its agents. Notwithstanding the foregoing, in no event shall PSF have any liability to any Participant for any act done or not done if such action or inaction is authorized pursuant to the terms of this Agreement or has otherwise been given such Participant's consent. The foregoing limitations on PSF's liability shall apply to all obligations undertaken by PSF under all provisions of this Agreement. Nothing contained in this Agreement or in any Loan Document shall be deemed or construed to create a partnership or joint venture between the Participants.

7. Representations and Warranties. Each party has the right, power and authority to enter into this Agreement and is duly authorized and empowered to act for and to bind itself. The execution, delivery and performance of this Agreement by each of PSF and PSLLC has been duly and validly authorized by all necessary action and proceedings, and no further action or authorization is necessary on the part of either party in order to consummate the transactions contemplated herein.

8. Miscellaneous.

8.1 Other Arrangements. Nothing contained in this Agreement shall prohibit PSF from entering into new credit arrangements or continuing existing credit arrangements with any Borrower, guarantor or any other party in any way related to a Borrower or the Loans.

8.2 Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of California without reference to choice of law rules, and shall be subject to all applicable laws and official orders, rules and regulations governing the Participants. If any provision of this Agreement, or the transactions contemplated hereby, are found to be inconsistent with or contrary to any law, official order, rule or regulation, this Agreement shall be deemed modified in accordance with such law, order, rule or regulation and, as so modified, shall continue in full force and effect.

8.3 Assignment and Termination of PSF's Duties. All of the rights and obligations delegated to PSF in this Agreement are terminable at any time for any reason in the sole discretion of PSLLC by written notice to PSF given in accordance with Section 7.9 hereof. PSF is permitted to delegate its duties hereunder to any loan servicer, document custodian or other agent chosen by PSF in its reasonable discretion. PSF shall be permitted to make assignments of the Loans at the direction of PSLLC, including to any successor named by PSLLC in the event the duties of PSF hereunder are terminated.

8.4 Permitted Assigns; Binding Effect. PSLLC may sell, assign, convey, pledge or make any transfer of its Participations at any time without the consent of PSF. This Agreement shall be binding upon and inure to the benefit of the Participants and their respective successors and permitted assigns.

8.5 <u>Integration; Survival.</u> This Agreement sets forth the entire agreement between the Participants with respect to the subject matter hereof and shall survive the foreclosure of any lien created under the Loan Documents or acquisition by the Participants of all Collateral securing the Loans.

8.6 <u>Counterparts.</u> This Agreement may be executed in counterparts and/or electronically.

8.7 <u>Intentionally Omitted.</u>

8.8 <u>No Representations by PSF.</u> PSF makes no representation or warranty as to: (a) the legality, collectability, due execution, sufficiency, validity, genuineness or enforceability of the Loan Documents; (b) the accuracy or completeness of matters disclosed, represented or warranted by Borrower or any guarantor; (c) the value of the Collateral; (d) the performance of any obligation of Borrower or any guarantor; or (e) the financial condition of Borrower or any guarantor.

8.9 <u>Notices.</u>   Any notice required or permitted to be given under this Agreement shall be in writing and will be deemed given (a) upon personal delivery or via email, (b) on the first business day after receipted delivery to a courier service which guarantees next-business-day delivery, or (c) on the third business day after mailing, by registered or certified United States mail, postage prepaid, in any case to the appropriate party at its address set forth below:

If to PSF:

PS Funding, Inc.
2121 Park Place, Suite 250
El Segundo, CA 90245
Attn: Legal Department
Email: legal@peerstreet.com

If to PSLLC:

Peer Street Funding, LLC
2121 Park Place, Suite 250
El Segundo, CA 90245
Attn: Legal Department
Email: legal@peerstreet.com

Any party may change such party's address for notices or copies of notices by giving notice to the other parties in accordance with this Section.

**[Balance of page intentionally left blank]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

PS FUNDING, INC.,
a Delaware corporation

By: _____
Name: Brewster Johnson
Title: Authorized Signatory

PEER STREET FUNDING, LLC,
a Delaware limited liability company

By: _____
Name: Brewster Johnson
Title: Authorized Signatory

**EXHIBIT A**
**to**
**PARTICIPATION AGREEMENT**

|  | Percentage |
|---|---|
| PSF | 0% |
| PSLLC | 100% |

## **EXHIBIT 9**

**PARTICIPATION AGREEMENT**

THIS PARTICIPATION AGREEMENT (this "**Agreement**") is dated as of September 21, 2022, by and between PS Funding, Inc., a Delaware corporation ("**PS Funding**"), and PS Portfolio – ST1, LLC, a Delaware limited liability company ("**PS Portfolio**").

**RECITALS**

This Agreement is made on the basis of the following facts:

A.    PS Funding buys loans and interests in loans (each a "**Loan**" and collectively the "**Loans**") evidenced by, among other things, a promissory note (each a "**Note**") executed by the borrower (each a "**Borrower**"), and secured by, among other things, a mortgage or deed of trust of even date therewith (the "**Mortgage**") granted by Borrower encumbering certain real and personal property more particularly described therein (the "**Property**").

B.    Each Note, Mortgage, and all other documents now or hereafter evidencing, securing and/or executed in connection with each Loan, are referred to herein, collectively, as the "**Loan Documents**"; the Property and all other collateral now or hereafter pledged under any of the Loan Documents or as collateral for the Loan is referred to herein as the "**Collateral**".

C.    PS Funding and PS Portfolio (each a "**Participant**," and collectively, the "**Participants**") may collectively fund the Loan purchases, and PS Funding and PS Portfolio hereby desire to set forth their respective rights and obligations concerning the Loans and the Loan Documents.

**AGREEMENT**

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Recitals</u>. The Recitals are incorporated into and made a part of this Agreement.

2.    <u>Proportionate Share</u>. For each Loan whereby both PS Funding and PS Portfolio are Participants, pursuant to the terms of this Agreement, such ownership/participation interest shall be agreed upon by the Participants and confirmed in writing between the Participants through the use of a joint ledger with Loan-level information that shall be updated upon the Participants owning the Loan; the ratio of each Participant's share of the total amount of each Loan shall be referred to herein as its "**Proportionate Share**."

3.    <u>PS Funding's Covenants</u>.

3.1.    <u>Eligible Loans</u>. Each Loan subject to this Agreement shall be an "Eligible Loan" as such term is defined in <u>Exhibit A</u> attached hereto, on the date of funding for such Loan (the "**Participation Date**").

3.2.    <u>Loan Documents</u>. Subject to Section 7.3 below, PS Funding, or its designated document custodian, shall hold each Note, Mortgage and other Loan Documents for the benefit of all Participants according to their Proportionate Share.

3.3.    <u>Performance of Loan Documents</u>. Subject to Section 7.3 below, and the terms of the parties' Loan Management Agreement of even date herewith ("**Loan Management Agreement**"), PS Funding shall perform all of the functions of the lender and/or servicer under

the Loan Documents (including administering, or causing to be administered, all accounts and other amounts held by PS Funding under any Loan Document, and all other escrow or reserve accounts created or established pursuant to the Loan Documents) including, without limitation, the following functions:

(a)   <u>Receipt of Payments</u>. Subject to Section 7.3 below, PS Funding shall receive all sums due or received from Borrower under the Note and the other Loan Documents for the ratable benefit of all Participants. Subject to Section 7.3 below, to the extent such payments are made by Borrower, PS Funding shall accept and distribute such payments in accordance with Section 3.4 of this Agreement.

(b)   <u>Enforcement of the Loan Documents</u>. Subject to Section 7.3 below, PS Funding shall have and retain the right, power and authority to take any action, or to refrain from taking any action, as PS Funding may deem necessary or appropriate in its discretion to satisfy the obligations, enforce the rights, exercise the remedies and pursue any other benefits available under the Loan Documents or any title insurance or other insurance policy delivered or maintained in connection with the Loans; provided, however, if PS Funding owns 51% or more Proportionate Share in a Loan, PS Portfolio shall have certain loan administrative/management rights, as specifically set forth and defined in the Loan Management Agreement.

(i)   <u>Notices to Participants</u>. PS Funding shall give prompt notice to the other Participants at the address set forth herein of the occurrence of any of the following events: (A) PS Funding has notified Borrower in writing of a Default or Event of Default under any of the Loan Documents; (B) Borrower has notified PS Funding in writing of a Default or Event of Default under any of the Loan Documents; (C) any event which, in PS Funding's judgment, has a material adverse effect on the value of the Collateral; and (D) any event which, in PS Funding's judgment, has a material effect on Borrower's ability to repay the Loan in accordance with the provisions of the Loan Documents. Notwithstanding anything in this Section, PS Funding shall not be responsible for reporting to any Participant on the economy, business climate or other general economic factors which may affect the Collateral or the economic viability of the properties being financed by the Loan.

(ii)   <u>Borrower's Default</u>. Subject to Section 7.3 below, upon the occurrence of an Event of Default by Borrower under any Loan Document, PS Funding's exercise (or forbearance from any exercise) of any of its rights and remedies under the Loan Documents shall be within PS Funding's sole authority and discretion, except if PS Portfolio owns at least 51% Proportionate Share of a Loan, in which case PS Portfolio shall have certain loan administrative/management rights as specifically set forth in the Loan Management Agreement.

(c)   <u>No Assignment</u>. PS Funding shall not assign, grant a security interest, collaterally assign or otherwise encumber Loan Documents, any rights of PS Funding to exercise remedies with respect to the Loan Documents, or any proceeds of the foregoing.

3.4.   <u>Distribution</u>.

(a)   Subject to the provisions of Sections 3.4(b) and 7.3 below, PS Funding shall promptly pay to each Participant such Participant's Proportionate Share of all payments of principal and interest made by Borrower under the Note, but excluding any amounts held in escrow or otherwise applied by PS Funding in accordance with the terms of the Loan Documents. Any payment or credit to a Participant shall be subject to PS Funding's right to deduct sums for expenses, advances and liabilities referred to herein, including, without limitation, expenses for and of loan servicers and other agents engaged by PS Funding.

(b)   If any payment, prepayment or other amount received by PS Funding

under the Note or the other Loan Documents must be returned or released for any reason, each Participant shall promptly upon demand therefore remit to PS Funding such Participant's Proportionate Share of the amount to be returned by PS Funding.

3.5.  <u>Maintenance of Records</u>. PS Funding shall keep proper books of account and records reflecting the interests of each Participant in the Loans, which books and records shall be available for inspection and copying by any Participant upon reasonable notice during normal business hours. Upon request, any Participant may demand and receive an accounting of all monies received and Collateral held by PS Funding in connection with the Loans.

3.6.  <u>Repurchase</u>.

(a)  PS Portfolio shall have the right, but not the obligation, to require that PS Funding repurchase any Loan for which any of the statements in <u>Section 3.1</u> was not true and correct as of its related Participation Date. PS Funding shall repurchase any such Loan on the date mutually agreed to by PS Funding and the other Participants, which date shall be within a commercially reasonable time period, not to exceed five (5) Business Days, after PS Funding receives written notice of the circumstance giving rise to repurchase.

(b)  PS Funding shall repurchase any Loan on the date, if any, specified by PS Portfolio at the time PS Portfolio acquires its Proportionate Share in such Loan (the "Repurchase Deadline"). At any time, Loans comprising at least fifty percent (50%), in the aggregate, of the unpaid principal balance of all outstanding Loans shall have a Repurchase Deadline of not more than one hundred twenty (120) days after PS Portfolio has acquired its Proportionate Share therein.

(c)  Upon written notice to PS Funding from PS Portfolio given by the first (1st) day of any month (or if such day is not a business day, the preceding business day), PS Funding shall repurchase any Loan identified in such notice by the first (1st) day of the month (and if such day does not fall on a business day, then the immediately following business day) immediately following such notice.

(d)  PS Funding may repurchase any Loan without premium or penalty on any date.

(e)  On the date of any repurchase, automatically and without further action, upon payment to the other Participants of the Repurchase Price for such Loan pursuant to <u>Section 3.7</u>, such other Participants shall be deemed to have sold to PS Funding, without recourse, representation or warranty other than as provided under <u>Section 3.7</u>, all of such Participant's right, title and interest in, to, and under such Loan and all subsequent proceeds thereof. Each party shall execute all agreements and other documents, and shall take all other actions, reasonably requested by the other to effect any repurchase.

3.7.  <u>Repurchase Price</u>. For each repurchase of a Loan under <u>Section 3.6</u>, the **"Repurchase Price"** to be paid by PS Funding to each other Participant with respect to such Loan shall be equal to such Participant's Proportionate Share of (i) the outstanding principal balance of such Loan as of the date of such repurchase (without giving effect to any adjustments thereof for charge-offs or otherwise), plus (ii) all accrued and unpaid regular contract interest on such outstanding principal balance up to and including the date of such repurchase, minus (iii) all accrued and unpaid servicing fees with respect to such Loan up to and including the date of such repurchase. Upon receipt of such Repurchase Price, such Participant shall transfer its interest in such repurchased Loan to PS Funding on an "AS-IS", "WHERE-IS" basis, without any recourse, representations or warranties other than with respect to such Participant's clear and marketable title to such repurchased Loan, to the extent clear and marketable title was transferred to such

Participant by PS Funding hereunder. Any payment of the Repurchase Price by PS Funding pursuant to this Section 3.7 shall be made by the wire transfer of immediately available funds to the bank account designated by such Participant.

4.      Necessary Advances and Expenses.

4.1.    Necessary Advances. Subject to Section 7.3 below, PS Funding may advance such funds as may be necessary for insurance premiums, real estate taxes, other taxes and assessments or such funds as may be reasonably necessary for the preservation, maintenance, repair or completion of improvements or renovations of the Collateral, when in the judgment of PS Funding (as exercised under Section 6 below) such advances are reasonably necessary to preserve and protect the Collateral or the interests of the Participants under the Loan Documents.

4.2.    Expenses Shared by Participants. All losses, costs and expenses incurred by PS Funding (including, without limitation, attorneys' fees and expenses) in connection with (a) the purchase of the Loans, (b) the administration (including any servicing fees or costs paid to any third party) or collection of the Loans, (c) enforcement of any obligations of Borrower or rights or remedies of PS Funding under the Loan Documents, (d) any claim on any insurance policy, lawsuit, collection activity, receivership action, foreclosure, acceptance of a conveyance in lieu thereof, or (e) any other exercise of any of its rights or remedies under the Loan Documents (individually, an **"Enforcement Action"**), and all amounts advanced by PS Funding (except PS Funding's Proportionate Share of any such advances) in accordance with this Agreement, the Loan Documents or any Enforcement Action, shall be shared by PS Funding and the Participants based upon their respective Proportionate Shares. Promptly upon demand made by PS Funding, each Participant shall pay to PS Funding such Participant's Proportionate Share of any reasonable expense, cost, advance or other amount incurred by PS Funding in connection with the administration or collection of the Loans or any Enforcement Action. PS Funding shall have the right to deduct each Participant's Proportionate Share of such costs, expenses or advances from any distributions described in Section 3.4.

5.      Acquisition of Collateral. If PS Funding (or its designee) acquires title to any Collateral, this Agreement shall continue in full force and effect with respect to such Collateral, and each Participant shall be deemed to have an undivided interest in such Collateral equal to the Participant's Proportionate Share therein. Each Participant shall pay its Proportionate Share of expenses for maintenance and operation of the Collateral, including but not limited to all expenses related to the ownership, management, and/or sale or other disposition of such Collateral (the decisions with respect thereto to be made by PS Funding as part of its rights and authority under Section 3.3 above). If, as result of an Enforcement Action, PS Funding recovers any monies available for repayment of the Loan, then PS Funding shall remit to each Participant such Participant's Proportionate Share of such proceeds, subject to PS Funding's right to deduct sums for expenses, advances and liabilities referred to herein.

6.      Duty of Care. In discharging its responsibilities under this Agreement in connection with the Loans, PS Funding shall endeavor to exercise the same care and judgment as it ordinarily exercises in the performance of its own business affairs; provided, however, that PS Funding shall be liable to the other Participants for any losses incurred in relation to the Loans only if such incurrence is due to the gross negligence or willful misconduct of PS Funding or its agents. Notwithstanding the foregoing, in no event shall PS Funding have any liability to any Participant for any act done or not done if such action or inaction is authorized pursuant to the terms of this Agreement or has otherwise been given such Participant's consent. The foregoing limitations on PS Funding's liability shall apply to all obligations undertaken by PS Funding under all provisions of this Agreement. Nothing contained in this Agreement or in any Loan Document shall be deemed or construed to create a partnership or joint venture between the Participants.

7.       Miscellaneous.

7.1.    Other Arrangements. Nothing contained in this Agreement shall prohibit PS Funding from entering into new credit arrangements or continuing existing credit arrangements with any Borrower, guarantor or any other party in any way related to a Borrower or the Loans.

7.2.    Governing Law. This Agreement shall be construed and enforced in accordance with the laws of the State of California without reference to choice of law rules, and shall be subject to all applicable laws and official orders, rules and regulations governing the Participants. If any provision of this Agreement, or the transactions contemplated hereby, are found to be inconsistent with or contrary to any law, official order, rule or regulation, this Agreement shall be deemed modified in accordance with such law, order, rule or regulation and, as so modified, shall continue in full force and effect.

7.3.    Assignment and Termination of PS Funding's Duties.

(a)     With the exception of PS Funding being a named lender (whether in fact, by participation or as successor by assignment) for each Loan and except as otherwise set forth in the Loan Management Agreement, all of the rights and obligations delegated to PS Funding in this Agreement are terminable at any time for any reason in the sole discretion of PS Funding by written notice to PS Portfolio given in accordance with Section 7.8 hereof. Subject to the terms contained herein, PS Funding is permitted to delegate its duties hereunder to any loan servicer, document custodian or other agent chosen by PS Funding in its reasonable discretion and acceptable to Lender (as defined below). PS Funding shall be permitted to make assignments of the Loans at the direction of PS Portfolio in its sole discretion.

(b)     All of the rights and obligations delegated to PS Funding in this Agreement and the Loan Management Agreement are, with respect to any Loan, terminable at any time for any reason in the sole discretion of PS Portfolio by written notice to PS Funding given in accordance with Section 7.8 hereof.

(c)     Upon termination pursuant to this Section 7.3, all legal title to the underlying Loans shall be deemed to have been conveyed to PS Portfolio such that PS Portfolio shall be the sole legal, beneficial and record owner of the Loans (including, without limitation, the related servicing rights appurtenant thereto) and PS Funding shall cooperate with PS Portfolio in effectuating such transfer, including without limitation, by agreeing to execute and deliver to PS Portfolio such reasonable and appropriate documents, instruments or agreements as may be necessary or appropriate to effectuate such transfer (including without limitation, all assignments and endorsements of the Loan Documents to the benefit of PS Portfolio).

7.4.    Permitted Assigns; Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Participants and their respective successors and permitted assigns.

7.5.    Integration; Survival. This Agreement sets forth the entire agreement between the Participants with respect to the subject matter hereof and shall survive the foreclosure of any lien created under the Loan Documents or acquisition by the Participants of all Collateral securing the Loans.

7.6.    Counterparts.   This Agreement may be executed in counterparts and/or electronically.

7.7.    No Representations by PS Funding. PS Funding makes no representation

or warranty as to: (a) the legality, collectability, due execution, sufficiency, validity, genuineness or enforceability of the Loan Documents; (b) the accuracy or completeness of matters disclosed, represented or warranted by Borrower or any guarantor; (c) the value of the Collateral; (d) the performance of any obligation of Borrower or any guarantor; or (e) the financial condition of Borrower or any guarantor.

          7.8.  <u>Notices</u>. Any notice required or permitted to be given under this Agreement shall be in writing and will be deemed given (a) upon personal delivery or via email, (b) on the first business day after receipted delivery to a courier service which guarantees next-business-day delivery, or (c) on the third business day after mailing, by registered or certified United States mail, postage prepaid, in any case to the appropriate party at its address set forth below:

          If to PS Funding:

          c/o Peer Street, Inc.
          2121 Park Place, Suite 250, El Segundo, CA 90245
          Attention: Legal Department
          E-Mail: legal@peerstreet.com

          If to PS Portfolio:

          c/o PS Funding, Inc.
          2121 Park Place, Suite 250, El Segundo, CA 90245
          Attention: Legal Department
          E-Mail: legal@peerstreet.com

Any party may change such party's address for notices or copies of notices by giving notice to the other parties in accordance with this Section.

          [SIGNATURES FOLLOW ON NEXT PAGE.]

IN WITNESS HEREOF, the parties have executed this Agreement as of the date written above.

