# **EXHIBIT 11**

# Investor Agreement
# For Real Estate Securities

## 1.  Introduction

The terms used in this Introduction are defined below in section 2. Definitions. This Investor Agreement is applicable for investments made on or after December 2, 2019.

This Investor Agreement for Real Estate Securities constitutes a binding agreement between you and PeerStreet and is effective as of the date you e-sign (as defined in Section 3(c) below) the agreement. The Investor Agreement describes the terms and conditions pursuant to which you agree to invest in Real Estate Securities to be issued by PS Issuer.  If your Investment Commitment Amount is accepted, this Investor Agreement entitles you to receive an amount of Real Estate Securities to be issued by PS Issuer in exchange for payment of your Investment Commitment Amount under the conditions described in the Transaction Documents, subject to any limitations set forth in this Investor Agreement.

Each time you deposit funds or invest through the PeerStreet Platform (including through the Automated Investing program, as defined below), you are, without limitation, (a) agreeing to the terms of this Agreement, (b) accepting and agreeing to the PeerStreet.com Terms of Use and PPM, (c) agreeing to transact business with us and receive communications relating to the Notes electronically, and (d) agreeing to have any dispute with us resolved by binding arbitration.

Subject to the terms and conditions of this Investor Agreement, we will provide you the opportunity, through the PeerStreet Website, to review and purchase the Real Estate Securities further described in the PPM and PPM Supplements describing each type of Real Estate Securities to be offered.

In addition to the general body of this Investor Agreement, you also agree to the terms and conditions of the other Transaction Documents (as defined below).

## 2.  Definitions

In this Investor Agreement, unless otherwise specified or required by context, the following terms are defined to mean:

    A.  "**Final Instrument**" is the final document you will receive, through the Platform, evidencing your ownership of the Real Estate Security if your Investment Commitment Amount has been accepted by PeerStreet and the other conditions of this Investor Agreement have been met. The Final Instrument will (i) set forth the specific terms that apply to the Real Estate Security, (ii) be substantially similar to the Form Instrument, and (iii) be subject to the limitations set forth in the Transaction Documents. If there is a conflict between the terms of the Final Instrument and the Form Instrument or any other Offering Materials, the Final Instrument shall prevail.

    B.  "**Form Instrument**" is the form template of the Final Instrument that sets forth the specific terms that are intended to apply to the particular Series of Real Estate Securities being offered.

C. "**Investment Commitment Amount**" is the amount you are committing to invest in a Series of Real Estate Securities made pursuant to the terms of this Investor Agreement.

D. "**Investor Agreement**" refers to this investor agreement, between you and PeerStreet for the purchase of Real Estate Securities.

E. "**IA Supplement**" refers to any supplement to this Investor Agreement that sets forth additional provisions that are applicable to a particular Series or type of Real Estate Securities.

F. "**Listing**" is the listing on a webpage of the PeerStreet Website that sets forth the particular terms that apply to a Series of Real Estate Securities being purchased under this Investor Agreement.

G. "**Offering Materials**" refers collectively to the Listing, the PPM, the relevant PPM Supplement, tand the Transaction Documents for the Real Estate Securities offered by PeerStreet and purchased by an Investor.

H. "**PeerStreet**" refers collectively to PSFLLC, PSI, and any PSI affiliate.

I. "**PeerStreet Platform**" or "**Platform**" is the investing platform sponsored by PeerStreet that is described in the PPM;

J. "**PeerStreet Website**" is the www.PeerStreet.com website, domain name, and other related applications, owned and operated by PSI and is the mechanism through which the PeerStreet Platform operates.

K. "**PPM**" is the private placement memorandum available here on the PeerStreet Website under which PeerStreet is offering Real Estate Securities.

L. "**PPM Supplement**" is the supplement to the PPM that sets forth the terms and conditions of the particular type and Series of Real Estate Securities being offered.  The PPM Supplement also describes specific risk factors that apply to those Real Estate Securities.

M. "**Privacy Policy**" is PeerStreet's privacy policy available here regarding information shared on the PeerStreet Website.

N. "**PSFLLC**" is Peer Street Funding, LLC, a Delaware limited liability company.

O. "**PSI**" is Peer Street, Inc., a Delaware corporation, that wholly owns PSFLLC.

P. "**PSI affiliate**" is any affiliate of PSI or PSFLLC.

Q. "**PS Issuer**" is (i) the issuer of the particular Series of Real Estate Securities offered by PeerStreet and purchased by an investor, as disclosed on the Series' Listing and PPM Supplement. The PSI Issuer will be named in the Final Instrument, the Listing and the PPM Supplement for each Series.

R. "**Real Estate Security(ies)**" are real estate-related securities that may be offered by PS Issuer in a Series as set forth on the applicable Listing and described in the PPM and its PPM

Supplements.  The Real Estate Securities will, subject to the terms and conditions of the Transaction Documents, entitle holders to receive certain payments or distributions that are either indirectly or directly tied to one or more Underlying Investments.

S.  "**Series**" are specific Real Estate Securities associated with a particular Underlying Investment, which represent a portion or all of the Real Estate Securities to be issued in connection with any given Underlying Investment. A Series may be any type of debt or equity offered through the PeerStreet Platform described in the PPM and PPM Supplement, and the specific terms of a Series will be provided in a Listing.  The terms of a Series may differ from that of other Series issued in connection with that common Underlying Investment.

T.  "**Terms of Use**" are the terms of use available [here](here) that apply to your use of the PeerStreet Platform.

U.  "**Transaction Documents**" refers collectively to this Investor Agreement, the Final Instrument, and any other contracts or other agreements you agree to in connection with investing in Real Estate Securities being offered under the terms of this Investor Agreement. If there is a conflict between the Transaction Documents and any other document, the Transaction Documents will prevail.

V.  "**Underlying Investment(s)**" are generally real estate loans, equity investments, or other investments related to real estate that are each associated with one or more specific Series of Real Estate Securities.  Investors in Real Estate Securities will be entitled to receive certain payments or distributions generally based on the underlying investments' performance, as described in the Offering Materials tied to those underlying investments.

## 3.    Instructions

Before investing in any Series of Real Estate Securities, please carefully read and consider all of the Offering Materials for the Series and review the Terms of Use and Privacy Policy regarding your use of the PeerStreet Platform and PeerStreet's policy regarding information shared on the PeerStreet Platform. The Transaction Documents are incorporated in their entirety by reference into this Investor Agreement.

The Listing for a Series identifies the specific Real Estate Securities being offered.  It is important that you review the PPM Supplement(s), Form Instrument and any other Offering Materials for the specific type of Real Estate Securities being offered before e-signing this Investor Agreement.  Each of these documents are available [here](here) on the PeerStreet Website for your review and consideration.

## 4.    Your Eligibility to Invest

Due to current securities laws and regulations, not every natural person or entity can invest through PeerStreet. To help you determine whether you are eligible to invest in Real Estate Securities issued by a PS Issuer, this Section 4 lists factors that may qualify you as a U.S. person and an accredited investor. Because laws and regulations are constantly subject to change, you should consult the Securities and Exchange Commission's website to confirm your eligibility. PeerStreet will only accept investments in Real Estate Securities from you if you qualify as a "U.S. person" and as an "accredited investor".

**5.    Terms of Your Investment**

A.    <u>Investor Agreement Binding on Present and Future Investments.</u>  By completing and e-signing this Investor Agreement, you agree that your investments in Real Estate Securities offered on PeerStreet Platform Listings shall be governed in accordance with the terms of Transaction Documents, until the Transaction Documents are terminated by PeerStreet. You agree that, if PeerStreet accepts your investment in whole or in part in any investment opportunity, you will be bound by all of the terms and conditions of the Transaction Documents then in use.

B.    <u>Investment Commitments Are Irrevocable.</u> Although funding your investor account on the PeerStreet Platform does not obligate you to invest in any given Series of Real Estate Securities, once you commit to invest in a Series and confirm your intent to invest, your investment commitment is irrevocable.  Subject to <u>Section 5(g)</u> of this Investor Agreement, you will be released from your investment commitment only if PeerStreet rejects your investment commitment, which it may do for any reason (including, for example, if the Series is not fully subscribed). If you have enabled Automated Investing, as defined in Section 5(d)(v) below, you will have twenty-four hours after your Funds have been automatically allocated to a specific investment opportunity, and you are provided notice of that, to opt-out of that investment.

C.    <u>Minimum Investment Commitment Amount.</u> The Listings for each Series of Real Estate Securities may indicate a minimum investment commitment amount, which you must meet or exceed in order for PeerStreet to accept your investment commitment.  If no amount is listed, the minimum investment commitment amount will be $1,000.  PeerStreet reserves the right to modify the minimum investment commitment amount any time before a Series of Real Estate Securities closes, which PeerStreet will determine in its sole discretion. PeerStreet may also allow some investors to invest smaller amounts than the stated minimum for any given Series at its discretion, without disclosing that fact to you=.

D.    <u>Funding Your Investment Commitment.</u>

   i.    *Timing of Funding.*  In order to invest in Real Estate Securities issued by a PS Issuer, you must first fund your PeerStreet investor account. Funding your PeerStreet investor account does not in and of itself commit you to purchasing any Real Estate Securities. To make an investment in Real Estate Securities, you must either enable the Automated Investing feature or go to the "Investments" tab on the PeerStreet Website and manually select available investments.

   ii.    *No Interest or Returns on Funds until the Underlying Series Closes.*  In its sole and absolute discretion, PeerStreet may sell a given Underlying Investment as a single Series or divide it into separate Series. Unless indicated otherwise on the Listing for the Series, any funds that you commit to investing will not accumulate interest or earn any other returns until the relevant Series closes, the date of which PeerStreet will determine in its sole discretion.  If you have committed funds to a given Series that does not close for any reason, then PeerStreet will return your funds to you, without interest, as soon as practicable after termination of the offering of the Series.

iii.  *Offering-Specific Terms.* Real Estate Securities offered for sale shall have the terms and conditions described in this Investor Agreement (and IA Supplements, if any), as more fully explained in the PPM and applicable PPM Supplement, and the other Transaction Documents. These documents will be available for you to review on the PeerStreet Website. The interest rate, maturity date and other terms of the corresponding Underlying Investments will be described in the Listing and the relevant PPM Supplement.

iv.  *Changes to Minimum Investment Commitment Amount*. If PeerStreet increases the applicable minimum Investment Commitment Amount at any time prior to the applicable Series of Real Estate Securities closing, then PeerStreet may request you to transfer additional funds to your PeerStreet account to meet the increased minimum Investment Commitment Amount. If you decline to do so, then PeerStreet may reject your investment commitment in whole or in part, even if it had previously accepted your investment commitment, and PeerStreet will return your funds to you as soon as practicable after rejecting your investment commitment.

v.  *Automated Investing.* PeerStreet may offer features allowing you to automatically invest your funds in various Series of Real Estate Securities based on your investment criteria ("**Automated Investing**"). Automated Investing works on an "opt-in" basis, meaning that you must individually and affirmatively enroll in Automated Investing for your funds to be automatically invested. Once Automated Investing is enabled, however, PeerStreet will automatically allocate you Real Estate Securities that meet your stated criteria and if you do not wish to accept the allocated Real Estate Securities, you must actively opt out of the individual investment by following the then-prevailing Automated Investing rules and procedures, which shall remain accessible on the Platform. If you enroll in Automated Investing and your funds are allocated to a given Series, you will be deemed to accept, agree, and consent to the applicable and then-current Transaction Documents. By enrolling in Automated Investing, you will acknowledge that (i) PeerStreet is not, through Automated Investing, providing you investment advice and does not in any way assume any liabilities or obligations related to the allocation of your funds or investments, to your investment decisions, or to your investment performance, (ii) you are subject to the rules and restrictions of this feature, as provided in this Agreement and further detailed on the [PeerStreet Website,](#) and (iii) you are solely responsible for disabling Automated Investing, should you no longer want to use this feature.

You do not need to enable Automated Investing to invest in Real Estate Securities. By enabling Automated Investing, you acknowledge and agree that funds committed through Automated Investing will not be available for you to withdraw or invest in different Real Estate Securities until the earliest of (i) your timely request to opt-out of the applicable Series, if applicable, (ii) the offering to which your funds were committed being cancelled, and (iii) the Underlying Investment paying off or otherwise being disposed of in accordance with the terms of the corresponding PPM or this Agreement. The Real Estate Securities you invest in through the Automated Investing feature may differ from the ones you would manually choose on the Site. The frequency at which investments are made via Automated Investing will vary based on the number of Series of Real Estate Securities available at any given

moment. If you enable Automated Investing, you are agreeing to rules and restrictions of this feature, as provided in this Agreement and further detailed on the PeerStreet Website. Once Automated Investing is activated, you are solely responsible for disabling it, should you no longer want to use this feature.

vi.    *Recurring Deposits.* PeerStreet may offer features allowing you to set-up automatic recurring deposits from your bank account into your account on the PeerStreet Platform ("**Recurring Deposits**"). It is not necessary for you to enable Recurring Deposits to invest on the Platform. If you do enable Recurring Deposits, however, you acknowledge and accept that PeerStreet, and some of its employees, will have access to your bank account information and will have the ability to transfer funds to the Platform. Although your account balance may be visible, PeerStreet does not monitor the availability of funds on an ongoing basis and cannot prevent overdrafts should you request Recurring Deposits in excess of your bank account balance. You acknowledge and agree that on each occasion that PeerStreet, directly or through a third-party vendor, automatically transfers funds from your bank account to your PeerStreet account pursuant to your enabling of Recurring Deposits, PeerStreet is not engaging in giving you investment advice, does not assume any liabilities or duties regarding your allocation of funds or investment decisions, and that funds automatically transferred into your PeerStreet account may be automatically invested in Real Estate Securities if you also enabled Automated Investing.

E.    <u>PeerStreet's Acceptance of Your Investment Commitment</u>.  You understand and agree that your investment is made subject to the terms and conditions of the Transaction Documents, and that PeerStreet will have the right to accept or reject, in its sole discretion, your investment in any particular offering of a Series of Real Estate Securities, in whole or in part, for any or no reason at any time prior to PeerStreet notifying you that it will accept your investment commitment.

i.    *Timing of Acceptance*.  By issuing the Final Instrument to you, PeerStreet will be deemed to have accepted your investment and the terms and conditions of the Transaction Documents will be binding on the parties.

F.    <u>Electronic Issuance of Real Estate Securities</u>.  If PeerStreet accepts your investment commitment and the corresponding Series successfully closes, PeerStreet will, as soon as practicable, electronically issue you, through the PeerStreet Platform, one or more Real Estate Securities substantially in the same form as the Form Instrument.  You will not receive a physical instrument for any Real Estate Security.  Instead, any Real Estate Security you have invested in will be visible through your Dashboard on the PeerStreet Website.  There, you can view the number of Real Estate Securities you own, as well as other financial terms and details about the Real Estate Securities.

G.    <u>Your Rescission Rights in the Event of Any Material Change</u>.  The terms and conditions of the Real Estate Securities may change after the corresponding Series closes.  In the event of any material change to the Offering Materials, Transaction Documents or Final Instrument, which change would materially alter the Series' risk profile, PeerStreet will notify you of such changes and you may be provided with an opportunity to rescind your investment commitment by sending a written cancellation notice to PeerStreet within a specified time

period. Changes that PeerStreet does not in good faith believe materially alter the Series' risk profile will be noted on the Listing but will not necessarily provide you with rescission rights.

H.  <u>Indemnification</u>.  You agree to indemnify and hold harmless PeerStreet, its respective partners, managers, officers, directors, principals, members, agents, and each of their respective affiliates (each, a "**Management Party**"), each person or entity that previously was a Management Party, and each other person, if any, who controls, is controlled by, or is under common control with any of the foregoing within the meaning of Section 15 of the Securities Act (each, an "**Indemnified Party**") from and against any and all loss, claim, damage, liability, or expense whatsoever (including reasonable attorneys' fees and disbursements) due to or arising out of or based upon (i) any inaccurate representation or warranty made by you, or breach or failure by you to comply with any covenant or agreement made by you in this Investor Agreement or in any other document furnished by you to any of the foregoing in connection with this transaction, (ii) any action for securities law violations instituted by you that is resolved by judgment against you, or (iii) any action instituted by or on behalf of you against an Indemnified Party that is resolved by judgment against you or in favor of an Indemnified Party.

  i.  *Third Party Beneficiaries.*  Each Indemnified Party that is not a party to this Investor Agreement is an intended third-party beneficiary of this Investor Agreement.  The remedies provided in this section will be cumulative and will not preclude the assertion by any Indemnified Party of any other rights or the seeking of any other remedies against you.

  ii.  *No Waiver.*  Notwithstanding the foregoing, nothing contained in the Transaction Documents will constitute a waiver by you of any of your legal rights under applicable U.S. federal securities laws or any other laws whose applicability is not permitted to be contractually waived.

I.  <u>No Right of First Offer, No Obligation to Offer, and Potential Adverse Selection</u>.  You agree and acknowledge that PeerStreet may offer to sell Real Estate Securities to a number of different counterparties and/or investors, and through programs other than the investment program described in this Investor Agreement. You further agree and acknowledge that you do not have any right of first offer from PeerStreet to any particular Series or Real Estate Security, whether offered through this program or another program. PeerStreet retains the right to decide, in its sole and absolute discretion, to whom it will offer any particular investment opportunity, and PeerStreet is under no obligation to offer any investments to you or anyone else through its Platform. Furthermore, you acknowledge and agree that PeerStreet may first offer a given investment to other investors or investor classes, and may subsequently offer that same investment opportunity on the Platform if the original offerees decide not to invest in (all or part of) the offering. You further acknowledge and agree that PeerStreet will not disclose whether or not a given investment opportunity was first offered to, and/or declined by, other investors or investor classes.

J.  <u>Accounts Generally Not Transferable</u>.  You acknowledge and agree that your investment account on the PeerStreet Platform cannot be transferred, assigned, or otherwise conveyed without PeerStreet's prior approval and that, barring significant extenuating circumstances as determined in PeerStreet's sole and absolute discretion, PeerStreet is unlikely to consent to such transfers. If a material change of circumstances, such as death or incapacitation, legally

impairs your ability to maintain your investment account, PeerStreet may require evidence of satisfactory legal documentation from appropriate parties or authorities prior to providing any third-party access or control of your account.

**6.    Your Representations and Warranties**

You represent, warrant, and covenant, as of the date of this Investor Agreement, that:

A.  Offering Materials Received.  You have received, read and understand all of the Offering Materials (including the Transaction Documents and the risk factors set forth in the PPM and the PPM Supplement(s) for the types of Real Estate Securities in which you seek to invest);

B.  Reliance.  You understand that in making decisions to invest in Real Estate Securities, you rely solely upon the Offering Materials and your independent investigations.  You are not relying and may not rely on any other materials for purposes of making a decision to invest in Real Estate Securities.

C.  Knowledge and Experience.  You have the knowledge and experience in real estate, financial, and business matters that you are capable of evaluating the merits and risks of the Real Estate Securities, are able to incur a complete loss of your investment without impairing your financial condition, are able to bear the economic risk of such investment for an indefinite period of time, and have no need for liquidity of the Real Estate Securities;

D.  Binding Obligation.  By e-signing this Investor Agreement, you agree to all terms and conditions of the Transaction Documents and further agree that the Transaction Documents constitute valid and binding obligations for you, enforceable in accordance with their terms, except as limited by bankruptcy, insolvency, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity;

E.  Legal Compliance.  Neither the execution, delivery, or performance of this Investor Agreement or any other document required to be executed and delivered by you in connection with your investment in an offering of a Series of Real Estate Securities, nor the consummation of any of the transactions contemplated by this Investor Agreement, (A) would violate or conflict with any law, rule, regulation, judgment, order, or decree of any court or other governmental body; (B) will conflict with or result in any breach or default under, permit any party to accelerate any rights under or terminate, or result in the creation of any lien, charge, or encumbrance pursuant to the provision of any material contract, indenture, mortgage, lease, franchise, license, permit authorization, instrument, or agreement of any kind to which you are a party or by which you are bound or to which the your properties or assets are subject; or (C) will require the consent or approval of any person other than consents or approvals that have already been obtained;

F.  Differences with Offering Materials.  You understand that in the event of any differences between the terms set forth in the Transaction Documents and any term sheet, private placement memorandum, or other Offering Materials provided to you prior to signing the e-signature page, the terms and conditions of the Transaction Documents will supersede any different, conflicting, or contrary information set forth in those other materials.

G.  Opportunity to Obtain Additional Information.  You have had an opportunity to (i) ask questions of and receive answers from PeerStreet concerning the terms and conditions of

Offering Materials, Transaction Documents, and the business of PeerStreet and (ii) obtain additional information concerning investments, PeerStreet, and related materials to the extent PeerStreet possesses such information, or can acquire it without unreasonable effort or expense.

H. <u>Good Standing for Entities</u>.  If you are an entity, then (A) you are a corporation or other organization duly incorporated or organized, validly existing, and in good standing under the laws of your state of incorporation or organization and have the requisite power and authority to carry on your business and operations as now being conducted; (B) the execution and delivery of this Investor Agreement and each other document required to be executed and delivered by you in connection with your investment in an offering of a Series of Real Estate Securities, and your performance under those agreements, have been duly authorized by appropriate action; (C) you will deliver to PeerStreet any evidence of the foregoing as PeerStreet may reasonably require, whether by way of certified resolution or otherwise; and (D) the person executing and delivering this Investor Agreement and any other document on behalf of your entity has all requisite power, authority, and capacity to execute and deliver those documents;

I. <u>Placement Agent</u>.  You understand that PeerStreet or a PSI affiliate may engage one or more placement agents in connection with an offering of a Series of Real Estate Securities, and any placement agent may be paid fees for services rendered based on, among other things, the aggregate amount of committed investments in an offering of a Series of Real Estate Securities;

J. **<u>CONTINGENT PAYMENTS</u>.  YOU UNDERSTAND THAT THE REAL ESTATE SECURITIES ARE TIED TO UNDERLYING INVESTMENTS  IN REAL ESTATE AND THAT PAYMENTS OR DISTRIBUTIONS ON THE REAL ESTATE SECURITIES ARE CONTINGENT ON THE PS ISSUER RECEIVING, EITHER DIRECTLY OR INDIRECTLY, PAYMENTS FROM THIRD PARTIES ON THOSE UNDERLYING INVESTMENTS, AND THAT ANY DEFAULT BY THOSE THIRD PARTIES WILL REDUCE, PARTIALLY OR COMPLETELY, ANY AMOUNT YOU MAY RECEIVE UNDER THE TERMS OF ANY REAL ESTATE SECURITY YOU HOLD THAT IS ASSOCIATED WITH THOSE UNDERLYING INVESTMENTS;**

K. <u>No Collection Rights</u>.  You agree that you have no right to, and will not, make any attempt, directly or through any third party, to contact or collect from any party other than the PS Issuer on any Real Estate Security you may receive;

L. <u>Accurate Information</u>.  Any and all information that you have provided to PeerStreet in this Investor Agreement and in setting up your profile on the PeerStreet Website, is current, true, correct, and complete and does not omit to state any material fact necessary in order to make that information not misleading as of the date you e-signed this Investor Agreement and until your investment has been accepted by PeerStreet;

M. <u>Obligation to Update Information</u>.  You agree to give prompt (within 3 days) notice by the method set forth in Section 10(b) of this Investor Agreement if any representations, warranties, or other information provided to PeerStreet in the Transaction Documents or through the Platform are not current, true, correct, and complete in any respect;

N. <u>Arms-Length Transaction</u>.  You agree that investment commitments in offerings of Real Estate Securities are arms-length transactions between you and PeerStreet, and you are solely responsible for consulting your own legal, accounting, regulatory, and tax advisors, to the extent you have deemed appropriate;

O. <u>Transfer Restrictions</u>.  You understand and are aware that (i) there are substantial restrictions on the transferability of the Real Estate Securities, including but not limited to those described in Section 6(q) below, (ii) any transfer made in violation of the transfer restrictions set forth in the Transaction Documents will be void; (iii) there are no public market for the Real Estate Securities; and (iv) there are substantial restrictions on your ability to withdraw from any investment in Real Estate Securities, in addition to the required consent of the PS Issuer, which the PS Issuer may withhold in its sole discretion.  You understand that you may have to hold and bear the economic risk of the Real Estate Securities invested in here indefinitely, and it may not be possible for you to liquidate your investment in Real Estate Securities.

P. <u>Unregistered and Restricted Real Estate Securities</u>.  You have been advised that the Real Estate Securities (i) have not been registered under the Securities Act or under any state securities laws, (ii) cannot be resold unless they are registered under the Securities Act and under applicable state securities laws or an exemption from registration applies, (iii) will not be listed on any securities exchange, and (iv) may never be traded on the PeerStreet Platform. Further, you understand that (v) PeerStreet is under no obligation to effect any registration of the Real Estate Securities, (vi) if trading on the PeerStreet Platform for the Real Estate Securities did occur in the future, any such trading must be conducted in accordance with federal and applicable state securities laws, (vii) you may not be able to liquidate the Real Estate Securities, and (viii) you may need to, and are prepared to, hold your Real Estate Securities for an indefinite period of time.

Q. <u>Distribution Restrictions</u>.  Your investment in an offering of a Series of Real Estate Securities is for your own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution of the Real Estate Securities, and you have no present intention of selling, granting any participation in, or otherwise distributing the Real Estate Securities and have not been formed solely for the purpose of making an investment in a particular offering of a Series of Real Estate Securities;

R. <u>Bad Actor Representation</u>.  You represent that neither (A) you, (B) any directors, executive officers, other officers that may serve as a director or officer of any company in which you invest, general partners or managing members, nor (C) any beneficial owner of any of your company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by you is subject to any of the "bad actor" disqualifications described in <u>Rule 506(d)(1)(i) through (viii)</u> under the Securities Act[1], except for any

---

[1] You are subject to a "**bad actor**" disqualification when you have been convicted within ten years of the date of your signature on the e-signature page of any felony or misdemeanor (i) in connection with the purchase or sale of any security, (ii) involving the making of any false filing with the SEC or (iii) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities; you are subject to any order, judgment or decree of any court of competent jurisdiction entered within five years of the date of your signature on the e-signature page that presently restrains or enjoins you from engaging or continuing to engage in any conduct or practice (i) in connection with the purchase or sale of any security, (ii) involving the making of any false filing with the SEC or (iii) arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor

disqualification events covered by Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed to PeerStreet in accordance with <u>Section 10</u> of this Investor Agreement.

S. <u>Benefit Plan Investor.</u> You may not be able to invest in the Real Estate Securities if you are acting (directly or indirectly) on behalf of an employee benefit plan (within the meaning of Section 3(3) of the Employee Retirement Income Security Act), whether or not the plan is subject to Title I of ERISA; a plan, individual retirement account or other arrangement that is subject to Section 4975 of the Internal Revenue Code ("Code"); a "benefit plan investor" within the meaning of 29 C.F.R. Section 2510.3-101; a "governmental plan" within the meaning of Section 3(32) of ERISA; a person that is deemed to hold "plan assets" under the ERISA plan assets regulations, and consequently subject to regulation under ERISA; or an entity with 25% or more of the value of any class of equity of which is held by entities described above; provided that for purposes of making the determination, the value of any equity interest held by a person (other than an entity described in the beginning of this item) who has discretionary authority or control with respect to the assets of the entity or a person who provides investment advice for a fee (direct or indirect) with respect to those assets, or any affiliate of that person, will be disregarded.[2]

T. <u>Investment Company Act Matters.</u> Neither PeerStreet nor any PS affiliate is registered as an investment company under the Investment Company Act, and, thus, you will not be afforded the full set of protections provided under the Investment Company Act.

---

of purchasers of securities; you are subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that (i) as of the date of my signature on the e-signature page, bars you from (A) association with an entity regulated by one of these commissions, authorities, agencies or officers, (B) engaging in the business of securities, insurance or banking or (C) engaging in savings association or credit union activities, or (ii) constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative or deceptive conduct entered within ten years of the date of my signature on the e-signature page; you are subject to any order of the SEC pursuant to Section 15(b) or 15B(c) of the Exchange Act or Section 203(e) or (f) of the Advisers Act that as of the date of my signature on the e-signature page (i) suspends or revokes my registration as a broker, dealer, municipal securities dealer or investment adviser, (ii) places limitations on my activities, functions or operations or (iii) bars you from being associated with any entity or from participating in this offering of any penny stock; you are subject to any order of the SEC entered within five years of the date of your signature on the e-signature page that presently orders you to cease and desist from committing or causing a violation or future violation of (i) any scienter-based anti-fraud provision of the federal securities laws or (ii) Section 5 of the Securities Act; you are as of the date of my signature on the e-signature page, suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade; you have filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the SEC that, within five years of the date of my signature on the e-signature page, was the subject of a refusal order, stop order or order suspending the Regulation A exemption, or is presently the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or you are subject to a United States Postal Service false representation order entered within five years of the date of my signature on the e-signature page or presently subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representation

[2] Based on this definition, an insurance company using general account assets may be deemed to include the assets of a benefit plan investor, pursuant to Section 401(c) of ERISA. For example, plans that are maintained by a foreign corporation, a governmental entity or a church are employee benefit plans within the meaning of Section 3(3) of ERISA but generally are not subject to Title I of ERISA or Section 4975 of the Code.

U. <u>Office of Foreign Assets Exchange Act Matters</u>.  PeerStreet is not registered as a broker-dealer with the Securities and Exchange Commission (the "SEC") or the Financial Industry Regulatory Authority in accordance with the Exchange Act or any other state or foreign securities commission, regulator or agency, and, thus, you will not be afforded the full set of protections provided under the Exchange Act or comparable state law.

V. <u>Anti-Money Laundering, Anti-Bribery and Other Sanctions</u>.  Your investment in an offering of a Series of Real Estate Securities is not derived from money laundering or similar activities deemed illegal under U.S. federal laws and regulations and will not cause PeerStreet to violate any applicable U.S. federal or state or non-U.S. laws or regulations regarding, without limitation, anti-money laundering, economic sanctions, anti-bribery or anti-boycott laws or regulations (including, without limitation, those promulgated under the U.S. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Executive Orders administered by the U.S. Department of the Treasury Control, the Bank Secrecy Act of 1970, the Money Laundering Control Act of 1986, the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001 and the Foreign Corrupt Practices Act of 1977); and you understand that the it is PeerStreet's intent to comply with all of these laws in offering Real Estate Securities.  In furtherance of these efforts, you represent, covenant, and agree that, to the best of your knowledge based on reasonable investigation:

    i. <u>Due Diligence</u>.  If you are an entity, you (A) have conducted due diligence with respect to all of your beneficial owners; (B) have established the identities of all direct and indirect beneficial owners and confirmed that each beneficial owner's funds derives from activity that is legal under applicable law; and (C) will retain evidence of those identities, source of funds and due diligence.  You understand that, pursuant to anti-money laundering laws and regulations, PeerStreet may be required to collect documentation verifying your identity and the source of funds used to acquire a Real Estate Security before, and from time to time after, acceptance by PeerStreet, of this Investor Agreement.

    ii. <u>Violation of Law</u>.  You represent, warrant, and agree that no capital commitment, contribution or payment to PeerStreet and no distribution to you will cause the PeerStreet to be in violation of applicable U.S. federal or state or non-U.S. laws or regulations, including, without limitation, anti-money laundering statutes at 18 U.S.C. Sections 1956 and 1957, Sanctions, anti-bribery laws, including the U.S. Foreign Corrupt Practices Act, or anti-boycott laws or regulations.

    iii. <u>Representations</u>.  You understand and agree that PeerStreet may not accept any amounts from you if you cannot make the representations set forth in this section.

W. <u>Tax Concerns</u>.  You (i) understand and have reviewed the tax implications of your investment in the Real Estate Securities as set forth in the PPM and the PPM Supplement for the type of Real Estate Securities you seek to invest in; (ii) agree that you will not take any position inconsistent with PeerStreet's treatment of the Real Estate Securities for tax, accounting, or other purposes, unless required by law; (iii) agree that you are solely responsible for consulting with your own tax advisors regarding the U.S. federal, state, and local and non-U.S. tax consequences of your investment in a Series of Real Estate Securities; (iv) with respect to those matters, are relying solely on your own tax advisors and not on any

statements or representations of PeerStreet or any of its agents, whether written or oral; (v) understand that you (and not PeerStreet) will be responsible for your own tax liability that may arise as a result of your investment in Real Estate Securities as contemplated by this Investor Agreement; and

X.   <u>Additional Tax Concerns</u>.   By executing this Investor Agreement, you understand that (i) PeerStreet may be required to provide the identities of your direct and indirect beneficial owners to a governmental entity, and (ii) you waive any provision of law or regulation of any jurisdiction that would, absent a waiver, prevent PeerStreet from compliance with the foregoing and otherwise with applicable law.   Furthermore, you understand and agree that (A) PeerStreet may be required by applicable law, and is authorized, to withhold or pay a tax to the IRS or other applicable tax authority, (B) any amount of tax so withheld or paid with respect to you will be treated as distributed to you in accordance with the PPM Supplement, and (C) you agree to repay such amount to PeerStreet if required in accordance with the PPM Supplement.

Y.   <u>No Dissemination of Information</u>. You agree that any information made available on, or through, password-protected areas of the Platform is proprietary, related to the sale of restricted securities, and may not be freely transferable at law. You agree not to disseminate, distribute, file, or otherwise provide any content or information obtained from PeerStreet or through the Platform, to any third party who is not an intended recipient of such content or information, except to the extent required by law or unless such disclosures are made confidentially to your attorney, accountant, or other investment professional in connection with your independent investigation of this Agreement or of investment opportunities on the Platform.

**7.   <u>No Advisory Relationship</u>**

PeerStreet is not recommending you invest in any Real Estate Security.   PeerStreet is not acting as your agent, fiduciary, or investment adviser with respect to your investment in any Real Estate Security. PeerStreet assumes no advisory or fiduciary responsibility in your favor in connection with your investment in any Real Estate Security.   It is your sole responsibility to consult with legal, accounting, regulatory or tax advisors in considering investing in an offering of a Series of Real Estate Securities, and PeerStreet will not provide you with any legal, accounting, regulatory or tax advice with respect to any Series of Real Estate Securities.

Further, PeerStreet (A) is not registered with the SEC as an investment adviser under the Advisers Act or with any other state or foreign securities commission, regulator or agency in any similar capacity and (B) is not notice filed as an "exempt reporting adviser" with the SEC or any state or foreign securities commission, regulator or agency; and, thus, you will not be afforded the full set of protections provided to clients of registered investment advisers under the Advisers Act or comparable state law.

**8.   <u>Limitations on Damages</u>**

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES, EVEN IF INFORMED OF THE POSSIBILITY OF THOSE DAMAGES.   FURTHERMORE, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY TO THE OTHER REGARDING THE EFFECT

THAT THIS INVESTOR AGREEMENT MAY HAVE UPON THE FOREIGN, FEDERAL, STATE, OR LOCAL TAX LIABILITY OF THE OTHER.

Notwithstanding the foregoing, nothing contained in the Transaction Documents will constitute a waiver by you of any of your legal rights under applicable U.S. federal securities laws or any other laws whose applicability is not permitted to be contractually waived.

**9.    Further Assurances**

You agree to promptly submit to PeerStreet any further assurances and to, without further consideration, prepare, execute, acknowledge, file, record, publish, and deliver any other instruments, documents, and statements and to take any other actions as PeerStreet may determine to be necessary or appropriate to effectuate and carry out the purposes of this Investor Agreement (including with respect to, among other things, your eligibility to invest in an offering of a Series of Real Estate Securities or as may be required by the federal or state securities administrators or regulators).

**10.   Notices**

A. Communications from PeerStreet. PeerStreet or any third party service provider selected by PeerStreet under its authority as set forth in the Transaction Documents may provide you (or your designated agents) statements, reports, and all other communications relating to (i) your investment in Real Estate Securities, (ii) the terms of the Real Estate Securities, and (iii) your account on PeerStreet, including but not limited to, your account information, investment activity, tax reports, and other updates to PeerStreet's policies and procedures in electronic form through the Dashboard or elsewhere on the Platform, including without limitation the Listing, or attached to an email sent to the email address provided by you.

You agree that all communications provided to you by email or through the Dashboard will be deemed to have been good and effective delivery to you when sent or posted, regardless of whether you actually or timely receive or access the email notification. Email messages are not secure and may contain computer viruses, or other defects, may not be accurately replicated on other systems, or may be intercepted, deleted or interfered with without the knowledge of the sender or the intended recipient.

PeerStreet and any third party service provider reserves the right to intercept, monitor, and retain email messages to and from its systems as permitted by applicable law. You agree that you will be solely responsible for notifying PeerStreet in writing of any change in your email address and that the Fund may not seek to verify or confirm your email address as provided.

B. Communications to PeerStreet. Unless otherwise described in the Offering Materials or the PPM or PPM Supplement, notices by you will be in writing and will be deemed to have been good and effective delivery if delivered in person or by any other method which results in evidence of receipt, including registered mail, electronic delivery, or overnight delivery service to PeerStreet at the following address (including e-mail address), or at any other addresses as PeerStreet may specify by notice in accordance with this section.

Peer Street, Inc.
2121 Park Pl, Suite 250
El Segundo, CA 90245

investor-relations@peerstreet.com
844-733-7787

## 11.  Entire Agreement

The Transaction Documents constitute and contain the entire agreement between you and PeerStreet and supersede any and all prior agreements, negotiations, correspondence, understandings, and communications between the parties, whether written or oral, respecting the subject matter of this Investor Agreement and the other Transaction Documents.

In addition to the terms of the Transaction Documents, you are bound to the terms of each other agreement to which you agree as a user of the PeerStreet Platform, including without limitation, each of the terms of the Terms of Use and the Privacy Policy.

## 12.  Duration and Termination

This Investor Agreement will continue in full force and effect with respect to each investment you make in a Series of Real Estate Securities until the final payment is made on the applicable Real Estate Securities and the Final Instrument for that Series is terminated by the mechanism described in the Final Instrument; *provided that* PeerStreet may terminate this Investor Agreement, and/or rescind any investment you make in a Real Estate Security, at any time in order to comply with applicable law or for any other reason at its discretion.

## 13.  Survival

Sections 5, 8, 10, 15, 16, 18, 19, 20, 22, 23 and 24 will survive the termination of this Investor Agreement.

## 14.  No Waiver

Any waiver of a breach of any provision of the Transaction Documents will not be a waiver of any subsequent breach.  Failure or delay by either party to enforce any term or condition of this Investor Agreement will not constitute a waiver of such term or condition.

## 15.  Governing Law

This Investor Agreement will be governed by the laws of the Delaware without regard to any principle of conflict of laws that would require or permit the application of the laws of any other jurisdiction.

## 16.  Severability

If at any time after the effective date of this Investor Agreement any of the provisions of the Transaction Documents, are held by any court of competent jurisdiction to be illegal, void, or unenforceable, that provision will be of no force and effect, but the illegality and unenforceability of that provision will have no effect upon and will not impair the enforceability of any other provisions of the Transaction Documents.

**17. Assignment**

You may not assign, transfer, sublicense, or otherwise delegate your rights or responsibilities under this Investor Agreement to any person without PeerStreet's prior written consent. Any assignment, transfer, sublicense, or delegation in violation of this section will be null and void.

**18. Headings**

The headings and sub-headings in this Investor Agreement are for reference purposes only and will not affect the interpretation of this Investor Agreement in any way.

**19. No Third-Party Beneficiaries**

Except for PSI affiliates and each Indemnified Party, the parties agree that there are no intended third-party beneficiaries of this Investor Agreement.

**20. Confidential Information**

You agree that the Transaction Documents and all information, and other materials related to the Transaction Documents, PeerStreet, or the PeerStreet Platform (collectively, the "**Confidential Information**") that you may receive pursuant to or in accordance with the Offering Materials, the Transaction Documents, or otherwise as a result of owning any Real Estate Security sold under this Investor Agreement constitute proprietary and confidential information about PeerStreet and cannot be disclosed, distributed, disseminated, or expropriated without the prior written consent of PeerStreet, except as provided below and otherwise in the Transaction Documents.

You understand that PeerStreet derives independent economic value from the Confidential Information not being generally known and that the Confidential Information is the subject of reasonable efforts to maintain its secrecy.

You further understand that the Confidential Information is a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to PeerStreet and their respective businesses.

You will not reproduce any of the Confidential Information or portion of the Confidential Information or make the contents available to any third party other than a disclosure on a need-to-know basis to your legal, accounting, or investment advisers, auditors and representatives (collectively, "**Advisors**") without the prior consent of PeerStreet, except to the extent compelled to do so in accordance with applicable law (in which case you will, to the fullest extent permitted by law, promptly notify PeerStreet of your obligation to disclose any Confidential Information) or with respect to Confidential Information that otherwise becomes publicly available other than through breach of this provision by you.

You agree to notify your Advisers about their obligations in connection with Confidential Information and will further cause its Advisers to abide by the aforesaid provisions relating to Confidential Information.

**21. No Relationship with Borrower or Interest in Underlying Investments**

You agree and acknowledge that you do not have privity of contract or any other legal relationship with any third party that provides services with respect to the Real Estate Securities in which you invest, or is otherwise directly or indirectly related to or involved with the Underlying Investments, and that you have no right of recourse to any such third party, including without limitation any borrower, servicer, or lender

partner of PeerStreet. You also agree and acknowledge that you do not have any direct interest in the Underlying Investments, and that, unless explicitly provided otherwise, you do not have any voting rights and/or decision-making authority beyond your decision to invest or not invest in the Real Estate Securities. Without limiting the generality of the foregoing, any borrower or lender partner who receives a loan or funds from PeerStreet has a legal relationship with PeerStreet only and obligations only to us. Although payments on your Real Estate Securities depend on the performance of the Underlying Investments, you do not own any direct, secured, and/or recorded interest in the Underlying Investment itself. PeerStreet is the only entity you have a legal relationship with in relation to the Real Estate Securities or the Underlying Investments and is the only entity with which you have any contractual privity.

PeerStreet reserves the right not to share, disclose, release, or otherwise distribute any loan documentation and collateral, or any borrower, lender or other third party information, beyond that information made available on the Platform. You agree that you have no right to, and shall not, make any attempt, directly or through any third party, to collect from a borrower or lender partner on your Real Estate Securities or to contact any third party – including, without limitation, any lender, borrower or servicer besides PeerStreet – involved with your Real Estate Securities or the Underlying Investments at all, for any reason, including without limitation for collection efforts.

If an Underlying Investment is held by or transferred to a PS Issuer (or affiliated entity), the holding entity alone shall have an interest in the Underlying Investment.  If an Underlying Investment is transferred to a PS Issuer due to default or similar circumstances, distributions to you, if any, will be dependent on (i) the PS Issuer's ability to sell the Underlying Investment and recover any fees, costs, and charges due to it and/or third-parties, and (ii) the other terms provided for in the Transaction Documents. PeerStreet reserves the right not to disclose specific, itemized, or otherwise cataloged financial information regarding the management of an Underlying Investment.

## 22.  Arbitration; Class Action Waiver

A. This section 22 (the "**Arbitration Provision**") shall be the sole and exclusive forum and remedy for resolution of any past, present, or future claim, dispute, or controversy (each, a "**Claim**") involving you (or persons claiming through or connected with you), on the one hand, and PeerStreet (or persons claiming through or connected with PeerStreet), on the other hand, relating to or arising out of any of the Offering Materials, the PeerStreet Platform, or the activities or relationships that involve, lead to, or result from any of the foregoing, including the validity or enforceability of any part of this Arbitration Provision, any part thereof, or this entire Investor Agreement will be final and binding arbitration. Claims are subject to this Arbitration Provision regardless of whether they arise from contract; tort (intentional or otherwise); a constitution, statute, common law, or principles of equity; or otherwise. Claims include matters arising as initial claims, counter-claims, cross-claims, third-party claims, or otherwise. The scope of this Arbitration Provision is to be given the broadest possible interpretation that is enforceable.

B. Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association, and judgment upon an award arising in connection therewith may be entered in any court of competent jurisdiction.

C. Any arbitration, mediation, court action, or other adjudicative proceeding arising out of or relating to this Agreement shall be held in the Central District of California and/or Los Angeles

County, CA, or, if such proceeding cannot be lawfully held in such location, as near thereto as applicable law permits.

D.  The prevailing party or parties in any arbitration, mediation, court action, or other adjudicative proceeding arising out of or relating to this Agreement shall be reimbursed by the party or parties who do not prevail for their reasonable attorneys, accountants and experts fees (including reasonable charges for in-house legal counsel and related personnel) and for the costs of such proceeding.

**THE PARTIES ACKNOWLEDGE THAT THEY HAVE A RIGHT TO LITIGATE CLAIMS THROUGH A COURT BEFORE A JUDGE, BUT WILL NOT HAVE THAT RIGHT IF ANY PARTY ELECTS ARBITRATION PURSUANT TO THIS ARBITRATION PROVISION.  THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THEIR RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT UPON ELECTION OF ARBITRATION BY ANY PARTY.**

## 23.  Venue

Each of the parties submits to the non-exclusive jurisdiction of the federal and state courts located in the Central District of California in Los Angeles County, California, and each waives any right of immunity to (a) the jurisdiction of any such court, (b) relief by way of injunction, (c) attachment of assets (whether before or after judgment), or (d) execution or enforcement of a judgment of any such courts in a proceeding in the courts of any other jurisdiction.

## 24.  Waiver of Jury Trial

YOU WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION PROCEEDING RELATING TO THIS INVESTOR AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE REAL ESTATE SECURITIES AND ANY OTHER RELATED AGREEMENTS OR DISPUTES.

## 25.  Fraud Prevention

In order to protect investor funds and prevent fraudulent activity, PeerStreet reserves the right to implement certain controls to verify the identity of users on the Platform. For example, and without limitation, PeerStreet may require you to provide current bank account details prior to permitting you to change bank accounts, and/or funds deposited from a given bank account may not be eligible to be withdrawn to a different bank account until sixty (60) days have passed from the initial deposit date.

## 26.  Release of Third-Parties' Liability

Information and reports prepared by third-party vendors may be made available for your review by PeerStreet, either on the Platform or elsewhere. You understand that these third-parties do not have any obligations or make any representations or warranties to you, and that you do not have, and will not seek, any claims or recourse against any third-party providing information on the Platform or services relating to the operation of the Platform or management of the investments. PeerStreet may have recourse against such parties and may elect to pursue such recourse in certain circumstances, but these rights do not flow to Investors. This provision notwithstanding, if a court or other proper authority were to deem that you have recourse against such third-parties, you acknowledge that these third-parties would not agree to provide services or information to PeerStreet, the Platform, and/or investors, without obtaining satisfactory releases of liability. Accordingly, you hereby agree to release, waive, and discharge these

third parties (including their directors, officers, shareholders, employees, agents, and other related individuals or entities) of any liability, claims, or damages relating to your use of the Platform and investment activities with PeerStreet. You further acknowledge and agree that you shall not disseminate, distribute, or otherwise provide such work product to third-parties, and that you will hold these third-parties harmless for any claims, damages, or liabilities alleged or resulting from your breach of this agreement.

# E-SIGNATURE PAGE

☐ By checking the "I Agree" and/or "Submit" buttons, I agree to comply with and be bound by all terms of this Investment Agreement, the other Transaction Documents (each of which is available here), the Terms of Use (available here) and the Privacy Policy (available here).

**EXHIBIT 12**

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
FOR OFFERINGS OF REAL ESTATE SECURITIES THROUGH THE

# PeerStreet Platform

A Real Estate Investment Platform Sponsored by
Peer Street, Inc. ("**PSI**") and its affiliates (collectively, "**PeerStreet**")

## SUMMARY OF THE OFFERINGS

Effective as of: December 2, 2019

---

**Please note the following:**

- This master private placement memorandum ("**PPM**") covers several types of Real Estate Securities that may be sponsored by PeerStreet and offered by PS Issuer in multiple offerings.

- All Real Estate Securities are being offered through www.PeerStreet.com, an online investment platform owned and operated by PSI.

- Before investing in any Real Estate Securities offered under this PPM, you should carefully review this PPM and the following materials on www.PeerStreet.com (collectively, the "**Offering Materials**"):

  o The supplement to this PPM for specific information and risks about the type of Real Estate Securities being offered ("**PPM Supplement**");

  o The listing of terms for the specific offering of Real Estate Securities ("**Listing**");

  o The form of instrument describing the terms of the specific real estate security being offered ("**Form Instrument**"); and

  o The investor agreement providing the terms and conditions of your investment commitment in one or more Real Estate Securities being offered ("**Investor Agreement**").

- PeerStreet reserves the right to withdraw any offering under this PPM and to accept or reject any investment in whole or in part at its discretion.

**Important Terms:**

Issuer of Real Estate Securities ("PS Issuer")

- Will be the PeerStreet entity identified on the PPM Supplement and Listing for each specific offering of Real Estate Securities;

- May periodically and privately offer, sell and issue certain Real Estate Securities in one or more Series and one or more offerings; and

- Will indirectly or directly own the right to receive payments from one or more underlying investments related to the Real Estate Securities.

Real Estate Securities

- May be debt or equity securities issued by a PS Issuer, in noncertificated form;

- Will be dependent on one or more underlying real estate investments that may be originated, purchased or co-invested in by PeerStreet, as described in this PPM; and

- Will entitle Investors to receive certain payments or distributions conditioned on PS Issuer receiving payments, directly or indirectly, on the underlying investments, net of any applicable fees and expenses.

Investors in Real Estate Securities

- Must be U.S. persons; and

- Must be accredited investors.

**THIS SUMMARY IS A SUMMARY AND DOES NOT COVER ALL THE INFORMATION YOU NEED TO KNOW BEFORE YOU INVEST. YOU ARE RESPONSIBLE FOR REVIEWING AND UNDERSTANDING ALL OF THE OTHER INFORMATION RELEVANT TO YOUR INVESTMENT IN REAL ESTATE SECURITIES PRIOR TO INVESTING.**

You should make your own decision as to whether any offering of Real Estate Securities under this PPM meets your investment objectives and risk tolerance level.  Any offering of Real Estate Securities under this PPM is highly speculative, and the Real Estate Securities offered through it involve a high degree of risk that may not be suitable for you.  The Real Estate Securities will not be insured by PeerStreet or any governmental agency or other third party.  You should only invest in the Real Estate Securities if you can afford the loss of your entire investment.

Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has reviewed, approved, disapproved, endorsed or recommended any offering of Real Estate Securities under this PPM.  Neither the SEC nor any state securities commission has confirmed the accuracy or truthfulness of this PPM or any of the other Offering Materials, nor whether they are complete.  Any representation to the contrary is illegal.

The Real Estate Securities are being offered in reliance on an exemption from registration with the SEC provided by Rule 506(b) of Regulation D under the Securities Act of 1933 (the "Securities Act").  This PPM is written for Rule 506(b) only.  The Real Estate Securities have not been qualified or registered federally or in any state, in reliance on exemptions under federal and state law.

The Real Estate Securities are "restricted securities" and may not be resold or otherwise disposed of unless a registration statement under the Securities Act covering disposition of the Real Estate Securities is then in effect or an exemption for the transfers is available.  Accordingly, the Real Estate Securities are subject to restrictions on transferability and resale and may not be transferred or resold without PeerStreet's prior written consent, and only then as permitted under the Securities Act and applicable state securities laws.

There is no public market for the Real Estate Securities, and none is expected to develop in the future.  The Real Estate Securities offered through this PPM and the other Offering Materials should be purchased only by investors who have no need for liquidity in their investment, as investors will have to bear the financial risks of an investment in the Real Estate Securities for an indefinite period of time.

No person has been authorized by PeerStreet in connection with any offering of Real Estate Securities under this PPM to give information or to make any representations other than those contained in the Offering Materials.  You should not rely on information you have received or any representations that have been made to you that are not contained in the Offering Materials.

The discussion contained in this PPM and the other Offering Materials has been prepared solely for the benefit of and is directed solely to prospective investors that are U.S. persons and accredited investors.  PeerStreet is not making an offer to sell Real Estate Securities in any jurisdiction where it is unlawful, in any jurisdiction where the person making the offer is not qualified to make an offer or sell them, or to any person who cannot legally be offered the Real Estate Securities.

The Offering Materials contain confidential information and may not be provided to anyone other than authorized persons, such as accountants, financial planners or attorneys retained by you for the purpose of rendering professional advice related to the purchase of Real Estate Securities offered under this PPM.  This PPM may not be reproduced, divulged or used for any other purpose without PeerStreet's prior written consent.

PRIVILEGED & CONFIDENTIAL

**You should not regard the contents of this PPM or any other communication from PeerStreet as a substitute for careful and independent tax and financial planning.  You are encouraged to consult with your own independent accountants, financial planners, attorneys and other professionals with respect to the legal and tax aspects of an investment in the Real Estate Securities with specific reference to your own tax situation before investing in any offering of Real Estate Securities under this PPM.**

**The statements and descriptions in this PPM regarding terms and provisions of the other Offering Materials and any Real Estate Securities are summaries, do not purport to be complete and are subject to, and qualified in their entirety by reference to, all of the terms and provisions of the other Offering Materials. All of the Offering Materials are available on the Listing and at https://www.peerstreet.com/agreements.  The specific terms and provisions of the applicable Listing and Form Instrument for Real Estate Securities issued to you, not any summaries of those terms and provisions in this PPM, will govern your rights as an investor in those Real Estate Securities.**

**This PPM contains forward-looking statements that involve substantial risks and uncertainties.  All statements, other than statements of historical facts, included in this PPM or any other Offering Materials are forward-looking statements.  The words "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "predict," "project," "will," "would" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words.**

**PeerStreet may not actually achieve its plans, intentions or expectations disclosed in forward-looking statements, and you should not place undue reliance on forward-looking statements.  Actual results or events could differ materially from plans, intentions and expectations disclosed in forward-looking statements, and PeerStreet does not assume any obligation to update any statements in this PPM or any of the other Offering Materials, whether as a result of new information, future events or otherwise, except as required by law.  Any forward-looking statements contained in this PPM or any of the other Offering Materials should be considered with these risks and uncertainties in mind.**

**PeerStreet has included important factors in the cautionary statements included in this PPM— particularly in the "General Risk Factors" section of this PPM and the description of risk factors in the PPM Supplements for each type of real estate security offered under this PPM—that could cause actual results or events to differ materially from forward-looking statements contained in this PPM.  Forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments that PeerStreet may make.**

---

[Remainder of page intentionally left blank]

PRIVILEGED & CONFIDENTIAL

# TABLE OF CONTENTS

**SUMMARY OF THE OFFERINGS** ...........................................................................I

**TABLE OF CONTENTS** ....................................................................................IV

**GENERAL INFORMATION** ............................................................................. 1

1.   About this Master PPM .......................................................................1
2.   About the Real Estate Securities We May Offer .............................................3
3.   About PeerStreet and the PeerStreet Platform ...............................................5
4.   Restrictions on Transfers .....................................................................6
5.   Investor Qualifications ........................................................................6
6.   ERISA Considerations .........................................................................6
7.   Investment Process and Plan of Distribution ................................................7
8.   Real Estate Securities Are Noncertificated Interests ......................................10
9.   General Risk Factors ..........................................................................10
10.  Conflicts of Interest ...........................................................................28
11.  Where to Find Additional Information ......................................................30

**PPM SUPPLEMENT: MORTGAGE-PAYMENT-DEPENDENT NOTES ("MPDN")** ....... 1

1.   About this PPM Supplement ..................................................................1
2.   About the MPDNs We May Offer ............................................................2
3.   Summary of Terms .............................................................................3
4.   Our Diligence Process .........................................................................10
5.   Risk Factors Related to MPDNs ..............................................................10
6.   Material U.S. Federal Income Tax Considerations .........................................18

PRIVILEGED & CONFIDENTIAL

# FOR OFFERINGS OF REAL ESTATE SECURITIES THROUGH THE

# PeerStreet Platform

## GENERAL INFORMATION

---

**1.** **About this Master PPM**

This PPM describes the terms by which a PS Issuer may issue Real Estate Securities in multiple offerings at prices and on terms that will be determined at the time of the applicable offering.  The Real Estate Securities will:

- Either be debt or equity securities;

- Be dependent, directly or indirectly, on one or more Underlying Investments in real estate, real estate loans or other real estate investments that may be originated, purchased or co-invested in by PeerStreet; and

- Entitle Investors in Real Estate Securities to receive certain payments or distributions conditioned on PS Issuer either indirectly or directly receiving payments from the Underlying Investments, net of any applicable fees and expenses.

In addition to this PPM, each time we offer to sell Real Estate Securities, we will provide the following other Offering Materials:

- The Listing on the PeerStreet Platform setting forth information about the specific Series (as defined below) of Real Estate Securities;

- The Form Instrument setting forth the terms of each real estate security being offered, which will be provided on the Listing;

- The Investor Agreement (and Investor Agreement Supplements, if any) setting forth the additional terms and conditions of your investment commitment in Real Estate Securities being offered, which is available on the PeerStreet Platform at **https://www.peerstreet.com/agreements**; and

- The PPM Supplement setting forth information and risks about the specific type of Real Estate Securities being offered in the Listing, which will be provided on the Listing.

The general terms and provisions described in this PPM apply to all offerings of different Series of Real Estate Securities, but the PPM Supplement, the Listing and the Form Instrument may add, update or change information contained in this PPM.  You should carefully read this PPM and all of the other Offering Materials before you make your investment decision.

In this PPM, unless otherwise specified or required by context, we use the following terms:

- "**Borrower**" is any third-party borrower to whom a third-party lender or PeerStreet loans funds.

PRIVILEGED & CONFIDENTIAL

- "**Dashboard**" is a personalized, password-protected portion of the PeerStreet Website unique to each Investor that allows that Investor to, among other things, view Real Estate Securities that they invested in.

- "**Final Instrument**" is the final document you will receive, through the Platform, evidencing your ownership of a Real Estate Security, if your Investment Commitment Amount has been accepted by PeerStreet and the other conditions of this Investor Agreement have been met. The Final Instrument will (i) set forth the specific terms that apply to the Real Estate Security, (ii) be substantially similar to the Form Instrument, and (iii) be subject to the limitations set forth in this Transaction Documents.  If there is a conflict between the terms of the Final Instrument and the Form Instrument or any other Offering Materials, the Final Instrument shall prevail.

-  "**Form Instrument**" is the form template of the Final Instrument that sets forth the specific terms that are intended to apply to the particular Series of Real Estate Securities being offered.

- "**Investor Agreement**" is the investor agreement for purchases of Real Estate Securities, which you must agree to in order to commit to invest in any Series of Real Estate Securities under this PPM.

- "**Investors**" are holders of Real Estate Securities offered pursuant to this PPM.

- "**Lender**" is any third-party or PeerStreet affiliated lender, broker, or real estate company that requests funding for Underlying Investments through offerings of Real Estate Securities.

- "**Listing**" is the listing on a webpage of the PeerStreet Website that sets forth the particular terms that apply to a Series of Real Estate Securities being offered under this PPM.

- "**Offering Materials**" refers collectively to the Listing, this PPM, the relevant PPM Supplement, and the Transaction Documents for the Real Estate Securities being offered under this PPM.

- "**PeerStreet**" or "**we**" refers collectively to PSFLLC, PSI, PSFI and any PSI affiliate.

- "**PeerStreet Platform**" or "**Platform**" is the investing platform sponsored by PeerStreet that is described in the PPM.

- "**PeerStreet Website**" is the http://www.peerstreet.com website, domain name, and other related applications, owned and operated by PSI and is the mechanism through which the PeerStreet Platform operates.

- "**PPM**" is this private placement memorandum for offerings of Real Estate Securities through the PeerStreet Platform.

- "**PPM Supplement**" is the section of this PPM that sets forth the terms and conditions of the specific type of Real Estate Securities being offered under this PPM and describes the specific risk factors that apply to those Real Estate Securities.

- "**PSI**" is Peer Street, Inc., a Delaware corporation.

- "**PSI affiliate**" is any affiliate of PSI, PSFLLC or PSFI.

PRIVILEGED & CONFIDENTIAL

- "**PS Issuer**" is the issuer of the particular Series of Real Estate Securities being offered in any given offering under this PPM. The PS Issuer will be named in the Final Instrument, PPM Supplement and Listing for that specific Series.

- "**PSFI**" is PS Funding, Inc., a Delaware corporation, or another similar PSI affiliate that may hold legal title to investments and enter into participation agreements with a PS Issuer.

- "**PSFLLC**" is Peer Street Funding, LLC, a Delaware limited liability company.

- "**Real Estate Securities**" are the specific real estate-related securities being offered by PS Issuer in a Series as set forth on the applicable Listing. The Real Estate Securities will, subject to the terms and conditions of the Transaction Documents, entitle Investors to receive certain payments or distributions that are either indirectly or directly tied to one or more Underlying Investments.

- "**Series**" are specific Real Estate Securities associated with a particular Underlying Investment, offered in the same offering and with the same terms, which represent a portion or all of the Real Estate Securities to be issued in connection with any given Underlying Investment. A Series may be any type of debt or equity covered by this PPM and its PPM Supplements, and the specific terms of a Series will be provided in a Listing. The terms of a Series may differ from that of other Series issued in connection with a common Underlying Investment.

a. "**Transaction Documents**" refers collectively to the Investor Agreement, the Final Instrument, and any other contracts or other agreements you agree to in connection with investing in Real Estate Securities being offered under the terms of this Investor Agreement. If there is a conflict between the Transaction Documents and any other document, the Transaction Documents will prevail.

- "**Underlying Investment(s)**" are generally real estate loans, equity investments, or other investments related to real estate that are each associated with one or more specific Series of Real Estate Securities. Investors in Real Estate Securities will be entitled to receive certain payments or distributions generally based on the underlying investments' performance, as described in the Offering Materials tied to those underlying investments.

Investing in Real Estate Securities involves certain risks. Before deciding to invest in the Real Estate Securities offered under this PPM, you should carefully read and consider the general risks set forth in the "General Risk Factors" section of this PPM and the specific risks that apply to the type of Real Estate Securities being offered as set forth in the PPM Supplement for that type of Real Estate Securities. PeerStreet makes all PPM Supplements available on the PeerStreet Website here: **https://www.peerstreet.com/agreements**.

## 2. <u>About the Real Estate Securities We May Offer</u>

PeerStreet sponsors an online marketplace where investors can view, analyze, and elect to invest in various real estate investments. Through the PeerStreet Platform, investors can invest in certain Real Estate Securities that may have been historically difficult for them to invest in, and lenders, borrowers (such as sponsors of real estate projects), and other actors in the real estate industry can access capital that may have been historically difficult for them to access.

For investors, the PeerStreet Platform enables them to invest from their desktop or mobile computing device and provides them with easy access to the possibility of attractive risk-adjusted returns on Real Estate Securities all offered and issued electronically. By aggregating funds from multiple investors, the

PRIVILEGED & CONFIDENTIAL

PeerStreet Platform allows investors to invest smaller amounts in multiple Series and, thus, more easily diversify their investment portfolio across a greater number of investment opportunities. For borrowers, lenders, and real estate companies, the PeerStreet Platform allows them to possibly find lower rates, better terms, and/or a more efficient funding process compared to those provided by traditional sources.

PeerStreet works with lenders, brokers, borrowers and other actors in the real estate industry to provide new investment opportunities to investors using the PeerStreet Platform. These opportunities may include Real Estate Securities tied to, among other things, a specific mortgage loan, a line of credit that PeerStreet extends to a lender, or a fund investing in real estate opportunities.

PeerStreet will initially evaluate whether or not to list an investment opportunity on the PeerStreet Platform based on its evaluation of the features and risk factors associated with the Underlying Investments and the lenders, borrowers or other key persons sponsoring the Underlying Investments. PeerStreet may, in some cases, structure proprietary investment vehicles (such as funds) that pool Underlying Investments. In other cases, a Real Estate Security offered through the PeerStreet Platform will track a single Underlying Investment.

Information about each offering of a Series Real Estate Securities under this PPM will be provided on the PeerStreet Website. Through the PeerStreet Website, investors may:

- Review Listings of various Real Estate Securities issued under this PPM;

- Select specific Listings for Real Estate Securities they are interested in investing in;

- Review Offering Materials relating to the Real Estate Securities being issued;

- Transfer funds to their PeerStreet accounts in order to fund investment commitments;

- Commit to invest in the Series of Real Estate Securities described on a Listing;

- Receive Real Estate Securities in electronic form if their investment commitment is accepted by PeerStreet; and

- Review information about Real Estate Securities they hold on the Dashboard.

Real Estate Securities may be debt securities (such as notes, bonds, lines of credit, debentures, collateral assignments of membership interests, or other evidences of indebtedness) or equity securities (such as equity interests in limited partnerships, limited liability companies, corporations or similar entities) and will be issued by the PS Issuer.

PeerStreet will provide the terms of each investment opportunity on the PeerStreet Platform through Listings made available on the PeerStreet Website. The terms of each Underlying Investment associated with an issuance of Real Estate Securities will be described in the applicable Listing, PPM Supplement and Form Instrument for that specific Series of Real Estate Securities. Investors should also carefully review the Investor Agreement.

After investing in Real Estate Securities through the PeerStreet Platform, Investors may receive reports on their investments through their Dashboard. Such reports, if any, would typically include the investment payment status and other updates that PeerStreet deems pertinent or material, such as third-party opinions of value, descriptions of comparable properties, and other information.

PRIVILEGED & CONFIDENTIAL

The Listing will generally include some of the following types of information:

- *For Real Estate Securities that are primarily debt-related securities*, a description of the type of debt security being offered, the aggregate principal amount, the maturity date, the interest rate, and/or other similar terms.

- *For Real Estate Securities that are primarily equity-related securities*, a description of economic rights associated with the type of equity security being offered, minimum commitment amount, distributions, the timing of distributions and other similar terms.

As noted above, different PeerStreet entities may issue a particular type or Series of Real Estate Securities. The PeerStreet entity that is the PS Issuer in any given Series will also be named on the Listing for a Series, the relevant PPM Supplement, and the corresponding Form Instrument and may change from Series to Series. **You should carefully review the Listing for the specific Series of Real Estate Securities that you are considering investing in, any corresponding PPM Supplement, and the Investor Agreement.**

The aggregate amount of Real Estate Securities that may be issued under this PPM is indefinite. Each Series will have a minimum investment commitment amount indicated on the Listing for that Series. Unless otherwise stated in the applicable Listing, PS Issuer may issue additional Real Estate Securities relating to a specific Underlying Investment without the consent of the Investors in any Real Estate Securities outstanding at the time of issuance.

**3.    About PeerStreet and the PeerStreet Platform**

PeerStreet has been operating the PeerStreet Platform since the end of 2014. For investors that have confirmed their eligibility to invest in offerings of Real Estate Securities, the PeerStreet Platform contains Listings of various issuances of Real Estate Securities that investors may invest in, along with updated information on the total amounts of investments raised through the PeerStreet Platform and other updated information about PeerStreet and its business activities.

- Headquarters. PeerStreet's headquarters are located at:

      2121 Park Place, Suite 250
      El Segundo, CA 90245

- Financial Information. PSI was formed in December 2013. PSFLLC was formed in July 2014. To date, PSI has incurred business losses and anticipates such losses will continue for the foreseeable future. PeerStreet's operations are currently principally financed by proceeds from the issuance of equity ownership in its business to various venture capital, angel investors, and institutional firms. From time to time, PeerStreet may post (but has no obligation to post) on www.PeerStreet.com pertinent information about its financial condition, business activities and investment results. Investors can review such information, if any, as is posted from time to time by PeerStreet on www.PeerStreet.com.

- Management Team. Information about our management team is available at:
  https://www.peerstreet.com/managementteam

PRIVILEGED & CONFIDENTIAL

**4.    Restrictions on Transfers**

Real Estate Securities issued under this PPM cannot be resold, transferred, exchanged or otherwise disposed of without the PS Issuer's prior written consent, unless the applicable Listing provides otherwise.  PeerStreet may charge Investors in Real Estate Securities a transfer fee in connection with any resale, transfer or other disposition of those Real Estate Securities and will notify Investors in advance of any such fee. The restrictions on transfer include transfers to and from accounts that you control. For example, PeerStreet may not be able, allowed, or willing, to transfer Real Estate Securities from an individual account to a trust account.

**5.    Investor Qualifications**

In order to invest in any Real Estate Securities offered under this PPM, you will be required to provide PeerStreet with information about you in order for PeerStreet to verify your eligibility to invest in any offering under this PPM, and you must electronically sign the Investor Agreement.  PeerStreet will only accept investments in Real Estate Securities from you if you qualify as a "U.S. person" within the meaning of Rule 902(k) under the Securities Act and as an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act.

- The term "U.S. person" generally includes, among other things, a U.S. citizen or permanent resident in the United States or a corporation, partnership, limited liability company or equivalent legal entity organized or incorporated under the laws of any state of the United States.

- The term "accredited investor" generally includes, among other things, a person who has a net worth of at least $1 million (excluding their primary residence) or a person who earned more than $200,000 in income for the last two years (or $300,000 as a married couple).

You should consult your attorney to confirm your qualification as a U.S. person and/or an accredited investor.   You are responsible for providing accurate and complete information regarding your accreditation status, and if you provide PeerStreet inaccurate, incomplete, or misleading information, you may be required to indemnify PeerStreet for any resulting losses or liabilities.

In addition, you will also be required to represent that you are investing in Real Estate Securities offered under this PPM for your own account, for investment purposes and not with a view to resale or distribution.

**6.    ERISA Considerations**

The Employee Retirement Income Security Act of 1974 ("**ERISA**"), and corresponding provisions of the Internal Revenue Code (the "**Code**"), impose certain requirements on pension, profit sharing, and other employee benefit plans to which they apply, including individual retirement accounts and annuities, Keogh plans and other tax-exempt plans ("**Plans**"), and on those persons who are fiduciaries or "parties in interest" with respect to such Plans.  PeerStreet has the right, in its sole discretion, to permit or restrict investments in the Real Estate Securities by "benefit plan investors" as that term is defined by ERISA. PeerStreet presently intends to restrict investments in the Real Estate Securities by benefit plan investors. As a result, it is not expected that any of the Real Estate Securities will be treated as "plan assets" of those benefit plan investors for purposes of the fiduciary responsibility standards and prohibited transaction restrictions of ERISA and the parallel prohibited transaction excise tax provisions of the Code.

PRIVILEGED & CONFIDENTIAL

## 7.  **Investment Process and Plan of Distribution**

PeerStreet will typically make the following available on the PeerStreet Website when making an offering of Real Estate Securities:

- The Investor Agreement;

- This PPM, including the applicable PPM Supplement for the type of Real Estate Securities being offered;

- The applicable Listing for the specific Series of Real Estate Securities; and

- The Form Instrument for the specific terms of each real estate security being offered.

You should carefully review these Offering Materials before deciding to invest in offerings of Real Estate Securities under this PPM.

To commit to invest in your first offering of Real Estate Securities, you must do the following:

- Complete your profile on the PeerStreet Website;

- Complete and electronically sign the Investor Agreement and this PPM;

- Transfer funds to your PeerStreet account in order to fund your investment commitment; and

- Review, acknowledge, and agree to the relevant Offering Materials and other related documentation.

Before investing in a Series of Real Estate Securities, you are strongly advised to review the details of your commitment to invest in that Series, as well as the terms provided in this PPM, the applicable PPM Supplement, the Investor Agreement, and any supplements thereto, if any.  Upon confirming your investment in a specific issuance, you will be legally bound to purchase the Real Estate Securities for the amount you committed to invest. Minimum investment amounts will be listed on the Listing or in a similarly identifiable portion of the Platform related to that issue of Real Estate Securities. PeerStreet may also offer certain programs, features, or special promotions, allowing certain investors to invest a smaller (or greater) amount than the required minimum (or maximum) listed on the Listing.

Please note that PeerStreet may choose, or be contractually bound, not to disclose all available information to you about an Underlying Investment.  We may not provide information about, for example, the name or identity of a lender, borrower or sponsor, or the address of a property.  If PeerStreet chooses to not disclose all available information as a result of an internal business decision, or because we are legally bound to keep that information in confidence, you must make your investment decision based solely on information made available to you on the PeerStreet Website about the Series of Real Estate Securities being offered and the Underlying Investment. Even after you invest in Real Estate Securities, PeerStreet may not share much of the information it gathers with you.  In no case does PeerStreet intend to distribute copies of loan or other similar documents related to an Underlying Investment. PeerStreet also reserves the right not to disclose specific, itemized, or otherwise cataloged financial information regarding the management of a loan or REO property.

We are not responsible for and are not liable for any information provided to you by unaffiliated third parties.

### *Recurring Deposits*

PRIVILEGED & CONFIDENTIAL

PeerStreet may offer you the option of setting up automatic recurring deposits from your bank account into your account on the PeerStreet Platform ("**Recurring Deposits**"). It is not necessary for you to enable Recurring Deposits to invest on the Platform. If you do enable Recurring Deposits, however, PeerStreet and some of its employees will have access to your bank account information and will have the ability to transfer funds to the Platform. PeerStreet will not monitor the availability of funds on an ongoing basis and cannot prevent overdrafts should you request Recurring Deposits in excess of your bank account balance.

### *Automated Investing*

You may decide to enroll in a program that allows you to automatically invest your funds in Real Estate Securities that meet certain investment criteria you provide to PeerStreet or across any Series available on the Platform ("**Automated Investing**"). Automated Investing works on an "opt-in" basis, meaning that you must individually and affirmatively enroll in Automated Investing for your funds to be automatically invested.  You can do this through the Platform at https://www.peerstreet.com/auto_investment.  Once Automated Investing is activated, you will be allocated to Series without any further consents or opt-ins required, through the process described below and more particularly described here https://www.peerstreet.com/auto_investment.

Once you have opted into Automated Investing and set your investment criteria (if any) and investment amount thresholds, PeerStreet will allocate you Real Estate Securities that meet those criteria in accordance with its regular allocation process.  In general, this means that an investment will be allocated to the investors whose criteria it meets that have gone the longest without investing.  PeerStreet will notify you, either via email or on the Platform, when you have been allocated a given Series; if you do not wish to accept the allocated Real Estate Securities, you must actively opt out of the investment by following the instructions provided in the notification, in accordance with the then-prevailing Automated Investing rules and procedures, which shall remain accessible on the Platform.  Activating Automated Investing will not preclude you from also manually selecting investments on the Platform, although funds invested through Automated Investing will not be available to you until the underlying Series pays off, the Property is disposed of, or another similar liquidation event occurs.

By activating Automated Investing, you are deemed to accept, agree, and consent to the related Transaction Documents for each subsequent transaction. If your funds are allocated to a given Series through the process described above, you will not be re-prompted to accept to the Transaction Documents for each Automated Investing investment, but will invest by default unless you tell us otherwise.

Investment minimums and other terms may be different for investments made via Automated Investing versus investments chosen independently by an investor.  For example, Automated Investing may allow you to invest smaller sums than the minimum amount for manual investing.

PeerStreet does not, by allocating investments to you through the Automated Investing program, make any recommendation as to whether the investments are appropriate investments for you or otherwise provide any investment advice to you.  PeerStreet has no liability or responsibility regarding allocations of Real Estate Securities to you through Automated Investing.

You do not need to enable Automated Investing to invest in Real Estate Securities. When you enable Automated Investing, however, you will be required to acknowledge and agree that any funds committed through Automated Investing will not be available for you to withdraw or invest in different Real Estate Securities until the earliest of (i) your timely request to opt-out of a Series or Automated Investing generally, if applicable, (ii) the offering of the Series Real Estate Securities allocated to you being cancelled, and (iii) the applicable Underlying Investment paying off or otherwise being disposed of in

PRIVILEGED & CONFIDENTIAL

accordance with the terms of the applicable Series. The Real Estate Securities you invest in through the Automated Investing feature may differ from the ones you would manually choose on the Platform. The frequency at which investments are made via Automated Investing will vary based on the number of corresponding Real Estate Securities available at any given moment and, if applicable, their match with the criteria you provide. If you enable Automated Investing, you are agreeing to rules and restrictions of this feature as provided in this Agreement and more fully described here. In the event of conflict between this Agreement and the Automated Investing page on the PeerStreet Website, the terms on the PeerStreet Website shall control. Once Automated Investing is activated, you are solely responsible for disabling it, should you no longer want to use this feature.

### *Acceptance*

If PeerStreet accepts your investment, it will notify you that your investment has been accepted. PeerStreet may, in its sole discretion, determine to wait to accept your investment until the aggregate minimum investment amount set forth in applicable Listing has been met and/or exceeded. Unless the Listing for a Series states otherwise, you will not receive any interest for the periods of time between your commitment to invest, PeerStreet's acceptance of your investment, and the Series tied to the investment closes.

Funds in your account will generally not accumulate interest or earn returns until you invest these funds in a given issuance of Real Estate Securities, PeerStreet accepts your investment, and the Series tied to the investment closes.  If the requested minimum aggregate investment amount for a specific Underlying Investment, or Series of that Underlying Investment, has not been realized prior to the scheduled closing date, or if PeerStreet must cancel the offering for any other reason, then one of the following will occur:

- The issuance described in the Listing will terminate, there will be no closing on the Real Estate Securities being offered, and any requested Underlying Investment will not be funded.

- Alternatively, PeerStreet may close the Series of Real Estate Securities, in which case it may fund any portion of an Underlying Investment left unfunded through the purchase of the applicable Real Estate Securities.

- If PeerStreet believes that additional investors may later elect to participate in the Series described in the Listing, PeerStreet may also elect (in its sole discretion) to arrange bridge financing to close on any Underlying Investment, in which case the Listing will remain active on the PeerStreet Website until the Underlying Investment is fully funded and the bridge loan repaid. Generally, if PeerStreet retains a portion of the Underlying Investment, it will do so on similar terms as those offered to investors.

If your commitment has been accepted by PeerStreet and the requested minimum aggregate investment amount for the Underlying Investment has been realized, then the applicable PS Issuer will issue a real estate security to you as soon as practicable.

All Real Estate Securities will be issued and tracked in electronic form only.  Processing and payment systems are automated and electronic.  PeerStreet does not have any physical branches and does not engage in any deposit-taking activities.

From the time you commit to investing in the real estate security to the time that the Series closes and your Real Estate Securities are issued, the funds in your PeerStreet account will not be available for investment in other Real Estate Securities or for withdrawal from your PeerStreet account.  In addition,

your funds will not earn interest until the issuance of the real estate security, so you will not receive any return on your investment during that time period.

Because certain terms (e.g., issuance date) of an offering of a Series of Real Estate Securities may not be known until all investment commitments have been received, and the closing for that offering of Real Estate Securities has occurred, there may be changes in the terms of the real estate security you ultimately receive.  In the event we are required to materially amend the Listing, any other terms of the offering, or any of the other Transaction Documents as a result of those changes, we will notify you by phone, through the PeerStreet Website or via email, and/or post a notice on the portion of the PeerStreet Website where the affected offering of Real Estate Securities is listed, indicating that a material amendment to the terms is pending, and providing applicable instructions and requirements related to any of those pending amendments.  In the event of material changes to the Listing, you will be provided the opportunity to rescind your investment or commitment as applicable.  To do so, you must send a written cancellation notice to PeerStreet through the PeerStreet Website within two business days of receiving such notice. In the event that PeerStreet discovers a material mistake or change after a Series has closed, PeerStreet reserves the right to terminate the affected Series and return investors their principal amount invested. PeerStreet generally defines material changes as events that meaningfully and significantly increase the risk of loss on a given investment.

## 8.  **Real Estate Securities Are Noncertificated Interests**

All Real Estate Securities offered under this PPM will be issued by the applicable PS Issuer in online, uncertificated form only. Investors will be required to hold any real estate security in PeerStreet's electronic registry system, which is accessible only to PeerStreet through a secure portion of the PeerStreet Platform, or through alternative digital ledgers as will be indicated in the relevant Listing and PPM Supplement.  Real Estate Securities you own can be viewed through your Dashboard.

## 9.  **General Risk Factors**

*Investing in the Real Estate Securities involves a high degree of risk.  In deciding whether to purchase Real Estate Securities, you should carefully consider the following risk factors and the specific risk factors set forth in the PPM Supplement for the type of Real Estate Securities being offered, as indicated on the applicable Listing.  Any of those and the following risks could have a material adverse effect on the value of the Real Estate Securities you invest in, could cause you to lose all or part of your investment, and could adversely affect future payments or distributions you expect to receive on the Real Estate Securities.  You should only invest in the Real Estate Securities if you can bear the loss of your entire investment.*

**Consider carefully the following risks related to investments in real estate generally:**

- Investing in Real Estate Carries Significant Important Risks.  PeerStreet is subject to risks generally attributable to the ownership of real estate investments.  These include changes in global, national, regional or local economic, demographic or capital market conditions; current and future adverse national real estate trends, including increasing vacancy rates, which may negatively impact resale value, declining rental rates and general deterioration of market conditions; changes in supply of or demand for properties in a given market or metropolitan area that result in changes in market rental rates or occupancy levels; increased competition for real property assets; bankruptcies, financial difficulties or lease defaults by borrowers and/or tenants; changes in interest rates and availability of financing; potential misconduct by third-parties, including, but not limited to, borrowers, tenants, lenders, vendors, and service providers; and changes in government rules, regulations and fiscal policies, including changes in tax, real estate,

environmental and zoning laws.  All of these factors are beyond our control.  Any changes in these factors may adversely affect the payments made to PeerStreet on the investments related to Real Estate Securities, and subsequently affect PS Issuer's ability to make payments or distributions to Investors in those Real Estate Securities.

- Real Estate Investments Are Highly Competitive.  The current market for properties that meet our investment objectives is extremely competitive, and many of our competitors have greater resources than we do.  We will compete with numerous other entities engaged in real estate investment activities, including individuals, corporations, banks and insurance company investment accounts, real estate investment trusts ("**REITs**"), real estate limited partnerships, the U.S. government, and other entities to acquire, manage and sell real estate and real estate-related assets.  Many of our competitors enjoy significant competitive advantages that result from, among other things, a lower cost of capital and enhanced operating efficiencies.  In addition, the number of entities and the amount of funds competing for suitable investments may increase.  Competition with these entities may result in even greater demand for the acquisition of real estate and real estate-related assets, which would result in increased prices for real estate and real estate-related assets and/or in lower returns for related debt securities as competition drives rates down.

- Unsuccessful Real Estate Investments May Result in Poor Returns. Real estate investments entail risks such as, without limitation, the risk of not correctly anticipating conditions or trends in the real estate market or misevaluating a sponsor's ability to adequately complete a project, and therefore not being able to generate profit from the real estate investments that may be tied to Underlying Investments. Misconduct from parties involved in a given real estate investment (such as the borrower, broker, escrow agent, appraiser, etc.) may also result in poor returns or complete less.  If such events occur, they may adversely affect returns on Underlying Investments related to the Real Estate Securities we sponsor.  This could, in turn, negatively affect the ability of a PS Issuer to make payments or distributions to Investors in the applicable Real Estate Securities.  Poor returns may also include total loss of Investor funds.

- Real Estate Valuation Is Inherently Inexact.  Real estate valuation is an inherently inexact process and depends on numerous factors, all of which are subject to change.  The property valuation models and methods used by PeerStreet and/or its vendors may be deficient and may increase the risk of default.  Appraisals or opinions of value may prove to be insufficiently supported, and PeerStreet's review of the value of the underlying property in determining whether to invest in an Underlying Investment and the value of the Real Estate Securities tied to that Underlying Investment may be based on information that is incorrect or opinions that are overly optimistic.  The risk of default in such situations is increased, and the risk of loss to Investors will be commensurately greater.

- Returns and Loss Rates on Underlying Investments May Be Uncertain.  PeerStreet does not have significant historical performance data about returns or the rates of loss on many of the Underlying Investments and, even if an abundance of data was available, historical returns are not necessarily an accurate indicator or predictor of future performance.  Underlying investments may lose value at a faster rate than PeerStreet anticipates.  Prior to investing in any Real Estate Securities, you should consider the risk of non-payment and default on the Underlying Investments. We cannot predict what the long-term rates of return or loss will be on any of the Underlying Investments, which could increase or decrease as a result of factors beyond PeerStreet's control and beyond the control of any lender, borrower or other person involved in the performance of an Underlying Investment, including prevailing interest rates, the rate of unemployment, the level of consumer confidence, decline in property values, degradation of

PRIVILEGED & CONFIDENTIAL

specific properties, the value of the U.S. dollar, energy prices, changes in consumer spending or sentiment, the number of personal bankruptcies, disruptions in the credit markets and other factors.

- <u>Delays in Filling Vacancies or Selling Real Estate Could Adversely Affect Underlying Investments</u>.  The Real Estate Securities offered under this PPM are tied to Underlying Investments, such as, among other things, residential and commercial properties, loans, funds, or lines of credit.  Some of these real estate investments may house tenants and incur vacancies either by the expiration of tenant leases or the continued default of tenants under their leases.  Some properties may be vacant at the time an investment is funded. Some properties may be believed to be occupied at the time an investment is made, but such leases may have been fraudulent, breached, or cancelled. If vacancies continue for a prolonged period of time or tenants cannot be found at the projected rates, Underlying Investments may suffer reduced revenues.  In addition, the resale value of an Underlying Investment could be diminished, because the market value of a particular property may depend upon the value of its cash flow.  Either of these scenarios, prolonged vacancies or diminished market value, may negatively affect returns on Underlying Investments and subsequently affect a PS Issuer's ability to make payments or distributions to Investors in the applicable Real Estate Securities.

- <u>Returns on Underlying Investments May Rely on Payments from Tenants</u>.  Some Underlying Investments may rely on rental payments from tenants under leases in order to generate payments to PeerStreet.  If tenants, especially significant tenants, fail to make rental payments under their leases, an Underlying Investment may not generate payments to PeerStreet and, therefore, payments or distributions to Investors in the applicable Real Estate Securities.

  The bankruptcy or insolvency of a major tenant may also adversely affect the income produced by a property tied to an Underlying Investment.  If a tenant becomes a debtor in a case under the U.S. Bankruptcy Code, the borrower cannot evict that tenant solely because of its bankruptcy.  The bankruptcy court may authorize the tenant to reject and terminate its lease, and any claim against such a tenant for uncollectible future rent would be subject to a statutory limitation that might be substantially less than the remaining rent actually owed under the tenant's lease.  Any shortfall in rent payments could adversely affect returns generated by Underlying Investments and subsequently adversely affect a PS Issuer's ability to make payments or distributions to Investors in the applicable Real Estate Securities.

- <u>Underlying Investments May Be Dispersed Geographically and Across Various Markets and Sectors</u>.  Underlying investments may be located in different locations throughout the United States and in different markets and sectors.  The success of the Underlying Investments will depend largely on the availability of effective managers and service providers in each area, market and sector where the Underlying Investments are located. We cannot guarantee that any given manager or service provider will be adequate and/or effective. Failure to meet these challenges could negatively affect payments generated by an Underlying Investment to PeerStreet and subsequently affect a PS Issuer's ability to make payments or distributions to Investors in the applicable Real Estate Securities.

- <u>Payments on Underlying Investments May Be Affected By Natural Disasters</u>.  Underlying investments may be located in areas in the United States that have increased risk of earthquakes, hurricanes or high winds, tornadoes, wildfires and floods.  An earthquake, hurricane, tornado, wildfire or flood could cause structural damage to or destroy the Underlying Investments. PeerStreet does not intend to obtain earthquake, wind or flood insurance for the Underlying Investment and does not intend to require lenders, borrowers or other sponsors of Underlying

PRIVILEGED & CONFIDENTIAL

Investments to obtain such insurance. It is possible that any such insurance, if obtained, will not be sufficient to pay for damage to any Underlying Investments. Any damage that these lenders, borrowers or other sponsors must pay for may affect payments generated by an Underlying Investment to PeerStreet and could, in turn, negatively affect the ability of a PS Issuer to make payments or distributions to Investors in the applicable Real Estate Securities.

- <u>Underlying Investments May Be Subject to Indirect or Direct Environmental Risks</u>. Environmental issues may affect the operation of a lender's or borrower's property or related Underlying Investment. If toxic environmental contamination is discovered to exist on a property tied to an Underlying Investment, it might affect the viability of and returns generated by an Underlying Investment, and any security interest held by PeerStreet in an underlying property could, in turn, be devalued or worthless. To the extent that PeerStreet is forced to foreclose and/or operate such a property, potential additional liabilities include reporting requirements, remediation costs, fines, penalties and damages, all of which would adversely affect the likelihood that Investors would be paid payments or distributions on the applicable Real Estate Securities. Of particular concern may be those properties that are, or have been, the site of manufacturing, industrial or disposal activity. These environmental risks may give rise to a diminution in value of the security interest or to liability for cleanup costs or other remedial actions. This liability could exceed the value of PeerStreet's security interest or the principal balance of the Underlying Investment. For this reason, we may choose not to foreclose even if we have foreclosure rights on contaminated property rather than risk incurring liability for remedial actions.

  Under the laws of certain states, an owner's failure to perform remedial actions required under environmental laws may give rise to a lien on mortgaged property to ensure the reimbursement of remedial costs. In some states this lien has priority over the lien of an existing mortgage against the real property. Because the costs of remedial action could be substantial, the value of a mortgaged property as collateral for a loan could be adversely affected by the existence of an environmental condition giving rise to a lien.

  In addition, the state of law is currently unclear as to whether and under what circumstances clean-up costs, or the obligation to take remedial actions, can be imposed on PeerStreet as a secured lender. If a lender, borrower, or other sponsor of an Underlying Investment becomes liable for cleanup costs, it may bring an action for contribution against the parties who contributed to the environmental hazard, but these persons or entities may be bankrupt or otherwise judgment-proof.

- <u>Underlying Investments May Have Toxic Mold That Could Result in Substantial Liabilities</u>. Litigation and concern about indoor exposure to certain types of toxic molds has been increasing as the public becomes aware that exposure to mold can cause a variety of health effects and symptoms, including allergic reactions. It is impossible to eliminate all mold and mold spores in the indoor environment. There can be no assurance that the Underlying Investments acquired by borrowers will not contain toxic mold. The difficulty in discovering indoor toxic mold growth could lead to an increased risk of lawsuits by affected persons and the risk that the cost to remediate toxic mold will exceed the value of the Underlying Investments. There is a risk that Underlying Investments may involve properties that contain toxic mold, which may affect the ultimate returns of the Underlying Investments, and subsequently affect a PS Issuer's ability to make payments or distributions to Investors in the applicable Real Estate Securities. Other defects may have similar effects on the Underlying Investment's performance.

PRIVILEGED & CONFIDENTIAL

**Consider carefully the following risks related to investing in the Real Estate Securities sponsored by PeerStreet:**

- The Real Estate Securities Being Offered Are Highly Risky and Speculative.  You may lose some or all of your initial purchase price for the Real Estate Securities, because the Real Estate Securities are highly risky and speculative.  Returns on the Real Estate Securities are special, limited, **unsecured** obligations of the PS Issuer that depend entirely on the performance of one or more Underlying Investments.  Only investors who can bear the loss of their entire purchase price should commit to invest in the Real Estate Securities.  Real Estate Securities are suitable purchases only for investors of adequate financial means.  No prospective investor should purchase Real Estate Securities offered under this PPM, if they cannot afford to lose all of the money they plan to invest in those Real Estate Securities.

- The Real Estate Securities Being Offered Are Unsecured, and PS Issuer May Not Own the Underlying Investment.  Although your investment in a given Series may be tied to the performance of a secured real estate loan (such as a mortgage) or another equity or debt investment, the Real Estate Securities you purchase are derivative investment product that do not grant you actual, legal, recorded or unrecorded, interests in the Underlying Investment itself. Furthermore, the PS Affiliate who owns the Underlying Investment may be different and/or separate from PS Issuer. PS Affiliates holding the legal interests in the Underlying Investments or security instruments may not be bankruptcy-proof entities and their creditors, regulators, and/or state or federal governments may seize their assets. In such an event, the Real Estate Securities in which you invested may lose all their value.

- PS Issuer Needs to Receive Returns Based on Underlying Investments Before Paying Any Interest or Principal Payments or Other Distributions on Real Estate Securities.  Payments or distributions on the Real Estate Securities depend entirely on the performance of the Underlying Investments.  If an Underlying Investment fails to generate payments or returns, payments or distributions on your real estate security will be correspondingly reduced.  While PeerStreet intends for payments or distributions on Real Estate Securities offered under this PPM to generally correspond to payments PeerStreet may receive from any related Underlying Investment, there is no guarantee that a PS Issuer will be able to make payments or distributions on Real Estate Securities in any specific amount or at all.

- PeerStreet May Not Provide You All the Information and Documentation It Has Regarding the Underlying Investments.  PeerStreet may choose, or be contractually bound, not to disclose all available information to you about an Underlying Investment.  For example, we not disclose or have the contractual ability to disclose the name or identity of a lender, borrower, or sponsor, or the address of a property.  If PeerStreet chooses to not disclose all available information as a result of an internal business decision, or because we are legally bound to keep that information in confidence, you must make your investment decision based solely on information made available to you on the PeerStreet Website about the Series of Real Estate Securities being offered and the Underlying Investment. Even after you invest in Real Estate Securities, PeerStreet may not share much of the information it gathers with you.  In no case does PeerStreet intend to distribute copies of underlying loan or other real estate documents related to an Underlying Investment. PeerStreet also reserves the right not to disclose specific, itemized, or otherwise cataloged financial information regarding the management of a loan or REO property.  We are not responsible for and are not liable for any information provided to you by unaffiliated third parties.

PRIVILEGED & CONFIDENTIAL

- <u>Investors in Real Estate Securities from One Series May Make Claims Against Your Investment</u>. PeerStreet pools assets in several ways.  First, PeerStreet offers Real Estate Securities in multiple Series, but often pools the related Underlying Investments in a single entity.  PeerStreet may also in certain cases issue more than one Series, with potentially different terms, with respect to the same Underlying Investment. In addition, although PeerStreet's recordkeeping practices identify cash belonging to each Investor, those funds may be held in a single bank account.  Similarly, although PeerStreet internally records Investors' ownership interests in each Series of Real Estate Securities, many or all Underlying Investments may be legally held in a single entity's name.

  These aspects of PeerStreet's structures increase the risk that Investors in Real Estate Securities from one Series may make claims against assets related to Real Estate Securities from another Series, a risk that is even more acute when there is more than one Series related to the same Underlying Investment.  Even if Underlying Investments were held by different PSI affiliates, Investors in Real Estate Securities tied to Underlying Investments in one PSI affiliate could make claims against the assets held in another PSI affiliate.  As a result, an Investor of in one Series may be adversely affected by claims made by an Investor of another.

  In addition, if a court or arbiter commingled PeerStreet's assets, your rights as an Investor may be negatively affected due to this structure.

- <u>There May Be a Delay Between When You Fund Your PeerStreet Account and When You Earn Returns</u>.  When you commit to purchase a real estate security, you must commit funds toward your purchase, but the funds may not be deployed until an extended period of time from when the Series of those Real Estate Securities closes.  Each funding request remains open until PeerStreet has received a minimum level of funding commitments for the relevant Series of Real Estate Securities, all due diligence on the Underlying Investment has been completed, and negotiations of terms on the Underlying Investment with the lender, borrower, seller, or tenant have successfully concluded.  This could take an extended period of time.  Once this is complete, the PS Issuer will issue Real Estate Securities as soon as practicable.  However, because commitments to purchase Real Estate Securities are irrevocable, during the period between the time of your purchase commitment and the time when your real estate security is issued, you will not have access to your funds.  Because your funds do not earn interest or other returns prior to the time when real estate security is issued, the delay in issuance of your real estate security will have the effect of reducing the effective rate of return on your investment.

- <u>Once You Confirm Your Intention to Invest in a Series, You Will Be Legally Bound to Purchase the Applicable Real Estate Securities</u>.  If you choose your own investments, once you commit to purchase Real Estate Securities in a Series through the website, or if you enroll in Auto-Investing, once you have been allocated a given Series and the opt-out period (if any) has passed, you are legally bound to purchase the Series to which you have committed.  As a result, you should carefully review the Offering Materials for each Series in which you invest prior to making a commitment.

- <u>You May Not Receive Incentives, Promotions, or Features Offered to Other Investors</u>.  From time to time PeerStreet may provide incentives, promotions, or extra features to certain investors that are not available to all investors.  You are not guaranteed to receive these types of benefits, and as a result, you may not invest on as favorable terms as other investors.  PeerStreet is under no obligation to provide all investors the same terms, including any or all incentives, promotions, or extra features.

PRIVILEGED & CONFIDENTIAL

- **Under the Investment Agreement You Are Subject to Mandatory Merger of Claims and Arbitration**.  To protect us from having to respond to multiple claims by Investors in the event of an alleged breach or default with respect to any Series of Real Estate Securities, the Investor Agreement restricts your right to pursue remedies individually in connection with an alleged breach or default.  In addition, we require any claims against us to be resolved through binding arbitration rather than in the courts.  The arbitration process may be less favorable to you than court proceedings and is likely to limit your right to engage in discovery proceedings or to appeal an adverse decision. PLEASE CONSULT THE INVESTOR AGREEMENT FOR ADDITIONAL DETAILS REGARDING YOUR ELECTION TO CONSENT TO MANDATORY ARBITRATION.

- **The Real Estate Securities Are Restricted Securities and Highly Illiquid**.  The Real Estate Securities in which you may invest are being offered in private offerings in reliance on Rule 506(b) of Regulation D of the Securities Act.  As a result, the Real Estate Securities are restricted securities, will not be listed on any securities exchange, and have no liquid market.  There is no trading market for the Real Estate Securities, and we do not expect that such a trading market will develop in the foreseeable future, nor do we intend in the near future to offer any features on the PeerStreet Platform to facilitate or accommodate such trading.  Any investment in the Real Estate Securities will be highly illiquid, and Investors may not be able to sell or otherwise dispose of their Real Estate Securities in the open market. The restrictions on transfer include transfers to and from accounts that you control. For example, PeerStreet may not be able, allowed, or willing, to transfer Real Estate Securities from an individual account to a trust account. Accordingly, you should be prepared to hold the Real Estate Securities you purchase for an extended period of time.

- **Other Investors May Be Given the Option to Invest in Real Estate Securities Before or Instead of You, and/or on Better Terms Than You, and You Will Not Have the Right to Invest in Those Real Estate Securities or Demand Equal Terms**.  PeerStreet sponsors a variety of investment programs and may choose to first offer a given investment to other investors or investor classes before offering them through the Platform.  This may mean that Series and Underlying Investments you would otherwise invest in are not available to you.  In addition, certain other investors may invest in larger amounts, pay higher fees, or be shareholders in PeerStreet itself, which may provide PeerStreet an incentive to provide those investors the most desirable investments. There is no guarantee whatsoever that you will have access to all of the investment opportunities offered by PeerStreet or to the best investment opportunities.

- **All Real Estate Securities Are Noncertificated Interests**.  All Real Estate Securities offered under this PPM will be issued by a PS Issuer in online form only.  All Investors will be required to hold any real estate security in PeerStreet's (or a PeerStreet-approved third party's) electronic registry system, which is accessible only to PeerStreet through the Dashboard.  Investors will not be provided any physical certificates representing the Real Estate Securities and must rely on PeerStreet to maintain a record of all Real Estate Securities.  If any Real Estate Securities become lost or the record of the ownership of any Real Estate Securities cannot be found, Investors may not be able to collect any returns on their Real Estate Securities, which may result in a complete loss of their investment.

- **Specific Risks Apply to Different Types of Real Estate Securities Offered under this PPM**.  You should carefully read and consider the additional risk factors set forth in the PPM Supplement for the type of Real Estate Securities you are interested in investing in, as set forth on the Listing for that specific Series.  In addition to the risks contained in this PPM related to investing in Real Estate Securities, each of the different types of Real Estate Securities in which you may invest

PRIVILEGED & CONFIDENTIAL

raise specific risks, any one of which may result in a complete loss of your investment. PeerStreet makes no guarantees as to the profitability of any investment you make in Real Estate Securities offered under this PPM.

- The Recurring Deposits Program Raises Particular Risks.  If you enable the Recurring Deposits feature, PeerStreet and some of its employees will have access to your bank account information and the ability to transfer funds to the Platform.  PeerStreet does not have systems in place to prevent overdrafts should you request Recurring Deposits in excess of your bank account balance.  In addition, PeerStreet does not take on any liability when implementing the Recurring Deposit program for providing you investment advice as to how the funds are used, including based on your allocation of funds or investment decisions.  If you also participate in the Automated Investing Program, funds automatically transferred into your PeerStreet account may be invested in Real Estate Securities, subject to the terms of Automated Investing.

- If You Participate in Automated Investing, You May Not Invest in the Same Investments You Would Choose for Yourself.  By participating in this program, you will be automatically allocated Series of Real Estate Securities that meet your investment criteria.  Although you may have the ability to opt out of any Series allocated to you, you may not, through Automated Investing, build the same portfolio you would by choosing investments yourself by browsing the Platform.  In certain cases, you may not be allocated Series you would otherwise be interested in and that match the criteria you choose, because they are allocated to other investors before you.  In others, you may be allocated Series that you would otherwise not be interested in.  There is no guarantee whatsoever that the portfolio of Real Estate Securities you build will have the same or better returns than the portfolio you would have chosen yourself.  PeerStreet takes no responsibility for any returns based on the Real Estate Securities you hold based on Automated Investing.

- If You Enroll in Automated Investing, and Do Not Opt Out of a Particular Series Allocated to You in Time, You May Invest in Real Estate Securities You Would Otherwise Not Have Purchased.  You are solely responsible for determining whether to opt out of any Real Estate Securities allocated to you and for notifying us of your decision to opt out.  If you do not do so within the time period for opting out indicated in the notice of allocation, you will invest in it.  As a result, you may invest in Series you may not want to invest in.

- If You Do Not Turn Off the Automated Investing Feature, You May Be Allocated Series Even Though You Wish to Withdraw from the Program.  You will stay enrolled in Automated Investing until you turn the feature off.  As a result, you may be allocated Series on an ongoing basis even though you wish to withdraw from Automated Investing.

- If You Have Insufficient Funds in Your Account on the Platform, You Will Not Be Able to Invest.  If you do not fund your account prior to choosing an investment (or being allocated an investment through the Automated Investing feature), you will not be able to invest.  As a result, you may miss out on opportunities you would otherwise like to invest in.  You are solely responsible for ensuring you have sufficient funds in your Platform account.

- Investments Made Through Auto-Investing May Have Different Terms Than Investments Made in the Same Real Estate Securities Through Investor-Chosen Investments.  Investment minimums and other terms may be different for investments made via Automated Investing and investments chosen independently by an investor.  You do not have the right to receive notification of the terms of any investments of any other potential investor in the same Series as you or in other Series.  You may invest on terms that are not as advantageous to you.

PRIVILEGED & CONFIDENTIAL

**Consider carefully the following risks related to relying on third parties, including lenders, borrowers, other sponsors of Underlying Investments, and service providers to Underlying Investments:**

- We Do Not Control Third Parties Who Affect the Success of the Real Estate Securities. The success of each real estate security is dependent on the success of each Underlying Investment, which in turn is dependent on the performance of third parties that we do not control, such as lenders, borrowers, sponsors, etc. While PeerStreet may set the terms of the Real Estate Securities being offered, these third parties are solely responsible for operating their respective businesses, and their poor management, poor financial condition, engaging in illegal or otherwise ill-advised activities could adversely affect the performance of the Underlying Investments or expose those Underlying Investments to unanticipated operating risks. As a result, the ability of the lender, borrower, or sponsor, to repay or provide returns on the Underlying Investment may be adversely affected, and the expected payments or distributions on Real Estate Securities tied to that Underlying Investment may be reduced, if received at all.

- Real Estate Securities May Depend on Third Parties with Limited to No Operating History. The management teams of the various key actors on which Real Estate Securities rely, including any lenders and borrowers associated with the Real Estate Securities or other similar sponsors, may lack experience in the types of actions we rely on them to engage in. For example, sponsors may be required to obtain insurance on property tied to an Underlying Investment, but may be unable to do so at competitive rates for lack of knowledge and experience or due to providers charging higher rates to those with limited operating history. In these cases, operations of an Underlying Investment will be subject to all of the risks inherent in the establishment of a new business enterprise, including, but not limited to, hurdles or barriers to the implementation of business plans, successful completion of construction work, and other related real estate business activities. Further, because there is no history of operations, there is also no operating history from which to evaluate the ability of a management team to achieve its business goals.

- We Rely on Information Provided by Third Parties. We rely on information provided to us by third parties, such as lenders, borrowers, other sponsors of Underlying Investments, appraisers, title agencies, escrow companies, data providers, machine-learning systems, etc., in our underwriting and vetting of potential investments. That information may be incomplete, inaccurate or intentionally false. For example, borrowers provide a variety of information to us regarding their management of Underlying Investments. When we evaluate a potential loan for investment, some of this information may be included in the Listing for the applicable Series of Real Estate Securities. Information provided by third parties may be incomplete, inaccurate, intentionally false or may misrepresent the intentions of the third parties. We make attempts to verify some of the information provided to us by third parties, but, as a practical matter, we cannot verify all of it.

  Typically, when we finance or make available an Underlying Investment, our primary assurances that the financing proceeds will be properly spent by the third party are the contractual covenants agreed to by that third party. Though we perform due diligence on lenders, borrowers and other relevant actors that we work with, you may lose all or a portion of your investment in the Real Estate Securities if any of these people or any other third party supplies false, misleading or inaccurate information.

- You Do Not Have Recourse Against Any Third-Party Service or Information Providers. You will not have the right to seek, and under the terms of the Transaction Documents you must agree not to seek, any claims or recourse against any third-party providing information on the Platform or

PRIVILEGED & CONFIDENTIAL

services relating to the operation of the Platform or management of the Underlying Investments, including lenders, servicers, and other entities. PeerStreet may have recourse against such parties and may elect to pursue such recourse in certain circumstances, but these rights do not flow to Investors. In addition, you must agree by executing the Transaction Documents that if a court or other proper authority were to deem that you have recourse against any third parties, those third parties would not agree to provide services or information to PeerStreet, the Platform, and/or investors without obtaining satisfactory releases of liability, and you will release, waive, and discharge these third-parties of any liability, claims, or damages relating to your use of the Platform and investment activities with PeerStreet.  These provisions of the Transaction Documents significantly limit your ability to take action in the event of default or other issues related to an Underlying Investment, and require you to rely solely on PeerStreet's efforts for these purposes.

- You Do Not Have Recourse Against Any Borrowers or Owners of Underlying Investments.  By investing in Real Estate Securities, you will not have privity of contract or any other legal relationship with any borrower, owner, sponsor or other third party involved with the Underlying Investment or any direct interest in the Underlying Investment.  Unless explicitly provided otherwise in a Listing, you do not have any voting rights and/or decision-making authority beyond your decision to invest or not invest in a Series of Real Estate Securities. PeerStreet is the only entity you have a legal relationship with in relation to the Real Estate Securities or the Underlying Investments and is the only entity with which you have any contractual privity. In fact, you will not be permitted to communicate with or otherwise contact any borrower, lender, sponsor, or other third party. These restrictions limit your ability to take action in the event of default or other issues related to an Underlying Investment, and require you to rely solely on PeerStreet's efforts for these purposes.

- Underlying Investments May Rely on Third-Party Property Managers and Leasing Agents for Effective Operations.  We expect that, in some instances, lenders, borrowers and other sponsors of Underlying Investments will rely on third party property managers and leasing agents. PeerStreet itself may rely on third-party property managers and leasing agents in certain situations, such as when we take properties over at foreclosure sales. The third party property managers will have significant decision-making authority with respect to the management of the Underlying Investments.  Our ability to direct and control how the Underlying Investments are managed may be limited.  We will not supervise any of the property managers or leasing agents or any of their respective personnel on a day-to-day basis.  Thus, the success of the Underlying Investments may depend in part on the ability of third party property managers to manage the day-to-day operations and the ability of leasing agents to lease vacancies in the Underlying Investments.  Any adversity experienced by the property managers or leasing agents could adversely impact the payments or other returns to PeerStreet on the Underlying Investments, and subsequently affect a PS Issuer's ability to make payments or distributions to Investors in the applicable Real Estate Securities.

- Many Third Parties on Which We Rely Are Subject to Regulation.  The lending industry is a highly regulated industry.  Many third parties we work with (e.g., banks,private lenders, servicers, appraisers, etc.) are responsible for their compliance with applicable state and federal lending laws, and we have no control over their compliance.  These third parties may be subject to licensing requirements in one or more states.  While we conduct due diligence on the third parties we work with, we do not and cannot guarantee their compliance with applicable laws, including with respect to their compliance with applicable licensing requirements.

PRIVILEGED & CONFIDENTIAL

**Consider carefully the following business risks related to PeerStreet as sponsor of the Real Estate Securities:**

- PeerStreet is an Early-Stage Company and Its Operations Involve Significant Risks.  PeerStreet is an early-stage company and its operations involve significant risks.  PeerStreet's operating capital depends on its ability to finance its operations from the sale of equity or other financing alternatives for the foreseeable future.  There can be no assurance that we will be able to successfully raise operating capital.  The failure to successfully raise operating capital from venture capital or institutional firms, and the failure to attract qualified real estate companies or lenders and sufficient investment commitments from investors, could result in our bankruptcy or cause us to cease operations.

- We Have a Limited Operating History.  PeerStreet, our parent company, PSI, and the PSI affiliates have limited operating histories.  We began offering online Underlying Investments in 2014 and did not issued Real Estate Securities prior to 2014.  As companies in the early stages of our development, we face increased risks, uncertainties, expenses and difficulties.

- We May Need Substantial Additional Capital to Fund Our Operations.  PSI will need to raise substantial additional capital to fund its operations, and if it fails to obtain additional funding, it may be unable to continue operations.  In these early stages of development, PSI has funded substantially all of its operations with proceeds from equity investments from various venture capital firms and similar institutional investors.

- To meet its financing requirements in the future, PeerStreet may raise funds through equity offerings, debt financings or strategic alliances.  Raising additional funds may involve agreements or covenants that restrict PeerStreet's and PSI affiliates' business activities and options.  Additional funding may not be available to us on favorable terms, or at all.  If we are unable to obtain additional funds, we may be forced to reduce or terminate our operations.  Any inability of PSI to fund operations could have a substantial and deleterious effect on our viability and operations. As a result, among other things, PeerStreet may not have sufficient resources to take actions it would otherwise deem necessary or desirable to protect the value of and returns on the Underlying Investments related to the Real Estate Securities. If such actions are not, or cannot be, undertaken, the value of the Underlying Investments may degrade.

- We Have Incurred Net Losses Before.  We have incurred net losses in the past and expect to incur net losses in the near-to-mid term.  Our failure to become profitable could impair the operations of the PeerStreet Platform.  We have not been profitable since our founding and may never become profitable.  In addition, we expect our operating expenses will increase in the future as we expand our operations.  If our operating expenses exceed our expectations, our financial performance could be adversely affected.  If our revenue does not grow to offset these increased expenses, we may never become profitable.  In future periods, we may not have any revenue growth, or our revenue could decline.

- You Will Not Receive Financial Statements Regarding PeerStreet, a PS Issuer, or the Real Estate Securities in Which You Invest.  We do not intend to provide you with financial statements at this time nor do we currently intend to do so in the future. Thus, you will not be in a position to independently evaluate our financial health, the health of any PS Issuer, or the financial viability of any Real Estate Securities in which you invest, in determining whether to purchase the Real Estate Securities.

PRIVILEGED & CONFIDENTIAL

- <u>Our Operations Rely on Maintaining and Attracting Key Personnel</u>.  If we fail to retain our key personnel, we may not be able to achieve our anticipated level of growth and our business could suffer.  Our future depends, in part, on our ability to attract and retain key personnel.  Our future also depends on the continued contributions of our executive officers and other key personnel, each of whom would be difficult to replace.  In particular, the Founder/Chief Executive Officer of PSI is critical to the management of our business and operations and the development of our strategic direction.  The loss of the services of Brewster Johnson or other executive officers or key personnel and the process to replace any of our key personnel would involve significant time and expense and may significantly delay or prevent the achievement of our business objectives.

- <u>Your Rights If PS Issuer or Any Other PSI Affiliate Dissolve Are Uncertain</u>.  If PS Issuer or any other PSI affiliate becomes subject to a bankruptcy or similar proceeding, your rights as an Investor of a real estate security are uncertain, and your recovery, if any, may be substantially delayed and substantially less than the amounts due and that may become due on the real estate security you hold.  In the event of our bankruptcy or a similar proceeding, your right to continue receiving payments or distributions on any real estate security held could be subject to the following risks and uncertainties:

  o   Interest payments or distributions on the Real Estate Securities may not accrue during a bankruptcy proceeding.  Accordingly, if you receive any recovery, it might be based on your claims for principal and interest payment accrued only up to the date the proceeding commenced.

  o   Our obligation to continue making interest payments on the Real Estate Securities would likely be suspended even if the funds to make those interest payments were available.  Because a bankruptcy or similar proceeding may take months or years to complete, even if the suspended payments were resumed, the suspension might effectively reduce the value of any recovery that you might receive by the time your recovery occurs.

  o   The Real Estate Securities are unsecured, and you do not have a security interest in the Underlying Investments.  Accordingly, you may be treated the same as other general creditors of ours and thus be required to share the proceeds of Underlying Investments with those creditors.

  o   Because the Real Estate Securities only entitle Investors to receive payments or distributions tied to one or more Underlying Investments, you might not be entitled to share in the other assets of PeerStreet available for distribution to general creditors, even though other general creditors might be entitled to a share of the proceeds of such Underlying Investments.

  o   Even if a lender or a borrower has paid PeerStreet on any Underlying Investment before any bankruptcy proceedings commenced, there can be no assurance that PeerStreet will be able to use those funds to make payments or distributions on any Real Estate Securities.

  o   If a bankruptcy proceeding commences after your total investment commitment has been paid to PeerStreet, you may not be able to obtain a return of that amount even if the proceeds from the offering in which you committed to invest in a Series of Real Estate Securities have not yet been used.

PRIVILEGED & CONFIDENTIAL

- o  Our ability to transfer our obligations to a back-up entity may be limited and subject to the approval of the bankruptcy court or other presiding authority.  The bankruptcy process may delay or prevent the implementation of back-up services, which may impair the collection or management of Underlying Investments to the detriment of the Real Estate Securities.

If we were to enter bankruptcy proceedings, similar proceedings or otherwise cease operations, our activities with respect to any Underlying Investment and any Series of Real Estate Securities would be interrupted, and we would be required to find other ways to meet our obligations regarding the Underlying Investments and the Real Estate Securities.  Such alternatives could result in substantial delays in the disbursement of payments or distributions on your Real Estate Securities or could require us to pay significant fees and expenses to another company that we engage to perform services for the Underlying Investments and the Real Estate Securities, and any funds you do recover may be substantially less than the amount you originally invested in the Real Estate Securities.

In a bankruptcy or similar proceeding, your rights to access any funds sent to PeerStreet in connection with one or more Real Estate Securities held by you are uncertain.  If we became a debtor in a bankruptcy proceeding, the legal right to administer our funds may vest with the bankruptcy trustee or debtor in possession.  In that case, you may have to seek a bankruptcy court order lifting an automatic stay in order to withdraw your funds.  You may suffer delays in accessing your funds in any PeerStreet account as a result.

Also, U.S. bankruptcy courts have broad discretionary powers, and a bankruptcy court could determine that some or all of your funds were beneficially owned by PeerStreet.  In any such case, those funds become available to other general creditors of ours.

- We Face Significant Competition from Major Financial Institutions.  The market in which we participate is competitive and, if we do not compete effectively, our operating results could be harmed.  The real estate market is competitive and rapidly changing.  We expect competition to persist and intensify in the future, which could harm our ability to increase lending volume.

Our principal competitors include traditional lenders, such as major banking institutions, and other real estate investment firms, such as real estate investment trusts, as well as other online lending platforms.  Competition could result in reduced volumes, reduced fees or the failure of the PeerStreet Platform to achieve or maintain more widespread market acceptance, any of which could harm our business.  In addition, in the future we may experience new competition from more established online and other companies possessing large, existing customer bases, substantial financial resources, and established distribution channels.  If any of these companies or any major financial institution decides to enter the online lending business, acquire one of our existing competitors or form a strategic alliance with one of our competitors, our ability to compete effectively could be significantly compromised, and our operating results could be harmed.

Many of our current or potential competitors have significantly more financial, technical, marketing and other resources than we do and may be able to devote greater resources to the development, promotion, sale and support of their platforms and distribution channels.  Our potential competitors may also have longer operating histories, more extensive customer bases, greater brand recognition and broader customer relationships than we have.  These competitors may be better able to develop new products, to respond quickly to new technologies and to undertake more extensive marketing campaigns.  Our industry is driven by constant innovation.

PRIVILEGED & CONFIDENTIAL

If we are unable to compete with such companies and meet the need for innovation, the demand for our loans and corresponding Real Estate Securities could stagnate or substantially decline.

**Consider carefully the following risks related to the operation of the PeerStreet Platform:**

- <u>The Continued Operation of the PeerStreet Website Is Critical to Our Business.</u>  Any significant disruption to the PeerStreet Website and our systems supporting the PeerStreet Website could reduce the attractiveness of the PeerStreet Website and result in a loss of users.  If a catastrophic event resulted in the PeerStreet Website temporarily shutting down or in data loss on the PeerStreet Website or our systems supporting the PeerStreet Website, then our ability to perform our obligations with respect to the Real Estate Securities offered under this PPM and the Underlying Investments tied to those Real Estate Securities would be materially and adversely affected.  The satisfactory performance, reliability and availability of the PeerStreet Website and our systems supporting the PeerStreet Website is critical to our business, customer service, reputation and ability to attract new users and retain existing users.

- <u>The PeerStreet Website Is Hosted by Third Parties.</u>  The PeerStreet Website and our systems run on a cloud-based platform that spans multiple digital and physical locations.  While we own, operate and maintain certain elements of the PeerStreet Website and our systems, significant elements of the PeerStreet Website and our systems are hosted and maintained by one or more third-party technology service providers that we do not control.  In particular, the PeerStreet Website and our systems is hosted by third-party technology services providers (the "Hosting Provider") that we do not control.

  Our operations and systems depend on the Hosting Provider's ability to protect its systems and facilities against damage or interruption from, among other things, natural disasters, power or telecom failures, adverse environmental factors (e.g., web servers that host the PeerStreet Website being subject to high temperature and humidity levels), computer viruses or other attempts to harm our systems and criminal acts.  We have entered into an agreement with the Hosting Provider for it to provide us with standard computing, storage capacity and other services (including related support services) in exchange for us providing timely payments to the Hosting Provider.  Neither that agreement nor the Hosting Provider guarantees, however, that users' access to the PeerStreet Website will be uninterrupted, error-free or secure.

  If our agreement with the Hosting Provider is terminated, or there is a lapse of service or damage to its systems or facilities, then the PeerStreet Website and our systems could experience interruptions as well as delays and additional expenses in finding a new Hosting Provider.  Interruptions or delays like these, irrespective of their origin, could harm our ability to perform services for Real Estate Securities offered under this PPM and the Underlying Investments (e.g., making payments or distributions to Investors in Real Estate Securities); our relationships with Investors and other users of the PeerStreet Website; our brand and reputation; and our operations and business.

  We have implemented a disaster recovery plan relating to the continued operation of the PeerStreet Website and our systems supporting the PeerStreet Website.  As part of that plan, we maintain backups of the PeerStreet Website and our systems at a separate region from the regions the Hosting Provider uses generally to host and maintain the PeerStreet Website and our systems.  These backups occur daily, cover all user and Investor data and replicate securely to a web server at a separate region within the Hosting Provider's cloud infrastructure.

PRIVILEGED & CONFIDENTIAL

Our disaster recovery plan has never been tested under actual disaster conditions, and we may not have sufficient capacity to recover all data and provide all services in the event of an interruption or delay to the PeerStreet Website and our systems because of any actual disaster affecting the Hosting Provider.  Additionally, in the event of any interruptions, delays and resulting damages, our insurance policies may not adequately cover all or any of the losses that we may incur.

- Your Confidential Information on the PeerStreet Website Is Susceptible to Cybersecurity Risks. The PeerStreet Website and our systems store confidential information about the Real Estate Securities offered under this PPM and the Investors in those Real Estate Securities, including information about your bank account and other personally identifiable sensitive data.  We collect this information from the PeerStreet Website, our systems supporting the PeerStreet Website and several other sources (e.g., information about Investors may be provided to us through Investors completing the Investor Agreement or from reports generated by credit reporting agencies, title insurance companies or other third parties and then stored on our systems).  If any of the confidential information stored on the PeerStreet Website or our systems is compromised, your confidential information and other Investors' confidential information may be stolen.  This could occur as the result of any accidental or willful cybersecurity breach or other unauthorized access of the PeerStreet Website and our systems.  If your confidential information is stolen, it may be used for criminal purposes, and you would be subject to increased risk of fraud or identity theft.

  Because techniques used to obtain unauthorized access to or to otherwise sabotage computer systems change frequently and generally are not recognized until they are launched against a target, we and any of our technology service providers (e.g., web hosting service providers) may be unable to anticipate these techniques or to implement adequate preventative measures.

  If Investors' confidential information becomes subject to a data security breach, then we would need to provide any disclosures required by applicable law, which may prove costly to provide and are likely to lead to widespread negative publicity about PeerStreet and the PeerStreet Website.  Any negative publicity of this nature may cause our investors, affiliates and partners to lose confidence in the effectiveness of our data security measures.  Any actual or perceived security breach would harm our reputation, potentially cause us to lose investors and could adversely affect the value of your investment in the Real Estate Securities.

  PeerStreet's privacy policies with respect to confidential information stored on the PeerStreet Platform and our systems supporting the PeerStreet Platform are set forth on the PeerStreet Website.

- The PeerStreet Platform Relies on Third-Party Service Providers.  We rely on certain third-party service providers, including third-party financial institutions and technology service providers.  If we are unable to continue utilizing these services, our business and ability to service the Real Estate Securities and the Underlying Investments may be adversely affected.  We rely on third-party depository institutions that are insured by the Federal Deposit Insurance Corporation (the "FDIC") to process our transactions, including for transfers of payments or distributions on Real Estate Securities to Investors and for transfers of payments on Underlying Investments to PeerStreet or one of its PSI affiliates.  Under Automated Clearing House ("ACH") rules, if we experience a high rate of reversed transactions (known as "chargebacks"), we may be subject to sanctions and potentially disqualified from using the ACH system to process payments.

  We also rely on computer hardware and software developed and licensed by certain technology service providers in operating the PeerStreet Platform.  The computer hardware or software we use may be physically located off-site, as is often the case with cloud-computing services, and

PRIVILEGED & CONFIDENTIAL

may not continue to be available on commercially reasonable terms (or at all).  If we cannot continue to obtain computer hardware and software from third-party technology service providers, or if we cannot transition to other technology service providers quickly, our ability to process payments will suffer and your ability to receive payments or distributions on the Real Estate Securities will be delayed or impaired.

- <u>The PeerStreet Platform Is Dependent on the Success of Multiple PSI Affiliates</u>.  The PeerStreet Platform relies on PSI affiliates to perform certain services and activities in order for the PeerStreet Platform to continue operating.  Because PeerStreet's financial success is tied to the volume of financings that are originated through the PeerStreet Platform, to increase that volume, PeerStreet relies on its PSI affiliates (especially its parent, PSI) to increase its facilities, personnel and infrastructure in order to accommodate greater obligations of and demands on the PeerStreet Platform.  This includes relying on PSI to constantly update its software and the PeerStreet Platform, expand its customer support services, and retain an appropriate number of employees to maintain the operations of PSI.

  If PSI is unable to increase capacity and maintain the necessary infrastructure, you may experience delays in receipt of payments or distributions on the Real Estate Securities and periodic downtime of the PeerStreet Platform, through which many functions of PSI and PeerStreet are run.  In addition, PeerStreet also relies on PSI and the PeerStreet Platform to maintain new Listings and to facilitate transactions in Real Estate Securities.  Any periodic downtime of the PeerStreet Platform will result in a decrease in the volume of financings being originated through the PeerStreet Platform, which will have a negative effect on our financial success.

**Consider carefully the following risks relating to federal and state regulation:**

- <u>Non-Compliance with Federal and State Regulations Could Harm Our Business</u>.  There are many state and federal laws and regulations that may potentially apply to our business, and non-compliance with those laws and regulations could impair our ability to arrange or service the Real Estate Securities and Underlying Investments.  Failure to comply with any of these laws and regulations that apply to our business may, among other things, limit our, or a collection agency's, ability to collect all or part of the payments on the Underlying Investments on which the Real Estate Securities are dependent for payment.  In addition, our non-compliance could subject us to damages, revocation of required licenses or other authorities, class action lawsuits, administrative enforcement actions, and civil and criminal liability, which may harm our business and our ability to maintain our business and may result in third parties rescinding their Underlying Investments.

- <u>PeerStreet and PSI Affiliates May Be Required to Obtain Lending Licenses in Certain States</u>.  Some states require companies like ours to obtain a real estate, broker, lending or other license in order to originate commercial loans.  We may originate loans directly, but we do not intend to finance any Underlying Investments in states where these licenses are required until we obtain the required licenses.  We may partner with either a PSI affiliate or unaffiliated third party (such as a bank or other depository institution) with a required license to originate loans in the jurisdictions where we would otherwise be restricted from doing so.  It is possible that some of these states might impose mortgage broker or licensing requirements on PeerStreet.

- <u>The Statuses of PeerStreet and PSI affiliates under the Investment Company Act May Change</u>.  Neither PeerStreet nor any PSI affiliate is currently registered with the SEC as an investment company under the Investment Company Act of 1940 (the "**Investment Company Act**").  The

PRIVILEGED & CONFIDENTIAL

SEC heavily regulates the manner in which "investment companies" are permitted to conduct their business activities.  If PeerStreet or any PSI affiliate is required to register with the SEC as an investment company under the Investment Company Act, PeerStreet or that PSI affiliate would become subject to extensive compliance requirements that would increase its costs and that could materially and/or adversely affect its business.

While we believe we conduct our business in a manner that does not result in us being characterized as an investment company, the SEC may ultimately disagree with our determination.  We intend to continue to operate our business and operations in a manner that does not subject us to registration as an investment company under the Investment Company Act, but we cannot guarantee we will be able to continue to be successful at doing so.

- The Statuses of PeerStreet and PSI Affiliates as Broker-Dealers under the Exchange Act May Change.  Neither PeerStreet nor any PSI affiliate is currently registered with the SEC as a broker-dealer under the Securities Exchange Act of 1934 (the "**Exchange Act**") or any comparable state law.  The SEC heavily regulates the manner in which broker-dealers are permitted to conduct their business activities.

While we believe that neither PeerStreet nor any PSI affiliate is required to register as a broker-dealer, the SEC or a state regulator may disagree with our determination. If PeerStreet or any PSI affiliate is required to register with the SEC or any state regulator as a broker-dealer under the Exchange Act, PeerStreet or that PSI affiliate would become subject to extensive compliance requirements that would increase its costs and that could materially and/or adversely affect its business.

- The Statuses of PeerStreet and PSI Affiliates as Investment Advisers under the Advisers Act May Change.  No PSI affiliate that provides services related to the Real Estate Securities described in this PPM is currently registered or has notice filed with the SEC or any state regulator as an investment adviser or exempt reporting adviser under the Investment Advisers Act of 1940 (the "**Advisers Act**") or comparable state law.  As a result, you will not have the protection of the Advisers Act or comparable state law based on your investments in the Real Estate Securities.

While we believe that neither PeerStreet nor any PSI affiliate is required to register as an investment adviser based on activities related to the Real Estate securities described in this PPM, the SEC or a state regulator may ultimately disagree with our determination, in light of PeerStreet's various activities related to the Real Estate Securities, including, without limitation, how offerings of Real Estate Securities are conducted, the Automated Investing feature, and the nature of the information provided through the Platform.  In addition, a PSI affiliate that conducts activities unrelated to the Real Estate Securities covered in this PPM has noticed filed with the state of California.  We intend to continue to operate our business and operations related to the Real Estate Securities in a manner that does not subject any PSI affiliate to registration as an investment adviser under the Advisers Act or comparable state law, but a regulator might disagree that we do not have an obligation to register or notice file.  If we were required to register, or subject to other penalties, it could disrupt our business related to the Real Estate Securities, and could result in significant costs to PeerStreet, which could have a negative effect on the Platform and the Real Estate Securities.

- We Are Not Currently Subject to Banking Regulations or Examinations.  As a result, we are not currently subject to the banking regulations of any state or federal regulatory agency.  We are not subject to the periodic examinations to which commercial banks and other thrift institutions are subject.  Consequently, our financing decisions and our decisions regarding establishing loan loss

PRIVILEGED & CONFIDENTIAL

reserves are not subject to periodic review by any governmental agency.  Moreover, we are not subject to regulatory oversight relating to our capital, asset quality, management or compliance with laws.

- <u>Changes in Regulation of Financial Institutions May Affect Our Business</u>.  Recent legislative and regulatory initiatives have imposed restrictions and requirements on financial institutions that could have an adverse effect on our business.  There has been, and may continue to be, a related increase in regulatory investigations of the trading and other investment activities of alternative investment funds.  Those investigations may impose additional expenses on us, may require the attention of senior management, and may result in fines if we are deemed to have violated any regulations.

- <u>Changes in Regulation of Internet Commerce May Affect Our Business</u>.  As online commerce develops, federal and state governments may adopt new laws to regulate it, which may negatively affect our business.  The cost to comply with such laws or regulations could be significant and would increase our operating expenses, and we may be required to pass along those costs to you and other Investors in Real Estate Securities in the form of increased fees.  In addition, federal and state governmental or regulatory agencies may decide to impose taxes on services provided over the Internet.  These taxes could discourage the use of the Internet as a means of commercial financing, which would adversely affect the viability of the PeerStreet Platform.

- <u>Cost of Complying with Regulations May Affect PS Issuer's Ability to Make Payments or Distributions to Investors</u>.  All Underlying Investments and the operations conducted in connection with those investments are subject to federal, state and local laws and regulations, as well oversight from independent agencies.  There are various local, state and federal fire, health, life-safety, building code, zoning, environmental, and similar regulations with which lenders and borrowers may be required to comply and which may subject lenders and borrowers to liability in the form of fines or damages for noncompliance.

  For example, the presence of hazardous substances on the property, or the lack of wheelchair access, can violate various laws, rules, and regulations. Violations may exist at the time the loan is funded or may arise post-funding. Certain laws, rules, and regulations may impose joint and several liability on customers, lenders, owners or operators for fines and/or the costs to investigate and remediate, regardless of fault or whether the acts causing the violations were legal.

  In connection with the acquisition of Real Estate Securities, lenders and borrowers may be exposed to such costs in connection with such regulations.  The cost of defending against claims, of any damages or fines lenders and borrowers must pay, of compliance with regulatory requirements or of remediating any related issues could materially and adversely affect returns provided to PeerStreet on Underlying Investments, which could, in turn, negatively affect the ability of a PS Issuer to make payments and distributions to Investors in the applicable Real Estate Securities.

- <u>We Must Comply with Anti-Money Laundering Laws and Regulations</u>.  Laws intended to prohibit money laundering may require us to disclose your information or information about other Investors in Real Estate Securities to regulatory authorities.  The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**PATRIOT Act**") requires financial institutions to establish and maintain compliance programs to guard against money laundering activities, and requires the Secretary of the U.S. Department of the Treasury (the "**Treasury**") to prescribe regulations in connection with anti-

PRIVILEGED & CONFIDENTIAL

money laundering policies of financial institutions.  It is possible that new legislation or regulations could require us or our third-party service providers to share information with governmental authorities with respect to prospective investors in connection with the establishment of anti-money laundering procedures.

Any legislation and/or regulations like this could require us to implement additional restrictions on the transfer of the Real Estate Securities.  For example, we will not consent to Investors purchasing or transferring Real Estate Securities unless we receive information necessary to verify the identity of any prospective Investor and the source of the any funds paid to us, or as is necessary to comply with any customer identification programs required by FinCEN or the SEC to comply with customer identification program rules.  No Investor will be accepted by us that is named on the Treasury's list of "Specially Designated Nationals," "Blocked Persons," or "Sanctioned Countries or Individuals."  In the event of delay or failure by a prospective investor to produce any information required for verification purposes, a request to transfer any Real Estate Securities may be refused.

## 10. Conflicts of Interest

PeerStreet may be subject to certain conflicts of interest in selling Real Estate Securities to you.  The following are a list of certain potential conflicts of interest that may arise in connection with any Real Estate Securities you may hold.  This list is not exhaustive, and you should carefully consider the risks associated with PeerStreet' potential conflicts of interest.

- PSI Controls PeerStreet Platform and Is Unlikely to Serve as PS Issuer.  It is likely that different PS Issuers will issue Series of Real Estate Securities under this PPM over time.  The Real Estate Securities will all be issued in electronic form through the PeerStreet Platform, which is owned and operated by PSI.  While PSI may serve as PS Issuer, it is more likely that another PS affiliate, such as PSFLLC, will serve as PS Issuer.  This means that the PS Issuer of Real Estate Securities in which you invest may be dependent on PSI to, among other things, maintain a record of and track Investors' Real Estate Securities on the PeerStreet Platform.  If anything were to negatively affect the PeerStreet Platform, PSI may choose to fix certain elements of the PeerStreet Platform prior to addressing other elements of it affecting Investors in Real Estate Securities issued by a PS Issuer.  For example, the PeerStreet Platform may face a cybersecurity threat, and PeerStreet may choose to protect the personal information of users of the PeerStreet Platform before protecting any information contained in its online recordation of ownership system built into the PeerStreet Platform for Real Estate Securities.

- PSI Affiliates May Receive Fees in Connection with Servicing Underlying Investments.  One or more PSI affiliates may be hired by PSI, PSFLLC, PSFI or any other PSI affiliate to perform certain services and activities with respect to the Real Estate Securities described in this PPM or the Underlying Investments.  These services and activities may include, among other things, loan origination, due diligence, servicing, payment processing, collections and workouts.  Any PSI affiliate performing these services and activities may receive fees from another PSI affiliate as compensation.  Because PeerStreet may delegate its services, duties and obligations under this PPM to any PSI affiliate, PeerStreet may receive additional revenue in connection with offerings of Real Estate Securities under this PPM through any PSI affiliate performing these services and activities.  This may incentivize PeerStreet to charge higher fees for, or provide additional, services and activities with respect to, the Real Estate Securities offered under this PPM or any of the Underlying Investments, or sell Underlying Investments associated with low quality loans, regardless of the negative affect on Investors.  All fees charged by PeerStreet may reduce

PRIVILEGED & CONFIDENTIAL

amounts paid to Investors. Fees charged to and/or by PeerStreet may have priority in payment over the Real Estate Securities you invested in.

- <u>PeerStreet May Consider its Relationship With Lenders or Sponsors in Electing Which Course of Action to Follow.</u>  There may be events where third-party lenders and/or sponsors' interests and your interests are at odds, and PeerStreet may not always strictly pursue its full legal recourse against lenders and/or sponsors.  For example, in the event of a breach of contract by a lender, where PeerStreet deems it detrimental to investors or its business to pursue legal action against the lender, PeerStreet may elect not to pursue its full legal rights and remedies against the lender.

- <u>PeerStreet May Prioritize Servicing More Profitable Real Estate Securities.</u>  Real Estate Securities offered under this PPM may be sold in multiple Series and offerings, so PeerStreet may arrange and service other Real Estate Securities and Underlying Investments for other investors at the same time that Real Estate Securities are being offered to you.  These Real Estate Securities may be more secure or more profitable than the Real Estate Securities offered to you or the Underlying Investments funded by them.  PeerStreet may be incentivized to service more secure and more profitable Real Estate Securities before servicing less secure and less profitable Real Estate Securities, which may further negatively affect the returns on otherwise less secure or profitable Real Estate Securities.

- <u>PeerStreet May Offer Investments to Other Investors That Are Not Available Through the Platform.</u>  PeerStreet offers a variety of investments, some of which are available through the Platform and some of which are offered through other investing programs.  There is no guarantee that a particular investment opportunity will be accessible on the Platform.  In addition, if all or some of the investment programs offered by PeerStreet other than through the Platform generate more fees than those offered through the Platform, or certain investments are desired by investors who pay higher fees, invest greater amounts, or are investors in PeerStreet's business, PeerStreet may have an incentive to prioritize those other programs and investors and offer any investments through them before offering them through the Platform.  This could result in investors that use the Platform receiving lower quality investment opportunities.

- <u>Poor Performing Sponsors May Affect PeerStreet's Foreclosure Decisions.</u>  PeerStreet may arrange to invest in multiple Underlying Investments for a single lender, borrower, or other sponsor of Underlying Investments.  Where a sponsor with multiple Underlying Investments arranged by PeerStreet does not generate returns on one or more of those Underlying Investments (e.g., by defaulting on a single loan), PeerStreet may choose or be required to enforce or forbear from enforcing its foreclosure rights, if any, associated with Real Estate Securities held by you to your detriment to maintain its relationship with the sponsor.  PeerStreet may also be incentivized in its decisions to minimize harm to PeerStreet from a single sponsor's failure, which may not result in the same decisions that would maximize returns to Investors in Real Estate Securities associated with the defaulting sponsor's failure.

- <u>PeerStreet Has an Incentive to Fund as Many Underlying Investments As Possible.</u>  Substantially all of PeerStreet's revenues are derived from listing, origination, and servicing fees or "spreads" generated through making and arranging real estate loan investments.  As a result, PeerStreet may have an incentive to fund as many Underlying Investments as possible in order to maximize the amount of fees that PeerStreet is able to generate.  Increased project volume increases the demands on PeerStreet's management resources and its ability to devote adequate attention and resources to collection of payments or returns on Underlying Investments.  In the event that PeerStreet takes on volumes of Underlying Investments that exceed its ability to manage them,

PRIVILEGED & CONFIDENTIAL

PS Issuer's ability to make timely payments and distributions on the Real Estate Securities will suffer.

- <u>Investors in PeerStreet May Control Third Parties that Are Involved in the Real Estate Securities Offered Through the PeerStreet Platform</u>.  Some of the investors and principals in PeerStreet may own, control or be affiliated with entities or organizations that are involved in the Real Estate Securities offered through the PeerStreet Platform.  PeerStreet may have past, present or future business or commercial relationships with any of these third parties, including lenders, borrowers or other sponsors of Underlying Investments, and these third parties may indirectly receive funds from investors through the PeerStreet Platform.  PeerStreet may, in its sole discretion, conduct business with these third parties without providing any notice or disclosure to you.  These arrangements may create potential conflicts of interest, as investors in PeerStreet that control these third parties may be incentivized to encourage PeerStreet to do additional business with third parties associated with those investors.

**11. <u>Where to Find Additional Information</u>**

In addition to this PPM, the other Offering Materials will be available to you on the PeerStreet Website at www.PeerStreet.com.  Should you have any questions on the offerings covered by this PPM, the Real Estate Securities being offered or any of the above materials, please do not hesitate to contact PeerStreet through the Platform or as follows:

> Peer Street Funding, LLC.
> 2121 Park Place, Suite 250
> El Segundo, CA 90245
> info@PeerStreet.com

You can also access and review information about any Real Estate Securities you hold through your PeerStreet account on the PeerStreet Platform by logging into your Dashboard.  From your Dashboard, you can review your PeerStreet account statement and review messages from PeerStreet.  PeerStreet may communicate with you through the PeerStreet Website at www.PeerStreet.com or through email if there are material developments regarding your Real Estate Securities and any Underlying Investments tied to those Real Estate Securities that we deem necessary to transmit.  PeerStreet, either directly or through a third-party custodian, will maintain possession of all original documents for the Underlying Investments and related security instruments, to the extent not held by the originators.

---

End of Master PPM Document

**ADDENDUM #1 TO PRIVATE PLACEMENT MEMORANDUM**
**May 22, 2020**

***COVID-19 and future pandemics may negatively impact our business operations and it is difficult to predict the full extent of such effects.***

The spread of pandemics and disease across the world has resulted in the temporary closure of many corporate offices, county recording offices, courts, and other venues, as well as the implementation of travel restrictions and remote working, quarantine, and similar policies by numerous companies and national and local governments. These actions have impacted companies' ability to conduct their business activities efficiently and has impacted companies' ability to access liquidity and funding. The overall impact of COVID-19 on the operations of the Company and our performance is difficult to predict. Any potential impact on such operations and performance will depend to a large extent on future developments and actions taken by authorities and other entities to contain COVID-19 and its economic impact.

***COVID-19 and future pandemics may negatively impact investment performance and the reliability of property valuations.***

Real estate lending, servicing, asset management, and investment companies' activities and performance may be materially impacted by the COVID-19 pandemic. Restrictions on travel and gatherings have resulted in the closure of many county recording offices, title agencies, courthouses, and other venues. As such, lending activity may slow down significantly, potentially making it more difficult for borrowers to refinance their properties or for buyers to obtain acquisition loans. Timelines to record documents and/or resolve delinquent loans may also be impacted indefinitely. Property valuations reflect opinions of value and are inherently subjective, but pandemics can increase their volatility and uncertainty. Appraisers and brokers may not have physical access to the properties and market participants may not be willing to transact until prices stabilize. These potential impacts, while uncertain, could adversely affect the performance of our investments.

**EXHIBIT 13**

## FOR OFFERINGS OF REAL ESTATE SECURITIES THROUGH THE

# PeerStreet Platform

### PPM SUPPLEMENT:
### MORTGAGE-PAYMENT-DEPENDENT NOTES ("MPDN")
### OFFERED BY PEER STREET FUNDING, LLC

---

1.  **About this PPM Supplement**

This PPM Supplement provides information on the Mortgage-Payment-Dependent Notes, or MPDNs, that PeerStreet intends to offer, and issue through its affiliate Peer Street Funding, LLC, or PSFLLC, from time to time, in one or more Series, and describes the specific risks associated with MPDNs.  In general, as described in more detail below, the MPDNs provide investors the indirect right to payments made by a borrower on an underlying loan.

In this PPM Supplement, unless otherwise specified or required by context, we use the following terms:

- "**Borrower**" is a borrower that ultimately receives funds from an underlying loan originated or purchased by a lender that requested that underlying loan be funded by PeerStreet through an offering of Series of MPDNs as described in this PPM Supplement;

- "**Investors**" are holders of MPDNs;

- "**Form Instrument**" refers to the form of MPDN available as an exhibit following this PPM Supplement;

- "**Lender**" is any third-party or PeerStreet-affiliated lender, broker, or real estate company that requests funding for Underlying Investments;

- "**MPDNs**" are debt securities issued by PSFLLC in one or more Series of notes that provide Investors with the right to receive certain interest and principal payments that are dependent on an underlying loan, as set forth on the applicable Listing for a Series of MPDNs;

- "**PeerStreet**" refers collectively to PSFLLC, PSI, PSFI and any PSI affiliate;

- "**PeerStreet Platform**" is the investing platform sponsored by PeerStreet that is described in the PPM;

- "**PPM**" is the private placement memorandum associated with this PPM Supplement that summarizes the terms and conditions for various offerings of Real Estate Securities, including MPDNs, through the PeerStreet Platform;

- "**PPM Supplement**" is this supplement to the PPM for MPDNs that summarizes the terms and conditions of the MPDNs and describes the specific risk factors that apply to MPDNs;

- "**PSFLLC**" is Peer Street Funding, LLC, a Delaware limited liability company, and is the issuer of MPDNs offered under the PPM and this PPM Supplement;

- "**PSFI**" is PS Funding, Inc., a Delaware corporation. For purposes this MPDN PPM Supplement, any reference to PSFI shall also include other PSI Affiliates whose role and structure will be similar to PS Funding, Inc.'s;

- "**PSI**" is Peer Street, Inc., a Delaware corporation;

- "**PSI Affiliate**" is any affiliate of PSI, PSFLLC or PSFI; and

- "**Underlying Loan**" is a specific mortgage loan that one or more lenders requested to be funded and/or that is originated, purchased or co-invested in by PeerStreet. Such loans may be senior, junior, tranched, or otherwise vary in priority, term, and other conditions.

Any capitalized term not defined in this PPM Supplement shall have the same meaning as in the Master PPM. This PPM Supplement contains summaries of the other Offering Materials related to the MPDNs being offered. You should refer to the other Offering Materials for complete information. Each time we offer a Series of MPDNs, we will also prepare a Listing—which will be posted to the PeerStreet Website—with specific terms for and relevant information about that Series of MPDNs, the terms of the Underlying Loan, the lender and the borrower, the priority of the Underlying Loan, and the nature of any security interest (if any) in the Underlying Loan.

All summaries in this PPM are qualified in their entirety by reference to the other Offering Materials. Please refer to "Where to Find Additional Information" in the PPM for information on how to contact PeerStreet for additional information. You should consult the applicable Listing and Form Instrument for the Series of MPDNs being offered in order to review and evaluate the specific terms and conditions that apply to that Series of MPDNs.

## 2. <u>About the MPDNs We May Offer</u>

The MPDNs are notes that provide Investors the indirect right to payments that are made on an Underlying Loan described in a given Listing and offered in a given Series. The MPDNs are originated and structured as described below.

PeerStreet works with numerous Lenders that source borrowers and lending opportunities. Lenders may fund Underlying Loans independently and then sell them to PeerStreet, or request that PeerStreet fund the loan at origination. On some occasion, Borrowers may directly request funding from PeerStreet. Once PeerStreet receives a funding request, it will begin performing its own data-driven diligence on the Underlying Loan and the associated borrower. PeerStreet will review, among other things, the lender's or borrower's prior use of the PeerStreet Platform, as well as other information regarding the borrower, underlying property, and loan. Such information may include the loan purpose, the borrower's credit score, third-party opinions of value, and other information.

Based on its evaluation of these and other factors, PeerStreet may originate, purchase, or participate in a loan and offer it on its Platform through the sale of MPDNs. PeerStreet operates a marketplace and its decision to fund a loan is neither indicative of that loan's creditworthiness nor a recommendation to invest in a corresponding MPDN. PeerStreet will create a Listing for the MPDNs and seek funding for the Series. In the Listing, PeerStreet will provide information relevant to the investment, such as, among other things, the property associated with the Underlying Loan, the priority of the Underlying Loan, the principal amount of the Underlying Loan and certain information regarding the borrower.

PeerStreet generally only closes offerings of Series of MPDNs if the requested Series amount for the loan is realized.  PeerStreet does not recommend any investments in MPDNs or the Underlying Loans. Investors using the PeerStreet Platform are solely responsible for their decision to invest, or not invest, in any Real Estate Securities.

PSFLLC is the issuer of the MPDNs, but PSFLLC may not itself purchase or hold any Underlying Loans tied to MPDNs.  Though PSFLLC may directly hold Underlying Loans tied to MPDNs, it may alternatively enter into participation agreements with affiliated entities, who in turn hold those loans. For example, after PSFLLC receives investors' investments, it may transfer those investments to its affiliate, including PSFI, in consideration for a whole participation interest in the Underlying Loan. These participation interests would grant PSFLLC the right to, among other things, receive payments from the borrower payable on the Underlying Loan and/or engage in collections or related efforts in the case of default.  Under this structure, PSFI retains title, legal ownership, and some servicing rights with respect to the Underlying Loan.  Information related to which entity holds the loans and whether PSFLLC has collections or foreclosure rights will be provided in the applicable Listing.

As holder of or participant in the Underlying Loans, PSFI receives payments from borrowers on the Underlying Loans.  As payments are received by PSFI, PSFI first uses these funds to pay out fees and expenses, including, without limitation, PeerStreet's own fees, and then transfers the remainder, if any, to PSFLLC under the terms of the participation.  Investors in MPDNs are, in turn, entitled to receive these net payments from PSFLLC. In situations where PSFLLC directly holds legal title to the Underlying Loan, in addition to the rights it would hold if it held a whole participation in the Underlying Loan, it may still retain PSFI as master servicer and payments may first flow through PSFI in that capacity. Section 3 below provides greater insights into fees, costs, and priority of payment.

While PeerStreet generally uses the participation structure to lower PSFLLC's exposure to certain bankruptcy risks, you should note that PSFLLC will not have entered into a contract with the lender directly and PSFI is not a bankruptcy-remote entity.  In situations where PSFLLC holds legal title to the Underlying Loans, it may still retain PSFI to perform certain servicing-related functions.

**3.  <u>Summary of Terms</u>**

*This summary provides key terms of the MPDNs and highlights selected information contained elsewhere in or incorporated by reference into this PPM Supplement.  It does not contain all of the information that you should consider before making an investment decision.  For a more complete understanding of the applicable offering of a Series of MPDNs, you should read the entirety of this PPM Supplement, the PPM, the Listing and Form Instrument for that Series of MPDNs, and the Investor Agreement.  Please read this PPM Supplement and the PPM in their entirety (including the risk factors described in the "<u>Risk Factors Related to the MPDNs</u>" section of this PPM Supplement and the "<u>General Risk Factors</u>" section of the PPM for more information about important factors you should consider before investing in the MPDNs).*

| | |
|---|---|
| **Issuer** | Peer Street Funding, LLC, a Delaware limited liability company, or PSFLLC. |
| **MPDNs Offered** | MPDNs, to be issued in Series, with each Series of MPDNs corresponding to a specific Underlying Loan that provides PeerStreet with the right to receive payments of principal and interest from the borrower.<br><br>Investors are entitled to receive principal and interest payments from PSFLLC, net of applicable fees and expenses, from amounts PeerStreet receives on that Underlying Loan.<br><br>**Neither PSFLLC nor PeerStreet has any obligation to make any payments on MPDNs, unless, and only to the extent that, PeerStreet has received payments from the applicable borrower on that Underlying Loan, net of any applicable fees and expenses. Neither PSFLLC nor PeerStreet guarantees Investors will receive payments on MPDNs or that borrowers will pay PeerStreet amounts due on Underlying Loans, in accordance with the applicable Listing.** |
| **Purchase Price** | Unless specified otherwise on any given Listing, the purchase price for any MPDNs you purchase through the Platform will equal 100% of the principal amount of the MPDN that you decide to purchase. The MPDNs, and your rights as an investor in the MPDNs, are at all times subject to the Investor Agreement, which will also be available on the Platform for your reference and review.<br><br>You must commit to purchase the MPDN through the Platform prior to the closing of the applicable Series. At the time you commit to purchase an MPDN, you must have sufficient funds in your account with PeerStreet to complete the purchase. |
| **Underlying Loan and Security Interest Therein** | PeerStreet expects each Underlying Loan will be secured by a deed of trust, mortgage, security agreement or legal title to the underlying real estate. The Underlying Loans will be whole mortgage loans, unless the Listing indicates otherwise. The loans are either originated by third-party lenders and purchased (in whole or in part) by PSFI (an affiliate of PSFLLC) or are originated by PSFI itself. PSFLLC may elect to either purchase loans from PSFI, to participate in loans (or whole participations in loans) held by PSFI, or to participate in portions of loans shared by PSFI and third-party lenders. In cases where PSFI or PSFLLC holds only a partial participation in an Underlying Loan, it may not have the ability to foreclose on a loan. In addition, in certain cases PeerStreet may not have first priority of payment relative to other loans or other obligations on a property, meaning that the holder of loans or portions of loans with higher priority will receive payments before PSFLLC or PSFI.<br><br>In scenarios where PSFI holds the Underlying Loans or participates in the Underlying Loans with other lenders, it will then issue participations to PSFLLC that provide PSFLLC the right to some of PSFI's economic interests in the Underlying Loan (net of fees and costs). In any case, Investors in the associated MPDNs will have the right to payments received by PSFLLC under the participation. |

| | The Listing for each Series of MPDNs will describe the Underlying Loan in more detail.  The Listing for each Series of MPDNs will be available to you on the PeerStreet Website. |
|---|---|
| | In the event of a borrower default, PSFI, PSFLLC, or an affiliate or third-party participating Lender, may need to foreclose on the underlying real estate or sell the Underlying Loan, potentially at a loss, and such risk of loss is borne by you, as an Investor in the MPDNs. If PSFLLC does not have foreclosure rights, its ability to collect payments will be dependent on a third party with that authority, and you may incur losses based on that third party's efforts or lack thereof.  In other words, payment to Investors in any Series of MPDNs is entirely dependent on PeerStreet receiving payment from the borrower associated with the Underlying Loan or on the liquidation of the loan or collateral securing the loan. Investors are bound by PeerStreet's or a third party's, as applicable, good faith decision-making regarding the servicing, managing, and disposition of any Underlying Loan. |
| **No Security Interest Held by Investors in MPDNs** | Investors in MPDNs will not have any security interest in the assets of PSFLLC, PSFI, PeerStreet, any borrower or lender, any Underlying Loan, any proceeds from any Underlying Loan or in the assets of any borrower or lender (including any PSI affiliate acting as lender) associated with any Underlying Loan.  MPDNs will be unsecured special, limited obligations of PSFLLC.

The priority and security interest of an Underlying Loan in the property securing it will be disclosed in the applicable Listing. |
| **Interest** | Subject to the limitations described in this PPM Supplement, the amount of interest an Investor will receive may vary among the Series of MPDNs tied to an Underlying Loan.  Generally, MPDNs will bear interest from the date of issuance and different Series of MPDNs may have different interest rates.

PeerStreet anticipates interest will be at a fixed or variable rate and tied to a specific mortgage loan constituting the Underlying Loan for that Series of MPDNs.

You should consult the applicable Listing for each Series of MPDNs—a copy of which will be posted on the PeerStreet Website—to determine the applicable interest rate for that Series of MPDNs. |
| **Interest Payment Dates** | Each Series of MPDNs will state the type of periodic payments (monthly, quarterly, etc.) applicable to that Series of MPDNs.

Typically, PeerStreet holds the right to receive interest payments on the Underlying Loans on certain, set due dates.  PeerStreet, directly or through a third-party servicer, expects to receive these payments within ten business days of the due dates.  Once interest payments are received in its bank account, PSFLLC will distribute the funds, net of applicable PeerStreet fees and any other recoverable fees and costs, pro rata to Investors' PeerStreet accounts as soon as practicable.

In its sole and absolute discretion, PSFLLC may elect to advance distributions of funds to Investors after a third-party servicer acknowledges receipt of funds, but before those funds are actually transferred to PSFLLC. In such an event, should the |

|  | funds advanced not have actually been collected by the servicer, PSFLLC reserves the right to reverse the distribution and/or offset the distribution at a later time. |
|  | In the event PeerStreet receives interest payments on Underlying Loans after the applicable payment dates, PSFLLC will deem the payment date of a Series of MPDNs to be the same as the dates applicable to the Underlying Loan. |
|  | Final proceeds collected by PSFLLC will be distributed to Investors, net of any fees, charges and reimbursements of advances payable to PeerStreet, as soon as practicable. |
| **Principal Payment Dates** | The payment process upon maturity and PSFLLC's treatment of the maturity date will occur in the same way for principal payments as described above for interest payments.  Loans may be paid off by a borrower prior to their maturity date, in which case, interest will usually only be payable by the corresponding borrower through the payoff date. In such scenarios, Investors may not receive as much interest as anticipated. |
| **Limitations on Payments of Interest and Principal** | All payments made to Investors will be net of any fees and expenses, charges or other reimbursements payable to PeerStreet or any PSI affiliate.  Principal and interest payments will only be made to Investors by PSFLLC to the extent that PeerStreet receives payments on the Underlying Loan, in all cases subject to the payment or repayment of any PeerStreet fees, costs, or other fees advanced by PeerStreet in connection with collection or similar efforts made with respect to the Underlying Loan. |
|  | To the extent PeerStreet has not received all (or a portion) of a required payment on the Underlying Loan, PSFLLC will not make all (or that corresponding portion) of payments to Investors in the Series of MPDNs tied to that delinquent or defaulted Underlying Loan.  Investors will have no rights with respect to the Underlying Loan and any event of default on that Underlying Loan by the borrower. |
|  | In the event the Underlying Loan is serviced by a third-party servicer (whether or not affiliated with PeerStreet), that servicer may charge a servicing fee on amounts collected, which will be paid prior to any interest payment being made to Investors. |
| **Fees** | <u>Standard Fee Paid to PeerStreet</u> |
|  | For each Series of MPDNs, PeerStreet anticipates that it will receive a portion of the proceeds generated by the Underlying Loan or corresponding property as a fee for its efforts servicing and providing other services with respect to the Underlying Loan and the MPDNs (the "**Standard Fee**").  The Standard Fee may be collected in installments from interest payments and principal repayments or, in the event of default, upon the sale of the underlying property or other liquidity event. PeerStreet's Standard Fee is earned on a daily basis and is payable prior to any disbursements being made to Investors. PeerStreet generally expects that its Standard Fee will be between 0% and 2% (annualized) of the loan amount, but the Standard Fee may vary beyond this range. Some factors affecting the size of the Standard Fee include, without limitation, liquidity premiums and seniority premiums, where applicable. The applicable Standard Fee for any Series of MPDNs |

will be specifically identified on the PeerStreet Website and/or the applicable Listing.

Additional Fees and Charges Paid to PeerStreet by Third Parties

At the time of origination or loan purchase, PeerStreet may collect origination fees from the Borrower or Lender.

Once a loan is purchased, PeerStreet may also retain any deferred origination fees, pre-negotiated exit fees, late fees, and other similar fees and charges, if any.

Fees Shared with Investors

Borrowers may also be required to pay extension fees, prepayment penalties, forbearance fees, and/or default interest (collectively, "**Shared Charges**"). PeerStreet will share any collected Shared Charges equally with Investors.

Other Fees; Foreclosure

PSFI may hire affiliated entities to perform certain activities associated with MPDNs, and these affiliates may receive fair, market-rate compensation for those services. Such fees may be paid out of funds that would otherwise go to Investors and may affect returns on the Underlying Loan. Non-sufficient funds or other unsuccessful payment fees shall be fully retained by PeerStreet or third-party servicers.

In the event of foreclosure, PeerStreet may recover the aforementioned fees from the sale proceeds and will share equally with the Investors any net gain on sale.

Interests Held by PeerStreet

PeerStreet may fund and retain an interest in the Underlying Loans.  If so, it will receive returns based on those Underlying Loans alongside, and on similar terms, to Investors.

| | |
|---|---|
| **Advances and Expenses** | Throughout the life of any given investment, including post-foreclosure if the ownership of underlying property reverts to PeerStreet after foreclosure or work-out ("real estate owned" and/or "REO"), PeerStreet may, in its sole and absolute discretion, elect to advance certain fees, taxes, costs, and expenses to protect its security interest and/or the property ("Advances").

For example, without limitation, if PeerStreet is made aware that the property insurance policy on a given property has lapsed, PeerStreet may elect to bind a new policy to protect the collateral. Other examples of advances that PeerStreet may elect to make include, without limitation: (i) foreclosure related fees and costs (such as attorneys' and property management fees), (ii) property taxes, (iii) property maintenance and/or repairs, (iv) broker fees, (v) miscellaneous legal or other professional fees and expenses, (vi) other encumbrances, etc.  In order of make advances, PeerStreet may need to take loans from third-parties or related entities, in |

|  | which case these loans may have priority in repayment over funds to be distributed to Investors. |
|---|---|
|  | PeerStreet may make these advances when, in its sole and absolute discretion, it determines in good faith that making these advances will ultimately be the most effective course of action with respect to the returns on an Underlying Loan. PeerStreet is under no obligation to make any advance, and PeerStreet's decisions regarding when to make an advance may differ from what an Investor would do. PeerStreet may also, in its sole and absolute discretion, reduce or waive some fees and costs. When PeerStreet elects to make advances, it shall be entitled to recover such advances prior to any payments being made to Investors. |
|  | Advances will be reimbursed prior to any funds being distributed on MPDNs. Any advances made by PeerStreet will, at PeerStreet's sole discretion, bear interest at reasonable rates, not to exceed the maximum rate allowed by law, and will be reimbursable to PeerStreet upon receipt of funds from the applicable borrower, sale of the property, or other source of funds. |
| **Defaults and Deferrals** | Pursuant to the terms of the applicable Underlying Loan, the borrower may have a grace period from the date that payments are due to PeerStreet.  After the expiration of any grace period and/or in accordance with applicable state law, PeerStreet or its retained servicing provider will generally notice the borrower of any delinquency. |
|  | If that borrower does not reinstate the loan or adequately respond to the notice of delinquency within a reasonable time, then in accordance with state law, to the extent that PeerStreet has foreclosure rights, PeerStreet or its retained service provider generally will initiate legal proceedings, if applicable, with respect to the Underlying Loan.  PeerStreet may exercise its discretion in the timing of the filing of any legal action and may also exercise its discretion in the timing of any foreclosure under the power of sale contained in the applicable security instrument (if any), including granting extensions of the foreclosure date.  If PeerStreet does not hold foreclosure rights, it will be dependent on any third party that does to make decisions regarding when to initiate and how to conduct those proceedings. |
|  | Where PeerStreet has such rights, PeerStreet retains the authority to grant appropriate payment deferrals or waivers based on its overall assessment of the borrower, the Underlying Loan and market conditions generally.  In such cases, the payment terms of MPDNs will be correspondingly adjusted, deferred, or waived, and PeerStreet will communicate any relevant adjustment to you through the PeerStreet Website. |
| **Term** | The term of MPDNs may vary by Series as may the term of the Underlying Loan. PeerStreet anticipates that the term of MPDNs will generally be the same as the term of the Underlying Loan. |
|  | PeerStreet anticipates the applicable term will typically range between one months and five years, but the exact term for any Series of MPDNs offered under this PPM Supplement and the PPM will be listed on the Listing for that Series of MPDNs. The term may be automatically modified, concurrently with the term of |

|  | the Underlying Loan, so as to make the MPDN and the Underlying Loan co-terminus. |
|---|---|
| **Maturity** | MPDNs in each Series will mature upon the maturity date of the Underlying Loan, unless any payments of that loan remain due and payable after the loan's maturity date. |
|  | If there are amounts owed to PeerStreet on the Underlying Loan at the end of the initial maturity date provided in the Listing, the term of MPDNs may be extended to allow for more time for PeerStreet to receive further payments due on the Underlying Loan and for Investors to thus receive further interest payments on the corresponding MPDNs. |
|  | If any of those payments are delinquent and remain due and payable on that date, the maturity of MPDNs will be automatically extended to the time when all payments from the Underlying Loan are received by PeerStreet, unless PeerStreet determines, in our sole discretion, to amend, modify, sell (at a gain, par, or loss), or write off the Underlying Loan at any time. If PeerStreet chooses to exercise our discretion accordingly, then MPDNs may not reach the stated maturity date. |
|  | In the event of a foreclosure sale, unless PeerStreet determines otherwise in accordance with the terms of this section, the term of the MPDN will further extend until the underlying property is sold and all collection efforts have ceased. |
|  | For the avoidance of doubt, PeerStreet will use commercially reasonable efforts to negotiate and/or will pursue collection efforts with respect to any delinquent or defaulted Underlying Loan. To the extent that PSFLLC is able to receive payments on any delinquent or defaulted Underlying Loan, it will distribute that unpaid interest to Investors, net of any applicable fees and expenses. |
| **Ranking** | MPDNs will not be contractually senior to any other indebtedness incurred by PSFLLC or PeerStreet. MPDNs will be limited, unsecured obligations of PSFLLC only and are not obligations of any borrower or lender (including any PSI affiliate acting as lender) associated with any Underlying Loan. |
| **No Sinking Fund** | MPDNs will not benefit from any sinking fund, which is a means of repaying debt through the issuance of a debt instrument requiring periodic payments to a trustee who retires part of that debt by purchasing the debt in the open market. |
| **Denomination** | Each MPDN will be denominated in U.S. dollars. |
| **Issuance, Form and Registration of Ownership** | The exact form of MPDN for each particular Series of MPDNs offered by PSFLLC under this PPM Supplement and the PPM will vary based on the terms and conditions of that Series of MPDNs. Because certain terms (e.g., issuance date) of a Series of MPDNs may not be known until all funding commitments have been received and the closing for that Series of MPDNs has occurred, the Form Instrument for each MPDN will simply be posted on the PeerStreet Website, along with the applicable Listing, this PPM Supplement, the PPM and the Investor Agreement. After the closing of a Series of MPDNs, PSFLLC will create a final form of note for the MPDNs, which will be available on an Investor's Dashboard. |

| | PeerStreet will treat the Investors in whose names MPDNs are registered as the owners of MPDNs for the purpose of receiving payments and for all other purposes.

MPDNs are issued in electronic form on the Platform as soon as practicable after completion of funding and due diligence, and you will not receive a physical instrument. Instead, the MPDNs you have purchased are visible through your account on the Platform. There, you can view the number of MPDNs you own, as well as other details, such as the interest rate and interest payment date. |
|---|---|
| **Use of Proceeds** | For each Series of MPDNs offered, the proceeds will be used, net of any applicable fees and costs, to facilitate the funding of a specific loan or investment purchased and held by PeerStreet. |

**4.  Our Diligence Process**

PeerStreet does not provide investment advice or make any representation as to any Underlying Loan's desirability. In performing diligence, PeerStreet generally limits its role to reviewing mortgage loan files associated with the borrower on the loan, obtaining some background information for the borrower, obtaining third-party opinions of value for any underlying real estate, and obtaining title insurance or coverage protection letters. Despite its good faith efforts in performing this diligence, however, PeerStreet cannot guarantee accuracy, absence of mistakes, and/or outcomes.

After performing the above diligence, PeerStreet will decide whether to purchase or fund the loan and whether it will subsequently offer and issue MPDNs that will entitle Investors in those MPDNs to receive certain payments or distributions that will be indirectly or directly tied to that borrower repaying funds to PeerStreet. PeerStreet may also have other sources of capital and/or other third-parties seeking to purchase interests in (or all of) its loans. PeerStreet will apportion investment opportunities, based on allocation processes developed in its sole and absolute discretion, among all such parties.

While PeerStreet evaluates and analyzes all Underlying Loans, you should perform your own respective due diligence and should not rely on any evaluation or analysis performed by PeerStreet.  You should independently assess the risks associated with any investment, including, without limitation, repayment risk associated with the borrower, market risk associated with the property, value of the security interest in the Underlying Loan held as collateral, and regulatory, casualty and environmental risks.

**5.  Risk Factors Related to MPDNs**

*Investing in the MPDNs involves a high degree of risk.  In deciding whether to purchase MPDNs, you should carefully consider the following risk factors **in addition to those risk factors provided in the "General Risk Factors" section of the PPM**.  Any of the following risks could have a material adverse effect on the value of the MPDNs you purchase and could cause you to lose all or part of your purchase price or could adversely affect future payments you expect to receive on the MPDNs.  Only investors who can bear the loss of their entire purchase price should purchase MPDNs.*

**Consider carefully the following risks related to the structure of the MPDNs specifically:**

- You May Not Receive Interest Payments.  If PeerStreet does not receive all or part of the payments on the Underlying Loans relating to your MPDNs, you will not receive the full principal and interest payments that you expect to receive on your MPDNs, and you may not recover your original investment.  Although we will seek to protect our investment in any

underling investment through various strategies, those strategies will vary by type of and Series of MPDNs offered and may not provide full protection, if any.

If an Underlying Loan becomes past due or is otherwise in default, PeerStreet may need to extend the borrower's time to payoff the loan, structure alternative settlements and resolutions, and/or enter into foreclosure proceedings (where it has foreclosure rights) against the relevant borrower. Foreclosure proceedings are costly and PeerStreet may need to advance funds to cover such costs. In that event, any costs advanced by PeerStreet may be reimbursed prior to any funds being distributed to Investors. Foreclosure and/or real estate owned ("REO") holding costs alone may significantly, or completely, impair the value of your investment.  If a third party controls foreclosure, the success of its efforts (if any) to foreclose may also negatively affect your returns.

In certain cases, we may not be able to recover any of the unpaid balance even if an Underlying Loan is fully secured.  As a result, an Investor that purchased an MPDN from the corresponding Series of MPDNs may receive little, if any, of the unpaid principal and interest payable on that MPDN.  You must rely on PeerStreet's collection efforts or any applicable collection agency to which we refer Underlying Loans in default.  YOU MUST NOT ATTEMPT TO CONTACT THE ORIGINATING LENDER, BORROWER, OR THIRD-PARTY SERVICE PROVIDERS, WHETHER OR NOT RETAINED DIRECTLY BY PEERSTREET, FOR ANY PURPOSES, INCLUDING, BUT NOT LIMITED TO, COLLECTION EFFORTS.

- Security on, or Participation in, Underlying Loans Does Not Eliminate Risk of Default.  As noted above, the security or participation we obtain for certain Underlying Loans does not remove the risk associated with default.  Underlying loans will be generally (but not always) secured by a lien security interest such as a mortgage, deed of trust or security deed on the underlying real estate.  The exact type of security interest related to a particular Underlying Loan will involve specific types of risk in terms of realizing on the collateral in the event that the borrower defaults.  These risks include, among others, completion costs for incomplete projects, an owner's ability to lease out office space, or difficulties in selling the underlying property or obtaining a refinance loan.  These risks are not mitigated by foreclosure, even where PeerStreet has foreclosure rights.

If an Underlying Loan becomes past due or is otherwise in default, PeerStreet or a third party may need to foreclose on any property tied to that Underlying Loan at a foreclosure sale unless the property is purchased by a third-party bidder at the foreclosure sale.  In certain cases, PeerStreet may act as manager for the foreclosed real estate, and the costs of foreclosure may be advanced by PeerStreet, but if PeerStreet cannot quickly sell such property and the property does not produce any significant income, the cost of owning, maintaining, and selling the property would reduce any proceeds gained through the sale.  If the foreclosed property cannot be sold for net proceeds that can fully return the outstanding amount of the Real Estate Securities, then you may lose all or part of your investment.

Foreclosure statutes vary widely from state to state.  Properties tied to defaulted Underlying Loans will need to be foreclosed upon in compliance with the laws of the state where any underlying property is located.  Many states require lengthy processing periods or the obtaining of a court decree before a mortgaged property may be sold or otherwise foreclosed upon.  Further, statutory rights to redemption and the effects of anti-deficiency and other laws may limit the ability for PeerStreet or a third party to timely recover the value of the Underlying Loan in the event that a borrower defaults on an Underlying Loan.  A bankruptcy of the borrower will prevent PeerStreet from exercising its foreclosure remedy promptly.

Where an Underlying Loan is secured, if the borrower or any other party claiming to have some form of interest in the property or Underlying Loan enters bankruptcy, all proceedings and collection efforts against the property are automatically stayed.  This stay will prevent PeerStreet from foreclosing on the property (even where it has such rights) unless relief from the stay can be obtained from the bankruptcy court, and there is no guarantee that any such relief will be obtained.  Significant legal fees and costs may be incurred in attempting to obtain relief from a bankruptcy stay from the bankruptcy court and, even if such relief is ultimately granted, it may take several months or more to obtain.  In such event, PeerStreet will be unable to promptly exercise its foreclosure remedy and realize any proceeds from a property sale.

Bankruptcy courts have broad powers to permit a sale of the real property free of PeerStreet's lien, to compel PeerStreet to accept an amount less than the balance due under the Underlying Loan and to permit the borrower to repay the loan over a term which may be substantially longer or at different interest rates than the original terms of the Underlying Loan.

- If PeerStreet Does Not Have Foreclosure Rights Related to an Underlying Loan, PeerStreet Will Not Control the Process of Collecting in the Case of Default.  In situations where PSFI participates in loans with other lenders, as opposed to acquiring the entire loan, its ability to make decisions in the foreclosure process may be limited. Although PSFLLC will be owed its share of economic interest in the Underlying Loan, other participating parties may control the servicing or asset management processes. This may decrease Investors' returns, due to our dependence on such third-parties' management ability.

- Our Security Interest in Underlying Loans May Decline in Value.  If we have a security interest in an Underlying Loan, that security interest may decline in value.  The value of our security interest will be subject to the risks generally incident to the ownership of improved and unimproved real estate, including changes in general or local economic conditions, increases in interest rates for real estate financing, physical damage that is not covered by insurance, zoning, entitlements and other risks.  Many real estate companies expect to use resale proceeds to repay their loans.  A decline in property values could result in loan amounts being greater than the associated property value, which could increase the likelihood of the borrower failing to make payments on the Underlying Loan. Factors negatively impacting the property, such as, without limitation, deferred maintenance, upkeep costs, lack of occupancy, etc., may completely eradicate the value of the security interest and/or the property itself.

- Our Security Interest May Not be Valid or Have the Stated Priority. Listings on the Platform will typically outline the security interest that PSFI will have in connection with any given loan. Such information represents the security interest that PeerStreet determines it has in the property, but such determination may be wrong. For example, without limitation, borrowers may acquire title to the underlying via fraud or forgery, which may invalidate any security interest that borrower has granted. As another common example, without limitation, there may be prior liens against the property that PeerStreet believed to be paid off and which may foreclose out PSFI's lien. Generally, PeerStreet will procure title insurance policies to protect against these types of risks, but title insurance companies may refuse to disburse insurance proceeds, may disburse a smaller amount than the Underlying Loan, and/or may take years to issue payment on a policy. PeerStreet may also, in its sole and absolute discretion, elect to advance funds to satisfy senior liens and/or to defend its security interest in court, which advances would be repaid before any funds were disbursed to you.

- An Underlying Loan May Not Have First Priority of Payment, Which May Affect Returns.  In certain cases, a Series may be associated with an Underlying Loan that does not provide PSFLLC

or PSFI as holder first priority to receive payments.  In such cases, PSFLLC or PSFI will only receive payments as provided for in the terms of the Underlying Loan, after the holders of any higher priority loans receive all funds they are entitled to.  In some cases, this could mean that PSFLLC or PSFI receive reduced or no payments based on the Underlying Loan or the MPDNs, because there are insufficient cash flows generated to reach PSFLLC or PSFI. If a third-party with higher priority forecloses on the borrower, your investment may be completely lost and valueless.

- PeerStreet May Retain Funds for Payment of Certain Fees. PeerStreet may retain a portion of funds received from the relevant borrower to pay any non-sufficient funds fees, attorneys' fees or collection fees incurred by us or imposed by any third-party service provider or collection agency in connection with collection efforts.  If any of these fees are collected or imposed, it may reduce your return.  Under the terms of the MPDNs, if PeerStreet does not receive any or all payments on the Underlying Investment, payments on your MPDNs will be correspondingly reduced in whole or in part.  If the relevant borrower does not make a payment due to us on any specific payment due date, or if the payment isn't sufficient to cover advances, fees, and costs, no payment will be made on your MPDNs on the corresponding succeeding MPDN payment date.

- All MPDNs Offered Are Unsecured.  All MPDNs offered under this PPM are special, limited obligations of PSFLLC only and are not secured by any collateral or guaranteed or insured by any governmental agency or instrumentality of any third party.  While Underlying Loans may be secured by a mortgage, deed of trust, security agreement, legal title, personal guarantee or other mechanism, MPDNs will not represent an obligation of the borrower, original lender or any other third party except PSFLLC.  Investors may look only to PSFLLC for interest payments on MPDNs.  Furthermore, if a borrower fails to make any payments on the Underlying Loan, Investors in MPDNs tied to that Underlying Loan will not receive interest payments from PSFLLC on those MPDNs.  You will not be able to pursue collection against the borrower and are prohibited from contacting the borrower about the Underlying Loan.

- PeerStreet Pools Participations and Underlying Loans Which Creates Risks.  PSFLLC pools the participations it receives from PSFI with respect to MPDNs, and PSFI pools Underlying Loans it holds that are associated with MPDNs.  It is possible that if either PSFLLC, PSFI or any PSI affiliate became bankrupt that Investors in MPDNs would be unable to recover their investment, as claimants against PSFLLC, PSFI or the applicable PSI affiliate may claim all participations and Underlying Loans were commingled and, thus, should not be treated as segregated assets for purposes of that PeerStreet entity's dissolution under bankruptcy law.  If a court commingles PeerStreet's assets, creditors may make claims against assets that would otherwise have been used to make payments to Investors.  If this were to occur, you may be unable to recover all or part of your investment in MPDNs.  If PSFLLC becomes bankrupt, but not PSFI, you may be unable to receive payments on your MPDNs.  If PSFI becomes bankrupt, but not PSFLLC, PSFLLC may be unable to recover payments from PSFI and, in turn, would be unable to make payments to Investors in MPDNs. Alternatively, if PeerStreet were sued by borrowers, other parties related to the Underlying Loan, Investors, etc., assets pooled into same accounts may be exposed to such risks. If PeerStreet were to run out of funds, it may also be unable to make advances to protect its or Investors' interests in the Underlying Loans.

- Other Investors May Receive Better Terms.  Because the interest rate for MPDNs will vary for each Series, the yield an Investor earns on one Series of MPDNs may differ from the yield earned by Investors in other Series of MPDNs.  In addition, PeerStreet may offer different terms on MPDNs related to the same Underlying Loan, meaning that different Investors may have different terms and/or priorities even though the Underlying Loan is the same.  PeerStreet also reserves the

right to offer incentives to individuals or classes of individuals, in the form of online promotions that are open to all investors (but only certain investors participate in) or on a discretionary basis to individual investors. These incentives may increase the rate of return for Investors who receive them.

**Consider carefully the following risks related to PSFLLC's dependence on the borrowers of Underlying Loans:**

- Defaulting Borrowers. If a borrower remains in default on any Underlying Loan and fails to cure that default after a reasonable period of time, then PSFI or PSFLLC may foreclose on the real estate corresponding with that Underlying Loan, in cases where PSFI or PSFLLC has such rights. PSFI or PSFLLC might have difficulty enforcing its foreclosure rights, however. The terms with respect to default and foreclosure will vary with each Series of MPDNs and each Underlying Loan. Some states have far longer and costlier foreclosure processes than others. It is the Investors' responsibility to familiarize themselves with various states' foreclosure laws prior to making an investment in MPDNs. Even if PSFI, or another PeerStreet entity or third-party participant, can successfully foreclose on a property, it may not be able to then sell the collateral for prolonged periods of time or to recover all (if any) funds back from such a sale.

- PeerStreet May Provide Additional Financing to Borrowers. PeerStreet may provide multiple loans to any given borrower, to be used on any number of projects. Such other loans extended by PeerStreet to a specific borrower will generally not be disclosed on any given Listing. Because PeerStreet works with many lenders and borrowers more than once, PeerStreet may choose not to act in the same manner that an Investor of MPDNs or a typical lender to a borrower would, which could adversely affect Investors in MPDNs. For example, and without limitation, PeerStreet may decide to pursue resolutions that prioritize certain loans over, or at the expense of, another loan.

- PeerStreet May Advance Funds to Borrowers. PeerStreet may determine to advance funds to a borrower if it finds such an advance to be necessary and prudent to protect the interests of Investors. For example, PeerStreet might do so upon finding that a borrower's casualty insurance was cancelled or expired or that a borrower is delinquent on paying property taxes. These advances will be added to the amount of the Underlying Loan and will bear interest at reasonable rates (not to exceed the maximum rate allowed by law). Advances at these rates may be significantly more expensive for the borrower than if that borrower had paid for those expenses originally. These advances will also need to be repaid by borrowers before any existing balance of the Underlying Loan is paid down, which, as a result, may delay payments on the existing balance of the Underlying Loan that would otherwise be ultimately provided to Investors.

- Borrowers May Misuse Funds. PeerStreet does not control any third-party borrower. Should the proceeds of any financing of an Underlying Loan on the PeerStreet Platform be diverted improperly or otherwise misused, the Investors in any MPDNs associated with that borrower could lose their entire investment.

- Borrowers May Incur Debt and May Be Over Leveraged. Borrowers are generally able to incur unsecured or secured indebtedness besides any Underlying Loans, regardless of whether the terms of a loan impose restrictions on their ability to incur additional indebtedness. Any increase in the debt loads held by borrowers that we work with may adversely affect their creditworthiness and could result in their financial distress, insolvency or bankruptcy. Borrowers who incur additional debt may also be less likely to make payments on the Underlying Loans to PSFI. As PSFLLC only provides payments and distributions on MPDNs to Investors upon PSFI receiving

payments on Underlying Loans, if borrowers incur additional debt and cannot make payments to PSFLLC, Investors will receive less in payments or distributions on MPDNs held by them.

- Borrowers Face Insurance Risks. PeerStreet may, in its sole and absolute discretion, require certain borrowers to obtain insurance against risks faced by the Underlying Loan. This insurance may prove costly or could become unavailable for borrowers altogether. Real estate properties are typically insured against risk of fire damage and certain other property casualties, but these casualties are sometimes not covered by severe weather or natural disaster events such as landslides, earthquakes or floods. Changes in the conditions affecting the economic environment in which insurance companies do business could affect the borrower's ability to continue insuring any underlying property at a reasonable cost or could result in insurance being unavailable altogether. Moreover, any hazard losses not then covered by the borrower's insurance policy would result in the Underlying Loan becoming significantly under secured, and an Investor of an MPDN tied to that Underlying Loan could sustain a significant reduction, or complete elimination of, any principal and interest payments from that MPDN.

- Lenders and Borrowers Rely on Projected Revenues. In determining funding requests, lenders rely on projected revenues from Underlying Loans typically developed by borrowers, which may prove inaccurate and overestimated over time. The payment schedules with respect to many Underlying Loans are based on these projected revenues, which are based on factors such as expected vacancy rates, expense rates, and other projected income and expense figures relating to the Underlying Loan. The actual revenues generated by the Underlying Loan could fall short of projections due to factors such as, among others, lower-than-expected rental revenues, greater-than-expected vacancy rates or higher property management expenses than anticipated. In such event, the borrower's cash flow could be inadequate to repay the Underlying Loan in full.

- Lenders and Borrowers May Provide False Information. PeerStreet relies on information provided to it by lenders and borrowers. That information may be incomplete, inaccurate or intentionally false. For example, borrowers provide a variety of information to us regarding their management of properties that PeerStreet may take a security interest in. When PeerStreet evaluates a potential Underlying Loan for investment, some of this information may be included in the Listing for the applicable Series of MPDNs. Information provided by third parties may be incomplete, inaccurate, intentionally false or may misrepresent the intentions of the third parties. We make attempts to verify some of the information provided to us by third parties, but, as a practical matter, we cannot verify all of it.

**Consider carefully the following risks related to the Underlying Loans:**

- Underlying Loans May Require Borrowers to Make Balloon Payments. Some Series of MPDNs and their Underlying Loans may provide for monthly payments of interest, as applicable, and will require the borrower to make a "balloon" payment of the unpaid principal and interest at the end of the Underlying Loan term. Borrowers may be unable to make principal payments out of their own funds and, if so, be compelled to refinance or sell their property. Fluctuations in real estate values, interest rates, and the unavailability of mortgage funds could adversely affect the ability of real estate companies to refinance their loans at maturity or successfully sell the property for enough money to pay off the Underlying Loans. If borrowers cannot pay any applicable "balloon" payment, you may lose all or part of your investment in MPDNs tied to the Underlying Loan subject to the "balloon" payment.

- Underlying Loans May Payoff Early. Prepayments of Underlying Loans by borrowers may extinguish or limit your ability to earn additional returns on the corresponding Series of MPDNs.

Prepayments occur if a borrower decides to pay some or all of the principal amount on the Underlying Loan earlier than originally scheduled.  With many of the Underlying Loans financed on the PeerStreet Platform, the borrower may prepay all or a portion of the remaining principal amount or redemption amount at any time without penalty.  Upon a prepayment of the entire remaining unpaid principal amount of the Underlying Loan, you will receive your share of that prepayment, but further interest will not accrue after the date on which the prepayment is made. If the borrower prepays a portion of the remaining unpaid principal balance on the Underlying Loan, the term for repayment of the Underlying Loan may not change, but you will not earn a return on the prepaid portion, and your anticipated total investment return may thus decrease.  In addition, you may not be able to find a similar rate of return on another investment at the time at which the Underlying Loan is prepaid.

- <u>Increased Principal Amount Due to Origination Fee</u>.  To the extent that PeerStreet (or any PSI affiliate or a third party) charges a borrower certain loan origination fees ("points"), the principal amount of the Underlying Loan may be increased, which may adversely affect the ability of the borrower to repay the Underlying Loan.  In addition, these points increase the gross amount of the Underlying Loan amount borrowed on a loan, which decreases the borrower's equity in the corresponding property and, in turn, decreases our security interest in that property.

- <u>Underlying Loans May Be in or Related to Construction and Rehabilitation Loans, Which Have Their Own Specific Risks</u>.  An Underlying Loan may constitute a construction or rehabilitation loan. These loans involve a number of particular risks involving, among other things, the timeliness of the project's completion, the integrity of appraisal values, whether or not the completed property can be sold for the amount anticipated, the priority of the lien sold to Investors, and the length of ultimate sale process.

  Disbursements are typically made on construction or rehabilitation loans only as portions of the construction work are completed, with the amount of disbursement based upon a percentage of work completed or certain milestones being reached.  Borrowers may misrepresent the progress made, which may lead to funds being disbursed where no work (or insufficient work) has been done. If the borrower defaults on the loan, construction or improvements have not been completed within the time period set forth in the construction or rehabilitation agreement, or if PeerStreet determines that the balance of the loan proceeds is not sufficient to complete the construction or rehabilitation, then PeerStreet or its servicer may use any remaining retained funds to pay down sums due on the loan, to complete the redevelopment, or may require the borrower to deposit additional funds with PeerStreet or the construction or builder's fund control company.

  If construction work is not completed (due to contractor abandonment, unsatisfactory work performance or various other factors) and all funds have already been expended, then in the event of a default PeerStreet may have to invest significant additional funds to complete the construction work.  Any such investment would be recuperated by PeerStreet prior to you being paid back on the MPDN.

  If the value of an uncompleted property is materially less than the amount of the loan, even if the work were completed, then upon a default PeerStreet might need to invest additional funds in order to recoup all or a portion of the investment.  Default risks also exist where it takes a borrower longer than anticipated either to construct or then sell the property, or if the borrower does not receive sufficient proceeds from the sale to repay the Underlying Loan in full.

PeerStreet may require a borrower receiving funds from a construction or rehabilitation loan to have special builder's risk insurance (or "course of construction" insurance), which could reduce Investors' return on any MPDNs tied to Underlying Loans that are construction or rehabilitation loans, as borrowers will be required to expend funds toward retaining insurance instead of using those funds to make payments to PeerStreet on the MPDNs.

In some jurisdictions, contractors or other parties performing work on a given property may record mechanic's liens against the associated property, and such liens may be legally granted priority over the lien for the Underlying Loan. This may result in the Underlying Loan being foreclosed out or the mechanic's lien being paid off first, either of which scenario may negatively affect Investors' returns and the loss of some, or all, of your investment.

**Consider carefully the following risks related to state and federal regulation:**

- Lenders Are Subject to Regulation. The lending industry is a highly regulated industry. The lenders we work with (e.g., banks and private lenders) are responsible for their compliance with applicable state and federal lending laws, and we have no control over their compliance. Although we may purchase mortgage loans from lenders and then act as lender to the borrowers associated with those loans, none of those lenders are our agents, and we have no control over their compliance with applicable federal or state law. These lenders may be subject to licensing requirements in one or more states. While we conduct due diligence on the lenders we work with, we do not and cannot guarantee their compliance with applicable laws, including with respect to their compliance with applicable licensing requirements.

  In the event that a lender fails to comply with applicable laws, it is possible that the loans originated by the lender would be deemed void in full or in part or would be otherwise unenforceable. Similarly, any Underlying Loan provided to a borrower by that lender that PeerStreet subsequently funded and purchased may prove unenforceable as a result of lender's non-compliance with applicable laws. As a result, payments on any Underlying Loans tied to these lenders could be reduced or never paid to us and, in turn, interest payments on the MPDNs could be reduced or never paid to Investors in MPDNs tied to those lenders, as the borrowers may no longer have to make payments on Underlying Loans tied to those lenders given their non-compliance in originating those Underlying Loans.

  We do not intend to make Underlying Loans that violate these laws, but do not have control over lenders, and it is possible that one or more Underlying Loans may violate these laws, in which case your investment in any MPDNs tied to those Underlying Loans may be adversely affected.

- Federal Regulation of MPDNs. Some of the Underlying Loans tied to MPDNs may also be subject to certain provisions of the Truth-In-Lending Act of 1968, the Home Ownership and Equity Protection Act, or other applicable laws and rules concerning loans. These regulations may impose additional disclosure and other requirements on creditors.

- There Will Be No Trustee for MPDNs. Because there is no trustee involved in the structure of the MPDNs, Investors in the MPDNs will not have the protection of a trustee, an indenture or the provisions of the Trust Indenture Act of 1939, which would require a trustee to represent your interests and the interests of other Investors in MPDNs.

**6.**  **Material U.S. Federal Income Tax Considerations**

Investing in MPDNs issued under this PPM Supplement may carry significant tax implications. You should not regard the contents of this PPM Supplement or any other communication from PeerStreet as a substitute for careful and independent tax and financial planning.  You are encouraged to consult with your own independent accountants, financial planners, attorneys and other professionals with respect to the legal and tax aspects of an investment in the Real Estate Securities with specific reference to your own tax situation before investing in any Series of Real Estate Securities. PeerStreet makes no representations as to any tax implication of investing in the Real Estate Securities offered on its Platform.

---

End of PPM Supplement Document

# FORM INSTRUMENT

## MASTER MORTGAGE PAYMENT DEPENDENT NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THIS NOTE UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY (AS DEFINED BELOW) THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. SEE THE PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") ISSUED BY COMPANY, DATED AS OF DECEMBER 2, 2019, AND THE INVESTOR AGREEMENT BETWEEN THE COMPANY AND THE INVESTOR WITH RESPECT TO THIS NOTE FOR MORE DETAILS.

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") BECAUSE PAYMENTS ON THIS NOTE ARE DEPENDENT ON PAYMENTS ON THE CORRESPONDING MORTGAGE LOAN (AS DEFINED IN THE MEMORANDUM). THIS NOTE'S ISSUE PRICE IS THIS NOTE'S STATED PRINCIPAL AMOUNT, AND THE ISSUE DATE IS THE ORIGINAL ISSUE DATE. FOR FURTHER INFORMATION REGARDING THE AMOUNT OF OID AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT THE COMPANY AT 2121 PARK PL., SUITE 250, EL SEGUNDO, CA 90245.

Mortgage Payment Dependent Note Series No: _____

Note No: _____

Company: Peer Street Funding, LLC

Investor: _____

Corresponding Mortgage Loan: _____

Stated Principal Amount of This Note: U.S. _____

Aggregate Principal Amount Of this Note: U.S. _____

Interest Rate: _____

PeerStreet Standard Fee: _____

As defined in Private Placement Memorandum

Original Issue Date: _____

Initial Maturity Date: _____

This Master Mortgage Payment Dependent Note ("Master Note") contains the terms that shall apply to each investment (a "Loan Investment") made by _____ ("Investor") via the platform located at www.peerstreet.com (the "PeerStreet Website") in accordance with the Investor Agreement and Memorandum. References herein to a "Note" shall apply to each Loan Investment made by Investor on the PeerStreet Website. Capitalized terms that are not defined herein shall have the meaning prescribed to them in the Memorandum, the MPDN Supplement to

the Memorandum, or Investor Agreement. Company will issue Notes in electronic form only. This means that each Note will be stored on the PeerStreet Website. Investor can view a record of the Notes owned by Investor online and print copies of this Master Note and the online record of your Notes for your records by visiting your secure, password-protected webpage in the "Dashboard" section of the PeerStreet Website. Company will not issue certificates for the Notes.

FOR VALUE RECEIVED, the undersigned, Peer Street Funding, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay Investor the principal sum(s) of each Loan Investment, together with interest on the unpaid principal balance thereon in accordance with the terms contained herein:

1. **Special Limited Obligation.**

This Note represents a special limited obligation of the Company, and (1) no payments of principal and interest on this Note shall be payable unless the Company has received payments relating to the corresponding mortgage loan, and then only to the extent of the amount of such payments received by the Company (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum), and (2) no Investor of this Note shall have any recourse against the Company unless, and then only to the extent that, the Company has received payment relating to the corresponding mortgage loan and has failed to pay such Investor their pro rata share of the payments that the Company actually received under the corresponding mortgage loan (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum). The principal and interest payable on any payment date will be paid to the party in whose name this Note is registered.

2. **Interest.**

Interest on the unpaid principal balance will accrue at an annual rate equal to the Interest Rate identified in a particular on the first page of this Note.

3. **Payment of Principal and Interest.**

> **3.1 Payments.** Payments shall be due and payable in arrears in consecutive periodic installments in accordance with this Note's payment schedule identified on the PeerStreet Website. All payments of principal and interest on this Note due to the Investor shall be made in U.S. dollars, in immediately available funds, by intra-institution book entry transfer to the Investor's designated account indicated through the Company's online platform. Such payments shall continue until the entire indebtedness evidenced by this Note and all accrued and unpaid interest and fees are fully paid, with any unpaid principal and interest due and payable on the Initial Maturity Date, unless the Company has extended the maturity date to the Final Maturity Date or unless the Company has otherwise sold the underlying mortgage loan, accepted a discounted payoff, or otherwise incurred a loss of principal and/or interest. Notwithstanding any payment schedule, the Company shall only be obligated to make any payment on this Note if and only if, and only to the extent that, Company receives payment relating to the corresponding mortgage loan (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum). Should the Company not receive any payments relating to the corresponding mortgage loan, Company will not owe anything to Investor. The Note will mature on the Maturity Date;

provided, however, that if on the Maturity Date any principal or interest payments in respect of the corresponding mortgage loan remain due and payable to the Company, the Maturity Date of this Note will be extended until all amounts due under the corresponding mortgage loan are fully paid, the corresponding property is liquidated, or similar events, as further described in the Memorandum.

**3.2 Amounts Advanced by Company**. As set forth in the Memorandum and the MPDN Supplement to the Memorandum, the Company will, at its sole discretion, advance any and all amounts necessary to protect its interest in the corresponding mortgage loan, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs Company deems necessary to protect its position in the corresponding mortgage loan (the "Company's Advances"). Any fees advanced by the Company will earn interest at the interest rate applicable to the corresponding mortgage loan. Any amounts paid to the Company under the corresponding mortgage loan shall be payable as follows: (1) to the Company, to recoup the Company's Advances, (2) to the Company or third parties for any fees and costs allowed to be charged under the Memorandum and the MPDN Supplement to the Memorandum and (3) the balance, if any, pro rata to the Investors of the Notes.

**3.3 Withholding**. If any withholding tax is imposed on any payment made by the Company to an Investor pursuant to this Note, such tax shall reduce the amount otherwise payable with respect to such payment. Upon request of the Company, a Investor shall provide the Company with an Internal Revenue Service Form W-9, W-BEN, W-8ECI, W-8IMY or other similar withholding certificate of a state, local or foreign governmental authority such that the Company may make payments under the Note without deduction for, or at a reduced rate of deduction for, any tax.

4. **Events of Default.**

On (a) the Company's failure to pay any installment or other sum due under this Note when due and payable when the Company has received the same from the corresponding mortgage loan (whether by extension, acceleration, or otherwise), (b) the Company has become subject to a voluntary or involuntary proceeding of bankruptcy, insolvency, or otherwise subject to receivership and remains so for a period of 60 days, or (c) any breach of any other promise or obligation in this Note or in any other instrument now or hereafter securing the indebtedness evidenced by this Note (collectively, "Default"), then after upon sixty (60) days from the date of receiving written notice of such default from the Investor, and if the Company fails thereafter to cure said default, the Investor may, at its option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the applicable Maturity Date. The Company must receive notice of the exercise of this option. For the purposes of this paragraph, shall be deemed to receive Investor's notice if Investor follows the notice provisions in paragraph 8 of this Note.

5. **Prepayment.**

Company may prepay this Note in whole or in part at any time without any penalty. All prepayments of principal on this Note shall be applied to the most remote principal installment or installments then unpaid.

**6.  Sale Clause.**

Subject to compliance with the Act and applicable securities laws and regulations, Company may sell, convey, assign or otherwise transfer (a) all or any part of the corresponding mortgage loan or (b) any interest in the corresponding mortgage loan, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of the Investor.

**7.  Waiver.**

The Company, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the security given for this Note, any acceptance of additional security of any kind and any release of any party liable under this Note.

**8.  Notice.**

Any notice required to be provided in this Note shall be given and received via electronic mail, unless applicable law requires that such notice be given in writing. All notices shall be addressed to the party to whom such notice is to be given at (i) investor-relations@peerstreet.com or such other email address the Company may provide to Investor via the PeerStreet Website, if the recipient is the Company or (ii) the electronic mail address used by Investor when registering online at the Company's investment platform if the recipient is the Investor; subject to the parties updating such addresses by providing notice pursuant to this Section 8.

**9.  Forbearance Not a Waiver.**

If the Investor delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any the Investor rights or of any breach, default, or failure of condition under this Note. No waiver by the Investor of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Investor.

**10.  Assignment.**

This Note inures to and binds the heirs, legal representatives, successors, and assigns of the parties; *provided* that the Investor may only assign or transfer this Note in connection with the terms outlined in the Investor Agreement and this Note, and under no circumstances may Investor assign or transfer this Note in violation of the Act.

**11.  Governing Law.**

This Note shall be construed and enforce able according to the laws of the State of Delaware (without giving effect to its conflicts of laws principles) for all purposes.

**12. Time Is of the Essence.**

Time is of the essence with respect to all obligations of the Company under this Note.

**13. No Modifications or Amendments; No Waiver.**

Except as specified herein or the Investor Agreement, this Promissory Note may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

**14. Severability.**

Any provision of this Promissory Note which shall be held by a court of competent jurisdiction to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and all other provisions or terms hereof shall remain in full force and effect.

**15. Nonrecourse Generally.**

(i) The Company shall not be personally liable, and Investor shall not commence or prosecute any action against the Company, for the nonpayment or non- performance of any obligation on this Note (the "Loan Obligations") due to failure or default of the corresponding mortgage loan; (ii) Investor shall not seek, obtain, or enforce a deficiency judgment against the Company; (iii) Investor's recourse for the Company's payment obligations shall be limited to the payments and amounts, if any, received by Company relating to the corresponding mortgage loan; (iv) the Investor shall not be entitled to obtain specific performance or any other similar order, remedy, or relief against the Company relating to any claim arising from the Note; and (v) the Investor waives any right to exercise any lenders' right of set-off arising from the Note, against any funds of the Company in the Investor's custody, control, or possession. No recourse under or upon any obligation, covenant or agreement contained in this Note, or because of any indebtedness evidenced thereby, shall be had against any past, present or future shareholder, officer, director or agent, as such, of the Company, either directly or through the Company, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or penalty or otherwise, all such personal liability of every such incorporator, shareholder, officer, director or agent, as such, being expressly waived and released by the acceptance hereof and as a condition of and as part of the consideration for the issuance of this Note.

**16. Note Series Limitation.**

Investor understands and agrees that each Note is part of a series of Notes, which series of Notes is held in the aggregate by multiple holders. The Investor shall not assert any right of action, including (without limitation) any arbitration, lawsuit or otherwise, except in conjunction or aggregation with other holders of the Notes as set forth in the Investor Agreement.

**17. Tax Matters.**

Each Investor, by acceptance of a Note, shall be deemed to have agreed to treat, and shall treat, such Note as debt of the Company for United States federal income tax purposes and shall refrain from taking any action inconsistent with such treatment.

**18. Incorporation by Reference.**

The terms contained in the Investor Agreement are hereby incorporated herein by this reference for all purposes. In the event any provisions of this Master Note conflict with provisions of the Investor Agreement or any other agreement, the provisions of this Note shall control.

**IN WITNESS WHEREOF,** Peer Street Funding, LLC has caused this instrument to be signed by its duly authorized officer.

Dated: _____

/s/ Brewster Johnson
Peer Street Funding, LLC
By: Brewster Johnson, Chief Executive Officer

**EXHIBIT 14**

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

May 2018

Limited Partnership Interests of

# PEER STREET OPPORTUNITY INVESTORS II, LP

(a Delaware limited partnership)

Peer Street Opportunity Fund GP, LLC
General Partner
2121 Park Place, Suite 250
El Segundo, CA 90245

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN LIMITED PARTNERSHIP INTERESTS IN PEER STREET OPPORTUNITY INVESTORS II, LP, A DELAWARE LIMITED PARTNERSHIP (THE "PARTNERSHIP"). DUE TO THE CONFIDENTIAL NATURE OF THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. CONSEQUENTLY, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL ADVISOR) WITHOUT PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

Offeree: _____

Copy #: _____

**CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM**

**PEER STREET OPPORTUNITY INVESTORS II, LP**

THIS MEMORANDUM IS NOT A PROSPECTUS OR AN ADVERTISEMENT, AND THE OFFERING OF THE LIMITED PARTNERSHIP INTERESTS IS NOT BEING MADE TO THE PUBLIC.

THE LIMITED PARTNERSHIP INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), SINCE THEY WILL BE OFFERED ONLY TO A LIMITED NUMBER OF QUALIFIED INVESTORS ON A CONFIDENTIAL BASIS. WITHIN THE UNITED STATES, THIS OFFERING IS MADE AS A PRIVATE PLACEMENT PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND THE RULES AND REGULATIONS THEREUNDER, AS AMENDED FROM TIME TO TIME, AND ONLY TO PARTIES THAT ARE "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT. OUTSIDE THE UNITED STATES, THIS OFFERING IS MADE PURSUANT TO REGULATION S UNDER THE SECURITIES ACT, ONLY TO PARTIES THAT ARE NOT "U.S. PERSONS" AS DEFINED IN SUCH REGULATION, AND PURSUANT TO EXEMPTIONS FROM APPLICABLE SECURITIES LAWS OF OTHER COUNTRIES ("FOREIGN SECURITIES LAWS").

THESE INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THESE OFFERING MATERIALS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THE PARTNERSHIP DOES NOT CURRENTLY INTEND TO TRADE PRODUCTS THAT ARE REGULATED BY THE COMMODITY FUTURES TRADING COMMISSION ("CFTC"). IN THE EVENT THE PARTNERSHIP IN THE FUTURE DECIDES TO TRADE SUCH PRODUCTS, THE GENERAL PARTNER WILL FILE AN APPROPRIATE EXEMPTION OR REGISTER AS A COMMODITY POOL OPERATOR WITH THE CFTC.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE INTERESTS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THESE OFFERING MATERIALS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THESE INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT AUTHORIZED.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE INTENDED OR SHOULD BE INFERRED WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE PARTNERSHIP.  NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY TO THE PARTNERSHIP OR THE PARTNERS.   PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS INVESTMENT, LEGAL OR TAX ADVICE AND THIS MEMORANDUM IS NOT INTENDED TO PROVIDE THE SOLE BASIS FOR ANY EVALUATION OF AN INVESTMENT IN AN INTEREST.  PRIOR TO ACQUIRING AN INTEREST, A PROSPECTIVE INVESTOR SHOULD CONSULT WITH ITS OWN LEGAL, INVESTMENT, TAX, ACCOUNTING AND OTHER ADVISORS TO DETERMINE THE POTENTIAL BENEFITS, BURDENS AND OTHER CONSEQUENCES OF SUCH INVESTMENT. IN PARTICULAR, IT IS THE RESPONSIBILITY OF EACH INVESTOR TO ENSURE THAT THE LEGAL AND REGULATORY REQUIREMENTS OF ANY RELEVANT JURISDICTION OUTSIDE THE UNITED STATES ARE SATISFIED IN CONNECTION WITH SUCH INVESTOR'S ACQUISITION OF AN INTEREST.

NO PERSON OTHER THAN THE GENERAL PARTNER HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THESE LIMITED PARTNERSHIP INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OR REPRESENTATION NOT CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE GENERAL PARTNER IN WRITING MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE PARTNERSHIP OR ANY OF ITS PARTNERS. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS PROHIBITED.

THE PARTNERSHIP IS NOT REGISTERED AS AN INVESTMENT COMPANY IN ITS RELIANCE UPON SECTION 3(C)(1) OF THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED ("INVESTMENT COMPANY ACT"). THE GENERAL PARTNER IS NOT CURRENTLY REGISTERED AS AN INVESTMENT ADVISER WITH THE STATE OF CALIFORNIA OR WITH THE SEC UNDER THE UNITED STATES INVESTMENT ADVISERS ACT OF 1940, AS AMENDED ("INVESTMENT ADVISERS ACT"), BUT MAY ELECT OR BE REQUIRED TO SO REGISTER IN THE FUTURE.

THE PARTNERSHIP WILL MAKE AVAILABLE TO EACH INVESTOR OR HIS AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY INTERESTS, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM REPRESENTATIVES OF THE GENERAL PARTNER CONCERNING ANY ASPECT OF THE PARTNERSHIP AND ITS PROPOSED BUSINESS AND TO OBTAIN ANY ADDITIONAL RELATED INFORMATION TO THE EXTENT THE PARTNERSHIP POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

EXCEPT WHERE OTHERWISE SPECIFICALLY INDICATED, THIS MEMORANDUM IS AS OF THE DATE HEREOF.  NEITHER THE SUBSEQUENT DELIVERY OF THIS MEMORANDUM NOR ANY SALE OF INTERESTS SHALL BE DEEMED A REPRESENTATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS, PROSPECTS OR ATTRIBUTES OF THE PARTNERSHIP SINCE THE DATE HEREOF. ALL DUTIES TO UPDATE THIS MEMORANDUM ARE HEREBY DISCLAIMED.

THIS MEMORANDUM SUPERSEDES ALL PRIOR VERSIONS.  FROM AND AFTER THE DATE OF THIS MEMORANDUM, PRIOR VERSIONS OF THIS MEMORANDUM MAY NOT BE RELIED UPON.

NOTHING CONTAINED HEREIN IS, OR SHOULD BE RELIED UPON AS, A PROMISE OR REPRESENTATION AS TO THE FUTURE PERFORMANCE OF THE PARTNERSHIP. STATEMENTS, ESTIMATES AND PROJECTIONS WITH RESPECT TO SUCH FUTURE PERFORMANCE SET FORTH IN THIS MEMORANDUM ARE BASED UPON ASSUMPTIONS MADE BY THE GENERAL PARTNER WHICH MAY OR MAY NOT PROVE TO BE CORRECT.  NO REPRESENTATION IS MADE AS TO THE ACCURACY OF SUCH STATEMENTS, ESTIMATES OR PROJECTIONS.

CERTAIN OF THE FACTUAL STATEMENTS MADE IN THIS MEMORANDUM ARE BASED UPON INFORMATION FROM VARIOUS SOURCES BELIEVED BY THE PARTNERSHIP OR THE GENERAL PARTNER TO BE RELIABLE.  THE GENERAL PARTNER AND THE PARTNERSHIP HAVE NOT INDEPENDENTLY VERIFIED ANY OF SUCH INFORMATION AND SHALL HAVE NO LIABILITY ASSOCIATED WITH THE INACCURACY OR INADEQUACY THEREOF.

EACH INVESTOR THAT ACQUIRES AN INTEREST WILL BECOME SUBJECT TO THE PARTNERSHIP AGREEMENT AND AN APPLICABLE SUBSCRIPTION DOCUMENT.  IN THE EVENT ANY TERMS OR PROVISIONS OF SUCH PARTNERSHIP AGREEMENT OR SUBSCRIPTION DOCUMENT CONFLICT WITH THE INFORMATION CONTAINED IN THIS MEMORANDUM, SUCH PARTNERSHIP AGREEMENT OR SUBSCRIPTION DOCUMENT SHALL CONTROL.

UNLESS OTHERWISE INDICATED, ALL REFERENCES TO "$" OR "DOLLARS" HEREIN ARE REFERENCES TO U.S. DOLLARS.  CAPITALIZED TERMS USED, BUT NOT DEFINED, HEREIN SHALL HAVE THE MEANINGS GIVEN TO THEM IN THE PARTNERSHIP AGREEMENT. WHENEVER THE MASCULINE OR FEMININE GENDER IS USED IN THIS MEMORANDUM, IT SHALL EQUALLY, WHERE THE CONTEXT PERMITS, INCLUDE THE OTHER, AS WELL AS INCLUDE ENTITIES.

**SPECIAL NOTICE TO FLORIDA INVESTORS:**

UPON THE ACCEPTANCE OF FIVE OR MORE FLORIDA INVESTORS, AND IF THE FLORIDA INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT, A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), THE FLORIDA INVESTOR ACKNOWLEDGES THAT ANY SALE OF AN INTEREST TO THE FLORIDA INVESTOR IS VOIDABLE BY THE FLORIDA INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE FLORIDA INVESTOR TO THE PARTNERSHIP, OR AN AGENT OF THE PARTNERSHIP, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE FLORIDA INVESTOR, WHICHEVER OCCURS LATER.  THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES IS HEREBY COMMUNICATED TO EACH FLORIDA INVESTOR.

## Table of Contents

**Page**

1.  OFFERING SUMMARY ............................................................................................... 1

2.  INTRODUCTION ...................................................................................................... 13

3.  INVESTMENT PROGRAM ....................................................................................... 13

4.  MANAGEMENT; ADMINISTRATOR ...................................................................... 15

5.  FEES; EXPENSES; RESERVES ............................................................................... 17

6.  ALLOCATION OF NET INCOME AND NET LOSSES ......................................... 17

7.  RISK FACTORS ....................................................................................................... 18

8.  ADMISSION OF PARTNERS; THE OFFERING; CAPITAL CALLS .................... 31

9.  WITHDRAWALS; DISTRIBUTIONS ...................................................................... 33

10. BROKERAGE ........................................................................................................... 36

11. TAX CONSIDERATIONS ........................................................................................ 36

12. OTHER PROVISIONS OF THE PARTNERSHIP AGREEMENT .......................... 44

13. SUBSCRIPTION INSTRUCTIONS ......................................................................... 45

# DIRECTORY

**General Partner**          Peer Street Opportunity Fund GP, LLC
                             2121 Park Place, Suite 250
                             El Segundo, CA 90245

**Auditor**                  Armanino LLP
                             11766 Wilshire Boulevard, Ninth Floor
                             Los Angeles, CA 90025

**Administrator**            Crestbridge Fund Services US, LLC
                             60 Columbia Road, Building B
                             Suite 150
                             Morristown, NJ 07960

**Legal Counsel**            Cole-Frieman & Mallon LLP
                             One Sansome Street, Suite 1895
                             San Francisco, CA 94104


Requests for additional information should be sent to the General Partner.

# 1.    OFFERING SUMMARY

The following is a summary of the more detailed information contained elsewhere in this Confidential Private Placement Memorandum (the "Memorandum") and is qualified in its entirety by reference to such information and to the Limited Partnership Agreement of Peer Street Opportunity Investors II, LP, as it may be amended from time to time (the "Partnership Agreement").

*Capitalized terms used but not defined herein shall have the meanings given to them in the Partnership Agreement.*

| The Partnership | Peer Street Opportunity Investors II, LP, is a Delaware limited partnership (the "Partnership"), designed for sophisticated investors, and expects to commence investment operations in the second quarter of 2018.

The Partnership may enter into an arrangement with other investment funds managed by the General Partner or investment funds managed by the Principals or the affiliates of the General Partner with the same or substantially similar investment objectives as the Partnership's to either allow other funds to contribute their assets to the Partnership to invest, or to pursue its investment activities by investing all or a portion of its assets in a "Master Fund" that will conduct the investment activities described in this Memorandum. |
| --- | --- |
| **Investment Objectives and Strategy** | The Partnership's primary investment objective is to provide attractive returns on invested capital while maintaining a materially reduced risk profile due to the secured nature of the Partnership's investments. The Partnership primarily intends to achieve this objective by investing in (1) loans or participation interests in such loans secured by real estate (the "Loans"), (2) mezzanine debt in warehouse lending facilities utilized by Peer Street, Inc. or its affiliates, and (3) subordinated loan positions held or sold by Peer Street, Inc. or its affiliates. The Partnership may also make other real estate related investments in accordance with the Partnership's investment strategy.  The Partnership's strategy may include, in a limited manner, borrowing funds collateralized by the Partnership's assets in order to enhance returns.

Through its normal course of business, PS Funding will purchase Loans from originators which are in compliance with its counterparty diligence requirements (each, an "Originator"). PS Funding will perform due diligence on each Loan pursuant to its underwriting guidelines. Each Loan will typically be secured by a deed of trust, mortgage, security agreement or legal title to the underlying real estate. Loans will be purchased, held, and ultimately re-sold by PS Funding, Inc., a Delaware corporation that holds a California brokerage license from the California Department of Real Estate and a California Finance |

Lender's License issued by the California Department of Business Oversight. PS Funding is licensed to buy, sell, and hold commercial and business purpose loans, to the extent such license is necessary, in the states it buys Loans in. PS Funding is an affiliate of the Partnership, the General Partner, and the managing member of the General Partner.

The Partnership's strategy may include investing in Loans on a levered or unlevered basis.  The leverage may be provided by one or more banks, other financial institutions, or other third-party lenders (each, a "Lender" and together, the "Lenders"). Legal title to each Loan will be held by PS Funding and PS Funding will pledge each Loan to the Lenders as collateral for the related line of credit.

Revenues on the Loans the Partnership invests in will be any interest income payments with respect to the Loans net of Loan Fees.  "Loan Fees" may include any expenses, costs, or other fees charged on the Loans, including, but not limited to, retained originator spread and servicing spread. All other fees earned on the Loans by PeerStreet (defined below) shall be retained by PeerStreet, provided, however, all modification fees, extension fees, holdover fees, prepayment premiums and default interest will be shared equally between PeerStreet and the Partnership (for the avoidance of doubt, PeerStreet and the Partnership will each receive 50% of all modification fees, extension fees, holdover fees, prepayment premiums and default interest).

The Loans may be held by PS Funding for a short period of time or through the life of the Loan.

Participation Investment. The Partnership intends to generate a return on its investment by entering into participation agreements with PS Funding to receive a portion of the (i) interest accrued and paid to PS Funding by the underlying borrower before the Loan held by PS Funding is sold to a third party and (ii) sale proceeds from such Loan (a "Participation Investment"). After the sale of an underlying Loan of a Participation Investment is sold to a third party, PS Funding may retain the right to receive a portion of such Loan's interest income (the "After Sale Interest Right"). Notwithstanding the foregoing, the Partnership will not be entitled to or receive any interest income received by PS Funding in connection with the After-Sale Interest Right.

Mezzanine Warehouse Investment. In order for PS Funding to purchase Loans and own them until they are sold, PS Funding may borrow funds from a third-party (the "Warehouse Financer") to buy the Loans ("Warehouse Financing"). The Warehouse Financer typically lends an amount less than 100%

of the value of a Loan, requiring PS Funding or another party to provide the remaining amount required to purchase a Loan. Accordingly, the Partnership may lend to PS Funding some or all of the remaining amount needed to purchase a Loan (a "Mezzanine Warehouse Investment"), which will be secured by the underlying Loan and will have a second lien position behind the Warehouse Financer. The remaining amount needed to purchase a Loan, if any, will be provided by PS Funding and PS Funding will hold a lien position behind the Partnership. PS Funding expects to sell the underlying Loan after a period of time, to be replaced by other Loans purchased by PS Funding. The maturity for Warehouse Financing will typically, but not always, range between 3 and 18 months.  The maturity for Mezzanine Warehouse Investments will be the same.

<u>B-Note Investment</u>. PS Funding may, at times, purchase Loans that have a Loan-to-Value ratio (or other similar measure) greater than what can be marketed and sold to third parties. Accordingly, the Partnership may purchase a subordinated position in such Loan in return for a stated yield greater than the loan investor rate (a "B-Note Investment").  A B-Note Investment will have the same maturity as the underlying Loan associated with the B-Note Investment.

***There can be no assurance that the Partnership will achieve this objective or that substantial losses will not be incurred.***

| | |
|---|---|
| **The General Partner** | Peer Street Opportunity Fund GP, LLC, a Delaware limited liability company, is the general partner of the Partnership (the "General Partner"). The General Partner is responsible for the business and affairs of the Partnership and the management of the Partnership's investment portfolio. Peer Street, Inc., a Delaware corporation, is the managing member of the General Partner ("PeerStreet").<br><br>PeerStreet is an award-winning, Andreessen Horowitz-backed platform focused on democratizing access to real estate debt. The company provides investments in high-yield, short-term, real estate backed loans. PeerStreet's unique marketplace allows investors to diversify their capital in an asset class that has been traditionally difficult to access. Loans are sourced and curated from vetted private lenders throughout the United States who have local real estate expertise and borrower relationships. The model allows for more borrowers to access capital and improve their local communities, one house at a time. PeerStreet's platform is secure and intuitive with an easy-to-use interface, offering a wealth of information and tools for every level of investor.  To date, PeerStreet has purchased more than $1 billion in loans while incurring no losses for its investors. |

| | |
|---|---|
| | Additional information about the key officers and principals of PeerStreet can be found in Section 4 below. |
| **Investment Period and Liquidation** | The "Investment Period" of the Partnership shall begin on the date of the Initial Closing and terminate on June 30, 2023, unless terminated earlier pursuant to the terms of the Partnership Agreement. The Partnership will not purchase any Loans or other investments following the termination of the Investment Period. For the avoidance of doubt, the General Partner may terminate the Investment Period at any time for any reason.<br><br>Following the termination of the Investment Period for any reason, the Partnership will be wound up and its assets will be liquidated and distributed to the Partners as set forth in the Partnership Agreement. Notwithstanding the foregoing, the Partnership intends for the vast majority of its Loans and other related investments to be sold, with the related proceeds available for distribution, immediately prior to the termination of the Investment Period. |
| **Size of the Offering** | <u>Minimum Offering Amount</u>: The Partnership is not subject to a minimum offering amount.<br><br><u>Maximum Offering Amount</u>: $50,000,000 of capital commitments ("Commitments").<br><br>The General Partner may, in its sole discretion, increase or decrease the Maximum Offering Amount. |
| **The Offering** | The Partnership is offering limited partnership interests (the "Limited Partnership Interests" or "Interests") to certain qualified investors as described herein and in the Subscription Document (the "Offering").<br><br>Admission as a Limited Partner in the Partnership is not open to the general public and Interests in the Partnership are privately offered on a confidential basis in reliance upon exemptions contained in the United States Securities Act of 1933, as amended (the "Securities Act") and the rules and regulations promulgated thereunder for transactions not involving any public offering. Each Limited Partner will be required to represent and warrant to the Partnership in connection with its subscription, among other things; (i) that the Limited Partner is acquiring its Limited Partnership Interest for its own account for investment purposes only, and not with a view toward resale or other distribution in whole or in part, (ii) that it will not transfer, sell or otherwise dispose of its Interest in any manner that will violate the Securities Act or other applicable laws, rules or regulations, and (iii) that it is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities |

Act, and a "qualified client" as defined in Rule 205-3 under the Investment Advisers Act of 1940, as amended.

In addition to the foregoing, admission as a Limited Partner in the Partnership is not open to investors or organizations that are otherwise exempt from Federal income taxation, such as qualified pension, profit-sharing and stock bonus plans, individual retirement accounts, educational institutions and other tax-exempt entities ("Tax-Exempt Investors").

The minimum Commitment of each Limited Partner shall be $250,000, subject to the sole discretion of the General Partner to accept lesser amounts. The General Partner may, in its sole discretion, decline to accept all or any part of any subscriptions that are tendered. After the Initial Closing (as defined below), each Limited Partner may, with the consent of the General Partner, increase its Commitment; provided that all such increases must be in increments of at least $50,000, subject to the sole discretion of the General Partner to accept lesser amounts.

| | |
|---|---|
| **Closings** | The General Partner intends to hold an initial closing of the sale of Interests in the Partnership on June 15th, 2018 (the "Initial Closing"), but reserves the right, in its sole discretion, to hold the Initial Closing prior to or after such date.<br><br>The General Partner may from time to time after the Initial Closing elect to hold one or more additional closings (each a "Subsequent Closing" and together with the Initial Closing, "Closings"), as necessary, to accommodate the admission of additional Limited Partners and to permit existing Limited Partners to increase their Commitments. The General Partner may hold Subsequent Closings until such time that it, in its sole discretion, elects to no longer hold any additional Subsequent Closings (such date, the "Final Closing Date").<br><br>Each Limited Partner admitted to the Partnership or increasing its Commitment after the Initial Closing will be required to contribute to the Partnership an amount equal to the Capital Contributions (defined below) such Limited Partner would have made had all Limited Partners been admitted to the Partnership at the Initial Closing, *plus* an amount equal to interest thereon at the rate of the "Prime Rate" as published by the Wall Street Journal as of the date of the Initial Closing, *plus* five percent per annum, compounded annually, from the dates when such Capital Contributions would have been required to be drawn down ("Notional Interest").<br><br>Amounts attributable to the Management Fee and Notional Interest thereon shall be paid to the General Partner. All other contributed amounts will be paid to the Partners that have |

|  | participated in prior closings *pro rata* in accordance with each such Partner's Capital Contributions and, other than Notional Interest, will be available to be redrawn by the General Partner in the same manner and to the same extent as unfunded Commitments. Additional Interests acquired by the General Partner at Subsequent Closings will not be subject to payment of Notional Interest.<br><br>If the General Partner, in its sole and absolute discretion, determines that a payment from a Limited Partner on the foregoing basis at a Subsequent Closing would not appropriately reflect a material change in the value of a Loan, the income received by the Partnership prior to such Subsequent Closing in connection with the Loans or the expenses incurred by the Partnership prior to such Subsequent Closing, the General Partner may make adjustments to the amount to be contributed by such Limited Partner to reflect such change in value or exclude such Limited Partner from participating in such Loan. |
|---|---|
| **Capital Calls** | Capital calls generally will be made as necessary to fund investments, meet expenses and liabilities of the Partnership or to establish and maintain cash reserves for such purposes and in such amounts as the General Partner deems necessary and appropriate, with not less than 10 business days' prior written notice, subject to certain excuse and exclusion provisions described herein and in the Partnership Agreement (each such drawdown, and any contribution to the Partnership in exchange for Interests, a "Capital Contribution"). Each Capital Contribution shall be due and payable on the date set forth in the applicable capital call. Notwithstanding the foregoing, each Partner admitted to the Partnership in the Initial Closing shall be required to contribute its entire Commitment to the Partnership upon the Initial Closing.<br><br>Any amounts contributed but returned to Partners because such amounts were neither invested nor used to pay expenses will be added back to unpaid Commitments and will be subject to recall by the Partnership. |
| **Excuse and Exclusion** | A Limited Partner may be excused from funding all or a portion of a Loan if the General Partner receives an opinion of counsel, which opinion and counsel are reasonably satisfactory to the General Partner, that such investment would be reasonably likely to cause a violation of any material law, regulation, order or administrative practice or written investment policy (to the extent such policy was provided to the General Partner prior to the closing of such Limited Partner's investment in the Partnership and continues in effect as of the date such excuse is sought) to which such Limited Partner is subject. |

|  | The General Partner may exclude a Limited Partner from participating in the funding of all or a portion of a Loan if the General Partner reasonably determines in good faith that (i) a significant delay, extraordinary expense or material adverse effect on the Partnership, any Loan or future Loans, the General Partner or their respective affiliates would result from such Limited Partner's participation or (ii) based on written advice of counsel (which advice and counsel must be reasonably acceptable to the Limited Partner to be excluded), that such Limited Partner's participation in such Loan would be reasonably likely to cause a violation of any material law, regulation, order or administrative practice (including any interpretation thereof by any governmental authority or court of competent jurisdiction) to which such Limited Partner is subject.<br><br>The excused or excluded Limited Partner's available Commitment will not be reduced as a result of any excuse or exclusion. The General Partner may require each other Limited Partner to make an additional Capital Contribution in respect of such Loan equal to its *pro rata* share of the excused or excluded Limited Partner's Capital Contribution; provided that no Limited Partner will be required to fund amounts in excess of its unpaid Commitment. |
|---|---|
| **Default Provisions** | The Partnership Agreement provides that any Limited Partner that defaults with respect to any payment of its Commitment when due shall, at the election of the General Partner, be subject to certain consequences specified therein, including an interest charge, a loss of future participation in Partnership distributions, a reduction of up to 100% of its Capital Contributions, cancellation of all or a portion of its unfunded Commitment, a forced sale of its Interest, and set-off against and withholding of such Partner's share of distributions. A defaulting Limited Partner shall be liable to the Partnership and the General Partner, as applicable, for Partnership expenses (including Management Fees) through the remaining life of the Partnership. The General Partner may require each non-defaulting Limited Partner to make an additional Capital Contribution equal to its *pro rata* share of the defaulted Capital Contribution; provided that no Limited Partner will be required to fund amounts in excess of its unfunded Commitment. |
| **Risk Factors** | The planned investment program of the Partnership is speculative and entails substantial risks.  There can be no assurance that the investment objectives of the Partnership will be achieved and that investors will not incur losses.  Moreover, an investment in the Partnership provides limited liquidity since the Interests are not freely transferable. All investments risk a total loss of capital. ***The foregoing list of certain risk factors does not purport to be a complete enumeration or explanation*** |

| | |
|---|---|
| | *of the risks involved in the Partnership. See Section 7 herein "Risk Factors".* |
| **Management Fee** | With respect to each Limited Partner, the General Partner will receive a quarterly management fee (the "Management Fee"), calculated at an annual rate of 0.5% (0.125% per quarter) of the difference between (i) such Limited Partner's Commitment, <u>less</u> (ii) amounts distributed to such Limited Partner as a return of such Limited Partner's Capital Contributions. The Management Fee will be paid quarterly in advance. The General Partner may elect to reduce, otherwise modify or waive the Management Fee with respect to any Limited Partner. |
| **Allocation of Net Income and Net Losses** | The Partnership will establish a Capital Account for each Partner. The initial balance of a Partner's Capital Account shall equal such Partner's Capital Contributions.  The Net Income and Net Loss of the Partnership will be allocated among the Partners in a manner generally consistent with the distribution of investment proceeds, as described under the "*Distributions*" provision set forth below. |
| **Distributions** | Net investment proceeds available for distribution to the Partners, less amounts available for reinvestment (as determined in the discretion of the General Partner), will be distributed among Partners pro rata in proportion to each of their respective Capital Contributions. Notwithstanding the foregoing, the General Partner will receive a portion of amounts distributable to each Limited Partner (hereafter referred to as "Carried Interest"). Accordingly, each Limited Partner's share of net investment proceeds will be distributed in the following amounts and order of priority (the "Distribution Waterfall"): <br><br> (A) FIRST, 100% to such Limited Partner until such Limited Partner has received aggregate distributions in an amount equal to the following: <br><br>    (i)    Such Limited Partner's aggregate Capital Contributions at such time; and <br><br>    (ii)    A preferred return on all unreturned Capital Contributions of such Limited Partner, calculated at the rate of 10% per annum (compounded annually) from the date each such Capital Contribution was made by such Limited Partner (the "Preferred Return"). <br><br> (B) SECOND, 70% to such Limited Partner and 30% to the General Partner as Carried Interest. <br><br> The General Partner will be entitled to withhold from any distributions amounts necessary to create, in its sole discretion, |

| | appropriate Reserves, as well as for any required tax withholdings. Taxes paid or withheld by the Partnership will be deemed distributed for purposes hereof. |
|---|---|
| | The General Partner may, in its sole discretion, cause the Partnership to make distributions from time to time to the General Partner in amounts sufficient to permit the payment of the tax obligations of the General Partner and its owners. Any such distributions shall be taken into account in making subsequent distributions to the Partners. |
| | The General Partner may elect in its sole and absolute discretion to defer all or any portion of any Carried Interest distributions that would otherwise be made to it. Any such deferred distribution shall be, in the General Partner's sole discretion, either retained by the Partnership on the General Partner's behalf or distributed to the Limited Partners. To the extent that the General Partner elects not to receive any Carried Interest distribution, subsequent distributions shall be made to the General Partner until it has received the amount of Carried Interest distributions it would then have been entitled to receive without such election; provided that no interest shall accrue on or be paid to the General Partner with respect to any such deferred Carried Interest distributions. |
| | All short-term interest income that is not generated from Loans and related securities, such as interest earned on cash holdings of the Partnership, will be distributed to the Partners *pro rata* in proportion to their Capital Contributions, and will not be taken into account in determining the General Partner's Carried Interest. |
| **Expenses** | The Partnership bears and shall be responsible for its own expenses including, but not limited to, investment related expenses such as all costs associated with procuring financing for Loan purchases, any brokerage commissions or, interest on margin accounts and other indebtedness, the Partnership's custodial fees, bank service fees, withholding and transfer fees, taxes, systems and technology expenses, third party research tools, corporate licensing fees, all organizational expenses incurred in the formation of the Partnership, legal and auditing expenses, accounting, fund administration, filing fees and expenses (including regulatory filings made in respect of the Partnership such as Form PF preparation and filing expenses), outsourced risk management advisory and software, investment related consultants and travel costs that are research related (if any), expenses incurred with respect to the preparation, duplication and distribution to Limited Partners and prospective Limited Partners of Partnership offering documents, annual reports and other financial information, and any other services |

| | or service provider expenses deemed necessary by the General Partner on behalf of the Partnership. |
| | The General Partner bears its own expenses, including office space and utilities, computer equipment and software (not otherwise paid by the Partnership) and secretarial, clerical, employee related and other personnel, except as assumed by the Partnership. |
| **Withdrawals** | Generally, Capital Accounts of Limited Partners may first be withdrawn as of the last day of any calendar quarter ending on or after the first anniversary of the Capital Contribution (the "Lock-Up Period").  After satisfying the Lock-Up Period, Capital Accounts may be withdrawn by a Limited Partner on the last day of each calendar quarter upon 90 days' prior written notice (subject to the General Partner's right to waive such notice and permit withdrawals at other times).  Each date as of which Capital Accounts may be withdrawn is herein referred to as a "Withdrawal Date".  Each new Capital Contribution will have a new Lock-Up Period.  The General Partner, in its sole discretion, may waive the Lock-Up Period requirement, in whole or in part, for certain Limited Partners. |
| | Provided that the General Partner has received all necessary documentation, distribution in respect of the withdrawn capital normally will be made in U.S. dollars within 30 calendar days after an authorized Withdrawal Date.  However, the General Partner shall have the right, at its discretion, to withhold up to 5% of the Capital Account for the Partnership's liabilities and other contingencies until no later than 30 days after the completion of the year-end audit of the Partnership's financial statements for any withdrawal of 90% or more of a Limited Partner's Capital Account balance (or if a withdrawal, when combined with all other withdrawals of such Limited Partner during the preceding 12 months, would result in such Limited Partner having withdrawn 90% or more of such Limited Partner's Capital Account as of the beginning of such period). In those circumstances, the Partnership will remit the balance of the withdrawal proceeds without interest. The General Partner, in its sole discretion, may waive these withdrawal restrictions as to any Limited Partner.  The General Partner, in its sole discretion, may effect withdrawal payments in cash or in-kind. |
| | The General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise required or permitted by U.S. generally accepted accounting principles) which could reduce the amount of a distribution upon withdrawal. |

| | The General Partner may withdraw a portion of its Capital Account on the same terms as the Limited Partners or at such other times as it determines; provided that the General Partner may not withdraw capital from the Partnership if the General Partner suspends withdrawal rights. Notwithstanding the foregoing, the General Partner may withdraw capital from its Capital Account in the Partnership equal to the amount of a previously earned Carried Interest at any time in the General Partner's sole and absolute discretion. |
|---|---|
| | The General Partner may suspend withdrawal rights for any or all Limited Partners in certain circumstances. See Section 9 herein, "Withdrawals; Distributions". |
| | The General Partner, by written notice to any Limited Partner, may compel the withdrawal of all of such Limited Partner's Capital Account at any time if the General Partner deems it to be in the best interest of the Partnership to do so because the continued participation of any such Limited Partner in the Partnership may result in adverse legal, pecuniary, regulatory or tax consequences for the Partnership. |
| **Reserves** | The General Partner may establish reserves for the Partnership for various obligations and liabilities of the Partnership as the General Partner may reasonably determine to be advisable, whether or not in accordance with generally accepted accounting principles ("Reserves"). |
| **Conflicts of Interest** | The General Partner will use its best efforts in connection with the purposes and objectives of the Partnership and will devote as much of its time and effort to the affairs of the Partnership as it deems necessary and appropriate to accomplish the purposes of the Partnership. Nevertheless, the Partnership will be subject to a number of actual and potential conflicts of interest involving the General Partner and its affiliates. |
| | For example, all of the Partnership's investments in the Loans are made through agreements with PS Funding, an affiliate of PeerStreet. There is an inherent conflict of interest created by this relationship because the Partnership will pay interest or other fees to and/or the expenses of PS Funding in connection with an agreement with PS Funding. Additionally, there is an inherent conflict of interest associated with B-Note Investments because of the Partnership's subordinate position in such investments, second to PS Funding. In certain situations, PS Funding may be incentivized to sell the Partnership's subordinated investments to third parties on terms or at such times that are beneficial to PS Funding but are not in the best interests of the Partnership. |

|  | Furthermore, PS Funding shall hold a superior interest to the Partnership's interest in the underlying Loan of a B-Note Investment. Such investments create a conflict of interest due to the fact that PS Funding is an affiliate of the General Partner and PeerStreet and may be incentivized to sell such underlying Loans to third parties on terms or at such times that benefit PS Funding and are not in the best interests of the Partnership.<br><br>However, the General Partner intends to conduct such transactions in accordance with, and subject to, the General Partner's fiduciary obligations to the Partnership. See Section 7 herein for additional risk factors. |
|---|---|
| **Reports** | The General Partner intends to deliver to each Partner, no less than quarterly, an account statement for such Partner, the unaudited financial statements for the Partnership, and a letter from the General Partner describing the business activities of the Partnership. Limited Partners will receive annual audited financial statements, copies of Schedule K-1 to the Partnership's tax return, and a review by the General Partner of the Partnership's performance during the prior year. |
| **Tax Matters** | The Partnership expects that it will be treated as a partnership and not as an association or a publicly traded partnership taxable as a corporation for Federal income tax purposes. Accordingly, the Partnership does not expect to be subject to Federal income tax, and each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of the Partnership's taxable income or loss, regardless of whether any distributions have been made by the Partnership to such Limited Partner.<br><br>Potential Limited Partners should consult their own tax advisors regarding the tax consequences of an investment in the Partnership applicable to them. Limited Partners should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them. |
| **Non-U.S. Investors** | Prospective non-U.S. investors should be aware that an investment in the Partnership could cause them to be treated as engaged in a U.S. trade or business and to derive income treated as effectively connected to such U.S. trade or business and, as a result, could likely subject them to U.S. tax filing and payment obligations.<br><br>Please see the discussion under the heading "Tax Considerations." |

## 2.    INTRODUCTION

Peer Street Opportunity Investors II, LP (the "Partnership") is a Delaware limited partnership formed for the purpose of investing its assets in accordance with the investment objectives set forth in this Confidential Private Placement Memorandum (the "Memorandum") and the terms of the Limited Partnership Agreement of the Partnership (the "Partnership Agreement").   Peer Street Opportunity Fund GP, LLC, a Delaware limited liability company, is the general partner of the Partnership (the "General Partner"). The General Partner is responsible for the business and affairs of the Partnership and the management of the Partnership's portfolio. Peer Street, Inc., a Delaware corporation, is the managing member of the General Partner ("PeerStreet").   The General Partner's principal office is at 2121 Park Place, Suite 250, El Segundo, CA 90245.

This Memorandum sets forth the investment objectives and method of operation of the Partnership, the principal terms of the Partnership Agreement and certain other pertinent information. However, the Memorandum does not set forth all the provisions and distinctions of the Partnership Agreement that may be significant to a particular prospective Limited Partner.   Each prospective Limited Partner should examine this Memorandum, the Partnership Agreement and the Subscription Document accompanying this Memorandum in order to assure itself that the terms of the Partnership Agreement and the Partnership's investment program is satisfactory to each Limited Partner.

Prospective Limited Partners may wish to review materials available to the General Partner relating to the Partnership, the operations of the Partnership and any other matters regarding this Memorandum.  All such materials are available at the office of the General Partner, at any reasonable hour, after reasonable prior notice.  The General Partner will afford prospective Limited Partners the opportunity to ask questions of and receive answers from its representatives concerning the terms and conditions of the offering and to obtain any additional information to the extent that the General Partner or the Partnership possesses such information or can acquire it without unreasonable effort or expense.

## 3.    INVESTMENT PROGRAM

THE PARTNERSHIP MAY BE DEEMED TO BE A HIGHLY SPECULATIVE INVESTMENT AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM.  IT IS DESIGNED ONLY FOR SOPHISTICATED PERSONS WHO CAN BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR INVESTMENT IN THE PARTNERSHIP AND WHO HAVE A LIMITED NEED FOR LIQUIDITY IN THEIR INVESTMENT. THERE CAN BE NO ASSURANCE THAT THE PARTNERSHIP WILL ACHIEVE ITS INVESTMENT OBJECTIVES.

**Investment Objective and Strategy**

The Partnership's primary investment objective is to provide attractive returns on invested capital while maintaining a materially reduced risk profile due to the secured nature of the Partnership's investments. The Partnership primarily intends to achieve this objective by investing in (1) Participation Investments, (2) Mezzanine Warehouse Investments and (3) B-Note Investments; each type of investment is more fully described below. The Partnership may also make other real estate related investments in accordance with the Partnership's investment strategy.  The Partnership's

strategy may include, in a limited manner, borrowing funds collateralized by the Partnership's assets in order to enhance returns.

Through its normal course of business, PS Funding will purchase Loans from originators which are in compliance with its counterparty diligence requirements (each, an "Originator"). PS Funding will typically perform due diligence on each Loan pursuant to its underwriting guidelines. Each Loan will typically be secured by a deed of trust, mortgage, security agreement or legal title to the underlying real estate. Loans will be purchased, held, and ultimately re-sold by PS Funding, Inc., a Delaware corporation that holds a California brokerage license from the California Department of Real Estate and a California Finance Lender's License issued by the California Department of Business Oversight. PS Funding is licensed to buy, sell, and hold commercial and business purpose loans in every state in that it buys Loans in. PS Funding is an affiliate of the Partnership, the General Partner, and the managing member of the General Partner.

The Partnership's strategy may include investing in Loans on a levered or unlevered basis.  The leverage may be provided by one or more banks, other financial institutions, or other third-party lenders (each, a "Lender" and together, the "Lenders"). Legal title to each Loan will be held by PS Funding and PS Funding will pledge each Loan to the Lenders as collateral for the related line of credit.

Revenues on the Loans the Partnership invests in will be any interest income payments with respect to the Loans net of Loan Fees.  "Loan Fees" may include any expenses, costs, or other fees charged on the Loans, including, but not limited to, retained originator spread and servicing spread. All other fees earned on the Loans by PeerStreet shall be retained by PeerStreet, provided, however, all modification fees, extension fees, holdover fees, prepayment premiums and default interest will be shared equally between PeerStreet and the Partnership (for the avoidance of doubt, PeerStreet and the Partnership will each receive 50% of all modification fees, extension fees, holdover fees, prepayment premiums and default interest).

The Loans may be held by PS Funding for a short period of time or through the life of the Loan.

Participation Investment.

The Partnership intends to generate a return on its investment by entering into participation agreements with PS Funding to receive a portion of the (i) interest accrued and paid to PS Funding by the underlying borrower before the Loan held by PS Funding is sold to a third party and (ii) sale proceeds from such Loan (a "Participation Investment"). After the sale of an underlying Loan of a Participation Investment is sold to a third party, PS Funding may retain the right to receive a portion of such Loan's interest income (the "After Sale Interest Right"). Notwithstanding the foregoing, the Partnership will not be entitled to or receive any interest income received by PS Funding in connection with the After-Sale Interest Right.

Mezzanine Warehouse Investment.

In order for PS Funding to purchase Loans and own them until they are sold, PS Funding may borrow funds from a third-party (the "Warehouse Financer") to buy the Loans ("Warehouse Financing"). The Warehouse Financer typically lends an amount less than 100% of the value of a Loan, requiring PS Funding or another party to provide the remaining amount required to purchase a Loan. Accordingly, the Partnership may lend to PS Funding some or all of the remaining amount needed to purchase a Loan (a "Mezzanine Warehouse Investment"), which will be secured by the underlying Loan and will have a second lien position behind the Warehouse Financer. The remaining amount

needed to purchase a Loan, if any, will be provided by PS Funding and PS Funding will hold a lien position behind the Partnership. PS Funding expects to sell the underlying Loan after a period of time, to be replaced by other Loans purchased by PS Funding. The maturity for Warehouse Financing will typically, but not always, range between 3 and 18 months.  The maturity for Mezzanine Warehouse Investments will be the same.

<u>B-Note Investments</u>.

PS Funding may, at times, purchase Loans that have a Loan-to-Value ratio (or other similar measure) greater than what can be marketed and sold to third parties.  Accordingly, the Partnership may purchase a subordinated position in such Loan in return for a stated yield greater than the loan investor rate (a "B-Note Investment"). A B-Note Investment will have the same maturity as the underlying Loan associated with the B-Note Investment.

The General Partner, in consultation with PS Funding, will typically identify and invest in Loans that it believes will achieve the Partnership's investment objective while minimizing overall risk.

## Other Investment Strategies and Techniques

The Partnership is not limited with respect to the types of real estate loans and related securities and financial instruments in which it may invest, the real estate loan-focused investment strategies it may employ, or the percentage of its capital that may be invested in a single Loan or security. Depending on the condition of markets, the United States economy or international economies, the General Partner may alter its investment strategy and/or employ different techniques that it considers to be appropriate and in the best interest of the Partnership.

## Master Fund and Other Funds

In the future**,** the Partnership may enter into arrangements with other investment funds that may be managed by the General Partner and its principals with the same or substantially similar investment objectives as the Partnership's.  Such arrangement may either allow other funds to contribute their assets to the Partnership to invest, or pursue its investment activities by investing all or a portion of its assets in a "Master Fund" that will conduct the investment activities described in this Memorandum.  Even during periods in which the Partnership's assets are invested primarily through a Master Fund, the Partnership may invest some of its assets directly rather than through the Master Fund.  The Partnership Agreement provides that the General Partner may either allow other funds to contribute their assets to the Partnership, or contribute the Partnership's assets to a Master Fund managed by the General Partner, its principals, or any of their affiliates without consent of the Limited Partners.

## 4.    MANAGEMENT; ADMINISTRATOR

## GENERAL PARTNER

Peer Street Opportunity Fund GP, LLC, a Delaware limited liability company, is the General Partner of the Partnership. The General Partner is responsible for the business and affairs of the Partnership and the management of the Partnership's portfolio. PeerStreet is the managing member of the General Partner.  The General Partner's principal office is at 2121 Park Place, Suite 250, El Segundo, CA 90245.  The General Partner is not currently registered as an investment adviser under the United States Investment Advisers Act of 1940, as amended (the "Investment Advisers Act") and relies

on an exemption from registration as an investment adviser with the State of California pursuant to Section 260.204.9 of Title 10 of the California Code of Regulations.

## PeerStreet

PeerStreet, the managing member of the General Partner, is an award-winning, Andreessen Horowitz-backed platform focused on democratizing access to real estate debt. The company provides investments in high-yield, short-term, real estate backed loans. PeerStreet's unique marketplace allows investors to diversify their capital in an asset class that has been traditionally difficult to access. Loans are sourced and curated from vetted private lenders throughout the United States who have local real estate expertise and borrower relationships. The model allows for more borrowers to access capital and improve their local communities, one house at a time. PeerStreet's platform is secure and intuitive with an easy-to-use interface, offering a wealth of information and tools for every level of investor.  To date, PeerStreet has purchased more than $1 billion in loans while incurring no losses for its investors.

## Management of PeerStreet

<u>Brewster Johnson</u>.  Brewster Johnson is Founder and CEO of PeerStreet. Prior to PeerStreet, he worked as general counsel at VirtualTourist where he oversaw the company's sale to TripAdvisor (then wholly owned by Expedia). Prior to VirtualTourist, he was a real estate attorney at Allen Matkins Leck Gamble & Mallory and a technology attorney at Brobeck Phleger & Harrison. For over a decade, Brewster has been pursuing his two passions, real estate and technology; he advises and invests in tech startups and is an active real estate developer, investor and private lender. Brewster graduated from USC with degrees in international relations and history and earned a JD degree from UCLA School of Law.

<u>Brett Crosby</u>. Brett Crosby is Co-Founder and COO of PeerStreet. Brett is responsible for product, marketing, PR, sales and business development. Previously he was Director of Marketing at Google where his 10-year tenure spanned many of Google's most prominent products. Most notably he co-founded Google Analytics, helped start Google's mobile advertising business, ran the founding marketing team that launched Google+ and most recently ran the marketing teams responsible for the dramatic growth of Chrome, Gmail, Docs, and Drive. Before Google he co-founded Urchin Software Corporation, a web analytics service acquired by Google in 2005. He graduated USC with degrees in international relations and political science and furthered his education with programs at Georgetown, Michigan State and Semester at Sea.

<u>Ellen Coleman</u>. Ellen is Chief Financial Officer of PeerStreet. Ellen has 15+ years of experience working in treasury finance at residential mortgage companies, including Countrywide, Nationstar, and Stearns Lending. Ellen is experienced in liquidity planning, and has arranged and managed structured warehouse funding facilities with banks and institutional investors.  She earned an MBA from the Anderson School at UCLA and a BS in Finance from Georgetown University.

<u>Tom Danehey</u>. Tom Danehey is Head of Asset Management of PeerStreet. Tom has over 30 years of experience in the banking and asset management industry, over which time period he has held a number of executive positions and amassed deep expertise managing loan portfolios and resolving problem loans. He was previously EVP, Asset Management and Special Servicing at Ciena Capital, LLC. managing a $2B portfolio of securitized commercial mortgages.

<u>Louis Nees</u>. Louis Nees is the Head of Capital Markets at PeerStreet, as well as the Senior Portfolio Manager for the Partnership. Prior to PeerStreet, from 2015-2017, Louis was CEO of Walter Capital Opportunity Corp, a private REIT, and Head of Capital Markets for Walter Investment Management from 2013 - 2015. From 2009 to 2013, Louis was a senior portfolio manager for Ally Financial and

ran capital markets for its subsidiary, Rescap. From 1983 through 2008, Louis was in various trading and management positions in the mortgage and derivatives arenas.

**ADMINISTRATOR**

The Partnership has retained Crestbridge Fund Services US, LLC (the "Administrator") to serve as the Partnership's third-party administrator and perform certain financial, accounting, corporate, administrative and other services. This engagement may be terminated by either party at any time upon sixty (60) days' prior written notice to the other party.

## 5.    FEES; EXPENSES; RESERVES

**Management Fee.**  With respect to each Limited Partner, the General Partner will receive a quarterly management fee (the "Management Fee"), calculated at an annual rate of 0.5% (0.125% per quarter) of the difference between (i) such Limited Partner's Commitment, underline(less) (ii) amounts distributed to such Limited Partner as a return of such Limited Partner's Capital Contributions. The Management Fee will be paid quarterly in advance. The General Partner may elect to reduce, otherwise modify or waive the Management Fee with respect to any Limited Partner.

**Expenses.**  The Partnership bears and shall be responsible for its own expenses including, but not limited to, investment related expenses such as all costs associated with procuring financing for Loan purchases, any brokerage commissions or interest on margin accounts and other indebtedness, the Partnership's custodial fees, bank service fees, withholding and transfer fees, taxes, systems and technology expenses, third party research tools, corporate licensing fees, all organizational expenses incurred in the formation of the Partnership, legal and auditing expenses, accounting, fund administration, filing fees and expenses (including regulatory filings made in respect of the Partnership such as Form PF preparation and filing expenses), outsourced risk management advisory and software, investment related consultants and travel costs that are research related (if any), expenses incurred with respect to the preparation, duplication and distribution to Limited Partners and prospective Limited Partners of Partnership offering documents, annual reports and other financial information, and any other services or service provider expenses deemed necessary by the General Partner on behalf of the Partnership.

The General Partner bears its own expenses, including office space and utilities, computer equipment and software (not otherwise paid by the Partnership) and secretarial, clerical, employee related and other personnel, except as assumed by the Partnership.

**Reserves.** The General Partner may establish reserves for the Partnership for various obligations and liabilities of the Partnership as the General Partner may reasonably determine to be advisable, whether or not in accordance with generally accepted accounting principles ("Reserves").

## 6.    ALLOCATION OF NET INCOME AND NET LOSSES

**Allocation of Net Income and Net Losses.**  The Partnership will establish a Capital Account for each Partner. The Net Income or Net Loss of the Partnership as of the end of each Fiscal Period will be allocated among the Partners in a manner generally consistent with the distribution of investment proceeds, as described under the "*Distributions*" provision set forth in Section 9 below. Net Income and Net Loss of the Partnership will be determined as provided for in the Partnership Agreement.

## 7.    RISK FACTORS

No guarantee or representation is made that the Partnership will achieve its investment objectives.  Investment in the Partnership involves significant risks and conflicts of interest, including, but not limited to, the risks and conflicts of interest set forth below.  The risks set out below do not purport to be exhaustive. Additional risks and uncertainties that are currently unknown or currently deemed immaterial may become material factors that affect the Partnership.  Prospective investors should carefully consider the risks involved in an investment in the Partnership, including but not limited to those discussed below.  Prospective investors should consult their own legal, tax and financial advisers as to all these risks and as to an investment in the Partnership generally.

### GENERAL RISK FACTORS

**Lack of Operating History.**  The Partnership has no operating history and therefore may not be able to operate its business, implement its investment strategy or generate sufficient revenue to make or sustain distributions to investors. Failure to procure adequate funding and capital could adversely affect the Partnership's ability to grow and/or expand its business, which can negatively impact its performance.  In addition, the past investment performance of the Partnership or other entities or accounts managed by the General Partner or any of its employees or affiliates may not be indicative of the future performance of the Partnership.

**Reliance on the General Partner.** The success of the Partnership depends on the ability of the General Partner to develop and implement investment strategies to achieve the Partnership's investment objectives. Although the General Partner may impose limits on the types of positions the Partnership may take, or the concentration of its investments, the Partnership Agreement imposes no such limits. Limited Partners will have no right or power to take part in the management of the Partnership. The Partnership's investment performance could be materially affected if any principals of PeerStreet, the managing member of the General Partner, were to die, become ill or disabled, or otherwise cease to be involved in the active management of the business of the Partnership's portfolio.

**Operating Deficits.** The expenses of operating the Partnership (including Management Fees payable to the General Partner) could exceed its income. This would require that the difference be paid out of the Partnership's capital, reducing the amount of capital available to the Partnership for investment and the Partnership's potential for profitability.

**Absence of Regulatory Oversight.**  While the Partnership may be considered similar to an investment company, it is not required, and does not intend, to register as such under the laws of any jurisdiction.  For instance, the provisions of the Investment Company Act of 1940, as amended (the "Investment Company Act"), which may provide certain regulatory safeguards to investors, are not applicable.

**Business and Regulatory Risks of Private Investment Funds.**  Legal, tax and regulatory changes could occur during the Investment Period and subsequent liquidation of the Partnership that may adversely affect the Partnership.  The regulatory environment for private investment funds is evolving, and changes in the regulation of private investment funds may adversely affect the value of investments held by the Partnership and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.  In addition, securities and futures markets are subject to comprehensive statutes, regulations and margin requirements.  The SEC, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies.  The regulation of derivative transactions and funds that engage in such

transactions is an evolving area of law and is subject to modification by government and judicial actions. The effect of any future regulatory change on the Partnership could be substantial and adverse.

**Investment of Capital Contributions.** Not all of each investor's Capital Contributions will be available for investment in Loans. After the deduction of Reserves and other Partnership expenses, it is possible that a significant amount of an Investor's Capital Contributions may not be available for investment in Loans.

**Enhanced Scrutiny and Potential Regulation of Private Investment Funds.** There has been enhanced governmental scrutiny and/or increased regulation of the private investment fund and financial services industries in general. The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") requires, among other things, registration with the SEC of advisors to private investment funds whose assets under management exceed $150 million (with certain limited exceptions) and imposes new reporting and recordkeeping obligations with respect to the private investment funds they advise.

The Dodd-Frank Act, as well as future related legislation, may have an adverse effect on the private investment fund industry generally and/or on the Partnership, specifically. In addition, regulatory agencies in the U.S., Europe, or elsewhere may adopt burdensome laws (including tax laws) or regulations, or changes in law or regulation, or in the interpretation or enforcement thereof, which are specifically targeted at the private investment fund industry, or other changes that could adversely affect private investment firms and the funds they sponsor, including the Partnership. Additional governmental scrutiny may increase the Partnership's and the General Partner's exposure to potential liabilities and to legal, compliance and other related costs. Increased regulatory oversight, enhanced regulation and the adoption of new statutes, rules or regulations with respect to the investment activities of the Partnership may also reduce the amount and availability of the investment opportunities of the Partnership. The reduction of such investment opportunities could have a material and adverse effect on the investment performance of the Partnership. Such increased regulatory oversight and regulation may also impose additional administrative burdens on the General Partner and such regulatory proposals, or any future proposals, if adopted could adversely affect the Partnership, including the business, financial condition and prospects of the Partnership, and could also require increased transparency as to the identity of the Limited Partners.

**Long-Term Investments.** The Loans will have different anticipated holding periods depending on the type of investment. Loans that are purchased by PS Funding, which the General Partner intends to dispose of within a short period of time following its acquisition, may ultimately be held for a significant period of time following the initial purchase. PS Funding expects to hold the underlying Loans associated with Mezzanine Warehouse Investments and B-Note Investments for up to 36 months. There is no assurance that the underlying Loans of the B-Note Investments will be sold prior to their final maturity. Overall economic conditions, the competitive market for comparable investments, and the availability for acquirers of such Loans may affect how long the Partnership holds a Mezzanine Warehouse Investment or B-Note Investment. The Partnership's ability to achieve its investment objective may be materially affected if the Partnership is unable to dispose of an investment within an anticipated time period.

**Assignment of Advisory Contracts.** Federal and state laws applicable to investment advisers (including, without limitation, the Advisers Act and rules promulgated thereunder) may impose limitations on the General Partner's ability to assign certain of its rights and obligations under the Partnership Agreement. Normally, such limitations would permit the General Partner to engage in transactions that do not involve a change of control of the General Partner without consent of the Limited Partners. However, to the extent that an assignment does involve a change of control, the

General Partner will be required to seek consent of the Limited Partners before the transaction will be consummated. To the extent that the consent of Limited Partners is required for a particular assignment, such consent may be withheld to a transaction that would, in the view of the General Partner benefit the Partnership and/or the Limited Partners. Generally, these laws do not require a minimum length of time for notices or deadlines to provide or withhold consent. The General Partner may establish reasonable notice periods and deadlines in its discretion. The General Partner may seek Limited Partner consent via electronic means and/or negative consent.

**Lack of Liquidity.** Interests being offered pursuant to this Memorandum have not been registered under the Securities Act or under the securities laws of any other jurisdiction. The Interests may therefore not be sold, pledged or otherwise transferred or disposed of unless they are first so registered or unless an exemption from such registration is available. Limited Partners will have no right to require the registration of their Interests. In addition, there is no public or other market for Interests, nor is such a market likely to develop. To avoid the application of certain provisions of ERISA, transfers to "benefit plan investors" (as defined in ERISA) will be prohibited. In addition, the transfer of Interests will be significantly restricted under the terms of the Partnership Agreement. Accordingly, any investor may be required to retain its investment in the Partnership for the entire Investment Period of the Partnership.

**Limited Withdrawal Rights.** An investment in the Partnership is suitable only for certain sophisticated investors who have no need for liquidity in the investment. Generally, Limited Partners may withdraw their Capital Accounts as of the last day of any calendar quarter after satisfying the Lock-Up Period (as defined below). Further, distribution of proceeds upon a Limited Partner's withdrawal may be limited where, in the view of the General Partner, the disposal of all or part of the Partnership's assets, or the determination of the value of the Limited Partner's Capital Account, among other reasons, would not be reasonable or practicable or would be prejudicial to the non-withdrawing Limited Partners.

**Effect of Withdrawals.** A significant withdrawal of Capital Accounts from the Partnership may cause a temporary imbalance in the Partnership's portfolio, which may adversely affect the remaining non-withdrawing Limited Partners. The Partnership may distribute cash and/or securities to withdrawing Limited Partners.

**Contingency Reserves.** The Partnership, at any time in its discretion and in consultation with the General Partner, may establish reserves for contingencies (including general reserves for unspecified contingencies). The establishment of such reserves will not insulate any portion of the Partnership's assets from being at risk, and such assets may still be traded by the Partnership.

**Information Rights.** Subject to the sole and absolute discretion of the General Partner, certain Limited Partners may invest on terms that provide access to information that is not generally available to other Limited Partners and, as a result, may be able to act on such additional information that other Limited Partners do not receive.

**Side Letter Agreements.** In accordance with common industry practice, the General Partner may enter into one or more "Side Letters" or similar agreements with certain Limited Partners pursuant to which they may agree to vary certain of the terms applicable to any such Limited Partner or grant to any such Limited Partner specific rights, benefits or privileges that are not made available to Limited Partners generally. The General Partner may also agree to provide a greater level of disclosure regarding the investments and activities of the Partnership to certain Limited Partners than other Limited Partners. Such agreements will be disclosed only to those actual or potential Limited Partners that have separately negotiated with the General Partner for the right to review such agreements.

**Legal Counsel.**  Documents relating to the Partnership, including the Subscription Document to be completed by each Limited Partner (the "Subscription Document") as well as the Partnership Agreement, are detailed and often technical in nature. Cole-Frieman & Mallon LLP is legal counsel to the Partnership and the General Partner; this firm represents the interests solely of such parties and does not represent the interests of any Limited Partner.  Moreover, under the Partnership Agreement, each Limited Partner will be required to waive any actual or potential conflicts of interest between such Limited Partner and legal counsel to the Partnership.  Accordingly, each prospective Limited Partner is urged to consult with its own legal counsel before investing in the Partnership.  Finally, in advising as to matters of law (including matters of law described in this Memorandum), legal counsel has relied, and will rely, upon representations of fact made by the General Partner and other persons in this Memorandum and other documents.  Such advice may be materially inaccurate or incomplete if any such representations are themselves inaccurate or incomplete, and legal counsel generally will not undertake independent investigation with regard to such representations.

## CONFLICTS OF INTEREST

**General Partner Conflicts of Interest.**  The General Partner will use its commercially reasonable efforts in connection with the purposes and objectives of the Partnership and will devote as much of its time and effort to the affairs of the Partnership as it deems necessary and appropriate to accomplish the purposes of the Partnership.  Under the terms of the Partnership Agreement, the General Partner and its directors, members, partners, shareholders, officers, employees, agents and affiliates, including the Managing Partner, (hereinafter referred to as the "Affiliated Parties"), may conduct any other business, including any business within the securities industry, whether or not such business is in competition with the Partnership.  Without limiting the generality of the foregoing, the Affiliated Parties may act as investment adviser or investment manager for others, may manage funds, separate accounts or capital for others and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms. Such other entities or accounts may have investment objectives or may implement investment strategies similar to or different from those of the Partnership.  In addition, the Affiliated Parties may, through other investments, including other investment funds, have interests in investments in which the Partnership invests as well as interests in investments in which the Partnership does not invest.  As a result of the foregoing, the Affiliated Parties may have conflicts of interest in allocating their time and activity between the Partnership and other entities, in allocating investments among the Partnership and other entities and in effecting transactions for the Partnership and other entities, including ones in which the Affiliated Parties may have a greater financial interest.

**Partnership and PS Funding Conflicts of Interest.** All of the Partnership's investments are made through agreements with PS Funding or PeerStreet. There is an inherent conflict of interest created by this relationship because the Partnership may pay interest or other fees to and/or the expenses of PS Funding under the agreements. These payments and reimbursements may not be negotiated at arm's length, and the Partnership may be able to obtain more favorable terms by entering into similar agreements with other licensed brokers who provide services similar to PS Funding.

Additionally, while (i) the Partnership will receive all interest income generated by Participation Investments received by PS Funding before Participation Investments are sold to third parties (as described in Section 3 above) and (ii) the Partnership will receive its applicable share of the proceeds from such sales of the Participation Investment loans to third parties (as described in Section 3 above), PS Funding may retain certain rights to receive a portion of the interest income generated by such Loans associated with Participation Investments after they are sold to third parties (the "PS Funding Interest Rights"), with such income being used to pay for on-going and other expenses of PS

Funding. While PS Funding will typically receive one percentage point of the total interest payable under the Participation Investment in connection with the PS Funding Interest Rights, it may receive more or less than such amount. The Partnership will not receive any of the interest income received by PS Funding in connection with the PS Funding Interest Rights following the sale of an underlying Loan of a Participation Investment to third parties. Furthermore, PS Funding will hold a superior interest to the Partnership's interest in the underlying Loan of a B-Note Investment.  Such investments create a conflict of interest due to the fact that PS Funding is an affiliate of the General Partner and PeerStreet and may be incentivized to sell such Loans to third parties on terms or at such times that benefit PS Funding and are not in the best interests of the Partnership.

Notwithstanding the foregoing, the General Partner and PeerStreet intend to structure and conduct all transactions with respect to the Loans, including the participation agreements and the ultimate sale of the Loans to third parties, in accordance with and subject to the General Partner's fiduciary obligations to the Partnership.

**Co-Investments and Similar Conflicts.** A conflict of interest might arise if at any given time an opportunity to invest in a Loan would be suitable for both the Partnership and future funds or investment entities managed by the General Partner, thus requiring the General Partner to choose and allocate different amounts of investment among the suitable investment funds. The General Partner may also determine that more than one investment fund should have the opportunity to invest in a Loan, in which case those investment funds will be co-investors. The Partnership expects that certain of its investments will eventually be co-investments with other investors that are Affiliated Parties.  As a result, a conflict of interest may arise because the General Partner's investment recommendations to the Partnership may benefit Affiliated Parties.

**Diverse Membership; Relationships with Limited Partners.**   The Limited Partners of the Partnership may include persons or entities organized in various jurisdictions, including the United States and foreign countries, which may have conflicting investment, tax and other interests with respect to their investments in the Partnership. The conflicting interests of particular Limited Partners may relate to or arise from, among other things, the nature of investments made by the Partnership, the structuring of the acquisition of Loans, and the timing of disposition of Loans. Such structuring of the Partnership's investments and other factors may result in different returns being realized by different Limited Partners of the Partnership. As a consequence, conflicts of interest may arise in connection with decisions made by the General Partner, including with respect to the nature of structuring of Loans, which may be more beneficial for one Limited Partner than for another Limited Partner, especially with respect to the Limited Partner's particular tax situations.

**Investment Opportunities.**  The Affiliated Parties are not obligated to make any particular investment opportunity available to the Partnership and may take advantage of any opportunity, either for other accounts they manage or for themselves.

**Allocations.**  The Affiliated Parties may give advice or take action with respect to such other entities or accounts that differs from the advice given with respect to the Partnership.  To the extent a particular investment is suitable for both the Partnership and other clients of the Affiliated Parties, such investments may be allocated between the Partnership and the other clients in some manner that the Affiliated Parties determine is fair and equitable under the circumstances to all clients, including the Partnership.

**Cross-Transactions.**  Situations may arise where certain assets held by one or more funds and investment accounts managed by the General Partner may be transferred to other funds and investment accounts managed by the General Partner, including for the purpose of rebalancing the portfolios of

such funds and investment accounts.  Such transactions will be conducted in accordance with, and subject to, the General Partner's fiduciary obligations to the Partnership.  At its discretion, the General Partner is authorized to select one or more persons not affiliated with the General Partner to serve on a committee the purpose of which will be to consider and, on behalf of the Limited Partners, approve or disapprove, to the extent required by applicable law, principal transactions and certain other related party transactions.

**Fees to Third Parties.**  The General Partner or its affiliates may pay a fee representing a portion of the Management Fee earned to third parties for soliciting Limited Partners in the Partnership.  Such fees will be paid out of the General Partner's revenues from the Partnership, and will not result in an increase in expenses paid by the Partnership over the amount that would be paid to the General Partner in the absence of such fees.

The foregoing description of conflicts of interest does not purport to be a complete list of potential conflicts.  Other present and future activities of the General Partner and its affiliates may give rise to additional conflicts of interest.  If a conflict of interest arises, the General Partner will attempt to resolve such conflicts in a fair and equitable manner.

## INVESTMENT AND TRADING RISKS

**General Investment and Trading Risks.** An investment in the Partnership involves a high degree of risk, including the risk that the entire amount invested may be lost. The Partnership's investments in the Loans and other securities and financial instruments are based on strategies and investment techniques with significant risk characteristics. No guarantee or representation is made that the Partnership's program will be successful. The Partnership's investment program may utilize investment techniques which can, in certain circumstances, maximize the adverse impact to which the Partnership may be subject.

**General Economic and Market Conditions.** The success of the Partnership's activities may be affected by general economic and market conditions, such as local real estate market conditions, prevailing interest rates, the rate of unemployment, the level of consumer confidence, the value of the U.S. dollar, energy prices, changes in consumer spending, the number of personal bankruptcies, disruptions in the credit markets and other factors. None of these factors are within the control of the General Partner. These factors may affect the level and volatility of securities or real estate prices and the liquidity of the Partnership's investments. Unexpected volatility or illiquidity could impair the Partnership's profitability or result in losses.

**General Risks of Lending.** While the Partnership intends to hold the Loans, via PS Funding, for short periods of time, many of the risks associated with lending are still applicable to the Partnership and the Loans. Such risks include the risk of non-payment by the borrower, the risk of default by the borrower, the risk of a decrease in value of any applicable collateral, and other related risks. The occurrence of any of these risks could materially affect the ability of the Partnership to achieve its investment objective. If PS Funding is unable to sell the Loans to third parties within the time period it anticipates and instead is required to hold the Loans for extended periods of time, such risks, and the negative consequences associated therewith, may be magnified.

**General Risks of Asset-Based Loans.**  Asset based loans, such as the Loans purchased by PS Funding, involve numerous risks, including but not limited to: (i) the inability of the borrower to find additional credit to re-finance the Loan at maturity, if necessary; (ii) a decrease in the value of the underlying property securing the Loan due to macroeconomic and/or localized conditions; and (iii) the risk of the borrower abandoning the property due to financial difficulties or overall market decline.

The occurrence of any of these could lead the borrower of each Loan to default on the Loan, thereby diminishing the ability of PS Funding to ultimately sell the Loan to a third party and the ability of the borrower to repay the Loan.

**Subordination of Investments.** Some of the Partnership's investments may be in b-notes, structurally subordinated mezzanine loans and other subordinated loans. Greater credit risks are usually attached to these subordinated investments than to other senior obligations. In addition, these investments may not be protected by financial or other covenants and may have limited liquidity. Adverse changes in the borrower's financial condition and/or in general economic conditions may impair the ability of the borrower to make payments on a Loan in which the Partnership holds a subordinated interest. The ability to foreclose on any collateral securing such investments will be subject to the rights of the more senior lenders and contractual inter-creditor provisions. As such, it is more likely that a complete loss may occur in the event of a borrower's default on the Partnership's Mezzanine Warehouse Investments and B-Note Investments.

**B-Note Investments.** The Partnership may invest in b-notes, which investments are subordinate to the a-note portion of the same loan (which PS Funding is expected to hold). In addition to the risks described above in Subordination of Investments, certain additional risks apply to b-note Investments, including those described herein. The b-note portion of a Loan is typically small relative to the overall Loan, and vis-à-vis the a-note portion of the loan is in the first loss position. Although there a b-note holder may protect against the holder of the a-note from taking certain actions or receiving certain benefits to the detriment of the holder of the b-note, the holder of the b-note often (but not always) has the right to purchase the a-note from its holder, the Partnership will not have the right to purchase the a-note from PS Funding. Accordingly, PS Funding may take certain actions to protect its interest in the underlying loan of the B-Note Investment and would affect an investment in the Partnership.

**Borrower Credit Risk.** Credit information pertaining to a borrower may be inaccurate or may not accurately reflect the borrower's creditworthiness because the borrower's credit score may be based on outdated, incomplete or inaccurate consumer reporting data. Additionally, there is a risk that, following the data of the credit report that is obtained and reviewed, a borrower may become delinquent in the payment of an outstanding obligation; take on additional debt; or sustain other adverse financial events. An increase in the credit risk of a borrower could impact the value of a Loan, thus impacting the value of the Partnership's investments. Although PS Funding will perform customary due diligence on the Loans it purchases, such methods may or may not be able to discover factors that would impact a credit score or credit rating of the borrower.

**Loan Default Risk.** The Loans the Partnership invests in are subject to default by the underlying borrower. In the event of such default, the ability of PS Funding to ultimately sell the Loan to a third party may be severely limited. Further, upon default PS Funding may attempt to foreclose on the underlying property. There is no guarantee that such foreclosure will be successful or that the amounts collected by PS Funding during such foreclosure will be sufficient to repay any amounts owed to the Partnership. Such amounts recovered may also be reduced by collection fees, attorneys' fees, and other related fees incurred during the foreclosure process.

**Line of Credit Default Risk.** The lines of credit that have been obtained by PS Funding with the Banks are secured with the Loans. In the event of a default on such lines of credit by PS Funding, the Banks may enforce their security interest in some or all of Loans. Such an occurrence could result in the loss of all of the Partnership's investment in such Loans and materially impact the ability of the Partnership to achieve its investment objective.

**Risk of Prepayment by Borrower.** The underlying borrower of a Loan may be permitted by the terms of such Loan to prepay some or all of the outstanding principal balance before the applicable Loan maturity date without penalty. In the event that a borrower does prepay a Loan, interest will not continue to accrue on such prepaid amount and, consequently, the interest received by the Partnership will be reduced. Such reduced interest payments may adversely affect the ability of the Partnership to achieve its investment objective.

**Risk of Bankruptcy of Borrower.** The bankruptcy of a borrower may result in the discharge of the underlying Loan by a bankruptcy court and the loss of all unpaid principal and interest associated therewith. Such a discharge may prevent the Partnership from collecting on the interest rate of a Loan.

**Risk of Increased Debt.** The Loans may not restrict borrowers from incurring additional unsecured or secured debt, and may not impose any financial restrictions on the borrowers during the term of the Loan, both of which may impair the Partnership's ability to receive the full principal and interest payments for such Loan. In the event that the borrower incurs additional debts while the Loan remains outstanding, the borrower's ability to repay the Loan and the Partnership's ability to collect on the Loan may be adversely affected.

**Limited Liquidity of Some Loans.** Some of the Loans in which the Partnership invests may be relatively illiquid because they are thinly traded, because they are subject to transfer restrictions, or because there is no ready market for such Loans. The Partnership may not be able to liquidate those Loans promptly if the need should arise, and its ability to realize gains, or to avoid losses in periods of rapid market activity, may therefore be affected. The value assigned to thinly-traded investments or non-marketable securities for purposes of determining gains and losses may differ from the value the Partnership is ultimately able to realize.

**Amortization, Refinance or Sale.** Some Loans may not be fully amortizing, which means that they may have a significant principal balance or "balloon" payment due on maturity. Loans with a balloon payment involve a greater risk to a Lender than fully amortizing Loans because the ability of a borrower to make a balloon payment typically will depend upon its ability either to fully refinance the loan or to sell the property securing the loan at a price sufficient to permit the borrower to make the balloon payment. The ability of a borrower to effect a refinancing or a sale will be affected by a number of factors, including the value of the property, the level of available mortgage rates at the time of sale or refinancing, the borrower's equity in the property, the financial condition and operating history of the property and the borrower, tax laws, prevailing economic conditions and the availability of credit for Loans secured by the specific type of property. In addition, the Loans generally are nonrecourse to borrowers. In the event of foreclosure on a Loan, the value of the collateral securing the Loan at the time of foreclosure may be less than the principal amount outstanding on the Loan plus accrued but unpaid interest thereon, resulting in a non-collectable deficiency. Losses realized on the sale of foreclosed properties may not cover the full amount of a Loan, and could negatively impact an investment in the Partnership.

**Informational Asymmetries.** The underlying borrowers for each Loan supply a variety of information regarding the current rental income, property valuations, market data, and other information related to the property securing the Loan. The Partnership will make an attempt to verify some of this information, but as a practical matter, cannot verify all of it, which may be incomplete, inaccurate or intentionally false. Such borrowers may also misrepresent their intentions for the use of loan investment proceeds. The Partnership cannot verify all statements by applicants as to how loan proceeds are to be used. If such a borrower supplies false, misleading or inaccurate information, the value of the Loan and the ability of the borrower to repay may suffer. The Partnership's primary assurances that the Loan proceeds will be properly spent by the underlying borrower are the contractual

covenants agreed to by the borrower, along with the borrower's business history and reputation. Should the proceeds of a Loan be diverted improperly, the underlying borrower might become insolvent, which could result in the loss of investment of the entire Loan.

**Property Revenues.**  The payment schedules with respect to many Loans may be based on projected revenues generated by the underlying property over the term of the Loan. These projections are based on factors such as expected vacancy rates, expense rates, and other projected income and expense figures relating to the property. The actual revenues generated by a property could fall short of projections due to factors such as lower-than-expected rental revenues, or greater-than-expected vacancy rates or property management expenses. In such event, the underlying borrower's cash flow could be inadequate to repay the Loan in full.

**Insurance Risks.**  Real estate properties are typically insured against risk of fire damage and certain other property casualties, but are sometimes not covered by severe weather or natural disaster events such as landslides, earthquakes, or floods. Changes in the conditions affecting the economic environment in which insurance companies do business could affect the underlying borrowers' abilities to continue insuring the properties securing the Loans a reasonable cost or could result in insurance being unavailable altogether. Moreover, any hazard losses not then covered by a given borrower's insurance policy would result in the Loan becoming significantly under secured, and the Partnership could sustain a significant reduction, or complete elimination of, the return and repayment of principal from that Loan. Further, such an occurrence could severely limit PS Funding's ability to re-sell the Loan to a third party.

In addition to the insurance described above, real estate property purchases are typically insured against the risk of competing claims to the title of such property. While such insurance does mitigate the likelihood of such competing claims, oftentimes such insurance policies contain exceptions. In the event that a competing claim to the title of a property securing one of the Loans arises and such claim falls within an exception to the associated title insurance policy, the value of the associated Loan and the Partnership's ability to ultimately re-sell it to a third party may be severely reduced.

**Availability of Investment Opportunities.** The success of the Partnership depends upon its ability to identify, select and consummate the closing of the purchase of Loans on terms favorable to the Partnership that it believes offer the potential for superior returns within the time frame it desires. The availability of such opportunities will depend, in part, upon general market conditions. Although the Partnership believes that significant opportunities currently exist and that others will arise, there can be no assurance that the Partnership will be able to identify, select and consummate a sufficient number of opportunities to permit the Partnership to invest all of its capital.

**Risk of Unspecified Investment.**  The Partnership will have no investments or commitments to invest prior to the first admission of Limited Partners to the Partnership. Therefore, investors will not have an opportunity to evaluate for themselves the Loans, but must depend solely upon the ability of the General Partner to identify and select Loans for the Partnership. The Partnership anticipates, but cannot be certain, that full investment of the Capital Contributions will be made in Loans within six (6) months after the Initial Closing Date.

**Concentration of Investments.** The Partnership Agreement does not limit the amount of the Partnership's capital that may be committed to any single investment, industry or sector. The General Partner will attempt to spread the Partnership's capital among a number of Loans. However, the Partnership Agreement imposes no limits on the concentration of the Partnership's investments and at

times the Partnership may hold a relatively small number of Loans.  Losses incurred in any of those positions could have a materially adverse effect on the Partnership's overall financial condition.

**Use of Leverage and Financing.**  The Partnership may leverage its capital because the General Partner believes that the use of leverage may enable the Partnership to achieve a higher rate of return on its investments in the Loans. Accordingly, when such leverage is used, PS Funding, acting as a borrower, will pledge the Loans to the Banks as collateral for such financing. The Partnership will likely subordinate its participatory interests in the Loans to the Banks from which such financing is obtained. The Partnership may also leverage its investment return with options, short sales, swaps, forwards and other derivative instruments. The amount of borrowings or pledges which the Partnership may have outstanding at any time may be substantial in relation to its capital. There is no limit on the Partnership's ability to borrow or use leverage. While leverage presents opportunities for increasing the Partnership's total return, it has the effect of potentially increasing losses as well. Accordingly, any event that adversely affects the value of an investment by the Partnership would be magnified to the extent the Partnership is leveraged. The cumulative effect of the use of leverage by the Partnership in a market that moves adversely to the Partnership's investments could result in a substantial loss to the Partnership that would be greater than if the Partnership were not leveraged.

Further, the Partnership's investment strategy significantly relies on its ability to obtain financing from one or more Banks. In the event that such Banks modify the terms of such financing, or withdraw such financing altogether, the ability of the Partnership to achieve its investment objective may be materially affected.

**Net Cash.**  The Partnership may hold a significant portion of its portfolio in cash and cash equivalents.  This may result in the Partnership's investment results underperforming market indices.

**Unidentified Investments; Competitive Market for Investments.** The General Partner may be very selective when seeking investments. The business of identifying and structuring certain transactions is competitive (and may become more competitive in the future), and involves a high degree of uncertainty. There can be no assurance that the General Partner will be able to locate and complete attractive investments or that it will be able to adhere to the investment strategy outlined herein. Furthermore, there can be no assurance that the General Partner will be able to invest the entire amount of the Partnership's assets or that suitable investment opportunities will otherwise be identified. If the General Partner is unable to identify adequate investments at any given time, a significant portion of the Partnership's assets may be held in cash or equivalents, which produce low rates of return.

**Hedging Transactions.** The General Partner is not required to attempt to hedge the Partnership's investments and, for various reasons, may determine not to do so. Furthermore, the General Partner may not anticipate a particular risk so as to hedge against it. The Partnership may utilize financial instruments, both for investment purposes and for risk management purposes in order to: (i) protect against possible changes in the market value of the Partnership's investment so resulting from fluctuations in the overall markets and changes in interest rates; (ii) facilitate the sale of any such investments; (iii) hedge the interest rate or currency exchange rate on any of the Partnership's liabilities or assets; (iv) protect against any increase in the price of any investments the Partnership anticipates making at a later date; or (vii) for any other reason that the General Partner deems appropriate. The success of the Partnership's hedging strategy is subject to the General Partner's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the Partnership's investments being hedged. While the Partnership may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Partnership than if it had not engaged in any such hedging transactions. For a variety of reasons, the General Partner may not seek to establish a perfect correlation between

such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Partnership from achieving the intended hedge or expose the Partnership to risk of loss. The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Partnership's portfolio holdings.

**No Assurance of Distributions.**    There can be no assurance that any distributions to the Limited Partners will be made by the Partnership or that aggregate distributions, if any, will equal or exceed the Limited Partner's Capital Contributions to the Partnership. Dispositions of Loans, along with the interest accrued and paid thereon prior to such disposition, will be the principal source of distributable cash to the Limited Partners. The General Partner has absolute discretion in the timing of distributions to the Limited Partners.

**Counterparty Risk.**    The counterparties with whom the Partnership will engage in transactions s may not be subject to credit evaluation and regulatory oversight. This exposes the Partnership to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not bona fide) or because of a credit or liquidity problem, thus causing the Partnership to suffer a loss. The Partnership is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. These characteristics may increase the potential for losses by the Partnership.

**Terrorist Action.**    There is a risk of terrorist attacks on the United States and elsewhere causing significant loss of life and property damage and disruptions in global markets. Economic and diplomatic sanctions may be in place or imposed on certain states and military action may be commenced. The impact of such events is unclear, but could have a material effect on general economic conditions and market liquidity.

**Master-Feeder Structure.**    In the future, the Partnership may invest through a "master-feeder" structure, which will include a feeder fund for non-U.S. investors. The "master-feeder" fund structure presents certain unique risks to investors. For example, a smaller feeder fund investing in a master fund may be materially affected by the actions of a larger feeder fund investing in such master fund. If a larger feeder fund redeems its shares of a master fund, a remaining feeder fund may experience higher pro rata operating expenses, thereby producing lower returns. A master fund may become less diverse due to a redemption by a larger feeder fund, resulting in increased portfolio risk. A master fund is a single entity and creditors of such master fund may enforce claims against all assets of such master fund, including a pro rata share of assets owned by the feeder.

The Partnership may enter into an arrangement with other investment funds managed by the General Partner with the same or substantially similar investment objectives as the Partnership's to either allow other funds to contribute their assets to the Partnership to invest, or to pursue its investment activities by investing all or a portion of its assets in a "Master Fund" that will conduct the investment activities described in this Memorandum.

### FUND RISKS

**Tax Liability Without Distributions.**    Partners will be liable to pay taxes on their allocable shares of Partnership taxable income. It is possible that a Partner will be allocated income for a given year in excess of the cash, if any, distributed to such Partner for such year. It will generally be necessary for Partners to pay such tax liabilities out of separate funds. Limited Partners generally have no right to withdraw funds from the Partnership.

**Risk of Asset Growth.** If the assets that the General Partner and its Affiliates manage grow significantly, it may adversely affect the Partnership's investment performance. It becomes more difficult to find attractive investment opportunities as the amount of assets that the General Partner must invest increases. In this event, the General Partner may find it necessary to invest in a greater number of positions than it currently intends, which could dilute its focus on individual positions, impair its ability to monitor existing and potential investments, and result in investments in positions that it otherwise would not select. In addition, with greater assets to invest, it will be increasingly difficult for the Partnership to make investments large enough to be meaningful to their overall portfolios.

**Potential Mandatory Withdrawal.** The General Partner may, in its sole discretion at any time, require a Limited Partner to withdraw all or a portion of his or her Capital Contributions. Such a mandatory withdrawal could result in adverse tax and/or economic consequences to such Limited Partner.

## OTHER RISKS

**Tax Considerations.** An investment in the Partnership involves complex federal, state, and local income tax considerations, which will differ for each investor. The Partnership expects that the vast majority of its income will consist of interest and short-term capital gains (which are generally subject to tax at rates applicable to ordinary income under current law). In addition, it is possible that some portion of a non-U.S. Investor's allocable share of Partnership income (as well as gain from the sale or disposition of an interest in the Partnership) may be treated as effectively connected with a U.S. trade or business. Each investor should consult with and rely on its own independent tax counsel as to the U.S. federal income tax consequences of an investment in the Partnership based on its particular circumstances, as well as to applicable state, local or non-United States tax laws. For a more detailed discussion of the income tax considerations associated with an investment in the Partnership, see the discussion below under "Tax Considerations."

**Reliance on Management.** Decisions with respect to the management of the Partnership will be made solely by the General Partner. Limited Partners will have no right to take part in the management of the Partnership in which they have subscribed for Limited Partnership Interests. The success of the Partnership will depend upon the ability of the General Partner to consummate suitable investments and to dispose of those investments at a profit. Accordingly, no party should make any investment in the Partnership unless such party is willing to entrust all aspects of the management to the General Partner. In addition, the success of the Partnership is expected to be significantly dependent upon the ability of the General Partner to retain and hire additional investment professionals. Competition among private investment firms for such professionals is intense, and there can be no assurance that the General Partner will be able to attract and retain the services of such professionals.

**Investment Company Regulation.** The Partnership relies on either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to avoid requirements that the Partnership register as an "investment company" under, and comply with the substantive provisions of, the Investment Company Act. If the Partnership were required to be registered as an investment company, the Investment Company Act would require, among other things, that the Partnership have a board of directors, some of whom were unrelated to the General Partner, compel certain custodial arrangements and regulate the relationship and transactions between the Partnership and the General Partner. Compliance with some of those provisions could possibly reduce certain risks of loss, although such compliance could significantly increase the Partnership's operating expenses and limit the Partnership's investment and trading activities. Interpretations of Section 3(c)(1) and Section 3(c)(7) are complex and uncertain in several respects and, as a result, there can be no assurance that the Partnership will remain entitled to

rely on that Section. If the Partnership were found not to have been entitled to such reliance, the Partnership and the General Partner could be subject to legal actions by the SEC and others and the Partnership could be forced to terminate its business under adverse circumstances.

**Private Offering Exemption.**  The Partnership offers Interests without registration under the Securities Act in reliance on an exemption for "transactions by an issuer not involving any public offering," and without registration or qualification of the Interests under state laws in reliance on related exemptions. While the General Partner believes reliance on such exemptions is justified, there can be no assurance that factors such as the manner in which offers and sales are made, concurrent offerings by other funds, the scope of disclosure provided, failures to file notices or renewals of claims for exemption, or changes in applicable laws, regulations, or interpretations will not cause the Partnership to fail to qualify for such exemptions under federal or one or more states' laws. Failure to so qualify could result in the rescission of sales of Interests at prices higher than the current value of those Interests, potentially materially and adversely affecting the Partnership's performance and business. Further, even non-meritorious claims that offers and sales of Interests were not made in compliance with applicable securities laws could materially and adversely affect the General Partner's ability to conduct the Partnership's business.

**Investment Adviser Registration.**  The General Partner may be required to register as an investment adviser with the state of California or with the SEC under the Investment Advisers Act. Such registration may temporarily divert the attention of the Managing Partner from the business and affairs of the Partnership and the management of the Partnership's portfolio.  If the Partnership's assets under management reach threshold amounts that trigger the requirement of state or SEC investment adviser registration, the General Partner will comply with all relevant laws and regulations, and anticipates to satisfy all registration requirements within a reasonable time.

**Possibility of Additional Government or Market Regulation.**  Market disruptions, the dramatic increase in the capital allocated to alternative investment strategies during recent years, and the growing concern about the lack of regulation of private investment funds, have led to increased governmental as well as self-regulatory scrutiny of the private investment fund industry in general. Certain legislation proposing greater regulation of the industry periodically is considered by U.S. federal, state and local and non-U.S. governments, regulatory or administrative agencies, self-regulatory organizations or other similar entities.  It is impossible to predict what, if any, changes in the regulations applicable to the Partnership, the General Partner, the markets in which they trade and invest or the counterparties with which they do business may be instituted in the future.  Any such regulation could have a material adverse impact on the profit potential of the Partnership, as well as require increased transparency as to the identity of the Limited Partners. The financial services industry generally, and certain investment activities of private investment funds similar to the Partnership, and their managers, in particular, have been subject to intense and increasing regulatory scrutiny.

Additional governmental scrutiny may increase the Partnership's and the General Partner's exposure to potential liabilities and to legal, compliance and other related costs.  Increased regulatory oversight, enhanced regulation and the adoption of new statutes, rules or regulations with respect to the investment activities of the Partnership may also reduce the amount and availability of the investment opportunities of the Partnership.  The reduction of such investment opportunities could have a material and adverse effect on the investment performance of the Partnership.  Such increased regulatory oversight and regulation may also impose additional administrative burdens on the General Partner and such regulatory proposals, or any future proposals, if adopted could adversely affect the Partnership, including the business, financial condition and prospects of the Partnership, and could also require increased transparency as to the identity of the Limited Partners.

**Other Laws and Regulations.**  The Partnership and the General Partner are subject to various other securities and similar laws and regulations that could limit some aspects of the Partnership's operations or subject the Partnership or the General Partner to the risk of sanctions for noncompliance.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Partnership. Prospective Limited Partners should read the entire Memorandum and consult with their own advisers before deciding to subscribe for Interests.*

## 8.    ADMISSION OF PARTNERS; THE OFFERING; CAPITAL CALLS

**Investment Period and Liquidation.**  The "Investment Period" of the Partnership shall begin on the date of the Initial Closing (as defined below) and terminate on June 30, 2023, unless terminated earlier pursuant to the terms of the Partnership Agreement. The Partnership will not purchase any Loans or other investments following the termination of the Investment Period. For the avoidance of doubt, the General Partner may terminate the Investment Period at any time for any reason. Following the termination of the Investment Period for any reason, the Partnership will be wound up and its assets will be liquidated and distributed to the Partners as set forth in the Partnership Agreement. Notwithstanding the foregoing, the Partnership intends for the vast majority of its Loans and other related investments to be sold, with the related proceeds available for distribution, immediately prior to the termination of the Investment Period.

**Size of the Offering.**  The maximum offering amount shall be $50,000,000 of Commitments ("Maximum Offering Amount"). The Partnership is not subject to a minimum offering amount.  The General Partner may, in its sole discretion, increase or decrease the Maximum Offering Amount.

**Limited Partnership Interests.**  The Partnership is offering limited partnership interests (the "Limited Partnership Interests" or "Interests") to certain qualified investors as described herein and in the Subscription Document (the "Offering").

**Closings.**  The General Partner intends to hold an initial closing of the sale of Interests in the Partnership on June 15th, 2018 (the "Initial Closing"), but reserves the right, in its sole discretion, to hold the Initial Closing prior to or after such date.

The General Partner may, from time to time, after the Initial Closing, elect to hold one or more additional closings (each a "Subsequent Closing" and together with the Initial Closing, "Closings"), as necessary, to accommodate the admission of additional Limited Partners and to permit existing Limited Partners to increase their Commitments. The General Partner may hold Subsequent Closings until such time that it, in its sole discretion, elects to no longer hold any additional Subsequent Closings (such date, the "Final Closing Date").

Each Limited Partner admitted to the Partnership or increasing its Commitment after the Initial Closing will be required to contribute to the Partnership an amount equal to the Capital Contributions (as defined below) such Limited Partner would have made had all Partners been admitted to the Partnership at the Initial Closing plus an amount equal to interest thereon at the rate of the "Prime Rate" as published by the Wall Street Journal as of the date of the Initial Closing plus five percent per annum, compounded annually, from the dates when such capital contributions would have been required to be drawn down ("Notional Interest").  Amounts attributable to the Management Fee and Notional Interest thereon shall be paid to the General Partner.  All other contributed amounts will be paid to the Partners that participated in prior closings pro rata in accordance with each such Partner's Capital Contributions and, other than Notional Interest, will be available to be redrawn by the General

Partner in the same manner and to the same extent as unfunded Commitments. Additional Interests acquired by the General Partner at Subsequent Closings will not be subject to payment of Notional Interest.

If the General Partner in its sole and absolute discretion determines that a payment from a Limited Partner on the foregoing basis at a Subsequent Closing would not appropriately reflect a material change in the value of a Loan, the income received by the Partnership prior to such Subsequent Closing in connection with the Loans, or the expenses incurred by the Partnership prior to such Subsequent Closing, the General Partner may make adjustments to the amount to be contributed by such Limited Partner to reflect such change in value or exclude such Limited Partner from participating in such Loan.

**Admission of Partners.**  Admission as a Limited Partner in the Partnership is not open to the general public and interests in the Partnership are privately offered on a confidential basis in reliance upon exemptions contained in the Securities Act of 1933, as amended (the "Securities Act") and the rules and regulations promulgated thereunder for transactions not involving any public offering.  Each Limited Partner will be required to represent and warrant to the Partnership in connection with its subscription, among other things, that the Limited Partner is acquiring its Limited Partnership Interest for its own account for investment purposes only, and not with a view toward resale or other distribution in whole or in part, that it will not transfer, sell or otherwise dispose of its Interest in any manner that will violate the Securities Act or other applicable laws, rules or regulations, and that it is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act, and a "qualified client" as defined in Rule 205-3 under the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act"). In addition to the foregoing, admission as a Limited Partner in the Partnership is not open to investors or organizations that are otherwise exempt from U.S. federal income taxation, such as qualified pension, profit-sharing and stock bonus plans, individual retirement accounts, educational institutions and other tax-exempt entities ("Tax-Exempt Investors").

**Minimum Commitment.**  The minimum Commitment of each Limited Partner shall be $250,000, subject to the sole discretion of the General Partner to accept lesser amounts.  The General Partner may, in its sole discretion, decline to accept all or any part of any subscriptions that are tendered. After the Initial Closing, each Limited Partner may, with the consent of the General Partner, increase its Commitment; provided that all such increases must be in increments of at least $50,000, subject to the sole discretion of the General Partner to accept lesser amounts.

**Capital Calls.**  Capital calls generally will be made as necessary to fund investments, meet expenses and liabilities of the Partnership or to establish and maintain cash reserves for such purposes and in such amounts as the General Partner deems necessary and appropriate, with not less than 10 business days' prior written notice, subject to certain excuse and exclusion provisions described herein and in the Partnership Agreement (each such drawdown, and any contribution to the Partnership in exchange for Interests, a "Capital Contribution"). Each Capital Contribution shall be due and payable on the date set forth in the applicable capital call. Notwithstanding the foregoing, each Partner admitted to the Partnership in the Initial Closing shall be required to contribute its entire Commitment to the Partnership upon the Initial Closing.

Any amounts contributed but returned to Partners because such amounts were neither invested nor used to pay expenses will be added back to unpaid Commitments and will be subject to recall by the Partnership.

**Excuse and Exclusion.**  A Limited Partner may be excused from funding all or a portion of a Loan if the General Partner receives an opinion of counsel, which opinion and counsel are reasonably

satisfactory to the General Partner, that such investment would be reasonably likely to cause a violation of any material law, regulation, order or administrative practice or written investment policy (to the extent such policy was provided to the General Partner prior to the closing of such Limited Partner's investment in the Partnership and continues in effect as of the date such excuse is sought) to which such Limited Partner is subject.

The General Partner may exclude a Limited Partner from participating in the funding of all or a portion of a Loan if the General Partner reasonably determines in good faith that (i) a significant delay, extraordinary expense or material adverse effect on the Partnership, any Loan or future Loan, the General Partner or their respective affiliates would result from such Limited Partner's participation or (ii) based on written advice of counsel (which advice and counsel must be reasonably acceptable to the Limited Partner to be excluded), that such Limited Partner's participation in such Loan would be reasonably likely to cause a violation of any material law, regulation, order or administrative practice (including any interpretation thereof by any governmental authority or court of competent jurisdiction) to which such Limited Partner is subject.

The excused or excluded Limited Partner's available Commitment will not be reduced as a result of any excuse or exclusion. The General Partner may require each other Limited Partner to make an additional Capital Contribution in respect of such Loan equal to its pro rata share of the excused or excluded Limited Partner's Capital Contribution; provided that no Limited Partner will be required to fund amounts in excess of its unpaid Commitment.

**Default Provisions.**  The Partnership Agreement provides that any Limited Partner that defaults with respect to any payment of its Commitment when due shall, at the election of the General Partner, be subject to certain consequences specified therein, including an interest charge, a loss of future participation in Partnership distributions, a reduction of up to 100% of its Capital Contributions, cancellation of all or a portion of its unfunded Commitment, a forced sale of its Interest, and set-off against and withholding of such Partner's share of distributions. A defaulting Limited Partner shall be liable to the Partnership and the General Partner, as applicable, for Partnership expenses (including Management Fees) through the remaining life of the Partnership. The General Partner may require each non-defaulting Limited Partner to make an additional Capital Contribution equal to its pro rata share of the defaulted Capital Contribution; provided that no Limited Partner will be required to fund amounts in excess of its unfunded Commitment.

**General Partner Not a Guarantor.**  In providing services to the Partnership, the General Partner does not act as guarantor or offeror of the Interests.  Furthermore, the General Partner will not and will not be responsible for providing Limited Partners with any tax advice related to their Capital Contributions to the Partnership.

## 9.    WITHDRAWALS; DISTRIBUTIONS

**Withdrawals of Capital.**    Generally, Capital Accounts of Limited Partners may first be withdrawn as of the last day of any calendar quarter ending on or after the first anniversary of the Capital Contribution (the "Lock-Up Period").  After satisfying the Lock-Up Period, Capital Accounts may be withdrawn by a Limited Partner on the last day of each calendar quarter upon 90 days' prior written notice (subject to the General Partner's right to waive such notice and permit withdrawals at other times).  Each date as of which Capital Accounts may be withdrawn is herein referred to as a "Withdrawal Date".  Each new Capital Contribution will have a new Lock-Up Period.  The General Partner, in its sole discretion, may waive the Lock-Up Period requirement, in whole or in part, for certain Limited Partners.

**Suspension of Withdrawals.**  The General Partner may suspend Capital Account withdrawals and the determination of the net asset value, (a) during any period when any stock exchange on which any of the Partnership's investments are quoted is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (b) during the existence of any state of affairs which, in the opinion of the General Partner, constitutes an emergency as a result of which disposal of investments by the Partnership would not be reasonably practicable or would be seriously prejudicial to the Partners of the Partnership; (c) during any breakdown in the means of communication normally employed in determining the price or value of any of the Partnership's investments, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any investments owned or sold short by the Partnership cannot reasonably be promptly and accurately ascertained; (d) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the opinion of the General Partner, be effected at normal rates of exchange; or (e) during any period in which the Partnership receives withdrawal requests that, in the aggregate, would create, in the sole discretion of the General Partner, a material adverse effect on the Partnership if such withdrawal requests were satisfied.  To the extent that a request for withdrawal of capital is not subsequently withdrawn, the withdrawal shall be effected as of the first Withdrawal Date following the recommencement of withdrawals.

**Suspension of Withdrawal Proceeds.**  The General Partner may suspend the right of any Partner to withdraw capital or receive a distribution from the Partnership if, in the General Partner's judgment, such a suspension would be in the best interests of the Partnership. Situations in which such a suspension might occur include: when a withdrawal would cause the Partnership or the General Partner to violate securities laws, commodities laws, or other laws; when significant withdrawals or disruptions in securities markets or real estate markets would make pricing and/or liquidation of some or all Partnership assets difficult or would result in losses if the Partnership attempted such liquidations; when the General Partner determines, in consultation with tax advisors, that the withdrawal could result in the Partnership being treated as a "publicly-traded partnership" and thus taxable as a corporation; or if other events make accurate determination of the Partnership's net asset value impractical. The General Partner will give notice to Partners who make withdrawal requests that are affected by any such suspension. Unless a Partner rescinds his suspended withdrawal request, the withdrawal will generally become effective after the suspension is lifted, on the basis of the Partner's Capital Account balance at that time.

**Payment.**  Provided that the General Partner has received all necessary documentation, distribution in respect of the withdrawn capital normally will be made in U.S. dollars within 30 calendar days after an authorized Withdrawal Date.  However, the General Partner shall have the right, at its discretion, to withhold up to 5% of the Capital Account for the Partnership's liabilities and other contingencies until no later than 30 days after the completion of the year-end audit of the Partnership's financial statements for any withdrawal of 90% or more of a Limited Partner's Capital Account balance (or if a withdrawal, when combined with all other withdrawals of such Limited Partner during the preceding 12 months, would result in such Limited Partner having withdrawn 90% or more of such Limited Partner's Capital Account as of the beginning of such period). In those circumstances, the Partnership will remit the balance of the withdrawal proceeds without interest. The General Partner, in its sole discretion, may waive these withdrawal restrictions as to any Limited Partner.  The General Partner, in its sole discretion, may effect withdrawal payments in cash or in-kind.

**Death or Disability of a Limited Partner.**  In the event of the death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner, the General Partner may, in its sole discretion, at any time after such an event, effect a complete withdrawal of the balance of such Limited Partner's Capital Account.  The Capital Account of such Limited Partner shall continue at the risk of the Partnership's business until such complete withdrawal

is effected or the earlier termination of the Partnership. Payment of the withdrawing Limited Partner's Capital Account shall be made on the same terms, and shall be subject to the same conditions as a withdrawal by a Limited Partner of all of its Capital Account.

**Limited Partner Interest After Notice.** The Interest of a Limited Partner that gives notice of withdrawal shall not be included in calculating the partnership percentages of the Limited Partners required to take any action under the Partnership Agreement.

**General Partner Withdrawals.** The General Partner may withdraw a portion of its Capital Account on the same terms as the Limited Partners or at such other times as it determines; provided that the General Partner may not withdraw capital from the Partnership if the General Partner suspends withdrawal rights. Notwithstanding the foregoing, the General Partner may withdraw capital from its Capital Account in the Partnership equal to the amount of a previously earned Carried Interest at any time in the General Partner's sole and absolute discretion.

**Mandatory Withdrawals.** The General Partner, in its sole discretion, may require any Limited Partner to withdraw all or any part of its Capital Account from the Partnership at any time, such withdrawal to be effective on the date specified in such notice. If the General Partner, in its sole discretion, deems it to be in the best interests of the Partnership to do so because the continued participation of any Limited Partner in the Partnership might cause the Partnership to suffer adverse legal, pecuniary, regulatory or tax consequences for the Partnership. Under such circumstances, the General Partner will have the irrevocable power to act in the name of such Limited Partner to withdraw its interest in the Partnership. The General Partner has the right to terminate the Partnership at any time by the compulsory termination of all Interests. In the case of such termination, the Partnership's assets will be distributed to the Partners within 30 days after completion of a final audit of the Partnership's financial statements (which must be performed within 120 days of the termination of the Partnership).

**Distributions.** Net investment proceeds available for distribution to the Partners, less amounts available for reinvestment (as determined in the discretion of the General Partner), will be distributed among Partners pro rata in proportion to each of their respective Capital Contributions. Notwithstanding the foregoing, the General Partner will receive a portion of amounts distributable to each Limited Partner (hereafter referred to as "Carried Interest"). Accordingly, each Limited Partner's share of net investment proceeds will be distributed in the following amounts and order of priority (the "Distribution Waterfall"):

**(A)** FIRST, 100% to such Limited Partner until such Limited Partner has received aggregate distributions in an amount equal to the following:

    **(i)** Such Limited Partner's aggregate Capital Contributions at such time; and

    **(ii)** A preferred return on all unreturned Capital Contributions of such Limited Partner, calculated at the rate of 10% per annum (compounded annually) from the date each such Capital Contribution was made by such Limited Partner (the "Preferred Return").

**(B)** SECOND, 70% to such Limited Partner and 30% to the General Partner as Carried Interest.

The General Partner may, in its sole discretion, cause the Partnership to make distributions from time to time to the General Partner in amounts sufficient to permit the payment of the tax obligations of the General Partner and its owners. Any such distributions shall be taken into account in making subsequent distributions to the Partners.

The General Partner will be entitled to withhold from any distributions amounts necessary to create, in its sole discretion, appropriate Reserves, as well as for any required tax withholdings. Taxes paid or withheld by the Partnership will be deemed distributed for purposes hereof.

The General Partner may elect in its sole and absolute discretion to defer all or any portion of any Carried Interest distributions that would otherwise be made to it. Any such deferred distribution shall be, in the General Partner's sole discretion, either retained by the Partnership on the General Partner's behalf or distributed to the Limited Partners. To the extent that the General Partner elects not to receive any Carried Interest distribution, subsequent distributions shall be made to the General Partner until it has received the amount of Carried Interest distributions it would then have been entitled to receive without such election; provided that no interest shall accrue on or be paid to the General Partner with respect to any such deferred Carried Interest distributions.

All short-term interest income that is not generated from Loans and related securities, such as interest earned on cash holdings of the Partnership, will be distributed to the Partners pro rata in proportion to their Capital Contributions, and will not be taken into account in determining the General Partner's Carried Interest.

## 10.    BROKERAGE

As further described in the Investment Strategy section above, the Loans are intended to be purchased and sold through PS Funding. The General Partner may in its sole discretion choose another broker or dealer through which purchases or sales of the Loans are made. In selecting brokers to effect portfolio transactions, the General Partner considers such factors as price, quality of execution, expertise in particular markets, the ability of the brokers to effect the transactions, the brokers' facilities, reliability, reputation, experience, financial responsibility in particular markets, familiarity both with investment practices generally and techniques employed by the Partnership and clearing and settlement capabilities, subject at all times to principles of best execution, in accordance with the General Partner's policies and procedures. In selecting broker/dealers to execute transactions, the General Partner need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost.

The General Partner may enter into directed brokerage arrangements in its discretion. The General Partner, in its discretion, may change custodians, or change or add prime brokers without notice to the Limited Partners.

## 11.    TAX CONSIDERATIONS

## CERTAIN UNITED STATES TAX CONSIDERATIONS

This summary generally outlines certain U.S. federal income tax principles that are relevant to an investment in the Partnership as a Limited Partner, given the anticipated nature of the Partnership's activities.  The actual tax consequences of the purchase, ownership and sale or other disposition of an Interest in the Partnership by an investor will vary depending upon the investor's circumstances.

The discussion of U.S. federal income tax matters contained herein is based on existing law as contained in the United States Internal Revenue Code of 1986, as amended (the "Code"), United States Treasury regulations promulgated thereunder ("Regulations"), administrative rulings and court decisions, all as of the date of this Memorandum.  No assurance can be given that future legislation, administrative rulings or court decisions will not modify the conclusions set forth in this summary, possibly with retroactive effect.

This summary does not discuss all of the U.S. federal income tax considerations that may be relevant to a particular investor or to investors subject to special treatment such as, without limitation, Tax-Exempt Investors, banks, thrifts, insurance companies, persons liable for the alternative minimum tax, charitable remainder trusts and persons holding interests in the Partnership as beneficiaries of charitable remainder trusts, dual residents, expatriates, former long-term U.S. residents, investors who acquire their interests in the Partnership in exchange for property other than cash, dealers and other investors that do not own their interests in the Partnership as capital assets, and does not constitute legal or tax advice. This summary does not discuss the application of state, local, non-U.S. or U.S. federal estate taxes to an investment in the Partnership. Accordingly, prospective investors should consult their own tax advisers regarding the specific U.S. federal, state, local, and non-U.S. tax consequences to them of investing in the Partnership.

This summary does not address the tax considerations of Limited Partners that are partnerships or other entities classified as partnerships for U.S. federal income tax purposes or of persons that own Interests in the Partnership through any such entities.

The Partnership has not requested, and does not plan to request, a ruling from the U.S. Internal Revenue Service (the "IRS") on any matter affecting the Interests, or any holders thereof.

Because the nature of the Partnership's investments is not fully known at the time of this Memorandum, it is not possible to address the specific tax consequences of the Partnership's investments. Accordingly, the following discussion is intended as a general guide only.

**IRS Circular 230 Disclosure.  The following summary was written to support the promotion or marketing of the Partnership and was not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. federal, state, or local tax penalties. Each investor should consult with and rely on its own independent tax counsel as to the U.S. federal income tax consequences of an investment in the Partnership based on its particular circumstances, as well as to applicable state, local or non-United States tax laws.**

As used herein, the term "U.S. Investor" includes a beneficial owner of an Interest that is (i) an individual who is a citizen or resident of the United States, (ii) a corporation or other entity which is treated as a corporation for U.S. federal income tax purposes and which is created or organized under the laws of the United States or any political subdivision thereof, (iii) an estate, the income of which is includable in gross income for United States federal income tax purposes regardless of its source, or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust, and one or more United States persons have the authority to control all substantial decisions of the trust. A "Non-U.S. Investor" is any beneficial owner of an Interest that is not a U.S. Investor.

**Prospective investors should consult their own tax advisers concerning the U.S. federal, state, and local tax consequences in the particular situations of the purchaser, ownership, and disposition of Interests, as well as any consequences under the laws of any other taxing jurisdiction.**

**Partnership Status.**  The Partnership expects to be treated as a partnership, and not as an association taxable as a corporation, for U.S. federal income tax purposes. As a partnership, the Partnership itself will not be subject to U.S. federal income tax.

**Publicly Traded Partnership.**    Under Section 7704 of the Code, "publicly traded partnerships" ("PTPs") are generally treated as corporations for federal income tax purposes.  It is intended that the Partnership will be operated in a manner such that it will not be treated as a PTP.

**Consequences of Treatment as an Association Taxable as a Corporation.  If**, for any reason, the Partnership were to be treated as an association taxable as a corporation (including if the Partnership were to be treated as a PTP as discussed above), it would be subject to U.S. federal income tax (at regular corporate tax rates) on its income, without any deduction for distributions made to its beneficial owners, thereby potentially reducing materially the amount of cash available for distribution. In addition, capital gains and losses and other income and deductions of the Partnership would not be passed through to its beneficial owners, the owners would be treated as shareholders for U.S. federal income tax purposes and distributions to the owners (to the extent of current or accumulated earnings and profits) would be treated as a taxable dividend, resulting in taxable income for U.S. Investors (and withholding tax with respect to Non-U.S. Investors).  The Partnership's treatment as a corporation for U.S. federal income tax purposes would result in a material reduction in the anticipated cash flow and after-tax return to the investors and therefore would likely result in a substantial reduction in the value of the Interests.

The remainder of this discussion assumes that the Partnership will at all times be treated as a partnership for U.S. federal income tax purposes.

### U.S. INVESTORS

The discussion in this section outlines certain U.S. federal income and other tax principles that are likely to apply to U.S. Investors given the anticipated nature of the Partnership's activities.  The discussion assumes that each U.S. Investor is a U.S. citizen or resident individual or a U.S. domestic corporation that is not a Tax-Exempt Investor.  In some cases, the activities of a U.S. Investor other than its investment in the Partnership may affect the tax consequences to such investor of an investment in the Partnership.

**General.**  Each U.S. Investor will be required to report on its U.S. federal income tax return, and thus to take into account, in determining its U.S. federal income tax liability, its allocable share of the Partnership's items of income, gain, loss, deduction and credit for the taxable year ending within or with such investor's taxable year, generally as if these items had been recognized directly by that investor.  These tax items generally will have the same character (ordinary or capital, short-term or long-term) in the hands of each U.S. Investor as they have in the hands of the Partnership. It is anticipated that the Partnership may generate substantial ordinary income in the form of interest on Loans in which the Partnership invests by way of participations in addition to short term capital gains (which are generally subject to tax at rates applicable to ordinary income under current law).  A U.S. Investor will be taxable on its share of the income of the Partnership without regard to whether the Partnership makes a corresponding distribution of cash or other property to such investor.  In addition, certain investments held by the Partnership may give rise to income subject to U.S. federal income tax even though there has been no corresponding receipt of money or property by the Partnership. Accordingly, a U.S. Investor's tax liability related to its Interest could exceed the amounts (if any) distributed to such investor in a particular year.  U.S. Investors should ensure that they have sufficient funds from other sources to pay all tax liabilities resulting from their investment in the Interests.

**Allocations of Partnership Income and Losses.**  Allocations of partnership income and losses are valid under applicable Regulations if they meet the "substantial economic effect" test, or are made in accordance with a partner's interest in the Partnership.  The General Partner believes that the Partnership's method of allocating income and losses to the Partners under the Partnership Agreement

complies with these Regulations.  However, the Regulations are complex and lack significant administrative and/or judicial interpretation. There can be no assurance that the Regulations would not be interpreted by the IRS in a manner materially adverse to the Partners.  If the allocations provided in the Partnership Agreement are successfully challenged by the IRS, the redetermination of the allocations to any Partner for federal income tax purposes may be less favorable than the allocations set forth in the Partnership Agreement.

**Non-Cash Income.**  It is possible that the Partnership, and therefore U.S. Investors, will recognize income without a corresponding receipt of cash.  For example, in the event that the Partnership holds or purchases interests in debt instruments that are issued with "original issue discount," such "original issue discount" will be includible in the taxable income of U.S. Investors in each year that the Partnership owns such debt instruments on a current basis even though there have been no corresponding cash distributions to the Partnership.

**Tax Basis and Cash Distributions.**  A U.S. Investor's basis in its Interest will generally be equal to the amount paid for such Interest, increased by its allocable share of income and liabilities (if any) of the Partnership, and decreased, but not below zero, by its allocable share of distributions, losses, and reductions in such liabilities.  Cash distributions received from the Partnership by a U.S. Investor (including deemed cash distributions arising from reductions in a U.S. Investor's share of the liabilities (if any) of the Partnership) are not reportable as taxable income by the U.S. Investor, except as described below.  Rather, such distribution will reduce (but not below zero) the total tax basis of the Interest held by the U.S. Investor after the distribution.  Any cash distribution in excess of a U.S. Investor's adjusted tax basis for its Interest will be taxable to it as gain from the sale or exchange of such Interest.  Because a U.S. Investor's tax basis in its Interest is not increased on account of his distributive share of the Partnership's income until the end of the Partnership's taxable year, distributions during the taxable year could result in taxable gain to a U.S. Investor even though no gain would result if the same distributions were made at the end of the taxable year.  Furthermore, the share of the Partnership's income allocable to a U.S. Investor at the end of the Partnership's taxable year would also be includible in the U.S. Investor's taxable income and would increase its tax basis in his remaining Interest as of the end of such taxable year.

**Distributions In-Kind.**  In general, a U.S. Investor will not recognize gain or loss on the distribution of property (other than cash and, unless an exception applies, marketable securities) and the tax basis of a U.S. Investor in any property distributed will be the same as the Partnership's tax basis but not in excess of the U.S. Investor's adjusted tax basis for its Interest, reduced by any cash distributed in the transaction.  U.S. Investor who receives an in-kind distribution of property in liquidation of its Interest will have a basis in such property equal to such U.S. Investor's adjusted basis in its Interest, reduced by any cash distributed in the transaction.

**Disposition Proceeds.**  Gain or loss on the sale or exchange of a U.S. Investor's Interest in the Partnership will generally be taxable as capital gain or loss (except to the extent otherwise required under Section 751 of the Code), and will be long-term capital gain or loss if the U.S. Investor held its Interest for more than one year.).

**Characterization of Partnership Activities.**  The Partnership may recognize expenses, the deductibility of which may be limited based on whether the Partnership is characterized as a "trader" or "investor."  In general, traders engage in a "trade or business" of buying and selling securities for their own accounts to take advantage of short-term price changes while investors buy securities for longer-term appreciation.  Whether the Partnership is a "trader" or an "investor" is not determined by a specific formula or set of objective criteria; it depends on an analysis of all the facts and circumstances involved in one's activities, taken as a whole.  This characterization will affect, among other things,

the extent to which Limited Partners may deduct certain items of Partnership expense for federal income tax purposes. The Partnership does not generally expect to hold any of its investments long enough to cause a portion of its realized gains to be long-term in character, and the Partnership expects to engage in significant short-term investment activities, which may involve significant turnover. It is not possible to predict accurately whether, in any given tax year, the Partnership will be considered a "trader" or an "investor." In years in which the Partnership is treated as a "trader," each Limited Partner should be allowed fully to deduct his or her allocable share of the ordinary and necessary expenses incurred by the Partnership in connection with the Partnership's "trade or business," including management expenses. If the Partnership is treated as an "investor" for any year, the ability of individual Limited Partners to deduct their share of the Partnership's expenses will be subject to various limitations, as discussed below.

**Limitations on the Deductibility of Losses and Expenses.** Various provisions of the Code may apply to restrict the deductibility of capital and ordinary losses realized, or expenses incurred, by the Partnership. For example, the ability of U.S. Investors (other than widely held corporations) to deduct their shares of any losses attributable to the Partnership may be subject to the "passive activity loss" limitations and the "at risk" limitations of the Code.

Section 163(d) of the Code disallows a non-corporate taxpayer's deduction for "investment interest" in excess of "net investment income," as those terms are defined in Code Section 163(d). This limitation could apply to limit the deductibility of a non-corporate U.S. Investor's share of any interest paid by the Partnership, as well as the deductibility of interest paid by a non-corporate U.S. Investor on indebtedness incurred to finance its indirect investment in the Partnership. Additionally, Section 704(d) of the Code prohibits a partner from claiming partnership losses in excess of the partner's adjusted basis in its partnership interest. This limitation will apply to both individual and corporate U.S. Investors.

Subject to certain exceptions, all miscellaneous itemized deductions of an individual taxpayer, and certain of such deductions of an estate or trust, are deductible only to the extent that such deductions exceed 2% of such taxpayer's adjusted gross income. Moreover, the otherwise allowable itemized deductions of individuals whose gross income exceeds an applicable threshold amount are subject to phase out rules that may reduce or eliminate such individual's ability to deduct such expenses. The operating expenses of the Partnership, including the Management Fee, may be treated as miscellaneous itemized deductions subject to the foregoing rule. Alternatively, it is possible that the Partnership will be required to capitalize Management Fees. Non-corporate U.S. Investors should consult their own tax advisers with respect to the application of these limitations.

Syndication expenses that are attributable to the offering and sale of Interests in the Partnership must be capitalized and added to the U.S. Investor's basis in its Interest in the Partnership (and, hence, cannot be deducted or amortized). Other organizational expenses of the Partnership must generally also be capitalized, but may be amortized over a 180-month period.

**3.8% Medicare Tax**. A U.S. Investor that is an individual or estate, or trust that does not fall into a special class of trusts that is exempt from such tax, will be subject to a 3.8% Medicare tax on the lesser of (1) the U.S. Investor's "net investment income" for the relevant taxable year and (2) the excess of the U.S. Investor's adjusted gross income (increased by certain amounts of excluded foreign income) for the taxable year over a certain threshold. It is anticipated that net income and gain attributable to an investment in the Partnership will be included in a U.S. Investor's "net investment income" subject to this Medicare tax, as well as net gain from a disposition of such U.S. Investor's Interest. Net investment income may, however, be reduced by properly allocable deductions to such income.

**U.S. Foreign Account Tax Compliance Act.** Sections 1471 through 1474 of the Code and the Regulations promulgated thereunder ("FATCA") impose a 30% withholding tax on certain "withholdable payments" received by foreign financial institutions, their affiliates and certain other foreign entities, unless the payee entity agrees to comply with certain due diligence, reporting and related requirements  Persons located in a jurisdiction that has entered into an intergovernmental agreement with the U.S. governing FATCA (an "IGA") may be subject to different rules.  Withholding under FATCA began to apply to certain payments of U.S. source income such as interest and dividends paid on or after July 1, 2014, and beginning on January 1, 2019 includes gross proceeds from the sales of property that give rise to U.S. source income.  Accordingly, the Partnership may be required to withhold under FATCA on distributions or other payments to investors that fail to comply with the applicable requirements of FATCA or an applicable IGA or related legislation or to timely certify as to such compliance. Investors will be required to timely furnish to the Partnership any information, certification, representation, form or other documentation reasonably requested by the General Partner for the Partnership to fulfill its obligations under FATCA, an applicable IGA and any related legislation.  A U.S. Investor will generally be required to provide to the Partnership a properly completed and duly executed IRS Form W-9 (or applicable substitute form). A Non-U.S. Investor will generally be required to provide to the Partnership a properly completed and duly executed applicable IRS Form W-8 and information which identifies its direct and indirect U.S. ownership and, if applicable, its GIIN.  Any such information provided to the Partnership will be shared with the IRS. A Non-U.S. Investor that is a "foreign financial institution" within the meaning of Section 1471(d)(4) of the Code will generally be required to enter into an agreement with the IRS identifying certain direct and indirect U.S. account holders or equity holders. An investor that fails to provide such information to the Partnership or otherwise satisfy its obligations under FATCA would be subject to the 30% withholding tax with respect to its share of any payments attributable to actual and deemed U.S. investments of the Partnership. The General Partner may take any action in relation to an investor to ensure that any FATCA withholding is economically borne by the relevant investor whose failure to provide any necessary information or take any necessary action gave rise to the withholding under FATCA, any applicable IGA or related legislation. Investors should consult their own tax advisers regarding the impact of FATCA and any applicable IGA and related legislation on their investments in the Partnership.

## ADDITIONAL U.S. TAX CONSIDERATIONS

• *Adjustments to Basis of Assets.* The Partnership may make an election under Section 754 of the Code to adjust the tax basis of the assets of the Partnership in connection with a transfer of an Interest in the Partnership and certain distributions by the Partnership.  Because of the accounting complexities that can result from having such an election in effect, and because the election, once made, cannot be revoked without the consent of the IRS, the General Partner currently does not intend to make this election.  A partnership is generally required, under certain circumstances, to reduce the basis of its assets in connection with certain transfers of interests in a partnership and certain distributions by a partnership.  The Partnership may qualify for an exemption from this requirement in connection with transfers of Interests, but there can be no assurance in this regard.  If the Partnership were to qualify for and elect this exemption, a transferee's distributive share of losses from the Partnership would generally be disallowed until they exceeded any loss recognized by the transferor (or prior transferors) on the transfer of the Interest in the Partnership.

• *Information Returns and Schedules.* The Partnership will provide information on Schedule K-1 (or equivalent) to U.S. Investors as soon as reasonably practicable following the close of the Partnership's taxable year.  The Partnership may not be able to provide this information before April 15.  As a result, U.S. Investors may need to apply for an extension of time to file their U.S. federal, state, and local income tax returns.

• *Audits.* The General Partner decides how to report the partnership items on the Partnership's tax returns. In certain cases, the Partnership may be required to file a statement with the IRS disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the IRS may not agree with the manner in which the Partnership's items have been reported. In the event the income tax returns of the Partnership are audited by the IRS, the tax treatment of income and deductions of the Partnership generally will be determined at the Partnership level in a single proceeding, rather than by individual audits of the U.S. Investors. The General Partner has been appointed as tax matters partner and, with respect to taxable years beginning on or after January 1, 2018, partnership representative, with the authority to determine the Partnership's response to an audit. With respect to taxable years beginning on or after January 1, 2018, the General Partner has discretion to cause tax liabilities resulting from final audit adjustments to be made at the Partner or at the Partnership level. Such actions could cause Limited Partners to be subject to higher rates of interest on tax underpayments resulting from an audit. Each Limited Partner must agree to provide promptly, and to update as necessary at any times requested by the General Partner, all information, documents, self-certifications, tax identification numbers, tax forms, and verifications thereof, that the General Partner deems necessary generally in connection with (1) certain elections by the Partnership relating to audits of the Partnership, and (2) an audit or a final adjustment of the Partnership by a taxing authority. Each Partner covenants and agrees to take any action reasonably requested by the Partnership in connection with an audit or a final adjustment of the Partnership by a taxing authority (including, without limitation, promptly filing amended tax returns and promptly paying any related taxes, including penalties and interest) and certain elections relating to audits of the Partnership. The limitations period for assessment of deficiencies and claims for refunds with respect to items related to the Partnership is generally three years after the Partnership's return for the taxable year in question is filed, and the General Partner has the authority to, and may, extend such period with respect to all Limited Partners. It is possible that the IRS will audit the information returns to be filed by the Partnership. If an audit results in an adjustment, each Partner may be required to pay additional taxes, interest and possibly penalties and additions to tax. There can be no assurance that the Partnership's tax return will not be audited by the IRS or that no adjustments to such returns will be made as a result of such an audit. If the IRS audits the tax returns of the Partnership, an audit of such investors' own returns may result. Limited Partners will bear the cost of audits of their own returns.

### NON-U.S. INVESTORS

The discussion in this section is limited to the U.S. federal income tax consequences applicable to a Non-U.S. Investor that is neither (i) an individual present in the United States for 183 days or more in a taxable year nor (ii) an expatriate or former long-term resident of the United States.

**U.S. Trade or Business.** The Partnership's principal activity will be purchasing participations in Loans that have been purchased with a view towards selling them to third parties ("Debt Investments"). The Partnership's investment in Debt Investments may cause it to be treated as engaged in a trade or business within the United States for federal income tax purposes.

**Effectively Connected Income.** If, as is possible, the Partnership is deemed to be engaged in a U.S. trade or business with respect to its investments or activities, Non-U.S. Investors in the Partnership would themselves be treated as engaged in such U.S. trade or business and would be required to file a U.S. federal income tax return, (and possibly one or more state or local returns) and the Partnership will be required to periodically withhold and remit to the IRS a portion of the income and gains from such

investments or activities that are effectively connected with such U.S. trade or business ("ECI"), at the various rates applicable to the Non-U.S. Investors, whether or not the Partnership makes any actual distributions to the Non-U.S. Investors.  Non-U.S. Investors that are corporations could be subject to an additional 30% branch profits tax on their ECI from the Partnership.

**Non-Effectively Connected Income.**  A Non-U.S. Investor will be subject to a 30% withholding tax with respect to its allocable share of the Partnership's U.S. source interest, dividend, and other passive income for that tax year that is not effectively connected to a U.S. trade or business conducted by the Partnership.  An exemption from the 30% withholding tax applies to interest derived from certain portfolio debt instruments. A Non-U.S. Investor will generally be exempt from U.S. taxation on its allocable share of non-effectively connected capital gains (subject to the discussion below regarding dispositions of U.S. real property interests).  See also the discussion on U.S. Foreign Account Tax Compliance Act in this Section 11, "Tax Considerations".

**U.S. Real Property Interests.**  Regardless of whether the activities of the Partnership constitute a U.S. trade or business or generate ECI, a Non-U.S. Investor will be taxed on gain from the disposition of a "United States real property interest" ("USRPI") as if the gain were ECI. The Partnership does not anticipate holding significant interests in investments that are treated as USRPIs for U.S. federal income tax purposes. If, contrary to the Partnership's expectations, the Partnership holds a USRPI, income derived from the gain on the sale of the USRPI would be treated as ECI. Generally, the Partnership will be required to withhold on the proceeds of the sale of a USRPI allocable to a Non-U.S. Investor. In addition, gain on the sale of a Non-U.S. Investor's Interest that is attributable to a USRPI may be subject to U.S. federal income tax (which the purchaser may be required to withhold).

## OTHER TAX CONSIDERATIONS

**State and Local Taxes.**  Investors and/or the Partnership may be subject to various state and local taxes in jurisdictions in which the Partnership's investments are located and may be required to file tax returns in those jurisdictions.  The Partnership may be required to withhold or pay state or local taxes if it, directly or indirectly, through a partnership or limited liability company, engages in business in certain states or localities.  State and local tax laws may differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit.  Prospective investors are encouraged to consult their tax advisers regarding the state and local tax consequences of an investment in the Partnership.

**Miscellaneous.**  Each Limited Partner will be required to indemnify the General Partner, the Partnership and their affiliates for (1) all U.S. income and withholding taxes applicable to its allocable share of Partnership income; (2) all taxes (including penalties, interest and associated costs) resulting from such Limited Partner's failure to comply with its covenants concerning the supply of documentation, information and certifications and other actions related to audits and final adjustments of the Partnership; and (3) such Limited Partner's share of all tax liabilities (including penalties, interest and associated costs) imposed on the Partnership as a result of an audit of the Partnership.

*The foregoing summary should not be considered to describe fully the income and other tax consequences of an investment in the Partnership. Prospective investors are strongly urged to consult with their tax advisors, with specific reference to their own situations, with respect to the potential tax consequences of an investment in the Partnership.*

## 12.    OTHER PROVISIONS OF THE PARTNERSHIP AGREEMENT

The following description is a summary of certain provisions of the Partnership's Partnership Agreement. All the prospective investors should carefully review the Partnership Agreement before making an investment decision. To the extent there are any inconsistencies, the Partnership Agreement will control.

**Management.** The Partnership shall be managed by the General Partner, which shall have the sole discretion to invest in Loans on behalf of the Partnership. The General Partner may appoint such agents of the Partnership as it deems necessary to hold such offices and exercise such powers of the General Partner in the management of the Partnership and perform such duties in connection therewith as shall be determined from time to time by the General Partner. The General Partner shall devote so much of its time and efforts to the affairs of the Partnership as may, in its judgment, be necessary to accomplish the purposes of the Partnership. Nothing herein contained shall prevent the General Partner or any of its members, officers, employees or affiliates or any other Partner from conducting any other business, including any business within the securities industry, whether or not such business is in competition with the Partnership. Without limiting the generality of the foregoing, the General Partner, and its respective members, officers, employees or affiliates may act as general partner, investment adviser or investment manager for others, may manage funds or capital for others, may have, make and maintain investments in their own name or through other entities, and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms.

**Assignability of Limited Partner's Interest.** The Limited Partnership Interest of a Limited Partner in the Partnership may not be transferred or assigned without the written consent thereto of the General Partner given in its sole discretion. Upon such a transfer or assignment, the assignee shall become a Limited Partner only upon the execution of such agreements and other documents as shall be required by the General Partner.

**Amendments to Partnership Agreement.** The Partnership Agreement may be amended by the General Partner in any manner that does not adversely affect any Limited Partner; provided, however, that in any event the General Partner may amend the Partnership Agreement to correct ambiguities and inconsistencies identified by the General Partner. The Partnership Agreement may also be amended by action taken by both (a) the General Partner and (b) the Limited Partners who, as of the date determined by the General Partner, hold interests in the Partnership representing greater than 50% of all of the interests in the Partnership that are held by the Limited Partners.

**Reports to Partners.** The General Partner intends to deliver to each Partner, no less than quarterly, an account statement for such Partner, the unaudited financial statements for the Partnership, and a letter from the General Partner describing the business activities of the Partnership. Limited Partners will receive annual audited financial statements, copies of Schedule K-1 to the Partnership's tax return, and a review by the General Partner of the Partnership's performance during the prior year. Within 120 days of the end of each fiscal year or as soon thereafter as is reasonably possible, the Partnership will prepare and mail, or cause its accountants to prepare and mail, to each Partner and, to the extent necessary, to each former Partner (or its legal representatives), a report setting forth in sufficient detail such information as shall enable such Partner or former Partner (or such Partner's legal representatives) to prepare its Federal income tax return in accordance with the laws, rules and regulations then prevailing.

**Exculpation.** The Affiliated Parties will not be liable to any Partner or the Partnership for any acts or omissions arising out of, or in connection with, the Partnership, any investment made or held

by the Partnership or the Partnership Agreement unless such action or inaction was made in bad faith or constitutes fraud, willful misconduct or gross negligence or for any act or omission of any broker or agent of the Partnership, provided that such broker or agent was selected, engaged or retained by the Partnership in accordance with the standard above. Each of the General Partner and the Affiliated Parties may consult with counsel and accountants in respect of the Partnership's affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected in accordance with the standard above. The foregoing provisions will not be construed so as to provide for the exculpation of the General Partner or any Affiliated Party for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but will be construed so as to effectuate the foregoing provisions to the fullest extent permitted by law.

**Indemnification.** To the fullest extent permitted by law, the Partnership shall indemnify and hold harmless the General Partner, each Affiliated Party and the legal representatives of any of them (an "Indemnified Party"), from and against any loss, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of, or in connection with, the Partnership, any investment made or held by the Partnership or the Partnership Agreement, including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, provided that such acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim are based were not made in bad faith or did not constitute fraud, willful misconduct or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with the standard above. The Partnership shall, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct. If such an advance is made by the Partnership, the Indemnified Party shall agree to reimburse the Partnership for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification. The foregoing provisions will not be construed so as to provide for the indemnification of the General Partner or any Affiliated Party for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but will be construed so as to effectuate the foregoing provisions to the fullest extent permitted by law.

## 13.    SUBSCRIPTION INSTRUCTIONS

Prospective investors ("Subscribers") should read the Memorandum of the Partnership, the Partnership Agreement as well as the subscription documents prior to subscribing to the Partnership. The Subscriber will also need to complete the following steps.

1.    Complete and sign the Suitability Questionnaire.

2.    Complete and sign the Subscription Agreement (including additional representation page, if applicable).

3.    Complete and sign the Partnership Agreement Signature Page.

4.      Complete and sign the applicable IRS Form W-9 or W-8 in accordance with the instructions to such forms.

5.      Send the completed and executed documents by mail or email to the appropriate party as instructed in the Subscription Documents, to arrive as soon as possible and in any event at least five (5) business days prior to the Initial Closing (or if the Initial Closing has already occurred, the appropriate Subsequent Closing).   Please keep a photocopy of the executed documents for your records.

6.      After notification from the appropriate party as indicted in the Subscription Document that the subscription has been accepted, send the applicable Capital Contribution amount to the Partnership as instructed in the applicable capital call; provided, however, that Subscribers admitted to the Partnership during the Initial Closing shall be required to make a Capital Contribution equal to their entire Commitment upon the Initial Closing.

7.      Upon acceptance of the subscription, a copy of the executed Subscription Document, signed as accepted on behalf of the Partnership, will be returned to the investor.  The General Partner and/or other party as indicated in the Subscription Document may request additional documents as necessary under securities laws from any prospective investor.

# EXHIBIT A

## PRIVACY POLICY

Financial institutions like Peer Street Opportunity Investors II, LP and Peer Street Opportunity Fund GP, LLC are required to provide privacy policy notices to their clients. We believe that protecting the privacy of your nonpublic personal information ("personal information") is of the utmost importance. Personal information is nonpublic information about you that is personally identifiable and that we obtain in connection with providing a financial product or service to you. For example, personal information includes information regarding your account balance and investment activity. This notice describes the personal information that we collect about you, and our treatment of that information.

- We collect personal information about you from the following sources: (i) information we receive from you on fund subscription documents and related forms (for example, name, address, social security number, birth date, assets, income, and investment experience); (ii) information about your transactions with us, our affiliates, or others (for example, account activity and balances); and (iii) any other information that you may provide to us upon request in the future.

- We do not disclose any personal information we collect, as described above, about our customers or former customers to anyone other than in connection with the administration, processing and servicing of customer accounts or to our accountants, attorneys and auditors, or otherwise as permitted by law.

- We restrict access to personal information we collect about you to our personnel and trusted partners who perform certain key operational functions for us who need to know that information in order to provide products or services to you. We maintain physical, electronic and procedural controls in keeping with federal standards to safeguard your nonpublic personal information.

- We reserve the right to change this notice, and to apply changes to information previously collected, as permitted by law. We will inform you of any changes as required by law.

**EXHIBIT 15**

# Monsey, NY Acquisition #5 (Series 2)
Single Family Residential (SFR)

| Property Type: Single Family Residential (SFR) | Loan Strategy: Light Construction | Location: Monsey, NY |
| --- | --- | --- |



| 8.25% | 77% | 0 Mo. |
| --- | --- | --- |
| YTM | LTV | Term |

0% Funded                                    $215,387 Left

Investment Amount:                        **$215,387**
Lien Position:                                    **First**

### Additional Information and Disclosures

Loan can be prepaid by borrower [Learn More](#)

Loan can be extended [Learn More](#)

Offering document: [Mortgage Payment Dependent Note Private Placement Memorandum](#)

---

## Yield Details

| PeerStreet Note Purchase Rate | |
| --- | --- |
| | **9.00%** |
| PeerStreet Fee | **-0.75%** |
| Net Investor Yield | **8.25%** |

**Originator:**

Lender Logo Coming Soon

---

## Investment Overview

| Overview | | |
| --- | --- | --- |
| | Originator | **Viva Capital Group** |
| | Lien Type | **First** |
| | Repayment Type | **Interest-Only** |
| | Origination Date | **September 20, 2021** |
| | Maturity Date | **April 1, 2023** |

| Purpose & Strategy | | |
| --- | --- | --- |
| | Loan Purpose | **Acquisition** |
| | Loan Strategy | **Light Construction** |
| | Property Purchase Price | In Sep 2021 **$1,350,000** |
| | Rehab Budget | **$326,590** |
| | Construction Reserve Remaining | **$326,590** |

| Debt Stack | | |
| --- | --- | --- |
| | First Lien | |
| | Senior Positions | |
| | PeerStreet Investment | **$1,362,500** |
| | Pari Passu | **$0** |
| | Total Senior Positions | **$1,362,500** |
| | Subordinate Positions | **$0** |

| Leverage Details | | |
|---|---|---|
| First Lien Amount | | **$1,362,500** |
| Purchase Price | | **$1,350,000** |
| As-Is Value ❓ | Appraisal As Of June 9, 2021 | **$1,350,000** |
| After Repair Value | Appraisal As Of June 9, 2021 | **$1,950,000** |
| Median Home Price ❓ | | **$736,703** |
| As-Is LTV ❓ | | **77%** |
| After Repair LTV ❓ | | **70%** |
| LTC | | **77%** |
| As-Is Value To Median Home Price | | **183%** |
| ARV To Median Home Price | | **265%** |

## Series Details

PeerStreet previously made available a pari passu interest totaling $1,035,910.00 in a separate series, which has fully funded. PeerStreet is now making available another $215,387.00 pari passu interest in the loan. PeerStreet may make available the remaining pari passu interest $111,203.00 in subsequent series.

## Valuation

| Source | Date | As-Is Value | After Repair Value |
|---|---|---|---|
| 📍 **22 Wallenberg Cir** 📄 | 6/9/2021 | ✓ $1,350,000 | ✓ $1,950,000 |

## Payment Terms & Extension Options

| | |
|---|---|
| Original Loan Term | **12 Months from September 20, 2021** |
| Original Maturity Date | **October 1, 2022** |
| Borrower Extension Option | **3 months** |
| Extended Maturity Date | **April 1, 2023** |
| Prepayable | **Yes** |
| Prepayment Penalty | **None** |
| Lock-Out | **None** |

## Borrower

| | |
|---|---|
| Borrower | Entity - LLC |
| Credit Score | 725 - 749 Guarantor |
| Track Record ❓ | 2 |

## Property Details

### 🏠 22 Wallenberg Cir, Monsey, NY 10952

| Overview | There is no Clear Capital data available for this Zip Code. |
|---|---|

| Property Type | Single Family Residential (SFR) |
|---|---|
| Bedrooms | 5 |
| Bathrooms | 3.1 |
| Square Feet | 4,080 |
| Lot Acres | 0.75 |

| Location | | |
|---|---|---|
| | Location | Monsey, NY |
| | ZIP Code | 10952 |
| | Nearest Metro | New York (38 Miles) |

\* At the time this loan was published.

DISCLAIMER: The information provided in this site, including, without limitation, the Projected Return Calculator, should not be construed as advice on any subject matter whatsoever. You should not act or refrain from acting on the basis of any content included in this site without seeking legal or other professional advice. This information is provided strictly for informational purposes only and is subject to change from time to time without notice to you.

**About Us**
Blog
News
Press
Careers
Affiliate Program

**Investments**
How It Works
Self-Directed IRA
Want to borrow?
Accredited Investor

**Help**
FAQs
Contact Us
844-733-7787
info@peerstreet.com



The information on this website does not constitute an offer to sell securities or a solicitation of an offer to buy securities. Further, none of the information contained on this website is a recommendation to invest in any securities. By using this website, you accept our **Terms of Service**, **Privacy Policy** and **Notice of Right to Opt-Out**. Past performance is no guarantee of future results. Any historical returns, expected returns or probability projections may not reflect actual future performance. All investments involve risk and may result in loss. **Terms and Investment Disclosures**.

© 2023 Peer Street, Inc. All rights reserved.
PS Funding, Inc. CA Bureau of Real Estate - Real Estate Broker License No. 01984664; California Finance Lenders License 60DBO-45398

# Inglewood, CA Acquisitions #11
Multifamily

| | Property Type: **Multifamily** | | Loan Strategy: **Bridge** | | Location: **Inglewood, CA** |
|---|---|---|---|---|---|

| **9.00**% | **45**% | **2** Mo. |
|---|---|---|
| YTM | LTV | Term |

Paid off in full on 04/25/23    312 Investors

Investment Amount: **$750,000**
Lien Position: **First**



EARLY ACCESS

### Early Access Loan

Loan is currently in the review process and funding is dependent on investor demand. It is estimated to close within 10 days.

What are Early Access loans?

https://info.peerstreet.com/faqs/what-are-early-access-loans/

## Additional Information and Disclosures

Loan can be prepaid by borrower    Learn More

Loan can be extended    Learn More

Offering document: Mortgage Payment Dependent Note Private Placement Memorandum

Asset Management Fees    Learn More

## Yield Details

| | |
|---|---|
| PeerStreet Note Purchase Rate | **11.00%** |
| PeerStreet Fee [1] | **-2.00%** |
| Net Investor Yield | **9.00%** |

| Originator: | Skin in the Game: |
|---|---|
| BRC Loans COMMERCIAL BRIDGE LOANS | 50% |

[1] A 1% Asset Management Fee may also be assessed to this investment. For more information on the circumstances where PeerStreet may levy the Asset Management Fee for this loan, please see the Additional Information and Disclosures section.

## Investment Overview

### Overview

| | |
|---|---|
| Originator | **BRC Loans** |
| Lien Type | **First** |
| Repayment Type | **Interest-Only** |
| Origination Date | **October 4, 2022** |
| Maturity Date | **November 1, 2023** |

### Purpose & Strategy

| | |
|---|---|
| Loan Purpose | **Acquisition** |
| Loan Strategy | **Bridge** |
| Property Purchase Price | In Oct 2022 **$1,575,000** |

Cash Into Closing (includes
...........)    $109,796

**Debt Stack**

| First Lien | | |
|---|---|---|
| Senior Positions | | |
| PeerStreet Investment | **$750,000** | |
| Pari Passu | **$0** | |
| Total Senior Positions | **$750,000** | |
| Subordinate Positions | **$590,000** | |
| | Held By Originator | |
| Total First Lien | **$1,340,000** | |
| Junior Liens | Held By Originator | **$167,500** |

**Leverage Details**

| First Lien Amount | **$1,340,000** |
|---|---|
| Purchase Price | **$1,575,000** |
| As-Is Value ❓ Appraisal As Of October 17, 2022 | **$1,675,000** |
| As-Is LTV ❓ | **45%** |
| LTC | **48%** |

**Valuation**

| Source | Date | As-Is Value | After Repair Value |
|---|---|---|---|
| 🏠 230 E Hazel St 📄 | 10/17/2022 | ✅ $1,675,000 | N/A |

**Payment Terms & Extension Options**

| Original Loan Term | **12 Months from October 4, 2022** |
|---|---|
| Original Maturity Date | **November 1, 2023** |
| Borrower Extension Option | **Negotiable** |
| Prepayable | **Yes** |
| Prepayment Penalty | **None** |
| Lock-Out | **None** |

**Borrower**

| Borrower | Entity - LLC |
|---|---|
| Credit Score | 775 - 799 Guarantor |
| Track Record ❓ | 6+ |

**Property Details**

🏠 **230 E Hazel St, Inglewood, CA 90302**

| Location | | |
|---|---|---|
| Location | | **Inglewood, CA** |
| ZIP Code | | **90302** |

**Updates:**

The following data fields were updated on 2/22/2023: - Origination Date went from 2022-10-18 to 2022-10-04

\* At the time this loan was published.

DISCLAIMER: The information provided in this site, including, without limitation, the Projected Return Calculator, should not be construed as advice on any subject matter whatsoever. You should not act or refrain from acting on the basis of any content included in this site without seeking legal or other professional advice. This information is provided strictly for informational purposes only and is subject to change from time to time without notice to you.

**About Us**
Blog
News
Press
Careers
Affiliate Program

**Investments**
How It Works
Self-Directed IRA
Want to borrow?
Accredited Investor

**Help**
FAQs
Contact Us
844-733-7787
info@peerstreet.com



The information on this website does not constitute an offer to sell securities or a solicitation of an offer to buy securities. Further, none of the information contained on this website is a recommendation to invest in any securities. By using this website, you accept our **Terms of Service**, **Privacy Policy** and **Notice of Right to Opt-Out**. Past performance is no guarantee of future results. Any historical returns, expected returns or probability projections may not reflect actual future performance. All investments involve risk and may result in loss. **Terms and Investment Disclosures**.

© 2023 Peer Street, Inc. All rights reserved.
PS Funding, Inc. CA Bureau of Real Estate - Real Estate Broker License No. 01984664; California Finance Lenders License 60DBO-45398

| | Property Type:<br>**Single Family<br>Residential<br>(SFR)** | | Loan Strategy:<br>**Light<br>Construction** | | Location:<br>**Fullerton, CA** |
|---|---|---|---|---|---|



| **7.50**% | **75**% | **11** Mo. |
|---|---|---|
| YTM ⓘ | LTV | Term |

1 Month Left

| Investment Amount: | **$849,435** |
|---|---|
| Lien Position: | **First** |

**This loan is full.**

Reserve your place quickly and automatically in more investments like this at the moment that they publish.

Try Automated Investing

## Yield Details

| | |
|---|---|
| PeerStreet Note Purchase Rate ⓘ | |
| | **9.50%** |
| PeerStreet Fee [1] | **-2.00%** |
| Net Investor Yield | **7.50%** |

Originator:



[1] A 1% Asset Management Fee may also be assessed to this investment. For more information on the circumstances where PeerStreet may levy the Asset Management Fee for this loan, please see the Additional Information and Disclosures section.

### Additional Information and Disclosures

Loan can be prepaid by borrower Learn More

Loan can be extended Learn More

Offering document: Mortgage Payment Dependent Note Private Placement Memorandum

Asset Management Fees Learn More

## Investment Overview

| Overview | | |
|---|---|---|
| | Originator | **Mavin Loans Corp** |
| | Lien Type | **First** |
| | Repayment Type | **Interest-Only** |
| | Origination Date | **September 1, 2022** |
| | Maturity Date | **October 1, 2023** |

| Purpose &<br>Strategy | | |
|---|---|---|
| | Loan Purpose | **Acquisition** |
| | Loan Strategy | **Light Construction** |
| | Property Purchase Price | In Aug 2022 **$940,000** |
| | Rehab Budget | **$99,435** |
| | Construction Reserve<br>Remaining | **$99,435** |

| Debt Stack | | |
|---|---|---|
| | First Lien | |
| | Senior Positions | |
| | PeerStreet Investment | **$849,435** |
| | Pari Passu | **$0** |

| Total Senior Positions | $849,435 |
| Subordinate Positions | $0 |
| Total First Lien | $849,435 |

**Leverage Details**

| First Lien Amount | $849,435 |
| Purchase Price | $940,000 |
| As-Is Value ❓ Appraisal As Of August 16, 2022 | $1,000,000 |
| After Repair Value | $1,350,000 |
| Appraisal As Of August 16, 2022 | |
| Median Home Price ❓ | $871,797 |
| As-Is LTV ❓ | 75% |
| After Repair LTV ❓ | 63% |
| LTC | 80% |
| As-Is Value To Median Home Price | 115% |
| ARV To Median Home Price | 155% |

## Valuation

| Source | Date | As-Is Value | After Repair Value |
| --- | --- | --- | --- |
| 📍 2231 El Rancho Vista 📄 | 8/16/2022 | ✅ $1,000,000 | ✅ $1,350,000 |

## Payment Terms & Extension Options

| Original Loan Term | **13 Months from September 1, 2022** |
| --- | --- |
| Original Maturity Date | **October 1, 2023** |
| Borrower Extension Option | **Negotiable** |
| Prepayable | **Yes** |
| Prepayment Penalty | **None** |
| Lock-Out | **None** |

## Borrower

| Borrower | Entity - LLC |
| --- | --- |
| Credit Score | 750 - 774 Guarantor |
| Track Record ❓ | 3 |

## Property Details

🏠 **2231 El Rancho Vista, Fullerton, CA 92833**

## Overview

| | |
|---|---|
| Bedrooms | **4** |
| Bathrooms | **2.0** |
| Square Feet | **1,904** |
| Lot Acres | **0.22** |

## Location

| | |
|---|---|
| Location | **Fullerton, CA** |
| ZIP Code | **92833** |
| Nearest Metro | **Los Angeles (25 Miles)** |

## Home Price Index [1]

| | |
|---|---|
| YoY Change | **+6.82%** |
| Forecast Next 12 Mo. | **+3.56%** |
| Forecast Next 24 Mo. | **+7.24%** |

## Downside Scenarios

| | |
|---|---|
| Worst 12-Month Price Decline [2] | **-24.04%** |
| Stressed LTV [3] | **99%** |
| Stressed After Repair LTV [4] | **83%** |

[1] Data provided by Clear Capital based on property prices in the zip code as of September 2022.

[2] The worst 12-month price decline is the worst price decline in the zip code over the last 20 years according to data provided by Clear Capital as of September 2022.

[3] The Stressed LTV is the LTV that would be the result of applying the worst 12-month price decline to the subject property valuation.

[4] The Stressed After Repair LTV is the LTV that would be the result of applying the worst 12-month price decline to the subject property valuation.

* At the time this loan was published.

DISCLAIMER: The information provided in this site, including, without limitation, the Projected Return Calculator, should not be construed as advice on any subject matter whatsoever. You should not act or refrain from acting on the basis of any content included in this site without seeking legal or other professional advice. This information is provided strictly for informational purposes only and is subject to change from time to time without notice to you.

**About Us**
Blog
News
Press
Careers
Affiliate Program

**Investments**
How It Works
Self-Directed IRA
Want to borrow?
Accredited Investor

**Help**
FAQs
Contact Us
844-733-7787
info@peerstreet.com



The information on this website does not constitute an offer to sell securities or a solicitation of an offer to buy securities. Further, none of the information contained on this website is a recommendation to invest in any securities. By using this website, you accept our **Terms of Service**, **Privacy Policy** and **Notice of Right to Opt-Out**. Past performance is no guarantee of future results. Any historical returns, expected returns or probability projections may not reflect actual future performance. All investments involve risk and may result in loss. **Terms and Investment Disclosures**.

© 2023 Peer Street, Inc. All rights reserved.
PS Funding, Inc. CA Bureau of Real Estate - Real Estate Broker License No. 01984664; California Finance Lenders License 60DBO-45398

# Tarzana, CA Acquisition #5
Single Family Residential (SFR)

| | | |
|---|---|---|
| Property Type:<br>**Single Family Residential (SFR)** | Loan Strategy:<br>**Light Construction** | Location:<br>**Tarzana, CA** |



| 8.25% | 67% | 8 Mo. |
|---|---|---|
| YTM ? | LTV | Term |

1 Month Left

Investment Amount: **$1,699,010**
Lien Position: **First**

**This loan is full.**

Reserve your place quickly and automatically in more investments like this at the moment that they publish.

Try Automated Investing

## Yield Details

**Originator:**



| | |
|---|---|
| PeerStreet Note Purchase Rate ? | |
| | **10.25%** |
| PeerStreet Fee [1] | **-2.00%** |
| Net Investor Yield | **8.25%** |

[1] A 1% Asset Management Fee may also be assessed to this investment. For more information on the circumstances where PeerStreet may levy the Asset Management Fee for this loan, please see the Additional Information and Disclosures section.

## Additional Information and Disclosures

Loan can be prepaid by borrower Learn More

Loan can be extended Learn More

Offering document: Mortgage Payment Dependent Note Private Placement Memorandum

Asset Management Fees Learn More

## Investment Overview

| Overview | | |
|---|---|---|
| | Originator | **Mavin Loans Corp** |
| | Lien Type | **First** |
| | Repayment Type | **Interest-Only** |
| | Origination Date | **September 23, 2022** |
| | Maturity Date | **October 1, 2023** |

| Purpose & Strategy | | |
|---|---|---|
| | Loan Purpose | **Acquisition** |
| | Loan Strategy | **Light Construction** |
| | Property Purchase Price | In Sep 2022 **$1,800,000** |
| | Rehab Budget | **$439,010** |
| | Construction Reserve Remaining | **$439,010** |

| Debt Stack | | |
|---|---|---|
| | First Lien | |
| | Senior Positions | |
| | PeerStreet Investment | **$1,699,010** |
| | Pari Passu | **$0** |

| Total Senior Positions | $1,699,010 |
| Subordinate Positions | $0 |
| Total First Lien | $1,699,010 |

**Leverage Details**

| First Lien Amount | $1,699,010 |
|---|---|
| Purchase Price | $1,800,000 |
| As-Is Value ❓Appraisal As Of September 2, 2022 | $1,875,000 |
| After Repair Value | $3,100,000 |
| | Appraisal As Of September 2, 2022 |
| Median Home Price ❓ | $1,370,689 |
| As-Is LTV ❓ | 67% |
| After Repair LTV ❓ | 55% |
| LTC | 70% |
| As-Is Value To Median Home Price | 137% |
| ARV To Median Home Price | 226% |

## Valuation

| Source | Date | As-Is Value | After Repair Value |
|---|---|---|---|
| 📍 **18871 Rosita St** 📄 | 9/2/2022 | ✓ $1,875,000 | ✓ $3,100,000 |

## Payment Terms & Extension Options

| Original Loan Term | **12 Months from September 23, 2022** |
|---|---|
| Original Maturity Date | **October 1, 2023** |
| Borrower Extension Option | **Negotiable** |
| Prepayable | **Yes** |
| Prepayment Penalty | **None** |
| Lock-Out | **None** |

## Borrower

| Borrower | Entity **-** LLC |
|---|---|
| Credit Score | 750 **-** 774 Guarantor |
| Track Record ❓ | 6+ |

## Property Details

🏠 **18871 Rosita St, Tarzana, CA 91356**

## Overview

| | |
|---|---|
| Bedrooms | 4 |
| Bathrooms | 4.0 |
| Square Feet | 3,927 |
| Lot Acres | 0.28 |

## Location

| | |
|---|---|
| Location | Tarzana, CA |
| ZIP Code | 91356 |
| Nearest Metro | Los Angeles (23 Miles) |

## Home Price Index [1]

| | |
|---|---|
| YoY Change | +0.82% |
| Forecast Next 12 Mo. | -0.32% |
| Forecast Next 24 Mo. | -0.65% |

## Downside Scenarios

| | |
|---|---|
| Worst 9-Month Price Decline [2] | -22.76% |
| Stressed LTV [3] | 87% |
| Stressed After Repair LTV [4] | 71% |

[1] Data provided by Clear Capital based on property prices in the zip code as of October 2022.
[2] The worst 9-month price decline is the worst price decline in the zip code over the last 20 years according to data provided by Clear Capital as of October 2022.
[3] The Stressed LTV is the LTV that would be the result of applying the worst 9-month price decline to the subject property valuation.
[4] The Stressed After Repair LTV is the LTV that would be the result of applying the worst 9-month price decline to the subject property valuation.

\* At the time this loan was published.

DISCLAIMER: The information provided in this site, including, without limitation, the Projected Return Calculator, should not be construed as advice on any subject matter whatsoever. You should not act or refrain from acting on the basis of any content included in this site without seeking legal or other professional advice. This information is provided strictly for informational purposes only and is subject to change from time to time without notice to you.

**About Us**
Blog
News
Press
Careers
Affiliate Program

**Investments**
How It Works
Self-Directed IRA
Want to borrow?
Accredited Investor

**Help**
FAQs
Contact Us
844-733-7787
info@peerstreet.com



The information on this website does not constitute an offer to sell securities or a solicitation of an offer to buy securities. Further, none of the information contained on this website is a recommendation to invest in any securities. By using this website, you accept our **Terms of Service**, **Privacy Policy** and **Notice of Right to Opt-Out**. Past performance is no guarantee of future results. Any historical returns, expected returns or probability projections may not reflect actual future performance. All investments involve risk and may result in loss. **Terms and Investment Disclosures**.

© 2023 Peer Street, Inc. All rights reserved.
PS Funding, Inc. CA Bureau of Real Estate - Real Estate Broker License No. 01984664; California Finance Lenders License 60DBO-45338

## **EXHIBIT 16**



# MORTGAGE DEPENDENT PROMISSORY NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THIS NOTE UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO COMPANY THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. SEE THE PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") ISSUED BY COMPANY, DATED AS OF OCTOBER 26, 2014, AND THE INVESTOR AGREEMENT BETWEEN COMPANY AND HOLDER (THE "INVESTOR AGREEMENT") WITH RESPECT TO THIS NOTE FOR MORE DETAILS.

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") BECAUSE PAYMENTS ON THIS NOTE ARE DEPENDENT ON PAYMENTS ON THE CORRESPONDING MORTGAGE LOAN (AS DEFINED IN THE MEMORANDUM). THIS NOTE'S ISSUE PRICE IS THIS NOTE'S STATED PRINCIPAL AMOUNT, AND THE ISSUE DATE IS THE ORIGINAL ISSUE DATE. FOR FURTHER INFORMATION REGARDING THE AMOUNT OF OID AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT COMPANY AT P.O. BOX 3207, MANHATTAN BEACH, CA 90266.

Mortgage Dependent Note Series No: 5101435336

Note No: 6662728905

Company: Peer Street Funding, LLC

Holder:    REDACTED

Corresponding Mortgage Loan:    REDACTED

Stated Principal Amount of This Note: U.S. $1,358.00

Aggregate Principal Amount Of this Note: U.S $5,400,000.00

Interest Rate: 8.00%

PeerStreet Servicing Fee: 1.00%
An Annualized Rate applied to the Outstanding Principal Amount of the Corresponding Mortgage Loan

Original Issue Date: November 27, 2019

Initial Maturity Date: November 01, 2019

EXTENSION OF MATURITY DATE: This Note will mature on the Initial Maturity Date, unless the maturity of this Note is extended to the Final Maturity Date. In no event will the maturity of this Note be extended beyond the Final Maturity Date.

PAYMENT DATES: Subject to the limitations on payment described below, Company will make payments of principal and interest in arrears in consecutive periodic installments in accordance with this Note's payment schedule identified on www.peerstreet.com (the "PeerStreet Website"), subject to prepayment at any time without penalty.

Capitalized terms that are not defined herein shall have the meaning prescribed to them in the Memorandum or Investor Agreement.

Peer Street Funding LLC, a limited liability company duly organized and existing under the laws of the State of Delaware (herein called the "Company"), for value received, hereby promises to pay to the person identified as the "Holder" above (the "Holder"), principal and interest on this Note in U.S. dollars in accordance with the Investor Agreement and Memorandum, on each Payment Date (in accordance with the payment schedule for this Note, which is available on Holder's account page on the "PeerStreet Website" and subject to prepayment) until the Initial Maturity Date or, if the maturity of this Note has been extended, until the Final Maturity Date.

Maker will issue this Note in electronic form only. This means that this Note will be stored on the PeerStreet Website. Holder can view a record of the Notes owned by Holder online and print copies of this Note and the online record of Holder's Notes by visiting Holder's secure, password-protected webpage in the "Dashboard" section of the PeerStreet Website. Maker will not issue a certificate for this Note.

This Note is part of a series of Notes, which series of Notes is held in the aggregate by multiple holders.

This Note represents a special limited obligation of Company, and (i) no payments of principal and interest on this Note shall be payable unless Company has received payments relating to the Corresponding Mortgage Loan, and then only to the extent of the amount of such payments received by Company (less any fees and costs allowed to be charged under the Memorandum), and (ii) no Holder of this Note shall have any recourse against Company unless, and then only to the extent that, Company has received payment relating to the Corresponding Mortgage Loan and has failed to pay such Holder their pro rata share of the payments that Company actually received under the Corresponding Mortgage Loan (less any fees and costs allowed to be charged under the Memorandum). The principal and interest payable on any payment date will be paid to the party in whose name this Note is registered.

All payments of principal and interest on this Note due to Holder shall be made in U.S. dollars, in immediately available funds, by intra-institution book entry transfer to Holder's designated account indicated through Company's online platform. All U.S. dollar amounts used in or resulting from the calculation of amounts due in respect of this Note shall be rounded to the nearest cent (with one-half cent being rounded upward). Such

payments shall continue until the entire indebtedness evidenced by this Note and all accrued and unpaid interest and fees are fully paid, with any unpaid principal and interest due and payable on the Initial Maturity Date, unless Company has extended the maturity date to the Final Maturity Date. Notwithstanding any payment schedule, Company shall only be obligated to make any payment on this Note if and only if, and only to the extent that, Company receives payment relating to the Corresponding Borrower Loan (less any fees and costs allowed to be charged under the Memorandum).

Should Company not receive any payments relating to the Corresponding Mortgage Loan, Company will not owe anything to Holder. This Note will mature on the Initial Maturity Date; provided, however, that if on the Initial Maturity Date any principal or interest payments in respect of the Corresponding Mortgage Loan remain due and payable to Company, the maturity date of this Note will be extended to the Final Maturity Date. Company may prepay this Note in whole or in part at any time without any penalty. All prepayments of principal on this Note shall be applied to the most remote principal installment or installments then unpaid.

As set forth in the Memorandum, Company will, at its sole discretion, advance any and all amounts necessary to protect its interest in the Corresponding Borrower Loan, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs Company deems necessary to protect its position in the Corresponding Borrower Loan (the "Company's Advances"). Any fees advanced by Company will earn interest at the interest rate applicable to the Corresponding Borrower Loan. Any amounts paid to Company under the Corresponding Borrower Loan shall be payable as follows: (i) to Company, to recoup Company's Advances, (ii) to Company or third parties for any fees and costs allowed to be charged under the Memorandum and (iii) the balance, if any, pro rata to the holders of each Note in the same series of

Notes, which series of Notes is held in the aggregate by multiple holders.

If any withholding tax is imposed on any payment made by Company to Holder pursuant to this Note, such tax shall reduce the amount otherwise payable with respect to such payment. Upon request of Company, Holder shall provide Company with an Internal Revenue Service Form W-9, W-BEN, W-8ECI, W-8IMY or other similar withholding certificate of a state, local or foreign governmental authority such that Company may make payments under this Note without deduction for, or at a reduced rate of deduction for, any tax.

On (i) Company's failure to pay any installment or other sum due under this Note when due and payable when Company has received the same from the Corresponding Mortgage Loan (whether by extension, acceleration, or otherwise), (ii) Company has become subject to a voluntary or involuntary proceeding of bankruptcy, insolvency, or otherwise subject to receivership and remains so for a period of 60 days, or (iii) any breach of any other promise or obligation in this Note or in any other instrument now or hereafter securing the indebtedness evidenced by this Note (collectively, "Default"), then after upon sixty (60) days from the date of receiving written notice of such default from Holder, and if Company fails thereafter to cure said default, Holder may, at its option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the applicable maturity date. Company must receive notice of the exercise of this option. For the purposes of this paragraph, Company shall be deemed to have received Holder's notice if Holder follows the notice provisions of this Note.

Subject to compliance with the Act and applicable securities laws and regulations, Company may sell, convey, assign or otherwise transfer (i) all or any part of the Corresponding Mortgage Loan or (ii) any interest in the Corresponding Mortgage Loan, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of Holder.

Company, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the security given for this Note, any acceptance of additional security of any kind and any release of any party liable under this Note.

Any notice required to be provided in this Note shall be given and received via electronic mail, unless applicable law requires that such notice be given in writing. All notices shall be addressed to the party to whom such notice is to be given at (i) info@peerstreet.com or such other email address Company may notify Holder via the PeerStreet Website, if the recipient is Company or (ii) the electronic mail address used by Holder when registering online at the PeerStreet Website if the recipient is Holder; subject to the parties updating such addresses by providing notice pursuant to this paragraph.

If Holder delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any Holder's rights or of any breach, default, or failure of condition under this Note. No waiver by Holder of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Holder.

This Note inures to and binds the heirs, legal representatives, successors, and assigns of the parties; provided that Holder may only assign or transfer this Note in connection with the terms outlined in the Memorandum, and under no circumstances may Holder assign or transfer this Note in violation of the Act.

This Note shall be construed and enforceable according to the laws of the State of Delaware (without giving effect to its conflicts of laws principles) for all purposes.

Time is of the essence with respect to all obligations of Company under this Note.

Except as specified herein or the Memorandum, this Note may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

Any provision of this Note which shall be held by a court of competent jurisdiction to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and all other provisions or terms hereof shall remain in full force and effect.

Company shall not be personally liable, and Holder shall not commence or prosecute any action against Company or the borrower or lender partner on this Note or the Corresponding Borrower Loan for the nonpayment or non-performance of any obligation on this Note (the "Loan Obligations") due to failure or default of the Corresponding Borrower Loan. Holder shall not seek, obtain, or enforce a deficiency judgment against Company. Holder's recourse for Company's payment obligations shall be limited to the payments and amounts, if any, received by Company relating to the Corresponding Borrower Loan.

Holder shall not be entitled to obtain specific performance or any other similar order, remedy, or relief against Company relating to any claim arising from this Note. Holder waives any right to exercise any lenders' right of set-off arising from this Note, against any funds of Company in Holder's custody, control, or possession. No recourse under or upon any obligation, covenant or agreement contained in this Note, or because of any indebtedness evidenced thereby, shall be had against any past, present or future shareholder, officer, director or agent, as such, of Company, either directly or through Company, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or penalty or otherwise, all such personal liability of every such incorporator, shareholder, officer, director or agent, as such, being expressly waived and released by the acceptance hereof and as a condition of and as part of the consideration for the issuance of this Note.

Holder, by acceptance of this Note, agrees to treat, and shall treat, this Note as debt of Company for United States federal income tax purposes and shall refrain from taking any action inconsistent with such treatment.

The terms contained in the Memorandum and Investor Agreement are hereby incorporated herein by this reference for all purposes. In the event any provisions of this Note conflict with provisions of the Memorandum, the provisions of the Memorandum shall control.

IN WITNESS WHEREOF, PeerStreet Funding, LLC has caused this instrument to be signed by its duly authorized officer.

Date: <u>November 27, 2019</u>

/s/ Brewster Johnson

Peer Street Funding, LLC

Brewster Johnson, President

About Us
Blog
News
Press
Careers
Affiliate Program

Investments
How It Works
Self-Directed IRA
Want to borrow?
Accredited Investor

Help
FAQs
Contact Us
844-733-7787
info@peerstreet.com



The information on this website does not constitute an offer to sell securities or a solicitation of an offer to buy securities. Further, none of the information contained on this website is a recommendation to invest in any securities. By using this website, you accept our **Terms of Service**, **Privacy Policy** and **Notice of Right to Opt-Out**. Past performance is no guarantee of future results. Any historical returns, expected returns or probability projections may not reflect actual future performance. All investments involve risk and may result in loss. **Terms and Investment Disclosures**.

© 2023 Peer Street, Inc. All rights reserved.
PS Funding, Inc. CA Bureau of Real Estate   Real Estate Broker License No. 01984664; California Finance Lenders License 60DBO 45398

## **EXHIBIT 17**



# MASTER MORTGAGE PAYMENT DEPENDENT NOTE

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THIS NOTE UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY (AS DEFINED BELOW) THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. SEE THE PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") ISSUED BY COMPANY, DATED AS OF DECEMBER 2, 2019, AND THE INVESTOR AGREEMENT BETWEEN THE COMPANY AND THE INVESTOR WITH RESPECT TO THIS NOTE FOR MORE DETAILS.

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") BECAUSE PAYMENTS ON THIS NOTE ARE DEPENDENT ON PAYMENTS ON THE CORRESPONDING MORTGAGE LOAN (AS DEFINED IN THE MEMORANDUM). THIS NOTE'S ISSUE PRICE IS THIS NOTE'S STATED PRINCIPAL AMOUNT, AND THE ISSUE DATE IS THE ORIGINAL ISSUE DATE. FOR FURTHER INFORMATION REGARDING THE AMOUNT OF OID AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT THE COMPANY AT P.O. BOX 3207, MANHATTAN BEACH, CA 90266.

Mortgage Payment Dependent Note Series No: <u>118263457927</u>

Note No: <u>6995047807</u>

Company: <u>Peer Street Funding, LLC</u>

Investor: <u>Pacific RBLF Funding Trust</u>

Corresponding Mortgage Loan: <u>Oakland, CA Acquisition #83</u>

Stated Principal Amount of This Note: U.S. <u>$365,774.00</u>

Aggregate Principal Amount of Notes in this Series: U.S. <u>$720,000.00</u>

Yield to Maturity: <u>7.375%</u>

PeerStreet Standard Fee (as defined in Private Placement Memorandum Supplement for the MPDNs): <u>1.13%</u>

Original Issue Date: <u>September 13, 2021</u>

Initial Maturity Date: <u>October 01, 2023</u>

This Master Mortgage Payment Dependent Note ("Master Note") contains the terms that shall apply to each investment (a "Loan Investment") made by Pacific RBLF Funding Trust ("Investor") via the platform located at www.peerstreet.com (the "PeerStreet Website") in accordance with the Investor Agreement and Memorandum. References herein to a "Note" shall apply to each Loan Investment made by Investor on the PeerStreet Website. Capitalized terms that are not defined herein shall have the meaning prescribed to them in the Memorandum, the MPDN Supplement to the Memorandum, or Investor Agreement. Company will issue Notes in electronic form only. This means that each Note will be stored on the PeerStreet Website. Investor can view a record of the Notes owned by Investor online and print copies of this Master Note and the online record of your Notes for your records by visiting your secure, password-protected webpage in the "Dashboard" section of the PeerStreet Website. Company will not issue certificates for the Notes.

FOR VALUE RECEIVED, the undersigned, Peer Street Funding, LLC, a Delaware limited liability company (the "Company"), hereby promises to pay Investor the principal sum(s) of each Loan Investment, together with interest on the unpaid principal balance thereon in accordance with the terms contained herein:

**1. Special Limited Obligation.** This Note represents a special limited obligation of the Company, and (1) no payments of principal and interest on this Note shall be payable unless the Company has received payments relating to the corresponding mortgage loan, and then only to the extent of the amount of such payments received by the Company (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum), and (2) no Investor of this Note shall have any recourse against the Company unless, and then only to the extent that, the Company has received payment relating to the corresponding mortgage loan and has failed to pay such Investor their pro rata share of the payments that the Company actually received under the corresponding mortgage loan (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum). The principal and interest payable on any payment date will be paid to the party in whose name this Note is registered.

**2. Yield to maturity.** Yield to maturity (YTM) is the total investment return anticipated if the loan pays off in full on the stated maturity date, expressed as an annualized yield. Yield to maturity includes all interest payments and principal accretion in the case of a discounted loan.

**3. Payment of Principal and Interest.**

**3.1 Payments.** Payments shall be due and payable in arrears in consecutive periodic installments in accordance with this Note's payment schedule identified on the PeerStreet Website. All payments of principal and interest on this Note due to the Investor shall be made in U.S. dollars, in immediately available funds, by intra-institution book entry transfer to the Investor's designated account indicated through the Company's online platform. Such payments shall continue until the entire indebtedness evidenced by this Note and all accrued and unpaid interest and fees are fully paid, with any unpaid principal and interest due and payable on the Maturity Date, unless the Company has extended the Maturity Date or unless the Company has otherwise sold the underlying mortgage loan, accepted a discounted payoff, or otherwise incurred a loss of principal and/or

interest. Notwithstanding any payment schedule, the Company shall only be obligated to make any payment on this Note if and only if, and only to the extent that, Company receives payment relating to the corresponding mortgage loan (less any fees and costs allowed to be charged under the MPDN Supplement to the Memorandum). Should the Company not receive any payments relating to the corresponding mortgage loan, Company will not owe anything to Investor. The Note will mature on the Maturity Date; provided, however, that if on the Maturity Date any principal or interest payments in respect of the corresponding mortgage loan remain due and payable to the Company, the Maturity Date of this Note will be extended until all amounts due under the corresponding mortgage loan are fully paid, the corresponding property is liquidated, or similar events, as further described in the Memorandum.

**3.2 Amounts Advanced by Company.** As set forth in the Memorandum and the MPDN Supplement to the Memorandum, the Company will, at its sole discretion, advance any and all amounts necessary to protect its interest in the corresponding mortgage loan, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs Company deems necessary to protect its position in the corresponding mortgage loan (the "Company's Advances"). Any fees advanced by the Company will earn interest at the interest rate applicable to the corresponding mortgage loan. Any amounts paid to the Company under the corresponding mortgage loan shall be payable as follows: (1) to the Company, to recoup the Company's Advances, (2) to the Company or third parties for any fees and costs allowed to be charged under the Memorandum and the MPDN Supplement to the Memorandum and (3) the balance, if any, pro rata to the Investors in the Notes.

**3.3 Withholding.** If any withholding tax is imposed on any payment made by the Company to a Investor pursuant to this Note, such tax shall reduce the amount otherwise payable with respect to such payment. Upon request of the Company, a Investor shall provide the Company with an Internal Revenue Service Form W-9, W-BEN, W-8ECI, W-8IMY or other similar withholding certificate of a state, local or foreign governmental authority such that the Company may make payments under the Note without deduction for, or at a reduced rate of deduction for, any tax.

**4. Events of Default.** On (a) the Company's failure to pay any installment or other sum due under this Note when due and payable when the Company has received the same from the corresponding mortgage loan (whether by extension, acceleration, or otherwise), (b) the Company has become subject to a voluntary or involuntary proceeding of bankruptcy, insolvency, or otherwise subject to receivership and remains so for a period of 60 days, or (c) any breach of any other promise or obligation in this Note or in any other instrument now or hereafter securing the indebtedness evidenced by this Note (collectively, "Default"), then after sixty (60) days from the date of receiving written notice of such default from the Investor, and if the Company fails thereafter to cure said default, the Investor may, at its option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the applicable Maturity Date. The Company must receive notice of the exercise of this option. For the purposes of this paragraph, the Company shall be deemed to receive Investor's notice if Investor follows the notice provisions in paragraph 8 of this Note.

**5. Prepayment.** Company may prepay this Note in whole or in part at any time without any penalty. All prepayments of principal on this Note shall be applied to the most remote principal installment or installments then unpaid.

**6. Sale Clause.** Subject to compliance with the Act and applicable securities laws and regulations, Company may sell, convey, assign or otherwise transfer (a) all or any part of the corresponding mortgage loan or (b) any interest in the corresponding mortgage loan, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of the Investor.

**7. Waiver.** The Company, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the security given for this Note, any acceptance of additional security of any kind and any release of any party liable under this Note.

**8. Notice.** Any notice required to be provided in this Note shall be given and received via electronic mail, unless applicable law requires that such notice be given in writing. All notices shall be addressed to the party to whom such notice is to be given at (i) info@peerstreet.com or such other email address the Company may provide to Investor via the PeerStreet Website, if the recipient is the Company or (ii) the electronic mail address used by Investor when registering online at the Company's investment platform if the recipient is the Investor; subject to the parties updating such addresses by providing notice pursuant to this Section 8.

**9. Forbearance Not a Waiver.** If the Investor delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any the Investor rights or of any breach, default, or failure of condition under this Note. No waiver by the Investor of any of its rights or of any such breach, default, or failure of condition shall be effective, unless the waiver is expressly stated in a writing signed by Investor.

**10. Assignment.** This Note inures to and binds the heirs, legal representatives, successors, and assigns of the parties; provided that the Investor may only assign or transfer this Note in connection with the terms outlined in the Investor Agreement and this Note, and under no circumstances may Investor assign or transfer this Note in violation of the Act.

**11. Governing Law.** This Note shall be construed and enforce able according to the laws of the State of Delaware (without giving effect to its conflicts of laws principles) for all purposes.

**12. Time Is of the Essence.** Time is of the essence with respect to all obligations of the Company under this Note.

**13. No Modifications or Amendments; No Waiver.** Except as specified herein or the Investor Agreement, this Promissory Note may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

**14. Severability.** Any provision of this Promissory Note which shall be held by a court of competent jurisdiction to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and all other provisions or terms hereof shall remain in full force and effect.

**15. Nonrecourse Generally.** (i) The Company shall not be personally liable, and Investor shall not commence or prosecute any action against the Company, for the nonpayment or non- performance of any obligation on this Note (the "Loan Obligations") due to failure or default of the corresponding mortgage loan; (ii) Investor shall not seek, obtain, or enforce a deficiency judgment against the Company; (iii) Investor's recourse for the Company's payment obligations shall be limited to the payments and amounts, if any, received by Company relating to the corresponding mortgage loan; (iv) the Investor shall not be entitled to obtain specific performance or any other similar order, remedy, or relief against the Company relating to any claim arising from the Note; and (v) the Investor waives any right to exercise any lenders' right of set-off arising from the Note, against any funds of the Company in the Investor's custody, control, or possession. No recourse under or upon any obligation, covenant or agreement contained in this Note, or because of any indebtedness evidenced thereby, shall be had against any past, present or future shareholder, officer, director or agent, as such, of the Company, either directly or through the Company, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or penalty or otherwise, all such personal liability of every such incorporator, shareholder, officer, director or agent, as such, being expressly waived and released by the acceptance hereof and as a condition of and as part of the consideration for the issuance of this Note.

**16. Note Series Limitation.** Investor understands and agrees that each Note is part of a series of Notes, which series of Notes is held in the aggregate by multiple holders. The Investor shall not assert any right of action, including (without limitation) any arbitration, lawsuit or otherwise, except in conjunction or aggregation with other holders of the Notes as set forth in the Investor Agreement.

**17. Tax Matters.** Each Investor, by acceptance of a Note, shall be deemed to have agreed to treat, and shall treat, such Note as debt of the Company for United States federal income tax purposes and shall refrain from taking any action inconsistent with such treatment.

**18. Incorporation by Reference.** The terms contained in the Investor Agreement are hereby incorporated herein by this reference for all purposes. In the event any provisions of this Master Note conflict with provisions of the Investor Agreement or any other agreement, the provisions of this Note shall control.

**IN WITNESS WHEREOF,** Peer Street Funding, LLC has caused this instrument to be signed by its duly authorized officer.

Dated: <u>September 13, 2021</u>

/s/ Brewster Johnson

Peer Street Funding, LLC

By: Brewster Johnson, Chief Executive Officer

**About Us**
Blog
News
Press
Careers
Affiliate Program

**Investments**
How It Works
Self-Directed IRA
Want to borrow?
Accredited Investor

**Help**
FAQs
Contact Us
844-733-7787
info@peerstreet.com



The information on this website does not constitute an offer to sell securities or a solicitation of an offer to buy securities. Further, none of the information contained on this website is a recommendation to invest in any securities. By using this website, you accept our **Terms of Service**, **Privacy Policy** and **Notice of Right to Opt-Out**. Past performance is no guarantee of future results. Any historical returns, expected returns or probability projections may not reflect actual future performance. All investments involve risk and may result in loss. **Terms and Investment Disclosures**.

© 2023 Peer Street, Inc. All rights reserved.
PS Funding, Inc. CA Bureau of Real Estate - Real Estate Broker License No. 01984664; California Finance Lenders License 60DBO-45398

**EXHIBIT 18**



## Investor Agreement

The following terms constitute a binding agreement ("Investor Agreement") between you, as the account holder, and Peer Street, Inc., a Delaware corporation and Peer Street Funding, LLC, a Delaware limited liability company (collectively, "PeerStreet ", "we", or "us").

This Investor Agreement will govern all purchases of promissory notes of PeerStreet that are dependent for payment on payments that PeerStreet receives from specific loan investments (the "Notes") that you make from us. Please read this Investor Agreement and the PeerStreet Private Placement Memorandum dated October 26, 2014 (the "PPM") carefully and _print_ and retain a copy of these documents for your records.

The Notes are further described in the PPM. We have elected to use the PeerStreet.com web platform ("PeerStreet Platform" or "Platform") to facilitate the marketing and purchase of Notes. Please read the PeerStreet.com Terms of Use available on the PeerStreet.com website. Each time you submit a purchase order through the PeerStreet Platform, you are (a) accepting and agreeing to the following terms, (b) accepting and agreeing to the PeerStreet.com Terms of Use and PPM, (c) agreeing to transact business with us and receive communications relating to the Notes electronically, and (d) agreeing to have any dispute with us resolved by binding arbitration.

You **acknowledge** that this Investor Agreement, along with the PPM has been delivered to you via the Platform, and that you have read and understood each document.

In consideration of the covenants, agreements, representations and warranties hereinafter set forth, and for other good and valuable consideration, receipt of which is hereby acknowledged, it is agreed as follows:

### 1.      Purchase of Notes

Subject to the terms and conditions of this Investor Agreement, we will provide you the opportunity through the PeerStreet web platform:

- To review requests for loans or requests to participate or invest in loans that PeerStreet has received from borrowers or from lender partners (collectively, a "Loan Investment" in the singular and "Loan Investments" in the plural);

- To purchase Notes through the Platform, with each such Note associated with, and dependent on, a specific Loan Investment (the Notes will have a minimum denomination of $1,000, or such other amount as we may designate from time to time); and



- To instruct PeerStreet to apply the proceeds from the sale of each Note you purchase to the funding of a specific Loan Investment you have designated on the Platform.

The purchase price for any Notes you purchase through the Platform will equal 100% of the principal amount of the Notes that you decide to purchase. The Notes, and your rights as an investor in the Notes, are at all times subject to this Investor Agreement, which will also be available on the Platform for your reference and review.

You must commit to purchase a Note through the Platform to fund a Loan Investment prior to the closing of that Loan Investment. At the time you commit to purchase a Note you must have sufficient funds in your account with PeerStreet to complete the purchase. Your account will be a non-interest bearing, commingled, custodial deposit account with a bank that is held by PeerStreet for the benefit of identified investors and administered in a manner intended to allow for "pass through" deposit insurance coverage for the interest of each investor. You may fund your account with PeerStreet at any point after you register on the Platform and provide PeerStreet the authority to open the account by electronic funds or wire transfer. You will not have access to any funds associated with a Loan Investment after you make a purchase commitment unless and until PeerStreet has notified you that the Loan Investment will not be funded. Once you make a funding commitment, it is irrevocable regardless of whether the full amount of the Loan Investment request is funded. If the Loan Investment does not close, then PeerStreet will inform you and release you from your purchase commitment.

Notes are issued in electronic form on the Platform as soon as practicable after completion of funding and due diligence, and you will not receive a physical instrument. Instead, the Notes you have purchased are visible through your account on the Platform. There, you can view the number of Notes you own, as well as other details, such as the interest rate and interest payment date.

**2.    Issuance**

Each time you purchase a Note, it will be issued immediately following the closing of the Loan Investment that you have selected on the Platform. Loan Investments are anticipated to close no later than the end of their designated posting period unless (1) the borrower or lender partner declines the Loan Investment prior to closing, in which case PeerStreet will release you from your purchase commitment; (2) lender commitments for the entire amount of the Loan Investment request have been received earlier, in which case the Loan Investment may close earlier; (3) the loan request is canceled by PeerStreet for reasons relating to the integrity of the Loan Investment that corresponds to the Note discovered by PeerStreet during the due diligence process; or



(4) there are insufficient commitments from PeerStreet's investors to fully fund the loan. In the event of any of the foregoing, you will be notified via the Platform or email.

### 3.    Terms of the Notes

The Notes shall have the terms and conditions described in this Investor Agreement, the PPM and the particular Note related to a specific loan. These documents will be available for you to review on the Platform. The interest rate, maturity date and other terms of the corresponding Loan Investments will be described in the loan requests on the Platform, and the corresponding Notes.

- **Electronic.** The Notes are held in electronic form. There is no physical certificate to represent the Note. The Notes you own are electronically represented in your account on the Platform.

- **Interest Rate.** For some Notes, the interest rate you will receive on your Notes may be different from the rate other investors receive on Notes corresponding to the same loan. For example, in some instances a Loan Investment may be divided into different categories based on risk. Those investors who agree to take the riskier portion of a particular Loan Investment may receive a higher rate of return. You will immediately see what interest rate your Notes will return and have discretion whether or not to buy a particular Note based on your analysis of the return as it relates to the risk.

- **Coupon.** The coupon payment represents the interest we will pay to you on the money you lend to us. It is calculated by multiplying your interest rate by the principal amount you invest. Coupon payment frequency can vary from Loan Investment to Loan Investment and may be monthly, quarterly, semi-annual, or annual. The frequency of coupon payments for a particular Loan Investment will be disclosed and described to you on the Platform. The final payment is expected to be paid at maturity; however, many loans will have no pre-payment penalty, meaning that if a borrower pays off the balance of their loan prior to the original maturity date, you will lose the opportunity to collect future interest payments relating to the original term of the Note. Notice will be given to you via the Platform as to the date of the coupon payment. Interest owed to you will begin accruing on the date a particular Loan Investment is closed by PeerStreet, which will likely not correspond with the date you commit your funds.

- **Term.** The term of the Notes for a corresponding Loan Investment will be disclosed and described to you on the Platform.

- **Transferability.** Notes must stay in your account on the Platform, and cannot be resold or transferred to others, except as described in the PPM.



- **Notes May Lose Value.** The Notes you purchase are not guaranteed investments. They represent a claim on the repayment and interest of a loan that we, or a third party partner, will issue to a borrower. If the borrower or lender partner defaults on its repayment obligation to us, we may not be able to repay the Note you hold. Because of our agreement with the borrower or lender partner, we have the authority to attempt to resolve the default, and in extreme cases foreclose on an underlying asset the borrower has pledged as collateral for its loan, if any exists. Depending on our ability to resolve the default or dispose of the underlying asset, we may only be able to return a portion of the amount you have invested and in some cases, you may lose the entire value of your investment. If the borrower or lender partner meets its entire obligation, we will be able to return the full amount of your investment plus interest owed.

## 4.    Default

The Notes we issue are dependent on payments we receive from loans we provide to borrowers or agreements we have with third party lenders. If a borrower or third party lender fails to meet its obligations under the agreement we have with them, that party will be in default. We will endeavor to resolve the default condition so the borrower or third party lender can continue paying its obligation and will notify you via the Platform or by email of any material default. In some circumstances, we may not be able to resolve a default. In those circumstances, we will use our discretion to act in a manner that we believe will recover as much money as possible, which may include, without limitation, foreclosing on the property, receiving a deed in lieu of foreclosure, pursuing other legal action, or pursuing a work-out. Our goal at that point will be to dispose of the asset and recover as much money as possible, distributing what we recover to you in the form of Note repayment. This may be less than what you initially invested and you may lose your entire investment (see Notes May Lose Value, above). In attempting to resolve a default scenario, we will make commercially reasonable efforts. In the foregoing cases, we will return what we recover to you (less fees and expenses), to the extent we recover anything. We are not under any obligation to return the full amount of your investment, but have outlined in this Investor Agreement, processes we have in place to attempt recovery of funds, if such recovery is possible.

## 5.    Relationship with Borrower

You do not have a legal relationship with the borrower or PeerStreet's lender partners and hereby acknowledge this. A borrower or lender partner who receives a loan or funds from PeerStreet only has a legal relationship with PeerStreet and is obligated only to us. There is no privity of contract between you or the borrower or lender partner. PeerStreet is the only entity you have a legal relationship with and is the only entity with which you have any contractual privity.



**6.      Your Covenants and Acknowledgements**

You agree that you have no right to, and shall not, make any attempt, directly or through any third party, to collect from a borrower or lender partner on your Notes or the corresponding Loan Investments. YOU UNDERSTAND AND ACKNOWLEDGE THAT BORROWERS OR LENDER PARTNERS MAY DEFAULT ON THEIR PAYMENT OBLIGATIONS UNDER THE LOANS AND THAT SUCH DEFAULTS WILL REDUCE THE AMOUNTS, IF ANY, YOU MAY RECEIVE UNDER THE TERMS OF ANY NOTES YOU HOLD ASSOCIATED WITH SUCH LOANS. You and PeerStreet agree that the Notes are intended to be indebtedness of PeerStreet for U.S. federal income tax purposes. You agree that you will not take any position inconsistent with such treatment of the Notes for tax, accounting, or other purposes, unless required by law. You further acknowledge that the Notes may be subject to the original issue discount rules of the Internal Revenue Code of 1986, as amended, as described in the PPM. You acknowledge that you are prepared to bear the risk of loss of your entire purchase price for any Notes you purchase.

**7.      Your Financial Suitability Acknowledgments, Representations, Warranties, and Covenants**

You represent and warrant that you satisfy the minimum financial suitability standards applicable to the state in which you reside; and you covenant that you will abide by the maximum investment limits, each as set forth below or as may be set forth in the PPM or any prospectus supplement on the Platform. You agree to provide any additional documentation reasonably requested by us, as may be required by the securities administrators or regulators of any state, to confirm that you meet such minimum financial suitability standards and have satisfied any maximum investment limits. You understand and acknowledge that: you are an "Accredited Investor" as determined pursuant to Rule 501(a) of Regulation D under the Securities Act of 1933. You understand that the Notes will not be listed on any securities exchange, that there may be no trading platform for the Notes, that any trading of Notes must be conducted in accordance with federal and applicable state securities laws and that Note purchasers should be prepared to hold the Notes they purchase until the Notes mature.

**8.      PeerStreet Acknowledgements, Representations and Warranties**

PeerStreet represents and warrants to you, as of the date of this Investor Agreement and as of any date that you commit to purchase Notes, that: (a) it is duly organized and is validly existing as a corporation in good standing under the laws of Delaware and has corporate power to enter into and perform its obligations under this Investor Agreement; (b) this Investor Agreement has been duly authorized, executed and delivered by PeerStreet; (c) the Notes have been duly authorized and, following payment of the purchase price by you and electronic execution, authentication and delivery to you, will constitute valid and binding obligations of PeerStreet enforceable



against us in accordance with their terms, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency or similar laws; (d) it has complied in all material respects with applicable federal, state and local laws in connection with the offer and sale of the Notes; and (f) PeerStreet has made and will make commercially reasonable efforts to enforce its interest in the Loan Investments on your behalf.

YOU WILL ONLY RECEIVE PAYMENT ON ANY NOTES YOU PURCHASE IF PEERSTREET RECEIVES PAYMENTS ON THE UNDERLYING LOANS ASSOCIATED WITH THOSE NOTES. WE DO NOT WARRANT OR GUARANTEE IN ANY WAY THAT YOU WILL RECEIVE ALL OR ANY PORTION OF THE PRINCIPAL OR INTEREST YOU EXPECT TO RECEIVE ON ANY NOTE OR REALIZE ANY PARTICULAR OR EXPECTED RATE OF RETURN. PEERSTREET ALSO DOES NOT MAKE ANY REPRESENTATIONS REGARDING OUR ABILITY TO PAY THE NOTES.

### 9.    Your Additional Representations and Warranties

You represent and warrant to PeerStreet, as of the date of this Investor Agreement and as of any date that you commit to purchase Notes, that: (a) you have the power to enter into and perform your obligations under this Investor Agreement; (b) this Investor Agreement has been duly authorized, executed and delivered by you; (c) you have received, read and understood the PPM; (d) in connection with this Investor Agreement, you have complied in all material respects with applicable federal, state and local laws; and (e) you have made your decisions in connection with your consideration of any risks which have been disclosed to you and any risks which may not have been disclosed to you but which may nevertheless impact our ability to meet our obligations to you.

### 10.    No Advisory Relationship

You acknowledge and agree that the purchase and sale of the Notes pursuant to this Investor Agreement is an arms-length transaction between you and PeerStreet. In connection with the purchase and sale of the Notes, PeerStreet is not acting as your agent or fiduciary. We assume no advisory or fiduciary responsibility in your favor in connection with the purchase and sale of the Notes. We have not provided you with any legal, accounting, regulatory or tax advice with respect to the Notes. You have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate.

### 11.    Limitations on Damages

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR SPECIAL, EXEMPLARY, CONSEQUENTIAL OR PUNITIVE DAMAGES, EVEN IF INFORMED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHERMORE, NEITHER PARTY MAKES ANY REPRESENTATION OR WARRANTY TO THE OTHER REGARDING THE EFFECT



THAT THIS AGREEMENT MAY HAVE UPON THE FOREIGN, FEDERAL, STATE OR LOCAL TAX LIABILITY OF THE OTHER.

## 12.    Further Assurances

The parties agree to execute and deliver such further documents and information as may be reasonably required in order to effectuate the purposes of this Investor Agreement.

## 13.    Entire Investor Agreement

In addition to the terms of this Investor Agreement, you are bound to the terms of each other agreement to which you agree as a user of the Platform, including, without limitation, each of the terms of the Terms of Use, the PPM, the Consent to Electronic Transactions and Disclosures, your Representations Regarding Use of the Platform, and any Series Note Listing (as defined in the PPM) for a series of Notes in which you invest.

## 14.    Miscellaneous

The terms of this Investor Agreement shall survive until the maturity of the Notes purchased by you. The parties acknowledge that there are no third party beneficiaries to this Investor Agreement. You may not assign, transfer, sublicense or otherwise delegate your rights or responsibilities under this Investor Agreement to any person without PeerStreet's prior written consent. Any such assignment, transfer, sublicense or delegation in violation of this section shall be null and void. This Investor Agreement shall be governed by the laws of the State of Delaware without regard to any principle of conflict of laws that would require or permit the application of the laws of any other jurisdiction. Any waiver of a breach of any provision of this Investor Agreement will not be a waiver of any subsequent breach. Failure or delay by either party to enforce any term or condition of this Investor Agreement will not constitute a waiver of such term or condition. If at any time subsequent to the date hereof, any of the provisions of this Investor Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality and unenforceability of such provision shall have no effect upon and shall not impair the enforceability of any other provisions of this Investor Agreement. The headings in this Investor Agreement are for reference purposes only and shall not affect the interpretation of this Investor Agreement in any way.

## 15.    Arbitration

a.    Either party to this Investor Agreement may, at its sole election, require that the sole and exclusive forum and remedy for resolution of a Claim (as defined below) be final and binding arbitration pursuant to this section 17 (the "Arbitration Provision"), unless you opt out as provided in section 17(b) below. As used in this



Arbitration Provision, "Claim" shall include any past, present, or future claim, dispute, or controversy involving you (or persons claiming through or connected with you), on the one hand, and PeerStreet (or persons claiming through or connected with PeerStreet ), on the other hand, relating to or arising out of this Investor Agreement, any Note, the Platform, and/or the activities or relationships that involve, lead to, or result from any of the foregoing, including (except to the extent provided otherwise in the last sentence of section 17(f) below) the validity or enforceability of this Arbitration Provision, any part thereof, or the entire Investor Agreement. Claims are subject to arbitration regardless of whether they arise from contract; tort (intentional or otherwise); a constitution, statute, common law, or principles of equity; or otherwise. Claims include matters arising as initial claims, counter-claims, cross-claims, third-party claims, or otherwise. The scope of this Arbitration Provision is to be given the broadest possible interpretation that is enforceable.

b.  You may opt out of this Arbitration Provision for all purposes by sending an arbitration opt out notice to PeerStreet that is received at the specified address within 30 days of the date of your electronic acceptance of the terms of this Investor Agreement. The opt out notice must clearly state that you are rejecting arbitration; identify the Investor Agreement to which it applies by date; provide your name, address, and social security number; and be signed by you. You may send the opt out notice in any manner you see fit as long as it is received at the specified address within the specified time. No other methods can be used to opt out of this Arbitration Provision. If the opt out notice is sent on your behalf by a third party, such third party must include evidence of his or her authority to submit the opt out notice on your behalf.

c.  The party initiating arbitration shall do so with the American Arbitration Association (the "AAA") or JAMS. The arbitration shall be conducted according to, and the location of the arbitration shall be determined in accordance with, the rules and policies of the administrator selected, except to the extent the rules conflict with this Arbitration Provision or any countervailing law. In the case of a conflict between the rules and policies of the administrator and this Arbitration Provision, this Arbitration Provision shall control, subject to countervailing law, unless all parties to the arbitration consent to have the rules and policies of the administrator apply.

d.  If we elect arbitration, we shall pay all the administrator's filing costs and administrative fees (other than hearing fees). If you elect arbitration, filing costs and administrative fees (other than hearing fees) shall be paid in accordance



with the rules of the administrator selected, or in accordance with countervailing law if contrary to the administrator's rules. We shall pay the administrator's hearing fees for one full day of arbitration hearings. Fees for hearings that exceed one day will be paid by the party requesting the hearing, unless the administrator's rules or applicable law require otherwise, or you request that we pay them and we agree to do so. Each party shall bear the expense of its own attorneys fees, except as otherwise provided by law. If a statute gives you the right to recover any of these fees, these statutory rights shall apply in the arbitration notwithstanding anything to the contrary herein.

e.  Within 30 days of a final award by the arbitrator, any party may appeal the award for reconsideration by a three-arbitrator panel selected according to the rules of the arbitrator administrator. In the event of such an appeal, any opposing party may cross-appeal within 30 days after notice of the appeal. The panel will reconsider de novo all aspects of the initial award that are appealed. Costs and conduct of any appeal shall be governed by this Arbitration Provision and the administrator's rules, in the same way as the initial arbitration proceeding. Any award by the individual arbitrator that is not subject to appeal, and any panel award on appeal, shall be final and binding, except for any appeal right under the Federal Arbitration Act (FAA), and may be entered as a judgment in any court of competent jurisdiction.

f.  We agree not to invoke our right to arbitrate an individual Claim you may bring in Small Claims Court or an equivalent court, if any, so long as the Claim is pending only in that court. NO ARBITRATION SHALL PROCEED ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS (INCLUDING AS PRIVATE ATTORNEY GENERAL ON BEHALF OF OTHERS), EVEN IF THE CLAIM OR CLAIMS THAT ARE THE SUBJECT OF THE ARBITRATION HAD PREVIOUSLY BEEN ASSERTED (OR COULD HAVE BEEN ASSERTED) IN A COURT AS CLASS REPRESENTATIVE, OR COLLECTIVE ACTIONS IN A COURT. Unless consented to in writing by all parties to the arbitration, no party to the arbitration may join, consolidate, or otherwise bring claims for or on behalf of two or more individuals or unrelated corporate entities in the same arbitration unless those persons are parties to a single transaction. Unless consented to in writing by all parties to the arbitration, an award in arbitration shall determine the rights and obligations of the named parties only, and only with respect to the claims in arbitration, and shall not (a) determine the rights, obligations, or interests of anyone other than a named party, or resolve any Claim of anyone other than a named party; nor (b) make an award for the benefit of, or against, anyone other than a named party. No administrator or arbitrator shall have the power or authority to waive, modify, or fail to enforce this section 17(f), and any attempt to do so, whether by rule, policy, arbitration decision or otherwise, shall be invalid and unenforceable. Any challenge to the



validity of this section 17(f) shall be determined exclusively by a court and not by the administrator or any arbitrator.

g.  This Arbitration Provision is made pursuant to a transaction involving interstate commerce and shall be governed by and enforceable under the FAA. The arbitrator will apply substantive law consistent with the FAA and applicable statutes of limitations. The arbitrator may award damages or other types of relief permitted by applicable substantive law, subject to the limitations set forth in this Arbitration Provision. The arbitrator will not be bound by judicial rules of procedure and evidence that would apply in a court. The arbitrator shall take steps to reasonably protect confidential information.

h.  This Arbitration Provision shall survive (i) suspension, termination, revocation, closure, or amendments to this Investor Agreement and the relationship of the parties; (ii) the bankruptcy or insolvency of any party or other person; and (iii) any transfer of any loan or Note or any other promissory note(s) which you owe, or any amounts owed on such loans or notes, to any other person or entity. If any portion of this Arbitration Provision other than section 17(f) is deemed invalid or unenforceable, the remaining portions of this Arbitration Provision shall nevertheless remain valid and in force. If an arbitration is brought on a class, representative, or collective basis, and the limitations on such proceedings in section 17(f) are finally adjudicated pursuant to the last sentence of section 17(f) to be unenforceable, then no arbitration shall be had. In no event shall any invalidation be deemed to authorize an arbitrator to determine Claims or make awards beyond those authorized in this Arbitration Provision.

THE PARTIES ACKNOWLEDGE THAT THEY HAVE A RIGHT TO LITIGATE CLAIMS THROUGH A COURT BEFORE A JUDGE, BUT WILL NOT HAVE THAT RIGHT IF ANY PARTY ELECTS ARBITRATION PURSUANT TO THIS ARBITRATION PROVISION. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THEIR RIGHTS TO LITIGATE SUCH CLAIMS IN A COURT UPON ELECTION OF ARBITRATION BY ANY PARTY.

**16.    Waiver of Jury Trial**

THE PARTIES HERETO WAIVE A TRIAL BY JURY IN ANY LITIGATION RELATING TO THIS AGREEMENT, THE CORRESPONDING MEMBER LOAN OR ANY OTHER AGREEMENTS RELATED THERETO.



**<u>EXHIBIT 19</u>**

LIMITED LIABILITY COMPANY AGREEMENT

OF

PEER STREET FUNDING LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "*Agreement*") of PEER STREET FUNDING LLC (the "*Company*") is entered into effective as of the 25th day of July, 2014 by Peer Street, Inc. as the member (the "*Member*").

The Member, in order to form a limited liability company pursuant to and in accordance with the Delaware Limited Company Act, as amended from time to time (6 Del.C. §18-101, et seq.) (the "*Act*"), hereby agrees with the Company as follows:

1.    <u>Name</u>.  The name of the Company shall be PEER STREET FUNDING LLC.

2.    <u>Member</u>.  The name and the business address of the Member is as follows:

| Name | Address |
| --- | --- |
| Peer Street, Inc. | 300 Manhattan Beach Blvd, Suite 204, Manhattan Beach, 90266 |

3.    <u>Registered Office/Registered Agent</u>.  The address of the registered office of the Company in the State of Delaware, and the name and address of the registered agent of the Company for service of process on the Company in the State of Delaware, is Incorporating Services, Ltd., 3500 South DuPont Highway, in the City of Dover, County of Kent, Delaware 19904.

4.    <u>Certificate</u>.  The Member and any person designated by the Member shall be an authorized person within the meaning of the Act to execute, deliver and file the Company's Certificate of Formation (the "*Certificate*"), and to execute, deliver and file any amendments or restatements of the Certificate or any certificate of cancellation of the Certificate.

5.    <u>Purpose/Powers</u>.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.  The Company shall have the power and authority to do any and all acts necessary or convenient to or in furtherance of said purposes, including all power and authority, statutory or otherwise, possessed by, or which may be conferred upon, limited liability companies under the laws of the State of Delaware.

6.    <u>Management</u>.  Management, operation and policy of the Company shall be vested exclusively in the Member, and there shall be no "manager" within the meaning of the Act.  The Member, acting through its duly authorized agents, is authorized and empowered on behalf and in the name of the Company to perform all acts and engage in all activities and transactions which it may in its sole discretion deem necessary or advisable in order to cause the Company to carry out its purpose and exercise the powers granted to the Company hereunder and under the Act.  The Member is an agent of the Company and the actions of the Member in such capacity shall be binding on the Company without liability to the Member.

7.      Agents.  The Member shall have the power to appoint officers and agents to act for the Company with such titles as the Member deems appropriate and to delegate to such officers and agents such of the powers as are held by the Member hereunder as the Member may determine.  The Member may, in its sole discretion, ratify any act previously taken by an officer or agent acting on behalf of the Company.  Except as provided in this Section 7, the Member shall be the sole person with the power to bind the Company. The individuals listed on Exhibit A hereto shall hold the officer positions as set forth opposite their name.

8.      Reliance by Third Parties.  Any person or entity dealing with the Company or the Member may rely upon a certificate signed by the Member as to: (a) the identity of the Member; (b) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Member or are in any other manner germane to the affairs of the Company; (c) the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or (d) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or the Member.

9.      Capital Contributions.  The Member shall contribute, as its initial capital contribution to the Company, cash in the amount set forth opposite the Member's name on Exhibit B hereto.  The Member may make, but shall not be required to make, additional capital contributions to the Company.

10.     Allocation of Profits and Losses.  The Company's profits and losses shall be allocated to the Member.

11.     Distributions.  Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.

12.     Dissolution.  The Company shall have perpetual existence unless it shall be dissolved and its affairs shall have been wound up upon (a) the written consent of the Member or (b) the entry of a decree of judicial dissolution under Section 18-802 of the Act.  The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate as provided in the Act.  None of the events described in Section 18-304 of the Act shall cause the Member to cease to be the Member of the Company.

13.     Assignments.  The Member may assign its limited liability company interest to any person, which person shall become a member of the Company upon the filing of the instrument of assignment with the records of the Company.

14.     Amendments.  This Agreement may be amended or restated from time to time by the Member.

15.     Liability of Member.  The Member shall not have any liability for any obligations or liabilities of the Company except as provided in the Act.

16.     Governing Law.  This Agreement shall be governed by, and construed under, the Laws of the State of Delaware, all rights and remedies being governed by said laws.

*[Remainder of the page intentionally left blank.]*

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the date and year first above written.

MEMBER:

Peer Street, Inc.

By: _____

Name:  Brewster Johnson

Title:  President

## EXHIBIT A

| Named Individual | Officer Title |
| --- | --- |
| Brewster Johnson | Executive Officer |

<u>EXHIBIT B</u>

| <u>Member</u> | <u>Initial Capital Contribution</u> |
|---|---|
| Peer Street, Inc. | $100.00 |

## **EXHIBIT 20**

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## PS INDEX PORTFOLIO, LLC

This Limited Liability Company Agreement (together with the schedules attached hereto, this "Agreement") of PS Index Portfolio, LLC, a Delaware limited liability company (the "Company"), is entered into as of August 2, 2022 by PS Funding, Inc., a Delaware corporation, as the sole equity member (the "Member"), and Christine Wilson, as the Special Member (as defined on Schedule A hereto). The capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A or Schedule B hereto, as applicable.

The Member, by execution of this Agreement, hereby forms the Company as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act"), and this Agreement, and the Member and Special Member agree as follows:

Section 1.    Name.

The name of the limited liability company formed hereby is PS Index Portfolio, LLC.

Section 2.    Principal Business Office.

The principal business office of the Company shall be located at 2121 Park Place, Suite 250, El Segundo, CA 90245 or such other location as may hereafter be determined by the Member.

Section 3.    Registered Office.

The address of the registered office of the Company in the State of Delaware is 3500 S. Dupont Hwy., Dover, County of Kent, Delaware 19901.

Section 4.    Registered Agent.

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware are Incorporating Services, Ltd., 3500 S. Dupont Hwy., Dover, County of Kent, Delaware 19901.

Section 5.    Members.

(a)    The mailing address of the Member is set forth on Schedule C attached hereto.  The Member was admitted to the Company as a member of the Company upon its execution of a counterpart signature page to this Agreement.

(b)    Subject to Section 9(d) and Schedule B, the Member may act by written consent.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

(c)     The Special Member shall, without any action of any Person, automatically be admitted to the Company as a Special Member upon its executing a counterpart to this Agreement. Upon the occurrence of any event that causes the Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its limited-liability-company interest in the Company and the admission of the transferee pursuant to Sections 21 and 23, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to Sections 22 and 23), the Company shall continue without dissolution.  No Special Member may resign from the Company or transfer its rights as Special Member unless a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement.  The Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Special Member. The Special Member shall be a member of the Company that has no direct interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets.  Pursuant to Section 18-301 of the Act, the Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited-liability-company interest in the Company.  The Special Member, in its capacity as Special Member, may not bind the Company, except as expressly provided for herein.  Except as required by any mandatory provision of the Act or any section of this Agreement, the Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company.

Section 6.     Formation.

The Certificate of Formation, the formation of the Company as a limited liability company under the Act, and all actions taken by the person who executed and filed the Certificate of Formation are hereby adopted and ratified.  The affairs of the Company and the conduct of its business shall be governed by the terms and subject to the conditions set forth in this Agreement, as amended from time to time.  The Member or an Officer is hereby authorized and directed to file any necessary amendments to the Certificate of Formation of the Company in the office of the Secretary of State of the State of Delaware and such other documents as may be required or appropriate under the Act or the laws of any other jurisdiction in which the Company may conduct business or own property.

Section 7.     Purpose.

(a)     Subject to Section 9(d) and Schedule B, the purpose to be conducted or promoted by the Company is to engage in the following activities:

(i)     to acquire and service real-estate loans;

(ii)     to incur Investor Obligations;

(iii)     to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient, or advisable for the accomplishment of the above-mentioned purposes.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

(b)     The Member on behalf of the Company is hereby authorized to execute and deliver, the Transaction Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto, all without any further act, vote or approval of any other Person notwithstanding any other provision of this Agreement.  The foregoing authorization shall not be deemed a restriction on the powers of the Member to enter into other agreements on behalf of the Company.

Section 8.     Powers.

Subject to Section 9(d) and Schedule B, the Company, and the Member on behalf of the Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

Section 9.     Management.

(a)     Management. Subject to Section 9(d) and Schedule B, the business and affairs of the Company shall be managed by or under the direction of the Member.

(b)     Powers.  Subject to Section 9(d) and Schedule B, the Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise.  Subject to Sections 7 and 9, the Member has the authority to bind the Company.

(c)     Member as Agent.  To the extent of its powers set forth in this Agreement and subject to Section 9(d) and Schedule B, the Member is an agent of the Company for the purpose of the Company's business, and the actions of the Member taken in accordance with such powers set forth in this Agreement shall bind the Company.

(d)     Limitations on the Company's Activities.

(i)     This Section 9(d) is being adopted in order to comply with certain provisions set forth on Schedule B, attached hereto.

(ii)     The Member shall not, so long as any Investor Obligation is outstanding, amend, alter, change or repeal Sections 5(c), 7, 8, 9, 10, 16, 20, 21, 22, 23, 24, 25, 26 or 31 or Schedule A or Schedule B of this Agreement without the written consent of the Special Member.  Subject to this Section 9(d), the Member reserves the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 31.

(iii)     In order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Agreement, the Company shall conduct its affairs in accordance with the provisions set forth on Schedule B attached hereto and incorporated herein by this reference.  From and after the date that the Investor Obligations are no longer outstanding, the covenants set forth on Schedule B shall no longer be operative and shall be deemed to be automatically deleted without the necessity of any further documentation.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

(iv)     The Company shall not be permitted, without the prior, written, unanimous consent of the Special Member(s), to file for protection under bankruptcy laws, make an assignment for the benefit of creditors, appoint a receiver or trustee over its property, or file a petition under any bankruptcy. Any attempt to do the foregoing without the requisite Special Member(s) consent shall be deemed void ab initio.

Section 10.     <u>Net Asset Value Calculation</u>.  The Member, on behalf of the Company will calculate the net asset value of the Company immediately prior to (i) the incurrence or issuance of any Investor Obligation, or (ii) the date of redemption of any Investor Obligation.  The net asset value of the Company will be determined by the Member, on behalf of the Company, utilizing a range of factors including, among other things, valuation advice provided by a nationally-recognized third-party valuation firm (such advice being only one factor considered in the determination of net asset value); provided that, the ultimate determination as to net asset value will be determined by the Member on behalf of the Company in its sole discretion. The Member, on behalf of the Company, may, but shall not be required to, engage such valuation firm or one or more other third parties to perform such other financial, accounting, administrative or other services on behalf of the Company as the Member may determine in its sole discretion. The Member may, at any time in its sole discretion, replace such valuation firm or any other third party with which the Company has contracted for services.

Section 11.     <u>Intentionally Omitted</u>.

Section 12.     <u>Limited Liability</u>.

Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and neither the Member nor the Special Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Special Member of the Company.

Section 13.     <u>Capital Contributions</u>.

The Member has made a capital contribution to the Company and owns the percentage interest listed on <u>Schedule C</u> attached hereto.  In accordance with <u>Section 5(c)</u>, the Special Member shall not be required to make any capital contributions to the Company.

Section 14.     <u>Additional Contributions</u>.

The Member is not required to make any additional capital contribution to the Company. However, the Member may make additional capital contributions to the Company at any time upon the written consent of such Member.  To the extent that the Member makes an additional capital contribution to the Company, the Member shall revise <u>Schedule C</u> of this Agreement. The provisions of this Agreement, including this <u>Section 14</u>, are intended to benefit only the Member and the Special Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (other than a Covered Person), and the Member and the Special Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

Section 15.    <u>Allocation of Profits and Losses</u>.

The Company's profits and losses shall be allocated to the Member.

Section 16.    <u>Distributions</u>.

Distributions shall be made to the Member at the times and in the aggregate amounts determined by the Member.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Member on account of its interest in the Company if such distribution would violate the Act or any other applicable law or any of the Transaction Documents.

Section 17.    <u>Books and Records</u>.

The Member shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business.  The Member and its duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours.  The Company's books of account shall be kept using the method of accounting determined by the Member.  The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Member.

Section 18.    <u>Intentionally Omitted</u>.

Section 19.    <u>Other Business</u>.

Notwithstanding any duty otherwise existing at law or in equity, the Member, the Special Member and any Affiliate of the Member or the Special Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 20.    <u>Exculpation and Indemnification</u>.

(a)    To the fullest extent permitted by applicable law, neither the Member nor the Special Member nor any officer, director, employee, agent or Affiliate of the foregoing (collectively, the "<u>Covered Persons</u>") shall be liable to the Company or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this <u>Section 20</u> by the Company shall be provided out of and to the extent of Company assets only, and the Member and the Special Member shall not have personal liability on account thereof.

(c)    To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this <u>Section 20</u>.

(d)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)    The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(f)    The foregoing provisions of this <u>Section 20</u> shall survive any termination of this Agreement.

Section 21.    <u>Assignments</u>.

The Member may assign in whole or in part its limited-liability-company interest in the Company.  Subject to <u>Section 23</u>, the transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement.  If the Member transfers all of its limited-liability-company interest in the Company pursuant to this <u>Section 21</u>, such admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company.  Notwithstanding anything in this Agreement to the contrary, any successor to the Member by merger or consolidation in compliance with the Transaction Documents shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

Section 22.    <u>Resignation</u>.

So long as any Investor Obligation is outstanding, the Member may not resign, except as permitted under the Transaction Documents.  If the Member is permitted to resign pursuant to this <u>Section 22</u>, an additional member of the Company shall be admitted to the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

Section 23.    <u>Admission of Additional Members</u>.

One or more additional Members of the Company may be admitted to the Company with the written consent of the Member.

Section 24.    <u>Dissolution</u>.

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following:  (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.  Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company or that causes the Member to cease to be a member of the Company (other than upon continuation of the Company without dissolution upon (i) an assignment by the Member of all of its limited-liability-company interest in the Company and the admission of the transferee pursuant to <u>Sections 21</u> and <u>23</u>, or (ii) the resignation of the Member and the admission of an additional member of the Company pursuant to <u>Sections 22</u> and <u>23</u>), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of such member in the Company.

(b)    The Bankruptcy of the Member or a Special Member shall not cause the Member or Special Member, respectively, to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution. The foregoing notwithstanding, the Bankruptcy of the Member will result in the immediate surrender of the Member's management authority over the affairs of the Company, which would then be assumed by the Special Members or their designee. In such an event, the Special Members shall manage the Company in the manner that they deem most appropriate, in their good faith discretion, while prioritizing the orderly repayment of the then-outstanding Investor Obligations, if any.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

Section 25.    <u>Waiver; Nature of Interest</u>.

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Member, and the Special Member hereby irrevocably waives any right or power that such Person might have to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company.  The Member shall not have any interest in any specific assets of the Company, and the Member shall not have the status of a creditor with respect to any distribution pursuant to <u>Section 16</u> hereof.  The interest of the Member in the Company is personal property.

Section 26.    <u>Benefits of Agreement; No Third-Party Rights</u>.

None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member or a Special Member.  Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Covered Persons).

Section 27.    <u>Severability of Provisions</u>.

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

Section 28.    <u>Entire Agreement</u>.

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

Section 29.    <u>Binding Agreement</u>.

Notwithstanding any other provision of this Agreement, the Member agrees that this Agreement, including, without limitation, <u>Sections 7</u>, <u>8</u>, <u>9</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>24</u>, <u>26</u>, <u>29</u> and <u>31</u>, constitutes a legal, valid and binding agreement of the Member.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

Section 30.    <u>Governing Law</u>.

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict-of-laws principles), all rights and remedies being governed by said laws.

Section 31.    <u>Amendments</u>.

Subject to <u>Section 9(d)</u> and <u>Schedule B</u>, this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Member.  Notwithstanding anything to the contrary in this Agreement, so long as any Investor Obligation is outstanding, this Agreement may not be modified, altered, supplemented or amended except: (i) in a manner not inconsistent with <u>Section 9(d)</u> and <u>Schedule B,</u> (ii) to cure any ambiguity or (ii) to convert or supplement any provision in a manner consistent with the intent of this Agreement and the Transaction Documents.

Section 32.    <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

Section 33.    <u>Notice</u>.

Any notice required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in <u>Section 2</u>, (b) in the case of the Member, to the Member at its address as listed on <u>Schedule C</u> attached hereto and (c) in the case of either of the foregoing, at such other address as may be designated by written notice to the other party.

Section 34.    <u>Intentionally Omitted</u>.

Section 35.    <u>Intentionally Omitted</u>.

Section 36.    <u>Effectiveness</u>.

Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate of Formation with the Office of the Delaware Secretary of State on July 15, 2022.

[SIGNATURE PAGE FOLLOWS]

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first set forth above.

**MEMBER**:

PS Funding, Inc., a Delaware corporation

By: *Ellen Coleman*
Name: Ellen Coleman
Title: Treasurer

**SPECIAL MEMBER**:

By: _____
    Christine Wilson

S-1

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

## SCHEDULE A

A.    <u>Definitions</u>

When used in this Agreement, the following terms not otherwise defined herein have the following meanings.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"<u>Agreement</u>" means this Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"<u>Bankruptcy</u>" means, with respect to any Person, (A) if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or (vi) seeks or consents to the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (B) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"<u>Certificate of Formation</u>" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on July 15, 2022, as amended or amended and restated from time to time.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings.  Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"<u>Covered Persons</u>" has the meaning set forth in <u>Section 20(a)</u>.

"<u>Investor Obligations</u>" means the contractual indebtedness and obligations of the Company to investors that purchase notes or similar obligations of the Company under or in connection with the online investment platform <u>www.peerstreet.com</u>, including any applicable

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

terms of use, notes, placement memoranda, series note listing, investor agreement, note purchase agreement and related documents contemplated thereby or delivered in connection therewith.

"Member" means PS Funding, Inc., a Delaware corporation, as the initial member of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include the Special Member.

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

"Special Member" means, Christine Wilson, and includes its successors duly appointed, and upon such successor's admission to the Company as a special member of the Company in accordance with Section 5(c) of this Agreement.  The Special Member shall only have the rights and duties expressly set forth in this Agreement.

"Transaction Documents" means the agreements and other documents creating or governing Investor Obligations, and such other agreements and documents as are necessary or appropriate to allow the Company to perform the Investor Obligations.

B.      Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."  The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision.  The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement.  All Section, paragraph, clause, or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

## SCHEDULE B

### SINGLE PURPOSE PROVISIONS

(a)     Company has not engaged, does not engage, and will not engage in any business other than the purpose specified in Section 7 of this Agreement and will conduct and operate its business as presently conducted and operated.

(b)     Company has not entered and is not a party to and will not enter into or be a party to any contract or agreement with any Affiliate of Company, any constituent party of Company or any Affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any such party, or unless otherwise permitted by the Transaction Documents.

(c)     Company has not incurred and will not incur any indebtedness other than (i) the Investor Obligations and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not exceeding ten percent (10%) of the original principal amount of the loan at any one time; provided that any indebtedness incurred pursuant to subclause (ii) shall (A) be not more than sixty (60) days past due, (B) not be evidenced by a promissory note or other instrument and shall be unsecured, and (C) be incurred in the ordinary course of business (the indebtedness described in the foregoing clauses (i) and (ii) is referred to herein, collectively, as **"Permitted Indebtedness").**

(d)     Company has not made and will not make any loans or advances to any Person other than as expressly permitted pursuant to the Transaction Documents, has not made and will not make any loans or advances whatsoever to any Affiliate or constituent party, and has not acquired and shall not acquire obligations or securities of its Affiliates, other than mortgage payment dependent notes or substantially similar products.

(e)     Company is and intends to remain solvent, Company has paid and will, to the extent that it has sufficient cash to do so, pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) as the same shall become due, and Company has not allowed and will not allow any Affiliate to pay its debts and liabilities on behalf of Company; provided, however, that the foregoing shall not require any Person, including any direct or indirect member, partner or shareholder in Company, to make any capital contributions to Company.

(f)     Neither Company nor any constituent party has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Company.

(g)     Company has not assumed or guaranteed or become obligated for the debts of any other Person and has not held itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, and Company will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

(h)     Except in connection with the Investor Obligations, Company has not pledged and will not pledge its assets for the benefit of any other Person.

(i)     Company will consider the interests of Company's creditors in connection with all limited liability company or limited partnership actions.

(j)     Except as provided in the Transaction Documents, Company has not had and will not have any of its obligations guaranteed by any Affiliate.

SCHEDULE B
-2-

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

# SCHEDULE C

## Member

| Name | Mailing Address | Limited Liability Company Interest |
|------|-----------------|------------------------------------|
| PS Funding, Inc., a Delaware corporation | 2121 Park Place, Suite 250, El Segundo, CA 90245 | 100% |

Doc ID: 0a56c663f75c578c848272d629aeeacbe058d508

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | 02a. PS Index Portfolio - LLC Agreement |
| **FILE NAME** | 02a. PS Index Por...LC Agreement .pdf |
| **DOCUMENT ID** | 0a56c663f75c578c848272d629aeeacbe058d508 |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Signed |

Document History

**SENT**
**08 / 04 / 2022**
09:19:24 UTC-7

Sent for signature to Ellen Coleman
(ecoleman@peerstreet.com) from tdringenberg@peerstreet.com
IP: 24.205.88.83

**VIEWED**
**08 / 04 / 2022**
12:28:38 UTC-7

Viewed by Ellen Coleman (ecoleman@peerstreet.com)
IP: 70.187.225.168

**SIGNED**
**08 / 04 / 2022**
12:29:05 UTC-7

Signed by Ellen Coleman (ecoleman@peerstreet.com)
IP: 70.187.225.168

**COMPLETED**
**08 / 04 / 2022**
12:29:05 UTC-7

The document has been completed.