## EXHIBIT 21

**FOR OFFERINGS OF REAL ESTATE SECURITIES THROUGH**

# PeerStreet Platform's Portfolio Product

**PDN SUPPLEMENT:**
**PAYMENT-DEPENDENT PROMISSORY NOTES**

---

**Please note the following:**

*Except as otherwise defined, all capitalized terms used herein are defined in the section entitled "About this PDN Supplement" beginning on page 1 of the PDN Supplement.*

- This PDN Supplement: Payment-Dependent Promissory Notes ("**PDN Supplement**") to the PPM covers payment-dependent promissory notes ("**Notes**") that are offered by PS Portfolio – ST1, LLC, a Delaware limited liability company (the "**Company**"), as part of PeerStreet's Portfolio product initiative ("**Portfolio**").

- The Company reserves the right to withdraw the offering under this PDN Supplement in whole or in part and to accept or reject any investment in whole or in part at its discretion.

- The Notes will be offered for sale, from time to time, on the Platform through the Portfolio Dashboard.

- Before investing in Notes offered under this PDN Supplement, you should carefully review this PDN Supplement and the following materials provided to you by the Company:

  o The PPM;

  o The Portfolio Dashboard;

  o The Form Instrument; and

  o The Investor Agreement (the foregoing, collectively, the "**Offering Materials**").

**THIS SUMMARY OF THE OFFERING IS A SUMMARY AND DOES NOT COVER ALL THE INFORMATION YOU NEED TO KNOW BEFORE YOU INVEST. YOU ARE RESPONSIBLE FOR REVIEWING AND UNDERSTANDING ALL OF THE OTHER INFORMATION RELEVANT TO YOUR INVESTMENT IN NOTES PRIOR TO INVESTING.**

**Company Business Overview; Summary of Terms**:

**Company Business Overview**

Through the Portfolio Dashboard, each Investor will purchase payment-dependent promissory notes that entitle such Investor to receive, in respect of the Note owned by such Investor (i) on a monthly basis in arrears, its Pro Rata Interest Payment (as defined below), and (ii) upon redemption of the Note in accordance with its terms, a payment equal to the Redemption Price (as defined below) for such Note.  In respect of all non-interest proceeds of the Underlying Loans and the Underlying Participations, including, without limitation, any principal payments on the Underlying Loans, proceeds from the sale of Underlying Loans or Underlying Participations, or proceeds from the sale of property corresponding to an Underlying Loan or Underlying Participation, the Company will, in its sole discretion, either (A) retain and hold such proceeds in the form of cash or cash equivalents, (B) use such proceeds to acquire new Underlying Loans or Underlying Participations, or (C) use such proceeds to make payments on outstanding Notes.

The amount of the interest payments payable to Investors in respect of the Notes each month will be wholly dependent on the amount of the interest payments actually received by the Company on the Underlying Loans and Underlying Participations.  If in any month the Underlying Loans and Underlying Participations do not generate any interest payments, or generate interest payments in amounts lower than anticipated, interest payments to Investors in the Notes will be correspondingly reduced.

Each Underlying Loan will be a mortgage loan, originated or purchased by PSFI and then sold by PSFI to the Company, which satisfies the Credit Guidelines set forth on Schedule I to this PDN Supplement (the "**Credit Guidelines**").  Each Underlying Participation will be a participation interest in a mortgage loan owned by PSFI or an affiliate thereof, which mortgage loan satisfies the Credit Guidelines.  The Credit Guidelines provide certain minimum criteria that each Underlying Loan or a mortgage loan corresponding to an Underlying Participation must satisfy for the Underlying Loan or Underlying Participation, as applicable, to be eligible for purchase by the Company.  **In addition to the Credit Guidelines, the Company may, from time to time in its sole discretion, require mortgage loans to satisfy such additional conditions or criteria ("Additional Conditions") to be eligible for purchase by the Company as it deems appropriate to respond to market conditions and to manage its portfolio. The Company may change or remove any Additional Condition at any time in its sole discretion, with or without notice to Investors.  The Company may also, in its sole discretion, disclose any Additional Condition to one or more Investors in the Notes described in this PDN Supplement or to investors in other investment opportunities sponsored by one or more affiliates of the Company that rely on the same or similar Credit Guidelines; as a result, from time to time Investors in the Notes may not have access to information regarding applicable Additional Conditions that is available to those other Investors.**

PSFI sells mortgage loans to the Company, to various affiliates of the Company, and to various third parties. In cases where a mortgage loan is allocated to an affiliate of PSFI, that purchaser may buy a whole or partial participation interest in the applicable mortgage loan rather than directly purchasing the mortgage loan  Any whole participation provides all economic and foreclosure rights associated with the applicable mortgage loan. Partial participations provide a pro-rata share of economics and may also provide the holder foreclosure rights.

PSFI allocates loans among prospective purchasers as follows: each new loan originated or acquired by PSFI is allocated pursuant to PeerStreet's allocation process whereby each loan will be allocated to the prospective purchaser that is next in line to purchase a loan (i.e., the purchaser that was allocated a loan or participation interest least recently), whose credit guidelines allow for the purchase of the loan. In cases where the next eligible purchasers include the Company and another affiliate of PSFI, the Company may purchase a 51% participation, or greater, in the applicable mortgage loan, and the other PSFI affiliate(s) will purchase the remaining participation interest in the applicable mortgage loan.

Notwithstanding the foregoing, the Company (i) may decline to purchase any participation interest allocated to it; or (ii) may purchase (a) the loan as a whole loan (not as a participation interest); (b) a 100% participation interest in the loan; or (c) less than a majority participation interest in the loan for purposes of compliance with an exemption from registration under the Investment Company Act, including, but not limited to, conducting its operations so that composition of its assets will not require it to register as an investment company under the Investment Company Act, as described in the Risk Factors set forth below.

For the avoidance of doubt, PSFI's customary allocation procedures apply to both third-party purchasers of loans or participation interests and to the Company and its affiliates. As a result of this system, it is possible that the Company will not have access to direct or indirect interests in mortgage loans purchased by mortgage loan buyers with more stringent criteria.

Prospective Investors who wish to purchase Notes must have or establish an account on the Platform and, for new Platform users, verify that they satisfy the requirements to purchase Notes. After completing the required verification and agreeing to the terms of the Offering Materials, prospective Investors may purchase Notes through the Platform.

**Summary of Terms**

This summary provides an overview of the key terms of the Notes and highlights selected information contained elsewhere in or incorporated by reference into this PDN Supplement. It does not contain all of the information that you should consider before making an investment decision. For a more complete understanding of this offering of Notes, you should read this PDN Supplement and the other Offering Materials in their entirety (including the risk factors described in the "Risk Factors" section of this PDN Supplement and the "General Risk Factors" section of the PPM). All summaries in this PDN Supplement are qualified in their entirety by reference to the other Offering Materials. Please refer to "Where to Find Additional Information" in this PDN Supplement for information on how to contact PeerStreet for additional information.

| **The Company** | The issuer of the Notes will be PS Portfolio – ST1, LLC, a Delaware limited liability company (the "**Company**").  The Company will be managed by its sole member, PS Funding, Inc. ("**PSFI**" and, in such capacity, the "**Member**"), an affiliate of the Company, or another of the Company's affiliates.  Investors in the Notes will have no right to control or direct the management of the Company or of the Underlying Loans and Underlying Participations. |
|---|---|
| **Notes; Maturity; Issuance of New Notes** | The Notes are unsecured, special, limited obligations of the Company.<br><br>Investors will be permitted to purchase Notes only on a Closing Date, upon at least five business days' (or such shorter period as the Company may agree) prior written notice to the Company. "**Closing Date**" means the first business day of any calendar month.  The principal amount of the Note issued to Investor in respect of their investment will be equal to the quotient (rounded to the nearest dollar) obtained by dividing (a) the amount of such investment (the "**Investment Amount**") by (b) a fraction (the "**Note Multiple**"), the numerator of which is the Net Asset Value of the Company and the denominator of which is the aggregate outstanding principal amount of all Investors' Notes, taken as a whole. There will be a minimum Investment Amount of $1,000.<br><br>The initial term of each Note will expire on the first Redemption Date that is at least ten (10) years from the initial issue date of such Note (the "**Initial Maturity Date**"; and any subsequent Redemption Date upon which the Note will expire by extension of its term as described below, a "**Subsequent Maturity Date**"; and the Initial Maturity Date, together with each Subsequent Maturity Date, a "**Maturity Date**"). Upon the Initial Maturity Date, the Company will extend the term of the Note in accordance with its terms for an additional ten (10) year period, and the Company will not make any payment to such Investor except for any payments of interest to which such Investor is entitled, unless such Investor notifies the Company in writing at least 60 days in advance of the Initial Maturity Date of the Note that such Investor does not want the term of the Note to be extended.  If the Investor timely delivers such notice with respect to the Initial Maturity Date, or for any Subsequent Maturity Date, the Company will pay to such Investor on the applicable Maturity Date an amount equal to the Redemption Price of the Note for such Maturity Date. For the avoidance of doubt, the Maturity Date of a Note will always coincide with a Redemption Date.<br><br>Notes will be issued solely in electronic form, and Investors will not receive a physical instrument. Investors will receive a single Note, |

|  | which will be issued in electronic form on the Platform as soon as practicable following a given investment. If an Investor elects to increase the outstanding principal balance of their investment in a Note, or to partially redeem a Note, the Company will amend the electronic Note accordingly. The Company and its affiliates will treat the Investor to whom a Note was issued as the owner of such Note for the purpose of receiving payments and for all other purposes unless such Note was validly transferred to a third party.<br><br>The Notes, and Investors' rights in the Notes, are at all times subject to the Investor Agreement. In the event of conflict between the terms of the Investor Agreement and this PDN Supplement, the terms of this PDN Supplement shall govern. |
|---|---|
| **First Closing** | Notwithstanding anything to the contrary herein or in the other Offering Materials, if the First Closing Date is not the first business day of a calendar month, the first Closing Date may be held on any business day (the "**First Closing Date**"). The Net Asset Value of the Company as of the First Closing Date shall be equal to the principal amount of all Investors' Notes, taken as a whole, as of such First Closing Date. In the event that the First Closing Date is not the first business day of a calendar month, then (i) the first Interest Payment Date will be the fifth business day of the month following the first full calendar month after the First Closing Date, in respect of the period commencing on the First Closing Date through and including the last day of the first full calendar month after the Closing Date, and (ii) the next Closing Date shall not occur until the first business day of the month following the first full calendar month after the First Closing Date. |
| **Redemptions** | Each Investor may redeem all or any part of any outstanding Note that it owns on the first business day of any calendar quarter during the term of the Note (each such date, a "**Redemption Date**"), subject to the conditions and limitations below, upon at least 60 days' prior written notice to the Company (a "**Redemption Notice**"); provided, that the Company may, in its sole discretion, enter into letter agreements with one or more Investor(s) to increase the notice period set forth above for delivery of Redemption Notices by such Investor(s).<br><br>Upon redemption of all or any part of a Note, the redeeming Investor will be entitled to receive an amount (such amount, the "**Redemption Price**") equal to the product obtained by multiplying (a) the portion of the principal amount of the Note being redeemed by (b) a fraction, the numerator of which is the Net Asset Value of the Company and the |

|  | denominator of which is the aggregate outstanding principal amount of all Investors' Notes, taken as a whole.<br><br>Any partial redemption shall be in increments of $1.00 (by principal amount) and shall be applied on a first-in, first-out basis against investments in the Note.  The Company may in the future enable Investors to specify application of any partial redemption, but that feature does not yet exist and may never be developed.<br><br>**Payment of the Redemption Price to the redeeming Investor shall be in full satisfaction of any of the Company's payment obligations in respect of the portion of the principal amount of the Note being redeemed, and there can be no guarantee that the Redemption Price will be equal to or greater than the portion of the original principal amount of such Note being redeemed.** |
|---|---|
| **Cut-Backs** | If the Company receives redemption requests in respect of any Redemption Date which exceed an amount equal to ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date, the Company may, in its sole discretion, reduce each such request for redemption pro rata so that the aggregate amount redeemed in respect of such Redemption Date does not exceed ten percent (10%) of the Net Asset Value.  Any unfulfilled or reduced request will be satisfied at the next Redemption Date (subject to further deferral if the deferred requests themselves exceed ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date) with priority over any subsequent Redemption Notices. |
| **Compulsory Redemptions** | The Company may, in its sole discretion, require an Investor to redeem all or any part of its Note (a "**Compulsory Redemption**") for any reason or no reason at all, without any notice period, including, without limitation, in the event that (i) such Investor requests a partial redemption of its Note or (ii) the Company believes that the continued investment of such Investor would result in the Company not meeting a regulatory exemption. |
| **Suspension of Redemptions** | The Company may, in its sole discretion, limit or suspend the right of Investors to submit Redemption Notices and/or make redemptions in circumstances where the Company's investments cannot be liquidated in an orderly manner or reasonably valued, including, without limitation, in the following circumstances (each, a "**Suspension Event**"): (i) in the event that the Company determines that the disposition of Underlying Loans or Underlying Participations necessary to give effect to the requested redemptions would or may |

result in (x) the Company realizing less than the fair value of the disposed investments (such fair value determined in the sole discretion of the Company), (y) the altering of the risk profile of the Company or (z) a significant decline in the prices or values of the Underlying Loans or Underlying Participations retained by the Company following such dispositions; (ii) during the existence of any state of affairs as a result of which, in the opinion of the Company, disposal of the Underlying Loans or Underlying Participations would not be reasonably practicable or might prejudice the non-redeeming Investors; (iii) if the Company has adopted a resolution calling for its winding-up and sale of assets; or (iv) as the Company may determine in its sole discretion.

In the event of any such suspension, any unfulfilled Redemption Notices will be satisfied at the next Redemption Date after such suspension has been lifted in priority to any subsequent Redemption Notices.

| **Calculation of Net Asset Value** | The Company will determine its Net Asset Value on the last business day of each month (each, a "**NAV Determination Date**").<br><br>For each NAV Determination Date, the Company will obtain advisory services from a nationally recognized third-party valuation firm with respect to a range (the "**Valuation Range**") of fair values of the Company's assets as of no more than five (5) business days prior to such NAV Determination Date (the "**Cut-Off Date**"). The "**Net Asset Value**" of the Company for any NAV Determination Date will be the weighted average (as calculated by the Company) of the Valuation Range for such NAV Determination Date and will be used to calculate the Note Multiple and the Redemption Price (as applicable) for the immediately succeeding Closing Date and Redemption Date (as applicable).<br><br>In the event that the Company consummates any purchase or disposition of any Underlying Loans or Underlying Participations during the period from the Cut-Off Date through the NAV Determination Date which was not reflected in the determination of the Valuation Range, the Company will adjust the Net Asset Value as of the applicable NAV Determination Date by the actual purchase or sale price, as applicable of any such Underlying Loans or Underlying Participations; provided that the Company will not purchase or sell an Underlying Loan or Underlying Participation during this period if it has a reasonable belief that the cost of such Underlying Loan or Underlying Participation does not accurately reflect its value. |
|---|---|

|  | No valuation firm will be liable to the Company or any of its affiliates, to any Investor, or to any third party in respect of the Valuation Range or the determination of Net Asset Value by the Company. The Company is solely responsible for the use of any valuation by such valuation firm. The valuation firm will perform certain financial analyses and, in so doing, will rely, without independent verification, on certain information provided to it by the Company or available from public sources as being accurate and complete in all material respects. The services provided by the valuation firm will not involve an audit, appraisal, review, compilation or any other form of examination or attestation under generally accepted auditing standards or otherwise.<br><br>The Company may declare a suspension of the determination of its Net Asset Value upon the occurrence of a Suspension Event. |
|---|---|
| **Investor Qualifications** | Investors in Notes (i) must be U.S. persons as defined in Rule 902(k) of Regulation S under the Securities Act, and (ii) must be "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act. |
| **Use of Proceeds** | The Company will use the net proceeds of the sale of Notes to facilitate the purchase by the Company of Underlying Loans and Underlying Participations from PSFI; provided that, in its sole discretion, the Company may retain and hold such proceeds in the form of cash or cash equivalents pending application for the purchase of Underlying Loans or Underlying Participation and general corporate purposes, (but excluding the payment of the Redemption Price payable to another Investor). PSFI will utilize the funds from the sale of the Underlying Loans and Underlying Participations to the Company, net of any applicable fees and costs, to finance its origination or purchase of additional Underlying Loans and mortgage loans corresponding to the Underlying Participations.<br><br>At any time, the Company's assets will consist of (i) the Underlying Loans, the Underlying Participations and the proceeds and products thereof (including any Underlying Property acquired in connection with any foreclosure or deed in lieu of foreclosure), and (ii) cash or cash equivalents owned by the Company. |
| **Interest Rate** | In respect of each Note, Investors will be entitled to receive payments of interest in an amount (the "**Pro Rata Interest Payment**") equal to such Investor's pro rata portion of any interest payments actually received by the Company in respect of the Underlying Loans and Underlying Participations during the preceding month, less Standard Fees and Issuer Expense reimbursements. For purposes of this |

|  | paragraph, each Investor's "pro rata portion" will be determined based on the proportion of the outstanding principal amount of such Investor's Note relative to the aggregate outstanding principal amount of all Investors' Notes, taken as a whole.

**The Company has no obligation to make any interest payments on the Notes, unless, and only to the extent that, the Company has received interest payments from Borrowers in respect of the Underlying Loans and mortgage loans corresponding to the Underlying Participations in the aggregate in excess of Standard Fees and unreimbursed Issuer Expenses actually incurred by the Company. Neither the Company, the Member, PSFI, nor any of their respective affiliates guarantees that Investors will receive any interest payments on any Note, or that the Company (or PSFI on behalf of the Company) will collect any amounts payable on any Underlying Loan or Underlying Participation.**

Interest on the Notes will be payable monthly in arrears, on the 5th business day of each month (each such date, an "**Interest Payment Date**"); provided, however, that if any Interest Payment Date falls on a day that banks in the State of California are not open for business, the Interest Payment Date shall be the next day on which banks in the State of California are open for business.

The applicable interest rate for each Underlying Loan and Underlying Participation (based on the interest rate for the associated mortgage loan) will be specifically identified on the Monthly Portfolio Report provided to Investors. |
| **Standard Fee** | The Company will pay to PSFI a portion of the proceeds generated by the Underlying Loans, Underlying Participations or corresponding Underlying Properties as a fee for its efforts servicing and providing other services with respect to the Underlying Loans, the mortgage loans corresponding to the Underlying Participations, and the Notes (the "**Standard Fee**"). The Standard Fee applicable to an Underlying Loan or Underlying Participation may be collected in installments from interest payments and principal repayments or, in the event of default, upon the sale of the corresponding Underlying Property or other liquidity event. The Standard Fee is earned on a daily basis and is payable prior to any disbursements being made to Investors. The Standard Fee applicable to an Underlying Loan or Underlying Participation is fixed at the time of purchase of such Underlying Loan by the Company and will not exceed 2.5% (annualized) of the Underlying Loan amount. |

| | |
|---|---|
| | Some factors affecting the size of the Standard Fee include, without limitation, liquidity premiums, Borrower attributes (such as credit score and experience), loan-to-value ratio and the state in which the corresponding Underlying Property is located. The applicable Standard Fee for each Underlying Loan and Underlying Participation will be specifically identified on the Monthly Portfolio Report provided to Investors.<br><br>For the avoidance of doubt, the Standard Fee will remain payable during any period in which the right of the Investors to make redemptions has been suspended. |
| **Issuer Expenses** | The Company will be entitled to reimbursement from any proceeds of the Underlying Loans and Underlying Participations for all fees, costs and expenses actually incurred by the Company or any of its affiliates in connection with the management of the Company's assets and its operations, except for the Standard Fee. |
| **Underlying Loans; Underlying Participations** | The Company intends to acquire, hold and sell Underlying Loans and Underlying Participations on an ongoing basis during its existence.<br><br>Each Underlying Loan will be a mortgage loan, originated or purchased by PSFI and then sold by PSFI to the Company, which satisfies the Credit Guidelines set forth on <u>Schedule I</u> to this PDN Supplement (the "**Credit Guidelines**").   Each Underlying Participation will be a participation interest in a mortgage loan owned by PSFI or an affiliate thereof, which mortgage loan satisfies the Credit Guidelines.   The Credit Guidelines provide certain minimum criteria that each Underlying Loan or mortgage loan corresponding to an Underlying Participation must satisfy to be eligible for purchase by the Company.<br><br>**In addition to the Credit Guidelines, the Company may, from time to time in its sole discretion, require mortgage loans to satisfy such additional conditions or criteria ("Additional Conditions") to be eligible for purchase by the Company as it deems appropriate to respond to market conditions and to manage its portfolio.   The Company may change or remove any Additional Condition at any time in its sole discretion, with or without notice to Investors.   The Company may also, in its sole discretion, disclose any Additional Condition to one or more Investors in the Notes described in this PDN Supplement or to investors in other investment opportunities sponsored by one or more affiliates of the Company that rely on the same or similar Credit Guidelines; as a result, from time to time** |

|  | **Investors in the Notes may not have access to information regarding applicable Additional Conditions that is available to those other Investors.** |
|  | Generally, each Underlying Loan or mortgage loan corresponding to an Underlying Participation will be secured by a deed of trust, mortgage, security agreement or legal title to the Underlying Property, which will in each case provide the Company the right to foreclose on, or to direct the foreclosure by PSFI on, the Underlying Property in the event of default.  In cases where the Company purchases an Underlying Participation, the Participation will provide the Company the right to direct foreclosure on the Underlying Property. |
|  | In respect of each Underlying Loan and each mortgage loan corresponding to an Underlying Participation, the Company will generally have first priority of payment relative to any other loans or other obligations on the corresponding Underlying Property (excluding workman's liens and other similar liens arising by operation of law), meaning that the Company or PSFI, as applicable, will generally receive payments in respect of the Underlying Loan or the mortgage loan corresponding to an Underlying Participation, before any other creditor with a loan on the Underlying Property. |
|  | For the avoidance of doubt, in the event the Company purchases an Underlying Participation that is a partial participation interest in the corresponding mortgage loan, the Company will not have any priority of payment over any other holder of another partial participation interest in that mortgage loan.  In the event of a default or payment shortfall, payments owing to the Company and any other holder of interests in the loan will be reduced on a pro rata basis. |
|  | Investors will not have any security interest in any assets owned by the Company, the Member, PSFI, any of their respective affiliates, the Borrowers or any of their assets, the Underlying Loans, the Underlying Participations, or any proceeds of the Underlying Loans or Underlying Participations.  The Notes will be unsecured special, limited obligations of the Company. |
|  | The Company may sell one or more Underlying Loans or Underlying Participations to an affiliate or to a third-party buyer at any time in its sole discretion. |
| **Underlying Loan Servicing; Servicing of Loans** | PSFI will service the Underlying Loans and the mortgage loans corresponding to the Underlying Participations (i) in accordance with its ordinary servicing and asset management procedures and practices, |

| | |
|---|---|
| **Corresponding to Underlying Participations** | (ii) in accordance with accepted servicing practices for prudent, business-purpose, residential mortgage lending institutions that service mortgage loans of the same type in the applicable jurisdiction, and (iii) to achieve what it reasonably and in good faith believes to be the best loan-level outcome for Investors in the Notes. For the avoidance of doubt, PSFI may delegate all or any portion of its obligations in respect of servicing the Underlying Loans or the mortgage loans corresponding to the Underlying Participations to one or more subcontractors. |
| **Reserves** | The Company does not intend to establish and maintain any dedicated cash reserves to fund payments in respect of the Notes. |
| **Portfolio Reporting** | Investors will receive a monthly report detailing the composition characteristics and performance of the Company's portfolio of Underlying Loans and Underlying Participations, as well as the Company's calculation of its Net Asset Value (each, a "**Monthly Portfolio Report**"). |
| **Investor Rights in Respect of Underlying Loan Defaults and Underlying Participation Defaults** | In the event of a default on an Underlying Loan or a mortgage loan corresponding to an Underlying Participation, PSFI, on behalf of the Company or on its own account, as applicable, in its capacity as servicer with respect to the Underlying Loans and the mortgage loans corresponding to the Underlying Participations, will attempt to collect on the defaulted Underlying Loan or mortgage loan, which may include, without limitation, negotiating new payment terms for the defaulted Underlying Loan or mortgage loan, selling or otherwise disposing of the defaulted Underlying Loan or mortgage loan, or foreclosing on the property corresponding to the defaulted Underlying Loan or mortgage loan.<br><br>Investors will not have any right to make any decisions regarding servicing and collections on any Underlying Loan or any mortgage loan corresponding to an Underlying Participation, and will be prohibited from taking any action, directly or indirectly, to collect on any Underlying Loan or any mortgage loan corresponding to an Underlying Participation. |

**You should make your own decision as to whether the offering of Notes under this PDN Supplement meets your investment objectives and risk tolerance level. The offering of Notes under this PDN Supplement is highly speculative, and the Notes offered through it involve a high degree of risk that may not be suitable for you. The Notes will not be insured by the Company or any of its affiliates or by any governmental agency or other third party. You should only invest in the Notes if you can afford the loss of your entire investment.**

**Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has reviewed, approved, disapproved, endorsed or recommended the offering of Notes under this PDN Supplement.  Neither the SEC nor any state securities commission has confirmed the accuracy or truthfulness of this PDN Supplement or any of the other Offering Materials, nor whether they are complete.  Any representation to the contrary is illegal.**

**The Notes are being offered by the Company in reliance on an exemption from registration with the SEC provided by Rule 506(b) of Regulation D under the Securities Act of 1933, as amended (the "Securities Act").  This PDN Supplement is written for Rule 506(b) only.  The Notes have not been qualified or registered federally or in any state, in reliance on exemptions under federal and state law.**

**The Notes are "restricted securities" and may not be resold or otherwise disposed of unless a registration statement under the Securities Act covering disposition of the Notes, as applicable, is then in effect or an exemption for the transfers is available.  Accordingly, the Notes are subject to restrictions on transferability and resale and may not be transferred or resold without the Company's prior written consent, and only then as permitted under the Securities Act and applicable state securities laws.**

**There is no public market for the Notes, and none is expected to develop in the future.  The Notes offered through this PDN Supplement and the other Offering Materials should be purchased only by Investors who have no need for liquidity in their investment, as Investors will generally have to bear the financial risks of an investment in the Notes until their redemption.**

**No person has been authorized by the Company in connection with the offering of Notes under this PDN Supplement to give information or to make any representations other than those contained in the Offering Materials.  You should not rely on information you have received or any representations that have been made to you that are not contained in the Offering Materials.**

**The discussion contained in this PDN Supplement and the other Offering Materials has been prepared solely for the benefit of and is directed solely to prospective investors that are U.S. persons and accredited investors.  The Company is not making an offer to sell Notes in any jurisdiction where it is unlawful, in any jurisdiction where the person making the offer is not qualified to make an offer or sell them, or to any person who cannot legally be offered the Notes.**

**The Offering Materials contain confidential information and may not be provided to anyone other than authorized persons, such as accountants, financial planners or attorneys retained by you for the purpose of rendering professional advice related to the purchase of Notes offered under this PDN Supplement.  This PDN Supplement may not be reproduced, divulged or used for any other purpose without the Company's prior written consent.**

**You should not regard the contents of this PDN Supplement or any other communication from the Company or any of its affiliates as a substitute for careful and independent tax and financial planning.  You are encouraged to consult with your own independent accountants, financial planners, attorneys and other professionals with respect to the legal and tax aspects of an investment in the Notes, as applicable, with specific reference to your own tax situation before investing in the Notes offered under this PDN Supplement.**

**The statements and descriptions in this PDN Supplement regarding terms and provisions of the other Offering Materials are summaries, do not purport to be complete and are subject to, and qualified in their entirety by reference to, all of the terms and provisions of the other Offering Materials.  All of the Offering Materials are available at [_____].  The specific terms and provisions of the Offering Materials, not any summaries of those terms and provisions in this PDN Supplement, will govern your rights as an Investor.**

**This PDN Supplement contains forward-looking statements that involve substantial risks and uncertainties.  All statements, other than statements of historical facts, included in this PDN Supplement or any other Offering Materials are forward-looking statements.  The words "anticipate," "believe," "estimate," "expect," "intend," "may," "plan," "predict," "project," "will," "would" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain these identifying words.**

**The Company and its affiliates may not actually achieve their respective plans, intentions or expectations disclosed in forward-looking statements, and you should not place undue reliance on forward-looking statements.  Actual results or events could differ materially from plans, intentions and expectations disclosed in forward-looking statements, and neither the Company nor any of its affiliates assumes any obligation to update any statements in this PDN Supplement or any of the other Offering Materials, whether as a result of new information, future events or otherwise, except as required by law.  Any forward-looking statements contained in this PDN Supplement or any of the other Offering Materials should be considered with these risks and uncertainties in mind.**

**The Company has included important factors in the cautionary statements included in this PDN Supplement —particularly in the "Risk Factors" section of this PDN Supplement — that could cause actual results or events to differ materially from forward-looking statements contained in this PDN Supplement.  Forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments that the Company or any of its affiliates may make.**

[Remainder of page intentionally left blank]

TABLE OF CONTENTS

**SUMMARY OF THE OFFERINGS**                                                   **I**

**TABLE OF CONTENTS**                                                     **X**

**GENERAL INFORMATION**                                                 **1**

| | | |
|---|---|---:|
| 1. | About this PDN Supplement | 1 |
| 2. | About PeerStreet | 4 |
| 3. | About the Company | 5 |
| 4. | About the Notes | 5 |
| 6. | Underlying Loan and Mortgage Loan Due Diligence Process | 7 |
| 7. | Restrictions on Transfers | 8 |
| 8. | Investor Qualifications | 8 |
| 9. | ERISA Considerations | 9 |
| 10. | Investment Process and Plan of Distribution | 9 |
| 11. | Notes Are Noncertificated Instruments | 10 |
| 12. | Risk Factors | 10 |
| 13. | Conflicts of Interest | 34 |
| 14. | Material U.S. Federal Income Tax Considerations | 35 |
| 15. | Where to Find Additional Information | 35 |

<u>Exhibit A</u>: Form Instrument
<u>Schedule I</u>: Underlying Loan and Mortgage Loan Criteria

**FOR THE OFFERING OF PAYMENT-DEPENDENT PROMISSORY NOTES FOR**

# PEERSTREET PLATFORM'S PORTFOLIO PRODUCT

## 1.  About this PDN Supplement

This PDN Supplement provides information on the Notes that the Company intends to offer and issue, and describes the specific risks associated with the Notes.  As described in more detail below, the Notes provide Investors the right to receive (i) on a monthly basis in arrears, its Pro Rata Interest Payment, and (ii) a payment equal to the Redemption Price for such Note, upon redemption of the Note in accordance with its terms, which payments are dependent upon performance of the Underlying Loans and Underlying Participations, and other factors affecting Net Asset Value.  You should carefully read this PDN Supplement and all of the other Offering Materials before you make your investment decision.

In this PDN Supplement, unless otherwise specified or required by context, we use the following terms:

"**ACH**" means Automated Clearing House.

"**Additional Conditions**" shall have the meaning ascribed to it in the section titled "Company Business Overview".

"**Advisers Act**" means the Investment Advisers Act of 1940, as amended.

"**Borrower**" is a borrower party to an Underlying Loan Agreement.

"**Code**" means the Internal Revenue Code.

"**Company**" shall have the meaning ascribed to it in the section titled "Summary of the Offering".

"**Compulsory Redemption**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Credit Guidelines**" shall have the meaning ascribed to it in the section titled "Company Business Overview".

"**Cut-Off Date**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Final Instrument**" is the final document you will receive, in electronic form, evidencing your ownership of a Note.  The Final Instrument will (i) set forth the specific terms that apply to the Note, (ii) be substantially similar to the Form Instrument, and (iii) be subject to the limitations described in this PDN Supplement.

"**Form Instrument**" is a form document provided to prospective Investors setting forth substantially the terms that will be applicable to the Notes, a copy of which is attached as <u>Exhibit A</u> to this PDN Supplement.

"**Hosting Provider**" shall have the meaning ascribed to it in the section titled "Risk Factors".

"**Interest Payment Date**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Investment Amount**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Investment Company Act**" means the Investment Company Act of 1940, as amended.

"**Investors**" refers to holders of Notes.

"**Issuer Expenses**" means any fees, costs and expenses incurred by the Company or any of its affiliates in connection with the management of the Company's assets and operations, excluding the Standard Fee, payroll, lease payments, and other ordinary overhead expenses.

"**Member**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Maturity Date**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Monthly Portfolio Report**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**NAV Determination Date**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Net Asset Value**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Note Multiple**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Notes**" shall have the meaning ascribed to it in the section titled "Summary of the Offering".

"**Offering Materials**" shall have the meaning ascribed to it in the section titled "Summary of the Offering".

"**PDN Supplement**" shall have the meaning ascribed to it in the section titled "Summary of the Offering".

"**Plans**" shall have the meaning ascribed to it in the section titled "ERISA Considerations".

"**Platform**" means the investing platform sponsored by PeerStreet that is described in the PPM.

"**Portfolio**" shall have the meaning ascribed to it in the section titled "Summary of the Offering".

"**Portfolio Dashboard**" means a page on the Platform specific to Portfolio and the Notes.

"**PPM**" is the private placement memorandum, dated December 2, 2019, associated with this PDN Supplement that summarizes the terms and conditions for various offerings of Real Estate Securities, including the Notes, through the Platform.

"**Pro Rata Interest Payment**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**PSFI**" shall have the meaning ascribed to it in the section titled "Summary of the Offering".

"**PSI**" shall have the meaning ascribed to it in the section titled "About PeerStreet".

"**Redemption Date**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Redemption Notice**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Redemption Price**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**SEC**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Securities Act**' shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Standard Fee**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Suspension Event**" shall have the meaning ascribed to it in the section titled "Summary of Terms".

"**Treasury**" means the U.S.  Department of the Treasury.

"**Underlying Loan**" is a mortgage loan owned by the Company which satisfied the Credit Guidelines and any applicable Additional Conditions as of the date of its acquisition by the Company.

"**Underlying Participation**" is a participation interest issued by PSFI to the Company in the proceeds of a mortgage loan owned by PSFI which satisfied the Credit Guidelines and any Applicable Conditions as of the date of the acquisition of the Underlying Participation by the Company.

"**Underlying Loan Agreement**" is a loan agreement (i) by and between a Borrower and the Company evidencing an Underlying Loan, or (ii) by and between a Borrower and PSFI evidencing a mortgage loan corresponding to an Underlying Participation.

"**Underlying Property**" is a real estate asset securing (i) a corresponding Underlying Loan, or (ii) a mortgage loan corresponding to an Underlying Participation.

"**Valuation Range**" shall have the meaning ascribed to it in the section titled "Summary of Terms"

Any capitalized term not defined in this PDN Supplement shall have the same meaning as in the PPM. In the event of a conflict between the terms of this PDN Supplement and the PPM, the terms of this PDN Supplement shall control.

Investing in Notes involves certain risks.  Before deciding to invest in Notes offered under this PDN Supplement, you should carefully read and consider the risks set forth in the "Risk Factors" section of this PDN Supplement.

## 2.  **About PeerStreet**

Peer Street, Inc.  ("**PSI**") and certain of its affiliates sponsor the Platform, an online marketplace where users can view, analyze, and elect to invest in various real estate investments.  Through the Platform, users can invest in various real estate securities that may have been historically difficult for them to invest in, and lenders, borrowers (such as sponsors of real estate projects), and other actors in the real estate industry can access capital that may have been historically difficult for them to access.

The Platform provides users with easy access to the possibility of attractive risk-adjusted returns on real estate securities all offered and issued electronically.  By aggregating funds from multiple investors, the Platform allows investors to invest smaller amounts in multiple offerings and, thus, more easily diversify their investment portfolio across a greater number of investment opportunities.  For borrowers, lenders, and real estate companies, the Platform allows them to possibly find lower rates, better terms, and/or a more efficient funding process compared to those provided by traditional sources.

PSI and its affiliates work with lenders, borrowers and other actors in the real estate industry to provide new investment opportunities to investors using the Platform.  These opportunities may include real estate securities tied to, among other things, a specific mortgage loan, lender lines of credit, or a fund investing in real estate opportunities.

PSI and its affiliates have been operating the Platform since the end of 2014.

Headquarters

PSI's headquarters are located at:

2121 Park Place, Suite 250
El Segundo, CA 90245

Financial Information

PSI was formed in December 2013.  To date, PSI has incurred business losses and anticipates such losses will continue for the foreseeable future.  The operations of PSI and its affiliates are currently

principally financed by proceeds from the issuance of equity ownership in their respective businesses to various venture capital, angel investors, and institutional firms.  From time to time, PSI and its affiliates may, but have no obligation to, distribute information about their respective financial conditions, business activities and investment results.

Management Team

Information about PSI's management team is available at https://www.peerstreet.com/managementteam.

## 3.  **About the Company**

The Company is a Delaware limited liability company and an affiliate of PSI and PSFI.  The manager of the Company will be the Member, its sole member and an affiliate of the Company. The Company will have no employees, and will be dependent upon the efforts of the Member to conduct its business operations.  The Company is a newly formed limited liability company, with limited prior operating history.

## 4.  **About the Notes**

Overview; Allocation Process; Term and Redemptions

PSFI sells mortgage loans to the Company, to various affiliates of the Company, and to various third parties.   In cases where a mortgage loan is allocated to an affiliate of PSFI, that purchaser may buy a whole or partial participation interest in the applicable mortgage loan rather than directly purchasing the mortgage loan  Any whole participation provides all economic and foreclosure rights associated with the applicable mortgage loan.  Partial participations provide a pro-rata share of economics and may also provide the holder foreclosure rights.

PSFI allocates loans among prospective purchasers as follows: each new loan originated or acquired by PSFI is allocated pursuant to PeerStreet's allocation process whereby each loan will be allocated to the prospective purchaser that is next in line to purchase a loan (i.e., the purchaser that was allocated a loan or participation interest least recently), whose credit guidelines allow for the purchase of the loan.  In cases where the next eligible purchasers include the Company and another affiliate of PSFI, the Company may purchase a 51% participation interest, or greater, in the applicable mortgage loan, and the other PSFI affiliate(s) will purchase the remaining participation interest in the applicable mortgage loan.

Notwithstanding the foregoing, the Company (i) may decline to purchase any participation interest allocated to it; or (ii) may purchase (a) the applicable mortgage loan as a whole loan (not as a participation interest); (b) a 100% participation interest in the applicable mortgage loan; or (c) less than a majority participation interest in the mortgage loan for purposes of compliance with an exemption from registration under the Investment Company Act, including, but not limited to, conducting its operations so that composition of its assets will not require it to register as an investment company under the Investment Company Act, as described in the Risk Factors set forth below.

For the avoidance of doubt, PSFI's customary allocation procedures apply to both third-party purchasers of loans or participation interests and to the Company and its affiliates. As a result of this system, it is possible that the Company will not have access to direct or indirect interests in mortgage loans purchased by mortgage loan buyers with more stringent criteria.

The Notes are payment-dependent notes that provide Investors the right to receive (i) on a monthly basis in arrears, its Pro Rata Interest Payment, and (ii) a payment equal to the Redemption Price for such Note, upon redemption of the Note in accordance with its terms.

The initial term of each Note will expire on the first Redemption Date that is at least ten (10) years from the initial issue date of such Note. Upon the Initial Maturity Date of a Note, the Company will extend the term of the Note in accordance with its terms for an additional ten (10) year period, and the Company will not make any payment to such Investor except for any payments of interest to which such Investor is entitled, unless such Investor notifies the Company in writing at least 60 days in advance of the Initial Maturity Date of the Note that such Investor does not want the term of the Note to be extended. If the Investor timely delivers such notice with respect to the Initial Maturity Date, or for the Subsequent Maturity Date, the Company will pay to such Investor on the applicable Maturity Date an amount equal to the Redemption Price of the Note for such Maturity Date. For the avoidance of doubt, the Maturity Date of a Note will always coincide with a Redemption Date.

The Notes are unsecured, special, limited obligations of the Company. Investors will not have any security interest in the assets of the Company, the Member, PSI, PSFI, or any of their respective affiliates, any Borrower or any of their assets, any of the Underlying Loans or Underlying Participations, or any proceeds of any Underlying Loan or Underlying Participation.

<u>Interest Payments</u>

In respect of each Note, Investors will be entitled to receive payments of interest in an amount equal to such Investor's Pro Rata Interest Payment.

**The Company has no obligation to make any interest payments on the Notes, unless, and only to the extent that, the Company has received interest payments from Borrowers in respect of the Underlying Loans and mortgage loans corresponding to the Underlying Participations in the aggregate in excess of Standard Fees and unreimbursed Issuer Expenses actually incurred by the Company. Neither the Company, the Member, PSFI, nor any of their respective affiliates guarantees that Investors will receive any interest payments on any Note, or that the Company (or PSFI on behalf of the Company) will collect any amounts payable on any Underlying Loan or Underlying Participation.**

Interest on the Notes will be payable monthly in arrears on each Interest Payment Date; <u>provided, however,</u> that if any Interest Payment Date falls on a day that banks in the State of California are not open for business, the Interest Payment Date shall be the next day on which banks in the State of California are open for business.

<u>Maturity</u>

The initial term of each Note will expire on the first Redemption Date that is at least ten (10) years from the initial issue date of such Note. Upon the Initial Maturity Date of a Note, the Company will extend the term of the Note in accordance with its terms for an additional ten (10) year period, and the Company will not make any payment to such Investor except for any payments of interest to which such Investor is entitled, unless such Investor notifies the Company in writing at least 60 days in advance of the Initial Maturity Date of the Note that such Investor does not want the term of the Note to be extended.  If the Investor timely delivers such notice with respect to the Initial Maturity Date, or for any Subsequent Maturity Date, the Company will pay to such Investor on the applicable Maturity Date an amount equal to the Redemption Price of the Note for such Maturity Date. For the avoidance of doubt, the Maturity Date of a Note will always coincide with a Redemption Date.

<u>Redemptions</u>

Each Investor may redeem all or any part of any outstanding Note that it owns on any Redemption Date upon at least 60 days' prior written notice to the Company, subject to the limitations and conditions below.

Upon redemption of all or any part of a Note, the redeeming Investor will be entitled to receive the relevant Redemption Price in respect of the portion of the principal amount of the Note being redeemed.

Any partial redemption shall be in increments of $1.00 (by principal amount) and shall be applied on a first-in, first-out basis against investments in the Note.  The Company may in the future enable Investors to specify application of any partial redemption, but that feature does not yet exist and may never be developed.

**Payment of the Redemption Price to the redeeming Investor shall be in full satisfaction of any of the Company's payment obligations in respect of the portion of the principal amount of the Note being redeemed, and there can be no guarantee that the Redemption Price will be equal to or greater than the portion of the original principal amount of such Note being redeemed.**

<u>Limitations on Redemptions</u>

If the Company receives redemption requests in respect of any Redemption Date in excess of ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date, the Company may, in its sole discretion, reduce each such request for redemption pro rata so that the aggregate amount redeemed in respect of such Redemption Date does not exceed ten percent (10%) of the Net Asset Value.  Any unfulfilled or reduced request will be satisfied at the next Redemption Date (subject to further deferral if the deferred requests themselves exceed ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date) with priority over any subsequent Redemption Notices.

The Company may, in its sole discretion, require the Compulsory Redemption by an Investor of all or any part of its Note for any reason or no reason at all, without any notice period.  Additionally, the Company may, in its sole discretion, limit or suspend the right of Investors to submit Redemption Notices and/or make redemptions in circumstances where the Company's investments cannot be liquidated in an orderly manner or reasonably valued.   In the event of any such suspension, any unfulfilled Redemption Notices will be satisfied at the next Redemption Date after such suspension has been lifted in priority to any subsequent Redemption Notices.

<u>Calculation of Net Asset Value</u>

The Company will determine its Net Asset Value on each NAV Determination Date.

For each NAV Determination Date, the Company will obtain advisory services from a nationally recognized third-party valuation firm with respect to a Valuation Range as of no earlier than the Cut-Off Date for such NAV Determination Date. The Net Asset Value of the Company for any NAV Determination Date will be the weighted average (as calculated by the Company) of the Valuation Range for such NAV Determination Date and will be used to calculate the Note Multiple and the Redemption Price (as applicable) for the immediately succeeding Closing Date and Redemption Date (as applicable).

In the event that the Company consummates any purchase or disposition of any Underlying Loans or Underlying Participations during the period from the Cut-Off Date through the NAV Determination Date which was not reflected in the determination of the Valuation Range, the Company will adjust the Net Asset Value as of the applicable NAV Determination Date by the actual purchase or sale price, as applicable of any such Underlying Loans or Underlying Participations; provided that the Company will not purchase or sell an Underlying Loan or Underlying Participation during this period if it has a reasonable belief that the cost of such Underlying Loan or Underlying Participation does not accurately reflect its value.

No valuation firm will be liable to the Company or any of its affiliates, to any Investor, or to any third party in respect of the Valuation Range or the determination of Net Asset Value by the Company. The Company is solely responsible for the use of any valuation by such valuation firm. The valuation firm will perform certain financial analyses and, in so doing, will rely, without independent verification, on certain information provided to it by the Company or available from public sources as being accurate and complete in all material respects. The services provided by the valuation firm will not involve an audit, appraisal, review, compilation or any other form of examination or attestation under generally accepted auditing standards or otherwise.

The Company may declare a suspension of the determination of its Net Asset Value upon the occurrence of a Suspension Event.

<u>Electronic Notes</u>

Notes will be issued solely in electronic form, and Investors will not receive a physical instrument. Investors will receive a single Note, which will be issued in electronic form on the Platform as soon as practicable following a given investment. If an Investor elects to increase the outstanding principal balance of their investment in a Note, or to partially redeem a Note, the Company will

amend the electronic Note accordingly. The Company and its affiliates will treat the Investor to whom a Note was issued as the owner of such Note for the purpose of receiving payments and for all other purposes unless such Note was validly transferred to a third party.

## 5.  Underlying Loan and Mortgage Loan Due Diligence Process

Neither the Company, the Member, PSFI, PSI, nor any of their respective affiliates, provides investment advice, recommends to any prospective investor an investment in Notes, or makes any representation as to the desirability or suitability of the Notes, or as to any credit risk associated with any Underlying Loan, any Borrower, or any Underlying Participation. Prospective investors should independently assess the risks associated with any investment in Notes and the suitability of Notes for their investment purposes.

In performing diligence on prospective mortgage loans for origination or acquisition, PSFI generally limits its role to reviewing mortgage loan files associated with the Borrower, obtaining limited background information on the Borrower, obtaining third-party opinions of value for the Underlying Property, and obtaining title insurance or coverage protection letters.  Despite its good faith efforts in performing this diligence, however, neither PSFI nor any of its affiliates can guarantee accuracy, absence of mistakes, and/or outcomes. In particular, neither the Company, PSFI, nor any of their respective affiliates can guarantee that any Underlying Loan or mortgage loan corresponding to an Underlying Participation, or the Company's overall portfolio of Underlying Loans and Underlying Participations, will generate returns as anticipated, or result in a return of all or any portion of the Company's principal.

## 6.  Restrictions on Transfers

Notes issued under this PDN Supplement cannot be resold, transferred, exchanged or otherwise disposed of without the prior written consent of the Member, in its capacity as manager of the Company, and in compliance with applicable law.  The restrictions on transfer include transfers to and from accounts that an Investor controls.  For example, the Company may not be able, allowed, or willing, to permit an Investor to transfer Notes from an individual account controlled by such Investor to a trust account controlled by that same Investor.

## 7.  Investor Qualifications

In order to invest in the Notes offered under this PDN Supplement, Investors will be required to provide the Company, or an affiliate or representative thereof, with information about their qualifications in order for the Company to verify their eligibility to invest in Notes.  The Company will only accept an Investor's purchase of Notes if it qualifies as a "U.S.  person" within the meaning of Rule 902(k) under the Securities Act and as an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the Securities Act.

The term "U.S.  person" generally includes, among other things, a U.S.  citizen or permanent resident in the United States or a corporation, partnership, limited liability company or equivalent legal entity organized or incorporated under the laws of any state of the United States.

The term "accredited investor" generally includes, among other things, a person who has a net worth of at least $1 million (excluding their primary residence) or a person who earned more than $200,000 in income for the last two years (or $300,000 as a married couple).

You should consult your attorney to confirm your qualification as a U.S. person and/or an accredited investor. You are responsible for providing accurate and complete information regarding your accreditation status, and if you provide the Company or any affiliate thereof inaccurate, incomplete, or misleading information, you may be required to indemnify any such party for any resulting losses or liabilities.

In addition, you will also be required to represent that you are investing in Notes offered under this PDN Supplement for your own account, for investment purposes only and not with a view to resale or distribution.

## 8. **ERISA Considerations**

ERISA, and corresponding provisions of the Code, impose certain requirements on pension, profit sharing, and other employee benefit plans to which they apply, including individual retirement accounts and annuities, Keogh plans and other tax-exempt plans ("**Plans**"), and on those persons who are fiduciaries or "parties in interest" with respect to such Plans. The Company has the right, in its sole discretion, to permit or restrict investments in Notes by "benefit plan investors" as that term is defined by ERISA. The Company presently intends to restrict investments in Notes by benefit plan investors. As a result, it is not expected that any of the Notes will be treated as "plan assets" of those benefit plan investors for purposes of the fiduciary responsibility standards and prohibited transaction restrictions of ERISA and the parallel prohibited transaction excise tax provisions of the Code.

## 9. **Investment Process and Plan of Distribution**

To invest in Notes offered under this PDN Supplement, you must first have or establish an account on the Platform and submit any information requested by the Company or any affiliate or representative thereof to confirm your qualification to purchase Notes. In order to purchase Notes, you must (i) review, acknowledge, and agree to the other Offering Materials and any other related documentation, and (ii) transfer funds to the Company via the Platform in an amount equal to the investment in such Note. You should carefully review this PDN Supplement and the other Offering Materials before purchasing any Notes offered under this PDN Supplement.

Before investing in a Note, you are strongly advised to review the details of your investment, as well as the terms provided in this PDN Supplement and the other Offering Materials. The minimum Investment Amount for Notes will be $1,000. The Company may also offer certain programs, features, or special promotions, allowing certain Investors to invest a smaller (or greater) amount than the applicable required minimum Investment Amount.

Please note that the Company and its affiliates may choose, or be contractually bound, not to disclose all available information to you about the Underlying Loans and Underlying Participations. The Company may not provide information about, for example, the name or identity of the originating lenders, Borrowers or sponsors, or the addresses of the Underlying Properties. Investors must make their investment decisions based solely on information made

available in the Offering Materials and the Monthly Portfolio Reports the Investor has received (if any).  Even after Investors invest in Notes, the Company and its affiliates may not report to Investors much of the information they gather regarding the Underlying Loans and Underlying Participations.  The Company and its affiliates will not distribute copies of any Underlying Loan Agreements or other similar documents.  The Company and its affiliates also reserve the right not to disclose specific, itemized, or otherwise cataloged financial information regarding the management of the Underlying Loans, Underlying Participations or Underlying Properties.

The Company and its affiliates are not responsible for and are not liable for any information provided to Investors by unaffiliated third parties.

## 10. **Notes Are Noncertificated Instruments**

All Notes offered under this PDN Supplement will be issued by the Company in electronic, uncertificated form only.  Investors will receive a single Note, which will be issued in electronic form on the Platform as soon as practicable following a given investment.

## 11. **Risk Factors**

*Investing in the Notes involves a high degree of risk.  In deciding whether to purchase Notes, you should carefully consider the following risk factors* **in addition to those risk factors provided in the "General Risk Factors" section of the PPM**.  *Any of the following risks could have a material adverse effect on the value of the Notes you invest in, could cause you to lose all or part of your investment, and could adversely affect future payments you expect to receive on the Notes.  You should only invest in the Notes if you can bear the loss of your entire investment.*

**Consider carefully the following risks related to investing in the Notes:**

The Notes Being Offered Are Highly Risky and Speculative.  You may lose some or all of your initial investment in the Notes because the Notes are highly risky and speculative.  The Notes are special, limited, unsecured obligations of the Company that depend entirely on the performance of the Underlying Loans, the performance of the Underlying Participations, and other factors affecting Net Asset Value.  Only investors who can bear the loss of their entire investment should commit to invest in Notes.  Notes are suitable purchases only for investors of adequate financial means.  No prospective Investor should purchase Notes offered under this PDN Supplement, if they cannot afford to lose all of the money they plan to invest in those Notes.

The Notes Offered Are Unsecured.  The Notes offered under this PDN Supplement are special, limited obligations of the Company and are not secured by any collateral or guaranteed or insured by any governmental agency or instrumentality of any third party.  While the Underlying Loans and the mortgage loans corresponding to the Underlying Participations may be secured by a mortgage, deed of trust, security agreement, legal title, personal guarantee or other mechanism, the Notes will not represent an obligation of any Borrower, originating lender, Member, PSFI, PSI, any affiliate of the Company, or any other third party.  Investors may look only to the Company for payments on the Notes.  Furthermore, (i) if any Borrower fails to make any payments on an Underlying Loan, or (ii) if any Borrower fails to make any payments on a mortgage loan corresponding to an Underlying Participation, interest payments to Investors in respect of their

Notes may be correspondingly reduced on a pro rata basis, and the Net Asset Value may be negatively impacted.

Payments on the Notes Depend on the Performance of the Underlying Loans, the Performance of the Underlying Participations, and the Net Asset Value.  Payments by the Company to Investors on the Notes depend entirely on the performance of the Underlying Loans, the performance of the Underlying Participations, and other factors affecting Net Asset Value.  If a Borrower defaults on an Underlying Loan or on a mortgage loan corresponding to an Underlying Participation, interest payments to Investors in respect of the Notes may be reduced on a pro rata basis among all Investors holding outstanding Notes, and the Net Asset Value may be negatively impacted.  There is no guarantee that the Company will be able to make payments on the Notes in any specific amount or at all.

<u>Investors Will Not Have Recourse Against Any Third Parties, Including the Member, PSFI, PSI or any Borrower</u>.  The Notes are unsecured, special limited obligations of the Company.  Investors will not have the right to seek, and under the terms of the Investor Agreement, agree not to seek, any claims or recourse against any third party, including, without limitation, the Member, PSFI, PSI, any other affiliate of the Company, any Borrower, or any other third party in connection with any claim relating to the Notes.  The Company or an affiliate thereof may have recourse against one or more third parties in connection with the Underlying Loans and Underlying Participations, and may elect to pursue such recourse in certain circumstances, but these rights do not flow to Investors.  Investors will not be permitted to communicate with or otherwise contact any such third parties in connection with their Notes or the Underlying Loans and Underlying Participations.  These restrictions limit Investors' ability to take action in the event of default or other issues related to their Notes or the Underlying Loans and Underlying Participations, and require Investors to rely solely on the efforts of the Company or its affiliates for these purposes.

The Company May Not Provide You All the Information and Documentation that it and its Affiliates have Regarding the Underlying Loans and Underlying Participations.  The Company may choose, or be contractually bound, not to disclose all available information to you about the Underlying Loans and Underlying Participations.  For example, the Company and its affiliates may not disclose or have the contractual ability to disclose the name or identity of the Borrowers, or the addresses of the Underlying Properties.  If the Company and its affiliates choose to not disclose all available information as a result of an internal business decision, or because they are legally bound to keep that information in confidence, you must make your investment decisions based solely on information made available to you in the Offering Materials and the Monthly Portfolio Reports the Investor has received (if any).  Even after you invest in Notes, the Company and its affiliates may not share much of the information they gather regarding the Underlying Loans and Underlying Participations.  In no case does the Company or any of its affiliates intend to distribute copies of any agreements evidencing an Underlying Loan, a mortgage loan corresponding to an Underlying Participation, or other real estate documents related to an Underlying Property.  The Company and its affiliates also reserve the right not to disclose specific, itemized, or otherwise cataloged financial information regarding the management of the Underlying Loans and Underlying Participations.  The Company and its affiliates are not responsible for and are not liable for any information provided to Investors by unaffiliated third parties.

There May Be a Delay Between When You Fund Your Purchase of Notes and When You Earn Returns.  When you commit to purchase Notes, you must commit funds toward your purchase. However, the Company reserves the right to withdraw the offering under this PDN Supplement in whole or in part at its discretion at any time, including after you have committed funds. Additionally, the Company will only conduct sales of Notes on a monthly basis on Closing Dates. As a result, because commitments to purchase Notes are irrevocable, during the period between the time of your purchase commitment and the time when your Notes are issued, you will not have access to your funds.  Because your funds do not earn interest or other returns prior to the time when your Notes are issued, any delay in the issuance of your Notes will have the effect of reducing the effective rate of return on your investment.

Under the Investor Agreement, Investors Are Subject to Mandatory Merger of Claims and Arbitration.  To protect the Company and its affiliates from having to respond to multiple claims by Investors in the event of an alleged breach or default with respect to the Notes, the Investor Agreement restricts Investors' rights to pursue remedies individually in connection with an alleged breach or default.  In addition, the Company and its affiliates require that any claims against any of them to be resolved through binding arbitration rather than in the courts.  The arbitration process may be less favorable to Investors than court proceedings and is likely to limit Investors' right to engage in discovery proceedings or to appeal an adverse decision.  PLEASE CONSULT THE INVESTOR AGREEMENT FOR ADDITIONAL DETAILS REGARDING THE ELECTION TO CONSENT TO MANDATORY ARBITRATION.

The Notes Are Restricted Securities and Highly Illiquid.  The Notes are being offered in private offerings in reliance on Rule 506(b) of Regulation D of the Securities Act.  As a result, the Notes are restricted securities, will not be listed on any securities exchange, and have no liquid market. There is no trading market for the Notes, and the Company and its affiliates do not expect that such a trading market will develop in the foreseeable future, nor does the Company intend in the near future to take any actions to facilitate or accommodate such trading.  Any investment in Notes will be highly illiquid, and Investors may not be able to sell or otherwise dispose of their Notes in the open market.  The restrictions on transfer include transfers to and from accounts that an Investor controls.  For example, the Company may not be able, allowed, or willing, to transfer Notes from an individual account controlled by an Investor to a trust account controlled by that same Investor.  Accordingly, you should be prepared to hold the Notes you purchase for an extended period of time, particularly in the event redemptions are limited or suspended.

All Notes Are Noncertificated Instruments.  All Notes offered under this PDN Supplement will be issued by the Company in online form only.  Investors will receive a single Note, which will be issued in electronic form on the Platform as soon as practicable following a given investment. Investors will not be provided any physical certificates representing their Notes and must rely on the Company and its affiliates to maintain a record of all issued Notes.  If any Notes become lost or the record of the ownership of any Notes cannot be found, Investors may not be able to collect any returns on their Notes, which may result in a complete loss of their investment.

There Will Be No Trustee for the Notes.  Because there is no trustee involved in the structure of the Notes, Investors will not have the protection of a trustee, an indenture or the provisions of the Trust Indenture Act of 1939, which would require a trustee to represent your interests and the interests of other Investors.

The Portfolio of Underlying Loans and Underlying Participations May Include Loans You Would Not Independently Choose to Invest In.  Returns to Investors on the Notes are dependent on, among other factors, returns on the Underlying Loans and Underlying Participations.  Investors will have no ability to direct or control the acquisition, management or disposal of Underlying Loans and Underlying Participations by the Company.  As a result, an Investor may be investing in one or more Underlying Loans or Underlying Participations as part of its investment in Notes that it would not otherwise choose to invest in.  There is no guarantee whatsoever that the portfolio of Underlying Loans and Underlying Participations will have the same or better returns as a portfolio of investments that an Investor could have chosen for itself.

The Term of an Investor's Note Will be Automatically Extended by the Company Unless the Investor Notifies the Company Otherwise.  Upon each Maturity Date of a Note, the Company will extend the term of the Note in accordance with its terms for an additional ten (10) year period, unless such Investor notifies the Company in writing at least 60 days in advance of the applicable Maturity Date of the Note that such Investor does not want the term of the Note to be extended.

Limits on Redemption Rights.  A Note may only be redeemed by an Investor on the first business day of any calendar quarter during the term of the Note upon at least 60 days' prior written notice to the Company.  Redemptions may be suspended by the Company in its sole and absolute discretion from time to time where its investments cannot be liquidated in an orderly manner or be reasonably valued.  Additionally, Investors' redemption rights are subject to restrictions as described in the sections titled "Cut-Backs" and "Suspension of Redemptions".

In particular, Investors should note that the Company may exercise substantial discretion to limit Investors' redemption rights.  For example, the Company may, in its sole discretion, in the event that it receives redemption requests in respect of any Redemption Date which exceed ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date, reduce each such request for redemption pro rata so that the aggregate amount redeemed in respect of such Redemption Date does not exceed ten percent (10%) of the Net Asset Value.  Additionally, the Company may, in its sole discretion, limit or suspend the right of Investors to submit Redemption Notices and/or make redemptions in circumstances where the Company's investments cannot be liquidated in an orderly manner or reasonably valued.

Possible Effect of Redemptions.  Redemptions could require the Company to liquidate its positions more rapidly than is otherwise desirable, which could adversely affect the value of the Company's assets, including the Underlying Loans and Underlying Participations, and the Investors' Notes.  Illiquidity in certain Underlying Loans or Underlying Participations could make it difficult for the Company to liquidate positions on favorable terms, which may affect the Net Asset Value.

In the event that there are substantial redemptions within a limited period of time, the Company may have difficulty adjusting its asset allocation and trading strategies to the reduced amount of assets under management.  Under such circumstances, in order to provide funds to satisfy redemptions, the Company may be required to liquidate positions at an inappropriate time or on unfavorable terms, resulting in a lower Net Asset Value.  On an ongoing basis, irrespective of the period over which substantial redemptions occur, it may be more difficult for the Company to generate additional profits operating on a smaller asset base and, as a result of liquidating assets to satisfy redemption, the Company may be left with a much less liquid portfolio.

If requests to redeem all or any portion of any outstanding Notes are received in respect of any Redemption Date for an aggregate amount in excess of ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date, the Company may, in its sole discretion, reduce each such request for redemption pro rata so that the aggregate amount redeemed in respect of such Redemption Date does not exceed ten percent (10%) of the Net Asset Value.

In addition, the Company may, in its sole discretion, suspend the right of Investors to submit Redemption Notices and/or make redemptions upon the occurrence of a Suspension Event.

Although the Company may take any or all of the foregoing actions in order to seek to minimize the risks to the Company related to redemptions, it might not always do so; nor would the use of any or all of these provisions eliminate such value or liquidity risks.

**Consider carefully the following risks related to the Net Asset Value, the Underlying Loans and the Underlying Participations:**

The Net Asset Value May Be Affected by a Variety of Factors, Including Underlying Loan and Underlying Participation Performance. Factors other than performance of the Underlying Loans and Underlying Participations may affect Net Asset Value, including fluctuations in prevailing interest rates, the number of Investors with Notes outstanding, general economic conditions, and other market conditions, all of which are beyond our control.

The Net Asset Value Determination Will Consider a Range of Factors. The Valuation Range used to determine Net Asset Value will be determined by a nationally recognized third-party valuation firm on behalf of the Company utilizing a range of factors (some of which may be subjective), that such valuation firm considers relevant to such valuation.

Net Asset Value Determinations Will be Based on Portfolio Information as of Five Days Prior to Each NAV Determination Date. For each NAV Determination Date, the Company will obtain from a nationally recognized third-party valuation firm a Valuation Range based on the fair values of the Company's assets as of no more than five (5) business days prior to such NAV Determination Date. A range of economic conditions may affect the value of the Underlying Loans and Underlying Participations during the period between any Cut-Off Date and the subsequent NAV determination date. As a result, the actual value of the Company's portfolio of Underlying Loans and Underlying Participations may differ from the reported Net Asset Value as of any NAV Determination Date.

Additionally, the Company may purchase or sell Underlying Loans and Underlying Participations during the period between any Cut-Off Date and the subsequent NAV determination date. In such an event, the Company will adjust the Net Asset Value as of the applicable NAV Determination Date by the actual purchase or sale price, as applicable of any such Underlying Loans or Underlying Participations; provided that the Company will not purchase or sell an Underlying Loan or Underlying Participation during this period if it has a reasonable belief that the cost of such Underlying Loan or Underlying Participation does not accurately reflect its value. However, there can be no assurance that the cost of any such Underlying Loans or Underlying Participations will accurately reflect their actual value.

<u>Valuation Firm Will Not Be Liable to Investors for Determinations of Valuation Range</u>.  The Company will engage a nationally recognized third-party valuation firm to determine the Valuation Range.  No such valuation firm will be liable to the Company or any of its affiliates, or to any Investor, in respect of its determination of the Valuation Range.  In the event that such valuation firm incorrectly determines the Valuation Range, Investors will not have any right to recover any losses from such valuation firm.

The Company May Not Receive Payments from Borrowers in Respect of Underlying Loans, or from PSFI in respect of Underlying Participations.  If the Company does not receive all or part of the payments on an Underlying Loan or Underlying Participation, then the anticipated amount of payments to Investors on the Notes may be reduced and the Net Asset Value may be negatively impacted.  As a result, Investors may not receive the full payments that they expect to receive on their Notes and may not recover their original investment.  Although the Company will seek to protect its investments in the Underlying Loans and Underlying Participations through various strategies, those strategies may not provide full protection, if any.

> If an Underlying Loan or a mortgage loan corresponding to an Underlying Participation becomes past due or is otherwise in default, the Company, or PSFI on behalf of the Company, may need to extend the applicable Borrower's time to pay off such Underlying Loan, structure alternative settlements and resolutions, and/or enter into foreclosure proceedings (where it has foreclosure rights) against such Borrower.  Foreclosure proceedings are costly, and the Company may need to advance funds to cover such costs.  In that event, any costs advanced by the Company may be reimbursed prior to any funds being paid in respect of the Notes.  Foreclosure and/or REO holding costs in respect of an Underlying Property may impair the value of your investment in Notes.

> In certain cases, the Company may not be able to recover (i) any of the unpaid balance of an Underlying Loan even if such Underlying Loan is fully secured, or (ii) any of the unpaid balance of a mortgage loan corresponding to an Underlying Participation.  As a result, payments on the Notes may be impaired, and the Net Asset Value may be negatively impacted.  Investors must rely on the collection efforts of the Company and its affiliates, or any applicable collection agency to which they refer any Underlying Loan or mortgage loan corresponding to an Underlying Participation in default.  INVESTORS MUST NOT ATTEMPT TO CONTACT ANY ORIGINATING LENDER, BORROWER, THIRD-PARTY SERVICE PROVIDER OR ANY OTHER THIRD PARTY, WHETHER OR NOT RETAINED DIRECTLY BY THE COMPANY OR ANY OF ITS AFFILIATES, FOR ANY PURPOSES, INCLUDING, BUT NOT LIMITED TO, COLLECTION EFFORTS.

<u>PSFI is an Affiliate of the Company</u>.  The Company and PSFI believe that the terms on which the Company purchases the Underlying Loans and Underlying Participations from PSFI, and PSFI services the Underlying Loans on behalf of the Company, are substantially the same as could reasonably have been obtained as of the date thereof from third parties.  However, the affiliate relationship between the Company and PSFI could create, or appear to create, potential conflicts of interest.  For example, the Company and PSFI may be more likely than an unaffiliated third party to waive certain rights or remedies under the agreements governing these relationships, or decline to take action to enforce certain rights under such agreements.

<u>The Purchase by the Company of the Underlying Loans and Underlying Participations from PSFI may be Recharacterized as a Loan by the Company to PSFI by a Court of Competent Jurisdiction</u>. The purchase by the Company of the Underlying Loans and Underlying Participations from PSFI is intended to be a "true sale" and not a loan from the Company to PSFI, with PSFI agreeing to sell and assign, in consideration of its receipt of the purchase price therefor, the Underlying Loans and Underlying Participations to the Company.  There is a risk that, in the event that PSFI becomes subject to bankruptcy or other insolvency proceedings, a court of competent jurisdiction could recharacterize the purchase and sale of the Underlying Loans and Underlying Participations as a loan from the Company to PSFI.  In such an event, the proceeds of the Underlying Loans and Underlying Participations could be deemed to constitute a part of the bankruptcy estate of PSFI, and the Company may be required to disgorge proceeds of the Underlying Loans and Underlying Participations that it has received, and may not be able to continue collecting on the Underlying Loans and Underlying Participations, which in turn would adversely affect payments by the Company on the Notes.

<u>PSFI's Loan and Participation Interest Allocation Procedure May Cause the Company to Receive Lower Quality Loans than Other Buyers</u>.  PSFI will allocate each new mortgage loan it purchases pursuant to PeerStreet's allocation process whereby each loan will be allocated to the prospective purchaser that is next in line to purchase a loan (i.e., the purchaser that was allocated a loan or participation interest least recently), whose credit guidelines allow for the purchase of the loan.  In cases where the next eligible purchasers include the Company and another affiliate of PSFI, the Company may purchase a 51% participation interest, or greater, in the applicable mortgage loan, and the other PSFI affiliate(s) will purchase the remaining participation interest in the applicable mortgage loan.

Notwithstanding the foregoing, the Company (i) may decline to purchase any participation interest allocated to it; or (ii) may purchase (a) the applicable mortgage loan as a whole loan (not as a participation interest); (b) a 100% participation interest in the applicable mortgage loan; or (c) less than a majority participation interest in the mortgage loan for purposes of compliance with an exemption from registration under the Investment Company Act, including, but not limited to, conducting its operations so that composition of its assets will not require it to register as an investment company under the Investment Company Act, as described in the Risk Factors set forth below.

This procedure for allocating  direct and indirect participation interests in loans could cause the Company to receive riskier or otherwise less attractive Underlying Loans or Underlying Participations.  For example, if the credit guidelines of other prospective buyers are stricter than the Company's, the Company may purchase a higher portion of Underlying Loans and Underlying Participations with less advantageous terms or higher risk profiles.  That may mean that the Company purchases Underlying Loans  or Underlying Participations corresponding to mortgage loans with lower interest rates and/or higher default rates than other potential purchasers of those loans.  This outcome could in turn affect the returns enjoyed by the Company relative to other potential investors or loan purchasers.

<u>Investors May Not Receive All Available Information Regarding Additional Conditions Applicable to the Company's Acquisition of Underlying Loans and Underlying Participations</u>. The Company may, from time to time in its sole discretion, require Underlying Loans and

mortgage loans corresponding to Underlying Participations to satisfy Additional Conditions over and above the Credit Guidelines to be eligible for purchase by the Company.  The Company reserves discretion to do so as it deems appropriate to respond to market conditions and to manage its portfolio.  The Company may change or remove Additional Conditions at any time in its sole discretion with or without notice to Investors.  Additionally, the Company may, in its sole discretion, disclose any Additional Condition to one or more other Investors in the Notes and/or potential direct or indirect purchasers of loans other than Investors in the Notes described in this PDN Supplement.  The Company has, and will have, no obligation to disclose any Additional Conditions to Investors in the Notes, even if it does provide information on Additional Conditions to third-party investors.  As a result, from time to time, certain Investors in the Notes may have more limited information regarding applicable Additional Conditions, if any.

<u>Investing in Real Estate and Real Estate-Related Assets Carries Significant Important Risks</u>.  The Company is subject to risks generally attributable to the ownership of real estate investments. These include changes in global, national, regional or local economic, demographic or capital market conditions; current and future adverse national real estate trends, including increasing vacancy rates, which may negatively impact resale value, declining rental rates and general deterioration of market conditions; changes in supply of or demand for properties in a given market or metropolitan area that result in changes in market rental rates or occupancy levels; increased competition for real property assets; bankruptcies, financial difficulties or lease defaults by borrowers and/or tenants; changes in interest rates and availability of financing; potential misconduct by third-parties, including, but not limited to, borrowers, tenants, lenders, vendors, and service providers; and changes in government rules, regulations and fiscal policies, including changes in tax, real estate, environmental and zoning laws.  All of these factors are beyond our control.  Any changes in these factors may adversely affect the payments made to the Company in respect of the Underlying Loans and, in turn, adversely affect the Company's ability to make payments to Investors on the Notes, as well as the Net Asset Value.

<u>The Company's Security Interest in an Underlying Loan, or PSFI's Security Interest in a Mortgage Loan Corresponding to an Underlying Participation, May Decline in Value</u>.  The Company's security interest in an Underlying Loan, or PSFI's security interest in a mortgage loan corresponding to an Underlying Participation, may decline in value.  The value of a security interest will be subject to the risks generally incident to the ownership of improved and unimproved real estate, including changes in general or local economic conditions, increases in interest rates for real estate financing, physical damage that is not covered by insurance, zoning, entitlements and other risks.  Many real estate companies expect to use resale proceeds to repay their loans.  A decline in property values could result in loan amounts being greater than the associated property value, which could increase the likelihood of affected Borrowers failing to make payments on their Underlying Loans or mortgage loans corresponding to Underlying Participations. Factors negatively impacting Underlying Properties, including, without limitation, deferred maintenance, upkeep costs, lack of occupancy, etc., may completely eradicate the value of the security interest and/or the property itself.

<u>The Company's Security Interest or PSFI's Security Interest, as Applicable, May Not be Valid or Have the Stated Priority</u>.  The determination by the Company and its affiliates in respect of each Underlying Loan and each mortgage loan corresponding to an Underlying Participation that the Company or PSFI, as applicable, will have a valid first priority security interest securing each

Underlying Loan and each mortgage loan corresponding to an Underlying Participation may be wrong. For example, without limitation, a Borrower may have acquired title to an Underlying Property via fraud or forgery, which would invalidate any security interest that such Borrower has granted. As another common example, without limitation, there may be prior liens against an Underlying Property that the Company and its affiliates believed to be paid off and which may have priority relative to the Company's lien. Generally, the Company or an affiliate thereof will procure title insurance policies to protect against these types of risks, but title insurance companies may refuse to disburse insurance proceeds, may disburse a smaller amount than the Underlying Loan or mortgage loan corresponding to an Underlying Participation related to the affected Underlying Property, and/or may take years to issue payment on a policy. The Company or an affiliate thereof may also, in its sole and absolute discretion, elect to advance funds to satisfy senior liens and/or to defend its security interest in court, which advances would be repaid before any funds were disbursed to Investors.

Real Estate Investments Are Highly Competitive. The current market for properties that meet the Company's investment objectives is extremely competitive, and many third-party competitors have greater resources than we do. We will compete with numerous other entities engaged in real estate investment activities, including individuals, corporations, banks and insurance company investment accounts, real estate investment trusts, real estate limited partnerships, the U.S. government, and other entities to acquire, manage and sell real estate and real estate-related assets. Many of our competitors enjoy significant competitive advantages that result from, among other things, a lower cost of capital and enhanced operating efficiencies. In addition, the number of entities and the amount of funds competing for suitable investments may increase. Competition with these entities may result in even greater demand for the acquisition of real estate and real estate-related assets, which would result in increased prices for real estate and real estate-related assets and/or in lower returns for related debt securities as competition drives rates down.

Unsuccessful Real Estate Investments May Result in Poor Returns. Real estate investments entail risks including, without limitation, the risk of not correctly anticipating conditions or trends in the real estate market or misevaluating a sponsor's ability to adequately complete a project, and therefore not being able to generate profit from real estate investments tied to the Underlying Loans and Underlying Participations. Misconduct from parties involved in a given real estate investment (such as the Borrower, broker, escrow agent, appraiser, etc.) may also result in poor returns or complete loss. If such events occur, they may adversely affect returns on affected Underlying Loans and Underlying Participations. This could, in turn, negatively affect the ability of the Company to make payments in respect of the Notes, as well as the Net Asset Value.

Real Estate Valuation Is Inherently Inexact. Real estate valuation is an inherently inexact process and depends on numerous factors, all of which are subject to change. The property valuation models and methods used by the Company and its affiliates and/or their respective vendors may be deficient and may increase the risk of default on an Underlying Loan or mortgage loan corresponding to an Underlying Participation. Appraisals or opinions of value may prove to be insufficiently supported, and any review by the Company or any of its affiliates of the value of an Underlying Property may be based on information that is incorrect or opinions that are overly optimistic. The risk of default on the affected Underlying Loans or mortgage loans corresponding to Underlying Participations in such situations is increased, and the risk of loss to Investors will be commensurately greater.

<u>Historical Information Regarding Returns and Loss Rates on Underlying Properties May Be Uncertain</u>.  The Company and its affiliates may not have significant historical performance data about returns or the rates of loss on Underlying Properties and, even if an abundance of data was available, historical returns are not necessarily an accurate indicator or predictor of future performance.  Underlying Properties may lose value at a faster rate than the Company and its affiliates anticipate.  Prior to investing in Notes, you should consider the risk of non-payment and default on the Underlying Loans and on the mortgage loans corresponding to the Underlying Participations.  The Company and its affiliates cannot predict what the long-term rates of return or loss will be on any Underlying Property and, as a result, cannot definitively predict the risk of nonpayment or default on the Underlying Loans or the mortgage loans corresponding to the Underlying Participations, which could increase or decrease as a result of factors beyond the control of the Company or any of its affiliates, and beyond the control of the applicable Borrower or any other person involved in the performance of the Underlying Loans or mortgage loans corresponding to the Underlying Participations, including prevailing interest rates, the rate of unemployment, the level of consumer confidence, decline in property values, degradation of specific properties, the value of the U.S.  dollar, energy prices, changes in consumer spending or sentiment, the number of personal bankruptcies, disruptions in the credit markets and other factors.

**Consider carefully the following business risks related to the Company and its Affiliates:**

<u>The Company, the Member, PSFI, PSI and their Respective Affiliates are Early-Stage Companies and their Respective Operations Involve Significant Risks</u>.  The Company, the Member, PSFI, PSI and their respective affiliates are early-stage companies and their respective operations involve significant risks.  The operating capital of the Company, the Member, PSFI, PSI and their respective affiliates depends on their ability to finance their respective operations from the sale of securities, equity or other financing alternatives for the foreseeable future.  There can be no assurance that any of the Company, the Member, PSFI, PSI, or any of their respective affiliates will be able to successfully raise operating capital.  The failure to successfully raise operating capital from venture capital or institutional firms, the failure to originate or acquire Underlying Loans and Underlying Participations which satisfy the Credit Guidelines as anticipated, or the failure to raise sufficient operating capital by and of the Company, the Member, PSFI, PSI, or any of their respective affiliates could result in their bankruptcy or cause us them to cease operations.

The Member, PSFI, PSI and their Respective Affiliates May Need Substantial Additional Capital to Fund Their Respective Operations.  The Member, PSFI, PSI and their respective affiliates will need to raise substantial additional capital to fund their respective operations, and if they fail to obtain additional funding, may be unable to continue operations.  In respect of PSI, in its early stages of development, it has funded substantially all of its operations with proceeds from equity investments from various venture capital firms and similar institutional investors.

To meet their financing requirements in the future, the Member, PSFI, PSI and their respective affiliates may raise funds through equity offerings, debt financings or strategic alliances.  Raising additional funds may involve agreements or covenants that restrict the business activities and operations of the Member, PSFI, PSI and their respective affiliates.  Additional funding may not be available on favorable terms, or at all.  If the Member, PSFI, PSI and their respective affiliates are unable to obtain additional funds as needed, they may be forced to reduce or terminate their respective operations.  Any inability of any of the

Member, PSFI, PSI or any of their respective affiliates to fund their respective operations could have a substantial and deleterious effect on their viability and operations. As a result, among other things, the Company, or PSFI on behalf of the Company, may not have sufficient resources to take actions it would otherwise deem necessary or desirable to protect the value of and returns on the Underlying Loans and mortgage loans corresponding to Underlying Participations. If such actions are not, or cannot be, undertaken, the value of the Underlying Loans and Underlying Participations may degrade.

PSFI and Affiliates Thereof Have Incurred Net Losses Before. PSFI and affiliates thereof have incurred net losses in the past and expect to incur net losses in the near-to-mid term. The failure of such parties to become profitable could impair the operations of the Company and its other affiliates. PSFI and its affiliates have not been profitable since their founding and may never become profitable. In addition, PSFI and its affiliates expect their respective operating expenses will increase in the future as they expand their respective operations. If the operating expenses of PSFI and its affiliates exceed projections, their financial performance could be adversely affected. If the revenue of PSFI and its affiliates does not grow to offset these increased expenses, they may never become profitable. In future periods, PSFI and its affiliates may not have any revenue growth, or their revenue could decline.

Investors Will Not Receive Financial Statements Regarding the Company or any of its Affiliates, or the Notes. The Company and its affiliates do not intend to provide Investors with financial statements at this time nor do they currently intend to do so in the future. Thus, Investors will not be in a position to independently evaluate the financial health of the Company and its affiliates or the financial viability of any Notes, in determining whether to purchase Notes.

The Operations of the Member, PSFI, PSI and their Respective Affiliates Rely on Maintaining and Attracting Key Personnel. If any of the Member, PSFI, PSI and their respective affiliates fail to retain their key personnel, they may not be able to achieve their anticipated level of growth and their respective businesses could suffer. The future of the Member, PSFI, PSI and their respective affiliates depends, in part, on their ability to attract and retain key personnel. The future of the Member, PSFI, PSI and their respective affiliates also depends on the continued contributions of their respective executive officers and other key personnel, each of whom would be difficult to replace. In particular, the Founder/Chief Executive Officer of PSI is critical to the management of the business and operations of the Company and its affiliates and the development of their strategic direction. The loss of the services of Brewster Johnson or other executive officers or key personnel and the process to replace any key personnel would involve significant time and expense and may significantly delay or prevent the achievement of the business objectives of the Member, PSFI, PSI and their respective affiliates.

Your Rights If the Company Is Involved in a Bankruptcy Proceeding Are Uncertain. If the Company becomes subject to a bankruptcy or similar proceeding, (i) the Investors' rights are uncertain, (ii) Investors' recovery, if any, may be substantially delayed and may be substantially less than the amounts due and that may become due on the Notes the Investors hold, and (iii) Investors' right to continue receiving payments on Notes could be subject to the following risks and uncertainties:

o   Payments on Notes may not accrue during a bankruptcy proceeding.  Accordingly, if Investors receive any recovery, it might be based on their claims for payments accrued only up to the date the proceeding commenced.

o   The Company's obligation to continue making interest payments on the Notes would likely be suspended even if the funds to make those payments were available. Because a bankruptcy or similar proceeding may take months or years to complete, even if the suspended payments were resumed, the suspension might effectively reduce the value of any recovery that Investors might receive by the time their recovery occurs.

o   The Notes are unsecured, and Investors do not have a security interest in any Underlying Loan or Underlying Participation.  Accordingly, Investors may be treated the same as other general creditors of the Company, and thus be required to share the proceeds of the Underlying Loans and Underlying Participations with such other creditors.

o   Even if a Borrower has made a payment to the Company on an Underlying Loan, or if PSFI has made a payment to the Company on an Underlying Participation, before any bankruptcy proceedings of the Company commenced, there can be no assurance that the Company will be able to use those funds to make payments on the Notes.

o   If a bankruptcy proceeding commences after an Investor's total investment commitment has been paid to the Company, the Investor may not be able to obtain a return of that amount even if the sale of Notes has not yet closed.

o   The ability of the Company to transfer its obligations to a back-up entity may be limited and subject to the approval of the bankruptcy court or other presiding authority.  The bankruptcy process may delay or prevent the implementation of back-up services, which may impair the collection or management of the Underlying Loans, Underlying Participations, or the Notes, as applicable.

If the Company were to enter bankruptcy proceedings, similar proceedings or otherwise cease operations, its activities with respect to the Underlying Loans, the Underlying Participations or the Notes, as applicable would be interrupted, and the Company would be required to find other ways to meet the obligations of such entity.  Such alternatives could result in substantial delays in the disbursement of payments on the Notes or could require the Company or an affiliate thereof to pay significant fees and expenses to one or more third parties, and any funds Investors do recover may be substantially less than the amount they originally invested in the Notes.

In a bankruptcy or similar proceeding of the Company, Investors' rights to access any funds sent to the Company in connection with Investors' investment in Notes are uncertain.  If the Company becomes a debtor in a bankruptcy proceeding, the legal right to administer the Company's funds may vest with the bankruptcy trustee or debtor in possession.  In that case, Investors may have to seek a bankruptcy court order lifting an automatic stay in order

to receive a refund.  Investors may suffer delays in obtaining a refund, if they are able to obtain a refund, as a result.

Also, U.S.  bankruptcy courts have broad discretionary powers, and a bankruptcy court could determine that some or all of the Investors' funds were beneficially owned by the Company.  In any such case, those funds become available to other general creditors of the Company.

The Continued Operation of the Platform Is Critical to the Company's Business.  Any significant disruption to the Platform and our systems supporting the Platform could reduce the attractiveness of the Platform and result in a loss of users.  If a catastrophic event resulted in the Platform temporarily shutting down or in data loss on the Platform or our systems supporting the Platform, then our ability to perform our obligations with respect to the Notes offered under this PDN Supplement, the Underlying Loans and the Underlying Participations would be materially and adversely affected.  The satisfactory performance, reliability and availability of the Platform and the systems supporting the Platform is critical to the Company and its affiliates' businesses, customer service, reputation and ability to attract new users and retain existing users.

The Platform Is Hosted by Third Parties.  The Platform and related systems run on a cloud-based platform that spans multiple digital and physical locations.  While PSI or an affiliate owns, operates and maintains certain elements of the Platform and related systems, significant elements of the Platform and related systems are hosted and maintained by one or more third-party technology service providers that PSI or an affiliate does not control.  In particular, the Platform and related systems is hosted by third-party technology services providers (each, a "**Hosting Provider**") that PSI or an affiliate does not control.

> The Platform and related systems, and the operations of PSI and its affiliates depend on the Hosting Providers' ability to protect their systems and facilities against damage or interruption from, among other things, natural disasters, power or telecom failures, adverse environmental factors (e.g., web servers that host the Platform being subject to high temperature and humidity levels), criminal acts, computer viruses or other attempts to harm the Platform and related systems.  PSI or an affiliate has entered into an agreement with each Hosting Provider for it to provide us with standard computing, storage capacity and other services (including related support services) in exchange for timely payments.  Neither those agreements nor the Hosting Providers guarantee, however, that users' access to the Platform will be uninterrupted, error-free or secure.

> If an agreement with a Hosting Provider is terminated, or there is a lapse of service or damage to its systems or facilities, then the Platform and related systems could experience interruptions as well as delays and additional expenses in finding a new Hosting Provider.  Interruptions or delays like these, irrespective of their origin, could harm the ability of PSI or an affiliate to perform services for the Notes offered under this PDN Supplement, the Underlying Loans and the Underlying Participations (e.g., making payments or distributions to Investors); our relationships with Investors and other users of the Platform; our brand and reputation; and our operations and business.

PSI and its affiliates have implemented a disaster recovery plan relating to the continued operation of the Platform and related systems supporting the Platform. As part of that plan, PSI and its affiliates maintain backups of the Platform and related systems at a separate region from the regions the Hosting Providers use generally to host and maintain the Platform and related systems. These backups occur daily, cover all user and Investor data and replicate securely to a web server at a separate region within a Hosting Provider's cloud infrastructure.

The Platform disaster recovery plan has never been tested under actual disaster conditions, and PSI and its affiliates may not have sufficient capacity to recover all data and provide all services in the event of an interruption or delay to the Platform and related systems because of any actual disaster affecting a Hosting Provider. Additionally, in the event of any interruptions, delays and resulting damages, insurance policies of PSI and its affiliates may not adequately cover all or any of the losses that they may incur.

Confidential Information on the Platform Is Susceptible to Cybersecurity Risks. The Platform and related systems store confidential information about the Notes offered under this PDN Supplement and the Investors, including information about Investors' bank accounts and other personally identifiable sensitive data. The Company and its affiliates collect this information from the Platform, related systems supporting the Platform and several other sources (e.g., Investors' completion of various agreements with the Company or its affiliates, or from reports generated by credit reporting agencies, title insurance companies or other third parties). If any of the confidential information stored on the Platform or related systems is compromised, Investors' confidential information may be stolen. This could occur as the result of any accidental or willful cybersecurity breach or other unauthorized access of the Platform and related systems. If Investors' confidential information is stolen, it may be used for criminal purposes, and affected Investors would be subject to increased risk of fraud or identity theft.

Because techniques used to obtain unauthorized access to or to otherwise sabotage computer systems change frequently and generally are not recognized until they are launched against a target, PSI and its affiliates, and any of their technology service providers (e.g., Hosting Providers) may be unable to anticipate these techniques or to implement adequate preventative measures.

If Investors' confidential information becomes subject to a data security breach, then PSI or its affiliates would need to provide any disclosures required by applicable law, which may prove costly to provide and are likely to lead to widespread negative publicity about the Company, its affiliates, and the Platform. Any negative publicity of this nature may cause the Company's investors, affiliates and partners to lose confidence in the effectiveness of the data security measures of PSI and its affiliates. Any actual or perceived security breach would harm the Company and its affiliates' reputations, potentially cause them to lose investors and could adversely affect the value of Investors' investment in the Notes.

Applicable privacy policies with respect to confidential information stored on the Platform and related systems supporting the Platform are set forth on the Platform.

The Platform Relies on Third-Party Service Providers.  PSI and its affiliates rely on certain third-party service providers, including third-party financial institutions and technology service providers.  If PSI and its affiliates are unable to continue utilizing these services, their businesses and ability to service the Notes, the Underlying Loans and the Underlying Participations may be adversely affected.  PSI and its affiliates rely on third-party depository institutions that are insured by the Federal Deposit Insurance Corporation to process their transactions, including for transfers of payments on the Notes to Investors and for transfers of payments on the Underlying Loans and the Underlying Participations to the Company.  Under ACH rules, if PSI or an affiliate experiences a high rate of reversed transactions (known as "chargebacks"), it may be subject to sanctions and potentially disqualified from using the ACH system to process payments.

PSI and its affiliates also rely on computer hardware and software developed and licensed by certain technology service providers in operating the Platform.  The computer hardware or software they use may be physically located off-site, as is often the case with cloud-computing services and may not continue to be available on commercially reasonable terms (or at all).  If PSI and its affiliates cannot continue to obtain computer hardware and software from third-party technology service providers, or if they cannot transition to other technology service providers quickly, their ability to process payments will suffer and Investors' ability to receive payments on the Notes will be delayed or impaired.

Investors Must Rely on PSFI to Service the Loans and on the Member to Manage the Company and its Investments.  The Member will, subject to the terms of the limited liability company agreement of the Company, be solely responsible for the management of the operations of the Company.  Although the limited liability company agreement of the Company requires consent of a special member for (i) certain amendments to the limited liability company agreement of the Company and (ii) bankruptcy filings and similar actions, neither Investors nor the special member will have any ability to influence or control management by the Member of the day-to-day operations of the Company.

The Company has engaged PSFI to service the Underlying Loans and the mortgage loans corresponding to the Underlying Participations.  PSFI, in its capacity as Member and servicer, may take actions in respect of the Company, the Underlying Loans, and the mortgage loans corresponding to the Underlying Participations that adversely affect the value of the Underlying Loans, the Underlying Participations, and the Notes.  No Investor will have any ability to influence or control any action of PSFI, the Member, or the Company with respect to any Underlying Loan, any mortgage loan corresponding to an Underlying Participation, or any Underlying Participation.

Additionally, there can be no assurance that any consent, or denial of consent, by the special member in accordance with the terms of the limited liability company agreement of the Company will be in the best interests of all Investors.  Any such consent, or denial of consent, may adversely affect the value of the Underlying Loans, the Underlying Participations and the Notes.  Investors will have no ability to influence or control any activities of the special member with respect to the performance of its obligations under the limited liability company agreement of the Company, and the special member may make decisions with which a particular Investor disagrees.

The Platform Is Dependent on the Success of Multiple PSI Affiliates.  The Platform relies on PSI and its affiliates to perform certain services and activities in order for the Platform to continue

operating.  Because the financial success of PSI and its affiliates is tied to the volume of financings that are originated through the Platform, to increase that volume, the Company relies on its affiliates (especially PSI) to increase their facilities, personnel and infrastructure in order to accommodate greater obligations of and demands on the Platform.  This includes relying on PSI to constantly update its software and the Platform, expand its customer support services, and retain an appropriate number of employees to maintain their operations.

> If PSI and its affiliates are unable to increase capacity and maintain the necessary infrastructure, Investors may experience delays in receipt of payments or distributions on the Notes and periodic downtime of the Platform, through which many functions of PSI and its affiliates are run.  In addition, the Company and its affiliates also rely on PSI and the Platform to facilitate transactions through the Platform.  Any periodic downtime of the Platform will result in a decrease in the volume of financings being originated through the Platform, which will have a negative effect on their financial success.

**Consider carefully the following risks related to federal and state regulation:**

<u>Non-Compliance with Federal and State Regulations Could Harm the Businesses of the Company and its Affiliates</u>.  There are many state and federal laws and regulations that may potentially apply to the businesses of the Company and its affiliates, and non-compliance with those laws and regulations could impair their abilities to arrange or service the Notes, the Underlying Loans and the Underlying Participations.  Failure to comply with any of these laws and regulations that apply to the Company or an affiliates' businesses may, among other things, limit their, or a collection agency's, ability to collect all or part of the payments on Underlying Loans and Underlying Participations on which the Notes are indirectly dependent for payment.  In addition, non-compliance by the Company or any of its affiliates could subject them to damages, revocation of required licenses or other authorities, class action lawsuits, administrative enforcement actions, and civil and criminal liability, which may harm their businesses.

<u>The Company and One or More of its Affiliates May Be Required to Obtain Lending Licenses in Certain States</u>.  Some states require companies like PSFI, the Company and certain of their respective affiliates to obtain a real estate, broker, lending or other license in order to originate, hold and service commercial loans.  PSFI may originate Underlying Loans and mortgage loans corresponding to Underlying Participations directly, but PSFI does not intend to purchase or finance any loans or other investments in states where these licenses are required until such required licenses have been obtained. PSFI, the Company, or any of their respective affiliates may partner with one or more third parties (such as a bank or other depository institution) with a required license to originate loans in compliance with applicable law.  It is possible that some jurisdictions might impose mortgage broker or licensing requirements on PSFI, the Company or one or more of their respective affiliates.

<u>The Statuses of the Company and its Affiliates under the Investment Company Act May Change</u>. Neither the Company nor any of its affiliates is currently registered with the SEC as an investment company under the Investment Company Act.  The SEC heavily regulates the manner in which "investment companies" are permitted to conduct their business activities.  If the Company or any of its affiliates is required to register with the SEC as an investment company under the Investment

Company Act, it would become subject to extensive compliance requirements that would increase its costs and that could materially and/or adversely affect its business.

The Company intends to conduct its operations so that it is not required to register as an investment company under the Investment Company Act, in reliance on Section 3(c)(5)(C) of the Investment Company Act. Section 3(c)(5)(C) of the Investment Company Act, as interpreted by the staff of the SEC, requires the Company to invest at least 55% of its total assets in "mortgages and other liens on and interests in real estate" ("**Qualifying Real Estate Assets**") and at least 80% of its total assets in Qualifying Real Estate Assets plus real estate related assets.

The Company intends to invest in and hold at least 55% of its total assets in Underlying Loans and Underlying Participations that are whole participations, each of which are Qualifying Real Estate Assets. In addition, the Company intends to hold at least 80% of its total assets in a combination of Underlying Loans, whole Underlying Participations, and partial Underlying Participations (which constitute real estate related assets). The Company will monitor its assets under the 55% test and the 80% test to ensure that it is in compliance with Section 3(c)(5)(C) and related guidance.

Based on the composition of its assets, the Company believes that it will not be required to register as an investment company pursuant to the exemption set forth at Section 3(c)(5)(C). However, there can be no assurance that the Company will successfully manage its total assets to comply at all times with the 55% test and the 80% test. In addition, the provisions of the Investment Company Act, the rules and regulations promulgated under the Investment Company Act, and interpretative guidance from the SEC and its staff are subject to change. To the extent the SEC staff provides different or more specific guidance regarding any of the matters bearing upon the Section 3(c)(5)(C) exemption, the Company may be required to adjust its strategy accordingly. Any additional guidance from the SEC or its staff could provide additional flexibility to the Company, or it could further inhibit the Company's ability to pursue the investment strategy it has chosen. The loss of the Company's exemption from registration as an Investment Company could require the Company to restructure its operations, sell certain of its assets, or abstain from the purchase of certain assets, which could have an adverse effect on the Company's financial condition and results of operation, and in turn on the performance of the Notes.

The Statuses of the Company and its Affiliates as Broker-Dealers under the Exchange Act May Change. Neither the Company nor any of its affiliates is currently registered with the SEC as a broker-dealer under the Exchange Act, or any comparable state law. The SEC heavily regulates the manner in which broker-dealers are permitted to conduct their business activities.

While the Company and each of its affiliates believes that it is not required to register as a broker-dealer, the SEC or a state regulator may disagree with that determination. If the Company or any of its affiliates is required to register with the SEC or any state regulator as a broker-dealer under the Exchange Act, it would become subject to extensive compliance requirements that would increase its costs and that could materially and/or adversely affect its business.

Investors in the Notes will not receive any protection under the Advisers Act. No PeerStreet affiliate responsible for management of the Company and the Underlying Loans and Underlying Participations is currently registered or notice filed with the SEC or any state regulator as an

investment adviser or exempt reporting adviser under the Advisers Act or comparable state law. As a result, Investors will not have the protection of the Advisers Act or comparable state law based on their investments in Notes.

> Each of the Company and PSFI believes that it is not required to register as an investment adviser in connection with the operations of the Company because neither believes that the Underlying Loans and Underlying Participations would be deemed to be securities, and so they are not providing any advice with respect to the value of or the advisability of investing in securities. However, the SEC or a state regulator may ultimately disagree with the Company's determination that it (or any other affiliate responsible for managing the Underlying Loans and Underlying Participations) is not subject to regulation under the Advisers Act or similar state laws. In particular, the SEC or a state regulator may view the purchase by the Company of Underlying Participations, which are partial participation interests in mortgage loans owned by PSFI or an affiliate thereof, as a purchase of securities.

> If the Company or a currently unregistered affiliate were required to register, or subject to penalties related to its alleged noncompliance, that outcome could disrupt the Company's business related to the Notes, and could result in significant costs to the Company, which could have a negative effect on the business operations and financial conditions of the Company and the performance of the Notes.

The Company and its Affiliates Are Not Currently Subject to Banking Regulations or Examinations. The Company and its affiliates are not currently subject to the banking regulations of any state or federal regulatory agency, nor are they subject to the periodic examinations to which commercial banks and other thrift institutions are subject. Consequently, financing decisions and decisions regarding establishing loan loss reserves by the Company and its affiliates are not subject to periodic review by any governmental agency. Moreover, such entities are not subject to regulatory oversight relating to their capital, asset quality, management or compliance with laws.

Changes in Regulation of Financial Institutions May Affect the Businesses of the Company and its affiliates. Recent legislative and regulatory initiatives have imposed restrictions and requirements on financial institutions that could have an adverse effect on the businesses of the Company and its affiliates. There has been, and may continue to be, a related increase in regulatory investigations of the trading and other investment activities of alternative investment funds. Those investigations may impose additional expenses on the Company and its affiliates, may require the attention of senior management, and may result in fines if any such entities are deemed to have violated any regulations.

Changes in Regulation of Internet Commerce May Affect the Businesses of the Company and its Affiliates. As online commerce develops, federal and state governments may adopt new laws to regulate it, which may negatively affect the businesses of the Company and its affiliates. The cost to comply with such laws or regulations could be significant and would increase such parties' operating expenses, which may cause them to pass along those costs to Investors and other customers in the form of increased fees. In addition, federal and state governmental or regulatory agencies may decide to impose taxes on services provided over the Internet. These taxes could

discourage the use of the Internet as a means of commercial financing, which would adversely affect the viability of the businesses of the Company and its affiliates.

<u>Cost of Complying with Regulations May Affect the Company's Ability to Make Payments on the Notes to Investors</u>.  The Underlying Loans, the Underlying Participations and the operations of the Company, the Member, PSFI, PSI and their respective affiliates, conducted in connection with the Underlying Loans and Underlying Participations are subject to federal, state and local laws and regulations, as well oversight from independent agencies.  There are various local, state and federal fire, health, life-safety, building code, zoning, environmental, and similar regulations with which lenders and Borrowers may be required to comply and which may subject lenders and Borrowers to liability in the form of fines or damages for noncompliance.

For example, the presence of hazardous substances on the property, or the lack of wheelchair access, can violate various laws, rules, and regulations.  Violations may exist at the time an Underlying Loan or mortgage loan corresponding to an Underlying Participation is funded or may arise post-funding.  Certain laws, rules, and regulations may impose joint and several liability on customers, lenders, owners or operators for fines and/or the costs to investigate and remediate, regardless of fault or whether the acts causing the violations were legal.

In connection with the acquisition of Notes, Investors may be exposed to costs incurred in connection with such regulations.  The cost of defending against claims, of any damages or fines, of compliance with regulatory requirements or of remediating any related issues could materially and adversely affect the Company's collections on the Underlying Loans and Underlying Participations, which could, in turn, negatively affect payments by the Company on the Notes, as well as the Net Asset Value.

<u>The Company and its Affiliates Must Comply with Anti-Money Laundering Laws and Regulations</u>.  Laws intended to prohibit money laundering may require the Company and its affiliates to disclose information about Investors to regulatory authorities.  The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 requires financial institutions to establish and maintain compliance programs to guard against money laundering activities, and requires the Secretary of the Treasury to prescribe regulations in connection with anti-money laundering policies of financial institutions. It is possible that new legislation or regulations could require us or our third-party service providers to share information with governmental authorities with respect to prospective investors in connection with the establishment of anti-money laundering procedures.

Any legislation and/or regulations like this could require the Company and its affiliates to implement additional restrictions on the transfer of the Notes.  For example, Member, in its capacity as manager of the Company, will not consent to Investors purchasing or transferring Notes unless it receives information necessary to verify the identity of any prospective Investor and the source of the any funds paid to the Company, or as is necessary to comply with any customer identification programs required by FinCEN or the SEC to comply with customer identification program rules.  No Investor will be accepted by the Company that is named on the Treasury's list of "Specially Designated Nationals," "Blocked Persons," or "Sanctioned Countries or Individuals." In the event of delay or

failure by a prospective Investor to produce any information required for verification purposes, a request to transfer any Notes may be refused.

**Consider carefully the following additional risks:**

<u>Delays in Filling Vacancies or Selling Real Estate Could Adversely Affect the Underlying Loans and Mortgage Loans Corresponding to the Underlying Participations.</u> Each Note offered under this PDN Supplement corresponds to the Company's portfolio of Underlying Loans and Underlying Participations, which generally consist of or correspond to residential properties which are intended to generate revenue for Borrowers through the rental or sale of such property, and which revenue is intended to fund payments by the Borrowers on the Underlying Loans and the mortgage loans corresponding to the Underlying Participations. There can be no assurance that the Borrowers will be able to generate revenue from the Underlying Properties as anticipated, whether due to vacancies, inability to rent or sell the Underlying Properties at an attractive price, or a variety of other factors. For example, (i) an Underlying Property may incur vacancies either by the expiration of tenant leases or the continued default of tenants under their leases, (ii) an Underlying Property may be vacant at the time the corresponding Underlying Loan or mortgage loan corresponding to an Underlying Participation is funded, or (iii) an Underlying Property may be believed to be occupied at the time an Underlying Loan or a mortgage loan corresponding to an Underlying Participation is funded, but such leases may have been fraudulent, breached, or cancelled. If vacancies continue for a prolonged period of time or tenants cannot be found at the projected rates, Borrowers may be unable to make payments on their Underlying Loans and mortgage loans corresponding to Underlying Participations as anticipated. In addition, the resale value of an Underlying Property could be diminished, because the market value of such Underlying Property may depend upon the value of its cash flow.

<u>Returns on Underlying Loans and Mortgage Loans Corresponding to Underlying Participations May Rely on Payments from Tenants.</u> Payments by Borrowers to the Company on Underlying Loans and on mortgage loans corresponding to Underlying Participations may rely on rental payments from tenants to Borrowers under leases. If tenants, especially significant tenants, fail to make rental payments under their leases, the corresponding Underlying Loans and mortgage loan corresponding to Underlying Participations may not generate payments to the Company and, therefore, payments by the Company on the Notes could be reduced.

> The bankruptcy or insolvency of a tenant may also adversely affect the income produced by the applicable Underlying Property. If a tenant becomes a debtor in a case under the U.S. Bankruptcy Code, a Borrower cannot evict that tenant solely because of its bankruptcy. The bankruptcy court may authorize the tenant to reject and terminate its lease, and any claim against such a tenant for uncollectible future rent would be subject to a statutory limitation that might be substantially less than the remaining rent actually owed under the tenant's lease. Any shortfall in rent payments to a Borrower could adversely affect the Company's collections on the corresponding Underlying Loan or mortgage loan corresponding to an Underlying Participation, which in turn could negatively affect payments by the Company on the Notes.

<u>Underlying Properties May Be Located in Jurisdictions and Markets Unfamiliar to the Company and its Affiliates</u>.  Underlying Properties may be located in jurisdictions or markets with which the Company and its affiliates are unfamiliar, and in which the Company and its affiliates do not have experience evaluating or managing properties.  Borrowers' ability to generate revenue from Underlying Properties will depend largely on their effective management of their Underlying Properties.  Neither the Company nor any of its affiliates can guarantee, and may not be able to effectively evaluate, a Borrower's ability to manage an Underlying Property in the applicable jurisdiction and market.  In addition, in the event that a Borrower defaults on an Underlying Loan or mortgage loan corresponding to an Underlying Participation, applicable laws, market conditions and other factors specific to the applicable jurisdiction and market in which the Underlying Property is located may affect the Company's available remedies or its ability to recoup losses.

<u>Payments on Underlying Loans and Mortgage Loans Corresponding to Underlying Loans May Be Affected by Natural Disasters or Other Factors</u>.  Underlying Properties may be located in areas that are subject to an increased risk of natural disaster, including without limitation earthquakes, hurricanes or high winds, tornadoes, wildfires and floods.  The occurrence of a natural disaster could cause structural damage to or destroy Underlying Properties.  Neither the Company nor any of its affiliates intends to obtain any insurance policies covering such natural disasters and does not intend to require Borrowers to obtain such insurance.  It is possible that any such insurance, if obtained, will not be sufficient to pay for any damage to an Underlying Property that may occur as the result of a natural disaster.  Any damage that a Borrower must pay for could affect payments to the Company on such Borrower's Underlying Loan or payments to PSFI on such Borrower's mortgage loan corresponding to an Underlying Participation, which in turn could negatively affect payments by the Company on the Notes.

> In addition to the foregoing, events such as natural disasters, pandemics and acts of war or terrorism could affect the marketability and value of Underlying Properties for rental or sale purposes.  Any such diminution in the marketability or value of an Underlying Property could affect payments to the Company on the corresponding Underlying Loan or Underlying Participation, which in turn could negatively affect payments by the Company on the corresponding Notes.

<u>Underlying Properties May Be Subject to Indirect or Direct Environmental Risks</u>.  Environmental issues may affect the operation and value of Underlying Properties and Borrowers' ability to make payments on Underlying Loans and mortgage loans corresponding to Underlying Participations. If toxic environmental contamination is discovered to exist on an Underlying Property, it might affect the viability of and returns generated by such Underlying Property, the affected Borrower's ability to make payments on the corresponding Underlying Loan or mortgage loan corresponding to an Underlying Participation could be negatively affected, and any security interest held by the Company in such Underlying Property could, in turn, be devalued or worthless.  To the extent that the Company is forced to foreclose on and/or operate such a property, potential additional liabilities include reporting requirements, remediation costs, fines, penalties and damages, all of which could adversely affect the Company's ability to make payments on the Notes.

> Of particular concern may be those properties that are, or have been, the site of manufacturing, industrial or disposal activity.  These environmental risks may give rise to a diminution in value of the security interest or to liability for cleanup costs or other

remedial actions. This liability could exceed the value of the Company's security interest. For this reason, the Company may choose not to foreclose even if we have foreclosure rights on contaminated property rather than risk incurring liability for remedial actions.

Under the laws of certain states, an owner's failure to perform remedial actions required under environmental laws may give rise to a lien on mortgaged property to ensure the reimbursement of remedial costs. In some states this lien has priority over the lien of an existing mortgage against the real property. Because the costs of remedial action could be substantial, the value of a mortgaged property as collateral for a loan could be adversely affected by the existence of an environmental condition giving rise to a lien.

In addition, the state of law is currently unclear as to whether and under what circumstances clean-up costs, or the obligation to take remedial actions, can be imposed on the Company as holder of an Underlying Loan or Underlying Participation, or PSFI as holder of a mortgage loan corresponding to an Underlying Participation. If a Borrower becomes liable for cleanup costs, it may bring an action for contribution against the parties who contributed to the environmental hazard, but these persons or entities may be bankrupt or otherwise judgment-proof.

<u>Security on an Underlying Loan or Mortgage Loan Corresponding to an Underlying Participation Does Not Eliminate the Risk of Default</u>. The security interest of the Company in an Underlying Loan or mortgage loan corresponding to an Underlying Participation does not remove the risk associated with default. Each Underlying Loan and each mortgage loan corresponding to an Underlying Participation will generally be secured by a first priority security interest such as a mortgage, deed of trust or security deed on the underlying real estate. The exact nature of the security interest related to each Underlying Loan and each mortgage loan corresponding to an Underlying Participation will involve specific types of risk in terms of realizing on the collateral in the event that the applicable Borrower defaults. These risks include, among others, completion costs for incomplete projects, an owner's ability to lease out office space, or difficulties in selling the underlying property or obtaining a refinance loan. These risks are not mitigated by foreclosure, even where the Company has foreclosure rights.

If an Underlying Loan or a mortgage loan corresponding to an Underlying Participation becomes past due or is otherwise in default, the Company, or PSFI on behalf of the Company, may need to foreclose on the relevant Underlying Property at a foreclosure sale unless the property is purchased by a third-party bidder at the foreclosure sale.

In certain cases, PSFI or an affiliate thereof may act as manager for the foreclosed real estate, and the costs of foreclosure may be advanced by the Company or an affiliate thereof, but if the Company cannot quickly sell such property and the property does not produce any significant income, the cost of owning, maintaining, and selling the property would reduce any proceeds gained through the sale. If the foreclosed property cannot be sold for net proceeds that can fully return the outstanding amount of the corresponding Underlying Loan or mortgage loan corresponding to an Underlying Participation, then payments by the Company to Investors on the Notes may be impaired.

Foreclosure statutes vary widely from state to state. Properties tied to a defaulted Underlying Loan or mortgage loan corresponding to an Underlying Participation will need to be foreclosed upon in compliance with the laws of the state where the applicable Underlying Property is located. Many states require lengthy processing periods or the obtaining of a court decree before a mortgaged property may be sold or otherwise foreclosed upon. Further, statutory rights to redemption and the effects of anti-deficiency and other laws may limit the ability for the Company (or PSFI, on behalf of the Company), an affiliate thereof, or a third party to timely recover the value of an Underlying Loan or mortgage loan corresponding to an Underlying Participation in the event that the corresponding Borrower defaults on such Underlying Loan or mortgage loan corresponding to an Underlying Participation. A bankruptcy of a Borrower may prevent the Company and its affiliates from exercising its foreclosure remedy promptly.

If a Borrower or any other party claiming to have some form of interest in an Underlying Property, Underlying Loan or mortgage loan corresponding to an Underlying Participation enters bankruptcy, all proceedings and collection efforts against such Underlying Property are automatically stayed. This stay will prevent the Company and its affiliates from foreclosing on the Underlying Property (even where it has such rights) unless relief from the stay can be obtained from the bankruptcy court, and there is no guarantee that any such relief will be obtained. Significant legal fees and costs may be incurred in attempting to obtain relief from a bankruptcy stay from the bankruptcy court and, even if such relief is ultimately granted, it may take several months or more to obtain. In such event, the Company and its affiliates will be unable to promptly exercise any foreclosure remedy and realize any proceeds from a property sale.

Bankruptcy courts have broad powers to permit a sale of an Underlying Property free of the Company's lien, to compel the Company to accept an amount less than the balance due under the corresponding Underlying Loan or mortgage loan corresponding to an Underlying Participation, and to permit the Borrower to repay the loan over a term which may be substantially longer or at different interest rates than the original terms of the Underlying Loan or mortgage loan corresponding to an Underlying Participation.

<u>The Company May Retain Funds for Payment of Certain Fees</u>. The Company may retain a portion of funds received from Borrowers in respect of the Underlying Loans or from PSFI in respect of the Underlying Participations to pay any non-sufficient funds fees, attorneys' fees or collection fees incurred by it or imposed by any third-party service provider or collection agency in connection with collection efforts. If any of these fees are collected or imposed, it may reduce the amount paid by the Company in respect of the Notes. If a Borrower does not make a payment due to the Company on any specific payment due date, or if the payment isn't sufficient to cover advances, fees, and costs, the amount paid by the Company to Investors on the Notes may be reduced in whole or in part and the Net Asset Value may be negatively impacted.

<u>The Company and its Affiliates Do Not Control Third Parties Who May Affect the Success of the Underlying Loans or Underlying Participations</u>. The performance of the Underlying Loans and the Underlying Participations is dependent on the performance of third parties that neither the Company nor its affiliates control, including various Borrowers and any third parties engaged by the Borrowers to perform services relating to the Underlying Properties. These third parties are

solely responsible for operating their respective businesses, and their conduct could adversely affect the performance of the Underlying Loans or Underlying Participations, or expose the Underlying Properties to unanticipated risks.  As a result, the ability of Borrowers to make payments on Underlying Loans and mortgage loans corresponding to Underlying participations may be adversely affected, and the expected payments on the Notes may be reduced in whole or in part and the Net Asset Value may be negatively impacted.

Additionally, in cases where Underlying Participations represent only a portion of PSFI's right, title and interest in and to the relevant mortgage loans, PSFI and any other party that owns any interest in the mortgage loan may take actions that adversely affect the value of the mortgage loan or the Company's ability to collect on its Underlying Participation.

The Performance of the Underlying Loans and Underlying Participations May Depend on Third Parties with Limited to No Operating History.  Borrowers, and third parties engaged by various Borrowers, including without limitation property managers or leasing agents, in connection with the management and operation of Underlying Properties, may have limited or no operating history and may lack experience managing and operating properties similar to the applicable Underlying Properties.  Such lack of experience may negatively affect the performance of the applicable Underlying Loans and Underlying Participations and the expected payments on the Notes.

The Ability of the Company and its Affiliates to Direct and Control how Underlying Properties are Managed may be Limited.  Neither the Company nor any of its affiliates will supervise any Borrower or any third party engaged by any Borrower in connection with any Underlying Property on a day-to-day basis.  Thus, the success of the Underlying Loans and Underlying Participations may depend in part on the ability of the Borrowers and any such third parties to manage the Underlying Properties.  Any adversity experienced by the Borrowers or such third parties could adversely affect the performance of the Underlying Loans and the Underlying Participations, and the expected payments on the Notes.

The Company and its Affiliates Rely on Information Provided by Third Parties.  The Company and its affiliates rely on information provided to them by third parties, such as prospective Borrowers, appraisers, title agencies, escrow companies, data providers, machine-learning systems, etc., in their underwriting and administration of potential loans.  Such information, and information provided by any third parties, may be incomplete, inaccurate or intentionally false.  Although the Company and its affiliates may make attempts to verify some of the information provided by Borrowers or third parties, as a practical matter, they cannot verify all such information.  Though the Company or an affiliate thereof performs due diligence on Underlying Loans, Underlying Participations and counterparties, Investors may lose all or a portion of their investments in Notes if any Borrowers or third parties have supplied false, misleading or inaccurate information to the Company or an affiliate thereof.

Many Third Parties on Which the Company and its Affiliates May Rely Are Subject to Regulation.  The lending industry is a highly regulated industry.  Many third parties that the Company and its affiliates work with (e.g., banks, private lenders, servicers, appraisers, etc.) are responsible for their compliance with applicable state and federal lending laws, and neither the Company nor any of its affiliates have any control over their compliance.  These third parties may be subject to licensing requirements in one or more states.  While the Company and its affiliates may conduct

due diligence on the third parties they work with, there can be no assurance that such third parties are in compliance with applicable laws, including with respect to their compliance with applicable licensing requirements.

<u>Defaulting Borrowers</u>.  If a Borrower remains in default on an Underlying Loan or on a mortgage loan corresponding to an Underlying Participation and fails to cure that default after a reasonable period of time, then the Company, or PSFI on behalf of the Company, may foreclose on the Underlying Property corresponding to that Underlying Loan or that mortgage loan corresponding to the Underlying Participation, in cases where the Company has such rights.  The Company or PSFI might have difficultly enforcing its foreclosure rights, however.  Even if the Company or PSFI can successfully foreclose on the Underlying Property, it may not be able to then sell the Underlying Property for a prolonged period of time or recover all (if any) funds back from such a sale.

<u>PSFI or an Affiliate Thereof May Provide Additional Financing to Borrower</u>.  PSFI or an affiliate thereof may originate or acquire multiple loans corresponding to a Borrower, to be used on any number of projects.  Any such other loans will generally not be disclosed on the Monthly Portfolio Report.  Because PSFI and its affiliates work with many Borrowers more than once, PSFI and its affiliates may choose not to act in the same manner that a typical lender to a borrower would, which could adversely affect Investors in Notes corresponding to any defaulted Underlying Loans or defaulted mortgage loan corresponding to an Underlying Participation corresponding to such Borrower.  For example, and without limitation, the Company, or PSFI on behalf of the Company, may decide to pursue resolutions that prioritize certain loans over, or at the expense of, a defaulted Underlying Loan or a defaulted mortgage loan corresponding to an Underlying Participation.

<u>The Company May Advance Funds to Borrowers</u>.  The Company may determine to advance funds to a Borrower in connection with an Underlying Loan if it determines such an advance to be necessary and prudent to protect the interests of Investors.  For example, the Company might make such an advance upon finding that a Borrower's casualty insurance was cancelled or expired or that a Borrower is delinquent on paying property taxes.  The amount of any such advances will be added to the outstanding principal amount of the applicable Underlying Loan and will bear interest at reasonable rates (not to exceed the maximum rate allowed by law).  Advances at these rates may be significantly more expensive for Borrowers than if they had paid for those expenses originally.  Such advances will also need to be repaid by a Borrower before any existing balance of the applicable Underlying Loan is paid down, which, as a result, may delay payments on the existing balance of an Underlying Loan that would otherwise be ultimately utilized to fund payments by the Company to Investors on the Notes.

<u>Borrowers May Misuse Funds</u>.  Neither PSFI nor any of its affiliates controls any Borrower.  Should the proceeds of an Underlying Loan or a mortgage loan corresponding to an Underlying Participation be diverted improperly or otherwise misused, payments by the Company to Investors could by impaired.

<u>Borrowers May Incur Debt and May Be Over Leveraged</u>.  Borrowers may incur unsecured or secured indebtedness besides an Underlying Loan or a mortgage loan corresponding to an Underlying Participation, regardless of whether the terms of such Underlying Loan or such mortgage loan corresponding to an Underlying Participation impose restrictions on their ability to

incur additional indebtedness.  Any increase in the debt loads held by a Borrower may adversely affect their creditworthiness and could result in their financial distress, insolvency or bankruptcy. Additional indebtedness may also cause a Borrower to be less likely to make payments on their Underlying Loan to the Company or on their mortgage loan corresponding to an Underlying Participation to PSFI.

Borrowers May Face Insurance Risks.  Borrowers may be required to, or may elect to, obtain insurance against risks faced by Underlying Loans or mortgage loans corresponding to Underlying Participations.  This insurance may prove costly or could become unavailable for a Borrower altogether.  Real estate properties are typically insured against risk of fire damage and certain other property casualties, but these casualties are sometimes not covered by severe weather or natural disaster events such as landslides, earthquakes or floods.  Changes in the conditions affecting the economic environment in which insurance companies do business could affect Borrowers' ability to continue insuring any underlying property at a reasonable cost or could result in insurance being unavailable altogether.  Moreover, any hazard losses not then covered by a Borrower's insurance policy would result in the Underlying Loan or the mortgage loan corresponding to an Underlying Participation corresponding to such Underlying Property becoming significantly under-secured.

Borrowers Rely on Projected Revenues.  In underwriting business purpose loans, lenders generally rely on revenue projections typically developed by prospective borrowers, which may prove inaccurate and overestimated over time.  The payment schedule with respect to an Underlying Loan or a mortgage loan corresponding to an Underlying Participation may be based in whole or in part on these projected revenues, which are based on factors such as expected vacancy rates, expense rates, and other projected income and expense figures relating to the corresponding Underlying Property.  The actual revenues generated by an Underlying Property could fall short of projections due to factors such as, among others, lower-than-expected rental revenues, greater-than-expected vacancy rates or higher property management expenses than anticipated.  In such event, a Borrower's cash flow could be inadequate to repay the Underlying Loan or the mortgage loan corresponding to an Underlying Participation in full.

Underlying Loans or Mortgage Loans Corresponding to Underlying Participations May Require Borrowers to Make Balloon Payments.  One or more Underlying Loans or mortgage loans corresponding to Underlying Participations may require the applicable Borrower to make a "balloon" payment of all unpaid principal and interest at the end of the term of such Underlying Loan or mortgage loan.  Borrowers may be unable to make such payments out of their own funds and, if so, be compelled to refinance or sell the Underlying Properties corresponding to such Underlying Loans or such mortgage loans corresponding to Underlying Participations. Fluctuations in real estate values, interest rates, and the unavailability of mortgage funds could adversely affect the ability of real estate companies to refinance their loans at maturity or successfully sell the property for enough money to pay off an Underlying Loan or a mortgage loan corresponding to an Underlying Participation.  If a Borrower cannot pay any applicable "balloon" payment, payments by the Company to Investors in the Notes may be impaired.

Underlying Loans and Mortgage Loans corresponding to Underlying Participations May Pay off Early.  Prepayment of Underlying Loans and mortgage loans corresponding to Underlying Participations by Borrowers may impair payments by the Company to Investors on the Notes. Prepayments occur if a Borrower decides to pay some or all of the principal amount on an

Underlying Loan or a mortgage  loan corresponding to an Underlying Participation earlier than originally scheduled.  Generally, Borrowers may prepay all or a portion of the remaining principal amount or redemption amount of any of their Underlying Loans or mortgage loans corresponding to Underlying Participations at any time without penalty.  Upon a prepayment of the entire remaining unpaid principal amount of an Underlying Loan or a mortgage  loan corresponding to an Underlying Participation, further interest will not accrue after the date on which the prepayment is made.  If a Borrower prepays a portion of the remaining unpaid principal balance on an Underlying Loan or a mortgage  loan corresponding to an Underlying Participation, the term for repayment of such Underlying Loan or mortgage loan may not change, but the prepaid portion of such Underlying Loan or mortgage loan will not accrue interest after the date of prepayment, and the anticipated total investment return on such Underlying Loans or such mortgage loans corresponding to Underlying Participations may thus decrease.

Increased Principal Amounts Due to Origination Fees.  Borrowers are generally required to pay certain loan origination fees in connection with the origination of Underlying Loans and mortgage loans corresponding to Underlying Participations.  As a result, the principal amount of the Underlying Loans and mortgage loans corresponding to Underlying Participations will generally be increased, which may adversely affect the ability of Borrowers to repay such Underlying Loans or mortgage loans.  In addition, these fees increase the gross principal amount of the Underlying Loans and the mortgage loans corresponding to Underlying Participations, which decreases Borrowers' equity in the Underlying Properties corresponding to such Underlying Loans and mortgage loans and, in turn, decreases the Company's security interest in the corresponding Underlying Property.

The Underlying Loans and the Mortgage Loans Corresponding to Underlying Participations are Construction or Rehabilitation Loans.  The Underlying Loans and the mortgage loans corresponding to Underlying Participations may include construction or rehabilitation loans.  Such loans involve a number of particular risks involving, among other things, the timeliness of the applicable project's completion, the integrity of appraisal values, whether or not the completed Underlying Property can be sold for the amount anticipated, the priority of lien sold to investors, and the length of the ultimate sale or rental process.

> Disbursements are typically made on construction or rehabilitation loans only as portions of the construction work are completed, with the amount of each disbursement based upon a percentage of work completed or certain milestones being reached.  Borrowers may misrepresent the progress made, which may lead to funds being disbursed where no work (or insufficient work) has been done.  If a Borrower defaults on an Underlying Loan or a mortgage  loan corresponding to an Underlying Participation, construction or improvements have not been completed within the time period set forth in the construction or rehabilitation agreement, or if the Company, or PSFI on behalf of the Company, determines that the balance of the applicable Underlying Loan or mortgage loan is not sufficient to complete the construction or rehabilitation, then the Company, or PSFI on behalf of the Company, may generally use any remaining retained funds to pay down sums due on the applicable Underlying Loan or mortgage loan, to complete the redevelopment, or may require the Borrower to contribute additional funds to support completion of the construction.

If construction work is not completed (due to contractor abandonment, unsatisfactory work performance or various other factors) and all funds have already been expended, then in the event of a default the Company, or an affiliate thereof, may have to invest significant additional funds to complete the construction work.  Any such investment would be recuperated by the Company, or such affiliate, prior to any payments being made in respect of the Notes.

If the value of an uncompleted Underlying Property is materially less than the amount of the corresponding Underlying Loan or mortgage loans corresponding to the applicable Underlying Participation, even if the work were completed, then upon a default, the Company, or an affiliate thereof, might need to invest additional funds in order to recoup all or a portion of the Underlying Loan or mortgage loan amount.  Default risks also exist where it takes a Borrower longer than anticipated either to construct, sell or lease the Underlying Property, or if a Borrower does not receive sufficient proceeds from the sale or lease of an Underlying Property to repay the corresponding Underlying Loan or mortgage loan in full.

The Company, or an affiliate thereof, may require a Borrower to have special builder's risk insurance (or "course of construction" insurance) for an Underlying Property, which could reduce payments by the Company to the Investors' on the Notes, as the Borrower will be required to expend funds toward retaining insurance instead of using those funds to make payments on its Underlying Loan or its mortgage loan corresponding to an Underlying Participation.

In some jurisdictions, contractors or other parties performing work on an Underlying Property may record mechanic's liens against the associated property, and such liens may be legally granted priority over the Company's lien securing the Underlying Loan or mortgage loan corresponding to the Underlying Participation, if any.  This may result in an Underlying Loan or mortgage loan being foreclosed out or the mechanic's lien being paid off first, either of which scenario may negatively affect the anticipated returns of Investors in the Notes.

Lenders Are Subject to Regulation.  The lending industry is a highly regulated industry.  PSFI and the third-party lenders that PSFI and its affiliates work with (e.g., banks and private lenders) are responsible for their compliance with applicable state and federal lending laws.  PSFI and its affiliates have no control over the compliance of any third party with applicable law.  Although PSFI or an affiliate thereof may purchase mortgage loans from third party lenders and then act as lender to the borrowers associated with those loans, none of those lenders are the agents of PSFI or any of its affiliates.  Third party lenders may be subject to licensing requirements in one or more states.  While PSFI and its affiliates conduct due diligence on the third-party lenders they work with, there can be no assurance of their compliance with applicable laws, including with respect to their compliance with applicable licensing requirements.

In the event that the originating lender of an Underlying Loan or a mortgage loan corresponding to an Underlying Participation fails to comply with applicable laws, it is possible that such Underlying Loan or mortgage loan would be deemed void in full or in part or would be otherwise unenforceable as a result of the originating lender's non-

compliance with applicable laws.  As a result, payments on such Underlying Loan or mortgage loan could be reduced or never paid to the Company and, in turn, payments on the Notes could be impaired.

Federal Regulation of Underlying Loans and Mortgage Loans Corresponding to Underlying Participations.  Underlying Loans and mortgage loans corresponding to Underlying Participations may be subject to certain provisions of the Truth-In-Lending Act of 1968, the Home Ownership and Equity Protection Act, or other applicable laws and rules concerning loans.  These regulations may impose additional disclosure and other requirements on creditors.

## 12. Conflicts of Interest

The Company and its affiliates may be subject to certain conflicts of interest in selling Notes.  The following are a list of certain potential conflicts of interest that may arise in connection with any Notes Investors hold.  This list is not exhaustive, and Investors should carefully consider the risks associated with any potential conflicts of interest.

PSFI Will Receive Fees in Connection with Servicing Underlying Loans and Mortgage Loans Corresponding to Underlying Participations.  PSFI will service the Underlying Loans and the mortgage loans corresponding to the Underlying Participations, and will receive the Standard Fee for the performance of these services.  This may incentivize PSFI to charge higher fees for, or provide additional, services and activities with respect to, the Underlying Loans.  All fees charged by PSFI will reduce amounts paid to Investors in respect of the Notes.  The Standard Fee charged in respect of an Underlying Loan or Underlying Participation will vary based on a variety of factors, including the identity of the purchaser or purchasers of the Underlying Loan or Underlying Participation.  As a result, PSFI may be incentivized to sell more whole Underlying Loans or more Underlying Participations based on variations in the Standard Fees, which may adversely affect the composition of the Company's portfolio of Underlying Loans and Underlying Participations.  In addition, in certain cases the Standard Fee may be higher than fees paid by investors in loans made through other products available through the PeerStreet platform, in which case investors in the Notes could receive lower returns than they would have by investing in those instruments.

The Member, PSFI, PSI and their Respective Affiliates May Prioritize Servicing More Profitable Offerings of Securities.  Various affiliates of the Company may engage in offerings of securities simultaneously with this offering of Notes.  These other offerings may be more secure or more profitable than the Notes.  Each of the Member, PSFI, PSI and their respective affiliates may be incentivized to service more secure and more profitable offerings of securities before servicing less secure and less profitable offerings of securities, which may further negatively affect the returns on otherwise less secure or profitable offerings of securities.

Relationships of the Company, PSFI and their Respective Affiliates with Third Parties May Affect Foreclosure Decisions.  The Company, PSFI and their respective affiliates may arrange to invest in multiple investments corresponding to the same third party or third parties.  To the extent that an Underlying Loan or a mortgage loan corresponding to an Underlying Participation corresponds to such a third party, in the event of a default by the applicable Borrower on such Underlying Loan or mortgage loan, in order to maintain its relationship with that third party, the Company, or PSFI on behalf of the Company, may choose or be required to enforce or forbear from enforcing its

foreclosure rights, if any, in an Underlying Loan or a mortgage loan corresponding to an Underlying Participation. In addition, the Company, or PSFI on behalf of the Company, may also be incentivized to make decisions in respect of such third parties that minimize harm to itself and its affiliates, rather than to make decisions which maximize returns to Investors. Additionally, the Company and other affiliates of PSFI may invest in partial participation interests in the same loan. In the event of a default or payment shortfall in respect of such a loan, PSFI, the Company and any relevant affiliates may be subject to conflicts of interest relating to foreclosure decisions or alternative default resolutions which may disproportionately disadvantage the Company.

<u>PSFI, the Company and their Respective Affiliates Have an Incentive to Purchase or Originate as Many Underlying Loans as Possible</u>. Substantially all of the revenues of PSFI, the Company and their respective affiliates are derived from listing, origination, and servicing fees or "spreads" generated through making and arranging real estate loan investments. As a result, PSFI, the Company and their respective affiliates may have an incentive to fund as many investment opportunities as possible in order to maximize the amount of fees that they are able to generate. Increased volume increases the demands on the management resources of PSFI, the Company and their respective affiliates, and their ability to devote adequate attention and resources to collection of payments or returns on such investment opportunities. In the event that PSFI, the Company and their respective affiliates take on volumes of investments that exceed their respective abilities to manage them, collections on the Underlying Loans and Underlying Participations could be adversely affected.

<u>Investors in affiliates of the Company May Control Third Parties that Are Involved in the Notes Offered Under this PDN Supplement</u>. Some of the investors and principals in affiliates of the Company may own, control or be affiliated with entities or organizations that are involved in the Notes offered under this PDN Supplement. Affiliates of the Company may have past, present or future business or commercial relationships with any of these third parties, including without limitation an originating lender or Borrower of an Underlying Loan or a mortgage loan corresponding to an Underlying Participation. One or more affiliates of the Company may, in its sole discretion, conduct business with these third parties without providing any notice or disclosure to Investors. These arrangements may create potential conflicts of interest, as investors in affiliates of the Company that control these third parties may be incentivized to encourage affiliates of the Company to do additional business with third parties associated with those investors.

13. **Material U.S. Federal Income Tax Considerations**

Investing in Notes issued under this PDN Supplement may carry significant tax implications. You should not regard the contents of this PDN Supplement or any other communication from the Company or any of its affiliates as a substitute for careful and independent tax and financial planning. You are encouraged to consult with your own independent accountants, financial planners, attorneys and other professionals with respect to the legal and tax aspects of an investment in Notes with specific reference to your own tax situation before investing in Notes. The Company and its affiliates make no representations as to any tax implication of investing in the Notes.

14. **Where to Find Additional Information**

In addition to this PDN Supplement, the other Offering Materials will be provided to you in electronic form by the Company or an affiliate thereof.  Should you have any questions on the offering of Notes covered by this PDN Supplement, the Notes being offered or any of the above materials, please do not hesitate to contact PeerStreet at support@peerstreet.com or as follows:

> PS Portfolio – ST1, LLC
> 2121 Park Place, Suite 250
> El Segundo, CA 90245
> info@PeerStreet.com

You can also access and review information about any Notes you hold through the Platform.  The Company or an affiliate thereof may communicate with you by e-mail or by mail at the address you provide if there are material developments regarding your Notes or the corresponding Underlying Loans or Underlying Participations that it deems necessary to transmit.  PSFI (on behalf of the Company), an affiliate thereof, or a third-party custodian, will maintain possession of all original documents for each Underlying Loan, Underlying Participation, and related security instruments.

<u>**EXHIBIT A**</u>

**FORM INSTRUMENT**

**PAYMENT-DEPENDENT NOTE**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS. THIS NOTE IS SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF A REGISTRATION STATEMENT IN EFFECT WITH RESPECT TO THIS NOTE UNDER THE ACT OR APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY (AS DEFINED BELOW) THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. SEE THE PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") ISSUED BY THE COMPANY, DATED AS OF DECEMBER 2, 2019, THE INVESTOR AGREEMENT BETWEEN THE COMPANY AND THE INVESTOR, AND THE PDN SUPPLEMENT FOR THE PORTFOLIO INVESTMENT PRODUCT (THE "PDN SUPPLEMENT") FOR MORE DETAILS.

FOR PURPOSES OF SECTIONS 1272, 1273 AND 1275 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, THIS NOTE IS BEING ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID") BECAUSE PAYMENTS ON THIS NOTE ARE DEPENDENT ON PAYMENTS ON THE UNDERLYING LOANS, UNDERLYING PARTICIPATIONS AND THE NET ASSET VALUE OF THE COMPANY (AS EACH SUCH TERM IS DEFINED IN THE PDN SUPPLEMENT). THIS NOTE'S ISSUE PRICE IS THE INVESTMENT AMOUNT AS SET FORTH BELOW, AND ANY ISSUE DATE IS THE ORIGINAL ISSUE DATE. FOR FURTHER INFORMATION REGARDING THE AMOUNT OF OID AND THE YIELD TO MATURITY OF THIS NOTE, THE HOLDER OF THIS NOTE SHOULD CONTACT THE COMPANY AT 2121 PARK PL., SUITE 250, EL SEGUNDO, CA 90245.

Company: PS Portfolio – ST1, LLC
Investor: **_____**
Aggregate Outstanding Principal Amount of this Note: U.S. **_____**
Initial Issue Date: **_____**
Initial Maturity Date: **_____**[1]

This Payment-Dependent Note (this "**Note**") contains the terms that shall apply to the investments (the "**Portfolio Investment**") made by Investor via the platform located at www.peerstreet.com (the "**PeerStreet Website**") in accordance with the Investor Agreement, the Memorandum, and the PDN Supplement. Capitalized terms that are not defined herein shall have the meaning prescribed to them in the Memorandum, the PDN Supplement, or Investor Agreement. The Company will issue Notes in electronic form only. This means that each Note will be stored on the PeerStreet Website. Investor can view this Note online and print copies of this Note for its records by visiting its secure, password-protected webpage in the "Portfolio" section of the PeerStreet

---

[1] To be the first Redemption Date that is at least ten (10) years after the initial issue date.

Website (the "**Portfolio Dashboard**"). The Company will not issue certificates for the Notes. As stated in the PDN Supplement, a single Note will be issued for each Portfolio investor. If and when Investor makes an additional investment in the Portfolio Investment evidenced by this Note, the outstanding principal amount of this Note shall be increased by the principal amount of such additional investment. If and when Investor redeems all or part of this Note, the outstanding principal amount of this Note shall be decreased by the principal amount of such redemption. The Company will record (such record, the "**PDN Schedule**"), for each investment in the Portfolio Investment made by Investor, the amount of such investment (the "**Investment Amount**"), the principal amount, and the issue date of such investment, and the principal amount, the Redemption Price and the date of any redemptions of such investment.  The PDN Schedule may be included as a schedule to this Note, or otherwise made available to Investor on the Portfolio Dashboard and will be conclusive absent manifest error.

FOR VALUE RECEIVED, the undersigned, PS Portfolio – ST1, LLC, a Delaware limited liability company (the "**Company**"), hereby promises to pay Investor the principal sum(s) of its Portfolio Investment on the Platform, together with accrued interest on the unpaid principal balance thereon in accordance with the terms contained in this Note:

**1.     Principal Amount.** The principal amount of this Note will be equal to the quotient (rounded to the nearest dollar) obtained by dividing (i) the Investment Amount by (ii) a fraction (the "**Note Multiple**"), the numerator of which is the Net Asset Value of the Company and the denominator of which is the aggregate outstanding principal amount of all investors' Notes, taken as a whole.

**2.   Special Limited Obligation.**

This Note represents a special limited obligation of the Company, and entitles Investor the right to receive (i) on a monthly basis in arrears, its Pro Rata Interest Payment, and (ii) upon redemption of this Note in accordance with its terms, the Redemption Price, which payments are dependent upon performance of the Underlying Loans, performance of the Underlying Participations and other factors affecting Net Asset Value.

**The Company has no obligation to make any interest payments on this Note, unless, and only to the extent that, the Company has received interest payments from Borrowers in respect of the Underlying Loans and mortgage loans corresponding to the Underlying Participations in the aggregate in excess of Standard Fees and unreimbursed Issuer Expenses actually incurred by the Company.  Payment of the Redemption Price to the Investor upon redemption of this Note shall be in full satisfaction of any of the Company's payment obligations in respect of the portion of the principal amount of this Note being redeemed, and there can be no guarantee that the Redemption Price will be equal to or greater than the portion of the original principal amount of this Note being redeemed.**

The amounts payable on any payment date will be paid to the party in whose name this Note is registered.

3. **Payment of Principal and Interest.**

**3.1 Interest**. Interest will be payable on a monthly basis in arrears on the 5th business day of the month (each such date, an "**Interest Payment Date**"; provided, however, that if any Interest Payment Date falls on a day that banks in the State of California are not open for business, the Interest Payment Date shall be the next day on which banks in the State of California are open for business), in an amount (the "**Pro Rata Interest Payment**") equal to the Investor's pro rata portion of any interest payments actually received by the Company in respect of the Underlying Loans Underlying Participations, less Standard Fees and Issuer Expense reimbursements. For purposes of this paragraph, the Investor's "pro rata portion" will be determined based on the proportion of the outstanding principal amount of this Note relative to the aggregate outstanding principal amount of all investors' Notes, taken as a whole.

**3.2 Maturity; Redemptions**. The initial term of this Note will expire on the date set forth above as the "Initial Maturity Date" (the "**Initial Maturity Date**"; and any subsequent Redemption Date upon which this Note will expire by extension of its terms as described below, a "**Subsequent Maturity Date**"; and the Initial Maturity Date, together with the Subsequent Maturity Date, a "**Maturity Date**"). Upon the Initial Maturity Date of this Note, the Company may, in its sole discretion, elect to extend the tenor and maturity of this Note for one additional ten (10) year period, unless the Investor notifies the Company in writing at least 60 days in advance of the Initial Maturity Date of this Note that the Investor does not want the term of this Note to be extended. If the Investor timely delivers such notice with respect to the Initial Maturity Date, the Company will pay to the Investor on the applicable Maturity Date an amount equal to the Redemption Price of this Note for such Maturity Date. For the avoidance of doubt, the Maturity Date of this Note will always coincide with a Redemption Date.

The Investor may redeem all or any part of this Note on any Redemption Date upon at least 60 days' prior written notice to the Company substantially in the form attached as Exhibit A to this Note. Upon redemption of all or any part of this Note, the Investor will be entitled to receive an amount (such amount, the "**Redemption Price**") equal to the product obtained by multiplying (i) the principal amount of this Note being redeemed by (ii) a fraction, the numerator of which is the Net Asset Value of the Company and the denominator of which is the aggregate outstanding principal amount of all investors' Notes, taken as a whole. Any partial redemption shall be in increments of $1.00 (by principal amount) and shall be applied on a first-in, first-out basis against the Portfolio investments made and evidenced by this Note.

**3.3 Limitations on Redemptions**. Redemptions of this Note are subject to the limitations set forth below.

If the Company receives redemption requests in respect of any Redemption Date which exceed ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date, the Company may, in its sole discretion, reduce each such request for redemption pro rata so that the aggregate amount redeemed in respect of such Redemption Date does not exceed ten percent (10%) of the Net Asset Value. Any unfulfilled or reduced request will

be satisfied at the next Redemption Date (subject to further deferral if the deferred requests themselves exceed ten percent (10%) of the Net Asset Value immediately prior to such Redemption Date) with priority over any subsequent Redemption Notices.

The Company may, in its sole discretion, limit or suspend the right of Investors to submit Redemption Notices and/or make redemptions in circumstances where the Company's investments cannot be liquidated in an orderly manner or reasonably valued, including, without limitation, upon the occurrence of any Suspension Event. In the event of any such suspension, any unfulfilled Redemption Notices will be satisfied at the next Redemption Date after such suspension has been lifted in priority to any subsequent Redemption Notices.

**3.4 Calculation of Net Asset Value**. For each NAV Determination Date, the Company will obtain advisory services from a nationally recognized third-party valuation firm with respect to a range (the "**Valuation Range**") of fair values of the Company's assets as of no more than five (5) business days prior to such NAV Determination Date (the "**Cut-Off Date**"). The "**Net Asset Value**" of the Company for any NAV Determination Date will be the weighted average (as calculated by the Company) of the Valuation Range for such NAV Determination Date and will be used to calculate the Note Multiple and the Redemption Price (as applicable) for the immediately succeeding Closing Date and Redemption Date (as applicable).

In the event that the Company consummates any purchase or disposition of an Underlying Loan or Underlying Participation during the period from the Cut-Off Date through the NAV Determination Date which was not reflected in the determination of the Valuation Range, the Company will adjust the Net Asset Value as of the applicable NAV Determination Date by the actual purchase or sale price, as applicable of any such Underlying Loans or Underlying Participations; provided that the Company will not purchase or sell an Underlying Loan or Underlying Participation during this period if it has a reasonable belief that the cost of such Underlying Loan or Underlying Participation does not accurately reflect its value.

No valuation firm will be liable to the Company or any of its affiliates, to any Investor, or to any third party in respect of the Valuation Range or the determination of Net Asset Value by the Company. The Company is solely responsible for the use of any valuation by such valuation firm. The valuation firm will perform certain financial analyses and, in so doing, will rely, without independent verification, on certain information provided to it by the Company or available from public sources as being accurate and complete in all material respects. The services provided by the valuation firm will not involve an audit, appraisal, review, compilation or any other form of examination or attestation under generally accepted auditing standards or otherwise.

**3.5 Payments Generally**. All payments on this Note due to the Investor shall be made in U.S. dollars, in immediately available funds, by intra-institution book entry transfer to the Investor's designated account indicated through the Company's online Platform.

**3.6 Amounts Advanced by Company**. As set forth in the Memorandum and the PDN Supplement, the Company may, at its sole discretion, advance any and all amounts necessary to protect its interest in the Underlying Loans, including (without limitation) foreclosure fees and related costs as well as payments necessary to pay property taxes, senior liens, junior liens, and other fees and costs the Company deems necessary to protect its position in the Underlying Loans (the "**Company's Advances**"). Any fees advanced by the Company will earn interest at the interest rate applicable to the corresponding Underlying Loan. Any amounts paid to the Company under the Underlying Loans shall be payable first to the Company to recoup the Company's Advances and any fees and costs allowed to be charged under the Memorandum and the PDN Supplement.

**3.7 Withholding**. If any withholding tax is imposed on any payment made by the Company to the Investor pursuant to this Note, such tax shall reduce the amount otherwise payable with respect to such payment. Upon request of the Company, the Investor shall provide the Company with an Internal Revenue Service Form W-9, W-BEN, W-8ECI, W-8IMY or other similar withholding certificate of a state, local or foreign governmental authority such that the Company may make payments under the Note without deduction for, or at a reduced rate of deduction for, any tax.

## 4.  Use of Proceeds.

The Company will use the net proceeds of the sale of Notes to facilitate the purchase by the Company of Underlying Loans and Underlying Participations from PSFI; provided that, in its sole discretion, the Company may retain and hold such proceeds in the form of cash or cash equivalents pending application for the purchase of Underlying Loans and Underlying Participations, and general corporate purposes, (but excluding the payment of the Redemption Price payable to another Investor).  PSFI will utilize the funds from the sale of the Underlying Loans and the Underlying Participations to the Company, net of any applicable fees and costs, to finance its origination or purchase of the Underlying Loans and Underlying Participations.

At any time, the Company's assets will consist of (i) the Underlying Loans, the Underlying Participations and the proceeds and products thereof (including any Underlying Property acquired in connection with any foreclosure or deed in lieu of foreclosure), and (ii) cash or cash equivalents owned by the Company.

## 5.  Events of Default.

On (i) the Company's failure to pay any installment or other sum due under this Note when due and payable in accordance with the terms hereof, (ii) the Company having become subject to a voluntary or involuntary proceeding of bankruptcy, insolvency, or otherwise subject to receivership and remaining so for a period of 60 days, or (iii) any breach by the Company of any other obligation of the Company in this Note (collectively, "**Default**"), then after sixty (60) days from the date of receiving written notice of such default from the Investor, and if the Company fails thereafter to cure said default, the Investor may, at its option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the applicable Maturity Date. The Company must receive notice of the exercise of this option. For the purposes

of this paragraph, the Company shall be deemed to receive Investor's notice if Investor follows the notice provisions in paragraph 7 of this Note.

**6.  Compulsory Redemption.**

Company may, in its sole discretion, require Investor to redeem this Note in whole or in part at any time for any reason or for no reason at all, without any notice period.

**7.  Sale Clause.**

Subject to compliance with the Act and applicable securities laws and regulations, Company may sell, convey, assign or otherwise transfer all or any part of the Underlying Loans or the Underlying Participations, or any interest in the Underlying Loans or Underlying Participations, whether any such sale, conveyance, assignment or other transfer occurs directly or indirectly, voluntarily or involuntarily or by operation of law, without the prior written consent of the Investor.

**8.  Waiver.**

The Company, endorsers, and all other persons liable or to become liable on this Note waive diligence, presentment, protest and demand, and also notice of protest, demand, nonpayment, dishonor and maturity and consents to any extension of the time or terms of payment hereof, any and all renewals or extensions of the terms hereof, any release of all or any part of the security given for this Note, any acceptance of additional security of any kind and any release of any party liable under this Note.

**9.  Notice.**

Any notice required to be provided in this Note shall be given and received via electronic mail, unless applicable law requires that such notice be given in writing. All notices shall be addressed to the party to whom such notice is to be given at (i) investor-relations@peerstreet.com or such other email address the Company may provide to Investor via the PeerStreet Website, if the recipient is the Company or (ii) the electronic mail address used by Investor when registering online at the Company's investment Platform if the recipient is the Investor; subject to the parties updating such addresses by providing notice pursuant to this Section 7.

**10.  Forbearance Not a Waiver.**

If the Investor delays in exercising or fails to exercise any of its rights under this Note, that delay or failure shall not constitute a waiver of any of the Investor's rights or of any breach, default, or failure of a condition under this Note. No waiver by the Investor of any of its rights or of any such breach, default, or failure of a condition shall be effective, unless the waiver is expressly stated in a writing signed by Investor.

**11.  Assignment.**

This Note inures to and binds the heirs, legal representatives, successors, and assigns of the parties; *provided* that the Investor may only assign or transfer this Note in connection with the terms

outlined in the Investor Agreement and this Note, and under no circumstances may Investor assign or transfer this Note in violation of the Act.

## 12. <u>Governing Law.</u>

This Note shall be construed and enforceable according to the laws of the State of Delaware (without giving effect to its conflicts of laws principles) for all purposes.

## 13. <u>No Modifications or Amendments; No Waiver.</u>

Except as specified herein or the Investor Agreement, this Note may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

## 14. <u>Severability.</u>

Any provision of this Note which shall be held by a court of competent jurisdiction to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision or term hereof, and all other provisions or terms hereof shall remain in full force and effect.

## 15. <u>Nonrecourse Generally.</u>

(i) The Company shall not be personally liable, and Investor shall not commence or prosecute any action against the Company, for the nonpayment or non-performance of any obligation on this Note due to failure or default of the Underlying Loans or Underlying Participations; (ii) Investor shall not seek, obtain, or enforce a deficiency judgment against the Company; (iii) Investor's recourse for the Company's payment obligations shall be limited as set forth herein; (iv) the Investor shall not be entitled to obtain specific performance or any other similar order, remedy, or relief against the Company relating to any claim arising from this Note; and (v) the Investor waives any right to exercise any lenders' right of set-off arising from this Note, against any funds of the Company in the Investor's custody, control, or possession. No recourse under or upon any obligation, covenant or agreement contained in this Note, or because of any indebtedness evidenced thereby, shall be had against any past, present or future shareholder, officer, director or agent, as such, of the Company, either directly or through the Company, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or penalty or otherwise, all such personal liability of every such incorporator, shareholder, officer, director or agent, as such, being expressly waived and released by the acceptance hereof and as a condition of and as part of the consideration for the issuance of this Note.

## 16. <u>Note Series Limitation.</u>

Investor understands and agrees that this Note is part of a pool of many Notes issued by the Company, which pool of Notes is held in the aggregate by multiple holders. The Investor shall not assert any right of action, including (without limitation) any arbitration, lawsuit or otherwise,

except in conjunction or aggregation with other holders of the Notes as set forth in the Investor Agreement.

**17. <u>Tax Matters.</u>**

Each Investor, by acceptance of a Note, shall be deemed to have agreed to treat, and shall treat, such Note as debt of the Company for United States federal income tax purposes and shall refrain from taking any action inconsistent with such treatment.

**18. <u>Incorporation by Reference.</u>**

The terms contained in the Memorandum, PDN Supplement, and Investor Agreement are hereby incorporated herein by this reference for all purposes. In the event any provisions of this Note conflict with provisions of the Investor Agreement or Memorandum, the provisions of this Note shall control. The provisions of the PDN Supplement shall govern in case of conflict with this Note.

**IN WITNESS WHEREOF,** the Company has caused this instrument to be signed as of the date set forth below.

Dated: _____

/s/ Brewster Johnson
PS Portfolio – ST1, LLC
    By: PS Funding, Inc., its sole member
    By: Brewster Johnson, President

<u>**EXHIBIT A**</u>

**FORM OF REDEMPTION NOTICE**

Date: _____

PS Portfolio – ST1, LLC
2121 Park Place, Suite 250
El Segundo, CA 90245
Attn: _____
Email: _____

RE: Notice of Redemption of Payment-Dependent Note of [INVESTOR NAME]

Ladies and Gentlemen:

We refer to the Payment-Dependent Note, issued by PS Portfolio – ST1, LLC (the "**Company**") to _____ (the "**Investor**", "**we**", "**our**") dated as of _____ (as amended from time to time, the "**Note**"). Capitalized terms used but not defined in this letter have the meanings assigned to them in the Note.

Pursuant to Section 3.2 [6] of the Note, we hereby notify the Company of our election to redeem $_____ of the outstanding principal balance (the "**Redemption Amount**") of the Note. The proposed date of such redemption is _____.

Upon the payment by the Company of the applicable Redemption Price, the outstanding principal balance of the Note will be reduced by the Redemption Amount , and we hereby forever release and discharge the Company and each of its officers, members, employees, agents, affiliates, and representatives (collectively, the "**Released Parties**") from any and all claims, causes of actions, damages and liabilities of any nature whatsoever, known or unknown, which we ever had, now have, or might hereafter have against any of the Released Parties, with respect to the Redemption Amount, to the extent that any such claim, cause of action, damage or liability shall be based in whole or in part upon facts, circumstances, actions or events existing as of or prior to payment of the Redemption Amount.

Sincerely yours,

_____
Name

_____

## SCHEDULE I

# UNDERLYING LOAN AND MORTGAGE LOAN CORRESPONDING TO UNDERLYING PARTICIPATION CRITERIA

| Attribute | Value |
|---|---|
| Maximum Loan to Value Ratio | 90:100 |
| Maximum Combined Loan to Value Ratio | 90:100 |
| Maximum Loan to After Repair Value Ratio | 75:100 |
| Minimum Borrower FICO Score | 620 |
| Restricted Geographies | Alaska, South Dakota, Minnesota, Rural Designation |
| Underlying Property Type | 1-4 Unit Single Family, Multi-Family < 50 units |
| Maximum Loan Term | 24 Months |

**EXHIBIT 22**

**AMENDED AND RESTATED FRAMEWORK AGREEMENT**

THIS AMENDED AND RESTATED FRAMEWORK AGREEMENT (this "<u>Agreement</u>"), dated as of March 2, 2018, is made by and between Peer Street, Inc., a Delaware corporation (together with its successors and permitted assigns, "<u>PeerStreet</u>"), and Colchis Capital Management, L.P., a Delaware limited partnership (together with its successors and permitted assigns, "<u>Colchis</u>"), and amends and restates, in its entirety, the Framework Agreement between PeerStreet and Colchis dated as of May 19, 2017 (the "<u>Original Agreement</u>").

**RECITALS**

WHEREAS, PeerStreet and Colchis have agreed to enter into a Loan Purchase Program (as defined below) pursuant to which PeerStreet and its Affiliates will source, underwrite, and offer to sell Loans (as defined below) and Notes (as defined below) to the Colchis Purchaser (as defined below);

WHEREAS, as soon as commercially feasible following the date hereof, PeerStreet and the Colchis Purchaser will negotiate in good faith and enter into the Loan Sale Agreement (as defined below) and the LSA (as defined below) for certain loan and note purchases by the Colchis Purchaser; and

WHEREAS, PeerStreet and Colchis wish to enter into this Agreement to, among other things, provide for those provisions relating to the Loan Purchase Program on which they have agreed that are not otherwise to be covered in the Loan Sale Agreement or the LSA and to amend and restate, in its entirety, the Original Agreement.

**AGREEMENT**

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties hereby agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

1.1    <u>Defined Terms.</u>

As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Accepted Servicing Practice</u>" shall have the meaning set forth in the LSA.

"<u>Affiliate</u>" means, when used with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person. As used in this definition of Affiliate, the term "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of a Person, whether through ownership of such Person's voting securities, by contract or otherwise, and the terms "affiliated", "controlling" and "controlled" have correlative meanings. For the avoidance of doubt, any investment fund managed

or advised by Colchis, and any trust or other entity through which any of such investment funds invest shall be considered an Affiliate of Colchis.

"<u>Applicable Laws</u>" means all federal, state and local laws, statutes, rules, regulations, court orders and decrees, administrative orders and decrees, and other legal requirements of any and every conceivable type applicable to any Note or Loan (including, without limitation, the underwriting, marketing, origination, servicing (including all collection activities related thereto), ownership, holding, acquisition and sale of such Note or Loan), and all requirements of any Regulatory Authority having jurisdiction over the Bank, any Loan Originator, PeerStreet or Colchis as indicated by the context, as any such laws, statutes, regulations, orders, decrees or requirements may be amended and in effect from time to time.

"<u>Bank</u>" means any bank that originates Loans and sells them to PeerStreet or a PeerStreet Affiliate.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq., as amended from time to time.

"<u>Borrower</u>" means, with respect to any Loan, collectively, each borrower and other obligor (including any co-signor or guarantor) of the payment obligation for such Loan.

"<u>Business Day</u>" means any day other than (i) a Saturday, (ii) a Sunday, (iii) any day that is a legal holiday under the laws of the State of California or the State of New York or (iv) any day on which a bank located in the State of California or the State of New York is authorized or permitted to close for business.

"<u>Colchis Entity</u>" means each of Colchis or an Affiliate of Colchis that has been formed as an investment vehicle for purposes of purchasing, directly or indirectly, Loans or Notes for the benefit of Colchis or for the benefit of any investment fund managed or advised by Colchis, or any trust or other entity through which any of such investment funds invest in Loans or Notes for the benefit of limited partners, members, equity holders or beneficiaries.

"<u>Colchis Purchaser</u>" means each Colchis Entity that is a party to the Loan Sale Agreement and LSA.

"<u>Colchis Purchase Test</u>" means:

(i)    Colchis Purchasers purchase zero percent (0%) of Loans offered (whether as whole Loans, through a Series Trust or in the form of Notes) to Colchis Purchasers by PeerStreet over a period of two (2) consecutive months; or

(ii)    Colchis Purchasers purchase less than fifty percent (50%) of the aggregate principal amount of Loans offered (whether as whole Loans, through a Series Trust or in the form of Notes) to Colchis Purchasers by PeerStreet each month over a period of six (6) consecutive months, measured on a dollar-amount basis and calculated by dividing (x) the aggregate principal amount of Loans purchased by Colchis Purchasers (whether as whole Loans, through a Series Trust or in the form of Notes) during a month by (y) the aggregate

principal amount of Loans offered (whether as whole Loans, through a Series Trust or in the form of Notes) to Colchis Purchasers by PeerStreet during such month.

"Confidential Information" means:

(i)     information regarding Discloser's customers, capital structure, financial condition and results of operations, financial and risk models, projections, loss and return estimates, compliance and risk management systems, loan pricing, customer fees and charges, vendor pricing, organizational structure, employee compensation and benefits, stock and other deferred compensation plans, employee and stockholder agreements, as well as non-public information regarding pending or threatened litigation or regulatory matters involving Discloser;

(ii)    information regarding Discloser's inventions, discoveries, developments, improvements, processes, systems, methods, devices, patents, patent applications, trademarks, intellectual property, know-how, trade secrets, instruments, materials, products, programs, techniques, designs, research/development activities and plans, data, specifications, computer programs/code (object or source), costs of production, promotional methods, marketing plans/strategies, clinical plans, business opportunities, vendors, customer lists, including, without limitation, when PeerStreet is the Discloser, new credit Products, the Platform, the Website and the credit policy of each Bank and Loan Originator;

(iii)   information: (A) that is marked "Confidential", "Proprietary" or in some similar way; (B) that Discloser identifies as Confidential Information when disclosed or within a reasonable time afterwards; or (C) that Recipient knows, or should know, to be confidential or proprietary to Discloser;

(iv)    any portions of this Agreement that are subject to confidential treatment and are not publicly available and any other documents, instruments or agreements entered into or delivered in connection herewith or therewith; or

(v)     any third party information with respect to which Discloser is subject to restrictions on disclosure or use based on the confidential nature of such information; *provided, however*, that "Confidential Information" does not include any information:

(A)     that was publicly known or made generally available to the public prior to its disclosure hereunder;

(B)     that becomes publicly known or is made generally available to the public following its disclosure hereunder through no wrongful act or omission of Recipient or anyone to whom Recipient has disclosed such information;

(C)     that Recipient rightfully possessed without any duty of confidentiality prior to its disclosure hereunder;

(D)     that was independently developed by Recipient without use of or reference to any information received by or on behalf of Recipient hereunder; or

(E)      that Recipient rightfully obtained from a third party, where such third party was not subject to any restrictions on disclosure with respect to such information.

"Current Product Line" means senior position real estate debt investments, that are originated, in the case of each Loan, in accordance with the PeerStreet Underwriting Guidelines in effect as of the closing date of this Agreement (and any non-material modifications to said Underwriting Guidelines made during the term of the Loan Purchase Program) and sold to investors in the regular course of business as shown in Exhibit A.  "Current Product Line" does not include Excluded Products.

"Debtor Relief Laws" means (i) the Bankruptcy Code and (ii) all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization, suspension of payments, adjustment of debt, marshalling of assets or similar debtor relief laws of the United States, any state or any foreign country from time to time in effect affecting the rights of creditors generally.

"Discloser" has the meaning set forth in Section 7.1.

"Estimated Monthly Amount" has the meaning set forth in Section 2.2.

"Excluded Products" means structured or tranched notes and loans, longer duration (greater than 36 months) "Buy to Rent" loans, warehouse facilities, owner occupied mortgages, commercial real estate loans, short-term 30-day loans, fund investments and/or equity investments.

"Insolvency Event" means, with respect to any Person, if any of the following events shall occur: (i) such Person shall file a petition or commence a Proceeding (A) to take advantage of any Debtor Relief Law or (B) for the appointment of a trustee, conservator, receiver, liquidator or similar official for or relating to such Person or all or substantially all of its property, or for the winding up or liquidation of its affairs, and such petition or Proceeding shall not have been dismissed or stayed within ninety (90) days of its filing or commencement, (ii) such Person shall consent or fail to object to any such petition filed or Proceeding commenced against or with respect to it or all or substantially all of its property, or any such petition or Proceeding shall not have been dismissed or stayed within ninety (90) days of its filing or commencement, or a court, agency or other supervisory authority with jurisdiction shall not have decreed or ordered relief with respect to such petition or Proceeding, (iii) such Person shall admit in writing its inability to pay its debts generally as they become due, (iv) such Person shall make an assignment for the benefit of its creditors, (v) such Person shall stop making payment of a material portion of its obligations for a period of ninety (90) days or (vi) such Person shall take any action in furtherance of any of the foregoing.

"Loan" or "Loans" means loan(s) originated by a Bank or Loan Originator in accordance with the Underwriting Guidelines and meeting the definition of "Current Product Line" or "Small MFR Loans" which are acquired by PeerStreet or an Affiliate of PeerStreet, which includes all right, title and interest with respect to such loan as a holder of both the beneficial and legal title to such loan, including, without limitation (i) electronic copies of the related Loan documents, Loan file and servicing file as well as of any related data files and all other loan documents, files and records of the lender and its servicing agent for such Loan, (ii) all proceeds from such loan

including, without limitation any monthly payments, any prepayments, all unpaid periodic interest and finance charges due or which may become due with respect thereto, all fees (including late payment fees) applicable to such Loan, and all other fees, charges and other amounts that have been, or may be, assessed against the Borrower or otherwise may be due and payable thereunder; and any other proceeds, (iii) all other rights, interests, benefits, proceeds, remedies and claims in favor or for the benefit of the lender (or its successors or assigns) arising from or relating to such Loan, including any servicing rights, and (iv) all proceeds of any of the foregoing. Notwithstanding the foregoing, pursuant to the LSA, PeerStreet, or its service provider, acting as Master Servicer, will own and maintain the customer relationship with the Borrower in accordance with the LSA for so long as it acts as Master Servicer pursuant to the LSA.  In the event PeerStreet or a PeerStreet Affiliate directly or indirectly (i) originates loan(s) other than through a Bank or Loan Originator, then each such loan shall be a "Loan" for purposes of this Agreement, or (ii) revises its product offerings to Borrowers so that it documents providing capital to Borrowers in the form of a note, deed of trust, receivable or other instrument, then each such note, deed of trust or other instrument shall be a "Loan" for purposes of this Agreement.

"Loan Originator" means each lender to a customer of funds, on a short-term basis, to be used to acquire or improve real estate and secured by such real estate.

"Loan Purchase Program" means the Loans and Notes offered for sale by the PeerStreet to investors on its Platform or through separately negotiated transactions.

"Loan Purchase Program Custodian" has the meaning set forth in Section 4.8.

"Loan Sale Agreement" means that certain Master Loan Sale Agreement in respect of the Loan Purchase Program by and between PeerStreet and the Colchis Purchaser (or, to the extent Colchis determines to have one or more different Colchis Entities serve as the purchasing entity, then each such other Colchis Entity who becomes a party thereto as a "Colchis Purchaser") anticipated to be entered into after the date hereof, and all exhibits and schedules attached thereto, each as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.  The Loan Sale Agreement will include standard and customary representations, warranties and covenants.

"LSA" means that certain Master Loan Servicing Agreement in respect of the Loan Purchase Program by and between PeerStreet and the Colchis Purchaser (or, to the extent Colchis determines to have one or more different Colchis Entities serve as the serviced entity, then each such other Colchis Entity who becomes a party thereto as the "Colchis Purchaser") anticipated to be entered into after the date hereof and all exhibits and schedules attached thereto, each as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, pursuant to which PeerStreet will act as Master Servicer of Loans and Notes.  The LSA will include standard and customary representations, warranties and covenants.

"New Products" has the meaning set forth in Section 3.1.

"Notes" means the mortgage payment dependent notes representing an interest in Loans issued and sold by PeerStreet or an Affiliate of PeerStreet through its Platform to retail investors. In the event PeerStreet or a PeerStreet Affiliate directly or indirectly offers interests in Loans that

provide the purchaser of such interests an indirect economic interest in the Loans ("whether in the form of participations, certificates, or any other instrument, then each such participation, certificate or other instrument shall be a "Note" for purposes of this Agreement.

"Party" means any of PeerStreet, Colchis, and "Parties" means PeerStreet and Colchis, collectively.

"Passive Allocation" means the passive allocation of interests in Loans made by PeerStreet to Colchis Purchaser.

"Performance Trigger" means the outstanding principal balance of Loans (whether sold as whole Loans, through a Series Trust or in the form of Notes) in respect of which a default notice has been issued to the borrowers under PeerStreet's Accepted Servicing Practice ("Default Notice Loans"), exceeding five percent (5%) of the cumulative outstanding amount of Loans (whether sold as whole Loans, through a Series Trust or in the form of Notes) purchased by Colchis Purchasers over a rolling period of twelve (12) months calculated by dividing (x) the outstanding amount of Default Notice Loans held by Colchis Purchasers at the time of calculating the Performance Trigger by (y) the total outstanding Loans (whether sold as whole Loans, through a Series Trust or in the form of Notes) purchased by Colchis Purchasers.

"Person" means any individual, corporation (including a business trust), partnership, joint venture, association, bank, limited liability company, joint-stock company, estate, trust, unincorporated organization, government or any agency or political subdivision thereof, or any other entity.

"Platform" means, collectively, each online credit platform(s) owned and operated by PeerStreet or any of its Affiliates.

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Recipient" has the meaning set forth in Section 6.1.

"Regulatory Authority" means any federal, state or local regulatory agency or other governmental agency, department, court, commission, board, bureau, instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, having jurisdiction over a Party, any Loan, any Note or any Borrower.

"Series Trust" means a statutory trust with an owner trustee in which one or more Colchis Purchasers are beneficiaries.

"Servicing Fee" has the meaning set forth in Section 4.7.

"Servicer Default" shall have the meaning set forth in the LSA.

"Small MFR Loans" means Loans in respect of small multi-family residential properties which have an unpaid principal balance of less than or equal to Five Million Dollars ($5,000,000)

and between five (5) and fifty (50) units, generated in accordance with the Underwriting Guidelines and sold to investors in the regular course of business.

"Standard Agreement" has the meaning set forth in Section 4.9.

"Trailing Three Month Average" has the meaning set forth in Section 2.1(d).

"Underwriting Guidelines" means PeerStreet's Underwriting Guidelines for its Current Product Line and Small MFR Loans, as applicable, a copy of which as in effect on the date hereof is attached as Exhibit B hereto, as they may be amended, restated, amended and restated, supplemented or otherwise modified by PeerStreet from time to time, in accordance with the terms of this Agreement.

"Website" means www.peerstreet.com, any related landing pages or similar or successor sites operated in connection with the online marketplace of PeerStreet and any other platform operated by PeerStreet or any of its Affiliates.

**1.2**      **Rules of Construction**.

(a)      As used in this Agreement: (i) all references to the masculine gender shall include the feminine gender (and vice versa); (ii) all references to "include," "includes," or "including" shall be deemed to be followed by the words "without limitation"; (iii) references to any law or regulation refer to that law or regulation as amended from time to time and include any successor law or regulation; (iv) references to another agreement, instrument or other document means such agreement, instrument or other document as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof; (vi) references to "dollars" or "$" shall be to United States dollars unless otherwise specified herein; (vii) unless otherwise specified, all references to days, months or years shall be deemed to be calendar days, months or years; (vi) all references to "quarter" shall be deemed to mean calendar quarter; and (viii) unless otherwise specified, all references to an article, section, subsection, exhibit or schedule shall be deemed to refer to, respectively, an article, section, subsection, exhibit or schedule of or to this Agreement.

(b)      The fact that any Party provides approval or consent shall not mean or otherwise be construed to mean that: (i) either Party has performed any due diligence with respect to the requested or required approval or consent, as applicable; (ii) either Party agrees that the item or information for which the other Party seeks approval or consent complies with any Applicable Laws; (iii) either Party has assumed the other Party's obligations to comply with all Applicable Laws arising from or related to any requested or required approval or consent; or (iv) except as otherwise expressly set forth in such approval or consent, either Party's approval or consent impairs in any way the other Party's rights or remedies under the Agreement, including indemnification rights for any failure to comply with all Applicable Laws.

## ARTICLE 2.
## PURCHASE OF LOANS

2.1     **Purchases of Loans.**

(a)     <u>Passive Allocation</u>.

(i)     <u>Required Offer and Required Purchase</u>.  PeerStreet will offer to sell to Colchis Purchasers, and Colchis Purchasers will purchase from PeerStreet, a minimum of (i) twenty percent (20%) of the aggregate principal amount of all Loans comprising PeerStreet's Current Product Line originated by PeerStreet and (ii) twenty percent (20%) of the aggregate principal amount of all Small MFR Loans originated by PeerStreet (<u>i.e.</u>, in the case of each of clauses (i) and (ii), originated directly, through a Bank or through a Loan Originator and whether sold as whole Loans, through a Series Trust or in the form of Notes) until Colchis Purchaser has purchased and is holding an outstanding balance of One-Hundred Fifty Million Dollars ($150,000,000) in principal amount of Loans (including both Current Product Line and Small MFR Loans) in the aggregate (under this Passive Allocation), subject to (x) PeerStreet being required to offer a minimum of Five Million Dollars ($5,000,000) aggregate principal amount of Loans included in the Current Product Line and Small MFR Loans per month (<u>i.e.</u>, even if greater than 20%) and (y) Colchis Purchaser's obligation to purchase being conditioned on the Performance Trigger not having been breached.  The Parties understand that, at present, (I) most Loans are sold by PeerStreet to investors in the form of Notes and (II) Colchis will be purchasing Notes from PeerStreet subject to the parameters applicable to Current Product Line and Small MFR Loans set forth on <u>Exhibit C</u>. Not later than thirty (30) days after the end of each calendar quarter, PeerStreet will provide Colchis with a written report of the actual percentage of the aggregate principal amount of Loans comprising PeerStreet's Current Product Line and Small MFR Loans (separately, as to each, and in the aggregate) purchased by Colchis (whether as whole Loans, through a Series Trust or in the form of Notes) during such calendar quarter.  If the amount of Loans purchased by Colchis during such calendar quarter is less than 20% of the aggregate principal amount of Loans comprising PeerStreet's Current Product Line or 20% of Small MFR Loans originated during such calendar quarter, then PeerStreet will work in good faith with Colchis to offer Colchis additional Loans in the subsequent quarter so that, in the aggregate, from inception of the Loan Purchase Program, Colchis has purchased a minimum of 20% of the aggregate principal amount of all Loans comprising PeerStreet's Current Product Line and 20% of the aggregate principal amount of all Small MFR Loans.  Whenever under this Agreement an aggregate principal amount of Loans to be offered to Colchis or an outstanding principal balance of Loans held by Colchis is to be determined, if the offer of Loans to Colchis or the amount of Loans held by Colchis includes Loans offered or acquired, as the case may be, in the form of Notes, then only the percentage of the underlying Loan represented by such Notes shall be included in any such determinations.

(ii)    <u>Required Offer and Optional Purchase</u>.  For a period of two and a half (2.5) years after Colchis Purchasers have acquired and are holding an outstanding balance of $150 million in principal amount of Loans, PeerStreet will offer to sell to Colchis Purchasers a minimum of (x) fifteen percent (15%) of the aggregate principal amount of all Loans comprising PeerStreet's Current Product Line originated by PeerStreet and (y) fifteen percent (15%) of the aggregate principal amount of all Small MFR Loans originated by PeerStreet and, in the case of each of (x) and (y), whether sold as whole Loans, through a Series Trust or in the form of Notes, subject to (I) a minimum monthly amount of Loans offered (<u>i.e.</u>, even if greater than 15% in the case of Loans comprising PeerStreet's Current Product Line or Small MFR Loans) that is sufficient for the Colchis Purchasers, to maintain an outstanding balance of $150 million in principal amount of Loans, in the aggregate, (II) a monthly cap of $30 million initial principal amount of Loans offered per month; however, such cap will be waived if (A) the monthly purchase volume of Loans offered is insufficient for the Colchis Purchasers, in the aggregate, to maintain $150 million of outstanding principal amount of Loan balance, in which case additional Loans sufficient for Colchis Purchasers to maintain a $150 million outstanding principal amount of Loan balance will be offered by PeerStreet to Colchis Purchasers, or (B) PeerStreet waives such cap, in its sole discretion, and (z) the Colchis Purchase Test not having been met.

(b)    <u>Active Allocation</u>.  In addition to the Loans contemplated to be acquired by Colchis Purchasers under the Passive Allocation described in Section 2.1(a), Colchis and PeerStreet will work in good faith to negotiate a Loan Purchase Agreement pursuant to which, in accordance with PeerStreet's normal business practices, Colchis can actively select and purchase additional Loans on the PeerStreet Platform.  For so long as PeerStreet maintains the Platform on which investors actively may acquire Loans, Colchis will have access to such Platform and the right to bid to acquire Loans.

(c)    <u>Colchis Purchase Test</u>.  Notwithstanding the foregoing, PeerStreet will have the option, but not the obligation to offer Loans to the Colchis Purchasers as described in Section 2.1(a) if the Colchis Purchase Test has been met; however, if the Performance Trigger also is in effect at such time, then even if the Colchis Purchase Test has been met, PeerStreet's obligation to offer Loans to Colchis Purchasers under Section 2.1(a) shall remain in effect.  The Colchis Purchase Test shall be calculated monthly by PeerStreet and Colchis on the last Business Day of each month starting with the end of the second full month after PeerStreet commences its sales of Loans to Colchis Purchasers under Section 2.1(a).  For the avoidance of doubt, a breach of the Colchis Purchase Test shall not constitute a termination of the Loan Purchase Agreement.

(d)    <u>Adjusted Minimum Offering Amount</u>.  Notwithstanding anything contained herein to the contrary, in the event the average monthly Loan purchases made by Colchis Purchasers over any consecutive three (3) month period, calculated in the manner described below ("<u>Trailing Three Month Average</u>"), is less than the minimum amounts required to be offered by PeerStreet to Colchis Purchasers pursuant to Section 2.1(a)(ii), then the minimum amount required to be offered to Colchis Purchasers by PeerStreet will be the greater of (i) the Trailing Three Month Average multiplied by the minimum amounts

required to be offered to Colchis Purchasers by PeerStreet pursuant to Section 2.1(a)(ii); and (ii) the amount of Loans required to maintain a $150 million Loan balance if purchased by Colchis Purchasers. The Trailing Three Month Average shall be calculated as the ratio between (x) the cumulative amount of Loans purchased by Colchis Purchasers over the trailing three-month period and (y) the cumulative amount of Loans offered by PeerStreet to Colchis Purchasers over the trailing three-month period.

(e)    _Pricing of Loans_.  Colchis shall purchase Loans from PeerStreet at par.  If PeerStreet offers Loans within the same product lines in which Colchis is participating at such time at a price less than par to other purchasers during the term of the Loan Sale Agreement, then PeerStreet will offer the same discount to Colchis on a go forward basis (_i.e._, no retroactive pricing).

**2.2    Estimated Monthly Investment Amount**.

Colchis and PeerStreet will decide by the twentieth (20th) calendar day of each month on the estimated amount of Loans that Colchis Purchasers intend to purchase in the following month (the "Estimated Monthly Amount").  For the avoidance of doubt, if the Estimated Monthly Amount in any given month is zero, it shall not constitute a termination of the Loan Sale Agreement.  For clarification purposes only, any Estimated Monthly Amount agreed upon by PeerStreet and Colchis is for informational purposes only and is not binding on PeerStreet or Colchis.

**2.3    Eligibility Criteria**.

Loans purchased under the Loan Purchase Program shall follow PeerStreet's Underwriting Guidelines, internal credit and operational policy guidelines, and also, shall comply with the underwriting guidelines of any commercial partner or bank partner, if applicable, to the extent PeerStreet is using such partner to originate the Loans facilitated by PeerStreet.  Such eligibility criteria shall be defined as PeerStreet's Underwriting Guidelines in the Loan Sale Agreement. PeerStreet shall preview with Colchis any credit policy and underwriting, credit model, and / or pricing changes that materially impact the Loan Purchase Program ("Material Change") before such changes are implemented.  Without exception, in the event of such Material Change, to the extent reasonably available and not covered by confidentiality, PeerStreet shall furnish to Colchis such archive data files and retroactive credit scoring and pricing information as is reasonable to facilitate a review of each and every credit policy change implemented by PeerStreet at the time of such Material Change.

**2.4    Leverage and Securitization**.

If PeerStreet sponsors its own securitization, Colchis will have the ability to contribute Loans constituting acceptable assets into the transaction at its option.  PeerStreet will assist Colchis with any reasonable requests related to obtaining leverage or executing a securitization. PeerStreet will not receive any fee for such assistance, excluding third-party costs incurred; provided, however, if PeerStreet implements a standard, platform-wide securitization fee (and such fee is reasonable and is offered and agreed upon by all other participants), Colchis shall pay such fee in connection with executing a securitization.

## ARTICLE 3.
## NEW PRODUCTS

### 3.1    New Products.

If PeerStreet develops and commercializes any New Products (as defined below) that are in full production and made generally available to investors on the Platform, PeerStreet will notify Colchis and make such New Products available to the Colchis Entities on terms agreed to at such time by PeerStreet and Colchis. Colchis shall have a period of ninety (90) days of the later of (i) its receipt of notice from PeerStreet and (ii) the completion of the test phase of the New Products (the "Review Period") to either accept or reject any New Product offered to it. For the avoidance of doubt, the foregoing obligation shall not include the testing or introduction of New Products not yet generally available to investors, provided that a New Product may remain in a test phase for a period not exceeding six months (commencing on the first date of sale of a New Product) before being made available to the Colchis Entities under the terms of this Agreement, and thereafter such New Product shall be subject to the rights of the Colchis Entities under this Section 3.1 of this Agreement (only to the extent such New Products are being generally made available to investors on the Platform following the expiration of such six month period). If PeerStreet offers a New Product to Colchis, and Colchis, after the expiration of the Review Period, declines to purchase such New Product, then PeerStreet shall no longer have the obligation to continue to offer such New Product to Colchis. For purposes hereof, "New Products" means any Product that is materially different in terms of structure (*e.g.,* term of the loan, loan amount, collateral or fee structure) or borrower profile (*e.g.,* individual versus business, credit profile, purpose of the loan or marketing program) from the description of the Current Product Line or Small MFR Loans. For the avoidance of doubt, New Products shall include, but not be limited to, structured or tranched notes and loans, buy to rent loans, warehouse facilities, owner occupied mortgages, fund investments and/or equity investments, except to the extent such similar products are being originated as of the date of the Loan Sale Agreement (short-term buy to rent loans, loans with junior positions, etc.).

## ARTICLE 4.
## LOAN SALE AGREEMENT AND LSA; SERVICER; CUSTODIAN

### 4.1    Loan Sale Agreement and LSA.

Following the date hereof, as soon as commercially feasible, PeerStreet and Colchis shall negotiate in good faith the terms and conditions of the Loan Sale Agreement and LSA. For fractional and whole Loan purchases, Colchis Purchasers will fund investor accounts in PeerStreet.com and such funds shall be used by the Colchis Purchasers to buy Loans. For trust certificate purchases, the funding mechanism will be mutually agreed upon and described in the Loan Sale Agreement.

### 4.2    Master Servicer and Sub-Servicer.

PeerStreet or any third party approved and vetted by PeerStreet and reasonably approved by Colchis will serve as the Master Servicer for all Loans sold under the Loan Purchase Program, including the Loans purchased by Colchis Purchasers. PeerStreet shall designate FCI Lender

Services, Inc. or another Sub-Servicer previously approved and vetted by PeerStreet and reasonably approved by Colchis to serve as the Sub-Servicer for all whole Loans sold under the Loan Purchase Program, including the whole Loans purchased by the Colchis Purchasers. Colchis shall have the absolute right to reject any replacement Master Servicer or Sub-Servicer if such party is acting in such capacity for Loans purchased by Colchis Purchasers, but not in respect of the entire Loan Purchase Program. In the event Colchis does not reasonably approve any Master Servicer or Sub-Servicer for all Loans under the Loan Purchase Program presented to it by PeerStreet, then the minimum amounts required to be offered by PeerStreet pursuant to Section 2.1(a) shall be adjusted pro-rata so that the minimum percentage set forth in Section 2.1(a) for each subsequent calendar quarter (pro-rated for partial quarters) shall be the product of (x) such minimum amount and (y) a fraction (A) the numerator of which is the aggregate principal amount of Loans generated by such replacement Master Servicer and / or Sub-Servicer in such calendar quarter and (B) the denominator of which is the aggregate principal amount of Loans generated in the Loan Purchase Program in such calendar quarter. Without limiting the generality of the foregoing, if Colchis does not approve of a replacement Master Servicer or Sub-Servicer, it will so advise PeerStreet in writing and thereafter Colchis Purchasers shall not be required to purchase Loans and PeerStreet shall not be required to offer Loans serviced by such Master Servicer or Sub-Servicer under Section 2.1(a).

### 4.3    Removal of Master Servicer and Sub-Servicer.

In addition to any provisions of the LSA, subject to Section 4.2, PeerStreet may replace or terminate itself as the Master Servicer, or any third party as Sub-Servicer, with ninety (90) days' advance written notice to such Sub-Servicer and to Colchis. For Loans purchased as whole Loans, Colchis may replace or terminate PeerStreet or any third-party Sub-Servicer for a Servicer Default, subject to the terms of the LSA.

### 4.4    Back-Up Servicer.

The Sub-Servicer servicing the respective Notes and whole Loans acquired by Colchis Purchasers will initially serve as back-up servicer for fractional and whole Loans purchased by Colchis Purchasers. Colchis will retain the right to designate a new back-up servicer at Colchis's reasonable discretion for Loans purchased by Colchis Purchasers as whole Loans. PeerStreet agrees to bear all on-going fees and expenses of the Back-Up Servicer for existing back-up servicing; however, Colchis agrees to pay all ongoing costs as well as all initial fees and expenses related to replacing the back-up servicer for Loans purchased by Colchis Purchasers. Nothing in this Section 4.4 shall affect standard Servicing Fees.

### 4.5    Multiple Parties.

PeerStreet agrees that, at any time, there may be multiple Colchis Purchasers, and PeerStreet will (i) add any Colchis Entity which was formed in the U.S. and meets the definition of "Accredited Investor" as defined by the U. S. Securities and Exchange Commission, to become a party to the Loan Sale Agreement and LSA as a "Colchis Purchaser", and (ii) cooperate with Colchis to open an account with each Colchis Purchaser to purchase Loans and Notes from PeerStreet and its Affiliates, in each case, subject to any Applicable Laws and documentation (including but not limited to any private placement memoranda), the satisfaction of PeerStreet's

"know your customer" onboarding procedures and the payment by Colchis of any costs incurred by PeerStreet in cooperating to open said accounts.

### 4.6    Transfers.

PeerStreet agrees that each Colchis Purchaser and Colchis Entity, at any time, upon thirty (30) days' prior written notice to PeerStreet and subject to prior approval of PeerStreet and, if applicable, the issuer of the Notes, in their sole and absolute discretion, not to be unreasonably withheld or delayed, may transfer Notes and Loans to any other Colchis Purchaser, Colchis Entity, a securitization vehicle or any third party purchaser, and that the transferee of such Notes and Loans shall be charged the same servicing fee by PeerStreet as was being charged to the Colchis Purchaser or Colchis Entity immediately prior to such transfer. Colchis, Colchis Purchaser and Colchis Entity each agree that notwithstanding the foregoing, PeerStreet may require up to ninety (90) days after its approval of such transfer, if applicable, to allow the consummation of the transfer.

### 4.7    Servicing Fee.

Colchis will pay PeerStreet, in its capacity as Master Servicer, a servicing fee ("Servicing Fee"). For whole Loans purchased by Colchis Purchasers, the Servicing Fee shall be paid monthly and will be calculated by (a) dividing the annual servicing fee of one percent (1%) by 12 and (b) multiplying the resulting figure by the average outstanding balances of whole Loans owned by Colchis Purchasers in the preceding month. For fractional loans (i.e., Notes) purchased by Colchis Purchasers through PeerStreet's Platform, the Servicing Fee shall be the fee charged to all other fractional investors for the same Loan purchased by Colchis. If PeerStreet offers any other purchaser of whole Loans as part of a forward flow agreement or loan purchasing program, during the term of the Loan Sale Agreement, a total economic package that results in such purchaser receiving a substantially similar economic deal (i.e., aggregate purchase price, servicing fee, rebates, discounts, etc.) than that provided to Colchis, and if such economic deal includes a Servicing Fee that is lower than that which is being paid by Colchis Purchasers at such time, then PeerStreet will offer such lower Servicing Fee to Colchis. Notwithstanding the foregoing, if a standard Servicing Fee is implemented for all whole Loan Purchasers that is less than or greater than the Servicing Fee identified in this Section 4.7, the Servicing Fee paid by Colchis shall equal the standard Servicing Fee implemented. Additional fees related to special servicing shall be discussed and negotiated prior to the execution of the Loan Sale Agreement and LSA.

### 4.8    Loan Purchase Program Custodian.

Colchis will review PeerStreet's existing custodial agreement, practices and structure to determine suitability. If after such review Colchis deems necessary, in its sole and absolute discretion, that such existing custodial agreement is unsuitable, then Millennium Trust, or a similar company designated by Colchis, will serve as custodian for the Notes acquired by the Colchis Purchasers through the PeerStreet Platform. In the event Colchis determines that a custodian other than US Bank is required, then Colchis shall pay all fees and expenses of the Loan Purchase Program Custodian designated by Colchis for Notes acquired by the Colchis Purchasers and shall pay PeerStreet reasonable fees associated with consummating such transfer to the Colchis

custodian (US Bank or the custodian chosen by Colchis shall be the "<u>Loan Purchase Program Custodian</u>").

**4.9**    <u>**Standard Agreements**</u>.

Notwithstanding anything in this Agreement, no Colchis Entity shall be required to agree to any terms in a browser-wrap, click-wrap, shrink-wrap, click-through or terms of use agreement governing the use of any Platform (each, a "<u>Standard Agreement</u>" and, collectively, the "<u>Standard Agreements</u>") that conflict, or are inconsistent with, or diminish the rights of the Colchis Entities under the Loan Sale Agreement, the LSA, this Agreement or otherwise (including, without limitation, restrictions on use, revocability, termination of agreement, modification of terms, assessment of a fee for use of any Platform, restrictions on the right or ability of any Colchis Entity or Affiliate of Colchis, directly or indirectly, to conduct any form of business itself or with any third party or supersession by any of such Standard Agreements of any of the aforementioned agreements), and none of such terms (including any that may have been agreed to or accepted prior to the date of this Agreement) shall have any binding effect on any Colchis Entity or supersede this Agreement.

**ARTICLE 5.**
**VALUATION AND CONTROL**

**5.1**    <u>**Valuation**</u>.

PeerStreet will assist Colchis and Colchis's service provider(s) with any and all reasonable valuation data requests in a timely manner.  In addition, if Colchis requests additional assistance from PeerStreet's commercial partners for valuation, PeerStreet agrees to use its commercially reasonable efforts to obtain and provide such assistance.

**5.2**    <u>**Control**</u>.

For whole Loans purchased by Colchis, Colchis will retain all approval rights with respect to Loans purchased, without limitation, the incurrence of indebtedness, asset transfers, and establishment of reserves. For whole Loans purchased by Colchis, PeerStreet agrees to support the quick and expedited transition of any asset transfers by working with Colchis in regards to such transferred loans to facilitate servicing, account opening or other customary processes and or agreements. PeerStreet will assist Colchis with any reasonable requests related to obtaining leverage and PeerStreet will not receive any fee for such assistance, excluding reimbursement for third-party costs incurred. Colchis shall have the right to compel the sale of all or part of their interest in the Colchis Purchaser and/or, subject to approval by PeerStreet's counsel on regulatory and securities matters, any or all of the Colchis Purchaser's assets or a material portion of its portfolio at any time, and PeerStreet shall provide, at Colchis' expense, any and all reasonably requested consents, information and other relevant materials and otherwise cooperate with the exercise of such right.

**ARTICLE 6.**
**REPORTING**

6.1    <u>Reporting Requirements</u>.

(a)    For so long as any Colchis Purchaser owns Loans (or interests in Loans held in the form of Notes) purchased and outstanding from PeerStreet, PeerStreet will provide in substantially similar content, as mutually agreed upon, the following reports to Colchis, templates of which are provided on <u>Exhibit D</u>.  References to "Loans" in this Article 6 shall include all Loans in respect of which Colchis holds an interest in the form of Notes.

(i)    <u>Daily Purchase Report</u>.  Provides Loan-level information, property appraisal value, and Borrower credit attributes for all Loans purchased by Colchis (one record per Loan) at the time of purchase. PeerStreet will issue this report to Colchis each Business Day for the prior Business Day's activity. Days on which there is no purchase activity will result in a blank report.  The specific attributes of Loan-level information will be provided in the Loan Sale Agreement.  As described on <u>Exhibit D (A)</u>.

(ii)    <u>Monthly Status Report</u>. Provides Loan-level status and payment activity for all Loans purchased by Colchis Purchasers (one record per month-on-book for each Loan). PeerStreet will issue this report to Colchis within five (5) Business Days of month-end for the prior month's activity via a secure online site. Periods for which there are no status changes or payment activity on Colchis Loans will result in a blank report. As described on <u>Exhibit D (B)</u>.

(iii)    <u>Weekly Transaction Report</u>. Provides all transaction-level funding and payment activity for all Loans purchased by Colchis (one record per transaction) on a weekly basis.  Information provided in this report will include any and all transaction data that would change the Loan balance as well as other cash items.  PeerStreet, as Master Servicer, will issue this report to Colchis the first Business Day for the prior week's activity.  Days on which there is no transaction activity on Colchis' Loans will result in a blank report.  As described on <u>Exhibit D (C)</u>.

(iv)    <u>Monthly Colchis Statement (in Excel and PDF)</u>. Provides a month-end snapshot of payment activity broken out by principal, interest, fees etc. and ending balances for all Loans purchased by Colchis since inception (one record per Loan for most recent accounting month). Information provided in this report will include Loan terms and Loan performance data. PeerStreet, as Master Servicer, will issue this report to Colchis within three (3) Business Days of month-end in both Excel and PDF file formats.  As described on <u>Exhibit D (D)</u>.

(v)    <u>Closed Loan Tape</u>. As long as there are outstanding Loans held by a Colchis Purchaser, provides Loan-level information and property value for all Loans facilitated through PeerStreet's Platform, regardless of funding source (one record per Loan). Information provided in this report includes application, credit

bureau, and Loan terms data. The Loan tape data that has been previously provided to Colchis is sufficient in form and substance to satisfy this requirement when updated monthly going forward. PeerStreet shall furnish this report to Colchis within ten (10) Business Days of month-end. As described on <u>Exhibit D (E)</u>.

(vi)    Monthly Payment History Report. As long as there are outstanding Loans held by Colchis, provides payment history for all Loans facilitated through PeerStreet's Platform since inception, regardless of funding source (one record per month-on-book for each Loan). Information provided in this report includes Loan performance data. The Loan pay string data that has been previously provided to Colchis is sufficient in form and substance to satisfy this requirement when updated monthly going forward. PeerStreet shall furnish this report to Colchis within ten (10) Business Days of month-end. As described on <u>Exhibit D (F)</u>.

(vii)    Monthly Platform Report. Provides Loan-level information, property appraisal value, and Borrower credit attributes for all active and inactive Loans facilitated through PeerStreet's platform or website since Colchis' first Loan purchase, regardless of funding source (one record per Loan). Information provided in this report will include application, credit bureau, and Loan terms data. PeerStreet, as Master Servicer, shall furnish this report to Colchis within five (5) Business Days of month-end. As described on <u>Exhibit D(G)</u>.

(viii)    Monthly Platform Payment Report. Provides Loan-level status and payment activity for all active and inactive Loans facilitated through PeerStreet's platform or website since Colchis' first Loan purchase, regardless of funding source (one record per each month end date since Loan origination for each Loan). Information provided in this report includes Loan terms and Loan performance data. PeerStreet, as Master Servicer, will issue this report to Colchis within five (5) Business Days of month-end. As described on <u>Exhibit D (H)</u>.

Based on attributes currently collected by PeerStreet, Colchis shall specify the Loan-level and Borrower attributes to be incorporated into each of the aforementioned reports during definitive documentation. To the extent that additional attributes are collected in the future, Colchis will have the opportunity to specify that those attributes are added to such reports.

(b)    In no event, shall PeerStreet be required to provide any information (i) the provision of which a Regulatory Authority has determined violates an applicable regulation or (ii) that a court of competent jurisdiction, in a litigation has ruled may not be provided. In any such case, PeerStreet shall notify Colchis promptly in writing that information is not being provided and the reason for PeerStreet's decision not to provide the information. In furnishing these reports to Colchis, PeerStreet will remove all Personally Identifying Information ("PII"), without exception. PII includes borrower names and social security numbers. PeerStreet will, however, provide PII to Millennium Trust or another similarly qualified custodian designated by Colchis such that the Purchase Program Custodian designated by Colchis is able to perform its normal course duties. If PeerStreet receives a letter or notice from a Regulatory Authority stating that, in its view (but not an official determination), providing information to Colchis would violate an applicable law or

regulation, or if there is a change in law that PeerStreet is advised by its counsel does not permit PeerStreet to provide Colchis with the information required under this Agreement, then PeerStreet and Colchis will work together in good faith to determine the effect on the reporting PeerStreet is required to provide to Colchis and to establish new guidelines for reporting to Colchis that provides for the maximum reporting consistent with this Agreement as (i) is permitted by law and (ii) is in compliance with the view of such Regulatory Authority.

(c)     Without limiting the specific reporting requirements described above, PeerStreet always will provide Colchis with the broadest and most comprehensive reporting on a daily and monthly basis and on any other interval, as PeerStreet provides to any purchasers of Loans.

**6.2     Information Rights**.

PeerStreet will furnish to Colchis and its service providers all portfolio reporting pursuant to Section 6.1 and respond to all reasonable information requests from such service providers. In addition, PeerStreet shall provide the following information to Colchis and, if requested, to its auditors.

(a)     Unaudited quarterly corporate financial statements for purposes of normal-course counter-party risk monitoring within forty-five (45) days of quarter-end.

(b)     If available, a SOC-1 report within ninety (90) days of fiscal year-end.

(c)     Annual audited corporate financial statements immediately when available.

**6.3     Notification Rights**.

PeerStreet will notify Colchis promptly in the event of the following:

(a)     Any material and binding legal or regulatory action taken against PeerStreet, or defaults under any credit facility, in each case, directly related to Colchis's ownership of the Loans that could materially and adversely affect PeerStreet or Colchis's ownership of the Loans.

(b)     Any materially adverse changes in financial strength such as cash position or tangible net worth which are outside of the normal course of business.

(c)     Any material credit policy, credit underwriting, credit model or Loan pricing changes that impact the Loan Purchase Program and Colchis' participation therein.

**6.4     Communications and Meetings**.

(a)     PeerStreet shall make a representative of PeerStreet available to Colchis for a meeting (whether in person or via teleconference) to occur not less than once per quarter as requested by Colchis in order to update Colchis regarding the Loan Purchase Program. Upon receipt of Colchis' request to set up such meeting, such meeting shall be held as soon

as commercially practicable to both PeerStreet and Colchis. At each such meeting, PeerStreet shall provide Colchis a high-level overview of the terms and rights provided to other institutional purchasers of Loans through the Platform. To the extent an adjustment to the Servicing Fee is required in accordance with Section 4.7 above, Colchis and PeerStreet shall amend this Agreement, the Loan Sale Agreement and LSA, as necessary, to include herein or therein such adjusted Serving Fee and such other terms as may be agreed between Colchis and PeerStreet.

(b)     From the date of this Agreement, and for a period of 12 months, PeerStreet shall make available the appropriate personnel for a monthly call with Colchis to assist in implementing the terms of this Agreement and address and resolve any issues that may have arisen.

**6.5     Compliance Review.**

Upon signing this Agreement by Colchis and PeerStreet, and then annually, at Colchis' option within ninety (90) days of calendar year end, but not more than once per calendar year (or more frequently after the occurrence and during the continuation of an event of default by PeerStreet under the Loan Sale Agreement or LSA), Colchis and its agents, professional advisors, financing providers and other designees (collectively "Compliance Review Parties"), at Colchis' expense, may perform an on-site review of PeerStreet (a "Compliance Review") with twenty (20) Business Days' prior written notice to PeerStreet (provided that no such prior notice is required for the initial Compliance Review upon signing this Agreement or after the occurrence and during the continuance of an event of default by PeerStreet under the Loan Sale Agreement or the LSA), which Compliance Review shall occur during normal business hours in accordance with the scope of work attached hereto as Schedule I.1. Commencing with the calendar quarter ending April 30, 2018, and thereafter on a quarterly basis for each calendar quarter (a "Quarterly File Review"), the Compliance Review Parties may conduct a Quarterly File Review in accordance with the scope of work attached hereto as Schedule I.2 within forty five (45) days following the end of the quarter, at Colchis' expense. PeerStreet will cooperate with all reasonable requests and provide the Compliance Review Parties with all necessary assistance and information in connection with each such Compliance Review and Quarterly File Review. During each Compliance Review and Quarterly File Review, PeerStreet will provide the Compliance Review Parties with access to information in PeerStreet's and its Affiliates' possession regarding the Loans (subject to Applicable Laws) owned by Colchis. In connection with any Compliance Review and Quarterly File Review, Colchis agrees to make reasonable efforts to minimize the impact on the business operations, resources and personnel of PeerStreet. For the avoidance of doubt, any information obtained or disclosed to the Compliance Review Parties in connection with any Compliance Review or Quarterly File Review shall be treated as Confidential Information of PeerStreet in accordance with Article 7.

## ARTICLE 7.
## CONFIDENTIALITY

**7.1**      **Disclosure of Confidential Information**.

From time to time, in connection with the transactions contemplated by this Agreement, one Party ("Discloser") may disclose Confidential Information to the other Party ("Recipient"), whether in writing, orally or by allowing inspection of tangible objects (i.e., documents, tapes disks, prototypes, samples, plants or equipment).

**7.2**      **Handling of Confidential Information.**

Recipient shall:

(a)      hold Confidential Information in the strictest confidence and use such Confidential Information solely to fulfill its obligations hereunder;

(b)      disclose Confidential Information only: (i) to those personnel and third-party service providers of Recipient who need to receive such Confidential Information in connection with the permitted uses contemplated by this Agreement; (ii) to the extent disclosure is required by Applicable Law or other legal process or requested or demanded by any Regulatory Authority; (iii) in connection with the exercise or enforcement of any right or remedy under this Agreement, in connection with any litigation or other proceeding to which Recipient is a party or bound; and (iv) to Recipient's respective officers, directors, agents, employees, accountants, legal counsel or other advisors, investors and prospective investors, lenders and financing sources and prospective lenders and financing sources and as agent acting on behalf of any investor, lender or financing source (and Recipient agrees to be liable for any act or omission in breach of this Article 7 by the foregoing parties);

(c)      not intentionally reverse engineer, disassemble or decompile any prototypes, software or other tangible objects embodying Confidential Information;

(d)      not make any copies of Confidential Information unless previously authorized in writing by Discloser;

(e)      if authorized to make copies of Confidential Information, reproduce on such copies any proprietary rights and/or confidentiality notices appearing on the original Confidential Information in the same manner as on the original; and

(f)      use its reasonable best efforts to protect and maintain the confidentiality of the Confidential Information, which protections shall be at least equivalent in scope and effect to the measures taken by Recipient to protect its own confidential or proprietary information of a like or similar nature.

**7.3**      **Compelled Disclosure**.

Recipient may disclose Confidential Information required to be disclosed by law, regulation or a valid court order, *provided*, that Recipient: (a) requests maximum available

confidential treatment for such Confidential Information (to the extent permissible under the terms of the law, regulation or order compelling disclosure); (b) gives Discloser prompt written notice of such requirement to disclose prior to such disclosure (to the extent permissible under the terms of the law, regulation or order compelling disclosure or as soon as is reasonably practicable); and (c) reasonably cooperates with Discloser as reasonably necessary, at Discloser's sole cost, to obtain a protective order or securing confidential treatment for such Confidential Information.

**7.4**     **Return or Destruction of Materials**.

Recipient shall return or destroy, as Discloser indicates in writing, all Confidential Information, including without limitation all copies, compilations, summaries, analyses or other materials containing or reflecting Recipient's use of Confidential Information, within ten (10) days after the later to occur of: (a) termination of this Agreement; or (b) Discloser's written request to Recipient; _provided_, that Recipient may maintain in its possession all Confidential Information of Discloser required to be maintained under Applicable Laws relating to the retention of records for the period of time required thereunder or stored on Recipient's network as part of standard back-up procedures (_provided_, that such Confidential Information shall remain subject to the confidentiality provision of this Article 7).  Recipient shall promptly send Discloser written certification of such destruction or return.

**7.5**     **Ownership of Confidential Information.**

The Confidential Information (and related copies and materials) shall be the sole and exclusive property of Discloser.  Recipient has no rights under any of Discloser's patents, copyrights, trademarks, trade secrets or with respect to any of Discloser's other intellectual property, except as expressly set forth herein.  Recipient may not use Confidential Information to apply for or secure any patents or any other intellectual property rights.

**7.6**     **Use of Name**.

Except as required by Applicable Law, each Party agrees not to directly or indirectly disclose, use or refer to the name of the other Party or any of its Affiliates without the prior written permission of such Party.  Notwithstanding the foregoing, each Party may disclose the name of the other Party to its legal and other professional advisors who are bound to keep such information confidential, and Colchis may disclose to investors and potential investors in investment funds managed by or advised by Colchis, including in marketing materials for such investment funds, its relationship with PeerStreet and information related to its investment in PeerStreet and Loans and Notes purchased from PeerStreet.

**ARTICLE 8.**
**TERM AND TERMINATION**

**8.1**     **Term and Termination.**

Subject to Section 5.2, either Party may terminate this Agreement upon ninety (90) days prior written notice to the other Party.

8.2     **Survival of Termination**.

(a)     If PeerStreet terminates this Agreement for any reason, then PeerStreet's obligations under Sections 2.1(a), 2.4, 4.2, 5.1, 5.2, 6.1(a)(i)-(vi), 6.2, 6.3, 6.4, Article 7 and Article 9 of this Agreement shall remain in effect; and

(b)     if Colchis terminates this Agreement for any reason, then PeerStreet's obligations under Sections 2.4, 4.2, 5.1, 5.2, 6.1(a)(i)-(vi), 6.2, 6.3, Article 7 and Article 9 of this Agreement shall remain in effect.

(c)     _Regulatory Termination_.  In addition to other termination rights stated herein, PeerStreet will have the ability to terminate if it has been determined in a regulatory proceeding that Colchis Entities are restricted by law or regulation from purchasing Loans from PeerStreet.  If (i) PeerStreet receives a letter from a Regulatory Authority stating that, in its view (but not an official determination), the operation of the Platform or the sale of Loans to Colchis or any other party may be in violation of law or applicable regulations, or (ii) there is a change in law which PeerStreet is advised by its counsel does not permit PeerStreet to continue to operate the Platform or sell Loans to Colchis under this Agreement, then PeerStreet and Colchis will work together in good faith to determine a response to such Regulatory Authority or change in law and to decide whether and how to continue the Loan Purchase Program.

**ARTICLE 9.**
**MISCELLANEOUS**

9.1     **Notices.**

All notices and other communications hereunder and under any other transaction document will be in writing and will be deemed to have been duly given when delivered in person, by facsimile or email, by express or overnight mail delivered by a nationally recognized air courier (delivery charges prepaid), or by registered or certified mail (postage prepaid, return receipt requested) to the respective Parties as follows:

if to Colchis:

Colchis Capital Management, L.P.
150 California Street, 18th Floor
San Francisco, CA 94111
Facsimile No.: (415) 400-8609
Attention: Jonathan Strike
Email: jstrike@colchiscapital.com

With a copy to (which shall not constitute notice):

Moses & Singer, LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-1299
Facsimile No.: (212) 377-6053
Attention: Robert M. Friedman
Email: rfriedman@mosessinger.com

if to PeerStreet:

c/o Peer Street, Inc.
2121 Park Place, Suite 250
El Segundo, CA 90245
Attention: Legal Department
E-mail Address: legal@peerstreet.com

With a copy to (which shall not constitute notice):

Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
1200 Seaport Boulevard
Redwood City, CA 94063
Attention: Louis Soto
E-Mail Address: lsoto@gunder.com

or to such other address as the Party to whom notice is given may have previously furnished to the other Party in writing in the manner set forth above. Any notice or communication delivered in person will be deemed effective upon delivery. Any notice or communication sent by email or air courier will be deemed effective on the first business day at the place at which such notice or communication is received following the day on which such notice or communication was sent. Any notice or communication sent by registered or certified mail will be deemed effective on the third business day at the place at which such notice or communication is received following the day on which such notice or communication was mailed.

### 9.2     Costs.

Except as otherwise specifically set forth in this Agreement, each of Colchis and PeerStreet shall bear its own costs and expenses in connection with this Agreement, including without limitation any sales commissions, legal fees or costs and expenses relating to due diligence.

### 9.3     Amendment; Waiver.

Except as otherwise expressly provided herein, the Parties may amend this Agreement from time to time, in a writing signed by duly authorized officers of each Party. No waiver of any provision of this Agreement, nor consent to any departure by any Party therefrom, shall be effective unless the same shall be in writing and signed by a duly authorized officer of the Party

to be charged with the waiver or consent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

### 9.4      Cumulative Rights.

All rights and remedies of the Parties under this Agreement shall, except as otherwise specifically provided herein, be cumulative and non-exclusive of any rights or remedies that they may have under any other agreement or instrument, by operation of law or otherwise.

### 9.5      Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of and be enforceable by each Party hereto and their respective successors and permitted assigns.  Without limiting the foregoing, a change in control of PeerStreet (by any means effected) shall not cause the termination of this Agreement or the termination of the Loan Purchase Program, the Loan Sale Agreement, the LSA, any agreement with custodians, sub-servicers or Back-up Servicers or any side letters between PeerStreet and Colchis related to any of the foregoing.  This Agreement shall not be assigned, pledged or hypothecated by any Party without the prior written consent of the other Party, except that Colchis may assign this Agreement to an Affiliate of Colchis.

### 9.6      Choice of Law.

This Agreement shall be construed in accordance with the laws of the State of New York, without reference to the choice of law principles under the laws of the State of New York other than Section 5-1401 of New York General Obligations Law which shall govern.

### 9.7      Arbitration.

The Parties waive their right to seek remedies in court, including any right to a jury trial. The Parties agree that any dispute between or among any of the Parties or any of their Affiliates arising out of, relating to or in connection with this Agreement or the transactions contemplated hereby, including the determination of the scope and applicability of the agreement to arbitrate, shall be resolved exclusively through binding arbitration conducted under the auspices of JAMS pursuant to its Comprehensive Arbitration Rules and Procedures.  The arbitration hearing shall be held in San Francisco, California.  Disputes shall not be resolved in any other forum or venue.  The arbitration shall be conducted by a panel of three judges; each Party shall select one judge and the third judge shall be selected by mutual agreement of the Parties.  The Parties agree that the arbitrator shall apply the substantive law of the State of New York to all state law claims, that limited discovery shall be conducted in accordance with JAMS' Comprehensive Arbitration Rules and Procedures, and that the arbitrator may not award punitive or exemplary damages, unless (but only to the extent that) such damages are required by statute to be an available remedy for the specific claim(s) asserted.  In accordance with JAMS' Comprehensive Arbitration Rules and Procedures, the arbitrator's award shall consist of a written statement as to the disposition of each claim and the relief, if any, awarded on each claim.  The award shall not include or be accompanied by any findings of fact, conclusions of law or other written explanation of the reasons for the award.  The Parties understand that the right to appeal or to seek modification of any ruling or award by the arbitrator is severely limited under state and federal law.  Any award rendered by the arbitrator shall be final and binding, and judgment may be entered thereon in San Francisco,

California or as otherwise provided by law. The Parties shall maintain the confidential nature of the arbitration proceeding and the award, including when seeking to confirm or vacate the award in court, unless otherwise required by law or judicial decision. Nothing contained in this Section 9.7 shall, however, restrict a Party from seeking injunctive or equitable relief. Each Partner acknowledges and agrees that its failure to perform or abide by any of the covenants in this Agreement would cause irreparable injury to the other Party and cause damages to the other Party that would be difficult or impossible to ascertain or quantify. Accordingly, without limiting any remedies that may be available with respect to a breach of this Agreement, each Party consents to the entry of an injunction in court to restrain a breach of this Agreement.

### 9.8    Limitation of Liability.

Except for acts or omissions that constitute gross negligence, bad faith or willful misconduct, in no event shall any Party or any of its respective Affiliates, beneficiaries, assignees or successors (by assignment or otherwise) be liable to the other Party or to any other entity for punitive or exemplary damages, any actual or purported lost profits, costs of cover or other special damages, or any punitive, exemplary, remote, consequential, incidental or indirect damages, under this Agreement incurred or claimed by any Party or entity (or such party or entity's officers, directors, stockholders, members or owners), however caused, on any theory of liability.

### 9.9    Severability.

Any provision of this Agreement that is prohibited or not fully enforceable in any jurisdiction, will be ineffective only to the extent of such prohibition or unenforceability without otherwise invalidating or diminishing any Party's rights under the remaining provisions of this Agreement in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable in any respect any such provision in any other jurisdiction.

### 9.10    Entire Agreement.

As of the date hereof, each Party hereby acknowledges and agrees that this Agreement, together with the exhibits hereto, represents the complete and entire agreement between the Parties with regard to the subjects hereof and shall supersede all prior written or oral statements, agreements or understandings, including the Original Agreement, between the Parties.

### 9.11    Exhibits and Schedules.

The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

### 9.12    No Joint Venture or Partnership.

Each Party (including any of its respective successors and permitted assigns) acknowledges and agrees that such Party will not hold itself out as an agent, partner or joint venturer of the other Party, and that this Agreement and the transactions contemplated hereby, including the payment of any fees or the reimbursement of any expenses, are not intended and do not create an agency, partnership, joint venture or any other type of relationship between the Parties.

AMENDED AND RESTATED FRAMEWORK AGREEMENT (PEERSTREET) – Page 24

**9.13**    **Further Assurances**.

Each Party, upon the reasonable written request of the other Party, shall execute and deliver to such other Party any reasonably necessary or appropriate additional documents, instruments or agreements as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement or the consummation of the transactions contemplated hereunder.

**9.14**    **Counterparts.**

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. The Parties agree that this Agreement and signature pages may be transmitted between them by facsimile or by electronic mail and that faxed and PDF signatures may constitute original signatures and that a faxed or PDF signature page containing the signature (faxed, PDF or original) is binding upon the Parties.

**9.15**    **Waivers, Etc.**

No waiver of any single breach or default of this Agreement shall be deemed a waiver of any other breach or default of this Agreement.

**9.16**    **No Investment Advice**.

Each Party acknowledges and agrees that the acquisition of the Notes are not intended to establish, and shall not establish, an investment advisory relationship among any of Colchis, PeerStreet or any of their respective officers, directors, shareholders, partners, members, employees, agents or representatives or Affiliates, whereby any party serves as an investment adviser to any other party or that would otherwise result in any party meeting the definition of investment adviser in Section 202(a)(11) of the Investment Advisers Act of 1940, as amended, with respect to any of the parties. Furthermore, each party acknowledges and agrees that it is not relying upon any other party for investment advice, analysis or recommendations regarding any investment or potential investment.

**9.17**    **No Third Party Beneficiaries.**

Nothing expressed or referred to in this Agreement shall be construed to give any Person other than the parties to this Agreement and the Colchis Purchaser any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

**9.18**    **Non-Disparagement**.

Neither Party, at any time, except in connection with a legal proceeding or order (including a proceeding relating to this Agreement, the Loan Sale Agreement, or the LSA) or as otherwise required by law, from and after the date hereof, regardless of the expiration or termination of this Agreement, shall criticize, ridicule, or make, publish, or ratify any statement that disparages (i.e., negative statements), is derogatory or defamatory of the other Party or its businesses, or any of their respective stockholders, investors, officers, directors, agents or employees or any of their products, services or procedures, whether or not such disparaging, derogatory or defamatory

statements are true, in any material way, in a public forum or venue. The Parties agree and acknowledge that this non-disparagement provision is a material part of this Agreement, the absence of which would result in the Parties refusing to enter into this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused to be duly authorized, executed and delivered, as of the date first above written, this AMENDED AND RESTATED FRAMEWORK AGREEMENT.

**COLCHIS CAPITAL MANAGEMENT, L.P.**

By: _____
Name: Jonathan Strike
Title: Chief Operating Officer

**PEER STREET, INC.**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have caused to be duly authorized, executed and delivered, as of the date first above written, this AMENDED AND RESTATED FRAMEWORK AGREEMENT.

**COLCHIS CAPITAL MANAGEMENT, L.P.**

By: _____
Name: Jonathan Strike
Title: Chief Operating Officer

**PEER STREET, INC.**

By: _____
Name: _____
Title: _____

**EXHIBIT A**

**CURRENT PRODUCT LINE**

PeerStreet's Current Product Line includes the following:

1.      Short-term bridge loans that are being originated in accordance with the Underwriting Guidelines as of the date of this Agreement and specifically includes "Fix and Flip" Loans, "Fix to Rent" Loans, short-term (up to 36 months) "Buy to Rent" Loans, and "Bridge" Loans, as defined in the Underwriting Guidelines.

**EXHIBIT B**

**PEERSTREET UNDERWRITING GUIDELINES FOR
CURRENT PRODUCT LINE AND SMALL MFR LOANS**

(See Attached)

## SECOND AMENDMENT TO
## AMENDED AND RESTATED FRAMEWORK AGREEMENT

SECOND AMENDMENT TO AMENDED AND RESTATED FRAMEWORK AGREEMENT (this "Second Amendment") is dated as of April 8, 2019, by and between Peer Street, Inc., a Delaware corporation (together with its successors and permitted assigns, "PeerStreet"), and Colchis Capital Management, L.P., a Delaware limited partnership (together with its successors and permitted assigns, "Colchis").

## RECITALS

WHEREAS, PeerStreet and Colchis have entered into that certain Amended and Restated Framework Agreement, dated as of March 2, 2018, as amended by that certain First Amendment to Amended and Restated Framework Agreement dated as of June 19, 2018 (collectively, the "Framework Agreement"); and

WHEREAS, PeerStreet and Colchis desire to amend certain provisions of the Framework Agreement as set forth in this Second Amendment.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, PeerStreet and Colchis hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

**1.1    Defined Terms**.  Capitalized terms used herein (including in the preamble and recitals above) but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Framework Agreement.

## ARTICLE 2
## AMENDMENTS TO FRAMEWORK AGREEMENT

**2.1    Amendments to Framework Agreement**. The Framework Agreement is hereby amended as follows:

(a)    Section 1.1 of the Framework Agreement is hereby amended by deleting the definition of "Underwriting Criteria" and replacing it with the following:

""Underwriting Guidelines" means PeerStreet's Non-Owner Occupied Residential Loan Underwriting Standards Manual for its Current Product Line and Small MFR Loans, as applicable, a copy of which, effective December 18, 2018, is attached as Exhibit B hereto, as they may be amended, restated, amended and restated, supplemented or otherwise modified by PeerStreet from time to time, in accordance with the terms of this Agreement."

(b)    Section 2.1(a)(i) of the Framework Agreement is hereby amended by (i) deleting the text "One-Hundred Seventy Five Million Dollars" where it appears and inserting in

lieu thereof the text "Two-Hundred Million Dollars" and (ii) deleting the text "($175,000,000)" where it appears and inserting in lieu thereof the text "($200,000,000)".

      (c)    Section 2.1(a)(ii) of the Framework Agreement is hereby amended by (i) deleting the text "two and a half (2.5) years" where it appears and inserting in lieu thereof the text "three and a half (3.5) years" and (ii) deleting the text "$175 million" where it appears and inserting in lieu thereof the text "$200 million".

      (d)    Section 2.1(d) of the Framework Agreement is hereby amended by deleting the text "$175 million" where it appears and inserting in lieu thereof the text "$200 million".

      (e)    <u>Exhibit C</u> of the Framework Agreement (Parameters for Loan Purchases) is amended and restated in its entirety to read as follows:

CURRENT PRODUCT LINE AND SMALL MFR LOANS

<u>Note Purchases</u>

As a general matter, when a Colchis Purchaser purchases Notes, it will be purchasing the following fractional interest in each Loan represented by a Note based on the following net investor rate bands and property types and subject to the additional criteria set forth below:

| Net Investor Rate Band | Colchis Fractional Interest, Current Product Line | Colchis Fractional Interest, Small MFR Loans |
|---|---|---|
| below 6.50% to <7.25% | 25% | 25% |
| from 7.25% to <8.00% | 70% | 70% |
| 8.00% and above | 35% | 70% |

The fractional interests are subject to following criteria:

(a)    a maximum Colchis Purchaser investment of $1,500,000 per Loan, that has an LTV at or below seventy percent (70%);

(b)    a maximum Colchis Purchaser investment of $1,000,000 per Loan, that has an LTV at or below seventy five percent (75%) but above seventy percent (70%);

(c)    exclude "Cash Out Refinance" Loans (as defined in Exhibit B – see page 15) with LTV greater than sixty-five percent (65%); and

(d)    exclude "Bridge" Loans (as defined in Exhibit B – see pg. 11 ) with (i) loan strategy of "Buy to Rent" as specified on PeerStreet's Platform, (ii) loan borrower has no track record, and (iii) loan amount is greater than $1,000,000.

Colchis reserves the right for Colchis Purchasers to purchase Loans or interests in Loans through a Series Trust or in other structural formats as desired by Colchis and reasonably approved by PeerStreet. Notwithstanding the foregoing, PeerStreet reserves the right, in its sole discretion, to change any of the percentage allocations for loans set forth in the table above with a net investor rate from 7.25% and greater to no more than 70% but no less than 30% upon fifteen (15) days written notice to Colchis.

<u>Whole Loan Purchases</u>

As set forth on <u>Exhibit F</u> of the Loan Sale Agreement.

## ARTICLE 3
## MISCELLANEOUS

**3.1    Headings**. The headings, captions, and arrangements used in this Second Amendment are for convenience only and shall not affect the interpretation of this Second Amendment.

**3.2    Counterparts**. This Second Amendment may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. PeerStreet and Colchis agree that this Second Amendment and signature pages may be transmitted between them by facsimile or by electronic mail and that faxed and PDF signatures may constitute original signatures and that a faxed or PDF signature page containing the signature (faxed, PDF or original) is binding upon each of PeerStreet and Colchis.

**3.3    Severability**. Any provision of this Second Amendment that is prohibited or not fully enforceable in any jurisdiction, will be ineffective only to the extent of such prohibition or unenforceability without otherwise invalidating or diminishing either PeerStreet or Colchis' rights under the remaining provisions of this Second Amendment in such jurisdiction, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable in any respect any such provision in any other jurisdiction.

**3.4    Entire Agreement**. The Framework Agreement (as amended by this Second Amendment), the Loan Sale Agreement, the LSA and any documents attached as exhibits or executed in connection herewith or therewith, constitute PeerStreet and Colchis' entire and final agreement with respect to the subject matter hereof and thereof, and supersede all prior written or oral statements, agreements or understandings between PeerStreet and Colchis.

**3.5    Successors and Assigns**. This Second Amendment shall be binding upon and inure to the benefit of and be enforceable by each of PeerStreet and Colchis and their respective successors and permitted assigns. This Second Amendment shall not be assigned, pledged or hypothecated by either PeerStreet or Colchis without the prior written consent of the other, except that Colchis may assign this Second Amendment to an Affiliate of Colchis.

**3.6    Governing Law**. This Second Amendment shall be construed in accordance with the laws of the State of New York, without reference to the choice of law principles under the laws

of the State of New York other than Section 5-1401 of New York General Obligations Law which shall govern.

     **3.7**    **Arbitration**. PeerStreet and Colchis waive their right to seek remedies in court, including any right to a jury trial. PeerStreet and Colchis agree that any dispute between or among either PeerStreet or Colchis or any of their Affiliates arising out of, relating to or in connection with this Second Amendment, including the determination of the scope and applicability of the agreement to arbitrate, shall be resolved in the manner provided in the Framework Agreement.

     **3.8**    **Ratification**. Each of PeerStreet and Colchis hereby agrees to this Second Amendment and acknowledges that the Framework Agreement, as amended hereby, remains in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has caused this Second Amendment to be duly executed and delivered as of the date first above written.

PEERSTREET:

Peer Street, Inc.

By: _____

Name: Brewster Johnson

Title: Chief Executive Officer

COLCHIS:

Colchis Capital Management, L.P.

By: _____

Name: Tom Moore

Title:  Chief Financial Officer

[Second Amendment to Amended and Restated Framework Agreement]

## **EXHIBIT 23**

*Execution Version*

**LOAN AND SECURITY AGREEMENT**

By and Among

**PSF SUB 4, LLC**
as Borrower

**PS FUNDING, INC.**
as Guarantor and Servicer

and

**PACIFIC FUNDING TRUST 1002**
as Lender

This **LOAN AND SECURITY AGREEMENT** is made as of February 28, 2018, by and among PSF SUB 4, LLC, a Delaware limited liability company ("Borrower"), PS FUNDING, INC., a Delaware corporation (in its capacity as guarantor, "Guarantor" and in its capacity as servicer, ("Servicer"), and PACIFIC FUNDING TRUST 1002, a Delaware statutory trust (the "Lender").

## RECITALS

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, Borrower may from time to time purchase participation interests in certain Mortgage Loans from PS Funding pursuant to the Participation Agreement;

**WHEREAS,** to fund its purchases under the Participation Agreement, Borrower has requested that the Lender provide a multi-draw senior secured term loan facility under which Borrower may from time to time during the Commitment Period request that the Lender make Term Loans under such facility, in each case on the terms and conditions of this Agreement;

**WHEREAS,** Borrower has agreed to secure all of its Obligations by granting to Lender, a First Priority Lien on all of its assets; and

**WHEREAS,** Guarantor has agreed to guarantee the obligations of Borrower hereunder.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1.    Certain Definitions.  The terms defined in this Section 1.1, whenever used and capitalized in this Agreement, shall, unless the context otherwise requires, have the respective meanings herein specified.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Agreement" means this Loan and Security Agreement and all exhibits and schedules hereto, as the same may be amended, modified or supplemented from time to time.

"<u>Anti-Terrorism Laws</u>" means any laws relating to terrorism or money laundering, such as the USA PATRIOT Act and other laws administered by the U.S. Department of the Treasury Financial Crimes Enforcement Network.

"<u>Backup Servicer</u>" means FCI Lender Services or any independent third party selected by Lender who will perform servicing and monitoring functions with respect to the Mortgage Loans.

"<u>Backup Servicing Agreement</u>" means with respect to each Mortgage Loan, that certain Servicing Agreement by and between Servicer and Backup Servicer for such Mortgage Loan, as may be amended, modified or supplemented from time to time.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Code as now constituted or hereafter amended and any similar statute or law affecting the rights of debtors.

"<u>Books and Records</u>" means all of Credit Parties' original ledger cards, payment schedules, credit applications, contracts, lien and security instruments, guarantees relating in any way to the Collateral and other books and records or transcribed information of any type, whether expressed in electronic form in tapes, discs, tabulating runs, programs and similar materials now or hereafter in existence relating to the Collateral.

"<u>Borrower</u>" has the meaning assigned to that term in the preamble.

"<u>Borrowing Base Certificate</u>" means the borrowing base certificate setting forth the current calculation of Collateral Value that Borrower must deliver to Lender in substantially the form of <u>Exhibit A</u> attached hereto in accordance with this Agreement.

"<u>Business Day</u>" means any day except a Saturday, Sunday or other day on which national banks are authorized by law to close including, without limitation, United States federal government holidays.

"<u>Cash Collateral Account</u>" means the deposit account maintained with City National Bank, which account is subject to the Control Agreement.

"<u>Cash Equivalents</u>" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency or instrumentality of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state, territory or commonwealth of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state, territory or commonwealth of the United States, (d) any dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state, territory or commonwealth thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000 and (e) shares of any

United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"Change of Control" means the occurrence of any of the following:

(1)     the direct or indirect sale, conveyance, transfer, lease or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of any Credit Party, to any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act);

(2)     the adoption of a plan relating to the liquidation or dissolution of any Credit Party; or

(3)     the first day on which PS Funding, Inc. ceases to own 100% of the outstanding Stock in Borrower.

"Closing Date" means February 28, 2018.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and regulations with respect thereto in effect from time to time.

"Colchis" means Colchis Capital Management, L.P., a Delaware limited partnership.

"Collateral" means "Collateral" as defined in Section 9.1(a).

"Collateral Requirement" means the requirement to maintain aggregate value of cash reserves and Cash Equivalents and Collateral Value in an amount equal to or exceeding the Loan Amount.

"Collateral Value" means an amount equal to 95% of the aggregate outstanding principal balance of Eligible Mortgage Loans and Eligible Participations, without duplication, that are not Delinquent as of the date of determination.

"Consumer Finance Laws" means all applicable laws, regulations, interpretations and guidance, federal, state and local, relating to the extension of consumer credit, and the creation of a security interest in personal property in connection therewith, as the case may be, and laws with respect to protection of consumers' interests in connection with such transactions, including without limitation, any usury laws, any privacy laws, the Electronic Signatures in Global and National Commerce Act, the Federal Consumer Credit Protection Act, the Federal Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Federal Trade Commission's Rules and Regulations and Regulations B, E and Z of the Consumer Financial Protection Bureau, as any of the foregoing may be amended from time to time.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security (whether in the nature of Stock or otherwise) issued by such Person or of any written agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Credit Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"<u>Control Agreement</u>" means, collectively, (a) that certain deposit account control agreement dated on or about the date hereof among Borrower, Lender, and City National Bank, and (b) any other deposit account control agreement entered into between or among Borrower, Lender, and a financial institution, as each agreement may be amended, modified, restated or extended from time to time.

"<u>Credit Date</u>" means the date of the making of a Term Loan.

"<u>Credit Determination Date</u>" shall mean (i) three Business Days prior to the Closing Date with respect to the initial Term Loan; and (ii) ten Business Days in advance of the proposed Credit Date with respect to a subsequent Term Loan**.**

"<u>Credit Documents</u>" means this Agreement, the Notes, the Control Agreement, the Pledge and Security Agreement, the Guaranty, the Limited Guaranty and any and all additional documents, instruments, agreements and other writings executed and delivered pursuant to or in connection with this Agreement, as each may be amended, modified, restated or extended from time to time.

"<u>Credit Party</u>" means each of Borrower, PS Funding and Limited Guarantor.

"<u>Cut-Off Date</u>" shall mean (x) with respect to any date of determination (other than a Payment Date or the date of any proposed Term Loan), the Business Day immediately preceding such date and (y) with respect to any Payment Date or the date of any proposed Term Loan, the third Business Day immediately preceding such Payment Date or the date for any such proposed Term Loan, as applicable,

"<u>Debt</u>" means as of the date of determination, all outstanding indebtedness including without limitation (a) all loans made hereunder to Borrower; (b) accounts payable as of the date of determination (other than trade payables in the ordinary course of business); (c) mortgages; (d) debenture instruments, and other instruments, including all accruals of interest and fees related thereto; and (e) all other obligations of a Person, which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise).

"<u>Default</u>" means an event, condition or circumstance which, with the giving of notice or the passage of time, or both, would (if not cured or otherwise remedied during such time) constitute an Event of Default.

"<u>Delinquent</u>" means a Mortgage Loan or Participation for which any scheduled payment remains unpaid for more than sixty (60) calendar days from the original due date for such payment, in whole or in part.

"Eligible Mortgage Loan" means, as of the related Credit Date, a Mortgage Loan which meets PS Funding's internal credit, pricing and operational policy guidelines attached as Exhibit F hereto, and, if applicable, complies with the underwriting guidelines of any commercial partner or bank partner to the extent that PS Funding is using such partner to originate the Mortgage Loans and with respect to which the following eligibility criteria are satisfied as of such date of determination:

> (a)    does not have a payment default with respect to any scheduled payment as of the related Credit Date and no other default, breach, violation or event permitting acceleration under the terms of such Mortgage Loan;

> (b)    does not have an outstanding amount in excess of $2,500,000;

> (c)    does not have a remaining term greater than 36 months;

> (d)    does not have a Loan-to-Value greater than 85%;

> (e)    is not a thirty (30) day note; and

> (f)    is serviced by Servicer, and if sub-serviced, such sub-servicer is the Backup Servicer pursuant to a Backup Servicing Agreement or such other independent third party approved by Limited Guarantor and acceptable to Lender.

"Eligible Participation" means, as of any date of determination, a Participation in an Eligible Mortgage Loan.

"Environmental Control Statutes" means any applicable federal, state, county, regional or local laws governing the control, storage, removal, spill, release or discharge of Hazardous Substances, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and the Hazardous and Solid Waste Amendments of 1984, the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1976, the Hazardous Materials Transportation Act, the Emergency Planning and Community Right to Know Act of 1986, the National Environmental Policy Act of 1975, the Oil Pollution Act of 1990, any similar or implementing state law, and in each case including all amendments thereto, all binding rules and regulations promulgated thereunder and requirements in permits issued in connection therewith.

"EPA" means the United States Environmental Protection Agency, or any successor thereto.

"Event of Default" has the meaning assigned to that term in Article 7.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) taxes imposed on or measured by net income (in each case, however denominated), franchise taxes, and branch profits taxes, in each case, (i) imposed as a result of such Person being organized under the laws of, or having its principal office or, in the case of Lender, its applicable lending office located in, the jurisdiction

imposing such tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding taxes imposed on amounts payable to or for the account of Lender with respect its interest in the Loans pursuant to a law in effect on the date on which Lender acquired its interest in the Loans; (c) taxes attributable to such Person's failure to comply with Section 11.15 and (d) any U.S. federal withholding taxes imposed under FATCA.

"FATCA" means (a) Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), and any current or future regulations or official interpretations thereof, (b) any treaty, law, regulation or other official guidance enacted in any non-U.S. jurisdiction, or relating to an intergovernmental agreement between the U.S. and any other jurisdiction, which (in either case) directly relates to the implementation of (a) above, and (c) any agreement pursuant to the implementation of clauses (a) or (b) above with the U.S. Internal Revenue Service, the U.S. government or any governmental or taxation authority in any other jurisdiction.

"First Priority" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien

"Fiscal Year" means any of the annual accounting periods of Borrower ending on December 31 of each year.

"Framework Agreement" means that certain Amended and Restated Framework Agreement by and between Peer Street Inc., a Delaware corporation, and Colchis.

"Funding Notice" means a Notice of Borrowing substantially in the form of Exhibit E.

"GAAP" means generally accepted accounting principles applied on a consistent basis, in the United States of America. The requirement that such principles be applied on a consistent basis shall mean that the accounting principles observed in a current period are comparable in all material respects to those applied in a preceding period, or, in the event of a material change in any accounting principle from that observed in any previous period (i) financial reports covering preceding periods during the term of this Agreement are restated to reflect such change and provide a consistent basis for comparison among periods and (ii) the financial covenants set forth in Section 5.4 shall be adjusted as determined by Lender to reflect similar performance standards as those measured by the existing covenants using the previously observed accounting principles.

"Governmental Authorization" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing. The term "Governmental Authority" shall further include any institutional review board, ethics committee, data monitoring committee, or other committee or entity with defined authority to oversee regulatory matters.

"Guarantor" means PS Funding and any other Persons from time to time that are parties to the Guaranty in the capacity of a guarantor.

"Guaranty" means that certain Guaranty dated on or about the date hereof by Guarantor in favor of Lender, as may be amended, modified, restated or extended from time to time.

"Hazardous Substance" means any toxic, reactive, corrosive, carcinogenic, flammable or hazardous pollutant or other substance regulated under Environmental Control Statutes due to its dangerous or deleterious properties or characteristics, including without limitation petroleum and items defined in Environmental Control Statutes as "hazardous substances," "hazardous wastes," "pollutants" or "contaminants."

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment (or amount payable) made by or on account of any obligation of the Borrower under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Interest" or "Interest Rate" means the interest rate calculated in accordance with Section 2.4.

"Interest Period" means, a 30 day calendar month and with regard to the first period, the period commencing on (and including) the related Credit Date through and including the last day of such calendar month.

"Lender" has the meaning assigned to that term in the preamble.

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, taxes, commissions, charges, disbursements and expenses (including those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"Lien" means any mortgage, deed of trust, pledge, lien, security interest, charge or other encumbrance or security arrangement of any nature whatsoever, including without limitation any conditional sale or title retention arrangement, and any collateral assignment, deposit arrangement or lease intended as, or having the effect of, security but excluding the interests of a lessor under operating leases.

"Limited Guarantor" means Peer Street, Inc., a Delaware corporation and any other Persons from time to time that are parties to the Limited Guaranty in the capacity of a guarantor.

"Limited Guaranty" means that certain Limited Guaranty dated on or about the date hereof by Limited Guarantor in favor of Lender, as may be amended, modified, restated or extended from time to time.

"Loan" means a Term Loan.

"Loan Amount" means, at any time, the aggregate unpaid principal amount of the Term Loans outstanding at such time.

"Local Authorities" means individually and collectively the state and local governmental authorities which govern the business and operations owned or conducted by Borrower.

"Material Adverse Change" means any event, obligation, liability or circumstance or set of events, obligations, liabilities or circumstances which:

   (a) has a material adverse effect upon or material adverse change in (i) the legality, validity or enforceability of this Agreement or any other Credit Document, (ii) the status, perfection or priority of any Lien granted to Lender, under any of the Credit Documents, (iii) the value, validity, enforceability or collectability of the Collateral or, (iv) the rights and remedies of the Lender under the Credit Documents, or (v) the business, properties, assets, operations, the Collateral, results of operations, or financial condition of Borrower or Guarantor; or

   (b) has materially impaired or reasonably could be expected to materially impair the ability of Borrower or Guarantor to perform any of the Obligations or the ability of any party to the Credit Documents to perform its obligations under, or to consummate the transactions contemplated under, the Credit Documents.

"Maturity Date" means the earlier of (a) February 28, 2021, and (b) the date that all Term Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"Maximum Rate" shall mean the highest lawful and non-usurious rate of interest applicable to the Loans, that at any time or from time to time may be contracted for, taken, reserved, charged, or received on the Loans and the Obligations under the Requirements of Law.

"Monthly Summary Report" has the meaning assigned to that term in Section 5.2(c).

"Mortgage" means with respect to a Mortgage Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first Lien on a fee simple non-owner occupied residential or commercial real property securing the Mortgage Note or a leasehold estate with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely accepted practice.

"Mortgage File" means, with respect to each Mortgage Loan, the Mortgage Note, the Mortgage, all other documents related to the Mortgage Loan, and related information contained on a data tape or similar database information maintained in the ordinary course of business.

"Mortgage Loan" means a loan made to obligors in the United States secured by a non-owner occupied residential or commercial real property and includes the Mortgage Note and related Mortgage.

"Mortgage Note" shall mean the original executed promissory note or other evidence of the indebtedness of a mortgagor with respect to a Mortgage Loan.

"Net Liquidity" means cash and Cash Equivalents of the Servicer Consolidated Group, determined on a consolidated basis in accordance with GAAP, excluding restricted cash and Cash Equivalents and cash and Cash Equivalents held by Subsidiaries of Servicer that may not be distributed to Servicer as a result of Requirements of Law or contractual restrictions.

"Note" means the promissory note executed pursuant to this Agreement by Borrower in favor of Lender on behalf of Lender, evidencing the obligation of Borrower to repay the Loan Amount, and any and all amendments, renewals, replacements or substitutions therefor.

"Obligations" means each and every draft, liability and obligation of every type and description which Borrower may now or at any time hereafter owe to Lender arising under this Agreement, the Notes or any other Credit Document (whether such debt, liability or obligation now exists or is hereafter created or incurred, whether it arises in a transaction involving Lender or in a transaction involving other creditors of Borrower, and whether it is direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or sole, joint, several or joint and several).

"OFAC" has the meaning specified in Section 4.20.

"Organization Documents" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation, and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between such Person and the jurisdiction imposing such Tax (other than connections arising solely from such Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in the Loans or Credit Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, but excluding any Excluded Taxes and any Taxes that are Other Connection Taxes attributable to the sale of an assignment or grant of a participation by Lender hereunder.

"Participation" means a one hundred percent (100%) interest, including beneficial interest, participation, or share, in a Mortgage Loan with respect to which (a) Borrower has acquired such interest under a participation agreement with an Affiliate and (b) such Affiliate is obligated to hold

the Mortgage Note, other Mortgage Loan documents, and the Mortgage File as lender for the benefit of Borrower and all other participants, and for the benefit of Lender.

"Participation Agreement" means that certain Participation Agreement, dated as of the date hereof, by and between Borrower and PS Funding.

"Payment Date" means the fifth (5th) calendar day of each calendar month (or if such day is not a Business Day, the next succeeding Business Day), commencing the first calendar month after the Closing Date.

"Permitted Liens" means with respect to all of the Credit Parties, (i) Liens granted to Lender by the Credit Parties pursuant to this Agreement; (ii) Liens for Taxes, assessments or other governmental charges not delinquent or being properly contested; (iii) normal and customary rights of setoff upon (A) deposits of cash in favor of Lender, if applicable, and (B) deposits of cash in favor of other banks and depository institutions arising as a matter of law or pursuant to customary deposit account agreements and other similar agreements, in each case encumbering deposits, on cash deposits to secure ACH/EDI transactions in the ordinary course of business; (iv) Liens arising by virtue of the rendition, entry or issuance against Borrower, or any property of Borrower, of any judgment, writ, order, or decree for so long as each such Lien does not give rise to an Event of Default hereunder; (v) mechanics', workers', carriers', materialmen's, warehousemen or landlords or other like Liens arising in the ordinary course of business with respect to obligations which are not delinquent for more than ninety (90) days or remain payable without penalty or which are being contested in good faith; (vi) Liens on insurance proceeds and the unearned portion of insurance premiums incurred in the ordinary course of business in connection with the financing of insurance premiums; and (vii) extensions, renewals, or replacements of any Lien referred to above, provided that any Lien resulting from such extensions, renewals or replacements is limited to the assets originally encumbered by the Lien so extended, renewed or replaced.

"Persons" means all natural persons, corporations, limited partnerships, general partnerships, joint stock companies, limited liability companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and federal and state governments and agencies or regulatory authorities and political subdivisions thereof, or any other entity.

"Pledge and Security Agreement" means the Pledge and Security Agreement to be executed by Guarantor, as it may be amended, supplemented or otherwise modified from time to time.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"PS Funding" means PS Funding, Inc., a Delaware corporation.

"Register" has the meaning specified in Section 11.8(d).

"Regulatory Trigger Event" means (a) the Guarantor, the Borrower, or any Subsidiaries of Guarantor becomes the subject of any investigation, stay, order, ruling or judgment, issued by any Governmental Authority involving the legality or regulatory compliance of its business which is

not satisfied, released, stayed, vacated or discharged within thirty (30) days of such Person's knowledge thereof and, in either case, the effect, outcome or resolution of such action listed above would reasonably be expected to result in (i) in the case of Borrower, a Material Adverse Change, or (ii) in the case of Guarantor, any such direct or indirect parent or any such Subsidiary, a material adverse change in the business, properties, assets, operations, the collateral, results of operations, or financial condition of any such Person; or (b) the enactment of a usury cap applicable to the Collateral or the passage of any applicable State or Federal statute or regulation restricting the offering or sale of the Collateral which, in either case, would reasonably be expected to result in a Material Adverse Change in the sole discretion of Lender.

"Related Persons" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor and other consultants and agents of or to such Person or any of its Affiliates.

"Requirements of Law" means, as to any Person, any law (statutory or common), ordinance, treaty, rule, regulation, order, policy, other legal requirement or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or products or to which such Person or any of its Property or products is subject.

"Secured Obligations" means all the Obligations and all other obligations and liabilities of the Borrower under this Agreement.

"Servicer" has the meaning assigned to that term in the preamble.

"Servicer Consolidated Group" means the Servicer and each of its Subsidiaries consolidated for financial accounting purposes.

"Stock" means all shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including common stock, preferred stock, limited liability company interests or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"Subsidiary" of any entity means any corporation, limited liability company, partnership or other legal entity of which such entity directly or indirectly owns or controls at least a majority of the outstanding stock or other equity interest having general voting power.  For purposes of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise.

"Target Aggregate Loan Amount" means, as of any date of determination, an amount equal to sum of (i) the Collateral Value as of the Cut-Off Date (or, if the calculation is being made in connection with a Funding Notice, as of the Cut-Off Date for the applicable Borrowing Base Certificate), plus (ii) the cash and Cash Equivalents of Borrower.

"Tax" or "Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Term Loan" means a Term Loan made by Lender to Borrower pursuant to Section 2.1(a).

"Term Loan Availability" means, at any date of determination, the lesser of (a) the Target Aggregate Loan Amount, and (b) the Term Loan Commitment, minus, in each case, the Loan Amount.

"Term Loan Commitment" means the commitment of Lender to make or otherwise fund Term Loans in an amount not to exceed $50,000,000 in the aggregate.

"Term Loan Commitment Period" means the time period commencing on the Closing Date through and including the Term Loan Commitment Termination Date.

"Term Loan Commitment Termination Date" means the earliest to occur of (i) the date of the termination of the Term Loan Commitment pursuant to Section 8.1, (ii) the date on which Lender has made Term Loans in an aggregate principal amount equal to the Term Loan Commitment, and (iii) May 28, 2018.

"UCC" means the Uniform Commercial Code as in effect in the State of New York from time to time.

"Underlying Real Property Collateral" means non-owner occupied improved residential or commercial real property that secures repayment of a Mortgage Loan.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"Weekly Activity Report" has the meaning assigned to that term in Section 5.2(a).

"Weekly Summary Report" has the meaning assigned to that term in Section 5.2(b).

Section 1.2.    Rules of Construction.

(a)    Accounting Terms.  Except as otherwise provided herein, financial and accounting terms used in the foregoing definitions or elsewhere in this Agreement shall be defined in accordance with GAAP.  No change in the accounting principles used in the preparation of any financial statement hereafter adopted by Borrower shall be given effect for purposes of measuring compliance with any provision of Article 5 or Article 6 unless

the Borrower and Lender agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, the compliance certificate and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP. For purposes of this Agreement, any obligations of a Person under a lease that is not (or would not be) required to be classified and accounted for as a capitalized lease on a balance sheet of such Person under GAAP as in effect as of the Closing Date shall not be treated as a capitalized lease as a result of the adoption of changes in GAAP or changes in the application of GAAP.

(b)　　Uniform Commercial Code. Except as otherwise provided herein, terms used in the foregoing definitions or elsewhere in this Agreement that are defined in the Uniform Commercial Code, including without limitation, "Accounts", "Account Debtor", "Certificated Security", "Commercial Tort Claim", "Deposit Accounts", "Documents", "Instruments", "Investment Property", "General Intangibles", "Chattel Paper", "Inventory", "Goods", "Equipment", "Fixtures", "Supporting Obligations", "Proceeds", "Record", "Securities Account", "Security", and "Letter of Credit Rights" shall have the respective meanings given to such terms in Division 9 of the UCC, if defined therein, and otherwise as defined elsewhere in the UCC.

## ARTICLE 2
## THE LOAN FACILITY

Section 2.1.　　Term Loans.

(a)　　Loan Commitments. Subject to the terms and conditions hereof,

(i)　　Lender agrees to make, on the Closing Date, an initial Term Loan to Company in an amount equal to or greater than $20,000,000; provided that after giving effect to the making of the initial Term Loan on the Closing Date the aggregate principal amount of the outstanding Term Loans as of the Closing Date shall not exceed the Term Loan Availability as of the Credit Determination Date for such Loan; and

(ii)　　Lender agrees to make, after the Closing Date, and, at any time during the Term Loan Commitment Period, up to four (4) additional Term Loans to Company; provided that after giving effect to the making of any such Term Loan in no event shall the aggregate principal amount of all outstanding Term Loans as of the applicable Credit Date, and after making such Term Loan, exceed the Term Loan Availability as of the Credit Determination Date for such Term Loan.

(iii)　　Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.

(b)　　Borrowing Mechanics for Term Loans.

(i)　　Borrower shall deliver to Lender a fully executed Funding Notice no later than three (3) Business Days prior to the Closing Date with respect to the initial Term Loan to be made on the Closing Date. Following the Closing Date, whenever

Borrower desires that Lender make Term Loans, Borrower shall deliver to Lender a fully executed and delivered Funding Notice at least ten (10) days in advance of the proposed Credit Date.

(ii)    Each Funding Notice shall: (A) specify (1) the amount of the requested Term Loan which amount shall be (a) not less than $20,000,000 in the case of the initial Term Loan and (b) not more than $10,000,000 in the case of any subsequent Term Loan, (2) the aggregate principal amount of all Term Loans after giving effect to such requested Term Loan, (3) the desired Credit Date, and (4) the account of the Company to which the proceeds of such Term Loan are to be remitted, and (B) certify and evidence the Borrowing Base as of the Closing Date or the proposed Credit Date, as applicable, after giving effect to the requested Term Loan. Each Funding Notice shall be irrevocable and the Borrower shall be bound to make a borrowing in accordance therewith.

Section 2.2.    Evidence of Debt; Lenders' Books and Records; Notes.

(a)    Lenders' Evidence of Debt.  Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Borrower, absent manifest error; provided, that the failure to make any such recordation, or any error in such recordation, shall not affect Lender's Term Loan Commitment or Borrower's Obligations in respect of any applicable Loans.

(b)    Notes. Borrower shall execute and deliver to Lender on the Closing Date, and from time to time thereafter promptly after written request therefor, a Note or Notes to evidence the Term Loans of Lender.

Section 2.3.    Method of Payment.  Borrower shall make all payments of principal and interest on the Notes in lawful money of the United States of America and in funds immediately available by wire transfer or automated clearing house transfer to Lender in accordance with wire instructions Lender shall provide. Whenever any payment is due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and interest shall be paid for such extended time.  Borrower's obligations to Lender with respect to such payment shall be discharged by making such payments to Lender pursuant to this Section 2.3 or, if not timely paid or any Event of Default or Default then exists, may be added to the principal amount of the Loans outstanding.

Section 2.4.    Repayment of the Loans.

(a)    Interest.  Subject to Section 2.4(b) below, the Loans shall bear Interest at 8.00% per annum (the "Interest Rate"). All Interest charged hereunder shall be calculated on the basis of a three hundred sixty (360) day year, comprised of twelve (12) Interest Periods. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan shall be included, and the date of payment of such Loan shall be excluded. Except as otherwise set forth herein, interest on each Loan shall be payable in arrears (i) on each Payment Date for the immediately

preceding Interest Period: and (ii) upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) to the extent accrued, on the Maturity Date.

(b)      Default Interest.  Upon the occurrence and continuance of an Event of Default the Loans shall bear Interest at the rate equal to the lesser of (i) eleven percent (11.0%) per annum and (ii) the Maximum Rate, such Interest to be due and payable subject to the terms of the payment of Interest in this Agreement.  Accrued and unpaid Interest shall be payable upon demand during the occurrence and continuation of an Event of Default.

(c)      Principal.  Unless there is an Event of Default, Borrower shall repay the Loans in full in a single balloon payment on the Maturity Date in an amount equal to the outstanding Loan Amount plus any accrued and unpaid fees and interest and any other unpaid Obligations payable to Lender. Upon the occurrence of an Event of Default, Lender shall have rights and remedies available to it under Article 8 of this Agreement.

Section 2.5.    Use of Proceeds.  The Loan proceeds shall be used by Borrower solely (i) to finance the acquisition from PS Funding of Eligible Mortgage Loans and Eligible Participations on and after the Closing Date and (ii) for other lawful purposes permitted under the Credit Documents.

Section 2.6.    Voluntary Prepayments. Borrower shall not voluntarily prepay the Obligations prior to the expiration of six (6) months commencing on the Closing Date. Any time, and from time to time, commencing three (3) months after the Closing Date, Borrower may prepay the Obligations in whole or in part without premium or penalty upon ninety (90) days prior written notice of the proposed prepayment date to Lender; provided that (i) any such prepayment shall be in a principal amount equal to or greater than $500,000 or, if less, the entire outstanding principal amount of the Loans, and (ii) Borrower shall pay in full all accrued and unpaid interest on the portion of the Loan Amount so prepaid.  Borrower may, in connection with any such partial prepayment of the Obligations and any related disposition of Collateral that Borrower proposes to make, request Lender to release from its Lien the applicable portion of the Collateral in accordance with Section 9.7(a).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein.

Section 2.7.    Mandatory Prepayments. In addition to and without limiting any provision of any Credit Document:

(a)      If Borrower, in any transaction or series of related transactions after the Closing Date, without the prior written consent of Lender, (i) sells, transfers, pledges or assigns any Participation or other Collateral (other than pursuant to and in accordance with the Participation Agreement or this Agreement), (ii) sells or issues any equity or debt securities of Borrower, Stock in Borrower or other ownership interests in Borrower (other than pursuant to and in accordance with this Agreement), or (iii) incurs any Debt except for Debt under the Credit Documents, then Borrower shall deposit 100% (or such lesser amount as is required to indefeasibly pay in cash in full the Obligations (other than indemnity obligations of Borrower under the Credit Documents that are not then due and

payable or for which any events or claims that would give rise thereto are not then pending)) of the cash proceeds thereof (net of reasonable transaction costs and expenses and Taxes) to the Cash Collateral Account and within three (3) Business Days after such deposit prepay an amount equal to such cash proceeds. This Section 2.7(a) shall not be interpreted as authorizing any of the foregoing without the written consent of Lender.

(b)     In no event shall Borrower permit the Loan Amount to exceed the Target Aggregate Loan Amount. If at any time and for any reason, the Loan Amount exceeds the Target Aggregate Loan Amount, Borrower shall promptly (but, in any event, within three (3) Business Days) either (A) prepay the principal balance of the Loans in an amount equal to the difference between the Loan Amount and Target Aggregate Loan Amount plus any accrued and unpaid Interest thereon or (B) if no Default or Event of Default has occurred and is continuing, increase the aggregate principal amount of Eligible Mortgage Loans and Eligible Participations pledged to Lender in accordance with this Agreement so that the Target Aggregate Loan Amount is equal to or exceeds the Loan Amount.  The pledge and delivery to Lender of additional Eligible Mortgages Loans and Eligible Participations shall be accompanied by a certification from Borrower that demonstrates that after giving effect to the pledge to Lender of such additional Eligible Mortgages and Eligible Participations, the Loan Amount is equal to or less than the Target Aggregate Loan Amount.

### ARTICLE 3
### CONDITIONS PRECEDENT

Section 3.1.    Closing Date.  The obligation of Lender to make a Term Loan on the Closing Date is subject to the satisfaction (or waiver), of the following conditions on or before the Closing Date:

(a)     (i) Borrower shall have delivered to Lender the Credit Documents to which it, any Credit Party or any Affiliate of any Credit Party is a party, each duly executed by an authorized officer of each Credit Party, as applicable, and the other parties thereto, and (ii) each other Person shall have delivered to Lender the Credit Documents to which it is a party, each duly executed and delivered by such Person and the other parties thereto;

(b)     Lender shall have received, all in form and substance satisfactory to Lender in its sole discretion, (i) a report of UCC financing statement, tax and judgment lien searches performed with respect to Borrower and Guarantor in the State of Delaware, and such report shall show no Liens on the Collateral (other than Permitted Liens), (ii) each document (including, without limitation, any UCC financing statement) required by any Credit Document or under law or requested by Lender to be filed, registered or recorded to create, in favor of Lender, a valid, perfected First Priority Lien in the Collateral, and (iii) evidence of each such filing, registration or recordation and of the payment by Borrower of any necessary fee, tax or expense relating thereto;

(c)     Lender shall have received, all in form and substance acceptable to Lender in its sole discretion, (i) each Credit Party's Organizational Documents, (ii) each

Credit Party's bylaws, partnership agreement or operating agreement, as applicable, certified as of a recent date by such Person's secretary (or other appropriate officer); together with certificates of good standing existence or fact in such Credit Party's state of organization and in each jurisdiction in which such Person is qualified to do business, each dated within thirty (30) days from the date of this Agreement, (iii) a certificate of an authorized officer of each Credit Party in his or her capacity as such and not in his or her individual capacity dated as of the Closing Date, as to the incumbency and signature of the Persons executing the Credit Documents on behalf of such Person, and (iv) a certificate executed by an authorized officer of the Borrower, which shall constitute a representation and warranty by Borrower as of the Closing Date that the conditions contained in this Agreement have been satisfied;

(d)    Each Credit Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the transactions contemplated by the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Lender.  All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired;

(e)    Lender shall have received the written legal opinions of outside legal counsel to the Credit Parties regarding certain closing matters including corporate matters, enforceability, no conflicts, creation and perfection of security interests, in form and substance satisfactory to Lender, in its sole discretion, and its counsel;

(f)    Lender shall have received (or is satisfied that it will receive simultaneously with the funding of the initial Term Loan) all fees, charges and expenses due and payable or reimbursable to Lender on or prior to the Closing Date pursuant to the Credit Documents;

(g)    Copies of resolutions of each Credit Party authorizing the transactions contemplated by the Credit Documents shall be satisfactory to Lender in its sole discretion;

(h)    (i) no default (after any applicable grace or cure period has expired or been cancelled) shall exist pursuant to any obligations of any Credit Party, if any, under any material contract, and Credit Parties shall be in compliance with all Requirements of Law, except to the extent noncompliance could not reasonably be expected to result in a Material Adverse Change, (ii) no Event of Default shall exist and be continuing under this Agreement or any other Credit Document and (iii) there shall exist no fact, condition or circumstance which, with the passage of time, the giving of notice or both, could reasonably be expected to result in a Material Adverse Change;

(i)     Lender shall have received evidence of release and termination of, or Lender's authority to release and terminate, any and all Liens and/or UCC financing statements in, on, against or with respect to any of the Collateral (other than Permitted Liens and the Liens and UCC financing statements in favor of Lender on behalf of the Borrower);

(j)     the Liens in favor of Lender, shall have been duly perfected and shall constitute First Priority Liens, and the Collateral shall be free and clear of all Liens other than Liens in favor of Lender, in all cases subject to Permitted Liens;

(k)     Borrower shall have opened the Cash Collateral Account and such account shall be subject to a Control Agreement in form and substance satisfactory to Lender;

(l)     Lender shall have received from Guarantor certificates evidencing Borrower's Stock with any necessary endorsement and/or appropriate stock powers duly executed in blank; and

(m)     such other documents and items as Lender deems necessary, in its sole discretion.

Section 3.2.    <u>Conditions to Term Loans</u>.  The obligation of Lender to make any Term Loan on any Credit Date (including the Closing Date), is subject to the satisfaction (or waiver), of the following conditions:

(a)     Colchis shall have received fully executed documentation, in form and substance satisfactory to Colchis, increasing Colchis's minimum outstanding balance to $150,000,000 principal amount of loans in the aggregate as the threshold for PS Funding and Limited Guarantor to offer to Colchis Purchasers (as defined in the Framework Agreement) the minimum capacity of loans set forth in the Framework Agreement;

(b)     Solely with respect to the making of a Term Loan on a Credit Date other than the Closing Date, Colchis shall have received fully executed documentation, in form and substance satisfactory to Colchis, providing for whole loan purchases by Colchis, delivered pursuant to the Framework Agreement;

(c)     Lender shall have received a fully executed and delivered Funding Notice pursuant to <u>Section 2.1(b)</u> together with a fully executed Borrowing Base Certificate evidencing that that there is Term Loan Availability with respect to the Term Loan requested by Borrower;

(d)     Borrower shall own or have the unconditional right to purchase from PS Funding the Participations to be financed by such Term Loan;

(e)     each of the representations and warranties made by any Credit Party in or pursuant to the Credit Documents shall be accurate in all material respects (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect) before and after giving effect

to the making of such Term Loan (except for those representations and warranties made as of a specific date), each Credit Party shall be in compliance with all covenants, agreements and obligations under the Credit Documents, and no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the requested Term Loan;

       (f)     there shall not exist any litigation that negatively would impact Borrower's or Guarantor's ability to perform their respective obligations under the Credit Documents to which they are party;

       (g)     Non-occurrence of any Regulatory Trigger Event or other regulatory event, regulatory change or pending or threatened (in writing) proceeding that could reasonably be expected to have a material adverse effect on Borrower's or Guarantor's ability to fulfill their respective obligations under this Agreement or the Credit Documents or which would reasonably be expected to affect either such Person's ability to remain a going concern;

       (h)     there shall not have occurred any Material Adverse Change; and

       (i)     the Term Loan Commitment Period Termination Date, shall not have occurred.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Each of Borrower and Guarantor represents and warrants to Lender as follows:

       Section 4.1.    <u>Representations and Warranties as to Mortgage Loans</u>. Borrower or Guarantor, as the case may be, has good and valid title to the Mortgage Loans or Participations, as applicable, free and clear of all prior assignments, claims, liens, encumbrances and security interests, other than Permitted Liens, and has the right to pledge and grant Lender, a First Priority Lien in the same, in the manner provided in this Agreement.

       Section 4.2.    <u>Organization and Good Standing</u>. Each of Borrower and Guarantor is duly organized and validly existing in good standing under the laws of the state identified on <u>Schedule 4.2</u> attached hereto and made a part hereof and has the power and authority to engage in the business it conducts and is qualified and in good standing in those states wherein the nature of business or property owned by it requires such qualification, is not required to be qualified in any other state; or if not so qualified, no adverse effect on Borrower's or Guarantor's business would result therefrom.  The organizational number assigned to each of Borrower and Guarantor by the state of its organization is set forth on <u>Schedule 4.2</u> attached hereto and made a part hereof. Borrower is organized as a "Special-Purpose Entity," which means that in substance its purpose is restricted to owning the Collateral and incurring the obligations under this Agreement and the other Credit Documents (and ancillary activities related thereto), its ability to incur debt is restricted to incurring the obligations under this Agreement and the other Credit Documents and incidental unsecured debt related to the Collateral, and it must operate in accordance with customary separateness provisions, which include, inter alia, a prohibition on commingling of its funds or other assets with any other party and a requirement to deal with Affiliates on an arm's-

length basis, all as more particularly described in Borrower's limited liability company operating agreement in effect on the Closing Date.

Section 4.3.    <u>Perfection of Security Interest</u>.    Upon the filing of financing statements in all places as are necessary to perfect the security interests and disclosing Borrower as debtor and Lender as secured party, Lender will have a First Priority perfected security interest in the Collateral (other than Underlying Real Property Collateral) which can be perfected by the filing of UCC-1 financing statements in Borrower's state of organization.

Section 4.4.    <u>No Violations</u>.    The making and performance of the Credit Documents do not and will not violate any provisions of any law, rule, regulation, judgment, order, writ, decree, determination or award or breach any provisions of the certificate of formation, operating agreement or other Organization Documents of Borrower or Guarantor, or constitute a default or result in the creation or imposition of any security interest in, or lien or encumbrance upon, any assets of Borrower or Guarantor (immediately or with the passage of time or with the giving of notice and passage of time, or both) under any other contract, agreement, indenture or instrument to which Borrower or Guarantor is a party or by which Borrower or Guarantor or their respective property is bound where such violation, breach, default, creation of any security interest in or lien or encumbrance upon will result in the case of Borrower, in a Material Adverse Change, or in the case of Guarantor or any direct or indirect parent of such Person, a material adverse change in the business, properties, assets, operations, the collateral, results of operations, or financial condition of any such Person.  The making and performance of the Credit Documents will not cause any existing Borrower or Guarantor securities, indebtedness or facility to be subject to any "price reset" or any other material change in terms.

Section 4.5.    <u>Power and Authority</u>.

(a)    Each of Borrower and Guarantor has full power and authority under the law of the state of its organization and under its Organization Documents to enter into, execute and deliver and perform the Credit Documents; to borrow monies hereunder, to incur the obligations herein provided for and to pledge and grant to Lender, a security interest in the Collateral; and

(b)    All actions (corporate or otherwise) necessary or appropriate for Borrower's and Guarantor's, execution, delivery and performance of the Credit Documents have been taken.

Section 4.6.    <u>Validity of Agreements</u>.  Each of the Credit Documents is, or when delivered to Lender will be, duly executed and constitute valid and legally binding obligations of Borrower and Guarantor enforceable against Borrower and Guarantor, in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

Section 4.7.    <u>Litigation and Arbitration</u>.  There is no order, notice, claim, action, suit, litigation, arbitration, proceeding or investigation pending or, threatened in writing against or affecting Borrower or Guarantor as of the date hereof where the amount in controversy is in excess

of One Hundred Seventy Five Thousand Dollars ($175,000) individually or in the aggregate in case of the Borrower, or One Hundred Seventy Five Thousand Dollars ($175,000) individually or Five Hundred Thousand Dollars ($500,000) in the aggregate, in the case of the Guarantor, in each case, which (except in the case of a judgment or decree rendered against Borrower) is/are not bonded pending appeal, satisfied, stayed, vacated or discharged of record within thirty (30) calendar days of being rendered (or in any event later than five (5) days prior to the date of any proposed sale thereunder in connection with any enforcement proceedings commenced by a creditor upon such judgment), whether or not fully covered by insurance, except as identified and described on Schedule 4.7 attached hereto and made a part hereof.

Section 4.8.  Compliance.  To Borrower's and Guarantor's knowledge, respectively, each of Borrower and Guarantor is in compliance in all material respects with all applicable laws and regulations, federal, state and local (including all Consumer Finance Laws (including being in compliance with privacy notice requirements under the Gramm-Leach-Bliley Act)), material to the conduct of its business and operations; each of Borrower and Guarantor possesses all the franchises, permits, licenses, certificates of compliance and approval and grants of authority necessary or required in the conduct of its business and the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with Borrower's and Guarantor's execution and performance of the Credit Documents.

Section 4.9.  Accuracy of Information; Full Disclosure.  None of the representations or warranties made by Borrower, Guarantor or any of their Subsidiaries in the Credit Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Credit Documents, contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

Section 4.10.  Taxes.  Each of Borrower and Guarantor has filed and will file all Tax Returns which are required to be filed and all such Tax Returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations, and has paid or will pay when due all Taxes, license and other fees (whether or not shown on any Tax Return) of Borrower or Guarantor except Taxes contested in good faith for which adequate reserves in accordance with GAAP have been established by Borrower or Guarantor on its Books and Records.  There are no unpaid Taxes in any material amount claimed to be delinquent by the taxing authority of any jurisdiction (other than those being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and subject to adequate reserves taken by Borrower or Guarantor or such Subsidiaries as shall be required in conformity with GAAP), and the executive officers of each of Borrower, Guarantor and their Subsidiaries know of no basis for any such claim.  No written claim has ever been made by an authority in a jurisdiction where Borrower, Guarantor or any of their respective Subsidiaries does not file Tax Returns that Borrower, Guarantor or any of their respective Subsidiaries is or may be

subject to taxation by that jurisdiction.  There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of the Borrower, Guarantor or any of their respective Subsidiaries.

Section 4.11.   Debt.   The Borrower does not presently have outstanding indebtedness or obligations including contingent obligations and obligations under capitalized leases.

Section 4.12.   Subsidiaries; Investments.   Borrower has no direct or indirect Subsidiaries or investments in or loans to any other individuals or business entities, except as described in Schedule 4.12 attached hereto.

Section 4.13.   Hazardous Wastes, Substances and Petroleum Products.

(a)    Each of Borrower and Guarantor (i) has received all permits and filed all notifications necessary to carry on its respective business; and (ii) is in compliance in all respects with all Environmental Control Statutes.

(b)    Neither Borrower nor Guarantor has given any written notice to the EPA or any state or local agency with regard to any actual or imminently threatened removal, spill, release or discharge of Hazardous Substances at products or properties owned or leased by Borrower or Guarantor or in connection with the conduct of its business and operations.

(c)    Neither Borrower nor Guarantor has received written notice that it is potentially responsible for costs of clean-up of any actual or imminently threatened spill, release or discharge of hazardous or toxic wastes or substances or petroleum products pursuant to any Environmental Control Statute.

Section 4.14.   Business Location.    As of the date hereof, Borrower's and Guarantor's address set forth on Schedule 4.14 attached hereto and made a part hereof is the location of such Borrower's and Guarantor's principal place of business and such address, together with the addresses set forth on Schedule 4.14 attached hereto and made a part hereof, is the only location where Borrower or Guarantor keeps its records concerning the Collateral.  The location of all other places of business of Borrower and Guarantor and the names in which Borrower and Guarantor conduct business at each such location as of the date hereof are set forth in Schedule 4.14 attached hereto and made a part hereof.

Section 4.15.   Stock.  All of the issued and outstanding Stock of Borrower is owned as of the date hereof as described on Schedule 4.15 attached hereto and made a part hereof, and all such Stock is fully paid and non-assessable.

Section 4.16.   No Extension of Credit for Securities. Borrower is not, nor will it be, engaged principally or as one of its important activities in the business of extending credit for the purpose of purchasing or carrying or trading in any margin stocks or margin securities (within the meaning of Regulations T, U and X of the Board of Governors of the Federal Reserve System) or other securities, and no part of the proceeds of the Loans hereunder has been or will be applied for the purpose of purchasing or carrying or trading in any such stock or securities or of refinancing

any credit previously extended, or of extending credit to others, for the purpose of purchasing or carrying any such margin stock, margin securities or other securities in contravention of such Regulations.

Section 4.17.  Regulated Entities.  Neither Borrower nor Guarantor is (a) an "investment company" within the meaning of the Investment Company Act of 1940.

Section 4.18.  Insurance.  Borrower and Guarantor and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrower or Guarantor, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses of the same size and character as the business of the Borrower and Guarantor and, to the extent relevant, owning similar Properties in localities where such Persons operate.

Section 4.19.  Deposit Accounts and Other Accounts.  Schedule 4.19 lists all banks and other financial institutions at which Borrower maintains deposit or other accounts as of the Closing Date and in which any Collateral may be deposited, and such Schedule 4.19 correctly identifies the name, address and any other relevant contact information reasonably requested by Lender with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

Section 4.20.  Foreign Assets Control Regulations and Anti-Money Laundering.  To its knowledge, each of the Borrower and Guarantor is in compliance in all material respects with all applicable U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  Neither Borrower nor Guarantor (i) is a Person designated by the U.S. government on OFAC's list of Specially Designated Nationals and Blocked Persons (the "SDN List"), (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including by virtue of such Person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any Person on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Credit Document would be prohibited under U.S. law.

Section 4.21.  USA PATRIOT Act.  Each of Borrower and Guarantor is in compliance in all material respects with (a) the Trading with the Enemy Act, and each of OFAC's foreign assets control regulations and any other enabling legislation or executive order relating thereto, (b) the USA PATRIOT Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of the Loans will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

# ARTICLE 5
## AFFIRMATIVE COVENANTS

In addition to the covenants contained in Article 9 of this Agreement relating to the Collateral, until all Obligations (other than unasserted contingent indemnification obligations) have been satisfied in full, each of Borrower and Guarantor covenants and agrees as follows:

Section 5.1.    Place of Business and Books and Records.  Each of Borrower and Guarantor will within fifteen (15) Business Days advise Lender in writing of (a) the establishment of any new places of business by Borrower or Guarantor and of the discontinuance of any existing places of business of Borrower or Guarantor; (b) the creation of any new Subsidiaries of Borrower and (c) the acquisition and or use of any trade name or trade style.

Section 5.2.    Reporting Requirements.  Borrower will deliver, or cause to be delivered, to Lender:

(a)    within two (2) Business Days after the end of each calendar week, an activity report in substantially the form of Exhibit B attached hereto providing Mortgage Loan level information for Mortgage Loans and Participations added or removed from the Collateral during such week (the "Weekly Activity Report");

(b)    within two (2) Business Days after the end of each calendar week, a summary report in substantially the form of Exhibit C attached hereto providing aggregate information for cash flow reconciliation and outstanding collateral statistics for the Collateral for such week (the "Weekly Summary Report");

(c)    within three (3) Business after the end of each calendar month, a collateral report in substantially the form of Exhibit D attached hereto providing Mortgage Loan level information and credit attributes for all Mortgage Loans and Participations constituting the Collateral at the end of such month (the "Monthly Summary Report");

(d)    within forty-five (45) days after the end of each calendar quarter, commencing with the quarter ended March 31, 2018, the unaudited financial statements of Guarantor; and

(e)    annually, when completed, the audited financial statements of Guarantor.

Section 5.3.    Books and Records and Lender Audit Rights.  Borrower and Guarantor will keep accurate and complete Books and Records concerning the Collateral and all transactions with respect thereto consistent with sound business practices (including, without limitation, accurately account for insurance commissions) and will comply with Lender's reasonable requirements, from time to time in effect, including those concerning the submission of reports on all items of Collateral including those which are deemed to be delinquent.

Section 5.4.    Financial Covenants.  Borrower and Servicer shall maintain the following financial covenants:

(a)    <u>Borrower</u>.  All cash held by Borrower shall be deposited in an account subject to a Control Agreement and such cash shall be used exclusively to (i) make payments required under this Agreement and the other Credit Documents and (ii) so long as no Default or Event of Default shall have occurred or be continuing, fund the acquisition of Mortgage Loans or Participations by Borrower.

(b)    <u>Servicer Consolidated Group</u>.  Net Liquidity shall be equal to or greater than $1,000,000 (measured as of the last day of each calendar quarter and based on the certified unaudited financial statements delivered pursuant to <u>Section 5.2(d)</u>).

The determination of the financial covenants contained herein shall exclude any asset, liability, expense or income associated with Statement of Financial Accounting Standard No. 133.

Section 5.5.    <u>Collateral Covenants</u>. Borrower and Servicer shall maintain the following covenants with respect to the Mortgage Loans and Participations comprising the Collateral, measured as of the last day of each calendar month:

(a)    <u>Loan-to-Value</u>.  The weighted average loan-to-value ratio of the Eligible Mortgage Loans and the Eligible Participations, measured by the outstanding loan amounts, shall be equal to or less than 75%; and

(b)    <u>New Products</u>.  No more than 25% of the aggregate outstanding principal amount of the Eligible Mortgage Loans and Eligible Participations shall (i) fall outside of SFR Underwriting Guidelines but still meet PS Funding's underwriting criteria, (ii) have Underlying Real Property Collateral that is comprised of commercial real property securing such Mortgage Loans or (iii) be considered a New Product as defined in the Framework Agreement.

(c)    <u>Restrictions on Sales to Colchis</u>.  No Mortgage Loan pledged, or subject of a Participation pledged, as Collateral under this Agreement may be sold by Borrower, PS Funding or any of their respective Affiliates as a whole loan to Colchis Capital Management, L.P., Lender or any of their respective Affiliates.

Section 5.6.    <u>Compliance With Applicable Law</u>.

(a)    Each of Borrower and Guarantor shall comply in all material respects with all local, state and federal laws and regulations applicable to its business including without limitation the Consumer Finance Laws (including complying with privacy notice requirements under the Gramm-Leach- Bliley Act), Anti-Terrorism Laws, Environmental Control Statutes, and all laws and regulations of the Local Authorities, and the provisions and requirements of all franchises, permits, certificates of compliance and approval issued by regulatory authorities and other like grants of authority held by Borrower and Guarantor; and notify Lender promptly (and in any event, within five (5) Business Days) (and in reasonable detail) of any actual or alleged failure to materially comply with or perform, breach, violation or default under any such laws or regulations or under the terms of any of such franchises or licenses, grants of authority, or of the occurrence or existence of any facts or circumstances which with the passage of time, the

giving of notice or otherwise could create such a breach, violation or default or could occasion the termination of any of such franchises or grants of authority.

(b) With respect to the Environmental Control Statutes, Borrower and Guarantor shall notify Lender when, in connection with the conduct of Borrower's or Guarantor's business or operations, any Person (including, without limitation, EPA or any state or local agency) provides written notification to Borrower, Guarantor or any of their Subsidiaries with regard to an actual or imminently threatened removal, spill, release or discharge of hazardous or toxic wastes, substances or petroleum products; and notify Lender immediately (and in detail) upon the receipt by Borrower or Guarantor of an assertion of liability under the Environmental Control Statutes, of any actual or alleged failure to comply with or perform, breach, violation or default under any such statutes or regulations or of the occurrence or existence of any facts, events or circumstances which with the passage of time, the giving of notice, or both, could create such a breach, violation or default.

Section 5.7.    <u>Existence, Properties</u>.  Each of Borrower and Guarantor will (a) do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights and franchises and comply in all material respects with all laws applicable to it; (b) maintain, preserve and protect all franchises, licenses and trade names and preserve all the remainder of its property used or useful in the conduct of its business; and (c) maintain in effect insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as shall be consistent with prudent business practices in the industry in which Borrower and Guarantor operate and furnish to Lender from time to time, upon their request therefor, evidence of same.  Borrower and Guarantor will provide the Lender with written evidence of policy renewal and payment of premiums no less frequently than annually.  Borrower will continue to maintain its existence as a Special-Purpose Entity in accordance with its limited liability company operating agreement in effect on the Closing Date, and shall not amend its limited liability company operating agreement without Lender's consent.

Section 5.8.    <u>Payment of Debt; Taxes</u>.  Each of Borrower and Guarantor will (a) pay all of their indebtedness and obligations promptly and in accordance with normal terms; and (b) pay and discharge or cause to be paid and discharged promptly all Taxes, assessments, and governmental charges or levies imposed upon it or upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a lien or charge upon such properties or any part thereof; <u>provided</u>, however, that Borrower and Guarantor shall not be required to pay and discharge or to cause to be paid and discharged any such indebtedness, Tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and Borrower or Guarantor shall have set aside on their books adequate reserves (as may be required in accordance with GAAP) with respect to any such indebtedness, Tax, assessment, charge, levy or claim, so contested.

Section 5.9.    <u>Other Information</u>.  From time to time upon reasonable request of Lender, Borrower and Guarantor will furnish to Lender such additional information and reports regarding the Collateral and the operations, businesses, affairs, prospects and financial condition of the Credit Parties.

Section 5.10.  <u>Litigation</u>.  Borrower and Guarantor will within fifteen (15) days notify Lender (a) of any litigation, arbitration or action instituted or, to Borrower's or Guarantor's knowledge, threatened in writing against Borrower or Guarantor, in which the amount in controversy exceeds One Hundred Seventy Five Thousand Dollars ($175,000) and (b) of the entry of any judgment or lien against any property of Borrower or Guarantor, in each case, as applicable, in an amount of One Hundred Seventy Five Thousand Dollars ($175,000) or more as to any separate action, litigation, arbitration, judgment or lien instituted, threatened or entered or in an aggregate amount of Five Hundred Thousand Dollars ($500,000) or more as to all actions, litigation, arbitration, judgments, or liens instituted, threatened in writing or entered, in each case, which (except in the case of a judgment or decree rendered against Borrower) is/are not bonded pending appeal, satisfied, stayed, vacated or discharged of record within thirty (30) calendar days of being rendered (or in any event later than five (5) days prior to the date of any proposed sale thereunder in connection with any enforcement proceedings commenced by a creditor upon such judgment), whether or not fully covered by insurance, except as identified and described on Schedule 4.7 attached hereto and made a part hereof.

Section 5.11.  <u>Notices</u>. Borrower shall promptly, and in any event within five (5) Business Days after Borrower or any other Credit Party obtaining knowledge of the occurrence thereof, notify Lender in writing of (i) any actual or threatened in writing litigation, action, suit, arbitration, dispute, resolution, proceeding, inquiry or investigation at law or in equity or before or by any court, public board or body against or affecting any Credit Party or any of its property or assets that questions or challenges the validity or enforceability of this Agreement or any of the other Credit Documents or any action to be taken in connection with the transactions contemplated hereby or thereby, (ii) any Default or Event of Default under this Agreement or any other Credit Document, which notice shall specify the nature and status thereof, the period of existence thereof and what action is proposed to be taken with respect thereto, (iii) any Material Adverse Change or other development, event, fact, circumstance or condition that could reasonably be expected to have or result in a Material Adverse Change, in each case describing the nature and status thereof and the action proposed to be taken with respect thereto, (iv) any matter(s) in existence that Borrower becomes aware of affecting in any material respect the value, enforceability or collectability of Collateral taken as a whole, (v) any action taken or threatened in writing to be taken by any Governmental Authority (or any notice of any of the foregoing) with respect to any Credit Party or any Collateral, (vi) the submission of any claim or the initiation or threat of any legal process, litigation or administrative or judicial investigation (including notice of any threatened or pending audit by the Internal Revenue Service or any notice of adverse determination by the Internal Revenue Service in connection therewith), or rule making or disciplinary proceeding by or against any Credit Party that could result in a Material Adverse Change, (vii) the commencement of any proceedings by or against any Credit Party under any applicable bankruptcy, reorganization, liquidation, rehabilitation, insolvency or other similar law now or hereafter in effect or of any proceeding in which a receiver, liquidator, conservator, trustee or similar official shall have been, or may be, appointed or requested for any Credit Party, and (viii) the receipt of notice that (A) any Credit Party is being placed under regulatory supervision, (B) any license, permit, charter, registration or approval necessary for the conduct of any Credit Party's business is to be, or may be suspended or revoked, or (C) any Credit Party is to cease and desist any material practice, procedure or policy employed by any Credit Party in the conduct of their respective businesses.

Section 5.12. <u>Business Location, Legal Name and State of Organization</u>. Borrower and Guarantor shall notify Lender, within fifteen (15) Business Days after: (i) any proposed change in Borrower's or Guarantor's principal place of business, Borrower's or Guarantor's legal name or Borrower's or Guarantor's state of organization; (ii) any additional places of business of Borrower or Guarantor; (iii) the change in the names in which Borrower or Guarantor conducts business at each such location; and (iv) the change of Borrower's or Guarantor's jurisdiction of organization.  Upon request of Lender, Borrower and Guarantor will execute and deliver such additional documents, instruments and writings, and take such other action as Lender shall reasonably request to obtain, maintain or continue its perfected and First Priority Lien on and security interest in, the Collateral.

Section 5.13. <u>Operations</u>.  Guarantor and Borrower shall maintain, or cause to be maintained on their behalf, satisfactory credit underwriting and operating standards, including, with respect to each obligor of each Mortgage Loan, the completion of an adequate investigation of such obligor and a determination that the credit history and anticipated performance of such obligor is and will be satisfactory and meets the standards generally observed by prudent finance companies in the business of making loans secured by non-owner occupied residential or commercial real property.

Section 5.14. <u>Further Assurances</u>.  Borrower and Guarantor shall from time to time execute and deliver to Lender such other documents and shall take such other action as may be reasonably requested by Lender in order to implement or effectuate the provisions of, or more fully perfect the rights granted or intended to be granted by Borrower and Guarantor to Lender pursuant to the terms of this Agreement, the Notes or any other Credit Documents.

Section 5.15. <u>Insurance</u>.  Borrower and Guarantor shall (a) maintain in full force and effect all policies of insurance of any kind with respect to the Property and businesses of the Borrower and Guarantor with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower or Guarantor) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Borrower and Guarantor and (b) cause all such insurance relating to any Property or business of Borrower and Guarantor to name Lender as additional insured or lenders loss payee, as appropriate, and in form and substance satisfactory to Lender.

Section 5.16. <u>Cash Management Systems</u>.  Borrower and shall enter into, and cause each depository, securities intermediary or commodities intermediary to enter into, a Control Agreement with respect to each deposit, securities, commodity or similar account maintained by such Person and any account where any Collateral is deposited or located.  Borrower shall cause all obligors to make payments in respect of the Collateral directly into a deposit account that is subject to a Control Agreement.  Borrower shall maintain a positive account balance with respect to each deposit account that is subject to a Control Agreement.

# ARTICLE 6
## NEGATIVE COVENANTS

Borrower covenants and agrees with Lender that until all Obligations (other than unasserted contingent indemnification obligations) have been satisfied in full, neither Borrower nor Guarantor will do or permit any of the following:

Section 6.1.    <u>Payments to and Transactions with Affiliates</u>.  With respect to the Credit Parties (a) make any loan, advance, extension of credit or payment to any Affiliate, officer, employee, member, manager, equity holder or director of Borrower, Guarantor or any of their respective Affiliates or (b) enter into any other transaction, including, without limitation, the purchase, sale, lease or exchange of property, or the rendering or any service, to or with any Affiliate or any equity holder, officer, or employee of Borrower, Guarantor or any of their respective Affiliates except for transactions with or services rendered to any Affiliate of Borrower or Guarantor in the ordinary course of business and pursuant to the reasonable requirements of the business of such Affiliate and upon terms no less favorable to Borrower or Guarantor than Borrower or Guarantor would obtain in a comparable arms' length transaction with a Person not affiliated with Borrower or Guarantor. Notwithstanding this <u>Section 6.1</u> or anything else in this Agreement, Borrower may enter into participation agreements with Affiliates on terms that are similar to other participation agreements involving Guarantor, Borrower, or their Affiliates.

Section 6.2.    <u>Debt</u>.  With respect to the Borrower, borrow any monies or create any Debt except for the Loans.

Section 6.3.    <u>Nature of Business</u>.  With respect to Borrower and Guarantor, engage in any business other than the business in which Borrower or Guarantor currently is engaged or make any material change in the nature of the financings which Borrower or Guarantor is permitted to extend hereunder (including without limiting the generality of the foregoing, matters relating to size, type, term, nature and dollar amount).

Section 6.4.    <u>Sale of Assets/Negative Pledge</u>.  With respect to the Borrower, sell, assign, discount, pledge, grant a Lien in, encumber or otherwise dispose of any Mortgage Loan or the Underlying Real Property Collateral, except for Permitted Liens and as otherwise provided herein and except for the dispositions of Underlying Real Property Collateral in the ordinary course of business made when the related Mortgage Loan has been satisfied in full.

Section 6.5.    <u>Subsidiaries</u>.  With respect to the Borrower, without the prior written consent of the Lender, create or form any Subsidiaries.

Section 6.6.    <u>Mergers and Acquisitions</u>.  With respect to Borrower, except for such transactions as Lender may approve in its sole discretion, acquire any assets or shares of stock of or other equity interest in any Person, or be a party to any consolidation or merger.

Section 6.7.    <u>Use of Proceeds</u>.  With respect to Borrower, use the proceeds of the Loans or any other advance made by Lender hereunder for purposes other than as permitted herein.

Section 6.8.    <u>Ownership and Management</u>.  With respect to the Credit Parties, allow any Change of Control.

Section 6.9.    <u>No Negative Pledges</u>.  With respect to the Borrower:

(a)    Permit any of its Subsidiaries, if any, to (i) create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of Borrower to pay dividends or make any other distribution on any of Borrower's Stock or to pay fees, including management fees, or make other payments and distributions to or (ii) directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of Lender, whether now owned or hereafter acquired, except, in the case of clauses (i) and (ii), the following: (1) this Agreement and the other Credit Documents, (2) in connection with any document or instrument governing Permitted Liens, provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Liens, (3) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Credit Documents on any Collateral securing the Obligations and does not require the direct or indirect granting of any Lien securing any indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of Borrower to secure the Obligations, or (4) any prohibition or limitation that (a) exists pursuant to applicable Requirements of Law, (b) consists of customary restrictions and conditions contained in any agreement relating to the disposition of any property permitted under <u>Section 6.4</u> pending the consummation of such disposition or (c) restricts subletting or assignment of any lease governing a leasehold interest of Borrower.

Section 6.10.    <u>Changes in Accounting</u>.  With respect to the Borrower, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP and (ii) change their Fiscal Year or method for determining its fiscal quarters.

Section 6.11.    <u>OFAC; USA PATRIOT Act</u>.  With respect to the Credit Parties, fail to comply in any material respect with the laws, regulations and executive orders referred to in <u>Section 4.20</u> and <u>Section 4.21</u>.

## ARTICLE 7
## EVENTS OF DEFAULT

Each of the following events shall constitute an "<u>Event of Default</u>" under this Agreement:

Section 7.1.    <u>Failure to Make Payments</u>.  The failure of Borrower to make any payment of (i) principal when due, or (ii) interest under the Notes or this Agreement, within two (2) Business Days of becoming due, or (iii) any other payment hereunder or in respect of any other Obligation within five (5) Business Days of becoming due.

Section 7.2.    <u>Information, Representations and Warranties</u>.  Any representation or warranty made by any Credit Party herein or in any certificate or instrument delivered by any Credit Party in connection herewith or any other Credit Document shall be false, misleading or incorrect in any material respect at the time made or deemed made or furnished, which remains uncured after thirty (30) days.

Section 7.3.    Covenants.  Failure or neglect of Borrower or Guarantor to perform, keep or observe any term, provision, condition, covenant contained in this Agreement, or contained in any other Credit Document in any material respect, which remains uncured after ten (10) Business Days.

Section 7.4.    Collateral.  At any time after the grant to Lender of a security interest in or Lien upon any Collateral, Lender's interest therein shall for any reason cease to be a valid and subsisting First Priority Lien (other than with respect to Permitted Liens) in favor of Lender and/or a valid and perfected First Priority security interest in and to the Collateral purported to be covered thereby having the priority set forth therein.

Section 7.5.    Defaults Under Other Agreements.  Any default by Borrower or Guarantor under any agreement to which Borrower or Guarantor is a party and with respect to which the amount claimed exceeds Five Hundred Thousand Dollars ($500,000), singly or in the aggregate or any acceleration or redemption of indebtedness of Borrower or Guarantor after any such default regardless of monetary amount which remains uncured for fifteen (15) days.

Section 7.6.    Certain Events.  The occurrence of any of the following with respect to Borrower or Guarantor:

(a)    Voluntary Proceedings.  It shall (i) apply for or consent to the appointment of a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) be generally not paying its debts as such debts become due as defined in the Bankruptcy Code, (iii) make a general assignment for the benefit of its creditors, (iv) commence a voluntary case under the Bankruptcy Code, (v) fail to controvert in a timely or appropriate manner, or acquiesce in writing to, any petition filed against it in any involuntary case under the Bankruptcy Code, or (vi) take any corporate action for the purpose of effecting any of the foregoing.

(b)    Involuntary Proceeding.  A proceeding or case shall be commenced against it without its application or consent in any court of competent jurisdiction, seeking (i) the liquidation, reorganization, dissolution, winding up, or composition or readjustment of debts, of it, (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for it or of all or any substantial part of its assets, or (iii) similar relief in respect of it under any law providing for the relief of debtors, and such proceeding or case shall continue undismissed or unstayed and in effect, for a period of sixty (60) days, or an order for relief against it shall be entered in an involuntary case under the Bankruptcy Code.

(c)    Suspension of Activities.  Either Borrower or Guarantor liquidates, dissolves, terminates or suspends its business operations or otherwise fails to operate its business in the ordinary course whether done voluntarily or pursuant to a court, regulatory or other order or directive.

(d)    Judgments.  Any money judgment, writ or warrant of attachment, decrees or similar process, consent order, settlement or regulatory fine or penalty involving (i) an amount of One Hundred Seventy Five Thousand Dollars ($175,000) or more as to any individual action, or (ii) an aggregate amount of Five Hundred Thousand Dollars

($500,000) or more as to all actions (to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has not denied coverage or which has not been paid with proceeds of an equity issuance) shall be entered or filed against Borrower or Guarantor or any of their respective assets and shall remain undischarged, unsatisfied, unvacated, unbonded or unstayed for a period of thirty (30) days (or in any event later than five (5) days prior to the date of any proposed sale thereunder in connection with any enforcement proceedings commenced by a creditor upon such judgment, writ, warrant of attachment or similar process).

(e)     Loan Amount. The Loan Amount exceeds the Target Aggregate Loan Amount for more than three (3) Business Days after the earlier of Borrower's knowledge thereof and written notice to Borrower of such event.

(f)     Servicer Default.  A Default with respect to the Servicer occurs and such Default has not been cured or the Servicer has not been replaced by Backup Servicer (or another successor servicer reasonably acceptable to Lender), in either case, within thirty (30) days after the date on which such Default occurred.

(g)     Material Adverse Change. A Material Adverse Change with respect to the Collateral or any Credit Party (or a Credit Party's ability to perform its obligations under the Credit Documents to which it is a party) shall occur.

Section 7.7.   Guarantor and Limited Guarantor.

(a)     Guarantor shall repudiate, purport to revoke or fail to perform Guarantor's obligations under the Guaranty, or any other Credit Document to which it is party or a petition shall be filed by or against Guarantor under the Bankruptcy Code naming Guarantor as a debtor.

(b)     Limited Guarantor shall repudiate, purport to revoke or fail to perform Limited Guarantor's obligations under the Limited Guaranty, or any other Credit Document to which it is party or a petition shall be filed by or against Limited Guarantor under the Bankruptcy Code naming Limited Guarantor as a debtor.

Section 7.8.   Credit Documents.  An event of default following the expiration of any cure period (however defined) shall occur under any Credit Document other than this Agreement or any material provision of any Credit Document shall at any time for any reason be declared to be null and void or the validity or enforceability thereof shall be contested by any Credit Party.  Any Credit Party shall in writing rescind or repudiate any Credit Document or any of its obligations under any Credit Document or any material term thereof shall cease to be, or is asserted any Credit Party not to be, a legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms.

Section 7.9.   Change of Control.  The occurrence of a Change of Control.

Section 7.10.   Insolvency. Any Credit Party shall become insolvent.

Section 7.11.  <u>Cure Period</u>. The cure periods, if any, set forth above shall run from the earlier of (x) the date on which such violation shall first become known to any officer of Borrower or Guarantor or the date when any such officer of Borrower or Guarantor should reasonably have known or been aware thereof, whichever is earlier, or (y) the date on which written notice thereof is given to Borrower or Guarantor by Lender.

## ARTICLE 8
## <u>REMEDIES OF LENDER AND WAIVER</u>

Section 8.1.  <u>Lender's Remedies</u>.   Upon the occurrence and during the continuance of an Event of Default, Lender may (i) immediately terminate the Term Loan Commitment, (ii) immediately terminate this Agreement, or (iii) declare the Obligations immediately due and payable without presentment, notice of dishonor, protest or further notice of any kind, all of which Borrower and Guarantor hereby expressly waive.  Upon such occurrence and/or declaration, Lender shall have, in addition to the rights and remedies given to it by the Notes, this Agreement and the other Credit Documents, all the rights and remedies of a secured party as provided in the UCC (regardless of whether such Uniform Commercial Code has been adopted in the jurisdiction where such rights and remedies are asserted) and without limiting the generality of the foregoing, and without demand of performance and without other notice (except as specifically required by the Notes, this Agreement or the documents executed in connection herewith) or demand whatsoever to any Credit Party, all of which are hereby expressly waived, Lender may, in addition to all the rights conferred upon it by law, exercise one or more of the following rights successively or concurrently: (a) to take possession of the Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which Borrower and Guarantor hereby expressly waive), (b) to lawfully dispose of the whole or any part of the Collateral, or any other Property, instrument or document pledged as security for any Obligation at public or private sale, with the right on the part of Lender or its nominees to become the purchaser thereof as provided by law absolutely freed and discharged from any equity of redemption, and all trusts and other claims whatsoever; (c) after deduction of all legal and other costs and expenses permitted by law, including attorneys' fees, to apply the Collateral or all or any portion of proceeds thereof on account of, or to hold as a reserve against, all Obligations; and (d) to exercise any other rights and remedies available to it by law or agreement.  Any remainder of the proceeds after satisfaction in full of the Obligations shall be distributed as required by applicable law.  Notice of any sale or disposition of Collateral shall be given to Borrower and Guarantor at least ten (10) days before any intended public sale or the time after which any intended private sale or other disposition of the Collateral is to be made, which Borrower and Guarantor agree shall be reasonable notice of such sale or other disposition.

Section 8.2.  <u>Waiver and Release by Borrower</u>.   To the extent permitted by applicable law, each of Borrower and Guarantor: (a) waives (i) presentment and protest of the Notes and this Agreement held by Lender on which Borrower or Guarantor is any way liable and (ii) notice and opportunity to be heard, after acceleration in the manner provided in <u>Article 8</u> of this Agreement, before exercise by Lender of the remedies of self-help or set-off permitted by law or by any agreement with Borrower or Guarantor, and except where required hereby or by law, notice of any other action taken by Lender; and (b) releases Lender and its officers, attorneys and employees from all claims for loss or damage caused by any act or omission on the part of Lender or its officers, attorneys, and employees, except willful misconduct or gross negligence.

Section 8.3.   <u>No Waiver</u>.  Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege under the Note or this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other further exercise of any right, power or privilege.

# ARTICLE 9
# SECURITY AGREEMENT

Section 9.1.   <u>Grant of Security Interest</u>.  The Borrower hereby grants, pledges, transfers and collaterally assigns to Lender, as collateral security for all Obligations, a security interest in, and a continuing Lien upon all of Borrower's right, title and interest in, to and under, the Collateral.

(a)   <u>Collateral</u>.  For the purposes of this Agreement, all assets of the Borrower, including, without limitation, the following, whether presently owned or existing or hereafter acquired or coming into existence and wherever located, and all additions and accessions thereto and all substitutions and replacements thereof, and all proceeds, products and accounts thereof, including, without limitation, all proceeds from the sale or transfer thereof and of insurance covering the same and of any tort claims in connection therewith is collectively referred to as the "<u>Collateral</u>":

(i)   all accounts, chattel paper, deposit accounts, documents (as defined in the UCC), general intangibles, goods, instruments, investment property, letter-of-credit rights, and any supporting obligations related to any of the foregoing;

(ii)   whether or not included in the foregoing, all "Mortgage Loans" and "Participations," as defined herein;

(iii)   any commercial tort claims and any supplement thereto received by the Lender;

(iv)   all books and records pertaining to the other property described in this <u>Section 9.1</u>;

(v)   all property of the Borrower held by any Lender, including all property of every description, in the custody of or in transit to such Lender for any purpose, including safekeeping, collection or pledge, for the account of the Borrower or as to which the Borrower may have any right or interest, including but not limited to cash;

(vi)   each Credit Document and all rights, remedies, powers, privileges and claims under or in respect thereto (whether arising pursuant to the terms thereof or otherwise available to the Borrower at law or equity), including the right to enforce each such Credit Document and to give or withhold any and all consents, requests, notices, directions, approvals, extensions or waivers under or

(vii)    to the extent not otherwise included, all proceeds of the foregoing.

(b)    Intentionally Omitted.

Section 9.2.    Representations and Warranties.

To induce the Lender to enter into the Credit Documents, the Borrower hereby represents and warrants each of the following to the Lender:

(a)    Title; No Other Liens.  Except for the Lien granted to the Lender herein and other Permitted Liens, the Borrower owns each item of the pledged Collateral free and clear of any and all Liens.  The Borrower (a) is the record and beneficial owner of the Collateral pledged by it hereunder constituting instruments or certificates and (b) has rights in or the power to transfer each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien other than the Liens granted to the Lender herein and other Permitted Liens.

(b)    Perfection and Priority.  The security interest granted herein, to the extent that a security interest can be granted by a security agreement governed by the UCC, constitutes a valid and continuing perfected First Priority security interest in favor of the Lender in all Collateral in which perfection can be achieved by the filings and other actions of the type described in this Section 9.2, subject, for the following Collateral (to the extent any such item is Collateral and such steps are required herein), to the occurrence of the following:  (a) in the case of all Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the UCC-1 filing for Borrower with the Delaware Secretary of State, and (b) with respect to any deposit account, the execution of the Control Agreement; provided, however, that additional filings may be required to perfect such security interest in any copyrights; and (d) in the case of letter-of-credit rights that are not supporting obligations of Collateral, the execution of a Contractual Obligation granting control to the Lender over such letter-of-credit rights.  Except as set forth in this Section 9.2, all actions by the Borrower necessary or desirable to protect and perfect the Lien granted hereunder on the Collateral have been duly taken.

(c)    Instruments and Tangible Chattel Paper Formerly Accounts.  No amount payable to the Borrower under or in connection with any account is evidenced by any document, instrument or tangible chattel paper that has not been delivered to the Lender, properly endorsed for transfer, to the extent delivery is required by this Agreement.

(d)    Commercial Tort Claims.  Borrower has no commercial tort claims existing on the Closing Date.

(e)    Enforcement.  No permit, notice to or filing with any Governmental Authority or any other Person or any consent from any Person is required for the exercise by the Lender of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except (a) any approvals that may be required to be obtained

from any bailees or landlords to collect the Collateral, or (b) other notice required by non-waivable provisions of the UCC or (c) as may be required under the Bankruptcy Code.

Section 9.3.    Covenants.  The Borrower agrees with the Lender to the following, as long as any Obligation or commitment to extend credit remains outstanding (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted):

(a)    Maintenance of Perfected Security Interest; Further Documentation and Consents.

(i)    The Borrower shall not use or knowingly permit any Collateral to be used in violation of any provision of any Credit Document.

(ii)    Except as otherwise permitted in the Credit Documents or to the extent perfection actions are not required with respect to this Agreement, the Borrower shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 9.2 and shall use commercially reasonable efforts to defend such security interest and such priority against the material claims and demands of all Persons (except to the extent that the Lender and the Borrower agree that the cost of such defense is excessive in relation to the benefit to the Lender of the security interest and priority), in each case, other than assets of the Borrower subject to a disposition permitted by Section 6.4.

(iii)    The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as the Lender may reasonably request, all in reasonable detail and in form and substance reasonably satisfactory to the Lender.

(iv)    At any time and from time to time, upon the written request of the Lender, the Borrower will, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing) of any financing statement or amendment under the UCC (or other filings under similar Requirements of Law) in effect in any jurisdiction with respect to the security interest created hereby and (ii) take such further action as the Lender may reasonably request.

(v)    At the Lender's discretion, the Borrower will arrange, at the Borrower's sole expense, for Lender's First Priority security interest to be noted on the documentation evidencing the Collateral as of the date hereof and from time to time.

(b)    Delivery of Instruments and Tangible Chattel Paper and Control of Investment Property, Letter-of-Credit Rights and Electronic Chattel Paper.

(i)      The Borrower will (a) upon request of the Lender following the occurrence of an Event of Default, deliver to the Lender or its designee all such Collateral; and (b) execute and deliver to the Lender, such assignments, endorsements and allonges to promissory notes in form reasonably satisfactory to the Lender, and such additional agreements, documents or instruments as the Lender may, from time to time, reasonably require to evidence, perfect and continue to perfect the Lender's liens and security interests granted hereunder.

(ii)     The Borrower shall not grant "<u>control</u>" (within the meaning of such term under Article 9-106 of the UCC) over any investment property to any Person other than the Lender.

(iii)    If the Borrower is or becomes the beneficiary of a letter of credit that is (i) not a supporting obligation of any Collateral and (ii) in excess of $25,000, the Borrower will promptly, and in any event within two (2) Business Days after becoming a beneficiary, notify the Lender thereof and use its commercially reasonable efforts to enter into a Contractual Obligation with the Lender, the issuer of such letter of credit or any nominated person with respect to the letter-of-credit rights under such letter of credit. Such Contractual Obligation shall collaterally assign such letter-of-credit rights to the Lender and such collateral assignment shall be sufficient to grant control for the purposes of Section 9-107 of the UCC (or any similar section under any equivalent UCC). Such Contractual Obligation shall also direct all payments thereunder to a Cash Collateral Account. The provisions of the Contractual Obligation shall be in form and substance reasonably satisfactory to the Lender.

(iv)    If any amount payable under or in connection with any Collateral owned by the Borrower shall be or become evidenced by electronic chattel paper, the Borrower shall, take all steps necessary to grant the Lender control of all such electronic chattel paper for the purposes of Section 9-105 of the UCC (or any similar section under any equivalent UCC) and all "<u>transferable records</u>" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

(c)      <u>Notices</u>. The Borrower shall promptly (but in any event, within twenty (20) days) notify the Lender in writing of its acquisition of any interest hereafter in property that is of a type where a security interest or lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation.

(d)      <u>Notice of Commercial Tort Claims</u>.  The Borrower agrees that, if it will acquire any interest in any commercial tort claim with a value in excess of $100,000 (whether from another Person or because such commercial tort claim shall have come into existence), (i) the Borrower, shall promptly following such acquisition, deliver to the Lender, in each case in form and substance reasonably satisfactory to the Lender, a notice of the existence and nature of such commercial tort claim containing a specific description of such commercial tort claim, (ii) <u>Section 9.1</u> shall apply to such commercial tort claim and (iii) upon the reasonable request of the Lender, the Borrower shall execute and deliver

to the Lender, in each case in form and substance reasonably satisfactory to the Lender, any document, and take all other action, deemed by the Lender to be reasonably necessary or appropriate for the Lender to obtain a perfected security interest having at least the priority set forth in Section 9.2 in all such commercial tort claims.

(e)    Controlled Account.  The Borrower shall deposit all of its Cash Equivalents, if any, in a Cash Collateral Account.

Section 9.4.    Remedial Provisions.

(a)    Code and Other Remedies.

(i)    UCC Remedies.  During the continuance of an Event of Default, the Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the UCC or any other applicable law.

(ii)    Disposition of Collateral.  Without limiting the generality of the foregoing, the Lender may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), after the occurrence of and during the continuance of any Event of Default (personally or through its Lenders or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving the Borrower or any other Person notice or opportunity for a hearing on the Lender's claim or action except as may be required by applicable Requirements of Law, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) sell, assign, convey, transfer, grant option or options to purchase and deliver any Collateral (enter into Contractual Obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Lender shall have the right, upon any such public sale or sales and, to the extent permitted by the UCC and other applicable Requirements of Law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of the Borrower, which right or equity is hereby waived and released.

(iii)    Management of the Collateral.  The Borrower further agrees, that, upon the occurrence and during the continuance of any Event of Default, (i) at the Lender's request, it shall assemble the Collateral and make it available to the Lender at places that the Lender shall reasonably select, whether at the Borrower's premises or elsewhere, (ii) without limiting the foregoing, the Lender also has the right to require that the Borrower store and keep any Collateral pending further

action by the Lender and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Lender is able to sell, assign, convey or transfer any Collateral, the Lender shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Lender and (iv) the Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Lender's remedies with respect to such appointment without prior notice or hearing as to such appointment.  The Lender shall not have any obligation to the Borrower to maintain or preserve the rights of the Borrower as against third parties with respect to any Collateral while such Collateral is in the possession of the Lender.

(iv)  <u>Application of Proceeds</u>.  The Lender shall apply the cash proceeds of any action taken by it pursuant to this <u>Section 9.4</u>, after deducting all reasonable and documented out-of-pocket costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of the Lender hereunder, including reasonable and documented attorneys' fees and disbursements, and, in each case, subject to the limitations on reimbursement of costs and expenses in Section 11.7, to the payment in whole or in part of the Secured Obligations, as set forth herein, and only after such application and after the payment by the Lender of any other amount required by any Requirement of Law, need the Lender account for the surplus, if any, to the Borrower.

(v)  <u>Direct Obligation</u>.  The Lender shall not be required to make any demand upon, or pursue or exhaust any right or remedy against, the Borrower or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Lender under any Credit Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Requirement of Law.  To the extent it may lawfully do so, the Borrower absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by applicable Requirements of Law, to the extent permitted by applicable Requirements of Law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(vi)  <u>Commercially Reasonable</u>.  To the extent that applicable Requirements of Law impose duties on the Lender to exercise remedies in a commercially reasonable manner, the Borrower acknowledges and agrees that it is not commercially unreasonable for the Lender to do any of the following:

(a)     fail to incur significant costs, expenses or other Liabilities reasonably deemed as such by the Lender to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(b)     fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Requirements of Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(c)     fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(d)     advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature, or to contact other Persons, whether or not in the same business as the Borrower, for expressions of interest in acquiring any such Collateral;

(e)     exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature, or, to the extent deemed appropriate by the Lender, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(f)     dispose of assets in wholesale rather than retail markets;

(g)     disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(h)     purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of any Collateral or to provide to the Lender a guaranteed return from the collection or disposition of any Collateral.

The Borrower acknowledges that the purpose of this Section 9.4 is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 9.4.  Without limitation upon the

foregoing, nothing contained in this <u>Section 9.4</u> shall be construed to grant any rights to the Borrower or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this <u>Section 9.4</u>.

(b)     <u>Accounts and Payments in Respect of General Intangibles</u>.

(i)     In addition to, and not in substitution for, any similar requirement in this Agreement, if required by the Lender at any time during the continuance of an Event of Default, any payment of accounts or payment in respect of general intangibles, when collected by the Borrower, shall be promptly (and, in any event, within two (2) Business Days) deposited by the Borrower in the exact form received, duly indorsed by the Borrower to the Lender) in a Cash Collateral Account, subject to withdrawal by the Lender as provided in this Agreement.  Until so turned over, when such Event of Default is continuing, such payment shall be held by the Borrower for the Lender, segregated from other funds of the Borrower.

(ii)     At any time during the continuance of an Event of Default, the Borrower shall, upon the Lender's request, deliver to the Lender all documents evidencing, and relating to, the Contractual Obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all orders, invoices and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Lender and that payments in respect thereof shall be made directly to the Lender; and

(iii)     Anything herein to the contrary notwithstanding, the Borrower shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  The Lender shall not have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Credit Document or the receipt by the Lender of any payment relating thereto, nor shall the Lender be obligated in any manner to perform any obligation of the Borrower under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

(c)     <u>Proceeds to be Turned over to and Held by the Lender</u>.  During the continuance of an Event of Default, unless otherwise provided in this Agreement, all proceeds of any Collateral received by the Borrower hereunder in cash or Cash Equivalents shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower, and shall, promptly upon receipt by the Borrower, be turned over to the Lender in the exact form received (with any necessary endorsement).  All such proceeds of

Collateral and any other proceeds of any Collateral received by the Lender in cash or Cash Equivalents shall be held by the Lender in a Cash Collateral Account. All proceeds being held by the Lender in a Cash Collateral Account (or by the Borrower in trust for the Lender) shall continue to be held as collateral security for the Secured Obligations and shall not constitute payment thereof until applied as provided in this Agreement.

(d)    Deficiency. The Borrower shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations in full.

Section 9.5.    Lender.

(a)    Lender's Appointment as Attorney-in-Fact.

(i)    Anything in this Section 9.5(a)(i) to the contrary notwithstanding, the Lender agrees that it will not exercise any rights under the power of attorney and proxy provided for in this Section 9.5(a)(i) unless an Event of Default shall have occurred and be continuing. The Borrower hereby irrevocably constitutes and appoints the Lender and any Related Person thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, for the purpose of carrying out the terms of the Credit Documents, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of the Credit Documents, and, without limiting the generality of the foregoing, the Borrower hereby gives the Lender and its Related Persons the power and right, on behalf of the Borrower, without notice to or assent by the Borrower, to do any of the following after an Event of Default has occurred and is continuing:

(a)    in the name of the Borrower, in its own name or otherwise, take possession of and indorse and collect any Collateral consisting of a check, draft, note, acceptance or other instrument for the payment of moneys due under any account or general intangible or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any such moneys due under any Collateral consisting of an account or general intangible or with respect to any other Collateral whenever payable;

(b)    pay or discharge taxes and Liens (other than Permitted Liens) levied or placed on or threatened against any Collateral, effect any repair or pay any insurance called for by the terms of this Agreement (including all or any part of the premiums therefor and the costs thereof);

(c)     execute, in connection with any sale provided for in Section 9.4(a), any document to effect or otherwise necessary or appropriate in relation to evidence the sale of any Collateral; or

(d)     (A) direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to the Lender or as the Lender shall direct, (B) ask or demand for, and collect and receive payment of and receipt for, any moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice and other document in connection with any Collateral, (D) commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral, (E) defend any actions, suits, proceedings, audits, claims, demands, orders or disputes brought against the Borrower with respect to any Collateral, (F) settle, compromise or adjust any such actions, suits, proceedings, audits, claims, demands, orders or disputes and, in connection therewith, give such discharges or releases as the Lender may deem appropriate, and (G) generally, sell, assign, convey, transfer or grant a Lien on, make any Contractual Obligation with respect to and otherwise deal with, any Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes and do, at the Lender's option, at any time or from time to time, all acts and things that the Lender deems necessary to protect, preserve or realize upon any Collateral and its security interests therein and to effect the intent of the Credit Documents, all as fully and effectively as the Borrower might do.

(e)     If the Borrower fails to perform or comply with any Contractual Obligation contained herein, the Lender, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such Contractual Obligation.

(ii)     The reasonable and documented out of pocket costs and expenses of the Lender, in each case subject to the limitations set forth in Section 11.7, incurred in connection with actions undertaken as provided in this Section 9.5, together with interest thereon at the default rate set forth herein, from the date of payment by the Lender to the date reimbursed by the Borrower, if applicable, shall be payable by the Borrower to the Lender promptly (but in no event later than thirty (30) days) following written demand therefore by the Lender to the Borrower.

(iii)     During the effectiveness of this Agreement, the Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue of this Section 9.5. All powers, authorizations and agencies contained in this

Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

(b)     <u>Authorization to File Financing Statements</u>.  The Borrower authorizes the Lender and its Related Persons, at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as the Lender reasonably determines appropriate to perfect, or continue or maintain perfection of, the security interests of the Lender under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby as "all assets of the debtor," "all assets of the debtor whether now existing or hereafter arising" or words of similar import. The Borrower also hereby ratifies its authorization for the Lender to have filed any initial financing statement or amendment thereto under the UCC (or other similar laws) in effect in any jurisdiction if filed prior to the date hereof.  The Borrower hereby (i) waives any right under the UCC or any other Requirement of Law to receive notice and/or copies of any filed or recorded financing statements, amendments thereto, continuations thereof or termination statements and (ii) releases and excuses the Lender from any obligation under the UCC or any other Requirement of Law to provide notice or a copy of any such filed or recorded documents.

(c)     <u>Duty; Obligations and Liabilities</u>.

(i)     <u>Duty of Lender</u>.  The Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Lender deals with similar property for its own account.  The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any such powers.  The Lender shall be accountable only for amounts that it receives as a result of the exercise of such powers, and neither it nor any of its Related Persons shall be responsible to the Borrower for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as determined by a court of competent jurisdiction.  In addition, the Lender shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by the Lender in good faith.

(ii)     <u>Obligations and Liabilities with respect to Collateral</u>. Neither the Lender nor any Related Person thereof shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Borrower or any other Person or to take any other action whatsoever with regard to any Collateral.

Section 9.6.     <u>Reinstatement</u>.  The Borrower agrees that, if any payment made by the Borrower or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise

required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by the Lender to the Borrower, its estate, trustee, receiver or any other party, including the Borrower, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made.  If, prior to any of the foregoing, (a) any Lien or other Collateral securing the Borrower's liability hereunder shall have been released or terminated by virtue of the foregoing or (b) any provision of the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of the Borrower in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

Section 9.7.    Release of Collateral.

(a)    So long as no Default or Event of Default has occurred and is continuing, upon request of Borrower, Lender shall release any Lien granted to or held by Lender upon any Collateral being sold or disposed of in compliance with the provisions of the Credit Documents, as determined by Lender in its sole discretion, subject to the conditions precedent that: (i) before and after giving effect to such release, no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) after giving effect to such release, the Loan Amount shall not exceed the Target Aggregate Loan Amount, (iii) compliance with Section 2.6 hereof, and (iv) on or prior to such release, Borrower shall have delivered a certificate to Lender certifying that the foregoing conditions described in clauses (i) through (iii) above, together with a pro forma certificate demonstrating compliance with the conditions described in clause (ii) above.

(b)    Upon the indefeasible payment to Lender of all Secured Obligations, the Collateral shall be released from the Lien created hereby and this Agreement and all guaranties and other obligations (other than those expressly stated to survive such termination) of the Lender and the Borrower hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Borrower.  The Borrower is hereby authorized to file UCC amendments, termination statements and such other documents as may be necessary or appropriate at such time evidencing the termination of the Liens so released.  At the request of the Borrower following any such termination, the Lender shall promptly deliver to the Borrower any Collateral of the Borrower held by the Lender hereunder and execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination.

(c)    If the Lender shall be directed or permitted pursuant to herein to release any Lien or any Collateral, such Collateral shall be released from the Lien created hereby to the extent provided under, and subject to the terms and conditions set forth in herein.  In connection therewith, the Lender, at the request of the Borrower, shall execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such release.

# ARTICLE 10
# INTENTIONALLY OMITTED

# ARTICLE 11
# MISCELLANEOUS

Section 11.1.  Indemnification and Release Provisions.  Borrower and Guarantor hereby agree to defend Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents employees and attorneys from, and hold each of them harmless against, any and all losses, liabilities (including without limitation settlement costs and amounts), claims, damages, interests, judgments, costs, or expenses, including without limitation, reasonable and documented fees and disbursements of attorneys, incurred by any of them arising out of or in connection with or by reason of this Agreement, the making of the Loans or any Collateral, or any other Credit Document, or related transaction, including without limitation, any and all losses, liabilities, claims, damages, interests, judgments, costs or expenses relating to or arising under any Consumer Finance Laws or Environmental Control Statute or the application of any such statute to Borrower's or Guarantor's properties or assets (provided, however, that the indemnification in this Section 11.1 shall not extend to any Taxes, however denominated, or any costs attributable to any Taxes, including without limitation penalties and interest), other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim).  Borrower and Guarantor hereby release Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents employees and attorneys from any and all claims for loss, damages, costs or expenses caused or alleged to be caused by any act or omission on the part of any of them, other than such loss, damage cost or expense which has been determined by a court of competent jurisdiction to have been caused by the gross negligence or willful misconduct of Lender.  All obligations provided for in this Section 11.1 shall survive any termination of this Agreement and the repayment of the Loans.

Section 11.2.  Amendments.  Neither the amendment or waiver of any provision of this Agreement or any other Credit Document, nor the consent to any departure by any Credit Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and each Credit Party party thereto, and each such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 11.3.  APPLICABLE LAW.   THIS AGREEMENT AND ALL DOCUMENTS EXECUTED IN CONNECTION HEREWITH SHALL BE DEEMED TO HAVE BEEN MADE AND TO BE PERFORMABLE IN THE STATE OF NEW YORK AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Section 11.4.  Notices.  All communications provided for hereunder shall be in writing and shall be deemed to have been delivered, if delivered in person, or sent by certified mail, postage pre- paid, return receipt requested, by reliable overnight courier or by E-mail, as follows:

If to Borrower:

**PSF Sub 4, LLC**
c/o Peer Street, Inc.
2121 Park Place, Suite 250, El Segundo, CA 90245
Attention: Legal Department
E-Mail: legal@peerstreet.com

If to Guarantor:

**PS Funding, Inc.**
c/o Peer Street, Inc.
2121 Park Place, Suite 250, El Segundo, CA 90245
Attention: Legal Department
E-Mail: legal@peerstreet.com

If to Lender:

**Pacific Funding Trust 1002**
c/o Colchis Capital Management, L.P.
150 California Street, 18th Floor
San Francisco, CA 94111
Attention: Jonathan Strike
E-mail: jstrike@colchiscapital.com

With a copy (not constituting notice) to:

Moses & Singer LLP
405 Lexington Avenue
New York, NY 10174
Attention: Robert M. Friedman, Esq.
E-Mail: rfriedman@mosessinger.com

or to such other address as any party shall specify to the other party in writing in accordance with this Section 11.4.

Section 11.5. <u>Termination and Release</u>. This Agreement shall not terminate until all amounts due under the Notes, this Agreement and any other Credit Document and other Obligations (other than unasserted contingent obligations), together with all interest and costs due, shall have been paid in full. Upon such termination and payment of amounts owing under this Agreement, the Collateral securing the Loans, the Notes, this Agreement and the other Obligations shall be released from the provisions of this Agreement and any right, title and interest of Lender in or to the same shall cease. Thereafter, Lender agrees to deliver to Borrower and Guarantor such documents as Borrower and Guarantor request to release of record any security interest or lien of Lender in the Collateral.

Section 11.6. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making

proof of this Agreement to produce or account for more than one such counterpart. Signature by facsimile or electronic transmission shall bind the parties hereto.

Section 11.7.   <u>Costs, Expenses and Taxes</u>.   In any calendar year, the Lender shall be permitted to conduct audits and inspections in accordance with this Agreement and any other Credit Documents. The Borrower shall reimburse the Lender for up to three (3) such audits or inspections in any calendar year, and any additional audits or inspections will be conducted at the sole expense of the Lender; provided and notwithstanding the foregoing, upon the occurrence of an Event of Default, any such audit or inspection will be conducted at the sole expense of the Borrower without regard to such reimbursement cap. Borrower shall also pay promptly (and in any event, within three (3) Business Days) upon demand therefor all reasonable out-of-pocket fees (including without limitation, legal fees and expenses), costs and other expenses incurred by Lender in connection with collection of the Loans, the maintenance or preservation of the security interest in the Collateral, the sale, disposition or other realization on the Collateral, or the enforcement of Lender's rights hereunder, under this Agreement or under any Credit Document, including, without limitation, such fees, costs and expenses incurred by Lender which Lender, in its reasonable business judgment, deems reasonably necessary to preserve or protect the business conducted by Borrower, the Guarantor, the Collateral, or any portion thereof. In addition, Borrower shall also pay any and all Other Taxes or filing fees payable or determined to be payable in connection with the execution and delivery of the Notes and this Agreement, the Collateral and other documents to be delivered hereunder, and agrees to save Lender harmless from and against any and all liabilities with respect to or resulting from any delay in payment or omission to pay such Taxes.

Section 11.8.   <u>Participations and Assignments</u>.

(a)   This Agreement shall bind and inure to the benefit of each signatory, its successors and assigns; <u>provided</u>, however that, Borrower and Guarantor shall not have the right to assign or delegate their obligations and duties under this Agreement or any other Credit Documents or any interest therein except with the prior written consent of Lender.

(b)   The Lender agrees that, without the prior written consent of Borrower, it will not make any assignment or sell a participation hereunder in any manner or under any circumstances that would require registration or qualification of, or filings in respect of, any advance, Note or other Obligation under the securities laws of the United States of America or of any jurisdiction.

(c)   Lender, acting for this purpose as a non-fiduciary Lender of Borrower, shall maintain at its principal executive office (or such other office or agency of the Lender as it may designate from time to time) a register (the "<u>Register</u>") showing the principal amount (and stated interest) of the Loans and Notes held by Lender, the advances owing to Lender, and the interests therein of Lender, from time to time, and such Register shall, absent manifest error, conclusively be presumed to be correct and accurate. Lender shall update the Register to reflect any assignments under this <u>Section 11.8</u>. Notwithstanding anything to the contrary contained in this Agreement, the Notes and Loans made under this Agreement are registered obligations and the right, title, and interest

Lender and its assignees in and to such Note (or any rights under this Agreement) shall be transferable only upon notation of such transfer in the Register.  It is the intent of the parties hereto that the Obligations and interests therein be in "registered form" for purposes of Code Sections 163(f), 871(h) and 881(c) and Treasury Regulations Sections 5f.103-1(c), and 1.871-14, and the provisions of this <u>Section 11.8</u> shall be interpreted and applied consistently with such purpose.  The Register shall be available for inspection by the Borrower and Lender, at any reasonable time and from time to time upon reasonable prior notice.

Section 11.9.  <u>Effectiveness of Agreement</u>.  Anything to the contrary in this Agreement notwithstanding, the provisions hereof shall not be effective until this Agreement is: (a) duly executed, and delivered by authorized officers of Borrower to the Lender; and (b) duly signed by an authorized officer of the Lender.

Section 11.10. <u>Expenses</u>.  Whether or not the transactions contemplated hereby shall be consummated, Borrower agrees to pay promptly (a) all Lender's actual and reasonable third-party costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; (b) all the reasonable fees, expenses and disbursements of Moses & Singer LLP, counsel to Lender in connection with the negotiation, preparation and execution of the Credit Documents; (c) all the actual third-party costs and reasonable expenses of creating and perfecting Liens in favor of Lender, including filing and recording fees, expenses and taxes, stamp or documentary taxes, and search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to Lender providing any opinions that Lender may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (d) all Lender's actual third-party costs and reasonable fees, expenses for, and disbursements of any of Lenders, auditors, accountants, consultants or appraisers, and all reasonable attorneys' fees incurred by Lender; (e) all the actual third-party costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Lender and its counsel) in connection with the custody or preservation of any of the Collateral; provided, that such fees, costs or expenses described in clauses (a) – (e) up to and including the Closing Date herein shall in no event be greater than $75,000 in the aggregate, and (f) after the occurrence of a Default or an Event of Default, all actual third-party costs and expenses, including reasonable attorneys' fees and costs of settlement, incurred by Lender in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.

Section 11.11. <u>JURISDICTION AND VENUE</u>.    IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY CREDIT DOCUMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, BORROWER AND GUARANTOR HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN NEW YORK COUNTY, STATE OF NEW YORK AND AGREE NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING

OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH JURISDICTION.  BORROWER AND GUARANTOR AGREE THAT SERVICE OF PROCESS IN ANY SUCH PROCEEDING MAY BE DULY EFFECTED UPON THEM BY MAILING A COPY THEREOF, BY REGISTERED MAIL, POSTAGE PREPAID, TO BORROWER AND GUARANTOR.

Section 11.12. <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO AND THE GUARANTOR HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY CREDIT DOCUMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT.

Section 11.13. <u>REVIEW BY COUNSEL</u>.  BORROWER AND GUARANTOR ACKNOWLEDGE THAT THEY HAVE HAD THE ASSISTANCE OF COUNSEL IN THE REVIEW AND EXECUTION OF THIS AGREEMENT AND, SPECIFICALLY, <u>SECTIONS 11.11</u> AND <u>11.12</u> HEREOF, AND FURTHER ACKNOWLEDGE THAT THE MEANING AND EFFECT OF THE FOREGOING WAIVER OF JURISDICTION AND VENUE OBJECTION AND JURY TRIAL HAVE BEEN FULLY EXPLAINED TO BORROWER AND GUARANTOR BY THEIR COUNSEL.

Section 11.14. <u>USA PATRIOT Act Notice</u>.  Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act, Lender is required to obtain, verify and record information that identifies Borrower, including its legal names, address, tax ID numbers and other information that will allow Lender to identify Borrower in accordance with the USA PATRIOT Act.  Lender will also require information regarding Guarantor, if any, and may require information regarding Borrower's and Guarantor's management and owners, such as legal name, address, social security number and date of birth.

Section 11.15. <u>Acknowledgment of Receipt</u>.  Borrower and Guarantor acknowledge receipt of a copy of this Agreement and each other Credit Document.

Section 11.16. <u>Taxes</u>.

(a)    Any and all payments by or on account of any obligation of the Borrower under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding Lender) requires the deduction or withholding of any Tax from any such payment by a withholding Lender, then the applicable withholding Lender shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 11.16</u>), the applicable recipient

receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      The Borrower shall indemnify Lender, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 11.16) payable or paid by such Person or required to be withheld or deducted from a payment to such Person and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant governmental authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by Lender (with a copy to Lender), or by Lender shall be conclusive absent manifest error.  Failure or delay on the part of Lender to demand compensation pursuant to the foregoing provisions of this Section 11.16 shall not constitute a waiver of such Person's right to demand such compensation.

(c)      As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 11.16, the Borrower shall deliver to the Lender the original or a certified copy of a receipt issued by such governmental authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(d)      Lender shall deliver to Borrower, prior to receiving any payment under this Agreement, and thereafter whenever any previously provided documentation expires, becomes invalid, or becomes materially inaccurate, or whenever reasonably requested by Borrower or Lender, such properly completed and executed documentation prescribed by applicable laws and such other reasonably requested information as will permit Borrower (A) to determine whether or not any payments made hereunder or under any other Credit Document are subject to any Taxes or withholding, (B) to determine, if applicable, the required rate of withholding or deduction and (C) otherwise required by Borrower to comply with its obligations with respect to laws pertaining to Taxes (including without limitation FATCA).  Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of such documentation shall not be required if in reasonable judgment of Lender such completion, execution or submission would subject Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Person.  Without limiting the generality of the foregoing:

(i)      Lender shall deliver to Borrower, to the extent legally entitled to do so, one of the following before receiving its first payment under this Agreement (and from time to time thereafter upon reasonable request by Borrower):

(a)      if Lender is entitled to claim an exemption from United States withholding tax pursuant to the portfolio interest exception, (A) a statement of Lender, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the Code, (II) a ten percent (10%) shareholder of Borrower (within the meaning of Section 871(h)(3)(B) of the Code), or (III) a controlled foreign corporation

related to Borrower within the meaning of Section 864(d)(4) of the Code, and (B) a properly completed and executed IRS Form W-8BEN, Form W-8BEN-E or Form W-8IMY (with proper attachments);

(b)    if Lender is entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN or Form W-8BEN-E;

(c)    if Lender is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of Lender, a properly completed and executed copy of IRS Form W-8ECI;

(d)    if Lender is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because Lender serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments); or a properly completed and executed IRS Form W-9 certifying that such person is not subject to U.S. federal backup withholding tax.

(ii)    If Lender claims an exemption from withholding tax in a jurisdiction other than the United States, Lender agrees with and in favor of Borrower, to deliver to Borrower any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement, but only if Lender is legally able to deliver such forms; provided, however, that nothing in this Section 11.16(d)(ii) shall require Lender to disclose any information that it deems to be confidential (including without limitation, its Tax Returns), unless otherwise required by applicable law.

(iii)    Lender shall provide, to the extent legally entitled to do so, new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and shall promptly notify Borrower of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(e)    If Lender claims exemption from, or reduction of, withholding tax and Lender sells, assigns, grants a participation in, or otherwise transfers all or part of its interest in the Obligations owed to Lender, or Lender agrees to notify Lender of the percentage amount in which it is no longer the beneficial owner of such interest in the Obligations owed to Lender.

(f)    If a payment made to Lender under this Agreement or any other Credit Document would be subject to tax imposed under FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower, at the time or times prescribed by law and at such time or times reasonably requested by

Borrower, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA, to determine that Lender has complied with its obligations under FATCA, or to determine the amount to deduct and withhold from such payment under FATCA, if any. Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g)    The parties agree to treat and report (including on any Tax Return, audit or any other Tax proceeding) the Mortgage Loans and Notes (and the Loans made hereunder) as debt for U.S. federal income tax purposes, unless otherwise required pursuant to a change in law occurring after the date hereof or pursuant to a final non-appealable judgment of a court of competent jurisdiction.

(h)    Each party's obligations under this <u>Section 11.16</u> shall survive the resignation or replacement of the Lender or any assignment of rights by, or the replacement of, Lender and the repayment, satisfaction or discharge of all obligations under any Credit Document.

Section 11.17. <u>Confidentiality</u>.

(a)    Lender shall hold all non-public information regarding the Credit Parties and their respective businesses identified as such by the Credit Parties and obtained by Lender pursuant to the requirements hereof in accordance with Lender's customary procedures for handling confidential information of such nature, it being understood and agreed by the Credit Parties that, in any event, Lender may make (i) disclosures of such information to Affiliates of Lender and to their agents and advisors (and to other persons authorized by Lender to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 11.17), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by Lender of any Loans or any participations therein, (iii) to Lender's financing sources, provided that prior to any disclosure, such financing source is informed of the confidential nature of the information, and (iv) disclosures required or requested by any Governmental Authority or representative thereof or pursuant to legal or judicial process; provided, unless specifically prohibited by applicable law or court order, Lender shall make reasonable efforts to notify the Credit Parties of any request by any Governmental Authority or representative thereof for disclosure of any such non-public information prior to disclosure of such information. Neither Lender nor any Credit Party shall issue any trade announcement relating to this transaction without the prior written consent of the other parties except (i) disclosures required by applicable law, regulation, legal process or the rules of the Securities and Exchange Commission.

[SIGNATURES FOLLOW ON NEXT PAGE.]

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

Dated the date and year first set forth above.

**PSF SUB 4, LLC**, as Borrower

By:   PS Funding, Inc.,
      a Delaware corporation
      its Sole Member

By: _____
Name: Brewster Johnson
Title: President

**PS FUNDING, INC.**, as Servicer and Guarantor

By: _____
Name: Brewster Johnson
Title: President

**PACIFIC FUNDING TRUST 1002**, as Lender

By:   Colchis Capital Management, L.P., its
      Administrator

By: _____
Name: Jonathan Strike
Title: Chief Operating Officer

[end of signature page]

**IMPORTANT:  READ BEFORE SIGNING.  THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

Dated the date and year first set forth above.

**PSF SUB 4, LLC**, as Borrower

By:    PS Funding, Inc.,
       a Delaware corporation
       its Sole Member

By: _____
Name: Brewster Johnson
Title: President

**PS FUNDING, INC.,** as Servicer and Guarantor

By: _____
Name: Brewster Johnson
Title: President

**PACIFIC FUNDING TRUST 1002**, as Lender

By:    Colchis Capital Management, L.P., its
       Administrator

By: _____
Name: Jonathan Strike
Title: Chief Operating Officer

[end of signature page]

## EXHIBIT A

BORROWING BASE CERTIFICATE

We submit the following information dated _____ in connection with that certain Loan and Security Agreement dated as of February 28, 2018 (the "Loan Agreement") by and among PSF SUB 4, LLC, a Delaware limited liability company (the "Borrower"), PS FUNDING, INC., a Delaware corporation ("PS Funding"), and PACIFIC FUNDING TRUST 1002, a Delaware statutory trust (the "Lender").  Capitalized terms not defined herein have the meanings given to them in the Loan Agreement:

    A.    Loan Amount: [$_____]
    B.    Collateral: See Schedule 1
    C.    Collateral Value: _____
    D.    Collateral Requirement (equals Loan Amount LESS the sum of cash reserves and Cash Equivalents plus Collateral Value): _____

I hereby certify that the information above is true, accurate, and complete and that Borrower is in compliance with the Loan Agreement and Credit Documents and Borrower ratifies and affirms all covenants, representations and warranties set forth in the Credit Documents as of the date hereof.

BORROWER:

By: _____

Name:_____

Title: _____

SCHEDULE 1 – COLLATERAL

| Property Address | Outstanding Principal Balance |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

EXHIBIT A

PSLEGAL_v.2
3876238v7 013580.0126

# **EXHIBIT B**

WEEKLY ACTIVITY REPORT

(see attached)

PSLEGAL_v.2
3876238v7 013580.0126

| Field Name | Description | PeerStreet Response |
|---|---|---|
| Start Date | Date when total principal balance was added to the credit line | |
| Ending Balance | Amount of the Total Principal Balance (as of the Report Date) in a Senior Position currently outstanding on a loan level | |
| Series ID | Series ID | |
| Loan ID | Loan ID | |
| Property Count | Number of properties as collateral in this loan | |
| Primary Property Street Address | Primary property street address | |
| Primary Property City | Primary property city | |
| Primary Property State | Primary property state | |
| Primary Property Zip | Primary property zip code | |
| Primary Property Type | Primary property type | |
| Originator Name | Originator name | |
| Loan Purpose | Loan purpose | |
| Loan Strategy | Strategy for the loan | |
| Primary Property Purchase Price | Price paid to purchase the property | |
| Primary Property Purchase Date | Date the property was purchased | |
| Projected Rehab Budget | Total rehab budget | |
| Total Principal Balance at Origination | Amount of 1st lien at origination | |
| Construction Reserve at Origination | Construction reserve at origination | |
| Interest Reserve at Origination | Interest reserve of the at origination | |
| Tax Reserve at Origination | Tax reserve of the at origination | |
| Other Reserve at Origination | Other reserve of the at origination | |
| Series Amount | Series amount | |
| Construction Reserve Drawn | Construction reserve funded at time of PS U/W | will provide amount drawn at time of PS purchase |
| Interest Reserve Drawn | Interest reserve funded at time of PS U/W | will provide amount drawn at time of PS purchase |
| Tax Reserve Drawn | Tax reserve funded at time of PS U/W | will provide amount drawn at time of PS purchase |
| Misc Reserve Drawn | Other reserve funded at time of PS U/W | will provide amount drawn at time of PS purchase |
| Current Construction Reserve | Construction reserve remaining at time of PS U/W | will provide reserve amount remaining at time of PS purchase |
| Current Interest Reserve | Interest reserve remaining at time of PS U/W | will provide reserve amount remaining at time of PS purchase |

| | | |
|---|---|---|
| Current Tax Reserve | Tax reserve remaining at time of PS U/W | will provide reserve amount remaining at time of PS purchase |
| Current Misc Reserve | Other reserve remaining at time of PS U/W | will provide reserve amount remaining at time of PS purchase |
| Originator Valuation | Originator valuation of property at time of originator U/W | |
| PS Valuation | Sum of the PS valuation of the property(-ies) at time of PS valuation (during PS U/W) | |
| Primary Property Valuation Method | Valuation method | |
| Primary Property Appraiser | Appraiser (AMC) | |
| Primary Property Valuation Date | Valuation date | |
| LTV % | (A-Piece - Construction Reserve Remaining at Valuation)/"Designated" As-Is Valuation | |
| LTPP % | (Total Principal Balance at Origination - B-Piece - Construction Reserve at Origination - Total Principal Payments) / Property Purchase Price | will provide when loan purchase is acquisition |
| ARV | Sum of the PS valuation of property(-ies) after repairs | will provide when loan has a remaining construction reserve |
| ARV (LTV) % | A-Piece / ARV | will provide when loan has a remaining construction reserve |
| Total Principal Balance | Total Principal Balance at the time of PS sale to investors. This is generally equal to the Total Principal Balance at Origination minus any principal payments made on the loan since origination and up until PeerStreet purchased the loan | |
| A-Piece Amount | Portion of the Total Principal Balance in a senior position at the time of PS sale to investors | will provide this value at the time of PS purchase |
| PS A-Piece Amount | Portion of the Total Principal Balance in a senior position that PeerStreet sells to investors | will provide this value at the time of PS purchase |
| Pari Passu Amount | Portion of the Total Principal Balance in a senior position, pari passu to the PS A-Piece | |
| Pari Passu Holder | Party that holds the "Pari Passu Amount" | |
| Subordinate Positions Amount | Portion of the Total Principal Balance in a subordinate position at the time of PS sale to investors | |
| Subordinate Position Holder | Party that holds the "Subordinate Positions" | |
| Junior Lien Amount | Sum of all junior lien(s). | |
| Junior Lien Holders | Holder of junior lien(s). | |
| Loan Origination Date | Date the loan was originated | |
| Loan Maturity Date | Loan maturity date without extensions, if any | |
| PS Loan Acquisition Date | Date when PS acquired the loan | |
| Floating Rate Index | Floating Rate Index, if "Loan Interest Type" = "floating" | not immediately available (will add in the future) |

| | | |
|---|---|---|
| Loan Interest Rate % | Loan interest rate | |
| Originator Spread % | Originator spread | |
| Payment Structure | Interest only or amortizing | |
| Borrower Count | Number of borrowers | not immediately available (will add in the future) |
| Primary Borrower Track Record | Number of projects that the primary borrower has successfully completed in the past. IF PS was unable to obtain that information, or if they do not have a track record, then "0" | |
| Personal Guaranty | Personal guaranty (Y/N) | not immediately available (will add in the future) |
| Primary Borrower FICO High | High range of primary borrower's FICO score | |
| Primary Borrower FICO Low | Low range of primary borrower's FICO score | |
| Co-Guarantors | Are there multiple guarantors? | not immediately available (will add in the future) |
| Primary Property Square Feet | Square feet for the primary property | |
| ~~Primary Property Bedrooms~~ | ~~Number of bedrooms in primary property~~ | strike |
| ~~Primary Property Bathrooms~~ | ~~Number of bathrooms in primary property~~ | strike |
| ~~Price Per Sq Ft~~ | ~~"PS Valuation" / "Primary Property Square Feet"~~ | strike |
| ~~Loan Per Sq Ft~~ | ~~"Current Loan Amount" / "Primary Property Square Feet"~~ | strike |
| ~~HPI - YoY Change %~~ | ~~House Price Index - YoY change~~ | strike |
| ~~HPI - FN12M %~~ | ~~House Price Index - forecast next 12 months~~ | strike |
| ~~HPI - FN24M %~~ | ~~House Price Index - forecast next 24 months~~ | strike |
| ~~HPI - Worst Historical Price Decline %~~ | ~~Worst historical price decline; based on remaining term of loan without extensions~~ | strike |
| ~~Stressed LTV %~~ | ~~LTV that would be result of applying Worst Historical Price Decline~~ | strike |
| ~~MSA~~ | ~~Metropolitan Statistical Area where primary property is located~~ | strike |
| Cash out to Borrower | Cash out to borrower amount, if "Loan Strategy" is "cash_out_refinance". | not immediately available (will add in the future) |
| Payment Due Date | Payment due date (date of month) | |
| ~~Grace Period~~ | ~~Grace period (# of days)~~ | strike |
| ~~Loan Offering Type~~ | ~~Loan offering type~~ | strike |
| Amortization Term | Amortization term in months, if "Payment Structure" is "amortized" | not immediately available (will add in the future) |
| Monthly Payment | Monthly payment, if "Payment Structure" is "amortized" | not immediately available (will add in the future) |

# **EXHIBIT C**

WEEKLY SUMMARY REPORT


(see attached)

EXHIBIT C
-1-
PSLEGAL_v.2
3876238v7 013580.0126

| **Collateral** | **Mock Example** |
|---|---|
| Beginning Bal (Prior Week's Ending) | $21,000,000 |
|   Newly Added Loans - Principal Balance (+) | $400,000 |
|   Loans Sold - Principal Balance (-) | ($800,000) |
|   Principal Payments (-) | ($1,200) |
| Ending Collateral Principal Balance | $20,598,800 |
|   Ineligibles (-) | ($20,000) |
| **(a) Eligible Collateral (Borrowing Base)** | **$20,578,800** |

| **Cash Account** | |
|---|---|
| Beginning Cash Balance | $1,000,000 |
|   Loans Sold (+) | $800,000 |
|   Loans Purchased (-) | ($400,000) |
|   Principal Payments (+) | $1,200 |
| **(b) Ending Cash Balance** | **$1,401,200** |

| **Facility (Amount)** | **$50,000,000** |
|---|---|
| Beginning Loan Balance | $20,000,000 |
| Advance Rate | |
|   (c) Collateral | 95% |
|   (d) Cash | 100% |
| Target Loan Amount (a*c + b*d) | $20,951,060 |
| Available to borrow / (repay) | $951,060 |
| Ending Loan Amount (as of this week) | $20,000,000 |
| Borrowing Base Trigger (Out of Compliance)? | No |

# **EXHIBIT D**

MONTHLY SUMMARY REPORT

(see attached)

PSLEGAL_v.2
3876238v7 013580.0126

| Field Name | Description |
|---|---|

**Fields are the same as the Weekly Activity Report (added)

## Covenants

| | Value | Trigger |
|---|---|---|
| Weighted Average LTV on Eligible loans | | > 75% |
| % of New Products (outside SFR - including MFR) | | > 25% |

## EXHIBIT E

[FORM OF NOTICE OF BORROWING]

[Date]

Pacific Funding Trust 1002
c/o Colchis Capital Management, L.P.
150 California Street, 18th Floor
San Francisco, CA 94111
Attention: [Jonathan Strike]

Ref: PSF Sub 4, LLC

    This Notice of Borrowing is made pursuant to Section 2.1(b) of that certain Loan and Security Agreement (the "*Loan Agreement*"), dated as of February 28, 2018, by and among PSF Sub 4, LLC, a Delaware limited liability company, as borrower (the "Borrower"), PS Funding, Inc., a Delaware corporation, as guarantor and servicer, and Pacific Funding Trust 1002, as lender. Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Loan Agreement.

    1.    The Borrower hereby requests that on _____, 201_ (the "Credit Date") it receive a Term Loan under the Loan Agreement in an aggregate principal amount of _____ Dollars ($_____) (the "Requested Amount").

    2.    The Borrower hereby gives notice of its request for a Term Loan in an aggregate principal amount equal to the Requested Amount to the Lender pursuant to Section 2.1(b) of the Loan Agreement and requests that the Lender remit, or cause to be remitted, the proceeds thereof to the Cash Collateral Account in accordance with the following wiring instructions:

_____
_____
_____
_____

    3.    The Borrower certifies that immediately after giving effect to the proposed Term Loan on the Credit Date each of the applicable conditions precedent set forth in Section 3.2 of the Loan Agreement is satisfied, including:

        (a)    Colchis shall have received fully executed documentation, in form and substance satisfactory to Colchis, increasing Colchis's minimum outstanding balance to $150,000,000 principal amount of loans in the aggregate as the threshold for PS Funding and Limited Guarantor to offer to Colchis Purchasers (as defined in the Framework Agreement) the minimum capacity of loans set forth in the Framework Agreement;

PSLEGAL_v.2
3876238v7 013580.0126

(b)      Solely with respect to the making of a Term Loan on a Credit Date other than the Closing Date, Colchis shall have received fully executed documentation, in form and substance satisfactory to Colchis, providing for whole loan purchases by Colchis, delivered pursuant to the Framework Agreement;

(c)      Lender shall have received a fully executed and delivered Funding Notice pursuant to Section 2.1(b) together with a fully executed Borrowing Base Certificate evidencing that that there is Term Loan Availability with respect to the Term Loan requested by Borrower;

(d)      Borrower shall own or have the unconditional right to purchase from PS Funding the Participations to be financed by such Term Loan;

(e)      each of the representations and warranties made by any Credit Party in or pursuant to the Credit Documents shall be accurate in all material respects (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect) before and after giving effect to the making of such Term Loan (except for those representations and warranties made as of a specific date), each Credit Party shall be in compliance with all covenants, agreements and obligations under the Credit Documents, and no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the requested Term Loan;

(f)      there shall not exist any litigation that negatively would impact Borrower's or Guarantor's ability to perform their respective obligations under the Credit Documents to which they are party;

(g)      Non-occurrence of any Regulatory Trigger Event or other regulatory event, regulatory change or pending or threatened (in writing) proceeding that could reasonably be expected to have a material adverse effect on Borrower's or Guarantor's ability to fulfill their respective obligations under this Agreement or the Credit Documents or which would reasonably be expected to affect either such Person's ability to remain a going concern;

(h)      there shall not have occurred any Material Adverse Change; and

(i)      the Term Loan Commitment Period Termination Date, shall not have occurred.

[SIGNATURE PAGE TO FOLLOW]

This Notice of Borrowing is made this _____ day of _____, 201_.

PSF SUB 4, LLC, as Borrower

By PS Funding, Inc., its Sole Member

By: _____
Name: _____
Title: _____

PSLEGAL_v.2
3876238v7 013580.0126

## **EXHIBIT F**

PS FUNDING CREDIT, PRICING AND OPERATIONAL POLICY GUIDELINES

(see attached)

PSLEGAL_v.2
3876238v7 013580.0126

**<u>Schedule 4.2</u>:**

Organization and Good Standing

| <u>Entity</u> | <u>Jurisdiction of Organization and Organizational ID</u> |
|---|---|
| PSF Sub 4, LLC | Delaware<br><br>Org ID # 6660525 |
| PS Funding, Inc. | Delaware<br><br>Org ID # 5743664 |
| Peer Street, Inc. | Delaware<br><br>Org ID # 5453287 |

PSLEGAL_v.2
3876238v7 013580.0126

## **Schedule 4.7**

### **Litigation**

None.

**Schedule 4.12**

**Investments**

None.

PSLEGAL_v.2
3876238v7 013580.0126

**Schedule 4.14**

**Business Locations**

2121 Park Place, Suite 250
El Segundo, CA 90245

**Schedule 4.15**

**Stock**

| Entity | Equity Ownership |
|---|---|
| PSF Sub 4, LLC | PS Funding, Inc. (100%) |
| PS Funding, Inc. | Peer Street, Inc. (100%) |

**Schedule 4.19**

**Deposit Accounts**

| Name of Account Bank | Address | Contact Person | Telephone Number | Name Held | Purpose of Acct | Account Number |
|---|---|---|---|---|---|---|
| City National Bank | 555 S. Flower St; 17th Floor Los Angeles, Ca 90071 | Julie Chambers | (213) 673-0434 | | Deposit Account | |

EXECUTION VERSION

THIRD AMENDMENT TO

LOAN AND SECURITY AGREEMENT

This THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT (this "Third Amendment") is dated as of April 8, 2019 (the "Third Amendment Date"), by and among PSF SUB 4, LLC, a Delaware limited liability company ("Borrower"), PS FUNDING, INC., a Delaware corporation (in its capacity as guarantor, "Guarantor" and in its capacity as servicer, "Servicer") and PACIFIC FUNDING TRUST 1002, a Delaware statutory trust ("Lender").

RECITALS

WHEREAS, Borrower, Servicer, Guarantor, and Lender are parties to that certain Loan and Security Agreement, dated as of February 28, 2018, as amended by that certain First Amendment to Loan and Security Agreement, dated as of May 22, 2018 and that certain Second Amendment to Loan and Security Agreement, dated as of June 19, 2018, (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"); and

WHEREAS, in accordance with the terms of the Loan Agreement, Borrower has requested and Lender has agreed to modify certain provisions of the Loan Agreement, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

AMENDMENT

1.        Defined Terms.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Loan Agreement.

2.        Amendments to the Loan Agreement.  Upon satisfaction of the conditions set forth in Section 3 and Section 4 hereof, the parties hereto hereby agree to:

(a)        amend Section 1.1 of the Loan Agreement by deleting the definition of "Collateral Value" in its entirety and replacing it with the following:

"'*Collateral Value'* means an amount equal to:

(i) 95% of the aggregate outstanding principal balance of Eligible Mortgage Loans and Eligible Participations, without duplication, comprised of SFR Mortgage Loans or MFR Mortgage Loans (that are not Large Mortgage Loans) with a Loan-to-Value ratio at or below 75%, that are not Delinquent as of the date of determination;

(ii) 90% of the aggregate outstanding principal balance of Eligible Mortgage Loans and Eligible Participations, without duplication, comprised of SFR Mortgage Loans with a Loan-to-Value ratio greater

than 75%, that are not Delinquent as of the date of determination; provided, that if any such SFR Mortgage Loan has comprised a portion of the Collateral for fifty (50) cumulative days (not consecutive days), then the Collateral Value for such SFR Mortgage Loan shall be reduced to zero on the fifty first (51st) day;

(iii) 95% of the aggregate outstanding principal balance of Eligible Mortgage Loans and Eligible Participations, without duplication, comprised of CRE Mortgage Loans that are not Large Mortgage Loans with a Loan-to-Value ratio at or below 65%, that are not Delinquent as of the date of determination; provided, that if any such CRE Mortgage Loan has comprised a portion of the Collateral for fifty (50) cumulative days (not consecutive days), then the Collateral Value for such CRE Mortgage Loan shall be reduced to zero on the fifty first (51st) day;

(iv) 90% of the aggregate outstanding principal balance of Eligible Mortgage Loans and Eligible Participations, without duplication, comprised of CRE Mortgage Loans with a Loan-to-Value ratio greater than 65%, that are not Delinquent as of the date of determination; provided, that if any such CRE Mortgage Loan has comprised a portion of the Collateral for fifty (50) cumulative days (not consecutive days), then the Collateral Value for such CRE Mortgage Loan shall be reduced to zero on the fifty first (51st) day;

(v) 90% of the aggregate outstanding principal balance of Eligible Mortgage Loans and Eligible Participations, without duplication, comprised of Large Mortgage Loans, that are not Delinquent as of the date of determination; provided, that if any such Large Mortgage Loan has comprised a portion of the Collateral for fifty (50) cumulative days (not consecutive days), then the Collateral Value for such Large Mortgage Loan shall be reduced to zero on the fifty first (51st) day;  and

(vi) 90% of the aggregate outstanding principal balance of Eligible Mortgage Loans and Eligible Participations, without duplication, comprised of Rental Mortgage Loans, that are not Delinquent as of the date of determination; provided, that if any such Rental Mortgage Loan has comprised a portion of the Collateral for fifty (50) cumulative days (not consecutive days), then the Collateral Value for such Rental Mortgage Loan shall be reduced to zero on the fifty first (51st) day."

(a)        amend Section 1.1 of the Loan Agreement by adding the following definition in the appropriate alphabetical order therein:

"'*CRE Mortgage Loan*' means, an Eligible Mortgage Loan or Eligible Participation secured by non-owner occupied commercial real property, sold to investors in the regular course of business."

(b)        amend Section 1.1 of the Loan Agreement by deleting the definition of "Eligible Mortgage Loan" in its entirety and replacing it with the following:

"'*Eligible Mortgage Loan*' means, as of the related Credit Date, a Mortgage Loan which meets PS Funding's internal credit, pricing and operational policy guidelines set forth in the PS Non-Owner Occupied Residential Loan Underwriting Standards Manual attached as <u>Exhibit F</u> hereto, and, if applicable, complies with (i) the Multifamily Credit Box Guidelines attached as <u>Exhibit G</u> hereto ("<u>MFR Guidelines</u>"), if such Mortgage Loan is an MFR Mortgage Loan, (ii) the Commercial Credit Box Guidelines attached as <u>Exhibit H </u>hereto ("<u>CRE Guidelines</u>"), if such Mortgage Loan is a CRE Mortgage Loan, (iii) the Rental Loans Underwriting Guidelines attached as <u>Exhibit I</u> hereto ("<u>Rental Guidelines</u>"), if such Mortgage Loan is a Rental Mortgage Loan; provided however, to the extent the provisions of the *MFR Guidelines*, CRE Guidelines or Rental Guidelines conflict with any provision of the PS Non-Owner Occupied Residential Loan Underwriting Standards Manual, then such MFR Guidelines, CRE Guidelines or Rental Guidelines shall control, and (iv) the underwriting guidelines of any commercial partner or bank partner to the extent that PS Funding is using such partner to originate the Mortgage Loans and with respect to which the following eligibility criteria are satisfied as of such date of determination:

(a)        does not have a payment default with respect to any scheduled payment as of the related Credit Date and no other default, breach, violation or event permitting acceleration under the terms of such Mortgage Loan;

(b)        does not have an outstanding amount in excess of (i) $2,500,000 for SFR Mortgage Loans; (ii) $3,500,000 for CRE Mortgage Loans; (iii) $3,500,000 for MFR Mortgage Loans; or (iv) $1,500,000 for Rental Mortgage Loans;

(c)        does not have a remaining term greater than (i) 24 months for SFR Mortgage Loans; (ii) 36 months for CRE Mortgage Loans; (iii) 36 months for MFR Mortgage Loans; or (iv) 30 years for Rental Mortgage Loans;

(d)        does not have a Loan-to-Value greater than (i) 85% for SFR Mortgage Loans; (ii) 70% for CRE Mortgage Loans; (iii) 75% for MFR Mortgage Loans; or (iv) 80% for Rental Mortgage Loans;

(e)        is not a thirty (30) day note; and

(f)        is serviced by Servicer, and if sub-serviced, such sub-servicer is the Backup Servicer pursuant to a Backup Servicing Agreement or such other independent third party approved by Limited Guarantor and acceptable to Lender."

(c)        amend Section 1.1 of the Loan Agreement by adding the following definition in the appropriate alphabetical order therein:

"'*Framework Agreement*' means that certain Amended and Restated Framework Agreement, dated March 2, 2018, as amended by that certain First Amendment to Amended and Restated Framework Agreement dated June 19, 2018, and as amended by that certain Second Amendment to Amended and Restated Framework Agreement dated April 8, 2019, by and between Peer Street Inc., a Delaware corporation, and Colchis (as amended, restated, supplemented or otherwise modified from time to time)."

(d)        amend Section 1.1 of the Loan Agreement by adding the following definition in the appropriate alphabetical order therein:

"'*Large Mortgage Loan*' means, a CRE Mortgage Loan or a MFR Mortgage Loan with an "original principal balance" in excess of $2,500,000, provided, that such CRE Mortgage Loan or MFR Mortgage Loan shall not have an "original principal balance" greater than $3,500,000."

(e)        amend Section 1.1 of the Loan Agreement by adding the following definition in the appropriate alphabetical order therein:

"'*MFR Mortgage Loan*' means, an Eligible Mortgage Loan or Eligible Participation secured by non-owner occupied multifamily residential real property between five (5) and fifty (50) units, sold to investors in the ordinary course of business."

(f)        amend Section 1.1 of the Loan Agreement by deleting the definition of "Mortgage" in its entirety and replacing it with the following:

"'*Mortgage*' means with respect to a Mortgage Loan, the mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first Lien on a fee simple non-owner occupied residential, multifamily residential or commercial real property securing the Mortgage Note or a leasehold estate with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely accepted practice."

(g)        amend Section 1.1 of the Loan Agreement by deleting the definition of "Mortgage Loan" in its entirety and replacing it with the following:

"'*Mortgage Loan*' means a loan made to obligors in the United States secured by a non-owner occupied residential, multifamily residential or commercial real property and includes the Mortgage Note and related Mortgage."

(h)        amend Section 1.1 of the Loan Agreement by adding the following definition in the appropriate alphabetical order therein:

"'*Rental Mortgage Loan*' means, an Eligible Mortgage Loan or Eligible

Participation secured by non-owner occupied rental residential real property, the proceeds of which are used to finance such residential rental real property."

(i)        amend Section 1.1 of the Loan Agreement by adding the following definition in the appropriate alphabetical order therein:

"'*SFR Mortgage Loan*' means, an Eligible Mortgage Loan or Eligible Participation secured by non-owner occupied residential real property."

(j)        amend Section 1.1 of the Loan Agreement by deleting the definition of "Term Loan Commitment" in its entirety and replacing it with the following:

"'*Term Loan Commitment*' means the commitment of Lender to make or otherwise fund Term Loans in an amount not to exceed $100,000,000 in the aggregate."

(k)        amend Section 1.1 of the Loan Agreement by deleting the definition of "Term Loan Commitment Termination Date" in its entirety and replacing it with the following:

"'*Term Loan Commitment Termination Date*' means the earlier to occur of (i) the date of the termination of the Term Loan Commitment pursuant to Section 8.1, and (ii) the date on which Lender has made Term Loans in the aggregate principal amount equal to the Term Loan Commitment."

(l)        amend Section 1.1 of the Loan Agreement by deleting the definition of "Underlying Real Property Collateral" in its entirety and replacing it with the following:

"'*Underlying Real Property Collateral*' means non-owner occupied improved residential, multifamily residential or commercial real property that secures repayment of a Mortgage Loan."

(m)        amend section 2.1(a)(ii) of the Loan Agreement by deleting the existing Section 2.1(a)(ii) in its entirety and replacing it with the following:

"(ii)    Lender agrees to make, on the Third Amendment Date, a Term Loan to Company in an amount equal to $25,000,000; provided, that after giving effect to the making of such Term Loan on the Third Amendment Date, such date shall be the Term Loan Commitment Termination Date."

(n)        amend Section 3.2(a) of the Loan Agreement by deleting the existing Section 3.2(a) in its entirety and replacing it with the following:

"(a)    Colchis shall have received fully executed documentation, in form and substance satisfactory to Colchis, increasing Colchis's minimum outstanding balance to $200,000,000 principal amount of loans in the aggregate as the threshold for PS Funding and Limited Guarantor to offer to Colchis Purchasers (as defined in the Framework Agreement) the minimum capacity of loans set forth in the Framework Agreement;"

5

(o)    amend Section 5.2(c) of the Loan Agreement by deleting the existing Section 5.2(c) in its entirety and replacing it with the following:

"(c)    within three (3) Business Days after the end of each calendar month, a collateral report in substantially the form of Exhibit D attached hereto providing Mortgage Loan level information and credit attributes for all Mortgage Loans and participations including the cumulative number of days that each Mortgage Loan has constituted Collateral at the end of such month (the "Monthly Summary Report")."

(p)    amend Section 5.5 of the Loan Agreement by deleting the current Section 5.5 in its entirety, and replacing it with the following:

"Section 5.5    Collateral Covenants. Borrower and Servicer shall maintain the following covenants with respect to the Mortgage Loans and Participations comprising the Collateral, measured as of the last day of each calendar month:

(a)    Loan-to-Value. The weighted average Loan-to-Value ratio of the Eligible Mortgage Loans and the Eligible Participations, measured by the outstanding loan amounts, and without duplication, shall be equal to or less than 75%.

(b)    New Products. Subject to the further limitations set forth in Section 5.5(c) below, no more than 25% of the aggregate outstanding principal amount of the Eligible Mortgage Loans and Eligible Participations, without duplication and on a cumulative basis, shall:

(i) fall outside of SFR Underwriting Guidelines or MFR Guidelines but still meet PS Funding's underwriting criteria;

(ii) be CRE Mortgage Loans or Rental Mortgage Loans;

(iii) be SFR Mortgage Loans with a Loan-to-Value ratio greater than 75%;

(iv) be Large Mortgage Loans; or

(v) be considered a New Product as defined in the Framework Agreement, except to the extent permitted as an Eligible Mortgage Loan or Eligible Participation under the terms of this Third Amendment.

(c)    Further Limitations Impacting 25% Cap for New Products. The following additional limitations apply to certain Eligible Mortgage Loans and Eligible Participations, and any such Eligible Mortgage Loans and Eligible Participations will be counted towards the 25% "New Products" limitation set forth in Section 5.5(b).

(i)    No more than 20% of the aggregate outstanding principal amount of the Eligible Mortgage Loans and Eligible Participations, without duplication, shall be Large Mortgage Loans, and

(ii)    No more than 10% of the aggregate outstanding principal amount of the Eligible Mortgage Loans and Eligible Participations, without duplication, shall be Rental Mortgage Loans.

(d)    MFR Mortgage Loan Limitations. No more than 50% of the aggregate outstanding principal amount of the Eligible Mortgage Loans and Eligible Participations, without duplication, shall be MFR Mortgage Loans (including any MFR Mortgage Loans that are also Large Mortgage Loans).

(e)    Restrictions on Sales to Colchis. No Mortgage Loan pledged, or subject of a Participation pledged, as Collateral under this Agreement may be sold by Borrower, PS Funding or any of their respective Affiliates as a whole loan to Colchis Capital Management, L.P., Lender or any of their respective Affiliates."

(q)    "Exhibit A" to the Loan Agreement is hereby amended and restated in its entirety in the form of Exhibit A attached hereto.

(r)    "Exhibit D" to the Loan Agreement is hereby amended and restated in its entirety in the form of Exhibit D attached hereto.

(s)    "Exhibit E" to the Loan Agreement is hereby amended and restated in its entirety in the form of Exhibit E attached hereto.

(t)    "Exhibit F" to the Loan Agreement is hereby amended and restated in its entirety in the form of Exhibit F attached hereto.

(u)    Exhibit G attached hereto is hereby added to the Loan Agreement.

(v)    Exhibit H attached hereto is hereby added to the Loan Agreement.

(w)    Exhibit I attached hereto is hereby added to the Loan Agreement.

3.    Conditions Precedent. The effectiveness of this Third Amendment is subject to the receipt by Lender of this Third Amendment duly executed and delivered by Borrower, Servicer, Guarantor and Lender (such date being referred to herein as the "Effective Date").

4.    Fees and Expenses. Upon execution of this Agreement, Borrower shall reimburse Lender for all the reasonable fees, expenses and disbursements of Moses & Singer LLP, counsel to Lender, in the preparation, execution, review and negotiation of this Third Amendment, provided, that such amount shall not exceed $15,000.

5.    Representations and Warranties of Borrower and Guarantor. Borrower and Guarantor hereby represent and warrant to Lender that:

(a)    all representations and warranties set forth in Article 4 of the Loan Agreement are true and correct in all material respects on and as of the Third Amendment Date, except to the extent that such representations and warranties expressly relate to an earlier date, in

which case such representations and warranties remain true and correct in all material respects as of such earlier date and, in the case of any of the foregoing, other than representations that are qualified by materiality, which are true and correct in all respects;

(b)        no Default or Event of Default has occurred and is continuing;

(c)        each of Borrower and Guarantor has full power and authority under the law of the state of its organization and under its Organization Documents to enter into, execute, and deliver and perform its obligations under this Third Amendment and the Credit Documents as amended hereby;

(d)        the making and performance of this Third Amendment does not and will not violate any provisions of any law, rule, regulation, judgment, order, writ, decree, determination or award or breach any provisions of the certificate of formation, operating agreement or other Organization Documents of Borrower or Guarantor, or constitute a default or result in the creation or imposition of any security interest in, or lien or encumbrance upon, any assets of Borrower or Guarantor (immediately or with the passage of time or with the giving of notice and passage of time, or both) under any other contract, agreement, indenture or instrument to which Borrower or Guarantor is a party or by which Borrower or Guarantor or their respective property is bound where such violation, breach, default, creation of any security interest in or lien or encumbrance upon will result in the case of Borrower, in a Material Adverse Change, or in the case of Guarantor or any direct or indirect parent of such Person, a material adverse change in the business, properties, assets, operations, the collateral, results of operations, or financial condition of any such Person;

(e)        all actions (corporate or otherwise) necessary or appropriate for Borrower's and Guarantor's, execution, delivery and performance of this Third Amendment has been taken; and

(f)        this Third Amendment is, or when delivered to Lender will be, duly executed and constitute valid and legally binding obligations of Borrower and Guarantor enforceable against Borrower and Guarantor, in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

6.        <u>Effect on the Credit Documents and Ratification</u>.

(a)        Except as expressly set forth herein, nothing contained herein shall be deemed to constitute a waiver of compliance with any term or condition contained in the Loan Agreement or any of the other Credit Documents or constitute a course of conduct or dealing among the parties hereto.  Lender reserves all rights, privileges and remedies under the Credit Documents.  The Loan Agreement, as hereby amended, and all other Credit Documents are hereby ratified and re-affirmed in all respects and shall remain unmodified and in full force and effect. All references in the Credit Documents to the Loan Agreement shall be deemed to be references to the Loan Agreement as modified hereby. This Third Amendment shall constitute part of the Credit Documents.

(b)        The relationship of Lender, on the one hand, and Borrower and

Guarantor, on the other hand, has been and shall continue to be, at all times, that of creditor and debtor and not as joint ventures or partners.  Nothing contained in this Third Amendment, any instrument, document or agreement delivered in connection herewith or in the Loan Agreement or any of the other Credit Documents shall be deemed or construed to create a fiduciary relationship between or among the parties.

7.        No Novation.  This Third Amendment is not intended by the parties to be, and shall not be construed to be, a novation of the Loan Agreement or any other Credit Documents or an accord and satisfaction in regard thereto.

8.        Successors and Assigns.  This Third Amendment shall bind and inure to the benefit of each signatory hereto and its successors and assigns; provided, however, that Borrower and Guarantor shall not have the right to assign or delegate their obligations and duties under this Third Amendment or any interest therein except with the prior written consent of Lender.

9.        Headings.  The captions and headings of this Third Amendment are for convenience of reference only and shall not affect the interpretation of this Third Amendment.

10.        Incorporation of Loan Agreement.  The provisions contained in Section 11.1 (Indemnification and Release Provisions), Section 11.2 (Amendments), Section 11.3 (Applicable Law), Section 11.6 (Counterparts), Section 11.9 (Effectiveness of Agreement), Section 11.11 (Jurisdiction and Venue), Section 11.12 (Waiver of Jury Trial) and Section 11.17 (Confidentiality) of the Loan Agreement are incorporated herein by this reference, *mutatis mutandis*.

REMAINDER OF PAGE INTENTIONALLY BLANK; SIGNATURES FOLLOW.

IN WITNESS WHEREOF, the parties have caused this Third Amendment to be duly executed and delivered by its duly authorized officer as of the day and year first above written.

PSF SUB 4, LLC, as Borrower

By: PS Funding, Inc., its Sole Member

By: _____
Name: Brewster Johnson
Title: President

PS FUNDING, INC., as Servicer and Guarantor

By: _____
Name: Brewster Johnson
Title: President

PACIFIC FUNDING TRUST 1002, as Lender

By: Colchis Capital Management, L.P., its Administrator

By:_____
Name: Tom Moore
Title: Chief Financial Officer

## <u>EXHIBIT A</u>

BORROWING BASE CERTIFICATE

We submit the following information dated April 8, 2019 in connection with that certain Loan and Security Agreement dated as of February 28, 2018, as amended by (i) that certain First Amendment to Loan and Security Agreement, dated as of May 22, 2018, (ii) that certain Second Amendment to Loan and Security Agreement, dated as of June 19, 2018, and (iii) that certain Third Amendment to Loan and Security Agreement, dated as of April 8, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), by and among PSF SUB 4, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), PS FUNDING, INC., a Delaware corporation ("<u>PS Funding</u>"), and PACIFIC FUNDING TRUST 1002, a Delaware statutory trust (the "<u>Lender</u>").  Capitalized terms not defined herein have the meanings given to them in the Loan Agreement:

   A.  Loan Amount: $25,000,000
   B.  Collateral: See Schedule 1
   C.  Collateral Value: _____
   D.  Collateral Requirement (equals Loan Amount LESS the sum of cash reserves and Cash Equivalents plus Collateral Value): _____

I hereby certify that the information above is true, accurate, and complete and that Borrower is in compliance with the Loan Agreement and Credit Documents and Borrower ratifies and affirms all covenants, representations and warranties set forth in the Credit Documents as of the date hereof.

BORROWER:

By: _____

Name:_____

Title: _____

# **EXHIBIT D**

MONTHLY SUMMARY REPORT

(see attached)

**EXHIBIT E**

[FORM OF NOTICE OF BORROWING]

April 8, 2019

Pacific Funding Trust 1002
c/o Colchis Capital Management, L.P.
150 California Street, 18th Floor
San Francisco, CA 94111
Attention: Tom Moore

Ref: PSF Sub 4, LLC

    This Notice of Borrowing is made pursuant to Section 2.1(b) of that certain Loan and Security Agreement, dated as of February 28, 2018, as amended by (i) that certain First Amendment to Loan and Security Agreement, dated as of May 22, 2018, (ii) that certain Second Amendment to Loan and Security Agreement, dated as of June 19, 2018, and (iii) that certain Third Amendment to Loan and Security Agreement, dated as of April 8, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among PSF Sub 4, LLC, a Delaware limited liability company, as borrower (the "Borrower"), PS Funding, Inc., a Delaware corporation, as guarantor and servicer, and Pacific Funding Trust 1002, as lender. Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Loan Agreement.

    1.    The Borrower hereby requests that on April 8, 2019 (the "Credit Date") it receive a Term Loan under the Loan Agreement in an aggregate principal amount of twenty-five million Dollars ($25,000,000) (the "Requested Amount").

    2.    The Borrower hereby gives notice of its request for a Term Loan in an aggregate principal amount equal to the Requested Amount to the Lender pursuant to Section 2.1(b) of the Loan Agreement and requests that the Lender remit, or cause to be remitted, the proceeds thereof to the Cash Collateral Account in accordance with the following wiring instructions:

    _____

    _____

    _____

    _____

    3.    The Borrower certifies that immediately after giving effect to the proposed Term Loan on the Credit Date each of the applicable conditions precedent set forth in Section 3.2 of the Loan Agreement is satisfied, including:

    (a)    Colchis shall have received fully executed documentation, in form and substance satisfactory to Colchis, increasing Colchis's minimum outstanding

balance to $200,000,000 principal amount of loans in the aggregate as the threshold for PS Funding and Limited Guarantor to offer to Colchis Purchasers (as defined in the Framework Agreement) the minimum capacity of loans set forth in the Framework Agreement and extending the period for the required offer and optional purchase to three and a half (3.5) years, both as set forth in Section 2.1(a)(ii) of the Framework Agreement;

(b)     Solely with respect to the making of a Term Loan on a Credit Date other than the Closing Date, Colchis shall have received fully executed documentation, in form and substance satisfactory to Colchis, providing for whole loan purchases by Colchis, delivered pursuant to the Framework Agreement;

(c)     Lender shall have received a fully executed and delivered Funding Notice pursuant to <u>Section 2.1(b)</u> together with a fully executed Borrowing Base Certificate evidencing that that there is Term Loan Availability with respect to the Term Loan requested by Borrower;

(d)     Borrower shall own or have the unconditional right to purchase from PS Funding the Participations to be financed by such Term Loan;

(e)     each of the representations and warranties made by any Credit Party in or pursuant to the Credit Documents shall be accurate in all material respects (except to the extent already qualified by materiality, in which case it shall be true and correct in all respects and shall not be false or misleading in any respect) before and after giving effect to the making of such Term Loan (except for those representations and warranties made as of a specific date), each Credit Party shall be in compliance with all covenants, agreements and obligations under the Credit Documents, and no Default or Event of Default shall have occurred or be continuing or would exist after giving effect to the requested Term Loan;

(f)     there shall not exist any litigation that negatively would impact Borrower's or Guarantor's ability to perform their respective obligations under the Credit Documents to which they are party;

(g)     Non-occurrence of any Regulatory Trigger Event or other regulatory event, regulatory change or pending or threatened (in writing) proceeding that could reasonably be expected to have a material adverse effect on Borrower's or Guarantor's ability to fulfill their respective obligations under this Agreement or the Credit Documents or which would reasonably be expected to affect either such Person's ability to remain a going concern;

(h)     there shall not have occurred any Material Adverse Change; and

(i)     the Term Loan Commitment Period Termination Date, shall not have occurred.

[SIGNATURE PAGE TO FOLLOW]

EXHIBIT E
-15-

This Notice of Borrowing is made this 8th day of April, 2019.

PSF SUB 4, LLC, as Borrower

By PS Funding, Inc., its Sole Member

By:
   Name:
   Title:

4227339v8 013580.0126

## **EXHIBIT F**

PS NON-OWNER OCCUPIED RESIDENTIAL LOAN UNDERWRITING STANDARDS
MANUAL

(see attached)

# **EXHIBIT G**

MULTIFAMILY CREDIT BOX GUIDELINES

(see attached)

# **EXHIBIT H**

COMMERCIAL CREDIT BOX GUIDELINES

(see attached)

## __EXHIBIT I__

RENTAL PILOT CREDIT BOX GUIDELINES

(see attached)

**<u>EXHIBIT 24</u>**

**FOR OFFERINGS OF REAL ESTATE SECURITIES THROUGH THE**

# PeerStreet Platform

## POCKET 3-MONTH RWN SUPPLEMENT:
## REDEEMABLE WAREHOUSE NOTES ("RWN")
## OFFERED BY PEER STREET FUNDING, LLC

---

     1.   <u>About this RWN Supplement</u>

This RWN Supplement provides information on the Redeemable Warehouse Notes, or RWNs, that PeerStreet intends to offer, and to issue through its affiliate Peer Street Funding, LLC, or PSFLLC, from time to time as part of its "Pocket 3-Month" product initiative, and describes the specific risks associated with RWNs.

In general, the RWNs represent pro rata interests in a loan (the **"Warehouse Loan"**) made by PSFLLC to PS Warehouse, LLC, PS Warehouse II, LLC or a similar entity (individually, a "**Warehouse Entity**", and collectively, the "**Warehouse Entities**"), which Warehouse Entities are subsidiaries of PeerStreet's lending entity, PS Funding, Inc. ("PSFI"). PSFLLC will fund the Warehouse Loan with the proceeds from the sale of RWNs to Investors. Investors in RWNs (**"Investors"**) will be entitled to their pro rata share of the interest earned by PSFLLC on the Warehouse Loan. ***Interest accrued on the RWNs is automatically capitalized in the RWN and reinvested in the Pocket 3-Month product(s), until the earliest of the particular RWN's Maturity Date or the Investor's Redemption date***.

The funds lent by PSFLLC to Warehouse Entity are called the **"Warehouse Funds"**. Warehouse Entities are entitled to use the Warehouse Funds for the **"Eligible Activities" (defined below)**.

**Pocket 3-Month is not a checking account, savings account, CD, or other banking product; it is an investment product that provides Investors with the right to receive certain payments that are made on the Warehouse Loan.**

PSFI is the guarantor on the Warehouse Loan. **RWNs are not FDIC or SIPC insured; their performance and repayment is not guaranteed and depends on a variety of factors including, without limitation, a Warehouse Entity's solvency, PSFI's solvency, and the value and performance of the Mortgage Loans.**

In this RWN Supplement, unless otherwise specified or required by context, we use the following terms:

- **"Eligible Activities"** are (i) purchasing Financed Loans, (ii) purchasing participation interests in Financed Loans; (iii) funding Servicing Advances; (iv) acquiring interests in Servicing Advance

Receivables; (v) making payments or prepayments on the Warehouse Loan, and (vi) investing in Permitted Investments.

- "**Financed Loans**" are specific mortgage loans or interests in mortgage loans that are acquired or originated by PSFI in which a Warehouse Entity acquires in whole or via a Participation Interest. After origination, Financed Loans are retained by PSFI (either in whole or assigned in whole, or in part, to a PSI Affiliate) and serviced by PSFI;

- "**Form Instrument**" refers to the form RWN issued to Investors who invest in Pocket 3-Month, a copy of which is available as an exhibit following this RWN Supplement;

- "**Investors**" are holders of RWNs;

- "**Mortgage Loans**" are Financed Loans and Non-Financed Loans.

- "**Non-Financed Loans**" are specific mortgage loans or interests in mortgage loans that are originated or purchased by PSFI in which a Warehouse Entity does not acquire Participation Interests. Non-Financed Loans are either: (i) owned and serviced by PSFI or (ii) owned by a third party and serviced by PSFI;

- "**Participation Interests**" are participation interests, assignments of security instruments, whole loan purchases, or other similar interests in Mortgage Loans that a Warehouse Entity acquires with the use of Warehouse Funds, causing such Mortgage Loans to be "Financed Loans" as defined above;

- "**PeerStreet**" refers collectively to PSFLLC, PSI, PSFI, the Warehouse Entities, and any PSI affiliate;

- "**PeerStreet Platform**" is the investing platform sponsored by PeerStreet that is described in the PPM;

- "**Permitted Investments** " means (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof, (ii) commercial paper maturing no more than one year from the date of creation thereof and currently having a rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (iii) certificates of deposit issued by any bank headquartered in the United States maturing no more than one year from the date of investment therein,  (iv) money market accounts, and (v) any other instruments substantially similar to the foregoing; provided that such instruments mature or are subject to redemption or withdrawal no more than one year from the date of investment therein.

- "**Pocket 3-Month**" is the marketing name of the investment product for which RWNs are issued;

- "**PPM**" is the private placement memorandum, dated December 2, 2019, that summarizes the terms and conditions for various offerings of Real Estate Securities, including RWNs, through the PeerStreet Platform;

- "**PSFLLC**" is Peer Street Funding, LLC, a Delaware limited liability company, and is the issuer of RWNs offered under the PPM and this RWN Supplement;

- "**PSFI**" is PS Funding, Inc., a Delaware corporation in the business of originating, purchasing, servicing and selling loans secured by real property, and for purposes of this RWN Supplement, any reference to PSFI shall also include other PSI Affiliates whose role and structure will be similar to PS Funding, Inc.'s;

- "**PSI**" is Peer Street, Inc., a Delaware corporation;

- "**PSI Affiliate**" is any affiliate of PSI, PSFLLC or PSFI;

- "**RWNs**" are debt securities issued by PSFLLC that provide Investors with the indirect right to receive certain payments made by a Warehouse Entity to PSFLLC;

- "**Servicing Advances**" generally represent payments that are required to be made (or "advanced") by PSFI, as a servicer, including (A) in cases where borrowers fail to make timely payments under a Mortgage Loan, including, but not limited to, any form of "protective advance" (made to for the purpose of preserving and protecting the mortgaged property), payments of principal or interest, and payments in respect of real estate taxes and assessments or hazard, flood or primary insurance premiums required to be paid under the terms of the Mortgage Loan, and (B) the costs and expenses incurred in foreclosing upon (or undertaking similar action), preserving and selling the real property securing the Mortgage Loan, including but not limited to attorneys' and other professional fees and expenses incurred in connection with foreclosure and liquidation or other proceedings arising in the course of servicing the Mortgage Loan, which payments are reimbursable to the servicer, generally from late payments and other collections and recoveries with respect to the Mortgage Loan for which the advance was made;

- "**Servicing Advance Receivable(s)**" the contractual right to receive any and all funds due and owing to PSFI for providing Servicing Advances on behalf of borrowers of Non-Financed Loans which right is an asset which can be transferred or pledged;

- "**Special Member**" refers to a third-party, independent member who does not directly own any equity interest in a Warehouse Entity and does not have any day-to-day management authority, but will have some limited oversight authority over the affairs of a Warehouse Entity;

- "**Warehouse Funds**" are the monies lent by PSFLLC to a Warehouse Entity pursuant to a Warehouse Loan, which monies may be used by a Warehouse Entity for Eligible Activities;

- A "**Warehouse Entity**" or "**Warehouse Entities**" refers to PS Warehouse, LLC, PS Warehouse II, LLC, or similar entities, either individually or collectively. The sole equity member of the Warehouse Entities is PSFI.

- "**Warehouse Loan**" refers to, in the aggregate, the Warehouse Funds, together with the terms and agreements governing the extension of Warehouse Funds from PSFLLC to a Warehouse Entity (including the guaranty from PSFI and other loan documents), which terms may supplement, but not contradict (without prior notice to Investors) the terms set forth in this RWN Supplement or on the corresponding Pocket Dashboard (defined below).

***Any capitalized term not defined in this RWN Supplement shall have the same meaning as in the PPM.***

RWNs will be offered for sale, from time to time, on the PeerStreet Website, with specific terms such as the interest rate, amount being offered, and other relevant terms, if any, on a page on the PeerStreet

Website (the "**Pocket 3-Month Dashboard**") specific to Pocket 3-Month and the RWNs. In the event of a conflict between the terms of this RWN Supplement and the PPM, the terms of the RWN Supplement shall control. In the event of a conflict between the terms of this RWN Supplement and that of the Pocket 3-Month Dashboard, the terms of the Pocket 3-Month Dashboard shall control.

All summaries in this RWN Supplement are qualified in their entirety by reference to the other offering materials. Please refer to **"*Where to Find Additional Information*"** in the PPM for information on how to contact PeerStreet for additional information. You should consult the Pocket 3-Month Dashboard and the Form Instrument for the RWNs, a copy of which is attached hereto as an exhibit, in order to review and evaluate the specific terms and conditions that apply to the RWNs.

## 2.   About Pocket 3-Month and RWNs

*Pocket 3-Month*

Pocket 3-Month is an investment product developed and offered by PeerStreet that aims to allow Investors to act indirectly as a lender or capital provider to a Warehouse Entity, and by extension to PeerStreet's lending and servicing entity (PSFI), through the issuance of RWNs by PSFLLC. The RWNs are notes issued by PSFLLC that provide Investors the indirect right to interest payments that are made by a Warehouse Entity to PSFLLC under the terms of the Warehouse Loan.

Pocket 3-Month gives Investors on the PeerStreet Platform an opportunity to invest in a warehouse capital provider-like function, by purchasing RWNs from PSFLLC, a Delaware limited liability company that provides the Warehouse Entities with Warehouse Funds, while also offering Investors the ability to redeem their RWN Investment at certain intervals. Investors in Pocket 3-Month will receive a single RWN evidencing all investments by such Investor in Pocket 3-Month (each such investment, including any capitalized interest thereon, an **"RWN Investment"**).

The Warehouse Entities' sole equity member is PSFI, but each Warehouse Entity also has a Special Member. While PSFI, as sole equity member, has most decision-making authority over a Warehouse Entity's management, the Special Member has limited oversight rights and can assume management of the entity in the event that PSFI becomes insolvent or otherwise ceases to be able to discharge its management duties.

*PSFI and the Warehouse Entities*

Each Warehouse Entity is a wholly-owned subsidiary of PSFI formed for the purpose of (i) purchasing participation interests in Financed Loans; (ii) funding Servicing Advances; (iii) acquiring interests in Servicing Advance Receivables; (iv) making payments or prepayments on the Warehouse Loan, and (v) investing in Permitted Investments. .

In order to fund or purchase mortgage loans, PSFI may enter into financing arrangements, including, but not limited to, warehouse financings, which may be provided by multi-national banks and other credit providers. Under warehouse financing arrangements, banks, hedge funds, and other credit providers may provide PSFI with the monies necessary to fund its origination or purchase of mortgage loans.

After funding Mortgage Loans, PSFI may retain ownership of the Mortgage Loans, or sell those loans, or Participation Interests therein, to investors on the PeerStreet Platform or to institutional whole loan purchasers. If and when PSFI completes the sale of a given Mortgage Loan, it typically uses the sale proceeds to pay back its financing sources. In some cases, PSFI may sell Participation Interests to a Warehouse Entity.

Additionally, PSFI provides loan management, administration and/or servicing (collectively, "servicing") of certain Mortgage Loans (Financed Loans or Non-Financed Loans).  For each Mortgage Loan PSFI services, such servicing shall be performed pursuant to a servicing agreement between PSFI, as servicer, and the owner of the Mortgage Loan and, pursuant to the terms of that agreement, PSFI may have the right and/or obligation to make Servicing Advances pursuant to the terms of the loan documents.

Upon making such Servicing Advances, those Servicing Advances shall be added to the amount of outstanding principal and interest due and owning on each Mortgage Loan and the borrower shall be charged interest on the amount of all outstanding Servicing Advances to the full extent such interest is allowed under Mortgage Loan and permitted under applicable law and those advances shall be treated as receivables for PSFI. Thereafter, such receivables shall be recovered (are reimbursable) in the first instance from payments and other collections and recoveries with respect to the Mortgage Loan from which the Servicing Advances were made. PSFI has agreed that any Servicing Advance Receivables purchased with Warehouse Funds, which are collected by PSFI, shall be immediately transferred to the funding Warehouse Entity upon PSFI's receipt thereof.

Mortgage Loans in which a Warehouse Entity holds a Participation Interest from PSFI are "Financed Loans."  Mortgage Loans in which a Warehouse Entity does not hold a Participation in are "Non-Financed PSFI Loans," and may be owned by PSFI or a third party.
*Use of Warehouse Funds*

Warehouse Funds may be used for the following "**Eligible Activities**": (i) to purchase participation interests in Financed Loans at the time that they are originated or acquired by PSFI; (ii) to fund Servicing Advances; (iii) to acquire interests in Servicing Advances Receivables; (iv) to make payments or prepayments on the Warehouse Loan and (v) to invest in Permitted Investments.

- *Acquire Participation Interests*. As PSFI funds certain Mortgage Loans, a Warehouse Entity may acquire Participation Interests in those loans through the use of Warehouse Funds. Mortgage Loans in which a Warehouse Entity purchases Participation Interests with the use of Warehouse Funds are referred to herein as "Financed Loans." The Warehouse Entity will typically retain Participation Interests in each Financed Loan until PSFI sells the Financed Loan to an end-buyer or investor. Upon the disposition of a Financed Loan or PSFI's repurchase of the Participation Interests, the Warehouse Entity will receive its pro rata proceeds (which may be the entirety of sale proceeds, if the Warehouse Entity purchases Participation Interests representing 100% of the PSFI Financed Loan) and may use the proceeds for any Eligible Activities.

  Under the terms of the Warehouse Loan, with respect to some or all of the Financed Loans, PSFI may have a maximum number of days from the day that the Warehouse Entity acquires Participation Interests in which to sell or assign such Financed Loan to another investor or to otherwise repurchase Warehouse Entity's Participation Interests therein.

- *Fund Servicing Advances and Acquire Servicing Advance Receivables*. A Warehouse Entity may use Warehouse Funds to support PSFI's servicing of Mortgage Loans in two ways:

  - To fund Servicing Advances when they arise on a Mortgage Loan; and

  - To acquire an interest in Servicing Advance Receivables from PSFI, which represent the right to receive reimbursements of existing Servicing Advances previously made on Non-Financed Loans by PSFI.

PSFI may determine to advance funds to a borrower of a Mortgage Loan if it finds such an advance to be necessary and prudent to protect the interests of Investors. For example, PSFI might do so upon finding that a borrower's casualty insurance was cancelled or expired or that a borrower is delinquent on paying property taxes. For Financed Loans, these advances will be added to the amount of the Financed Loan and may bear interest at reasonable rates (not to exceed the maximum rate allowed by law). Advances at these rates may be significantly more expensive for the borrower than if that borrower had paid for those expenses originally. These advances will also need to be repaid by borrowers before any existing balance of the Financed Loan is paid down (meaning, the advanced funds will be reimbursed before any other payments are made on the mortgage loan); however, this could reduce the proceeds ultimately provided to Investors if the Warehouse Entity and PSFI default and PSFLLC takes over legal title to the Financed Loans, as further described below.

PSFI may also determine to make Servicing Advances for Non-Financed Loans, as necessary and prudent to protect the interests of Investors. However, such advances will not reduce the proceeds ultimately provided to Investors if the Warehouse Entity and PSFI default and PSFLLC takes over legal title to the Non-Financed Loans.

- *Make Payments or Prepayments on the Warehouse Loan*. Pursuant to the agreement among PSFI, PSFLLC and each Warehouse Entity, a Warehouse Entity will be obligated to make principal and interest payments on the Warehouse Loan, and may do so with Warehouse Funds.

- *Invest in Permitted Investments*. Warehouse Funds that are being held by a Warehouse Entity may be invested in Permitted Investments. Any and all investment earnings from any such Permitted Investments shall be for the benefit of the Warehouse Entity. Although unlikely to occur, any losses realized as a result of such investments will be covered by the PSFI guarantee.

*RWNs*

PSFLLC is the issuer of the RWNs, which represent special limited obligations of PSFLLC and whose payment are dependent on a Warehouse Entity's payments to PSFLLC pursuant to the Warehouse Loan.

For example, after PSFLLC receives Investors' investments via the sale of RWNs, it may advance those funds (as Warehouse Funds) to a Warehouse Entity, who may then use those funds to engage in Eligible Activities. While PSFI will typically retain title, legal ownership, and some servicing rights with respect to the Financed Loans, a Warehouse Entity's Participation Interests and interests in the Servicing Advance Receivables will serve as security or collateral for the Warehouse Funds. In return for PSFLLC providing Warehouse Funds, the Warehouse Entity shall pay to PSFLLC interest, on a monthly basis, although this interest may be allowed to accrue until the Warehouse Loan's Maturity Date, a Warehouse Entity's repayment of the Warehouse Loan, Investor Redemption, or other events requiring a Warehouse Entity to pay back sums due under the Warehouse Loan.

Each Warehouse Entity and PSFI, as guarantor, will be responsible for making payments to PSFLLC regardless of the performance of the underlying Financed Loans or the recoupment of Servicing Advance Receivables on Non-Financed Loans. The foregoing notwithstanding, it is important for Investors to note that investing in RWNs carries some loan-level risks, as (among other risks) loan non-performance might affect a Warehouse Entity's ability to make payments on the Warehouse Loan and impairment of the Financed Loans' value might decrease the value of PSFLLC's collateral. Similarly, PSFI's primary revenue source comes from the servicing of loans on the PeerStreet Platform and a sudden drop in servicing revenues could impact its ability to fulfill its obligations under the guaranty.

In the event that a Warehouse Entity or PSFI fail to make interest payments or principal repayments to PSFLLC, or otherwise default under the terms of the Warehouse Loan, PSFLLC shall have the right to take ownership of the Participation Interests and, by extension, the Financed Loans. PSFLLC shall also have the right to take ownership of a Warehouse Entity's interest in the Service Advance Receivables.  In situations where PSFLLC holds or takes legal title to the Financed Loans, it may retain PSFI to perform certain servicing-related functions.

So long as a Warehouse Entity and PSFI are not in default under the Warehouse Loan, they shall be entitled to all income from the Financed Loans, as well as any payments on the Servicing Advance Receivables.  Each Warehouse Entity and PSFI may use those funds, or funds from other sources (such as corporate funds), to pay the interest it owes to PSFLLC. Investors in RWNs are, in turn, entitled to receive their pro rata interest payments from PSFLLC at the rate listed in the Pocket 3-Month Dashboard.

PSFI is not a bankruptcy-remote entity and is the sole equity member of each Warehouse Entity, but each Warehouse Entity has a Special Member with the authority to dispose of the Participation Interests (and, by extension, the Financed Loans) securing PSFLLC's warehouse facility, as well as any Servicing Advance Receivables, and pay back PSFLLC in the event that PSFI files for bankruptcy. each Warehouse Entity itself cannot voluntarily file for bankruptcy without the Special Member's consent.

Investing in RWNs can result in the loss of some or all of Investors' investment in RWNs if, without limitation, PSFI were to become insolvent or the value of the Financed Loans were to become materially impaired, or PSFI fails to recoup Servicing Advance Receivables. PSFI, each Warehouse Entity's sole equity member is a guarantor on the Warehouse Loan. PSFI's revenue sources come primarily from lending and servicing activities. Peer Street, Inc. ("PSI"), PSFI's venture-backed parent entity, is not an obligor or guarantor under the Warehouse Loan and does not guarantee repayment of Warehouse Funds or of RWNs.

### 3.   Summary of Terms

*This summary provides key terms of the RWNs and highlights selected information contained elsewhere in or incorporated by reference into this RWN Supplement.  It does not contain all of the information that you should consider before making an investment decision.  For a more complete understanding of the applicable offering of RWNs, you should read the entirety of this RWN Supplement, the PPM, the Pocket 3-Month Dashboard and Form Instrument for the RWNs, and the Investor Agreement. Please read this RWN Supplement and the PPM in their entirety (including the risk factors described in the "Risk Factors Related to the RWNs" section of this RWN Supplement and the "General Risk Factors" section of the PPM for more information about important factors you should consider before investing in the RWNs)..*

| Issuer | Peer Street Funding, LLC, a Delaware limited liability company, or PSFLLC. |
|---|---|
| **RWNs Offered** | RWNs, to be issued from time to time via the Pocket 3-Month Dashboard, corresponding to an indirect dollar-for-dollar portion of the Warehouse Loan extended by PSFLLC to a Warehouse Entity.<br><br>Investors are entitled to receive their pro rata share of interest and principal payments made by a Warehouse Entity to PSFLLC.<br><br>**The RWNs represent a limited obligation of PSFLLC. Interest and principal distributions on the RWNs are dependent on the Warehouse Entity's payment of principal and interest to PSFLLC. PSFI, each Warehouse Entity's sole member primarily engaged in lending and servicing activities, is a guarantor** |

|  |  |
|---|---|
|  | **on the Warehouse Loan. PSI, PSFI's venture-backed parent entity, is neither a borrower nor guarantor under the Warehouse Loan.**<br><br>**In the event that the Warehouse Entity defaults under the terms of the Warehouse Loan, and unless PSFLLC grants the Warehouse Entity a temporary forbearance, distributions may be indefinitely delayed as PSFLLC takes legal ownership of the Participation Interests and Servicing Advance Receivables serving as collateral for the Warehouse Funds and, by extension, the Financed Loans or Non-Financed Loans, respectively, and either collects interest on those loans or, if it has the legal right to do so, liquidates them. In such an event, Investors in the RWNs will be entitled to their pro rata proceeds from payments on, or liquidation of (if applicable), the underlying Financed or Non-Financed Loans, net of servicing fees and other customary advances, fees, and costs incurred in the servicing, management, and disposition of the Financed and Non-Financed Loans.** |
| **Amount of RWNs Issued** | The RWNs you purchase through the Pocket 3-Month Dashboard will represent an indirect dollar-for-dollar interest in the Warehouse Loan extended by PSFLLC to the Warehouse Entity. PSFLLC intends to initially sell $50,000,000 of RWNs although it may increase or decrease this amount in its sole and absolute discretion, at any time and without notice, depending on Investors' demand for RWNs, the Warehouse Entity and PSFI's demand for Warehouse Funds, and other factors that PSFLLC deems appropriate.<br><br>Unless stated otherwise on the Pocket 3-Month Dashboard, the minimum initial RWN Investment will be $1,000. Subsequent investments may have different or no minimums. PSFLLC reserves the right to modify these amounts at any time.<br><br>The RWNs, and your rights as an investor in the RWNs, are at all times subject to the Investor Agreement, which will also be available on the PeerStreet Platform for your reference and review. In the event of conflict between the terms of the Investor Agreement and this RWN Supplement, the terms of the RWN Supplement shall govern. At the time you commit to purchase an RWN, you must have sufficient funds in your account with PeerStreet to complete the purchase. |
| **Use of PSFLLC Funds and Mortgage Loans** | Each Warehouse Entity shall only be permitted to use Warehouse Funds for Eligible Activities, which include (i) acquiring Financed Loans (or Participation Interests therein), (ii) acquiring Servicing Advance Receivables, (iii) making Servicing Advances for Mortgage Loans, (iv) making any payment or prepayment of the Warehouse Loan, and (v) investing in Permitted Investments.<br><br>Each Financed Loan must be secured by a deed of trust, mortgage, security agreement, or a participation in similar instruments, granting PSFI or the Warehouse Entity a senior, first-position interest in that instrument. Financed Loans may either be originated by third-party lenders and purchased (in whole or in part) by PSFI (or an affiliate) or originated by PSFI itself. PSFI may also service Financed Loans, and as servicer may make Servicing Advances on such loans.<br><br>PSFI may also be a servicer for Non-Financed Loans (which must be secured by a first-position deed of trust, mortgage, security agreement, or a participation in similar instruments) and may (i) make future Servicing Advances on Non-Financed |

| | |
|---|---|
| | Loans by requesting the Warehouse Entity to use Warehouse Funds to make such Servicing Advances; (ii) sell an interest in existing Servicing Advances on Non-Financed Loans to the Warehouse Entity in the form of a Servicing Advance Receivable. PSFI may transfer its economic interest in each Servicing Advance Receivable to the Warehouse Entity.<br><br>Each Warehouse Entity may also use Warehouse Funds to make any payment or prepayment of the Warehouse Loan to PSFLLC and to invest in Permitted Investments.  Any and all investment earnings from any such Permitted Investments shall be for the benefit of the Warehouse Entity and may be withdrawn at any time by the Warehouse Entity.<br><br>PSFLLC itself will not own the Participation Interests in Financed Loans or the Servicing Advance Receivables. In the event of a Warehouse Entity's default under the Warehouse Loan, however, PSFLLC shall have the right to take possession of the Participation Interests and the Warehouse Entity's interest in Servicing Advance Receivables (or economic interests therein), in which case PSFLLC may first need to record assignments of security instruments or follow other legal procedures prior to taking full control and ownership of the Participation Interests (and, by extension, the Financed Loans) and the economic interest in the Servicing Advance Receivables. |
| **PSFLLC's Collateral** | Each Warehouse Entity and PSFI hold the first risk of loss in the Financed Loans and Servicing Advance Receivables relative to PSFLLC and, by extension, RWN holders. In other words, interest owed by a Warehouse Entity (and PSFI as guarantor) to PSFLLC accrues as scheduled, regardless of the performance of the Financed Loans or recoupment of Servicing Advance Receivables. In the event that a Warehouse Entity defaults under the terms of the Warehouse Loan and the Financed Loans then-held by PSFI and/or underlying Non-Financed Loans are also in default, PSFLLC may need to foreclose on the underlying real estate or sell the Financed Loans, potentially at a loss, and such risk of loss would then be borne by you, as an Investor in the RWNs. PSFLLC's ability to foreclose and collect payments may then be dependent on third parties, and you may incur losses based on that third party's efforts or lack thereof.  Payment to Investors on any RWN is entirely dependent on PSFLLC receiving payment from the Warehouse Entity and PSFI or, in the event of the Warehouse Entity's default, on the performance and/or sale of the Financed Loans and Non-Financed Loans where Servicing Advances were made by PSFI. Investors are bound by PSFLLC's good faith decision-making regarding the management of the Warehouse Loan and the servicing, management, and disposition of any Mortgage Loan. |
| **No Security Interest Held by Investors in RWNs** | Investors in RWNs will have a claim to their share of funds held by PSFLLC, but will not have any security interest in the assets of PSFLLC, the Warehouse Entities, PSFI, PeerStreet, any borrower or lender, any Financed Loan or Non-Financed Loan, any proceeds from any Mortgage Loan or in the assets of any borrower or lender (including any PSI affiliate acting as lender) associated with any Mortgage Loan, or Servicing Advance Receivables.  RWNs will be unsecured special, limited obligations of PSFLLC. the Warehouse Entities and PSFI are liable to make payments to PSFLLC, but are not directly liable to RWN holders. Accordingly, in the event of a Warehouse Entity's default under the Warehouse Loan, Investors in RWNs will not be capable of enforcing the terms of the Warehouse Loan against a |

| | |
|---|---|
| | Warehouse Entity themselves and will instead need to rely on PSFLLC's collection efforts. |
| **Interest** | Subject to the limitations described in this RWN Supplement or as stated otherwise on the Pocket 3-Month Dashboard, interest on the RWNs will accrue at the rate set forth on the Pocket 3-Month Dashboard from time to time (the "**RWN Rate**"). |
| | The RWN Rate applicable to each RWN Investment shall be fixed for **three (3)-month periods (each such three (3)-month period, an "Investment Period")** commencing on the date of such RWN Investment. Upon the expiration of each Investment Period (each such date, an **"Interest Adjustment Date"**), if the Investor has not timely submitted a Redemption notice as outlined below, the RWN Rate applicable to such RWN Investment will be fixed at the rate then set forth on the **Pocket 3-Month** Dashboard as of such Interest Adjustment Date for the succeeding Investment Period. Only that RWN Investment which has an Investment Period expiring as of such Interest Adjustment Date will be subject to the interest rate adjustment on such Interest Adjustment Date. An Investor's RWN may have multiple Interest Adjustment Dates (and multiple RWN Rates) depending on the timing of purchases and the number of RWN Investments comprising such RWN. |
| | RWNs will begin accruing interest on the day following an Investor's purchase of such RWN. Interest is computed on an Actual/Actual basis and accrues in arrears. |
| | **Accrued interest on the RWNs is automatically capitalized and reinvested on the first day of each calendar month and upon Redemption (as defined below).** |
| **Interest Payments on RWNs and Reinvestment** | Subject to the limitations described in this RWN Supplement or as stated otherwise on the Pocket 3-Month Dashboard, RWNs will accrue interest daily, beginning on the day after each such investment is made. Interest payments to Investors will be payable and capitalized by PSFLLC monthly, in arrears, on the first day of each month and upon Redemption. |
| | ***Interest payments on the RWNs will be automatically capitalized and reinvested in RWNs, on the first day of each month and upon Redemption. Investors desiring to withdraw their funds from Pocket 3-Month can do so in accordance with the Redemption terms below.*** |
| | Daily accrual means that Investors will be entitled to interest for each day that their RWN is outstanding, but the monthly in arrears payment schedule means that interest will not be capitalized (and thus begin accruing its own interest) until the first day of the following month, except such interest shall be capitalized upon Redemption. |
| | Withdrawal of interest payments to Investors' PeerStreet account will be governed by the Redemption rules outlined below and the terms of the Investor Agreement. |
| | Notwithstanding the foregoing, PSFLLC shall only be obligated to make interest payments on the RWNs to the extent that PSFLLC receives a corresponding payment from the Warehouse Entity or PSFI relating to the Warehouse Loan. |

| RWN Maturity Date | RWNs mature, and repayment of Investors' principal and accrued interest will be due in full, on December 31, 2029 (the **"Maturity Date"**), as such date may be extended in accordance with the terms hereof. The foregoing notwithstanding, Investors may redeem their RWN investment at an earlier date, in accordance with the Redemption rules outlined below.<br><br>RWNs may be paid off by PSFLLC, in full or in part, without penalty, at any time prior to the Maturity Date, in which case interest on the RWNs will only be payable through such payoff date. In such scenarios, Investors may not receive as much interest as if the RWNs remained outstanding through the Maturity Date. |
|---|---|
| **Redemptions and Limitations on Payments of Interest and Principal** | Subject to the terms of this RWN Supplement, unless otherwise expressly stated on the Pocket 3-Month Dashboard or as this RWN Supplement may be amended, each Investor shall only have the right to redeem and withdraw an RWN Investment (each withdrawal, a **"Redemption"**) upon the expiration of each Investment Period applicable thereto (each such date, a **"Redemption Eligibility Date"**) (in the future, PSFLLC may, in its sole and absolute discretion, allow Investors to redeem RWN Investments prior to the Redemption Eligibility Date pursuant to terms and conditions determined in PSFLLC's sole and absolute discretion). Only an RWN Investment which has an Investment Period expiring as of such Redemption Eligibility Date will be eligible for Redemption on such Redemption Eligibility Date. An Investor's RWN may have multiple Redemption Eligibility Dates depending on the timing of purchases and the number of RWN Investments comprising such RWN. Investors desiring to redeem their RWN must request a Redemption through the Pocket 3-Month Dashboard no later than the 1st day of the month in which the applicable Redemption Eligibility Date occurs (or, if such day is on a weekend or bank holiday, the preceding business day) (the **"Redemption Cutoff Date"**). For illustrative purposes, an Investor desiring to redeem their RWN with a Redemption Eligibility Date of October 15th of a given year must provide notice no later than October 1st of that year, unless that October 1st is a weekend or bank holiday, in which case notice must be given on the preceding business day.<br><br>Barring any Liquidation Trigger (as described below in this section), Redemption requests will be processed, and monies returned to Investors' PeerStreet account, no later than the 1st day of the month following the Redemption Eligibility Date (or, if such day is on a weekend or bank holiday, on the next business day); provided, however, that requests received after the Redemption Cutoff Date of the previous month will not be processed until the 1st day of the subsequent month. For the avoidance of doubt, Investors will not be permitted to redeem any RWN Investment prior to the Redemption Eligibility Date for such RWN Investment. Monies invested in RWNs will not be investable in other PeerStreet investment products or withdrawable to Investors' bank accounts until the earlier to occur of (i) the Maturity Date or (ii) Redemptions being processed. PeerStreet may in the future enable Investors to immediately transfer funds from RWNs to other investment products or to withdraw directly to their bank accounts (bypassing the need to first go to Investors' regular PeerStreet account), but those features do not yet exist and may never be developed.<br><br>While PSFLLC endeavors to timely meet all Redemption requests, the availability of cash for Redemptions depends on a number of factors including, without limitation, how much of the Warehouse Funds are being held in cash (as opposed to |

Permitted Investments) at any given time. The Warehouse Entities are not obligated to keep any cash reserves and may invest all Warehouse Funds in non-cash Permitted Investments or use them for other Eligible Activities at any given time.

As PSFLLC receives Redemption requests, it will make similar requests to each Warehouse Entity under the terms of the Warehouse Loan(s). Subject to the conditions below, each Warehouse Entity will be required to make the corresponding payment to PSFLLC, who will then use such funds to remit payments to Investors. **If there aren't sufficient Warehouse Funds held in cash to meet a given month's request,** the Warehouse Entity will be responsible for selling its Participation Interests or finding other capital sources (including, without limitation, PSFI as guarantor) to remit payment to PSFLLC.

In order to protect Investors' interest in RWNs and the value of the collateral for the Warehouse Funds, as well as to allow for the orderly distribution of Investor principal and interest and the orderly sale of Participation Interests or Financed Loans (if necessary), PSFLLC may (in its sole and absolute discretion) elect to temporarily halt Redemptions upon the occurrence of any of the following events:

- **If more than 25% of then outstanding principal due on all RWNs issued by PSFLLC pursuant to this Supplement is redeemed within a single calendar month (a "Material Aggregate Redemption") and a Warehouse Entity fails to timely pay back the corresponding sums to PSFLLC;**

- **If a Warehouse Entity defaults under the terms of the Warehouse Loan;**

- **If a Warehouse Entity or PSFI makes an assignment for the benefit of creditors, files a voluntary petition in bankruptcy, is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, or seeks or consents to the appointment of a trustee, receiver or liquidator for itself or of all or any substantial part of its assets; or**

- **If reasonably necessary in the good faith opinion of PSFLLC to allow for the orderly liquidation of the Pocket 3-Month program and the return of Investors' monies.**

A halt in Redemptions shall be considered a **"Liquidation Trigger."** Upon a Liquidation Trigger occurring, the Warehouse Loan shall be suspended and the corresponding Warehouse Entity shall be barred from using any Warehouse Funds then held in cash for other Eligible Activities.

In the event of a Material Aggregate Redemption, the corresponding Warehouse Entity shall have one hundred twenty (120) days, from the day that PSFLLC notifies it of such an event, to pay back to PSFLLC all sums due under the Warehouse Loan. In the event that the Warehouse Entity fails to pay back all sums within this time period, PSFLLC shall be entitled to exercise its rights and remedies against the Warehouse Entity and PSFI to their fullest extent, including, without limitation, taking title to or interest in the Servicing Advance Receivables, Participation Interests and Financed Loans and disposing of such loans or interests as it deems fit in order to return sums owed to RWN holders.

In the event of a Liquidation Trigger, PSFLLC is under no obligation to immediately liquidate Financed Loans but will proceed with the liquidation of Financed Loans in its discretion. The timing of post-Liquidation Trigger distributions of principal and interest to Investors may vary greatly, depending on prevailing market conditions, the payment status of Financed Loans and/or Servicing Advances, and other factors. In these circumstances, PSFLLC will endeavor to distribute cash to Investors as it becomes available but may elect (in its sole and absolute discretion) to retain some cash as reserves to cover third-party fees and costs (such as, without limitation, servicing fees, legal fees, servicing advances, etc.) associated with the disposition of Financed Loans pursuant to the Liquidation Trigger.

All payments made to Investors after a Liquidation Trigger will be net of any fees and expenses, charges or other reimbursements payable to PSFLLC and third-party service providers associated with the disposition of Financed Loans. If the post-Liquidation Trigger sale of Financed Loans and underlying Non-Financed Loans by PSFLLC generates greater returns than was owed to holders of RWNs prior to the Liquidation Trigger, the Investors will be entitled to all excess returns. Conversely, however, if the post-Liquidation Trigger sale of Financed Loans and underlying Non-Financed Loans does not generate sufficient cash to pay all expenses and return all sums owed to Investors, and neither the Warehouse Entity nor PSFI can cover the shortfall, Investors may lose some or all of their RWN investment. While the Warehouse Entity and PSFI may be liable to PSFLLC for any shortfall, PSFLLC's obligations to Investors is limited to monies actually received from the Warehouse Entity and PSFI and/or the sale of Financed Loans.

**Fees**

PSFLLC does not charge Investors fees in connection with the sale of, and distribution of payments under, the RWNs.

The foregoing notwithstanding, upon a Liquidation Trigger, PSFLLC may incur fees, costs, and charges, in connection with the servicing or liquidation of Financed Loans, the enforcement of its rights against the Warehouse Entity and PSFI, and other similar circumstances. In such an event, PSFLLC shall be entitled to full reimbursement of such fees, costs, and charges (other than Servicing Advances), prior to proceeds being distributed to Investors. PSFLLC may engage affiliates to perform the aforementioned services, provided that such services are performed at prevailing, fair, arm's length rates.

Other examples of Financed Loan advances that PSFLLC may elect to make in the event that it takes legal title to Financed Loans after a Liquidation Trigger include, without limitation: (i) foreclosure related fees and costs (such as attorneys' and

|  | property management fees), (ii) property taxes, (iii) property maintenance and/or repairs, (iv) broker fees, (v) miscellaneous legal or other professional fees and expenses, and (vi) other encumbrances, etc.  In order to make these advances, PSFLLC may need to take loans from third-parties or related entities, in which case these loans may have priority in repayment over funds to be distributed to Investors. |
|  | PSFLLC may make these Financed Loan advances when, in its sole and absolute discretion, it determines in good faith that making these advances will ultimately be the most effective course of action. PSFLLC is under no obligation to make any such advances and PSFLLC's decisions regarding when to make these advances may differ from what an individual Investor would do. PSFLLC may also, in its sole and absolute discretion, reduce or waive some fees and costs. When PSFLLC elects to make these advances, it shall be entitled to recover such advances prior to any payments being made to Investors. These advances will be reimbursed prior to any funds being distributed on RWNs. If the Financed Loans cannot be sold and go into default, PSFLLC may need to foreclose on such loans and take title to the underlying property (each, an "REO"), in which case additional expenses may be incurred. |
| **Defaults and Deferrals** | Pursuant to the terms of the Warehouse Loan, a Warehouse Entity and PSFI may have grace periods to cure potential defaults.  If the Warehouse Entity and PSFI fail to timely cure a default, PSFLLC may exercise its discretion in the timing of the filing of any legal action or contractual remedy and may also exercise its discretion in the timing of any foreclosure under the power of sale contained in the security instrument (if any) for each Financed Loan and Non-Financed Loan where Servicing Advances have been made by PSFI, including granting temporary forbearances for borrowers to cure defaults, based on PSFLLC's overall assessment of the default and market conditions generally. |
| **Extensions** | Upon the Maturity Date, PSFLLC and the Warehouse Entity may elect to enter into an extension agreement, extending the term of the Warehouse Loan. In such an event, an Investor's RWN will continue accruing interest until the earliest of (i) Redemption by the Investor or (ii) the end of the extension term. |
| **Ranking** | RWNs will be limited, unsecured obligations of PSFLLC only and are not direct obligations of any borrower, lender, or PSFLLC affiliate, including the Warehouse Entities, PSFI and PSI. PSFLLC is the Investors' only counter-party and PSFLLC's obligations are limited to passing through payments received from the Warehouse Entities and PSFI, if any. |
| **No Sinking Fund** | RWNs will not benefit from any sinking fund, which is a means of repaying debt through the issuance of a debt instrument requiring periodic payments to a trustee who retires part of that debt by purchasing the debt in the open market. |
| **Denomination** | Each RWN will be denominated in U.S. dollars. |
| **Issuance, Form and Registration of Ownership** | Investors in Pocket 3-Month will receive a single RWN evidencing all investments by such Investor in Pocket 3-Month (each such investment, including any capitalized interest thereon, an **"RWN Investment"**). The RWN will be issued in electronic form on the PeerStreet Platform as soon as practicable following a given RWN Investment. As Investors invest more monies into, or redeem funds from, |

Pocket 3-Month, the electronic RWN will be adjusted to reflect the new outstanding principal. Similarly, as the RWN Rate is adjusted, the Investor's RWN on the PeerStreet Platform will be automatically updated. PeerStreet will record for each RWN Investment (such record, the **"RWN Schedule"**) the outstanding principal amount, the applicable RWN Rate, the issue date and the current Investment Period end date. The RWN Schedule may be included as a schedule to the RWN, or otherwise made available to the Investor on the Pocket 3-Month Dashboard and will be conclusive absent manifest error.

Each RWN Investment shall be deemed a separate "purchase" for purposes of this RWN Supplement.

RWN holders will not receive physical notes.

### 4.  The Diligence Process

PeerStreet does not provide investment advice or make any representation as to any particular investment's desirability. While Warehouse Funds are made available to the Warehouse Entities to, among other things, acquire Participation Interests, make Servicing Advances, and/or acquire interest in Servicing Advance Receivables, PSFLLC acts as a capital provider; it does not independently underwrite any of the Mortgage Loans.

PSFI itself will typically fund loans based on its own investors' demand and generally limits its role to reviewing mortgage loan files associated with the borrower on the loan, obtaining some background information for the borrower, obtaining third-party opinions of value for any underlying real estate, and obtaining title insurance or coverage protection letters. Each Warehouse Entity will typically purchase Participation Interests, make Servicing Advances, or acquire interest in Servicing Advance Receivables on demand from PSFI. PSFLLC cannot guarantee accuracy, absence of mistakes, and/or outcomes. Investors should perform their own respective due diligence on warehouse financing risks and RWNs, and should not rely on any evaluation or analysis performed by PeerStreet.  Investors should independently assess the risks associated with any investment, including, without limitation, repayment risk associated with RWNs, borrowers on Financed Loans, rights under Non-Financed Loans, market risk associated with the property, and regulatory, casualty and environmental risks.

### 5.  Risk Factors Related to RWNs

*Investing in the RWNs involves a high degree of risk.  In deciding whether to purchase RWNs, you should carefully consider the following risk factors **in addition to those risk factors provided in the "General Risk Factors" section of the PPM**.  Any of the following risks could have a material adverse effect on the value of the RWNs you purchase and could cause you to lose all or part of your purchase price or could adversely affect future payments you expect to receive on the RWNs.  Only investors who can bear the loss of their entire investment should purchase RWNs.*

**Consider carefully the following risks related to the structure of the RWNs specifically:**

- You May Not Recover Principal or Interest.  The Warehouse Entity (and PSFI as guarantor) are liable on the corresponding Warehouse Loan regardless of the performance of the Financed Loans or Non-Financed Loans. If the Warehouse Entity and PSFI default on the Warehouse Loan, or PSFLLC otherwise does not receive all or part of the payments due thereunder, you will not receive the full principal and interest payments that you expect to receive on your RWNs, and

you may not recover your original investment. Although PSFLLC will seek to protect its interest in Warehouse Funds through various strategies, those strategies may not provide RWN holders with full protection of their principal, if any.

RWNs are limited obligations of PSFLLC, representing an indirect interest in PSFLLC's rights in the Warehouse Loan. As such, payments on the RWNs are dependent on the Warehouse Entity's and PSFI's performance and solvency. PSFI engages in real estate lending and servicing operations, which are regulated, cyclical businesses with high costs of capital and where the use of debt and leverage is prevalent. Many factors could affect PSFI's solvency and, should PSFI become insolvent, payments to RWN holders may be indefinitely delayed and impaired. If PSFI or the Warehouse Entity file for bankruptcy or otherwise become insolvent, this could also impact PSFLLC's ability to collect Servicing Advance Receivables, take legal ownership of Financed Loans, liquidate those loans, or even seize or distribute that portion of Warehouse Funds then-advanced to and held in cash by, the Warehouse Entity.

Although the Warehouse Entity and PSFI are liable regardless of the performance of Financed Loans or Non-Financed Loans, those loans' performance (or lack thereof) may affect the Warehouse Entity and PSFI's ability to timely make payments on the Warehouse Loan. With respect to some or all of the Financed Loans, PSFI may have a maximum number of days from the day that the Warehouse Entity acquires Participation Interests therein in which it is required to sell or assign such Financed Loan to another investor or otherwise repurchase such Financed Loan. However, the remaining Financed Loans may not have any such limitation and may be held for significantly longer periods of time in the discretion of PSFI. If the borrower on an underlying Financed Loan fails to make payments due thereunder or such loan otherwise goes into default before PSFI sells its interest in such loan, PSFI may need to extend the borrower's time to payoff the loan, structure alternative settlements and resolutions, and/or enter into foreclosure proceedings (where it has foreclosure rights) against the relevant borrower. In addition, PSFI may not be able to collect Servicing Advance Receivables or recoup Servicing Advances made by PSFI. The missing interest income and the impaired value of a Financed Loan or this failure to collect on Servicing Advance Receivables or recoup Servicing Advances made by PSFI may negatively impact the Warehouse Entity's and PSFI's ability to make payments under the Warehouse Loan.

These same risks may also apply to PSFLLC directly if PSFLLC has to take over legal title to the Financed Loans due to a default or for other reasons. This means that, despite the fact that the Warehouse Entity and PSFI are the expected primary sources of payments for the RWNs, Investors are also exposed to underlying real estate risk. In certain cases, PSFLLC may not be able to recover any of the Warehouse Funds. As a result, an Investor that purchased an RWN may receive little, if any, of the unpaid principal and interest on that RWN.

- <u>Security on, or Participation in, Financed Loans or Servicing Advances or Servicing Advance Receivables Does Not Eliminate Risk of Default</u>. The Participation Interest and the Warehouse Entities' interest in Servicing Advances and Servicing Advance Receivables as collateral for Warehouse Funds do not ensure timely repayment or remove the risk of loss. PSFLLC may have to follow certain procedural and/or legal measures to take title to Financed Loans or liquidate Non-Financed Loans (in cases where it has such rights) in the event of a default under the Warehouse Loan. This could delay PSFLLC's disposition of the underlying Mortgage Loans in the event of a Liquidation Trigger and, in turn, indefinitely delay PSFLLC's distributions to Investors.

- <u>RWNs are Exposed to Real Estate Risk</u>. While the Warehouse Entities are expected to make payments under the Warehouse Loan(s) regardless of the Mortgage Loans' performance, and payments on RWNs are thus not exclusively reliant on Mortgage Loans' performance, the impairment or non-performance of the Mortgage Loans may negatively affect a Warehouse Entity's ability to make payments to PSFLLC and may also negatively affect the value of the collateral for the Warehouse Funds. For these reasons, while payments on RWNs are not directly linked to the performance of underlying Mortgage Loans, Investors nonetheless have exposure to the underlying real estate and borrower risk. Investors are highly encouraged to familiarize themselves with the risks associated with real estate finance prior to investing in RWNs. Below are some, but not all of the risks to consider.

- If a Financed Loan or Non-Financed Loan where PSFI made Servicing Advances becomes past due or is otherwise in default, PSFI or a third-party may need to foreclose on any property tied to that loan at a foreclosure sale unless the property is purchased by a third-party bidder at the foreclosure sale. If PSFI cannot quickly sell such property and the property does not produce any significant income, the cost of owning, maintaining, and selling the property would reduce any proceeds gained through the sale. If the foreclosed property cannot be sold for net proceeds that can fully return the outstanding amount of the RWNs and the Warehouse Entity is unable to pay the shortfall, RWN holders may lose all or part of their investment.

  o Foreclosure statutes vary widely from state to state. Properties tied to defaulted Financed Loans or Non-Financed Loans where PSFI made Servicing Advances will need to be foreclosed upon in compliance with the laws of the state where any underlying property is located. Many states require lengthy processing periods or the obtaining of a court decree before a mortgaged property may be sold or otherwise foreclosed upon. Further, statutory rights to redemption and the effects of anti-deficiency and other laws may limit the ability for PSFI or a third party to timely recover the value of the Financed Loan or Non-Financed Loans where PSFI made Servicing Advances in the event that a borrower defaults on such a loan. A bankruptcy of the borrower will prevent PSFI from exercising its foreclosure remedy promptly.

    Bankruptcy courts have broad powers to permit a sale of the mortgaged property free of PSFI's lien, to compel PSFI to accept an amount less than the balance due under the Mortgage Loan and to permit the borrower to repay the loan over a term which may be substantially longer or at different interest rates than the original terms of the Mortgage Loan.

  o While PSFI may have security interests in the Financed Loans, those security interests may decline in value. The value of a security interest will be subject to the risks generally incident to the ownership of improved and unimproved real estate, including changes in general or local economic conditions, increases in interest rates for real estate financing, physical damage that is not covered by insurance, zoning, entitlements and other risks. Many real estate companies expect to use resale proceeds to repay their loans. A decline in property values could result in loan amounts being greater than the associated property value, which could increase the likelihood of the borrower failing to make payments on the Mortgage Loan. Factors negatively impacting the property, such as, without limitation, deferred maintenance, upkeep costs, lack of occupancy, etc., may completely eradicate the value of the security interest and/or the property itself.

  o Issues with title to the underlying property or loan may affect recovery. For example, without limitation, borrowers may acquire title to the underlying property via fraud or

forgery, which may invalidate any security interest that borrower has granted. As another common example, without limitation, there may be prior liens against the property that PSFI believed to be paid off and which may foreclose out PSFI's lien. Generally, PSFI will procure title insurance policies to protect against these types of risks, but title insurance companies may refuse to disburse insurance proceeds, may disburse a smaller amount than the Mortgage Loan, and/or may take years to issue payment on a policy. Some title insurance policies may also be issued fraudulently by purported title agents.

- All RWNs Offered Are Unsecured.  While the Warehouse Loan itself is at all times collateralized by cash, the Warehouse Entities' interests in Servicing Advances and Servicing Advance Receivables, and/or Participation Interests, the RWNs offered under this RWN Supplement are special, limited obligations of PSFLLC only and are not themselves secured by any collateral or guaranteed or insured by any governmental agency or instrumentality or any third party. Pocket 3-Month is not a checking account, savings account, CD, or other bank product and the RWNs are not insured by the FDIC or SIPC. While Financed Loans and Non-Financed Loans may be secured by a mortgage, deed of trust, security agreement, legal title, personal guarantee or other mechanism, RWNs will not represent an obligation of the borrower, original lender or any other third party except PSFLLC, through which payments (if any) from a Warehouse Entity will flow. Investors may look only to PSFLLC for interest payments on RWNs.  If a Warehouse Entity and PSFI default under the Warehouse Loan and PSFLLC cannot recover any or part of Investors' monies invested in RWNs, Investors may not receive any or part of their investment.  Investors will not be able to pursue collection against the Warehouse Entities, PSFI or borrowers on Mortgage Loans.

- PSFI Pools Acquired Mortgage Loans Which Creates Risks.  PSFI may hold many Mortgage Loans at any given time, including Mortgage Loans that are not Financed Loans. While the Warehouse Entities will have Participation Interests, other borrowers, creditors, or third-parties may assert claims against PSFI and may try to reach the totality of PSFI's assets, including, without limitation, the Financed Loans. Similarly, if PSFI were to become bankrupt it or its creditors may assert claims against the entirety of the loans in which PSFI has legal or beneficial interest. While the Warehouse Loan seeks to mitigate such risks, there are no guarantees that the mitigation tools will be successful and that the Financed Loans will not become commingled with other assets and subject to judgments, liens, or other judicial or non-judicial proceeding. If a court commingles PSFI's assets, creditors may make claims against assets that would otherwise have been used to make payments to Investors. If this were to occur, you may be unable to recover all or part of your investment in RWNs. If PSFI becomes bankrupt, PSFLLC may be unable to recover payments from PSFI and, in turn, would be unable to make payments to Investors in RWNs unless it could both perfect its interest in the Financed Loans and have them payoff in full or sell them or collect on Servicing Advance Receivables or recoup Servicing Advances financed by Warehouse Funds for amounts sufficient to repay Investors.

- PSFLLC Pools Funds Invested in RWNs and Other Products.  PSFLLC pools proceeds it receives from the Warehouse Entities with respect to the Warehouse Loan(s) and proceeds it receives from other warehouse loans, and it sells RWNs (and other products, such as MPDNs) to multiple investors. In the event of litigation regarding any specific Financed Loan, warehouse loan, RWN, or MPDN, the entirety of assets held by PSFLLC could end up subject to a judgment, bankruptcy court determination, or other event that would impair recovery of Investors' investment. Namely, but without limitation, such judgment could result in other creditors seizing assets to which Investors would otherwise be entitled.

- <u>Other Investors May Receive Better Terms</u>.  PSFLLC does not anticipate offering different terms to different Investors, but reserves the right to do so, as well as to offer incentives to individuals or classes of individuals on a discretionary basis. These incentives may increase the rate of return for Investors who receive them.

**Although payment on the RWNs is not tied to the performance of Mortgage Loans, the impairment of Mortgage Loans and their non-performance can affect a Warehouse Entity's (and PSFI's, as guarantor) ability to make its scheduled payments to PSFLLC, thus also affecting payments to RWN holders. Consider carefully the following risks related to the borrowers of those loans:**

- <u>Defaulting Borrowers</u>.  Each Warehouse Entity must make payments (when due) on the Warehouse Loan regardless of the performance of Non-Financed Loans where Warehouse Funds have financed Servicing Advances or were used to acquire interest in corresponding Servicing Advance Receivables or Financed Loans or of cash flows on its Participation Interests. Financed Loans' and underlying Non-Financed Loans' performance, however, may affect a Warehouse Entity's ability to timely meet its obligations. A portion of the Financed Loans or underlying Non-Financed Loans may be delinquent loans for which a scheduled payment remains unpaid for a period following the original due date for such payment, in whole or in part. Such delinquent Financed Loans and/or underlying Non-Financed Loans are at increased risk of nonpayment, although the Warehouse Loan may seek to mitigate such risk by reducing the advance rate for delinquent Financed Loans and/or underlying Non-Financed Loans. If a borrower remains in default on any Financed Loan and/or underlying Non-Financed Loans and fails to cure that default after a reasonable period of time, then PSFI may foreclose on the real estate corresponding with that Financed Loan and/or underlying Non-Financed Loans, in cases where PSFI has such rights.  PSFI might have difficultly enforcing its foreclosure rights, however.  Some states have far longer and costlier foreclosure processes than others. It is the Investors' responsibility to familiarize themselves with various states' foreclosure laws and other risks relating to real estate lending prior to making an investment in RWNs. Even if PSFI, or another PeerStreet entity or third-party participant, can successfully foreclose on a property, it may not be able to then sell the collateral for prolonged periods of time or to recover all (if any) funds back from such a sale.

- <u>PSFI May Advance Funds to Borrowers of Financed Loans</u>.  PSFI may determine to advance funds to a borrower of a Financed Loan if it finds such an advance to be necessary and prudent to protect the interests of Investors.  For example, PSFI might do so upon finding that a borrower's casualty insurance was cancelled or expired or that a borrower is delinquent on paying property taxes.  These advances will be added to the amount of the Financed Loan and may bear interest at reasonable rates (not to exceed the maximum rate allowed by law).  Advances at these rates may be significantly more expensive for the borrower than if that borrower had paid for those expenses originally.  These advances will also need to be repaid by borrowers before any existing balance of the Financed Loan is paid down, which, unlike Servicing Advances for Non-Financed Loans (and associated Servicing Advance Receivables), will reduce the proceeds ultimately provided to Investors if the Warehouse Entity and PSFI default and PSFLLC must take over legal title to the Financed Loans.

- <u>Borrowers Face Insurance Risks</u>. PSFI may, in its sole and absolute discretion, require certain borrowers to obtain insurance against risks faced by the Financed Loan and/or the Non-Financed Loans where Warehouse Funds have financed Servicing Advances or were used to acquire interest in corresponding Servicing Advance Receivables.  This insurance may prove costly or could become unavailable for borrowers altogether.  Real estate properties are typically

insured against risk of fire damage and certain other property casualties, but these casualties are sometimes not covered by severe weather or natural disaster events such as landslides, earthquakes or floods.  Changes in the conditions affecting the economic environment in which insurance companies do business could affect the borrower's ability to continue insuring any underlying property at a reasonable cost or could result in insurance being unavailable altogether. Moreover, any hazard losses not then covered by the borrower's insurance policy would result in the Financed Loan and/or Non-Financed Loan becoming significantly under secured.

- Lenders and Borrowers May Provide False Information. PSFI relies on information provided to it by lenders and borrowers.  That information may be incomplete, inaccurate or intentionally false. For example, borrowers provide a variety of information to us regarding their management of properties that PSFI may take a security interest in.  Information provided by third parties may be incomplete, inaccurate, intentionally false or may misrepresent the intentions of the third parties. PSFI may make attempts to verify some of the information provided to it by third parties, but, as a practical matter, it cannot verify all of it.

- Lenders Are Subject to Regulation.  The lending industry is a highly regulated industry.  The lenders PSFI works with (e.g., banks and private lenders) are responsible for their compliance with applicable state and federal lending laws, and we have no control over their compliance. Although PSFI may purchase Mortgage Loans from lenders and then act as lender to the borrowers associated with those loans, PSFI has no control over their compliance with applicable federal or state law.  These lenders may be subject to licensing requirements in one or more states.  PSFI does not and cannot guarantee their compliance with applicable laws, including with respect to their compliance with applicable licensing requirements.

  In the event that a lender fails to comply with applicable laws, it is possible that the loans originated by the lender would be deemed void in full or in part or would be otherwise unenforceable.  Similarly, any Financed Loan provided to a borrower by that lender that PSFI subsequently funded and purchased may prove unenforceable as a result of lender's non-compliance with applicable laws.

- Federal Regulation of Loans.  Some of the Mortgage Loans may also be subject to certain provisions of the Truth-In-Lending Act of 1968, the Home Ownership and Equity Protection Act, or other applicable laws and rules concerning loans.  These regulations may impose additional disclosure and other requirements on creditors.

**Consider the following risks regarding the absence of trustees and fiduciary obligations:**

- There Will Be No Trustee for RWNs.  Because there is no trustee involved in the structure of the RWNs, Investors in the RWNs will not have the protection of a trustee, an indenture or the provisions of the Trust Indenture Act of 1939, which would require a trustee to represent your interests and the interests of other Investors in RWNs.

- There is No Fiduciary Relationship Created between PeerStreet and RWN Holders. None of PSFLLC, the Warehouse Entities, PSFI, PSI, other PeerStreet entities, or the Special Members are fiduciaries or owe fiduciary obligations to Investors. While each Warehouse Entity has Special Members to add layers of control over its operations, those Special Members are not fiduciaries, make no representations and warranties to Investors, do not have any privity with Investors, and are not in any way liable to Investors.

### 6.  Material U.S. Federal Income Tax Considerations

Investing in RWNs issued under this RWN Supplement may carry significant tax implications. You should not regard the contents of this RWN Supplement or any other communication from PeerStreet as a substitute for careful and independent tax and financial planning.  You are encouraged to consult with your own independent accountants, financial planners, attorneys and other professionals with respect to the legal and tax aspects of an investment in the RWNs with specific reference to your own tax situation before investing in any RWNs. PeerStreet makes no representations as to any tax implication of investing in the RWNs offered on its Platform.

### 7.  Limited Liquidity, Restrictions on Transfer, and Restricted Security

RWNs are "restricted securities" and may not be resold or otherwise disposed of unless a registration statement under the Securities Act covering disposition of the RWNs is then in effect or an exemption for the transfers is available.  Accordingly, the RWNs are subject to restrictions on transferability and resale and may not be transferred or resold without PSFLLC's prior written consent, and only then as permitted under the Securities Act and applicable state securities laws.

There is no public market for the RWNs, and none is expected to develop in the future.  The RWNs offered through the PPM and the RWN Supplement should be purchased only by investors who have no need for liquidity in their investment, as investors will have to bear the financial risks of an investment in the RWN for an indefinite period of time.

---

End of RWN Supplement Document

## EXHIBIT 25

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- x

In re:            :     Chapter 11

                            :

AMERICAN HOME MORTGAGE    :     Case No. 07-11047 (CSS)
HOLDINGS, INC.,             :
a Delaware corporation, <u>et al.</u>,    :     Jointly Administered

                            :    **Sale Procedures Hearing Date: April 21, 2009 at 2:00 p.m.**

Debtors.               :    **Sale Procedures Objection Deadline: April 20, 2009 at 12:00 p.m.**
                            :    **Sale Motion Hearing Date: May 15, 2009 at 1:00 p.m.**
                            :    **Sale Motion Objection Deadline: May 8, 2009 at 4:00 p.m.**

--------------------------------------------------------- x

## MOTION OF THE DEBTORS FOR ORDERS:
## (A)(I) APPROVING SALE PROCEDURES; (II) APPROVING PAYMENT OF EXPENSE REIMBURSEMENTS; (III) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN MORTGAGE LOANS AND REO PROPERTIES; (IV) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (V) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF MORTGAGE LOANS AND REO PROPERTIES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING SALE AGREEMENTS THERETO; AND <u>(III) GRANTING RELATED RELIEF</u>

American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>"), a Delaware

corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors

in possession in the above cases (collectively, "<u>AHM</u>" or the "<u>Debtors</u>"),[1] hereby submit this

motion (the "<u>Motion</u>"), pursuant to sections 105(a) and 363 of title 11 of the United States Code,

11 U.S.C. §§ 101 <u>et seq.</u> (the "<u>Bankruptcy Code</u>"), and Rules 2002, 6004 and 9014 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") for entry of two orders: (a) one,

substantially in the form annexed hereto as <u>Exhibit A</u> (the "<u>Sale Procedures Order</u>"): (i) approving

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>") (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("<u>AHM SV</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

13.    Specifically, the Debtors propose to pool and sell the Mortgage Loans and

REO Properties on an "as-is, where-is" basis, as follows:

(a)    <u>Second Lien Performing Loans Asset Pool</u>.  Home equity lines of credit or other mortgage loan products secured by a junior interest in real property where the mortgagor is current or less than thirty (30) days delinquent in its payment obligations as of March 31, 2009. The Debtors seek to sell approximately 131 of the Performing Second Lien Loans, none of which are ABN Mortgage Loans, with a total unpaid principal balance ("<u>UPB</u>") of approximately $6,709,327.

(b)    <u>Second Lien Non-Performing Loans Asset Pool</u>.  Home equity lines of credit or other mortgage loan products secured by a junior interest in real property where the mortgagor is more than thirty (30) days delinquent in its payment obligations as of March 31, 2009.  The Debtors seek to sell approximately 44 of the Non-Performing Second Lien Loans, none of which are ABN Mortgage Loans, with a total UPB of approximately $2,435,865.

(c)    <u>REO Properties Asset Pool</u>.  Properties owned by the Debtors through foreclosure.  The Debtors seek to sell approximately 26 REO Properties, of which approximately 7 are ABN Mortgage Loans, with a total UPB of approximately $7,559,970.

(d)    <u>First Lien Loans Asset Pool</u>.  Mortgage loans issued for purposes other than to finance the construction of housing secured by a first priority security interest in the real property.  The Debtors seek to sell approximately 19 First Lien Loans, of which approximately 7 are ABN Mortgage Loans, with a total UPB of approximately $3,828,721.

The number of Mortgage Loans that the Debtors propose to sell may decrease as a result of, for

instance, mortgagors satisfying their loan obligations.  The Debtors, after significant deliberation,

have concluded that pooling the Mortgage Loans and REO Properties as set forth above creates the

greatest likelihood of obtaining the maximum return for the estates.

14.    The Debtors have identified Vantium as the Stalking Horse Bidder, who

submitted formal, binding, unconditional, irrevocable bids (each, a "<u>Stalking Horse Bid</u>") for each

of the four Asset Pools. The following paragraphs in this section summarize key provisions of the

Stalking Horse Bids as set forth in the Sale Agreements attached to the Sale Procedures as <u>Exhibits</u>

1, 2, 3 and 4.[3]  These summaries are qualified in their entirety by reference to the actual Sale Agreements.

    (a)   Second Lien Performing Loans

        (i) Purchase Price.  The Purchase Price for this Asset Pool is approximately $628,538, or 9.177% of the UPB of the Asset Pool.

        (ii) Deposit.  Vantium shall provide a deposit in the amount of $50,000 for this Bid.

        (iii) Reduction for Non-Performing.  If any Mortgage Loan in the Asset Pool are non-performing as of the Closing Date, the Purchaser may specify an alterative purchase price for that Mortgage Loan.

    (b)   Second Lien Non-Performing Loans

        (i) Purchase Price.  The Purchase Price for this Asset Pool is approximately $6,960, or 0.2952% of the UPB of the Asset Pool.

        (ii) Deposit.  Vantium shall provide a deposit in the amount of $5,000 for this Bid.

    (c)   REO Properties

        (i) Purchase Price.  The Purchase Price for this Asset Pool is approximately $2,335,496 (UPB at time of foreclosure was approximately $9.8 million).  Approximately $808,066 of the Purchase Price proceeds will be paid to ABN.

        (ii) Deposit.  Vantium shall provide a deposit in the amount of $300,000 for this Bid.

        (iii) Removal for Properties Under Contract.  Debtors reserve the right to remove any properties from the Asset Pool that are under contract prior to the Closing Date.

---

[3] The prices referenced in the Sale Agreements and in this Motion are based on a Cut-off Date prior to March 31, 2009.  Updated pricing will be provided when received by the Debtors.

      066585.1001

(d)    First Lien Loans

(i) Purchase Price. The Purchase Price for this Asset Pool is approximately $1,193,782, or 31.35% of the UPB of the Asset Pool. Approximately $376,456 of the Purchase Price proceeds will be paid to ABN.

(ii) Deposit. Vantium shall provide a deposit in the amount of $100,000 for this Bid.

(iii) Reduction for Non-Performing. If any Mortgage Loan in the Asset Pool are non-performing as of the Closing Date, the Purchaser may specify an alterative purchase price for that Mortgage Loan.

15.    The Debtors, with the assistance of their financial advisors have determined that the sale of the Asset Pools pursuant to the Sale Procedures is a reasonable exercise of their sound business judgment, is consistent with their fiduciary duties to these estates, and will maximize the value of these assets for creditors of these estates.

**RELIEF REQUESTED**

16.    By this Motion, the Debtors seek the entry of two orders of this Court: (a) the Sale Procedures Order (i) approving the Sale Procedures, (ii) approving the Expense Reimbursements, (iii) scheduling the Sale Hearing, (iv) approving the form and manner of the Sale Procedures, including the Auction and Sale Hearing, (v) granting such other and further relief as is just and proper; and (b) the Sale Order (i) authorizing the Sale of the Asset Pools free and clear of Liens to the highest or otherwise best bid received at each Auction; (ii) authorizing and approving the form of Sale Agreement for each Asset Pool; and (iii) granting related relief. It is anticipated that the Asset Pools may be sold to multiple buyers. The Debtors seek approval of the Sale of each Asset Pool through separate Sale Agreements with different purchasers; provided that the Debtors reserve the right to seek approval of a combination bid in the event that a bid for a combination of the Asset Pools is determined by the Debtors to obtain the highest value for such Asset Pools.

DB02:7772423.8                                    066585.1001

the District of Delaware (the "Bankruptcy Court"), 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, by 4:00 p.m. (ET) on May 8, 2009; and (d) be served so as to be received by such date and time on: (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to the Committee; (iv) the Office of the United States Trustee; and (v) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b).

22.     Not later than two business days after the entry of the Sale Procedures Order, the Debtors will serve copies of the Notice of Auction, substantially in the form attached hereto as Exhibit D, by mail, postage prepaid to:  (i) all entities known to have expressed a *bona fide* interest in acquiring the any of the Asset Pools; (ii) counsel to the Committee; (iii) the Office of the United States Trustee for the District of Delaware; (iv) taxing authorities whose rights may be affected by a sale of one or more Asset Pools; (v) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; (vi) all parties who may assert a security or ownership interest in any of the Mortgage Loans or REO Properties; and (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Sale Procedures Order.

23.     Not later than five business days after entry of the Sale Procedures Order, the Debtors will publish the Notice of Auction, substantially in the form attached hereto as Exhibit D in the national edition of *The Wall Street Journal*.  Additionally, the Debtors will use their best efforts to cause the Notice of Auction to be posted on the Bloomberg newswire service.

**D.    Expense Reimbursements**

24.     The Debtors seek to reimburse the certain parties for reasonable costs and expenses incurred in connection with the due diligence process (each, an "Expense Reimbursement").  Specifically, the Debtors propose to reimburse Vantium in the amount of $250 for each Mortgage Loan or REO Property, as applicable, for which Vantium is acting as a Stalking

11

Horse Bidder – approximately $57,000 (the "Stalking Horse Expense Reimbursement"). The

Stalking Horse Expense Reimbursement shall be payable out of the proceeds received from the

Sales. In addition, the Debtors shall not be entitled to pay the Stalking Horse Expense

Reimbursement if Vantium is determined to be the Successful Bidder (as defined in the Sale

Procedures).

      25.    The Debtors also seek authority to pay reasonable costs and expenses, not to

exceed $100,000 in the aggregate, in connection with the due diligence process of potential bidders

(excluding Vantium) designated by the Debtors, subject to the criteria below and in consultation

with the Committee (the "Bidder Expense Reimbursement"). The Bidder Expense Reimbursement

shall be paid to one or more potential bidders and in such amounts, not to exceed $100,000 in the

aggregate, that the Debtors determine in their discretion and with the consent of the Committee.

Notwithstanding the foregoing, if a potential bidder is notified that they shall be entitled to a

portion of the Bidder Expense Reimbursement, such Bidder Expense Reimbursement shall only be

payable to the extent such bidder submits a Qualified Bid (as defined in the Sale Procedures). The

Bidder Expense Reimbursement shall be payable only out of the proceeds received from the Sales.

In addition, the Debtors shall not be entitled to pay the Bidder Expense Reimbursement to a bidder,

if that bidder is determined to be the Successful Bidder (as defined in the Sale Procedures).

      26.    Additionally, the Debtors seek an Expense Reimbursement (the "Restoration

Expense Reimbursement") for Restoration Capital, RC5, LLC ("Restoration") in the amount of

$5,946.52 to compensate for due diligence costs related to the First Lien Construction Loans Asset

Pool, which has been removed from the Asset Pools to be sold pursuant to these Sale Procedures.

Restoration had initially agreed to act as stalking horse bidder for the First Lien Construction

Loans Asset Pool and the Debtors, in consultation with the Committee, had agreed to seek an

12

expense reimbursement for Restoration for its willingness to act as the stalking horse bidder. ABN

subsequently decided to withdraw their loans from the First Lien Construction Loans Asset Pool,

materially changing the contents and value of the pool. Restoration expended $5,946.52 prior to

the withdrawal of the ABN Mortgage Loans from the First Lien Construction Loans Asset Pool

and the Debtors' decision not to sell the First Lien Construction Loans Asset Pool pursuant to these

Sale Procedures.

## AUTHORITY FOR REQUESTED RELIEF

**A.    The Sale is Within the Sound Business
Judgment of the Debtors and Should be Approved**

27.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy

Code does not set forth a standard for determining when it is appropriate for a court to authorize

the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this

Circuit and others have required that the decision to sell assets outside the ordinary course of

business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d

389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.,

(In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

28.    The "sound business judgment" test requires a debtor to establish four

elements in order to justify the sale or lease of property outside the ordinary course of business,

namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware corporation, | ) | |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors | ) | **Ref. Docket No. 7258** |

**ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE: (I) APPROVING SALE PROCEDURES; (II) APPROVING EXPENSE REIMBURSEMENTS; (III) SCHEDULING A HEARING TO CONSIDER SALE OF CERTAIN MORTGAGE LOANS AND REO PROPERTIES; (IV) APPROVING FORM AND MANNER OF NOTICE THEREOF; AND (V) GRANTING RELATED RELIEF**

Upon the consideration of the motion (the "Motion") of American Home Mortgage

Holdings, Inc., and certain of its direct and indirect affiliates and subsidiaries, the debtors and

debtors in possession in the above-captioned cases (collectively, "AHM" or the "Debtors"),[1]

pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101

et seq. (the "Bankruptcy Code"), for entry of an order:  (i) approving procedures (the "Sale

Procedures")[2] with respect to the proposed sale or sales (the "Sale") of pools of certain mortgage

loans and REO properties (collectively, the "Asset Pools"); (ii) approving the payment of the

Expense Reimbursements; (iii) scheduling a hearing (the "Sale Hearing") on the Sale and setting

objection deadlines with respect to the Sale; (iv) approving the form and manner of notice of any

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

[2] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion or the Sale Procedures.

Auctions for each of the Asset Pools; and (v) granting such other related relief as the Court deems just and proper; and the Court having determined that the relief provided herein is in the best interest of the Debtors, their estates, their creditors and other parties in interest; and due and adequate notice of the Motion and the Sale Procedures having been given under the circumstances; and upon the record of the hearing on the Motion, and the full record of these cases; and after due deliberation thereon; and good and sufficient cause appearing therefor:

FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

C.      For the reasons set forth in the Motion, due and adequate notice of the Motion and the Sale Procedures, and the subject matter thereof has been provided to all parties-in-interest, and no other or further notice is necessary.  A reasonable opportunity to object or to be heard with respect to the Motion and the relief requested therein has been afforded to all interested parties.

D.      The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief requested in the Motion.

E.      The Sale Procedures, substantially the form attached hereto as <u>Exhibit A</u>, are reasonable and appropriate and are designed to maximize the value to be achieved for the Asset Pools.

F.      The Debtors' proposed notice of bid deadlines, auction and sale (the "<u>Notice of Auction</u>"), substantially in the form attached hereto as <u>Exhibit B</u>, is appropriate and

2

reasonably calculated to provide all interested parties with timely and proper notice of the Sale and the Sale Procedures to be employed in connection therewith.

   G.  The entry of this Order is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.

  IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

   1.  The Motion is granted.

   2.  Except as otherwise expressly provided in this Order, all objections to the Motion or the relief provided herein that have not been withdrawn, waived or settled, are hereby overruled and denied on the merits.

   3.  The Sale Procedures are hereby approved and shall apply with respect to the Sales.

   4.  Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors are hereby authorized and empowered to (i) conduct the Sale for each of the Asset Pools in accordance with the Sale Procedures and (ii) enter into Sale Agreements for each Asset Pool with the respective Successful Bidders and the Second Best Bidders, which Sale Agreements shall be subject to approval by separate order(s) of this Court.

   5.  The Notice of Auction to be issued and published in connection with the proposed Sales is approved.

   6.  Not later than two business days after the entry of this Order, the Debtors will serve copies of the Notice of Auction, the Sale Procedures, and this Order by first-class mail, postage prepaid to: (i) all entities known to have expressed a *bona fide* interest in acquiring the any of the Asset Pools; (ii) counsel to the Committee; (iii) the Office of the United States Trustee for the District of Delaware; (iv) taxing authorities whose rights may be affected by a

3

sale of one or more Asset Pools; (v) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; (vi) all parties who may assert a security or ownership interest in any of the Mortgage Loans or REO Properties; and (vi) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of this Order.

7.      Not later than five business days after entry of this Order, the Debtors will publish the Notice of Bid Deadlines and Sale, in the national edition of *The Wall Street Journal*. Additionally, the Debtors shall use best efforts to cause the Notice of Auction to be posted on the Bloomberg newswire service.

8.      The Debtors shall post the Bids received by the Stalking Horse Bidder for each Asset Pool on their Intralinks website on or before 4:00 p.m. (ET) on April 20, 2009.

9.      The deadline for submitting final Bids shall be 5:00 p.m. (ET) on May 11, 2009.

10.     In the event that the Debtors receive two or more Qualified Bids for an Asset Pool, the Debtors shall conduct an auction (the "Auction") on May 13, 2009 at 10:00 AM (ET) at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware. Qualified Bidders may appear at the Auction in person or by telephone.

11.     A hearing to consider the Sales to the Successful Bidders and the Second Best Bidders at the Auction shall be held before this Court on May 15, 2009 at 1:00 p.m. (ET), or as soon thereafter as counsel and interested parties may be heard.

12.     This Order shall be binding upon the Debtors, all creditors of the Debtors, and any trustees appointed in these proceedings or any trustees appointed in any subsequent proceedings under chapter 7 or chapter 11 of the Bankruptcy Code relating to the Debtors, and all other parties-in-interest.

13.     The Debtors are hereby authorized and directed to pay the Stalking Horse Expense Reimbursement to the Stalking Horse Bidder in accordance with the terms of the Sale Procedures. The Stalking Horse Expense Reimbursement shall be paid as follows with respect to the applicable asset pool:

>    Second Lien Performing Asset Pool - $17,000
>
>    Second Lien Non-Performing Asset Pool - $0
>
>    REO Properties Asset Pool - $22,000
>
>    First Lien Loans Asset Pool - $18,000

14.     The Debtors are hereby authorized to pay the Bidder Expense Reimbursements, in their sole discretion, with the consent of the Committee and in accordance with the terms of the Sale Procedures; provided, however, that no bidder shall receive a Bidder Expense Reimbursement in an amount in excess of 3% of the Purchase Price for the applicable Asset Pool.

15.     The Debtors are hereby authorized to pay the Restoration Expense Reimbursement.

16.     The Debtors are hereby authorized to market and sell the ABN Mortgage Loans and remit the proceeds from the Sale of the ABN Mortgage Loans to ABN pursuant to the terms of the applicable sale order and Sale Agreement after deducting and retaining the Marketing Fee. Upon remitting the ABN Mortgage Loan proceeds to ABN, the Debtors shall have no further obligations with respect to the ABN Mortgage Loans.

17.     Notwithstanding anything to the contrary in this Order or the Sale Agreements, to the extent any of the Mortgage Loans or REO Properties are determined to be an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a

5

consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations), the Purchaser shall remain subject to the same claims and defenses that are related to such consumer credit transaction or such consumer credit contract to the same extent as the Purchaser would be subject to such claims and defenses of the consumer if such interest had been purchased at a sale not under section 363 of the Bankruptcy Code, as provided for in section 363(o) of the Bankruptcy Code.

18.    Pursuant to Bankruptcy Rules 7062, 9014, and 6004(h), this Order shall be effective immediately upon entry.

19.    This Court shall retain exclusive jurisdiction over any matters related to arising from the implementation of this Order and the Sale Procedures.

Dated:  _April 21_____, 2009
        Wilmington, Delaware

                                    _____
                                    Christopher S. Sontchi
                                    United States Bankruptcy Judge

**<u>EXHIBIT 26</u>**

**Letters Filed by Investors**

| Date | Docket No. | Party[1] |
|---|---|---|
| July 18, 2023 | D.I. 100 | Siva S. Reddy |
| July 24, 2023 | D.I. 108 | Jakow G. Diener |
| July 27, 2023 | D.I. 136 | Kevin Keegan |
| July 28, 2023 | D.I. 149 | Douglas Lyon |
| July 28, 2023 | D.I. 150 | Carl. A. Brown |
| July 31, 2023 | D.I. 154 | Tomas & Susan Cioffe |
| July 31, 2023 | D.I. 155 | John S. Sharp II |
| July 31, 2023 | D.I. 156 | Brent D. Lowe |
| August 1, 2023 | D.I. 160 | Rachel Joseph |
| August 1, 2023 | D.I. 161 | Olivier Meyjonade |
| August 2, 2023 | D.I. 164 | Murtha Kellrooney |
| August 2, 2023 | D.I. 165 | Todd Doersch |
| August 2, 2023 | D.I. 166 | Yazholi Kanikkannan |
| August 2, 2023 | D.I. 167 | Alex Tsui |
| August 2, 2023 | D.I. 170 & 240 | Anand Pradhan |
| August 3, 2023 | D.I. 176 | Roy Batchelor |
| August 3, 2023 | D.I. 177 | Qiang Fang |
| August 7, 2023 | D.I. 188 | Joseph & Christine Gigantino |
| August 7, 2023 | D.I. 189 | Vinodkumar Singh |
| August 7, 2023 | D.I. 190 | Gene B. Goldstein |
| August 7, 2023 | D.I. 191 | Varun B. Parekh |
| August 7, 2023 | D.I. 192 | David Anthony Pelner |
| August 7, 2023 | D.I. 193 | Jennifer Rodriguez |
| August 7, 2023 | D.I. 194 | James R. Pickard |
| August 10, 2023 | D.I. 204 | Nancy Navarini |
| August 10, 2023 | D.I. 205 | Steven Michael Gerstein Living Trust |
| August 10, 2023 | D.I. 206 | Shivakumar Rajaraman |
| August 11, 2023 | D.I. 216 | Jonathan Newman |
| August 11, 2023 | D.I. 217 | James Fariss |
| August 11, 2023 | D.I. 218 | Thomas Werth |
| August 14, 2023 | D.I. 224 | Mark Haiden |
| August 14, 2023 | D.I. 225 | Tomas Larsson |

---

[1]    The letters written by Messrs. Quinn [D.I. 107] and Tarpenning [D.I. 145] are not included herein as they are directly addressed in the Reply.

| August 14, 2023 | D.I. 226 | John Peta |
|---|---|---|
| August 14, 2023 | D.I. 227 | John W. Popeo |
| August 14, 2023 | D.I. 228 | Jason Elmore |
| August 14, 2023 | D.I. 229 | Thomas Blundell |
| August 15, 2023 | D.I. 230 | Michael Navarini |
| August 15, 2023 | D.I. 231 | Sherman Marital Share One Trust |
| August 15, 2023 | D.I. 232 | Cobra Ventures, LLC<br>Theodore Welter, Manager |
| August 15, 2023 | D.I. 233 | Welter Realty, LLC |
| August 15, 2023 | D.I. 234 | William R. Ahern |
| August 15, 2023 | D.I. 237 | Michael Preisach |
| August 15, 2023 | D.I. 238 | Sumeet Bansal |
| August 15, 2023 | D.I. 239 | Kelly Yang |
| August 16, 2023 | D.I. 243 | Brian Benitz |
| August 16, 2023 | D.I. 244 | Deborah Shepard |
| August 16, 2023 | D.I. 245 | Marc Franken Living Trust |
| August 16, 2023 | D.I. 246 | Tim Regan |
| August 16, 2023 | D.I. 247 | Nedjip Tozun |
| August 16, 2023 | D.I. 248 | Robert DiGruccio |
| August 17, 2023 | D.I. 254 | The Tuli Family Trust |
| August 17, 2023 | D.I. 255 | Luke Scrivanich |

## **EXHIBIT 27**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re: US Real Estate Equity Builder, LLC,

                                                 Case No. 20-21358-11

    Debtor.

_____

In re: US Real Estate Equity Builder
      Dayton, LLC,

                                                 Case No. 20-21359-11

    Debtor.

_____

### United States Trustee's Motion
### to Appoint Chapter 11 Trustee
_____

Under 11 U.S.C. § 1104(a), the United States Trustee moves the Court for an order to remove the debtors' principal, Sean Tarpenning, and order the appointment of a chapter 11 trustee in these two cases for these reasons:

1. Before and since filing for bankruptcy, Tarpenning oversaw the commingling of debtors' funds with each other and with entities not in bankruptcy.

2. Under Tarpenning's post-petition management, the debtors have continued to use the cash collateral of their secured lenders without consent and without court authority.

1

3.  Tarpenning may have misstated to other lenders or
    investors that they would receive security for their
    loans/investments, and the debtors are now facing
    federal and state securities investigations as listed on
    their schedules and statement of financial affairs.

4.  Tarpenning's corporate connections and insider
    dealings cast doubt on his trustworthiness and
    capabilities as a fiduciary and manager. Relevant
    assets and items are not disclosed on the debtors'
    schedules, which Tarpenning signed under penalty of
    perjury. And at the § 341 meeting of creditors,
    Tarpenning was unable or unwilling to explain his
    interests in and dealings with other companies, some
    of which are owned or controlled by insiders or close
    associates.

The appointment of a trustee under § 1104(a)(1) for fraud,

dishonesty, gross mismanagement, and other cause is warranted

based on Tarpenning's pre- and post-petition mismanagement and

conduct. The appointment is also justified under § 1104(a)(2)

because it would serve the best interests of creditors.

## Background

### A.  Pre-bankruptcy events

Sean Tarpenning is the debtors' president. His parents work in

real estate, and at 41, he has spent most of his adult life selling

real properties—except for a five-year term in a federal

2

penitentiary. In 2006, Tarpenning was one of 16 defendants charged in a drug-trafficking conspiracy whose operations stretched to Mexico. Tarpenning pleaded guilty and was sentenced to five years in prison followed by five years of supervised release.[1] Tarpenning's criminal history also includes a 2018 guilty plea to battery stemming from a confrontation with a girlfriend's stepfather.[2]

In 2015, Tarpenning formed USREEB LLC as the president and sole member. The company specialized in "turnkey" or "cash flow" real estate transactions, where USREEB or one of its closely held subsidiaries such as 1 Big Red, LLC, or 1 Big Blue, LLC purchased a residential or commercial property, repaired and remodeled it, placed a tenant in it, and then sold the property. In 2017, Tarpenning formed the Dayton company with the same business model for properties throughout southern Ohio. The companies financed acquisitions both through hard-money lenders

---

[1] *United States v. Tarpenning*, Case No. 4:06-cr-00337-FJG-12 (W.D. Mo.).

[2] Case No. 17CR00778, Johnson County (Kan.) Dist. Ct.

3

such as Aloha, Anchor, and Peerstreet. Some of these entities received deeds of trust or mortgages on specific properties. If a given deal worked as intended, the lender would receive monthly interest payments, sometimes on rates exceeding 30 percent, and then receive repayment of its principal at closing on the sale of the property to a new owner. Tarpenning personally guaranteed the loans made by the companies' lenders.

By 2018, the debtors were operating largely out of two locations: Tarpenning's home in Leawood, Kansas, and an office building owned by USREEB at 440 E. 63rd in Kansas City, Missouri. He had a staff of three employees: C.J. McKinney, an office manager; Hunter Beach, who managed construction; and an accountant, Louis or Lewis.[3] Tarpenning also worked closely with Mackaylee Beach, Hunter's sister. Ms. Beach owns Guardians of Travel, LLC, a real estate sales and marketing company headquartered out the USREEB office building. Beach lives with

---

[3] At the § 341 meeting, Tarpenning testified that he could not remember the accountant's last name.

4

Tarpenning, and they have a child together. Beach signed important real estate and title documents as a "manager" for USREEB or its subsidiaries, and Tarpenning acknowledged at the § 341 meeting that Beach was an "authorized signer" for his companies.

Beyond USREEB and the Dayton company, Tarpenning owns or controls interests in several other entities with operations that competed or overlapped with the debtors' operations. Several of the debtors' transactions were actually completed in the name of one or two subsidiaries, 1 Big Red or 1 Big Blue. Neither of these entities is in bankruptcy. At the § 341 meeting, Tarpenning was questioned about several other similar companies with integral connections to the debtors' business and to Tarpenning or other insiders, but he professed little knowledge of their operations or his interests in the companies, or said he thought they were defunct.

As Tarpenning testified at the § 341 meeting, the debtors' misfortunes began when some of the hard-money secured lenders, Aloha, Anchor, and Peerstreet, began refusing to issue payoff

5

statements and blocking the closings on multiple properties. The lenders then initiated foreclosures. Tarpenning alleges that these foreclosures were initiated wrongfully.  By 2019, the debtors' finances relied heavily on smaller individual or self-directed investors who would loan back the proceeds of a deal just completed. In some of those transactions, Tarpenning promised security in the form of a deed of trust or mortgage, but he would then file either an "affidavit of equitable interest" or nothing at all.

In May 2020, as the debtors were sliding into bankruptcy, Tarpenning formed another company, Always Ready, LLC, with the same business model. Tarpenning testified that he funded Always Ready with his own money.

## B.  Bankruptcy events

On October 2, 2020, USREEB and the Dayton entity filed separate chapter 11 petitions. The debtors' manager, Sean Tarpenning, signed, under oath, the bankruptcy petitions, schedules, and statements of financial affairs. As of the date of this

6

motion, there has been no motion for joint administration or substantive consolidation.

The schedules list several unsecured creditors mostly for lines of credit. Lenders such as Aloha, Anchor, and Peerstreet complete the list of secured creditors. The debtors listed none of their creditors' claims, secured or unsecured, as contingent, unliquidated, or disputed, except for a disputed $30,000 mechanic's lien and a disputed $5,000 debt to an individual for "alleged services," both in the Dayton case.

One notable omission from the schedules of the debtors  is Guardians of Travel, an entity controlled by Mackaylee Beach and headquartered at the same building as the debtors. Guardians of Travel has filed a proof of claim alleging a $625,000 claim secured by a deed of trust on one of USREEB's properties. No transfers to Guardians of Travel were listed on the USREEB statement of financial affairs.

On October 27, USREEB amended its statement of financial affairs where it disclosed that the Securities and Exchange

7

Commission sent USREEB a request letter in August 2020. Based on that disclosure, Tarpenning was asked at the § 341 meeting about any underlying allegations in the SEC action but said he knew nothing about them.

The § 341 meetings of creditors were held telephonically on November 10, 2020. (The U.S. Trustee has requested transcripts of the § 341 meetings. Although the transcripts have not been completed as of the filing of this motion, the transcripts, and any supplemental papers, will be filed as soon as possible.) The meetings collectively lasted about four hours. Several creditors, or their attorneys, and the proposed counsel for the unsecured creditors' committee participated in asking questions at the meetings of crediotrs. During the meetings, and under oath, Tarpenning's testimony as manager of the debtors highlighted corporate operations in serious disarray. Among the things that were elicited from Tarpenning's testimony:

- Before bankruptcy and continuing throughout the bankruptcy, Tarpenning commingled and continues to commingle the funds of USREEB with the funds of the Dayton company. His testified that the rental proceeds

8

from the Dayton company, which have been deposited in its separate bank account, were used to pay USREEB expenses. In fact, Tarpenning said, "They're the same, more or less, is how I've always run it."

- Tarpenning admitted under oath that both companies are using cash collateral belonging to secured creditors. He further testified that he was taking the rental income, which is cash collateral without the consent of their respective secured lenders and without court authority. Tarpenning acknowledged the use of cash collateral without consent or court order and specifically testified, "I'm not sure where it says that I need consent."

- As part of the testimony Tarpenning was asked about the use of his common practice of recording an "affidavit of equitable interest" instead of granting a deed of trust or mortgage in favor of investors. In response to these questions, Tarpenning claimed no recollection of ever doing so and refused to give any meaningful answers.

- With respect to questions about other liens against real property assets of the debtors, Tarpenning testified he recorded mechanic's liens for "services" purportedly rendered by one of his other entities.

- When asked about a number of properties held in the names of the debtors, at least before bankruptcy, he testified that the properties were transferred to Guardians of Travel, which is owned by his girlfriend and business associate Mackaylee Beach. These transfers were made for no consideration. Tarpenning acknowledged that he did not cause any of these transfers to be included in the debtors' schedules or statement of financial affairs.

- Guardians of Travel has filed a proof of claim for $625,000 that it claims is secured by a deed of trust from June 2020. Tarpenning testified that the debt arose from a loan to

9

help fund USREEB operations. Tarpenning did not sign the deed of trust on behalf of USREEB and 1 Big Red. Rather, Mackaylee Beach, who is not an officer or interest holder in either of the debtors or their related entities, signed the deed of trust in favor of Guardians of Travel. She is also the person who signed the Guardians of Travel secured proof of claim.

- At the meeting of creditors, Tarpenning testified that in May 2020, as the debtors were sliding into bankruptcy, Tarpenning formed a new company, Always Ready, LLC, which does the same type of business as the debtors and is essentially a competitor of the debtors. He testified that it has the same business model as the debtors' but is funded by his own money.

On November 19, the Court conducted a hearing on, among other things, the debtors' motion to use cash collateral and their motion to sell several properties. Based on a lack of disclosure of the terms of use, the Court set the cash-collateral motion for pretrial conference on December 1 and declined to authorize the use of cash collateral in the meantime. The Court continued the motion to sell subject to call to give the debtors time to provide sale paperwork to the lenders whose collateral would be sold.

## Law and Argument

Under 11 U.S.C. § 1104(a), the United States Trustee may seek

the appointment of a Chapter 11 trustee to manage the financial

affairs of a chapter 11 debtor. The statute provides:

> At any time after the commencement of the case but
> before confirmation of a plan, on request of a party
> in interest or the United States Trustee, and after
> notice and a hearing, the court shall order the
> appointment of a trustee—
>
> > (1) for cause, including fraud, dishonesty,
> > incompetence, or gross mismanagement of the
> > affairs of the debtor by current management,
> > either before or after the commencement of the
> > case, or similar cause, but not including the
> > number of holders of securities of the debtor or
> > the amount of assets or liabilities of the debtor;
> > or
> >
> > (2) if such appointment is in the interest of
> > creditors, any equity security holders, and other
> > interests of the estate, without regard to the
> > number of holders of securities of the debtor or
> > the amount of assets and liabilities of the
> > debtor.

The appointment of a chapter 11 trustee is an extraordinary

remedy based on a strong presumption in favor of leaving the

debtor in possession. Nevertheless, in an appropriate case, "the

appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are preserved.[4] The appointment of a chapter 11 trustee should better serve creditors, shareholders, and the public interest by promoting efficiency, effectiveness, and transparency, traits which may have been lost by current management.

Courts are divided on the burden of proof that a party moving for the appointment of chapter 11 trustee must carry. The majority of courts cite a clear and convincing burden, yet with little support in the language of the Code or in legislative history.[5] The Tenth Circuit, for its part, has not adopted that burden over the lower "preponderance of the evidence" standard.[6] But as this Court has observed, in practice, the appointment of a chapter 11 trustee "is

---

[4] *In re Celeritas Technologies, LLC, et al.*, 446 B.R. 514, 518 (Bankr. D. Kan. 2011) (citing *In the Matter of Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)).

[5] *Id.* at 518–19.

[6] *Id.* at 519 (citing *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 640 n.8 (Bankr. D.N.M. 2009)).

not a close call," with courts in several instances holding that even if the lower burden applied, the movants satisfied the higher burden anyway.[7] That is exactly the case here. Tarpenning's conduct as the debtors' manager is so egregious that replacing him with a chapter 11 trustee should not be a close call.

## A.  Under § 1104(a)(1), cause exists for the appointment.

Although § 1104(a)(1) provides fraud, dishonesty, incompetence, and gross mismanagement as specific examples of cause, but is not an exhaustive definition. Rather, the Code recognizes that what constitutes sufficient cause for the appointment of a chapter 11 trustee is a question of fact.[8] Once the court determines that the facts as presented establish cause, the statute mandates that the court "shall" appoint a trustee.[9] Thus, the Court may order the appointment of a chapter 11 trustee

---

[7] *Id.*

[8] *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989), 7 *Collier on Bankruptcy* ¶ 1104.02[3][a] (16th Ed. Rev.).

[9] *In re Oklahoma Refining Co.,* 838 F.2d 1133, 1136 (10th Cir. 1988). *See also Escoe v. Zerbst*, 295 U.S. 490, 493 (1935) (stating that "shall" is the language of command and its use in a statute indicates intent that the statute should be mandatory).

without a finding of fraud, dishonesty, incompetence, or gross mismanagement.[10]

These bankruptcies present ample evidence to support a finding of cause under § 1104(a)(1). Tarpenning fueled the debtors' pre-petition growth by promising substantial returns to investors over relatively short periods. But this financing model devolved into, at best, musical chairs, or, at worst, a Ponzi scheme. He also misled investors by promising security that he never effectively formalized. And to avoid the repercussions from his own actions, he started a new company, Always Ready, LLC, as a competitior.

As manager, Tarpenning's disregard for bankruptcy code formalities presents numerous obstacles to a successful reorganization in these bankruptcy proceedings. Tarpenning treats the two companies as one, diverting the Dayton company's rental income to cover USREEB's costs. To the extent that constitutes use of cash collateral without consent or court authority, the appointment of a chapter 11 trustee is imperative. And he

---

[10] *Oklahoma Refining,* 838 F.2d at 1136.

delegated authority—at least over signatures of the debtors and their affiliates—to Mackaylee Beach, his girlfriend, who runs a company that has a significant claim against the debtors. At the same time, he abuses the notion of corporate formalities by starting other LLCs such as Always Ready with precisely the same business model as the debtors' businesses. If Tarpenning is effectively running a competitor, how can he be trusted with carrying out a reorganization of the debtors?

As a result of starting a competitor, commingling funds of the debtors, ignoring his fiduciary responsibilities under the Bankruptcy Code to preserve the assets of the bankruptcy estates, and his failure to protect the cash collateral of the secured creditors substantiates and requires the immediate appointment of a chapter 11 trustee under § 1104(a)(1).

## 2.   Under § 1104(a)(2), the best interests of creditors support the appointment of a trustee.

Section § 1104(a)(2) also provides a basis for ordering the appointment of a chapter 11 trustee. The statute empowers the Court to consider the best interests of creditors as a reason for the

appointment. Among the factors a court typically considers in this analysis are (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's reorganization; (3) confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by appointment of a trustee, balanced against the costs of appointment.[11]

All of those factors support the appointment of a chapter 11 trustee in these debtors' cases. First, Tarpenning is not a trustworthy steward of the debtors' businesses, in no small part because of his competing work for Always Ready. Second, the debtors' prospects of reorganization are uncertain; Tarpenning, as manager, has moved to liquidate the bulk of the debtors' real-estate assets and has already moved on to a new LLC with the same business model. A trustee would evaluate and marshal the assets, identify claims, and make sober-minded business decisions about

---

[11] *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990); *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 176 (Bankr. D.Colo. 1990).

16

whether the debtors can reorganize. Third, because of the unauthorized use of cash collateral, the debtors lack the confidence of their secured creditors. Fourth, the benefits of appointing a trustee outweigh the costs. Tarpenning is a cavalier manager who doesn't respect corporate boundaries or the restrictions attendant to bankruptcy, and a trustee would be far better positioned to administer these cases toward a fair result for all creditors. Under § 1104(a)(2), then, the best interests of creditors weigh in favor of an order directing the appointment of a chapter 11 trustee.

## Conclusion

Based on the foregoing, the U.S. Trustee submits that there is sufficient evidence to meet its burden of proof and requests that the Court remove Sean Tarpenning and order the appointment of a chapter 11 trustee.

ILENE J. LASHINSKY
UNITED STATES TRUSTEE

By *Christopher T. Borniger*, No. 24692
301 N. Main St., Suite 1150
Wichita KS 67202
202-603-5195 (phone)
Christopher.T.Borniger@usdoj.gov

17

## CERTIFICATE OF SERVICE

I certify that on November 23, 2020, a true and correct copy of the **United States Trustee's Motion to Appoint Chapter 11 Trustee** was electronically filed with the Court using the CM/ECF system, which sent notification to all interested parties participating in the CM/ECF system.

Further, I certify that copies of the **United States Trustee's Motion to Appoint Chapter 11 Trustee** were forwarded via U.S. Mail, first class, postage prepaid and properly addressed to the following:

US Real Estate Equity Builder, LLC
US Real Estate Equity Builder Dayton, LLC
440 E. 63rd St.
Kansas City, MO 64110

*Christopher T. Borniger*

18

# EXHIBIT 28



The relief described hereinbelow is SO ORDERED.

SIGNED this 27th day of July, 2022.

_____
Robert D. Berger
United States Bankruptcy Judge

_____

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| **US Real Estate Equity Builder, LLC, and** | ) **Case No. 20-21358-11** |
| **US Real Estate Equity Builder Dayton, LLC,** | ) |
| | ) **(Jointly Administered)** |
| Debtors. | ) |

**ORDER (A) ORDER APPROVING (A) THE SALE REAL PROPERTY FREE AND
CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES AND
RELATED PROCEDURES AND BID PROTECTION PURSUANT TO 11 U.S.C. § 363,
(B) THE POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND RELATED
PROCEDURES, PURSUANT TO 11 U.S.C. § 365, AND (C) RELATED RELIEF
<u>PURSUANT TO 11 U.S.C. §§ 102 AND 105</u>**

This matter comes before the Court upon the *Motion to Approve (a) Sale of Real Property*

*Free and Clear of All Liens, Interests, Claims and Encumbrances, and Related Procedures and*

*Bid Protection Pursuant to 11 U.S.C. § 363, (b) the Potential Assumption and Assignment of*

*Certain Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11*

*U.S.C. § 365, and (c) Related Relief Pursuant to 11 U.S.C. §§ 102 and 105* [Dkt. 600, refiled under

different event at Dkt. 612 on April 19, 2022] (the "Motion"),[1] filed by Eric L. Johnson ("Trustee"), the Chapter 11 trustee of US Real Estate Equity Builder, LLC ("Debtor'), the *Response to Motion to Sell*  [Dkt. 621] (the "Response") filed by 1 Big Red, LLC ("1 Big Red"), the *Limited Objection to Motion to Sell* [Dkt. 651] (the "Limited Objection") filed by Sean Tarpenning, the *Trustee's Reply to 1 Big Red, LLC's Response/ Objection to Motion to Sell* [Dkts. 626 and 627], the Trustee's *Reply to Sean Tarpenning's Objection to Motion to Sell* [Dkt. 652], and PS Funding, Inc.'s *Reply to Sean Tarpenning's Objection to Motion to Sell* [Dkts. 655 and 656].

Having heard arguments in support of, and in opposition to, the Motion, and for the reasons detailed in this order and as detailed in the Court's bench decision on July 6, 2022, which is hereby incorporated by reference, the Court finds and determines that:

1.    The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    On April 15, 2022, the Trustee filed the Motion seeking to sell the Debtor's real property commonly known and numbered as 440 E. 63rd St., Kansas City, Missouri 64110 and legally described as:

> Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri.

(the "Property") [Dkt. 600].

---

[1]  Capitalized terms that are not defined herein shall have the meanings given to them in the Bid Procedures.

3.       On June 10, 2022, the Court entered an *Order (A) Approving Bidding Procedures for the Sale of Debtor's Property Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Debtor's Entry Into a Stalking Horse Agreement, (C) Establishing Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Related Notices, (E) Scheduling a Hearing to Consider the Proposed Sale, and (F) Related Relief Pursuant to 11 U.S.C. § 105* [Dkt.  640] (the "Bid Procedures Order").  The Bid Procedures Order approved certain Bid Procedures and other relief requested in the Motion.

4.       As reflected in the Certificate of Service [Dkt. 619] filed with respect to the Motion [Dkt. 600] and Notice of Objection Deadline and Bid Procedures Hearing [Dkt. 601], the Motion and Notice of Objection Deadline and Bid Procedures Hearing was served via the Court's electronic filing system on those parties receiving electronic notice by such system, and on all other parties identified in the certificate of service, including the mailing matrix for the case, via U.S. Mail.

5.       As evidenced by the Certificate of Service filed with respect to the Order to Continue the Bid Procedures Hearing [Dkt. 633], notice of the Continued Bid Procedures Hearing was served via the Court's electronic filing system on those parties receiving electronic notice by such system, and on all other parties identified in the certificate of service, including the mailing matrix for the case, via U.S. Mail.

6.       As evidenced by the Certificate of Service filed on June 14, 2022 [Dkt. 641], the Bid Procedures Order was served via the Court's electronic filing system on those parties receiving electronic notice by such system, and on all other parties identified in the certificate of service, including the mailing matrix for the case, via U.S. Mail.

KC 18901746.2

7.      The Court finds the scope and manner of notice and service to be proper, timely, adequate, and sufficient in accordance with Bankruptcy Code §§ 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006, 6007, and 9014, and in compliance with the Bid Procedures Order. No further notice of the Motion, the Bid Procedures, the Auction, the Sale Hearing, or the assignment and assumption of the Assumed Contracts is or shall be required.

8.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion has been afforded to all creditors and parties in interest.

9.      The Trustee has conducted the sale process in compliance with the Bid Procedures Order and has completed a full, fair, and complete auction process.

10.     On June 23, 2022, the auction (the "Auction") of the Property was held both virtually and in person.  Prior to the Auction, the Court had approved the stalking horse purchase agreement of Dutton Ranch, LLC (the "Stalking Horse"), which was subject to competing bids. There were three additional competing bids: (1) Gary Roles ("Roles"), (2) USA Regrowth, LLC ("URL"), and (3) PS Funding, Inc. The Auction was conducted in two phases. In the first phase, the non-stalking horse purchasers would bid against each other. In the second phase, the Phase 1 winning bid would compete against the Stalking Horse, who had the right to match any bid without advancing a new bid.

11.     PS Funding, Inc. ("PS Funding" or "Purchaser") made an initial credit bid of $717,000 for the Property (the "Credit Bid"). Through various rounds of bidding, PS Funding increased the Credit Bid to $880,000.00 (not including the buyer's premium).  After PS Funding's last bid, the Stalking Horse declined to match, whereupon in consultation with Committee's counsel, the Trustee concluded that the Credit Bid was the highest and best offer for the Property.

4

KC 18901746.2

12.     On June 23, 2022, the Trustee filed his Notice of Auction Results [Dkt 646] (the "Auction Report") identifying the Property and the various bids related to the same, which are detailed as follows:

| Highest Bidder | Highest Bid |
| --- | --- |
| PS Funding, Inc. | (Credit Bid) $880,000.00, plus $52,800.00 (6%) buyer's premium, for a total purchase price of $932,800.00.<br><br>The purchase price shall be payable as a credit except where cash is required as indicated in the bidding procedures order. |
| **First Backup Bidder** | **First Backup Bid** |
| Dutton Ranch, LLC ("Stalking Horse") | $870,000.00, plus $52,200.00 (6%) buyer's premium, for a total purchase price of $922,200.00. |
| **Second Backup Bidder** | **Second Backup Bid** |
| Gary Roles | $800,000.00 plus $48,000.00 (6%) buyer's premium, for the total purchase price of $848,000.00 |
| **Third Backup Bidder** | **Third Backup Bid** |
| USA Regrowth Fund, LLC | $820,000.00 plus $49,200.00 (6%) buyer's premium, for the total purchase price of $869,200.00.<br><br>Commercial lease(s) to be rejected. |

13.     On July 6, 2022, the Motion came before the Court. Other than the Limited Objection and the Response, there were no other objections to the Motion and approval of the proposed sale.  As set forth in more detail in the Court's bench decision on July 6, 2022, the Court finds that PS Funding is approved as the successful bidder for the Property for the amount of $880,000 (the "Purchase Price"), plus $52,800 (6%) buyer's premium (the "Buyer's Premium"), for a total price of $932,800

14.     At the time of closing, PS Funding shall pay to the Title Company an amount to cover: (a) the fourteen percent (14%) carveout ($123,200) (the "Carveout"); (b) an amount sufficient to pay the estate's share of the closing costs; and (c) outstanding real property taxes, tax liens, and ad valorem taxes (collectively, the "Cash Component") included in the PSA.

15.     The Trustee is further authorized and directed to transfer the Carveout to his operating account for the benefit of administrative expenses and unsecured creditors, free and clear of liens.

16.     The Cash Component does not include the Buyer's Premium, which shall be paid in addition to the Cash Component.

17.     The Auction conducted by the Trustee, including the methodology for determining the highest and best offers, was conducted in a manner that was reasonably calculated to achieve the highest and best offers for the Property. In fact, the final bid exceeded in the initial Stalking Horse offer by $172,000.00. The Auction was conducted in a non-collusive, fair and good-faith manner and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Property.

18.     The Trustee has full power and authority to execute a Purchase and Sale Agreement that is substantially similar to the form attached to this Order as **Exhibit 1** ("PSA"),[2] as well as all other documents referenced in or contemplated by the PSA or that are necessary or appropriate to effectuate the sale of the Property as contemplated under the PSA.[3] All actions contemplated by the PSA have been duly and validly authorized and the Trustee has the full power and authority to consummate the transactions contemplated by the PSA. No further consents or approvals, other than the entry of this Order and any necessary approval by the any state regulatory authorities are required for the Trustee to consummate the transactions contemplated in the PSA.

---

[2] The PSA is in a form substantially similar as what was previously filed as an Exhibit 3 to the Motion [Dkt. 600-3] and approved pursuant to the Bid Procedures Order.

[3] To the extent the Trustee is required to look to the First Back-Up Bidder or the Second Back-Up Bidder, such bidders shall be required to executed a PSA is that is substantially the same as PSA executed by the Highest Bidder, such agreement is also approved and incorporated into the defined term "PSA" for purposes of this Order.

6

19.     The PSA was negotiated, proposed, and entered into by the Trustee and Purchaser in good faith, without collusion, and was the result of arm's-length bargaining with the parties and/or the parties' independent counsel.

20.     The Purchaser is a good-faith purchaser of the Property under Bankruptcy Code § 363(m) and, as such, are entitled to all of the protections afforded thereby. The Purchaser has acted in good-faith within the meaning of Bankruptcy Code § 363(m) prior to entry of this Order and the Purchaser may rely on entry of this Order and this good-faith determination in closing such transactions.

21.     The sale of the Property to the Purchaser pursuant to the PSA is reasonable and appropriate under the circumstances. The Trustee is authorized to sell the Property free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided herein or in the PSA) (collectively, "Liens"), as one or more of the standards set forth in Bankruptcy Code § 363(f) have been satisfied with respect to each such lien, claim, encumbrance, and other interest. The transfers of the Property to the Purchaser pursuant to the PSA will be a legal, valid, and effective transfer of the Property and will vest Purchaser with all of the Debtor's rights, title, and interest in and to the Property free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided herein or in the PSA), which have, or could have, been asserted by the Debtor, its creditors, or other holders of such liens, claims, encumbrances, and other interests.

22.     As demonstrated in the preliminary title work that was attached as Exhibit 4 to the Trustee's *Reply to Sean Tarpenning's Objection to Motion to Sell* [Dkt. 652], the following Liens are associated with the Property:

        a.      Deed of Trust dated December 19, 2018, recorded January 4, 2019, as Document No. 2019E0000812, from US Real Estate Equity Builder, LLC, to Nachman Registered, Inc., Trustee for Aloha Capital, LLC, in the original amount of $937,500.00, which was last assigned to PS Funding, Inc., by

7

Assignment recorded January 29, 2019 as Document No. 2019E0006898; Centre Trustee Corp. appointed successor trustee by instrument filed October 1, 2019 as Document No. 2019E0079203.

b.   Deed of Trust dated January 17, 2019, recorded January 22, 2019, as Document No. 2019E0004669, from US Real Estate Equity Builders, LLC, to Walter C. Whisler, Trustee for USA Regrowth Fund, LLC, in the original amount of $320,000.00.

c.   Partial Release of the Deed of Trust dated June 4, 2020, recorded June 16, 2020, as Document No. 2020E0050177, from 1 Big Red, LLC and US Real Estate Equity Builder, LLC, to Walter C. Whisler, Trustee for Guardians of Travel, LLC, in the original amount of $625,000.00.

For the avoidance of doubt, the inclusion of the above Liens is not intended to limit the "free and clear" nature of the sale approved by the Court, but is for informational purposes only.

23.     Any holder of a Lien also will be adequately protected by having its Liens, if any, attach to the cash proceeds received by the Trustee for the sale of the Purchased Assets to the Purchaser, in the same order of priority, with the same validity, force, and effect that such creditor has prior to such sale, subject to any claims and defenses that the Trustee and the Debtor's bankruptcy estate may possess with respect thereto.[4]  Accordingly, pursuant to Section 363(f) of the Bankruptcy Code, this Order authorizes the sale of the Purchased Assets to UMB, free and clear of any such Liens.

24.     As set forth in the Response [Dkt. 621, 1 Big Red also asserts a purported mechanic's lien to the Property. However, as indicated in the Trustee's *Reply to 1 Big Red, LLC's Response/ Objection to Motion to Sell* [Dkts. 626 and 627], such lien is defective on its face and would be subsequent to the prior the Liens identified above. As such, the relief sought in the Response is hereby overruled.

---

[4] For the avoidance of doubt, no Liens shall attach to the Carveout and it shall be unencumbered property of the bankruptcy estate.

8

KC 18901746.2

25.     The Purchaser would not have entered into the PSA and would not consummate the transactions contemplated thereby if either (i) the sale and the assignment of the Property were not free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (except as otherwise provided herein or in the PSA), or (ii) the Purchaser would, or in the future could, be liable for any of such liens, claims, encumbrances, and other interests (except as otherwise provided herein or in the PSA).

26.     Except as otherwise distinguished in this Order, the assumption and assignment of the contract(s) and lease(s) identified in the PSA including the Alpha One Property Management lease (collectively, the "Assumed Contracts") is integral to the PSA, is in the best interests of the Debtor's estate, creditors, and other parties in interest, and represents a reasonable exercise of sound and prudent business judgment by the Trustee.

27.     There are no outstanding cure amounts for the Assumed Contracts. The Trustee shall have no further liability or obligation under the Assumed Contracts, and Purchaser shall have no obligation to make any payment or provide any performance to cure any default or breaches arising on or before the closing under the PSA.

28.     The Purchaser has demonstrated adequate assurance of future performance under the Assumed Contracts that will be assumed and assigned pursuant to this Order.

29.     Subject to the terms of the PSA and the occurrence of the respective closing date, the assumption by the Trustee and the Assumed Contracts and the assignment of such Assumed Contracts, as provided for or contemplated by the PSA, is hereby authorized and approved pursuant to Bankruptcy Code §§ 363 and 365.

30.     If ultimately URL becomes the purchaser because the other bidders fail to close and otherwise elects not to take assignment of the Assigned Contracts, then upon filing a notice with

9

the Court ("Notice of Election"), the contract(s) and lease(s) associated with the Property will be deemed rejected pursuant to Bankruptcy Code § 365(b) as of the date such notice is filed with the Court; provided, however, such rejection remains subject to tenant rights under Bankruptcy Code § 365(h).

31.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), the stay pursuant to Bankruptcy Rule 6004(h) or 6006(d) is hereby waived and this Order shall be effective and enforceable immediately upon entry.

32.     To the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that cause exists not to delay the implementation of this Order due to the time, effort, expense, and risk of delaying any closing under the PSA.

33.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a) upon its entry.

34.     The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

**BASED ON THE FOREGOING FINDINGS OF FACT, GOOD CAUSE EXISTS FOR ENTRY OF THE FOLLOWING ORDER. IT IS THEREFORE ORDERED:**

35.     The notice of the Motion and Sale Hearing and notice of the assumption and assignment of the Assumed Contracts are approved as being fair, reasonable and adequate under the circumstances of these cases, and any additional notice as may otherwise be required under state and federal law is hereby deemed satisfied.

10

36.    The Motion is **GRANTED** as set forth herein and the sale of the Property and assumption and assignment of the Assumed Contracts to the Purchaser is hereby authorized as set forth in this Order. Such assumption and assignment will not be effective until the sale transaction of the Property is closed. In the instance where URL becomes the purchaser and elects not to take an assignment of the Assumed Contracts, then the lease(s) and contract(s), then the lease(s) and contract(s) identified in the Notice of Election shall be deemed rejected as of the date of the filing of the notice.

37.    All objections to the Motion as it relates to the Property including, without limitation, the relief sought in the Response that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby **OVERRULED** on the merits as to the sale of the Property contemplated by this Order.

38.    The Trustee and the Purchaser have complied with the Bid Procedures Order.

39.    P.S. Funding is the successful bidder of the Property via credit bid and pursue Bankruptcy Code § 363(k).

40.    Pursuant to 11 U.S.C. §§ 105 and 363, the Trustee is authorized and directed to consummate the sale of the Property, pursuant to and in accordance with the terms and conditions of the PSA and this Order, including, without limitation, to convey to PS Funding, or its successor or assigns, the Property.  PS Funding may assign its purchase rights to another party as long as such assignment is disclosed to the Trustee and the Court prior to closing and such assignment does not violate 11 U.S.C. § 363(n).  For the avoidance of doubt, to the extent such purchase rights are assigned to an affiliated entity, it shall be presumed that such sale is not in violation of 11 U.S.C. § 363(n), but such presumption may be rebutted.  If such assignment occurs, references to "Purchaser" shall also mean PS Funding's successor and assign.

11

KC 18901746.2

41.     For the avoidance of doubt, the Purchase Price (except for the Cash Component) shall be offset against PS Funding's secured claims, with the balance of such claims continuing to be due and owing and secured by any remaining collateral subject to any applicable defense or claim.  PS Funding, within twenty-one (21) days of Closing, shall file revised proofs of claim reflecting the credit bid.

42.     The Cash Component of the Credit Bid is approved. If the actual amount of the Cash Component changes, then so shall the credit component of the Credit Bid in a corresponding amount. At Closing (as such term is defined in the Credit Bid), Purchaser is directed to pay the Cash Component of the Purchase Price and any other consideration then due under the Credit Bid to the Trustee including the Buyer's Premium.

43.     Should the PS Funding (or its successors or assigns) fail to close on the sale, and without further order from this Court, the Trustee is authorized and empowered to sell the Property to the Stalking Horse and execute and deliver the agreements contemplated herein and to implement and consummate all of the transactions and perform all obligations contemplated by the Stalking Horse's back-up bid at the Auction and this Order as if the Stalking Horse was successful bidder. The Stalking Horse shall be entitled to all of the findings and protections of this Order and will be considered the "Purchaser" as set forth in this Order.

44.     Should the PS Funding, the Stalking Horse, or their successors or assigns fail to close on the sale, and without further order from this Court, the Trustee is authorized and empowered to sell the Property to Roles and execute and deliver the agreements contemplated herein and to implement and consummate all of the transactions and perform all obligations contemplated by Role's back-up bid at the Auction and this Order as if Roles was successful

KC 18901746.2

bidder. Roles shall be entitled to all of the findings and protections of this Order and will be considered the "Purchaser" as set forth in this Order.

45.     Should the PS Funding, the Stalking Horse, Roles, or their successors or assigns fail to close on the sale, and without further order from this Court, the Trustee is authorized and empowered to sell the Property to URL and execute and deliver the agreements contemplated herein and to implement and consummate all of the transactions and perform all obligations contemplated by URL's back-up bid at the Auction and this Order as if URL was successful bidder. URL shall be entitled to all of the findings and protections of this Order and will be considered the "Purchaser" as set forth in this Order. Further, in the instance where URL becomes the "Purchaser", the lease rejection provisions of this Order become effective.

46.     The PSA, all exhibits and schedules thereto, and all of the terms and conditions thereof are hereby approved.

47.     Pursuant to Bankruptcy Code §§ 105, 363 and 365, the Trustee is authorized and directed to consummate the sale of the Property, pursuant to and in accordance with the terms and conditions of the PSA, including, without limitation, to convey to Purchaser the Property and assume and assign the Assumed Contracts and rights thereunder.

48.     Without need for any additional Court order, the Trustee and his agents are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the PSA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the PSA, and to take all further actions as may be reasonably requested by Purchaser or otherwise required under the PSA.

49.     The consideration to be provided by Purchaser for the purchase of the Property under the PSA constitutes reasonably equivalent value, fair value, and fair consideration thereof

13

KC 18901746.2

under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable state or federal law.

50.     Pursuant to Bankruptcy Code §§ 105(a), 363(b) and 363(f), the transfer of the Property to the Purchaser pursuant to the PSA shall (a) be valid, legal, binding, and effective transfers, (b) vest Purchaser with all rights, title, and interest of the Debtor's estate in and to the Property effective as of the time of the transfers under the PSA, and (c) be free and clear of liens, claims, encumbrances, and other interests in the Property (except as otherwise provided herein or in the PSA) including, without limitation, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens — including, without limitation, mechanics', materialmens' and other consensual and nonconsensual liens and statutory liens — judgments, demands, encumbrances, rights of first refusal, offsets, contracts, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtor, its estate, or its predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether

14

KC 18901746.2

arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, law, equity or otherwise, with all the same released, terminated and discharged as to the Property.

51.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Trustee to transfer the Property to the Purchaser in accordance with this Order and the terms of the PSA, or otherwise interfere with Purchaser's title to or use and enjoyment of the Property.

52.     This Order shall be the Court's determination that, on the closing date of the respective PSA, all liens, claims, encumbrances, and other interests in and to the Property being conveyed have been unconditionally released, discharged, and terminated from the Property.

53.     Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Property other than as expressly set forth herein or in the PSA, and in no event shall Purchaser have any liability or responsibility for any liabilities of the Debtor (including any unrecorded liabilities of the Debtor) other than as expressly set forth herein or in the PSA. Without limiting the effect or scope of the foregoing, the transfer of the Property from the Trustee to Purchaser does not and will not subject Purchaser or its affiliates, successors or assigns or their respective properties (including the Property) to any liability for claims (as that term is defined in Bankruptcy Code § 101(5)) against the Debtor or the Property (other than as expressly set forth herein or in the PSA) by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions. Except as otherwise provided herein or in the PSA, on and after the closing date of the PSA, all

KC 18901746.2

persons or entities holding liens, claims, encumbrances, or other interests of any kind and nature with respect to the Property are hereby forever barred and estopped from asserting such liens, claims, encumbrances, or other interests of any kind or nature against Purchaser, their successors or assigns, or the Property.

54.    On and after the closing date, except as otherwise set forth herein or in the PSA, the Trustee shall have no liability or responsibility for the Property.

55.    On the closing date, the Trustee is hereby authorized, but not directed, pursuant to §§ 363 and 365 of the Bankruptcy Code, to assume and assign to the applicable Purchaser the Assumed Contracts and rights thereunder.

56.    Except as it relates to URL as a potential purchaser, on the closing date, the Debtor's right, title and interest in, to and under the Assumed Contracts attributable to the Property shall be assumed by the Debtor's estate and assigned to Purchaser, and the Assumed Contracts will remain valid and binding and in full force and effect in accordance with their respective terms for the benefit of Purchaser, notwithstanding any provision in such contracts or leases (including those described in Bankruptcy Code §§ 365(b)(2) and (f)(1) and (3)), that prohibits, restricts or conditions such assignment or transfer.

57.    The Trustee is further authorized to take any and all actions necessary or appropriate to consummate the proposed assignment of the Debtor's right, title and interest in, to and under the Assumed Contracts to Purchaser, as specified in the PSA. Purchaser shall have no liability for any defaults under the Assumed Contracts (except as may be explicitly provided in the PSA) that occurred prior to the assignment of the Debtor's right, title and interest in, to and under the Assumed Contracts. Pursuant to Bankruptcy Code § 365(k), the Trustee, Debtor and

16

bankruptcy estate are relieved of any liability for any breach of any Assumed Contract that is assigned to Purchaser occurring after the assignment of such Assumed Contracts to Purchaser.

58.     The Trustee and/or any property management company are authorized to transfer any deposits related to the leases related to the Property and execute such other necessary documents and take other necessary actions in connection therewith.

59.     The failure of the Trustee or Purchaser to enforce at any time one or more terms or conditions of any Assumed Contracts shall not be a waiver of such terms or conditions, or of Purchaser' rights to enforce every term and condition of the Assumed Contracts.

60.     There shall be no rent accelerations, assignment fees, increases, or any other fees charged to Purchaser as a result of the assumption, assignment, and sale of the Assumed Contracts.

61.     The Trustee is authorized to execute such other necessary documents and take other necessary actions in connection the closing of the sale of Property and assignment of Assumed Contracts.

62.     No bulk sales law, or similar law of any state or other jurisdiction, shall apply in any way to the transaction contemplated by the PSA and this Order.

63.     The failure specifically to include any particular provision of the PSA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the PSA be authorized and approved in its entirety.

64.     This Order (a) shall be effective as a determination that, on the closing date, all liens, claims, encumbrances, other interests, and rights of any kind or nature whatsoever existing with respect to the Property have been unconditionally released, discharged and terminated (except as otherwise provided herein or in the PSA), and that the conveyances described herein have been effected and (b) shall be binding upon and shall govern the acts of all entities, including without

KC 18901746.2

limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Property.

65.     Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and/or recording, and approve as necessary, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the PSA.

66.     To the extent permitted by Bankruptcy Code § 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Property sold, transferred, or conveyed to Purchaser on account of the filing or pendency of these cases or the consummation of the sale.

67.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing claims or interests with respect to the Property shall not have delivered to the Trustee prior to the closing date, in proper form for filing and executed by the appropriate parties, releases of liens or interests which the person or entity has with respect to the Property, then Purchaser, at its own expense, is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests in the Property of any kind or nature whatsoever to the extent provided herein.

KC 18901746.2

68. All entities that presently are in possession of some or all the Property hereby are directed to surrender possession of the Property to Purchaser at the closing date.

69. This Court retains exclusive jurisdiction so long as the Debtor's case is pending to determine as a core proceeding (by motion and without necessity for an adversary proceeding) any proceeding, dispute, or controversy (i) to enforce and implement the terms and provisions of the PSA (including any breach of the PSA), all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects and (ii) arising out of or related to this Order and the PSA.

70.  The transactions contemplated by the PSA are undertaken by Purchaser in good faith, as that term is used in Bankruptcy Code § 363(m). Accordingly, the reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect the validity of the sale of the Property to Purchaser, unless such authorization is duly stayed. Purchaser is entitled to all of the protections afforded by Bankruptcy Code § 363(m).

71. The consideration to be provided by Purchaser for the Property under the PSA is fair and reasonable, and the sale of the Property and the related transactions may not be avoided under Bankruptcy Code § 363(n).

72. The terms and conditions of the PSA and this Order shall be binding in all respects and shall inure to the benefit of the Trustee, Debtor and its creditors and interest holders, successors, and assigns and Purchaser, and its respective affiliates, successors and assigns.

73. The PSA and any related agreements, documents or other instruments may be modified, amended, supplemented, or waived by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that

KC 18901746.2

such modification, amendment, supplement, or waiver shall not have a material adverse effect on the Debtor's estate.

74.     At the time of closing and if it is the "Purchaser", PS Funding (or its assigns) shall pay to the Title Company an amount to cover the Carveout and an amount sufficient to pay the estate's share of the closing costs, including outstanding real property taxes and tax liens, and sufficient to pay the Buyer's Premium. The Trustee is further authorized and directed to transfer the Carveout to his operating account for the benefit of administrative expenses and unsecured creditors, free and clear of liens.

75.     If PS Funding (or its assigns) does not close and the bankruptcy estate closes with either the Stalking Horse, Roles or URL, then the following shall apply:

      a.     At the time of closing, and from the proceeds of the sale, the Trustee is authorized and directed to pay the estate's share of the closing costs, including outstanding real property taxes and tax liens. The Trustee is further authorized and directed to transfer the Carveout to his operating account for the benefit of administrative expenses and unsecured creditors, free and clear of liens.

      b.     Any Liens shall attach to the sale proceeds with the same extent, priority, and validity as the liens in the Property except for the Carveout which shall be free and clear of liens. The Trustee shall distribute the net proceeds and Buyer's Premium pursuant to subsequent Court Order(s).

76.     The provisions of this Order are non-severable and mutually dependent.

77.     In the event of any inconsistency between the terms and provisions of this Order and the PSA, the terms and provisions of this Order shall control unless explicitly provided otherwise herein.

78.     Nothing in this Order, except for the amount credited to the debt owed to PS Funding, shall have any impact or other preclusive effect in other court proceedings.

79.     This Court may supplement this Order with one or more additional orders within the scope of this Order, with or without additional notice or opportunity for a hearing to other

20

parties depending upon the facts and circumstances as determined by the Court at the time the Court is requested to enter such separate order(s).

80.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), there is no stay pursuant to Bankruptcy Rule 6004(h) or 6006(d) and this Order shall be effective and enforceable immediately upon entry.

81.     Counsel for Trustee shall serve a copy of this Order by mail to all interested parties who were not served electronically.

###

Respectfully submitted,

SPENCER FANE LLP

By:      */s/ Elizabeth M. Lally*
Elizabeth M. Lally (*pro hac vice*)
13815 FNB Parkway, Suite 200
Omaha, NE 68154
Phone:  (402) 800-2299
Facsimile:  (402) 965-8601
Email: elally@spenerfane.com

Eric L. Johnson                    KS #20542
Andrea M. Chase                 KS #26307
1000 Walnut St., Suite 1400
Kansas City, Missouri  64106-2140
Phone: 816-474-8100
Facsimile: 816-474-3216
Email: ejohnson@spencerfane.com
        achase@spencerfane.com

COUNSEL FOR CHAPTER 11 TRUSTEE

KC 18901746.2

**Exhibit 1**

# PURCHASE AND SALE AGREEMENT

between

PS FUNDING, INC.
(as purchaser)

and

**ERIC L. JOHNSON, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
OF US REAL ESTATE EQUITY BUILDER LLC**
(as seller)

KC 18398980.6

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**"), is made and entered into as of July 18, 2022 ("**Effective Date**"), by and between PS Funding Inc., a Delaware corporation, (the "**Purchaser**"), and Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**").

**WHEREAS**, US Real Estate Equity Builder LLC, a Missouri limited liability company ("**USREEB**") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined below) on October 2, 2020. On December 10, 2020, Seller was appointed as the Chapter 11 Trustee of USREEB's estate. The USREEB case is pending before the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**") styled *In re US Real Estate Equity Builder LLC*, Case No. 20-21358 (the "**Bankruptcy Case**"); and

**WHEREAS**, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, the Property (this and other capitalized terms used and not otherwise defined herein have the meanings given them terms in Section 1 below), subject to and upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the Seller and the Purchaser intending to be legally bound agree as follows:

## SECTION I.  DEFINITIONS

Capitalized terms used in this Agreement have the meanings set forth below or in the section of this Agreement referred to below:

1.1.    "**Agreement**" has the meaning given such term in the Preamble to this Agreement.

1.2.    "**Alternative Transaction**" shall mean a transaction or series of transactions pursuant to which Seller sells, transfers, leases, or otherwise disposes of all or any material portion of the Property to a person other than Purchaser.

1.3.    "**Apportioned Items**" has the meaning given such term in Section 9.1(a).

1.4.    "**Assumed Contracts**" means any contracts, leases, licenses, or other agreements with respect to the operation or occupancy of Property, or any portion thereof, and identified on Exhibit A.

1.5.    "**Auction**" shall mean the auction conducted by Seller pursuant to the Bidding Procedures Order for the Property entered in the Bankruptcy Case at Docket No. 640.

1.6.    "**Back-up Bidder**" has the meaning given such term in Section 12.5.

1.7.    "**Bankruptcy Case**" has the meaning given such term in the Recitals of this Agreement.

-1-

KC 19011271.1

**Exhibit 1**

1.8.    "**Bankruptcy Code**" means Title 11 and applicable portions of Titles 18 and 28 of the United States Code.

1.9.    "**Bankruptcy Court**" has the meaning given such term in the Recitals of this Agreement.

1.10.    "**Business Day**" means any day other than a Saturday, Sunday or any day that is a "Legal Holiday" as defined in Bankruptcy Rule 9006(a)(6).

1.11.    "**Closing**" has the meaning given such term in Section 2.2.

1.12.    "**Closing Date**" has the meaning given such term in Section 2.2.

1.13.    "**Closing Documents**" has the meaning given such term in Section 4.1.

1.14.    "**Competing Offer**" has the meaning given such term in Section 12.3.

1.15.    "**Deposit**" has the meaning given such term in Section 2.4.

1.16.    "**Due Diligence Period**" has the meaning given such term in Section 3.1(a).

1.17.    "**Effective Date**" has the meaning given such term in the Preamble to this Agreement.

1.18.    "**Environmental Law**" means any and all federal, state and municipal statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or to emissions, discharges or releases of Hazardous Substances into the environment including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances or the cleanup or other remediation thereof.

1.19.    "**Excluded Property**" means the property specifically listed on Schedule 1.19.

1.20.    "**Fixtures**" means all fixtures, furniture, equipment, machinery, systems and other items of personal property owned by the Seller and attached or appurtenant to, located on, and used in connection with the ownership, use, operation or maintenance of the Land and Improvements (including but not limited to all alarm systems, and all plumbing, heating, air conditioning and lighting fixtures and equipment, cabinets and awnings), other than the Excluded Property.

1.21.    "**Hazardous Substances**" means and include any oils, petroleum products, asbestos, radioactive, biological, medical or infectious wastes or materials, and any other toxic or hazardous wastes, materials and substances that are defined, determined or identified as such in any Environmental Laws, or in any judicial or administrative interpretation of Environmental Laws.

-2-

KC 19011271.1

**Exhibit 1**

1.22. "**Improvements**" means the buildings and other improvements located on the Land.

1.23. "**Land**" means that certain parcel of land commonly known and numbered as 440 E. 63rd St., Kansas City, Missouri 64110, which land is more particularly described on Exhibit B, together with all rights and appurtenances thereto, including all right, title and interest of Seller in and to any water and mineral rights and adjacent streets, alleys or rights of way.

1.24.  "**Licenses and Permits**" means any certificates of occupancy and other licenses, permits, registrations, authorizations, use agreements, orders, or approvals of governmental or quasi-governmental agencies and authorities (whether federal, state, local, municipal, or foreign) or private parties relating to the construction, use, operation, or enjoyment of the Property, in each case to the extent transferable.

1.25. "**Lien**" means any lien, mortgage, pledge, claim, charge, security interest, hypothecation or encumbrance of any nature whatsoever.

1.26. "**Property**" means, collectively, the Land, the Improvements, the Fixtures, the Licenses and Permits, and any Assumed Contracts, but does not include the Excluded Property.

1.27. "**Purchase Price**" has the meaning given such term in Section 2.3.

1.28. "**Purchaser**" has the meaning given such term in the Preamble to this Agreement.

1.29.

1.30. "**Sale Order**" means the order to be entered by the Bankruptcy Court in form and substance reasonably acceptable to Seller and Purchaser pursuant to Sections 105, 363 or 365, as applicable, of the Bankruptcy Code (i) authorizing the sale of the Property to the Purchaser or Successful Bidder (as defined in the Bidding Procedures) at any Auction; (ii) approving this Agreement or, if there is an Auction, the successful contract, and the transactions contemplated therein; (iii) approving, with specific findings of fact in support thereof, the sale of the Property to Purchaser or Successful Bidder free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code; (iv) finding, with specific findings of fact in support thereof, that Purchaser or Successful Bidder is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (v) authorizing and approving the results of any Auction; and (vi) finding that the order is final upon entry by the Bankruptcy Court.

1.31. "**Seller**" has the meaning given such term in the Preamble to this Agreement.

1.32. "**Survey**" has the meaning given such term in Section 3.2.

1.33. "**Tenant**" means each tenant under any Assumed Contract, which includes any leases as further set forth in Exhibit A.

1.34. "**Title Commitment**" has the meaning given such term in Section 3.3.

-3-

KC 19011271.1

1.35.   "**Title Company**" means National Secured Title or such other title company as mutually agreed to in writing by the Seller and Purchaser.

1.36.   "**Title Objection Notice**" has the meaning given such term in Section 3.4(a).

1.37.   "**Title Policy**" has the meaning given such term in Section 3.3.

1.38.   "**USREEB**" has the meaning given such term in the Recitals of this Agreement.

## SECTION II.  PURCHASE AND SALE; CLOSING

2.1.   **Purchase and Sale**.  On the terms and subject to the conditions contained in this Agreement and the Sale Order, the Seller agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Seller, the Property for the Purchase Price, subject to and in accordance with the terms and conditions of this Agreement and the Sale Order. Notwithstanding anything to the contrary contained in this Agreement, at Closing, Seller shall not transfer, convey, sell or assign to Purchaser any Excluded Property.

2.2.   **Closing**.  The purchase and sale of the Property will be consummated at a closing (the "**Closing**") through an escrow with the Title Company, or at such other location as the Seller and the Purchaser may agree, on or before the later of (a) 14 days after entry of the Sale Order, or (b) such date mutually agreed to by the Parties (the "**Closing Date**").  The Closing will be deemed to have occurred at 12:01 a.m. local time for the Property on the Closing Date.

2.3.   **Purchase Price**.

(a)     The aggregate purchase price for the Property shall be Eight Hundred Eighty Thousand and 00/100 Dollars ($880,000.00), plus Fifty Two Thousand and Eight Hundred and 00/100 Dollars ($52,800.00) for the six percent (6.00%) buyer's premium, for a total purchase price of $932,800.00 (the "**Purchase Price**"). The Purchase Price will be paid at Closing as follows: (a) Purchaser will pay to Seller in U.S. Dollars in good funds an amount equal to (i) the sum of any liens on the Property that are senior to the secured debt owed by Seller to Purchaser (the "**Purchaser Secured Debt**"), (ii) real estate, transfer, or ad valorem taxes, (iii) the 14% estate carve out ($123,200), and (iv) closing costs (collectively, the "**Cash Portion**"); and (b) Purchaser will pay the balance of the Purchase Price via credit bid pursuant to Section 363(k) of the Bankruptcy Code of a portion of the Purchaser Secured Debt (the "**Credit Bid Amount**"), with the balance of the Purchaser Secured Debt continuing to be due and owing to Purchaser.

(b)     On the earlier of (i) the Closing Date, or (ii) 14 days of entry of the Sale Order, the Purchaser will deposit the Cash Portion of the Purchase Price owed to the Title Company. At Closing, the Title Company will deliver the Cash Portion of the Purchase Price to the Seller, less amounts to be paid to the Title Company, and taxing authorities, which shall be paid directly to such parties at closing. Any commissions shall either be paid directly by the Title Company to sale agents, or, if no Order has been entered approving such compensation, by the Trustee upon Court approval of such commissions.

-4-

KC 19011271.1

**Exhibit 1**

## SECTION III.  DILIGENCE

3.1.    **Due Diligence Period**.

3.2.    **Title Insurance**.  Seller shall, within fourteen (14) Business Days after the entry of the Sale Order, request the Title Company to furnish to Purchaser and Seller a preliminary title insurance commitment (the "**Title Commitmen**t") issued by the Title Company pursuant to which the Title Company agrees to issue to Purchaser an ALTA owner's policy of standard title insurance (collectively, the "**Title Policy**"), in the amount of the Purchase Price, insuring fee simple title to the Land and Improvements in Purchaser, subject only to real estate taxes and assessments for the current year and subsequent years, not yet due and payable, and any encumbrances of record or other exceptions on the Title Commitment which are expressly approved in writing by Purchaser or which are deemed approved by Purchaser as provided in this Agreement ("**Permitted Encumbrances**").  The premium for the Title Policy shall be at the sole cost of Seller; provided, however, that any endorsements to the Title Policy requested by Purchaser, as well as any lender's policy of title insurance, shall be at the sole cost of Purchaser.

3.3.    **Seller's Title Documents**.  Seller agrees to execute, acknowledge and deliver to the Title Company, on or before the Closing Date, such documents, instruments and other information as the Title Company shall reasonably require as a condition to issuance of the Title Policy to the extent it is in the Seller's power to deliver such documents.  Seller shall make reasonable efforts to attempt to compel USREEB to execute any documents.

## SECTION IV.  CONDITIONS TO THE PURCHASER'S OBLIGATION TO CLOSE

The obligation of the Purchaser to acquire the Property is subject to the satisfaction of the following conditions precedent on and as of the Closing Date such that if any condition fails, and is not waived in writing by the Purchaser, the Purchaser may terminate this Agreement and receive a prompt return of the Deposit:

4.1.    **Closing Documents**.  The Seller shall have delivered to the Title Company or Purchaser the following (collectively, the "**Closing Documents**"), duly executed by Seller and, where applicable, acknowledged by notary:

(a)    A trustee's deed for transfer of the Land and Improvements, in substantially the form of Exhibit C (the "**Deed**");

(b)    If applicable, an Assignment and Assumption Agreement for assignment and assumption of any Assumed Contracts, in substantially the form of Exhibit D (the "**Assignment and Assumption Agreement**");

(c)    A Quit Claim Bill of Sale and General Assignment for transfer of the Fixtures and Licenses and Permits, in substantially the form of Exhibit E;

(d)    A settlement statement prepared by the Title Company, together with any other affidavits and agreements reasonably required by the Title Company in order to issue the Title Policy, and

-5-

KC 19011271.1

(e)    Such other documents, instruments, certificates and assurances as are reasonably required to consummate the transactions contemplated by this Agreement.

4.2.    **Condition of Property**.  The Property, including all improvements located thereon, is in substantially the same physical condition on the Closing Date as on the Effective Date, ordinary wear and tear and damage by casualty or condemnation excepted (subject to the terms of, and except as otherwise provided pursuant to, this Agreement).

4.3.    **Seller's Representations and Warranties**.  All representations and warranties of the Seller herein shall remain true, correct and complete in all material respects on and as of the Closing Date and the Seller shall have performed all covenants and obligations required to be performed by the Seller on or before the Closing Date.

4.4.    **Bankruptcy Court Approval**.  The Bankruptcy Court shall have entered the Sale Order.

4.5.    **Title Policy**.  The Title Company shall have committed to the issuance of the Title Policy, subject only to the Permitted Encumbrances.

## SECTION V.  CONDITIONS TO THE SELLER'S OBLIGATION TO CLOSE

The obligation of the Seller to convey the Property to the Purchaser is subject to the satisfaction of the following conditions precedent on and as of the Closing Date such that if any condition fails, and is not waived in writing by the Seller, the Seller may terminate this Agreement:

5.1.    **Purchase Price**.  The Purchaser shall have delivered to the Title Company or Seller the Purchase Price payable hereunder.

5.2.    **Closing Documents**.  The Purchaser shall have delivered to the Title Company or the Seller a duly executed counterpart of the Assignment and Assumption Agreement, the settlement statement prepared by the Title Company, and such other documents, instruments, certificates and assurances as are reasonably required to consummate the transactions contemplated by this Agreement.

5.3.    **Representations**.  All representations and warranties of the Purchaser herein shall remain true, correct and complete in all material respects on and as of the Closing Date and the Purchaser shall have performed all covenants and obligations required to be performed by the Purchaser on or before the Closing Date.

5.4.    **Bankruptcy Court Approval**.  The Bankruptcy Court shall have entered the Sale Order.

## SECTION VI.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

6.1.    **Representations of the Seller**.  To induce the Purchaser to enter into this Agreement, the Seller represents and warrants to the Purchaser as follows:

-6-

KC 19011271.1

(a) **Status and Authority of Seller**.  Subject to approval by the Bankruptcy Court, the Seller has all requisite power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

(b) **Use and Operation**.  To the best of Seller's knowledge, there are no governmental actions pending against the Property and there is no existing eminent domain or similar proceeding which would materially affect the Property, and neither Seller nor any of its agents, representatives or employees has received a written notice from any governmental agency or office or from any other third party alleging the Property's violation or alleged violation of applicable law.

(c) **Foreign Person**. Seller is not a "Foreign Person" within the meaning of Section 1445 of the Internal Revenue Code, as amended.

(d) **Knowledge Definition**.  The phrase "*to the best of Seller's knowledge*" means the actual knowledge, without investigation, of the Seller.

6.2.  **Non-Survival of Representations and Warranties**.  The representations and warranties made by the Seller herein or pursuant hereto will expire with, and be terminated and extinguished by, the Closing, and thereafter neither the Seller nor any agent, contractor, director, officer, creditor or shareholder of the Seller will have any liability whatsoever with respect to any such representations or warranties.

6.3.  **DISCLAIMER OF SELLER'S WARRANTIES.**

(a) GENERAL. PURCHASER HEREBY EXPRESSLY ACKNOWLEDGES THAT, PRIOR TO THE END OF THE DUE DILIGENCE PERIOD, PURCHASER WILL HAVE THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE PURCHASE OF THE PROPERTY. PURCHASER IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS AND PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF AS PURCHASER DEEMS APPROPRIATE AND NECESSARY. UPON CLOSING, PURCHASER WILL ASSUME THE RISK OF ANY ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS THAT MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS.  PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER IS ACQUIRING THE PROPERTY ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT.  PURCHASER HEREBY WAIVES AND RELINQUISHES ALL RIGHTS AND PRIVILEGES ARISING OUT OF, OR WITH RESPECT OR IN RELATION TO, ANY REPRESENTATIONS, WARRANTIES OR COVENANTS, WHETHER EXPRESS OR IMPLIED, WHICH MAY HAVE BEEN MADE OR GIVEN, OR WHICH MAY HAVE BEEN DEEMED TO HAVE BEEN MADE OR GIVEN, BY SELLER OR ITS AGENTS OR REPRESENTATIVES, EXCEPT FOR THOSE EXPRESSLY

-7-

SET FORTH IN THIS AGREEMENT AND THE DEED. UPON THE CLOSING, PURCHASER AGREES TO ASSUME ALL FUTURE RISK AND LIABILITY (AND AGREES THAT SELLER WILL NOT BE LIABLE FOR ANY FUTURE SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL OR OTHER DAMAGES) RESULTING OR ARISING FROM OR RELATING TO PURCHASER'S OWNERSHIP, USE, CONDITION, LOCATION, MAINTENANCE, REPAIR OR OPERATION OF THE PROPERTY.

(b)    SPECIFIC.  WITHOUT LIMITING THE GENERAL PROVISIONS OF SECTION 6.3(a), BUT SUBJECT TO THE PROVISIONS OF SECTION 6.3(c), EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, AS TO MATTERS OF ZONING, COMPLIANCE WITH STATUTES, LAWS, REGULATIONS, ORDINANCES, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION: (I) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY AND (II) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES THAT SELLER HAS NOT WARRANTED, AND DOES NOT HEREBY WARRANT, THE PROPERTY NOW OR IN THE FUTURE WILL MEET OR COMPLY WITH THE REQUIREMENTS OF ANY SAFETY, BUILDING, ZONING OR PLATTING CODES, ENVIRONMENTAL LAW OR LAWS OF THE COUNTRY, STATE, COUNTY OR CITY IN WHICH THE PROPERTY IS LOCATED OR ANY OTHER AUTHORITY OR JURISDICTION.

## SECTION VII.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

7.1.    **Representations of the Purchaser**.  To induce the Seller to enter in this Agreement, the Purchaser represents and warrants to the Seller as follows:

(a)    **Status and Authority of the Purchaser**.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

(b)    **Action of the Purchaser**.  The Purchaser has taken all necessary action to authorize the execution, delivery and performance of this Agreement, and upon the execution and delivery of any document to be delivered by the Purchaser on or prior to the Closing Date, this Agreement and such documents will constitute the valid and binding obligation and agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general application affecting the rights and remedies of creditors.

(c)    **No Violations of Agreements**.    Neither the execution, delivery or performance of this Agreement by the Purchaser, nor compliance with the terms and provisions

-8-

KC 19011271.1

hereof, will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under, or result in the creation of any Lien upon any property or assets of the Purchaser pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness or any other agreement or instrument by which the Purchaser is bound.

(d)     **Litigation**.  No investigation, action or proceeding is pending and, to the Purchaser's knowledge, no action or proceeding is threatened and no investigation looking toward such an action or proceeding has begun, that questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

(e)     **Financing**.  The Purchaser has sufficient available funds to pay the Purchase Price at the Closing.

(f)     **Bid Required Representations**.  Purchaser (i) has relied solely upon its own independent review, investigation and/or inspection of the Property in submitting this Agreement, (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property or the transaction contemplated herein, or the completeness of any information provided in connection therewith, except as expressly stated herein, and (iii) has authority to enter into this Agreement, execute any necessary documents to close on the transactions contemplated herein, and proceed to Closing.

(g)     **Adequate Assurance of Future Performance**.  Purchaser is and will be capable of providing to counterparties to any Assumed Contracts adequate assurances of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code.

### SECTION VIII.  COVENANTS OF THE SELLER

The Seller hereby covenants with the Purchaser between the date of this Agreement and the Closing Date as follows:

8.1.    **Actions Without Purchaser's Consent**.  Subject to the terms and provisions of this Agreement, Seller shall not, without the prior consent of Purchaser, which consent shall not be unreasonably withheld, conditioned, or delayed, (a) enter into any lease, concession agreement, license agreement, easement agreement or other agreement relating to the Property or any part thereof that will continue past Closing; (b) amend, modify, terminate, or renew any Assumed Contract; or (c) sell, transfer, assign, or otherwise convey any of the Property to anyone other than Purchaser.

8.2.    **Notice of Material Changes or Untrue Representations**.  Upon learning of any material change in any condition with respect to the Property or of any event or circumstance that makes any representation or warranty of the Seller under this Agreement untrue in any material respect, promptly to notify the Purchaser thereof.

8.3.    **Operation of Property**.  To continue to operate the Property in a fashion consistent with past practices; provided, however, that Seller will terminate, effective as of the Closing Date, all employment contracts with employees at the Property.

-9-

KC 19011271.1

## SECTION IX.  APPORTIONMENTS

9.1.    **Real Property Apportionments**.

(a)    The following items will be apportioned at the Closing as of 12:01 a.m. local time for the Property on the Closing Date (the "**Apportioned Items**"):

(i)    amounts owed or owing under any Assumed Contract;

(ii)    all other items of income and expense normally apportioned in sales of property in similar situations;

(iii)    if applicable, monthly rents and other fixed charges payable under any Assumed Contract;

(iv)    if applicable, percentage rents and other unfixed charges payable under any Assumed Contract;

(v)    gas, electric, water and other utility costs;

(vi)    municipal assessments and governmental license and permit fees;

(vii)    real estate taxes and assessments, based on the rates and assessed valuation applicable in the fiscal year for which assessed; and

(viii)    personal property taxes and assessments, if any, based on the rates and assessed valuation applicable in the fiscal year for which assessed.

(b)    For the avoidance of doubt, the Apportioned Items shall be apportioned to Seller prior to the Closing Date, and Apportioned Items shall be apportioned to Purchaser on and after the Closing Date. If any of the foregoing cannot be apportioned at the Closing because of the unavailability of the amounts that are to be apportioned, such items will be apportioned on the basis of a good faith written estimate by the parties and reconciled as soon as practicable after the Closing Date.  To the extent granted in the Sale Order, the sale, transfer, assignment and conveyance of the Property to the Purchaser will be entitled to the protections afforded under Section 1146(c) of the Bankruptcy Code.

(c)    If there are water, gas or electric meters located at the Property, the Seller will obtain readings thereof to a date not more than thirty (30) days prior to the Closing Date and the unfixed water rates and charges, sewer taxes and rents and gas and electricity charges, if any, based thereon for the intervening time will be apportioned on the basis of the last readings.  If readings are not obtainable by the Closing Date, then, at the Closing, any water rates and charges, sewer taxes and rents and gas and electricity charges that are based on the readings will be prorated based upon the *per diem* charges obtained by using the most recent period for which readings are then available.

(d)    If any refunds of real property taxes or assessments, water rates and charges or sewer taxes and rents will be made after the Closing, the same will be held in trust by the Seller

-10-

KC 19011271.1

or the Purchaser, as the case may be, and will first be applied to the unreimbursed costs incurred in obtaining the same, then to any required refunds to Tenants, and the balance, if any, will be paid to the Seller (for the period prior to the Closing Date) and to the Purchaser (for the period commencing with the Closing Date).

(e)     No insurance policies of the Seller are to be transferred to the Purchaser, and no apportionment of the premiums therefor will be made.

(f)     Tenant security deposits, if any, will be transferred to the Purchaser, and Purchaser shall become responsible for all claims related to the refund of Tenant security deposits.

(g)     If a net amount is owed by the Seller to the Purchaser pursuant to this Section 9.1, then such amount will be credited against the Purchase Price.  If a net amount is owed by the Purchaser to the Seller pursuant to this Section 9.1, then such amount will be paid together with the Purchase Price.

(h)     If there is a dispute between the parties with respect to amounts under this Section 9.1, undisputed amounts will be paid at Closing.  With respect to disputed amounts, a proper adjustment will be determined after the Closing Date by the Bankruptcy Court.

The provisions of this Section 9.1 will survive the Closing.

9.2.     **Closing Costs**.

(a)     The Purchaser will pay (i) all charges related to any endorsements to the Title Policy requested by Purchaser, and any lender's policy of title insurance, (ii) all applicable excise, sales, use, value added, registration, stamp, recording, documentary, conveyance, franchise, transfer, gains and similar taxes and impositions incurred in connection with the transactions contemplated by this Agreement, (iii) all charges for any Survey and (iv) all recording charges for the Deed.

(b)     The Seller will pay all charges for the Title Commitment (including search and exam fees) and Title Policy other than those costs identified in Section 9.2(a).

(c)     Each party will pay the fees and expenses of its attorneys and other consultants.  Any charges and expenses incurred by Title Company in effecting Closing will be shared equally by the parties.

(d)     Purchaser shall be solely responsible to provide to counterparties to any Assumed Contracts adequate assurances of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code.

## SECTION X.  DAMAGE TO OR CONDEMNATION OF PROPERTY

10.1.     **Casualty**.  If, prior to the Closing, all or any part of the Property is destroyed or damaged by fire or other casualty, then the Seller will promptly notify the Purchaser of this fact.  If any such casualty damages all or any material portion of the Property, then the Purchaser may terminate this Agreement by giving notice thereof to the Seller not later than

-11-

KC 19011271.1

ten (10) Business Days after the date on which the Purchaser receives the Seller's notice as aforesaid. If the Purchaser elects to terminate this Agreement as aforesaid, then the Title Company will return the Deposit to the Purchaser, and, upon the Purchaser's receipt of the Deposit, this Agreement will terminate and be of no further force and effect and neither party will have any liability to the other hereunder (except for Purchaser's obligations under Section 3.1(c), which shall survive such termination). If any such casualty damages less than a material portion of the Land or Improvements or if the Purchaser elects not to terminate this Agreement as aforesaid, then there will be no abatement of the Purchase Price and the Seller will assign to the Purchaser at the Closing all of the Seller's rights to the insurance proceeds, if any, under the Seller's insurance policies covering the Land and Improvements with respect to such damage or destruction and there will be credited against the Purchase Price the following: (a) the amounts of any applicable insurance deductibles; and (b) the amounts of any proceeds previously received by Seller for the damage or destruction to the Land or Improvements.

10.2.    **Condemnation**. If, prior to the Closing, all or any part of the Land or Improvements is taken by eminent domain (or is the subject of a pending taking that has not yet been consummated), then the Seller will promptly notify the Purchaser of this fact. If such taking affects all or any material portion of the Land or Improvements, then the Purchaser may terminate this Agreement by giving notice to the Seller not later than ten (10) Business Days after receipt of the Seller's notice. If the Purchaser elects to terminate this Agreement as aforesaid, then the Deposit will be returned to the Purchaser, and, upon the Purchaser's receipt of the Deposit, this Agreement will terminate and be of no further force and effect and neither party will have any liability to the other hereunder (except for Purchaser's obligations under Section 3.1(c), which shall survive such termination). If less than a material portion of the Land or Improvements is affected by a taking or if the Purchaser elects not to terminate this Agreement as aforesaid, then the sale of the Property will be consummated as herein provided without any adjustment to the Purchase Price (except to the extent of any condemnation award received by the Seller prior to the Closing) and the Seller will assign to the Purchaser at the Closing all of the Seller's right, title and interest in and to all awards, if any, for the taking, and the Purchaser will be entitled to receive and keep all awards for the taking of the Land or Improvements or portion thereof.

10.3.    **Survival**. The parties' obligations, if any, under this <u>Section X</u> will survive the Closing.

## SECTION XI.  TERMINATION

11.1.    **Default by the Seller**. If the Seller has made any representation or warranty herein that is untrue in any material respect, or if the Seller fails to perform any of the material covenants and agreements contained herein to be performed by the Seller, then the Purchaser may, as its sole and exclusive remedy, elect prior to the Closing to terminate this Agreement and receive a refund of the Deposit.

11.2.    **Default by the Purchaser**. If the Purchaser has made any representation or warranty herein that is untrue in any material respect, or if the Purchaser fails to perform any of the covenants and agreements contained herein to be performed by it, then the Seller may,

KC 19011271.1

as its sole and exclusive remedy, elect prior to the Closing to terminate this Agreement and retain the Deposit, as liquidated damages and not as a penalty.

11.3.   **Offer Open Date**. Pursuant to the Bid Procedures approved by the Bankruptcy Court, Purchaser may not revoke, withdraw or otherwise terminate the offer reflected in this Agreement until thirty (30) days after the entry of the Sale Order except as otherwise provided herein.

## SECTION XII.  COURT APPROVAL PROCESS

12.1.   **Court Approval**. This Agreement is subject to approval by the Bankruptcy Court, pursuant to the Sale Order.  In the event (a) the Bankruptcy Case is terminated, (b) Seller is removed as Trustee for USREEB's estate, such that Seller no longer holds possession and control of the Property, or (c) the Bankruptcy Court does not approve and authorize this Agreement and the transactions contemplated herein pursuant to the Sale Order, then this Agreement shall automatically terminate, the Deposit shall be returned to Purchaser, and neither party hereto shall have any further obligation to the other hereunder except as expressly otherwise provided herein.

12.2.   **Other Bids**. Seller has solicited bids from other prospective Purchasers for the sale of the Property, on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Seller). No other offers or bids for the Property shall be allowed after the entry of the Sale Order unless this Agreement is terminated pursuant to Section XI.

## SECTION XIII.  MISCELLANEOUS

13.1.   **Continuing Jurisdiction**.  The Bankruptcy Court will retain jurisdiction over the enforcement of this Agreement including the performance of the obligations and transactions contemplated hereunder.

13.2.   **Brokers**.  Mayo Auction and Realty represents the Seller. In the event that Purchaser is successful in closing on the purchase of the Property, the parties agree that the six percent (6%) buyer's premium will be paid at Closing (or upon entry of any order approving such compensation (whichever is later)) to Mayo Auction and Realty.

13.3.   **Notices**.  Any notice, request or demand hereunder may be given or furnished to or served upon a party by email, hand delivery, certified mail, return receipt requested, or express overnight delivery to the following addresses. Notice shall be deemed given three (3) Business Days after notice is deposited with the U.S. Mail, the next Business Day following timely deposit with an express overnight delivery service and at the time of hand delivery or email delivery.

if to the Seller, to:

Eric L. Johnson, Trustee
Spencer Fane LLP
1000 Walnut Street, Suite 1400

-13-

KC 19011271.1

**Exhibit 1**

> Kansas City, Missouri 64106
> Email: ejohnsontrustee@spencerfane.com

with a copy to:

> Elizabeth Lally
> Spencer Fane LLP
> 13815 FNB Parkway, Suite 200
> Omaha, NE 68154
> Email: elally@spencerfane.com

If to the Purchaser, to:

> PS Funding, Inc.
> Attn: Matthew Dameron
> 2121 Park Pl.
> El Segundo, CA 90245
> Email: mdameron@peerstreet.com

with a copy to:

> Sandberg Phoenix
> 4600 Madison Avenue, Suite 1000
> Kansas City, MO 64112
> Attn: Sharon Stolte
> Email: sstolte@sandbergphoenix.com

By notice given as herein provided, the parties and their respective successors and permitted assigns may from time to time and at any time change their respective addresses effective upon receipt by the other party of such notice and each may specify as its address any other address within The United States of America.

13.4.    **Waivers**.  Any waiver of any term or condition of this Agreement, or of the breach of any covenant, representation or warranty contained herein, in any one instance, will not operate as or be deemed to be or construed as a further or continuing waiver of any other breach of such term, condition, covenant, representation or warranty or any other term, condition, covenant, representation or warranty, nor will any failure at any time or times to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such party's right at a later time to enforce or require performance of such provision or any other provision hereof.  This Agreement may not be amended, nor will any waiver, change, modification, consent or discharge be effected, except by (a) an instrument in writing executed by or on behalf of the party against whom enforcement of any amendment, waiver, change, modification, consent or discharge is sought, and (b) if the amendment, modification, consent, or discharge is of a material term of this Agreement, a final order of the Bankruptcy Court after appropriate notice and opportunity for a hearing to all parties in interest.

-14-

KC 19011271.1

13.5. **Assignment; Successors and Assigns**.  This Agreement and all rights and obligations hereunder may not be assigned by any party without the written consent of the other party.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement is not intended and may not be construed to create any rights in or to be enforceable in any part by any other persons.

13.6. **Severability**.  If any provision of this Agreement is held or deemed to be, or in fact becomes, invalid, inoperative or unenforceable as applied to any particular case in any jurisdiction or jurisdictions, or in all jurisdictions or in all cases, because of the conflict of any provision with any constitution or statute or rule of public policy or for any other reason, such circumstance will not have the effect of rendering the provision or provisions in question invalid, inoperative or unenforceable in any other jurisdiction or in any other case or circumstance or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement will be reformed and construed in any such jurisdiction or case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such jurisdiction or in such case.

13.7. **Counterparts**.  This Agreement may be executed in counterparts and delivered by facsimile, portable document format (.pdf) transmission or other electronic format, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.

13.8. **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes and takes the place of any other instruments purporting to be an agreement of the parties hereto relating to the subject matter hereof.

13.9. **Performance on Business Days**.  If the date on which performance or payment of any obligation of a party required hereunder is other than a Business Day, the time for payment or performance will automatically be extended to the next Business Day following such date.

13.10. **Attorneys' Fees**.  Notwithstanding anything contained herein to the contrary, if any lawsuit or arbitration or other legal proceeding arises in connection with the interpretation or enforcement of this Agreement, the prevailing party therein will be entitled to receive from the other party the prevailing party's costs and expenses, including reasonable attorneys' fees incurred in connection therewith, in preparation therefor and on appeal therefrom, which amounts will be included in any judgment therein.

13.11. **Time of Essence**.  Time is of the essence with respect to the performance of each and every covenant and obligation, and the giving of all notices, under this Agreement.

KC 19011271.1

13.12. **Governing Law**.  This Agreement is governed by, and is to be construed in accordance with, the laws of the State of Missouri.

13.13. **Certain Interpretive Matters**.  In construing this Agreement, it is the intent of the parties that:

(a)     no consideration may be given to the section headings, all of which are inserted for convenience in locating the provisions of this Agreement and not as an aid in its construction;

(b)     no consideration may be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement;

(c)     examples are not to be construed to limit, expressly or by implication, the matter they illustrate;

(d)     the word "includes" and its derivatives means "includes, but is not limited to," and corresponding derivative expressions;

(e)     a defined term has its defined meaning throughout this Agreement and each exhibit and schedule to this Agreement, regardless of whether it appears before or after the place where it is defined;

(f)     the meanings of the defined terms are applicable to both the singular and plural forms thereof;

(g)     all references to prices, values or monetary amounts refer to United States dollars;

(h)     accounting terms not defined in this Agreement, and accounting terms partly defined to the extent not defined, have the respective meanings given to them under generally accepted accounting principles;

(i)     all references to sections, subsections, paragraphs, clauses, exhibits or schedules refer to sections, subsections, paragraphs and clauses of this Agreement, and to exhibits or schedules attached to this Agreement, unless expressly provided otherwise;

(j)     each exhibit and schedule to this Agreement is a part of this Agreement and references to the term "Agreement" are deemed to include each such exhibit and schedule to this Agreement except to the extent that the context indicates otherwise, but if there is any conflict or inconsistency between the main body of this Agreement and any exhibit or schedule, the provisions of the main body of this Agreement will prevail;

(k)     the words "this Agreement," "herein," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular article, section, subsection or other subdivision, unless expressly so limited;

(l)     the word "or" is disjunctive but not necessarily exclusive; and

KC 19011271.1

(m)    all references to agreements or laws are deemed to refer to such agreements or laws as amended or as in effect at the applicable time.

*[Remainder of Page Intentionally Left Blank – Signature Page to Follow]*

-17-

KC 19011271.1

**Exhibit 1**

The parties have caused this Purchase and Sale Agreement to be executed as of the date first above written.

**SELLER:**

By: _____
        Eric L. Johnson, in his capacity as Chapter 11
        Trustee of US Real Estate Equity Builder LLC,
        and not individually

**PURCHASER:**

PS Funding, Inc., a Delaware corporation

By: _____
Name: Matthew Dameron
Title: Authorized Signatory

-18-

KC 19011271.1

**Exhibit 1**

## EXHIBIT A

**ASSUMED CONTRACTS**

Lease Agreement dated May 1, 2020 by and between USREEB LLC, as landlord, and Alpha One PM limited liability company, as tenant.

A-1

KC 19011271.1

## EXHIBIT B

### LAND

Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri.

B-1

KC 19011271.1

## EXHIBIT C

## FORM OF DEED

_____

(Space above reserved for Recorder of Deeds certification)

## COVER PAGE FOR RECORDING

| | | |
|---|---|---|
| 1. | Title of Document: | Trustee's Deed |
| 2. | Date of Document: | _____, 2022 |
| 3. | Grantor: | Eric L. Johnson, as Chapter 11 Trustee of US Real Estate Equity Builder LLC |
| 4. | Grantee Name/Address:<br>PSF TX 1, LLC.<br>Attn: Matthew Dameron<br>2121 Park Pl.<br>El Segundo, CA 90245 | _____ |
| 5. | Legal Description: | See Exhibit A |
| 6. | Book and Page Reference: | N/A |

C-1

KC 19011271.1

**Exhibit 1**

## TRUSTEE'S DEED

**THIS INDENTURE** is made this ____ day of _____, 2022, between Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company, as Grantor, and PSF TX 1, LLC, a Delaware limited liability company, as Grantee.

**WHEREAS**, Grantor, by virtue of the Order Approving (a) One or More Potential Sale(s) of All Assets Free and Clear of all Liens, Interests, Claims and Encumbrances, and Related Procedures and Bid Protection Pursuant to 11 U.S.C. §363, and (b) The Potential Assumption and Assignment, or Rejection, of Certain Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11 U.S.C. §365, and (c) Related Relief Pursuant to 11 U.S.C. §105 (the "**Sale Order**") issued out of the U.S. Bankruptcy Court for the District of Kansas , in Case No. 20-21358, and dated _____ _____, 2022, does by these presents grant, bargain, sell and convey unto Grantee, its successors and assigns, all right, title and interest of Grantor "as is, where is" with no representations or warranty, in and to all of the real property situated in Jackson County, Missouri and legally described on Exhibit A attached hereto.

Subject to (i) all exceptions, easements, covenants, restrictions, reservations, rights of way and other matters of record, (ii) any matters that would be disclosed by a current accurate survey or physical inspection of said real property, and (iii) real estate taxes and assessments for 2022 and thereafter.

**TO HAVE AND TO HOLD** the above granted premises, together with the appurtenances and hereditaments and every part thereof, unto Grantee, its successors and assigns.

*[Signature and Acknowledgement on Following Page]*

C-2

KC 19011271.1

**Exhibit 1**

     **IN WITNESS WHEREOF**, Grantor has signed this Trustee's Deed as of the date first above written.

 

                                      _____
                                        Eric L. Johnson, as Chapter 11 Trustee for the
                                        Bankruptcy Estate of US Real Estate Equity Builder
                                        LLC, and not individually

STATE OF MISSOURI       )
                             ) ss.
COUNTY OF _____)

     On this _____ day of _____, 2022, before me, a Notary Public in and for said state, personally appeared Eric L. Johnson as Trustee for the Bankruptcy Estate of US Real Estate Equity Builder LLC, a Missouri limited liability company, known to me to be the person who executed the within Trustee's Deed in behalf of the Bankruptcy Estate of US Real Estate Equity Builder LLC, and acknowledged to me that he executed the same for the purposes therein stated.

                                        _____
                                        Notary Public
My commission expires:

C-3

KC 19011271.1

**Exhibit 1**

## Exhibit A

Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri

C-4

KC 19011271.1

## EXHIBIT D

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS

**THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS** (this "**Assignment**") is made and entered into as of _____, 2022, by and between Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**"), and PS Funding, Inc., a Delaware corporation (the "**Purchaser**").

WHEREAS, the Seller and the Purchaser are parties to that certain Purchase and Sale Agreement, dated as of **[_____]**, 2022 (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, and the Purchaser has agreed to purchase, certain land and other property as described in the Purchase Agreement; and

WHEREAS, in connection with the closing of the sale contemplated by the Purchase Agreement, the Seller has agreed to assign, and the Purchaser has agreed to assume, among other things, the Assumed Contracts (as such term is defined in the Purchase Agreement and as set forth on Exhibit A, subject to and upon the terms and conditions hereinafter set forth).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the Seller and the Purchaser agree as follows:

1.       Capitalized terms used and not otherwise defined herein have the meanings given them in the Purchase Agreement.

2.       The Seller hereby assigns to the Purchaser all of the Seller's right, title and interest in and to the Assumed Contracts.  The Purchaser hereby assumes, as of the date hereof, all of the Seller's obligations under the Assumed Contracts accruing from and after the date hereof.  The Purchaser hereby agrees to perform all of the Seller's obligations arising under the Assumed Contracts from and after the date hereof.

3.       This Assignment is binding on, and will inure to the benefit of, the parties hereto, their respective successors in interest, and their respective assigns.

4.       This Assignment is governed by, and is to be construed in accordance with, the laws of the State of Missouri.

5.       Neither party will record this Assignment.

6.       This Assignment may be executed in counterparts and delivered by facsimile, portable document format (.pdf) transmission or other electronic format, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.

[Signature page follows]

D-1

KC 19011271.1

**Exhibit 1**

      The parties have executed this Assignment and Assumption of Contracts as of the date first hereinabove written.

**SELLER**:

By: _____
          Eric L. Johnson, in his capacity as
          Chapter 11 Trustee of US Real Estate
          Equity Builder LLC, and not individually

**PURCHASER:**

PS Funding, Inc., a Delaware corporation

By: _____
Name:  Matthew Dameron
Title:  Authorized Signatory

D-2

KC 19011271.1

**Exhibit 1**

## <u>Exhibit A</u>

**Assumed Contracts**

Lease Agreement dated May 1, 2020 by and between USREEB LLC, as landlord, and Alpha One PM limited liability company, as tenant

D-3

KC 19011271.1

**EXHIBIT E**

## QUIT CLAIM BILL OF SALE AND GENERAL ASSIGNMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**"), effective as of the _____ day of _____, 2022, does hereby REMISE, RELEASE AND FOREVER QUIT CLAIM to PSF TX 1, LLC, a Delaware limited liability company (the "**Purchaser**"), and its successors and assigns, all of Seller's right, title and interest, if any, in and to all Fixtures, as such term is defined in that certain Purchase and Sale Agreement, dated as of **[_____]**, 2022 between Seller and Purchaser (the "**Purchase Agreement**").

EXCEPT AS OTHERWISE PROVIDED IN THE PURCHASE AGREEMENT, SELLER HAS NOT MADE AND DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER WITH RESPECT TO THE FIXTURES, INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, DESIGN OR CONDITION, COMPLIANCE WITH THE REQUIREMENTS OF ANY RULE, LAW, REGULATION, ORDINANCE, SPECIFICATION OR CONTRACT, OR LATENT DEFECT. EXCEPT AS OTHERWISE PROVIDED IN WRITTEN AGREEMENT BETWEEN SELLER AND PURCHASER, THE FIXTURES ARE SOLD "AS IS" AND "WITH ALL FAULTS."

If any taxes are assessed against the Fixtures, such taxes shall be prorated between Seller and Purchaser as of the date of conveyance.

FURTHERMORE, Seller does hereby assign, transfer, set over and deliver unto Purchaser all of Seller's right, title, and interest in and to all Licenses and Permits (as defined in the Purchase Agreement) to the extent any such Licenses and Permits are assignable. Except as otherwise provided in the Purchase Agreement, this conveyance of Licenses and Permits is made on an "AS-IS", "WHERE-IS" basis, without any representations or warranties express or implied from Seller.

Seller has executed this Quit Claim Bill of Sale and General Assignment effective as of the date first above-written.

**SELLER**:

By: _____
Eric L. Johnson, in his capacity as
Chapter 11 Trustee of US Real Estate
Equity Builder LLC, and not individual

F-1

KC 19011271.1

**Exhibit 1**

## <u>SCHEDULE 1.19</u>

**List of Excluded Property**

1.      Servers and other computer equipment for which the Seller has an interest.

# EXHIBIT 29

## GUARANTY AND INDEMNIFICATION AGREEMENT

This Guaranty and Indemnity Agreement (this "Guaranty") is entered into as of February 1, 2021, by PS FUNDING, INC., a Delaware corporation (the "Guarantor" and/or "Servicer"), in favor of PEER STREET FUNDING, LLC, a Delaware limited liability company, as a lender (together with its successors and assigns, the "Lender") under the Loan Agreement referred to below.

WHEREAS, PS WAREHOUSE LLC, a Delaware limited liability company (the "Borrower" and collectively with Guarantor and Lender, the "Parties"), the Guarantor, and the Lender are parties to that certain Loan and Security Agreement dated as of even date herewith (as amended, modified or supplemented from time to time, the "Loan Agreement");

WHEREAS, it is a condition precedent to the Lender making the Loan under the Loan Agreement, that the Guarantor enters into this Guaranty;

WHEREAS, the Guarantor directly owns all the ownership interests of the Borrower; and

WHEREAS, the Guarantor will receive substantial direct and indirect benefits from the consummation of the transactions contemplated by the Credit Documents.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. **Definitions**. Unless otherwise defined in this Guaranty, all defined terms used in this Guaranty shall have the meanings ascribed to such terms in the Loan Agreement.

Section 2. **Guaranty of Guaranteed Obligations**. The Guarantor hereby absolutely, irrevocably and unconditionally guarantees, for the benefit of the Lender, the due and punctual payment and performance by Borrower of its covenants, agreements and obligations contained in Loan Agreement and the other Credit Documents to which Borrower is a party (the "Guaranteed Obligations"), whether presently outstanding or arising subsequent to the date hereof.

Section 3. **Unconditionality; Irrevocability**.

(a)    This is an absolute, unconditional and continuing guaranty of payment and performance of all Guaranteed Obligations, and the Guarantor agrees that its obligations under this Guaranty shall be irrevocable. The dissolution, insolvency or adjudication of bankruptcy of the Guarantor shall not revoke this Guaranty. For the avoidance of doubt, the Guarantor shall have no obligation to guaranty (and does not guaranty) any obligations of the underlying mortgagors under the Financed Loans, but fully guarantees the timely payment and repayment of the Loan made by Lender to Borrower.

(b)     No act or thing need occur to establish the liability or obligation of the Guarantor hereunder, and no act or thing, except full payment, discharge and performance of all Guaranteed Obligations, shall in any way exonerate the Guarantor hereunder or modify, reduce, limit or release the liability of the Guarantor hereunder.  The Lender shall not be required first to resort to payment of the Guaranteed Obligations by the Borrower or other Person, or their properties or the Financed Loans, before enforcing this Guaranty. Until performance and payment in full of the Guaranteed Obligations, the Guaranteed Obligations of the Guarantor under this Guaranty shall not be affected, modified or impaired upon the happening from time to time of any event, including, without limitation, the events described in Section 4 herein, whether or not with notice to or the consent of the Guarantor.

(c)     The Guarantor further agrees that, if any payment applied hereunder to the Guaranteed Obligations is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of the Borrower or any other obligor) or declared to be fraudulent or preferential, the Guaranteed Obligations to which such payment was applied shall for the purpose of this Guaranty be deemed to have continued in existence, notwithstanding such payment, and this Guaranty shall be enforceable as to such Guaranteed Obligations as fully as if such payment had never been made. The provisions of this Section 3(c) hereof shall survive any termination of this Guaranty.

(d)     The Guarantor further agrees that any and all Financed Loans are pledged to Lender as collateral for the Guaranteed Obligations. It is understood by the Parties hereto that Guarantor may retain record and legal title of the Financed Loans while Borrower purchases participation interests therein and it is the Parties' intent and understanding that record and legal title to Financed Loans be vested in Lender while the corresponding obligations are still outstanding. For convenience purposes, the Parties may decide not to record assignments of security instruments each time that the Borrower purchases participation interests in Financed Loans, but this shall not operate as a waiver of Lender's rights to hold record and legal title. In the event of Borrower and/or Guarantor's default under any Credit Document, Lender shall be allowed to execute for itself, on behalf of and as attorney-in-fact for Guarantor, assignments of security instruments for any then-Financed Loans, with such assignments being deemed made and executed as of the date that Borrower acquired participation interests in such loans. Alternatively, in Lender's sole and absolute discretion, in the event of default, Lender may (i) require that the Financed Loans be assigned to Borrower of record and (ii) elect to record an assignment of membership interest, assigning all of Guarantor's rights and interests in Borrower to Lender.

Section 4.  *Continuation and Validity of Guaranteed Obligations*.  The liability of the Guarantor shall not be affected or impaired by any of the following events: (a) the validity, enforceability, discharge, disaffirmance, settlement or compromise (by any Person, including any trustee in bankruptcy or other similar official) of the Guaranteed Obligations or of the Credit Documents, (b) the absence of any attempt to collect the Guaranteed Obligations from the Borrower or any guarantor or other Person, (c) the waiver or consent by Lender or any other Person with respect to any provision of any instrument or agreement evidencing the Guaranteed Obligations, any delay or lack of diligence in the enforcement of the Guaranteed Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect the Guaranteed Obligations other than the obligations sought to be enforced, (d) any change of the time, manner or place of payment or performance, or any other term of any of the Guaranteed

2

Obligations, (e) any law, regulation or order of any jurisdiction affecting any term of any of the Guaranteed Obligations or rights of the Lender with respect thereto, (f) the failure by Lender to take any steps to perfect and maintain perfected its interest in any security or collateral related to the Guaranteed Obligations, (g) the commencement of any bankruptcy, insolvency or similar proceeding with respect to the Borrower or any other Affiliate of the Borrower, (h) any full or partial release of, compromise or settlement with, or agreement not to sue, the Borrower or any guarantor or other person liable in respect of any Guaranteed Obligations, (i) any release, surrender, cancellation or other discharge of any evidence of the Guaranteed Obligations or the acceptance of any instrument in renewal or substitution thereof, (j) any collection, sale, lease or disposition of, or any other enforcement of or realization on, any Collateral, (k) any assignment, pledge or other transfer of the Guaranteed Obligations or any evidence thereof, (l) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Guaranteed Obligations, (m) any change in the existing relationship between the Guarantor and the Borrower including, without limitation, any sale or other transfer of the ownership interest of the Borrower by an affiliate of the Guarantor or (n) any legal or equitable discharge or defense of the Guarantor. The Guarantor waives any and all defenses and discharges available to a surety, guarantor or accommodation co-obligor.

Section 5. ***Representations and Warranties***. The Guarantor hereby makes the following representations and warranties as of the date hereof and as of each Credit Date (as defined in the Loan Agreement), with respect to itself alone, on which the Lender will be deemed to have relied in making the Loan or accepting the pledge of the Collateral, as the case may be:

(a)    *Existence and Power.* The Guarantor is a corporation duly organized, validly existing under the laws of its state of organization and has the power and authority to engage in the business it conducts and is qualified and in good standing in those states wherein the nature of business or property owned by it requires such qualification, is not required to be qualified in any other state; or if not so qualified, no adverse effect on the Guarantor's business would result therefrom. The Guarantor possesses all the franchises, permits, licenses, certificates of compliance and approval and grants of authority necessary or required in the conduct of its business and the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with the Guarantor's execution and performance of this Guaranty.

(b)    *Corporate Authorization and No Contravention*. The making, performance and execution of this Guaranty does not and will not violate any provisions of any law, rule, regulation, judgment, order, writ, decree, determination or award or breach any provisions of the certificate of incorporation, bylaws or other organization documents of Guarantor and the Guarantor has full power and authority under the laws of the state of its organization to enter into, execute and deliver and perform this Guaranty.

(c)    *No Consent Required.* All actions (corporate or otherwise) necessary or appropriate for the Guarantor's, execution, delivery and performance of this Guaranty have been taken. No approval or authorization by, or filing with, any (i) Federal, state, municipal, foreign or other

3

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

governmental entity, board, bureau, agency or instrumentality, (ii) administrative or regulatory authority (including any central bank or similar authority) or (iii) court or judicial authority is required in connection with the execution, delivery and performance by the Guarantor of this Guaranty other than (x) approvals and authorizations that have previously been obtained and filings that have previously been made or approvals, authorizations or filings which will be made on a timely basis and (y) approval, authorizations or filings which, if not obtained or made, would not have a material adverse effect on the financial condition, business or operations of the Guarantor, taken as a whole.

(d)      *Binding Effect*. This Guaranty when delivered to the Lender will be, duly executed and constitute valid and legally binding obligations of the Guarantor enforceable against the Guarantor, in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

(e)      *No Proceedings*. There are no actions, suits or proceedings pending or, to the knowledge of the Guarantor, threatened in writing against the Guarantor or any of its Affiliates before or by any governmental authority that (i) assert the invalidity or unenforceability of this Guaranty or the Loan Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Guaranty or the Loan Agreement, (iii) seeking any determination or ruling that would materially and adversely affect the performance by the Guarantor of its obligations under this Guaranty or the performance by the Borrower of its obligations under the Loan Agreement, (iv) seeking any determination or ruling that would adversely affect the validity or enforceability of this Guaranty or the Loan Agreement, or (v) that could reasonably be expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of, this Guaranty.

(f)      *Benefits*. The Guarantor has a substantial economic interest in the Borrower and expects to derive substantial benefits therefrom and from the transaction described in the Credit Documents, any loans, credit transactions, financial accommodations, discounts, purchases of property and other transactions and events resulting in the creation of Guaranteed Obligations and the other obligations guaranteed hereby, and this Guaranty shall be effective and enforceable by the Lender without regard to the receipt, nature or value of any such benefits.

(g)      *Solvency*. The Guarantor is not insolvent nor will it be rendered insolvent by virtue of entering into or carrying out this Guaranty.

(h)      *No Fines or Sanctions*. With respect to the Mortgage Loans, the sale of the Mortgage Loans and Participations or the origination of the Mortgage Loans, as applicable, the Guarantor has not had any existing accrued and/or unpaid penalties, fines or sanctions imposed by and owing to any Governmental Authority.

(i)      *Ant-Money Laundering*. The Guarantor is fully compliant with all applicable provisions of the AML-BSA Laws and the Foreign Corrupt Practices Act of 1977, as amended, and, to the extent required by Requirements of Law, has adopted policies and procedures reasonably designed to ensure its ongoing compliance with such laws, which policies and procedures are consistent with generally accepted standards within the Guarantor's industry for ensuring such compliance.

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

(j)     *Compliance with Law.* To the Guarantor's knowledge, the Guarantor is in compliance in all material respects with all applicable laws and regulations, federal, state and local, material to the conduct of its business and operations. The Guarantor possesses all the franchises, permits, licenses, certificates of compliance and approval and grants of authority necessary or required in the conduct of its business and the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with the Guarantor's execution and performance of this Guaranty. The Guarantor has not received any notice that the Guarantor, any of the Guarantor's Affiliates or Borrower (either in any such Person's capacity as the seller or servicer of Mortgage Loans) are not in material compliance in any respect with any of the requirements of any of the foregoing.

(k)     *Permits.* The Guarantor is in compliance with and has all permits necessary or required by any Requirement of Law or any Governmental Authority for the operation of its business as presently conducted and as proposed to be conducted, except where noncompliance, violation or lack thereof is not reasonably expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of this Guaranty.

(l)     *No Defaults.* The Guarantor is not in default under any agreement, contract, instrument or indenture to which the Guarantor is a party or by which it (or any of its assets) is bound, which default would reasonably be expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of this Guaranty, nor has any event occurred which, with the giving of notice, the lapse of time or both, would constitute a default under any such agreement, contract, instrument or indenture that would reasonably be expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of, this Guaranty.

Section 6. **Covenants**.

(a)     *Further Assurances.* The Guarantor will do, execute and perform all such other acts, deeds and documents as any Lender may from time to time reasonably require in order to carry out this Guaranty.

(b)     *Adequate Capital.* The Guarantor at all times shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

Section 7. ***Indemnification***. The Guarantor hereby agrees to indemnify, defend and hold harmless the Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents and employees and attorneys (hereinafter collectively referred to as the "Indemnified Lender Parties"), from and against, and agrees promptly to pay on demand or reimburse each of them with respect to, any and all liabilities, claims, demands, losses, damages, costs, and expenses (including all reasonable attorney's fees and expenses, court costs, other legal and expert witness fees and expenses and all costs of investigation, taxes and penalties) (collectively, "Damages") incurred by such Indemnified Lender Party by reason of (i) any breach

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

of any covenant or agreement or the incorrectness or inaccuracy of any representation or warranty of the Guarantor contained in this Guaranty, or any other agreement, instrument or document executed in connection with this Guaranty; (ii) the exercise by the Lender of any rights or remedies under this Guaranty; (iii) any fraud or gross negligent or willful act or omission committed by the Guarantor, or any party acting on its behalf, or (iv) any litigation, proceeding or investigation initiated by a mortgagor or any third party or by any Governmental Authority asserting a violation of Requirements of Law by the Guarantor or a bank in respect of the origination of any Mortgage Loan or the transfer thereof by the bank to the Guarantor or by the Guarantor to Borrower, in which such Indemnified Lender Party becomes involved as a result of any of the transactions contemplated by the Loan Agreement. The provisions of this Section 7 shall survive the full payment, performance, and discharge of the obligations of the Borrower under, and the termination of, the Loan Agreement, and shall continue thereafter in full force and effect.

Section 8. ***Independent Obligations***. The obligations of the Guarantor hereunder are undertaken as primary obligor and independently of the obligations of the Borrower, or any other obligor, guarantor or Person, and action or actions may be brought or prosecuted directly against the Guarantor whether or not action is brought first or at all against the Borrower, the Servicer or any other obligor, guarantor or Person, against any collateral security or any other circumstance whatsoever, and whether or not any other obligor, guarantor or Person is joined in any such action or actions, or any claims or demands are made or are not made, or any action is taken on or against any other obligor, guarantor or Person or any collateral security or otherwise.

Section 9. ***Waivers***. The Guarantor waives any and all defenses, claims, setoffs and discharges of the Borrower or any other obligor, pertaining to the Guaranteed Obligations. Without limiting the generality of the foregoing or any other provision hereof, to the fullest extent permitted by applicable law, the Guarantor hereby waives: (a) any defense arising by reason of any invalidity or unenforceability of the Borrower's obligations in respect of the Credit Documents, any manner in which the Lender has exercised (or not exercised) any rights and remedies under the Credit Documents, or any cessation from any cause whatsoever of the liability of any obligor, guarantor or Person; (b) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of the Credit Documents (including this Guaranty); (c) notice of any indulgences, extensions, consents or waivers given to the Borrower or any other obligor, guarantor or Person, notice of any Default or Event of Default under the Loan Agreement or default or event of default under any of the other Credit Documents or other notice of any kind whatsoever; (d) any right or claim of right to cause the Lender to proceed against the Borrower or any other obligor, guarantor or Person in any particular order, to proceed against or exhaust any collateral security held by the Lender at any time or to pursue any other right or remedy whatsoever at any time; (e) any requirement of diligence or promptness on the Lender's part in (x) making any claim or demand on or commencing suit against the Borrower or any other obligor, guarantor or Person, and (y) otherwise enforcing the Lenders' rights in respect of the Loan Agreement or the other Credit Documents; (f) any defense of waiver, release, discharge in bankruptcy, statute of limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, usury, illegality or unenforceability which may be available to any person liable in respect of any Guaranteed Obligations, or any setoff available against, the Lender to the Borrower, or any other such person, whether or not on account of a related transaction; and (g) any duty of the Lender to advise the Guarantor of any information known to the Lender regarding the financial condition of the Borrower or any other circumstance, it being agreed that the Guarantor assumes responsibility for being and keeping informed of such condition or any such circumstance.

6

Without limiting the generality of the foregoing, to the fullest extent permitted by applicable law, the Guarantor specifically waives all defenses the Guarantor may have based upon any election of remedies by the Lender which eliminates the Guarantor's rights to proceed against the Borrower or any other obligor, guarantor or Person for reimbursement, contribution or otherwise, including any loss of rights that it may suffer by reason of any rights, powers, remedies or defenses of the Borrower in connection with any laws limiting, qualifying or discharging indebtedness of or remedies against the Borrower, and the Guarantor hereby agrees not to exercise or pursue, so long as any of the Guaranteed Obligations remain unsatisfied, any right to reimbursement, subrogation, or contribution from the Borrower in respect of payments hereunder.

Section 10.  *Significance of Waivers*.  The Guarantor represents, warrants and agrees that each of the waivers set forth herein are made with the Guarantor's full knowledge of its significance and consequences, with the understanding that events giving rise to any defense waived may diminish, destroy or otherwise adversely affect rights which the Guarantor otherwise may have against the Borrower or any other obligor, guarantor or Person, or against collateral, and that under the circumstances the waivers are reasonable.

Section 11.  *Reimbursement*. The Guarantor shall pay or reimburse upon demand all third-party out-of-pocket costs and expenses (including attorneys' fees and legal expenses) incurred by the Lender in connection with the protection, defense or enforcement of this Guaranty in any litigation or bankruptcy or insolvency proceedings.

Section 12.  *Cumulative Liability*.  The liability of the Guarantor under this Guaranty is in addition to and shall be cumulative with all other liabilities of the Guarantor, if any, as Guarantor, surety, endorser, accommodation co-obligor or otherwise of any Guaranteed Obligations or obligation of the Borrower, without any limitation as to amount.

Section 13.  *Amendments*. This Guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the Guarantor and the Lender. The Guarantor may not assign its obligations hereunder without the prior written consent of the Lender.

Section 14.  *Governing Law*. THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL, SUBSTANTIVE LAWS OF THE STATE OF CALIFORNIA BUT EXCLUDING TO THE MAXIMUM EXTENT PERMITTED BY LAW ALL RULES RELATING TO CONFLICTS OF LAW AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 15.  *Submission to Jurisdiction.*  Each of the parties hereto hereby irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Guaranty or any documents executed and delivered in connection herewith, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of California, the courts of the United States of America for the Central District of California and appellate courts from any thereof;

7

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

(b)        consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; and

(c)        agrees that nothing herein shall affect the right to effect service of process in any manner permitted by law or shall limit the right to sue in any other jurisdiction.

Section 16. *Counterparts*.  This Guaranty may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 17. *Severability of Provisions*.  If any one or more of the covenants, agreements, provisions or terms of this Guaranty shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Guaranty and shall in no way affect the validity or enforceability of the other provisions of this Guaranty.

Section 18. *Benefits; Third-party Beneficiary*. This Guaranty shall be effective as of the date hereof, without further act, condition or acceptance by the Lender, shall be binding upon the Guarantor and the successors and assigns of the Guarantor and shall inure to the benefit of the Lender and its successors and assigns.

Section 19. *Termination*. This Guaranty shall terminate upon the payment in full of the principal balance of the Loan plus any accrued interest (and fees, if any) thereon; *provided*, *however*, that the provisions of <u>Section 3(c)</u>, <u>Section 6</u> and <u>Section 7</u> hereof shall survive any termination of this Guaranty.

Section 20. *Notices.* All notices and other communications provided for hereunder shall be in writing (including by electronic mail) and mailed, sent or delivered to the applicable party at the address specified for such notices for such party in the Loan Agreement. All such notices and communications shall be effective, (i) if personally delivered, when received, (ii) if sent by certified mail, three Business Days after having been deposited in the mail, postage, prepaid, and (iii) if transmitted by electronic mail, when sent, receipt confirmed by telephone or electronic means.

[SIGNATURE PAGE FOLLOWS]

Doc ID: 15ae68e0846420a1193ea2628a1b735a80a05c7b

IN WITNESS WHEREOF, this Guaranty has been duly executed by the parties hereto a of the date and year first above written.

**GUARANTOR**

PS FUNDING, INC.,
a Delaware corporation

By: *Ellen Coleman*
Name:  Ellen Coleman
Title:    Treasurer

**LENDER**

PEER STREET FUNDING, LLC,
a Delaware limited liability company

By: *Louis A. Nees*
Name:   Louis Nees
Title:    Authorized Signatory

**ACKNOWLEDGED AND AGREED**

**BORROWER**

PS WAREHOUSE, LLC,
a Delaware limited liability company

By: PS FUNDING, INC.
Its: Member

By: *Ellen Coleman*
Name:  Ellen Coleman
Title:    Treasurer

[Guaranty and Indemnification Agreement]

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | PeerStreet Pocket Documents |
| **FILE NAME** | Guaranty - ...n copy).pdf and 4 others |
| **DOCUMENT ID** | 15ae68e0846420a1193ea2628a1b735a80a05c7b |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

Document History

**SENT**
**02 / 01 / 2021**
14:56:13 UTC-8

Sent for signature to Ellen Coleman (ecoleman@peerstreet.com) and Louis Nees (lnees@peerstreet.com) from mkay@peerstreet.com
IP: 172.90.219.10

**VIEWED**
**02 / 01 / 2021**
14:58:00 UTC-8

Viewed by Louis Nees (lnees@peerstreet.com)
IP: 47.155.8.42

**SIGNED**
**02 / 01 / 2021**
14:58:34 UTC-8

Signed by Louis Nees (lnees@peerstreet.com)
IP: 47.155.8.42

**VIEWED**
**02 / 01 / 2021**
16:50:37 UTC-8

Viewed by Ellen Coleman (ecoleman@peerstreet.com)
IP: 70.187.225.168

**SIGNED**
**02 / 01 / 2021**
16:50:52 UTC-8

Signed by Ellen Coleman (ecoleman@peerstreet.com)
IP: 70.187.225.168

**COMPLETED**
**02 / 01 / 2021**
16:50:52 UTC-8

The document has been completed.

## EXHIBIT 30

### GUARANTY AND INDEMNIFICATION AGREEMENT

This Guaranty and Indemnification Agreement (this "Guaranty") is entered into as of October 10, 2022, by PS FUNDING, INC., a Delaware corporation (the "Guarantor" and/or "Servicer"), in favor of PEER STREET FUNDING, LLC, a Delaware limited liability company, as a lender (together with its successors and assigns, the "Lender") under the Loan Agreement referred to below.

WHEREAS, PS WAREHOUSE, LLC, a Delaware limited liability company and PS WAREHOUSE II, LLC, a Delaware limited liability company, along with any similar Warehouse Entity (as defined in the Loan Agreement) (the "Borrower" and collectively with Guarantor and Lender, the "Parties"), the Guarantor, and the Lender are parties to that certain Loan and Security Agreement dated as of even date herewith (as amended, modified or supplemented from time to time, the "Loan Agreement");

WHEREAS, it is a condition precedent to the Lender making the Loan under the Loan Agreement, that the Guarantor enters into this Guaranty;

WHEREAS, the Guarantor directly owns all the ownership interests of the Borrower; and

WHEREAS, the Guarantor will receive substantial direct and indirect benefits from the consummation of the transactions contemplated by the Credit Documents.

NOW, THEREFORE, in consideration of the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. ***Definitions***. Unless otherwise defined in this Guaranty, all defined terms used in this Guaranty shall have the meanings ascribed to such terms in the Loan Agreement.

Section 2. ***Guaranty of Guaranteed Obligations***. The Guarantor hereby absolutely, irrevocably and unconditionally guarantees, for the benefit of the Lender, the due and punctual payment and performance by Borrower of its covenants, agreements and obligations contained in Loan Agreement and the other Credit Documents to which Borrower is a party (the "Guaranteed Obligations"), whether presently outstanding or arising subsequent to the date hereof.

Section 3. ***Unconditionality; Irrevocability***.

(a)    This is an absolute, unconditional and continuing guaranty of payment and performance of all Guaranteed Obligations, and the Guarantor agrees that its obligations under this Guaranty shall be irrevocable. The dissolution, insolvency or adjudication of bankruptcy of the Guarantor shall not revoke this Guaranty. For the avoidance of doubt, the Guarantor shall have no obligation to guarantee (and does not guarantee) any obligations of the underlying mortgagors under the Mortgage Loans, but fully guarantees the timely payment and repayment of the Loan made by Lender to Borrower.

(b)     No act or thing need occur to establish the liability or obligation of the Guarantor hereunder, and no act or thing, except full payment, discharge and performance of all Guaranteed Obligations, shall in any way exonerate the Guarantor hereunder or modify, reduce, limit or release the liability of the Guarantor hereunder. The Lender shall not be required first to resort to payment of the Guaranteed Obligations by the Borrower or other Person, or their properties or the Mortgage Loans, before enforcing this Guaranty. Until performance and payment in full of the Guaranteed Obligations, the Guaranteed Obligations of the Guarantor under this Guaranty shall not be affected, modified or impaired upon the happening from time to time of any event, including, without limitation, the events described in Section 4 herein, whether or not with notice to or the consent of the Guarantor.

(c)     The Guarantor further agrees that, if any payment applied hereunder to the Guaranteed Obligations is thereafter set aside, recovered, rescinded or required to be returned for any reason (including, without limitation, the bankruptcy, insolvency or reorganization of the Borrower or any other obligor) or declared to be fraudulent or preferential, the Guaranteed Obligations to which such payment was applied shall for the purpose of this Guaranty be deemed to have continued in existence, notwithstanding such payment, and this Guaranty shall be enforceable as to such Guaranteed Obligations as fully as if such payment had never been made. The provisions of this Section 3(c) hereof shall survive any termination of this Guaranty.

(d)     The Guarantor further agrees that the Borrower's interest in any and all Financed Loans and/or Borrower's Eligible Activity Interest are pledged to Lender as collateral for the Guaranteed Obligations. It is understood by the Parties hereto that Guarantor may retain record and legal title of (i) the Financed Loans while Borrower purchases participation interests therein and/or (ii) the other Eligible Activities and it is the Parties' intent and understanding that record and legal title to Eligible Activities be held by Guarantor for the benefit of the Borrower while the corresponding obligations are still outstanding. For convenience purposes, the Parties may decide not to record assignments of security instruments each time that the Borrower purchases Eligible Activity Interest, but this shall not operate as a waiver of the Borrower's rights to hold record and legal title. If an Event of Default has occurred and is continuing under any Credit Document and Lender has elected to exercise remedies with respect to the Collateral pursuant to the Loan Agreement (including, without limitation, Article 9 thereof), Lender shall be allowed to execute for itself, on behalf of and as attorney-in-fact for Guarantor, assignments of security instruments for any then-Eligible Activity Interest, with such assignments being deemed made and executed as of the date that Borrower acquired such Eligible Activity Interest. Alternatively, in Lender's sole and absolute discretion, if an Event of Default has occurred and is continuing and Lender has elected to exercise remedies with respect to the Collateral pursuant to the Loan Agreement (including, without limitation, Article 9 thereof), Lender may (i) require that the Eligible Activity Interest be assigned to Borrower of record and (ii) elect to record an assignment of membership interest, assigning all of Guarantor's rights and interests in Borrower to Lender.

Section 4. ***Continuation and Validity of Guaranteed Obligations***. The liability of the Guarantor shall not be affected or impaired by any of the following events: (a) the validity, enforceability, discharge, disaffirmance, settlement or compromise (by any Person, including any trustee in bankruptcy or other similar official) of the Guaranteed Obligations or of the Credit Documents, (b) the absence of any attempt to collect the Guaranteed Obligations from the Borrower or any guarantor or other Person, (c) the waiver or consent by Lender or any other

Person with respect to any provision of any instrument or agreement evidencing the Guaranteed Obligations, any delay or lack of diligence in the enforcement of the Guaranteed Obligations, or any failure to institute proceedings, file a claim, give any required notices or otherwise protect the Guaranteed Obligations other than the obligations sought to be enforced, (d) any change of the time, manner or place of payment or performance, or any other term of any of the Guaranteed Obligations, (e) any law, regulation or order of any jurisdiction affecting any term of any of the Guaranteed Obligations or rights of the Lender with respect thereto, (f) the failure by Lender to take any steps to perfect and maintain perfected its interest in any security or collateral related to the Guaranteed Obligations, (g) the commencement of any bankruptcy, insolvency or similar proceeding with respect to the Borrower or any other Affiliate of the Borrower, (h) any full or partial release of, compromise or settlement with, or agreement not to sue, the Borrower or any guarantor or other person liable in respect of any Guaranteed Obligations, (i) any release, surrender, cancellation or other discharge of any evidence of the Guaranteed Obligations or the acceptance of any instrument in renewal or substitution thereof, (j) any collection, sale, lease or disposition of, or any other enforcement of or realization on, any Collateral, (k) any assignment, pledge or other transfer of the Guaranteed Obligations or any evidence thereof, (l) any acceptance of collateral security, guarantors, accommodation parties or sureties for any or all Guaranteed Obligations, (m) any change in the existing relationship between the Guarantor and the Borrower including, without limitation, any sale or other transfer of the ownership interest of the Borrower by an affiliate of the Guarantor or (n) any legal or equitable discharge or defense of the Guarantor. The Guarantor waives any and all defenses and discharges available to a surety, guarantor or accommodation co-obligor.

Section 5. ***Representations and Warranties***. The Guarantor hereby makes the following representations and warranties as of the date hereof and as of the date of each advance of the Loan, with respect to itself alone, on which the Lender will be deemed to have relied in making the Loan or accepting the pledge of the Collateral, as the case may be:

(a)    *Existence and Power*. The Guarantor is a corporation duly organized, validly existing under the laws of its state of organization and has the power and authority to engage in the business it conducts and is qualified and in good standing in those states wherein the nature of business or property owned by it requires such qualification, is not required to be qualified in any other state; or if not so qualified, no adverse effect on the Guarantor's business would result therefrom. The Guarantor possesses all the franchises, permits, licenses, certificates of compliance and approval and grants of authority necessary or required in the conduct of its business and the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with the Guarantor's execution and performance of this Guaranty.

(b)    *Corporate Authorization and No Contravention*. The making, performance and execution of this Guaranty does not and will not violate any provisions of any law, rule, regulation, judgment, order, writ, decree, determination or award or breach any provisions of the certificate of incorporation, bylaws or other organization documents of Guarantor and the Guarantor has full power and authority under the laws of the state of its organization to enter into, execute and deliver and perform this Guaranty.

(c)    *No Consent Required*. All actions (corporate or otherwise) necessary or appropriate for the Guarantor's, execution, delivery and performance of this Guaranty have been taken. No approval or authorization by, or filing with, any (i) Federal, state, municipal, foreign or other governmental entity, board, bureau, agency or instrumentality, (ii) administrative or regulatory authority (including any central bank or similar authority) or (iii) court or judicial authority is required in connection with the execution, delivery and performance by the Guarantor of this Guaranty other than (x) approvals and authorizations that have previously been obtained and filings that have previously been made or approvals, authorizations or filings which will be made on a timely basis and (y) approval, authorizations or filings which, if not obtained or made, would not have a material adverse effect on the financial condition, business or operations of the Guarantor, taken as a whole.

(d)    *Binding Effect*. This Guaranty when delivered to the Lender will be, duly executed and constitute valid and legally binding obligations of the Guarantor enforceable against the Guarantor, in accordance with their respective terms except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

(e)    *No Proceedings*. There are no actions, suits or proceedings pending or, to the knowledge of the Guarantor, threatened in writing against the Guarantor or any of its Affiliates before or by any governmental authority that (i) assert the invalidity or unenforceability of this Guaranty or the Loan Agreement, (ii) seeking to prevent the consummation of any of the transactions contemplated by this Guaranty or the Loan Agreement, (iii) seeking any determination or ruling that would materially and adversely affect the performance by the Guarantor of its obligations under this Guaranty or the performance by the Borrower of its obligations under the Loan Agreement, (iv) seeking any determination or ruling that would adversely affect the validity or enforceability of this Guaranty or the Loan Agreement, or (v) that could reasonably be expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of, this Guaranty.

(f)    *Benefits*. The Guarantor has a substantial economic interest in the Borrower and expects to derive substantial benefits therefrom and from the transaction described in the Credit Documents, any loans, credit transactions, financial accommodations, discounts, purchases of property and other transactions and events resulting in the creation of Guaranteed Obligations and the other obligations guaranteed hereby, and this Guaranty shall be effective and enforceable by the Lender without regard to the receipt, nature or value of any such benefits.

(g)    *Solvency.* The Guarantor is not insolvent nor will it be rendered insolvent by virtue of entering into or carrying out this Guaranty.

(h)    *No Fines or Sanctions.* With respect to the Mortgage Loans, the sale of the Mortgage Loans and Participation Interests or the origination of the Mortgage Loans, as applicable, the Guarantor has not had any existing accrued and/or unpaid penalties, fines or sanctions imposed by and owing to any Governmental Authority.

(i)    *Anti-Money Laundering.* The Guarantor is fully compliant with all applicable provisions of the AML-BSA Laws and the Foreign Corrupt Practices Act of 1977, as amended,

and, to the extent required by Requirements of Law, has adopted policies and procedures reasonably designed to ensure its ongoing compliance with such laws, which policies and procedures are consistent with generally accepted standards within the Guarantor's industry for ensuring such compliance.

(j)    *Compliance with Law.* To the Guarantor's knowledge, the Guarantor is in compliance in all material respects with all applicable laws and regulations, federal, state and local, material to the conduct of its business and operations. The Guarantor possesses all the franchises, permits, licenses, certificates of compliance and approval and grants of authority necessary or required in the conduct of its business and the same are valid, binding, enforceable and subsisting without any defaults thereunder or enforceable adverse limitations thereon, and are not subject to any proceedings or claims opposing the issuance, development or use thereof or contesting the validity thereof; and no approvals, waivers or consents, governmental (federal, state or local) or non-governmental, under the terms of contracts or otherwise, are required by reason of or in connection with the Guarantor's execution and performance of this Guaranty. The Guarantor has not received any notice that the Guarantor, any of the Guarantor's Affiliates or Borrower (either in any such Person's capacity as the seller or servicer of Mortgage Loans) are not in material compliance in any respect with any of the requirements of any of the foregoing.

(k)    *Permits.* The Guarantor is in compliance with and has all permits necessary or required by any Requirement of Law or any Governmental Authority for the operation of its business as presently conducted and as proposed to be conducted, except where noncompliance, violation or lack thereof is not reasonably expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of this Guaranty.

(l)    *No Defaults.* The Guarantor is not in default under any agreement, contract, instrument or indenture to which the Guarantor is a party or by which it (or any of its assets) is bound, which default would reasonably be expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of this Guaranty, nor has any event occurred which, with the giving of notice, the lapse of time or both, would constitute a default under any such agreement, contract, instrument or indenture that would reasonably be expected to have a material adverse effect on the ability of the Guarantor to perform its obligations under, or the validity or enforceability of, this Guaranty.

Section 6. ***Covenants***.

(a)    *Further Assurances.* The Guarantor will do, execute and perform all such other acts, deeds and documents as any Lender may from time to time reasonably require in order to carry out this Guaranty.

(b)    *Adequate Capital.* The Guarantor at all times shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

Section 7. ***Indemnification***. The Guarantor hereby agrees to indemnify, defend and hold harmless the Lender and its directors, officers, trustees, managers, shareholders, partners, members, agents and employees and attorneys (hereinafter collectively referred to as the

"Indemnified Lender Parties"), from and against, and agrees promptly to pay on demand or reimburse each of them with respect to, any and all liabilities, claims, demands, losses, damages, costs, and expenses (including all reasonable attorney's fees and expenses, court costs, other legal and expert witness fees and expenses and all costs of investigation, taxes and penalties) (collectively, "Damages") incurred by such Indemnified Lender Party by reason of (i) any breach of any covenant or agreement or the incorrectness or inaccuracy of any representation or warranty of the Guarantor contained in this Guaranty, or any other agreement, instrument or document executed in connection with this Guaranty; (ii) the exercise by the Lender of any rights or remedies under this Guaranty; (iii) any fraud or gross negligent or willful act or omission committed by the Guarantor, or any party acting on its behalf, or (iv) any litigation, proceeding or investigation initiated by a mortgagor or any third party or by any Governmental Authority asserting a violation of Requirements of Law by the Guarantor or a bank in respect of the origination of any Mortgage Loan or the transfer thereof by the bank to the Guarantor or by the Guarantor to Borrower, in which such Indemnified Lender Party becomes involved as a result of any of the transactions contemplated by the Loan Agreement. The provisions of this Section 7 shall survive the full payment, performance, and discharge of the obligations of the Borrower under, and the termination of, the Loan Agreement, and shall continue thereafter in full force and effect.

Section 8. *Independent Obligations*. The obligations of the Guarantor hereunder are undertaken as primary obligor and independently of the obligations of the Borrower, or any other obligor, guarantor or Person, and action or actions may be brought or prosecuted directly against the Guarantor whether or not action is brought first or at all against the Borrower, the Servicer or any other obligor, guarantor or Person, against any collateral security or any other circumstance whatsoever, and whether or not any other obligor, guarantor or Person is joined in any such action or actions, or any claims or demands are made or are not made, or any action is taken on or against any other obligor, guarantor or Person or any collateral security or otherwise.

Section 9. *Waivers*. The Guarantor waives any and all defenses, claims, setoffs and discharges of the Borrower or any other obligor, pertaining to the Guaranteed Obligations. Without limiting the generality of the foregoing or any other provision hereof, to the fullest extent permitted by applicable law, the Guarantor hereby waives: (a) any defense arising by reason of any invalidity or unenforceability of the Borrower's obligations in respect of the Credit Documents, any manner in which the Lender has exercised (or not exercised) any rights and remedies under the Credit Documents, or any cessation from any cause whatsoever of the liability of any obligor, guarantor or Person; (b) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of the Credit Documents (including this Guaranty); (c) notice of any indulgences, extensions, consents or waivers given to the Borrower or any other obligor, guarantor or Person, notice of any Default or Event of Default under the Loan Agreement or default or event of default under any of the other Credit Documents or other notice of any kind whatsoever; (d) any right or claim of right to cause the Lender to proceed against the Borrower or any other obligor, guarantor or Person in any particular order, to proceed against or exhaust any collateral security held by the Lender at any time or to pursue any other right or remedy whatsoever at any time; (e) any requirement of diligence or promptness on the Lender's part in (x) making any claim or demand on or commencing suit against the Borrower or any other obligor, guarantor or Person, and (y) otherwise enforcing the Lenders' rights in respect of the Loan Agreement or the other Credit Documents; (f) any defense of waiver, release, discharge in bankruptcy, statute of

limitations, res judicata, statute of frauds, anti-deficiency statute, fraud, usury, illegality or unenforceability which may be available to any person liable in respect of any Guaranteed Obligations, or any setoff available against, the Lender to the Borrower, or any other such person, whether or not on account of a related transaction; and (g) any duty of the Lender to advise the Guarantor of any information known to the Lender regarding the financial condition of the Borrower or any other circumstance, it being agreed that the Guarantor assumes responsibility for being and keeping informed of such condition or any such circumstance.

Without limiting the generality of the foregoing, to the fullest extent permitted by applicable law, the Guarantor specifically waives all defenses the Guarantor may have based upon any election of remedies by the Lender which eliminates the Guarantor's rights to proceed against the Borrower or any other obligor, guarantor or Person for reimbursement, contribution or otherwise, including any loss of rights that it may suffer by reason of any rights, powers, remedies or defenses of the Borrower in connection with any laws limiting, qualifying or discharging indebtedness of or remedies against the Borrower, and the Guarantor hereby agrees not to exercise or pursue, so long as any of the Guaranteed Obligations remain unsatisfied, any right to reimbursement, subrogation, or contribution from the Borrower in respect of payments hereunder.

Section 10. ***Significance of Waivers***. The Guarantor represents, warrants and agrees that each of the waivers set forth herein are made with the Guarantor's full knowledge of its significance and consequences, with the understanding that events giving rise to any defense waived may diminish, destroy or otherwise adversely affect rights which the Guarantor otherwise may have against the Borrower or any other obligor, guarantor or Person, or against collateral, and that under the circumstances the waivers are reasonable.

Section 11. ***Reimbursement***. The Guarantor shall pay or reimburse upon demand all third-party out-of-pocket costs and expenses (including attorneys' fees and legal expenses) incurred by the Lender in connection with the protection, defense or enforcement of this Guaranty in any litigation or bankruptcy or insolvency proceedings.

Section 12. ***Cumulative Liability***. The liability of the Guarantor under this Guaranty is in addition to and shall be cumulative with all other liabilities of the Guarantor, if any, as Guarantor, surety, endorser, accommodation co-obligor or otherwise of any Guaranteed Obligations or obligation of the Borrower, without any limitation as to amount.

Section 13. ***Amendments***. This Guaranty may not be waived, modified, amended, terminated, released or otherwise changed except by a writing signed by the Guarantor and the Lender. The Guarantor may not assign its obligations hereunder without the prior written consent of the Lender.

Section 14. ***Governing Law***. THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL, SUBSTANTIVE LAWS  OF THE STATE OF CALIFORNIA BUT EXCLUDING TO THE MAXIMUM EXTENT PERMITTED BY LAW ALL RULES RELATING TO CONFLICTS OF LAW AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 15. ***Submission to Jurisdiction.*** Each of the parties hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Guaranty or any documents executed and delivered in connection herewith, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of California, the courts of the United States of America for the Central District of California and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; and

(c)    agrees that nothing herein shall affect the right to effect service of process in any manner permitted by law or shall limit the right to sue in any other jurisdiction.

Section 16.    ***Counterparts***. This Guaranty may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 17. ***Severability of Provisions***. If any one or more of the covenants, agreements, provisions or terms of this Guaranty shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Guaranty and shall in no way affect the validity or enforceability of the other provisions of this Guaranty.

Section 18. ***Benefits; Third-party Beneficiary***. This Guaranty shall be effective as of the date hereof, without further act, condition or acceptance by the Lender, shall be binding upon the Guarantor and the successors and assigns of the Guarantor and shall inure to the benefit of the Lender and its successors and assigns.

Section 19. ***Termination***. This Guaranty shall terminate upon the payment in full of the principal balance of the Loan plus any accrued interest (and fees, if any) thereon; *provided*, *however*, that the provisions of <u>Section 3(c)</u>, <u>Section 6</u> and <u>Section 7</u> hereof shall survive any termination of this Guaranty.

Section 20. ***Notices.*** All notices and other communications provided for hereunder shall be in writing (including by electronic mail) and mailed, sent or delivered to the applicable party at the address specified for such notices for such party in the Loan Agreement. All such notices and communications shall be effective, (i) if personally delivered, when received, (ii) if sent by certified mail, three Business Days after having been deposited in the mail, postage, prepaid, and (iii) if transmitted by electronic mail, when sent, receipt confirmed by telephone or electronic means.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, this Guaranty has been duly executed by the parties hereto a of the date and year first above written.

**GUARANTOR**

PS FUNDING, INC.,
a Delaware corporation


By: _____
Name: Ellen Coleman
Title: Treasurer


**LENDER**

PEER STREET FUNDING, LLC,
a Delaware limited liability company

By:    Peer Street, Inc.,
        a Delaware corporation, its Member


        By: _____
            Brewster Johnson, President

**ACKNOWLEDGED AND AGREED**

**BORROWER**

PS WAREHOUSE, LLC,
a Delaware limited liability company

By: PS FUNDING, INC.
Its: Member


By: _____
Name:   Brewster Johnson
Title:    President

PS WAREHOUSE II, LLC,
a Delaware limited liability company

By: PS FUNDING, INC.
Its: Member


By: _____
Name: Brewster Johnson
Title: President

## EXHIBIT 31

## MASTER LOAN SALE AGREEMENT

This MASTER LOAN SALE AGREEMENT (this "Agreement"), is made effective as of September 21, 2022 ("Effective Date"), by and between PS FUNDING, INC., a Delaware corporation, and its affiliates and designated assignees (collectively "Seller"), and PS PORTFOLIO – ST1, LLC, a Delaware limited liability company ("Buyer").

### RECITALS

A.    Seller is (or will be) the holder of the Loans, with each such Loan being evidenced, secured, and/or guaranteed by the Loan Documents applicable thereto.

B.    From time to time, Buyer desires to purchase and assume from Seller, and Seller desires to sell and assign to Buyer (i) all of Seller's right, title, and interest in and to one (1) or more of the Loans (as evidenced by the Notes and other Loan Documents applicable to the Loans in question), and any and all of the Seller's rights, duties, and obligations that may exist with respect thereto pursuant to the terms and conditions of this Agreement and the applicable Loan Purchase Certificates; and/or (ii) a certain Participation Interest (defined below) in and to one (1) or more of the Loans, pursuant to terms of a Participation Agreement (defined below) entered into by and between the Buyer and Seller.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE 1  – DEFINED TERMS

As used herein and/or in any Loan Purchase Certificate, the following terms shall have the following meanings.  Whenever the context of this Agreement and/or any Loan Purchase Certificate requires, references to the singular number shall include the plural, and the plural shall include the singular, where appropriate; words denoting gender shall be construed to include the masculine, feminine, and neuter where appropriate; and specific enumeration shall not exclude the general, and shall be considered as cumulative.

Section 1.1    "Accepted Servicing Practices" shall mean, with respect to any Loan, those mortgage servicing practices of prudent business purpose residential mortgage lending institutions which service mortgage loans of the same type as such Loan in the jurisdiction where the related Collateral is located, including, without limitation, mortgage servicing practices that comply, in all material respects, with any applicable laws and regulations and any applicable insurer or guarantor requirements in respect of a Loan.

Section 1.2    "Appraisal" shall mean, with respect to any Loan, an appraisal of the value of the related Property that was made that meets the requirements of Title XI of FIRREA, and prepared by a Qualified Appraiser. All appraisals shall be written, in form and substance, to (i) USPAP standards or (ii) satisfies applicable legal and regulatory requirements. If the Loan provides

1

for a holdback of loan proceeds to be used for rehabilitation or repair of the Property, the appraisal shall be based on the "as repaired" value of the Property (i.e., assuming completion of all repairs contemplated by Seller); and if the Loan does not provide for such a holdback, then the appraisal shall be based on the Property's "as is" value.

Section 1.3    "Borrower" or "Borrowers" shall mean, with respect to the Loan in question, individually and collectively, as applicable, those certain borrowers under such Loans, as identified on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

Section 1.4    Intentionally Omitted.

Section 1.5    "BPO"  shall mean, with respect to any Loan, a broker's price opinion of the "as is" fair market value of the related Property given by a licensed real estate agent or broker acceptable to Seller, incorporating an exterior or interior inspection of the residence on such Property and obtained by or on behalf of Seller or Buyer in conformity with customary and usual business practices.

Section 1.6    "Business Day" shall mean any day which is not a Saturday or Sunday and is not a public holiday in California, or the jurisdictions of the office of the Custodian or a day on which businesses or banks are required or requested to close by government proclamation.

Section 1.7    "Closing" shall mean, for the Loan in question, the consummation of the transactions set forth herein and contemplated in a Loan Purchase Certificate for such Loan, and, without limitation, shall not occur unless and until Seller has received the entirety of the Purchase Price in immediately available funds for such Loan pursuant to the terms and conditions of this Agreement and such Loan Purchase Certificate.

Section 1.8    "Closing Date" shall mean the date that Seller receives the Purchase Price for a particular Loan if received by 12pm Pacific Time; if the Purchase Price is received by Seller after 12pm Pacific Time on a particular day, the Closing Date shall be the following Business Day.

Section 1.9    "Collateral" shall mean, for a particular Loan, any and all real and/or personal property securing the indebtedness and other obligations of the Borrowers and/or Guarantors under such Loan, including without limitation, the Properties encumbered by such Loan.

Section 1.10      "Commitment Amount" shall have the meaning assigned to it in Section 2.1.

Section 1.11      "Custodian" shall mean the document custodian appointed by Buyer to hold the Loan Files.

Section 1.12      "Diligence Period" shall mean, for the Loan in question, the time period commencing on the date that Buyer receives the Loan Purchase Certificate for the Loan(s) in question and ending five (5) Business Days thereafter; provided, however, in no event shall the foregoing preclude or otherwise limit Buyer's right to (i) inspect the Loan File for the Loan in question or (ii) request any documents, reports, plans and/or agreements from and after the commencement or expiration of the Diligence Period for the Loan in question, and upon any

such request, Seller shall promptly deliver (or cause to be delivered) same to Buyer to the extent such documents, reports, plans and/or agreements, as applicable, are within Seller's possession and/or control.

Section 1.13          Intentionally Omitted.

Section 1.14          "Guarantor" or "Guarantors" shall mean, with respect to the Loan in question, individually and collectively, as applicable, any guarantor, surety, or other Person (other than the Borrowers) that has guaranteed the indebtedness and/or obligations, in whole or in part, of the Borrowers, and any of them, under such Loan.

Section 1.15          "Guaranty" shall mean, with respect to the Loan in question, any and all instruments and/or agreements evidencing Guarantor's obligations in respect of his, her, and/or its guaranty of such Loan.

Section 1.16          "Loan" or "Loans" shall mean, individually and collectively, as applicable, the loans made to each of the Borrowers identified in the Loan Purchase Certificates applicable to such loans, as evidenced by the Loan Documents applicable thereto, and as referenced on Schedule 1 of the Loan Purchase Certificate in question, which Schedule 1 shall be attached to such Loan Purchase Certificate and made a part hereof and thereof.

Section 1.17          "Loan Documents" shall mean, with respect to the Loan in question, each of the documents set forth on Exhibit "D" hereto, as applicable, together with all extensions, modifications, supplements, and amendments thereto or restatements thereof.

Section 1.18          "Loan File" shall mean, with respect to the Loan in question, the documents and correspondence in Seller's possession with respect to such Loan (including documents and correspondence from the Borrower, and Borrower's agents and representatives used by Seller in connection with its underwriting and origination of such Loan) that Seller reviewed or considered in connection with Seller's underwriting and origination of such Loan, including, but not limited to, as may be applicable to such Loan, the Loan Documents, appraisals, credit applications, credit reports, final internal credit memoranda, leases, surveys, audits, environmental reports, financial statements, insurance on collateral, the Seller Loan Policy, or, in the absence of a final Seller Loan Policy, a final pro forma title policy or commitment issued to Seller by the Title Company, complete and current credit information regarding Loan collateral value, factual information bearing on the creditworthiness of the Borrower or any Guarantor, any other credit, due diligence material and other information concerning Borrower, the Collateral, or any Guarantors of such Loan.

Section 1.19          "Loan Purchase Certificate" shall mean an agreement in the form attached hereto as Exhibit "A", or as otherwise agreed in writing by the Parties.

Section 1.20          "Note" or "Notes" shall mean, with respect to the Loan in question, individually and collectively, as applicable, the promissory note(s) made by a Borrower evidencing the indebtedness owed under such Loan.

3

Section 1.21          "Party" shall mean a signatory to this Agreement.

Section 1.22          "Parties" shall mean Buyer and Seller, collectively, as signatories to this Agreement.

Section 1.23          "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, trust, or unincorporated organization, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

Section 1.24          Intentionally Omitted.

Section 1.25          "Participation Agreement" shall mean that certain Participation Agreement of even date by and between the Parties hereto.

Section 1.26          "Property" or "Properties" shall mean, with respect to the Loan in question, individually and collectively, as applicable, the real property Collateral (if any) securing the obligations of Borrowers and/or Guarantors under such Loan.

Section 1.27          "Purchase Price" shall mean, with respect to a particular Loan, the Purchase Price for such Loan as set forth on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

Section 1.28          "Qualified Appraiser" shall mean, with respect to each Loan, an independent appraiser, duly appointed by Seller or Buyer, who had no interest, direct or indirect, in the related Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Loan, and licensed or certified by the applicable governmental body for the jurisdiction in which the related Property is located.

Section 1.29          "Repurchase Price" shall mean, with respect to any Loan, a price equal to (i) the unpaid principal balance of such Loan as of such date of determination, plus (ii) accrued interest thereon from the date to which interest had last been paid and distributed to Buyer through the date of such repurchase, plus (iii) the amount of any outstanding advances owed to any servicer, plus (iv) Buyer's expenses incurred in transferring such Loan, including, without limitation, expenses incurred for maintenance and repairs, assessments, taxes and similar items, and (v) all reasonable out-of-pocket costs and expenses incurred in the enforcement of Seller's repurchase obligation hereunder.

Section 1.30          "Security Instrument" or "Security Instruments" shall mean, for the Loan in question, individually and collectively, as applicable, any security instrument, deed of trust, mortgage, or other instrument creating a lien on any real property Collateral securing such Loan.

Section 1.31          "Seller Loan Policy" shall mean (i) an ALTA lender's title insurance policy, (ii) with respect to any Loan secured by a Property located in any jurisdiction as to which an opinion of counsel is customarily rendered in lieu of title insurance, such customary opinion of counsel, or (iii) other comparable form of title insurance policy approved for use in the

4

applicable jurisdiction (or, if such policy is yet to be issued, a pro forma policy, a preliminary title policy with escrow instructions or a "marked up" commitment, in each case binding on the title insurer). Each such title insurance policy is issued by a title insurer qualified, authorized and licensed to transact the applicable insurance business and to write the insurance provided in the jurisdiction where the Property is located, insuring Seller, its successors and assigns, as to the first priority lien of the Security Instrument in the original principal amount of the Loan, subject only to encumbrances permitted by the Loan Documents.

Section 1.32    "Servicing Agreement" shall mean that certain Loan Management Agreement dated as of the date hereof made by and between the Parties hereto.

Section 1.33    "Termination Date" shall mean the date which is five (5) Business Day after the mutual execution of the Loan Purchase Certificate applicable to such Loan.

Section 1.34    "Title Company" the title insurance company issuing the Seller Loan Policy.

### ARTICLE 2    – PURCHASE AND SALE OF LOANS

Section 2.1    The Parties are entering into this Agreement wherein Seller may sell to Buyer and Buyer may buy from Seller one (1) or more Loans; provided the Parties mutually execute a Loan Purchase Certificate for the Loans in question.

Section 2.2    Seller and Buyer shall become obligated to sell/purchase a Loan, subject to the terms and conditions of this Agreement (including without limitation, satisfaction of all conditions precedent to the Closing of such sale), when Buyer and Seller mutually execute a Loan Purchase Certificate for the Loan in question, in their mutual discretion. Seller shall prepare and deliver to Buyer for Buyer's execution, a Loan Purchase Certificate for the approved Loan(s).  Buyer shall have five (5) Business Days from receipt of the applicable Loan Purchase Certificate to execute and return the Loan Purchase Certificate for the Loan(s) in question to Seller for counter-execution.

Section 2.3    Upon and subject to the terms and conditions of this Agreement and the Loan Purchase Certificate for the Loans in question, and in consideration of the Purchase Price for said Loans, upon the Parties' mutual execution of a Loan Purchase Certificate, Seller shall be deemed to have agreed to sell and to assign to Buyer, and Buyer shall be deemed to have agreed to purchase, accept, and assume from Seller, on the terms and conditions set forth herein and in such Loan Purchase Certificate, all of Seller's right, title and interest in, to, under, and concerning the Loans identified in such Loan Purchase Certificate. Notwithstanding anything to the contrary in this Agreement or in any Loan Purchase Certificate, the Closing shall occur on the Closing Date.  If the Closing Date for a particular Loan has not occurred on or prior to the Termination Date, the Loan Purchase Certificate, to the extent applicable to such Loan, shall terminate, and following Seller's request, Buyer shall deliver to Seller, or discard, all information, reports, data, and other materials that Buyer and/or Buyer's agents, consultants, or employees discover, obtain, or generate in

5

connection with, or resulting from, Buyer's inspection and investigation of such Loan, except one copy to be retained for audit and regulatory compliance purposes.

Section 2.4    <u>Diligence</u>.

2.4.1    During the Diligence Period for each Loan, Buyer shall have the opportunity to review, inspect, and investigate (or shall have affirmatively chosen not to obtain, review, inspect, or investigate), each and every aspect of the Loan in question, the Loan Documents for such Loan, the Property securing such Loan, all other Collateral securing such Loan, and all other documents, instruments, statements, records, returns, agreements, information, and other matters delivered by Seller to Buyer, or otherwise made available to Buyer, in connection with such Loan and/or this Agreement and/or the Loan Purchase Certificate applicable to such Loan.

2.4.2    During the Diligence Period, Buyer shall not contact either directly or indirectly, any Borrower or other party related to any Loan in connection with Buyer's proposed purchase of a Loan unless specifically permitted by Seller in writing.  During the Diligence Period, Buyer shall contact Seller to request any document or information that Buyer believes is not contained in the Loan File and may be material to its independent evaluation of the Loan and its decision whether to purchase the Loan, and Seller shall provide such documents or information to the extent such documents or information are not privileged or otherwise protected from disclosure by applicable law or regulation and within Seller's possession or control.  Seller shall notify Buyer of any material changes to the Loan or Loan File as they become available prior to the Closing Date.

2.4.3    Notwithstanding anything to the contrary in this Agreement, the fact that Buyer has conducted or has determined not to conduct, any partial or complete examination of the Loan File shall in no event impair or diminish the rights of Buyer or any of its successors under this Agreement with respect to any breach of the representations and warranties contained in this Agreement, including but not limited to Buyer's or any of its successor's rights to demand repurchase or indemnification provided for in this Agreement.

Section 2.5    <u>Payment of Purchase Price</u>.  Within one (1) Business Day following mutual execution of the Loan Purchase Certificate, Buyer shall deliver to Seller the Purchase Price for such Loan in immediately available funds, plus Buyer's share of costs and charges payable pursuant to this Agreement for such Loan on such Closing Date.

2.5.1    If the Closing for a particular Loan has not occurred on or prior to the Termination Date, unless otherwise agreed by both Parties in writing, the offer, and the Loan Purchase Certificate, shall be terminated and Seller shall have no further obligation to sell the Loan and Buyer shall have no further obligation to buy the Loan.

2.5.2    Seller shall, on or before the related Closing Date, deliver and release to Custodian, on behalf of Buyer, the Loan Documents to be held by Custodian with respect to each Loan purchased on such Closing Date.  To the extent that any such Loan Documents have been delivered for recording and have not yet been returned to Seller by the applicable recording office, Seller shall, promptly following receipt by it of such Loan Documents from

the applicable recording office, deliver such documents to Custodian; provided, however, that the original recorded document or a clerk-certified copy thereof shall be delivered to Custodian no later than one hundred twenty (120) days following the related Closing Date; provided, however, in the event that Seller has not received the recorded document from the recording office by the time set forth herein, Seller shall deliver such document promptly upon receipt thereof.

Section 2.6    <u>Deliveries</u>.

2.6.1    <u>Seller Deliveries</u>.  At least five (5) Business Days before the Closing Date for the sale of any particular Loan, Seller shall execute (and where applicable, duly acknowledge) and deliver a copy to Buyer via electronic delivery, the following documents (collectively, "<u>Seller Closing Documents</u>") in connection with the sale of such Loan, unless (and then, only to the extent) delivery of any of the below items is waived by Buyer in writing:  (i) the Note evidencing such Loan; (ii) the duly executed allonge endorsement to the Note evidencing such Loan, the form of which is attached hereto as <u>Exhibit B</u>; (iii) the Loan Documents applicable to such Loan; (iv) an Assignment of Security Instrument and Other Loan Documents with respect to the Security Instrument applicable to such Loan and all other Loan Documents in connection therewith, in substantially the form and content set forth on <u>Exhibit C</u>, attached hereto and made a part hereof, executed and acknowledged by Seller ("<u>Assignment of Security Instrument</u>"); (vi) the Seller Loan Policy for such Loan; (vii) a loan payment history for the Note; and (viii) such other documents as may be reasonably requested by Buyer to consummate the sale of such Loan to Buyer in accordance with the terms of this Agreement and the Loan Purchase Certificate for such Loan.

2.6.1(a)    Seller shall, upon request of Buyer and within three (3) Business Days of the Closing Date for sale of the Loan in question, cause the Assignment of Security Instrument for such Loan to be recorded in the official records of each and every county and state in which the Property securing such Loan is located; provided that to the extent recording information from the Security Instrument or prior assignments is unavailable, Seller shall cause the Assignment of Security Instrument for such Loan to be recorded promptly when such information is available.

2.6.2    <u>Buyer Deliveries</u>.  For each Loan being purchased by Buyer, and in addition to the Purchase Price for such Loan plus Buyer's share of costs and charges payable pursuant to this Agreement for such Loan, Buyer shall deliver to Seller via electronic delivery at least one (1) Business Day before the Closing Date of such Loan any other documents as may be reasonably requested by Seller to consummate the sale of such Loan to Seller in accordance with the terms of this Agreement and the Loan Purchase Certificate for such Loan (the "<u>Buyer Closing Documents</u>").

Section 2.7    <u>Closing Costs</u>.  Seller shall pay (a) the premiums for any title endorsements, if applicable, (b) any broker, finder, or other person claiming by, through or under Seller, and (c) all recording and filing costs and expenses incurred hereunder.  Other closing costs shall be apportioned in accordance with the custom and practice in the jurisdiction where the Property is located.  Each Party shall pay its own attorney's fees.

Section 2.8    <u>Loan Proceeds</u>.  With respect to each Loan, Seller shall be entitled to, and shall be entitled to the benefit of, all payments of principal and interest, prepayment penalties or premiums, fees, reimbursements, proceeds (including, without limitation, insurance proceeds, condemnation awards, and proceeds from any Collateral for such Loan), and all other sums and amounts (collectively, the "Loan Proceeds") collected from the Borrower, Guarantor, or any other Person with respect to such Loan, on or prior to the Closing Date for such Loan. Buyer shall be entitled to all Loan Proceeds with respect to such Loan collected from the Borrower, Guarantor, or any other person with respect to such Loan after the related Closing Date (net of any originator fees or other amounts payable pursuant to the Servicing Agreement in respect thereof).

Section 2.9    <u>Intentionally Omitted.</u>

Section 2.10        <u>Conditions to Closing</u>.

2.10.1        <u>Conditions to Buyer's Obligations</u>.  The Closing Date for any particular Loan and the obligations of Buyer to consummate the transactions contemplated by this Agreement and the Loan Purchase Certificate for such Loan are, in addition to the other terms and conditions of this Agreement and such Loan Purchase Certificate, subject to the satisfaction of the following conditions set forth in this Section 2.11.1, each of which is for the sole benefit of Buyer, and any one or more of which may be waived in whole or in part by Buyer in writing in its sole discretion:

(a)    the representations and warranties of Seller set forth in Article 4 of this Agreement shall be true on and as of the Closing Date for such Loan as if the same were made on and as of such Closing Date; and

(b)    Seller shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement and the Loan Purchase Certificate for such Loan to be performed by Seller on or prior to the Closing Date for such Loan; and

(c)    Buyer's title to the beneficial interest under the Security Instrument for such Loan shall be evidenced by the Seller Loan Policy or a mortgage assignment endorsement, applicable in the jurisdiction where the Property is located, to the Seller Loan Policy for such Loan, issued by Title Company, insuring Buyer's beneficial interest under the Security Instrument evidencing such Loan and naming Buyer or Seller's successors and assigns as the insured party under the Seller Loan Policy for such Loan.

2.10.2        <u>Conditions to Seller's Obligations</u>.  The Closing Date for any particular Loan and the obligations of Seller to consummate the transactions contemplated by this Agreement and the Loan Purchase Certificate for such Loan are, in addition to the other terms and conditions of this Agreement and such Loan Purchase Certificate, subject to the satisfaction of the following conditions set forth in this Section 2.11.2, each of which is for the sole benefit of Seller, and any one or more of which may be waived in whole or in part by Seller in writing in its sole discretion:

8

(a) the representations and warranties of Buyer set forth in Article 3 of this agreement shall be true on and as of the Closing Date for such Loan as if the same were made on and as of such Closing Date; and

(b) Buyer shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement for such Loan to be performed by Buyer on or prior to the Closing Date for such Loan; and

(c) Seller shall have received the Purchase Price for such Loan, and Buyer shall have paid any and all costs, fees, or expenses required of Buyer hereunder in connection with such Loan; and

(d) Buyer shall have executed and deposited with Seller all of the Buyer Closing Documents applicable to such Loan.

## ARTICLE 3 – INTENTIONALLY OMITTED

## ARTICLE 4 - SELLER'S REPRESENTATIONS AND WARRANTIES

Section 4.1    Seller shall be deemed to have made the following additional representations, warranties and covenants to Buyer, with respect to each Loan in question, each of which representations, warranties and covenants Seller represents to be true and correct in all material respects as of the execution of the Loan Purchase Certificate for the Loan in question and as of the Closing Date for such Loan, unless otherwise expressly stated in Schedule 2 to the Loan Purchase Certificate for the Loan in question.

4.1.1    Servicing.  At all times during which Seller has owned the Loan, the Loan has been serviced in compliance with Accepted Servicing Practices.

4.1.2    Ownership.    Seller is the owner of the Loan and holder of the Loan Documents, and except to Buyer as set forth in this Agreement, Seller has not assigned, transferred, conveyed, pledged, or granted a security interest in the Loan Documents, and Seller has the full right to transfer and sell the Loan to Buyer free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest, and following the sale of each Loan, Buyer will own the Loan and hold the Loan Documents free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest. Seller used no selection procedures that identified Loans offered for sale to Buyer hereunder as being less desirable or valuable than other comparable Loans owned by Seller.

4.1.3    Loan Balance; Disbursement of Proceeds.  The outstanding principal balance of the Note for the Loan in question, as well as the amount which remains committed but undisbursed, is accurately set forth on Schedule 1 attached to the Loan Purchase Certificate for the Loan in question.  To Seller's knowledge, all costs, fees and expenses incurred in making or closing the Loan and all recording fees and costs were paid, and the Borrower is not entitled to any refund of any amounts paid or due under the Loan Documents.

9

4.1.4    Impound Accounts.  There are no impound accounts for taxes, insurance or any other items associated with the Loan in question except as may be shown on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

4.1.5    No Foreclosure Actions.  Seller has not commenced any judicial or non-judicial foreclosure actions or exercised any other enforcement actions in connection with the Loan, including without limitation, any equitable rights of set-off.

4.1.6    No Litigation.  Seller has not received written notice of any material pending or threatened litigation, administrative proceeding, investigation, executive or legislative proceeding or other form of governmental enforcement in any way related to, directed at or otherwise affecting (i) the Loan Documents or (ii) the use, operation or occupancy of any portion of the Property securing the Loan or other Collateral referenced in the Security Instrument for such Loan, or (iii) any affirmative defenses of Borrower or Guarantor to the Loan.

4.1.7    Loan Payments.  All payments required to be made under the terms of the Loan Documents have been made and credited up to the Closing Date for the Loan.  No Loan is (or, during the period Seller has owned such Loan, or to Seller's knowledge at any other time, has been) more than 30 days delinquent (beyond any applicable grace or cure period) in making required payments.  To Seller's knowledge, there is (a) no material default, breach, violation or event of acceleration existing under any Loan, and (b) no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration, which default, breach, violation or event of acceleration, in the case of either clause (a) or clause (b), materially and adversely affects the value of the Loan.  Seller has not waived any default, breach, violation or event of acceleration under the Loan or any Loan Document.

4.1.8    Accuracy of Loan Documents.  The Loan Documents delivered to Buyer and/or Custodian in accordance with the terms of this Agreement are true and correct and the terms of the Loan Documents have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded to the extent any such recordation is required by law, or, necessary to protect the interest of the Buyer.  The terms of any such waiver, alteration or modification (whether complete or in process) are reflected in the Loan Documents, and the written instrument reflecting such terms has been included in the Loan File for the Loan.  No Borrower has been released, in whole or in part, from the terms of the Loan Documents.

4.1.9    Taxes Paid.  To Seller's knowledge,  all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents and any other charges payable on the Loan which previously became due and owing are non-delinquent, have not become a lien upon the Property securing the Loan and have been paid, or escrow funds have been established, to the extent permitted by law, in an amount sufficient to pay for every such escrowed item which remains unpaid and which has been assessed but is not yet due and payable.

4.1.10        No Defenses.  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense and no such right of rescission, set-off, counterclaim or defense has been asserted in writing with respect thereto. Seller has no knowledge nor has it received any written notice that any Borrower in respect of the Loan is presently, or was at the time the Loan was originated, a debtor in any state or Federal bankruptcy or insolvency proceeding.  Seller has not, nor, to Seller's knowledge, has any originator from which Seller acquired the Loan, advanced funds, or induced, solicited, or knowingly received any advance of funds by a party other than the Borrower, directly or indirectly, for the payment of any amount required under the Loan.

4.1.11        Hazard Insurance.  The Property securing the Loan is insured by a fire and extended perils insurance policy, issued by a generally acceptable insurance carrier, and such other hazards as are customary in the area where such Property is located, and to the extent required by Seller as of the date on which the Loan was originated, and against other risks insured against by Persons operating like properties in the locality of such Property, in an amount not less than the lesser of (a) one hundred percent (100%) of the replacement cost of all improvements to such Property, or (b) the outstanding principal balance of the Loan, all in a form usual and customary in the industry and that is in full force and effect, and all amounts required to have been paid under any such policy have been paid.  If any portion of such Property is in an area identified by any Federal governmental authority as having special flood hazards, and flood insurance is available, a flood insurance policy meeting the current guidelines of the Federal Emergency Management Agency is in effect with a generally acceptable insurance carrier, in an amount representing coverage not less than the least of (a) the outstanding principal balance of the Loan, (b) the full insurable value of the Property, and (c) the maximum amount of insurance available under the National Flood Insurance Act of 1968, as amended by the Flood Disaster Protection Act of 1974.  All such insurance policies (collectively, the "Hazard Insurance Policy") contain a standard mortgagee clause naming Seller, its successors and assigns (including, without limitation, subsequent owners of the Loan), as mortgagee, loss payee or additional insured.  Seller has not engaged in, and has no knowledge of the Borrower's having engaged in, any act or omission which would impair the coverage of any such policy or the validity and binding effect of either. Each such insurance policy may not be reduced, terminated or canceled without thirty (30) calendar day's prior written notice to the mortgagee.  The Security Instrument obligates the Borrower thereunder to maintain all such hazard insurance policies at the Borrower's cost and expense.

4.1.12        Compliance with Applicable Laws.  (a) Any and all requirements of any federal, state or local law applicable to the Loan have been complied with in all material respects, and (b) the consummation of the transactions contemplated hereby will not involve the violation by Seller of any such laws or regulations.

4.1.13        Loan Documents.  Seller has delivered complete and authentic copies of the Loan Documents to Buyer (or, at Buyer's direction in accordance with this Agreement, to the Custodian designated by Buyer) as required by, and not later than the time periods set forth in, this Agreement. Neither Borrower nor any Guarantor has been released, in whole or in part, from the terms of the Loan Documents. There are no other agreements between

Borrower and/or any Guarantor (or their affiliates or related persons) and Seller (or its affiliated or related persons) that relate to the Loan or the Property other than the Loan Documents or as otherwise included in the Loan File provided to Buyer prior to the Closing Date. The Note and the Security Instrument are original and all Loan Documents are genuine. To Seller's knowledge, all parties to the Note and the Security Instrument and other Loan Documents had legal capacity and authority to enter into the Loan, as applicable, and to execute and deliver the Note and the Security Instrument and other Loan Documents, and the Note and the Security Instrument and other Loan Documents have been duly and properly executed by such parties. To the knowledge of Seller, the Note and the Security Instrument and other Loan Documents (1) have been duly executed and delivered by all parties thereto; and (2) are the valid, binding and enforceable obligations of the Borrower and each Guarantor, subject to bankruptcy, insolvency, moratorium, reorganization and other laws of general application affecting the rights of creditors and by general equitable principles. The Security Instrument is a valid, subsisting, enforceable and perfected first lien and first priority security interest on the Property securing the Note's original principal balance.

4.1.14    No Waivers. The Note, Security Instrument securing the Loan and other Loan Documents have not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Property has not been released from the lien of the Security Instrument, in whole or in part, nor has any instrument been executed that would affect any such release, cancellation, subordination or rescission. Seller has not waived the performance by the Borrower or Guarantor of any action, if the Borrower's or Guarantor's failure to perform such action would cause the Loan to be in default, nor has Seller waived any default resulting from any action or inaction by the Borrower or any Guarantor.

4.1.15    Location and Type of Property. The Property is located in the United States or a territory of the United States. The Property consists of real Property with a detached single-family residence erected thereon, a two-to-four-family dwelling, a multi-family property, a mixed-use or a commercial property; provided that no residence or dwelling is a mobile home, a manufactured home, or a cooperative apartment. To Seller's knowledge, no portion of the Property is used for (a) for commercial purposes (other than the general rehabilitation of the Property by the Borrower in the ordinary course of the Borrower's business), (b) as the Borrower's primary residence or in any other manner that would cause the Property to be considered an owner-occupied Property or (c) for any other personal or household purposes.

4.1.16    Accuracy of Information.    To the best of the Seller's knowledge, all information supplied by, on behalf of, or concerning the Borrower is true, accurate and complete and does not contain any statement that is or will be inaccurate or misleading in any material respect.

4.1.17    Title Insurance. The Loan is covered by a Seller Loan Policy. To Seller's knowledge, Seller's Loan Policy is valid and remains in full force and effect and will be in full force and effect upon the consummation of the purchase of Loans as contemplated hereunder. Where required by state law or regulation, to the Seller's knowledge, the Borrower has been given the opportunity to choose the carrier of such lender's title insurance policy. The Seller (or its respective affiliate), its successors and assigns, are the sole insureds

12

of such lender's title insurance policy. The assignment to Buyer of the Seller's (or its respective affiliates') interest in such lender's title insurance policy does not require any consent of or notification to the title insurer that has not been obtained or made. No claims have been made under such lender's title insurance policy, and neither Seller nor, to Seller's knowledge, any other Person has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy. In connection with the issuance of such lender's title insurance policy, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by the Seller, its affiliates or assigns.

4.1.18     <u>Payment Terms</u>. Principal on the Loan is payable on the earlier of the maturity date of the Loan and the date on which the indebtedness thereunder becomes immediately due and payable thereunder. The Loan Documents do not permit negative amortization.

4.1.19     <u>Occupancy</u>. To Seller's knowledge, all inspections, licenses, and certificates required to be made or issued with respect to all occupied portions of the Property have been obtained from the appropriate authorities in the jurisdiction such Property resides. Seller has not received written notification from any governmental authority that the Property is in material non-compliance with such laws or regulations or has failed to have or obtain such inspection, licenses or certificates, as the case may be.

4.1.20     <u>No Other Collateral</u>. The Loan is not and has not been secured by any collateral except the lien of the corresponding Security Instrument and the security interest of any applicable security agreement or chattel mortgage and such collateral does not serve as security for any other obligation.

4.1.21     <u>Security Instrument</u>. If applicable, a trustee, authorized and duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Security Instrument, and no fees or expenses are or will become payable by the Buyer to the trustee under the Security Instrument, except in connection with a trustee's sale or attempted sale after default by the Borrower.

4.1.22     <u>Recordable</u>. The Security Instrument was recorded, or is in the process of being recorded, and all subsequent assignments of the original Security Instrument, showing a complete chain of title from the originator to the Seller, as applicable, have been recorded or are in the process of being recorded in the jurisdiction(s) where the Property is located. The Assignment of Security Instrument is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the related Property is located.

4.1.23     <u>No Damage/Condemnation</u>. To Seller's knowledge, the Property is in substantially the same condition it was at the time the most recent appraised value was obtained, unless the business plans of the Borrower (as submitted to Seller and disclosed in writing to Buyer) are to perform construction or repairs on the subject Property. To Seller's knowledge, there is no proceeding pending or threatened for the total or partial condemnation of the Property.

13

4.1.24 <u>Collection Practices</u>.  To Seller's knowledge, the origination and collection practices used by the originator, each servicer of the Loan and Seller with respect to the Loan have been in all respects in compliance with Accepted Servicing Practices.

4.1.25 <u>Doing Business</u>.  To Seller's knowledge, all parties which have had any interest in the Loan, whether as mortgagee, assignee or pledgee, are (or, during the period in which they held and disposed of such interest, were) (i) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Property is located, and (ii) either (A) organized under the laws of such state, (B) qualified to do business in such state, (C) a federal savings and loan association, a savings bank or a national bank having a principal office in such state, or (D) not doing business in such state.

4.1.26 <u>Valuation</u>.  Each Loan File contains a written Appraisal or BPO with respect to the related Property prepared by a Qualified Appraiser. The person preparing the Appraisal or BPO with respect to the Property valuation received no benefit from, and such person's compensation or flow of business from the originator was not affected by, the approval or disapproval of the Loan.

4.1.27 <u>HOEPA</u>.  No Loan is subject to the provisions of 12 U.S.C. Section 226.32 of Regulation Z implementing the Homeownership and Equity Protection Act of 1994 as amended ("<u>HOEPA</u>"). In the event that Seller has knowledge that any Loan is subject to HOEPA it shall be required to immediately repurchase the affected Loan.

4.1.28 <u>HAMP</u>.  No Loan is eligible for the Home Affordable Modification Program established pursuant to Sections 101 and 109 of the Emergency Economic Stabilization Act of 2008, as amended ("<u>HAMP</u>").  In the event that the Seller has knowledge that any Loan is an "Eligible Loan" (as defined in HAMP), the Seller will promptly notify the Seller and the Administrator.  Unless the Servicer is a registered servicer in good standing under HAMP at the time of acquisition of the Loan by the Buyer and agrees to service such Loans in accordance with HAMP requirements, no "Eligible Loan" as defined in HAMP shall be sold to the Buyer.

4.1.29 <u>No Equity</u>.  No document relating to the Loan provides for any contingent or additional interest in the form of participation in the cash flow of the Property or a sharing in the appreciation of the value of the Property.  The indebtedness evidenced by the Loan Documents is not convertible to an ownership interest in the Property or the Borrower and Seller has not financed nor does it own directly or indirectly, any equity of any form in the Property or the Borrower.

4.1.30 <u>Hazardous Substances</u>.  To Seller's knowledge, the Property is free from any and all toxic or hazardous substances in violation of any local, state or federal environmental law, and there exists no violation of any local, state or federal environmental law, rule or regulation.  To Seller's knowledge, there is no pending action or proceeding directly involving the Property in which compliance with any environmental law, rule or regulation is alleged to have been violated.

14

4.1.31    No Holdbacks.  Except with respect to any Loan identified on the Loan Purchase Certificate as being subject to holdback funds, the stated principal balance of each Loan has been fully disbursed as of the Closing Date and there is no requirement for future advances thereunder except where (a) the full amount of the Loan has been disbursed but a portion thereof is being held in escrow or reserve accounts or (b) future advances are required, in each case, pending the satisfaction of certain conditions relating to leasing, repairs, property improvement or other matters with respect to the related Property, the Borrower or other considerations determined by Seller to merit such holdback.

4.1.32    No Ground Leases. No Property is subject to a ground lease.

4.1.33    Anti-Money Laundering.  To Seller's knowledge, Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); to the extent required by law, Seller has conducted the requisite due diligence in connection with the Loan for purposes of the applicable Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Borrower and the origin of the assets used by said Borrower to purchase the Property in question, and maintains, and will maintain, sufficient information to identify the applicable Borrower for purposes of the Anti-Money Laundering Laws.

4.1.34    No Fraud. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Loan has taken place (i) on the part of the Seller, (ii) to Seller's knowledge, on the part of the Borrower, any Guarantor, or any other Person, including, without limitation, any servicer (if applicable), any appraiser, builder, developer, escrow agent, broker or correspondent, closing or settlement agent, closing attorney, realtor, title company or any other party involved in the solicitation, origination, sale or servicing of the Loan or in the determination of the value of the Property or the sale of the Property, or (iii) to Seller's knowledge, in the application for any insurance in relation to such Loan or in connection with the sale of such Loan to PeerStreet, or (iii) to Seller's knowledge, that would impair in any way the rights of PeerStreet in the Loan or Property or that violated applicable law. No Person, has made any representations to the Seller that are inconsistent with the Loan Documents.  The Borrower has received all disclosure materials required by applicable law in connection with the origination of the Loan.

Section 4.2    Change in Circumstances.  With respect to any representation that was true as of the Effective Date but thereafter becomes untrue due to facts or circumstances that are outside of Seller's control and either occurs following the Effective Date and prior to the Closing Date for the Loan in question, or are first discovered by Seller following the Effective Date and prior to such Closing Date, the following shall apply: (a) Seller shall promptly notify Buyer in writing of such untrue matters (describing with particularity the nature of the untrue matters in question); and (b) notwithstanding anything contained herein to the contrary, (i) Seller shall not be deemed to be in default under this Agreement with respect to any untrue matters contained in such representation or warranty, so long as Seller notifies Buyer of such untrue matter in writing prior to the Closing Date for such Loan (and the Closing Date for such Loan shall be extended for two (2) Business Days to allow Buyer to evaluate the untrue matters in question), and (ii) Seller shall have no liability to Buyer with respect to such matters if Seller timely notifies Buyer, pursuant to clause (i) above, of the untrue matters in

15

question and Buyer nevertheless proceeds to Closing despite Buyer's knowledge that such representation or warranty is untrue (and in such event, Buyer's purchase of such Loan shall be subject to such matters) and (iii) Buyer shall have no obligation to purchase such Loan.

Section 4.3    <u>Survival</u>. Seller's representations and warranties in this Article 4 shall survive each Closing until the Loans are repaid in full.

## ARTICLE 5 – SERVICING

Section 5.1    <u>Servicing of Loans Prior to Closing</u>.  Up to and including the related Closing Date, Seller shall have the sole and exclusive right, power, and authority to service such Loan and deal with the Borrower and Guarantor under such Loan in all matters pertaining to such Loan and the Loan Documents applicable thereto; provided, however, Seller shall not amend or otherwise modify any of the Loan Documents for such Loan from and after the date the Parties mutually execute a Loan Purchase Certificate for such Loan without the express written consent of Buyer, which consent shall not be unreasonably conditioned, delayed or withheld.  Up to and including the Closing Date, Seller may, in its sole discretion, but shall have no duty to, take any action to enforce any right or obligation of Borrower, Guarantor, or any other obligor under the Loan Documents for such Loan, and/or to liquidate or pursue any recovery from any security for such Loan; provided, however, notwithstanding anything to the contrary contained herein, from and after the expiration of the Diligence Period for such Loan, Seller shall not take any action to enforce any right or obligation of Borrower, Guarantor, or any other obligor under the Loan Documents for such Loan, and/or liquidate or pursue any recovery from any security for such Loan without the express written consent of Buyer, which consent shall not be unreasonably withheld.  Seller shall inform Buyer in writing of any change in the Borrower and/or Guarantor under each Loan identified in the Loan Purchase Certificates and deliver to Buyer copies of all written notices, billings and/or other communications to Borrower and/or Guarantor under such Loans, including without limitation, any notices, billings and/or other communications with respect to (i) Borrower's and/or Guarantor's performance (or ability to perform) under the Loan Documents for such Loan, and/or (ii) Borrower's and/or Guarantor's management, composition, organization, financial condition and/or any disability of Borrower and/or Guarantor or any of their respective partners or affiliates, including any written enforcement or default notices delivered to Borrower and/or Guarantor from and after the date the Parties mutually execute a Loan Purchase Certificate that includes such Loan.

Section 5.2    <u>Servicing of Loans After Closing</u>.  The Loan Purchase Certificate shall delineate whether a Loan is sold to Buyer servicing-retained or servicing-released. If a Loan is sold to Buyer servicing-retained, Seller, in its capacity as master-servicer, shall service the Loan in accordance with the terms of the Servicing Agreement. If a Loan is sold to Buyer as servicing-released, Seller shall interim service and administer the Loan in accordance with Accepted Servicing Practices starting on the Closing Date up to and including the servicing transfer date ("<u>Interim Servicing Period</u>") and shall, subject to the terms of this Agreement, do or cause to be done any and all things in connection with such servicing and administration which the Seller may deem necessary or desirable and consistent with the terms of this Agreement.  Seller shall not make any servicing advances with respect to any Loan during the Interim Servicing Period without Buyer's prior written consent. During the

Interim Servicing Period, Seller shall be entitled to an interim servicing fee as shown on the Loan Purchase Certificate. Following the Interim Servicing Period, Buyer shall have the sole and exclusive right, power and authority to service the Loans sold as servicing-released to Buyer or cause such Loans to be serviced, including, without limitation, the right to assign the servicing rights to another party and to deal with the Borrower and Guarantor under the Loan in all matters pertaining to such Loan and the Loan Documents applicable thereto.

## ARTICLE 6  – REMEDIES

Section 6.1    **Repurchase.**

6.1.1        Upon discovery by either Seller or Buyer of a breach of any representation or warranty contained in Article 4 that materially and adversely affects the value of the applicable Loans and/or the interests of Buyer in such Loans (a "Breach"), the Party discovering such Breach shall give prompt written notice to the other Party.

6.1.2        Seller shall have thirty (30) days to cure any Breach, or such longer period as the Buyer reasonably determines is necessary given the nature of such Breach (the "Cure Period") prior to being required to repurchase the affected Loans.  The Cure Period shall commence upon either Party's written notice to the other party of the related Breach, supported by commercially reasonable documentation supporting such alleged Breach.  If a Breach is not cured within such Cure Period, then at Buyer's option, the affected Loan shall be repurchased by Seller within five (5) Business Days of the expiration of such Cure Period at the Repurchase Price.

6.1.3        In the event that the applicable Borrower fails to make the first monthly payment due after the Closing Date with respect to a Loan, then at Buyer's option, the affected Loan shall be repurchased by Seller within five (5) Business Days of Buyer providing written notice to Seller of such failure at the Repurchase Price.

6.1.4        Upon completion of any repurchase by Seller pursuant to Sections 6.1.2 or 6.1.3 above, Buyer and Seller shall arrange for the reassignment of the repurchased Loan to Seller and the delivery to Seller of any documents held by Buyer or its custodian relating to the repurchased Loan.  In the case of any lien for which an assignment from Seller to Buyer has been recorded prior to repurchase, Buyer shall concurrently with the repurchase provide an executed assignment from Buyer to Seller.  Seller shall pay any necessary recording costs in connection with recording such reassignment.

Section 6.2    Buyer Default. Buyer and Seller hereby acknowledge and agree that in the event of a default or breach by Buyer in the performance of Buyer's obligations or covenants under this Agreement and/or under any Loan Purchase Certificate, or the breach by Buyer of any of Buyer's representations or warranties under this Agreement, a "Buyer Default" under this Agreement shall have been deemed to have occurred.  In the event of a Buyer Default concerning a particular Loan, where such Buyer Default occurs prior to the Closing Date for such Loan, Seller's sole and exclusive remedy shall be to either (a) waive such Buyer Default and proceed to the Closing for the sale of such Loan pursuant to the terms of this Agreement and the Loan Purchase Certificate applicable to such Loan, or (b) cancel the related Closing

by written notice to Buyer.  In the event of a Buyer Default concerning a particular Loan, where such Buyer Default occurs after Buyer has acquired such Loan, Seller shall be entitled to all rights and remedies available hereunder, at law and/or in equity as a result of such Buyer Default with respect to such Loan.

Section 6.3    <u>Seller Default</u>. Buyer and Seller hereby acknowledge and agree that in the event of a default or breach by Seller in the performance of Seller's obligations or covenants under this Agreement and/or under any Loan Purchase Certificate, or the breach by Seller of any of Seller's representations or warranties under this Agreement, a "<u>Seller Default</u>" under this Agreement shall have been deemed to have occurred.  In the event of a Seller Default concerning a particular Loan, where such Seller Default occurs prior to the Closing Date for such Loan, Buyer's sole and exclusive remedy shall be to either (a) waive such Seller Default and proceed to the Closing for the sale of such Loan pursuant to the terms of this Agreement, or (b) cancel this Agreement by written notice to Seller.  In the event of a Seller Default concerning a particular Loan, where such Seller Default occurs after Buyer has acquired such Loan, Buyer shall be entitled to all rights and remedies available hereunder, at law and/or in equity as a result of such Seller Default with respect to such Loan.

Section 6.4    <u>Limitation of Remedies</u>.  Notwithstanding any provision to the contrary contained in this Agreement, in no event shall Seller or Buyer be liable to the other or to any other party for any punitive, speculative, special, or consequential damages.  The provisions of this Article 6 shall survive each Closing and the consummation of the transactions hereunder and under each Loan Purchase Certificate.

### ARTICLE 7  – AS-IS SALE; RELEASE; INDEMNIFICATION

Section 7.1    <u>As-Is Sale</u>.  Subject to the terms and conditions of this Agreement (including without limitation, Seller's indemnity obligations set forth in Section 7.3 below, the Retained Claims and Seller's express representations and warranties contained in this Agreement), Seller agrees to sell, transfer and assign, and Buyer agrees to purchase and assume on the Closing Date applicable to the Loan in question, each of the Loans identified in those Loan Purchase Certificates, if any, that are mutually executed by the Parties, if at all, on an "AS IS," "WHERE IS" BASIS, "WITH ALL FAULTS" AND WITHOUT REPRESENTATIONS, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE (INCLUDING, WITHOUT LIMITATION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND WITHOUT WARRANTIES, EXPRESS OR IMPLIED, OF ANY TYPE, KIND, CHARACTER OR NATURE (INCLUDING, WITHOUT LIMITATION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), EXCEPT THE LIMITED AND EXPRESS REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER SET FORTH IN ARTICLE 4 HEREOF, AND WITHOUT RECOURSE OF ANY NATURE TO SELLER (EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT).

Section 7.2    <u>Release</u>.  Other than with respect to the Retained Claims, Buyer hereby releases and forever discharges Seller and Seller's directors, officers, employees, servicers, successors, assigns and affiliates (all such persons being collectively referred to as the "<u>Seller Related Persons</u>"), of and from any and all causes of action, claims, demands and remedies of whatsoever kind

and nature (collectively, "Claims") that Buyer has or may in the future have against Seller or any Seller Related Persons, to the extent such Claims in any manner are on account of, arise out of or relate to the Loans purchased by Buyer and the rights assigned hereunder (the "Released Matters"). In no event, however, shall the Released Matters include, and Buyer does not release or discharge Seller or any Seller Related Persons from, any Liabilities and/or Claims to the extent same are on account of, arising out of, relating to, or by reason of Seller's breach of this Agreement and/or any Loan Purchase Certificate (including without limitation, Seller's breach of any representations, warranties and/or covenants contained herein) or Seller's indemnity obligations set forth in Section 7.3 below (collectively, the "Retained Claims"). It is the intention of Buyer that, subject to the Retained Claims, the foregoing general release shall be effective as a bar to all actions, causes of action, suits, claims or demands of every kind, nature or character whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, arising out of or in connection with the Released Matters.

Section 7.3    Indemnification. Each Party shall indemnify, defend and hold the other Party (and, such other Party's "Related Persons") harmless from and against any and all losses, liabilities, costs, expenses and damages (individually, a "Liability," and collectively, "Liabilities") sustained due to the indemnifying Party's failure to comply with applicable laws and regulations. Upon request, each Party shall provide evidence reasonably satisfactory to the requesting Party of such compliance. Buyer will indemnify, defend and hold Seller and the Seller Related Persons harmless from Liabilities incurred by Seller and the Seller Related Persons, and Claims made by Crowd Investors, to the extent arising from Buyer's activities related to advertising of Loans and taking investment in said Loans (or in other products or derivatives related to said Loans) via Buyer's platform. Seller will indemnify, defend and hold harmless Buyer and Buyer's present and former agents, servants, directors, officers, employees, servicers, attorneys, successors, assigns and affiliates (all such persons being collectively referred to as the "Buyer Related Persons") from Liabilities incurred by Buyer and the Buyer Related Persons and Claims arising or resulting from or in connection with, Seller's brokering, lending, originating and/or servicing activities in connection with the Loans and/or Seller's action or failure to act or any breach of any warranty, representation or covenant contained in or made pursuant to this Agreement. Buyer's and Seller's indemnities set forth in this Section 7.3 shall survive the Closing. Notwithstanding anything to the contrary in this Agreement or in any Loan Purchase Certificate, Seller shall continue to be entitled (on a non-exclusive basis) to the rights of indemnity, defense and to be held harmless provided to the lender under the Loan Documents for the Loan in question; provided, however, that (i) nothing herein shall be construed to limit the right, title and interest of Buyer once Buyer has acquired such Loans and thereby becomes the lender under such Loan Documents, to all such rights of indemnity, defense and to be held harmless, (ii) if and to the extent Seller's rights of indemnity, defense and to be held harmless provided to the lender under such Loan Documents conflict or compete in any way with Buyer's rights of indemnity, defense and to be held harmless provided to the lender under such Loan Documents, Buyer's rights shall have priority, and (iii) if and to the extent any amounts are recoverable from or payable by a Borrower and/or any Guarantor in satisfaction of such indemnity and/or defense obligations, then as between Buyer (and Buyer's Related Persons)

19

and Seller (and Seller's Related Persons), Buyer (and Buyer's Related Persons) shall have first priority as to same.

## ARTICLE 8 – MISCELLANEOUS

Section 8.1    <u>Equal Employment Opportunity</u>. During the performance of this Agreement, the Parties agree that neither Party shall discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or mental or physical disability. Each Party shall ensure that applicants are employed and that employees are treated during employment without regard to their race, color, religion, sex, national origin, or mental or physical disability. Such actions shall include, but not be limited to the following: employment upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation and selection for training, including apprenticeship.

Section 8.2    <u>Notices</u>.  All demands, notices and communications under this Agreement shall be in writing and shall be deemed to have been duly given if (i) mailed by registered or certified mail, return receipt requested or by overnight delivery service, addressed to the appropriate Party hereto at the addresses set forth below or (ii) transmitted by electronic mail with acknowledgment, to the appropriate Party hereto at the address provided by the other Party to this Agreement.

> If to Seller:
> PS Funding, Inc.
> 2121 Park Place, Suite #250
> El Segundo, California 90245
> Attn: Legal Department
> Email: legal@peerstreet.com
>
> If to Buyer:
> PS Portfolio – ST1, LLC
> 2121 Park Place, Suite #250
> El Segundo, California 90245
> Attn: Legal Department
> Email: legal@peerstreet.com

Any such demand, notice or communication shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced by the date noted on the return receipt or overnight delivery receipt or other evidence of receipt).  Each Party covenants that it shall not disseminate the other Party's notice information to any third party without the prior consent of the affected Party.  No notice of termination shall impair the rights or priorities of any party created or acquired prior to the receipt of such notice.  Either Party may change its address for purposes of this Section upon delivery to the other Party of a notice of a change of address in the manner provided for notices hereunder.

Section 8.3    <u>Attorneys' Fees</u>.  The prevailing Party in any action or proceeding to interpret or enforce this Agreement and/or any Loan Purchase Certificate, or the terms of either, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing Party or Parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

Section 8.4    <u>Authority</u>.  With the intent to be legally bound, each of the undersigned hereby covenants and acknowledges that he, she, or it (a) has read each of the terms set forth herein, (b) has the authority to execute this Agreement for such person or entity, and (c) expressly consents and agrees that the person or entity upon behalf of which the undersigned is acting, shall be bound by all terms and conditions contained herein.

Section 8.5    <u>Successors and Assigns and Sale of Loans</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of, each of the Parties hereto, and their respective successors in interest, assigns, heirs, and personal representatives.  This Agreement may not be assigned by either Party without the prior written consent of the other Party, which consent may be granted or withheld in such other Party's sole and absolute discretion; provided, however, that Buyer shall have the right to assign this Agreement without Seller's consent to any entity controlled by, controlling or under common control with Buyer. Seller will cooperate with Buyer's reasonable requests in connection with Buyer's future financing arrangements, provided Buyer pays Seller's reasonable out-of-pocket costs, if any, in connection with such cooperation. Seller will cooperate with Buyer's reasonable requests in connection with a future securitization by or on behalf of Buyer, provided that (i) any such requests for cooperation are reasonable and do not adversely impact the regular operation of Seller's business, and (ii) Buyer pays all reasonable out-of-pocket costs incurred by Seller in connection with such cooperation. For the avoidance of doubt, Buyer shall not be restricted from selling, transferring, pledging or taking other actions with respect to any Loan purchased hereunder and any sale, transfer, pledge or other action taken by Buyer with respect to a Loan purchased hereunder shall not void Buyer's rights under this Agreement with respect to such Loan (including without limitation the right to require a repurchase of the Loan pursuant to Section 6.1).

Section 8.6    <u>Severability</u>.  If any provision of this Agreement and/or any Loan Purchase Certificate shall be determined to be invalid, illegal, or unenforceable, the balance of this Agreement and such Loan Purchase Certificate shall remain in full force and effect, and if any provision is inapplicable to any person or circumstance, it shall nevertheless remain applicable to all other Persons and circumstances.

Section 8.7    <u>Headings; Exhibits; Loan Purchase Certificate</u>.  The article, section and paragraph headings set forth in this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.  The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  The terms and conditions set forth in the related Loan Purchase Certificate between the Buyer and the Seller with respect to each Closing Date shall be incorporated herein.  With respect to the sale and purchase of

21

the Loan or pool of Loans on each Closing Date, in the event of any conflict between the terms of this Agreement and the related Loan Purchase Certificate, the related Loan Purchase Certificate shall control with respect to such Loan or pool of Loans.

Section 8.8    Time.  Time is, and shall be, of the essence of each and every provision of this Agreement.

Section 8.9    Governing Law; Jurisdiction; Waiver of Jury Trial.  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF CALIFORNIA.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.  BUYER AND SELLER IRREVOCABLY (I) SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREE THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENT TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER. SELLER AND BUYER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 8.10    Intentionally Omitted.

Section 8.11    Knowledge.  Wherever the phrase "to Seller's knowledge" or words of similar import relating to the knowledge or the awareness of Seller are used in this Agreement, such phrase shall mean and refer to the knowledge of Seller's principals, directors, officers, and employees.

Section 8.12    Neutral Interpretation.  This Agreement and each Loan Purchase Certificate are the product of negotiations of the Parties, and in the enforcement or interpretation hereof and thereof are to be enforced and interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any Party by reason of that Party having drafted, or caused to be drafted, this Agreement and/or any Loan Purchase Certificate, or any portion of either, shall not be effective in regard to the interpretation hereof or thereof.

Section 8.13    Entire Agreement.  This Agreement and each Loan Purchase Certificate, and any documents attached as exhibits or executed in connection herewith or therewith, constitute the Parties' entire and final agreement with respect to the subject matter hereof and thereof, and supersede all agreements, representations, warranties, statements, promises, and

22

understandings, whether oral or written, with respect to the subject matter herewith. Neither this Agreement nor any Loan Purchase Certificate may be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties, and there are no (and shall be no) unwritten oral agreements between the Parties. The Parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying exhibits or the certificates or other Closing documents delivered according to this Agreement. Neither this Agreement nor any Loan Purchase Certificate may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the Party against which enforcement of such change, waiver, discharge, or termination is sought.

Section 8.14    Counterparts.  This Agreement and each Loan Purchase Certificate may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Electronic signatures may be accepted as original signatures.

Section 8.15    Further Assurance and Acts.  From time to time, the Seller shall (i) execute and deliver to Buyer such additional documents, (ii) provide such additional information to Buyer and (iii) do such further acts, as Buyer may reasonably require to effectuate the intent and purposes of, and to carry out the terms of, this Agreement, each Loan Purchase Certificate and all Loan Documents and any agreements executed in connection herewith or therewith, which further acts may include without limitation, reasonably cooperating with Buyer to ensure that Buyer is named, promptly following the Closing Date for any particular Loan, (a) as the loss payee on each such Borrower's casualty insurance policy required by the Loan Documents for such Loan, and (b) an "additional insured" on each such Borrower's liability insurance policies required by the Loan Documents for such Loan.

Section 8.16    Relationships of Seller and Buyer.  The relationship between Seller and Buyer created under this Agreement shall be as seller and buyer.  Seller and Buyer are not partners or joint venturers, and neither Party shall act as agent for the other.  Except for the transactions described in this Agreement, Seller has no business or other relationship with Buyer and is not engaged in Buyer's business or other activities.  It is the intention of the Parties hereto that the sale, transfer, assignment and conveyance of Loans contemplated by this Agreement shall constitute a sale of such Loans by Seller to Buyer and not a financing transaction, borrowing, loan or any other form of transaction.  In furtherance of the foregoing, each of Seller and Buyer will treat the sale, transfer, assignment and conveyance of each such Loan hereunder as a true sale on its books and records and for accounting, tax and, to the extent applicable, regulatory purposes and will not take or assert positions which are inconsistent with the true sale treatment of this transaction.

*[SIGNATURE PAGE FOLLOWS]*

23

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.


BUYER:

PS PORTFOLIO – ST1, LLC,
a Delaware limited liability company

By:    PS FUNDING, INC.,
          a Delaware corporation, its sole member



By:    _____
Name:  Brewster Johnson
Title:  President



SELLER:

PS FUNDING, INC.,
a Delaware corporation



By:    _____
Name:  Brewster Johnson
Title:  President

24

EXHIBIT A

FORM OF LOAN PURCHASE CERTIFICATE

LOAN PURCHASE CERTIFICATE

THIS LOAN PURCHASE CERTIFICATE (this "Loan Purchase Certificate") is entered into by and between PS PORTFOLIO – ST1, LLC, a Delaware limited liability company ("Buyer") and PS FUNDING, INC., a Delaware corporation ("Seller"), and is executed pursuant to and in accordance with the terms of that certain Master Loan Sale Agreement (with Loan Purchase Certificates) dated as of September 21, 2022 ("Master Agreement").  All capitalized terms used but not otherwise defined herein shall have the meaning afforded to such terms under the Master Agreement.

The rights and obligations of the Parties to this Loan Purchase Certificate are governed by the Master Agreement, which (i) is fully incorporated herein by reference as if set forth in full herein and (ii) shall govern the sale by Seller to Buyer of the Loans described in this Loan Purchase Certificate below.

Seller does hereby agree to sell, assign, set over and otherwise convey, and Buyer does hereby agree to purchase from Seller, all of Seller's right, title and interest to the Loans identified on Schedule "1" hereto, for a price equal to the Purchase Price set forth on Schedule "1" hereto.

Loan Purchase Certificate Date:        _____ ___, 20__

Description of Loans and Purchase Price:    See Schedule "1" attached to this Loan Purchase Certificate, which is incorporated herein and into the Master Agreement by reference.

Qualification of Buyer's Representations, Warranties and Covenants:  The representations, warranties and covenants being made by Buyer in the Master Agreement are hereby qualified, but only as and to the extent expressly set forth, if at all, on Schedule "2" attached hereto, which is incorporated herein and into the Master Agreement by reference.

Qualification of Seller's Representations, Warranties and Covenants:  The representations, warranties and covenants being made by Seller in the Master Agreement are hereby qualified, but only as and to the extent expressly set forth, if at all, on Schedule "3" attached hereto, which is incorporated herein and into the Master Agreement by reference.

[SIGNATURE PAGE FOLLOWS]

1

Exhibit "A"

IN WITNESS WHEREOF, the parties hereto have executed this Loan Purchase Certificate as of the Loan Purchase Certificate Date set forth above.

SELLER:                                                BUYER:

PS FUNDING, INC.,                          PS PORTFOLIO – ST1, LLC,
a Delaware corporation                    a Delaware limited liability company

                                                        By:    PS FUNDING, INC.,
                                                                 a Delaware corporation, its sole member

By:    _____
Name:  _____
Title:  _____

                                                             By:    _____
                                                             Name:  _____
                                                             Title:  _____

2

Exhibit "A"

## SCHEDULE 1
## TO LOAN PURCHASE CERTIFICATE

[see attached]

3

Exhibit "A"

SCHEDULE 2
TO LOAN PURCHASE CERTIFICATE

QUALIFICATION OF
<u>SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS</u>

IF AND TO THE EXTENT ANY OF THE REPRESENTATIONS, WARRANTIES AND COVENANTS BEING MADE BY SELLER UNDER ARTICLE 4 OF THE MASTER AGREEMENT ARE NOT TRUE AND CORRECT IN ALL MATERIAL RESPECTS AS OF THE DATE OF THIS LOAN PURCHASE CERTIFICATE AND AS OF THE CLOSING DATE FOR THE LOANS IDENTIFIED IN THIS LOAN PURCHASE CERTIFICATE, THEN SPECIFICALLY IDENTIFY (BY SECTION NUMBER OF THE MASTER AGREEMENT) THE EXTENT TO WHICH SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS ARE NOT TRUE AND CORRECT IN ALL MATERIAL RESPECTS.

(See Article 4 of the Master Agreement)

☐      None.

OR

Section          Exception

[_____]     _____

[_____]     _____

[_____]     _____

[_____]     _____

[_____]     _____

[_____]     _____

[_____]     _____

[_____]     _____

<u>Material Disclosures</u>

☐      None.

OR

_____
_____

1

Exhibit "A"

EXHIBIT B

ALLONGE

      This Allonge is affixed to, and is hereby made a part of, that certain ___[Promissory Note]___, dated _____, 20___, in the original principal amount of $_____.00 ("Note"), made by _____, for the benefit of _____, a _____ ("Assignor"), and evidences the endorsement of the Note by Assignor as provided in that certain Master Loan Sale Agreement, dated _____, 20___, by and between Assignor and the endorsee hereon, to wit:

      The Note is hereby made PAYABLE TO THE ORDER OF [_____], at [_____].

Dated: _____, 201__    ASSIGNOR:

                              _____,
                              a _____

                              By:  _____

                                  Name:  _____

                                  Title:  _____

1

EXHIBIT C

## FORM OF ASSIGNMENT OF DEED OF TRUST/MORTGAGE AND OTHER LOAN DOCUMENTS

RECORDING REQUESTED BY:

_____
_____

WHEN RECORDED RETURN TO:

_____
_____
_____

APN: _____

_____

### ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT AND OTHER LOAN DOCUMENTS]

This ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT AND OTHER LOAN DOCUMENTS] ("Assignment") is made this \_\_\_\_ day of _____, 201\_\_, by _____, a _____ ("Assignor"), to _____, a _____ ("Assignee").

FOR VALUE RECEIVED, Assignor hereby sells, grants, assigns, and transfers to Assignee any and all of its right, title and interest in and to that certain [Security Instrument]\_\_, dated _____, made by _____, for the benefit of Assignor ("Security Instrument"), and recorded on _____, in the Official Records of _____ County, [_____], as Instrument Number _____, and as a lien on that certain real property described on Exhibit A, attached hereto and made a part hereof.

FURTHER, Assignor hereby grants, assigns, and transfers to Assignee any and all of its right, title and interest in and to any and all loan documents related to the Security Instrument, including, without limitation, any notes, allonges, loan agreements, guarantees, and title policies.

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under the foregoing Security Instrument.

*[Signature On Following Page]*

1

Exhibit "C"

IN WITNESS WHEREOF, this Assignment is made to be effective as of the date first above written.

ASSIGNOR:

_____,
a _____

By: _____

    Name: _____

    Title: _____

2

Exhibit "C"

ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF [_____]                  )

                                               )   ss

COUNTY OF _____     )

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of [_____] that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

3

Exhibit "C"

EXHIBIT A TO
ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT AND
OTHER LOAN DOCUMENTS]
LEGAL DESCRIPTION OF PROPERTY

[To Be Inserted Prior To Recordation]

4

EXHIBIT D

LOAN DOCUMENTS

1. The original Note bearing all intervening endorsements;
2. The original Security Instrument with evidence of recording thereon or a copy of the Security Instrument provided by the related Title Company;
3. Any guarantee made in connection with the Note (if applicable);
4. Any assumption, modification, consolidation or extension agreements;
5. Any intervening assignments of mortgage with evidence of recording thereon or copies certified by the related Title Company; and
6. The title insurance policy or attorney's opinion of title and abstract of title

**<u>EXHIBIT 32</u>**

**AMENDED LIMITED PARTNERSHIP AGREEMENT**

**OF**

**PEER STREET OPPORTUNITY INVESTORS II, LP**

May 25, 2018

*Amended on March 2, 2021*

THE LIMITED PARTNERSHIP INTERESTS OF PEER STREET OPPORTUNITY INVESTORS II, LP HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS. SUCH LIMITED PARTNERSHIP INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (i) THE SECURITIES ACT, ANY APPLICABLE STATE SECURITIES LAWS, AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (ii) THE TERMS AND CONDITIONS OF THIS LIMITED PARTNERSHIP AGREEMENT. THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH SUCH LAWS AND THIS LIMITED PARTNERSHIP AGREEMENT. THEREFORE, PURCHASERS OF SUCH LIMITED PARTNERSHIP INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

**PEER STREET OPPORTUNITY INVESTORS  II, LP**

**AMENDED LIMITED PARTNERSHIP AGREEMENT**

This Limited Partnership Agreement (this "Agreement") of Peer Street Opportunity Investors II, LP, a Delaware limited partnership (the "Partnership"), originally entered into as of May 25, 2018, and amended on March 2, 2021 (this "Agreement"), by and among Peer Street Opportunity Fund GP, LLC, as general partner (the "General Partner"), Ankush Israni as the initial limited partner (the "Initial Limited Partner") and all the parties who sign copies of this Agreement to become limited partners (the "Limited Partners").  The General Partner and the persons who sign as Limited Partners are sometimes collectively referred to as the "Partners".  Whenever the masculine or feminine gender is used in this Agreement, it will equally, where the context permits, include the other, as well as include entities.

ARTICLE I

**General Provisions**

Section 1.01  <u>Formation</u>.  Peer Street Opportunity Investors II, LP, was formed as a limited partnership (the "Partnership") pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act (the "Act").  The existence of the Partnership commenced upon the filing with the Secretary of State of the State of Delaware of a Certificate of Limited Partnership in accordance with the provisions of the Act on October 13, 2017.

Section 1.02  <u>Partnership Name and Address</u>.  The name of the Partnership is Peer Street Opportunity Investors  II, LP.  Its principal office is located at 2121 Park Place, Suite 250, El Segundo, CA 90245, or at such other location as the General Partner in the future may designate.  The General Partner shall promptly notify the Limited Partners of any change in the Partnership's address.

Section 1.03  <u>Purpose</u>.  The purpose of the Partnership is to serve as a fund through which the assets of its Partners will be utilized to (i) acquire, operate, manage, finance, and dispose of Investments; and (ii) deal in all manners and in all ways as is customary for an investment partnership, carry on any activities relating thereto or arising therefrom and do anything reasonably incidental or necessary with respect to the foregoing. For purposes of this Agreement, "Investments" means (i) any investment by the Partnership in (x) loans or participation interests in such loans secured by real estate (the "Loans"); (y) mezzanine debt in warehouse lending facilities utilized by Peer Street, Inc. or its affiliates; and (z) subordinated loan positions held or sold by Peer Street, Inc. or its affiliates, with such Investments typically being purchased from originators by PS Funding, Inc. ("PS Funding"), an affiliate of the Partnership and the General Partner, and (ii) investments in any of the following assets, securities, and other financial instruments related to real estate, whether readily marketable or not: securities and other financial instruments of United States, including, without limitation, capital stock; shares of beneficial interest; partnership interests and similar financial instruments; bonds, and notes and debentures (whether subordinated, convertible or otherwise).

Section 1.04  <u>Registered Office and Agent for Service of Process</u>.  The registered office of the Partnership in the State of Delaware will be the initial registered office named in the Certificate of Limited Partnership or such other office (which need not be a place of business of the Partnership) as the General Partner may designate from time to time in any manner provided by law. The registered agent of the Partnership in the State of Delaware shall be the initial registered agent named in the

Certificate of Limited Partnership or such other person or entity as the General Partner may designate from time to time in the manner provided by law.

Section 1.05  <u>Place of Business</u>.  The principal place of business of the Partnership shall be at 2121 Park Place, Suite 250 El Segundo, CA 90245, or at such place as the General Partner shall determine from time to time.

Section 1.06  <u>Fiscal Year and Fiscal Periods</u>.  The fiscal year of the Partnership shall end on December 31 of each year, subject to change by the General Partner from time to time ("Fiscal Year").  A new fiscal period ("Fiscal Period") shall commence on the first day of each calendar month, on each date of any Capital Contribution (as defined below) to the Partnership and on each date next following the date of any withdrawal of capital or retirement from the Partnership, and the prior Fiscal Period shall end on the date immediately preceding such date of commencement of a new Fiscal Period. The General Partner may from time to time change the Fiscal Period.

Section 1.07  <u>Liability of the Limited Partners</u>.  Except as expressly provided in the Act, the Limited Partners shall not be liable for any liabilities, or for the payment of any debts and obligations, of the Partnership.

Section 1.08  <u>Transfers and Assignments of Limited Partnership Interests</u>.  The limited partnership interest of a Limited Partner in the Partnership (each an "Interest"), or any beneficial interest therein, may not be transferred or assigned, in whole or in part, except with the written consent thereto of the General Partner given in its sole discretion.  Upon such a transfer or assignment of an Interest, the assignee shall become a Limited Partner upon the execution of such agreements and other documents as shall be required by the General Partner.

ARTICLE II

**Admissions of Partners; Closings; Withdrawal of Initial Limited Partner**

Section 2.01 <u>Capital Contributions by General Partner</u>. The General Partner may make Capital Contributions (as defined in Section 5.04) to the Partnership at any time during the Investment Period (as defined in Section 9.01).

Section 2.02  <u>Admission of Partners</u>.  The Partnership is offering the Interests to certain qualified investors as described herein and in the Subscription Agreement (as defined below) in a private placement offering (the "Offering").

Section 2.03  <u>Closings</u>.

(a)  The General Partner intends to hold an initial closing of the sale of Interests in the Partnership on June 15th, 2018 (the "Initial Closing"), but reserves the right, in its sole discretion, to hold the Initial Closing prior to or after such date.

(b) The General Partner may from time to time after the Initial Closing elect to hold one or more additional closings (each a "Subsequent Closing" and together with the Initial Closing, "Closings"), as necessary, to accommodate the admission of additional Limited Partners and to permit existing Limited Partners to increase their capital commitments to the Partnership ("Commitments").  The General Partner may hold Subsequent Closings until such

time that it, in its sole discretion, elects to no longer hold any additional Subsequent Closings (such date, the "Final Closing Date").

(c) The maximum Offering amount shall be $50,000,000 of Commitments (the "Maximum Offering Amount"); provided, however, that the General Partner may, in its sole discretion, increase or decrease the Maximum Offering Amount. The Partnership will not be subject to a minimum Offering amount.

(d) Each Limited Partner admitted to the Partnership or increasing its Commitment after the Initial Closing will be required to contribute to the Partnership an amount equal to the Capital Contributions such Limited Partner would have made had all Partners been admitted to the Partnership at the Initial Closing plus an amount equal to interest thereon at the rate of the "Prime Rate" as published by the Wall Street Journal as of the date of the Initial Closing *plus* five percent per annum, from the dates when such Capital Contributions would have been required to be drawn down ("Notional Interest"). Amounts attributable to the Management Fee and Notional Interest thereon shall be paid to the General Partner. All other contributed amounts will be paid to the Partners that participated in prior Closings pro rata in accordance with each such Partner's Capital Contributions and, other than Notional Interest, will be available to be redrawn by the General Partner in the same manner and to the same extent as unfunded Commitments. Additional Interests acquired by the General Partner at Subsequent Closings will not be subject to payment of Notional Interest. If the General Partner in its sole and absolute discretion determines that a payment from a Limited Partner on the foregoing basis at a Subsequent Closing would not appropriately reflect a material change in the value of an Investment, the income received by the Partnership in connection with its Investments, or the expenses incurred by the Partnership prior to such Subsequent Closing, the General Partner may make adjustments to the amount to be contributed by such Limited Partner to reflect such change in value or exclude such Limited Partner from participating in such Investment.

Section 2.04    Withdrawal of Initial Limited Partner. Immediately after the admission to the Partnership, as a Limited Partner, of a person who acquires an Interest pursuant to the provisions of Section 2.02, the Initial Limited Partner shall be deemed to have withdrawn from the Partnership as a limited partner without any further action on the part of the Initial Limited Partner or the Partnership. Upon such withdrawal, the Initial Limited Partner shall cease to (i) have any interest, right, power or authority in or with respect to the Partnership as a Partner and (ii) be subject to any of the duties or liabilities of a Partner (unless he shall thereafter become a Partner in accordance with the provisions of this Agreement).

## ARTICLE III

### Management of the Partnership;
### Powers of the General Partner; Liability; Indemnification

Section 3.01    Management of the Partnership. The Partnership shall be managed by the General Partner, which shall have the sole discretion of making Investments on behalf of the Partnership and of exercising the powers set forth in Section 3.02. The General Partner may appoint such agents of the Partnership as it deems necessary who shall hold such offices and shall exercise such powers of the General Partner in the management of the Partnership and perform such duties in connection therewith as shall be determined from time to time by the General Partner. The General Partner shall devote as much of its time and efforts to the affairs of the Partnership as may, in its

judgment, be necessary to accomplish the purposes of the Partnership.  Nothing herein contained shall prevent the General Partner or any of its respective members, officers, employees or affiliates or any other Partner from conducting any other business, including any business within the securities industry, whether or not such business is in competition with the Partnership.  Without limiting the generality of the foregoing, the General Partner and its respective members, officers, employees or affiliates may act as general partner, investment adviser or investment manager for others, may manage funds or capital for others, may have, make and maintain Investments in their own name or through other entities, and may serve as an officer, director, consultant, partner or stockholder of one or more investment funds, partnerships, securities firms or advisory firms.

Section 3.02    Powers of the General Partner.  The General Partner shall have the following powers on behalf of the Partnership to be exercised in accordance with Section 3.01:

(a)    To direct the formulation of investment policies and strategies for the Partnership;

(b)    To investigate, identify, select, evaluate, negotiate, structure, acquire, purchase, invest in, monitor, improve, resolve, modify, alter, pledge, foreclose, exchange, transfer and sell or otherwise dispose of Investments;

(c)    To monitor the performance of Investments, to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Investments and to take whatever action as may be necessary or advisable, as determined by the General Partner in its discretion;

(d)    To borrow and raise monies and employ leverage on behalf of the Partnership by entering into one or more credit agreements, warehousing facilities, loans, securitizations, repurchase and reverse repurchase agreements or other similar financing transactions with one or more banks or other institutions;

(e)    To form subsidiaries in connection with the purpose and activities of the Partnership;

(f)    To structure all or any portion of any Investment through the formation of, and/or the direct or indirect investment in, an entity, the beneficial ownership of which is held by the Partnership;

(g)    To enter into any kind of activity and to make, negotiate, enter into, execute, acknowledge, deliver, perform, carry out and terminate contracts of any kind necessary to, in connection with, or incidental to the accomplishment of the purposes of the Partnership, including, without limitation, an investment management agreement and "Subscription Agreements" ("Subscription Agreement" means, with respect to each Limited Partner, the subscription agreement entered into between the Partnership and such Limited Partner pursuant to the terms of which such Limited Partner has agreed or shall agree to purchase an Interest) with Limited Partners;

(h)    To open, maintain and close bank accounts designated by the General Partner in its sole discretion (including banks located within or outside the United States) and draw checks or other orders for the payment of money;

(i)      To open, maintain and close other accounts, including, without limitation, brokerage accounts, money market fund accounts, margin accounts, custodial accounts, trading accounts, and investment accounts with brokerage firms and/or financial institutions designated by the General Partner in its sole discretion;

(j)      To engage, select, monitor, retain and terminate the engagement of personnel and entities, whether part-time or full-time, and agents for the General Partner and the Partnership, including, without limitation, attorneys, accountants, administrators, consultants, brokers, servicers, management companies and such other persons for the Partnership as it may deem necessary or advisable, and authorize any such agent to act for and on behalf of the Partnership, including Affiliates (as defined below) of the General Partner;

(k)      To purchase insurance policies on behalf of the Partnership, the General Partner and entities indemnified by the Partnership, for director and officer liability and other liabilities;

(l)      To institute, defend and settle litigation relating to the Partnership and give receipts, releases and discharges with respect to all of the matters incident hereto;

(m)      To retain placement agents or other entities to engage in activities designed to assist in the sale of Interests in the Partnership on behalf of the Partnership;

(n)      To take action as is necessary to comply with the valuation obligations and responsibilities specified in this Agreement;

(o)      To pay all expenses of the Partnership and the General Partner in accordance with this Agreement;

(p)      To enter into arrangements with other investment funds managed by the General Partner with the same or substantially similar investment objectives as those of the Partnership to either allow other funds to contribute their assets to the Partnership to invest, or to pursue investment activities by investing all or a portion of the Partnership's assets in a fund managed by the General Partner, which will conduct the Partnership's investment activities ("Master Fund");

(q)      To establish one or more additional limited partnerships or similar investment vehicles through co-investments that may be made with the Partnership in Investments;

(r)      To establish, from time to time, an advisory committee, and to delegate to such advisory committee the performance of certain functions and to receive from it such guidance, as determined by the General Partner;

(s)      To appoint an entity to serve as the investment manager of the Partnership  and provide the investment manager with authority to provide certain administrative services to the Partnership and with discretionary investment authority over the Partnership's assets;

(t)      To make on election on behalf of the Partnership under Sections 6221(b) or 6226 of the Internal Revenue Code of 1986, as amended (the "Code") as in effect for the first Fiscal Year beginning after December 31, 2017 and thereafter; and

(u)      To take any and all other actions which are determined by the General Partner to be necessary, convenient or incidental to performing the activities to be conducted by the Partnership.

Section 3.03   Limitation of Liability; Indemnification.

(a) The General Partner, affiliates of the General Partner, and any of its respective members, partners, officers and employees (collectively, "Affiliates"), will not be liable to any Partner or the Partnership (or the Master Fund, if such fund is formed) for any acts or omissions arising out of, or in connection with, the Partnership, any investment made or held by the Partnership or this Agreement unless such action or inaction was made in bad faith or constitutes fraud, willful misconduct or gross negligence or for any act or omission of any broker or agent of the Partnership, provided that such broker or agent was selected, engaged or retained by the Partnership in accordance with the standard above.  Each of the General Partner and Affiliates may consult with counsel and accountants in respect of the Partnership's affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants, provided that they shall have been selected in accordance with the standard above.  The foregoing provisions will not be construed so as to provide for the exculpation of the General Partner or any Affiliate for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but will be construed so as to effectuate the foregoing provisions to the fullest extent permitted by law.  The foregoing provisions also apply with respect to a Master Fund.

(b) To the fullest extent permitted by law, the Partnership (or the Master Fund, if such fund is formed) shall indemnify and hold harmless the General Partner, each Affiliate and the legal representatives of any of them (an "Indemnified Party"), from and against any loss, cost or expense suffered or sustained by an Indemnified Party by reason of (i) any acts, omissions or alleged acts or omissions arising out of, or in connection with, the Partnership, any investment made or held by the Partnership or this Agreement, including, without limitation, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, provided that such acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim are based were not made in bad faith or did not constitute fraud, willful misconduct or gross negligence by such Indemnified Party, or (ii) any acts or omissions, or alleged acts or omissions, of any broker or agent of any Indemnified Party, provided that such broker or agent was selected, engaged or retained by the Indemnified Party in accordance with the standard above.  The Partnership shall, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct.  If such an advance is made by the Partnership, the Indemnified Party shall agree to reimburse the Partnership for such fees, costs and expenses to the extent that it shall be determined that it was not entitled to indemnification.  The foregoing provisions will not be construed so as to provide for the indemnification of the General Partner or any Affiliate for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but will be construed so as to effectuate the foregoing provisions to the fullest extent permitted by law.

The provisions contained in this Section 3.03(b) shall survive the termination of the Partnership and the termination of this Agreement.

ARTICLE IV

**Management**

Section 4.01  <u>Expenses of the Partnership</u>.  The General Partner (or an entity designated by it) shall be authorized to incur and pay in the name and on behalf of the Partnership all expenses that it deems necessary or desirable.

Section 4.02  <u>Expenses</u>.

(a) The General Partner shall bear its own expenses, including office space and utilities, computer equipment and software (not otherwise paid by the Partnership), and secretarial, clerical, employee related and other personnel, except as assumed by the Partnership.

(b) Except as otherwise provided in this Agreement, the Partnership bears and shall be responsible for its own expenses, including, but not limited to, investment related expenses such as all costs associated with procuring financing for Loan purchases, any brokerage commissions or, interest on margin accounts and other indebtedness, the Partnership's custodial fees, bank service fees, withholding and transfer fees, taxes, systems and technology expenses, third party research tools, corporate licensing fees, legal and auditing expenses, accounting, fund administration, filing fees and expenses (including regulatory filings made in respect of the Partnership such as Form PF preparation and filing expenses), outsourced risk management advisory and software, investment related consultants and travel costs that are research related (if any), expenses incurred with respect to the preparation, duplication and distribution to Limited Partners and prospective Limited Partners of Partnership offering documents, annual reports and other financial information, any other services or service provider expenses deemed necessary by the General Partner on behalf of the Partnership.

Section 4.03  <u>Organizational Expenses</u>.  Expenses incurred with respect to the following Partnership matters will be paid by the Partnership (collectively, the "Organizational Expenses"): (i) the offering and sale of the Interests and partnership interests in any parallel investment vehicle, including legal expenses and expenses related to placement agent fees, and (ii) the negotiation, execution and delivery of this Agreement, any side letter, any investment management agreement and any related or similar documents, including, without limitation, any related legal and accounting fees and expenses, travel expenses and filing fees.

Section 4.04  <u>Management Fee</u>.  With respect to each Limited Partner, the General Partner will receive a quarterly management fee (the "Management Fee"), calculated at an annual rate of 0.5% (0.125% per quarter) of the difference between (i) such Limited Partner's Commitment, less (ii) amounts distributed to such Limited Partner as a return of such Limited Partner's Capital Contributions. The Management Fee will be paid quarterly in advance. The General Partner may elect to reduce, otherwise modify or waive the Management Fee with respect to any Limited Partner.

ARTICLE V

**Capital Accounts and Capital Commitments**

Section 5.01  <u>Capital Accounts</u>.  The Partnership will maintain a "<u>Capital Account</u>" for each Partner on the books of the Partnership in accordance with the following provisions:

(a)  To each Partner's Capital Account, there shall be credited such Partner's Capital Contributions, such Partner's distributive share of Net Income (or other items of income or gain) allocated pursuant to Section 6.01 or any item in the nature of income or gain which is specially allocated pursuant to Section 6.02 and the amount of any Partnership liabilities assumed by such Partner or which are secured in whole or in part by any property distributed to such Partner;

(b)  From each Partner's Capital Account, there shall be debited the amount of cash and the Gross Asset Value on the date of distribution of any other property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Net Loss (or other items of deduction, expense or loss) allocated pursuant to Section 6.01 or any item in the nature of expenses or losses which is specially allocated pursuant to Section 6.02 and the amount of any liabilities of such Partner assumed by the Partnership or which are secured in whole or in part by any property contributed by such Partner to the Partnership;

(c)  If all or a portion of an Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the transferred Interest; and

(d)  In determining the amount of any liability for purposes of subparagraphs (a) and (b), there shall be taken into account Code section 752(c) and any other applicable provisions of the Code and the Treasury Regulations.

(e)  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and will be interpreted and applied in a manner consistent with such Treasury Regulations.  If the General Partner determines that it is prudent to modify the manner in which the Capital Accounts, or any additions or subtractions thereto, are computed in order to comply with the Treasury Regulations, the General Partner may make the modification.  The General Partner will also make (i) any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(q), and (ii) any appropriate modifications in the event that unanticipated events might otherwise cause this Agreement not to comply with Regulations Sections 1.704-1(b) and 1.704-2.

Section 5.02  <u>Certain Adjustments to Capital Accounts</u>.  The amount of withdrawals, if any, made by a Partner shall be deducted from such Partner's Capital Account as of the effective date of such withdrawal.

Section 5.03   <u>Capital Commitment</u>.  Each Limited Partner will make a Commitment to the Partnership. The minimum Commitment of each Limited Partner shall be $250,000, subject to

the sole discretion of the General Partner to accept lesser amounts. The General Partner may, in its sole discretion, decline to accept all or any part of any subscriptions that are tendered. After the Initial Closing, each Limited Partner may, with the consent of the General Partner, increase its Commitment; provided that all such increases must be in increments of at least $50,000, subject to the sole discretion of the General Partner to accept lesser amounts. The General Partner may make calls on the Limited Partners' Commitments for any Partnership purpose.

Section 5.04  <u>Capital Calls</u>.  Subject to certain excuse, exclusion, and cancellation provisions described below, Commitments will generally be called down pro rata to Limited Partners' unfunded Commitments as necessary to fund Investments, meet expenses and liabilities of the Partnership or to establish and maintain cash reserves for such purposes and in such amounts as the General Partner deems necessary and appropriate, with not less than ten business days' prior written notice (each such drawdown, and any contribution to the Partnership in exchange for equity interests in the Partnership, a "Capital Contribution"). Each Capital Contribution shall be due and payable to the Partnership on the date set forth in the applicable capital call. Notwithstanding the foregoing, each Partner admitted to the Partnership in the Initial Closing shall be required to make a Capital Contribution equal to their Commitment upon the Initial Closing.

Amounts contributed but returned to Partners because such amounts were not invested or used to pay expenses will be added back to unpaid Commitments and will be subject to recall by the Partnership.

Section 5.05  <u>Excuse and Exclusion</u>.

(a) A Limited Partner may be excused from funding all or a portion of an Investment if the General Partner receives an opinion of counsel, which opinion is reasonably satisfactory to the General Partner, that such investment would be reasonably likely to cause a violation of any material law, regulation, order or administrative practice or written investment policy (to the extent such policy was provided to the General Partner prior to the closing of such Limited Partner's investment in the Partnership and continues in effect as of the date such excuse is sought) to which such Limited Partner is subject.

(b) The General Partner may exclude a Limited Partner from participating in an Investment if the General Partner reasonably determines in good faith that (i) a significant delay, extraordinary expense or material adverse effect on the Partnership, any Investment or future Investments, the General Partner or their respective Affiliates would result from such Limited Partner's participation or (ii) based on written advice of counsel (which advice and counsel must be reasonably acceptable to the Limited Partner to be excluded), that such Limited Partner's participation in such Investment would be reasonably likely to cause a violation of any material law, regulation, order or administrative practice (including any interpretation thereof by any governmental authority or court of competent jurisdiction) to which such Limited Partner is subject.

(c) The excused or excluded Limited Partner's available Commitment will not be reduced as a result of any excuse or exclusion. The General Partner may require each other Limited Partner to make an additional Capital Contribution in respect of such Investment equal to its pro rata share of the excused or excluded Limited Partner's Capital Contribution; provided that no Limited Partner will be required to fund amounts in excess of its unpaid Commitment.

Section 5.06  <u>Defaulting Limited Partner</u>.

(a)  Except to the extent such Limited Partner is excused pursuant to any provision of this Agreement from paying all or any part of its Capital Contribution, if any Limited Partner fails to pay in full when due the Capital Contribution to be paid by it pursuant to Section 5.04 or to pay when due any other payment required to be made hereunder, and such failure continues for thirty days following the date such Capital Contribution was due (a "Default"), then such Limited Partner may be designated by the General Partner as in default under this Agreement (a "Defaulting Limited Partner") and shall thereafter be subject to the provisions of this Section 5.06. The General Partner may choose not to designate any Limited Partner as a Defaulting Limited Partner and may agree to waive or permit the cure of any Default by a Limited Partner, subject to such conditions as the General Partner and the Defaulting Limited Partner may agree upon. The General Partner shall have full authority to interpret in good faith the provisions of this Section 5.06 to give effect to the intent of the preceding sentence.

(b)  With respect to any amount that is in Default (together with any interest pursuant to Section 5.06(b)(i) and any associated collection costs, including attorney's fees and expenses, plus any other liability or obligation incurred by the Partnership in connection with such Default being the "Defaulted Amounts"), the General Partner may, or may not in its sole discretion, undertake any one or more of the following steps: (i) require that such Defaulting Limited Partner pay interest at a rate equal to the lower of fifteen percent (15%) per annum and the highest rate per annum permitted by law on the outstanding unpaid balance of such Defaulted Amount, from and including the date such balance was due and payable through the date full payment for such balance is actually made; (ii) withhold, and use for any purpose, all distributions that would otherwise be made to the Defaulting Limited Partner pursuant to this Agreement, and cause such amounts to be credited against the Defaulted Amounts in a manner determined by the General Partner; (iii) for purposes of Sections 8.02 and 9.04, reduce the Defaulting Limited Partner's Capital Contributions balance in an amount up to 100% of the Capital Contributions of the Defaulting Limited Partner; and (iv) determine that a Defaulting Limited Partner shall not be entitled to make any further Capital Contributions to the Partnership; *provided*, that the liability of such Defaulting Limited Partner to make Capital Contributions to the Partnership shall in any case remain unchanged as if such Default had not occurred. If a Defaulting Limited Partner's Capital Contributions balance is reduced pursuant to this Section 5.06(b), such Defaulting Limited Partner's interest in each Investment shall be reduced by a corresponding percentage and the interests of the other Partners (other than any Defaulting Limited Partners) in each such Investment shall be increased ratably in proportion to their interests in such Investment. For the avoidance of doubt, a Defaulting Limited Partner shall remain liable to the Partnership and the General Partner, as applicable, for its share of Partnership expenses (including Management Fees) through the remaining life of the Partnership.

(c)  So long as any Defaulted Amounts remain unpaid, the General Partner may in its sole discretion offer the Defaulting Limited Partner's remaining Interest (after any reduction pursuant to Section 5.06(b)) to the Partners (other than any Defaulting Limited Partners) pro rata according to each such Partner's respective Commitment on the terms set forth below. If any Partner does not elect to purchase the entire Interest offered to it, such unpurchased Interest shall be reoffered pro rata to the Partners who have purchased the entire Interest offered to them until either all of such Interest is acquired or no Partner wishes to make a further purchase of such unpurchased Interest. At the closing of such purchase (on a date and at a place

designated by the General Partner), each purchasing Partner shall, as payment in full for the Defaulting Limited Partner's Interest being purchased, (i) deliver a non-interest bearing, non-recourse promissory note (in a form approved by the General Partner), secured only by the Defaulting Limited Partner's Interest being purchased, payable to the Defaulting Limited Partner upon the final liquidation of the Partnership in an amount equal to the portion of the Defaulting Limited Partner's remaining Capital Contributions balance (after any reduction pursuant to Section 5.06(b)) being purchased by such Partner, and (ii) assume the portion of the Defaulting Limited Partner's obligation to make both defaulted and future Capital Contributions pursuant to its Commitment which are commensurate with the portion of the Defaulting Limited Partner's Interest being purchased by such Partner. The General Partner shall handle the mechanics of making the offers set forth herein and shall in its discretion set time limits for acceptance. If the entire Defaulting Limited Partner's Interest is not purchased in the manner set forth in this Section 5.06(c), the General Partner in its sole discretion may offer the remaining Interest to a third party or parties on not more favorable terms than as originally offered to the Partners pursuant to this Section 5.06(c) (in which case such third party or parties shall, as a condition of purchasing such Interest, become a party to this Agreement).

(d) Whenever the vote, consent or decision of a Limited Partner is required or permitted pursuant to this Agreement, except as required by the Act, any Defaulting Limited Partner shall not be entitled to participate in such vote or consent, or to make such decision, and such vote, consent or decision shall be tabulated or made as if such Defaulting Limited Partner was not a Partner. No consent of any Limited Partner shall be required as a condition precedent to any transfer of a Defaulting Limited Partner's Interest pursuant to this Section 5.06.

(e) The Partnership may pursue and enforce all rights and remedies the Partnership may have against the Defaulting Limited Partner with respect to any Defaulted Amounts, including a lawsuit to collect Defaulted Amounts.

(f) In the event that a Limited Partner Defaults in making a Capital Contribution to the Partnership, the General Partner may, subject to and pursuant to the procedures set forth in Section 5.04, require all of the nondefaulting Partners to increase their Capital Contributions by an aggregate amount equal to the Capital Contribution of the Defaulting Limited Partner on which it Defaulted; *provided*, that, no Partner will be required to fund amounts in excess of its unfunded Commitment.

(g) The General Partner may, in its sole discretion and in addition to exercising any other rights afforded by law or equity, take any one or more of the foregoing actions. No right, power or remedy conferred upon the General Partner in this Section 5.06 shall be exclusive, and each such right, power or remedy shall be cumulative and in addition to every other right, power or remedy whether conferred in this Section 5.06 or now or hereafter available at law or in equity or by statute or otherwise. No course of dealing between the General Partner and any Defaulting Limited Partner and no delay in exercising any right, power or remedy conferred in this Section 5.06 or now or hereafter existing at law or in equity or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, power or remedy. Each Limited Partner acknowledges by its execution hereof that it has been admitted to the Partnership in reliance upon its agreements under this Agreement, that the General Partner and the Partnership

may have no adequate remedy at law for a breach hereof and that damages resulting from a breach hereof may be impossible to ascertain at the time hereof or of such breach.

ARTICLE VI

**Allocation of Net Income and Net Loss;
Determination of Net Income and Net Loss**

Section 6.01    Allocation of Net Income and Net Loss.

(a)  The rules set forth below in this Article shall apply for the purposes of determining each Partner's allocable share of the items of income, gain, loss and expense of the Partnership comprising Net Income or Net Loss (as defined in Section 6.03 below) of the Partnership for each Fiscal Year or other Fiscal Period, determining special allocations of other items of income, gain, loss and expense, and adjusting the balance of each Partner's Capital Account to reflect the aforementioned general and special allocations.  For each Fiscal Year, the special allocations in Section 6.02 shall be made immediately prior to the general allocations of Section 6.01.

(b)  Except as otherwise required by this Agreement, Net Income and Net Loss for each Fiscal Period shall be allocated to the Capital Accounts of the Partners (including the General Partner) in in a manner such that, after giving effect to the allocations set forth in Section 6.02, the Capital Account of each Partner, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the distribution of investment proceeds that would be made to such Partners pursuant to the Distribution Waterfall in Section 8.05 if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Partnership liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Partnership were distributed in accordance with Section 8.05 to the Partners immediately after making such allocation, minus (ii) such Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.  "Partnership Minimum Gain" shall have the meaning set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).  "Partner Nonrecourse Debt Minimum Gain" shall mean an amount with respect to each partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations Section 1.752-1(a)(2)) determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

(c)  *No Deficit Restoration Obligation.*  At no time during the term of the Partnership or upon dissolution and liquidation thereof shall a Partner with a negative balance in its Capital Account have any obligation to the Partnership or the other Partners to restore such negative balance, except as may be required by law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

(d)  *Loss Limitation.*  Notwithstanding anything to the contrary contained in Section 6.01, the amount of items of Partnership expense and loss allocated pursuant to Section 6.01 to any Partner shall not exceed the maximum amount of such items that can be so allocated without causing such Partner (other than a General Partner) to have an Adjusted Capital

Account Deficit at the end of any Fiscal Year. All such items in excess of the limitation set forth in this Section 6.01(d) shall be allocated first to Partners who would not have an Adjusted Capital Account Deficit, pro rata in proportion to their Capital Account balances. "Adjusted Capital Account Deficit" means, with respect to any Partner, a deficit balance in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account of any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)    Debit from such Capital Account the items described in Treasury Regulations Sections 1.704-l(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

Section 6.02  Certain Special Allocations.  Notwithstanding the general provisions of Section 6.01, the following items of cost, expense and, as applicable, income and gain will be specially allocated as provided in this Section 6.02.

(a) *Management Fee*.  The Management Fee expense payable pursuant to Section 4.04 as to each Limited Partner will be specially allocated to that Limited Partner.

(b) *Withdrawal Costs*.  If Investments are liquidated, distributed in kind or segregated in a separate account in connection with any Limited Partner withdrawal (other than a mandatory withdrawal), the General Partner may cause some or all of the costs the Partnership incurs in connection with selling or transferring those Investments to be specially allocated to the withdrawing Partner.

(c) *Other Special Costs*.  The General Partner may cause any expenditures, payments or amounts that the General Partner determines are, were or should be made or withheld on behalf of, for the benefit of, or because of circumstances applicable to, fewer than all Partners to be charged to those Partners.

(d) *Regulatory Allocations*.  The provisions of Sections 5.01, 6.01 and 6.02 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In furtherance of the foregoing, Section 704 of the Code and the Regulations issued thereunder, including, but not limited to, the provisions of such Regulations addressing qualified income offset provisions, minimum gain chargeback requirements and allocations of deductions attributable to nonrecourse debt and partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)), are hereby incorporated by reference.  If, as a result of the provisions of Section 704 of the Code and such Treasury Regulations, items of Net Income or Net Loss are allocated to the Partners in a manner that is inconsistent with the manner in which the Partners intend to allocate such

*Peer Street Opportunity Investors II, LP*
*Limited Partnership Agreement Page - 13*

items as reflected in Section 6.01 and 6.02, to the extent permitted under such Treasury Regulations, items of future income and loss shall be allocated among the Partners so as to prevent such allocations from distorting the manner in which Partnership distributions will be divided among the Partners pursuant to this Agreement. The General Partner shall be authorized to make appropriate amendments to the allocations of items pursuant to Section 6.01 and this Section 6.02 to the extent necessary in order to comply with Section 704 of the Code or applicable Treasury Regulations thereunder. Notwithstanding the foregoing, if there are any changes after the Initial Closing in applicable tax law, regulations or interpretation, or any errors, ambiguities, inconsistencies or omissions in this Agreement with respect to allocations to be made to Capital Accounts which would, individually or in the aggregate, cause the Partners not to achieve in any material respect the economic objectives underlying this Agreement, the General Partner may in its discretion make appropriate adjustments to such allocations in order to achieve or approximate such economic objectives. For the avoidance of doubt, the preceding sentence shall not be interpreted to permit the General Partner to make adjustments to allocations to recharacterize carried interest distributed to the General Partner pursuant to Section 8.05(b).

Section 6.03  Net Income and Net Loss.  "Net Income" and "Net Loss" shall mean, with respect to any Fiscal Year or other Fiscal Period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for United States federal income tax purposes with the following adjustments: (i) all items of income, gain, loss or deduction allocated pursuant to Section 6.02(c) shall not be taken into account in computing such Net Income or Net Loss; (ii) any income of the Partnership that is exempt from United States federal income taxation and not otherwise taken into account in computing Net Income and Net Loss shall be added to such taxable income or loss; (iii) if the Gross Asset Value of any asset differs from its adjusted tax basis for United States federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Gross Asset Value; (iv) If the Gross Asset Value of any Company asset is adjusted pursuant to the definition thereof, the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset for purposes of computing Net Income or Net Loss; (v) if the Gross Asset Value of any asset differs from its adjusted tax basis for United States federal income tax purposes the amount of depreciation, amortization or cost recovery deductions with respect to such asset shall for purposes of determining Net Income and Net Loss be an amount which bears the same ratio to such Gross Asset Value as the United States federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided, that if the United States federal income tax depreciation, amortization or other cost recovery deduction is zero, the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Net Income and Net Loss); and (v) any expenditures of the Partnership that are described in Section 705(a)(2)(B) of the Code or are treated as described in Section 705(a)(2)(B) of the Code pursuant to Regulation section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Income and Net Loss shall be treated as deductible items.

Section 6.04  Gross Asset Value.  "Gross Asset Value" shall mean, with respect to any Partnership asset, the asset's adjusted basis for United States federal income tax purposes, except that (i) the initial Gross Asset Value of any asset contributed by a Partner to the Partnership will be the gross fair market value, as determined by the General Partner ("Fair Market Value") of the asset at the time of contribution, (ii) the Gross Asset Value of all Partnership assets will be adjusted to equal their respective Fair Market Values as of the following times:  (A) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital

Contribution; (B) the distribution by the Partnership to a Partner of more than a de minimis amount of Partnership property as consideration for an interest in the Partnership, in the case of either (A) or (B), if the General Partner reasonably determines that the adjustment is necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership; and (C) the liquidation of the Partnership within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, (iii) the Gross Asset Value of any Partnership asset distributed (or deemed distributed) to any Partner will be the Fair Market Value of the asset on the date of distribution and (iv) the Gross Asset Values of Partnership assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of the assets pursuant to Section 732(d), Section 734(b) or Section 743(b) of the Code, but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values will not be adjusted pursuant to this subparagraph (iv) to the extent that the General Partner determines that an adjustment pursuant to subparagraph (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

ARTICLE VII

**Allocation of Income for Tax Purposes**

Section 7.01 <u>Tax Allocations.</u> For each Fiscal Year, items of income, deduction, gain, loss or credit shall be allocated for U.S. federal, state and local income tax purposes among the Partners in accordance with allocations of the corresponding items for Capital Account purposes under Section 6.01 and 6.02, except that allocations under this Section 7.01 shall be made pursuant to the principles of Section 704(c) of the Code, the Treasury Regulations promulgated thereunder, and Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and (g), 1.704-1(b)(4)(i) and 1.704-3(e), as applicable, or the successor provisions to such sections and regulations.

Section 7.02 <u>Tax Representative</u>. The General Partner shall be the "tax matters partner" of the Partnership pursuant to Section 6231(a)(7) of the Code, and, with respect to the Partnership's taxable years beginning after December 31, 2017, the "partnership representative" of the Partnership within the meaning of Section 6223(a) of the Code as in effect for the first Fiscal Year beginning after December 31, 2017 and thereafter. If any state or local tax law provides for a tax matters partner/partnership representative or person having similar rights, powers, authority or obligations, the General Partner shall also serve in such capacity (in any such federal, state or local capacity, the "Tax Representative"). In such capacity, the Tax Representative shall have all of the rights, authority and power, and shall be subject to all of the obligations, of a tax matters partner/partnership representative to the extent provided in the Code and the Treasury Regulations, and the Partners hereby agree to be bound by any actions taken by the Tax Representative in such capacity. The Tax Representative shall represent the Partnership in all tax matters to the extent allowed by law. Without limiting the foregoing, the Tax Representative is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities, including administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. The Tax Representative will have the authority and responsibility to arrange for the preparation, and timely filing, of the Partnership's tax returns. Any decisions made by the Tax Representative, including, without limitation, whether or not to settle or contest any tax matter, and the choice of forum for any such contest, and whether or not to extend the period of limitations for the assessment or collection of any tax, shall be made in the Tax Representative's sole discretion. Without limiting the generality of the foregoing, the Tax Representative (i) shall have the sole and absolute authority to make any elections on behalf of the Partnership permitted to be made pursuant to

the Code or the Treasury Regulations promulgated thereunder and (ii) without limiting the foregoing, may, in its sole discretion, make on election on behalf of the Partnership under Sections 6221(b) or 6226 of the Code as in effect for the first Fiscal Year beginning after December 31, 2017 and thereafter, and (iii) may take all actions the Tax Representative deems necessary or appropriate in connection with the foregoing.

Section 7.03  Withholding. Each Partner will furnish the Partnership or the General Partner with any information, representations and forms as shall reasonably be requested by the Partnership or the General Partner from time to time to assist it in complying with any applicable law or tax requirements or determining the extent of, and in fulfilling, its withholding obligations.  Each Partner agrees to furnish the Partnership or the General Partner with any representations and forms as shall reasonably be requested by the Partnership or the General Partner to assist it in obtaining any exemption, reduction or refund of any withholding or other taxes imposed by any taxing authority or other governmental agency upon the Partnership or amounts paid to the Partnership.  Each Partner acknowledges that it is responsible for compliance with all tax, exchange control, reporting and other laws and regulations applicable to its investment in the Partnership.  If withholding taxes are paid or required to be paid in respect of payments made to or by the Partnership, such payments or obligations shall be treated as follows:

(a) *Tax Advances*.  To the extent the Partnership (or any of its Affiliates or entities in which it holds an interest) is required by law to withhold or to make tax payments on behalf of or with respect to any Partner ("Tax Advances"), the General Partner may cause the Partnership to withhold those amounts and make those tax payments as so required.  Any withholding referred to in this Section 7.03(a) shall be made at the maximum applicable statutory rate under applicable law unless the General Partner has received evidence satisfactory to the General Partner to the effect that a lower rate is applicable or that no withholding is applicable.  All Tax Advances made on behalf of a Partner will, at the option of the General Partner, (i) be promptly paid to the Partnership by the Partner on whose behalf the Tax Advances were made (which payment will not constitute a Capital Contribution) or (ii) reduce any current withdrawal being made by that Partner (or, if no such withdrawal is being made by that Partner, be treated as a distribution to such Partner as of the last day of the Fiscal Period that includes the date the Tax Advance was remitted by the Partnership to the taxing authorities).  Whenever the General Partner selects option (i), from the date that is ten (10) days after the receipt by the Partner on whose behalf the Tax Advance was made of notice of the Tax Advance, the Tax Advance will bear interest at the lower of 15% or the highest rate permitted by law until repaid.  Whenever the General Partner selects option (ii), for all other purposes of this Agreement, the Partner on whose behalf the Tax Advance was made will be treated as having received the full amount of the withdrawal or distribution, as applicable, unreduced by the amount of the Tax Advance.

(b) *Overwithholding.*  Neither the Partnership nor the General Partner shall be liable for any excess taxes withheld in respect of any Limited Partner's Interest, and, in the event of overwithholding, a Limited Partner's sole recourse shall be to apply for a refund from the appropriate governmental authority.  Subject to Section 10.19, the General Partner shall use commercially reasonable efforts to provide information to any Limited Partner requesting such information for the purpose of applying for a tax refund.

(c) *Indemnity.*  If the Partnership, the General Partner, or any of their respective Affiliates, or any of their respective shareholders, partners, members, officers, directors, employees, managers and, as determined by the General Partner in its discretion, consultants

or agents, becomes liable as a result of a failure to withhold and remit taxes in respect of any Partner or otherwise, then, in addition to, and without limiting any indemnities for which such Partner may be liable under Article III hereof, such Partner shall, to the fullest extent permitted by law, indemnify and hold harmless the Partnership, the General Partner or any of their respective Affiliates, or any of their respective shareholders, partners, members, officers, directors, employees, managers and, as determined by the General Partner in its discretion, consultants or agents, as the case may be, in respect of all taxes, including, without limitation, interest and penalties and income taxes applicable to a Partner's allocable share of Partnership income, and any expenses incurred in any examination, determination, resolution and payment of any such liability.   The provisions contained in this Section 7.03(c) shall survive the termination of the Partnership, the termination of this Agreement and the transfer or assignment of any Interest. Each Limited Partner agrees that it will not make an election under Section 1471(b)(3) of the Code to have the Partnership withhold amounts on behalf of such Limited Partner.

(d)   *Refunds of Withholding Taxes.*  In the event that the Partnership receives a refund of taxes previously withheld by a third party from one or more payments to the Partnership, the economic benefit of such refund shall be apportioned among the Partners in a manner reasonably determined by the General Partner to offset the prior operation of this Section 7.03 in respect of such withheld taxes.

Section 7.04   Information Provision and Covenants. Each Partner agrees to provide promptly and to update as necessary at any times requested by the General Partner, all information, documents, self-certifications, tax identification numbers, tax forms, and verifications thereof, that the General Partner deems necessary in connection with (1) any information required for the Partnership to determine the scope of Sections 6221-6235 of the Code as in effect for the Fiscal Year starting after December 31, 2017 and thereafter; (2) an election by the Partnership under Section 6221(b) or 6226 of the Code as in effect for the Fiscal Year starting after  December 31, 2017, and (3) an audit or a final adjustment of the Partnership by a taxing authority.  Each Partner covenants and agrees to take any action reasonably requested by the Partnership in connection with an election by the Partnership under Section 6221(b) or 6226 of the Code as in effect for its first Fiscal Year beginning after December 31, 2017 or an audit or a final adjustment of the Partnership by a taxing authority (including, without limitation, promptly filing amended tax returns and promptly paying any related taxes, including penalties and interest).

Section 7.05    Audits.  The Partners agree that the Partnership shall elect out of the application of Section 6221(a) of the Code as in effect for its first Fiscal Year beginning after December 31, 2017, and for each Fiscal Year thereafter, if possible.  If such election out is impossible, the Partners acknowledge that the Partnership intends to elect the application of Section 6226 of the Code as in effect for its first Fiscal Year beginning after December 31, 2017, in the event that it receives a "notice of final partnership adjustment" that would otherwise permit the Internal Revenue Service (the "I.R.S.") to collect from the Partnership a deficiency of tax, for each relevant year.   This acknowledgement applies to each Partner whether or not it owns an Interest in the Partnership in both the reviewed year and the year of the I.R.S.'s adjustment. Each Partner agrees and covenants to take into account and report to the I.R.S. any adjustment to its items for the reviewed year as notified to them by the Partnership in a statement, in the manner provided in Section 6226(b) as in effect for the Partnership's first Fiscal Year beginning after December 31, 2017, whether or not such Partner owns any interests in the Partnership in the year of the Partnership's statement.   Any Partner that fails to report its share of such adjustments on its U.S. tax return for its taxable year including the date of the

Partnership's statement as described immediately above shall indemnify and hold harmless the Partnership, the General Partner, the Tax Representative, and each of their Affiliates from and against any and all liabilities related to taxes (including penalties and interest) imposed on the Partnership as a result of the Partner's inaction.  In addition, each Partner agrees and covenants to indemnify and hold the Partnership, the General Partner, the Tax Representative, and each of their Affiliates harmless from and against any and all liabilities related to taxes (including penalties and interest) imposed on the Partnership (i) pursuant to Section 6221 of the Code as in effect for the first Fiscal Year beginning after December 31, 2017, which liabilities relate to adjustments that would have been made to the tax items allocated to such Partner had such adjustments been made for a tax year beginning prior to January 1, 2018 (and assuming that the Partnership had not made an election to have Section 6221 of the Code as amended by P.L. 114-74 apply for such earlier tax years) and (ii) resulting from or attributable to such Partner's failure to comply with Section 7.04 of this Agreement. Each Partner acknowledges and agrees that no Partner shall have any claim against the Partnership, the General Partner, the Tax Representative, or any of their Affiliates for any tax, penalties or interest resulting from the Partnership's election under Section 6226 of the Code as in effect for the Fiscal Year starting after  December 31, 2017.  The provisions contained in this Section 7.05 shall survive the termination of the Partnership, the termination of this Agreement and, with respect to any Partner, the transfer or assignment of any portion of such Partner's Interest  in the Partnership.

ARTICLE VIII

**Withdrawals; Distributions**

Section 8.01    <u>Withdrawals from Capital Accounts</u>.  A Partner may withdraw capital from its Capital Account only in accordance with the following procedures and limitations without the express consent of the General Partner, which may be granted or withheld in the General Partner's sole discretion.

Section 8.02    <u>Withdrawals</u>.    Subject to the limitations set forth below, Capital Accounts of Limited Partners may be withdrawn as of the end of the calendar quarter that ends on or after the first anniversary of the Capital Contribution (the "Lock-Up Period"). After satisfying the Lock-Up Period, Capital Accounts may be withdrawn by a Limited Partner on the last day of each calendar quarter. All withdrawals will require 90 days' prior written notice (subject to the discretion of the General Partner to waive such notice and permit withdrawals at other times).  Each date as of which Capital Accounts may be withdrawn is herein referred to as a "Withdrawal Date." Each new Capital Contribution will have a new Lock-Up Period.  The General Partner, in its sole discretion, may waive the Lock-Up Period requirement, in whole or in part, for certain Limited Partners.

Section 8.03    <u>General Partner Withdrawals</u>.  The General Partner may withdraw a portion of its Capital Account on the same terms as the Limited Partners or at such other times as it determines; provided that the General Partner may not withdraw capital from the Partnership if the General Partner suspends withdrawal rights (pursuant to Section 8.09).  Notwithstanding the foregoing, the General Partner may withdraw capital from its Capital Account in the Partnership equal to the amount of a previously earned Carried Interest at any time in the General Partner's sole and absolute discretion.

Section 8.04    Payment.  Provided that the General Partner has received all necessary documentation, distribution in respect of the withdrawn capital normally will be made in U.S. dollars within 30 calendar days after an authorized Withdrawal Date.  However, the General Partner shall have the right, at its discretion, to withhold up to 5% of the net asset value of the withdrawn Capital Account for the Partnership's liabilities and other contingencies until no later than 30 days after the completion of the year-end audit of the Partnership's financial statements for any withdrawal of 90% or more of a Limited Partner's Capital Account balance (or if a withdrawal, when combined with all other withdrawals of such Limited Partner during the preceding 12 months, would result in such Limited Partner having withdrawn 90% or more of such Limited Partner's Capital Account as of the beginning of such period). In those circumstances, the General Partner will remit the balance of the withdrawal proceeds without interest. The General Partner, in its sole discretion, may waive these withdrawal restrictions as to any Limited Partner.  The General Partner, in its sole discretion, may effect withdrawal payments in cash or in-kind.

Section 8.05    Distributions.  Subject to Sections 8.06 and 8.12, net investment proceeds available for distribution to the Partners, less amounts available for reinvestment (as determined in the discretion of the General Partner), will be distributed among Partners pro rata in proportion to each of their respective Capital Contributions. Notwithstanding the foregoing, the General Partner will receive a portion of amounts distributable to each Limited Partner (hereafter referred to as "Carried Interest"). Accordingly, each Limited Partner's share of net investment proceeds will be distributed in the following amounts and order of priority (the "Distribution Waterfall"):

(a)    FIRST, 100% to such Limited Partner until such Limited Partner has received aggregate distributions in an amount equal to the following:

(i)  Such Limited Partner's aggregate Capital Contributions at such time; and

(ii) A preferred return on all unreturned Capital Contributions of such Limited Partner, calculated at the rate of 10% per annum (compounded annually) from the date each such Capital Contribution was made by such Limited Partner (the "Preferred Return").

(b)    SECOND, 70% to such Limited Partner and 30% to the General Partner as Carried Interest.

All short-term interest income that is not generated from Investments, such as interest earned on cash holdings of the Partnership, will be distributed to the Partners pro rata in proportion to their Capital Contributions, and will not be taken into account in determining the General Partner's Carried Interest.

The General Partner may elect in its sole and absolute discretion to defer all or any portion of any Carried Interest distributions that would otherwise be made to it. Any such deferred distribution shall be, in the General Partner's sole discretion, either retained by the Partnership on the General Partner's behalf or distributed to the Limited Partners. To the extent that the General Partner elects not to receive any Carried Interest distribution, subsequent distributions shall be made to the General Partner until it has received the amount of Carried Interest distributions it would then have been entitled to receive without such election; provided that no interest shall accrue on or be paid to the General Partner with respect to any such deferred Carried Interest distributions.

Section 8.06    Costs and Reserves.  The General Partner may establish reserves for the Partnership for various obligations and liabilities of the Partnership as the General Partner may reasonably determine to be advisable, whether or not in accordance with generally accepted accounting principles ("Reserves").

Section 8.07    Death, Bankruptcy or Legal Incapacity of a Partner.

(a)    The death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner shall not dissolve the Partnership. The legal representatives of a Limited Partner shall succeed as assignee to the Limited Partner's interest in the Partnership upon the death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of such Limited Partner, but shall not be admitted as a substituted Partner without the consent of the General Partner, in its sole discretion.

(b)    In the event of the death, disability, incapacity, adjudication of incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner, the legal representatives of such Limited Partner must notify the General Partner not more than 30 days after such event occurs.  The General Partner may, in its sole discretion, at any time after such an event, effect a complete withdrawal of the balance of such Limited Partner's Capital Account.  Until such withdrawal occurs, the Capital Account of such Limited Partner shall continue at the risk of the Partnership's business until the effective date of termination of the Partnership.

Section 8.08    Mandatory Withdrawals.  The General Partner, in its sole discretion, by written notice to any Limited Partner, may compel the withdrawal of all of such Limited Partner's Capital Contributions at any time and for any reason.  Under such circumstances, the General Partner will have the irrevocable power to act in the name of such Limited Partner to withdraw its interest in the Partnership.  The General Partner has the right to terminate the Partnership at any time by the compulsory termination of all Interests.  In the case of such termination, the Partnership's assets will be distributed to the Partners within 30 days after completion of a final audit of the Partnership's books (which must be performed within 120 days of the termination of the Partnership), or as soon as reasonably practicable thereafter.

Section 8.09    Suspension of Withdrawals.  The General Partner may suspend Capital Account withdrawals and the determination of the net asset value, (a) during any period when any stock exchange on which any of the Partnership's Investments are quoted is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (b) during the existence of any state of affairs which, in the opinion of the General Partner, constitutes an emergency as a result of which disposal of investments by the Partnership would not be reasonably practicable or would be seriously prejudicial to the Partners of the Partnership; (c) during any breakdown in the means of communication normally employed in determining the price or value of any of the Partnership's Investments, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any Investments owned or sold short by the Partnership cannot reasonably be promptly and accurately ascertained; (d) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the opinion of the General Partner, be effected at normal rates of exchange; or (e) during any period in which the Partnership receives withdrawal requests that, in the aggregate, would create, in the sole discretion of the General Partner, a material adverse effect on the Partnership if such withdrawal requests were satisfied.  To the

extent that a request for withdrawal of capital is not subsequently withdrawn, the withdrawal shall be effected as of the first Withdrawal Date following the recommencement of withdrawals.

Section 8.10    Suspension of Withdrawal Proceeds.    The General Partner may suspend the right of any Partner to withdraw capital or receive a distribution from the Partnership if, in the General Partner's judgment, such a suspension would be in the best interests of the Partnership. Situations in which such a suspension might occur include: when a withdrawal would cause the Partnership or the General Partner to violate securities laws, commodities laws, or other laws; when significant withdrawals or disruptions in securities markets or real estate markets would make pricing and/or liquidation of some or all Partnership assets difficult or would result in losses if the Partnership attempted such liquidations; when the General Partner determines, in consultation with tax advisors, that the withdrawal could result in the Partnership being treated as a "publicly-traded partnership" and thus taxable as a corporation; or if other events make accurate determination of the Partnership's net asset value impractical. The General Partner will give notice to Partners who make withdrawal requests that are affected by any such suspension. Unless a Partner rescinds his suspended withdrawal request, the withdrawal will generally become effective after the suspension is lifted, on the basis of the Partner's Capital Account balance at that time.

Section 8.11    In-Kind Distributions.    In the discretion of the General Partner, a Limited Partner may receive in-kind distributions from the Partnership's portfolio. Such investments so distributed may not be readily marketable or saleable and may have to be held by such Limited Partner for an indefinite period of time.  Any such in-kind distributions will not materially prejudice the interests of the remaining Limited Partners. If the Partnership distributes securities in-kind in satisfaction of a withdrawal request, the General Partner may, in its sole discretion, at the request of any Limited Partner and to the extent practicable, hold any such securities in trust or in a liquidating special purpose vehicle and liquidate such securities on the Limited Partner's behalf in which case (i) payment to such Limited Partner of that portion of its withdrawal attributable to such securities will be delayed until such time as such securities can be liquidated and (ii) the amount otherwise due such Limited Partner will be increased or decreased to reflect the performance of such securities through the date on which the liquidation of such securities is effected, and any applicable expenses, the Management Fee and Incentive Allocation.

Section 8.12    Tax Distributions.

(a)    Notwithstanding the foregoing distribution provisions of this Article VIII, the General Partner may, in its sole discretion, cause the Partnership to make a distribution to the General Partner in an amount sufficient to enable the General Partner and its direct or indirect owners to discharge their United States federal, state and local income tax liabilities arising from the allocations of income or gain (net of prior losses) to the General Partner pursuant to this Agreement (a "Tax Distribution"), and the amount distributed to the Limited Partners pursuant to this Article VIII will be reduced accordingly.  The amount of any Tax Distribution will be calculated based on the applicable Tax Rate and any other assumptions the General Partner reasonably determines to be appropriate. "Tax Rate" shall mean the highest marginal tax rate for an individual resident in Los Angeles, California, applicable to ordinary income, qualified dividend income, or capital gains, as appropriate, taking into account the deductibility of state and local income taxes as applicable at the time for United States federal income tax purposes and any limitations thereon including, without limitation, pursuant to Section 68 of the Code.

(b)      All Tax Distributions made to the General Partner shall be repaid to the Partnership by reducing the amount of the next succeeding distribution or distributions which would otherwise have been made to the General Partner, or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to the General Partner.  To the extent that an amount otherwise distributable to the General Partner is so applied, it shall be treated for all purposes hereof as if such amount had actually been distributed to the General Partner pursuant to Section 8.05.

## ARTICLE IX

### Investment Period, Dissolution and Winding Up of the Partnership

Section 9.01 <u>Investment Period of the Partnership</u>. The Partnership shall dissolve on June 30, 2023, unless terminated earlier pursuant to the terms of this Agreement (the "Investment Period"). The Partnership shall not purchase or enter into any additional Investments following the termination of the Investment Period.

Section 9.02 <u>Dissolution of the Partnership</u>.  The Partnership shall dissolve upon the happening of any of the following events:

(a)  The decision of the General Partner to dissolve the Partnership, which may be made at any time for any reason;

(b)  The expiration of the Investment Period of the Partnership;

(c)  The withdrawal, bankruptcy, insolvency or dissolution of the General Partner or the occurrence of any other event which constitutes an event of withdrawal of the General Partner under the Act, unless the business of the Partnership is continued in accordance with the terms of this Agreement;

(d)  The withdrawal, bankruptcy, insolvency, or dissolution of Peer Street, Inc., the managing member of the General Partner; or,

(e)  A judicial decree of dissolution has been obtained.

Section 9.03 <u>Winding Up</u>.  Upon dissolution of the Partnership, the Partnership shall not terminate, but shall cease to engage in further business, except to the extent necessary to perform existing contracts and preserve the value of its assets, and the General Partner, or if there is no General Partner, a person appointed by the General Partner to act as a liquidating trustee (the "Liquidating Trustee"), shall promptly wind up the Partnership's affairs and liquidate the Partnership's assets in a commercially reasonable manner. During the course of the winding up and liquidation of the Partnership, all of the provisions of this Agreement shall continue to bind the parties and apply to the activities of the Partnership including, without limitation, the allocation and distribution provisions hereof, except as specifically provided herein to the contrary.

Section 9.04 <u>Liquidation</u>.

(a)  As soon as practicable following the effective date of dissolution (unless the Partnership has been continued without dissolution in accordance with this Agreement), the

General Partner or the Liquidating Trustee shall liquidate all holdings of the Partnership, and proceeds from liquidation shall be applied and distributed as follows:

(i) First, to the satisfaction (whether by payment or the reasonable provision for payment) of the obligations of the Partnership to creditors, including any unpaid Management Fee to the General Partner in its capacity as a creditor of the Partnership, in the order of priority established by the instruments creating or governing such obligations and to the extent otherwise permitted by law, including to the establishment of any reserves which the General Partner or Liquidating Trustee, as may be selected, considers necessary for any anticipated contingent, conditional or unmatured liabilities or obligations of the Partnership. All such reserves shall be paid to the General Partner (or Liquidating Trustee if applicable) and held by the General Partner for the purpose of disbursing such reserves in payment in respect of any of the aforementioned liabilities. At the expiration of such period as the General Partner (or Liquidating Trustee, if applicable) shall deem advisable, any balance of any such reserves not required to discharge such liabilities or obligations shall be distributed as provided in subsection (ii) below; and

(ii) Second, to the Partners in accordance with Section 8.05 of this Agreement.

(b) Each Limited Partner shall look solely to the assets of the Partnership for all distributions with respect to the Partnership and shall have no recourse therefore, upon dissolution or otherwise, against the General Partner or a Limited Partner.

(c) Distributions in liquidation will be made in cash or in kind or partly in cash or partly in kind, at the discretion of the General Partner. To the extent reasonably practicable, distributions of Investments shall be made pro rata based on the amount which each such Partner receiving a distribution is entitled. Investments which are not publicly traded shall not be distributed to any Partner without the consent of that Partner, unless the distribution of such Investments is made pro rata to all Partners.

Section 9.05    Retroactive Adjustment.  If a Partner receives any amount distributed by the Partnership in excess of an amount to which such Partner was entitled under this Agreement for any reason, then such Partner shall be liable to the Partnership for the return of such amount. As such, the amount due to the Partnership shall be treated as a demand loan payable by the Partner to the Partnership with interest at the Prime Rate in effect from time to time plus 5.0%, compounded annually. The General Partner may, in its discretion, either demand payment of the principal and accrued interest on such demand loan at any time and enforce payment thereof by legal process, or withhold from one or more distributions to a Partner amounts sufficient to satisfy such Partner's obligations under any such demand loan.

Section 9.06    Termination of Partnership.  Upon the application and distribution of the proceeds of liquidation and the assets of the Partnership as provided herein, the Partnership shall file its certificate of cancellation of the Certificate of Limited Partnership in accordance with the Act, whereupon the Partnership shall terminate. Upon cancellation of the Certificate of Limited Partnership in accordance with the Act, other than as expressly provided herein, this Agreement shall terminate.

ARTICLE X

**Miscellaneous Provisions**

Section 10.01 <u>Designation of Attorney-in-Fact</u>.  Each of the Limited Partners hereby irrevocably constitutes, appoints and empowers the General Partner and each of its duly authorized officers, managers, successors and assignees, with full power of substitution and re-substitution, as its true and lawful attorney-in-fact, in its name, place and stead and for its use and benefit, to execute, certify, acknowledge, file, record and swear to all instruments, agreements and documents necessary or advisable to carrying out the following:

(a)  the Certificate of Limited Partnership and any amendment thereto or cancellation thereof which is or may be required by the laws of the State of Delaware;

(b)  any and all amendments to this Agreement that may be permitted or required by this Agreement or the Act, including, without limitation, amendments required to effect the admission of additional or substituted Limited Partners pursuant to and as permitted by this Agreement or to revoke any admission of a Limited Partner which is prohibited by this Agreement;

(c)  any certificate required by reason of the dissolution of the Partnership;

(d)  any application, certificate, report or similar instrument or document required to be submitted by or on behalf of the Partnership to any governmental or administrative agency or body, to any securities exchange, board of trade, clearing corporation or association or to any self-regulatory organization or trade association; and

(e)  all other instruments that may be required or permitted by law to be filed on behalf of the Partnership and that are not inconsistent with this Agreement.

Section 10.02 <u>Maintaining Books of Account</u>.  Proper and complete books of account shall be kept at all times and Limited Partners shall be permitted to inspect the books and records of the Partnership as provided under the Act. The names, addresses, capital account information and/or other identifying information of other Limited Partners will not be disclosed to any Limited Partner.

Section 10.03 <u>Audit of Books</u>.  The books of account and records of the Partnership will be audited as of the end of each Fiscal Year by independent certified public accountants designated from time to time by the General Partner.

Section 10.04 <u>Reports to Partners</u>.  The General Partner intends to deliver to each Partner, no less than quarterly, an account statement for such Partner, the unaudited financial statements for the Partnership, and a letter from the General Partner describing the business activities of the Partnership. Limited Partners will receive annual audited financial statements, copies of Schedule K-1 to the Partnership's tax return, and a review by the General Partner of the Partnership's performance during the prior year.. Limited Partners will receive annual financial statements, copies of Schedule K-1 to the Partnership's tax return, and a review by the General Partner of the Partnership's performance during the prior year. Within 120 days of the end of each fiscal year or as soon thereafter as is reasonably possible, the Partnership will prepare and mail, or cause its accountants to prepare and mail, to each Partner and, to the extent necessary, to each former Partner (or its legal representatives), a report

setting forth in sufficient detail such information as shall enable such Partner or former Partner (or such Partner's legal representatives) to prepare its Federal income tax return in accordance with the laws, rules and regulations then prevailing.

Section 10.05  <u>Amendment of this Agreement</u>.  This Agreement may be amended by the General Partner in any manner that does not adversely affect any Limited Partner; provided, however, that in any event the General Partner may amend this Agreement to correct ambiguities and inconsistencies identified by the General Partner.  This Agreement may also be amended by action taken by both (a) the General Partner and (b) the Limited Partners who, as of the date determined by the General Partner, have aggregate Capital Contributions representing greater than 50% of all of the Capital Contributions in the Partnership.

Section 10.06  <u>BHCA Subject Persons</u>. Notwithstanding any other provision of this Agreement to the contrary, with regards to any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the Bank Holding Company Act of 1956, as amended (the "BHCA") and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder (each such Limited Partner, a "BHCA Subject Person"):

(a) *Notice.*  Any Limited Partner that is or becomes a BHCA Subject Person shall immediately inform the General Partner in writing that it is a BHCA Subject Person.

(b) *Nonvoting Interests.*  Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the Partnership an Election Notice (as defined below) and shall not thereafter have given the Partnership a Revocation Notice (as defined below), and that at any time has an ownership percentage (the "Ownership Percentage", calculated at any date by dividing such Partner's Capital Contribution balance at that date by the aggregate of all Partners' Capital Contribution balances at that date, except as described in this Section 10.06) in excess of four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold an Ownership Percentage of only four and nine-tenths percent of the aggregate Ownership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 10.06 on all such Limited Partners), and such Ownership Percentage in excess of said four and nine-tenths percent shall be deemed held by the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages; provided that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of the Agreement up to the full amount of its Ownership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partnership Interest. The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Limited Partnership Interest; provided, however, that the foregoing voting restriction shall not continue to apply if the Limited Partnership Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no person acquires more than two percent (2%) of the Partnership's outstanding Limited Partnership Interests; or (iv) in a single transaction to a third

party who acquires at least a majority of the Partnership's outstanding Limited Partnership Interests without regard to the transfer of such Limited Partnership Interests.

(c)    *Limited Right To Consent.*   Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the Partnership an Election Notice (as defined below) and shall not thereafter have given the Partnership a Revocation Notice (as defined below), shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, pro rata in proportion to their respective Ownership Percentages.

(d)    *Election Notice and Revocation Notice.*   A Limited Partner that is a BHCA Subject Person and that elects to be subject to this Section 10.06 (b) and (e) shall notify the Partnership thereof (an "Election Notice") and, upon the Partnership's receipt of such Election Notice, such Limited Partner shall be subject to this Section (b) and (e) until ninety (90) days after such Limited Partner notifies the Partnership that it elects no longer to be subject to this Section 10.06 (b) and (e) (a "Revocation Notice"), which ninety day period may be reduced by the Partnership.

(e)    *Special Right of Withdrawal.*   Promptly on receipt from any Limited Partner of a notice of intention to withdraw any portion of such Limited Partner's Capital Account pursuant to this Agreement and prior to consenting to any such withdrawal that requires the General Partner's consent or giving a notice of the General Partner's intention to redeem a Limited Partner's Interest in the Partnership pursuant to the provisions of this Agreement governing redemptions, if such withdrawal or redemption would result in a BHCA Subject Person having an Ownership Percentage in excess of twenty-four and nine-tenths percent, even if such BHCA Subject Person shall not have given the General Partner an Election Notice or, having given an Election Notice, shall thereafter have given a Revocation Notice, the General Partner shall so notify such BHCA Subject Person, which shall have the right to withdraw, at the time of the withdrawal or redemption giving rise thereto or as soon thereafter as is practical, so much of its Capital Account, after giving effect to any other withdrawals or redemptions (including withdrawals by other BHCA Subject Persons), as shall be required to reduce such BHCA Subject Person's Ownership Percentage to no more than twenty-four and nine-tenths percent.  If any BHCA Subject Person has a right to withdraw a portion of its Capital Account under the preceding sentence but does not exercise that right, the General Partner may require such BHCA Subject Person to make a withdrawal to reduce such BHCA Subject Person's Ownership Percentage to no more than twenty-four and nine-tenths percent.

Section 10.07   Notices.  Except as otherwise provided herein, all notices provided for under this Agreement will be in writing and will be deemed to have been duly given as indicated if sent to the Partner's address as set forth in the schedule in the files of the Partnership:

(a)  If delivered in person or by courier, on the date it is delivered;

(b)  If sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted;

(c)  If sent by first-class mail, two days after the date of postmark;

(d) If sent by facsimile, on generation of confirmation; and

(e) If sent by email or by posting to a secure website with notice by email, on the date the email is sent.

Notice by any Limited Partner to the Partnership will be deemed effective upon receipt by the Partnership. A Partner may change its address for purposes of this Agreement upon 5 days prior written notice to the General Partner.

Section 10.08  Side Letters.  Notwithstanding anything in this Agreement to the contrary, the General Partner, on its own behalf or on behalf of the Partnership, is specifically authorized without further consent by anyone to enter into agreements, understandings or undertakings ("Side Letters," and each a "Side Letter") with any Limited Partner or proposed Limited Partner with respect to the Partnership or such Partner's Interest in the Partnership which has the effect of establishing rights under, or altering, amending or supplementing any of the terms hereof and any subscription agreement.  All such Side Letters shall be deemed a part of this Agreement and the terms of any Side Letter shall govern with respect to such Limited Partner notwithstanding the terms of this Agreement or the subscription agreement.

Section 10.09  Additional Classes of Interests.  Notwithstanding anything in this Agreement to the contrary, the General Partner, on its own behalf or on behalf of the Partnership, is specifically authorized without further consent by anyone to issue additional classes of limited partnership interests which may differ in terms of, among other things, denomination of currency, the fees charged, minimum commitment amounts, withdrawal rights and other rights. The terms of such classes will be determined by the General Partner.

Section 10.10  No Third-Party Beneficiaries.  It is understood and agreed among the parties that this Agreement and the covenants made herein are made expressly and solely for the benefit of the parties hereto, and that no other Person, other than an Indemnified Party pursuant to Section 3.03, shall be entitled or be deemed to be entitled to any benefits or rights hereunder, nor be authorized or entitled to enforce any rights, claims or remedies hereunder or by reason hereof.

Section 10.11  Counsel to the Partnership.  Counsel to the Partnership may also be counsel to the General Partner and its respective Affiliates. The General Partner may execute on behalf of the Partnership and the Limited Partners any consent to the representation of the Partnership that counsel may request pursuant to the applicable rules of professional conduct in any jurisdiction (the "Rules").  The Partnership has initially selected Cole-Frieman & Mallon LLP as legal counsel to the Partnership (the "Partnership Counsel").  Each Limited Partner acknowledges that the Partnership Counsel does not represent such Limited Partner with respect to the Partnership in the absence of a clear and explicit agreement to such effect between such Limited Partner and the Partnership Counsel (and then only to the extent specifically set forth in that agreement), and that in the absence of any such agreement the Partnership Counsel shall owe no duties to such Limited Partner with respect to the Partnership.  In the event any dispute or controversy arises between a Limited Partner and the Partnership, or between a Limited Partner or the Partnership, on the one hand, and the General Partner or any of its Affiliates that the Partnership Counsel represents, on the other hand, then such Limited Partner agrees that the Partnership Counsel may represent either the Partnership, the General Partner (or any affiliate), or each, in any such dispute or controversy to the extent permitted by the Rules, and such Limited Partner hereby consents to such representation.  Each Limited Partner further acknowledges that, whether or not the Partnership Counsel has in the past represented or is currently

representing such Limited Partner with respect to other matters, the Partnership Counsel has not represented (or is not currently representing) the interests of such Limited Partner in the preparation and negotiation of this Agreement.

Section 10.12    Governing Law; Submission to Jurisdiction and Venue; Waiver of Jury Trial.  This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware and the parties hereto hereby submit to the non-exclusive jurisdiction of the federal and state courts of the State of New York.  TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

Section 10.13    Arbitration.  Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, will be determined by arbitration.  The location of the arbitration will be determined by the General Partner in either (i) Los Angeles, CA or (ii) the county and state of the General Partner's legal counsel, at the time of the dispute.  The arbitration will be administered by the Judicial Arbitration and Mediation Services (JAMS) pursuant to its Comprehensive Arbitration Rules and Procedures.  Disputes will not be resolved in any other forum or venue.  The parties agree that any arbitration will be conducted by a sole arbitrator who is experienced in dispute resolution regarding the securities industry. Pre-arbitration discovery will be limited to the greatest extent provided by the rules of JAMS, the arbitration award will not include factual findings or conclusions of law, and no punitive damages will be awarded. Notwithstanding any other rules, no arbitration proceeding brought against the General Partner will be consolidated with any other arbitration proceeding without the General Partner's consent.  Judgment may be entered upon any award granted in any arbitration in any court of competent jurisdiction in the county and state in which the General Partner maintains its principal office at the time the award is rendered, or in any other court having jurisdiction.  The arbitrator will, in the award, allocate all of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail. **NOTICE:  By becoming a party to this Agreement, each party is agreeing to have all disputes, claims or controversies arising out of or relating to this Agreement decided by neutral binding arbitration, and is giving up any rights it might possess to have those matters litigated in a court or jury trial.  By becoming a party to this Agreement, each party is giving up its judicial rights to discovery and appeal except to the extent that they are specifically provided for under this Agreement.  If any party refuses to submit to arbitration after agreeing to this provision, that party may be compelled to arbitrate under federal or state law.  By becoming a party to this Agreement, each party confirms that its agreement to this arbitration provision is voluntary.**

Section 10.14    Relations with Partners.  No person or entity shall be considered a Partner unless a person or entity (i) is the General Partner or (ii) is admitted to the Partnership by the General Partner as a Limited Partner, a substituted Limited Partner, or a substituted or additional general partner of the Partnership, as provided in this Agreement.  The Partnership and General Partner need deal only with persons and entities so admitted as Partners.

Section 10.15    Compliance with FATCA.  Each Limited Partner hereby agrees to provide to the Partnership on a timely basis (i) such information, representations, forms or other documentation as the General Partner may reasonably request in order for the General Partner and the Partnership (and any member of any "expanded affiliated group" (as defined in Section 1471(e)(2) of

the Code) of which the General Partner, the Partnership or any of their Affiliates is a member) to comply with their obligations under, and avoid becoming subject to, withholding, or to obtain any available exemption, reduction or refund of any tax withheld, pursuant to (a) Sections 1471-1474 of the Code (or any amended or successor version thereof), Treasury Regulations and any forms, instructions or other guidance issued thereunder (now or in the future) and any intergovernmental agreement or other similar agreement between the United States and one or more other governments or tax authorities that is entered into in order to facilitate compliance with, or otherwise relates to, any of the preceding, together with any regulations, forms, instructions or other guidance issued (now or in the future) by any government or tax authority in a jurisdiction other than the United States in relation to any intergovernmental agreement or similar agreement ("FATCA"); or (b) any legislation in any jurisdiction that the General Partner reasonably believes to be similar to FATCA; or (ii) any other information required for the Partnership to comply with its tax obligations (including, for the avoidance of doubt, obligations pursuant to any agreement that the Partnership enters into pursuant to Section 1471 of the Code or any similar agreement) or to answer any inquiries from any tax authority. In the event that any Limited Partner fails to provide any of the information, representations, certificates or forms (or undertake any of the actions) required by this Section 10.15, the General Partner shall be entitled to (i) form an entity organized in the United States, transfer such Limited Partner's interest in the Partnership to such entity, admit such Limited Partner as an owner of such entity and cause such Limited Partner to cease to be a Partner in the Partnership or (ii) take any other steps as the General Partner determines in its sole discretion are necessary or appropriate to mitigate the consequences of such Limited Partner's failure to comply with the requirements of this Section 10.15. Each Limited Partner hereby consents to the General Partner's exercise of the remedies described above and agrees, to the fullest extent permitted by applicable law, to indemnify and hold harmless the Partnership, each investor in the Partnership, and the General Partner and any Affiliate thereof against the amount of any costs incurred by the Partnership or the General Partner (including, without limitation, the withholding of any tax on payments to the Partnership pursuant to FATCA) as a result of (A) such Limited Partner's failure to comply with any of the above requirements or to do so in a timely manner, or (B) such Limited Partner's participation in the Partnership.

Section 10.16 <u>Entire Agreement</u>. This Agreement, each Subscription Agreement and any Side Letters constitute the entire agreement among the Partners with respect to the subject matter hereof and supersede any prior agreement or understanding among or between them with respect to such subject matter. The representations and warranties of the Limited Partners in, and the other provisions of, the Subscription Agreements shall survive the execution and delivery of this Agreement.

Section 10.17 <u>Binding Effect of this Agreement</u>. This Agreement shall be binding on the transferees, successors, assigns and the legal representatives of each of the Partners.

Section 10.18 <u>Counterparts</u>. This Agreement may be executed in more than one counterpart with the same effect as if the Partners executing the several counterparts had all executed one document.

Section 10.19 <u>Remedies and Waivers</u>. No delay or omission on the part of any party to this Agreement in exercising any right, power or remedy provided by law or provided hereunder shall impair such right, power or remedy or operate as a waiver thereof. The exercise of any right, power or remedy provided by law or provided hereunder shall not preclude any other or further exercise of any other right, power or remedy. The rights, powers and remedies provided hereunder are cumulative and are not exclusive of any rights, powers and remedies provided by law.

Section 10.20 <u>Confidentiality</u>.  In connection with the organization of the Partnership and its ongoing business, the Limited Partners may receive or have access to non-public, confidential and proprietary information concerning the Partnership, the General Partner and their agents and Affiliates, including, without limitation, investment positions, valuations, information regarding potential investments, financial information, trade secrets and the like (collectively, the "Confidential Information").  No Limited Partner shall disclose or cause to be disclosed any Confidential Information to any person or use any Confidential Information for its own purposes or its own account, except in connection with its investment in the Partnership and except as otherwise required by any regulatory authority, law or regulation or by legal process.  The obligations and undertakings of each Limited Partner under this Section shall be continuing and shall survive termination of the Partnership and this Agreement.  Any restriction or obligation imposed on a Limited Partner pursuant to this Section may be waived by the General Partner in its discretion.  Any such waiver or modification by the General Partner shall not constitute a breach of this Agreement or of any duty stated or implied in law or in equity to any Limited Partner, regardless of whether different agreements are reached with different Limited Partners.  The parties recognize and agree that any violation of this Section by any Limited Partner, its officers, employees, consultants, agents, or other affiliates, if any, may cause irreparable harm to the Partnership for which monetary damages would be inadequate and that, in addition to such other remedies as may be available to the Partnership, including recovery of damages, the Partnership shall be entitled to seek and each Limited Partner hereby consents to specific enforcement of the provisions of this Section and/or injunctive relief.  The parties hereto agree that irreparable damage would occur if the provisions of this Section are breached.  Accordingly, it is agreed that the Partnership shall be entitled to seek an injunction or injunctions to prevent breaches of this Section and to enforce specifically the terms and provisions hereof in any court of the United States or of any state having jurisdiction, in addition to any other remedy to which the Partnership is entitled at law or in equity.

*[Signature page follows.]*

IN WITNESS WHEREOF, the undersigned has hereunto signed this Agreement on the date set forth above.

**General Partner:**

Peer Street Opportunity Fund GP, LLC

By: Peer Street, Inc., its managing member

By:_____

Name: _____

Title: _____


**Initial Limited Partner:**


By:_____

Name: Ankush Israni


**Limited Partners:**

All Limited Partners now and hereafter admitted pursuant to powers of attorney now and hereafter granted to the General Partner in the Subscription Agreements

By:  Peer Street Opportunity Fund GP, LLC, as attorney-in-fact for the parties whose names are set forth in the books and records of the Partnership

By: Peer Street, Inc., its managing member

By:_____

Name: _____

Title: _____

**EXHIBIT 33**

## PARTICIPATION AGREEMENT

THIS PARTICIPATION AGREEMENT ("**Agreement**") is dated as of June 1, 2018 (the "**Effective Date**"), by and between PS FUNDING, INC., a Delaware corporation ("**PSF**"), and PEER STREET OPPORTUNITY INVESTORS II, LP, a Delaware limited partnership ("**PSOI**") .

### Recitals

This Agreement is made on the basis of the following facts:

A.  PSF buys loans (each a "**Loan**" and collectively the "**Loans**") evidenced by, among other things, a promissory note (each a "**Note**") executed by the borrower (each a "**Borrower**"), and secured by, among other things, a mortgage or deed of trust of even date therewith (the "**Mortgage**") granted by Borrower encumbering certain real and personal property more particularly described therein (the "**Property**").

B.  The Note, Mortgage and all other documents now or hereafter evidencing, securing and/or executed in connection with the Loan, are referred to herein, collectively, as the "**Loan Documents**"; the Property and all other collateral now or hereafter pledged under any of the Loan Documents or as collateral for the Loan is referred to herein as the "**Collateral**".

C.  PSF and PSOI (each a "**Participant**," and collectively, the "**Participants**") collectively fund the Loan purchases in the relative percentages set forth in Exhibit A attached hereto, and PSF and PSOI hereby desire to set forth their respective rights and obligations concerning the Loans and the Loan Documents.

### Agreement

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  Recitals.   The Recitals are incorporated into and made a part of this Agreement.

2.  Proportionate Share.   As of the date hereof, each Participant owns the beneficial participation interest in the Loans purchased by PSF in the portions set forth in Exhibit A attached hereto; the ratio of each Participant's share of the total amount of the Loans as set forth in Exhibit A shall be referred to herein as its "**Proportionate Share**."

3.  PSF's Covenants.  As of the Effective Date:

3.1 Loan Documents.   Subject to Section 7.3 below, PSF shall hold (or cause a document custodian to hold) the Note, the Mortgage and the other Loan Documents for the benefit of all Participants.

3.2 <u>Performance of Loan Documents</u>.  Subject to <u>Section 7.3</u> below, PSF shall perform all of the functions of the lender under the Loan Documents (including administering, or causing to be administered, all accounts and other amounts held by PSF under any Loan Document, and all other escrow or reserve accounts created or established pursuant to the Loan Documents) including, without limitation, the following functions:

(a) <u>Receipt of Payments</u>.  Subject to <u>Section 7.3</u> below, PSF shall receive all sums due or received from Borrower under the Note and the other Loan Documents, and other fees including but not limited to acquisition fees, for the ratable benefit of all Participants.  Subject to <u>Section 7.3</u> hereof, to the extent such payments are received by PSF, PSF shall accept and distribute such payments in accordance with <u>Section 3.3</u> of this Agreement.

(b) <u>Enforcement of the Loan Documents</u>.  Subject to <u>Section 7.3</u> below, PSF shall have and retain the right, power and authority to take any action, or to refrain from taking any action, as PSF may deem necessary or appropriate in its discretion to satisfy the obligations, enforce the rights, exercise the remedies and pursue any other benefits available under the Loan Documents or any title insurance or other insurance policy delivered or maintained in connection with the Loans.

(i) <u>Notices to Participants</u>.  PSF shall give prompt notice to the other Participants at the address set forth herein of the occurrence of any of the following events:  (A) PSF has notified Borrower in writing of a Default or Event of Default under any of the Loan Documents; (B) Borrower has notified PSF in writing of a Default or Event of Default under any of the Loan Documents; (C) any event which, in PSF's judgment, has a material adverse effect on the value of the Collateral; and (D) any event which, in PSF's judgment, has a material effect on Borrower's ability to repay the Loan in accordance with the provisions of the Loan Documents.  Notwithstanding anything in this Section, PSF shall not be responsible for reporting to any Participant on the economy, business climate or other general economic factors which may affect the Collateral or the economic viability of the properties being financed by the Loan.

(ii) <u>Borrower's Default</u>.  Subject to <u>Section 7.3</u> below, upon the occurrence of an Event of Default by Borrower under any Loan Document, PSF's exercise (or forbearance from any exercise) of any of its rights and remedies under the Loan Documents shall be within PSF's sole authority and discretion.

3.3 <u>Distribution</u>.

(a) Subject to the provisions of <u>Sections 3.3(b) and 7.3</u> below, PSF shall promptly pay to each Participant such Participant's Proportionate Share of all payments of principal and interest, made by Borrower under the Note, and at PSF's sole discretion, other fees including but not limited to a portion of any acquisition fees, to the

extent such payments are received by PSF, but excluding any amounts held in escrow or otherwise applied by PSF in accordance with the terms of the Loan Documents. In the event that loan acquisition fees are received by PSF upon acquisition of a Loan and PSOI participates in such Loan, then PSOI will receive a participation fee equal to their proportionate share of the Loan acquisition fees received by PSF.  The participation fee is recognized as revenue by PSOI upon the funding of PSOI's participation in such Loan. Each Participant may also receive any additional distributions from time-to-time subject to its Proportionate Share, as determined by PSF in its sole and absolute discretion. Any payment or credit to a Participant shall be subject to PSF's right to deduct sums for expenses, advances and liabilities referred to herein, including, without limitation, expenses for and of loan servicers and other agents engaged by PSF.

(b) If any payment, prepayment or other amount received by PSF under the Note or the other Loan Documents must be returned or released for any reason, each Participant shall promptly upon demand therefor remit to PSF such Participant's Proportionate Share of the amount to be returned by PSF.

3.4 <u>Maintenance of Records</u>.  PSF shall keep proper books of account and records reflecting the interests of each Participant in the Loans, which books and records shall be available for inspection and copying by any Participant upon reasonable notice during normal business hours.  Upon request, any Participant may demand and receive an accounting of all monies received and Collateral held by PSF in connection with the Loans.

4. <u>Necessary Advances and Expenses</u>.

4.1 <u>Necessary Advances</u>.  Subject to <u>Section 7.3</u> below, PSF may advance such funds as may be necessary for insurance premiums, real estate taxes, other taxes and assessments or such funds as may be reasonably necessary for the preservation, maintenance, repair or completion of improvements or renovations of the Collateral, when in the judgment of PSF (as exercised under <u>Section 6</u> below) such advances are reasonably necessary to preserve and protect the Collateral or the interests of the Participants under the Loan Documents.

4.2 <u>Expenses Shared by Participants</u>.  All losses, costs and expenses incurred by PSF (including, without limitation, attorneys' fees and expenses) in connection with (a) the purchase of the Loans, (b) the administration (including any servicing fees or costs paid to any third party) or collection of the Loans, (c) enforcement of any obligations of Borrower or rights or remedies of PSF under the Loan Documents, (d) any claim on any insurance policy, lawsuit, collection activity, receivership action, foreclosure, acceptance of a conveyance in lieu thereof, or (e) any other exercise of any of its rights or remedies under the Loan Documents (individually, an "**Enforcement Action**"), and all amounts advanced by PSF (except PSF's Proportionate Share of any such advances) in accordance with this Agreement, the Loan Documents or any Enforcement Action, shall be shared by PSF and the Participants based upon their respective Proportionate Shares.  Promptly upon demand made by PSF, each Participant shall pay to PSF such Participant's Proportionate Share of any reasonable expense, cost, advance or other amount incurred by PSF in connection with the administration or collection of the Loans or any Enforcement Action.  PSF shall have the right to deduct each Participant's Proportionate Share of such costs, expenses or advances from any distributions described in <u>Section 3.3</u>.

3

5. <u>Acquisition of Collateral</u>.  If PSF (or its designee) acquires title to any Collateral, this Agreement shall continue in full force and effect with respect to such Collateral, and each Participant shall be deemed to have an undivided interest in such Collateral equal to the Participant's proportionate share therein.  Each Participant shall pay its proportionate share of expenses for maintenance and operation of the Collateral, including but not limited to all expenses related to the ownership, management, and/or sale or other disposition of such Collateral (the decisions with respect thereto to be made by PSF as part of its rights and authority under <u>Section 3.2</u> above).  If, as result of any Enforcement Action, PSF recovers any monies available for repayment of the Loan, then PSF shall remit to each Participant such Participant's proportionate share of such proceeds, subject to PSF's right to deduct sums for expenses, advances and liabilities referred to herein.

6. <u>Duty of Care</u>.  In discharging its responsibilities under this Agreement in connection with the Loans, PSF shall endeavor to exercise the same care and judgment as it ordinarily exercises in the performance of its own business affairs; provided, however, that PSF shall be liable to the other Participants for any losses incurred in relation to the Loans only if such incurrence is due to the gross negligence or willful misconduct of PSF or its agents.  Notwithstanding the foregoing, in no event shall PSF have any liability to any Participant for any act done or not done if such action or inaction is authorized pursuant to the terms of this Agreement or has otherwise been given such Participant's consent.  The foregoing limitations on PSF's liability shall apply to all obligations undertaken by PSF under all provisions of this Agreement.  Nothing contained in this Agreement or in any Loan Document shall be deemed or construed to create a partnership or joint venture between the Participants.

7. <u>Miscellaneous</u>.

7.1 <u>Other Arrangements</u>.  Nothing contained in this Agreement shall prohibit PSF from entering into new credit arrangements or continuing existing credit arrangements with any Borrower, guarantor or any other party in any way related to a Borrower or the Loans.

7.2 <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of California without reference to choice of law rules, and shall be subject to all applicable laws and official orders, rules and regulations governing the Participants.  If any provision of this Agreement, or the transactions contemplated hereby, are found to be inconsistent with or contrary to any law, official order, rule or regulation, this Agreement shall be deemed modified in accordance with such law, order, rule or regulation and, as so modified, shall continue in full force and effect.

7.3 <u>Assignment and Termination of PSF's Duties</u>. With the exception of PSF being a named lender (whether in fact, by participation or as successor by assignment) for each Loan, all of the rights and obligations delegated to PSF in this Agreement are terminable at any time for any reason in the sole discretion of PSOI by written notice to PSF given in accordance with Section 7.9 hereof.  PSF is permitted to delegate its duties hereunder to any loan servicer, document custodian or other agent chosen by PSF in its reasonable discretion.  PSF shall be permitted to make assignments of the Loans at the direction of PSOI in its sole discretion.

7.4 <u>Permitted Assigns; Binding Effect</u>.  Any Participant (other than PSF) desiring to sell, assign, convey, pledge or make any transfer of such Participant's interest in the Loan or any part thereof shall give prior, written notice to PSF of such desire.  Subject to <u>Section 7.3</u> above, PSF shall have the right to approve or disapprove any such transfer in its sole discretion.  This Agreement shall be binding upon and inure to the benefit of the Participants and their respective successors and permitted assigns.

7.5 <u>Integration; Survival</u>.  This Agreement sets forth the entire agreement between the Participants with respect to the subject matter hereof and shall survive the foreclosure of any lien created under the Loan Documents or acquisition by the Participants of all Collateral securing the Loans.

7.6 <u>Counterparts</u>.  This Agreement may be executed in counterparts and/or electronically.

7.7 <u>Intentionally Omitted</u>.

7.8 <u>No Representations by PSF</u>.  PSF makes no representation or warranty as to:  (a) the legality, collectibility, due execution, sufficiency, validity, genuineness or enforceability of the Loan Documents; (b) the accuracy or completeness of matters disclosed, represented or warranted by Borrower or any guarantor; (c) the value of the Collateral; (d) the performance of any obligation of Borrower or any guarantor; or (e) the financial condition of Borrower or any guarantor.

7.9 <u>Notices</u>.  Any notice required or permitted to be given under this Agreement shall be in writing and will be deemed given (a) upon personal delivery or via email, (b) on the first business day after receipted delivery to a courier service which guarantees next-business-day delivery, or (c) on the third business day after mailing, by registered or certified United States mail, postage prepaid, in any case to the appropriate party at its address set forth below:

        If to PSF:

        PS Funding, Inc.
        2121 Park Place, Suite 250
        El Segundo, CA 90245
        Attn:  Legal Department
        Email: legal@peerstreet.com

        If to PSOI:

        PSOI
        2121 Park Place, Suite 250
        El Segundo, CA 90245
        Attn:  Legal Department
        Email: legal@peerstreet.com

Any party may change such party's address for notices or copies of notices by giving notice to the other parties in accordance with this Section.

**[Balance of page intentionally left blank]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date written above.

PS FUNDING, INC.,
a Delaware corporation

By:_____
Name: John Y. Chi
Title: Secretary


PEER STREET OPPORTUNITY FUND II, LP,
a Delaware limited partnership

By:     Peer Street Opportunity Fund GP, LLC,
        a Delaware limited liability company,
        its general partner


        By:     Peer Street, Inc.,
                a Delaware corporation,
                its managing member


        By:_____
        Name: John Y. Chi
        Title: Authorized Signatory

LA 52211765v1

**EXHIBIT A**
**to**
**PARTICIPATION AGREEMENT**

| | Percentage |
|---|---|
| PSF | 0% |
| PSOI | 100% |

# **EXHIBIT 34**

*Execution Version*

## MASTER LOAN SALE AGREEMENT

This MASTER LOAN SALE AGREEMENT (this "<u>Agreement</u>"), is made effective as of May 18, 2018 ("<u>Effective Date</u>"), by and between PS FUNDING, INC., a Delaware corporation, and its affiliates and designated assignees ("<u>Seller</u>"), and PS FUNDING TRUST 1004, a Delaware statutory series trust, solely with respect to Series 1 ("<u>Buyer</u>"). Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in Article 1 of this Agreement or in the Program Documents.

### RECITALS

A.      Seller is a wholly-owned subsidiary of Peer Street, Inc., a Delaware corporation ("<u>Parent</u>").

B.      Seller is (or will be) the holder of the Loans, with each such Loan being evidenced, secured, and/or guaranteed by the Loan Documents applicable thereto, as such Loan Documents are more particularly described in the Loan Purchase Certificate for the Loan(s) in question.

C.      From time to time, Buyer desires to purchase and assume from Seller, and Seller desires to sell and assign to Buyer, all of Seller's right, title, and interest in and to one (1) or more of the Loans (as evidenced by the Notes and other Loan Documents applicable to the Loans in question), and any and all of Seller's rights, duties, and obligations that may exist with respect thereto pursuant to the terms and conditions of this Agreement, the Program Documents and the applicable Loan Purchase Certificates.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

### ARTICLE 1 - DEFINED TERMS

As used herein and/or in any Loan Purchase Certificate, the following terms shall have the following meanings. Whenever the context of this Agreement and/or any Loan Purchase Certificate requires, references to the singular number shall include the plural, and the plural shall include the singular, where appropriate; words denoting gender shall be construed to include the masculine, feminine, and neuter where appropriate; and specific enumeration shall not exclude the general, and shall be considered as cumulative.

Section 1.1    "<u>Accepted Servicing Practices</u>" shall mean, with respect to any Loan (a) those mortgage servicing practices of prudent business or multifamily purpose residential mortgage lending institutions, or of other such major mortgage lending institutions, which service mortgage loans of the same type as such Loan in the jurisdiction where the related Collateral is located, including, without limitation, mortgage servicing practices that comply in all material respects with Applicable Laws and any applicable insurer or guarantor requirements in respect of a Loan, and (b) Seller's Servicing and Asset Management Guidelines attached hereto as Exhibit G.

Section 1.2    "Accredited Investor" has the meaning set forth in Resolution D, Rule 501(a), promulgated by the SEC under the Securities Act.

Section 1.3    "Affiliate" shall have the meaning ascribed to it in the Framework Agreement.

Section 1.4    "Applicable Laws" means all federal, state and local laws, statutes, rules, regulations, court orders and decrees, administrative orders and decrees, and other legal requirements of any and every conceivable type applicable to Seller, Parent, Buyer, any Originator, any Guarantor, the Collateral securing to any Loan, any Title Company, any Qualified Appraiser, any licensed real estate agent or broker for the Property related to any Loan, or any Loan Purchase Certificate (including, without limitation, the underwriting, marketing, servicing, Appraisal (including all collection activities related thereto)), ownership, holding, acquisition and sale of such Loan), and all requirements of any Governmental Authority having jurisdiction over Seller, Buyer, Parent, any Guarantor, any Title Company, any Qualified Appraiser, any licensed real estate agent or broker for the Property related to any Loan as indicated by the context, as any such laws, statutes, regulations, orders, decrees or requirements may be amended and in effect and interpreted by relevant courts or regulatory agencies from time to time.

Section 1.5    "Anti-Money Laundering Laws" means, collectively, (i) USA Patriot Act of 2001, as amended; (ii) the Bank Secrecy Act of 1970, as supplemented by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act, and any rules and regulations promulgated thereunder; (iii) OFAC's rules, and regulations regarding the blocking of assets and the prohibition of transactions involving Persons or countries designated by OFAC; and (iv) any other Applicable Laws relating to customer identification, anti-money laundering or preventing the financing of terrorism and other forms of illegal activity, each as amended.

Section 1.6    "Appraisal" shall mean, with respect to any Loan, an appraisal of the value of the related Property securing such Loan that was made, and signed within three (3) months of the Loan origination date that meets the requirements of Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, and prepared by a Qualified Appraiser. All appraisals shall be written, in form and substance, to (i) Uniform Standards of Professional Appraisal Practice or (ii) satisfies applicable legal and regulatory requirements. If the Loan provides for a holdback of loan proceeds to be used for rehabilitation or repair of the Property, the appraisal shall be based on the "as repaired" value of the Property (i.e., assuming completion of all repairs contemplated by Seller); and if the Loan does not provide for such a holdback, then the appraisal shall be based on the Property's "as is" value.

Section 1.7    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. Section 101 et. seq., as amended from time to time.

Section 1.8    "Borrower" or "Borrowers" shall mean, with respect to the Loan in question, individually and collectively, as applicable, those certain borrowers and other obligors (including any co-signor or guarantor) under such Loan, as identified on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

3822162v12 013580.0126

Section 1.9    Intentionally Omitted.

Section 1.10    "BPO" shall mean, with respect to any Loan, a broker's price opinion of the "as is" fair market value of the related Property given by a licensed real estate agent or broker acceptable to Seller, incorporating an exterior or interior inspection of the residence on such Property and obtained by or on behalf of Seller or Buyer in conformity with customary and usual business practices.

Section 1.11    "Business Day" shall mean any day which is not a Saturday or Sunday and is not a legal holiday in California or New York, or the jurisdiction of the corporate office of the Custodian or a day on which businesses or banks located in California or New York are required or requested to close by government proclamation.

Section 1.12    "Closing" shall mean, for the Loan in question, the consummation of the transactions set forth herein and contemplated in a Loan Purchase Certificate for such Loan, and, without limitation, shall not occur unless and until (a) Seller has received the entirety of the Purchase Price in immediately available funds for such Loan pursuant to the terms and conditions of this Agreement and such Loan Purchase Certificate and (b) the definition of "Closing Date" has been met in respect of the purchase of such Loan.

Section 1.13    "Closing Date" shall mean, with respect to the Loan in question, the date that is two (2) Business Days following the mutual execution of the Loan Purchase Certificate or such earlier date as Buyer and Seller may mutually agree.

Section 1.14    "Colchis" means Colchis Capital Management, L.P., a Delaware limited partnership.

Section 1.15    "Colchis Entity" means each of Colchis or an Affiliate of Colchis that has been formed as an investment vehicle for purposes of purchasing, directly or indirectly, Loans for the benefit of Colchis or for the benefit of any investment fund managed or advised, in an investment advisory capacity, by Colchis, or any trust or other entity through which any of such investment funds invest in Loans for the benefit of limited partners, members, equity holders or beneficiaries.

Section 1.16    "Collateral" shall mean, for a particular Loan, any and all real and/or personal property securing the indebtedness and other obligations of the Borrowers and/or Guarantors under such Loan, including without limitation, the Properties encumbered by such Loan.

Section 1.17    "Competitors" means those platforms that compete with Seller in offering loans for the same purpose as the Loans purchased by Buyer from Seller.

Section 1.18    "Custodian" shall mean Millennium Trust Company or any other custodian selected by Buyer, together with any permitted successors and assigns.

Section 1.19    "Custodial Agreement" shall mean that certain Custodial Agreement, dated as of May 15, 2018, by and between Buyer and Custodian.

3922162v.12 013580.0126

Section 1.20    "Debtor Relief Laws" means any of (i) the Bankruptcy Code and (ii) all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, receivership, insolvency, reorganization, suspension of payments, adjustment of debt, marshaling of assets or similar debtor relief laws of the United States, any state or any foreign country from time to time in effect affecting the rights of creditors generally.

Section 1.21    "Diligence Period" shall mean, for the Loan(s) in question, the time period commencing on the date that Buyer receives the Loan Purchase Certificate for the Loan(s) in question and ending three (3) Business Days thereafter; provided, however, in no event shall the foregoing preclude or otherwise limit Buyer's right to (i) inspect the Loan File for the Loan(s) in question or (ii) request any documents, reports, plans and/or agreements from and after the commencement of the Diligence Period for the Loan(s) in question, and upon any such request, Seller shall promptly deliver (or cause to be delivered) same to Buyer to the extent such documents, reports, plans and/or agreements, as applicable, are within Seller's possession and/or control.

Section 1.22    "Eligible Loan" means a Loan originated in accordance with the Underwriting Guidelines and the eligibility parameters set forth on Exhibit "F" hereto, or as otherwise agreed in writing between the Parties.

Section 1.23    "Exchange Act" means, the Securities Exchange Act of 1934, as amended.

Section 1.24    "Framework Agreement" means that certain Amended and Restated Framework Agreement by and between Parent and Colchis dated as of March 2, 2018.

Section 1.25    "Governmental Authority" shall mean any federal, state, municipal, national, local or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case, whether of the United States or a state, territory or possession thereof, a foreign sovereign entity or country or jurisdiction or the District of Columbia.

Section 1.26    "Guarantor" shall mean, with respect to the Loan in question, individually and collectively, as applicable, any guarantor, surety, or other Person (other than the Borrowers) that has guaranteed the indebtedness and/or obligations, in whole or in part, of the Borrowers, and any of them, under such Loan.

Section 1.27    "Insolvency Event" shall have the meaning ascribed to it in the Framework Agreement.

Section 1.28    "Guaranty" shall mean, with respect to the Loan in question, any and all instruments and/or agreements evidencing Guarantor's obligations in respect of his, her, and/or its guaranty of such Loan.

Section 1.29    "Loan" shall mean, individually and collectively, as applicable, the loans made to each of the Borrowers identified in the Loan Purchase Certificates applicable to such loans, as evidenced by the Loan Documents applicable thereto and referenced on Schedule 1 of the Loan Purchase Certificate in question, which Schedule 1 shall be attached to such Loan

3822162v.12 013580.0126

Purchase Certificate and made a part hereof and thereof.  The term "Loan" shall not include a participation interest in a loan.

Section 1.30    "Loan Documents" shall mean, with respect to the Loan in question, each of the documents set forth on Exhibit "D" hereto, together with all extensions, modifications, supplements, and amendments thereto or restatements thereof.

Section 1.31    "Loan File" shall mean, with respect to the Loan in question, the documents and correspondence in Seller's possession with respect to such Loan (including documents and correspondence from the Borrower, and Borrower's agents and representatives used by Seller in connection with its underwriting and origination of such Loan) that Seller reviewed or considered in connection with Seller's underwriting and origination of such Loan, including, but not limited to, as may be applicable to such Loan, the Loan Documents, appraisals, credit applications, credit reports, final internal credit memoranda, audits, environmental reports, financial statements, insurance on collateral, the Seller Loan Policy, or, in the absence of a final Seller Loan Policy, a final pro forma title policy or commitment issued to Seller by the Title Company, complete and current credit information regarding Loan collateral value, factual information bearing on the creditworthiness of the Borrower or any Guarantor, any other credit, due diligence material and other information concerning Borrower, the Collateral, or any Guarantors of such Loan.

Section 1.32    "Loan Purchase Certificate" shall mean an agreement in the form attached hereto as Exhibit "A", or as otherwise agreed in writing by the Parties.

Section 1.33    "Material Adverse Change" means, with respect to a Person, any material adverse change in the business, financial condition, operations or properties of such Person.

Section 1.34    "Material Adverse Effect" means, (i) with respect to a Person, (x) a Material Adverse Change with respect to such Person or any of its Affiliates taken as a whole, (y) a material impairment of the ability of such Person to perform under this Agreement (which impairment cannot be timely cured, to the extent a cure period is applicable), or (z) a material adverse effect upon the legality, validity, binding effect or enforceability of this Agreement against such Person (which material adverse effect cannot be timely cured, to the extent a cure period is applicable), or (ii) with respect to a Purchased Loan or a Loan Purchase Certificate, a material adverse effect upon the legality, validity, binding effect, collectability or enforceability of such Purchased Loan or Loan Purchase Certificate, or (ii) with respect to Collateral, a material diminution in the value of such Collateral.

Section 1.35    "Note" or "Notes" shall mean, with respect to the Loan in question, individually and collectively, as applicable, the promissory note(s) made by a Borrower evidencing the indebtedness owed under such Loan.

Section 1.36    "OFAC" means Office of Foreign Assets Control of the U.S. Treasury Department.

Section 1.37    "Originator" means one or more commercial partners capable of underwriting and servicing Loans.

Section 1.38    "Parent" shall have the meaning set forth in the recitals to this Agreement.

5

3822162v.12 013580.0126

Section 1.39    "Party" shall mean a signatory to this Agreement.

Section 1.40    "Parties" shall mean Buyer and Seller, collectively, as signatories to this Agreement.

Section 1.41    "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, trust, or unincorporated organization, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

Section 1.42    "Program Documents" shall mean, collectively and each individually, this Agreement, the Framework Agreement, the Servicing Agreement and all other agreements, documents, instruments and certificates heretofore or hereafter executed or delivered to Buyer by Seller or any of its Affiliates in connection with any of the foregoing, as the same may be amended, modified or supplemented from time to time.

Section 1.43    "Property" shall mean, with respect to the Loan in question, individually and collectively, as applicable, the real property Collateral (if any) securing the obligations of Borrowers and/or Guarantors under such Loan.

Section 1.44    "Purchase Price" shall mean, with respect to a particular Loan, the Purchase Price for such Loan as set forth on Schedule 1 attached to the Loan Purchase Certificate for such Loan.

Section 1.45    "Purchased Loan" shall mean any Loan purchased by Buyer.

Section 1.46    "Qualified Appraiser" shall mean, with respect to each Loan, an independent appraiser, duly appointed by Seller or Buyer, who had no interest, direct or indirect, in the related Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Loan, and licensed or certified by the applicable governmental body for the jurisdiction in which the related Property is located.

Section 1.47    "Repurchase Price" shall mean, with respect to any Loan, a price equal to (i) the unpaid principal balance of such Loan as of such date of determination, plus (ii) accrued interest thereon from the date to which interest had last been paid and distributed to Buyer through the date of such repurchase, plus (iii) the amount of any outstanding advances owed to any servicer, plus (iv) Buyer's expenses incurred in transferring such Loan, including, without limitation, expenses incurred for maintenance and repairs, assessments, taxes and similar items, and (v) all reasonable out-of-pocket costs and expenses incurred in the enforcement of Seller's repurchase obligation hereunder.

Section 1.48    "SEC" means the United States Securities and Exchange Commission.

Section 1.49    "Securities Act" means the Securities Act of 1933, as amended.

Section 1.50    "Security Instrument" shall mean, for the Loan in question, individually and collectively, as applicable, any security instrument, deed of trust, mortgage, or other instrument creating a lien on any real property Collateral securing such Loan.

6

3822162v.12 013580.0126

Section 1.51    "Seller Loan Policy" an irrevocable title commitment, preliminary title report, or an attorney's opinion of title and abstract of title, each of which must be in form and substance acceptable to prudent mortgage lending institutions making mortgage loans in the area wherein the Property is located or an American Land Title Association  lender's title insurance policy or other generally acceptable form of policy or insurance acceptable to Seller and each such title insurance policy is issued by a title insurer acceptable to Seller and qualified to do business in the jurisdiction where the Property is located, insuring Seller, its successors and assigns, as to the first priority lien of the Security Instrument in the original principal amount of the Loan, subject only to encumbrances permitted by the Loan Documents.

Section 1.52    "Servicer Default" has the meaning set forth in the Servicing Agreement.

Section 1.53    "Servicing Agreement" shall mean that certain Master Mortgage Loan Servicing Agreement dated as of May 18, 2018 made by and between Seller, as master servicer, and Buyer, as owner.

Section 1.54    "Termination Date" shall mean the date which is one (1) Business Day after the Closing Date applicable to such Loan.

Section 1.55    "Title Company" the title insurance company issuing the Seller Loan Policy.

Section 1.56    "UCC" means the Uniform Commercial Code as in effect, from time to time, in each applicable jurisdiction, as applicable to the respective actions of Seller relating to the creation, perfection, priority, validity and/or enforcement of the sale of the Purchased Loan Collateral or the backup security interest granted by Seller to Buyer hereunder.

## ARTICLE 2 - PURCHASE AND SALE OF LOANS

Section 2.1    The Parties are entering into this Agreement wherein Seller may sell to Buyer and Buyer will buy from Seller one (1) or more Loans; provided the Parties mutually execute a Loan Purchase Certificate for the Loans in question.

Section 2.2    Seller and Buyer shall become obligated to sell/purchase a Loan, subject to the terms and conditions of this Agreement (including without limitation, satisfaction of all conditions precedent to the Closing of such sale under Section 2.12), when Buyer and Seller mutually execute a Loan Purchase Certificate for the Loan in question. Seller shall prepare and deliver to Buyer for Buyer's execution, a Loan Purchase Certificate for the approved Loan(s). Buyer shall have three (3) Business Days from receipt of the applicable Loan Purchase Certificate to execute and return the Loan Purchase Certificate for the Loan(s) in question to Seller who shall be required to counter-execute the Loan Purchase Certificate.

Section 2.3    Upon and subject to the terms and conditions of this Agreement and the Loan Purchase Certificate for the Loans in question, and in consideration of the Purchase Price for said Loans, upon the Parties' mutual execution of a Loan Purchase Certificate, Seller shall be deemed to have agreed to sell and to assign to Buyer, and Buyer shall be deemed to have agreed to purchase, accept, and assume from Seller, on the terms and conditions set forth herein and in such Loan Purchase Certificate, all of Seller's right, title and interest in, to, under, and concerning

7

3822162v.12 013580.0126

the Loans identified in such Loan Purchase Certificate.  Notwithstanding anything to the contrary in this Agreement or in any Loan Purchase Certificate, the Closing shall occur on the Closing Date.  If the Closing for a particular Loan has not occurred on or prior to the Termination Date, the offer, and the Loan Purchase Certificate, to the extent applicable to such Loan and unless otherwise agreed by both Parties in writing, shall terminate, and following Seller's request, Buyer shall deliver to Seller, or discard, all information, reports, data, and other materials that Buyer and/or Buyer's agents, consultants, or employees discover, obtain, or generate in connection with, or resulting from, Buyer's inspection and investigation of such Loan, except one copy to be retained for audit and regulatory compliance purposes.

Section 2.4    Each of Seller and Buyer agrees that the transactions contemplated hereby are intended to be, and shall constitute and be construed, with respect to each Loan, as absolute and irrevocable sales of the Loan and related Loan Documents transferred, pursuant to this Article 2, and are not intended to be financings or loans by Buyer to Seller and shall provide Buyer with the benefits of ownership of the Loan and related Loan Documents conveying good title free and clear of any liens or rights of others, such that any interest in and title to the Loan and related Loan Documents would not be property of Seller's estate in the event Seller becomes a debtor in a case under Debtor Relief Laws.  The Parties shall treat such transactions as sales for tax, accounting and all other purposes.  The sale of each Loan and related Loan Documents pursuant to this Article 2, transfers to Buyer all of Seller's right, title and interest in and to such Loan, and Seller will not retain any residual rights with respect to any Loan and the related Loan Documents.

2.4.1    <u>Grant of Security Interest</u>.

(a)    Notwithstanding the intent of the Parties, in the event that the transactions contemplated hereby are construed to be financings or loans made by Buyer to Seller or the Loans are otherwise determined or held to be property of Seller, then (i) Seller hereby grants to Buyer a present and continuing security interest in and to the following, whether now existing or hereafter created: all Loans and the related Loan Documents (including all property described in the definition of "Loan", and all proceeds (as defined in the UCC) of such Loan and related Loan Documents, whether now existing or hereafter created (collectively, the "Purchased Loan Collateral"); (ii) this Agreement shall also be deemed to be a security agreement within the meaning of Article 9 of the UCC; (iii) the transfers of the Loan and related Loan Documents provided for herein shall be deemed to be a grant by Seller to Buyer of a first priority lien upon and security interest in all of Seller's right, title and interest in and to the Purchased Loan Collateral to secure Seller's obligations hereunder and under the Servicing Agreement, including the obligation to pay over to Buyer collections on the Loan and related Loan Documents; (iv) the possession by Buyer or its custodian of the Purchased Loan Collateral and related Loan Documents and such other items of property as constitute instruments, chattel paper, money, negotiable documents, general intangibles or accounts, shall be deemed to be "possession by the secured party" for purposes of perfecting the lien or security interest pursuant to the UCC, including Section 9-305 of the UCC; (v) Buyer is hereby authorized to take all necessary or appropriate actions to perfect Buyer's security interest in the Purchased Loan Collateral, including, without limitation, authorization to file financing statements on form UCC-1 naming Buyer as secured party and Seller as debtor, and identifying the Purchased Loan Collateral as collateral therein and any amendments thereto; and (vi) notifications to Persons holding such property and acknowledgments, receipts or confirmations from Persons holding such property, shall be deemed

3822162v12 013580.0126

notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of Buyer for the purpose of perfecting such lien or security interest under the UCC.  Any assignment of the interests of Buyer in the Loan and related Loan Documents pursuant to any provision hereof, shall also be deemed to be an assignment of any lien or security interest created hereby in the Purchased Loan Collateral.

        (b)     Seller shall not create, or permit any security interest in Purchased Loan Collateral, except in favor of Buyer, and, if necessary, shall modify any previously executed loan or security agreement to eliminate any security interest granted in the Purchased Loan Collateral that has not been, or will not be, released at or prior to the effective time of transfer of the related Loan and related Loan Documents to Buyer, including, without limitation, any security interest in such Purchased Loan Collateral as proceeds or as after-acquired property.

        (c)     To the extent consistent with this Agreement, Seller and Buyer shall take such actions as may be deemed reasonably necessary or appropriate such that, if this Agreement were deemed to create a lien upon or security interest in the Purchased Loan Collateral and all such reasonably necessary or appropriate actions had been taken, such lien or security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement, including, without limitation, the execution and delivery by Seller to Buyer of all assignments, security agreements, financing statements and other documents Buyer reasonably requests, in form and substance reasonably satisfactory to Buyer.

        (d)     Nothing in this <u>Section 2.4.1</u> shall limit the right Buyer has in Property as Collateral for any purchased Loans.

    Section 2.5    <u>Diligence</u>.

    2.5.1    During the Diligence Period for each Loan, Buyer shall have the opportunity to review, inspect, and investigate (or shall have affirmatively chosen not to obtain, review, inspect, or investigate), each and every aspect of the Loan in question, the Loan Documents for such Loan, the Property securing such Loan, all other Collateral securing such Loan, and all other documents, instruments, statements, records, returns, agreements, information, and other matters delivered by Seller to Buyer, or otherwise made available to Buyer, in connection with such Loan and/or this Agreement and/or the Loan Purchase Certificate applicable to such Loan.

    2.5.2    During the Diligence Period, Buyer shall not contact either directly or indirectly, any Borrower or other party related to any Loan in connection with Buyer's proposed purchase of a Loan unless specifically permitted by Seller in writing.  During the Diligence Period, Buyer shall contact Seller to request any document or information that Buyer believes is not contained in the Loan File and may be material to its independent evaluation of the Loan and its decision whether to purchase the Loan, and Seller shall provide such documents or information to the extent such documents or information are not privileged or otherwise protected from disclosure by applicable law or regulation and within Seller's possession or control.  Seller shall notify Buyer of any material changes to the Loan or Loan File as they become available prior to the Closing Date.

3822162v.12 013580.0126

Section 2.6    Payment of Purchase Price.  On or before the Closing Date applicable to the Loan in question, Buyer shall deliver to Seller the Purchase Price for such Loan in immediately available funds, plus Buyer's share of costs and charges payable pursuant to this Agreement for such Loan on such Closing Date.

2.6.1    Seller shall, no later fifteen than (15) Business Days following the related Closing Date, deliver and release to Custodian, on behalf of Buyer, the Loan Documents and related Loan File to be held by Custodian with respect to each Loan purchased on such Closing Date in accordance with the terms of the Custodial Agreement.  To the extent that any such Loan Documents have been delivered for recording and have not yet been returned to Seller by the applicable recording office, Seller shall, promptly following receipt by it of such Loan Documents from the applicable recording office, deliver such documents to Custodian; provided, however, that the original recorded document or a clerk-certified copy thereof shall be delivered to Custodian no later than one hundred twenty (120) days following the related Closing Date.  Notwithstanding the foregoing, Seller shall use its reasonable good faith efforts to deliver and release to Custodian the Loan Documents and related Loan File as soon as possible after the relevant Closing Date.

Section 2.7    Deliveries.

2.7.1    Seller Deliveries.  On or before the Closing Date for the sale of any particular Loan, Seller shall execute (and where applicable, duly acknowledge) and deliver a copy to Buyer via electronic delivery, the following documents (collectively, "Seller Closing Documents") in connection with the sale of such Loan, unless (and then, only to the extent) delivery of any of the below items is waived by Buyer in writing:  (i) the Note evidencing such Loan; (ii) the duly executed allonge endorsement to the Note evidencing such Loan, the form of which is attached hereto as Exhibit B; (iii) the Loan Documents applicable to such Loan; (iv) an Assignment of Security Instrument and Other Loan Documents with respect to the Security Instrument applicable to such Loan and all other Loan Documents in connection therewith, in substantially the form and content set forth on Exhibit C, attached hereto and made a part hereof, executed and acknowledged by Seller ("Assignment of Security Instrument"); (v) the Seller Loan Policy for such Loan; (vi) a loan payment history for the Note; (vii) a separate letter executed by Seller or it's designee and addressed to the Borrower of such Loan notifying the Borrower that the Loan and all Loan Documents associated therewith have been purchased by, and assigned to, Buyer as of the Closing Date (for each Loan, a "Borrower Notification Letter"), a form of which is attached hereto as Exhibit E, which shall be (A) prepared in accordance with the Loan Documents (to the extent the Loan Documents contemplate same) and (B) otherwise reasonably acceptable to Buyer, and (viii) such other documents as may be reasonably requested by Buyer to consummate the sale of such Loan to Buyer in accordance with the terms of this Agreement and the Loan Purchase Certificate for such Loan.

2.7.2    Buyer Deliveries.  For each Loan being purchased by Buyer, and in addition to the Purchase Price for such Loan plus Buyer's share of costs and charges payable pursuant to this Agreement for such Loan, Buyer shall deliver to Seller via electronic delivery at least one (1) Business Day before the Closing Date of such Loan such documents as may be reasonably requested by Seller to consummate the sale of such Loan to Seller in accordance with the terms of this Agreement and the Loan Purchase Certificate for such Loan (the "Buyer Closing Documents").

3822162v.12 013580.0126

Section 2.8    <u>Disbursements and Other Actions</u>.

2.8.1    Seller shall promptly undertake all of the following in the manner herein below indicated:

(a)    within three (3) Business Days of the Closing Date for sale of the Loan in question, cause the Assignment of Security Instrument for such Loan to be recorded in the official records of each and every County (or Parish) and State in which the Property securing such Loan is located; provided that to the extent recording information from the Security Instrument or prior assignments is unavailable, Seller shall cause the Assignment of Security Instrument for such Loan to be recorded promptly when such information is available;

2.8.2    On the Closing Date for the sale of the Loan in question, Buyer shall promptly disburse the Purchase Price for such Loan to Seller in immediately available funds, less items chargeable to the account of Seller pursuant hereto, if any.

Section 2.9    <u>Closing Costs</u>. Seller shall pay (a) the premiums for any title endorsements, if applicable, (b) any broker, finder, or other person claiming by, through or under Seller, and (c) all recording and filing costs and expenses incurred hereunder.  Buyer shall pay (a) a flat fee of One Hundred and 00/100 Dollars ($100.00) per Loan to Seller, (b) any costs or expenses above and beyond general recording and filing costs (i.e., tax map/parcel costs incurred by Seller, (c) expenses incurred by Buyer in connection with any review, inspection, and investigation undertaken pursuant to this Agreement, and (d) any broker, finder, or other person claiming by, through or under Buyer.  Other closing costs shall be apportioned in accordance with the custom and practice in the jurisdiction where the Property is located. Each Party shall pay its own attorney's fees.

Section 2.10    <u>Loan Proceeds</u>.  The Parties agree that, with respect to any particular Loan, (i) all interest payments received by Seller and applicable to the time period prior to the month in which the Closing Date for the sale of such Loan occurs, shall be retained by Seller, (ii) all interest payments received by Buyer and applicable to the time period from and after the month in which the Closing Date for the sale of such Loan occurs, shall be retained by Buyer, and (iii) all interest payment received by Buyer and/or Seller that are applicable to the month in which the Closing Date for the sale of such Loan occurs shall be prorated as of the Closing Date for such Loan based on the number of days in the month such Loan is owned by Seller and the number of days in the month such Loan is owned by Buyer, such that (A) to the extent Seller has, prior to the Closing Date for the sale of such Loan, received any interest payment applicable to the month in which the Closing Date for the sale of such Loan occurs that is payable to Buyer pursuant to this clause (iii), Buyer shall receive a credit against the Purchase Price for such Loan for the amount of same, and (B) to the extent Buyer has, from after the Closing Date for the sale of such Loan, received any interest payment applicable to the month in which the Closing Date for the sale of such Loan occurs that is payable to Seller pursuant to this clause (iii), Buyer shall promptly remit same to Seller.  Seller shall pay all servicing fees, trustee fees and any other costs and expenses that are in the ordinary course of owning the Loan and that are due and payable by Seller, in its capacity as the lender under the Loan, to third-parties prior to the related Closing Date.  The Parties further agree that any principal payments made on the Note for the Loan in question between the date that a Loan Purchase Certificate for such Loan is mutually executed by the Parties and the Closing

11

Date for the sale of such Loan occurs shall be fully credited for Buyer's benefit against the Purchase Price for such Loan.  Accordingly, subject to the provisions of this Section 2.10 (and, in particular, clause (i), (ii) and (iii) above), with respect to any particular Loan, Seller shall be entitled to, and shall be entitled to the benefit of, all payments of principal and interest, prepayment penalties or premiums, fees, reimbursements, proceeds (including proceeds from any Collateral for such Loan, but subject to the allocation of insurance proceeds and condemnation awards described below, all insurance proceeds and condemnation awards received in respect of any Property, unless such insurance proceeds or condemnation awards are used by Buyer rebuild the Property shall be remitted to Servicer to be used to rebuild the Property or distributed to Buyer in repayment of the applicable Note), and all other sums and amounts (collectively, for the Loan in question, the "<u>Loan Proceeds</u>") paid by Borrower, Guarantor, or any other Person with respect to such Loan and applicable to the time period preceding the Closing Date for the sale of such Loan. Buyer shall be entitled to all Loan Proceeds with respect to such Loan which are applicable to the time period from and after the Closing Date for the sale of such Loan, and to the extent Seller receives any such Loan Proceeds (x) after the Closing Date for the sale of such Loan, Seller shall promptly deliver same to Buyer or (y) prior to the Closing Date for the sale of such Loan, Buyer shall receive a credit against the Purchase Price for such Loan for the amount of same.  In the event that, between the date the Parties mutually execute a Loan Purchase Certificate and the Closing Date for the sale of any particular Loan identified in such Loan Purchase Certificate, Seller disburses to the Borrower pursuant to and in accordance with the terms and conditions of such Loan, any portion (if any) of the "Committed and Undisbursed Amount" (as identified on <u>Schedule 1</u> attached to such Loan Purchase Certificate) of such Loan, Seller shall receive a credit at the Closing for the sale of such Loan equal to the amount of such disbursement; provided, however, in no event shall that portion of the Purchase Price applicable to such Loan exceed the principal outstanding balance of such Loan as of the Closing Date therefor. Seller shall promptly notify Buyer of any disbursements made to the Borrower, or any principal payments received from Borrower, between the date the Parties mutually execute a Loan Purchase Certificate and the close of escrow for the sale of the Loan(s) included within such Loan Purchase Certificate.  For example purposes only, if (1) Seller has made a Loan to Borrower with a $1,000,000 principal commitment, (2) as of the date the Parties mutually executed a Loan Purchase Certificate that includes such Loan, Seller has disbursed $600,000 of such principal commitment to Borrower, (3) after the date the Parties mutually executed such Loan Purchase Certificate, but prior to the Closing Date for the sale of such Loan, Seller disburses an additional $100,000 of such principal commitment to Borrower and (4) the day immediately preceding the Closing Date for such Loan, Seller receives a principal payment from Borrower in the amount of $250,000 applicable to such Loan, then the total Purchase Price payable by Buyer to Seller under this Agreement and the Loan Purchase Certificate with respect to such Loan shall be $450,000. The obligations under this Section 2.10 shall survive the consummation of the transaction contemplated hereunder and/or under any Loan Purchase Certificate.  Any amounts paid by Buyer for a Loan that are committed to Borrower but which have not been disbursed to Borrower, will be held in the City National Bank Account, N.A. as to which Buyer has been granted a security interest (the "<u>Commitment Account</u>").

Section 2.11    <u>Early Payment Defaults</u>.  With respect to any Loan, if the related Borrower fails to make the first monthly payment due under such Loan after Buyer has acquired such Loan, and such failure is not due to an administrative error by the applicable servicer, Seller shall, upon receipt of written notice from Buyer, repurchase such Loan from Buyer within five (5) Business

3822162v12 013580.0126

Days of such written notice at the Repurchase Price and disburse to Buyer all amounts in the Commitment Account in respect of such Loan.

Section 2.12    Conditions to Closing.

2.12.1    Conditions to Buyer's Obligations.

(a)    The obligation of Buyer to make the initial purchase under this Agreement shall be subject to the satisfaction or waiver of the following conditions on the initial Closing Date with respect to each Loan, each of which is for the sole benefit of Buyer, and any one or more of which may be waived in whole or in part by Buyer in writing in its sole discretion:

(i)    This Agreement, the Servicing Agreement, the other Program Documents and all agreements, certificates, and instruments required to be delivered hereunder and thereunder have been executed by all relevant parties and received by Buyer;

(ii)    A secretary's certificate of Seller attaching its organizational documents, authorizing resolutions, incumbency certificate and certificate of good standing dated as of a date within five (5) Business Days of the initial Closing Date has been delivered to Buyer; and

(iii)    An officer's certificate of Seller that all conditions precedent under this Section 2.12.1(a) have been satisfied.

(b)    The Closing Date for any particular Loan and the obligations of Buyer to consummate the transactions contemplated by this Agreement and the Loan Purchase Certificate for such Loan are, in addition to the other terms and conditions of this Agreement and such Loan Purchase Certificate, subject to the satisfaction of the following conditions set forth in this Section 2.12.1(b), each of which is for the sole benefit of Buyer, and any one or more of which may be waived in whole or in part by Buyer in writing in its sole discretion:

(i)    the representations and warranties of Seller set forth in Article 4 of this Agreement and in Article V of the Program Agreement shall be true on and as of the Closing Date for such Loan as if the same were made on and as of such Closing Date;

(ii)    Seller shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement and the Loan Purchase Certificate for such Loan to be performed by Seller on or prior to the Closing Date for such Loan including the payment of any and all costs, fees, or expenses required of Seller hereunder in connection with such Loan.

(iii)    No Seller Default or event which, with the giving of notice or lapse of time or both, would constitute a Seller Default has occurred and is continuing as of such Closing Date;

(iv)    Seller shall have executed and deposited with Buyer all of the Seller Closing Documents applicable to such Loan;

3822162v.12 013589.0126

(v)    This Agreement has not been terminated; and

(vi)    Buyer's title to the beneficial interest under the Security Instrument for such Loan shall be evidenced by the Seller Loan Policy or a mortgage assignment endorsement, applicable in the jurisdiction where the Property is located, to the Seller Loan Policy for such Loan, issued by Title Company, insuring Buyer's beneficial interest under the Security Instrument evidencing such Loan and naming Buyer or Seller's successors and assigns as the insured party under the Seller Loan Policy for such Loan.

2.12.2    <u>Conditions to Seller's Obligations</u>.  The Closing Date for any particular Loan and the obligations of Seller to consummate the transactions contemplated by this Agreement and the Loan Purchase Certificate for such Loan are, in addition to the other terms and conditions of this Agreement and such Loan Purchase Certificate, subject to the satisfaction of the following conditions set forth in this Section 2.12.2, each of which is for the sole benefit of Seller, and any one or more of which may be waived in whole or in part by Seller in writing in its sole discretion:

(a)    the representations and warranties of Buyer set forth in Article 3 of this Agreement and in Article IV of the Program Agreement shall be true on and as of the Closing Date for such Loan as if the same were made on and as of such Closing Date; and

(b)    Buyer shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement for such Loan to be performed by Buyer on or prior to the Closing Date for such Loan; and

(c)    Seller shall have received the Purchase Price for such Loan, and Buyer shall have paid any and all costs, fees, or expenses required of Buyer hereunder in connection with such Loan; and

2.12.3    Buyer shall have executed and deposited with Seller all of Buyer Closing Documents applicable to such Loan.

### ARTICLE 3 - BUYER'S REPRESENTATIONS AND WARRANTIES

Section 3.1    Buyer represents, warrants and covenants to Seller that, as of the date hereof and as of each Closing Date:

3.1.1    <u>Organization and Standing</u>.  Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized with full power and authority to execute, deliver and perform this Agreement. Buyer is duly qualified to transact business in and is in good standing under the laws of each state in which the nature of the business transacted by it or the character of the properties owned or leased by it requires such qualification and in all jurisdictions where it is required to be qualified, except where the failure to be qualified is not material.

3.1.2    <u>Due Authority</u>.  Buyer has the full power and authority to perform, and to enter into and consummate, all transactions contemplated by this Agreement and to purchase and hold each Loan.  The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated thereby have been duly and validly authorized.

14

3.1.3    <u>Enforceability</u>.  This Agreement, assuming due authorization, execution and delivery by Seller, evidences the valid, binding and enforceable obligations of Buyer, subject as to enforcement, (i) to bankruptcy, insolvency, receivership, conservatorship, reorganization, arrangement, moratorium, and other laws of general applicability relating to or affecting creditor's rights and (ii) to general principles of equity, whether such enforcement is sought in a proceeding in equity or at law.

3.1.4    <u>No Conflict</u>.  None of the acquisition of the Loans by Buyer pursuant to this Agreement, the execution and delivery of this Agreement by Buyer, the consummation of the transactions contemplated hereby, or the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of its governing documents or result in a material breach of any law, rule, regulation, order, judgment or decree or regulation or any material agreement or instrument to which Buyer is now subject, or constitute a material default or result in an acceleration under any of the foregoing, or result in the creation or imposition of any lien on any of its assets or property

3.1.5    <u>No Consent Required</u>.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Buyer of or compliance by Buyer with this Agreement or the consummation of the transactions contemplated by this Agreement or if required, such consent, approval, authorization or order has been obtained prior to the Closing Date.

3.1.6    <u>Sophisticated Investor</u>.  Buyer: (i) has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Loans and making an informed investment decision with respect thereto; (ii) has reviewed and evaluated all information provided by Seller (including the Loan Documents, the Loan Files and related information) to assess the merits and risks of its investment in the Loans; (iii) is able to bear the economic and financial risk of an investment in the Loans for an indefinite period of time; (iv) has made its determination to cause Buyer to purchase the Loans independent of any other buyer of any Loans and independent of any statements or opinions as to the advisability of such purchase, which may have been made or given by any other Person or by any agent or employee thereof; (v) has been assisted and advised by its own legal and business advisers in connection with the acquisition of the Loans; (vi) except for the representations and warranties of Seller in <u>Articles 4</u> and <u>5</u>, Buyer has relied solely upon its independent investigations and knowledge; and (vii) acknowledges and agrees that the representations and warranties of Seller expressly set forth in <u>Articles 4</u> and <u>5</u> are the sole and exclusive representations and warranties given by Seller.  Without limiting the foregoing, Buyer acknowledges that, except as specifically set forth in <u>Articles 4</u> and <u>5</u> of this Agreement, neither Seller nor any agent or representative of Seller has made any express or implied, written or oral representations or warranties of any kind or nature as to the Loans (and the related Properties) or transactions contemplated by this Agreement.  In addition, Buyer further acknowledges and accepts that notwithstanding any representation or warranty made by Seller herein with respect to the lien position of any Loan on any related Property, any such representation or warranty is made subject to any homeowners' associations or similar liens that may exist or have priority over the lien of the Loan.

3.1.7    <u>Liquidity</u>.  Buyer acknowledges that the Loans may have limited or no liquidity and Buyer has the financial wherewithal to own the Loans for an indefinite period of time

3822162v.12 013580.0126

and to bear the economic risk of an outright purchase of the Loans and a total loss of the purchase price for the Loans.

## ARTICLE 4 - SELLER'S REPRESENTATIONS AND WARRANTIES

Section 4.1    As of the date hereof, and as of each scheduled Closing Date, Seller hereby represents and warrants to Buyer, with respect to Seller and, where applicable, with respect to the purchased Loans, purchased on the Scheduled Closing Date, that:

4.1.1    <u>Authority; Binding Effect</u>.  Seller has taken all necessary action to duly authorize its entry into and performance under this Agreement, the Program Documents and each Loan Purchase Certificate.  Seller is not required to obtain any licenses, consents or approvals to consummate the transactions contemplated in this Agreement, the Program Documents and/or any Loan Purchase Certificate not otherwise already obtained, except to the extent that the failure to obtain or maintain such license could not reasonably be expected to have a Material Adverse Effect with respect to Seller. Seller has the capacity and authority to enter into and consummate the transactions contemplated by this Agreement, the Program Documents and each Loan Purchase Certificate.  This Agreement, the Program Documents, each Loan Purchase Certificate and all instruments, documents and agreements to be executed by Seller in connection herewith and therewith are, or when delivered shall be, duly authorized, executed and delivered by Seller and are, or when delivered will be, valid, binding and enforceable obligations of Seller (except as such enforceability may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally and by general principles of equity).  Each individual executing this Agreement, the Program Documents and/or any Loan Purchase Certificate on behalf of Seller is duly authorized to do so.

4.1.2    <u>No Violation</u>.  The execution and delivery by Seller of this Agreement, the Program Documents and each Loan Purchase Certificate, and consummation of the transactions contemplated herein and therein, will not, with or without giving of notice or passage of time, or both: (i) conflict with or violate any law, statute, rule, regulation, or administrative order to which Seller is subject or by which Seller's assets are bound or affected; (ii) conflict with Seller's articles of incorporation or by-laws; (iii) violate any judgment, order, writ, or decree of any court or administrative body in any suit or proceeding to which Seller is a party; (iv) result in a breach of, or default under, any material agreement, commitment, contract (written or oral), or other instrument, to which Seller is a party or by which any of Seller's assets are bound or affected; (v) render Seller insolvent or without sufficient working capital; (vi) will result in the creation or imposition of any Lien upon any purchased Loans.

4.1.3    <u>No Consent Required</u>.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Seller of or compliance by Seller with this Agreement or the consummation of the transactions contemplated by this Agreement or if required, such consent, approval, authorization or order has been obtained prior to the Closing Date.

4.1.4    <u>Good Standing</u>.  Seller is duly organized, validly existing, and in good standing under the laws of the state in which it was formed.

16

3822162v.12 013580.0126

4.1.5    No Broker.  Seller has not dealt with any broker, investment banker, agent, or other person, except for Buyer, who may be entitled to any commission or compensation in connection with the sale of Eligible Loans pursuant to this Agreement or the Program Documents; provided, that if Seller has dealt with any broker, investment banker, agent, or other person, except for Buyer, who may be entitled to any commission or compensation in connection with the sale of Eligible Loans pursuant to this Agreement or the Program Documents, such commission or compensation shall have been paid in full by Seller.

4.1.6    Solvency.  Seller is solvent and no voluntary or involuntary bankruptcy petition has been commenced by or against Seller, nor has Seller made an offer of assignment or compromise for the benefit of creditors.  Seller will not be rendered insolvent by the consummation of the transactions contemplated hereby.  Seller is not transferring any Loan with any intent to hinder, delay or defraud any of its creditors.

4.1.7    Ordinary Course Transaction. The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of Seller, and the transfer, assignment and conveyance of Loans by Seller pursuant to this Agreement are not subject to bulk transfer or any similar statutory provisions.

4.1.8    Investment Company.  Seller is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

4.1.9    No Penalties.  With respect to the Loans and the sale of the Loans, Seller has not had any existing accrued and/or unpaid penalties, fines or sanctions imposed by and owing to any Governmental Authority with jurisdiction over Seller.

4.1.10    Seller Default.  Seller is in compliance with this Agreement and the Program Documents in all material respects and no Seller Default with respect to Seller or event which, with or without giving of notice or passage of time, or both, would constitute a Seller Default with respect to Seller, has occurred and is continuing.

4.1.11    No Ownership Interests. Seller does not have any ownership or other interest in the underlying assets, payment streams, legal documents or other tangible or intangible assets of the Borrowers; provided that Servicer is entitled to its Servicing Fee on payments made by Borrowers. All materials delivered to Buyer by Seller in connection with the performance of its duties and obligations under this Agreement shall be the property of Buyer, and Buyer shall have good and clear title to all such materials.

4.1.12    Closing Information and Data. (i) Any and all information, data, materials or documents including, without limitation, regarding underwriting or loan servicing process or methodology provided by Seller to Buyer prior to the Closing Date as part of the due diligence process primarily relating to the transactions contemplated by this Agreement or the Program Documents, excluding any projections or other forward-looking statements (collectively, the "Closing Information and Data"), are complete, true and correct as of the Closing Date, in all material respects, and (ii) (A) the Closing Information and Data and (B) the information, data, materials or documents provided by Seller to Buyer (other than any projections or other forward-looking statements) (x) with respect to servicing and modifications, credit risk and underwriting,

17

3822162v.12 013580.0126

fraud detection and loan verification, and loan origination, that is requested by Buyer and delivered to Buyer in response thereof, or (y) expressly required to be provided in accordance with the terms of this Agreement or any of the Program Documents, are complete, true and correct as of each Closing Date, in all material respects.

       4.1.13    Place of Business. The legal name of Seller is set forth on the signature pages hereto.  The principal place of business of Seller are located at the address set forth in Section 12.2 herein (or at such other locations, notified to Buyer in accordance with Section 5.4.7) and have been located at such location at all times for the last five (5) years except as specified in Schedule 1.

       4.1.14    Permits. Seller is in compliance with, and has all permits necessary or required by, Applicable Law or any Governmental Authority for the operation of its business as presently conducted, except where noncompliance, violation or lack thereof is not reasonably expected to materially and adversely affect the purchased Loans, Seller's right to sell, assign and transfer the purchased Loans or Buyer's ability to consummate the transactions contemplated hereby.  All permits necessary or required by Applicable Law or Governmental Authority for the operation of Seller's business are not in known conflict with the rights of others, except where such conflict or lack of being in full force and effect is not reasonably expected to materially and adversely affect the purchased Loans, Seller's right to sell, assign and transfer the purchased Loans or Buyer's ability to consummate the transactions contemplated hereby.

## ARTICLE 5 - SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS WITH RESPECT TO LOANS

       Section 5.1    Seller shall be deemed to have made the following additional representations, warranties and covenants to Buyer, with respect to each Loan in question, each of which representations, warranties and covenants Seller represents to be true and correct in all material respects (except for those representations that are modified by materiality, which representations and warranties shall be true and correct in all respects) as of the execution of the Loan Purchase Certificate for the Loan in question and as of the Closing Date for such Loan, unless otherwise expressly stated in Schedule 2 to the Loan Purchase Certificate for the Loan in question.

       5.1.1    Servicing.  To Seller's knowledge, at all times, the Loan has been serviced in compliance with Accepted Servicing Practices.

       5.1.2    Ownership.  Seller is the owner of the Loan and holder of the Loan Documents, and except to Buyer as set forth in this Agreement, Seller has not assigned, transferred, conveyed, pledged, or granted a security interest in the Loan Documents, and Seller has the full right to transfer and sell the Loan to Buyer free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest, and following the sale of each Loan, Buyer will own the Loan and hold the Loan Documents free and clear of any encumbrance, equity, participation interest (except subordinate debt or B-Pieces held by Seller or Originator), lien, pledge, charge, claim or security interest.

       5.1.3    Loan Balance; Disbursement of Proceeds.  The outstanding principal balance of the Note for the Loan in question, as well as the amount which remains committed but

3822162v.12 013580.0126

undisbursed, is accurately set forth on <u>Schedule 1</u> attached to the Loan Purchase Certificate for the Loan in question.  All costs, fees and expenses incurred in making or closing the Loan and all recording fees and costs were paid, and the Borrower is not entitled to any refund of any amounts paid or due under the Loan Documents.

       5.1.4     <u>Impound Accounts</u>.  There are no impound accounts for taxes, insurance or any other items associated with the Loan in question except as may be shown on <u>Schedule 1</u> attached to the Loan Purchase Certificate for such Loan.

       5.1.5     <u>No Foreclosure Actions</u>.  Seller has not commenced any judicial or non-judicial foreclosure actions or exercised any other enforcement actions in connection with the Loan, including without limitation, any equitable rights of set-off, and to Seller's knowledge, no such judicial or non-judicial foreclosure actions or enforcement actions have been commenced by any third party.

       5.1.6     <u>No Litigation</u>.  There is no litigation, administrative proceeding, investigation, executive or legislative proceeding or other form of governmental enforcement pending, or to the best of Seller's knowledge, threatened in writing, that is in any way related to, directed at or otherwise affecting (i) the Loan Documents, (ii) the use, operation or occupancy of any portion of the Property securing the Loan or other Collateral referenced in the Security Instrument for such Loan, (iii) any affirmative defenses of Borrower or Guarantor to the Loan or (iv) to the knowledge of Seller, against any Originator or its properties.

       5.1.7     <u>Loan Payments</u>.  All payments required to be made under the terms of the Loan Documents have been made and credited up to the last day before the Closing Date for the Loan.  No Loan has been more than 30 days delinquent, without giving effect to any grace or cure period, in making required payments since origination, and as of the Closing Date, no Loan is delinquent in making required payments.  There is (a) no material default, breach, violation or event of acceleration existing under any Loan, and (b) no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration, which default, breach, violation or event of acceleration, in the case of either clause (a) or clause (b), materially and adversely affects the value of the Loan.  Seller has not waived any default, breach, violation or event of acceleration under the Loan or any Loan Document.

       5.1.8     <u>Accuracy of Loan Documents</u>.  The Loan Documents delivered to Buyer and Custodian in accordance with the terms of this Agreement are true and correct and contain genuine and authentic signatures thereon, and the terms of the Loan Documents have not been impaired, waived, altered or modified in any respect, except by written instruments which have been recorded to the extent any such recordation is required by law, or, necessary to protect the interest of Buyer.  The terms of any such waiver, alteration or modification (whether complete or in process) are reflected in the Loan Documents, and the written instrument reflecting such terms has been included in the Loan File for the Loan.  No Borrower has been released, in whole or in part, from the terms of the Loan Documents and there have been no instruments executed by Borrower effectuating the release, cancellation, modification, or satisfaction of the terms of the Loan Documents.  Borrower has not satisfied, canceled or subordinated the Loan Documents in whole or in part.

3822162v.12 013589.0126

5.1.9     Taxes Paid.  All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents and any other charges payable on the Loan which previously became due and owing are non-delinquent, have not become a lien upon the Property securing the Loan and have been paid, or escrow funds have been established, to the extent permitted by law, in an amount sufficient to pay for every such escrowed item which remains unpaid and which has been assessed but is not yet due and payable.

5.1.10     No Defenses.  No Borrower in respect of the Loan is presently, or was at the time the Loan was originated, a debtor in any state or Federal bankruptcy or insolvency proceeding.  Seller has not, nor has any originator from which Seller acquired the Loan, advanced funds, or induced, solicited, or knowingly received any advance of funds by a party other than the Borrower, directly or indirectly, for the payment of any amount required under the Loan.

5.1.11     Hazard Insurance.  The Property securing the Loan is insured by a fire and extended perils insurance policy, issued by a generally acceptable insurance carrier, and such other hazards as are customary in the area where such Property is located, and to the extent required by Seller as of the date on which the Loan was originated, and against other risks insured against by Persons operating like properties in the locality of such Property, in an amount not less than the lesser of (a) one hundred percent (100%) of the replacement cost of all improvements to such Property, or (b) the outstanding principal balance of the Loan, all in a form usual and customary in the industry and that is in full force and effect, and all amounts required to have been paid under any such policy have been paid.  If any portion of such Property is in an area identified by any Federal governmental authority as having special flood hazards, and flood insurance is available, a flood insurance policy meeting the current guidelines of the Federal Emergency Management Agency is in effect with a generally acceptable insurance carrier, in an amount representing coverage not less than the least of (a) the outstanding principal balance of the Loan, (b) one hundred percent (100%) of the replacement cost of all improvements to such Property, and (c) the maximum amount of insurance available under the National Flood Insurance Act of 1968, as amended by the Flood Disaster Protection Act of 1974.  All such insurance policies (collectively, the "Hazard Insurance Policy") contain a standard mortgagee clause naming Seller, its successors and assigns (including, without limitation, subsequent owners of the Loan), as mortgagee, loss payee or additional insured.  Seller has not engaged in, and has no actual knowledge of the Borrower's having engaged in, any act or omission which would impair the coverage of any such policy or the validity and binding effect of either.

5.1.12     Compliance with Applicable Laws.  (a) Any and all requirements with respect to the Loan of any Applicable Laws have been complied with in all material respects while Seller has owned the Loan, and, to Seller's knowledge, at all times since the Loan was originated, and (b) the consummation of the transactions contemplated hereby will not involve the violation by Seller of any such Applicable Laws.

5.1.13     No Waivers.  The Security Instrument securing the Loan has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Property has not been released from the lien of the Security Instrument, in whole or in part, nor has any instrument been executed that would affect any such release, cancellation, subordination or rescission.  Seller has not waived the performance by the Borrower of any action, nor has Seller waived any default

3822162v12 013580.0126

resulting from any action or inaction by the Borrower.  The Security Instrument represents the only lien on the subject Property.

5.1.14    <u>Location and Type of Property</u>.  The Property is located in the United States or a territory of the United States.  The Property consists of real Property with a detached single-family residence erected thereon, a two- to four-family dwelling, or a five- to fifty-multi-family property; provided that no residence or dwelling is a mobile home, a manufactured home, or a cooperative apartment.  No Loan is secured by a multi-family property that has more than 50 units, a mixed-use or a commercial property, nor is any portion of the Property used for commercial purposes.  No portion of the Property shall be used (a) for commercial purposes (other than the general rehabilitation of the Property by the Borrower in the ordinary course of the Borrower's business), (b) as the Borrower's primary residence or in any other manner that would cause the Property to be considered an owner-occupied Property or (c) for any other personal or household purposes.

5.1.15    <u>Accuracy of Information</u>.  All information supplied by, on behalf of, or concerning the Borrower and all information in the Loan File is true, accurate and complete and does not contain any statement that is or will be inaccurate or misleading in any material respect.

5.1.16    <u>Title Insurance</u>. Seller's Loan Policy is valid and remains in full force and effect.

5.1.17    <u>Payment Terms</u>. Principal on the Loan is payable on the earlier of the maturity date of the Loan and the date on which the indebtedness thereunder becomes immediately due and payable thereunder.  The Loan Documents do not permit negative amortization.

5.1.18    <u>Occupancy</u>.  All material inspections, licenses, and certificates required to be made or issued with respect to all occupied portions of the Property have been obtained from the appropriate authorities in the jurisdiction such Property resides.  Seller has not received written notification from any governmental authority that the Property is not in compliance with such laws or regulations or has failed to have or obtain such material inspection, licenses or certificates, as the case may be.

5.1.19    <u>No Other Collateral</u>.  The Loan is not and has not been secured by any collateral except the lien of the corresponding Security Instrument and the security interest of any applicable security agreement or chattel mortgage and such collateral does not serve as security for any other obligation.  There are, as of the origination and Closing Date, no subordinate mortgages or junior liens (except for subordinate debt or B-Pieces held by Seller or Originator) securing the payment of money encumbering the related Property, and equipment and other personal property financing. No Loan is cross-collateralized with any other Loan and/or any loan outside of this Agreement.

5.1.20    <u>Security Instrument</u>.  If applicable, a trustee, authorized and duly qualified if required under applicable law to act as such, has been properly designated and currently so serves and is named in the Security Instrument, and no fees or expenses are or will become payable by Buyer to the trustee under the Security Instrument, except in connection with a trustee's sale or attempted sale after default by the Borrower.

3822162v.12 013580.0126

5.1.21    Recordable.  The Security Instrument was recorded, or is in the process of being recorded, and all subsequent assignments of the original Security Instrument, showing a complete chain of title from the Originator to Seller, as applicable, have been recorded or are in the process of being recorded in the jurisdiction(s) where the Property is located.

5.1.22    No Damage/Condemnation.  The Property is in substantially the same condition it was at the time the most recent appraised value was obtained, unless the business plans of the Borrower are to perform construction or repairs on the subject Property.  There is no proceeding pending or to Seller's actual knowledge, threatened in writing, for the total or partial condemnation of the Property.

5.1.23    Collection Practices.  The origination and collection practices used by the Originator, each servicer of the Loan and Seller with respect to the Loan have been in all respects in compliance with Accepted Servicing Practices, applicable Laws and regulations, and have been in all respects legal and proper.

5.1.24    Doing Business.  All parties which have had any interest in the Loan, whether as mortgagee, assignee or pledgee, are (or, during the period in which they held and disposed of such interest, were) (i) in material compliance with any and all applicable licensing requirements of the laws of the state wherein the Property is located, and (ii) either (A) organized under the laws of such state, (B) qualified to do business in such state, (C) a federal savings and loan association, a savings bank or a national bank having a principal office in such state or (D) not doing business in such state.

5.1.25    Valuation.  Each Loan File contains a written Appraisal or BPO with respect to the related Property prepared by a Qualified Appraiser. The person preparing the Appraisal or BPO with respect to the Property valuation received no benefit from, and such person's compensation or flow of business from the Originator was not affected by, the approval or disapproval of the Loan.

5.1.26    HOEPA.  No Loan is subject to the provisions of 12 U.S.C. Section 226.32 of Regulation Z implementing the Homeownership and Equity Protection Act of 1994 as amended ("HOEPA"). In the event that Seller has actual knowledge that any Loan is subject to HOEPA it shall be required to immediately repurchase the affected Loan.

5.1.27    HAMP. No Loan is eligible for the Home Affordable Modification Program established pursuant to Sections 101 and 109 of the Emergency Economic Stabilization Act of 2008, as amended ("HAMP").  In the event that Seller has actual knowledge that any Loan is an "Eligible Loan" (as defined in HAMP), Seller will promptly notify Buyer.  Unless the Servicer is a registered servicer in good standing under HAMP at the time of acquisition of the Loan by Buyer and agrees to service such Loans in accordance with HAMP requirements, no "Eligible Loan" as defined in HAMP shall be sold to Buyer.

5.1.28    No Equity.  No document relating to the Loan provides for any contingent or additional interest in the form of participation in the cash flow of the Property or a sharing in the appreciation of the value of the Property.  The indebtedness evidenced by the Loan Documents is not convertible to an ownership interest in the Property or the Borrower and Seller

3822162v12 013580.0126

has not financed nor does it own directly or indirectly, any equity of any form in the Property or the Borrower.

5.1.29    Hazardous Substances. To Seller's knowledge, the Property is free from any and all toxic or hazardous substances in violation of any local, state or federal environmental law, and there exists no violation of any local, state or federal environmental law, rule or regulation. To Seller's knowledge, there is no pending action or proceeding directly involving the Property in which compliance with any environmental law, rule or regulation is alleged to have been violated.

5.1.30    No Holdbacks. Except with respect to any Loan identified on the Loan Purchase Certificate as being subject to holdback funds, the stated principal balance of each Loan has been fully disbursed as of the Closing Date and there is no requirement for future advances thereunder except where (a) the full amount of the Loan has been disbursed but a portion thereof is being held in escrow or reserve accounts or (b) future advances are required, in each case, pending the satisfaction of certain conditions relating to leasing, repairs, property improvement or other matters with respect to the related Property, the Borrower or other considerations determined by Seller to merit such holdback.

5.1.31    No Ground Leases. No Property is subject to a ground lease.

5.1.32    Anti-Money Laundering. Seller has fully complied with all applicable Anti-Money Laundering Laws and has adopted policies and procedures reasonably designed to ensure its ongoing compliance with such laws, which policies and procedures are consistent with generally accepted standards within Seller's industry for ensuring such compliance; to the extent required by law, Seller has conducted the requisite due diligence in connection with the Loan for purposes of the applicable Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Borrower and the origin of the assets used by said Borrower to purchase the Property in question, and maintains, and will maintain, sufficient information to identify the applicable Borrower for purposes of the Anti-Money Laundering Laws.

5.1.33    Regulatory Compliance. At the time of origination, or if modified, the date of modification, (i) each Loan complied in all material respects with all then-applicable federal, state, and local laws, including (without limitation), as applicable, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, predatory and abusive lending laws, disclosure or unfair and deceptive practice laws.

5.1.34    Enforceability and Priority of Lien. The Security Instrument is valid, subsisting, and creates an enforceable first lien on the property therein described, the Property is free and clear of all encumbrances and liens having priority over the lien of the Loan Documents (including without limitation mechanics' or similar liens or claims which have been filed for work, labor or material affecting the Property which are or may be liens prior to, or equal or coordinate with, the lien of the Security Instrument).

5.1.35    Business Purpose Mortgage Loan. No Loan was originated primarily for a personal, family or household purpose, as defined in the Truth in Lending Act of 1968, as amended, and its implementing Regulation Z, and all such Loans were originated for business

3822162v12 013580.0126

purposes.  The Property securing the related Loan Documents (i) is non-owner occupied, and (ii) consists of a contiguous parcel of real property with a detached single family residence erected thereon, a two- to four-family dwelling, or a multi-family property with up to fifty units.

5.1.36    Origination Date.  Each Loan has been originated for at least two (2) days prior to its sale to Buyer.

5.1.37    No Recession.  No Note or any of the Loan Documents are subject to any right of recession, set-off, counterclaim, or defense, including the defense of usury, nor will the operation of any of the terms of the Note or Loan Documents, or the exercise of any right thereunder, render the Note or any of the Loan Documents unenforceable, in whole or in part, or subject to any right of recession, set-off, counterclaim, or defense, including the defense of usury.

5.1.38    No Consents.  Other than consents and approvals obtained as of the related Closing Date or those already granted in the documents governing such Loan, no consent or approval by any Person is required in connection with Seller's sale and/or Buyer's acquisition of such Loan.

5.1.39    Environmental Matters.  Seller has not received written notice of any pending action or proceeding directly involving the Property in which compliance with any environmental law, rule or regulation is an issue or is secured by a secured lender's environmental insurance policy.

5.1.40    Underwriting Guidelines.  The origination or purchase of such Loan was in full compliance with the Underwriting Guidelines.

5.1.41    Disbursement of Proceeds.   Any and all requirements as to disbursements of any escrow funds therefor have been complied with pursuant to the Loan Documents of such Loan.

5.1.42    No Defaults.   There is no default, breach, violation or event of acceleration existing under the Note or any of the related Loan Documents (including without limitation a failure by Seller to make an advance in accordance with the terms thereof to the related Borrower thereunder).

5.1.43    Location of Improvements; No Encroachments.  With respect to each Property related to a Loan , (a) all material improvements that were included for the purpose of determining the value of such each Property at the time of the origination of such Loan are within the boundaries of the related Property, except encroachments that do not adversely affect the value or current use of such Property or for which insurance or endorsements were obtained under the related title policy, (b) no improvements on adjoining parcels encroach onto the related Property except for encroachments that do not adversely affect the value or the current use of such Property or for which insurance endorsements were obtained under the related titled policy and (c) no improvements encroach upon any easements except for encroachments the removal of which would not adversely affect the value or current use of such Property or for which insurance or endorsements obtained with respect to the related title policy.

3822162v12 013580.0126

5.1.44    <u>Customary Provisions</u>.  The Note has a stated maturity.  The Security Instrument contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Property of the benefits of the security provided thereby, including, (i) in the case of a Security Instrument designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure, in each case subject to Applicable Law.

5.1.45    <u>Due-On-Sale</u>.  The Security Instrument and/or Loan Documents contain a provision for the acceleration of the payment of the unpaid principal balance of the Loan in the event that the Property is sold or transferred without the prior written consent of the Borrower thereunder.

5.1.46    <u>Consolidation of Future Advances</u>.  Any future advances made to the Borrower prior to the Closing Date have been consolidated with the outstanding principal amount secured by the Loan Documents, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term.

5.1.47    <u>Proceeds of Loan</u>.  The proceeds of the Loan have not been and shall not be used to satisfy, in whole or in part, any debt owed or owing by the Borrower to Seller or any Affiliate, except in connection with a refinanced Loan.

5.1.48    <u>Mortgage Releases</u>.  The terms of the related Security Instrument or related Loan Documents do not provide for the release of any related Property from the lien of the Security Instrument except (a) a release accompanied by principal repayment of not less than a specified percentage of the related allocated loan amount of such Property, (b) upon payment in full of such Loan, (c) as required pursuant to an order of condemnation or a material casualty, or (d) in connection with a substation of collateral within the parameters specified in the related Loan Documents.

5.1.49    <u>Advance of Funds by Seller</u>.  The related Borrower may request advances up to the loan amount as set forth in the related Loan Documents.

5.1.50    <u>Refinancing</u>.  No Loan to a Borrower is the result of more than one refinancing of such Loan from Seller to such Borrower.

5.1.51    <u>Access; Utilities; Separate Tax Lots</u>.  Each Property (a) is located on or adjacent to a public road and has direct legal access to such road, or has access via an irrevocable easement or irrevocable right of way permitting ingress and egress to/from a public road, (b) is served by or has uninhibited access rights to public or private water and sewer (or well and septic) and electricity all of which are appropriate for the current use of such Property, and (c) unless otherwise disclosed by Seller to Buyer in writing, constitutes one or more separate tax parcels.

5.1.52    <u>Licenses and Permits</u>.  Each Borrower covenants in the Loan Documents that it shall keep all licenses, permits and applicable governmental authorizations necessary for its operation of the related Mortgaged Property in full force and effect, and all such licenses, permits and applicable governmental authorizations are in effect.

3822162v12 013580.0126

5.1.53    <u>Compliance with Usury Laws</u>.  The mortgage rate (exclusive of any default interest late charges, yield maintenance charge, or prepayment premiums) of each Loan complied as of the date of origination with, or was exempt from, applicable state or federal laws, regulations and other requirements pertaining to usury.

5.1.54    <u>Costs</u>.  All costs, fees and expenses incurred in making or closing the Loan and the recording of the related Security Instrument, which if unpaid would have a material adverse effect on the value, use or operation for the Property or the value of the related Loan, were paid as of the related Purchase Date.

5.1.55    <u>No Fraud</u>.  No fraud with respect to the Loans has taken place in connection with the origination or servicing of such Loan.

Section 5.2    <u>Change in Circumstances</u>. With respect to any representation that was true as of the Effective Date but thereafter becomes untrue due to facts or circumstances that are outside of Seller's control and either occurs following the Effective Date and prior to the Closing Date for the Loan in question, or are first discovered by Seller following the Effective Date and prior to such Closing Date, the following shall apply:  (a) Seller shall promptly notify Buyer in writing of such untrue matters (describing with particularity the nature of the untrue matters in question); and (b) notwithstanding anything contained herein to the contrary, (i) Seller shall not be deemed to be in default under this Agreement with respect to any untrue matters contained in such representation or warranty, so long as Seller notifies Buyer of such untrue matter in writing prior to the Closing Date for such Loan (and the Closing Date for such Loan shall be extended for two (2) Business Days to allow Buyer to evaluate the untrue matters in question), and (ii) Seller shall have no liability to Buyer with respect to such matters if Seller timely notifies Buyer, pursuant to clause (i) above, of the untrue matters in question and Buyer nevertheless proceeds to Closing despite Buyer's knowledge that such representation or warranty is untrue (and in such event, Buyer's purchase of such Loan shall be subject to such matters) and (iii) Buyer shall have no obligation to purchase such Loan.

Section 5.3    <u>Survival</u>.  Seller's representations and warranties in this Article 5 shall survive each Closing until the Loans are repaid in full.

Section 5.4    <u>Seller Covenants</u>. Seller hereby covenants and agrees with Buyer as follows (and Parent shall use its best efforts to cause Seller to fulfill its obligations to Buyer under this Section 5.4):

5.4.1    <u>Information</u>.  Seller acknowledges and agrees that Buyer shall be the owner of all data and information relating to the Purchased Loans and the related Borrowers, including credit file information, servicing and collection history, and other books and records, and that all such information shall constitute Confidential Information subject to Section 7 of the Framework Agreement.

5.4.2    <u>Ownership</u>.  Seller will take all action necessary to effect and maintain Buyer's ownership interest in the purchased Loans.

3822162v12 013580.0126

5.4.3    <u>Seller Obligations</u>.  Seller will do, execute and perform all such other acts, deeds and documents as Buyer may, from time to time, reasonably require in order to carry out the intent of this Agreement.

5.4.4    <u>No Liens</u>.  Seller hereby covenants and agrees not to create or suffer to exist (by operation of law or otherwise) any lien (other than Buyer's security interest under Section 2.4.1) upon or with respect to, any of the purchased Loans or any of its interest therein.

5.4.5    <u>Books and Records</u>.  Seller shall maintain accounts and records as to each Purchased Loan hereunder accurately and in sufficient detail to permit the reader thereof to know at any time the status of such Purchased Loan.  Seller shall maintain its computer records so that Seller's master computer records (including any back-up archives) that refer to any Purchased Loan indicate that such Purchased Loan is owned by Buyer.

5.4.6    <u>Financing Facility Cooperation</u>. Seller acknowledges that Buyer may enter into one or more financing facilities (directly or indirectly) to finance purchases of Eligible Loans (each such financing facility, the "<u>Financing Facility</u>"). In connection with any Financing Facility, Seller shall:

(a)    cooperate with respect to all reasonable requests and reasonable due diligence procedures;

(b)    deliver to Buyer such information regarding Seller, loan delinquency, collection experience and such other information regarding the Loans as may be required by a potential lender and as is customarily provided to a potential lender in a financing transaction or as is reasonably requested by Buyer or by a potential lender;

(c)    indemnify the applicable parties to the financing transaction for any material misstatements or omissions contained in or with respect to information and documents delivered under clause (b) above; and

(d)    make any commercially reasonable amendments to this Agreement and the Servicing Agreement requested and needed by a potential lender in order to facilitate such Financing Facility.

In connection with each Financing Facility, Seller may be required (depending on the identity of the third party financing source) to execute a commercially reasonable multi-party agreement with the financing party and Seller may also be required to allow such financing party to be a third party beneficiary of this Agreement and the Servicing Agreement.  Buyer will reimburse Seller for its reasonable out-of-pocket expenses incurred to fulfill its obligations to Buyer under in this Section 5.4.6.

5.4.7    <u>Notices</u>.  Seller shall notify Buyer via electronic mail in accordance with Section 12.2 promptly (and in any event within ten (10) Business Days of its knowledge) of the occurrence of any of the following:

(a)    A Seller Default.

27

3822162v12 013589.0126

(b)     The failure to satisfy any conditions precedent specified in Section 2.12.

(c)     Any written action, suit, claim, investigation or proceeding commenced or, to the knowledge of Seller, threatened in writing against Seller, which if decided adversely to Seller would result in the payment of an amount greater to or equal to $1,000,000.

(d)     The failure to maintain, violation or suspension of any licenses, permits, approvals, qualifications or authorizations to service loans in any relevant jurisdiction of Seller to the extent any such failure could be reasonably likely to materially impair Seller's ability to perform its obligations under this Agreement.

(e)     A change of Seller's principal business address or legal name.

5.4.8     Tax Treatment.

(a)     Except as set forth in this Section 5.4.8, Seller will not take a position for U.S. federal income tax purposes other than (A) Originator or Seller, is the party that originates the purchased Loans, and (B) such origination is not on behalf of any other party, including, without limitation, Buyer.

(b)     Seller shall control any proceeding before the Internal Revenue Service or any state or local taxing authority, or resulting litigation, involving a challenge or questioning of Seller's use of the tax treatment described in Section 5.4.8(a).  Buyer shall have the right, through counsel or other representative of its choosing and at Buyer's sole expense, to observe the conduct of such proceeding, and Seller shall keep Buyer reasonably informed regarding the progress of such proceeding.

## ARTICLE 6 - SERVICING

Section 6.1     Servicing of Loans Prior to Closing.  Up to and including the related Closing Date, Seller shall have the sole and exclusive right, power, and authority to service such Loan and deal with the Borrower and Guarantor under such Loan in all matters pertaining to such Loan and the Loan Documents applicable thereto; provided, however, Seller shall not amend or otherwise modify any of the Loan Documents for such Loan from and after the date Buyer has executed a Loan Purchase Certificate for such Loan without the express written consent of Buyer, which consent shall not be unreasonably conditioned, delayed or withheld.  Up to and including the Closing Date, Seller may, in its sole discretion, but shall have no duty to, take any action to enforce any right or obligation of Borrower, Guarantor, or any other obligor under the Loan Documents for such Loan, and/or to liquidate or pursue any recovery from any security for such Loan; provided, however, notwithstanding anything to the contrary contained herein, from and after the expiration of the Diligence Period for such Loan, Seller shall not take any action to enforce any right or obligation of Borrower, Guarantor, or any other obligor under the Loan Documents for such Loan, and/or liquidate or pursue any recovery from any security for such Loan without the express written consent of Buyer, which consent shall not be unreasonably withheld.  Seller shall inform Buyer in writing of any change in the Borrower and/or Guarantor under each Loan identified in the Loan Purchase Certificates and deliver to Buyer copies of all written notices, billings and/or other communications to Borrower and/or Guarantor under such Loans, including

28

without limitation, any notices, billings and/or other communications with respect to (i) Borrower's and/or Guarantor's performance (or ability to perform) under the Loan Documents for such Loan, and/or (ii) Borrower's and/or Guarantor's management, composition, organization, financial condition and/or any disability of Borrower and/or Guarantor or any of their respective partners or affiliates, including any written enforcement or default notices delivered to Borrower and/or Guarantor from and after the date the Parties mutually execute a Loan Purchase Certificate that includes such Loan.

Section 6.2    <u>Servicing of Loans After Closing</u>.  Following the related Closing Date, Buyer shall have the sole and exclusive right, power and authority to service such Loan or cause such Loan to be serviced, including, without limitation, the right to assign the servicing rights to another party and to deal with the Borrower and Guarantor under such Loan in all matters pertaining to such Loan and the Loan Documents applicable thereto.

## ARTICLE 7 - REMEDIES

Section 7.1    <u>Repurchase</u>.

7.1.1    Upon discovery by either Seller or Buyer of a breach of any representation or warranty contained in Article 4 that materially and adversely affects the value of any applicable Loan and/or the interests of Buyer in any such Loan, (a "<u>Breach</u>"), the Party discovering such Breach shall give prompt written notice to the other Party.

7.1.2    Seller shall have thirty (30) days to cure any Breach, or such longer period as Buyer reasonably determines is necessary given the nature of such Breach (the "<u>Cure Period</u>") prior to being required to repurchase the affected Loans.  The Cure Period shall commence upon either Party's written notice to the other party of the related Breach, supported by commercially reasonable documentation supporting such alleged Breach.  If a Breach is not cured within such Cure Period, then at Buyer's option, the affected Loan shall be repurchased by Seller within five (5) Business Days of the expiration of such Cure Period at the Repurchase Price.

7.1.3    With respect to the representations and warranties that are made to Seller's knowledge or to the best of Seller's knowledge, if it is discovered by either Seller or Buyer that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Loan or the interest of Buyer in the related Loan, Buyer shall be entitled to all the remedies to which it would be entitled for a breach of representation or warranty, including, without limitation, the repurchase requirements contained herein, notwithstanding Seller's lack of knowledge with respect to the inaccuracy at the time the representation or warranty was made.

7.1.4    Upon completion of such repurchase by Seller, Buyer and Seller shall arrange for the reassignment of the repurchased Loan to Seller and the delivery to Seller of any documents held by Buyer or its custodian relating to the repurchased Loan.  In the case of any lien for which an assignment from Seller to Buyer has been recorded prior to repurchase, Buyer shall concurrently with the repurchase provide an executed assignment from Buyer to Seller.  Seller shall pay any necessary recording costs in connection with recording such reassignment.

3822162v12 013580.0126

Section 7.2    Buyer Default. Buyer and Seller hereby acknowledge and agree that in the event of a material default or material breach by Buyer in the performance of Buyer's obligations or covenants under this Agreement and/or under any Loan Purchase Certificate, or the material breach by Buyer of any of Buyer's representations or warranties under this Agreement, a "Buyer Default" under this Agreement shall have been deemed to have occurred.  In the event of a Buyer Default concerning a particular Loan, where such Buyer Default occurs prior to the Closing Date for such Loan, Seller's sole and exclusive remedy shall be to either (a) waive such Buyer Default and proceed to the Closing for the sale of such Loan pursuant to the terms of this Agreement and the Loan Purchase Certificate applicable to such Loan, or (b) cancel the related Closing by written notice to Buyer.

Section 7.3    Seller Default. Buyer and Seller hereby acknowledge and agree that (a) in the event of a default or breach by Seller in the performance of Seller's obligations or covenants under this Agreement and/or under any Loan Purchase Certificate, (b) the breach by Seller of any of Seller's representations or warranties under this Agreement, (c) should a Governmental Authority having oversight over the operations of Seller has reached a final determination that Seller has ceased to be in good standing with such Governmental Authority such that Seller becomes restricted or prohibited from meeting its material obligations under this Agreement, (d) shall occur any change in any federal, state or local law, statute, regulation or order or in any requirement of any Governmental Authority, which change (x) makes it illegal for Seller to Sell Loans or  (y) will result in a Material Adverse Change to Seller or (e) an Insolvency Event shall occur with respect to Seller, each a "Seller Default" under this Agreement shall have been deemed to have occurred.  In the event of a Seller Default concerning a particular Loan, where such Seller Default occurs prior to the Closing Date for such Loan, Buyer's sole and exclusive remedy shall be to either (i) waive such Seller Default and proceed to the Closing for the sale of such Loan pursuant to the terms of this Agreement, or (ii) cancel this Agreement by written notice to Seller. In the event of a Seller Default concerning a particular Loan, where such Seller Default occurs after Buyer has acquired such Loan, Buyer shall be entitled to all rights and remedies available hereunder, at law and/or in equity as a result of such Seller Default with respect to such Loan.

Section 7.4    Limitation of Remedies.  Notwithstanding any provision to the contrary contained in this Agreement except for acts or omissions that constitute fraud, gross negligence, bad faith or willful misconduct, in no event shall any Party or any of its respective Affiliates, beneficiaries, assignees or successors (by assignment or otherwise)  be liable to any other Party or to any other Person for actual or purported lost profits, costs of cover or other special damages, or any punitive, exemplary, remote, consequential, incidental or indirect damages, under this Agreement incurred or claimed by any Party or entity (or such party or entity's officers, directors, stockholders, members or owners), however caused, on any theory of liability.  Notwithstanding anything in this Agreement to the contrary, no Affiliate, or officer, director, partner, manager, equity holder or employee of any Party or any of its Affiliates will have any liability or obligation with respect to this Agreement or with respect to any claim or cause of action (whether in contract, tort or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.  The provisions of this Article 6 shall survive each Closing and the consummation of the transactions hereunder and under each Loan Purchase Certificate.

Section 7.5    Repurchase upon Failure to Deliver Loan Documents.  In the event that Seller shall fail to comply fully on a timely basis with any of the deliveries required under Section

3922162v12 013580.0126

2.6.1 of this Agreement in connection with any Loan(s), Buyer may provide written notice to Seller identifying in reasonable detail the Loan Document(s) that Seller has failed to deliver and/or the nature of the non-compliance (a "<u>Delivery Breach</u>") hereunder in any Loan Document(s) so delivered.  Seller shall have two (2) Business Days after receipt of such written notice to cure each Delivery Breach identified in such notice.  In the event that a Delivery Breach with respect to a Loan(s) is not cured within such two (2)-Business Day period, then at Buyer's option, the affected Loan(s) shall be repurchased by Seller within two (2) Business Days thereafter at the Repurchase Price for such Loan.  Upon completion of such repurchase by Seller, Buyer and Seller shall arrange for the reassignment of the repurchased Loan(s) to Seller and the delivery to Seller of any documents held by Buyer or the Custodian relating to the repurchased Loan(s).  In the case of any lien for which an assignment from Seller to Buyer has been recorded prior to repurchase, Buyer shall concurrently with the repurchase provide an executed assignment from the Buyer to Seller. Seller shall pay any necessary recording costs in connection with recording such reassignment.

## ARTICLE 8 - WHOLE LOAN SALE COOPERATION

Section 8.1    <u>Transfers of Purchased Loans; Whole Loan Sale Cooperation</u>.

8.1.1    Buyer is permitted to transfer ownership of purchased Loans pursuant to Section 4.6 of the Framework Agreement.  If such a transfer is made, such Loans shall be charged the same Servicing Fees as were being charged to Buyer immediately prior to such transfer.  With respect to each transfer of purchased Loans, Seller:

(a)    shall cooperate with Buyer and any prospective purchaser with respect to all reasonable requests and due diligence procedures and with respect to the preparation (including, but not limited to, the endorsement, delivery, assignment, and execution) of the related Loan Documents and other related documents and Security Instruments, each at Buyer's sole expense; and

(b)    shall execute an assignment, assumption and recognition agreement as reasonably mutually agreed upon between the Parties at the time of such transfer with Buyer and Buyer's assignee pursuant to which Buyer's assignee shall have agreed to assume Buyer's obligations under the Servicing Agreement (in a form satisfactory to Servicer) or to have entered into a separate servicing agreement on essentially the same material terms with Servicer with respect to the applicable purchased Loans, which purchased Loans will be assigned subject to the restatement by Seller of the representations and warranties set forth in set forth in <u>Section 4.1</u> and <u>5.1</u> and shall cooperate with all reasonable requests made by Buyer to effect any such assignment, assumption and recognition agreements provided, that Seller shall not be required to make any of the representation and warranties set forth in <u>Section 5.1</u> as of the date of such agreement if Seller reasonably determines that it cannot accurately make such representation or warranty as of such date due to any actual or threatened proceeding or other action by any Governmental Authority or due to the performance of the purchased Loans.  In addition, Seller shall (to the extent it can do so without incurring additional expense or risk) make any customary representations or warranties or provide (at Buyer's sole expense) any customary and available data, documents or information reasonably requested by Buyer.

(c)    shall permit any prospective assignees of Buyer (other than Competitors) that are Accredited Investors and that have entered into a commitment to purchase any of the purchased Loans to reasonably review Seller's servicing operations, upon reasonable prior notice to Seller, and Seller shall cooperate with such reasonable review to the extent such prospective assignees request information or documents that are available and can be produced without unreasonable expense or effort.  Seller may require that such prospective assignees sign a confidentiality agreement with respect to such information disclosed to the prospective assignee which is not available to the public at large and a release and indemnity agreement with respect to its activities on Seller's premises. Buyer shall be responsible for all reasonable out of pocket expenses of Seller or its Affiliates in connection with such review.

In connection with each whole loan sale, Buyer shall pay, or cause to be paid, to Seller the amount of reasonable out-of-pocket expenses incurred by Seller in connection with such whole loan sale.

8.1.2    In connection with any such sale of purchased Loans, Seller agrees that Buyer may assign the representations and warranties made by Seller to Buyer along with any accompanying remedies under this Agreement to the buyer in any whole loan sale pursuant to this Section 8.1.

8.1.3    Additionally, upon written request, in connection with any sale of Loans pursuant to this Section 8.1, Seller shall represent that as of the transfer of ownership of Loans, the terms covenants and conditions of such Loans have not been waived, altered, impaired, modified or amended in any respect, except as otherwise allowed under the Accepted Servicing Practices or as previously disclosed in a written document, which document has been included in the related Loan Documents delivered to the Custodian prior to such date.

8.1.4    Any transfer of ownership of a Purchased Loan shall require written notification, which may be in electronic form, to Seller.

8.1.5    For the avoidance of doubt, the provisions of this Section 8.1 shall apply to any transfers of purchased Loans to direct or indirect equity owners of Buyer (such Loans, "Equity Owner Transferred Loans") and sales of Equity Owner Transferred Loans by such equity owners.

## ARTICLE 9 - SECURITIZATION, COOPERATION

Section 9.1    Transfers of Loans and related Loan Documents and Security Instruments; Securitization Cooperation.

9.1.1    Seller acknowledges and agrees that Buyer may structure securitizations of the Loans and related Loan Documents without Seller's consent.  In connection with any such securitization, Seller agrees to negotiate in good faith the terms and conditions of each securitization, which terms and conditions, shall enable sales of the Loans and related Loan Documents from Buyer and/or any depositor in connection with such securitization, assignment to such applicable securitization vehicle of the representations and warranties made by Seller under this Agreement, and the servicing of such Loans and related Loan Documents in such securitization

3822162v.12 013580.0126

by Servicer.  In connection with any such transfer of Loan Documents, provision shall be made for the transfer of the related Security Instruments.

9.1.2    Any such securitization shall be subject to the conditions and requirements included in Seller's agreements with Originators, as applicable; provided that Seller shall not be required to make any loan-level representations and warranties with respect to the Loans and related Loan Documents other than the representations and warranties specified in Section 5.1 hereto or representations substantially similar thereto, provided that no additional loan-level representations are required to be made as of any date other than the applicable Closing Date.

9.1.3    In connection with any securitization transaction of Buyer, Seller shall:

(a)    cooperate with respect to all reasonable requests and reasonable due diligence procedures, including, without limitation, participating in meetings with rating agencies, underwriters and placement agents and such other parties as Buyer shall designate.

(b)    deliver to Buyer or to any person designated by Buyer (including, without limitation, for inclusion in any prospectus or other offering material) (i) such information regarding Seller, Loan delinquency, collection experience and such other information regarding the Loans as is reasonable and customarily provided to purchasers or investors in the applicable securitization or financing transaction or as is reasonably requested by Buyer, (ii) such statements and audit letters of reputable certified public accountants pertaining to information provided by Seller and such opinions of counsel (including 10b-5 opinions) as are, in each case, customarily delivered by the originator and servicers and reasonably determined by Buyer or any other person to be necessary in connection with the applicable securitization transaction and (iii) such other information or documents as may be necessary for the purposes of compliance with the Securities Act, the Exchange Act and the rules and regulations of the SEC thereunder (or provision in a private offering of disclosure comparable to that required under the foregoing);

(c)    deliver a loan representation and indemnity agreement relating to parts of the securitization prospectus or other offering material;

(d)    deliver a reconstitution agreement with respect to (i) the representations and warranties previously provided as of the applicable Closing Date relating to the Loans and related Loan Documents in the securitization, provided that Seller shall not be required to make any loan-level representations and warranties with respect to the Loans and related Loan Documents other than the representations and warranties specified in Section 5.1 hereto, and (ii) such other representations and warranties as may reasonably be required by underwriters, placement agents, initial purchasers or rating agencies in connection with any such securitization; provided further that Seller shall have no obligation to make any representation or warranty that (A) Seller does not believe to be true and correct, (B) does not speak as of a date no later than the date on which it is made, or (c) solely with respect to the other representations and warranties to be made pursuant to clause (ii) above, the truth and correctness of which cannot be objectively verified by Seller through the use of commercially reasonable means; and

(e)      indemnify the applicable parties to the securitization for material misstatements or omissions contained in or with respect to information and documents delivered under clause (b), (c) or (d).

9.1.4      In connection with a securitization transaction:

(a)      Seller, Buyer and Buyer's assignee shall execute an assignment, assumption and recognition agreement as reasonably mutually agreed upon between the Parties and Buyer's assignee shall have agreed to assume Buyer's obligations under this Agreement and the Servicing Agreement (in a form satisfactory to Servicer) or have entered into a separate servicing agreement on essentially the same material terms with Servicer with respect to the applicable Loan and related Loan Documents, which Loan and related Loan Documents will be assigned subject to the restatement by Seller of the representations and warranties set forth in Section 4.1 and 5.1 with respect to the Loan and related Loan Documents and Seller and shall cooperate with all reasonable requests made by Buyer to effect any such assignment, assumption and recognition agreements provided, that Seller shall not be required to make any of the representation and warranties set forth in Section 4.1 as of the date of such agreement if Seller reasonably determines that it cannot accurately make such representation or warranty as of such date due to any actual or threatened proceeding or other action by any Governmental Authority or due to the performance of the Loan and related Loan Documents;

(b)      Seller shall provide to any master servicer or trustee, as applicable, any rating agency and/or Buyer any and all related Data Files, available information regarding the Loan and related Loan Documents and any reasonable and customary documentation otherwise required to be provided (e.g. loan delinquency and loss experience for the Loan and related Loan Documents to be included in the securitization transaction), which will be at Buyer's sole expense;

(c)      Seller shall deliver to Buyer and to any Person designated by Buyer, at Buyer's sole expense, such statements and audit or agreed upon procedures, letters of reputable, certified public accountants pertaining to information provided by Seller pursuant to clause (b) above as shall be reasonably requested by Buyer (for the avoidance of doubt, Seller may, at its discretion, engage its regular vendors and service provides (including its outside counsel and registered public accounting firm) that provide these service to Seller and its Affiliates));

(d)      Seller shall cooperate with all reasonable requests of any rating agency to provide information in connection with the rating, to conduct an originator review and otherwise review its operations, loan performance, written policies and procedures, management, performance, infrastructure, technology, and compliance with Applicable Laws;

(e)      Seller shall cooperate with Buyer and each other party to the securitization transaction and provide all other assistance reasonably requested by Buyer in connection with the securitization transaction including, but not limited to, the certifications, legal opinions and negative assurance letters (which may be, at Seller's sole discretion, from Seller's or its Affiliates' regular securitization counsel) and other information reasonably requested by Buyer and each other party to the securitization transaction, including as may be required to comply with the laws, rules, regulations and customary disclosures applicable to securitization transactions. For the avoidance of doubt, all costs and expenses incurred by Seller (or its Affiliates) in connection

3822162v.12 013580.0126

with any securitization transaction pursuant to this Section 9.1 (including, without limitation, any expenses of counsel or registered independent accounting firms engaged by Seller or its Affiliates), shall be promptly paid by Buyer as incurred and shall be the sole responsibility of Buyer and shall be paid regardless of whether the securitization transaction closes;

(f)     Seller shall cooperate with all reasonable requests of any rating agency to the extent required by such rating agency as a condition of issuing its rating for such securitization transaction, so long as Seller can do so without incurring additional burden or expense; any such expense shall be paid promptly by Buyer; and

9.1.5     In connection with each such securitization transaction Buyer shall pay or cause to be paid to Seller the amount of reasonable out-of-pocket expenses incurred by Seller in connection with such securitization transaction.

9.1.6     In the event that Seller or an Affiliate thereof has an effective shelf registration statement for securitizations of loans such as the Loans and related Loan Documents, prior to Buyer securitizing any loans purchased under this Agreement, Buyer shall enter into good faith discussions regarding securitization of such Loans and related Loan Documents pursuant to Seller's or its Affiliate's shelf registration statement.

9.1.7     Buyer shall have the right to contribute Loans to any securitization for which Seller or an Affiliate acts as sponsor, as provided in the Framework Agreement.

## ARTICLE 10 - AS-IS SALE; RELEASE; INDEMNIFICATION

Section 10.1   **Seller's Indemnification.**

Subject to the limits on indemnification set forth in Section 10.4, each of Seller and Parent, jointly and severally, hereby agrees to indemnify, defend and hold harmless Buyer and its Affiliates and their respective successors and assigns, trustees, beneficiaries, officers, directors, agents, employees, members, managers, stockholders, limited and general partners and representatives (hereinafter collectively referred to as the "Indemnified Buyer Parties"), from and against, and agrees promptly to pay on demand or reimburse each of them with respect to, any and all liability, damages, costs or expenses, including reasonable out-of-pocket legal fees and expenses, for any third party claim or demand, including, without limitation, any fees or penalties assessed by a Governmental Authority ("Damages") arising out of or related to (i) any willful act or omission that violates the terms of this Agreement or any negligent act or omission of any of the Indemnified Seller Parties or their service providers in connection with this Agreement or any Loan, (ii) the material breach of any covenant or agreement of Seller or the incorrectness or inaccuracy of any representation or warranty of Seller contained in this Agreement, or any other instrument or document executed by Seller in connection herewith, (iii) the exercise by Buyer of any rights or remedies under this Agreement as a result of a breach by Seller of any provision of this Agreement; (iv) any theft or misappropriation of funds by any of the Indemnified Seller Parties or any party acting on its behalf, (v) fraud committed by any of the Indemnified Seller Parties or their service providers, or (vi) any litigation, proceeding or investigation initiated by a Borrower or any third party or by any governmental authority asserting a violation of Applicable Law by any of the Indemnified Seller Parties, their service providers or the Bank or any Originator.  The

3822162v.12 013580.0126

provisions of this Section 10.1 shall survive the full payment, performance, and discharge of the obligations of Seller hereunder and the termination of this Agreement, and shall continue thereafter in full force and effect.

Notwithstanding anything herein to the contrary, Buyer shall bear the risk of credit loss on any purchased Loans, and the foregoing indemnity does not apply to credit losses on the purchased Loans.

Section 10.2    Buyer's Indemnification.  Subject to the limits on indemnification set forth in Section 10.4, Buyer hereby agrees to indemnify, defend and hold harmless Seller and its Affiliates and their respective successors and assigns, trustees, officers, directors, agents, employees and representatives (hereinafter collectively referred to as the "Indemnified Seller Parties") from and against, and agrees promptly to pay on demand or reimburse each of them with respect to, all Damages incurred by such Indemnified Seller Party by reason of (i) the material breach of any covenant or agreement set forth herein or the incorrectness or inaccuracy of any representation or warranty of Buyer contained in this Agreement or (ii) such Indemnified Seller Party's cooperation with a Financing or Buyer's acts or omissions in connection with a Financing. The provisions of this Section 10.2 shall survive the full payment, performance, and discharge of the obligations of Buyer hereunder and the termination of this Agreement, and shall continue thereafter in full force and effect.

Section 10.3    Reserved.

Section 10.4    Limits on Indemnification.  Any provision of this Article 10 to the contrary notwithstanding, (i) Seller shall not be obligated to indemnify, defend and hold Buyer harmless with respect to Damages that result from any breach of a representation or warranty in Section 4.1 with respect to a Purchased Loan if Seller repurchases such Purchased Loan pursuant to Section 5.1; (ii) neither Party shall be obligated to indemnify, defend or hold any other Person harmless under this Article 10 from and against any Damages to the extent such Damages result from such other Person's gross negligence, bad faith or willful misconduct and (iii) no indemnification is provided by any Party hereunder in relation to any actual or purported lost profits, costs of cover or other special damages, or any punitive, exemplary, remote, consequential, incidental or indirect damages of any Indemnified Party.]

Section 10.5    Notice of Claims.  A Person seeking indemnification under this Article 9 (the "Indemnified Party") shall give prompt written notice to the Party from which indemnification is sought (the "Indemnifying Party") of any claim for Damages for which it may seek indemnity; provided, however, that the failure of the Indemnified Party to give timely notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Article 10, except to the extent the Indemnifying Party is materially prejudiced thereby.  From and after receipt of notice of a claim for Damages pursuant to this Section 10.5, the Indemnifying Party shall have the right, exercisable by written notice to the Indemnified Party within thirty (30) days of receipt of notice of a claim for Damages to assume and conduct the defense of such claim for Damages with counsel selected by the Indemnifying Party.  If the Indemnifying Party has assumed such defense as provided in this Section 10.5, the Indemnifying Party will not be liable for any legal expenses subsequently incurred by any Indemnified Party in connection with the defense of such claim.  In the event that the Indemnifying Party elects to assume the defense of a claim for Damages as

3822162v12 013580.0126

contemplated herein, the Indemnified Party shall be entitled to participate in (but not control) the defense of such claim and to employ counsel of its choice for such purpose at its sole expense, provided, however, that such defense will be at the sole expense of the Indemnifying Party if (i) the Indemnifying Party has agreed in writing to pay such fees and expenses, or (ii) the named parties to any such action, suit or Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and the Indemnified Party has been advised by its counsel that (a) there may be one or more legal defenses available to it which are different from, additional to or in conflict with those available to the Indemnifying Party and in the reasonable judgment of such counsel it is advisable for such Indemnified Party to employ separate counsel in connection with the claim or (b) representation of the Indemnifying Party and the Indemnified Party by the same counsel would be inappropriate under applicable standards of professional conduct (whether or not such representation by the same counsel has been proposed) due to actual or potential differing interests between them; and, in any such case the Indemnifying Party shall not have the right to assume the defense of such action, suit or Proceeding on behalf of the Indemnified Party.  If the Indemnifying Party does not assume the defense of any claim for Damages in accordance with this Section 10.5 or is prohibited from doing so in accordance with clause (ii) of the previous sentence, the Indemnified Party may continue to defend such claim at the sole cost and expense of the Indemnifying Party (subject to the limitations set forth in this Section 10.5) and the Indemnifying Party may still participate in, but not control, the defense of such claim for Damages at the Indemnifying Party's sole cost and expense.  In the event that the Indemnified Party assumes the defense of a claim for Damages in accordance with this Section 10.5, the Indemnified Party will not consent to a settlement, compromise or discharge of, or the entry of any judgment arising from, any such claim for Damages, without the prior written consent of the Indemnifying Party (such consent not to be unreasonably withheld, conditioned or delayed). In the event that the Indemnifying Party elects to assume the defense of a claim for Damages in accordance with this Section 10.5, the Indemnifying Party shall not, without the prior written consent of the Indemnified Party (such consent not to be unreasonably withheld, conditioned or delayed), consent to a settlement, compromise or discharge of, or the entry of any judgment arising from, any claim for Damages, unless such settlement, compromise, discharge or entry of any judgment (i) does not impose any non-monetary obligations on the Indemnified Party, (ii) is paid in full by the Indemnifying Party, (iii) does not include an admission of fault or any findings of fact against or admissions by the Indemnified Party and (iv) includes an unconditional release of the Indemnified Party from further liability.  In any such claim for Damages, the party responsible for the defense of such claim hereunder shall, to the extent reasonably requested by the other applicable Parties, keep such other applicable Parties informed as to the status of such claim, including all settlement negotiations and offers.

## ARTICLE 11 - CONFIDENTIALITY

Section 11.1   Disclosure of Confidential Information.  From time to time, in connection with the transactions contemplated by this Agreement, one Party may disclose Confidential Information to another Party, whether in writing, orally or by allowing inspection of tangible objects (i.e., documents, tapes, disks, prototypes, samples, plants or equipment).  The Parties agree that the provisions with respect to confidential information included in the Framework Agreement shall apply to confidential information provided by one Party to the other Party under this Agreement.

3822162v.12 013580.0126

## ARTICLE 12 - MISCELLANEOUS

Section 12.1    Equal Employment Opportunity.  During the performance of this Agreement, Seller agrees that it shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, national origin or mental or physical disability. Seller shall ensure that applicants are employed and that employees are treated during employment without regard to their race, color, religion, sex, national origin, or mental or physical disability. Such actions shall include, but not be limited to the following: employment upgrading, demotion or transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation and selection for training, including apprenticeship.

Section 12.2    Notices.  All demands, notices and communications under this Agreement shall be in writing and shall be deemed to have been duly given if (i) mailed by registered or certified mail, return receipt requested or by overnight delivery service, addressed to the appropriate Party hereto at the addresses set forth below or (ii) transmitted by electronic mail with acknowledgment, to the appropriate Party hereto at the address provided by the other Party to this Agreement.

> If to Seller:
>
> PS Funding, Inc.
> 2121 Park Place, Suite #250
> El Segundo, California 90245
> Attn: Legal Department
> Email: legal@peerstreet.com
>
> If to Buyer:
>
> PS Funding Trust 1004
> c/o Colchis Capital Management L.P.
> 150 California Street, 18th Floor
> San Francisco, California 94111
> Attn: Thomas Moore
> Email: TMoore@colchiscapital.com
>
> With a copy to:
>
> Moses & Singer LLP
> 405 Lexington Avenue
> New York, New York 10174
> Attn: Robert M. Friedman, Esq.
> Email: Rfriedman@mosessinger.com

Any such demand, notice or communication shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced by the date noted on the return receipt or overnight delivery receipt or other evidence of receipt).  Each Party covenants

3822162v.12 013580.0126

that it shall not disseminate the other Party's notice information to any third party without the prior consent of the affected Party.  No notice of termination shall impair the rights or priorities of any party created or acquired prior to the receipt of such notice.  Either Party may change its address for purposes of this Section 12.2 upon delivery to the other Party of a notice of a change of address in the manner provided for notices hereunder.

Section 12.3    Attorneys' Fees.  The prevailing Party in any action or proceeding to interpret or enforce this Agreement and/or any Loan Purchase Certificate, or the terms of either, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing Party or Parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

Section 12.4    Authority.  With the intent to be legally bound, each of the undersigned hereby covenants and acknowledges that he, she, or it (a) has read each of the terms set forth herein, (b) has the authority to execute this Agreement for such person or entity, and (c) expressly consents and agrees that the person or entity upon behalf of which the undersigned is acting, shall be bound by all terms and conditions contained herein.

Section 12.5    Successors and Assigns and Sale of Loans.  The provisions of this Agreement shall be binding upon and inure to the benefit of, each of the Parties hereto, and their respective successors in interest, assigns, heirs, and personal representatives.  This Agreement may not be assigned by either Party without the prior written consent of the other Party, which consent may be granted or withheld in such other Party's sole and absolute discretion; provided, however, that Buyer shall have the right to assign this Agreement without Seller's consent to any entity controlled by, controlling or under common control with Buyer.  Sale of Loans and/or participation interests in Loans from Buyer to third parties is expressly prohibited.  Both Parties agree that all Loans are to be held by Buyer until payment in full and complete liquidation of Buyer's interest in such Loan(s) and such covenant shall survive the termination of this Agreement.

Section 12.6    Severability.  If any provision of this Agreement and/or any Loan Purchase Certificate shall be determined to be invalid, illegal, or unenforceable, the balance of this Agreement and such Loan Purchase Certificate shall remain in full force and effect, and if any provision is inapplicable to any person of circumstance, it shall nevertheless remain applicable to all other Persons and circumstances.

Section 12.7    Investments.

12.7.1    Seller acknowledges and agrees that Buyer and its Affiliates currently may be invested in, may invest in or consider investments in companies held by or that compete either directly or indirectly with Seller and that this Agreement shall in no way be construed to prohibit or restrict Buyer's or any of its Affiliates' ability to maintain, make or consider such investments.

12.7.2    Buyer acknowledges and agrees that Seller and its Affiliates currently may be invested in, may invest in or consider investments in companies held by or that compete

either directly or indirectly with Buyer and that the execution of this Agreement shall in no way be construed to prohibit or restrict Seller's or any of its Affiliates' ability to maintain, make or consider such investments.

Section 12.8    Standard Agreements.    Notwithstanding anything contrary in this Agreement, neither Buyer nor its Affiliates shall be required to agree to any terms in a browser-wrap, click-wrap, shrink-wrap, click-through or terms of use agreement governing the use of any company platform or website (each, a "Standard Agreement" and, collectively, the "Standard Agreements") that conflict, or are inconsistent with, or diminish the rights of Buyer or its Affiliates under the Servicing Agreement, the Framework Agreement, the Program Agreement, this Agreement or otherwise (including, without limitation, restrictions on use, revocability, termination of agreement, modification of terms, assessment of a fee for use of any company platform or website, restrictions on the right or ability of Buyer its Affiliates, directly or indirectly, to conduct any form of business itself or with any third party or supersession by any of such Standard Agreements of any of the aforementioned agreements), and none of such terms (including any that may have been agreed to or accepted prior to the date of this Agreement) shall have any binding effect on Buyer or any of its Affiliates or supersede this Agreement.

Section 12.9    Change of Control.    Seller and Buyer agree that a Change of Control of Seller or Parent shall not terminate this Agreement or in any way modify Seller's obligations under this Agreement and Seller, or the surviving entity following such Change of Control, if it is not Seller, shall remain fully obligated to fulfill the terms of this Agreement.    Any surviving entity following the Change of Control of Parent shall be responsible for ensuring full performance of this Agreement by Seller and its Affiliates and such undertaking shall be a condition of any Change of Control.

Section 12.10    Headings; Exhibits; Loan Purchase Certificate.    The article, section and paragraph headings set forth in this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.    The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.    The terms and conditions set forth in the related Loan Purchase Certificate between Buyer and Seller with respect to each Closing Date shall be incorporated herein.    With respect to the sale and purchase of the Loan or pool of Loans on each Closing Date, in the event of any conflict between the terms of this Agreement and the related Loan Purchase Certificate, the related Loan Purchase Certificate shall control with respect to such Loan or pool of Loans.

Section 12.11    Time.    Time is, and shall be, of the essence of each and every provision of this Agreement.

Section 12.12    Governing Law; Jurisdiction; Waiver of Jury Trial.    THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF CALIFORNIA.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.    BUYER AND SELLER IRREVOCABLY (I) SUBMIT TO THE EXCLUSIVE

3822162v12 013580.0126

JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA FOR THE PURPOSE OF ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT; (II) WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT; (III) AGREE THAT A FINAL JUDGMENT IN ANY ACTION OR PROCEEDING IN ANY SUCH COURT SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (IV) CONSENT TO SERVICE OF PROCESS UPON IT BY MAILING A COPY THEREOF BY CERTIFIED MAIL ADDRESSED TO IT AS PROVIDED FOR NOTICES HEREUNDER. SELLER AND BUYER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 12.13 <u>Arbitration</u>.  Any dispute under this Agreement shall be resolved in an arbitration proceeding as provided in the Framework Agreement.

Section 12.14 <u>Neutral Interpretation</u>.  This Agreement and each Loan Purchase Certificate are the product of negotiations of the Parties, and in the enforcement or interpretation hereof and thereof are to be enforced and interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any Party by reason of that Party having drafted, or caused to be drafted, this Agreement and/or any Loan Purchase Certificate, or any portion of either, shall not be effective in regard to the interpretation hereof or thereof.

Section 12.15 <u>Entire Agreement</u>.  This Agreement, the Program Documents and each Loan Purchase Certificate, and any documents attached as exhibits or executed in connection herewith or therewith, constitute the Parties' entire and final agreement with respect to the subject matter hereof and thereof, and supersede all agreements, representations, warranties, statements, promises, and understandings, whether oral or written, with respect to the subject matter herewith. Neither this Agreement, the Program Documents, nor any Loan Purchase Certificate may be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties, and there are no (and shall be no) unwritten oral agreements between the Parties. The Parties make no representations or warranties to each other, except as contained in this Agreement or in the accompanying exhibits or the certificates or other Closing documents delivered according to this Agreement. Neither this Agreement, the Program Documents, nor any Loan Purchase Certificate may be changed, waived, discharged, or terminated orally, but only by an instrument in writing signed by the Party against which enforcement of such change, waiver, discharge, or termination is sought.

Section 12.16 <u>Counterparts</u>.  This Agreement and each Loan Purchase Certificate may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Electronic signatures may be accepted as original signatures.

Section 12.17 <u>Further Assurance and Acts</u>.  From time to time, Seller shall (i) execute and deliver to Buyer such additional documents, (ii) provide such additional information to Buyer and (iii) do such further acts, as Buyer may reasonably require to effectuate the intent and purposes of,

3822162v12 013580.0126

and to carry out the terms of, this Agreement, each Loan Purchase Certificate and all Loan Documents and any agreements executed in connection herewith or therewith, which further acts may include without limitation, reasonably cooperating with Buyer to ensure that Buyer is named, promptly following the Closing Date for any particular Loan, (a) as the loss payee on each such Borrower's casualty insurance policy required by the Loan Documents for such Loan, and (b) an "additional insured" on each such Borrower's liability insurance policies required by the Loan Documents for such Loan.

Section 12.18  <u>Relationships of Seller and Buyer</u>.  The relationship between Seller and Buyer created under this Agreement shall be as seller and buyer.  Seller and Buyer are not partners or joint venturers, and neither Party shall act as agent for the other.  Except for the transactions described in this Agreement, Seller has no business or other relationship with Buyer and is not engaged in Buyer's business or other activities.

Section 12.19  Intentionally Omitted.

Section 12.20  <u>Amendment; Waiver</u>. Except as otherwise expressly provided herein, the Parties may amend this Agreement, from time to time, only in writing, signed by duly authorized officers of each Party.  No waiver of any provision of this Agreement, nor consent to any departure by any Party therefrom, shall be effective unless the same shall be in writing and signed by a duly authorized officer of the Party to be charged with the waiver or consent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

[SIGNATURE PAGE FOLLOWS]

3922162v12 013580.0126

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

BUYER:

PS FUNDING TRUST 1004,
solely with respect to Series 1

By: Colchis Capital Management, L.P.,
     its Administrator

By: _____
Name:   Edward Conrads
Title:    President


SELLER:

PS FUNDING, INC.,
a Delaware corporation

By: _____
Name: Brewster Johnson
Title:  CEO


[Signature Page to Master Loan Sale Agreement]

EXHIBIT A

<u>FORM OF LOAN PURCHASE CERTIFICATE</u>

<u>LOAN PURCHASE CERTIFICATE</u>

THIS LOAN PURCHASE CERTIFICATE (this "<u>Loan Purchase Certificate</u>") is entered into by and between _____, a _____ ("<u>Buyer</u>") and _____, a _____ ("<u>Seller</u>"), and is executed pursuant to and in accordance with the terms of that certain Master Loan Sale Agreement (with Loan Purchase Certificates) dated as of _____ ___, 20__ ("<u>Master Agreement</u>").  All capitalized terms used but not otherwise defined herein shall have the meaning afforded to such terms under the Master Agreement.

The rights and obligations of the Parties to this Loan Purchase Certificate are governed by the Master Agreement, which (i) is fully incorporated herein by reference as if set forth in full herein and (ii) shall govern the sale by Seller to Buyer of the Loans described in this Loan Purchase Certificate below.

Seller does hereby agree to sell, assign, set over and otherwise convey, and Buyer does hereby agree to purchase from Seller, all of Seller's right, title and interest to the Loans identified on <u>Schedule "1"</u> hereto, for a price equal to the Purchase Price set forth on <u>Schedule "1"</u> hereto.

Loan Purchase Certificate Date: _____ ___, 20__

Description of Loans and Purchase Price:   See <u>Schedule "1"</u> attached to this Loan Purchase Certificate, which is incorporated herein and into the Master Agreement by reference.

Qualification of Seller's Representations, Warranties and Covenants:  The representations, warranties and covenants being made by Seller in the Master Agreement are hereby qualified, but only as and to the extent expressly set forth, if at all, on <u>Schedule "2"</u> attached hereto, which is incorporated herein and into the Master Agreement by reference.

[SIGNATURE PAGE FOLLOWS]

Exhibit "A"

IN WITNESS WHEREOF, the parties hereto have executed this Loan Purchase Certificate as of the Loan Purchase Certificate Date set forth above.

SELLER:                                              BUYER:

_____,        _____,

a(n) _____        a(n) _____

By: _____        By: _____

    Name: _____        Name: _____

    Title: _____        Title: _____

Exhibit "A"

## SCHEDULE 1
## TO LOAN PURCHASE CERTIFICATE

[see attached]

3822162v9 013580.0126
3822162v12 013580.0126

SCHEDULE 2
TO LOAN PURCHASE CERTIFICATE

QUALIFICATION OF
SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

IF AND TO THE EXTENT ANY OF THE REPRESENTATIONS, WARRANTIES AND COVENANTS BEING MADE BY SELLER UNDER ARTICLE 4 OF THE MASTER AGREEMENT ARE NOT TRUE AND CORRECT IN ALL MATERIAL RESPECTS AS OF THE DATE OF THIS LOAN PURCHASE CERTIFICATE AND AS OF THE CLOSING DATE FOR THE LOANS IDENTIFIED IN THIS LOAN PURCHASE CERTIFICATE, THEN SPECIFICALLY IDENTIFY (BY SECTION NUMBER OF THE MASTER AGREEMENT) THE EXTENT TO WHICH SUCH REPRESENTATIONS, WARRANTIES AND COVENANTS ARE NOT TRUE AND CORRECT IN ALL MATERIAL RESPECTS.

(See Article 4 of the Master Agreement)

☐    None.

OR

Section            Exception

[_____]    _____

[_____]    _____

[_____]    _____

[_____]    _____

[_____]    _____

[_____]    _____

[_____]    _____

[_____]    _____

Material Disclosures

☐    None.

OR

_____
_____

Exhibit "A"

EXHIBIT B

<u>ALLONGE</u>

      This Allonge is affixed to, and is hereby made a part of, that certain ___[Promissory Note]___, dated _____, 20___, in the original principal amount of $_____.00 ("<u>Note</u>"), made by _____, for the benefit of _____, a _____ ("<u>Assignor</u>"), and evidences the endorsement of the Note by Assignor as provided in that certain Master Loan Sale Agreement, dated _____, 20___, by and between Assignor and the endorsee hereon, to wit:

      The Note is hereby made PAYABLE TO THE ORDER OF [_____], at [_____].

Dated: _____, 201__     ASSIGNOR:

                         _____,

                     a _____

                     By:  _____

                           Name: _____

                           Title: _____

Exhibit "B"

EXHIBIT C

## FORM OF ASSIGNMENT OF DEED OF TRUST/MORTGAGE AND OTHER LOAN DOCUMENTS

RECORDING REQUESTED BY:

_____
_____

WHEN RECORDED RETURN TO:

_____
_____
_____

APN:  _____

_____

## ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT AND OTHER LOAN DOCUMENTS]

This ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT AND OTHER LOAN DOCUMENTS] ("Assignment") is made this \_\_\_\_ day of _____, 201\_\_, by _____, a _____ ("Assignor"), to _____, a _____ ("Assignee").

FOR VALUE RECEIVED, Assignor hereby sells, grants, assigns, and transfers to Assignee any and all of its right, title and interest in and to that certain [Security Instrument]\_\_, dated _____, made by _____, for the benefit of Assignor ("Security Instrument"), and recorded on _____, in the Official Records of _____ County, [_____], as Instrument Number _____, and as a lien on that certain real property described on Exhibit A, attached hereto and made a part hereof.

FURTHER, Assignor hereby grants, assigns, and transfers to Assignee any and all of its right, title and interest in and to any and all loan documents related to the Security Instrument, including, without limitation, any notes, allonges, loan agreements, guarantees, and title policies.

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon with interest, and all rights accrued or to accrue under the foregoing Security Instrument.

*[Signature On Following Page]*

Exhibit "C"

IN WITNESS WHEREOF, this Assignment is made to be effective as of the date first above written.

ASSIGNOR:

_____,
a _____

By: _____

    Name: _____

    Title: _____

Exhibit "C"

ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF [_____]                                    )
                                                       )   ss
COUNTY OF _____                         )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of [_____] that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Notary Public

Exhibit "C"

EXHIBIT A TO
ASSIGNMENT OF [DEED OF TRUST/MORTGAGE/DEED TO SECURE DEBT AND
OTHER LOAN DOCUMENTS]
LEGAL DESCRIPTION OF PROPERTY

[To Be Inserted Prior To Recordation]

Exhibit "C"

## EXHIBIT D

## LOAN DOCUMENTS

1. The original Note bearing all intervening endorsements;
2. The original Security Instrument with evidence of recording thereon or a copy of the Security Instrument certified by the related Title Company;
3. Any guarantee made in connection with the Note (if applicable);
4. Any assumption, modification, consolidation or extension agreements;
5. Any intervening assignments of mortgage with evidence of recording thereon or copies certified by the related Title Company; and
6. The title insurance policy or attorney's opinion of title and abstract of title.

Exhibit "D"

EXHIBIT E

FORM OF BORROWER NOTICE LETTER

[Current Servicer]
[Address]
[City, State, Zip]

    [Date]
    [Borrower]
    [Address]
    [City, State Zip]

Re: Notice of Assignment, Sale or Transfer of Servicing Rights
Our Reference: [Acct. No. /Borrower Name]

Please be advised that effective [Transfer Date], servicing of your loan will be transferred from [Current Servicer] to [New Servicer].

This transfer of the servicing does not affect any of the terms or conditions of your mortgage documents other than terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present Servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new Servicer must also send you this notice no later than 15 days after the effective date or at closing.

If you have any questions relating to the transfer of servicing from your present servicer, please call [Current Servicer Phone Number] between [___AM and ____PM] Monday through Friday.

Your new Servicer will be [New Servicer] The business address for your new Servicer is:

| CORRESPONDENCE | PAYMENTS |
|---|---|
| [New Servicer] | [New Servicer] |
| [Address] | [Address] |
| [City, State Zip] | [City, State Zip] |

If you have any questions relating to the transfer of servicing to [New Servicer], call [Current Servicer Phone Number] between [___AM and ____PM] Monday through Friday.

Your present Servicer will continue accepting payments from you through [Transfer Date Your new Servicer, [New Servicer], will begin accepting payments from you after [Transfer Date].  Send all payments due on or after that date to your new Servicer.

Exhibit "E"

You should also be aware of the following information, which is set out in more detail Section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2605):

> During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old Servicer before its due date may not be treated by the new loan Servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. section 2605) gives you certain consumer rights. If you send a "qualified written request" to your loan Servicer concerning the servicing of your loan, your Servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the Servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan, it must be sent to:

> New Servicer]
> [Address]
> [City, State Zip]

Not later than 60 Business Days after receiving your request, your Servicer must make any appropriate corrections to your account, and, must provide you with a written clarification regarding any dispute. During this 60-business day period, your Servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the Servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

A Business Day is a day on which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where Servicers are shown to have violated the requirements of that section. You should seek legal advice if you believe your rights have been violated.

Sincerely,

[Current Service]

EXHIBIT F

ELIGIBLE LOAN PARAMETERS

Buyer and Seller agree to transact whole loan sales with the following eligibility parameters:

| | |
|---|---|
| Max LTV/LTARV for non-judicial foreclosure states | 75.0% |
| Max LTV/LTARV for judicial foreclosure states | 75.0% |
| Max Loan Amount | $1.5 million |
| Minimum Net Investor Yield | 7.25% |

EXHIBIT G

SERVICING AND ASSET MANAGEMENT GUIDELINES

[see attached.]

## SCHEDULE 1

## PREVIOUS ADDRESSES

Peer Street, Inc.
300 Manhattan Beach Blvd., Suite #205
Manhattan Beach, CA 90266