

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (LSS) |
| Debtors. | (Joint Administration Requested) |
| | Ref. Docket Nos. 11, 18, 31, 169, 257 & 266 |

### INDEPENDENT OMNIBUS SUR-REPLY TO OBJECTIONS TO BIDDING PROCEDURES AND CASH MANAGEMENT MOTIONS: <u>DOCKET NUMBERS 11 AND 18</u>

I, Michael Ball, as a pro se individual retail investor in the Peer Street Mortgage Payment Dependent Notes ("MPDNs") and creditor in the above-referenced Case, hereby submit this Independent Omnibus Sur-Reply to the Debtors' Omnibus Reply to Objections To Bidding Procedures and Cash Management Motions (the "Reply"). In support of this Sur-Reply, I respectfully represent as follows:

### <u>INTRODUCTION</u>

1. The Omnibus Objection of Pacific Funding Trust 1002 and Pacific RBLF Funding Trust (the "Pacific Creditors") comprehensively captures and cogently argues many of the key matters that directly impact retail investors' positions in this bankruptcy.

2. The Debtors' Reply, however, obfuscates these essential points with dozens of pages of background, offering document analysis, and lengthy conflicting interpretations of supporting case law.

3. Given that the Pacific Creditors' sur-reply requires an equally dense response to substantively address each of the key issues, I respectfully felt it would behoove the Court to receive a more straightforward reply solely from a retail creditor point of view.

1

## THE PEER STREET WEBSITE AND PRIVATE PLACMENT MEMORANDUM

4. As highlighted in the Pacific Creditors' Objection, and in many of the letters submitted to the Court, retail investors relied heavily on a March 11, 2019 entry in the FAQ section of the Peer Street website, entitled "What investor protections does PeerStreet have in place?"

5. This post states, in relevant part, that "Investments in loans are held in a bankruptcy-remote entity that is separate from our primary corporate entity. In the unlikely event PeerStreet no longer remains in business, a third-party 'special member' will step in to manage pending loan investments and ensure that investors continue to receive interest and principal payments." A true and correct copy of this post is attached hereto as Exhibit A, and is herein incorporated by reference.

6. In their Reply, the Debtors go to great lengths to emphasize that the MPDNs are "special, limited, unsecured obligations" of Peer Street Funding LLC ("PSFLLC"), as defined in the Private Placement Memorandum ("PPM"), and that the website presents only "non-legal snippets" (*see* Debtors' Reply, Paragraph 54).

7. The PPM, however, provides that in the event of a conflict between the PPM and the website, that "the terms on the PeerStreet Website shall control." (A true and correct copy of this page is attached hereto as Exhibit B, and is herein incorporated by reference). Although this provision specifically refers to the Automated Investing page, it does establish the authority of the website to govern Peer Street's final and most current offering terms.

8. The PPM further fails to mention the existence or authority of a Special Member anywhere in either the 2014 or 2019 versions of the Memorandum. Instead, these provisions are contained exclusively in the limited liability operating agreement for Peer Street Funding LLC

(*see* Debtors' Reply, Paragraph 36), which is a private internal document that retail investors were never made privy to.

9.  It is established, then, that pursuant to the terms and contents of the PPM, the Peer Street website possesses legal authority to set the final offering terms of Peer Street's investments, and that investors had no alternative or additional information regarding the rights, responsibilities, or duties of the Special Member beyond what was communicated in the March 11, 2019 post.

### PEER STREET'S FAILURES AND BREACHES

10. In stating on the website that the Special Member would *"ensure that investors continue to receive interest and principal payments"* (emphasis added), Peer Street failed to exercise reasonable care or competence in describing the actual discretion afforded to the Special Member to, in fact, suspend or eliminate these payments through PSFLLC's voluntary bankruptcy.

11. In further stating on the website that *"Investments in loans are held in a bankruptcy-remote entity"* (emphasis added), Peer Street clearly communicated the commonly understood meaning of this organizational structure — with the obvious intent of conveying the "investor protections" that are promised in the very title of this website post. (*See also* Pacific Creditors' Objection, Paragraphs 11 and 13).

12. The Debtors' claim, in this case, that PSFLLC was never a "bankruptcy proof entity" is not only disingenuous on its face, but relies upon reference to an LLC operating agreement that retail investors never had the opportunity to review (*see* Debtors' Reply, Paragraph 36).

13. By placing PSFLLC into Chapter 11 bankruptcy and suspending payments on its MPDN investments, Peer Street has breached the implied and stated terms of its agreement with investors, as established with legal effect on its website.

3

14. The Debtors' position in their Reply that this fundamental breach is somehow negated by the fact that "the Debtors remain in business and are actively managing their loan portfolio" entirely sidesteps the core issue at hand — which is that investors have been deprived of promised payments since June 26, 2023 (*see* Debtors' Reply, Paragraph 41).

