Sean Thomas Quinn
10 Ridge Road
Succasunna, New Jersey 07876

Via US Mail

August 29, 2023

United States Bankruptcy Court
District Of Delaware
824 Market Street North
3rd Floor
Wilmington, DE 19801

Re: Objection To Sale Of Mortgage Dependent Notes ("MPDNs"), Peer Street, et. al., Case No. 23-10815 (LSS)

Dear Judge Silverstein:

Please accept this letter brief, as we are proceeding *pro se*. We feel the need to do so because the class of small retail investors who prudently took small $1000 interests in an array of notes with a low loan to value, have not been represented.

*The Court Should Not Allow Debtors To Confiscate Retail Investor Accounts*

We agree with Pacific/Colchis that the MDPNs should not be considered part of the estate, and join in the points made in their brief filed yesterday.

We take this position for the simple fact that Debtors promised small retail Secured Note Holders ("SNHs") that this would be the case, and have done nothing to even attempt to make this come true.

The Debtors came out of the box looking to sell the Notes. The Debtors set up a scenario where Peerstreet promised us the oversight of a Special Member.

Yet, at the 341 hearing, we learned that seven Special Members, one each for multiple entities, served pursuant to an annually renewable contract between CT Corporation *paid by the Debtors themselves, rather than a segregated fiduciary account*. That structure runs contrary to the promised incentive for the Special Member to serve only the interests of SNHs. The Debtors paid CT compensation on annually renewable contracts the renewal of which the Debtors controlled.

Not surprisingly, Peerstreet management has refused to produce that CT contract to the very group who should be its beneficiaries. This buttresses the inference, drawn from all seven Special Members merely offering up our income streams for the benefit of Magnetar and other venture capital parties ("VCPs"), without an utterance.

That seven Special Members simply rolled over without explaining their reasoning, if any, to the SNHs, or even considering the Servicer or Run Off options, indicates that a promised check and balance never existed and that Debtors never intended it to exist. The Court should decline to effectuate the scheme that this facade reveals.

This proceeding prompted the CEO of Groundfloor, also in the fractional note intermediary business, to say that a fractional note investment is only as good as what value the bankruptcy Court will give the documents. If this Court gave Debtors the green light to sack our accounts, retail investors would leave the space due to platform risk, letting Debtors harm an entire industry and cut off a source of badly needed SNH capital in an already high interest rate environment.

I request that the Court consider that the SNHs hold a very different position than Magnetar, Pacific or VCPs in general. As is evident from the numerous account statements submitted by many small income investors in the reco.d, the Small Note Holders ("SNHs") reduced risk in two ways: (1) placing only $1000 on each note, and (2) picking Notes with a low loan to value, thereby making us more likely to be made whole by a run off.

This is certainly not the case for Magnetar and the VCP UCC members who have an interest in freeing up capital, even if that means a discount, so they can reap the rewards of a high interest rate environment.

The Debtors placing this large quantity of Notes up for sale at one time will of necessity depress their value to the Small Note Holders, versus simply holding them to term or REO sale. SNHs invested for an income stream unlike UCC members, and so it is necessary for this Court to protect their interests.

Accordingly, the Notes should not be considered part of the estate, and this matter should be given to a trustee to select a servicer to sell the notes or REO in accord with the original plan, and quash the VCPs' overreach.

*The SNHs Have A Security Interest*

We previously stated that you need to reach this issue only if Pacific's position is not upheld. In their zeal to sell off other people's property, Debtors briefed this issue anyway.

We contend that the SNHs have a security interest in the income stream and REO proceeds of the mortgage notes, not the real estate. Until the Debtors invoked this Court's jurisdiction, they so stated themselves.

The agreement with the SNHs is stated in the FAQs :

"A mortgage-dependent promissory note, or "MDPN," is a note in which an investor receives stated interest and principal... PeerStreet issues an MDPN to investors, **meaning they have a direct interest in the underlying loan** and indirect interest in the underlying property." (emphasis added)

That representation still trumpets from Debtors website, and it gives me cause for concern for the system that Debtors felt free not to mention this on First Day.

What is a "direct interest" if not a security interest or enough of an interest to be given preference over Debtors' financiers? If Debtors meant something different, as they now contend, they should have said so. Instead, Debtors reinforced the belief we had a security interest by shrouding this promise of a "direct interest" in the mantle of bankruptcy protection language.

The SNHs did not lend Debtors money but ironically, Magnetar, a party that did, is considered by Debtors to be "secured."

Yes, there is no UCC filing or lien filed in one of over perhaps 1500 courthouses recording our "direct interest." But I ask that the Court consider that the original purpose that the judicial system sought to serve with a security interest filing was to provide notice to potential creditors.

Every real party in interest in this proceeding had notice of our "direct interest." Debtors published it on the internet for the world to see. This is more apparent, in this age, than a piece of paper in a county records office.

