# **EXHIBIT D**

**Settlement Order**

**The relief described hereinbelow is SO ORDERED.**

**SIGNED this 25th day of June, 2021.**



_____
Robert D. Berger
United States Bankruptcy Judge
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:

**US REAL ESTATE EQUITY BUILDER, LLC, and US REAL ESTATE EQUITY BUILDER DAYTON, LLC**,

Case No. 20-21358
Chapter 11
Jointly Administered

Debtors.

### ORDER GRANTING MOTION TO APPROVE SETTLEMENT AND COMPROMISE

Debtors US Real Estate Equity Builder LLC ("**USREEB**") and US Real Estate Equity Builder Dayton LLC ("**USREEB Dayton**"), who filed for Chapter 11 bankruptcy on October 2, 2020, specialize in "turnkey" real estate transactions. To finance some of their real-estate acquisitions, Debtors obtained loans from secured

creditors Aloha Capital, LLC; Anchor Loans, LP; PS Funding, Inc.; and their affiliates (collectively, "**Lenders**"). Debtors asserted a number of claims against Lenders in state court before filing for bankruptcy. This matter comes before the Court on a motion by Eric Johnson, Chapter 11 trustee for Debtors' bankruptcy estates, for an order approving a settlement with Lenders pursuant to Fed. R. Bankr. P. 9019.[1]

A.  **Asserted Claims**

The United States Trustee ("**UST**") described Debtors' operations in his motion to appoint the Chapter 11 trustee:[2]

> In 2015, [Sean] Tarpenning formed USREEB LLC as the president and sole member. The company specialized in "turnkey" or "cash flow" real estate transactions, where USREEB or one of its closely held subsidiaries such as 1 Big Red, LLC, or 1 Big Blue, LLC[3] purchased a residential or commercial property, repaired and remodeled it, placed a tenant in it, and then sold the property. In 2017, Tarpenning formed the Dayton company with the same business model for properties throughout southern Ohio. The companies financed acquisitions . . . through hard-money lenders such as Aloha, Anchor, and [PS Funding]. Some of these entities received deeds of trust or mortgages on specific properties. If a given deal worked as intended, the lender would receive monthly interest payments, sometimes on rates exceeding 30 percent, and then receive repayment of

---

[1] ECF 298. The Court granted the United States Trustee ("**UST**")'s motion to appoint a Chapter 11 trustee on December 2, 2020, and approved the UST's appointment of Mr. Johnson as Chapter 11 trustee on December 10, 2020. *See* ECF 113 (granting motion to appoint); ECF 134 (approving appointment); *see also* ECF 85 (motion to appoint); ECF 132 (motion for approval).

[2] ECF 85 at 3-4.

[3] 1 Big Red filed a separate Chapter 11 case on January 15, 2021. *See* Case No. 21-20044. 1 Big Blue is not currently in bankruptcy.

>its principal at closing on the sale of the property to a new owner. Tarpenning personally guaranteed the loans made by the companies' lenders.

On November 20, 2019, about a year before they filed for bankruptcy, Debtors sued Aloha and PS Funding in Jackson County, Missouri, asserting claims for breach of contract, breach of the duty of good faith and fair dealing, accounting, quiet title, negligent misrepresentation, fraudulent misrepresentation, and tortious interference with contracts and business expectancy.[4] Debtors' Jackson County complaint alleges that having loaned Debtors money to purchase various properties, Aloha and PS Funding refused to lend Debtors additional money to rehab the properties, refused to provide payoff statements, charged "exorbitant fees not contemplated under the loan documents," and engaged in wrongful foreclosures.[5] "In other words," the complaint argues, "[PS Funding] and Aloha try to force these rehab entrepreneurs' hands and take properties through trustee's sales rather than receiving the amounts owed under the loan documents, because the properties often have substantial equity which far outweigh[s] any debt owed."[6] The complaint alleges damages "in excess of $75,000" as to five of Debtors' seven claims.[7] Although Anchor and its affiliates are not parties to the Jackson County action, Debtors filed similar counterclaims against those entities while defending pre-

---

[4] Trustee's Ex. 32.

[5] *Id*. ¶¶ 12-14.

[6] *Id*. ¶ 14.

