## **<u>EXHIBIT E</u>**

## **Sale Order**



The relief described hereinbelow is SO ORDERED.

SIGNED this 27th day of July, 2022.

_____
Robert D. Berger
United States Bankruptcy Judge

_____

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re: | ) |
| | ) |
| US Real Estate Equity Builder, LLC, and | )    Case No. 20-21358-11 |
| US Real Estate Equity Builder Dayton, LLC, | ) |
| | )    (Jointly Administered) |
| Debtors. | ) |

**ORDER (A) ORDER APPROVING (A) THE SALE REAL PROPERTY FREE AND
CLEAR OF ALL LIENS, INTERESTS, CLAIMS AND ENCUMBRANCES AND
RELATED PROCEDURES AND BID PROTECTION PURSUANT TO 11 U.S.C. § 363,
(B) THE POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND RELATED
PROCEDURES, PURSUANT TO 11 U.S.C. § 365, AND (C) RELATED RELIEF
PURSUANT TO 11 U.S.C. §§ 102 AND 105**

This matter comes before the Court upon the *Motion to Approve (a) Sale of Real Property*

*Free and Clear of All Liens, Interests, Claims and Encumbrances, and Related Procedures and*

*Bid Protection Pursuant to 11 U.S.C. § 363, (b) the Potential Assumption and Assignment of*

*Certain Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11*

*U.S.C. § 365, and (c) Related Relief Pursuant to 11 U.S.C. §§ 102 and 105* [Dkt. 600, refiled under

different event at Dkt. 612 on April 19, 2022] (the "<u>Motion</u>"),[1] filed by Eric L. Johnson ("<u>Trustee</u>"), the Chapter 11 trustee of US Real Estate Equity Builder, LLC ("<u>Debtor'</u>), the *Response to Motion to Sell* [Dkt. 621] (the "<u>Response</u>") filed by 1 Big Red, LLC ("<u>1 Big Red</u>"), the *Limited Objection to Motion to Sell* [Dkt. 651] (the "<u>Limited Objection</u>") filed by Sean Tarpenning, the *Trustee's Reply to 1 Big Red, LLC's Response/ Objection to Motion to Sell* [Dkts. 626 and 627], the Trustee's *Reply to Sean Tarpenning's Objection to Motion to Sell* [Dkt. 652], and PS Funding, Inc.'s *Reply to Sean Tarpenning's Objection to Motion to Sell* [Dkts. 655 and 656].

Having heard arguments in support of, and in opposition to, the Motion, and for the reasons detailed in this order and as detailed in the Court's bench decision on July 6, 2022, which is hereby incorporated by reference, the Court finds and determines that:

1.    The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    On April 15, 2022, the Trustee filed the Motion seeking to sell the Debtor's real property commonly known and numbered as 440 E. 63rd St., Kansas City, Missouri 64110 and legally described as:

> Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri.

(the "<u>Property</u>") [Dkt. 600].

---

[1]  Capitalized terms that are not defined herein shall have the meanings given to them in the Bid Procedures.

3.        On June 10, 2022, the Court entered an *Order (A) Approving Bidding Procedures for the Sale of Debtor's Property Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Debtor's Entry Into a Stalking Horse Agreement, (C) Establishing Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Related Notices, (E) Scheduling a Hearing to Consider the Proposed Sale, and (F) Related Relief Pursuant to 11 U.S.C. § 105* [Dkt.  640] (the "Bid Procedures Order").  The Bid Procedures Order approved certain Bid Procedures and other relief requested in the Motion.

4.        As reflected in the Certificate of Service [Dkt. 619] filed with respect to the Motion [Dkt. 600] and Notice of Objection Deadline and Bid Procedures Hearing [Dkt. 601], the Motion and Notice of Objection Deadline and Bid Procedures Hearing was served via the Court's electronic filing system on those parties receiving electronic notice by such system, and on all other parties identified in the certificate of service, including the mailing matrix for the case, via U.S. Mail.

5.        As evidenced by the Certificate of Service filed with respect to the Order to Continue the Bid Procedures Hearing [Dkt. 633], notice of the Continued Bid Procedures Hearing was served via the Court's electronic filing system on those parties receiving electronic notice by such system, and on all other parties identified in the certificate of service, including the mailing matrix for the case, via U.S. Mail.

6.        As evidenced by the Certificate of Service filed on June 14, 2022 [Dkt. 641], the Bid Procedures Order was served via the Court's electronic filing system on those parties receiving electronic notice by such system, and on all other parties identified in the certificate of service, including the mailing matrix for the case, via U.S. Mail.

KC 18901746.2

7.      The Court finds the scope and manner of notice and service to be proper, timely, adequate, and sufficient in accordance with Bankruptcy Code §§ 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, 6006, 6007, and 9014, and in compliance with the Bid Procedures Order. No further notice of the Motion, the Bid Procedures, the Auction, the Sale Hearing, or the assignment and assumption of the Assumed Contracts is or shall be required.

8.      A reasonable opportunity to object or to be heard regarding the relief requested in the Motion has been afforded to all creditors and parties in interest.

9.      The Trustee has conducted the sale process in compliance with the Bid Procedures Order and has completed a full, fair, and complete auction process.

10.     On June 23, 2022, the auction (the "Auction") of the Property was held both virtually and in person.  Prior to the Auction, the Court had approved the stalking horse purchase agreement of Dutton Ranch, LLC (the "Stalking Horse"), which was subject to competing bids. There were three additional competing bids: (1) Gary Roles ("Roles"), (2) USA Regrowth, LLC ("URL"), and (3) PS Funding, Inc. The Auction was conducted in two phases. In the first phase, the non-stalking horse purchasers would bid against each other. In the second phase, the Phase 1 winning bid would compete against the Stalking Horse, who had the right to match any bid without advancing a new bid.

11.     PS Funding, Inc. ("PS Funding" or "Purchaser") made an initial credit bid of $717,000 for the Property (the "Credit Bid"). Through various rounds of bidding, PS Funding increased the Credit Bid to $880,000.00 (not including the buyer's premium).  After PS Funding's last bid, the Stalking Horse declined to match, whereupon in consultation with Committee's counsel, the Trustee concluded that the Credit Bid was the highest and best offer for the Property.

4

12.     On June 23, 2022, the Trustee filed his Notice of Auction Results [Dkt 646] (the "Auction Report") identifying the Property and the various bids related to the same, which are detailed as follows:

| Highest Bidder | Highest Bid |
| --- | --- |
| PS Funding, Inc. | (Credit Bid) $880,000.00, plus $52,800.00 (6%) buyer's premium, for a total purchase price of $932,800.00.<br><br>The purchase price shall be payable as a credit except where cash is required as indicated in the bidding procedures order. |
| **First Backup Bidder** | **First Backup Bid** |
| Dutton Ranch, LLC ("Stalking Horse") | $870,000.00, plus $52,200.00 (6%) buyer's premium, for a total purchase price of $922,200.00. |
| **Second Backup Bidder** | **Second Backup Bid** |
| Gary Roles | $800,000.00 plus $48,000.00 (6%) buyer's premium, for the total purchase price of $848,000.00 |
| **Third Backup Bidder** | **Third Backup Bid** |
| USA Regrowth Fund, LLC | $820,000.00 plus $49,200.00 (6%) buyer's premium, for the total purchase price of $869,200.00.<br><br>Commercial lease(s) to be rejected. |

13.     On July 6, 2022, the Motion came before the Court. Other than the Limited Objection and the Response, there were no other objections to the Motion and approval of the proposed sale.  As set forth in more detail in the Court's bench decision on July 6, 2022, the Court finds that PS Funding is approved as the successful bidder for the Property for the amount of $880,000 (the "Purchase Price"), plus $52,800 (6%) buyer's premium (the "Buyer's Premium"), for a total price of $932,800

14.     At the time of closing, PS Funding shall pay to the Title Company an amount to cover: (a) the fourteen percent (14%) carveout ($123,200) (the "Carveout"); (b) an amount sufficient to pay the estate's share of the closing costs; and (c) outstanding real property taxes, tax liens, and ad valorem taxes (collectively, the "Cash Component") included in the PSA.

KC 18901746.2

15.     The Trustee is further authorized and directed to transfer the Carveout to his operating account for the benefit of administrative expenses and unsecured creditors, free and clear of liens.

16.     The Cash Component does not include the Buyer's Premium, which shall be paid in addition to the Cash Component.

17.     The Auction conducted by the Trustee, including the methodology for determining the highest and best offers, was conducted in a manner that was reasonably calculated to achieve the highest and best offers for the Property. In fact, the final bid exceeded in the initial Stalking Horse offer by $172,000.00. The Auction was conducted in a non-collusive, fair and good-faith manner and a reasonable opportunity has been given to any interested party to make a higher or otherwise better offer for the Property.

18.     The Trustee has full power and authority to execute a Purchase and Sale Agreement that is substantially similar to the form attached to this Order as **Exhibit 1** ("PSA"),[2] as well as all other documents referenced in or contemplated by the PSA or that are necessary or appropriate to effectuate the sale of the Property as contemplated under the PSA.[3] All actions contemplated by the PSA have been duly and validly authorized and the Trustee has the full power and authority to consummate the transactions contemplated by the PSA. No further consents or approvals, other than the entry of this Order and any necessary approval by the any state regulatory authorities are required for the Trustee to consummate the transactions contemplated in the PSA.

---

[2] The PSA is in a form substantially similar as what was previously filed as an Exhibit 3 to the Motion [Dkt. 600-3] and approved pursuant to the Bid Procedures Order.