**PS FUNDING, INC.**
a Delaware corporation

By: _____
Name: Brewster Johnson
Its:    President

**PS PORTFOLIO – ST1, LLC,**
a Delaware limited liability company

By:    PS Funding, Inc.
       a Delaware corporation
Its:    Sole Member

       By: _____
       Name: Brewster Johnson
       Its:    President

## EXHIBIT A

"Eligible Loan" means, as of the related Participation Date, a Loan which meets PS Funding's and PS Portfolio's internal credit, pricing and operational policy guidelines and, if applicable, complies with the underlying Participation Criteria set forth below (the foregoing, the "**Eligibility Criteria**"):

| Attribute | Value |
|---|---|
| Maximum Loan to Value Ratio | 90:100 |
| Maximum Combined Loan to Value Ratio | 90:100 |
| Maximum Loan to After Repair Value Ratio | 75:100 |
| Minimum Borrower FICO Score | 620 |
| Restricted Geographies | Alaska, South Dakota, Minnesota, Rural Designation |
| Underlying Property Type | 1-4 Unit Single Family, Multi-Family < 50 units |
| Maximum Loan Term | 24 Months |

# **EXHIBIT 10**

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# Peer Street Funding, LLC

## MORTGAGE PAYMENT DEPENDENT NOTES

October 26, 2014

Peer Street Funding, LLC, a Delaware limited liability company  ("**PeerStreet**" or "**we**," "**us**," "**our**," or words to similar effect), is making a private offering to sell to accredited investors (each, an "**Investor**," "**Noteholder**" or "**you**") certain promissory notes of PeerStreet that are dependent for payment on payments that PeerStreet receives from specific loan investments made by PeerStreet (the "**Mortgage Dependent Notes**," or the "**Notes**").  The Notes are being offered through the online investment platform www.PeerStreet.com (the "**Platform**" or "**PSI Website**").  This Private Placement Memorandum is referred to herein as the **"PPM."**

PeerStreet, or an affiliate of PeerStreet, will issue the Notes on an ongoing basis, and will issue the Notes in series, through the Platform, which is owned and operated by Peer Street, Inc., a Delaware corporation ("**PSI**").  PeerStreet is a wholly-owned subsidiary of PSI. PeerStreet will conduct its activities using the PSI Website.  PeerStreet may hire PSI (or an affiliate of PSI; together with PSI, the "**PSI affiliates**") to perform certain other services and activities associated with the Notes described in this PPM, including, without limitation, loan origination, due diligence, servicing, payment processing, collections, and workouts.  PSI and any applicable PSI affiliates will receive a portion of the fees provided to PeerStreet as compensation for these activities.  Even if not expressly identified in this PPM, PSI may delegate services, duties and obligations of PSI described hereunder to PSI affiliates or third parties.

Each series of Notes will correspond to a single real estate loan investment that is either (i) originated by PSI, PSI affiliates or PeerStreet, (ii) originated by a third party (including PSI affiliates) and purchased by PSI or PeerStreet, or (iii) originated and held by a third party (including PSI affiliates) and participated in by PeerStreet (in other words, PeerStreet will invest alongside the third party).  These loan investments may take the form of  (a) a loan that has a first priority right of payment to other indebtedness (a "**senior loan**"), (b) a loan that is subordinate in right of payment to other indebtedness (a "**mezzanine loan**"), or (c) a participation in a senior or mezzanine loan (a "**participation loan**").  Senior loans, mezzanine loans and participation loans will each individually constitute a "**mortgage loan**" or "**loan**").  We expect each mortgage loan to be secured by a deed of trust, mortgage, security agreement, or legal title to the underlying real estate. In this PPM, we refer to the mortgage loans that are related to a particular series of Notes as the **"corresponding mortgage loan"**, the **"corresponding loan investment" or simply the "loan"** as for a particular series of Notes.  For purposes of this PPM,

borrowers and third party lenders associated with a mortgage loan or loan investment may be individually and collectively referred to herein as a "***Borrower***" or "***borrower***".

Each time we offer a series of Notes we will also prepare a disclosure supplement (which will be posted to the PSI Website) with relevant information about the applicable series of Notes, and the corresponding loan investment for that series of Notes. Each disclosure supplement is referred to as a "***Series Note Listing***." The Investor Agreement that must be executed as part of using the Platform also provides certain terms of the Notes.

A summary of the important terms of the Notes include the following, each of which is described in greater detail elsewhere in this PPM:

- Our obligation to make payments on a Note will be limited to an amount equal to the Investor's *pro rata* share of amounts we receive with respect to the corresponding mortgage loan for that Note, net of any applicable fees. We do not guarantee payment of the Notes or the corresponding loan investment.

- The Notes will be special, limited obligations of PeerStreet only and are not obligations of the borrowers or third party lenders associated with a corresponding loan investment.

- The Notes will be unsecured obligations of PeerStreet, and Investors will not have any security interest in any of PeerStreet's assets, including (without limitation) the corresponding loan investment, nor will the Notes be secured by any assets of any borrower or third party lender.

- We expect each senior loan, and certain mezzanine loans that correspond to a particular Note to be secured by a deed of trust, mortgage, security agreement, or legal title to the underlying real estate. In the event of a default on the corresponding loan investment, any recovery by PeerStreet under that security interest will be shared with Investors *pro rata*, net of any applicable fees, costs and charges.

- Each series of Notes will have its own set of terms. Generally, each Note will bear interest from the date of issuance; but different series of Notes will have different interest rates and have different terms to maturity, depending on the corresponding loan investment. Investors must consult the applicable Series Note Listing for each Note, a copy of which will be posted online, to review and evaluate the specific terms and conditions associated with any particular Note.

- All Notes will be issued in electronic form only and are restricted securities; thus, they are generally not transferable and are subject to the legal restrictions governing private offerings generally. Accordingly, no public market for the Notes is likely to develop. Investors must be prepared, therefore, to hold their Notes to maturity. Further information regarding restrictions on transfers is provided herein. To the extent we are unable to collect payments under a corresponding loan or loan investment, we will not be obligated to make the corresponding payment under the Notes.

- When you commit to purchase a Note, the Note will be issued as soon as practicable after due diligence on the underlying loan has been completed and PeerStreet has received all commitments for the corresponding loan investment. From the time you make your purchase commitment to the time that your funds are invested in the Note, the funds you have committed toward the purchase of your Notes will not be available for investment in other Notes or for withdrawal from your account. Because your funds do not earn interest until the issuance of the Note, the time between your funding of your commitment and the issuance of your Note will have the effect of reducing the effective rate of return on your investment.

- Because certain terms (e.g., issuance date) of a series of Notes may not be known until all funding commitments have been received and the closing for such series of Notes has occurred, the form of Note will simply be posted on the PSI Website along with the Series Note Listing, this PPM and the Investor Agreement**,** and Investors will need to indicate the amount they would like to commit for a particular Note. Investors will be electronically notified by PeerStreet of the closing date of the applicable series of Notes and of any material changes to Note terms, but clerical alterations to the final form of Notes will be reflected in PeerStreet's internal records without further Investor notification.  In the case of material changes to the Note terms, Investors will be notified through the website or by email before closing and will have the opportunity to rescind their purchase commitment if they notify PeerStreet in writing at least two business days before the scheduled closing.

- We have a limited operating history, and, as an online company in the early stages of development, we face increased risks, uncertainties, expenses and difficulties.

- We may need to raise substantial additional capital to fund our operations, and if we fail to obtain additional funding, we may be unable to continue operations.

- The Notes are structured as Mortgage Payment Dependent Notes, meaning that payment on the Notes is entirely dependent on PeerStreet receiving payment from the borrower and/or third party lender associated with a loan investment.  Investors should evaluate any investment in this context.

- If we were to become subject to a bankruptcy or similar proceeding, your rights could be uncertain, your recovery of funds due on the note may be substantially delayed, and any funds you do recover may be substantially less than the amounts due or to become due on the Note.

- We have minimal operating capital and no significant assets; if we were to become subject to bankruptcy or similar proceeding, your investment dollars will be at significant risk.

**This offering is highly speculative and the Notes involve a high degree of risk.  The Notes have not been approved or disapproved by, and they will not be insured by, any governmental agency.  Investing in the Notes should be considered only by persons who can afford the loss of their entire investment.**

**This offering is open solely to accredited Investors domiciled in the U.S.  The discussion contained in this PPM is solely directed to Investors domiciled in the U.S., and no offer to sell, or solicitation to buy, is made to any individuals or entities domiciled outside of the U.S.**

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE NOTES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS PPM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS OFFERING IS MADE IN RELIANCE ON AN EXEMPTION FROM REGISTRATION WITH THE SECURITIES AND EXCHANGE COMMISSION PROVIDED BY SECTION 4(a)(2) OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT" OR "THE SECURITIES ACT"), AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER, AND ANY OTHER APPLICABLE EXEMPTION FROM THE ACT AS APPLICABLE.

THIS INVESTMENT INVOLVES A HIGH DEGREE OF RISK THAT MAY NOT BE SUITABLE FOR ALL PERSONS.  ONLY THOSE INVESTORS WHO CAN BEAR THE LOSS OF THEIR ENTIRE INVESTMENT SHOULD PARTICIPATE IN THE INVESTMENT.  (SEE "RISK FACTORS.")

THIS PPM HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF AUTHORIZED PERSONS INTERESTED IN THE OFFERING.  IT CONTAINS CONFIDENTIAL INFORMATION AND MAY NOT BE DISCLOSED TO ANYONE OTHER THAN AUTHORIZED PERSONS SUCH AS ACCOUNTANTS, FINANCIAL PLANNERS OR ATTORNEYS RETAINED FOR THE PURPOSE OF RENDERING PROFESSIONAL ADVICE RELATED TO THE PURCHASE OF THE NOTES OFFERED HEREIN.  IT MAY NOT BE REPRODUCED, DIVULGED OR USED FOR ANY OTHER PURPOSE UNLESS WRITTEN PERMISSION IS OBTAINED FROM PEERSTREET.  THIS PPM DOES NOT CONSTITUTE AN OFFER TO OR SOLICITATION OF ANY PERSON EXCEPT THOSE PARTICULAR PERSONS WHO SATISFY THE INVESTOR QUALIFICATION STANDARDS FOR ACCREDITATION DESCRIBED HEREIN.  THE SALE OF THE NOTES COVERED BY THIS PPM HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, IN RELIANCE UPON THE EXEMPTIONS FROM SUCH REGISTRATION REQUIREMENTS SET FORTH IN SECTION 4(a)(2) OF THE ACT AND RULE 506 OF REGULATION D THEREUNDER.  THESE SECURITIES HAVE NOT BEEN QUALIFIED OR REGISTERED IN ANY STATE, IN RELIANCE UPON THE EXEMPTIONS FROM SUCH QUALIFICATION OR REGISTRATION UNDER STATE LAW.  THESE SECURITIES ARE "RESTRICTED SECURITIES" AND MAY NOT BE RESOLD OR OTHERWISE DISPOSED OF UNLESS A REGISTRATION STATEMENT UNDER THE ACT COVERING DISPOSITION OF SUCH SHARES IS THEN IN EFFECT, OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

THERE IS NO PUBLIC MARKET FOR THE NOTES AND NONE IS EXPECTED TO DEVELOP IN THE FUTURE.  THE NOTES OFFERED HEREBY SHOULD BE PURCHASED ONLY BY INVESTORS WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT.

NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS PPM; ANY SUCH INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON.  ANY PROSPECTIVE PURCHASER OF THE NOTES WHO RECEIVES ANY SUCH INFORMATION OR REPRESENTATIONS SHOULD CONTACT PEERSTREET IMMEDIATELY TO DETERMINE THE ACCURACY OF SUCH INFORMATION.  NEITHER THE DELIVERY OF THIS PPM NOR ANY SALES HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF PEERSTREET OR IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS PPM SET FORTH ABOVE.

PROSPECTIVE PURCHASERS SHOULD NOT REGARD THE CONTENTS OF THIS PPM OR ANY OTHER COMMUNICATION FROM PEERSTREET AS A SUBSTITUTE FOR CAREFUL AND INDEPENDENT TAX AND FINANCIAL PLANNING. EACH POTENTIAL INVESTOR IS ENCOURAGED TO CONSULT WITH THEIR OWN INDEPENDENT LEGAL COUNSEL, ACCOUNTANT AND OTHER PROFESSIONALS WITH RESPECT TO THE LEGAL AND TAX ASPECTS OF THIS INVESTMENT AND WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATION, PRIOR TO SUBSCRIBING FOR THE NOTES.

THE NOTES ARE OFFERED SUBJECT TO PRIOR SALE, ACCEPTANCE OF AN OFFER TO PURCHASE, AND TO WITHDRAWAL OR CANCELLATION OF THE OFFERING WITHOUT NOTICE. PEERSTREET RESERVES THE RIGHT TO REJECT ANY SUBSCRIPTIONS IN WHOLE OR IN PART.

THE INFORMATION CONTAINED IN THIS PPM HAS BEEN SUPPLIED BY PEERSTREET. THIS PPM CONTAINS SUMMARIES OF DOCUMENTS NOT CONTAINED IN THIS PPM, BUT ALL SUCH SUMMARIES ARE INCORPORATED IN THEIR ENTIRETY BY REFERENCES TO THE ACTUAL DOCUMENTS. COPIES OF DOCUMENTS REFERRED TO IN THIS PPM, BUT NOT INCLUDED AS AN EXHIBIT, WILL BE MADE AVAILABLE TO QUALIFIED PROSPECTIVE INVESTORS UPON REQUEST.

### NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE MADE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

[Remainder of page intentionally left blank]

# TABLE OF CONTENTS

Page

**INTRODUCTION** ...........................................................................................2
   Overview ..............................................................................................2
   Summary of the Offering ...................................................................6

**Investor Qualifications** .................................................................................8

**The Notes** .......................................................................................................9
   Denominations, Form and Registration .........................................10
   Interest Rates ...................................................................................11
   Maturity ...........................................................................................11
   Ranking; Sinking Fund ....................................................................11
   Servicing and Payments ..................................................................12
   Limitations on Payments .................................................................13
   Prepayments .....................................................................................14
   Certain Aspects of Loan Investments .............................................14

**Risk Factors** ................................................................................................17
   Risks Related to the Notes, and the Corresponding Loan Investments on Which the Notes are Dependent ...............................................................17
   Risks Related to PeerStreet and the Investment Platform ..............25
   Risks Related to Compliance and Regulation .................................32

**Special Note Regarding Forward-Looking Statements** ...........................35

**Use of Proceeds** ..........................................................................................36

**Plan of Distribution** ....................................................................................36

**About PeerStreet** .........................................................................................36

**Investment Standards and Policies** ...........................................................41

**Documentation and Information Available to the Investor** ....................45

**Certain U.S. Federal Income Tax Considerations** ...................................45

**ERISA Considerations** ...............................................................................53

**Restrictions on Transfers** ..........................................................................54

**Additional Information and Undertakings** ...............................................55

**Exhibit A    -    Master Mortgage Payment Dependent Note**

## INTRODUCTION

### Overview

We are offering the Notes directly to accredited investors only, through the PSI Website for a purchase price of 100% of the principal amount of the Notes.  The Notes will be PeerStreet obligations, the proceeds of which will fund a particular real estate loan or loan investment.  PeerStreet will issue and sell a series of Notes for each loan investment that is funded.  Each series of Notes is wholly dependent for payment on principal and interest, or on payments that PeerStreet receives from the corresponding loan investment.  The Notes will be unsecured obligations of PeerStreet.  Investing in the Notes should only be considered by persons who can afford the loss of their entire investment.  See "Risk Factors."

We will issue the Notes in series.  Each series will correspond to a single investment in a real estate loan:

(i)     that is made by PeerStreet to a borrower;

(ii)    that is made by PSI or another PSI affiliate and purchased by PeerStreet;

(iii)   that is purchased by PeerStreet from a third party lender; or

(iv)    in which PeerStreet participates alongside a third party lender.

These investments in real estate will generally take the form of a senior loan.   We expect each senior loan, to be secured by a deed of trust, mortgage, security agreement, or legal title to the underlying real estate.

Third party lenders may be banks or similar lending entities or may be private lenders, including private funds.  PeerStreet will perform due diligence on any such lenders, however, no third party lenders from which PeerStreet may purchase a loan is an agent of PeerStreet, and PeerStreet takes no responsibility for the actions of any such lenders or their compliance with requirements with state or federal law.

The Notes are sold to Investors who qualify as an Investor, fund their account with PeerStreet, agree to the terms of the Investor Agreement and commit to purchase Notes on the PSI Website.  Notes are issued in the principal amount of Investors' respective investments.  After a Series Note Listing is posted, Investors can commit to investments on such listing until the listing has received investments totaling the requested funding amount.  Loan investments may range from $50,000 to $25,000,000. PeerStreet currently accepts investments in amounts of as little as $1,000, although in some cases larger or smaller minimum investment amounts may be required.  Investor funds committed to a Series Note Listing will not accumulate interest prior to the requested funding amount being realized by the Series Note Listing and the closing of the corresponding loan investment by PeerStreet.  If the listing does not receive investments equal to or exceeding the minimum amount required for the listing to fund by the closing date shown on the listing, generally the listing will terminate and the requested loan will not be funded.  However, in some instances PeerStreet, or its affiliates, may, through the purchase of Notes or

otherwise, fund the portion of the corresponding loan investment remaining to meet the minimum amount, or, where PeerStreet believes that additional Investors may later elect to participate in the listing, PeerStreet may provide bridge financing in order for the loan to be closed on the corresponding loan investment, and the listing will remain active on the Platform until the listing is fully funded and the bridge loan repaid to PeerStreet.  In such cases, Investors who had already committed to purchase Notes at the time of the corresponding loan investment closing will begin to accrue interest as of such date.  Any investment made by PeerStreet or its affiliates in the Notes will be on the same terms and conditions as other Investors.  There will be no notation in any Series Note Listing signifying that PeerStreet has participated in the funding of any corresponding loan investment.

For some loan investments, PeerStreet will issue the corresponding loan investment directly.  In some cases, PeerStreet may enter into a relationship whereby one or more third parties (including a PSI affiliate) issue (and/or service) the corresponding loan investment and PeerStreet then purchases that corresponding loan investment (or a participating interest therein) from the third party.  Where PeerStreet merely takes a participating interest in a loan investment, the third party may sometimes remain the lead investor or lender, as the case may be, on that loan investment, and may retain control of the deed of trust, mortgage, or other security documents, if any.  In other cases, PeerStreet may purchase all or a portion of a loan investment that had been previously been issued by a third party.

The following diagram shows the relationship between Investors, the Notes, PeerStreet, the corresponding loan investment and security instrument, borrowers and third party lenders:



Investors can review, on the PSI Website, each Series Note Listing describing the offering of that series of Notes and the corresponding loan investment. The Series Note Listing will provide Investors with a description of the Notes, the terms of the corresponding loan investment, and the nature of the security of the corresponding loan investment. Taken together with this PPM and the form of Note, the Series Note Listing will contain the authoritative description of any series of Notes offered by PeerStreet.

PeerStreet will generally pay each Investor principal and interest on such Investor's Note in an amount equal to such Notes' *pro rata* portion of the principal and interest payments, if any, that PeerStreet receives on the corresponding loan investment, net of any PeerStreet fees or other third-party servicing fee, if applicable. Any such fees may vary with each series of Notes, and the applicable information will be provided in the Series Note Listing posted online. PeerStreet may offer different series of Notes for the same mortgage loan, meaning that different investors may have different terms even though the corresponding mortgage loan is the same. For example, in some instances, investors who agree to take a riskier portion of a particular loan investment may receive a higher rate of return. PeerStreet reserves the right to offer incentives to individual or classes of investors that may increase the rate of return for investors who receive said incentives (these incentives could be in the form of online promotions that are open to all investors, but only certain investors participate in, or may be offered to individual investors in PeerStreet's discretion). PeerStreet will disclose any such arrangements. If a loan contains a prepayment charge, Investors may be entitled to keep a portion or all of the charge (as will be described in the Series Note Listing for the applicable loan). The Series Note Listing of each loan will describe all such charges and fees, and whether the Investors will be entitled to keep all or a portion of such fees and charges or the applicable fees and charges that are assigned, retained and to be received by PeerStreet. In addition, the funds available for payment on the Notes will be reduced by the amount of any attorneys' fees or collection fees that PeerStreet, an affiliate or a third-party servicer or a collection agency imposes in connection with collection efforts related to the corresponding loan investment.

PeerStreet reserves the right, in its sole discretion, to not disclose all information available with respect to a particular loan investment, which information may include without limitation the name or identity of a borrower, the address or exact location of a property, or other relevant information relating to a particular loan investment with respect to any series of Notes. PeerStreet's decision to not disclose all relevant information may be an internal business decision, or the result of confidentiality, legal, regulatory or contractual obligations of PeerStreet. In such circumstances, Investors must make their respective investment decisions based solely on information provided on the PSI Website about the corresponding loan investment and other available facts. Neither PeerStreet, PSI nor any PSI affiliate has any liability for any information provided by third parties and passed along to Investors.

PeerStreet earns revenue from the fees we charge borrowers, third party lenders and Investors. These fees may include origination fees, exit fees, prepayment penalties, service charges and other similar fees. PeerStreet also receives a spread of interest or return on each Note, as described below. PeerStreet may also earn interest on loan investments to the extent that we fund those loan investments ourselves. To the extent that PSI or another PSI affiliate is hired to perform activities associated with the Notes, it may receive a portion of these fees.

Investors should review this PPM, together with the Series Note Listing for a particular series of Notes and the corresponding loan investment and the Investor Agreement (all of which are made available to Investors on the PSI Website) prior to making any decision to invest in a Note.

PeerStreet has been organized and is operated in a manner that is intended (i) to minimize the likelihood that it will become subject to bankruptcy proceedings, and (ii) to minimize the likelihood that it would be substantively consolidated with PSI, and thus have its assets subject to claims by PSI's creditors, if PSI files for bankruptcy. This is achieved by placing certain restrictions on PeerStreet's activities, and implementing certain formalities designed to expressly reinforce Peer Street Funding's status as a distinct corporate entity from PSI.