### **INEQUITY OF THE DEBTORS' BID PROCEDURES MOTION**

15. In the Statement of the Official Committee of Unsecured Creditors to the Pacific Creditors' Omnibus Objection to the Debtors' Bid Procedures and Cash Management Motions (the "Creditors' Committee Statement"), counsel notes that retail investors "are highly skeptical of the Debtors' sale process and almost uniformly believe that an alternative restructuring transaction (such as a managed "run off" of the underlying mortgage assets) would improve their recoveries." (*See* Creditors' Committee Statement, Paragraph 2). The uniformity of retail investors' collective assessment owes, in large measure, to the nature and process of how MPDN investments were structured and made.

16. In evaluating each individual loan, MPDN investors considered multiple specific factors, including the borrower's credit score and track record; property loan-to-value ratio; bridge loan vs. rehab strategy; housing market and sub-market; loan repayment timeframe; originator's "skin in the game;" and multiple other key metrics.

17. Because of the favorable loan-to-value ratios (typically in the mid-60% to mid-70% range for most investments), even defaulted mortgages most often deliver a positive return to investors at sale. In fact, as communicated in Peer Street's Q2 2021 quarterly report, "Many loans contain default interest provisions, which increase the interest rate owed by borrowers when defaults occur. For this reason, investors are often compensated for the extended timeline of defaulted loans, earning a median historical annual return premium of 30 to 40 bps above the expected investor rate."

18. This same report further notes that the "median return on all loans that went into foreclosure was 8.2%, with 50% of the 286 loans that went into foreclosure returning at least 0.4% higher than the original expected rate."

19. The Debtors' Bid Procedures Motion now proposes segregating and packaging loans by performance — free and clear of warranties — and conducting a distressed sale to institutional and portfolio-level buyers of mortgages and REO properties. Yet not only would these buyers almost certainly demand discounts to book value even on the best assets (as is common with most any bankruptcy sale), but the Debtors' mortgage pooling scheme would materially and significantly undervalue the nonperforming or defaulted loans that have, on balance, provided **above-expected returns** to MPDN investors over the years.

20. Indeed, granting the Debtors' Bid Procedures Motion in this case would allow the sale of MPDNs at bulk rates unreflective of their current value; would enable buyers to selectively reprice specific notes (for tax reasons or otherwise), resulting in even further inequitable returns; and would effectively negate the original investment terms, promises, and historical performance data upon which retail investors relied in committing their capital.

## ARGUMENT FOR A MANAGED RUN OFF

21. To preserve retail investors' rights to equitable recoveries in each MPDN, and to properly reflect the extensive due diligence conducted on each loan prior to investment, all notes must be treated on an expressly individual basis, and valued at the original sale price, under the original note terms. The only reasonable means by which to fulfill these requirements — as suggested by the Pacific Creditors and dozens of individual investors' letters — is to engage a competent mortgage servicer to manage a loan run-off process.

22. The Debtors dismiss this approach offhand, however, asserting in their Reply that outside of a bulk sale, "there would simply be no other way for those nearly 7,000 investors to determine how to 'service' their nearly 7,000 individual fractional interests." (*See* Debtors' Reply, Paragraph 50). Yet Peer Street's business is hardly so complex that a seasoned operator — many of which with years more experience than Peer Street — could not readily assume all key servicing duties and investor payouts. In this scenario, there would be no need for any of the confusing and conflicting "ownership decisions" contemplated by the Debtors.

23. While the Creditors' Committee Statement rightly notes that "a 'run off' of the loan portfolio will not be free," the fees that Peer Street currently collects from the MPDNs to run its own servicing operations would simply be reallocated in this case to the third-party servicer, plus whatever incremental premium, if and as required.

24. Notwithstanding the net difference in fees, although presently unknown, this solution is virtually certain to provide the highest-yielding return for investors. In fact, it could be reasonably argued that any excess expense should be absorbed by Peer Street Funding, Inc. ("PSFI"), given the false assurances and failures that have improperly and unexpectedly landed retail investors in these Chapter 11 proceedings in the first place.

25. Still, it follows that the Debtors would object to this straightforward approach to making retail investors whole, as these servicing fees are currently financing their bankruptcy process. As the Pacific Creditors observe, "The Debtors are now attempting to use the Cash Management Motion to effectively force PSFLLC to fund a surreptitious DIP Loan to certain of the Debtors with Investors' funds that would otherwise be off limits." (*See* Pacific Creditors' Objection, Paragraph 29).

## CONCLUSION

26. In light of the significant financial harms suffered by retail investors arising from the negligent misrepresentations and breaches by Peer Street, this investor class (inclusive of the Pacific Creditors as MPDN holders) should be given special priority in these Chapter 11 proceedings.