Magnetar and every member of the UCC knew of this "direct interest" because the SNHs' capital participation, alongside theirs, lies at the core of the published business model. The VCPs cannot rely on the aid of oarsmen and then deny promises that enticed them to join the crew. Every creditor who has laid claim to the proceeds of an SNH note sale knew of our "direct interest."

Debtors cannot create a business model that lives exclusively on the internet to the point they require only electronic documentation and email communication, and then deny that that method of notice does not suffice to create a security interest.

*The Debtors Committed To Not Sell The MPDNs In A Peerstreet Ignited Fire Sale*

The Debtors attempt to have the Court ignore the FAQs. That Debtors try to walk away from promises in writing to investors constitutes a request to this Court to assist in effectuating a fraud.

The right result lies in treating the FAQs as part of an overall underlying agreement to be read *in para materia* with the Note document, as well as the agreements between PSI and PSFLLC, as intended. It is a tenet of contract interpretation that written language, particularly language posted publicly to induce investors, should not be treated as a nullity.

The Court should treat the FAQs how Debtors portrayed them to individual retail investors. The Debtors presented very specific FAQs, as an explanation of the language of the MPDNs, and those written words should be treated as such.

The documents speak specifically to what happens in case of a Peerstreet or what is known as a "platform bankruptcy":

"[I]n the unlikely event PeerStreet no longer remains in business, a third-party 'special member' will step in to manage pending loan investments and ensure that investors continue to receive interest and principal payments."

Debtors make the startling claim that they are "still in business," so the foregoing promise does not apply. The Debtors' only business consisted of crowdfunding capital from many investors to make or buy mortgage loans, and remit the income or REO stream to investors. Debtors no longer engage in any of those activities. So Debtors are not "in business."

Debtors Alice In Wonderland linguistic alchemy, does not, in any event, matter. The MPDN document also states:

"[If]... the Company has become subject to a voluntary or involuntary proceeding of bankruptcy, insolvency, or otherwise subject to receivership and remains so for a period of 60 days, ... , the Investor may ... declare this Note...due and payable immediately regardless of the applicable Maturity Date."

This MPDN language constitutes a reaffirmation of the protection against "platform bankruptcy" provided for and explained in the FAQ. This language is not contingent on an interpretation of "in business" and constitutes yet another indication of intent to protect SNHs against platform risk, which Debtors now seek to inflict.

The Debtors claim the MPDN language contemplates selling all the Notes in one market dump. There is no language that allows the sale of "all Notes at once." Actually, the MPDN ties Debtors' sale right to "the corresponding mortgage loan," *in the singular*, and does not contemplate a bulk sale of millions of Notes all at once, with a corresponding value-depreciating market dump.

In fact, the above-quoted FAQ language says the exact opposite and requires Debtors to arrange "to manage pending loan investments and ensure that investors continue to receive interest and principal payments."

I submit that this Court should read the sale language together with the quoted FAQ and MPDN bankruptcy protection language, as well as the agreements between PSI and PSFLLC as Pacific has explained in its Brief, to mean only that Peerstreet could sell an individual particular Note if prudent to maximize the value of a particular underlying non-performing loan, and not a sale of all Notes at once. This is the only way to give full effect to all of the written statements made to investors.

As investors, we took the risk that a particular Note would not perform and Peerstreet could sell the Note, rather than go through the foreclosure proceeding, based on an individual property specific evaluation. We did not take the risk of a total dump all at once, particularly one driven by VCP financiers.

Debtors pay lip service to the Servicer Solution. In reality, Debtors First Day pleadings and statements to this Court speak only of sacking retail investor accounts through a bulk wash sale. There is no indication that Debtors even evaluated the Servicer Solution before or after filing. Indeed, they expended a great deal of estate resources until very many retail investors had to individually push back.

There is zero analysis of why selling all the Notes is even a good, never mind, best solution other than Piper's bald assertion. There is no explanation for why Debtors thought the Servicer Solution was best when they induced us to invest and now have dissembled to the opposite conclusion.

Accordingly, the Debtor/Magnetar request to sack our accounts should be denied.

Respectfully Submitted,

*[signatures]*

Sean Quinn, Thomas Kerl

I hereby declare, under the penalty of perjury, that I served the following Counsel via PDF email prior to depositing this communication to the Court in a repository of the United States Postal Service.

*[signature]*

Sean Quinn

Via Email PDF to:
Debtors Counsel
Unsecured Creditors Counsel
Magnetar Counsel

Office Of The United States Trustee

Case 23-10815-LSS    Doc 326    Filed 09/05/23    Page 7 of 7

Sea[...]
10 Ridge Road
Succasunna NJ 07876

J.S.M.S.
X-RAY

United States Bankruptcy Court
District Of Delaware
824 Market Street North
3rd Floor
Wilmington DE 19801



DVD PVDC AFSNF 2
KEARNY NJ 070
WED 30 AUG 2023    PM

FOREVER USA