[7] *Id*. ¶¶ 65, 72, 93, 106, 113.

petition foreclosure actions in Ohio.  Debtors' cases and claims against Lenders were still pending when Debtors filed for bankruptcy.

**B.    Debtors' Chapter 11 Cases; Appointment of the Trustee**

Debtors filed for bankruptcy under Chapter 11 on October 2, 2020.  They listed additional potential civil claims against Lenders (together with the claims in the Jackson County complaint, the "**Asserted Claims**") in their schedules.

On November 23, 2020, citing "corporate operations in serious disarray," the UST moved for the appointment of a trustee in Debtors' cases under 11 U.S.C. § 1104(a).[8]  The UST's motion contained a number of troubling allegations, including co-mingling of funds, unauthorized use of cash collateral, and pre-petition property transfers made without consideration to an insider.[9]  This Court granted the UST's motion on December 2, 2020, and approved the appointment of Eric Johnson as Chapter 11 trustee for Debtors' bankruptcy estates (the "**Trustee**") on December 10, 2020.[10]

The Trustee, Mr. Johnson, brought stability to Debtors' once-struggling bankruptcy cases.  He has practiced bankruptcy law for nearly 20 years; his experience includes representation of debtors, creditors (including secured lenders), and trustees.  His practice includes investigating and pursuing various causes of action such as fraudulent transfer, equitable subordination, breach of fiduciary

---

[8] ECF 85 at 8.
[9] *Id.* at 8-9.
[10] ECF 113; ECF 134.

4

duty, and preferences on behalf of bankruptcy estates. He has experience evaluating tort claims, contingency fees, and settlements, and has litigated a number of complex debtor/creditor matters, including lender liability. In short, the Trustee is a highly competent bankruptcy attorney with experience investigating, litigating, and settling precisely the type of claims he now seeks to settle on behalf of Debtors' Chapter 11 estates.

### C. Proposed Settlement

After investigating the Asserted Claims, the Trustee negotiated a settlement with Lenders under which Debtors' estates will receive a 14% carveout of the sale price (not including the buyer's premiums) of Debtors' real property that is subject to Lenders' security interests (the "**Estate Carveout**") in exchange for the release of all claims against Lenders. Additional terms in the proposed settlement include (1) the Trustee's agreement that Lenders' claims should be allowed as filed (minus any payments received post-petition), (2) Lenders' release of all claims against Debtors, and (3) a stipulation that the Estate Carveout cannot be used to pay for Debtors' counsel fees.[11]

On March 18, 2021, the Trustee filed an amended motion to sell substantially all of Debtors' assets, including the real property securing Lenders' claims.[12] USREEB Dayton's properties were sold at auction on April 29, 2021; an auction of

---

[11] The full proposed settlement agreement is attached to the Trustee's motion. *See* ECF 298-1.

[12] ECF 255.

5

USREEB's property is scheduled for July 8, 2021.[13] The Trustee estimates that the Estate Carveout, if approved by the Court, will yield approximately $280,000 for the USREEB estate and $1.1 million for the USREEB Dayton estate. The money would be used to pay UST expenses, the Trustee's fees and expenses, Debtors' professional fees (excluding Debtors' attorney fees), and Debtors' income tax liability; additionally, unsecured creditors in the USREEB Dayton case would receive an 8-11% payout on their non-priority claims. General unsecured creditors of USREEB, which has more tax debt and fewer assets subject to Lenders' security interests, would not receive a payout from the Estate Carveout.

### D. Guardians of Travel

The Trustee filed the present motion for approval of the settlement under Fed. R. Bankr. P. 9019 on April 22, 2021.[14] The unsecured creditors' committee did not object to the settlement. Debtors, however, did object, as did unsecured creditors Metropolitan Housing Development Corporation, Chris Mayberry, Ernest Tomas, and Guardians of Travel, LLC.[15]

The owner of Guardians of Travel is Mackaylee Beach. Debtors' principal, Sean Tarpenning, testified at the meeting of creditors held pursuant to 11 U.S.C.

---

[13] ECF 313; ECF 358.

[14] ECF 298.