[3] To the extent the Trustee is required to look to the First Back-Up Bidder or the Second Back-Up Bidder, such bidders shall be required to executed a PSA is that is substantially the same as PSA executed by the Highest Bidder, such agreement is also approved and incorporated into the defined term "PSA" for purposes of this Order.

6

19.     The PSA was negotiated, proposed, and entered into by the Trustee and Purchaser in good faith, without collusion, and was the result of arm's-length bargaining with the parties and/or the parties' independent counsel.

20.     The Purchaser is a good-faith purchaser of the Property under Bankruptcy Code § 363(m) and, as such, are entitled to all of the protections afforded thereby. The Purchaser has acted in good-faith within the meaning of Bankruptcy Code § 363(m) prior to entry of this Order and the Purchaser may rely on entry of this Order and this good-faith determination in closing such transactions.

21.     The sale of the Property to the Purchaser pursuant to the PSA is reasonable and appropriate under the circumstances. The Trustee is authorized to sell the Property free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided herein or in the PSA) (collectively, "Liens"), as one or more of the standards set forth in Bankruptcy Code § 363(f) have been satisfied with respect to each such lien, claim, encumbrance, and other interest. The transfers of the Property to the Purchaser pursuant to the PSA will be a legal, valid, and effective transfer of the Property and will vest Purchaser with all of the Debtor's rights, title, and interest in and to the Property free and clear of all liens, claims, encumbrances, and other interests (except as otherwise provided herein or in the PSA), which have, or could have, been asserted by the Debtor, its creditors, or other holders of such liens, claims, encumbrances, and other interests.

22.     As demonstrated in the preliminary title work that was attached as Exhibit 4 to the Trustee's *Reply to Sean Tarpenning's Objection to Motion to Sell* [Dkt. 652], the following Liens are associated with the Property:

      a.    Deed of Trust dated December 19, 2018, recorded January 4, 2019, as Document No. 2019E0000812, from US Real Estate Equity Builder, LLC, to Nachman Registered, Inc., Trustee for Aloha Capital, LLC, in the original amount of $937,500.00, which was last assigned to PS Funding, Inc., by

7

KC 18901746.2

> Assignment recorded January 29, 2019 as Document No. 2019E0006898; Centre Trustee Corp. appointed successor trustee by instrument filed October 1, 2019 as Document No. 2019E0079203.

b.  Deed of Trust dated January 17, 2019, recorded January 22, 2019, as Document No. 2019E0004669, from US Real Estate Equity Builders, LLC, to Walter C. Whisler, Trustee for USA Regrowth Fund, LLC, in the original amount of $320,000.00.

c.  Partial Release of the Deed of Trust dated June 4, 2020, recorded June 16, 2020, as Document No. 2020E0050177, from 1 Big Red, LLC and US Real Estate Equity Builder, LLC, to Walter C. Whisler, Trustee for Guardians of Travel, LLC, in the original amount of $625,000.00.

For the avoidance of doubt, the inclusion of the above Liens is not intended to limit the "free and clear" nature of the sale approved by the Court, but is for informational purposes only.

23.    Any holder of a Lien also will be adequately protected by having its Liens, if any, attach to the cash proceeds received by the Trustee for the sale of the Purchased Assets to the Purchaser, in the same order of priority, with the same validity, force, and effect that such creditor has prior to such sale, subject to any claims and defenses that the Trustee and the Debtor's bankruptcy estate may possess with respect thereto.[4]  Accordingly, pursuant to Section 363(f) of the Bankruptcy Code, this Order authorizes the sale of the Purchased Assets to UMB, free and clear of any such Liens.

24.    As set forth in the Response [Dkt. 621, 1 Big Red also asserts a purported mechanic's lien to the Property. However, as indicated in the Trustee's *Reply to 1 Big Red, LLC's Response/ Objection to Motion to Sell* [Dkts. 626 and 627], such lien is defective on its face and would be subsequent to the prior the Liens identified above. As such, the relief sought in the Response is hereby overruled.

---

[4] For the avoidance of doubt, no Liens shall attach to the Carveout and it shall be unencumbered property of the bankruptcy estate.

8

KC 18901746.2

25.     The Purchaser would not have entered into the PSA and would not consummate the transactions contemplated thereby if either (i) the sale and the assignment of the Property were not free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (except as otherwise provided herein or in the PSA), or (ii) the Purchaser would, or in the future could, be liable for any of such liens, claims, encumbrances, and other interests (except as otherwise provided herein or in the PSA).

26.     Except as otherwise distinguished in this Order, the assumption and assignment of the contract(s) and lease(s) identified in the PSA including the Alpha One Property Management lease (collectively, the "Assumed Contracts") is integral to the PSA, is in the best interests of the Debtor's estate, creditors, and other parties in interest, and represents a reasonable exercise of sound and prudent business judgment by the Trustee.

27.     There are no outstanding cure amounts for the Assumed Contracts. The Trustee shall have no further liability or obligation under the Assumed Contracts, and Purchaser shall have no obligation to make any payment or provide any performance to cure any default or breaches arising on or before the closing under the PSA.

28.     The Purchaser has demonstrated adequate assurance of future performance under the Assumed Contracts that will be assumed and assigned pursuant to this Order.

29.     Subject to the terms of the PSA and the occurrence of the respective closing date, the assumption by the Trustee and the Assumed Contracts and the assignment of such Assumed Contracts, as provided for or contemplated by the PSA, is hereby authorized and approved pursuant to Bankruptcy Code §§ 363 and 365.

30.     If ultimately URL becomes the purchaser because the other bidders fail to close and otherwise elects not to take assignment of the Assigned Contracts, then upon filing a notice with

9

KC 18901746.2

the Court ("Notice of Election"), the contract(s) and lease(s) associated with the Property will be deemed rejected pursuant to Bankruptcy Code § 365(b) as of the date such notice is filed with the Court; provided, however, such rejection remains subject to tenant rights under Bankruptcy Code § 365(h).

31.    Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), the stay pursuant to Bankruptcy Rule 6004(h) or 6006(d) is hereby waived and this Order shall be effective and enforceable immediately upon entry.

32.    To the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that cause exists not to delay the implementation of this Order due to the time, effort, expense, and risk of delaying any closing under the PSA.

33.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a) upon its entry.

34.    The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

**BASED ON THE FOREGOING FINDINGS OF FACT, GOOD CAUSE EXISTS FOR ENTRY OF THE FOLLOWING ORDER. IT IS THEREFORE ORDERED:**

35.    The notice of the Motion and Sale Hearing and notice of the assumption and assignment of the Assumed Contracts are approved as being fair, reasonable and adequate under the circumstances of these cases, and any additional notice as may otherwise be required under state and federal law is hereby deemed satisfied.

10

36.     The Motion is **GRANTED** as set forth herein and the sale of the Property and assumption and assignment of the Assumed Contracts to the Purchaser is hereby authorized as set forth in this Order. Such assumption and assignment will not be effective until the sale transaction of the Property is closed. In the instance where URL becomes the purchaser and elects not to take an assignment of the Assumed Contracts, then the lease(s) and contract(s), then the lease(s) and contract(s) identified in the Notice of Election shall be deemed rejected as of the date of the filing of the notice.

37.     All objections to the Motion as it relates to the Property including, without limitation, the relief sought in the Response that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby **OVERRULED** on the merits as to the sale of the Property contemplated by this Order.

38.     The Trustee and the Purchaser have complied with the Bid Procedures Order.

39.     P.S. Funding is the successful bidder of the Property via credit bid and pursue Bankruptcy Code § 363(k).

40.     Pursuant to 11 U.S.C. §§ 105 and 363, the Trustee is authorized and directed to consummate the sale of the Property, pursuant to and in accordance with the terms and conditions of the PSA and this Order, including, without limitation, to convey to PS Funding, or its successor or assigns, the Property.  PS Funding may assign its purchase rights to another party as long as such assignment is disclosed to the Trustee and the Court prior to closing and such assignment does not violate 11 U.S.C. § 363(n).  For the avoidance of doubt, to the extent such purchase rights are assigned to an affiliated entity, it shall be presumed that such sale is not in violation of 11 U.S.C. § 363(n), but such presumption may be rebutted.  If such assignment occurs, references to "Purchaser" shall also mean PS Funding's successor and assign.

11

KC 18901746.2

41.    For the avoidance of doubt, the Purchase Price (except for the Cash Component) shall be offset against PS Funding's secured claims, with the balance of such claims continuing to be due and owing and secured by any remaining collateral subject to any applicable defense or claim.  PS Funding, within twenty-one (21) days of Closing, shall file revised proofs of claim reflecting the credit bid.

42.    The Cash Component of the Credit Bid is approved. If the actual amount of the Cash Component changes, then so shall the credit component of the Credit Bid in a corresponding amount. At Closing (as such term is defined in the Credit Bid), Purchaser is directed to pay the Cash Component of the Purchase Price and any other consideration then due under the Credit Bid to the Trustee including the Buyer's Premium.

43.    Should the PS Funding (or its successors or assigns) fail to close on the sale, and without further order from this Court, the Trustee is authorized and empowered to sell the Property to the Stalking Horse and execute and deliver the agreements contemplated herein and to implement and consummate all of the transactions and perform all obligations contemplated by the Stalking Horse's back-up bid at the Auction and this Order as if the Stalking Horse was successful bidder. The Stalking Horse shall be entitled to all of the findings and protections of this Order and will be considered the "Purchaser" as set forth in this Order.