## Summary of the Offering

**Issuer**                      Peer Street Funding, LLC, a Delaware limited liability company.

**Securities Offered**          Notes, to be issued in series, with each series of Notes corresponding to a specific loan investment that is listed on the PSI Website.   Each series of Notes is dependent for payment on payments that PeerStreet receives on the corresponding loan investment.

This offering is made solely to accredited investors under Regulation D, Rule 506 promulgated under Section 4(a)(2) of the Securities Act of 1933.   Investors will be deemed "accredited" based upon application of Rule 501(a) of the Securities Act of 1933 as such may be amended from time to time.

**Interest Rate**               Interest rates may vary among series of Notes.  Within a series of Notes, interest rate schedules will be standardized.  Some series of Notes may also provide for additional contingent payments upon the occurrence of certain events (any such contingent payments to be described in detail in the Series Note Listing).  The interest rate for each Note will be equal to the interest rate paid to PeerStreet or its affiliates on a loan investment, minus a "spread" of interest or return, if any, that may vary among series of Notes but is generally expected to be 0%-2%.  The "spread" will always be identified on the PSI Website and Series Note Listing.

**Servicing & Other Fees**      Any fees to be charged by PeerStreet to Investors will be specified in the Series Note Listing for the particular loan investment.

**Term**                        The term of each of the Notes will vary by series and the term of the corresponding loan investment.   Generally, the terms will be from six (6) months to five (5) years from the date that the corresponding loan investment is made.

**Security Interest**           The Notes will not be contractually senior to other indebtedness (if any) that PeerStreet incurs.  All Notes will be unsecured special, limited obligations of PeerStreet.  Holders of Notes will not have a security interest in the assets of PeerStreet or any of its PSI affiliates, the corresponding loan investment, the proceeds of that investment or of any underlying assets of the Borrower.

**Maturity**                    The Notes in each series will mature at the end of the given term (the "***Initial Maturity Date***"), unless any payments of the corresponding loan investment remain due and payable upon such date, in which case the maturity of the Notes will be automatically extended to the time when all payments from the corresponding loan investment are received from the Borrower (the ***"Final***

***Maturity Date***"). However, PeerStreet reserves the right, in our sole discretion to amend, modify, sell to a third-party purchaser or charge off the corresponding loan investment at any time after its delinquency, in which event(s), the corresponding loan investment may never reach the Final Maturity Date and Investors may not receive the return of their investment for the corresponding loan investment that was charged off. Notwithstanding the foregoing, PeerStreet will use commercially reasonable efforts to "work out" delinquent or defaulted loan investments and/or pursue collection efforts with respect to said loan investments and will disburse to Investors their *pro rata* share of amounts we receive with respect to the corresponding loan investment for such Note, net of any applicable fees, costs and charges.

**Payment Dates**

Payments on the Notes will depend on the terms of each series of Notes. Generally, payments are expected to be on a monthly or quarterly basis during the term of the Note. Payments will only be made to the extent that PeerStreet receives payments on the corresponding loan investment.

**Prepayment**

The underlying Borrowers may or may not have prepayment penalties attached to the corresponding loan investment. On loan investments that do not have a prepayment penalty, the Notes will similarly be pre-payable without penalty. If the Borrower has a prepayment penalty and such penalty is actually paid, the Notes may share in that prepayment penalty. Each Series Note Listing will describe such terms.

**Use of Proceeds**

The proceeds of each series of Notes will be used to purchase the corresponding loan investment or, in some cases, to repay funds PeerStreet has directly financed through a bridge loan or otherwise borrowed from a third-party or affiliate to originate loan investments directly.

**U.S. Federal Income Tax Consequences**

Although the matter is not settled, PeerStreet intends to treat the Notes as indebtedness of PeerStreet for U.S. federal income tax purposes, and each Investor, by its acceptance of a Note, will be deemed to have agreed to such treatment except as otherwise required by applicable law. As a result of such treatment, the Notes will have original issue discount, or "***OID***", for U.S. federal income tax purposes because payments on the Notes are dependent on payments on the corresponding loan investment. Furthermore, a holder of a Note will be required to include the OID in income as ordinary interest income for U.S. federal income tax purposes as it accrues (which may be in advance of interest being paid on the Note), regardless of such holder's regular method of accounting.

Prospective purchasers of the Notes should consult their own tax advisors regarding the U.S. federal, state, local and non-U.S. tax consequences of the purchase and ownership of the Notes, including any possible differing treatments of the Notes.    See "Certain U.S. Federal Income Tax Considerations" for more information.

## INVESTOR QUALIFICATIONS

With respect to each investment made by an Investor, that Investor will be required to electronically sign or acknowledge the Investor Agreement, and verify through a process outlined on the PSI Website that he, she or it is an accredited investor.   The federal securities laws define the term accredited investor in Rule 501(a) of Regulation D as:

1. An employee benefit plan, within the meaning of the Employee Retirement Income Security Act, if a bank, insurance company, or registered investment adviser makes the investment decisions, or if the plan has total assets in excess of $5 million;

2. A bank, insurance company, registered investment company, business development company, or small business investment company;

3. A charitable organization, corporation, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets exceeding $5 million;

4. A director, executive officer, or general partner of the company selling the securities, or any director, executive officer, or general partner of a general partner of that issuer;

5. A natural person who has individual net worth, or joint net worth with the person's spouse, that exceeds $1 million at the time of the purchase, excluding the value of the primary residence of such person;

6. A natural person with income exceeding $200,000 in each of the two most recent years or joint income with a spouse exceeding $300,000 for those years and a reasonable expectation of the same income level in the current year;

7. A trust with assets in excess of $5 million, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person; and

8. A business in which all the equity owners are accredited investors.

In addition, each person acquiring a Note will also be required to represent that he, she, or it is purchasing for his, her, or its own account for investment purposes and not with a view to resale or distribution.   Each Investor must be domiciled in the United States and must meet certain income and/or net worth requirements before investing in the Notes.      (See "Risk Factors".)

**This offering is open solely to accredited Investors domiciled in the U.S. The discussion contained in this PPM is solely directed to Investors domiciled in the U.S., and no offer to**

**sell, or solicitation to buy, is made to any individuals or entities domiciled outside of the U.S.**

### THE NOTES

The Notes are PeerStreet's unsecured special, limited obligations that are tied to the performance of a particular loan investment. The Notes will be U.S. dollar denominated and will be issued in series.

Each series of Notes will correspond to a specific loan investment, and payment to Investors will depend on payments we receive on the corresponding loan investment. We have no obligation to make any payments on the Notes unless, and only to the extent that, we have received payments on the corresponding loan investment.

The exact form of Note for each particular series of Notes offered to Investors through this offering will vary based on the terms and conditions of the specific transaction. Because certain terms (e.g., issuance date) of a series of Notes may not be known until all funding commitments have been received and the closing for such series of Notes has occurred, the form of Note will simply be posted on the PSI Website along with the Series Note Listing, this PPM, the Investor Agreement. Investors will be electronically notified by PeerStreet of the closing date of the applicable series of Notes and of any material changes to Note terms, but clerical alterations to the final form of Notes will be reflected in PeerStreet's internal records without further Investor notification. In the case of material changes to the Note terms, Investors will be notified before closing and will have the opportunity to rescind their purchase commitment if they notify PeerStreet in writing at least two business days before the scheduled closing.

All Notes will be issued and tracked in electronic form only, through the PSI Website and processing and payment systems are automated and electronic. We do not have any physical branches, deposit-taking or interest payment activities. The PSI Website will provide detailed information about the Platform, including the full text of the necessary legal agreements, as well as the Series Note Listing applicable to each series of Notes. The Series Note Listing will provide Investors with a description of the Notes, the terms of the corresponding loan investment, some information about the Borrower (but not necessarily the name or identity of the Borrower), and the nature of the security of the loan investment (if any). In addition to the customer support materials available on the PSI Website, PSI and PeerStreet makes additional customer support available to members by email and phone.

After a Series Note Listing is posted online, Investors can place investments on that listing until the listing has received investments totaling the requested loan amount. Investments will not accumulate interest while the Series Note Listing is pending. PeerStreet currently accepts investments in amounts of as little as $1,000, although in some cases larger (or lower) minimum investment amounts may be required or allowed. If the Series Note Listing does not receive the minimum aggregate investments prior to the scheduled closing date for the underlying loan investment, either (i) the listing will terminate and the requested loan investment will not be funded, (ii) PeerStreet, or its affiliates, may fund the portion of the corresponding loan investment left unfunded through the purchase of Notes, (iii) where PeerStreet believes that additional Investors may later elect to participate in the listing, PeerStreet may elect (in its sole

discretion) to arrange bridge financing to close the loan investment, and the listing will remain active on the Platform until the listing is fully funded and the bridge loan repaid; or (iv) in certain cases, PeerStreet's participation amount in the underlying loan may be reduced.  In the foregoing cases (ii), (iii), and (iv), Investors who had already committed to Notes at the time of the loan investment closing will begin to accrue interest as of such date.  Any investment made by PeerStreet or its affiliates in the Notes will be on the same terms and conditions as other Investors.

For some loan investments, PeerStreet will participate in the loan investment directly. PeerStreet may service the loan investment directly or, in certain cases, may put in place a third party servicer.  In addition, a servicer may be a PSI affiliate.  In some cases, PeerStreet may enter into a relationship whereby one or more third parties (including but not limited to a PSI affiliate) issue (and/or service) the corresponding loan investment and PeerStreet then purchases that corresponding loan investment (or a participating interest therein) from the third party.  Where PeerStreet merely takes a participating interest in a loan investment, the third party may sometimes remain the lead lender on that loan investment, and may retain control of the deed of trust, mortgage, or other security documents, as applicable.  In other cases, PeerStreet may purchase all or a portion of a loan investment that had been previously issued by a third party. PeerStreet may enter into a relationship with one or more third parties to have the third party undertake and service the loan investment and for PeerStreet to then purchase the corresponding loan investment remittances from the third party.  Holders of any Notes will not have a security interest in the assets of PeerStreet or any PSI affiliate, the corresponding loan investment, the proceeds of that investment or of any underlying assets of the Borrower.

Investors can review on the PSI Website each Series Note Listing describing that series of Notes and the corresponding loan investment.  The Series Note Listing will provide Investors with a description of the Notes in that series, the terms of the specific loan investment, some information about the Borrower, and the nature of the security of the loan investment if any.  The Series Note Listing (posted online) will, together with this PPM and the form of Note, contain the authoritative description of any Notes offered by PeerStreet.

**Denominations, Form and Registration**

Each note will have the terms described in the Master Mortgage Dependent Note attached hereto as Exhibit A.  We will issue the Notes in electronic form only.  This means that each Note will be stored on the PSI Website.  You can view a record of the Notes you own and the form of your Notes online and print copies for your records by visiting your secure, password-protected webpage in the "Dashboard" section of the PSI Website.  We will not issue certificates for the Notes.  Investors will be required to hold their Notes through PeerStreet's electronic Note register.  The Notes will not be listed on any securities exchange.

We will treat the Investors in whose names the Notes are registered as the owners thereof for the purpose of receiving payments and for all other purposes.

**Interest Rates**

The interest rate applicable for each series of Notes will be set forth in the Series Note Listing. PeerStreet expects that, in nearly all cases, the interest rate provided to Investors in the Notes will be less than the interest rate payable on the on the corresponding mortgage loan, as PeerStreet, its affiliates and/or a third party lender may receive an economic "spread" of interest that will vary among the series of Notes.

The interest rates payable on each loan investment will vary among the loan investments, depending on various factors applicable to the underlying property, borrower and, as applicable, the third party lender. Consequently, the interest rate will vary for each series of Notes, and the yield an Investor earns on one series of Notes may differ from the yield earned by other Investors in other series of Notes. In addition, PeerStreet may offer different terms on Notes related to the same mortgage loan or mortgage loan investment, meaning that different Investors may have different terms even though the corresponding mortgage loan is the same. PeerStreet also reserves the right to offer incentives to individual or classes of Investors that may increase the rate of return for those Investors who receive said incentives (these incentives could be in the form of online promotions that are open to all Investors, but only certain Investors participate in, or may be offered to individual Investors in PeerStreet's discretion).

**Maturity**

Each series of Notes will have varying terms, depending on the term of the corresponding loan investment. Most of the loan investments, and thus the Notes, will have a typical term of between six (6) months and five (5) years. The Notes in each series will mature at the end of the term of the corresponding loan investment. If there are amounts owing to PeerStreet on the corresponding loan investment at the end of the initial maturity date, the term of the Notes will be extended to allow for more time for PeerStreet to receive further payments due under the corresponding loan investment and for Investors to thus receive further payments on the corresponding Notes.

The Notes may never reach maturity, however, because we expect that in most cases loan investments may be prepaid without penalty, and because we may, in our sole discretion and, subject to the applicable servicing standards, amend, modify, or assign or sell our rights under the loan to a third-party, or charge off the loan investment at any time after any delinquency thereon. Our obligation to make payments on a Note will be limited to an amount equal to the Investor's *pro rata* share of amounts we receive with respect to the corresponding loan investment for such Note, net of any applicable fees.

**Ranking; Sinking Fund**

The Notes will be unsecured special, limited obligations of PeerStreet. For each series of Notes, PeerStreet will be obligated to make payments on the Notes if and only if, and only to the extent that, PeerStreet receives principal and interest payments from the Borrower on the corresponding loan investment. Payments on the loan investment will be shared ratably among all Investors in the related series of Notes. In the event of a bankruptcy or similar proceeding of PeerStreet, the relative rights of the holder of a Note as compared to the holders of other

unsecured indebtedness of PeerStreet with respect to payment from the proceeds of the loan investments or other assets of PeerStreet is uncertain. See "Risk Factors." Each series of Notes will correspond to a specific loan investment, and payment will depend on payments we receive on the corresponding loan investment. The Notes will not have the benefit of a sinking fund.

**Servicing and Payments**

Subject to the limitations described below under "Limitations on Payments," we will make installment payments on the Notes upon receiving payments in respect of the corresponding loan investment, in accordance with the payment schedule for the Notes. In some cases, PeerStreet will collect payments on the loan investments, while in other cases PeerStreet may enter into a relationship with a third party in order to have that third party issue, or act as the servicer of, the loan investment. In all cases, PeerStreet, an affiliate or a third party will disburse corresponding payments on the applicable series of Notes.

Each series of Notes will have a payment schedule providing for periodic payments over a term equal to the corresponding loan. Such schedule will specify the payment dates and the type of periodic payments (monthly, quarterly, etc.) applicable to that series of Notes. After any loan is paid in full, either as a result of the Borrower paying off the loan investment or as a result of a payoff in a foreclosure proceeding, PeerStreet will pay off the Note and pay Investor with the proceeds (net of any fees, charges and reimbursement of advances payable to PeerStreet) as soon as practicable.

We expect that, for each loan investment, we will receive a payment from Borrowers (through the Automated Clearing House system of the U.S. Federal Reserve Board or a successor system providing electronic funds transfers between banks, which we refer to as the "**ACH**") on or about the payment due date. A payment by a Borrower will be distributed to the applicable Note holders' PeerStreet accounts as soon as practicable. Investors can review their account statements online to track when such payments are received. The same process occurs upon maturity of the Note. In the event payment is made after the applicable payment and maturity date of the loan investment, PeerStreet will deem the payment date and maturity date of the Note to be the same as the dates applicable to the corresponding loan investment.

Pursuant to the terms of the applicable loan, the Borrower may have a grace period from the date that payments are due under the loan investment. Within ten (10) days after the expiration of any grace period and/or in accordance with applicable state law, PeerStreet or its retained servicing provider will generally telephone and/or send a notice of delinquency to the Borrower. If the Borrower does not adequately respond to the notice of delinquency within a reasonable time, then (or as may be in accordance with state law) PeerStreet or its retained service provider generally will record a notice of default, if applicable, with respect to the loan investment. PeerStreet may exercise its discretion in the timing of the filing of the notice of default. PeerStreet may also exercise its discretion in the timing of any foreclosure under the power of sale contained in the applicable security instrument (if any), including granting extensions of the foreclosure date.

PeerStreet will communicate with Investors through the PSI Website at www.PeerStreet.com or via electronic mail as to material developments regarding a loan.

PeerStreet or its affiliates will maintain possession of all original loan investment documents and related security instruments, to the extent not held by loan originators.

**Limitations on Payments**

Any amounts received on loan investments will be forwarded by PeerStreet to the holders of the corresponding series of Notes, net of any fees, charges or other reimbursements payable to PeerStreet or its affiliates.  Each Investor's right to receive installment payments and other amounts in respect of that series of Notes is limited in all cases to the Investor's *pro rata* portion of the amounts received by PeerStreet in connection with the corresponding loan investment, including, without limitation, all principal and interest payments, prepayments, partial payments, late payments or settlements, the proceeds from any foreclosure on collateral, the proceeds from an assignment to a collections agent, or redemption and preferred return payments (as applicable), subject to the repayment of any PeerStreet advances made in connection with collection or similar efforts made with respect to the loan.  To the extent we do not receive a required payment on a loan, we will not make any payments on the series of Notes related to that payment (or the portion thereof that we do not receive, in the case of a partial payment), and a holder of a Note will not have any rights against PeerStreet or the Borrower in respect of the Note or the corresponding loan.

In the event a loan is serviced by a third party servicer (whether or not affiliated with PeerStreet), that servicer may charge a servicing fee on amounts collected, and this fee will be paid prior to any distribution to Investors.

An "*unsuccessful payment fee*" is a fee charged by PeerStreet to a Borrower or a third-party or affiliated servicer or collection agency when a payment request is denied or a check is returned unpaid for any reason, including but not limited to, insufficient funds in the Borrower's bank account or the closing of that bank account.  Payments made to Noteholders will not be affected by the amount of any unsuccessful payment fees, which are paid as supplemental fees to PeerStreet.

PeerStreet retains the authority to grant appropriate payment deferrals based on its overall assessment of a Borrower, the property situation, and market conditions generally.  *In such cases, the payment terms of the Notes will be correspondingly adjusted.*  In such event, PeerStreet will communicate any adjustments to Investors via electronic mail or on the PeerStreet Website.  PeerStreet, or an affiliate, may also, in its sole discretion, advance amounts necessary to protect the security of any loan investment.  Such amounts may include the payment of taxes, prior encumbrances or liens, property and casualty insurance, foreclosure expenses, repair, litigation expenses and similar items, and also for accountant fees, consultants, property maintenance and similar items.  PeerStreet may make such advances when, in its sole discretion, it determines that the loan investment may be at risk of total or partial loss and believes that the making of such advances will ultimately be economically beneficial.  PeerStreet will notify Investors in the applicable series of Notes, through the PSI Website or via electronic mail, if and when such advances are made and that the amount of such advances may be withheld from payments that Investors would otherwise receive on the Notes.  PeerStreet is not required to make any such advances and may choose whether or not to make any such advance in its sole discretion.  Any advances made by PeerStreet will, at PeerStreet's sole discretion, bear interest at

the interest rate applicable to the corresponding mortgage loan, and will be reimbursable to PeerStreet upon receipt of funds from the Borrower.  Furthermore, in the event of foreclosure, PeerStreet is entitled to recover the costs of foreclosure and any amounts advanced by PeerStreet (with applicable interest thereon) in respect of the property being foreclosed upon prior to any payment or other distribution being made to Investors.

Each series of Notes will mature on its initial maturity date, unless any scheduled payments in respect of the corresponding loan remain due and payable upon the initial maturity date, in which case the maturity of the Notes will be automatically extended to the Final Maturity Date and the unpaid portion of the corresponding loan investment will continue to accrue interest at the applicable rate.  PeerStreet will use commercially reasonable efforts to "work out" delinquent or defaulted loan investments and/or pursue collection efforts with respect to said loan investments and will disburse to Investors their *pro rata* share of amounts we receive with respect to the corresponding loan investment for such Note, net of any applicable fees, costs and charges.  Notwithstanding the foregoing, PeerStreet reserves the right, in our sole discretion to amend, modify, sell to a third-party purchaser or charge off the corresponding loan investment at any time after its delinquency, in which event(s), the corresponding loan investment may never reach the Final Maturity Date and Investors may not receive the return of their investment for the corresponding loan investment that was charged off.

## Prepayments

To the extent that a Borrower prepays a corresponding loan investment, holders of the series of Notes related to that corresponding loan investment will typically be entitled to receive their *pro rata* share of the prepayment, net of any accrued or owing fees, advances, charges or other reimbursements otherwise due and payable to PeerStreet or its affiliates, unless otherwise stated in a Series Note Listing. Prepayment may decrease the total amount of payments received by Investors in the corresponding Notes.

## Certain Aspects of Loan Investments

As discussed above, if the Borrower remains in default on a loan after any accommodation granted by PeerStreet to the Borrower to cure such default, PeerStreet (or a servicer or other third party) may, in the case of a senior loan, and, if secured, a mezzanine loan, foreclose on the property underlying the corresponding loan investment.  The terms of corresponding loans with respect to default and foreclosure will vary.  PeerStreet may also determine that an advance is necessary and prudent to protect Investors' interests.  Such instances might include the cancelation or expiration of casualty insurance or the delinquency of property taxes.  Any such advances would be added to the corresponding loan amount, bear interest at the interest rate applicable to the corresponding mortgage loan, and, in the case of forced insurance, may be significantly more expensive than conventional casualty insurance.  Any such advances would have a repayment priority over the existing underlying loan balance and so may delay payments on the existing underlying loan that would otherwise be provided to Investors in the corresponding Notes.