27. In further light of the fundamental conflicts of interest inherent in the Debtors' Bid Procedures and Cash Management Motions, the Court should disallow the proposed bulk sale of MPDNs in asset pools, as well as suspend the forced underwriting of the Debtors' bankruptcy with retail investor funds owed to PSFLLC.

28. Instead, all due principal and interest receipts from MPDN payments since June 26, 2023 should be immediately distributed noteholders, as required by the terms of default outlined in the Master Mortgage Payment Dependent Note ("MMPDN").

29. Those remaining active loans and REO properties should be assigned to a competent third-party mortgage servicer — as promised by Peer Street to its investors — at a rate deemed mutually acceptable by the Pacific Creditors and Creditors' Committee, as measured against the servicing fees and costs historically incurred by PSFI.

30. Any excess fees beyond what PSFI would have otherwise recouped should be absorbed by the Debtors, such that retail investors are made whole to the fullest extent in accordance with the spirit of the terms that these investors reasonably believed they were agreeing to.

*[Remainder of this page intentionally left blank]*

Dated: August 25, 2023
      Los Angeles, California

Respectfully submitted,

*/s/ Michael Ball*
_____

5118 Otsego Ct.
Encino, CA 91436
(310) 383-8971
lotusmichael@gmail.com

By *Rebekah Jack*  Posted *March 11, 2019*  In

Investments in loans are held in a bankruptcy-remote entity that is separate from our primary corporate entity. In the unlikely event PeerStreet no longer remains in business, a third-party "special member" will step in to manage pending loan investments and ensure that investors continue to receive interest and principal payments. Additionally, from the time funds are received in an investor account until an investment closes (but not while funds are invested), investor funds are held in an Investors Trust Account with Wells Fargo and FDIC insurance of up to $250,000.

**EXHIBIT A**

accordance with the terms of the applicable Series. The Real Estate Securities you invest in through the Automated Investing feature may differ from the ones you would manually choose on the Platform. The frequency at which investments are made via Automated Investing will vary based on the number of corresponding Real Estate Securities available at any given moment and, if applicable, their match with the criteria you provide. If you enable Automated Investing, you are agreeing to rules and restrictions of this feature as provided in this Agreement and more fully described here. In the event of conflict between this Agreement and the Automated Investing page on the PeerStreet Website, the terms on the PeerStreet Website shall control. Once Automated Investing is activated, you are solely responsible for disabling it, should you no longer want to use this feature.

*Acceptance*

If PeerStreet accepts your investment, it will notify you that your investment has been accepted. PeerStreet may, in its sole discretion, determine to wait to accept your investment until the aggregate minimum investment amount set forth in applicable Listing has been met and/or exceeded. Unless the Listing for a Series states otherwise, you will not receive any interest for the periods of time between your commitment to invest, PeerStreet's acceptance of your investment, and the Series tied to the investment closes.

Funds in your account will generally not accumulate interest or earn returns until you invest these funds in a given issuance of Real Estate Securities, PeerStreet accepts your investment, and the Series tied to the investment closes. If the requested minimum aggregate investment amount for a specific Underlying Investment, or Series of that Underlying Investment, has not been realized prior to the scheduled closing date, or if PeerStreet must cancel the offering for any other reason, then one of the following will occur:

- The issuance described in the Listing will terminate, there will be no closing on the Real Estate Securities being offered, and any requested Underlying Investment will not be funded.

- Alternatively, PeerStreet may close the Series of Real Estate Securities, in which case it may fund any portion of an Underlying Investment left unfunded through the purchase of the applicable Real Estate Securities.

- If PeerStreet believes that additional investors may later elect to participate in the Series described in the Listing, PeerStreet may also elect (in its sole discretion) to arrange bridge financing to close on any Underlying Investment, in which case the Listing will remain active on the PeerStreet Website until the Underlying Investment is fully funded and the bridge loan repaid. Generally, if PeerStreet retains a portion of the Underlying Investment, it will do so on similar terms as those offered to investors.

If your commitment has been accepted by PeerStreet and the requested minimum aggregate investment amount for the Underlying Investment has been realized, then the applicable PS Issuer will issue a real estate security to you as soon as practicable.

All Real Estate Securities will be issued and tracked in electronic form only. Processing and payment systems are automated and electronic. PeerStreet does not have any physical branches and does not engage in any deposit-taking activities.

From the time you commit to investing in the real estate security to the time that the Series closes and your Real Estate Securities are issued, the funds in your PeerStreet account will not be available for investment in other Real Estate Securities or for withdrawal from your PeerStreet account. In addition,

Michael
5118 Crispo Ct.
Encino, CA 91436

U.S.M.S. X-RAY

Chief Judge Laurie Selber Silverstein
U.S. Bankruptcy Court
824 North Market St., 6th Flr.
Wilmington, DE 19801