[15] ECF 307 (Debtors); ECF 309 (Metropolitan, Mayberry, and Tomas); ECF 310 (Guardians of Travel). It is unclear whether Debtors have standing to object to the proposed settlement agreement, because standing requires a financial interest in the outcome—i.e., "a reasonable possibility of surplus after satisfying all debts." *See In re Brutsche*, 500 B.R. 62, 72 (Bankr. D.N.M. 2013) (citations omitted).

§ 341 that he lives with Ms. Beach and that they have a child together.[16] During that testimony, Mr. Tarpenning also acknowledged that Debtors transferred property to Guardians of Travel for no consideration before filing for bankruptcy.[17] Guardians of Travel and Ms. Beach have filed proofs of claim totaling more than $260,000 in Debtors' bankruptcy cases.[18]

E.   **Unauthorized Sur-Reply**

At the conclusion of the May 6, 2021 hearing, the Court took this matter under advisement. However, Guardians of Travel attempted to further weigh in on the proposed settlement in its May 25, 2021 response to a fee application filed by counsel for the unsecured creditors' committee.[19] A flurry of electronic filing regarding the settlement ensued, including a 100-page "supplemental objection" filed by Guardians of Travel.[20]

The document Guardians of Travel filed on May 25, 2021, was essentially a sur-reply to the Trustee's motion for approval of the settlement. D. Kan. Rule 7.1(c), however, does not provide for sur-replies, which "are permitted only with leave of court and under 'rare circumstances.'" *COPE v. Kan. State Bd. of Ed.*, 71 F. Supp. 3d 1233, 1238 (D. Kan. 2014) (quoting *Humphries v. Williams Nat. Gas Co.*,

---

[16] *See* ECF 100-1 at 17-18.

[17] *See* ECF 85 at 9.

[18] *See* Case No. 20-21358, Claim 12-3; Case No. 20-21359, Claims 13-1 and 14-1.

[19] *See* ECF 350.

[20] *See* ECF 351; ECF 352; ECF 353; ECF 355; ECF 367; ECF 368; ECF 370; ECF 382; ECF 393; ECF 394; ECF 395; ECF 398.

7

No. 96-4196-SAC, 1998 WL 982093, at *1 (D. Kan. Sept. 23, 1998)). If a sur-reply is filed without court leave, the court may disregard it. *See McShares, Inc. v. Barry*, 979 F. Supp. 1338, 1341 (D. Kan. 1997). Here, Guardians of Travel neither sought nor obtained leave from this Court to file a sur-reply or anything else regarding settlement after the hearing—and with the exception of the Trustee, no interested party sought leave from this Court to join, or further respond to, Guardians of Travel. The Court will therefore disregard everything filed after May 6, 2021, in ruling on the Trustee's motion.

### F. Trustee's Investigation and Opinion of the Asserted Claims

At the May 6, 2021 hearing, the Trustee testified that he and his law firm took the following actions to investigate the Asserted Claims:

- Reviewed Debtors' complaint and the other pleadings on the Jackson County docket, including the motion to withdraw filed by Debtors' counsel in that case, Deron Anliker;

- Spoke with Anliker about the strength of the Jackson County claims, the factual allegations underlying the Jackson County claims, the evidentiary support for those allegations, and the reasons Anliker and his firm withdrew from the Jackson County case;

- Reviewed parts of Anliker's file;

- Asked a construction law attorney to review Debtors' mechanics' liens against Lenders' properties and the legal challenges that might be made to those liens;

- Reviewed the transcript of the meeting of creditors conducted pursuant to 11 U.S.C. § 341 in Debtors' bankruptcy cases;

- Spoke with Debtors' principal, Sean Tarpenning;

- Requested loan documents from Lenders;

- Reviewed the loan documents provided by Lenders;

- Did not conduct examinations under Fed. R. Bankr. P. 2004 or formal discovery, because that would change the tenor of the parties' negotiations and Lenders' cooperation made it unnecessary in any event;

- Researched the legal issues presented by the Asserted Claims;

- Updated counsel for the unsecured creditors' committee about the status of his investigation as appropriate;

- Spoke with a plaintiffs' attorney about potential "blind spots" in Debtors' case and litigation of the Asserted Claims on a contingency fee basis;

- Researched potential Chapter 5 actions against Lenders;

- Reviewed Debtors' financial documents, including balance sheets and QuickBooks reports;

- Reviewed Debtors' bankruptcy petitions, schedules, and Statement of Financial Affairs;

- Reviewed Lenders' proofs of claim;

- Noted that Debtors' petitions did not list any of Lenders' claims as disputed; and

- Considered tort claims in general (e.g., RICO claims) that could arise out of the same set of facts.