44.    Should the PS Funding, the Stalking Horse, or their successors or assigns fail to close on the sale, and without further order from this Court, the Trustee is authorized and empowered to sell the Property to Roles and execute and deliver the agreements contemplated herein and to implement and consummate all of the transactions and perform all obligations contemplated by Role's back-up bid at the Auction and this Order as if Roles was successful

KC 18901746.2

bidder. Roles shall be entitled to all of the findings and protections of this Order and will be considered the "Purchaser" as set forth in this Order.

45.    Should the PS Funding, the Stalking Horse, Roles, or their successors or assigns fail to close on the sale, and without further order from this Court, the Trustee is authorized and empowered to sell the Property to URL and execute and deliver the agreements contemplated herein and to implement and consummate all of the transactions and perform all obligations contemplated by URL's back-up bid at the Auction and this Order as if URL was successful bidder. URL shall be entitled to all of the findings and protections of this Order and will be considered the "Purchaser" as set forth in this Order. Further, in the instance where URL becomes the "Purchaser", the lease rejection provisions of this Order become effective.

46.    The PSA, all exhibits and schedules thereto, and all of the terms and conditions thereof are hereby approved.

47.    Pursuant to Bankruptcy Code §§ 105, 363 and 365, the Trustee is authorized and directed to consummate the sale of the Property, pursuant to and in accordance with the terms and conditions of the PSA, including, without limitation, to convey to Purchaser the Property and assume and assign the Assumed Contracts and rights thereunder.

48.    Without need for any additional Court order, the Trustee and his agents are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the PSA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the PSA, and to take all further actions as may be reasonably requested by Purchaser or otherwise required under the PSA.

49.    The consideration to be provided by Purchaser for the purchase of the Property under the PSA constitutes reasonably equivalent value, fair value, and fair consideration thereof

KC 18901746.2

under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable state or federal law.

50.     Pursuant to Bankruptcy Code §§ 105(a), 363(b) and 363(f), the transfer of the Property to the Purchaser pursuant to the PSA shall (a) be valid, legal, binding, and effective transfers, (b) vest Purchaser with all rights, title, and interest of the Debtor's estate in and to the Property effective as of the time of the transfers under the PSA, and (c) be free and clear of liens, claims, encumbrances, and other interests in the Property (except as otherwise provided herein or in the PSA) including, without limitation, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens — including, without limitation, mechanics', materialmens' and other consensual and nonconsensual liens and statutory liens — judgments, demands, encumbrances, rights of first refusal, offsets, contracts, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any Court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtor, its estate, or its predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether

KC 18901746.2

arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, law, equity or otherwise, with all the same released, terminated and discharged as to the Property.

51.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Trustee to transfer the Property to the Purchaser in accordance with this Order and the terms of the PSA, or otherwise interfere with Purchaser's title to or use and enjoyment of the Property.

52.     This Order shall be the Court's determination that, on the closing date of the respective PSA, all liens, claims, encumbrances, and other interests in and to the Property being conveyed have been unconditionally released, discharged, and terminated from the Property.

53.     Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Property other than as expressly set forth herein or in the PSA, and in no event shall Purchaser have any liability or responsibility for any liabilities of the Debtor (including any unrecorded liabilities of the Debtor) other than as expressly set forth herein or in the PSA. Without limiting the effect or scope of the foregoing, the transfer of the Property from the Trustee to Purchaser does not and will not subject Purchaser or its affiliates, successors or assigns or their respective properties (including the Property) to any liability for claims (as that term is defined in Bankruptcy Code § 101(5)) against the Debtor or the Property (other than as expressly set forth herein or in the PSA) by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions. Except as otherwise provided herein or in the PSA, on and after the closing date of the PSA, all

KC 18901746.2

persons or entities holding liens, claims, encumbrances, or other interests of any kind and nature with respect to the Property are hereby forever barred and estopped from asserting such liens, claims, encumbrances, or other interests of any kind or nature against Purchaser, their successors or assigns, or the Property.

54.     On and after the closing date, except as otherwise set forth herein or in the PSA, the Trustee shall have no liability or responsibility for the Property.

55.     On the closing date, the Trustee is hereby authorized, but not directed, pursuant to §§ 363 and 365 of the Bankruptcy Code, to assume and assign to the applicable Purchaser the Assumed Contracts and rights thereunder.

56.     Except as it relates to URL as a potential purchaser, on the closing date, the Debtor's right, title and interest in, to and under the Assumed Contracts attributable to the Property shall be assumed by the Debtor's estate and assigned to Purchaser, and the Assumed Contracts will remain valid and binding and in full force and effect in accordance with their respective terms for the benefit of Purchaser, notwithstanding any provision in such contracts or leases (including those described in Bankruptcy Code §§ 365(b)(2) and (f)(1) and (3)), that prohibits, restricts or conditions such assignment or transfer.

57.     The Trustee is further authorized to take any and all actions necessary or appropriate to consummate the proposed assignment of the Debtor's right, title and interest in, to and under the Assumed Contracts to Purchaser, as specified in the PSA. Purchaser shall have no liability for any defaults under the Assumed Contracts (except as may be explicitly provided in the PSA) that occurred prior to the assignment of the Debtor's right, title and interest in, to and under the Assumed Contracts. Pursuant to Bankruptcy Code § 365(k), the Trustee, Debtor and

KC 18901746.2

bankruptcy estate are relieved of any liability for any breach of any Assumed Contract that is assigned to Purchaser occurring after the assignment of such Assumed Contracts to Purchaser.

58.    The Trustee and/or any property management company are authorized to transfer any deposits related to the leases related to the Property and execute such other necessary documents and take other necessary actions in connection therewith.

59.    The failure of the Trustee or Purchaser to enforce at any time one or more terms or conditions of any Assumed Contracts shall not be a waiver of such terms or conditions, or of Purchaser' rights to enforce every term and condition of the Assumed Contracts.

60.    There shall be no rent accelerations, assignment fees, increases, or any other fees charged to Purchaser as a result of the assumption, assignment, and sale of the Assumed Contracts.

61.    The Trustee is authorized to execute such other necessary documents and take other necessary actions in connection the closing of the sale of Property and assignment of Assumed Contracts.

62.    No bulk sales law, or similar law of any state or other jurisdiction, shall apply in any way to the transaction contemplated by the PSA and this Order.

63.    The failure specifically to include any particular provision of the PSA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the PSA be authorized and approved in its entirety.

64.    This Order (a) shall be effective as a determination that, on the closing date, all liens, claims, encumbrances, other interests, and rights of any kind or nature whatsoever existing with respect to the Property have been unconditionally released, discharged and terminated (except as otherwise provided herein or in the PSA), and that the conveyances described herein have been effected and (b) shall be binding upon and shall govern the acts of all entities, including without

KC 18901746.2

limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Property.

65.    Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and/or recording, and approve as necessary, any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the PSA.

66.    To the extent permitted by Bankruptcy Code § 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Property sold, transferred, or conveyed to Purchaser on account of the filing or pendency of these cases or the consummation of the sale.

67.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing claims or interests with respect to the Property shall not have delivered to the Trustee prior to the closing date, in proper form for filing and executed by the appropriate parties, releases of liens or interests which the person or entity has with respect to the Property, then Purchaser, at its own expense, is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests in the Property of any kind or nature whatsoever to the extent provided herein.

KC 18901746.2

68.    All entities that presently are in possession of some or all the Property hereby are directed to surrender possession of the Property to Purchaser at the closing date.

69.    This Court retains exclusive jurisdiction so long as the Debtor's case is pending to determine as a core proceeding (by motion and without necessity for an adversary proceeding) any proceeding, dispute, or controversy (i) to enforce and implement the terms and provisions of the PSA (including any breach of the PSA), all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects and (ii) arising out of or related to this Order and the PSA.

70.     The transactions contemplated by the PSA are undertaken by Purchaser in good faith, as that term is used in Bankruptcy Code § 363(m). Accordingly, the reversal or modification of the authorization provided herein to consummate the transactions contemplated herein shall not affect the validity of the sale of the Property to Purchaser, unless such authorization is duly stayed. Purchaser is entitled to all of the protections afforded by Bankruptcy Code § 363(m).

71.    The consideration to be provided by Purchaser for the Property under the PSA is fair and reasonable, and the sale of the Property and the related transactions may not be avoided under Bankruptcy Code § 363(n).

72.    The terms and conditions of the PSA and this Order shall be binding in all respects and shall inure to the benefit of the Trustee, Debtor and its creditors and interest holders, successors, and assigns and Purchaser, and its respective affiliates, successors and assigns.

73.    The PSA and any related agreements, documents or other instruments may be modified, amended, supplemented, or waived by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that

KC 18901746.2

such modification, amendment, supplement, or waiver shall not have a material adverse effect on the Debtor's estate.

74.    At the time of closing and if it is the "Purchaser", PS Funding (or its assigns) shall pay to the Title Company an amount to cover the Carveout and an amount sufficient to pay the estate's share of the closing costs, including outstanding real property taxes and tax liens, and sufficient to pay the Buyer's Premium. The Trustee is further authorized and directed to transfer the Carveout to his operating account for the benefit of administrative expenses and unsecured creditors, free and clear of liens.

75.    If PS Funding (or its assigns) does not close and the bankruptcy estate closes with either the Stalking Horse, Roles or URL, then the following shall apply:

      a.    At the time of closing, and from the proceeds of the sale, the Trustee is authorized and directed to pay the estate's share of the closing costs, including outstanding real property taxes and tax liens. The Trustee is further authorized and directed to transfer the Carveout to his operating account for the benefit of administrative expenses and unsecured creditors, free and clear of liens.

      b.    Any Liens shall attach to the sale proceeds with the same extent, priority, and validity as the liens in the Property except for the Carveout which shall be free and clear of liens. The Trustee shall distribute the net proceeds and Buyer's Premium pursuant to subsequent Court Order(s).