Some series of Notes and their corresponding loans may provide for monthly payments of interest, as applicable, and will require the Borrower to make a "balloon" payment of the

unpaid principal and interest at the end of the loan term.  Some series of Notes and the corresponding loans may be partially amortized, and will require the Borrower to make a "balloon" payment of the unpaid principal and interest at the end of the loan term.  PeerStreet does not currently expect to make or arrange loans that contain provisions for negative amortization.

From time to time PeerStreet may rewrite loan terms for certain loans.  With respect to such rewritten terms, PeerStreet may elect not to obtain a new appraisal or other evaluation of the property.

*Construction, Rehabilitation, Home Improvement and Entitlement Loans*

PeerStreet may offer some series of Notes relating to construction loans for various types of properties, including single family residential, condominiums, multi-family residential, industrial, office, retail, foreclosed (REO), unimproved land with entitlements and other types of real estate.   The loan underwriting for construction, rehabilitation and unimproved land with entitlement loans is typically based upon a determined "as completed" value, *i.e.,* the projected value of the property *after* the completion of the construction or rehabilitation of a property. PeerStreet may require special builder's risk insurance, or "course of construction" insurance, in these cases.

Although construction loans may be fully funded at the closing of the series of Notes, the proceeds of a construction loan will typically be disbursed by PeerStreet or its service provider to a construction or builder's fund control company (which may be affiliated with PeerStreet).  The Borrower will typically be required to enter into a construction loan agreement that governs the release of the loan proceeds.  Disbursements would be made by PeerStreet, its authorized agent, or the construction or builder's fund control company only as portions of the construction work are completed, and only upon instructions from PeerStreet or its agent after monitoring such progress, with the amount of disbursement based upon a percentage of work completed. Disbursements may include interest on the construction loan and advance payments to the Investors.   The amount of the disbursement to pay the contractor and the subcontractors generally would be based upon a percentage of completion of construction.  In its discretion, PeerStreet may require the retention of a percentage of the amounts paid to the contractor or subcontractors.   Disbursements may be made directly to the Borrower or contractors or subcontractors or jointly to the Borrower and to the contractors or the subcontractors or jointly to the contractors and subcontractors.

For rehabilitation loans, a portion of the loan proceeds will typically be disbursed directly to the Borrower or to a construction or builder's fund control company, and the Borrower would enter into a loan disbursement agreement that will govern the release of the portion of the loan proceeds that are intended to be used for repairs and rehabilitation. In most cases, PeerStreet will require the Borrower to have already completed certain line items within the scope of work before they will be entitled to receive any loan proceeds.    Construction or rehabilitation disbursements will be made by PeerStreet, its servicing agent, or the construction or builder's fund control company based on the disbursement schedule and fund control authorization.  If the improvements have not been completed within the time period set forth in the construction or rehabilitation agreement, or if PeerStreet were to determine that the balance of the loan proceeds

was not sufficient to complete the construction, then PeerStreet or its servicer may use any remaining retained funds to complete the construction or may require the Borrower to deposit additional funds with PeerStreet or the construction or builder's fund control company.

Interest on this type of loan will accrue and be payable as set forth in the applicable Note and Series Note Listing.  Upon any default pursuant to the corresponding loan, PeerStreet or its servicer may apply all or any portion of the amount in PeerStreet's trust account or held by the construction or builder's fund control company to amounts due under the corresponding loan.

To the extent available, PeerStreet will require the Borrower to obtain builder's risk insurance, which is also known as course of construction insurance.  This specialized insurance is intended to insure structures, while they are under construction.  Materials, fixtures and appliances that are intended to become an integral part of the structure being built are also insured.  The insurance is provided for loss resulting from accidental direct physical damage to the structure under construction.  The policies generally include broad coverage, but exclude earthquake, flood and damage caused by earth movement.  Some builder's risk policies limit coverage to physical damage caused by specifically named perils, such as fire and theft.  The coverage provided for specific perils would be would be specifically listed in the insurance policy or policies.

**Government Regulation**There are many levels of local, state and federal laws and regulations that may potentially affect PeerStreet's business.  In addition, the current state of the regulation of online investment platforms is unsettled and subject to change.

As a threshold matter, if PeerStreet is required to register under the Investment Company Act or become subject to the U.S. Securities and Exchange Commission's regulations governing broker-dealers, it may be required to institute substantial compliance requirements and controls.

Additionally, some states will require PeerStreet to qualify to "do business" and file registrations with the requisite offices of secretary of state or related governmental bodies.  Further, some states require companies such as PeerStreet, to obtain real estate and/or consumer credit licenses, including such licenses for the authority to engage in the business of mortgage lending, brokering, servicing, or collecting commercial mortgage loans.  PeerStreet does not intend to finance loan investments or engage in licensable activity in states where such licenses are required until it obtains the required license(s) in each jurisdiction, as required by applicable law.  PeerStreet may, in the future, do business with or affiliate itself with third parties (including banks or other depository institutions) in order to be able to offer loans in jurisdictions where PeerStreet might otherwise be restricted from doing so without a license.  It is possible that some of these states may still impose mortgage lender, broker, or licensing requirements on PeerStreet regardless of such affiliations and structures, and if such requirements are imposed, PeerStreet will obtain such required licenses in accordance with applicable law.

In addition, substantive requirements are imposed upon lenders in connection with the origination, assignment and servicing of mortgage loans by numerous federal and some state consumer protection laws.  These laws include the federal Truth in Lending Act, Real Estate Settlement Procedures Act, Fair Credit Reporting Act, Home Ownership Equity Protection Act, and similar statutes.  Some of the corresponding loans may be subject to certain provisions of

these and other applicable laws and regulations concerning loans. These laws generally impose additional disclosure and other substantive requirements on creditors with respect to mortgage loans where the loan funds are primarily used for personal, household or consumer purposes. (See "Risk Factors.")

In many states, the loans will be subject to state restrictions on interest rates and fees that may be imposed on PeerStreet loans.  We do not intend to make loans that violate these state laws.

As discussed above, PeerStreet may in certain cases purchase loans originated by private lenders.  Such lenders may be subject to licensing requirements in one or more states.  PeerStreet will engage in entity due diligence with respect to compliance with such licensing requirements, as well as operational due diligence on the private lenders' origination and production channels, but cannot guarantee compliance by such lenders with any applicable laws or regulations and will rely on representations of such lenders with respect to their compliance with such licensing requirements.  If a lender does not comply with state or federal requirements, the lack of compliance may affect the enforceability of loans purchased from that lender.

## RISK FACTORS

*Investing in the Notes involves a high degree of risk.  In deciding whether to purchase Notes, you should carefully consider the following risk factors.  Any of the following risks could have a material adverse effect on the value of the Notes you purchase and could cause you to lose all or part of your initial purchase price or could adversely affect future payments you expect to receive on the Notes.  Only Investors who can bear the loss of their entire purchase price should purchase Notes.*

**Risks Related to the Notes, and the Corresponding Loan Investments on Which the Notes are Dependent**

***You may lose some or all of your initial purchase price for the Notes because the Notes are highly risky and speculative.  Only investors who can bear the loss of their entire purchase price should purchase.***

The Notes are highly risky and speculative because payments on the Notes are special, limited obligations of PeerStreet that depend entirely on payments on the corresponding loans. Notes are suitable purchases only for Investors of adequate financial means.  If you cannot afford to lose all of the money you plan to invest in Notes, you should not purchase Notes.

***Payments on the Notes depend entirely on payments PeerStreet receives on corresponding loan investments.  If a Borrower fails to make any payments on the corresponding loan investment related to your Note, payments on your Note will be correspondingly reduced.***

PeerStreet will only make payments *pro rata* on a series of Notes, net of our service charge, after it receives a Borrower's payment on the corresponding loan investment.  PeerStreet also will retain (and not pay to Investors) from the funds received from the relevant Borrower

and otherwise available for payment on the Notes any non-sufficient funds fees and the amounts of any attorneys' fees or collection fees it, a third-party servicer or collection agency imposes in connection with collection efforts. If such fees are collected or imposed, it may reduce your return. Under the terms of the Notes, if PeerStreet does not receive any or all payments on the corresponding loan investment, payments on your Note will be correspondingly reduced in whole or in part.  If the relevant Borrower does not make a payment on a specific loan payment date, no payment will be made on your Note on the corresponding succeeding Note payment date.

***The Notes are special, limited obligations of PeerStreet only and are not secured by any collateral or guaranteed or insured by any third party.***

While a corresponding loan may be secured by a mortgage, deed of trust, security agreement, or legal title, the Notes themselves are special, limited obligations of PeerStreet and will not represent an obligation of the Borrower or any other party except PeerStreet.  The Notes will not be secured by any collateral and are not guaranteed or insured by any governmental agency or instrumentality or any third party.  Investors in the Notes may look only to PeerStreet for payment of the Notes.  Furthermore, if a Borrower fails to make any payments on the corresponding loan investment, Investors in the related Notes will not receive the corresponding payments on their respective Notes.  Investors will not be able to pursue collection against the Borrower and are prohibited from contacting the Borrower about a loan investment.

***PeerStreet does not have significant historical performance data about performance on the corresponding loan investments.  Loss rates on the corresponding loan investments may increase and prior to investing you should consider the risk of non-payment and default.***

PeerStreet is in the early stages of its development and has a limited operating history.  Only a limited number of loan investments have been offered through the PSI Website prior to this offering.  PSI and PeerStreet's management has experience in real estate loans but PeerStreet cannot predict what its long-term loan loss experience will be.

***If payments on the corresponding loan investments relating to your Notes are not paid, it is likely you will not receive the full principal and interest payments that you expect to receive on your Notes, and you may not recover your original purchase price.***

Senior loans and certain mezzanine loans will be secured by property.  If a corresponding loan becomes past due or is otherwise in default, PeerStreet may need to foreclose on the property underlying the corresponding loan at a foreclosure sale unless the property is purchased by a third party bidder at the foreclosure sale.  PeerStreet or one of its affiliates may act as manager for the foreclosed real estate, and the costs of foreclosure may be advanced by PeerStreet, but if PeerStreet cannot quickly sell such property and the property does not produce any significant income, the cost of owning, maintaining, and selling the property would reduce any proceeds gained through the sale. PeerStreet may offer its Investors the opportunity to advance such costs as a priority loan at a market interest rate, and Investors not willing to advance their pro-rata share of such costs will be subordinate to such loan.  If the foreclosed real estate cannot be sold for net proceeds that can fully return the outstanding amount of the related Notes, Investors will lose part or all of their investment.

In certain cases, even when a loan is secured, PeerStreet may not be able to recover any of the unpaid loan balance. As a result, an Investor who has purchased a corresponding Note may receive little, if any, of the unpaid principal and interest payable under the Note. You must rely on the collection efforts of PeerStreet or a third party to which such corresponding loans are referred. You are not permitted to attempt to collect payments on the corresponding loan investments in any manner.

***Loss rates on loan investments corresponding to the Notes may increase as a result of economic conditions beyond PeerStreet's control and beyond the control of the Borrower.***

Loan investment loss rates may be significantly affected by economic downturns or general economic conditions beyond PeerStreet's control and beyond the control of individual Borrowers. In particular, loss rates on corresponding loan investments may increase due to factors such as (among other things) local real estate market conditions, prevailing interest rates, the rate of unemployment, the level of consumer confidence, the value of the U.S. dollar, energy prices, changes in consumer spending, the number of personal bankruptcies, disruptions in the credit markets and other factors.

***The success of each loan investment is dependent on the performance of the Borrower and other third parties over which we have no control.***

With respect to a particular loan, the Borrower is responsible for various management functions that are essential to the success of the Project, including property marketing and leasing rates, payment of bills, maintenance of insurance, and property management generally. Poor management on the part of the Borrower could adversely affect the financial performance of the corresponding loan or expose it to unanticipated operating risks, which could reduce the property's cash flow and adversely affect the Borrower's ability to repay the corresponding loan investment. Neither PeerStreet nor any PSI affiliate has any control over a Borrower's management of a Project.

***Information supplied by Borrowers may be inaccurate or intentionally false.***

Borrowers supply a variety of information regarding the current rental income, property valuations, market data, and other information, some of which is included in the Series Note Listings. PeerStreet makes an attempt to verify some of this information, but as a practical matter, cannot verify all of it, which may be incomplete, inaccurate or intentionally false. Borrowers may also misrepresent their intentions for the use of loan investment proceeds. PeerStreet cannot verify all statements by applicants as to how loan proceeds are to be used. If a Borrower supplies false, misleading or inaccurate information, you may lose all or a portion of your investment in the Note.

With the exception of loans which have a draw feature coupled with them, when PeerStreet finances a corresponding loan investment, its primary assurances that the financing proceeds will be properly spent by the Borrower are the contractual covenants agreed to by the Borrower, along with the Borrower's business history and reputation. Should the proceeds of a financing be diverted improperly, the Borrower might become insolvent, which could cause the purchasers of the corresponding Notes to lose their entire investment.

***The Borrower may have no operating history, and the manager of the Borrower may lack experience in developing projects similar to a property underlying a loan investment.***

Real estate companies are often organized solely for the purpose of developing a particular property.  In that case, the Borrower may have no history of operations.  It therefore should be considered a development stage company, and its operations will be subject to all of the risks inherent in the establishment of a new business enterprise, including, but not limited to, hurdles or barriers to the implementation of its business plans.  Further, because there is no history of operations there is also no operating history from which to evaluate the Borrower manager's ability to manage the Borrower's operations and achieve its goals or the likely performance of the company.  No assurances can be given that a Borrower can operate profitably.

***Projected revenues from a property could fall short of the amounts projected.***

The payment schedules with respect to many corresponding loan investments are based on projected revenues generated by the property over the term of the corresponding loan investment.  These projections are based on factors such as expected vacancy rates, expense rates, and other projected income and expense figures relating to the property.  The actual revenues generated by a property could fall short of projections due to factors such as lower-than-expected rental revenues, or greater-than-expected vacancy rates or property management expenses.  In such event, the Borrower's cash flow could be inadequate to repay the corresponding loan investment in full.

***Insurance against risks faced by a property could become more costly or could become unavailable altogether.  There is no requirement for a Borrower to self-insure.***

Real estate properties are typically insured against risk of fire damage and certain other property casualties, but are sometimes not covered by severe weather or natural disaster events such as landslides, earthquakes, or floods.  Changes in the conditions affecting the economic environment in which insurance companies do business could affect the Borrower's ability to continue insuring the property at a reasonable cost or could result in insurance being unavailable altogether.  Moreover, any hazard losses not then covered by the Borrower's insurance policy would result in the corresponding loan investment becoming significantly under secured, and an Investor in a Note could sustain a significant reduction, or complete elimination of, the return and repayment of principal from that Note.

***Environmental issues may affect the operation of a Borrower property.***

If toxic environmental contamination is discovered to exist on a property underlying a corresponding loan investment, it might affect the Borrower's ability to repay the corresponding loan investment and PeerStreet could suffer from a devaluation of loan security.  To the extent that PeerStreet is forced to foreclose and/or operate such a property, potential additional liabilities include reporting requirements, remediation costs, fines, penalties and damages, all of which would adversely affect the likelihood that Investors would be repaid on the Notes.

Of particular concern may be those properties that are, or have been, the site of manufacturing, industrial or disposal activity. These environmental risks may give rise to a diminution in value of the security property or liability for cleanup costs or other remedial actions. This liability could exceed the value of the real property or the principal balance of the related mortgage loan. For this reason, PeerStreet may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

Under the laws of certain states, an owner's failure to perform remedial actions required under environmental laws may give rise to a lien on mortgaged property to ensure the reimbursement of remedial costs. In some states this lien has priority over the lien of an existing mortgage against the real property. Because the costs of remedial action could be substantial, the value of a mortgaged property as collateral for a loan could be adversely affected by the existence of an environmental condition giving rise to a lien.

The state of law is currently unclear as to whether and under what circumstances clean-up costs, or the obligation to take remedial actions, can be imposed on a secured lender. If a lender does become liable for cleanup costs, it may bring an action for contribution against the current owners or operators, the owners or operators at the time of on-site disposal activity or any other party who contributed to the environmental hazard, but these persons or entities may be bankrupt or otherwise judgment-proof. Furthermore, an action against the Borrower may be adversely affected by the limitations on recourse in the loan documents.

***PeerStreet has an incentive to fund as many corresponding loan investments as possible, which could impair its ability to devote adequate attention and resources to collection of corresponding loan investments.***

Substantially all of PeerStreet's revenues are derived from, listing, origination, and servicing fees, or "spreads" generated through making and arranging loans and offering related series of Notes. As a result, it has an incentive to finance as many projects as possible to maximize the amount of fees it is able to generate. Increased project volume increases the demands on its management resources and its ability to devote adequate attention and resources to the collection of corresponding loan investments. In the event that PeerStreet takes on loan volumes that exceed its ability to manage outstanding corresponding loan investments, our ability to make timely payments on the Notes will suffer.

***The property valuation models used by PeerStreet in determining whether to make a corresponding loan investment may be deficient and may increase the risk of default.***

Real estate valuation is an inherently inexact process and depends on numerous factors, all of which are subject to change. Appraisals or opinions of value may prove to be insufficiently supported, and PeerStreet's review of the value of the underlying property in determining whether to make a corresponding loan and the value of the underlying security may be based on information that is incorrect or opinions that are overly optimistic. The risk of default in such situations is increased, and the risk of loss to Investors will be commensurately greater.

***The real property security for the corresponding loan investments may decline in value.***

The value of the real property security for a loan will be subject to the risks generally incident to the ownership of improved and unimproved real estate, including changes in general or local economic conditions, increases in interest rates for real estate financing, physical damage that is not covered by insurance, zoning, entitlements, and other risks.  Many real estate companies expect to use resale proceeds to repay their loan.  A decline in property values could result in a loan amount being greater than the property value, which could increase the likelihood of the Borrower failing to make payments on the loan.

Although real estate assets are generally cyclical in nature, PeerStreet's operating history since its inception does not yet span any prolonged down cycles in the real estate market.

***Loans ending with large "balloon" payments carry particular risks.***

Some of the corresponding loans may be interest-only loans providing for relatively small monthly payments with a large "balloon" payment of principal due at the end of the term. Real estate companies may be unable to make principal payments out of their own funds and will be compelled to refinance or sell their property.  Fluctuations in real estate values, interest rates and the unavailability of mortgage funds could adversely affect the ability of real estate companies to refinance their loans at maturity or successfully sell the property for enough money to pay off the corresponding loans.

***Construction and rehabilitation investments carry particular risks.***

Construction and rehabilitation loans involve a number of particular risks, involving, among other things, the timeliness of the project's completion, the integrity of appraisal values, whether or not the completed property can be sold for the amount anticipated, and the length of ultimate sale process.

If construction work is not completed (due to contractor abandonment, unsatisfactory work performance, or various other factors) and all the loan investment funds have already been expended, then in the event of a default PeerStreet may have to invest significant additional funds to complete the construction work. Any such investment would be recuperated by PeerStreet prior to the Investor being paid back on the Note.  If the value of an uncompleted property is materially less than the amount of the loan, even if the work were completed, then upon a default PeerStreet might need to invest additional funds in order to recoup all or a portion of the investment.  Default risks also exist where it takes a Borrower longer than anticipated either to construct or then sell the property, or if the Borrower does not receive sufficient proceeds from the sale to repay the corresponding loan investment in full.

***Security of certain corresponding loans does not remove the risks associated with foreclosure.***

Senior loans and certain mezzanine loans will be secured by a first lien security interest such as a mortgage, deed of trust or security deed on the underlying real estate.  Different property types involve different types of risk in terms of realizing on the collateral in the event

that the Borrower defaults.  These risks include completion costs in the case of an incomplete project, partial resale for condominiums and tracts and lease-up (finding tenants) for multi-family residential, office, retail, commercial and industrial properties.  PeerStreet may not be able to sell a foreclosed commercial property, for example, before expending efforts to find tenants to make the property more fully leased and more attractive to potential buyers.

Moreover, foreclosure statutes vary widely from state to state.  Properties underlying defaulted loans will need to be foreclosed upon in compliance with the laws of the state where such property is located.  Many states require lengthy processing periods or the obtaining of a court decree before a mortgaged property may be sold or otherwise foreclosed upon.  Further, statutory rights to redemption and the effects of anti-deficiency and other laws may limit the ability for PeerStreet to timely recover the value of its loan in the event that a Borrower defaults on a loan.

**A bankruptcy of the Borrower will prevent PeerStreet from exercising its foreclosure remedy promptly.**

Where a mortgage loan is secured, if the Borrower enters bankruptcy, an automatic stay (the equivalent of an injunction) of all proceedings against the Borrower's property will be granted.  This stay will prevent PeerStreet from foreclosing on the property or otherwise enforcing any remedies under the Borrower's loan documents or at law unless relief from the stay can be obtained from the bankruptcy court.  There are a number of factors that a bankruptcy court will consider in deciding whether to grant a lender relief from the automatic stay, including the property's loan-to-value ratio and the Borrower's need to retain the property to effectively reorganize.  There is no guarantee as to whether or when any such relief may be obtained.  Significant legal fees and costs may be incurred in attempting to obtain relief from a bankruptcy stay from the bankruptcy court and, even if such relief is ultimately granted, that process may take several months or more.  In such event, PeerStreet will be unable to promptly exercise its foreclosure or other remedies and realize any proceeds from a property foreclosure sale.