When asked about his opinion of the Asserted Claims, the Trustee testified that:

- The Trustee has a limited "pot" of assets to use;

- The Asserted Claims would be difficult to prove and win;

- Litigation of the Asserted Claims would involve a large amount of discovery, time, and expense;

- Litigation can have unintended consequences;

- The cases would be well-defended and expensive to litigate;

- Debtors' bankruptcy estates are not well-funded—the USREEB Dayton estate had roughly $13,000 in cash, and the USREEB estate $11,000, as of the May 6, 2021 hearing;

- Debtors' cash is subject to Lenders' liens;

- The Trustee's use of Debtors' cash is constrained by the bankruptcy court's orders authorizing his use of cash collateral;

- Without cash collateral, the Trustee would have no money to pay for Debtors' operating costs (such as insurance and maintenance);

- If the Trustee pursued the Asserted Claims against Lenders, Lenders would likely withdraw their consent to his use of cash collateral,

10

which would result in litigation and an evidentiary hearing in the bankruptcy court;

- While some of Debtors' claims survived a motion to dismiss in the Jackson County case, a motion to dismiss is not a "monumental" hurdle and the case was just beginning;

- Even if attorneys were willing to take the Asserted Claims on contingency, Debtors would still have to pay expert witness fees and other costs to litigate those claims;

- The Asserted Claims could not necessarily be tried for less than $100,000, because the costs of litigation can spiral;

- Further review of the Asserted Claims would only increase administrative expense claims against Debtors' bankruptcy estates;

- Preference actions are difficult to assert against secured creditors, and fraudulent transactions are hard to prove if they involve payment on an antecedent debt;

- Lenders had not perfected any of their liens during the 90 days before Debtors filed their bankruptcy petitions;

- Equitable subordination and breach of fiduciary duty are easier to assert than to prove;

- Default interest is a contested area of the law;

- Cross-default provisions are not as open-and-shut as Debtors' objection to the settlement would suggest;

11

- Analysis of the Asserted Claims contains many moving parts;

- Debtors' bankruptcy estates have no money to pursue other potential claims;

- While a successful equitable subordination claim would be enough to pay unsecured creditors in the USREEB Dayton case, such a claim would involve long, contentious litigation, increased administrative cost, and possibly no recovery;

- Debtors' bankruptcy estates have neither unlimited resources nor unlimited time;

- The unsecured creditors' committee did not object to the proposed settlement; and

- None of the objections to the Trustee's motion to approve settlement changed his analysis of the settlement or his opinion that the settlement was in the best interests of the bankruptcy estate.

G.  **Analysis**

Compromises are favored in bankruptcy. 10 *Collier on Bankruptcy* ¶ 9019.01 (Richard Levin & Henry J. Sommer eds., 16th ed.). In no small part, bankruptcy is the art of compromise.

Fed. R. Bankr. P. 9019 authorizes the Trustee to seek an order approving a compromise. In considering whether to approve a compromise, or settlement, under Rule 9019, a bankruptcy court should consider (1) the probable success of the underlying litigation on the merits, (2) the possible difficulty in collecting a

12

judgment, (3) the complexity and expense of the litigation, and (4) the interests of the creditors in deference to their reasonable views. *See Kopp v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997); *see also Korngold v. Loyd (In re S. Med. Arts Cos.)*, 343 B.R. 250, 256 (B.A.P. 10th Cir. 2006). "Settlement should be approved only based on the informed and objective assessment of the facts in their totality." *Kearney v. Unsecured Creditors Comm.*, 987 F.3d 1284, 1295 (10th Cir. 2021) (citing *Kopexa*, 213 B.R. at 1022).