76.    The provisions of this Order are non-severable and mutually dependent.

77.    In the event of any inconsistency between the terms and provisions of this Order and the PSA, the terms and provisions of this Order shall control unless explicitly provided otherwise herein.

78.    Nothing in this Order, except for the amount credited to the debt owed to PS Funding, shall have any impact or other preclusive effect in other court proceedings.

79.    This Court may supplement this Order with one or more additional orders within the scope of this Order, with or without additional notice or opportunity for a hearing to other

KC 18901746.2

parties depending upon the facts and circumstances as determined by the Court at the time the Court is requested to enter such separate order(s).

80.    Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), there is no stay pursuant to Bankruptcy Rule 6004(h) or 6006(d) and this Order shall be effective and enforceable immediately upon entry.

81.    Counsel for Trustee shall serve a copy of this Order by mail to all interested parties who were not served electronically.

###

Respectfully submitted,

SPENCER FANE LLP

By:     /s/ Elizabeth M. Lally
Elizabeth M. Lally (*pro hac vice*)
13815 FNB Parkway, Suite 200
Omaha, NE 68154
Phone:  (402) 800-2299
Facsimile:  (402) 965-8601
Email: elally@spenerfane.com

Eric L. Johnson                  KS #20542
Andrea M. Chase                  KS #26307
1000 Walnut St., Suite 1400
Kansas City, Missouri  64106-2140
Phone: 816-474-8100
Facsimile: 816-474-3216
Email: ejohnson@spencerfane.com
        achase@spencerfane.com

COUNSEL FOR CHAPTER 11 TRUSTEE

KC 18901746.2

**PURCHASE AND SALE AGREEMENT**

between

PS FUNDING, INC.
(as purchaser)

and

**ERIC L. JOHNSON, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
OF US REAL ESTATE EQUITY BUILDER LLC**
(as seller)

KC 18398980.6

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**"), is made and entered into as of July 18, 2022 ("**Effective Date**"), by and between PS Funding Inc., a Delaware corporation, (the "**Purchaser**"), and Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**").

**WHEREAS**, US Real Estate Equity Builder LLC, a Missouri limited liability company ("**USREEB**") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined below) on October 2, 2020. On December 10, 2020, Seller was appointed as the Chapter 11 Trustee of USREEB's estate. The USREEB case is pending before the United States Bankruptcy Court for the District of Kansas (the "**Bankruptcy Court**") styled *In re US Real Estate Equity Builder LLC*, Case No. 20-21358 (the "**Bankruptcy Case**"); and

**WHEREAS**, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, the Property (this and other capitalized terms used and not otherwise defined herein have the meanings given them terms in Section 1 below), subject to and upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the Seller and the Purchaser intending to be legally bound agree as follows:

## SECTION I.  DEFINITIONS

Capitalized terms used in this Agreement have the meanings set forth below or in the section of this Agreement referred to below:

1.1.    "**Agreement**" has the meaning given such term in the Preamble to this Agreement.

1.2.    "**Alternative Transaction**" shall mean a transaction or series of transactions pursuant to which Seller sells, transfers, leases, or otherwise disposes of all or any material portion of the Property to a person other than Purchaser.

1.3.    "**Apportioned Items**" has the meaning given such term in Section 9.1(a).

1.4.    "**Assumed Contracts**" means any contracts, leases, licenses, or other agreements with respect to the operation or occupancy of Property, or any portion thereof, and identified on Exhibit A.

1.5.    "**Auction**" shall mean the auction conducted by Seller pursuant to the Bidding Procedures Order for the Property entered in the Bankruptcy Case at Docket No. 640.

1.6.    "**Back-up Bidder**" has the meaning given such term in Section 12.5.

1.7.    "**Bankruptcy Case**" has the meaning given such term in the Recitals of this Agreement.

-1-

KC 19011271.1

**Exhibit 1**

1.8.    "**Bankruptcy Code**" means Title 11 and applicable portions of Titles 18 and 28 of the United States Code.

1.9.    "**Bankruptcy Court**" has the meaning given such term in the Recitals of this Agreement.

1.10.    "**Business Day**" means any day other than a Saturday, Sunday or any day that is a "Legal Holiday" as defined in Bankruptcy Rule 9006(a)(6).

1.11.    "**Closing**" has the meaning given such term in Section 2.2.

1.12.    "**Closing Date**" has the meaning given such term in Section 2.2.

1.13.    "**Closing Documents**" has the meaning given such term in Section 4.1.

1.14.    "**Competing Offer**" has the meaning given such term in Section 12.3.

1.15.    "**Deposit**" has the meaning given such term in Section 2.4.

1.16.    "**Due Diligence Period**" has the meaning given such term in Section 3.1(a).

1.17.    "**Effective Date**" has the meaning given such term in the Preamble to this Agreement.

1.18.    "**Environmental Law**" means any and all federal, state and municipal statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, codes, plans, injunctions, permits, concessions, grants, franchises, licenses, agreements or other governmental restrictions relating to the environment or to emissions, discharges or releases of Hazardous Substances into the environment including ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances or the cleanup or other remediation thereof.

1.19.    "**Excluded Property**" means the property specifically listed on Schedule 1.19.

1.20.    "**Fixtures**" means all fixtures, furniture, equipment, machinery, systems and other items of personal property owned by the Seller and attached or appurtenant to, located on, and used in connection with the ownership, use, operation or maintenance of the Land and Improvements (including but not limited to all alarm systems, and all plumbing, heating, air conditioning and lighting fixtures and equipment, cabinets and awnings), other than the Excluded Property.

1.21.    "**Hazardous Substances**" means and include any oils, petroleum products, asbestos, radioactive, biological, medical or infectious wastes or materials, and any other toxic or hazardous wastes, materials and substances that are defined, determined or identified as such in any Environmental Laws, or in any judicial or administrative interpretation of Environmental Laws.

-2-

KC 19011271.1

1.22.   "**Improvements**" means the buildings and other improvements located on the Land.

1.23.   "**Land**" means that certain parcel of land commonly known and numbered as 440 E. 63rd St., Kansas City, Missouri 64110, which land is more particularly described on Exhibit B, together with all rights and appurtenances thereto, including all right, title and interest of Seller in and to any water and mineral rights and adjacent streets, alleys or rights of way.

1.24.   "**Licenses and Permits**" means any certificates of occupancy and other licenses, permits, registrations, authorizations, use agreements, orders, or approvals of governmental or quasi-governmental agencies and authorities (whether federal, state, local, municipal, or foreign) or private parties relating to the construction, use, operation, or enjoyment of the Property, in each case to the extent transferable.

1.25.   "**Lien**" means any lien, mortgage, pledge, claim, charge, security interest, hypothecation or encumbrance of any nature whatsoever.

1.26.   "**Property**" means, collectively, the Land, the Improvements, the Fixtures, the Licenses and Permits, and any Assumed Contracts, but does not include the Excluded Property.

1.27.   "**Purchase Price**" has the meaning given such term in Section 2.3.

1.28.   "**Purchaser**" has the meaning given such term in the Preamble to this Agreement.

1.29.

1.30.   "**Sale Order**" means the order to be entered by the Bankruptcy Court in form and substance reasonably acceptable to Seller and Purchaser pursuant to Sections 105, 363 or 365, as applicable, of the Bankruptcy Code (i) authorizing the sale of the Property to the Purchaser or Successful Bidder (as defined in the Bidding Procedures) at any Auction; (ii) approving this Agreement or, if there is an Auction, the successful contract, and the transactions contemplated therein; (iii) approving, with specific findings of fact in support thereof, the sale of the Property to Purchaser or Successful Bidder free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code; (iv) finding, with specific findings of fact in support thereof, that Purchaser or Successful Bidder is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (v) authorizing and approving the results of any Auction; and (vi) finding that the order is final upon entry by the Bankruptcy Court.

1.31.   "**Seller**" has the meaning given such term in the Preamble to this Agreement.

1.32.   "**Survey**" has the meaning given such term in Section 3.2.

1.33.   "**Tenant**" means each tenant under any Assumed Contract, which includes any leases as further set forth in Exhibit A.

1.34.   "**Title Commitment**" has the meaning given such term in Section 3.3.

-3-

KC 19011271.1

1.35.  "**Title Company**" means National Secured Title or such other title company as mutually agreed to in writing by the Seller and Purchaser.

1.36.  "**Title Objection Notice**" has the meaning given such term in Section 3.4(a).

1.37.  "**Title Policy**" has the meaning given such term in Section 3.3.

1.38.  "**USREEB**" has the meaning given such term in the Recitals of this Agreement.

## SECTION II.  PURCHASE AND SALE; CLOSING

2.1.  **Purchase and Sale**.  On the terms and subject to the conditions contained in this Agreement and the Sale Order, the Seller agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Seller, the Property for the Purchase Price, subject to and in accordance with the terms and conditions of this Agreement and the Sale Order. Notwithstanding anything to the contrary contained in this Agreement, at Closing, Seller shall not transfer, convey, sell or assign to Purchaser any Excluded Property.

2.2.  **Closing**.  The purchase and sale of the Property will be consummated at a closing (the "**Closing**") through an escrow with the Title Company, or at such other location as the Seller and the Purchaser may agree, on or before the later of (a) 14 days after entry of the Sale Order, or (b) such date mutually agreed to by the Parties (the "**Closing Date**").  The Closing will be deemed to have occurred at 12:01 a.m. local time for the Property on the Closing Date.