In addition, bankruptcy courts have broad powers to allow the Borrower to use the rents generated by the operation of the property, if any, to pay its expenses (including perhaps its attorneys and professionals) while making zero or reduced payments to PeerStreet, permit a sale of the real property free of PeerStreet's lien, to compel PeerStreet to accept an amount less than the balance due under the loan, and to modify the terms of the Borrower's loan such as by extending its term to something substantially longer than the original term of the loan, or reducing the interest rate or payment terms of the loan.

**The loans on which the Notes are dependent may not restrict Borrowers from incurring additional unsecured or secured debt.  Further, the loans might not impose any financial restrictions on Borrowers during the term of the loan, which may increase the likelihood that a Borrower may not make payments on the loan investments in accordance with their terms.**

If a Borrower incurs additional debt after the funding of a loan investment, that additional debt may adversely affect the Borrower's creditworthiness generally, and could result in the financial distress, insolvency, or bankruptcy of the Borrower.  This circumstance could ultimately impair the ability of that Borrower to make payments on the loan and your ability to

receive the principal and interest payments that you expect to receive on Notes dependent on those loans. To the extent that the Borrower has or incurs other indebtedness and cannot pay all of its indebtedness, the Borrower may choose to make payments to other creditors, rather than to us.

***The Notes are restricted securities, will not be listed on any securities exchange, and no liquid market for the Notes is expected to develop.***

The Notes are being offered in reliance on Rule 506 of Regulation D of the Securities Act of 1933 ("Securities Act") under the "non-public" offering exemption of Section 4(a)(2) of the Securities Act. The Notes will not be listed on any securities exchange or interdealer quotation system. There is no trading market for the Notes, and we do not expect that such a trading market will develop in the foreseeable future, nor do we intend in the near future to offer any features on our Platform to facilitate or accommodate such trading. Although the Notes by their terms are prepayable at any time without penalty, there is no obligation on our part to repurchase or otherwise prepay any Notes at the election of an investor. Therefore, any investment in the Notes will be highly illiquid, and Investors in the Notes may not be able to sell or otherwise dispose of their Notes in the open market. Accordingly, you should be prepared to hold the Notes you purchase until they mature.

***The U.S. federal income tax consequences of an investment in the Notes are uncertain.***

No statutory provisions, Treasury regulations, published rulings or judicial decisions directly address the characterization of the Notes or instruments similar to the Notes for U.S. federal income tax purposes. Although the matter is not free from doubt, we intend to treat the Notes as our debt instruments that have "original issue discount" for U.S. federal income tax purposes unless and until there is a change or clarification in the law, by Treasury regulation or otherwise, that would require a different characterization of the Notes.

You should be aware that the characterization of the Notes for U.S. federal income tax purposes is subject to substantial uncertainty, the IRS is not bound by our characterization and the IRS or a court may take a different position with respect to the Notes' proper characterization. For example, the IRS could determine that, in substance, each Investor owns a proportionate interest in the corresponding loan investment for U.S. federal income tax purposes. Alternatively, the IRS could seek to treat the Notes as a different financial instrument (including an equity interest in us or a derivative financial instrument).

Any different characterization of the Notes could significantly affect the amount, timing and character of income, gain or loss recognized by an Investor in respect of a Note. Moreover, any such different characterization may significantly reduce the amounts available to pay interest and principal on the Notes. For example, if each Investor was treated as owning a proportionate interest in the corresponding loan investment, the U.S. federal income tax consequences of owning the Notes would depend on the characteristics of the loan investment, which characteristics could differ significantly from the intended characteristics of the Notes for U.S. federal income tax purposes. If the Notes were treated as our equity (i) we would be subject to U.S. federal income tax on any income, including interest, accrued on the corresponding loan investment but would not be entitled to deduct interest or OID on the Notes, which, among other

things, would reduce the amount of cash available to make payments on the Notes, and (ii) payments on the Notes would be treated by the Investor for U.S. federal income tax purposes as dividends (that may be ineligible for reduced rates of U.S. federal income taxation or the dividends-received deduction) to the extent of our earnings and profits as computed for U.S. federal income tax purposes. You are strongly advised to consult your own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of the purchase, ownership and disposition of the Notes (including any possible differing treatment of the Notes).  For a discussion of the U.S. federal income tax consequences of an investment in the Notes, see "Certain U.S. Federal Income Tax Considerations."

**Risks Related to PeerStreet and the Investment Platform**

***PeerStreet and PSI have a limited operating history.  As companies in the early stages of development, PeerStreet and PSI face increased risks, uncertainties, expenses and difficulties.***

PeerStreet and its parent, PSI, have limited operating histories.  PeerStreet began offering online real estate investments in 2014, and has not issued Notes prior to this offering, nor has it to date directly held or serviced any loans that are tied to securities such as the Notes.

For PeerStreet to be successful, the volume of financings originated through the online Platform will need to increase, which will require PSI to increase its facilities, personnel and infrastructure to accommodate the greater obligations and demands on the Platform.  PeerStreet is dependent upon the PSI Website to maintain current listings and transactions in Notes.  PeerStreet is also dependent on PSI to constantly update its software and website, expand its customer support services and retain an appropriate number of employees to maintain the operations of its Platform.  If PSI is unable to increase the capacity of its Platform and maintain the necessary infrastructure, you may experience delays in receipt of payments on the Notes and periodic downtime of the PSI systems through which PeerStreet operates.

***PSI will need to raise substantial additional capital to fund its operations, and if it fails to obtain additional funding, it may be unable to continue operations.***

At this early stage in its development, PSI has funded substantially all of its operations with proceeds from private financings from individual Investors.  To continue the development of its Platform, PSI will require substantial additional funds.  To meet its financing requirements in the future, it may raise funds through equity offerings, debt financings or strategic alliances.  Raising additional funds may involve agreements or covenants that restrict PSI's business activities and options.  Additional funding may not be available to it on favorable terms, or at all.  If PSI is unable to obtain additional funds, it may be forced to reduce or terminate its operations.  Any inability of PSI to fund operations could have a substantial and deleterious effect on the viability and operations of PeerStreet.

***PeerStreet and PSI have incurred net losses in the past and expect to incur net losses in the near term.***

PSI has incurred net losses in the past, and both PeerStreet and PSI expect to incur net losses in the near future.  The failure of PSI to become profitable could impair the operations of its the Platform by limiting its access to working capital to operate the Platform.  PSI has not

been profitable since its inception, and it may not become profitable. In addition, both PSI and PeerStreet expect operating expenses to increase in the future as they expand their operations. If PeerStreet's or PSI's operating expenses exceed its expectations, its financial performance could be adversely affected. If its revenue does not grow to offset these increased expenses, it may never become profitable. In future periods, PeerStreet may not have any revenue growth, or its revenue could decline.

***PeerStreet does not intend to provide Investors with audited financial statements.***

PeerStreet does not intend to make the large expenditures necessary to provide audited financial statements to Investors. There will be no independent certified public accountant reviewing PeerStreet's finances and Investors will thus not be in a position to independently evaluate PeerStreet's financial health in determining whether to purchase the Notes.

***If PeerStreet were to become subject to a bankruptcy or similar proceeding, the rights of the holders of the Notes could be uncertain, and the recovery, if any, of a holder on a Note may be substantially delayed and substantially less than the amounts due and to become due on the Note.***

In the event of PeerStreet's bankruptcy or a similar proceeding, the rights of Investors to continue receiving payments on the Notes could be subject to substantial risks and uncertainties, including the following:

- Interest on the Notes may not accrue during a bankruptcy proceeding. Accordingly, if Investors received any recovery on their Notes, any such recovery might be based on the Investors' claims for principal and interest accrued only up to the date the proceeding commenced.

- Our obligation to continue making payments on the Notes would likely be suspended until the conclusion of the proceedings, even if the funds to make such payments were available. Because a bankruptcy or similar proceeding may take months or years to complete, even if the suspended payments were eventually resumed, the suspension might effectively reduce the value of any recovery that a owner of a Note might receive by the time such recovery occurs.

- The Notes are unsecured, and Investors do not have a security or ownership interest in the corresponding loan investments. Accordingly, the holders of Notes may be treated as general creditors and the proceeds of all loan investments could therefore be pooled to pay administrative and priority expenses of the proceeding and make a pro rata distribution to all investors and other general creditors, with regard to the fact that each investor purchased their Notes with respect to specific corresponding loans and loan documents.

- Because the terms of the Notes provide that they will be repaid only out of the proceeds of the corresponding loans, Investors might not be entitled to share in

the other assets of PeerStreet (or any of the PSI affiliates) available for distribution to general creditors, if any, even though other general creditors might be entitled to a share of the proceeds of such corresponding loans.

- If a Borrower has paid PeerStreet on any corresponding loans before the bankruptcy proceedings are commenced and those funds are held in the clearing account and have not been used by PeerStreet to make payments on the Notes, there can be no assurance that PeerStreet will be able to use such funds to make payments on the Notes and such funds could be pooled with some or all of the other funds held by Peer Street to pay administrative and priority expenses of the proceeding and make a pro rata distribution to all investors and other creditors.

- If a bankruptcy proceeding commences after the purchase price of Notes has been paid, holders of the Notes may not be able to obtain a return of the purchase price even if the offering proceeds have not yet been used to fund a loan investment, and such funds could be pooled with some or all of the other funds held by PeerStreet to pay administrative and priority expenses of the proceeding and make a pro rata distribution to all investors and other creditors.

- To the extent that any claim by an investor is deemed by the bankruptcy court to be a claim arising from the rescission of a purchase or sale of a security of PeerStreet, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution on account of such claim, the investor's claim would be subordinated by the bankruptcy court to all claims or interests that are senior to or equal to the claim or interest represented by such security. In that circumstance, payments to owners of Notes could be impaired and could reduce any recovery that an owner of a Note might receive.

- Our ability to transfer our obligations to a back-up entity may be limited and subject to the approval of the bankruptcy court or other presiding authority. The bankruptcy process may delay or prevent the implementation of back-up services, which may impair the collection of corresponding loan investments to the detriment of the Notes.

***If PeerStreet were to enter bankruptcy proceedings, the activities with respect to the corresponding loans and the Notes could be interrupted.***

If PeerStreet were to enter bankruptcy proceedings or were to cease operations, we could be required to find other ways to meet obligations regarding (a) servicing the corresponding loan investments, (b) making payments on and the Notes, (c) maintaining records sufficient to determine which Notes are entitled to be paid on account of any payments received from Borrowers on any loan investments, and (d) maintaining the Platform and keeping it operational. Such alternatives could result in the cessation of operations of the Platform (in which case, investors would have limited or no access to information on the Platform, including regarding their accounts or Notes) or delays in the disbursement of payments on your Notes or could require us to pay significant fees to another company that we engage to perform services for the corresponding loan investments and the Notes.

***In a bankruptcy or similar proceeding of PeerStreet or a PSI affiliate, there may be uncertainty regarding the rights of a holder of a Note, if any, to access funds sent to PeerStreet.***

Investors may not have access to or the ability to draw funds out of their accounts maintained with PSI until the conclusion of the proceedings, if ever.  Under those circumstances, investors would be unable to use those funds to make other investments or pay household or other expenses.

Moreover, U.S. bankruptcy courts have broad powers and a bankruptcy court could determine that some or all of such funds were beneficially owned by PeerStreet or the applicable PSI affiliate, including but not limited to PSI, and therefore that they became available to the creditors of PeerStreet or the PSI affiliate generally.  In such a case, Noteholders may experience the same types of risk and uncertainties described above with respect to PeerStreet's bankruptcy.  PeerStreet has imposed restrictions upon itself and adopted formalities under its organizational documents to minimize the likelihood of its becoming subject to a bankruptcy or similar proceeding.

***In a bankruptcy or similar proceeding of PeerStreet, a trustee could be appointed to administer PeerStreet and all of its assets and business affairs.***

If PeerStreet became a debtor in a bankruptcy proceeding, the legal right to administer PeerStreet's assets and business affairs could be vested in a third-party trustee appointed by the Bankruptcy Court.  A trustee would not be as familiar with the business operations and assets of PeerStreet, such as the loan investments, as current management of PeerStreet.  Also, a trustee may not have the staff or resources available to service the loan investments, make or account for payments due under the Notes, or maintain the Platform.  Under such circumstances, the trustee may need to engage one or more other companies or consultants to perform those services.  Since the trustee and his third-party vendors and consultants will be less familiar with our operations and the loan investments, they may not achieve collections or operating results on a par with our management and the trustee and his vendors and consultants could incur significant fees that could reduce the value of any recovery that a holder of a Note might receive.  Additionally, the trustee may elect to sell off some or all of the loan investments to third-party investors, subject to bankruptcy court approval.  Distressed asset sales or liquidation sales sometimes result in a recovery of less than fair market value, which could also reduce any recovery that a holder of a Note might receive.

***PeerStreet and PSI have minimal operating capital, no significant assets and will incur operating losses for the foreseeable future.***

PeerStreet and PSI have minimal operating capital and for the foreseeable future will be dependent upon its ability to finance its operations from the sale of equity or other financing alternatives.  There can be no assurance that PeerStreet or PSI will be able to successfully raise operating capital.  The failure to successfully raise operating capital, and the failure to attract qualified real estate companies and sufficient investor purchase commitments, could result in the bankruptcy of PeerStreet or PSI or other event, which would have a material adverse effect on

PeerStreet or PSI.  PeerStreet has no significant assets or financial resources, so such adverse event could put your investment dollars at significant risk.

***When you commit to purchase a Note, you must commit funds toward your purchase, but the funds may not be deployed for a period of time from when the funding request for the applicable Note is made.***

Each funding request for an opportunity to invest in a loan investment remains open until PeerStreet has received all funding commitments for the corresponding loan investment and due diligence on the underlying loan has been completed, after which PeerStreet will issue a note as soon as practicable.  Because Investors' commitments to purchase Notes are irrevocable, during the period between the time of your purchase commitment and the time when your Note is issued, you will not have access to your funds.  Because your funds do not earn interest prior to the time when the Note is issued, the delay in issuance of your Note will have the effect of reducing the effective rate of return on your investment.

***Borrower prepayments will extinguish or limit your ability to earn additional returns on a Note.***

Prepayment of a loan investment will occur if a Borrower decides to pay some or all of the principal amount on the corresponding loan earlier than originally scheduled.  With most of the investment opportunities financed on the Platform, the Borrower may prepay all or a portion of the remaining principal amount or redemption amount at any time without penalty.  Upon a prepayment of the entire remaining unpaid principal amount of the corresponding loan, you will receive your share of such prepayment, but further interest will not accrue after the date on which the payment is made.  If prevailing commercial loan rates decline in relation to the Note's effective interest rate, the Borrower may choose to prepay the corresponding loan with lower-cost funds.  If the Borrower prepays a portion of the remaining unpaid principal balance on the corresponding loan, the term for repayment of the corresponding loan will not change, but you will not earn a return on the prepaid portion, and your anticipated total investment return may thus decrease.  In addition, you may not be able to find a similar rate of return on another investment at the time at which the corresponding loan is prepaid.  See "The Notes."

***The market in which we participate is competitive and, if we do not compete effectively, our operating results could be harmed.***

The real estate lending market is competitive and rapidly changing.  We expect competition to persist and intensify in the future, which could harm our ability to increase lending volume.

Our principal competitors include major banking institutions, private equity funds, real estate investment trusts, as well as other online lending platforms.  Competition could result in reduced volumes, reduced fees or the failure of Platform to achieve or maintain more widespread market acceptance, any of which could harm our business.  In addition, in the future we may experience new competition from more established Internet companies possessing large, existing customer bases, substantial financial resources and established distribution channels.  If any of these companies or any major financial institution decided to enter the online lending business,

acquire one of our existing competitors or form a strategic alliance with one of our competitors, our ability to compete effectively could be significantly compromised and our operating results could be harmed.

Most of our current or potential competitors have significantly more financial, technical, marketing and other resources than we do and may be able to devote greater resources to the development, promotion, sale and support of their platforms and distribution channels. Our potential competitors may also have longer operating histories, more extensive customer bases, greater brand recognition and broader customer relationships than we have. These competitors may be better able to develop new products, to respond quickly to new technologies and to undertake more extensive marketing campaigns. Our industry is driven by constant innovation. If we are unable to compete with such companies and meet the need for innovation, the demand for our loans and corresponding Notes could stagnate or substantially decline.

***We rely on third-party banks and on third-party computer hardware and software. If we are unable to continue utilizing these services, our business and ability to service the corresponding loan investments may be adversely affected.***

We rely on third party and FDIC-insured depository institutions to process our transactions, including payments of corresponding loan investments and remittances to holders of the Notes. Under the ACH rules, if we experience a high rate of reversed transactions (known as "chargebacks"), we may be subject to sanctions and potentially disqualified from using the system to process payments. In addition, PSI relies on computer hardware purchased and software licensed from third parties to operate the Platform. This purchased or licensed hardware and software may be physically located off-site, as is often the case with "cloud services." This purchased or licensed hardware and software may not continue to be available on commercially reasonable terms, or at all. If PSI or PeerStreet cannot continue to obtain such services elsewhere, or if it cannot transition to another processor quickly, our ability to process payments will suffer and your ability to receive payments on the Notes will be delayed or impaired.

***If the security of our Investors' confidential information stored in PeerStreet's and PSI's systems is breached or otherwise subjected to unauthorized access, your secure information may be stolen.***

The Platform, PeerStreet, PSI and PSI affiliates may store Investors' bank information and other personally identifiable sensitive data. Any accidental or willful security breach or other unauthorized access could cause your secure information to be stolen and used for criminal purposes, and you would be subject to increased risk of fraud or identity theft. Because techniques used to obtain unauthorized access or to sabotage systems change frequently and generally are not recognized until they are launched against a target, PeerStreet, PSI and/or PSI's third-party hosting facilities may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, many states have enacted laws requiring companies to notify individuals of data security breaches involving their personal data. These mandatory disclosures regarding a security breach are costly to implement and often lead to widespread negative publicity, which may cause our Investors, affiliates and partners to lose confidence in the effectiveness of our data security measures. Any security breach, whether actual or

perceived, would harm our reputation, we could lose Investors, and the value of your investment in the Notes could be adversely affected.

***Any significant disruption in service on the PSI Website or in its computer systems could reduce the attractiveness of the Platform and result in a loss of users.***

If a catastrophic event resulted in a Platform outage and physical data loss, PeerStreet's ability to perform its obligations would be materially and adversely affected.  The satisfactory performance, reliability, and availability of PeerStreet's technology and its underlying hosting services infrastructure are critical to PeerStreet's operations, level of customer service, reputation and ability to attract new users and retain existing users.  PSI's hosting services infrastructure is provided by a third party hosting provider (the "**Hosting Provider**").  The Hosting Provider does not guarantee that users' access to the PSI Website will be uninterrupted, error-free or secure.  PeerStreet's operations depend on the Hosting Provider's ability to protect its and PSI's systems in its facilities against damage or interruption from natural disasters, power or telecommunications failures, air quality, temperature, humidity and other environmental concerns, computer viruses or other attempts to harm our systems, criminal acts and similar events.  If PSI's arrangement with the Hosting Provider is terminated, or there is a lapse of service or damage to its facilities, PeerStreet could experience interruptions in its service as well as delays and additional expense in arranging new facilities.  Any interruptions or delays in PeerStreet's service, whether as a result of an error by the Hosting Provider or other third-party error, PeerStreet's own error, natural disasters or security breaches, whether accidental or willful, could harm our ability to perform any services for corresponding loan investments or maintain accurate accounts, and could harm PeerStreet's and/or PSI's relationships with its users and customers and PeerStreet's and/or PSI's reputation.  Additionally, in the event of damage or interruption, PeerStreet's insurance policies may not adequately compensate PeerStreet for any losses that we may incur.  Neither PeerStreet nor PSI has tested a disaster recovery plan under actual disaster conditions, and any disaster recover plans may not have sufficient capacity to recover all data and services in the event of an outage at a facility operated by the Hosting Provider.  These factors could prevent us from processing or posting payments on the corresponding loan investment or the Notes, damage PSI's and/or PeerStreet's brand and reputation, divert its employees' attention, and cause users to abandon the Platform.

***The Notes limit your rights in some important respects.***

To protect PeerStreet from having to respond to multiple claims by Investors in the event of an alleged breach or default with respect to a series of Notes, the Investor Agreement restricts Investors' rights to pursue remedies individually in connection with such breach or default.

In addition, PeerStreet may require that any claims against it be resolved through binding arbitration rather than in the courts.  The arbitration process may be less favorable to Investors than court proceedings and may limit your right to engage in discovery proceedings or to appeal an adverse decision.

***PeerStreet's ability to pay principal and interest on the Notes may be affected by its ability to match the timing of its income and deductions for U.S. federal income tax purposes.***

PeerStreet's ability to pay principal and/or interest on a Note may be affected by its ability, for U.S. federal income tax purposes, to match the timing of income it receives from a corresponding loan investment that it holds and the timing of deductions that it may be entitled to in respect of payments made on the Notes that it issues.  For example, if the Notes are treated as equity of PeerStreet, or if the Notes are treated as contingent payment debt instruments for U.S. federal income tax purposes but the corresponding loan investments are not, there could be a potential mismatch in the timing of PeerStreet's income and deductions for U.S. federal income tax purposes, and PeerStreet's resulting tax liabilities could affect its ability to make payments on the Notes.