> [This analysis] does not require the bankruptcy judge to hold a full evidentiary hearing or even a "mini-trial" before a compromise can be approved. Otherwise, there would be no point in compromising; the parties might as well go ahead and try the case. Instead, the obligation of the court is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."

10 *Collier on Bankruptcy* ¶ 9019.02 (quoting *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994), and *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 497 (Bankr. S.D.N.Y. 1991)); *see Kearney*, 987 F.3d at 1295 ("A mini-trial on the matters under consideration is unnecessary; it is enough for the court to canvass . . . the issues and see whether the settlement falls below the lowest point in the range of reasonableness.") (citation omitted).

The proposed settlement is the result of good-faith, arms-length negotiations between Lenders and the Trustee over several months. Applying the *Kopexa* factors to the facts of this case, the Court finds that (1) the likelihood that any of the Asserted Claims would ultimately succeed on the merits is tenuous; (2) there is no evidence that collecting a judgment from any of the Lenders would be difficult; (3)

13

litigation of the Asserted Claims would be complex, lengthy, and expensive, and the Trustee has no unencumbered cash to finance it; and (4) although it is rational for the objecting creditors (all of whom filed general unsecured claims against USREEB) to object to the settlement, it would not be rational for the Trustee to risk administrative insolvency in pursuit of a recovery that is anything but guaranteed. These factors, considered together, suggest that the proposed settlement is within the range of reasonableness.

The total value of the Asserted Claims is nebulous, but includes the interest, fees, and charges assessed by Lenders against Debtors.[21]  Thus, successful litigation could decrease Lenders' claims by nearly $2.7 million.[22]  However, such litigation could cost upwards of $100,000, and Debtors' estates have only $24,000 in cash—all of it encumbered by Lenders' liens.  Even if the Trustee could find attorneys willing to litigate the Asserted Claims on contingency (an avenue he considered and rejected), Debtors' estates have no unencumbered cash to pay expert witness fees and other attendant costs of litigation.  Settlement, on the other hand, yields a guaranteed recovery of about $1.4 million—more than half the value of the interest, fees, and charges the Asserted Claims could eliminate, and enough to pay UST fees, administrative expenses, and income taxes in both cases, with some payout to USREEB Dayton's unsecured creditors.  Without settlement, Debtors' estates risk administrative insolvency.

---

[21] *Cf.* Trustee's Ex. 51 ("Scenario 2") (subtracting interest, fees, and charges from Lenders' claims).

[22] *See id.* ("Interest, Fees, and Charges").

14

The objecting parties presented no evidence at the May 6, 2021 hearing that any of the Asserted Claims are likelier to succeed on the merits than the Trustee estimates; that litigation of the Asserted Claims would be simple, fast, or inexpensive; that Debtors could realistically afford litigation; or that the Estate Carveout is too low.  Rather, they argued that the Trustee should delay settlement and take further steps, including additional discovery, in pursuit of the Asserted Claims.  However, they did not explain how the Trustee would pay for those further steps, whether such measures would be cost-effective, or how delayed settlement and/or additional discovery (which could just as easily reveal "bad" facts as "good" ones) would strengthen Debtors' position.  The parties' objections thus appear to be criticism without justification—"the type known colloquially as 'throw-as-much-mud-against-the-wall-as-you-can-and-hope-some-of-it-sticks.'"[23]  Such objections cannot defeat settlement.

The undisputed evidence before the Court shows that the Debtors' estates have no unencumbered cash to litigate the Asserted Claims, which are of nebulous value and tenuous strength.  Settlement of those claims will yield roughly $1.4 million for Debtors' estates and ensure that the estates remain administratively solvent.  The Court finds that the Trustee's proposed settlement falls within the range of reasonableness and is in the best interest of Debtors' bankruptcy estates.

---

[23] *See Williams v. BAC Home Loans Servicing, L.P. (In re Williams)*, Bankr. No. 09-41548, Adv. No. 10-7059, 2012 WL 695832, at *4 n.27 (Bankr. D. Kan. Mar. 1, 2012) (Karlin, J.) (quoting *Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1158 (10th Cir. 1991)).

**H.**     **Conclusion**

The Trustee's motion for approval of the proposed settlement pursuant to Fed. R. Bankr. P. 9019 is hereby granted.

IT IS SO ORDERED.

###