2.3.  **Purchase Price**.

(a)  The aggregate purchase price for the Property shall be Eight Hundred Eighty Thousand and 00/100 Dollars ($880,000.00), plus Fifty Two Thousand and Eight Hundred and 00/100 Dollars ($52,800.00) for the six percent (6.00%) buyer's premium, for a total purchase price of $932,800.00 (the "**Purchase Price**"). The Purchase Price will be paid at Closing as follows: (a) Purchaser will pay to Seller in U.S. Dollars in good funds an amount equal to (i) the sum of any liens on the Property that are senior to the secured debt owed by Seller to Purchaser (the "**Purchaser Secured Debt**"), (ii) real estate, transfer, or ad valorem taxes, (iii) the 14% estate carve out ($123,200), and (iv) closing costs (collectively, the "**Cash Portion**"); and (b) Purchaser will pay the balance of the Purchase Price via credit bid pursuant to Section 363(k) of the Bankruptcy Code of a portion of the Purchaser Secured Debt (the "**Credit Bid Amount**"), with the balance of the Purchaser Secured Debt continuing to be due and owing to Purchaser.

(b)  On the earlier of (i) the Closing Date, or (ii) 14 days of entry of the Sale Order, the Purchaser will deposit the Cash Portion of the Purchase Price owed to the Title Company. At Closing, the Title Company will deliver the Cash Portion of the Purchase Price to the Seller, less amounts to be paid to the Title Company, and taxing authorities, which shall be paid directly to such parties at closing. Any commissions shall either be paid directly by the Title Company to sale agents, or, if no Order has been entered approving such compensation, by the Trustee upon Court approval of such commissions.

-4-

KC 19011271.1

## SECTION III.  DILIGENCE

3.1.    **Due Diligence Period**.

3.2.    **Title Insurance**.  Seller shall, within fourteen (14) Business Days after the entry of the Sale Order, request the Title Company to furnish to Purchaser and Seller a preliminary title insurance commitment (the "**Title Commitmen**t") issued by the Title Company pursuant to which the Title Company agrees to issue to Purchaser an ALTA owner's policy of standard title insurance (collectively, the "**Title Policy**"), in the amount of the Purchase Price, insuring fee simple title to the Land and Improvements in Purchaser, subject only to real estate taxes and assessments for the current year and subsequent years, not yet due and payable, and any encumbrances of record or other exceptions on the Title Commitment which are expressly approved in writing by Purchaser or which are deemed approved by Purchaser as provided in this Agreement ("**Permitted Encumbrances**").  The premium for the Title Policy shall be at the sole cost of Seller; provided, however, that any endorsements to the Title Policy requested by Purchaser, as well as any lender's policy of title insurance, shall be at the sole cost of Purchaser.

3.3.    **Seller's Title Documents**.  Seller agrees to execute, acknowledge and deliver to the Title Company, on or before the Closing Date, such documents, instruments and other information as the Title Company shall reasonably require as a condition to issuance of the Title Policy to the extent it is in the Seller's power to deliver such documents.  Seller shall make reasonable efforts to attempt to compel USREEB to execute any documents.

## SECTION IV.  CONDITIONS TO THE PURCHASER'S OBLIGATION TO CLOSE

The obligation of the Purchaser to acquire the Property is subject to the satisfaction of the following conditions precedent on and as of the Closing Date such that if any condition fails, and is not waived in writing by the Purchaser, the Purchaser may terminate this Agreement and receive a prompt return of the Deposit:

4.1.    **Closing Documents**.  The Seller shall have delivered to the Title Company or Purchaser the following (collectively, the "**Closing Documents**"), duly executed by Seller and, where applicable, acknowledged by notary:

(a)    A trustee's deed for transfer of the Land and Improvements, in substantially the form of Exhibit C (the "**Deed**");

(b)    If applicable, an Assignment and Assumption Agreement for assignment and assumption of any Assumed Contracts, in substantially the form of Exhibit D (the "**Assignment and Assumption Agreement**");

(c)    A Quit Claim Bill of Sale and General Assignment for transfer of the Fixtures and Licenses and Permits, in substantially the form of Exhibit E;

(d)    A settlement statement prepared by the Title Company, together with any other affidavits and agreements reasonably required by the Title Company in order to issue the Title Policy, and

-5-

KC 19011271.1

     (e)    Such other documents, instruments, certificates and assurances as are reasonably required to consummate the transactions contemplated by this Agreement.

    4.2.    **Condition of Property**.  The Property, including all improvements located thereon, is in substantially the same physical condition on the Closing Date as on the Effective Date, ordinary wear and tear and damage by casualty or condemnation excepted (subject to the terms of, and except as otherwise provided pursuant to, this Agreement).

    4.3.    **Seller's Representations and Warranties**.  All representations and warranties of the Seller herein shall remain true, correct and complete in all material respects on and as of the Closing Date and the Seller shall have performed all covenants and obligations required to be performed by the Seller on or before the Closing Date.

    4.4.    **Bankruptcy Court Approval**.  The Bankruptcy Court shall have entered the Sale Order.

    4.5.    **Title Policy**.  The Title Company shall have committed to the issuance of the Title Policy, subject only to the Permitted Encumbrances.

## SECTION V.  CONDITIONS TO THE SELLER'S OBLIGATION TO CLOSE

    The obligation of the Seller to convey the Property to the Purchaser is subject to the satisfaction of the following conditions precedent on and as of the Closing Date such that if any condition fails, and is not waived in writing by the Seller, the Seller may terminate this Agreement:

    5.1.    **Purchase Price**.  The Purchaser shall have delivered to the Title Company or Seller the Purchase Price payable hereunder.

    5.2.    **Closing Documents**.  The Purchaser shall have delivered to the Title Company or the Seller a duly executed counterpart of the Assignment and Assumption Agreement, the settlement statement prepared by the Title Company, and such other documents, instruments, certificates and assurances as are reasonably required to consummate the transactions contemplated by this Agreement.

    5.3.    **Representations**.  All representations and warranties of the Purchaser herein shall remain true, correct and complete in all material respects on and as of the Closing Date and the Purchaser shall have performed all covenants and obligations required to be performed by the Purchaser on or before the Closing Date.

    5.4.    **Bankruptcy Court Approval**.  The Bankruptcy Court shall have entered the Sale Order.

## SECTION VI.  REPRESENTATIONS AND WARRANTIES OF THE SELLER

    6.1.    **Representations of the Seller**.  To induce the Purchaser to enter into this Agreement, the Seller represents and warrants to the Purchaser as follows:

-6-

KC 19011271.1

    (a)    **Status and Authority of Seller**.  Subject to approval by the Bankruptcy Court, the Seller has all requisite power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

    (b)    **Use and Operation**.  To the best of Seller's knowledge, there are no governmental actions pending against the Property and there is no existing eminent domain or similar proceeding which would materially affect the Property, and neither Seller nor any of its agents, representatives or employees has received a written notice from any governmental agency or office or from any other third party alleging the Property's violation or alleged violation of applicable law.

    (c)    **Foreign Person**. Seller is not a "Foreign Person" within the meaning of Section 1445 of the Internal Revenue Code, as amended.

    (d)    **Knowledge Definition**.  The phrase "*to the best of Seller's knowledge*" means the actual knowledge, without investigation, of the Seller.

    6.2.    **Non-Survival of Representations and Warranties**.  The representations and warranties made by the Seller herein or pursuant hereto will expire with, and be terminated and extinguished by, the Closing, and thereafter neither the Seller nor any agent, contractor, director, officer, creditor or shareholder of the Seller will have any liability whatsoever with respect to any such representations or warranties.

    6.3.    **DISCLAIMER OF SELLER'S WARRANTIES.**

    (a)    GENERAL. PURCHASER HEREBY EXPRESSLY ACKNOWLEDGES THAT, PRIOR TO THE END OF THE DUE DILIGENCE PERIOD, PURCHASER WILL HAVE THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE PURCHASE OF THE PROPERTY.  PURCHASER IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS AND PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF AS PURCHASER DEEMS APPROPRIATE AND NECESSARY. UPON CLOSING, PURCHASER WILL ASSUME THE RISK OF ANY ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS THAT MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS.   PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER IS ACQUIRING THE PROPERTY ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT.   PURCHASER HEREBY WAIVES AND RELINQUISHES ALL RIGHTS AND PRIVILEGES ARISING OUT OF, OR WITH RESPECT OR IN RELATION TO, ANY REPRESENTATIONS, WARRANTIES OR COVENANTS, WHETHER EXPRESS OR IMPLIED, WHICH MAY HAVE BEEN MADE OR GIVEN, OR WHICH MAY HAVE BEEN DEEMED TO HAVE BEEN MADE OR GIVEN, BY SELLER OR ITS AGENTS OR REPRESENTATIVES, EXCEPT FOR THOSE EXPRESSLY

KC 19011271.1

SET FORTH IN THIS AGREEMENT AND THE DEED. UPON THE CLOSING, PURCHASER AGREES TO ASSUME ALL FUTURE RISK AND LIABILITY (AND AGREES THAT SELLER WILL NOT BE LIABLE FOR ANY FUTURE SPECIAL, DIRECT, INDIRECT, CONSEQUENTIAL OR OTHER DAMAGES) RESULTING OR ARISING FROM OR RELATING TO PURCHASER'S OWNERSHIP, USE, CONDITION, LOCATION, MAINTENANCE, REPAIR OR OPERATION OF THE PROPERTY.