***If we fail to retain our key personnel, we may not be able to achieve our anticipated level of growth and our business could suffer.***

Our future depends, in part, on our ability to attract and retain key personnel.  Our future also depends on the continued contributions of our executive officers and other key personnel, each of whom would be difficult to replace.  In particular, the Founder/Chief Executive Officer of PSI is critical to the management of our business and operations and the development of our strategic direction.  The loss of the services of Brewster Johnson or other executive officers and key personnel and the process to replace any of our key personnel would involve significant time and expense and may significantly delay or prevent the achievement of our business objectives.

## Risks Related to Compliance and Regulation

***Non-compliance with laws and regulations may impair our ability to arrange or service loan investments.***

Failure to comply with the laws and regulatory requirements applicable to our business may, among other things, limit our ability or a third party's ability to collect all or part of the payments on the loan investments on which the Notes are dependent for payment.  In addition, our non-compliance could subject us to damages, revocation of required licenses or other authorities, class action lawsuits, administrative enforcement actions, and civil and criminal liability, which may harm our business and ability to maintain our Platform and may result in third party lenders, borrowers and real estate companies not doing business with us.

***If PeerStreet is required to register under the Investment Company Act or became subject to the SEC's regulations governing broker-dealers, its ability to conduct its business could be materially and adversely affected.***

The SEC heavily regulates the manner in which "investment companies" and "broker – dealers" are permitted to conduct their business activities.  PeerStreet believe it has conducted its business in a manner that does not result in it being characterized as an investment company or broker-dealer, as it does not believe that it engages in any of the activities described under Section 3(a)(1) of the Investment Company Act of 1940 or any similar provisions under state law, or in the business of (i) effecting transactions in securities for the account of others as described under Section 3(a)(4)(A) of the Securities Exchange Act of 1934 (the "**Exchange Act**") or any similar provisions under state law or (ii) buying and selling securities for our own account, through a broker or otherwise as described under Section 3(a)(5)(A) of the Exchange

Act or any similar provisions under state law. PeerStreet intends to continue to conduct its business in such manner. If, however, it is deemed to be an investment company or a broker-dealer, it may be required to institute burdensome compliance requirements and its activities may be restricted, which would affect its business to a material degree.

***Purchasers of Notes will not have the protection of the Investment Advisers Act of 1940.***

PeerStreet will not provide any advice with respect to the Notes or the loans, and as a result does not believe it is conducting its business in a manner that requires registration as an investment adviser under the Investment Advisers Act of 1940 ("Advisers Act") or similar state laws. As a result, purchasers of the Notes will not have the protections provided by the Advisers Act or any similar state laws.

***Purchasers of Notes will not have the protection of a trustee, an indenture or the provisions of the Trust Indenture Act of 1939.***

Because this offering is being made in reliance on an exemption from registration under the non-public offering exemption of Section 4(a)(2) of the Securities Act, it is not subject to the Trust Indenture Act of 1939. Consequently, purchasers of Notes will not have the protection of an indenture setting forth obligations of PeerStreet for the protection of Note holders or a trustee appointed to represent their interests.

***We are not subject to the banking regulations of the Office of Comptroller of the Currency, Federal Deposit Insurance Corporation, the National Credit Union Administration, or the Board of Governors of the Federal Reserve.***

We are not subject to the periodic examinations to which depository institutions are subject, such as national banks and federal thrifts. Consequently, our financing decisions and our decisions regarding establishing loan loss reserves are not subject to periodic review by a governmental agency. Moreover, we are not subject to regulatory oversight relating to our capital, asset quality, or management. We are subject to state licensing regimes and regulatory oversight by state banking departments and other state agencies, and the federal Consumer Financial Protection Bureau.

***Recent legislative and regulatory initiatives have imposed restrictions and requirements on financial institutions that could have an adverse effect on our business.***

The financial industry is becoming more highly regulated. There has been, and may continue to be, a related increase in regulatory investigations of the trading and other investment activities of alternative investment funds. Such investigations may impose additional expenses on us, may require the attention of senior management and may result in fines if we are deemed to have violated any regulations.

***Corresponding borrower loans may be subject to a variety of onerous regulations, including the Truth-In-Lending Act.***

Some of the corresponding mortgage loans may also be subject to certain provisions of the Truth-In-Lending Act, Real Estate Settlement Procedures Act, Fair Credit Reporting Act, Home Ownership Equity Protection Act, and similar statutes. and other applicable state laws and rules concerning loans. These provisions generally impose additional disclosure and other substantive requirements on creditors with respect to mortgage loans where funds are primarily used for personal, household or consumer purposes. These provisions can impose specific statutory liabilities upon creditors who fail to comply with their provisions and may affect the enforceability of the related loans. In addition, any assignee of the creditor may generally be subject to all claims and defenses that the consumer could assert against the creditor, including, without limitation, the right to rescind the loan. Furthermore, most states have enacted laws that contain substantive requirements on loans. These statutes and ordinances can place a significant burden of proof on the lender to justify its loan terms and lending practices, with some risk of rendering the loan unenforceable.

***Third-party lenders from which PeerStreet purchases loans are responsible for their compliance with applicable state and federal lending laws, and PeerStreet has no control over such compliance.***

The lending industry is a highly regulated industry. Although PeerStreet may purchase loans from, and participate in loans with, third party lenders, including banks and/or private lenders, those lenders are not agents of PeerStreet, and PeerStreet has no control over the compliance of such lenders with applicable state or federal laws. Although PeerStreet will conduct due diligence on such lenders, there is no guarantee of their compliance with applicable laws. In the event that a lender has not complied with such laws, it is possible that the loans originated by the lender would be deemed void in full or in part or would be otherwise unenforceable. As a result, payments on such loans would be reduced or never paid to PeerStreet and Investors in the associated Notes.

***As Internet commerce develops, federal and state governments may adopt new laws to regulate Internet commerce, which may negatively affect our business.***

As Internet commerce continues to evolve, increasing regulation by federal and state governments becomes more likely. Our business could be negatively affected by the application of existing laws and regulations or the enactment of new laws applicable to lending. The cost to comply with such laws or regulations could be significant and would increase our operating expenses, and we may be required to pass along those costs to our Investors in the form of increased fees. In addition, federal and state governmental or regulatory agencies may decide to impose taxes on services provided over the Internet. These taxes could discourage the use of the Internet as a means of commercial financing, which would adversely affect the viability of our Platform.

***Laws intended to prohibit money laundering may require PeerStreet to disclose investor information to regulatory authorities.***

The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "PATRIOT Act") requires that financial institutions establish and maintain compliance programs to guard against money laundering

activities, and requires the Secretary of the U.S. Treasury ("Treasury") to prescribe regulations in connection with antimony laundering policies of financial institutions. The Financial Crimes Enforcement Network ("FinCEN"), an agency of the Treasury, has announced that it is likely that such regulations would subject certain pooled investment vehicles to enact anti-money laundering policies. It is possible that there could be promulgated legislation or regulations that would require PeerStreet or its service providers to share information with governmental authorities with respect to prospective Investors in connection with the establishment of anti-money laundering procedures. Such legislation and/or regulations could require PeerStreet to implement additional restrictions on the transfer of the Notes. PeerStreet reserves the right to request such information as is necessary to verify the identity of prospective Investors and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by FinCEN and/or the U.S. Securities and Exchange Commission. In the event of delay or failure by a prospective investor to produce any information required for verification purposes, or our failure to adequately verify such information, an application for or transfer of the Notes may be refused.

### *Risk of Including Foreign Investors*

PeerStreet may accept Investors who are "Non-U.S. Persons," in which case interest payments made to such an investor by PeerStreet could be subject to withholding taxes. In the event that PeerStreet fails to properly withhold on such payments, PeerStreet could remain liable for withholding taxes with respect to a Non-U.S. Person's individual tax liabilities. There is a further risk that a Non-U.S. Person Investor could be named on the Treasury's list of "Specially Designated Nationals," "Blocked Persons," or "Sanctioned Countries or Individuals," which, if undiscovered, could result in an enforcement action against PeerStreet by the Treasury and/or other federal agencies. In order to mitigate these possibilities, PeerStreet will conduct due diligence on each Non-U.S. Person it admits as an Investor in the Notes, and will attempt to determine whether there are any security restrictions on its admissions, or applicable withholding taxes, at the time of its subscription.

### SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This PPM contains forward-looking statements that involve substantial risks and uncertainties. All statements, other than statements of historical facts, included in this PPM regarding real estate investments, real estate companies, our strategy, future operations, future financial position, series note listings, loan investments, future revenue, projected costs, prospects, plans, objectives of management and expected market growth are forward- looking statements. The words "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "predict," "project, " "will," "would" and similar expressions are intended to identify forward-looking statements, although not all forward -looking statements contain these identifying words. These forward-looking statements include, among other things, statements about:

- expected rates of return and interest rates;

- the attractiveness of our Platform;

- our financial performance;

- regulatory developments; and

- our estimates regarding expenses, future revenue, capital requirements and needs for additional financing.

We may not actually achieve the plans, intentions or expectations disclosed in forward-looking statements, and you should not place undue reliance on forward-looking statements. Actual results or events could differ materially from the plans, intentions and expectations disclosed in forward-looking statements. We have included important factors in the cautionary statements included in this PPM, particularly in the "Risk Factors" section, that could cause actual results or events to differ materially from forward-looking statements contained in this prospectus. Forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments we may make.

You should read this PPM, the Investor Agreement and any Series Note Listings completely and with the understanding that actual future results may be materially different from what we expect. We do not assume any obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## USE OF PROCEEDS

PeerStreet will use the proceeds of each series of Notes, net of any applicable fees, to facilitate the funding of the corresponding loan investments.

## PLAN OF DISTRIBUTION

The Notes will be offered by PeerStreet through the PSI Website at www.PeerStreet.com or through the efforts of brokers or dealers with whom PeerStreet may enter into agreements from time to time, and with whom PeerStreet may be affiliated. PeerStreet will pay all commissions to brokers or dealers.

## ABOUT PEERSTREET AND PSI

*Overview*

PeerStreet and PSI, which wholly owns PeerStreet, provide a marketplace that allows accredited Investors to invest in loan investment opportunities that may have been historically difficult to access for some such Investors. Through the use of the PSI Website, Investors can browse and screen real estate loans, view details of an investment and sign legal documents online.

The Platform was designed to, among other things, benefit Investors because of the relatively low minimum investments needed when pools of such Investors are aggregated together in this way, and because such smaller individual investment amounts allow Investors to diversify their investment portfolio across a greater number of investment opportunities. The Platform was also designed to help real estate companies accelerate their access to desired funds.

PSI (Peer Street, Inc.) was formed as a Delaware corporation in December 2013. PeerStreet (Peer Street Funding, LLC) was formed as a Delaware limited liability corporation on July 25, 2014.  For persons who have confirmed their status as accredited Investors, the PSI Website contains updated information on the total amounts of monies raised through the PSI Website and other updated information about PSI, PeerStreet and their business activities.  From time to time, PeerStreet and PSI may also post (but have no obligation to post) on www.PeerStreet.com pertinent information about their financial condition, business activities and investment results.  Investors can review such information as is posted from time to time by PeerStreet on www.PeerStreet.com.

## Properties

PeerStreet's and PSI's headquarters are located in Manhattan Beach, CA, at the following mailing address:  P.O Box 3207, Manhattan Beach, CA 90266.

## PeerStreet Financial Information

PSI was formed in December 2013 and has had minimal operations since that time. PeerStreet was formed in July 2014.  To date, PSI has incurred business losses and anticipates such losses will continue for the foreseeable future.  PSI, and its affiliated entities, are currently financed by proceeds from the issuance of convertible debt.  Prospective Investors can review information posted from time to time on the PSI Website for updated information about PSI and its financial background.

In the event that PSI is unable to generate profits and cannot obtain adequate financing, PeerStreet's operations and activities may be adversely affected.  Any deterioration of the financial condition of PSI may present significant challenges to the Investors in terms of recouping their respective investments and returns in the Notes.

## PeerStreet Management

The following section sets forth information regarding the management of PSI and PeerStreet as its wholly owned subsidiary.

**Brewster Johnson** is Founder and CEO of PSI.  Prior to PSI, he worked as general counsel at VirtualTourist where he oversaw the company's sale to TripAdvisor (then wholly owned by Expedia).  Prior to VirtualTourist, he was a real estate attorney at Allen Matkins Leck Gamble & Mallory and a technology attorney at Brobeck Phleger & Harrison.   For over a decade, Brewster has been pursuing his two passions, real estate and technology; he advises and invests in tech startups and is an active real estate developer, investor and private lender.  Brewster graduated from USC with degrees in international relations and history and earned a JD degree from UCLA School of Law.

**Brett Crosby** is Co-Founder and COO of PSI**.** Brett is responsible for product, marketing, PR, sales and business development. Previously he was Director of Marketing at Google where his 10 year tenure spanned many of Google's most prominent products. Most notably he co-founded

Google Analytics, helped start Google's mobile advertising business, ran the founding marketing team that launched Google+ and most recently ran the marketing teams responsible for the dramatic growth of Chrome, Gmail, Docs, and Drive. Before Google he co-founded Urchin Software Corporation, a web analytics service acquired by Google in 2005. He graduated USC with degrees in international relations and political science and furthered his education with programs at Georgetown, Michigan State and Semester at Sea.

**Scott Gottlieb** is Chief Compliance Officer of PSI.  Scott is responsible for managing and overseeing regulatory compliance. Scott brings more than eighteen years of experience in developing, implementing and monitoring compliance programs for investment advisers, hedge funds, private equity firms and broker-dealers. Scott also serves as President of U.S. Compliance Consultants, a national-recognized provider of compliance solutions to the investment management industry. Prior to founding U.S. Compliance Consultants, Mr. Gottlieb practiced corporate and securities law with Kelley, Drye & Warren LLP, an international law firm. During the course of his legal career he advised clients on securities regulation, investment adviser compliance, broker-dealer regulatory issues, initial public offerings, private placements, venture capital financings and international joint ventures. Scott is an honors graduate of Tufts University and the University of Connecticut School of Law.

**Alex Perelman** is Head of Technology of PSI.  Alex's broad experience in technology includes roles at Electronic Arts and Activision, where he developed some of the world's most successful video game franchises, Call of Duty and Spiderman.  After leaving the video game world, Alex has focused on startups, where he has co-founded two companies and gone through the prestigious Y Combinator program. Alex graduated from UC Berkeley with a degree in computer science and earned an MBA from UCLA.

**Jay Hartman** is Head of Finance and Investments of PSI.  Prior to PSI, he was a Managing Director of Paladin Realty Partners, where he worked from 1998 to 2014, and served on the firm's investment committee.  Founded in 1995 by the ex-U.S. Treasury Secretary William E. Simon, Paladin is an institutional real estate investment fund manager that has acquired or developed assets in the United States and Latin America with a total capitalization in excess of $5 billion.  Jay's responsibilities at Paladin included a lead role in selling the firm's REIT, in a $210 million transaction.  Prior to Paladin, Jay worked from 1992 to 1996 for Sanwa Bank, where he managed a portfolio of troubled commercial real estate loans.  Jay graduated from UC Davis with a degree in managerial economics and earned an MBA from UCLA.

**Dan Graham** is the Head of Partner Relations and Underwriting of PSI.  Prior to PSI, Dan started a real estate consulting business and has amassed a broad range of experience.  Dan's projects included sourcing equity and debt, underwriting acquisitions, and asset management for private investment funds.  He was also involved with underwriting and management of pools of distressed debt, and operations and technology-related projects for the single family residential space.  Dan began his career working in fixed income sales for Prudential, Deutsche Bank and Morgan Stanley, offering a full range of fixed income securities including treasuries, agencies, corporates, municipal bonds, ABS, MBS, CMBS and CDO's.  Dan graduated from Vanderbilt

University with a degree in economics and earned an MBA with a focus on real estate and finance from USC.

### *Technology*

The PSI Website and supporting services run on a cloud-based platform. PSI owns, operates and maintains elements of this system, but significant elements of the system are operated by third parties that PSI does not control. In particular, a significant portion of the system is hosted by the Hosting Provider which uses multiple locations. The Hosting Provider provides PSI with computing, storage capacity, and other services pursuant to an agreement that continues until terminated by either party. The agreement requires the Hosting Provider to provide PSI with the Hosting Provider's standard computing and storage capacity and related support in exchange for timely payment by PSI. PSI also maintains backups at a separate region within its cloud infrastructure. It backs up all customer data daily and replicates this data to a separate region within its cloud infrastructure via an encrypted connection.

PSI continuously monitors the performance and availability of its Platform. It has a scalable infrastructure that utilizes standard techniques such as load-balancing and redundancies. It has developed its architecture to work effectively in a flexible cloud environment that has a high degree of elasticity to enable it to quickly respond to significant changes in demand.

PSI expects to processes electronic deposits and payments by originating ACH transactions. The Platform is designed and built as a highly scalable, multi-tier, redundant system. The Platform incorporates technologies designed to prevent any single point of failure within the infrastructure from taking the entire system offline. PSI expects to maintain a complete backup of the PSI Website and supporting services within a separate region of its cloud infrastructure in order to minimize service disruptions in the event of significant regional outages.

### *Data Integrity and Scalability*

All sensitive data that is transmitted to and from our customers and service providers is transacted using a secure transport protocol. Communication of sensitive data via the web site to its customers is secured utilizing SSL 2048-bit enabled encryption certificates provided by GeoTrust. Communication of sensitive data with PeerStreet's service providers is secured utilizing authenticated SSL 2048-bit encryption and SSH protocols depending on the requirements. Access to the data and services by PeerStreet's and PSI's employees is expected to be restricted based upon a least-privilege principle such that employees have access only to the information and systems needed to perform their function. Logging and monitoring of host systems is done in real-time to a centralized database with web based reporting and additional notification to the appropriate staff for any remediation.

PeerStreet collects nonpublic personal information from several sources, including Investor applications, authorized verifications, credit reporting agencies, and title insurance companies. PeerStreet's privacy policies with respect to such information are set forth on the PSI Website at www.PeerStreet.com.

*Competition*

PeerStreet's business is highly competitive.  PeerStreet faces competition from traditional sources such as real estate companies, mortgage loan brokers, and from other lenders, including commercial banks, savings and loan associations, credit unions, and other online lending and investment platforms, as well as individuals.  PeerStreet also competes against other finance companies and other lenders whose loan structures and fee schedules might vary from those of traditional banking institutions.

We may also face future competition from new companies entering our market, which may include large, established companies.  These companies may have significantly greater financial, technical, marketing and other resources than we do and may be able to devote greater resources to the development, promotion, sale and support of their consumer lending platforms.  These potential competitors may be in a stronger position to respond quickly to new technologies and may be able to undertake more extensive marketing campaigns.  These potential competitors may have more extensive potential customer bases than us.    In addition, these potential competitors may have longer operating histories and greater name recognition than us.  Moreover, if one or more of our competitors were to merge or partner with another of our competitors or a new market entrant, the change in competitive landscape could adversely affect our ability to compete effectively.

**Conflicts of Interest.**

PeerStreet will provide notice or disclose all conflicts of interest if such conflict is likely to materially impact Investors.

PeerStreet and its affiliated entities reserve the right to acquire properties in foreclosure, including properties that were subject to loans originated or funded by PeerStreet relating to the Notes described in this PPM. PeerStreet may serve as the original or substituted trustee of a deed of trust and may be entitled to all or some portion of the statutory trustee fees upon foreclosure (*i.e.*, the fees that would otherwise be payable or paid to a third party serving as the trustee).

PeerStreet may arrange and service other loans for other Investors at the same time that Notes are being offered to Investors (such loans may not be part of this offering), and these loans may be more secure or more profitable than the loans funded pursuant to this offering.  In addition, PeerStreet may also arrange multiple loans for a single Borrower.  Where a Borrower with multiple loans arranged by PeerStreet defaults, PeerStreet may choose or be required to enforce or forbear from enforcing this loan to the detriment of the Investors while not enforcing or forbearing on another loan with the same Borrower arranged by PeerStreet and managed or administered by PeerStreet.

PeerStreet may provide some loans for short-term purposes.  This type of lending will typically occur through a bridge financing facility between PeerStreet and affiliates of PeerStreet.  In some instances, PeerStreet may fund portions of the corresponding loans through the purchase of Notes, or PeerStreet may provide bridge financing in order a loan to be closed while the listing can remain active on the Platform until the listing is fully funded.

PeerStreet or an affiliate may itself purchase or fund Notes. PeerStreet or its affiliate will hold all such Notes in parity with the other Investors and will have the same rights as any other Investor. As such, PeerStreet may have interests in the loan as both the investor in the corresponding loan as well as an Investor in the Notes. Any investment made by PeerStreet in the Notes will be on the same terms and conditions as other Investors. There will be no notation in any Series Note Listing signifying that PeerStreet has participated in the funding of any corresponding loan investment.

Some corresponding loan investments originated by PeerStreet may provide for prepayment charges to be imposed on the Borrower in the event of certain early payments on the corresponding loan investments. Such charges are typically allowed by applicable law. If a corresponding loan investment does contain a prepayment charge, the Investors and/or PeerStreet would be entitled to keep the charge as is described in the Series Note Listing for the applicable corresponding loan investment.

Some of the Investors and principals in PeerStreet may be affiliated with or part of entities or organizations with which PeerStreet may hold a past, present or future business or commercial relationship. PeerStreet may, in its sole discretion, conduct business with such affiliated parties, and without any notice or disclosure thereof to Investors. These arrangements may create a potential conflict of interest for Investors. PeerStreet will provide notice or disclose such conflicts of interest if: (i) it involves a current relationship, and (ii) the relationship is likely to materially impact Investors.