(b)     SPECIFIC. WITHOUT LIMITING THE GENERAL PROVISIONS OF SECTION 6.3(a), BUT SUBJECT TO THE PROVISIONS OF SECTION 6.3(c), EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, AS TO MATTERS OF ZONING, COMPLIANCE WITH STATUTES, LAWS, REGULATIONS, ORDINANCES, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION: (I) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY AND (II) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES THAT SELLER HAS NOT WARRANTED, AND DOES NOT HEREBY WARRANT, THE PROPERTY NOW OR IN THE FUTURE WILL MEET OR COMPLY WITH THE REQUIREMENTS OF ANY SAFETY, BUILDING, ZONING OR PLATTING CODES, ENVIRONMENTAL LAW OR LAWS OF THE COUNTRY, STATE, COUNTY OR CITY IN WHICH THE PROPERTY IS LOCATED OR ANY OTHER AUTHORITY OR JURISDICTION.

## SECTION VII.  REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

7.1.     **Representations of the Purchaser**.  To induce the Seller to enter in this Agreement, the Purchaser represents and warrants to the Seller as follows:

(a)     **Status and Authority of the Purchaser**.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite power and authority to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

(b)     **Action of the Purchaser**.  The Purchaser has taken all necessary action to authorize the execution, delivery and performance of this Agreement, and upon the execution and delivery of any document to be delivered by the Purchaser on or prior to the Closing Date, this Agreement and such documents will constitute the valid and binding obligation and agreement of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general application affecting the rights and remedies of creditors.

(c)     **No Violations of Agreements**.   Neither the execution, delivery or performance of this Agreement by the Purchaser, nor compliance with the terms and provisions

KC 19011271.1

hereof, will result in any breach of the terms, conditions or provisions of, or conflict with or constitute a default under, or result in the creation of any Lien upon any property or assets of the Purchaser pursuant to the terms of any indenture, mortgage, deed of trust, note, evidence of indebtedness or any other agreement or instrument by which the Purchaser is bound.

(d)    **Litigation**.  No investigation, action or proceeding is pending and, to the Purchaser's knowledge, no action or proceeding is threatened and no investigation looking toward such an action or proceeding has begun, that questions the validity of this Agreement or any action taken or to be taken pursuant hereto.

(e)    **Financing**.  The Purchaser has sufficient available funds to pay the Purchase Price at the Closing.

(f)    **Bid Required Representations**.  Purchaser (i) has relied solely upon its own independent review, investigation and/or inspection of the Property in submitting this Agreement, (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Property or the transaction contemplated herein, or the completeness of any information provided in connection therewith, except as expressly stated herein, and (iii) has authority to enter into this Agreement, execute any necessary documents to close on the transactions contemplated herein, and proceed to Closing.

(g)    **Adequate Assurance of Future Performance**.  Purchaser is and will be capable of providing to counterparties to any Assumed Contracts adequate assurances of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code.

## SECTION VIII.  COVENANTS OF THE SELLER

The Seller hereby covenants with the Purchaser between the date of this Agreement and the Closing Date as follows:

8.1.    **Actions Without Purchaser's Consent**.  Subject to the terms and provisions of this Agreement, Seller shall not, without the prior consent of Purchaser, which consent shall not be unreasonably withheld, conditioned, or delayed, (a) enter into any lease, concession agreement, license agreement, easement agreement or other agreement relating to the Property or any part thereof that will continue past Closing; (b) amend, modify, terminate, or renew any Assumed Contract; or (c) sell, transfer, assign, or otherwise convey any of the Property to anyone other than Purchaser.

8.2.    **Notice of Material Changes or Untrue Representations**.  Upon learning of any material change in any condition with respect to the Property or of any event or circumstance that makes any representation or warranty of the Seller under this Agreement untrue in any material respect, promptly to notify the Purchaser thereof.

8.3.    **Operation of Property**.  To continue to operate the Property in a fashion consistent with past practices; provided, however, that Seller will terminate, effective as of the Closing Date, all employment contracts with employees at the Property.

-9-

KC 19011271.1

## SECTION IX.  APPORTIONMENTS

9.1.    **Real Property Apportionments**.

(a)    The following items will be apportioned at the Closing as of 12:01 a.m. local time for the Property on the Closing Date (the "**Apportioned Items**"):

(i)    amounts owed or owing under any Assumed Contract;

(ii)    all other items of income and expense normally apportioned in sales of property in similar situations;

(iii)    if applicable, monthly rents and other fixed charges payable under any Assumed Contract;

(iv)    if applicable, percentage rents and other unfixed charges payable under any Assumed Contract;

(v)    gas, electric, water and other utility costs;

(vi)    municipal assessments and governmental license and permit fees;

(vii)    real estate taxes and assessments, based on the rates and assessed valuation applicable in the fiscal year for which assessed; and

(viii)    personal property taxes and assessments, if any, based on the rates and assessed valuation applicable in the fiscal year for which assessed.

(b)    For the avoidance of doubt, the Apportioned Items shall be apportioned to Seller prior to the Closing Date, and Apportioned Items shall be apportioned to Purchaser on and after the Closing Date. If any of the foregoing cannot be apportioned at the Closing because of the unavailability of the amounts that are to be apportioned, such items will be apportioned on the basis of a good faith written estimate by the parties and reconciled as soon as practicable after the Closing Date.  To the extent granted in the Sale Order, the sale, transfer, assignment and conveyance of the Property to the Purchaser will be entitled to the protections afforded under Section 1146(c) of the Bankruptcy Code.

(c)    If there are water, gas or electric meters located at the Property, the Seller will obtain readings thereof to a date not more than thirty (30) days prior to the Closing Date and the unfixed water rates and charges, sewer taxes and rents and gas and electricity charges, if any, based thereon for the intervening time will be apportioned on the basis of the last readings.  If readings are not obtainable by the Closing Date, then, at the Closing, any water rates and charges, sewer taxes and rents and gas and electricity charges that are based on the readings will be prorated based upon the *per diem* charges obtained by using the most recent period for which readings are then available.

(d)    If any refunds of real property taxes or assessments, water rates and charges or sewer taxes and rents will be made after the Closing, the same will be held in trust by the Seller

-10-

or the Purchaser, as the case may be, and will first be applied to the unreimbursed costs incurred in obtaining the same, then to any required refunds to Tenants, and the balance, if any, will be paid to the Seller (for the period prior to the Closing Date) and to the Purchaser (for the period commencing with the Closing Date).

(e)     No insurance policies of the Seller are to be transferred to the Purchaser, and no apportionment of the premiums therefor will be made.

(f)     Tenant security deposits, if any, will be transferred to the Purchaser, and Purchaser shall become responsible for all claims related to the refund of Tenant security deposits.

(g)     If a net amount is owed by the Seller to the Purchaser pursuant to this Section 9.1, then such amount will be credited against the Purchase Price.  If a net amount is owed by the Purchaser to the Seller pursuant to this Section 9.1, then such amount will be paid together with the Purchase Price.

(h)     If there is a dispute between the parties with respect to amounts under this Section 9.1, undisputed amounts will be paid at Closing.  With respect to disputed amounts, a proper adjustment will be determined after the Closing Date by the Bankruptcy Court.

The provisions of this Section 9.1 will survive the Closing.

9.2.     **Closing Costs**.

(a)     The Purchaser will pay (i) all charges related to any endorsements to the Title Policy requested by Purchaser, and any lender's policy of title insurance, (ii) all applicable excise, sales, use, value added, registration, stamp, recording, documentary, conveyance, franchise, transfer, gains and similar taxes and impositions incurred in connection with the transactions contemplated by this Agreement, (iii) all charges for any Survey and (iv) all recording charges for the Deed.

(b)     The Seller will pay all charges for the Title Commitment (including search and exam fees) and Title Policy other than those costs identified in Section 9.2(a).

(c)     Each party will pay the fees and expenses of its attorneys and other consultants.  Any charges and expenses incurred by Title Company in effecting Closing will be shared equally by the parties.

(d)     Purchaser shall be solely responsible to provide to counterparties to any Assumed Contracts adequate assurances of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code.

**SECTION X.  DAMAGE TO OR CONDEMNATION OF PROPERTY**

10.1.     **Casualty**.  If, prior to the Closing, all or any part of the Property is destroyed or damaged by fire or other casualty, then the Seller will promptly notify the Purchaser of this fact.  If any such casualty damages all or any material portion of the Property, then the Purchaser may terminate this Agreement by giving notice thereof to the Seller not later than

-11-

KC 19011271.1

ten (10) Business Days after the date on which the Purchaser receives the Seller's notice as aforesaid. If the Purchaser elects to terminate this Agreement as aforesaid, then the Title Company will return the Deposit to the Purchaser, and, upon the Purchaser's receipt of the Deposit, this Agreement will terminate and be of no further force and effect and neither party will have any liability to the other hereunder (except for Purchaser's obligations under Section 3.1(c), which shall survive such termination). If any such casualty damages less than a material portion of the Land or Improvements or if the Purchaser elects not to terminate this Agreement as aforesaid, then there will be no abatement of the Purchase Price and the Seller will assign to the Purchaser at the Closing all of the Seller's rights to the insurance proceeds, if any, under the Seller's insurance policies covering the Land and Improvements with respect to such damage or destruction and there will be credited against the Purchase Price the following: (a) the amounts of any applicable insurance deductibles; and (b) the amounts of any proceeds previously received by Seller for the damage or destruction to the Land or Improvements.