## INVESTMENT STANDARDS AND POLICIES

### *Evaluation and Pricing of Financing Opportunities*

The financing of each corresponding loan investment generally commences with an individual, lender or third part real estate company requesting a loan investment from PeerStreet. The amount financed generally ranges from $50,000 to $25,000,000, and the term of the indebtedness generally ranges from six (6) months to five (5) years.

### *Loan Underwriting and Procedures*

Subject to any exceptions set forth herein, PeerStreet intends to offer Loan Investments with the following characteristics:

| | |
|---|---|
| Loan Size | $50,000 to $25,000,0000 |
| Loan Type | First mortgage |
| Product Types | SFR, office, industrial, multi-family, retail, land, hospitality, and special purpose |
| Loan Purpose | Acquisition, rehabilitation, bridge, new construction |
| Location | United States |
| Term | One month to five years |
| LTV / LTC | Up to 75%, see below chart for detail |
| Debt Service Coverage Ratio | Flexible; in-place DSCR can be below 1.0X in some situations |

| Interest Rate | 5.0% - 15.0%, generally fixed |
|---|---|
| Loan Fees | 0% - 5.0% |
| Prepayment | Flexible |
| Amortization | Both interest only and amortizing |
| Recourse | Both recourse and non-recourse |

PeerStreet reviews proposed loan investment opportunities and pursues opportunities where the total amount of the loan will generally not exceed a certain percentage of the value of the property securing the loan (the "loan -to-value ratio"), as indicated in the chart below:

| **Property Type** | **Maximum Loan-to-Value Ratio** |
|---|---|
| Existing - Commercial or Residential | 75% |
| Rehabilitation - Commercial or Residential | 65% (on as-completed value) |
| New Construction | 60% (on as-completed value) |
| Land | 50% |
| Special Purpose (e.g., marina, cold storage) | 50% |

Notwithstanding the foregoing, the Company may offer Loan Investments with higher loan to value levels in certain instances.

### *Opportunistic Lending*

For opportunistic lending opportunities, PeerStreet reviews the proposed investment opportunity and pursues investment opportunities where the risk-adjusted return is generally at or above general market based returns.

PeerStreet may sometimes retain a licensed independent appraiser to assist with its confirmation of a property's fair market value.  In other cases, PeerStreet may rely on opinions of value from other sources, such as the price of a recent sale of that particular property or comparable properties and an opinion of value from PeerStreet itself, the opinion of value provided by a lender PeerStreet purchased the loan investment from, or a real estate broker knowledgeable in the area where the property is located.  In some cases, however, PeerStreet will determine that the cost or time to obtain an independent certified appraisal is not warranted.

The appraisal or evaluation for construction loans, rehabilitation loans and entitlement loans will be prepared on either an "after-completed" basis, *i.e.*, assuming that the entitlements or the improvements for which the loan is obtained will be completed or on an "as-is" basis if PeerStreet is not holding back any monies for rehabilitation or construction.  The appraiser may also assume that all public improvements to be funded by special assessment district bonds will be completed as proposed and that the property will be marketed and sold in the manner planned by the Borrower.  In the case of a construction loan, rehabilitation loan or entitlement loan, the loan-to-value ratio as estimated in the appraisal or evaluation and the budget for the project may exceed the loan-to-value ratios listed above at times during the term of the loan.  This may occur because the appraisal or evaluation may be based upon the value of the property when the construction or improvements are completed or the entitlements obtained; however, before the construction, improvements or entitlements are completed, the value of the property will generally be less than the "as completed" appraised or evaluated value.

The interest rate that PeerStreet requires from a Borrower and other loan terms are based on negotiations conducted by PeerStreet and/or its origination partner with the Borrower. PeerStreet performs its own underwriting analysis, in its sole discretion, with respect to all corresponding loans. However, Investors should perform their own respective due diligence and should not rely on any evaluation or analysis performed by PeerStreet. Investors should independently assess the prospects of risks associated with any investment, including, without limitation, repayment risk associated with the Borrower, market risk associated with the property, value of the property as collateral, and regulatory, casualty and environmental risks.

If PeerStreet makes a potential corresponding loan the subject of an offering of a series of Notes, the Borrower may be required to maintain appropriate liability and property casualty insurance, and PeerStreet may (but will not always) be named as loss payee on any such. Any payment made on such policies may be used to repair the property or to reduce the outstanding balance on the corresponding loan investment and thus result in PeerStreet paying down the balance of the applicable series of Notes. PeerStreet does not generally require that the Borrower maintain property damage coverage for landslides, earthquakes, floods, or similar natural disaster events. Any hazard losses not then covered by the Borrower's insurance policy would result in the corresponding loan investment becoming significantly under-secured, and an Investor in a Note could sustain a significant reduction, or complete elimination of, the return and repayment of principal from that Note.

A Borrower whose loan investment request is allocated to the Platform will have their loan investment and property information posted on the Platform as part of the Series Note Listing for the corresponding offering of Notes. Investors can review all the various investment listings on the Platform and make a commitment towards any listing they wish to participate in funding, including a Series Note Listing. If a Series Note Listing receives enough lender member commitments to be funded, PeerStreet (or, in some instances, an affiliated financial institution) will make the loan investment requested and, at the same time, PeerStreet will sell the series of Notes relating to the corresponding loan investment to the Investors that made a commitment therefor pursuant to the Series Note Listing.

For some loan investments, PeerStreet will enter into the corresponding loan directly. In other cases, PeerStreet may enter into a relationship with one or more third parties to enter into the corresponding loan, with PeerStreet then purchasing the corresponding loan investment (or a participating interest therein) from the third party. In other cases, PeerStreet may purchase all or a portion of a loan that had been previously been issued by a third party.

### Financing Terms

Loans are obligations of the Borrower to PeerStreet (or, in a participation arrangement, to the lead investor). Senior loans are generally secured by a first lien security interest such as a mortgage, deed of trust or security deed on the underlying real estate. If a Borrower defaults on a senior loan before the maturity date, PeerStreet (or lead lender) will, in its or their discretion, seek to foreclose on the property or take other actions to recover payment on the corresponding loan investment. Any funds PeerStreet recovers as a result of such actions prior to maturity of the related series of Notes will be paid to the holders of such Notes *pro rata*, net of any applicable collection fees or investor incentives.

Our payment obligations under the Notes are unsecured, and Investors do not have a security interest in the corresponding loans.

### *Purchase of Notes*

Any series of Notes offered by us will be available for sale to accredited Investors who provide sufficient funds to make the desired investment and, if any state residence limitations are applicable for such offering, who reside in the permitted states for such offering.  The Notes will be issued as soon as practicable after the corresponding loan investment closes and all due diligence on a corresponding loan investment is complete.

An Investor may purchase a Note by opening the Series Note Listing on the PSI Website and indicating the amount they wish to invest, subject to the minimum or maximum investment amount, if any.   The investor will then be prompted to confirm the "order."   After such confirmation, the order will represent the investor's binding commitment to purchase the Note.   In the event we are required to amend this PPM or the applicable Series Note Listing -- for example, as a result of material changes to the information contained herein -- we will post a notice on the web page where the series of Notes are listed, in each case advising Investors that a material amendment to the PPM or Series Note Listing is pending, and applicable instructions and requirements related thereto.   In such case, Investors will be able to cancel their order as long as a written cancellation notice is received by PeerStreet prior to close.

Upon the closing of the corresponding loan investment, the principal amount previously committed by the investor under the applicable Series Note Listing is deemed invested in a Note of that series.  Notes are issued electronically, in "book entry" form, by means of registration of each investor's ownership in our records.

### *PeerStreet Fees*

PeerStreet or its affiliates will earn and be paid certain origination fees, generally ranging from 0% to 5.0% of the principal amount of each corresponding loan, from the Borrower.  Such fees may be funded from the loan proceeds.  The amount of the loan origination fee depends upon market conditions and is payable at the time the loan closes.

PeerStreet or its affiliates may also be paid an economic "spread", which will be the difference between the Note interest rate paid to Investors and the interest rate or preferred return that real estate companies pay to PeerStreet under the corresponding real estate investment.   Each Series Note Listing will describe the terms of the corresponding real estate investment as well as the terms of the Note.  This fee shall only be earned and paid pari passu to PeerStreet as and when interest is paid by the underlying Borrower.  PeerStreet or its affiliates may also be paid a servicing fee, as described in the Series Note Listing, for the ongoing administration of loan or preferred return payments, investor distributions, tax filings, reporting, and property oversight.  In the cases of defaults, PeerStreet may also collect prevailing market rate special servicing fees to work out delinquent or non-performing real estate investments.  PeerStreet may also choose to outsource servicing and special servicing to a third party servicing firm.  Each Series Note Listing will describe the terms of the corresponding loan investment as well as the

terms of the Note. The servicing fee will reduce the effective yield on your Notes below their stated interest rate.

To the extent that PeerStreet (or an affiliate or a third party) charges the Borrower certain loan origination fees ("points"), the principal amount of the loan may be increased, which may adversely affect the ability of the Borrower to repay the loan. In addition, loan fees or points, (when added to the amount of the loan) will increase the gross amount of the loan thereby decreasing the Borrower's equity in his or her property and correspondingly decreasing the Investor's security.

If the loan is a construction or rehabilitation loan, PeerStreet (or an affiliate or a third party) may be reimbursed for its expenses and receive builder control fees for inspecting construction progress and monitoring disbursements from a loan disbursal account (if any). These fees and expenses generally will not exceed three percent (3%) of the principal amount of the loan and will be payable by the Borrower and may be payable out of loan or sales proceeds.

Certain provisions of applicable law may limit PeerStreet's compensation with respect to loans secured by single dwelling units in a condominium or a cooperative or a residential building containing four units or less.

Certain series of Notes may also entitle PeerStreet to other fees. Any such fees will be disclosed in the Series Note Listing.

If collection action must be taken with respect to a loan investment, PeerStreet or a collection agency may charge a prevailing, market-rate special servicing fee, at a rate similar to what would be expected if negotiated in an arms-length transaction. These fees will correspondingly reduce the amounts of any payments Investors may receive on the Notes.

PeerStreet's above-described compensation is not determined by arm's-length negotiations with any Investor.

### DOCUMENTATION AND INFORMATION AVAILABLE TO THE INVESTOR

In addition to this PPM, the following documentation will be available to each Investor on the PSI Website at www.PeerStreet.com:

1.      The Note and/or any related certificate, or a copy of the same,

2.      Investor Agreement, and

3.      Series Note Listing.

### CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion sets forth certain material U.S. federal income tax considerations generally applicable to the acquisition, ownership and disposition of the Notes by Investors that are U. S. Holders (as defined below). This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "***Code***"), Treasury regulations promulgated thereunder

(the "***Treasury Regulations***"), administrative pronouncements of the U.S. Internal Revenue Service (the "***IRS***") and judicial decisions, all as currently in effect and all of which are subject to change and to different interpretations.  Changes to any of the foregoing authorities could apply on a retroactive basis, and could affect the U.S. federal income tax consequences described below.

This discussion does not address all of the U.S. federal income tax considerations that may be relevant to a particular Investor's circumstances, and does not discuss any aspect of U.S. federal tax law other than income taxation, or any state, local or non-U.S. tax consequences of the acquisition, ownership and disposition of the Notes.  This discussion applies only to Investors who purchase the Notes for cash at original issue and who hold the Notes as "capital assets" within the meaning of the Code (generally, assets held for investment).  This discussion does not address U.S. federal income tax considerations applicable to Investors that may be subject to special tax rules, such as (without limitation):

- securities dealers or brokers, or traders in securities electing mark-to-market treatment;

- banks, thrifts or other financial institutions;

- insurance companies;

- regulated investment companies or real estate investment trusts;

- tax-exempt organizations;

- persons holding Notes as part of a "straddle," "hedge," "synthetic security" or "conversion transaction" for U.S. federal income tax purposes, or as part of some other integrated investment;

- partnerships or other pass-through entities;

- persons subject to the alternative minimum tax;

- certain former citizens or residents of the United States;

- Non-U.S. Holders (as defined below); and

- U.S. Holders (as defined below) whose functional currency is not the U.S. dollar.

In addition, this discussion does not address withholding taxes which may be imposed pursuant to Sections 1471 through 1474 of the Code and the Treasury Regulations thereunder.

As used herein, a "***U.S. Holder***" is a beneficial owner of Notes that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (iii) an estate whose income is subject to U.S. federal income tax regardless of its source, or

(iv) a trust if (A) a U.S. court has the authority to exercise primary supervision over the administration of the trust and one or more "United States persons" (as defined under the Code) are authorized to control all substantial decisions of the trust or (B) it has a valid election in place to be treated as a "United States person." A "***Non-U.S. Holder***" is any beneficial owner of a Note that is not a U.S. Holder or an entity treated as a partnership for U.S. federal income tax purposes.

If an entity treated as a partnership for U.S. federal income tax purposes holds Notes, the U.S. federal income tax treatment of a partner generally will depend on the status of the partner and the activities of the partnership. A partnership holding Notes, and partners in such a partnership, should consult their own tax advisors with regard to the U.S. federal income tax consequences of the acquisition, ownership and disposition of the Notes by the partnership.

THIS DISCUSSION OF U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATION ONLY. PROSPECTIVE INVESTORS SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF OWNING THE NOTES, INCLUDING THE APPLICABILITY AND EFFECT OF STATE, LOCAL, FOREIGN AND OTHER TAX LAWS AND POSSIBLE CHANGES IN TAX LAW.

**Tax Characterization of the Notes**

No statutory provisions, Treasury Regulations, published rulings or judicial decisions directly address the characterization of the Notes or instruments similar to the Notes for U.S. federal income tax purposes. Although the matter is not free from doubt, we intend to treat the Notes as our debt instruments that have original issue discount ("***OID***") for U.S. federal income tax purposes unless and until there is a change or clarification in the law, by Treasury Regulation or otherwise, that would require a different characterization of the Notes. Where required, we intend to file information returns with the IRS in accordance with such treatment. Each Investor, by its acceptance of a Note, will be deemed to have agreed to such treatment except as otherwise required by applicable law.

You should be aware that the characterization of the Notes for U.S. federal income tax purposes is subject to substantial uncertainty, the IRS is not bound by our characterization and the IRS or a court may take a different position with respect to the Notes' proper characterization. For example, the IRS could determine that, in substance, each Investor owns a proportionate interest in the corresponding loan investment for U.S. federal income tax purposes. Alternatively, the IRS could seek to treat the Notes as a different financial instrument (including an equity interest in us or a derivative financial instrument).

Any different characterization of the Notes could significantly affect the amount, timing and character of income, gain or loss recognized by an Investor in respect of a Note. Moreover, any such different characterization may significantly reduce the amounts available to pay interest and principal on the Notes. For example, if each Investor was treated as owning a proportionate interest in the corresponding loan investment, the U.S. federal income tax consequences of owning the Notes would depend on the characteristics of the loan investment, which characteristics could differ significantly from the intended characteristics of the Notes for

U.S. federal income tax purposes.  If the Notes were treated as our equity (i) we would be subject to U.S. federal income tax on any income, including interest, accrued on the corresponding loan investment but would not be entitled to deduct interest or OID on the Notes, which, among other things, would reduce the amount of cash available to make payments on the Notes, and (ii) payments on the Notes would be treated by the Investor for U.S. federal income tax purposes as dividends (which may be ineligible for reduced rates of U.S. federal income taxation or the dividends-received deduction) to the extent of our earnings and profits as computed for U.S. federal income tax purposes.

The following discussion assumes the Notes will be treated as our debt instruments that have OID for U.S. federal income tax purposes.

**Taxation of Payments on the Notes**

Subject to the discussion below regarding Short-Term Notes (*i.e.*, Notes that have a maturity of one year or less), generally, you will be required to accrue OID income as ordinary interest income for U.S. federal income tax purposes, regardless of your regular method of tax accounting, under a "constant yield method," as described below.  Under this treatment, if a payment on a Note is not made in accordance with the payment schedule in respect of the corresponding loan investment (for example, because of a late payment on the corresponding loan investment), you will be required to include an amount of OID in taxable income as interest even though you have not received the actual payment from the corresponding loan investment.

The Treasury Regulations governing OID provide special rules for determining the amount and accrual of OID for debt instruments that provide for one or more alternative payment schedules applicable upon the occurrence of contingencies.  If the timing and amounts of the payments that comprise each payment schedule are known as of the issue date, and based on all the facts and circumstances as of the issue date, a single payment schedule for a debt instrument, including the stated payment schedule, is significantly more likely than not to occur, the amount and accrual of OID is determined based on that payment schedule.  In addition, under the applicable Treasury Regulations, remote and/or incidental contingencies generally may be ignored.  A contingency relating to the amount of a payment is incidental if, under all reasonably expected market conditions, the potential amount of the payment is insignificant relative to the total expected amount of the remaining payments on the debt instrument.  A contingency relating to the timing of a payment is incidental if, under all reasonably expected market conditions, the potential difference in the timing of the payment is insignificant.

The regular payment schedule for each Note provides for payments of principal and interest on the Note in accordance with the payment schedule for the corresponding loan investment.  However, the Notes provide for one or more alternative payment schedules because we are obligated to make payments on a Note only to the extent that we receive payments on the corresponding loan investment.  In addition, we will prepay a Note to the extent that a Borrower prepays the loan investment corresponding to the Note, and we may pay late fees collected on a corresponding loan investment to the holders of the corresponding Note.  Moreover, certain series of Notes may feature additional contingent payment provisions reflecting a similar feature in a corresponding loan investment, whereby Investors may be able to realize additional payments upon the occurrence of certain events during the life of the corresponding investment.

Notwithstanding such contingencies, we intend to use the regular payment schedule of a Note (disregarding such contingencies) to determine the amount and accrual of OID on the Note because we believe a Note is significantly more likely than not to be paid in accordance with such payment schedule and/or the likelihood of nonpayment, prepayment, late payment or additional contingent payments on the loan corresponding to such Note will be remote or incidental.  If, in the future, we determine that the treatment described in the previous sentence does not apply to a Note, we anticipate that we will be required to determine the amount and accrual of OID for such Note pursuant to the rules applicable to "contingent payment debt instruments," which are described below, and we shall so notify you.

Assuming a Note does not constitute a "contingent payment debt instrument" (discussed in greater detail below), the aggregate amount of OID for the Note will equal the excess of the Note's "stated redemption price at maturity" over its "issue price."  The stated redemption price at maturity of a Note includes all payments on the Note under the payment schedule of the Note. The issue price of a Note generally will equal the principal amount of a Note.

Under the constant yield method, the amount of OID includible in income for a taxable year is the sum of the "daily portions" of OID with respect to the Note for each day during the taxable year in which the Investor held the Note.  The daily portion of OID is determined by allocating to each day of any accrual period within a taxable year a *pro rata* portion of an amount equal to the product of such Note's adjusted issue price at the beginning of the accrual period and its yield to maturity (properly adjusted for the length of the period). The adjusted issue price of a Note at the beginning of any accrual period should be its issue price, increased by the aggregate amount of OID previously accrued with respect to the Note, and decreased by any payments previously made on the Note.  A Note's yield to maturity should be the discount rate that, when used to compute the present value of all payments to be made on the Note under the payment schedule of the Note, produces an amount equal to the issue price of such Note.

If a Note is paid in accordance with its regular payment schedule, the amount of OID includible in income is anticipated to be based on the yield of the Note under such schedule.  For a series of Notes with respect to which the stated interest rate reflects any applicable fees or other charges borne by the Investors under the regular payment schedule, the amount of OID includible in income is anticipated to be based on the stated interest rate of the Notes, and as a result, an Investor generally will be required to include an amount of OID in income that is equal to the amount of stated interest paid on the Notes.  On the other hand, for a series of Notes with respect to which the stated interest rate does not reflect all applicable fees or other charges borne by the Investor under the regular payment schedule, the yield will be lower than the stated interest rate on the Note.  As a result, you generally would be required to include an amount of OID in income with respect to such a Note that is less than the amount of stated interest paid on the Note.

Cash payments under the payment schedule for the Notes will not be separately included in income, but rather will be treated first as payments of previously accrued but unpaid OID and then as payments of principal.

**Sale, Retirement or Other Taxable Dispositions of Notes**

Upon the sale, retirement or other taxable disposition of a Note, generally you will recognize gain or loss equal to the difference, if any, between the amount realized upon the sale, retirement or other taxable disposition and your adjusted tax basis in the Note.  In general, your adjusted tax basis in the Note will equal your cost for the Note, increased by any OID previously included in gross income by you, and reduced by any payments previously received by you in respect of the Note.

Except as discussed below with respect to a Note subject to the rules governing contingent payment debt instruments or short-term debt instruments, your gain or loss on the taxable disposition of a Note generally will be long-term capital gain or loss if the Note has been held for more than one year and short-term otherwise.  The deductibility of capital losses is subject to limitations.

**Prepayments**

If we prepay a Note in full, the Note will be treated as retired and, as described above, you generally will recognize gain or loss equal to the difference, if any, between the amount realized upon the retirement and your adjusted tax basis in the Note.  If we prepay a Note in part, a portion of the Note will be treated as retired.  Generally, for purposes of determining (i) your gain or loss attributable to the portion of the Note retired and (ii) your OID accruals on the portion of the Note remaining outstanding, the adjusted issue price, your adjusted tax basis, and the accrued but unpaid OID of the Note, determined immediately before the prepayment, will be allocated between the two portions of the Note based on the portion of the Note that is treated as retired.