10.2. **Condemnation**. If, prior to the Closing, all or any part of the Land or Improvements is taken by eminent domain (or is the subject of a pending taking that has not yet been consummated), then the Seller will promptly notify the Purchaser of this fact. If such taking affects all or any material portion of the Land or Improvements, then the Purchaser may terminate this Agreement by giving notice to the Seller not later than ten (10) Business Days after receipt of the Seller's notice. If the Purchaser elects to terminate this Agreement as aforesaid, then the Deposit will be returned to the Purchaser, and, upon the Purchaser's receipt of the Deposit, this Agreement will terminate and be of no further force and effect and neither party will have any liability to the other hereunder (except for Purchaser's obligations under Section 3.1(c), which shall survive such termination). If less than a material portion of the Land or Improvements is affected by a taking or if the Purchaser elects not to terminate this Agreement as aforesaid, then the sale of the Property will be consummated as herein provided without any adjustment to the Purchase Price (except to the extent of any condemnation award received by the Seller prior to the Closing) and the Seller will assign to the Purchaser at the Closing all of the Seller's right, title and interest in and to all awards, if any, for the taking, and the Purchaser will be entitled to receive and keep all awards for the taking of the Land or Improvements or portion thereof.

10.3. **Survival**. The parties' obligations, if any, under this Section X will survive the Closing.

## SECTION XI.  TERMINATION

11.1. **Default by the Seller**. If the Seller has made any representation or warranty herein that is untrue in any material respect, or if the Seller fails to perform any of the material covenants and agreements contained herein to be performed by the Seller, then the Purchaser may, as its sole and exclusive remedy, elect prior to the Closing to terminate this Agreement and receive a refund of the Deposit.

11.2. **Default by the Purchaser**. If the Purchaser has made any representation or warranty herein that is untrue in any material respect, or if the Purchaser fails to perform any of the covenants and agreements contained herein to be performed by it, then the Seller may,

KC 19011271.1

as its sole and exclusive remedy, elect prior to the Closing to terminate this Agreement and retain the Deposit, as liquidated damages and not as a penalty.

11.3.  **Offer Open Date**. Pursuant to the Bid Procedures approved by the Bankruptcy Court, Purchaser may not revoke, withdraw or otherwise terminate the offer reflected in this Agreement until thirty (30) days after the entry of the Sale Order except as otherwise provided herein.

## SECTION XII.  COURT APPROVAL PROCESS

12.1.  **Court Approval**. This Agreement is subject to approval by the Bankruptcy Court, pursuant to the Sale Order.  In the event (a) the Bankruptcy Case is terminated, (b) Seller is removed as Trustee for USREEB's estate, such that Seller no longer holds possession and control of the Property, or (c) the Bankruptcy Court does not approve and authorize this Agreement and the transactions contemplated herein pursuant to the Sale Order, then this Agreement shall automatically terminate, the Deposit shall be returned to Purchaser, and neither party hereto shall have any further obligation to the other hereunder except as expressly otherwise provided herein.

12.2.  **Other Bids**. Seller has solicited bids from other prospective Purchasers for the sale of the Property, on terms and conditions substantially the same in all respects to this Agreement (or more favorable terms to Seller). No other offers or bids for the Property shall be allowed after the entry of the Sale Order unless this Agreement is terminated pursuant to Section XI.

## SECTION XIII.  MISCELLANEOUS

13.1.  **Continuing Jurisdiction**.  The Bankruptcy Court will retain jurisdiction over the enforcement of this Agreement including the performance of the obligations and transactions contemplated hereunder.

13.2.  **Brokers**.  Mayo Auction and Realty represents the Seller. In the event that Purchaser is successful in closing on the purchase of the Property, the parties agree that the six percent (6%) buyer's premium will be paid at Closing (or upon entry of any order approving such compensation (whichever is later)) to Mayo Auction and Realty.

13.3.  **Notices**.  Any notice, request or demand hereunder may be given or furnished to or served upon a party by email, hand delivery, certified mail, return receipt requested, or express overnight delivery to the following addresses. Notice shall be deemed given three (3) Business Days after notice is deposited with the U.S. Mail, the next Business Day following timely deposit with an express overnight delivery service and at the time of hand delivery or email delivery.

if to the Seller, to:

Eric L. Johnson, Trustee
Spencer Fane LLP
1000 Walnut Street, Suite 1400

-13-

KC 19011271.1

**Exhibit 1**

>Kansas City, Missouri 64106
>Email: ejohnsontrustee@spencerfane.com

with a copy to:

>Elizabeth Lally
>Spencer Fane LLP
>13815 FNB Parkway, Suite 200
>Omaha, NE 68154
>Email: elally@spencerfane.com

If to the Purchaser, to:

>PS Funding, Inc.
>Attn: Matthew Dameron
>2121 Park Pl.
>El Segundo, CA 90245
>Email: mdameron@peerstreet.com

with a copy to:

>Sandberg Phoenix
>4600 Madison Avenue, Suite 1000
>Kansas City, MO 64112
>Attn: Sharon Stolte
>Email: sstolte@sandbergphoenix.com

By notice given as herein provided, the parties and their respective successors and permitted assigns may from time to time and at any time change their respective addresses effective upon receipt by the other party of such notice and each may specify as its address any other address within The United States of America.

13.4.  **Waivers**.  Any waiver of any term or condition of this Agreement, or of the breach of any covenant, representation or warranty contained herein, in any one instance, will not operate as or be deemed to be or construed as a further or continuing waiver of any other breach of such term, condition, covenant, representation or warranty or any other term, condition, covenant, representation or warranty, nor will any failure at any time or times to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such party's right at a later time to enforce or require performance of such provision or any other provision hereof.  This Agreement may not be amended, nor will any waiver, change, modification, consent or discharge be effected, except by (a) an instrument in writing executed by or on behalf of the party against whom enforcement of any amendment, waiver, change, modification, consent or discharge is sought, and (b) if the amendment, modification, consent, or discharge is of a material term of this Agreement, a final order of the Bankruptcy Court after appropriate notice and opportunity for a hearing to all parties in interest.

-14-

KC 19011271.1

13.5.    **Assignment; Successors and Assigns**.  This Agreement and all rights and obligations hereunder may not be assigned by any party without the written consent of the other party.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  This Agreement is not intended and may not be construed to create any rights in or to be enforceable in any part by any other persons.

13.6.    **Severability**.  If any provision of this Agreement is held or deemed to be, or in fact becomes, invalid, inoperative or unenforceable as applied to any particular case in any jurisdiction or jurisdictions, or in all jurisdictions or in all cases, because of the conflict of any provision with any constitution or statute or rule of public policy or for any other reason, such circumstance will not have the effect of rendering the provision or provisions in question invalid, inoperative or unenforceable in any other jurisdiction or in any other case or circumstance or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement will be reformed and construed in any such jurisdiction or case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such jurisdiction or in such case.

13.7.    **Counterparts**.  This Agreement may be executed in counterparts and delivered by facsimile, portable document format (.pdf) transmission or other electronic format, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.

13.8.    **Entire Agreement**.  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes and takes the place of any other instruments purporting to be an agreement of the parties hereto relating to the subject matter hereof.

13.9.    **Performance on Business Days**.  If the date on which performance or payment of any obligation of a party required hereunder is other than a Business Day, the time for payment or performance will automatically be extended to the next Business Day following such date.

13.10.    **Attorneys' Fees**.  Notwithstanding anything contained herein to the contrary, if any lawsuit or arbitration or other legal proceeding arises in connection with the interpretation or enforcement of this Agreement, the prevailing party therein will be entitled to receive from the other party the prevailing party's costs and expenses, including reasonable attorneys' fees incurred in connection therewith, in preparation therefor and on appeal therefrom, which amounts will be included in any judgment therein.

13.11.    **Time of Essence**.  Time is of the essence with respect to the performance of each and every covenant and obligation, and the giving of all notices, under this Agreement.

KC 19011271.1

13.12.  **Governing Law**.  This Agreement is governed by, and is to be construed in accordance with, the laws of the State of Missouri.

13.13.  **Certain Interpretive Matters**.  In construing this Agreement, it is the intent of the parties that:

(a)    no consideration may be given to the section headings, all of which are inserted for convenience in locating the provisions of this Agreement and not as an aid in its construction;

(b)    no consideration may be given to the fact or presumption that one party had a greater or lesser hand in drafting this Agreement;

(c)    examples are not to be construed to limit, expressly or by implication, the matter they illustrate;

(d)    the word "includes" and its derivatives means "includes, but is not limited to," and corresponding derivative expressions;

(e)    a defined term has its defined meaning throughout this Agreement and each exhibit and schedule to this Agreement, regardless of whether it appears before or after the place where it is defined;

(f)    the meanings of the defined terms are applicable to both the singular and plural forms thereof;

(g)    all references to prices, values or monetary amounts refer to United States dollars;

(h)    accounting terms not defined in this Agreement, and accounting terms partly defined to the extent not defined, have the respective meanings given to them under generally accepted accounting principles;

(i)    all references to sections, subsections, paragraphs, clauses, exhibits or schedules refer to sections, subsections, paragraphs and clauses of this Agreement, and to exhibits or schedules attached to this Agreement, unless expressly provided otherwise;

(j)    each exhibit and schedule to this Agreement is a part of this Agreement and references to the term "Agreement" are deemed to include each such exhibit and schedule to this Agreement except to the extent that the context indicates otherwise, but if there is any conflict or inconsistency between the main body of this Agreement and any exhibit or schedule, the provisions of the main body of this Agreement will prevail;

(k)    the words "this Agreement," "herein," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular article, section, subsection or other subdivision, unless expressly so limited;

(l)    the word "or" is disjunctive but not necessarily exclusive; and

-16-

KC 19011271.1

**Exhibit 1**

(m)    all references to agreements or laws are deemed to refer to such agreements or laws as amended or as in effect at the applicable time.