The yield to maturity of a Note is not affected by a partial prepayment.

**Late Payments**

As discussed above, late fees collected on a loan investment may be paid to you as described in the Series Note Listing.  We anticipate any late fees paid will be insignificant relative to the total expected amount of the remaining payments on the Note.  In such case, any late fees paid to you should be taxable as ordinary income at the time such fees are paid or accrued in accordance with your regular method of accounting for U.S. federal income tax purposes.

**Nonpayment of Loan Investment Corresponding to Note**

In the event that we do not make scheduled payments on a Note as a result of nonpayment by the Borrower on the corresponding loan investment, generally you must continue to accrue and include OID on a Note in taxable income until the maturity date except as described below.  Solely for purposes of the OID rules, the Note may be treated as retired and reissued on the scheduled payment date for an amount equal to the Note's adjusted issue price on that date.  As a result of such reissuance, the amount and accrual of OID on the Note may change.  At the time of the deemed reissuance, due to nonpayment by the Borrower, we may not be able to conclude that it is significantly more likely than not that the Note will be paid in

accordance with one payment schedule and/or that the likelihood of future nonpayment, prepayment, or late payment by the Borrower on the loan corresponding to such Note will be remote or incidental.  Accordingly, the Note may become subject to the contingent payment debt instrument rules (which are discussed in more detail below).  In addition, in the event that a Note's maturity date is extended because amounts remain due and payable on the initial maturity date by the Borrower on the loan investment corresponding to the Note, the Note likely will be treated as reissued and become subject to the contingent payment debt instrument rules.  If we determine that a Note is subject to the contingent payment debt instrument rules as a result of such a reissuance, we will notify you and provide the projected payment schedule and comparable yield.

If collection on a Note becomes doubtful, you may be able to cease accruing OID on the Note.  Under current IRS guidance, it is not clear whether you may cease accruing OID if scheduled payments on a Note are not made.

You should consult your own tax advisor regarding the accrual and inclusion of OID in income when collection on a Note becomes doubtful.

**Losses as a Result of Worthlessness**

The tax consequences of a Note becoming wholly or partly worthless are not entirely clear.  In the event a Note is considered a "security" within the meaning of Section 165(g)(2) of the Code and such Note becomes wholly worthless, you generally should be entitled to deduct your loss on the Note as a capital loss in the taxable year the Note becomes wholly worthless.  The portion of your loss attributable to accrued but unpaid OID may be deductible as an ordinary loss, although such treatment is not entirely free from doubt.  You should consult your own tax advisor regarding the consequences of a Note becoming worthless, including whether or not a Note is a "security" for these purposes.

**Potential Characterization as Contingent Payment Debt Instruments**

Although we believe our intended treatment of a Note as our debt instrument that is not subject to the "contingent payment debt instrument" rules is reasonable, our position is not binding on the IRS or the courts and we cannot predict what the IRS or a court would ultimately decide with respect to the proper U.S. federal income tax treatment of the Notes.  Accordingly, among other risks, the IRS or a court could determine the Notes are "contingent payment debt instruments" because payments on the Notes are linked to performance on the corresponding loan investment.  If a Note is characterized as a contingent payment debt instrument or, in the future, if we conclude a Note is subject to the contingent payment debt instrument rules, such Note would be subject to special rules.  Under such rules, you generally would be required to accrue interest income under the "non-contingent bond method."  Under this method, interest would be taken into account, whether or not the amount of any payment was fixed or determinable in the taxable year, based on a hypothetical non-contingent bond, which is based on a "comparable yield" (generally, a hypothetical yield to be applied to determine interest accruals with respect to the Note, and which can be no less than the applicable federal rate) and a "projected payment schedule" (generally, a series of projected payments, the amount and timing of which would produce a yield to maturity on the Note equal to the comparable yield).  Based

on the comparable yield and the projected payment schedule, generally you would be required to accrue as OID the sum of the daily portions of interest for each day in the taxable year that you held the Note, adjusted to reflect the difference, if any, between the actual and projected amount of any contingent payments on the Note.  The daily portions of interest are determined by allocating to each day in an accrual period the ratable portion of interest that accrues in such accrual period.  The amount of interest you may accrue under this method could be higher or lower than the stated interest rate on the Notes.  In addition, any gain recognized on the sale, exchange or retirement of your Note generally would be treated as ordinary interest income, and any loss would be treated as ordinary loss to the extent of prior OID inclusions, and then as capital loss thereafter.

**Short-Term Notes**

The following discussion applies to Notes that have a maturity of one year or less from the date of issue ("***Short-Term Notes***").  Special rules address the U.S. federal income taxation of Short-Term Notes, which rules are not entirely clear in all situations.  In general, applicable Treasury Regulations provide that, in the case of a debt instrument with a maturity date of one year or less, no payments of interest are considered qualified stated interest.  This means that a Short-Term Note is treated as having OID equal to the excess of the total payments on the obligation over its issue price.

In general, if you are a cash method taxpayer, you should not be required to recognize interest income until actual or constructive receipt of payment, unless you elect to accrue OID in income on a current basis under either a straight-line or a constant yield method.  If you do not elect to currently include accrued OID in income, you will not be allowed to deduct any of the interest paid or accrued on any indebtedness incurred or maintained to purchase or carry the Note (in an amount not exceeding the deferred income), and instead you will be required to defer deductions for such interest until the deferred income is realized upon the maturity of the Note or its earlier disposition in a taxable transaction.  If you elect to include accrued OID in income on a current basis, the limitation on the deductibility of interest will not apply.  Upon disposition of a Short-Term Note, you will be required to characterize some or all of the gain realized on a sale, exchange or retirement of the Note as ordinary income.  The amount characterized as ordinary income upon such disposition generally will equal an amount of OID that would have accrued under a straight -line basis or, if you so elect, an amount of OID that would have accrued under a constant yield method.

If you are an accrual method taxpayer, you generally will be required to accrue OID in income on a current basis on either a straight-line basis or, at your election, under the constant yield method based on daily compounding.

In addition, while there are special "contingent payment debt instrument" rules that address the U.S. federal income taxation of debt instruments that have a maturity date of more than one year and that provide for one or more contingent payments (as discussed above), those rules generally do not apply to short-term obligations.  Accordingly, the U.S. federal income taxation of short-term obligations that provide for contingent payments is not entirely clear.

You are strongly advised to consult your own tax advisor with regard to the U.S. federal income tax consequences of the acquisition, ownership and disposition of Short-Term Notes.

## Additional Tax on Net Investment Income

Certain non-corporate Investors are subject to a 3.8% tax, in addition to the regular tax on income and gains, on some or all of their "net investment income," which generally will include interest recognized on a Note and any net gain recognized upon a sale or other taxable disposition of a Note.  Investors should consult their tax advisors regarding the applicability of this tax in respect of the Notes.

## Backup Withholding and Reporting

We will be required to report information to the IRS on certain payments on a Note (including interest) and on proceeds of the sale of a Note if you are not an exempt recipient (such as a corporation).  In addition, backup withholding (currently at a 28% rate) may apply to payments made to you if (a) you do not furnish or you have failed to provide your correct taxpayer identification number, (b) we have been instructed by the IRS to backup withhold because of underreporting (generally meaning that the IRS has determined and notified you that you have failed to report any reportable dividend and interest payments required to be shown on a tax return for a taxable year), or (c) in certain circumstances, you have failed to comply with applicable certification requirements or otherwise establish an exemption from backup withholding.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is furnished to the IRS on a timely basis.  You should consult your tax advisor regarding the application of information reporting and backup withholding rules in your particular situation, the availability of an exemption, and the procedure for obtaining such an exemption, if applicable.

## ERISA CONSIDERATIONS

The Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), and corresponding provisions of the Code, impose certain requirements on pension, profit sharing, and other employee benefit plans to which they apply, including individual retirement accounts and annuities, Keogh plans, and other tax-exempt plans ("***Plans***"), and on those persons who are fiduciaries or parties in "interest" with respect to such Plans.  PeerStreet has the right, in its sole discretion, to permit or restrict investments in the Notes by "benefit plan investors" as that term is defined by ERISA.  PeerStreet presently intends to restrict investments in the Notes by benefit plan investors.  As a result, it is not expected that the assets of the Notes will be treated as "plan assets" of such benefit plan investors for purposes of the fiduciary responsibility standards and prohibited transaction restrictions of ERISA and the parallel prohibited transaction excise tax provisions of the Code.

## RESTRICTIONS ON TRANSFERS

The Notes are not being registered under the Securities Act of 1933.  The Notes may not be sold or transferred unless they are registered under the Securities Act and the applicable securities laws of any appropriate jurisdiction, or unless exemptions from such registration requirements are available.  Accordingly, the Notes will not be listed on any securities exchange, nor does PeerStreet have plans to establish any kind of trading platform to assist Investors who wish to sell their Notes.  There is no public market for the Notes, and none is expected to develop.  Accordingly, Investors may be required to hold Notes to maturity.

As a condition to this offering, various restrictions have been placed upon the ability of Investors to resell or otherwise dispose of any Notes purchased hereunder, including without limitation the following:

1.      No Investor may resell or otherwise transfer any Notes except to a person or entity that meets the eligibility standards described herein.  (See "Investor Qualifications")

2.      Prior to reselling or transferring any Notes to any person or entity in a manner that otherwise complies with the restrictions noted herein, the Investor must offer the Notes to PeerStreet (in writing) for purchase ("***Right of First Refusal***").  If PeerStreet does not purchase the securities within thirty (30) calendar days from the date upon which it receives written notice of the Investor's offer, then the Investor may resell or transfer the securities to another person or entity, provided that the transfer or resale otherwise complies with the requirements and restrictions on transfer noted herein.

3.      The Notes have not been registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "***Act***" or the "***Securities Act***"), in reliance upon the exemptions provided for under Section 4(a)(2) and Rule 506 of Regulation D promulgated thereunder.  Notes may not be sold or otherwise transferred without registration under the Securities Act or pursuant to an exemption therefrom.  In addition, no sales or transfers may be made for at least one (1) year after the last sale by PeerStreet of a particular series of Notes.  In the case of construction or rehabilitation loans, that one-year period will not begin to run until the last loan disbursement under the loan disbursement agreement has been funded.  Any such sale or transfer shall be subject to PeerStreet's right of first refusal described in the preceding paragraph.

4.      A transfer fee equal to five hundred dollars ($500) (the "***Transfer Fee***") shall be charged for every transfer request made by Investor to PeerStreet for administrative and legal costs.

5.      No sale or transfer shall be effective unless the buyer or transferee has executed and delivered to PeerStreet all documents required by PeerStreet for investing in the Notes and paid the Transfer Fee to PeerStreet.

The Notes will be registered electronically with PeerStreet and PeerStreet does not anticipate issuing physical Notes or related instruments.  The form of Note that will be available online will contain one or more legends stating that the Notes have not been registered under the Securities Act and describing the applicable limitations on resale.

## ADDITIONAL INFORMATION AND UNDERTAKINGS

PeerStreet undertakes to make available to each potential investor every opportunity to obtain any additional information from PeerStreet necessary to verify the accuracy of the information contained in this PPM.  PeerStreet will provide such information to the extent that it possesses such information or can acquire it without unreasonable effort or expense.   This additional information includes documents or instruments relating to the operation and business of PeerStreet that are material to this offering and the transactions contemplated and described in this PPM.   Should you have any questions, please do not hesitate to contact PeerStreet as follows:

Peer Street Funding, LLC.

P.O. Box 3207

Manhattan Beach, CA 90266

info@PeerStreet.com

**EXHIBIT A**

**MASTER MORTGAGE DEPENDENT PROMISSORY NOTE**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THIS NOTE UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. SEE THE PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") ISSUED BY COMPANY, DATED AS OF OCTOBER 26, 2014, AND THE INVESTOR AGREEMENT BETWEEN THE COMPANY AND THE HOLDER WITH RESPECT TO THIS NOTE FOR MORE DETAILS.

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") BECAUSE PAYMENTS ON THIS NOTE ARE DEPENDENT ON PAYMENTS ON THE CORRESPONDING MORTGAGE LOAN (AS DEFINED IN THE MEMORANDUM). THIS NOTE'S ISSUE PRICE IS THIS NOTE'S STATED PRINCIPAL AMOUNT, AND THE ISSUE DATE IS THE ORIGINAL ISSUE DATE. FOR FURTHER INFORMATION REGARDING THE AMOUNT OF OID AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT THE COMPANY AT P.O. BOX 3207, MANHATTAN BEACH, CA 90266. ,

This Master Mortgage Dependent Promissory Note ("Master Note") contains the terms that shall apply to each investment (a "Loan Investment") made by _____ ("Holder") via the platform located at www.peerstreet.com (the "PeerStreet Website") in accordance with the Investor Agreement and Memorandum. References herein to a "Note" shall apply to each Loan Investment made by Holder on the PeerStreet Website. Capitalized terms that are not defined herein shall have the meaning prescribed to them in the Memorandum or Investor Agreement. Maker will issue Notes in electronic form only. This means that each Note will be stored on the PeerStreet Website. Holder can view a record of the Notes owned by Holder online and print copies of this Master Note and the online record of your Notes for your records by visiting your secure, password-protected webpage in the "Dashboard" section of the PeerStreet Website. Maker will not issue certificates for the Notes.

FOR VALUE RECEIVED, the undersigned, Peer Street Funding, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay Holder the principal sum(s) of each Loan Investment, together with interest on the unpaid principal balance thereon in accordance with the terms contained herein:

**1.   Special Limited Obligation**.   This Note represents a special limited obligation of the Company, and (1) no payments of principal and interest on this Note shall be payable unless the Company has received payments relating to the corresponding mortgage loan, and then only to the extent of the amount of such payments received by the Company (less any fees and costs allowed to be charged under the Memorandum), and (2) no Holder of this Note shall have any recourse against the Company unless, and then only to the extent that, the Company has received payment relating to the corresponding mortgage loan and has failed to pay such Holder their pro rata share of the payments that the Company actually received under the corresponding mortgage loan (less any fees and costs allowed to be charged under the Memorandum). The principal and interest payable on any payment date will be paid to the party in whose name this Note is registered.

**2. Interest**. Interest on the unpaid principal balance will accrue at an annual rate equal to the Interest Rate identified in a particular Series Note Listing.

**3. Payment of Principal and Interest.**

**3.1 Payments**. Payments shall be due and payable in arrears in consecutive periodic installments in accordance with this Note's payment schedule identified on the PeerStreet Website. All payments of principal and interest on this Note due to the Holder shall be made in U.S. dollars, in immediately available funds, by intra-institution book entry transfer to the Holder's designated account indicated through the Company's online platform. Such payments shall continue until the entire indebtedness evidenced by this Note and all accrued and unpaid interest and fees are fully paid, with any unpaid principal and interest due and payable on the Initial Maturity Date, unless the Company has extended the maturity date to the Final Maturity Date. Notwithstanding any payment schedule, the Company shall only be obligated to make any payment on this Note if and only if, and only to the extent that, Company receives payment relating to the corresponding mortgage loan (less any fees and costs allowed to be charged under the Memorandum). Should the Company not receive any payments relating to the corresponding mortgage loan, Company will not owe anything to Holder. The Note will mature on the Initial Maturity Date; *provided, however*, that if on the Initial Maturity Date any principal or interest payments in respect of the corresponding mortgage loan remain due and payable to the Company, the maturity date of this Note will be extended to the Final Maturity Date.

**3.2 Amounts Advanced by Company**. As set forth in the Memorandum, the Company will, at its sole discretion, advance any and all amounts necessary to protect its interest in the corresponding mortgage loan, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs Company deems necessary to protect its position in the corresponding mortgage loan (the "Company's Advances"). Any fees advanced by the Company will earn interest at the interest rate applicable to the corresponding mortgage loan. Any amounts paid to the Company under the corresponding mortgage loan shall be payable as follows: (1) to the Company, to recoup the Company's Advances, (2) to the Company or third parties for any fees and costs allowed to be charged under the Memorandum and (3) the balance, if any, pro rata to the Holders of the Notes.

**3.3 Withholding**. If any withholding tax is imposed on any payment made by the Company to a Holder pursuant to this Note, such tax shall reduce the amount otherwise payable with respect to such payment. Upon request of the Company, a Holder shall provide the Company with an Internal Revenue Service Form W-9, W-BEN, W-8ECI, W-8IMY or other similar withholding certificate of a state, local or foreign governmental authority such that the Company may make payments under the Note without deduction for, or at a reduced rate of deduction for, any tax.

**4. Events of Default.** On (a) the Company's failure to pay any installment or other sum due under this Note when due and payable when the Company has received the same from the corresponding mortgage loan (whether by extension, acceleration, or otherwise), (b) the Company has become subject to a voluntary or involuntary proceeding of bankruptcy, insolvency, or otherwise subject to receivership and remains so for a period of 60 days, or (c) any breach of any other promise or obligation in this Note or in any other instrument now or hereafter securing the indebtedness evidenced by this Note (collectively, "Default"), then after upon sixty (60) days from the date of receiving written notice of such default from the Holder, and if the Company fails thereafter to cure said default, the Holder may, at its option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the applicable maturity date. The Company must receive notice of the exercise of this option. For the purposes of this paragraph, shall be deemed to receive Holder's notice if Holder follows the notice provisions in paragraph 7 of this Note.

**5. Prepayment.** Company may prepay this Note in whole or in part at any time without any penalty. All prepayments of principal on this Note shall be applied to the most remote principal installment or installments then unpaid.

**6. Sale Clause.** Subject to compliance with the Act and applicable securities laws and regulations, Company may sell, convey, assign or otherwise transfer (a) all or any part of the corresponding mortgage loan or (b) any interest in the corresponding mortgage loan, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of the Holder.

**7. Waiver.** The Company, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the security given for this Note, any acceptance of additional security of any kind and any release of any party liable under this Note.

**8. Notice.** Any notice required to be provided in this Note shall be given and received via electronic mail, unless applicable law requires that such notice be given in writing. All notices shall be addressed to the party to whom such notice is to be given at (i) info@peerstreet.com or such other email address the Company may notify Holder via the PeerStreet Website, if the recipient is the Company or (ii) the electronic mail address used by Holder when registering online at the Company's investment platform if the recipient is the Holder; subject to the parties updating such addresses by providing notice pursuant to this Section 8.

**9. Forbearance Not a Waiver.** If the Holder delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any the Holder rights or of any breach, default, or failure of condition under this Note. No waiver by the Holder of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Holder.

**10. Assignment.** This Note inures to and binds the heirs, legal representatives, successors, and assigns of the parties; *provided* that the Holder may only assign or transfer this Note in connection with the terms outlined in the Memorandum, and under no circumstances may Holder assign or transfer this Note in violation of the Act.

**11. Governing Law.** This Note shall be construed and enforce able according to the laws of the State of Delaware (without giving effect to its conflicts of laws principles) for all purposes.

**12. Time Is of the Essence.** Time is of the essence with respect to all obligations of the Company under this Note.

**13. No Modifications or Amendments; No Waiver.** Except as specified herein or the Memorandum, this Promissory Note may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

**14. Severability.** Any provision of this Promissory Note which shall be held by a court of competent jurisdiction to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and all other provisions or terms hereof shall remain in full force and effect.

**15. Nonrecourse Generally**. (i) The Company shall not be personally liable, and Holder shall not commence or prosecute any action against the Company, for the nonpayment or non-performance of any obligation on this Note (the "Loan Obligations") due to failure or default of the corresponding mortgage loan; (ii) Holder shall not seek, obtain, or enforce a deficiency judgment against the Company; (iii) Holder's recourse for the Company's payment obligations shall be limited to the payments and amounts, if any, received by Company relating to the corresponding mortgage loan; (iii) the Holder shall not be entitled to obtain specific performance or any other similar order, remedy, or relief against the Company relating to any claim arising from the Note; and (iv) the Holder waives any right to exercise any lenders' right of set-off arising from the Note, against any funds of the Company in the Holder's custody, control, or possession. No recourse under or upon any obligation, covenant or agreement contained in this Note, or because of any indebtedness evidenced thereby, shall be had against any past, present or future shareholder, officer, director or agent, as such, of the Company, either directly or through the Company, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or penalty or otherwise, all such personal liability of every such incorporator, shareholder, officer, director or agent, as such, being expressly waived and released by the

acceptance hereof and as a condition of and as part of the consideration for the issuance of this Note.

**16. Note Series Limitation.** Holder understands and agrees that each Note is part of a series of Notes, which series of Notes is held in the aggregate by multiple holders. The Holder shall not assert any right of action, including (without limitation) any arbitration, lawsuit or otherwise, except in conjunction or aggregation with other holders of the Notes as set forth in the Investor Agreement.

**17. Tax Matters**. Each Holder, by acceptance of a Note, shall be deemed to have agreed to treat, and shall treat, such Note as debt of the Company for United States federal income tax purposes and shall refrain from taking any action inconsistent with such treatment.

**18.   Incorporation by Reference.**   The terms contained in the Memorandum and Investor Agreement are hereby incorporated herein by this reference for all purposes.  In the event any provisions of this Master Note conflict with provisions of the Memorandum, the provisions of the Memorandum shall control.

**IN WITNESS WHEREOF,** PeerStreet Funding, LLC has caused this instrument to be signed by its duly authorized officer.

Dated:

_____
Peer Street Funding, LLC
By: Brewster Johnson, Chief Executive Officer