*[Remainder of Page Intentionally Left Blank – Signature Page to Follow]*

-17-

KC 19011271.1

**Exhibit 1**

The parties have caused this Purchase and Sale Agreement to be executed as of the date first above written.

**SELLER:**

By:  _____
     Eric L. Johnson, in his capacity as Chapter 11
     Trustee of US Real Estate Equity Builder LLC,
     and not individually

**PURCHASER:**

PS Funding, Inc., a Delaware corporation

By:  _____
Name:  Matthew Dameron
Title:  Authorized Signatory

-18-

KC 19011271.1

**Exhibit 1**

## <u>EXHIBIT A</u>

### ASSUMED CONTRACTS

Lease Agreement dated May 1, 2020 by and between USREEB LLC, as landlord, and Alpha One PM limited liability company, as tenant.

A-1

KC 19011271.1

## <u>EXHIBIT B</u>

### LAND

Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri.

B-1

KC 19011271.1

**Exhibit 1**

**EXHIBIT C**

**FORM OF DEED**

_____

(Space above reserved for Recorder of Deeds certification)

**COVER PAGE FOR RECORDING**

| | | |
|---|---|---|
| 1. | Title of Document: | Trustee's Deed |
| 2. | Date of Document: | _____, 2022 |
| 3. | Grantor: | Eric L. Johnson, as Chapter 11 Trustee of US Real Estate Equity Builder LLC |
| 4. | Grantee Name/Address: PSF TX 1, LLC. Attn: Matthew Dameron 2121 Park Pl. El Segundo, CA 90245 | _____ |
| 5. | Legal Description: | See Exhibit A |
| 6. | Book and Page Reference: | N/A |

C-1

KC 19011271.1

# TRUSTEE'S DEED

**THIS INDENTURE** is made this _____ day of _____, 2022, between Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company, as Grantor, and PSF TX 1, LLC, a Delaware limited liability company, as Grantee.

**WHEREAS**, Grantor, by virtue of the Order Approving (a) One or More Potential Sale(s) of All Assets Free and Clear of all Liens, Interests, Claims and Encumbrances, and Related Procedures and Bid Protection Pursuant to 11 U.S.C. §363, and (b) The Potential Assumption and Assignment, or Rejection, of Certain Executory Contracts and Unexpired Leases, and Related Procedures Pursuant to 11 U.S.C. §365, and (c) Related Relief Pursuant to 11 U.S.C. §105 (the "**Sale Order**") issued out of the U.S. Bankruptcy Court for the District of Kansas , in Case No. 20-21358, and dated _____ _____, 2022, does by these presents grant, bargain, sell and convey unto Grantee, its successors and assigns, all right, title and interest of Grantor "as is, where is" with no representations or warranty, in and to all of the real property situated in Jackson County, Missouri and legally described on Exhibit A attached hereto.

Subject to (i) all exceptions, easements, covenants, restrictions, reservations, rights of way and other matters of record, (ii) any matters that would be disclosed by a current accurate survey or physical inspection of said real property, and (iii) real estate taxes and assessments for 2022 and thereafter.

**TO HAVE AND TO HOLD** the above granted premises, together with the appurtenances and hereditaments and every part thereof, unto Grantee, its successors and assigns.

*[Signature and Acknowledgement on Following Page]*

C-2

KC 19011271.1

**Exhibit 1**

      **IN WITNESS WHEREOF**, Grantor has signed this Trustee's Deed as of the date first above written.

_____
Eric L. Johnson, as Chapter 11 Trustee for the
Bankruptcy Estate of US Real Estate Equity Builder
LLC, and not individually

STATE OF MISSOURI      )
                         ) ss.
COUNTY OF _____)

      On this _____ day of _____, 2022, before me, a Notary Public in and for said state, personally appeared Eric L. Johnson as Trustee for the Bankruptcy Estate of US Real Estate Equity Builder LLC, a Missouri limited liability company, known to me to be the person who executed the within Trustee's Deed in behalf of the Bankruptcy Estate of US Real Estate Equity Builder LLC, and acknowledged to me that he executed the same for the purposes therein stated.

_____
Notary Public

My commission expires:

C-3

KC 19011271.1

**Exhibit 1**

## **Exhibit A**

Lots 3, 4, 5 and 6, Block 1, ASTOR PLACE, a subdivision in Kansas City, Jackson County, Missouri

C-4

KC 19011271.1

## EXHIBIT D

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS

**THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS** (this "**Assignment**") is made and entered into as of _____, 2022, by and between Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**"), and PS Funding, Inc., a Delaware corporation (the "**Purchaser**").

WHEREAS, the Seller and the Purchaser are parties to that certain Purchase and Sale Agreement, dated as of **[_____]**, 2022 (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, and the Purchaser has agreed to purchase, certain land and other property as described in the Purchase Agreement; and

WHEREAS, in connection with the closing of the sale contemplated by the Purchase Agreement, the Seller has agreed to assign, and the Purchaser has agreed to assume, among other things, the Assumed Contracts (as such term is defined in the Purchase Agreement and as set forth on Exhibit A, subject to and upon the terms and conditions hereinafter set forth).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the Seller and the Purchaser agree as follows:

1.      Capitalized terms used and not otherwise defined herein have the meanings given them in the Purchase Agreement.

2.      The Seller hereby assigns to the Purchaser all of the Seller's right, title and interest in and to the Assumed Contracts.  The Purchaser hereby assumes, as of the date hereof, all of the Seller's obligations under the Assumed Contracts accruing from and after the date hereof.  The Purchaser hereby agrees to perform all of the Seller's obligations arising under the Assumed Contracts from and after the date hereof.

3.      This Assignment is binding on, and will inure to the benefit of, the parties hereto, their respective successors in interest, and their respective assigns.

4.      This Assignment is governed by, and is to be construed in accordance with, the laws of the State of Missouri.

5.      Neither party will record this Assignment.

6.      This Assignment may be executed in counterparts and delivered by facsimile, portable document format (.pdf) transmission or other electronic format, each of which shall be deemed an original, and all of which taken together shall constitute one and the same agreement.

[Signature page follows]

D-1

KC 19011271.1

**Exhibit 1**

      The parties have executed this Assignment and Assumption of Contracts as of the date first hereinabove written.

        **SELLER**:

    By: _____
        Eric L. Johnson, in his capacity as
        Chapter 11 Trustee of US Real Estate
        Equity Builder LLC, and not individually

        **PURCHASER:**

        PS Funding, Inc., a Delaware corporation

    By: _____
    Name:  Matthew Dameron
    Title:  Authorized Signatory

D-2

KC 19011271.1

**Exhibit 1**

## <u>Exhibit A</u>

**Assumed Contracts**

Lease Agreement dated May 1, 2020 by and between USREEB LLC, as landlord, and Alpha One PM limited liability company, as tenant

D-3

KC 19011271.1

**EXHIBIT E**

## QUIT CLAIM BILL OF SALE AND GENERAL ASSIGNMENT

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, Eric L. Johnson, in his capacity as Chapter 11 Trustee of US Real Estate Equity Builder LLC, a Missouri limited liability company (the "**Seller**"), effective as of the _____ day of _____, 2022, does hereby REMISE, RELEASE AND FOREVER QUIT CLAIM to PSF TX 1, LLC, a Delaware limited liability company (the "**Purchaser**"), and its successors and assigns, all of Seller's right, title and interest, if any, in and to all Fixtures, as such term is defined in that certain Purchase and Sale Agreement, dated as of **[_____]**, 2022 between Seller and Purchaser (the "**Purchase Agreement**").

EXCEPT AS OTHERWISE PROVIDED IN THE PURCHASE AGREEMENT, SELLER HAS NOT MADE AND DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER WITH RESPECT TO THE FIXTURES, INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE, DESIGN OR CONDITION, COMPLIANCE WITH THE REQUIREMENTS OF ANY RULE, LAW, REGULATION, ORDINANCE, SPECIFICATION OR CONTRACT, OR LATENT DEFECT.  EXCEPT AS OTHERWISE PROVIDED IN WRITTEN AGREEMENT BETWEEN SELLER AND PURCHASER, THE FIXTURES ARE SOLD "AS IS" AND "WITH ALL FAULTS."

If any taxes are assessed against the Fixtures, such taxes shall be prorated between Seller and Purchaser as of the date of conveyance.

FURTHERMORE, Seller does hereby assign, transfer, set over and deliver unto Purchaser all of Seller's right, title, and interest in and to all Licenses and Permits (as defined in the Purchase Agreement) to the extent any such Licenses and Permits are assignable.  Except as otherwise provided in the Purchase Agreement, this conveyance of Licenses and Permits is made on an "AS-IS", "WHERE-IS" basis, without any representations or warranties express or implied from Seller.

Seller has executed this Quit Claim Bill of Sale and General Assignment effective as of the date first above-written.

**SELLER**:

By: _____
      Eric L. Johnson, in his capacity as
      Chapter 11 Trustee of US Real Estate
      Equity Builder LLC, and not individual

KC 19011271.1

**Exhibit 1**

## <u>SCHEDULE 1.19</u>

**List of Excluded Property**

1.      Servers and other computer equipment for which the Seller has an interest.