*SOLICITATION VERSION*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (LSS) |
| Debtors. | (Jointly Administered) |

### COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN FOR PEER STREET, INC., AND ITS AFFILIATED DEBTORS

Dated: March 15, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Ryan M. Bartley (Del. Bar No. 4985)
S. Alexander Faris (Del. Bar No. 6278)
Shella Borovinskaya (Del. Bar No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
P. Bradley O'Neill (admitted *pro hac vice*)
Caroline Gange (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9511
Facsimile: (212) 715-8000

*Co-Counsel to the Debtors and Debtors in Possession*

> **This Plan is supported by the Official Committee (which is comprised entirely of Fractional Loan, Pocket, and OppFund investors) and the Pacific Creditors**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Peer Street, Inc. (8584); PS Funding, Inc. (3268); Peer Street Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485). The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn: David Dunn, Chief Restructuring Officer.

**DISCLAIMER**

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE ARTICLE VIII HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## **RECOMMENDATION**

**The Plan is the result of extensive, good faith negotiations between the Debtors, the Official Committee (comprised entirely of Fractional Loan, Pocket, and OppFund investors), and the Pacific Creditors.**

**The Plan was formulated in response to direct feedback from Peer Street investors, including the <u>hundreds of letters</u> filed by individual investors with the Bankruptcy Court, and an <u>extraordinary number of calls and emails</u> from Peer Street investors to the Official Committee.**

**The Plan represents a stark departure from Peer Street's initial strategy. Rather than selling the Underlying Loans, at a significant discount, the Plan provides for those loans to be "run off" by a replacement loan servicer, who will be supervised by an Advisory Committee appointed by the Official Committee and comprised of Holders of MPDNs and OppFund Interests.**

**<u>If the Plan is not approved</u>, <u>distributions</u> to Peer Street investors (including MPDNs for performing loans and investments in the Pocket product and Portfolio product) <u>will be significantly delayed</u>, by many months and potentially a year or more, <u>and millions of dollars of additional costs will likely be incurred</u>.**

**The Debtors, the Official Committee, and the Pacific Creditors <u>urge you to vote to accept the Plan</u>.**

# INTRODUCTION[1]

This is the Chapter 11 plan for Peer Street and its affiliates, referred to herein as the "Debtors." The Peer Street entities operated an online investment platform that allowed users that were accredited investors to invest in various Notes products and also sponsored the OppFund investment product.

After lengthy negotiations with the Committee and the Pacific Creditors, the Debtors hereby jointly propose this Plan for the resolution of their bankruptcy cases. By the Plan, the Debtors will transition management of the run-off of their mortgage assets to Colchis, an affiliate of the Pacific Creditors (as described in Article II), liquidate the Non-Loan Assets (as described in Article III), wind-down their corporate affairs (as described in Article III), and make distributions to Fractional Loan, Pocket, and OppFund investors and their other creditors (as described in Articles IV and IX).

**A.**     ***Why are the Debtors sending me this Combined Disclosure Statement and Plan?***

The Debtors sent you this Combined Disclosure Statement and Plan because the Debtors are seeking to obtain Bankruptcy Court approval of the Plan. The Committee, which is comprised entirely of Peer Street investors, fully supports the Plan. The Plan is the means by which the Debtors propose to implement the return of capital to investors and other creditors from the proceeds of the Debtors' assets, in particular the mortgage loan interests held by the Debtors. The Debtors and the Committee believe that the Plan provides for a resolution of the Chapter 11 Cases that allows for a return of value in a way that is most consistent with investors' expectation regarding how the various loan assets that the Debtors acquired and notes that the Debtors issued would be treated in repaying investors. The Debtors and the Committee also believe that if the Plan is not confirmed, any alternative to the Plan will (i) result in lower recoveries to investors and (ii) significantly delay the timing of such recoveries as the Debtors explore what alternative means exist to conclude these chapter 11 cases.

***The Debtors and the Committee, therefore, believe all creditors entitled to vote on the Plan should vote to accept it***.

At the outset of the bankruptcy cases, the Debtors proposed a sale of all of their mortgage interests (including those underlying their MPDN note products) and intended to use the proceeds of those mortgages to repay the claims of their creditors, including holders of MPDNs, RWNs, and PDNs consistent with the treatment of such proceeds under the terms of the notes in which each investor invested. While the Debtors believed that path was appropriate to maximize value, many investors in the note products expressed a preference to "run off" the mortgages. That is, allowing the underlying mortgages to liquidate in the ordinary course of Peer Street's business, whether paid through maturity, paid off through refinancing, other resolution of the mortgage (including a compromise or note sale), or subject to property foreclosure and resale. ***The Plan accomplishes this***.

---

[1]     Capitalized terms not defined in this Introduction shall have the meanings ascribed below.

The Debtors encourage all parties receiving this Plan to review the information herein in its entirety prior to voting on its implementation. Each ballot contains instructions for voting, as well as instructions for how to opt out of certain releases contained in the Plan that, if confirmed, would cause parties who do not opt-out to release claims or causes of action against various other parties. These releases are discussed in Section H of this Introduction and Section 14.1 and 14.3 of the Plan.

**B.** *What does the Plan do?*

If approved, the Plan implements four primary objectives.

*First*, the Plan provides for the immediate return to Peer Street investors of the vast majority of the Debtors' cash on hand.

- Investors in the Debtors' "Pocket 1 Month," "Pocket 3 Month," "OppFund" and "Portfolio" products will immediately receive all cash, net of allocated expenses described herein, associated with those investment products in a first and final distribution.

- Investors in the Debtors' "Fractional Note" and OppFund products will receive the proceeds of their underlying loans, net of (a) allocated expenses described herein, and (b) funds that may be "loaned," on a short-term basis and at a market interest rate, to assist with the run-off of unliquidated loans. This short-term "loan" is referenced in the Plan as the "Funding Pool," and will be repaid from the proceeds of future loan liquidations. However, if an outside exit facility is obtained, which is the Committee's preferred option and contemplated by the Plan, the Funding Pool will not be necessary and the cash that would have otherwise been loaned for that purpose will be immediately returned to investors, possibly subject to a customary reserve mechanism to ensure that costs are shared and recovered as contemplated by the Plan.

- If a loan is liquidated after the Plan becomes effective (referred to in the Plan as the "**Effective Date**"), the distribution to corresponding Fractional Loan or OppFund investors will be made immediately. If the loan is not liquidated, the distribution to investors will be made when the loan is liquidated.

*Second*, the Plan provides for the ordinary course run-off of unliquidated loans (including associated REO properties) under the supervision of an experienced, third-party asset manager. Specifically, the Debtors will transition management of their mortgage loan assets to Colchis Capital Management LP. Colchis is an affiliate of the Pacific Creditors, which are the largest investors in the Fractional Loan product. Colchis will manage the run-off of performing mortgage loans and resolve non-performing and REO properties in accordance with customary industry practices and standards. This run-off process will be subject to ultimate oversight by an Advisory Committee comprised of Fractional Loan investors. Colchis is entitled to reimbursement of expenses and compensation of: an Asset Management Fee of 1.5% of UPB *per annum* of loans or REO that are not liquidated as of the Effective Date; a Performance fee of 2% of collections (which is reduced by the Asset

Management Fee and Specified Expenses incurred for Colchis); and an up-front Structuring Fee of 0.5% of UPB of loans or REO that are not liquidated as of the Effective Date.

***Third***, the Plan recognizes the unfortunate reality that the Debtors are highly insolvent, and do not have an independent means to pay the costs associated with the chapter 11 process, the liquidation of the Debtors' assets, and the wind-down and run-off of the unliquidated loan portfolio. All of the Debtors' assets will be distributed to creditors under the Plan and, therefore, these costs must be borne by the Debtors' creditors. The Plan proposed to allocate these costs among creditors as follows:

- The ordinary course costs incurred to operate the Debtors' business (*e.g.*, paying employee salaries, maintaining leases and office space, running the technology platform) will allocated between Magnetar, the Debtors' secured lender, and the investors to the extent that their investments are backed by loan assets. These costs are referred to in the Plan as "OpEx." The OpEx allocated to investors is estimated to be $6,239,748, representing approximately 2.9% of UPB for Fractional Loan investors. The remaining OpEx, estimated to be $6,139,083, is being paid for with Magnetar's Cash Collateral.

- The restructuring costs incurred in connection with the bankruptcy (e.g., legal counsel fees, financial advisory fees) will be allocated between Magnetar and all investors in the Debtors' investment products. These costs are referred to in the Plan as "Restructuring Costs." As between Peer Street investors, the Restructuring Costs will be allocated ratably based on the face value of the assets associated with each investment product (including cash). The Restructuring Costs allocated to Peer Street investors are estimated to be $17,552,326. The remaining Restructuring Costs, estimated to be $2,996,297, are being paid for with Magnetar's Cash Collateral. This equates to an allocation of approximately 6.6% of UPB for Fractional Loan investors.

- In addition to the above allocation of Restructuring Costs and OpEx, investors in loans or REO properties that are not liquidated during the bankruptcy will directly bear the go-forward costs of servicing those assets on a go-forward basis. These costs will include the cost of borrowing money to fund payments that must be made on behalf of these investors before the corresponding assets are liquidated. If the funds are borrowed from the Funding Pool (which is described below), the borrowing cost is expected to be 14.2% per annum. If the funds are borrowed from a third-party exit lender, the borrowing costs will be disclosed in the Plan Supplement but is expected to be approximately 12.3% per annum (plus costs that are estimated to make the effective interest rate approximately 14.2% in the first year of the loan).

- ***Fourth***, the Plan provides ***no distribution or recovery*** to the Debtors' equity investors (*e.g.*, the venture capital funds that invested in the Debtors' business) or the Debtors' executives. Proceeds of non-loan assets are being paid to Magnetar or other creditors in accordance with their respective legal rights. The Debtors'

employees and other parties associated with the Debtors' business and the bankruptcy case will receive limited releases under the Plan in exchange for their contributions to bankruptcy cases generally and the formulation of the Plan. The Plan contemplates that the Debtors' will wind-down their corporate affairs and that Peer Street will eventually cease to exist.

### C.    *How are claims classified under the Plan, what is my projected recovery, and when can I expect to receive it?*

The Plan respects the contractual rights of Peer Street investors. So, for example, the net proceeds received from the liquidation of the loan backing a particular investment will be directed only to investors in that loan, and not to other investors or creditors, subject only to repayment of the costs and expenses allocated to the loan (as described above). The Plan classifies claims by investment product and, in the case of Fractional Loan products, by whether the underlying loan is liquidated by the Effective Date.

The recoveries to Peer Street investors are summarized in the following chart:[2]

| Class | Projected Recovery |
|---|---|
| Class 8: Pocket 1 Month Claims | 83-87% |
| Class 9: Pocket 3 Month Claims | 90-93% |
| Class 10: Liquidated MPDN Claims | Aggregate Distribution: 85-90% *Subject to initial holdback of ~23% if Funding Pool implemented |
| Class 10-1: Convenience Liquidated MPDN Claims | Aggregate Distribution: 75-90% *May be subject to initial holdback of ~23% if Funding Pool implemented **Subject to permanent 10% holdback if Funding Pool implemented and Convenience Holder election is made |
| Class 11: Unliquidated MPDN Claims | Aggregate Distribution: 0-90% *Subject to initial holdback of ~23% if Funding Pool implemented |
| Class 11-1: Convenience Unliquidated MPDN Claims | Aggregate Distribution: 0-90% *May be subject to initial holdback of ~23% if Funding Pool implemented **Subject to permanent 10% holdback if Funding Pool implemented and Convenience Holder election is made |
| Class 12: FBO Account Claims | 95-100% |
| Class 13: PDN Claims | 85-95% |
| Class 14: OppFund LP Interest | 75-90% |

---

[2]    The projected recoveries set forth in this Plan are estimates only and actual recoveries will depend on the performance of the underlying loan assets. Parties should read the entire Disclosure Statement and Plan, including the important disclaimers contained therein.

As described above, the Debtors have no independent means to pay the Restructuring Costs and OpEx and, therefore, these costs are being allocated to, and funded from, creditor recoveries. This is the reason why no investors are projected to receive 100% of the amount of their investment. In some instances, loan assets did not (or will not) fully perform and, as a result, the amount that can be repaid to investors in such a note product will be less than 100% before deducting allocated Restructuring Costs and OpEx, as well as specific amounts chargeable to the loan. In other instances, however, loan assets may over-perform, resulting in parties receiving amounts in excess of the Debtors' projections, and possibly even more than 100% of the amount invested. However, the Debtors anticipate this last scenario to be an exceptional result.

**D.** *How do I vote on the Plan?*

If you are a Peer Street investor or hold a claim in any of the other Voting Classes, you are entitled and encouraged to vote on the Plan. If you are entitled to vote, you will receive via e-mail (or regular mail for non-investors) a ballot and instructions to vote your Claim(s) in each Voting Class. **You will be able to vote online using the portal described in the ballot**. If you have any questions about the voting process, please immediately contact the Debtors' Claims Agent, Stretto by: (i) telephone at (833) 702-1320 (domestic toll-free), (949) 541-9932 (international, toll), or (ii) email at PeerStreetInquiries@stretto.com.

**The deadline to cast a ballot is April 16, 2024, so if you did not receive a ballot or you have questions, it is imperative that you contact Stretto immediately**.

**E.** *How are loan proceeds used under the Plan?*

As explained above, the Plan provides that the proceeds from the liquidation of each loan will be used to pay administrative, operating and restructuring costs allocated to such loan, with the remainder distributed to the Peer Street customers that invested in the loan. Each loan will also continue to pay the fees and expenses associated with servicing and managing the loan and servicing advances. If a loan has not liquidated by the Effective Date, the loan proceeds will also be surcharged by (a) the financing charges incurred to wind-down the loan after the bankruptcy concludes, and (b) the costs associated with money borrowed to fund administrative and wind-down costs that must be paid before the loan is liquidated. If the source of that financing is the internal loan facility described in the Plan as the "Funding Pool," a portion of the proceeds of all loans will be held for that purpose. In the event an outside exit facility is used, the Funding Pool will not be required.

**F.** *How does the Funding Pool work?*

If the Funding Pool is used, the Debtors will hold back proceeds from liquidated loans and contribute them to the Funding Pool and use the held-back funds to pay expenses allocated to loans that have not yet liquidated. Each loan that uses the Funding Pool will be assessed financing charges (equating to 14.2% *per annum*). The rate for the financing charge is intended to approximate a market rate of interest and has been informed by the negotiations with third-party capital providers, described below. When a loan liquidates, the amounts advanced from the Funding Pool will be repaid from the loan proceeds, plus the financing charge for such amounts assessed from the Effective Date of the Plan to the date advances from the Funding Pool are repaid.

The repaid amounts will then be used to repay investors that contributed to the Funding Pool. In addition, each investor that contributes to the Funding Pool will be entitled to a ratable share of the financing charges that remain at the conclusion of the wind-down of the loan portfolio and after the principal contributed to the Funding Pool has been repaid. It is anticipated that the Funding Pool will provide an approximately 14% *per annum* return on these borrowed funds, but the actual amount recovered may be lower if the amounts advanced from the Funding Pool and the associated financing charges cannot be repaid in full (e.g., if the value of the underlying loan is not sufficient to repay such amounts).

Through this process, the proceeds of loans that liquidate early are distributed in part and held-back in part to ensure that the costs of liquidating the loan portfolio can be paid for. Where funds are held-back, it is anticipated that those amounts are repaid over time from the proceeds of subsequent collections from loan resolutions (including REO sales). For loans that subsequently liquidated, these loans will also be subject to their own holdback, although the overall percentage of UPB that is held back from any loan to contribute to the Funding Pool on the date of liquidation is expected to decline over time. In addition, funds that are held back are subject to potential accretion through financing charges. On the other hand, loans that require utilization of amounts in the Funding Pool to get to their liquidation are assessed financing charges, resulting in dilution of recoveries on these loans.

The Debtors and the Committee initially decided to include the Funding Pool in the Plan because the Debtors' ability to obtain third-party financing to fund costs associated with unliquidated loans was uncertain, although the passage of time has shown that such third-party financing may be available and negotiations for third-party financing, which is the Committee's preferred financing, are ongoing. The Debtors and the Committee did not want the Debtors to be in a position where outside financing was the Debtors' only option, because that dynamic could have resulted in extraordinarily expensive exit financing. In addition, if the Funding Pool is used, financing costs are anticipated to have a net zero impact on the aggregate recoveries to investors, since financing charges assessed to one loan will, in effect, be repaid to the holders of earlier liquidated loans instead of to a third-party lender. The ability to deliver a material return for withheld funds, while not imposing too high of an interest rate as the cost of borrowing to support unliquidated loans, was a material consideration for pursuing the Funding Pool mechanism. The net zero impact on the aggregate portfolio (instead of dilution by paying interest to a third party lender) was another consideration in determining that the Funding Pool mechanism would be an appropriate tool, particularly since most investors in liquidated loans are also investors in unliquidated loans and, therefore, the financing charges paid in connection with the Funding Pool will effectively be round-tripped to many investors. That said, if the Funding Pool is used, there is the risk that amounts advanced from the Funding Pool for a particular loan cannot be fully recouped from the proceeds of that loan. In that instance, financing charges will first be used to absorb that loss and, second, if needed, the principal amounts contributed to the Funding Pool will be used ratably to offset such a shortfall.

## G.    *How would third-party exit financing work?*

The Committee believes that holders of Fractional Loan investments that invested in loans that have liquidated by the Effective Date may have a strong preference for using an outside source of capital to fund costs associated with unliquidated loans, rather than the Funding Pool

mechanism. The Committee has contacted five potential sources of third-party exit financing and has engaged in serious negotiations with two sources of financing. The Committee is currently negotiating with potential sources of outside financing and has obtained term sheets that contemplate an effective interest rate (after the inclusion of fees) of approximately 14.2%. The Committee and the Debtors will continue to negotiate with these sources of financing and, in the event that acceptable terms are reached with an exit lender, the terms of the exit lending will be disclosed in the Plan Supplement.

If exit financing is utilized, holders of liquidated loans can expect more accelerated distribution, since they will not be subject to holdbacks for the Funding Pool. As a result, they will not have the benefit of any accretion on those amounts from financing charges they may have shared in under the Funding Pool, and they will avoid the risk of dilution as a result of amounts advanced from the Funding Pool not being repaid from loans that liquidate after the Effective Date. Holders of unliquidated loans are likely to be subject to similar costs of borrowing under an exit financing versus the Funding Pool. However, the risk of dilution if amounts advanced from the exit facility are not repaid will be at more concentrated levels because there will be a smaller pool of assets over which that risk is spread.

## H.    *What Releases are in the Plan?  Who is a Released Party?*

Article XIV provides for certain exculpations, releases, and injunctions in connection with the Plan. The "Released Parties" under the Plan include the Debtors and its directors, officers and employees, the Debtors' advisors, the Committee's members and advisors, Magnetar and its advisors, and Colchis and the Pacific Creditors and their advisors. Section 14.3 of the Plan identifies these parties with more specificity. As detailed in section 14.3 of the Plan, the Debtors and the Committee have each individually undertaken to review, analyze and/or investigate potential claims or causes of action that any of the Debtors may assert against individuals or entities, including insiders of the Debtors. Hypothetical claims that were considered and are proposed to be released include claims for breaches of fiduciary duty, breaches of contract, and Avoidance Actions, in each instance subject to the carve-outs from the releases discussed herein. To date, no such actionable estate claims have been identified; the Debtors will, however, continue to assess whether any valuable estate claims do exist and warrant preservation.

The Plan will release substantially all of the Debtors' claims and causes of action against the Released Parties, including claims for breaches of fiduciary duty and breaches of contract. The releases **will not include** claims relating to fraud, gross negligence, willful misconduct, criminal acts, and for borrowed money and other indebtedness owed to the Debtors. The latter is intended to preserve, among other things, amounts owed to the Debtors by Brewster Johnson, the Debtors CEO, on account of a note issued by Mr. Johnson to Peer Street, Inc. on or about March 15, 2015 in the amount of $150,000, as amended, which is preserved for collection or other resolution by the Plan Administrator.

The Plan also proposes that Peer Street investors and other voting creditors will grant similar releases to the Released Parties, unless an investor or creditor affirmatively opts-out of granting such releases by making the appropriate election on its ballot. These releases by creditors are subject to the same exclusions for fraud, gross negligence, willful misconduct, criminal acts. Holders of Claims that DO NOT wish to provide these release (identified with more specificity in

Section 14.1(c) of the Plan) must affirmatively indicate so by checking the **<u>Opt-Out</u>** box on their ballot or by filing an objection indicating that they do not consent to such releases.   Please be advised that all holders of claims in the Voting Classes that do not affirmatively opt-out of the releases either on their ballot or by filing an objection **<u>shall be deemed to have consented</u>** to the releases set forth in Section 14.1(c) of the Plan.

## Table of Contents

...........................................................................................................Page

ARTICLE  I DEFINED TERMS AND RULES OF INTERPRETATION .......................1

ARTICLE  II LOAN PORTFOLIO; COMPLETION OF RUN-OFF OF LOANS; FUNDING AND COST ALLOCATION ...................................................................................20

2.1    Loan Portfolio .........................................................................................20
2.2    Post-Effective Date Management of the Loan Portfolio...........................22
2.3    Advisory Committee.................................................................................29
2.4    Allocation of Costs ..................................................................................29
2.5    Funding of Loan-Level Amounts; Post-Effective Date Funding; Proposed Funding Pool ............................................................................................32
2.6    Waterfall for Loan Proceeds; Amendment of Intercompany Loan-related Agreements ..............................................................................................36
2.7    Post-Effective Date Usage of the Peer Street Platform ...........................39
2.8    Administration of OppFund Loan and Associated Mortgage Interests .....39
2.9    Implementation of Exit Facility, if Applicable. ........................................39

ARTICLE  III NON-LOAN ASSET WIND-DOWN; OTHER PLAN IMPLEMENTATION TERMS ......................................................................................................40

3.1    Plan Administrator. ..................................................................................40
3.2    Disposition of Non-Loan Assets. .............................................................41
3.3    Resolution and Settlement of Intercompany Claims and Disputes over Participation Interests................................................................................42
3.4    Corporate Action......................................................................................43
3.5    Retention, Abandonment, Disposal, and Destruction of Records; Privileges. ...............................................................43
3.6    Continued Corporate Existence; Effectuating Documents; Corporate Action; Restructuring Transactions. ........................................44

ARTICLE  IV CLASSIFICATION OF CLAIMS AND INTERESTS, TREATMENT AND ESTIMATED RECOVERIES ........................................................................45

4.1    Joint Plan; Non-Consolidation; Separate Classes. ....................................45
4.2    Classification Generally.............................................................................45
4.3    Classification and Treatment. ...................................................................46
4.4    Convenience Holder Redemption Election................................................51
4.5    Reservation of Rights................................................................................52
4.6    Limitations. ..............................................................................................52

ARTICLE  V CONFIRMATION PROCEDURES AND REQUIREMENTS .................52

5.1    Confirmation Procedure.............................................................................52
5.2    Procedure for Objections. .........................................................................53

5.3  Requirements for Confirmation. ................................................................53
5.4  Classification of Claims and Interests.....................................................54
5.5  Impaired Claims or Interests ...................................................................55
5.6  Confirmation Without Necessary Acceptances; Cramdown ....................55
5.7  Feasibility...............................................................................................56
5.8  Best Interests Test and Liquidation Analysis...........................................57

ARTICLE  VI VOTING TO ACCEPT OR REJECT THE PLAN ................................57

6.1  Class Entitled to Vote. .............................................................................58
6.2  Manner of Voting on the Plan..................................................................58
6.3  Acceptance by Impaired Classes of Claims or Interests...........................58
6.4  Presumed Acceptance by Unimpaired Classes. ........................................58
6.5  Presumed Rejections by Impaired Classes. ..............................................59
6.6  Confirmation Pursuant to Bankruptcy Code Section 1129(b). .................59
6.7  Controversy Concerning Impairment. ......................................................59
6.8  Elimination of Vacant Classes. ................................................................59

ARTICLE  VII BACKGROUND AND DISCLOSURES ............................................59

7.1  General Background ................................................................................59
7.2  Events Leading to Chapter 11 ................................................................64
7.3  The Chapter 11 Cases ............................................................................66

ARTICLE  VIII CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ....72

8.1  The Plan May Not Be Accepted ..............................................................73
8.2  The Plan May Not Be Confirmed ............................................................73
8.3  Outcomes if the Plan is not Confirmed....................................................73
8.4  Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections ...................................................................74
8.5  Objections to treatment of Notes, Note Claims, Underlying Loans and Allocations.............................................................................................74
8.6  Objections to Classification of Claims .....................................................75
8.7  Failure to Consummate the Plan .............................................................76
8.8  Plan Releases May Not Be Approved.......................................................76
8.9  Reductions to Estimated Creditor Recoveries .........................................76
8.10  Certain Tax Considerations....................................................................76

ARTICLE  IX TREATMENT OF UNCLASSIFIED CLAIMS......................................80

9.1  Administrative Claims. ............................................................................80
9.2  Priority Tax Claims.................................................................................82

ARTICLE  X PROVISIONS GOVERNING DISTRIBUTIONS ...................................82

10.1  Distributions for Allowed Claims .........................................................82
10.2  Interest on Claims. ...............................................................................82

10.3    Distributions by Plan Administrator as Disbursement Agent. ...................82
10.4    Means of Cash Payment. ...........................................................................83
10.5    Fractional Distributions. ...........................................................................83
10.6    *De Minimis* Distributions. ........................................................................83
10.7    Delivery of Distributions; Unclaimed Distributions. ................................83
10.8    Application of Distribution Record Date. ..................................................84
10.9    Withholding, Payment and Reporting Requirements With Respect to
        Distributions. ............................................................................................84
10.10   Setoffs. .....................................................................................................85
10.11   No Distribution in Excess of Allowed Amounts. ......................................85
10.12   Allocation of Distributions. ......................................................................85
10.13   Allocation of Consideration ......................................................................85
10.14   Forfeiture of Distributions. .......................................................................86
10.15   Suspension of Distributions to Holders Receiving Avoidable Transfers ..86
10.16   Special Provisions for Holders where Investments were made through Self-
        Directed IRAs. ..........................................................................................86

ARTICLE  XI PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF
CLAIMS ............................................................................................................86

11.1    Claims Administration Responsibility. .....................................................86
11.2    Claims or Interests Objections. .................................................................87
11.3    Estimation of Contingent or Unliquidated Claims. ...................................87
11.4    Distributions on Account of Disputed Claims. ..........................................87
11.5    Amendments to Claims. ............................................................................87
11.6    Claims Paid and Payable by Third Parties. ...............................................88
11.7    Adjustment to Claims Without Objection ..................................................88

ARTICLE  XII EXECUTORY CONTRACTS ....................................................88

ARTICLE  XIII CONFIRMATION AND CONSUMMATION OF THE PLAN ...........88

13.1    Conditions Precedent to the Effective Date. .............................................88
13.2    Notice of Effective Date. ...........................................................................89
13.3    Waiver of Conditions Precedent to the Effective Date. .............................89
13.4    Effect of Non-Occurrence of Effective Date. ............................................89

ARTICLE  XIV EFFECTS OF CONFIRMATION ...........................................90

14.1    Exculpation, Releases, and Injunctions. ...................................................90
14.2    Term of Bankruptcy Injunction or Stays. .................................................92
14.3    Discussion of Releases ..............................................................................92

ARTICLE  XV RETENTION OF JURISDICTION ..........................................94

ARTICLE  XVI MISCELLANEOUS PROVISIONS ........................................98

16.1    Modification of the Plan. ..........................................................................98

16.2    Revocation, Withdrawal, or Non-Confirmation of the Plan. .....................98

16.3    Binding Effect. ................................................................................99

16.4    Vesting of Assets in the Reorganized Debtors. ........................................99

16.5    Cancellation of Notes, Instruments, Certificates, and Other Documents ..99

16.6    Subordination Rights. ......................................................................99

16.7    Severability of Plan Provisions. .......................................................100

16.8    Payment of Statutory Fees; Filing of Quarterly Reports. .......................100

16.9    Dissolution of the Committee. .........................................................100

16.10   Exemption from Section 1146. ..........................................................101

16.11   Closing of Chapter 11 Cases; Caption Change. ....................................101

16.12   Filing of Additional Documents. ......................................................101

16.13   Treatment of Insurance Policies; Director and Officer Indemnities. ........101

16.14   Successors and Assigns. .................................................................102

16.15   Governing Law. ............................................................................102

16.16   Exhibits and Schedules. .................................................................102

16.17   Reservation of Rights. ...................................................................103

# ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

**1.1**      "**Administrative Claim Bar Date**" shall mean (a) February 22, 2024, with respect to Administrative Claims that arose on or before January 16, 2024 (including claims under Section 503(b)(9) of the Bankruptcy Code), and (b) with respect to Administrative Claims that arose after January 16, 2024, the date that is thirty (30) days after the Effective Date, which dates shall be the deadlines for filing requests for payment of Administrative Claims that arose prior to the Effective Date; *provided*, that the Administrative Claim Bar Date shall not apply to Professional Fee Claims.

**1.2**      "**Administrative Claim**" shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases allowed under Bankruptcy Code sections 503(b), 507(b) or, if applicable, 1114(e)(2).

**1.3**      "**Advisory Committee**" shall mean the three member Committee designated in accordance with the Plan to oversee the administration of the Loan Assets and further described herein.

**1.4**      "**Affiliate**" shall mean "affiliate" as defined in Bankruptcy Code section 101(2).

**1.5**      "**Allowed**" shall mean, with respect to any Claim or Interest, except as otherwise provided herein: (i) a Claim or Interest (or any portion thereof) that is evidenced by a proof of Claim or Interest Filed or that is not required to be evidenced by a filed proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (ii) except with respect to Note Claims, a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no proof of Claim or Interest has been Filed that asserts a Claim or Interest different in amount or priority from that listed in the Schedule (unless otherwise agreed by stipulation between the Debtors and the applicable Holder); (iii) with respect to Note Claims, a Claim for amounts owed under a Peer Street Note that is listed in the Schedules as contingent, unliquidated, or both but is not listed as disputed; or (iv) a Claim or Interest Allowed pursuant to the Plan, including as settled or compromised pursuant to section 3.3 hereof, or a Final Order; provided that with respect to a Claim or Interest described in clause (i) or (ii) above, such Claim or Interest shall be considered Allowed only if and to the extent that (A) with respect to such Claim or Interest, no objection to the allowance thereof, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn by the Claim Objection Deadline, (B) an objection to such Claim or Interest is asserted and such Claim or Interest is subsequently allowed pursuant to a Final Order, or (C) such Claim or Interest is settled pursuant to a Final Order; provided, further that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502, 503, 506 or 507 of the Bankruptcy Code, to the

extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims or Interests that are reinstated or otherwise Unimpaired pursuant to the Plan.  If a Claim or Interest is Allowed only in part, any provisions hereunder with respect to Allowed Claims or Interests are applicable solely to the Allowed portion of such Claim or Interest.  For the avoidance of doubt, a proof of Claim or Interest Filed after the Bar Date shall not be Allowed for any purpose whatsoever absent entry of a Final Order allowing such late-Filed Claim or Interest and a Claim or Interest that has been Disallowed by a Final Order or settlement shall not be Allowed for any purpose whatsoever.  "**Allow**," "**Allowing**," and "**Allowance**," shall have correlative meanings.

**1.6** "**Asset Management Agreement**" shall mean the agreement between the applicable Debtors and the Asset Manager setting forth the terms on which the Asset Manager will manage the Loan Assets after the Effective Date, along with any ancillary documents related thereto.  A copy of the Asset Management Agreement will be included in the Plan Supplement and approved by the Confirmation Order.

**1.7** "**Asset Management Fee**" shall have the meaning ascribed to such term in the Asset Management Agreement.

**1.8** "**Asset Management Term Sheet**" shall mean the term sheet between Colchis, the Committee and the Debtors for post-Effective Date asset management of the Loan Assets.

**1.9** "**Asset Manager**" shall mean the party selected to manage the Underlying Loans after the Effective Date.  Colchis or its designee will be the Asset Manager as of the Effective Date.

**1.10** "**Available Cash Collateral**" shall mean all Cash Collateral as of the Effective Date, other than Cash Collateral used to fund the Corporate Debtor Reserve.

**1.11** "**Avoidance Actions**" shall mean any and all actual or potential Claims and Causes of Action to avoid, equitably subordinate, or recover a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 510, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code, or applicable non-bankruptcy law.

**1.12** "**Ballot**" shall mean the ballot form distributed to each Holder of a Claim or Interest in the Voting Classes, on which it is to be indicated, among other things, acceptance or rejection of the Plan.

**1.13** "**Bankruptcy Code**" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101–1532, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.14** "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of Delaware.

**1.15** "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules, and as each has been, or may be, amended

from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.16**    "**Bar Date Order**" shall mean the order of the Bankruptcy Court establishing the dates by which Holders must file proofs of Claims or Interests against the Debtors pursuant to Bankruptcy Rule 3003(c), *see* [D.I. 764].  A copy of the Bar Date Order is accessible at https://cases.stretto.com/peerstreet/court-docket/.

**1.17**    "**Bar Date**" shall mean, with respect to any particular Claim or Interest, the specific date set by the Bankruptcy Court (including pursuant to this Plan and the Bar Date Order) as the last day for Filing proofs of Claim or Interests or requests for allowance of Administrative Claims against the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

**1.18**    "**Business Day**" shall mean any day, other than a Saturday, Sunday, "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)), or any other day on which banking institutions in New York, New York are authorized or required by law or governmental action to close.

**1.19**    "**Cash**" shall mean money that is legal tender of the United States of America.

**1.20**    "**Cash Collateral Budget**" shall mean the "Budget" as defined in the Cash Collateral Order.

**1.21**    "**Cash Collateral Order**" shall mean the *Final Order (A) Authorizing the Prepetition Borrowers' Use of Cash Collateral; (B) Granting Adequate Protection to the Prepetition Secured Parties; and (C) Granting Related Relief* [D.I. 293].  A copy of the Cash Collateral Order is accessible at https://cases.stretto.com/peerstreet/court-docket/.

**1.22**    "**Cash Collateral**" shall mean all cash subject to the Prepetition Agent's liens and security interests, until such time as the Prepetition Loan Claims are paid in full; *provided*, the Cash Collateral shall not include any Cash held on the Petition Date or thereafter that was not held in the DACA Accounts.

**1.23**    "**Causes of Action**" shall mean any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate or inchoate, reduced to judgment or otherwise, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  The term "Causes of Action" also includes: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims or Interests; (iii) any claim pursuant to section 362 of the Bankruptcy Code; (iv) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section

558 of the Bankruptcy Code; (v) any state law fraudulent transfers; and (vi) any Avoidance Actions.

**1.24** "**Chapter 11 Cases**" shall mean the chapter 11 cases commenced by the Debtors and jointly administered under case number 23-10815 (LSS) in the Bankruptcy Court.

**1.25** "**Claim**" shall mean a claim against any Debtor, as such term is defined in Bankruptcy Code section 101(5).

**1.26** "**Claims Agent**" shall mean the Debtors' claims agent, Stretto, Inc.

**1.27** "**Claims Objection Deadline**" shall mean the deadline for objecting to Filed proofs of Claim or Interest, which shall be, unless otherwise extended pursuant to the Plan (i) the one hundred eightieth (180th) day following the Effective Date; or (ii) such later date as may be fixed by the Bankruptcy Court; *provided, however*, that the Plan Administrator may seek extensions of this date from the Bankruptcy Court by motion at any time.

**1.28** "**Class**" shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article IV hereof.

**1.29** "**Colchis**" shall mean Colchis Capital Management LP and, as the context requires, its Affiliates, managed funds and designees.

**1.30** "**Committee**" shall mean the official committee of unsecured creditors appointed in the Chapter 11 Cases.

**1.31** "**Confirmation**" shall mean entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

**1.32** "**Confirmation Date**" shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.33** "**Confirmation Hearing**" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan and final approval of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.34** "**Confirmation Order**" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to, among others, Bankruptcy Code section 1129.

**1.35** "**Consummation**" shall mean the occurrence of the Effective Date.

**1.36** "**Convenience Holder**" shall mean a holder of MPDN Claims whose aggregate principal amount of holdings does not exceed $5,000.00 as of the Petition Date.

**1.37** "**Corporate Debtor Reserve**" shall mean the account established to hold the funding to be used by the Plan Administrator to implement the Plan and discharge its duties hereunder with respect to PSI, PSFI and PSLI and their assets, other than the Loan Assets.

The initial funding of the Corporate Debtor Reserve shall be set forth in the Plan Supplement, funded from cash of either or both of PSI and PSFI, and shall be reasonably acceptable to the Prepetition Agent.

**1.38** **"Corporate Loans"** shall mean the Mortgage Interests owned by PSFI that are not subject to participation agreements with other Debtors and have not been pledged to secure the OppFund Loan.

**1.39** **"Creditor"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(10).

**1.40** **"DACA Accounts"** shall mean the accounts in the name of the Debtors at (i) Pacific Premier Bank ending in 7581 and (ii) Wells Fargo Bank, National Association ending in 4860, 4878, 4886, and 4910.

**1.41** **"Debtor"** shall mean each of the following, as a debtor and debtor in possession, with its respective numbered designation for purposes of the Plan

| Debtor Number | Debtor Name |
|---|---|
| 1 | PSI |
| 2 | PSFI |
| 3 | Warehouse I |
| 4 | Warehouse II |
| 5 | PSFLLC |
| 6 | PS Portfolio |
| 7 | OppFund GP |
| 8 | OppFund |
| 9 | PS Options |
| 10 | PSLI |
| 11 | PSF REO LLC |
| 12 | PSF Ohio, LLC |
| 13 | PSF TX 1, LLC |
| 14 | PSF TX 2, LLC |
| 15 | PSF TX 4 LLC |

**1.42** **"Disallowed"** shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in a Debtor or portion thereof which:  (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) is listed in the Schedules in the amount of zero or designated as one or more of as disputed, contingent or unliquidated, and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest, to the extent of such reduction; or (v) is unenforceable to the extent provided in Bankruptcy Code section 502(b).  In each case, a Disallowed Claim or

a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

**1.43** "**Disbursing Agent**" shall mean the Plan Administrator; *provided, however*, that the Plan Administrator may, in its discretion, retain a third party to act as Disbursing Agent.

**1.44** "**Disclosure Statement**" shall mean the disclosure statement, as amended, supplemented, or modified from time to time, that is embodied herein and distributed in accordance with, among others, Bankruptcy Code sections 1125, 1126(b), and 1145, Bankruptcy Rule 3018 and other applicable law.

**1.45** "**Disputed**" shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of the Plan.

**1.46** "**Disputed Claim Reserve**" shall mean the reserve established and maintained by the Plan Administrator for payment of Disputed Claims, which reserve shall be maintained in an amount equal to the face value of all Disputed First Tier Claims at the time of any distribution, *plus* the amount that would be paid pursuant to the Plan to all other Disputed Claims at the time of any distribution if such claims were Allowed and there are funds available for distribution thereto, *plus* any other amount ordered by the Court.

**1.47** "**Distributable Cash**" shall mean, for each Debtor, all of the Debtor's Cash after (i) Payment in Full or satisfaction of the First Tier Claims against that Debtor and (ii) funding of the Corporate Debtor Reserve or Wind-Down Reserve, as applicable; *provided*, *however*, that Distributable Cash shall not include Cash Collateral or the proceeds of any collateral securing an Other Secured Claim, unless the Allowed amount of such claims have been paid in full; *provided*, *further*, that Distributable Cash shall not include Cash to be distributed, directly or indirectly, to holders of MPDN Claims, PDN Claims, RWN Claims or FBO Account Claims, until all such claims that are Allowed have been paid in full.

**1.48** "**Distribution Record Date**" shall mean the Effective Date, unless the Court fixes another date with respect to any Claim or Class of Claims.

**1.49** "**Distribution**" shall mean a delivery of Cash by the Disbursing Agent to the Holders of Allowed Claims or Interests pursuant to the Plan.

**1.50** "**Effective Date**" shall mean the first Business Day on which (a) all conditions in Article XIII of the Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect. Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

**1.51** "**Effective Date Notice**" shall mean the notice of the Effective Date.

**1.52** "**Entity**" shall have the meaning ascribed to such term in Bankruptcy Code section 101(15).

**1.53**      "**Estate**" shall mean each of the Debtors' estates created by Bankruptcy Code section 541 upon the commencement of the Chapter 11 Cases on the Petition Date.

**1.54**      "**Excluded Loans**" shall mean Underlying Loans that are identified in the Plan Supplement as "Excluded Loans," with the consent of the Committee, the Exit Lender (if an Exit Facility is provided), and Prepetition Agent, or designated in accordance with Section 2.2 hereof as an "Excluded Loan," in each instance, for which, after consultation with the Asset Manager, the Pre-Effective Date Servicing Advances, Pre-Effective Date Servicing Fees, Post-Effective Date Loan Administration Costs and Post-Effective Date Servicing Advances expected to be incurred with respect to such Underlying Loan are not likely to be paid in full; _provided_, the Prepetition Agent shall have the right to remove the "Excluded Loan" designation from any Underlying Loan in accordance with Section 2.2 hereof, including the undertaking to pay, and the payment of, Post-Effective Date Loan Administration Costs and Post-Effective Date Servicing Advances as set forth in such Section.

**1.55**      "**Exculpated Parties**" shall mean, in each of their capacities as such, (a) the Debtors, (b) the Committee and its members, and (c) the Debtors' officers (including the CRO), directors, and Professionals retained in these Cases, and (d) the Professionals retained in these cases by the Committee, to the extent such entity served on and after the Petition Date.

**1.56**      "**Executory Contract**" shall mean a contract or unexpired lease to which the Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.57**      "**Exit Agent**" shall mean the administrative agent and collateral agent under the Exit Credit Agreement.

**1.58**      "**Exit Credit Agreement**" shall mean the Credit Agreement that may be entered into in connection with the Exit Facility, to be dated as of the Effective Date, by and among certain of the Reorganized Debtors, as borrowers, the Exit Agent, and the Exit Lenders, which shall be in form and substance acceptable to the Committee.

**1.59**      "**Exit Facility**" means a third-party exit facility to be entered into on the Effective Date, in partial or complete substitution of the Funding Pool.

**1.60**      "**Exit Facility Documents**" means, collectively, the Exit Credit Agreement and all other loan documents, including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time).  The Exit Facility Documents, if any, shall be included in the Plan Supplement.

**1.61**      "**Exit Facility Term Sheet**" means that certain term sheet provided by Colchis for a first lien delayed draw term loan exit facility to be provided on the terms and conditions set forth in the Exit Facility Term Sheet and arising pursuant to an Exit Credit Agreement.

**1.62**      "**Exit Lenders**" means the lenders party to the Exit Credit Agreement on the Effective Date and from time to time.

**1.63**      "**FBO Account**" shall mean the "for the benefit of" account at Wells Fargo Bank, N.A., with the last four digits of 4894, used to hold uninvested cash of the Debtors' retail investors.

**1.64**       "**FBO Account Claims**" shall mean a claim reflecting a Holder's stated amount in the FBO Account as of the Petition Date.

**1.65**      "**FBO Motion**" shall mean the *Debtors' Motion for Entry of an Order (i) Authorizing the Debtors to Honor Withdrawal Requests from the Wells Fargo Bank, N.A. FBO Retail Clients Account, and (ii) Granting Related Relief* [D.I. 441]. A copy of the FBO Motion is accessible at https://cases.stretto.com/peerstreet/court-docket/.

**1.66**      "**FBO Order**" shall mean the *Order (i) Authorizing the Debtors to Honor Withdrawal Requests from the Wells Fargo Bank, N.A. FBO Retail Clients Account, and (ii) Granting Related Relief* [D.I. 517]. A copy of the FBO Order is accessible at https://cases.stretto.com/peerstreet/court-docket/.

**1.67**      "**FCI**" shall mean FCI Lender Services, Inc.

**1.68**      "**File**," "**Filed,**" or "**Filing**" shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.69**      "**Final Order**" shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, with respect to the relevant subject matter, which (a) has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, reconsideration or rehearing has been timely taken, or (b) as to which any appeal that has been taken or any petition for certiorari or motion for reargument, reconsideration or rehearing that has been or may be Filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, reconsideration or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

**1.70**      "**First Tier Claims**" shall mean all Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims for which the Plan Administrator has elected or is required under the Plan to pay the Allowed amount in Cash.

**1.71** "**Forfeited Distributions**" shall have the meaning ascribed to such term in Section 10.14 of the Plan.

**1.72** "**Fractional Loan**" shall refer to the investment product associated with the MPDNs.

**1.73** "**Funding Pool**" shall mean the pool funded on the Effective Date and thereafter from the proceeds received from Underlying Loans and used to pay the costs allocated to Underlying Loans, including Post-Effective Date Loan Administration Costs and Post-Effective Date Servicing Advances and for the costs of liquidating any Underlying Loans not liquidated as of the Effective Date in accordance with Section 2.5 of the Plan.

**1.74** "**General Bar Date**" means February 22, 2024, at 4:00 p.m. (Eastern Time), which is the deadline by which all Persons, except Governmental Units, were required to have Filed proofs of Claim or Interests against the Debtors as established by the Bar Date Order.

**1.75** "**General Unsecured Claim**" shall mean a Claim against a Debtor, but excluding any Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Prepetition Loan Claims, Note Claims, FBO Account Claims, Intercompany Claims, and Interests.

**1.76** "**Government Bar Date**" shall mean February 22, 2024, which is the deadline by which Governmental Units must file prepetition proofs of Claim or Interest against the Debtors as established by the Bar Date Order.

**1.77** "**Governmental Unit**" shall have the meaning ascribed to such term in Bankruptcy Code section 101(27).

**1.78** "**Holder**" shall mean any Person holding (including as successor or assignee pursuant to a valid succession or assignment) a Claim or an Interest, as applicable, solely in its capacity as such.

**1.79** "**Impaired**" shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.80** "**Impaired Class**" shall mean a Class of Claims or Interests that is Impaired.

**1.81** "**Intercompany Claim**" shall mean a Claim by a Debtor against another Debtor.

**1.82** "**Intercompany Interest**" shall mean an Interest held by a Debtor in another Debtor; *provided*, for the avoidance of doubt, the term "Intercompany Interests" shall not include OppFund Interests.

**1.83** "**Interests**" shall mean any equity in a Debtor as defined in section 101(16) of the Bankruptcy Code, including the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Entity in the Debtors including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants,

contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

**1.84**    "**IRC**" shall mean the Internal Revenue Code of 1986, as amended.

**1.85**    "**IRS**" shall mean the Internal Revenue Service.

**1.86**    "**Liquidated Loan Assets**" shall mean the Underlying Loans that are liquidated as of the Effective Date.

**1.87**    "**Loan Assets**" shall mean the Wind-Down Loan Assets, Corporate Loans, and REOs and all claims and Causes of Action related to the foregoing.

**1.88**    "**Loan Realization Date**" shall mean for Underlying Loans liquidated after the Effective Date, the date(s) that a partial or final share of the proceeds of an Underlying Loan are made available to the Plan Administrator for distribution.

**1.89**    "**Local Rules**" shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.90**    "**Magnetar**" shall mean Magnetar Financial LLC.

**1.91**    "**Mortgage Interests**" shall mean loans secured by a mortgage on real property, the mortgages, any participations in such a loan, the proceeds received from such a loan, mortgage or participation (including real-estate owned property), and the servicing rights for such mortgages, and includes the REOs that were previously secured by a mortgage.

**1.92**    "**MPDN**" shall mean any note issued pursuant to the PPM and that certain PPM Supplement: Mortgage-Payment-Dependent Notes ("MPDN") offered by Peer Street Funding, LLC.

**1.93**    "**MPDN Claims**" shall mean any Claim, other than a Securities Law Claim, against the Debtors arising out of a MPDN.

**1.94**    "**Non-Loan Assets**" shall mean any and all right, title, and interest of PSFI, PSI and PSLI, and their Estates in and to property of whatever type or nature, including their books and records, other than the Liquidated Loan Assets or Loan Assets, and the proceeds of each of the foregoing.

**1.95**    "**Note Claims**" shall mean the MPDN Claims, PDN Claims and RWN Claims.

**1.96** "**Notes**" shall mean the MPDNs, PDNs, and RWNs.

**1.97** "**Objection**" shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

**1.98** "**Obligor Debtors**" shall mean each of PSI, PSFI and PSLI.

**1.99** "**OpEx**" shall mean operating disbursements in connection with the Debtors' business, including those set forth under the line item "Operating Disbursements" in the Cash Collateral Budget, and subject to the allocations set forth in Section 2.4 hereof and the settlement in Section 3.3 hereof.

**1.100** "**OppFund**" shall mean Peer Street Opportunity Investors II, LP, a Delaware limited partnership.

**1.101** "**OppFund Distribution**" shall mean all Distributable Cash of OppFund on the Effective Date, including after the funding of any Restructuring Costs allocated to OppFund as set forth in Article II.

**1.102** "**OppFund GP**" shall mean Peer Street Opportunity Fund GP, LLC, a Delaware limited liability company.

**1.103** "**OppFund Interests**" shall mean the limited partnership interests in OppFund.

**1.104** "**OppFund Loan**" shall mean those certain loans made by OppFund to PSFI pursuant to that certain Loan and Security Agreement dated as of October 1, 2019, by and among OppFund as Lender, PSFI as Borrower and PSI as Guarantor, as amended.

**1.105** "**Other Secured Claim**" shall mean any Secured Claim other than a Prepetition Loan Claim or a Note Claim.

**1.106** "**Pacific Creditors**" shall mean Pacific Funding Trust 1002 and Pacific RBLF Funding Trust.

**1.107** "**Paid in Full**," "**Payment in Full**," or "**Pay in Full**" shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.108** "**Parent Interests**" shall mean Interests in Peer Street, Inc.

**1.109** "**PDN**" shall mean any note issued pursuant to the PPM and that certain PDN Supplement: Payment-Dependent Promissory Notes offered by PS Portfolio.

**1.110** "**PDN Claims**" shall mean any Claim, other than a Securities Law Claim, against the Debtors arising out of a PDN.

**1.111** "**Peer Street Spread**" shall mean (A) the amount paid by the borrower under an Underlying Loan, _minus_ (B) the amount paid to holders of MPDNs on account of such Underlying Loan, which amount was retained by the Debtors; _provided_, that the term "Peer Street Spread" shall not include the amount (if any) allocated to a third party originator or broker originating or brokering such Underlying Loan.  For the avoidance of doubt, the Peer Street Spread for each Underlying Loan that remains outstanding is identified on Exhibit B to this Disclosure Statement based on a hypothetical loan liquidation date of May 1, 2024, and such calculations shall control, subject only to adjustment based on the actual date that the loan liquidates.

**1.112** "**Performance Fee**" shall have the meaning ascribed to such term in the Asset Management Agreement.

**1.113** "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**1.114** "**Petition Date**" shall mean June 26, 2023, the date on which the Debtors commenced Filing the Chapter 11 Cases in the Bankruptcy Court.

**1.115** "**Plan**" shall mean this joint plan of reorganization under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof.

**1.116** "**Plan Administrator**" shall mean the person jointly designated by the Debtors and the Committee, and acceptable to the Prepetition Agent (not to be unreasonably withheld or conditioned), to implement the Plan and manage the Debtors after the Effective Date and references to the Plan Administrator shall not include such person in their individual capacity.

**1.117** "**Plan Administrator Expenses**" shall mean the fees, costs and expenses of the Plan Administrator and its advisors.

**1.118** "**Plan Supplement**" shall mean the ancillary documents necessary to the implementation and effectuation of the Plan, including the Asset Management Agreement, which shall be Filed on or before the date that is seven (7) days prior to the earlier of the Voting Deadline or Confirmation Objection Deadline, _provided_, _however_, that the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan.

**1.119** "**Pocket**" shall refer to the investment product associated with the RWNs.

**1.120** "**Pocket 1 Month Claims**" shall mean the RWNs issued with a redemption period of 30 days under the name "Pocket 1 Month," the proceeds of which were used to fund the Warehouse I Loan.

**1.121** "**Pocket 3 Month Claims**" shall mean the RWNs issued with a redemption period of 90 days under the name "Pocket 3 Month," the proceeds of which were used to fund the Warehouse II Loan.

**1.122**    "**Portfolio**" shall refer to the investment product associated with the PDNs.

**1.123**    "**Portfolio Distribution**" shall mean the Distributable Cash available at PS Portfolio as of the Effective Date following the funding of PS Portfolio's share of Restructuring Costs.

**1.124**    "**Post-Effective Date Asset Management Terms**" shall mean the terms on which the Asset Manager will manage the Underlying Loans following the Effective Date.  The Post-Effective Date Asset Management Terms will be included in the Plan Supplement and are subject to approval by the Court at the Confirmation Hearing.

**1.125**    "**Post-Effective Date Loan Administration Costs**" shall mean the Plan Administrator Expenses allocated to the Underlying Loans, Asset Management Fee, Performance Fee, Structuring Expenses, and Reimbursable Expenses.

**1.126**    "**Post-Effective Date Servicing Advances**" shall mean Servicing Advances made with respect to an Underlying Loan following the Effective Date.  Post-Effective Date Servicing Advances are not part of the Prepetition Agent's collateral.

**1.127**    "**PPM**" shall mean that certain Private Placement Memorandum, issued by PSFLLC, dated as of December 2, 2019, and that certain Addendum #1 dated May 22, 2020, as amended and supplemented from time to time.

**1.128**    "**Pre-Effective Date Loan OpEx**" shall mean the OpEx allocated to PSFI that are to be recovered from the proceeds of the Underlying Loans, as set forth in Article II.

**1.129**    "**Pre-Effective Date Loan Restructuring Costs**" shall mean the Restructuring Costs allocated to PSFI that are to be recovered from the proceeds of the Underlying Loans, as set forth in Article II.

**1.130**    "**Pre-Effective Date Servicing Advances**" shall mean the Servicing Advances made with respect to an Underlying Loan prior to the Effective Date.  Pre-Effective Date Servicing Advances are part of the Prepetition Agent's collateral.

**1.131**    "**Pre-Effective Date Servicing Fees**" shall mean the fees owed to PSFI, as servicer, including the Peer Street Spread, that were accrued through the Effective Date, but not paid. Pre-Effective Date Servicing Fees are part of the Prepetition Agent's collateral.

**1.132**    "**Prepetition Agent Account**" shall mean the account designated by the Prepetition Agent to receive Pre-Effective Date Servicing Advances and Pre-Effective Date Servicing Fees collected by the Asset Manager or Plan Administrator after the Effective Date.

**1.133**    "**Prepetition Agent**" shall mean Magnetar in its capacity as the Paying Agent under the Prepetition Credit Agreement Documents.

**1.134**    "**Prepetition Credit Agreement Documents**" shall mean the Prepetition Credit Agreement together with all other related documents, guarantees, and agreements, including, without limitation, security agreements mortgages, pledge agreements, assignments,

financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Prepetition Credit Agreement.

**1.135** "**Prepetition Credit Agreement**" shall mean that certain Credit Agreement dated October 12, 2021 (as may be amended, restated, supplemented, or otherwise modified from time to time), by and among PSI, as borrower, PSFI and PSLI, as guarantors, Magnetar, as the Paying Agent, and the Prepetition Lenders, as lenders.

**1.136** "**Prepetition Lenders**" shall mean the lenders party to the Prepetition Credit Agreement, from time to time, in their capacity as such.

**1.137** "**Prepetition Loan Claim**" shall mean the claim of the Prepetition Agent or the Prepetition Lenders arising under the Prepetition Credit Agreement Documents.  The Prepetition Loan Claim is an Allowed Claim against the Obligor Debtors.

**1.138** "**Priority Non-Tax Claim**" shall mean any and all Claims accorded priority in right of payment under Bankruptcy Code section 507(a), other than Priority Tax Claims and Administrative Claims.

**1.139** "**Priority Tax Claim**" shall mean a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code section 507(a)(8).

**1.140** "**Professional Fee Claims Bar Date**" shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be thirty (30) days after the Effective Date.

**1.141** "**Professional Fee Claims**" shall mean all fees and expenses (including but not limited to, transaction fees and success fees) for services rendered by Professionals in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date.

**1.142** "**Professional**" shall mean an Entity employed pursuant to a Final Order in accordance with Bankruptcy Code sections 327, 328, 333, 363, 1103 and to be compensated for services rendered prior to the Confirmation Date, pursuant to Bankruptcy Code sections 327, 328, 329, 330, 331, and 363 or for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

**1.143** "**PS Options**" shall mean PS Options LLC, a Delaware limited liability company.

**1.144** "**PS Portfolio**" shall mean PS Portfolio – ST1, LLC, a Delaware limited liability company.

**1.145** "**PSFI**" shall mean PS Funding Inc., a Delaware corporation.

**1.146** "**PSFLLC**" shall mean Peer Street Funding LLC, a Delaware limited liability company.

**1.147** "**PSI**" shall mean Peer Street, Inc., a Delaware corporation.

**1.148** "**PSLI**" shall mean Peer Street Licensing, Inc., a Delaware corporation.

**1.149** "**Reimbursable Expenses**" shall mean the reasonable out-of-pocket fees, costs, servicing advances, and expenses incurred by the Asset Manager in connection with any of its duties under the Asset Management Agreement.

**1.150** "**Related Parties**" shall mean with respect to a Person, that Person's current and former Affiliates, and such Person's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, partners, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such, and any and all other Persons or Entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities.

**1.151** "**Release Opt-Out Election**" shall mean a timely election to "opt out" of being a Releasing Party by a Holder of a Claim in the Voting Classes that (a) selects the option set forth on the Ballot to not grant the releases set forth in Section 14.1(c) of this Plan or (b) Files a written objection to the releases set forth in Section 14.1(c) of this Plan by the deadline to object to Confirmation established by the Solicitation Procedures Order.

**1.152** "**Released Parties**" shall mean the following, solely in their capacity as such: (a) the Debtors' officers, directors, agents, attorneys, advisors, employees, and professionals; (b) the members of the Committee; (c) the Prepetition Agent and Prepetition Lenders; (d) the Plan Administrator; (e) the Asset Manager and Pacific Creditors; and (f) with respect to (b) through (e), their Related Parties, *provided, however,* that Released Parties shall exclude (i) any of the foregoing parties that makes a Release Opt-Out Election and (ii) any individual that was an officer or director of the Debtors but did not hold that position on or after the Petition Date.

**1.153** "**Releasing Parties**" shall mean the following, solely in their capacity as such:  (a) the Committee and its members; (b) the Prepetition Agent and Prepetition Lenders; (c) the Asset Manager and Pacific Creditors; (d) all Holders of Claims or Interests who are Unimpaired and do not File a written objection to the releases set forth in Section 14.1(c) of this Plan by the deadline to object to Confirmation established by the Solicitation Procedures Order; (e) all Holders of Claims and Interests in the Voting Classes that do not make a Release Opt-Out Election; and (f) each Related Party of each Entity in clause (a) through clause (e) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law.

**1.154** "**REO Debtors**" shall mean PSF REO LLC, PSF Ohio, LLC, PSF TX 1, LLC, PSF TX 2, LLC, and PSF TX 4 LLC.

**1.155**    "**REO**" shall mean a real estate owned property acquired through the exercise of remedies under the loan documents for an Underlying Loan.

**1.156**    "**Reorganized Debtor**" shall mean a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

**1.157**    "**Reorganized Parent**" shall mean Peer Street, Inc., a Delaware corporation, on and after the Effective Date.

**1.158**    "**Restructuring Costs**" shall mean the costs of the Debtors' restructuring and Chapter 11 Cases, including those set forth under the line item "Restructuring Disbursements" in the Cash Collateral Budget, and subject to the allocations set forth in Section 2.4 hereof and the settlement in Section 3.3 hereof, as well as any costs in connection with causing the Plan to become effective and implementing it that are described, designated and allocated as Restructuring Costs in the Plan Supplement.    For the avoidance of doubt, the term "Restructuring Costs" shall not include any OpEx.

**1.159**    "**RWN**" shall mean any note issued pursuant to the PPM and that certain RWN Supplement:  Redeemable Warehouse Notes ("RWN") offered by Peer Street Funding, LLC.

**1.160**    "**RWN Claims**" shall mean the Pocket 1 Month Claims and Pocket 3 Month Claims, other than a Securities Law Claim, against the Debtors arising out of an RWN.

**1.161**    "**Schedules**" shall mean the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to Bankruptcy Code section 521 and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**1.162**    "**Secured Claim**" shall mean, pursuant to Bankruptcy Code section 506, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, (b) Allowed as such pursuant to the terms of the Plan (subject to the Confirmation Order becoming a Final Order); (c) subject to an offset right under applicable law as of the Petition Date, or (d) a secured claim against the Debtors pursuant to Bankruptcy Code sections 506(a) and 553; *provided*, that no Note Claim shall be a Secured Claim under the Plan.

**1.163**    "**Securities Law Claim**" shall mean any Claim against a Debtor, whether or not the subject of an existing lawsuit (a) arising from rescission of a purchase or sale of Notes or OppFund Interests or any other shares, notes or securities of any Debtor or an affiliate of any Debtor, (b) for damages arising from the purchase or sale of any of the foregoing, (c) for violations of the securities laws, misrepresentations, or any similar Claims against a Debtor, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred

on account of the foregoing Claims against a Debtor, or (d) except as otherwise provided for in this Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim against a Debtor, including, without limitation (i) any prepetition indemnification, reimbursement or contribution obligations of the Debtors, pursuant to the Debtors' corporate charters, by-laws, agreements entered into any time prior to the Petition Date, or otherwise, and relating to Claims against a Debtor otherwise included in the foregoing clauses (a) through (c), and (ii) Claims against a Debtor based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the foregoing, or otherwise subject to section 510(b) of the Bankruptcy Code.

1.164    "**Servicing Advance**" shall mean advances made by PSFI or the Asset Manager, in their respective capacities as servicer or asset manager, in connection with the administration and servicing of an Underlying Loan.

1.165    "**Solicitation Procedures Order**" shall mean the order conditionally approving the disclosures set forth herein and authorizing the solicitation of acceptances or rejections of the Plan.

1.166    "**Specified Expenses**" shall have the meaning ascribed to such term in the Asset Management Agreement.

1.167    "**Structuring Expenses**" shall have the meaning ascribed to such term in the Asset Management Agreement.

1.168    "**Taxes**" shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

1.169    "**U.S. Trustee Fees**" shall mean fees payable pursuant to 28 U.S.C. § 1930.

1.170    "**Unclassified Claims**" shall mean any Administrative Claims, Professional Fee Claims, and Priority Tax Claims.

1.171    "**Undeliverable Distribution**" shall have the meaning ascribed to such term in Section 10.7 of the Plan.

1.172    "**Underlying Loans**" shall mean the Mortgage Interests held by the Debtors in connection with any MPDN, RWN or PDN, the OppFund Loan, or the Corporate Loans.

1.173    "**Unimpaired**" shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of Bankruptcy Code section 1124.

1.174    "**UPB**" shall mean the unpaid principal balance of an Underlying Loan as of the Petition Date or, in the case of an REO, the unpaid principal balance of the Underlying Loan related to such REO before the REO was acquired.

1.175    "**Voting Classes**" shall mean Classes 3 (with respect to PSI, PSFI and PLI), 4 (with respect to each Debtor other than the REO Debtors), 8-12 (with respect to PSFLLC), 13 (with respect to PS Portfolio), and 14 (with respect to OppFund).

1.176    "**Voting Deadline**" shall mean **April 16, 2024, at 5:00 p.m. (prevailing Eastern Time)**, the date and time by which ballots to accept or reject the Plan must be received to be counted, as set forth by the Solicitation Procedures Order.

1.177    "**Warehouse Entities**" shall mean Warehouse I and Warehouse II.

1.178    "**Warehouse I**" shall mean PS Warehouse, LLC, a Delaware limited liability company.

1.179    "**Warehouse I Distribution**" shall mean the Distributable Cash available at Warehouse I as of the Effective Date following the funding of Warehouse I's share of Restructuring Costs.

1.180    "**Warehouse I Loans**" shall mean those certain loans made by PSFLLC to PS Warehouse I pursuant to that certain Loan and Security Agreement dated as of February 1, 2021.

1.181    "**Warehouse II**" shall mean PS Warehouse II, LLC, a Delaware limited liability company.

1.182    "**Warehouse II Distribution**" shall mean the Distributable Cash available at Warehouse II as of the Effective Date following the funding of Warehouse II's share of Restructuring Costs.

1.183    "**Warehouse II Loans**" shall mean those certain loans made by PSFLLC to PS Warehouse II pursuant to that certain Loan and Security Agreement dated as of October 10, 2022.

1.184    "**Warehouse Loans**" shall mean the Warehouse I Loan and Warehouse II Loans.

1.185    "**Wind-Down Loan Assets**" shall mean the Underlying Loans that remain outstanding following the Effective Date associated with the MPDNs and OppFund Loan.

1.186    "**Wind-Down Reserve**" shall mean the account established to hold the funding to be used by the Plan Administrator to implement the Plan and discharge its duties hereunder with respect to the Wind-Down Loan Assets, PSFLLC, PS Portfolio, Warehouse I, Warehouse II, OppFund, OppFund GP, and the REO Debtors.  The initial funding of the Wind-Down Reserve shall be set forth in the Plan Supplement, shall not be funded from Cash Collateral, and shall be acceptable to the Committee.

**Rules of Interpretation**

For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (a) any capitalized term used herein that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (b) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (c) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (d) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (e) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (f) captions and headings to articles and sections are inserted for convenience of reference only and shall not limit or otherwise affect the provisions hereof or the interpretation of the Plan, (g) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter shall include the masculine, feminine and the neuter, (h) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender, (i) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan and/or the Confirmation Order, as applicable; (j) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto, (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases, and (m) the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

**Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day but shall be deemed to have been completed as of the required date.

**Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**Controlling Document**.

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control (unless stated otherwise in the Confirmation Order).  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan.

## ARTICLE  II
## LOAN PORTFOLIO; COMPLETION OF RUN-OFF OF LOANS; FUNDING AND COST ALLOCATION

**2.1    Loan Portfolio**

The Debtors' loan portfolio as of the Petition Date and as of January 31, 2024, is as follows:

| | Petition Date | | January 31, 2024 | |
|---|---|---|---|---|
| | # of Loans | UPB ($MM) | # of Loans | UPB ($MM) |
| *Loans Associated with MPDNs* | | | | |
| Performing | 148 | $ 50.7 | 25 | $ 7.4 |
| Non/Sub-Performing | 145 | 94.1 | 123 | 77.1 |
| REO | 44 | 42.1 | 41 | 31.0 |
| **Total MPDNs** | **337** | **$ 186.8** | **189** | **$ 115.6** |
| **Total Liquidated Loan Proceeds** | **n/a** | **$ 5.5** | **n/a** | **$ 74.7** |
| *Loans Associated with Pocket/Warehouse* | | | | |
| Performing | 4 | 0.0 | 2 | 0.0 |
| Non/Sub-Performing | 3 | 0.2 | 3 | 0.2 |
| REO | 2 | 0.2 | 1 | 0.1 |
| **Total Pocket/Warehouse** | **9** | **$ 0.3** | **6** | **$ 0.3** |
| **Total Liquidated Loan Proceeds** | **n/a** | **$ -** | **n/a** | **$ 0.0** |
| *Loans Associated with OppFund Loan* | | | | |
| Performing | 8 | 4.1 | 3 | 1.6 |
| Non/Sub-Performing | 17 | 9.8 | 13 | 7.0 |
| REO | 3 | 3.6 | 3 | 3.3 |
| **Total OppFund** | **28** | **$ 17.5** | **19** | **$ 11.9** |
| **Total Liquidated Loan Proceeds** | **n/a** | **$ 0.0** | **n/a** | **$ 5.5** |
| *Loans Associated with PDNs* | | | | |
| Performing | 1 | 0.2 | - | - |
| Non/Sub-Performing | - | - | - | - |
| REO | - | - | - | - |
| **Total PDNs** | **1** | **$ 0.2** | **-** | **$ -** |
| **Total Liquidated Loan Proceeds** | **n/a** | **$ -** | **n/a** | **$ 0.2** |
| *Unassociated Loans* | | | | |
| Performing | 6 | 1.0 | 3 | 0.4 |
| Non/Sub-Performing | 11 | 1.4 | 10 | 1.2 |
| REO | 3 | 0.5 | 1 | 0.1 |
| **Total Unassociated Loans** | **20** | **$ 2.9** | **14** | **$ 1.7** |
| **Total Liquidated Loan Proceeds** | **n/a** | **$ 0.0** | **n/a** | **$ 0.5** |

The Underlying Loans are not subject to the liens of the Prepetition Agent, although the Prepetition Agent does have liens on the Pre-Effective Date Servicing Advances and Pre-Effective Date Servicing Fees owed to PSFI in its capacity as servicer of the Underlying Loans. As of January 31, 2024, the following amounts are due and owing to PSFI and are subject to the Prepetition Agent's liens.

- Pre-Effective Date Servicing Advances:    $11,362,838
- Pre-Effective Date Servicing Fees:    $3,392,038

Since the Petition Date, the Debtors have serviced the Underlying Loans in accordance with their customary practices, subject to any limitations resulting from the commencement of the Chapter 11 Cases. The Debtors will continue to service the Underlying Loans until the Effective Date, at which point the Underlying Loans will be managed by the Asset Manager.

**2.2** **Post-Effective Date Management of the Loan Portfolio**

During the Chapter 11 Cases, the Debtors and the Committee engaged in a process to identify a party to manage the Debtors' loan portfolio following the Effective Date. Ultimately, the Committee indicated it supported a proposal put forth by Colchis. That support was an important consideration for the Debtors since the ultimate beneficiaries of the liquidation of the loan portfolio are the holders of MPDNs and OppFund Interests, whose interests are represented by the Committee. Indeed, certain of those holders are members of the Committee. After further negotiations concerning the terms of managing the loan portfolio, as well as the terms of this Plan, the Debtors, Committee, and Colchis have agreed to support the Plan, which provides for Colchis to act as the Asset Manager after the Effective Date.

*(a)* **Who is Colchis, the proposed asset manager? How was Colchis identified?**

Colchis is a boutique alternative asset manager based in San Francisco. The firm was started in 2005 and since that time has launched several strategies addressing distressed residential mortgage-backed securities (2006-2011), tech enabled lending (2011-2020), and, most recently, a business purpose investor in mortgage credit and residential real estate equity through single family rentals. Colchis currently manages approximately $1 billion in short-term business purpose investor mortgages with geographic exposure across the U.S. The firm aggregates these assets on a correspondent basis from approximately a dozen regional lenders. Since 2017 the firm has purchased more than $3 billion in short term investor mortgages with de minimis credit loss.

In order to identify a third party asset manager to replace the Debtors, the Debtors and the Committee conducted an outreach to potential asset manager candidates. That process resulted in four potential bidders for the asset management role. Each proposal included a management fee, which ranged between 1% and 2% of UPB under management across the proposals. After conducting additional diligence, the Debtors and the Committee narrowed the field down to two proposals, one from Colchis and another from a large international firm that manages a $5 billion portfolio. The other bidder proposed a fee structure that consisted of a 1.5% asset management fee (based on UPB) and a 2% performance fee (based on collections). During the course of negotiations, Colchis agreed to match the other bidders' fee structure and, additionally, to reduce the performance fee on a dollar-for-dollar basis by the amounts paid on account of its asset management fee and the Specified Expenses (e.g., costs charged to Colchis for utilizing personnel of the Debtors). The Committee believes this concession made Colchis's proposal the highest and best bid for the asset management role among the non-Debtor third party options. It should be noted that the Debtors' current loan portfolio is and will be highly concentrated with non-performing and defaulted loans that require a higher degree of effort and resources.

Based on this process, the Committee believes the fee structure proposed by Colchis is highly competitive and reflects the market price for the services of a third-party asset manager in this situation.

*(b)* **What is Colchis's relationship with the Debtors?**

Colchis was an equity investor in the Debtors, having invested approximately $2.5 million across three of the Debtors' capital raises.

Colchis is also a substantial investor in MPDNs (as discussed more fully below). Colchis acquired most of its MPDN interests through bulk purchase agreements with the Debtors. Under these agreements, Colchis provided the Debtors with certain fixed Underlying Loan investment criteria. When an Underlying Loan was available for acquisition by the Debtors, if it met these fixed criteria, Colchis would acquire up to 50% of the Underlying Loan. The economics offered to Colchis under these agreements were identical to the economics offered to investors on the PeerStreet platform (i.e., there were no additional economic benefits granted to Colchis, such as enhanced interest rate return). These agreements enhanced the Debtors' ability to grow their investment product availability by making more and higher quality loans available to non-institutional investors on the Peer Street Platform.

In 2017, Colchis also entered into an agreement with the Debtors pursuant to which Colchis purchased whole loans and notes from the Debtors (rather than investing in MPDNs off the Peer Street Platform). Under this agreement, Colchis would purchase the entirety of a loan, and the Debtors would serve as the master servicer for the loans purchased by Colchis in exchange for servicing fees. In total, Colchis purchased 63 loans under this agreement. All of these loans have either run-off or otherwise been resolved, with all amounts due to the Debtors fully repaid.

Finally, starting in 2018, Colchis provided warehouse financing to the Debtors. Using that facility, PSFI originated or purchased Underlying Loans and then made those loans available to investors on the Peer Street Platform through the issuance of MPDNs. The proceeds of those MPDNs would then be used to repay borrowing under the warehouse facility. The Colchis warehouse financing program was discontinued in 2020, as part of the Debtors' decision to provide investors with an alternative asset category through the Pocket program. No amounts have been owed to Colchis on account of warehouse financing since then.

Colchis and its affiliates are not members of the Committee, and it does not have a representative on or appointment rights with respect to the Debtors' board of directors.

*(c)*      **Are Colchis's interests aligned with the MPDN investors?**

Colchis's affiliates, the Pacific Creditors, are collectively the Debtors' largest MPDN customers. As of the Petition Date, the Pacific Creditors held approximately $38 million in claims against PSFLLC on account of MPDNs, making them the largest creditor in these chapter 11 cases. Colchis owns one hundred and twenty-one (121) MPDN positions across 117 different Underlying Loans (out of 372 Underlying Loans in total). As of January 31, 2024, greater than $28 million in UPB was outstanding associated with the Pacific Creditors' MPDNs. Given its substantial and varied investment holdings, Colchis is incentivized to maximizing the return on the Underlying Loans broadly across the entire portfolio, which will benefit all stakeholders.

Colchis's fee structure also demonstrates that it is aligned with maximizing the value of the Underlying Loans, which will ultimately benefit the MPDN holders. Under the Plan, Colchis will be paid an asset management fee equal to 1.5% of UPB per annum of loans or REO that are not liquidated on the Effective Date, a performance fee equal to 2% of collections, and an up-front Structuring Fee of 0.5% of UPB of loans or REO that are not liquidated as of the Effective Date. Notably, the performance fee will be reduced on a dollar-for-dollar basis by the asset management fee and the Specified Expenses (e.g., costs charged to Colchis for utilizing personnel of the

Debtors).  Because a significant portion of Colchis's compensation as asset manager is based on collections, Colchis will be incentivized to ensure maximum return on the underlying mortgage loans and REO properties and to avoid excessive Asset Management Fees and Specified Expenses, which are dilutive of its Performance Fee.

The Debtors, the Committee, and Colchis are currently negotiating definitive documentation for the asset manager role.  Although those documents are not yet finalized, the term sheet negotiated with Colchis contemplates that Colchis will manage the Peer Street loan portfolio in the same manner in which, and with the same degree of care, skill, prudence, and diligence with which, Colchis manages, services, and administers comparable loans and REO properties in its own portfolio.  This servicing standard for an asset manager is generally accepted within the real estate industry.

    *(d)*    **On what terms will Colchis Manage the Loan Portfolio?**

The Plan provides for the Loan Assets to be managed by the Asset Manager on the terms and conditions set forth in the Asset Management Term Sheet and the Asset Management Agreement, a copy of which will be included in the Plan Supplement.  A summary of the key terms in the Asset Management Term Sheet are as follows:

- *Post-Effective Date Loan Administration Costs*:  The Asset Manager will be entitled to be paid the following (which are part of the Post-Effective Date Loan Administration Costs and have the priority described further below), which, subject to the priority described further below, shall be paid monthly from the Exit Facility (or Funding Pool, if applicable):

  - Asset Management Fee.  A management fee equal to one- and one-half percent (1.50%) *per annum* of the UPB of the Loan Assets; *provided*, that such fee shall be payable monthly in arrears and calculated based on the UPB of the Loan Assets at the beginning of each month.  The Asset Management Fee shall be reduced by the Specified Expenses, if any,[1] which are amounts paid from sources other than the Asset Manager to former employees retained (with the approval of the Asset Manager) to assist with the asset management of the Loan Assets.  The Asset Management Fee and the Specified Expenses payable for any month (or any part thereof) shall be allocated ratably across the Loan Assets that were managed by the Asset Manager during such month, based on the UPB of the Loan Assets on the first day of such month.

  - Performance Fee:  A performance fee equal to two percent (2%) of all collections on Loan Assets, net of the Asset Management Fee and the Specified Expenses.  The Performance Fee will be charged to, and deducted by the Asset Manager from, the Underlying Loan for which the Performance Fee was incurred.

---

[1]    Specified Expenses shall be treated as Post-Effective Date Loan Administration Costs.

    o   <u>Structuring Expenses</u>.  An amount equal to one-half percent (0.5%) of the UPB of the Loan Assets as of the Effective Date; *provided*, that if the Asset Manager provides or backstops the Debtors' entire exit financing need, then the Structuring Expenses shall include reasonable fees and expenses incurred by the Asset Manager in connection with negotiating and finalizing such exit financing.  The Structuring Expenses shall be allocated ratably across the Loan Assets based on the UPB of the Loan Assets on the Effective Date.

    o   <u>Reimbursable Expenses</u>.  The Asset Manager shall be entitled to reimbursement from the Exit Facility (or the Funding Pool, if applicable) for all Reimbursable Expenses in connection with any of its duties under the Asset Management Agreement; *provided*, that the Reimbursable Expenses shall not include the costs of Asset Manager's overhead (including its employees, insurance fees, and taxes) or the Specified Expenses; *provided*, *further*, that Asset Manager shall not be permitted to reimbursement for expenses incurred under contracts entered into with any of its affiliates without the prior written approval of the non-interested members of the Advisory Committee, which shall not be unreasonably withheld; *provided* that such contracts are on market terms as determined by the non-interested members of the Advisory Committee in their reasonable discretion.  Allocation of the Reimbursable Expenses will be determined by the Plan Administrator, in consultation with the Asset Manager and subject to the review of the Advisory Committee, based on the nature of the services giving rise to such amount.

    o   <u>Reserves</u>.  The Asset Manager shall be entitled to receive and hold a reserve equal to (i) three (3) months anticipated payment of the Asset Management Fee, *plus* (ii) three (3) months of anticipated costs and expenses of the administration of the Loan Assets, including Reimbursable Expenses, Structuring Expenses and Servicing Advances for the Loan Assets.

- *Retention of Subservicer*:  The Asset Manager will either continue to retain the Debtors' existing subservicer, FCI, or retain another subservicer with the consent of the Advisory Committee, not to be unreasonably withheld (such party, the "**Subservicer**").  The Subservicer shall have duties that are substantially similar to the duties that FCI has under its existing agreements with the Debtors.

- *Managing the Loan Assets*:  The Asset Manager's duties shall include, without limitation: (a) administering and managing the Loan Assets in accordance with Accepted Asset Management Standards (as defined below); (b) maintaining accurate books and records on both an aggregate and an individual Loan Asset basis and providing all reporting reasonably required by the Plan Administrator, to the extent possible based on information provided by the Debtors and Subservicer; (c) monitoring the compliance of borrowers and other parties under the Loan Documents (including payment of tax and insurance amounts), exercising remedies, and funding protective advances when required in Asset Manager's

reasonable judgment in accordance with Accepted Asset Management Standards to the extent possible based on information provided by the Debtors and Subservicer; (d) maintaining the priority of the underlying security instruments encumbering the Loan Assets; (e) making construction advances in accordance with the Loan Documents; and (f) managing and selling REO properties.  For the avoidance of doubt, the Asset Manager may delegate certain duties to the Subservicer consistent with Accepted Asset Management Standards.

Notwithstanding the foregoing, but subject to the Advisory Committee's consent rights with respect to affiliated sales, the consent of the Plan Administrator and/or the Advisory Committee (which consent shall not be unreasonably withheld) shall be required before the Asset Manager may take certain material actions with respect to the Loan Assets that are outside of the Accepted Asset Management Standards, including, without limitation, the bulk sale of multiple Loan Assets other than the Clean Up Sale (as defined below).

In accordance with industry practice, the Loan Assets may be charged off, modified, or sold in an effort to maximize realization with respect to such Loan Assets.

The term "Accepted Asset Management Standards" shall be defined as "in compliance with applicable law and the underlying documents governing the Loan Assets (the "**Loan Documents**") and in the same manner in which, and with the same degree of care, skill, prudence and diligence with which, the Asset Manager or Subservicer manages, services, and administers comparable loans with similar borrowers and comparable REO property owned or managed by the Asset Manager, the Subservicer or its affiliates, in order to timely collect payments of principal and interest under the Loans Assets, or if the Loan Assets have gone into default or the collateral has become REO property, use commercially reasonable efforts to maximize recovery on such Loans Assets and REO property on a present value basis."

- _Sales_:  The Asset Manager shall be permitted to sell the Loan Assets (other than the Excluded Loans) consistent with the following principles:[2]

  o Loan Assets that are REO may be sold on an individual basis consistent with Accepted Asset Management Standards;

  o If the Asset Manager determines that market demand for certain Loan Assets that are not REO allows for the optimal recovery through a sale, then the Asset Manager may sell such assets; _provided_, that a bulk sale of the

---

[2]    Any fees or costs incurred in connection with the sale of a Loan Asset will be treated as a Post-Effective Date Loan Administration Cost for such Loan Asset.

Wind-Down Loan Assets (other than the Clean Up Sale) shall require the consent of the Advisory Committee (not to be unreasonably withheld).

o  When the UPB of the remaining Wind-Down Loan Assets is equal to or less than fifteen percent (15%) of an amount equal to the unpaid principal balance of the Wind-Down Loan Assets on the Effective Date, the Asset Manager may take commercially reasonable efforts to sell all of the remaining Loan Assets if market conditions allow for a sale, as determined by the Asset Manager in its reasonable discretion, in consultation with the Plan Administrator (the "**Clean Up Sale**").  All Wind-Down Loan Assets in the Clean Up Sale shall be deemed Excluded Loans, and the Prepetition Agent shall not have the ability to remove any Wind Down Loan Assets from the Clean Up Sale.

- _Excluded Loans_:  The Asset Manager shall, in consultation with the Plan Administrator, as promptly as possible after the Effective Date, sell the Excluded Loans.  Notwithstanding the foregoing, if the Prepetition Agent agrees to timely pay the Post-Effective Date Loan Administration Costs and Post-Effective Date Servicing Advances for any Underlying Loan designated as an Excluded Loan (such amounts the "Designated Loan Amounts"), then such Underlying Loan shall continue to be managed by the Asset Manager after the Effective Date in accordance with the Asset Management Agreement and shall not be treated as an Excluded Loan. _provided_, _however_, that if the Prepetition Agent fails to timely pay, on a monthly basis, the Designated Loan Amounts for an Underlying Loan described in this sentence, then such Underlying Loan will be classified and treated as an Excluded Loan, and the Prepetition Agent shall timely pay any unpaid Designated Loan Amounts incurred prior to the date such Underlying Loan is classified and treated as an Excluded Loan.

- _Term_:  Asset Manager shall serve from the Effective Date until the date that is the later of (a) thirty (30) days following the final repayment or disposition of the last outstanding Loan Asset and (b) the date on which all remaining Post-Effective Date Loan Administration Costs and Post-Effective Date Servicing Advances have been fully paid, unless earlier terminated by mutual agreement of the Asset Manager and the Plan Administrator, in consultation with the Advisory Committee, or by either of them "for cause," as defined in the Asset Management Agreement.

- _Arm's-Length Transactions_:  If a sale of a Loan Asset is proposed to be made to an affiliate of the Asset Manager, such sale shall be on terms no less favorable than would be obtained in a comparable arms-length transaction, as determined by the non-interested members of the Advisory Committee in their reasonable discretion.

- _Designation of Certain Underlying Loans as Excluded Loans_:  Following the Effective Date, the Plan Administrator, after consultation with the Advisory Committee, Prepetition Agent and Asset Manager, shall be authorized to designate any Underlying Loan as an Excluded Loan if the Plan Administrator determines, following such consultation, that Post-Effective Date Loan Administration Costs

and Post-Effective Date Servicing Advances expected to be incurred with respect to such Underlying Loan are not likely to be fully recovered.  Any fees and expenses incurred prior to such designation shall be paid from the Exit Facility (or Funding Pool, if applicable) as Post Effective Date Loan Administration Costs. Notwithstanding the foregoing and for any Underlying Loan that is not part of the Clean Up Sale, (a) if the Prepetition Agent agrees to timely pay the Post-Effective Date Loan Administration Costs and Post-Effective Date Servicing Advances for any Underlying Loan designated as an Excluded Loan until such Loan is liquidated and the resulting proceeds are distributed according to Section 2.6, including any Performance Fee due to the Asset Manager, then such Underlying Loan shall continue to be managed by the Asset Manager after the Effective Date in accordance with the Asset Management Agreement and shall not be treated as an Excluded Loan, and (b) the Prepetition Agent's consultation shall not be required if there are no Pre-Effective Date Servicing Advances and unpaid Pre-Effective Date Servicing Fees related to the Underlying Loan.

- *Segregation of Prepetition Agent's Collateral*:  Any amounts that are recoverable from the proceeds of the Loan Assets on account of Pre-Effective Date Servicing Advances and Pre-Effective Date Servicing Fees shall be deposited, no more frequently than once every two weeks and no less frequently than monthly with such frequency to be agreed upon by the Prepetition Agent and Asset Manager or set by the Court in the Confirmation Order, into the Prepetition Agent Account by the Plan Administrator.

- *Reporting*:  The Asset Manager shall provide, or cause to be provided, to the Plan Administrator, Advisory Committee and Prepetition Agent monthly reporting on terms to be agreed in the Asset Management Agreement.

- *Treatment of Pre-Effective Date Servicing Fees or Pre-Effective Date Servicing Advances*.  The Asset Manager and Plan Administrator shall not be authorized to waive Pre-Effective Date Servicing Fees or Pre-Effective Date Servicing Advances without obtaining the prior written consent of the Prepetition Agent.  The Asset Manager shall obtain the consent of the Prepetition Agent for any disposition transaction for an Underlying Loan where the Pre-Effective Date Servicing Fees or Pre-Effective Date Servicing Advances related to that loan aggregate at least $50,000 and will not be paid in full in the transaction; *provided*, that if the Prepetition Agent withholds its consent, then the Prepetition Agent shall undertake to pay the Post-Effective Date Loan Administration Costs and Post-Effective Servicing Advances for such Underlying Loan that are not recovered and the Underlying Loan may be designated by the Asset Manager as an Excluded Loan and/or sold in the Clean Up Sale as provided for in this Section.

***The foregoing is provided for informational purposes only and shall not be deemed to modify the terms of the Asset Management Agreement.***

**2.3    Advisory Committee**

A three member Advisory Committee will be established on the Effective Date comprised of Holders of either MPDN Claims, OppFund Interests, or both.  The initial members of the Advisory Committee shall be selected by the Committee and disclosed in the Plan Supplement. At present, these three members are anticipated to be:  C. Aristides, D. Sagron, and Y. Wang, who each are substantial MPDN holders and presently serve on the Committee.  So long as Colchis is the Asset Manager, Colchis shall not sit on the Advisory Committee.

If there is a vacancy on the Advisory Committee, a majority of the remaining members of the Advisory Committee and the Plan Administrator, acting collectively, may select a replacement, that is not related to or otherwise affiliated with any member of the Advisory Committee, Plan Administrator, Prepetition Agent, the Debtors, or the Asset Manager and shall do so as soon as reasonably practicable after a vacancy occurs that results in only one member on the Advisory Committee.  Any member of the Advisory Committee may be removed for cause, solely by motion filed with the Bankruptcy Court by any other member of the Advisory Committee or the Plan Administrator.

Service on the Advisory Committee may be compensated, and reasonable expenses (including costs of outside advisors and professionals) incurred by the Advisory Committee in their capacity as such may be reimbursed, in each case, from the Wind-Down Reserve, subject to advance approval by the Plan Administrator and, if such costs exceed $250,000, by the Bankruptcy Court.

The Debtors shall indemnify and hold harmless the members of the Advisory Committee, and their designees, employees, agents, representatives or professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation and administration of the Plan; *provided*, *however*, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**2.4    Allocation of Costs**

The costs of the Chapter 11 Cases shall be allocated as described below.

***The following important note qualifies these allocations:***  the description below is based on amounts known as of March 11, 2024, or good faith estimates of amounts not known as of such date based on, among other factors, the Cash Collateral Budget agreed to with the Prepetition Agent and proceeds collected as of that date and anticipated to be collected thereafter.  Changes in the actual amounts incurred (or that became known) after March 11, 2024, any extended Cash Collateral Budget, and the Debtors' assumptions and estimates as of the date hereof, could impact the dollar amount or percentage allocations described below.

<u>*Chapter 11 Operating Disbursements*</u>:  As reflected in the Cash Collateral Budget, Operating Expenses (or OpEx) include payroll, rent and occupancy, insurance, and other miscellaneous vendors and service providers.  For purposes of the Plan, the OpEx to be allocated

- 29 -

is estimated to be $12,378,831.  *Consistent with the introductory note, this amount will be different if actual OpEx differs from what is estimated as of the date hereof.*

The Prepetition Agent has agreed that up to $6,139,083 (or 49.6% of the budgeted and incurred OpEx), excluding Servicing Advances, may be paid from its Cash Collateral, through the Cash Collateral Budget.  The Prepetition Agent has agreed that 100% of post-Petition Date and pre-Effective Date Servicing Advances may be paid from its Cash Collateral under the Cash Collateral Budget.

The balance of the OpEx (estimated to be approximately 50.4% of the budgeted and incurred OpEx) shall be designated as Pre-Effective Date Loan OpEx and will be allocated ratably across the Underlying Loans, based on UPB of the Underlying Loans as of the Petition Date, in recognition of the work done to maintain and service those loans.  The Debtors estimate that this will result in a per loan allocation of OpEx of $29.0 per $1,000 (or 2.9%) of UPB of Underlying Loans.  *Consistent with the introductory note, this amount will be different if actual OpEx differs from what is estimated as of the date hereof.*

The Debtors, Committee and Prepetition Agent believe that this allocation of OpEx is reasonable relative to the work performed to service the Prepetition Agent's collateral and Underlying Loans, as well as the resolution of intercompany claims and Causes of Action described herein, *see* Section 3.3 below.

*Restructuring Costs*:  As reflected in the Cash Collateral Budget, Restructuring Costs include the Debtors' and Committee's professional fees and the costs of administering the Chapter 11 Cases.  For purposes of the Plan, the Restructuring Costs to be allocated are estimated to be $20,548,623.  *Consistent with the introductory note, this amount will be different if actual Restructuring Costs differ from what is estimated as of the date hereof.*

The Prepetition Agent has agreed that up to $2,996,297 of the Restructuring Costs (or 14.6% of the budgeted and incurred Restructuring Costs) may be paid from its Cash Collateral through the Cash Collateral Budget.

The balance of the Restructuring Costs has been allocated by Debtor as follows:

($MM)

|  | PSFI | PSW | PSW2 | Portfolio | Opp Fund (LP) | Total |
|---|---|---|---|---|---|---|
| *Mortgage Loans* |  |  |  |  |  |  |
| Loans Associated with MPDNs | $ 186.8 | $ - | $ - | $ - | $ - | $ 186.8 |
| Loans Associated with Pocket/Warehouse | 0.3 | - | - | - | - | 0.3 |
| Loans Associated with OppFund Loan | 17.5 | - | - | - | - | 17.5 |
| Loans Associated with PDNs | 0.2 | - | - | - | - | 0.2 |
| Unassociated Loans | 2.9 | - | - | - | - | 2.9 |
| **Total Mortgage Loans** | **$ 207.7** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 207.7** |
| **Allocated Restructuring Costs $** | **$ (13.8)** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (13.8)** |
| Allocated Restructuring Costs % | *6.6%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *6.6%* |
| **Cash** | **$ 5.5** | **$ 37.2** | **$ 1.3** | **$ 2.0** | **$ 10.7** | **$ 56.7** |
| **Allocated Restructuring Costs $** | **$ (0.4)** | **$ (2.5)** | **$ (0.1)** | **$ (0.1)** | **$ (0.7)** | **$ (3.7)** |
| *Allocated Restructuring Costs %* | *6.6%* | *6.6%* | *6.6%* | *6.6%* | *6.6%* | *6.6%* |

That same amount allocated by investment product is as follows:

($MM)

| Product Group | | Total Cash | | UPB | | Total Value |
|---|---|---|---|---|---|---|
| **Allocable Restructuring Costs** | | | | | $ | **17.6** |
| | | | | | | |
| Loans Associated with MPDNs | $ | 5.5 | $ | 186.8 | $ | 192.3 |
| Restructuring Cost Allocation $ | | 0.4 | | 12.4 | | 12.8 |
| *Restructuring Cost Allocation %* | | *6.6%* | | *6.6%* | | *6.6%* |
| | | | | | | |
| Loans Associated with Pocket/Warehouse | $ | 38.5 | $ | 0.3 | $ | 38.8 |
| Restructuring Cost Allocation $ | | 2.5 | | 0.0 | | 2.6 |
| *Restructuring Cost Allocation %* | | *6.6%* | | *6.6%* | | *6.6%* |
| | | | | | | |
| Loans Associated with OppFund Loan | $ | 10.7 | $ | 17.5 | $ | 28.2 |
| Restructuring Cost Allocation | | 0.7 | | 1.2 | | 1.9 |
| *Restructuring Cost Allocation %* | | *6.6%* | | *6.6%* | | *6.6%* |
| | | | | | | |
| Loans Associated with PDNs | $ | 2.0 | $ | 0.2 | $ | 2.1 |
| Restructuring Cost Allocation | | 0.1 | | 0.0 | | 0.1 |
| *Restructuring Cost Allocation %* | | *6.6%* | | *6.6%* | | *6.6%* |
| | | | | | | |
| Unassociated Loans | $ | - | $ | 2.9 | $ | 2.9 |
| Restructuring Cost Allocation | | - | | 0.2 | | 0.2 |
| *Restructuring Cost Allocation %* | | *-* | | *6.6%* | | *6.6%* |

These allocations were determined based on the value of the assets at each of the Debtors, including the UPB of the Underlying Loans, the value received or estimated for Non-Loan Assets, and the cash balances at the various Debtors, in each case, as of the Petition Date. As reflected in the foregoing chart, certain Restructuring Costs allocated to PSFI[3] have been further allocated to the Underlying Loans serviced by PSFI and will be allocated ratably, based on the UPB of the Underlying Loans, and paid from the proceeds of the Underlying Loans before such amounts are made available for ultimate distribution to holders of MPDNs, RWNs, PDNs, and OppFund Interests.[4] The Debtors estimate that this will result in a per loan allocation of Restructuring Costs

---

[3]    Consistent with the methodology of allocating costs at the servicer level and withholding them from loan proceeds before remitting the proceeds to the Debtor that has an ownership or participation interest in Underlying Loans, the first chart above reflects the allocation of Restructuring Costs to the Underlying Loans at PSFI, even though PSFI is, in most instances, only the nominal owner and servicer of the Underlying Loans.

[4]    These allocated amounts constitute the Pre-Effective Date Loan Restructuring Costs. The Corporate Loans have been allocated Pre-Effective Date Loan Restructuring Costs.

of $66 per $1,000 of UPB (or 6.6%).[5]  *Consistent with the introductory note, this amount will be different if actual Restructuring Costs differ from what is estimated as of the date hereof.*

As set forth in Article IV of the Plan, to the extent that the allocated amount of Restructuring Costs for a particular Debtor have been paid using advances from another Debtor, such amounts shall be repaid to the lending Debtor on the Effective Date by the borrowing Debtor, or from the Exit Facility (or the Funding Pool, if applicable) with respect to the Pre-Effective Date Loan OpEx and Pre-Effective Date Loan Restructuring Costs.

The Plan Supplement will further disclose the wind-down budget for the Plan Administrator Expenses and the source of funding for such amounts.  The initial budget for Plan Administrator Expenses shall be acceptable to (i) the Prepetition Agent for amounts to be paid from the Corporate Debtor Reserve and (ii) the Committee for amounts to be paid from the Wind-Down Reserve.  The Plan Administrator Expenses shall be payable from the Corporate Debtor Reserve or the Wind-Down Reserve, to the extent consistent with the definition thereof and set forth in the applicable budget.

The Debtors, Committee and Prepetition Agent believe that the allocation of Restructuring Costs is reasonable relative to the work performed to liquidate and distribute the Debtors' various assets, address matters specific to the Debtors' diverse creditor body, make distributions to creditors, and the resolution of intercompany claims and Causes of Action described herein, *see* Section 3.3 below.

*Servicing Advances*.  Servicing Advances have been paid using Cash Collateral, with the Prepetition Agent receiving a replacement lien on all post-petition Pre-Effective Date Servicing Advances.  Servicing Advances will be charged to, and recovered from, the Underlying Loan for which the Servicing Advance was made.

**The Plan Supplement will include an updated discussion of the allocations, percentages, and amounts that will take into account actual amounts and prevailing assumptions and estimates as of a date closer to the anticipated Confirmation Date and Effective Date.**

## 2.5    Funding of Loan-Level Amounts; Post-Effective Date Funding; Proposed Funding Pool

Since the Petition Date, PSFI's servicing business has been almost entirely dedicated to the runoff of the Underlying Loans in the Peer Street loan portfolio.  The Debtors have not yet used the proceeds of the Underlying Loans to pay the costs associated with this run off or the Chapter 11 Cases generally.  The Plan will implement the payment of such costs.

The Underlying Loans are non-amortizing.  While the Underlying Loans do provide for the payment of interest by the borrowers, as the portfolio of Underlying Loans ages, it becomes more concentrated in non-performing loans for which regular cash flow is the exception and not

---

[5]     Because the allocation of Restructuring Costs has been performed based on the cash value or UPB of loan assets, and each investment product has distinct assets associated with it, the percentage allocation is the same for each investment product.

the norm.  As a result, the Debtors have increasingly less certainty over the regularity of the cash flow from the portfolio on the Underlying Loans, and more so on a loan-to-loan basis.  The Debtors anticipate that they will become more dependent on the repayment of Underlying Loans at maturity or some other realization event as the means to generate the cash needed to pay the costs allocated to each Underlying Loans.

To date, to fund the Chapter 11 Cases, the Prepetition Agent has consented to the use of its Cash Collateral to pay for certain of the OpEx of running the servicing business, as well as to fund 100% of the Debtors' Servicing Advances, and certain Restructuring Costs.  The remaining OpEx and Restructuring Costs have been funded from unencumbered cash or, where there has been no unencumbered cash at a debtor, through intercompany loans (primarily from Warehouse I) as administrative expenses pursuant to the terms of the Cash Management Order.

The Prepetition Agent has indicated it is unwilling to continue to allow the Debtors to use Cash Collateral to support the servicing business following the Effective Date.  On the Effective Date, the Debtors intend to cause all post-Petition Date intercompany loans and advances to be repaid and to effectuate the distribution of the assets of the various Estates to their creditors and, as a result, intercompany loans and advances are not anticipated to be available.  Thus, the Debtors will have no access to the working capital they need to complete the runoff of the Loan Assets.

The Debtors and Committee are exploring whether third-party financing may be available, as the Committee has made clear that it believes third-party financing at a market rate is the preferred outcome.  The Debtors and Committee have received the Exit Facility Term Sheet for a proposed Exit Facility from Colchis, and they are actively involved in discussions with another lender.  The Debtors and Committee may determine that the proposal in the Exit Facility Term Sheet (as revised) or other third-party financing is a better alternative.  The Debtors and Committee are actively discussing with Colchis the terms of the Exit Facility Term Sheet, and the potential Exit Facility to be provided by Colchis, as well as terms with the other lender, and will continue to do so to ensure that a fair and reasonable solution is implemented to address the funding needs for the runoff.

At present, the Debtors, after consultation with the Committee, believe the only option available with certainty is to fund the aggregate costs allocated to Loan Assets using the proceeds from the Underlying Loans.  However, the Committee is actively negotiating to obtain a market-rate exit facility from a third party and if an acceptable and executable transaction can be negotiated, the Debtors and Committee anticipate substituting the Funding Pool with the Exit Facility.

If the Debtors utilize the Funding Pool, this includes funding the post-Petition Date, pre-Effective Date expenses that are not covered by Cash Collateral, but also the anticipated costs and expenses (including Servicing Advances) to be incurred after the Effective Date.  To do so, the Debtors will hold back proceeds from Underlying Loans that have been liquidated to fund the expenses allocated to Underlying Loans that have not been liquidated.  Parties who benefit from this holdback (*i.e.*, who are invested in Loan Assets) will be assessed a financing charge of 14.2% *per annum*, assessed from the Effective Date to the date amounts are repaid at the time of liquidation of the Underlying Loan. Parties who are subject to this holdback (*i.e.*, who are invested in liquidated loans) will receive a ratable share of those financing charges, based on the amounts

withheld and the duration of such withholding, at the conclusion of the wind-down of the loan portfolio.  However, as discussed in the Introduction, there are different benefits and risks to Class 10/10-1 and Class 11/11-1 if the Funding Pool or Exit Facility are selected.  Both options remain on the table.

A summary of the key terms of the proposed Funding Pool are as follows:

*Oversight of the Funding Pool*.  The Plan Administrator shall be responsible for overseeing the Funding Pool.

*Use of Funding Pool*.  The Funding Pool will be available to pay (or repay intercompany loans already extended to pay) Pre-Effective Date Loan OpEx and Pre-Effective Date Loan Restructuring Costs and to fund Post-Effective Date Loan Administration Costs, Post-Effective Date Servicing Advances, and Plan Administrator Expenses.

*Value of Funding Pool Units*.  Funding Pool Units and Funding Pool Incremental Units shall be valued at one dollar each.

*Source of Funding Pool*.  On the Effective Date, the Plan Administrator shall hold back an amount equal to the Funding Pool Amount, on a *pro rata* basis, from distributions on account of the Liquidated Loan Assets, and contribute such amount to the Funding Pool.  The Funding Pool Units will be distributed to investors as set forth in Article IV.  Following the Effective Date, when a Loan Asset is liquidated, the Plan Administrator shall hold back an amount equal to the product of (i) the Holdback Percentage as of the first day of the month during which the liquidation occurred, *times* (ii) the amount that otherwise would be distributed to the investors in such Loan Asset and contribute such amount to the Funding Pool.  For each dollar of distributions held back and contributed to the Funding Pool, the investors that would otherwise have been entitled to such distributions will receive an equal amount of Funding Pool Units to be distributed among such investors on a *pro rata* basis in accordance with their respective ownership stake in the Underlying Loan.

*Funding Pool Incremental Units*.  Funding Pool Incremental Units will be distributed monthly.  Effective as of the first day of each month, each holder of a Funding Pool Unit during the prior month will receive Funding Pool Incremental Units that would yield a 14.2% per annum return on the number of Funding Pool Units held by such holder on the first day of the prior month (but excluding any such units that were redeemed during the prior month).

*Return of Funding Pool*.  Subject to the Waterfall (as defined below) set forth in Section 2.6, Funding Pool Units will be subject to mandatory redemptions as follows.  At the beginning of each month, the Plan Administrator shall compare the Holdback Percentage as of the first day of the current month against the Holdback Percentage as of the first day of the prior month.  To the extent the Holdback Percentage has decreased from the prior month to the current month, each holder of Funding Pool Units as of the first day of the prior month shall receive a redemption payment from the Funding Pool equal to the product of (i) the decrease in the Holdback Percentage from the prior month to the current month, *times* (ii) the sum of (A) all distributions made to such holder, *plus* (B) the Funding Pool Units held by such holder as of the first day of the prior month,

expressed as a dollar value.  For the purposes of the foregoing calculation, the Plan Administrator shall exclude any Funding Pool Units that were redeemed during the prior month.

For example, if the Holdback Percentage for the prior month was 10%, and the Holdback Percentage for the current month is 8%, the decrease in the Holdback Percentages would be 2%.  An investor that had received $100,000 in distributions and held 10,000 in Funding Pool Units as of the first day of the prior month (excluding any Funding Pool Units that were redeemed during the prior month) would receive a redemption payment equal to $2,200 (*i.e.*, the product of 2% *times* $110,000).  After receiving such redemption payment, the investor would have received $102,200 in distributions and would hold 7,800 Funding Pool Units.

There shall be no redemption of Funding Pool Incremental Units until the loan portfolio shall be fully resolved.

Upon the final resolution of the loan portfolio (*i.e.*, when all Loan Assets have been liquidated and all Post-Effective Loan Administration Costs have been reconciled and satisfied), all amounts remaining in the Funding Pool shall be distributed, first to redeem any remaining Funding Pool Units on a *pro rata* basis determined by number of units, and second, to the extent funds remain after redeeming all Funding Pool Units, to redeem all Funding Pool Incremental Units on a *pro rata* basis determined by number of units.

The following terms and definitions apply with respect to the administration of the Funding Pool.

| | |
|---|---|
| **Holdback Percentage** | The percentage determined from time to time by dividing the Funding Pool Amount by the sum of (A) all distributions made on account of the Underlying Loans from the Effective Date through the date of determination, *plus* (B) all Funding Pool Units issued and outstanding as of the first day of the prior month (excluding any Funding Pool Units that were redeemed during the prior month). |
| **Financing Rate** | 14.2% *per annum* from the 1st day of the month in which the Effective Date occurs to the last day of the month prior to the date of determination. |
| **Funding Pool Units** | Units issued on a dollar-for-dollar basis, on account of any distributions on account of such Underlying Loans that are held back and contributed by the Plan Administrator to the Funding Pool.  Funding Pool Units shall be valued at one dollar each. |
| **Funding Pool Incremental Units** | Units issued each month on account of Funding Pool Units that have not been redeemed.  Funding Pool Incremental Units shall be valued at one dollar each. |

| Funding Pool Amount | The amount necessary to fund (A) the Pre-Effective Date Loan OpEx and Pre-Effective Date Loan Restructuring Costs allocated to Loan Assets that have not yet been recovered from the proceeds of an Underlying Loan, _plus_ (B) the anticipated Post-Effective Date Administration Costs, and Post-Effective Date Servicing Advances that have not yet been recovered from the proceeds of that Loan Asset, as well as the reserve for the same required by the Asset Manager, _plus_ (C) the Plan Administrator Expenses and any discretionary reserve established by the Plan Administrator. The amounts in clauses (B) and (C) shall be subject to adjustment by the Plan Administrator, after consultation with the Asset Manager, with the consent of the Advisory Committee.<br><br>The initial Funding Pool Amount will be determined as of the Effective Date, with the consent of the Committee (not to be unreasonably withheld). However, as of the date hereof, the Funding Pool Amount is estimated to be approximately $18 million as of the Effective Date, and a further good faith estimate will be included in the Plan Supplement. |
| Funding Pool | The funds held back from distributions under the Waterfall on account of Liquidated Loan Assets or Loan Assets and used to pay for costs allocated to the management and servicing of the Underlying Loans through the Chapter 11 Cases and complete the run-off of the Underlying Loans after the Effective Date, including, without limitation, payment of the Post-Effective Date Loan Administration Costs and the Post-Effective Date Servicing Advances. |

## 2.6    Waterfall for Loan Proceeds; Amendment of Intercompany Loan-related Agreements

The proceeds of each Underlying Loan shall be applied in the following order, to the extent of available funds and on a pro rata basis (determined by amount owed) within each payment priority if funds are not available to satisfy in full the amounts in such payment priority:

_First_, the following amounts will be paid:

A.    solely for Underlying Loans liquidated after the Effective Date, an amount equal to the Post-Effective Date Loan Administration Costs and Plan Administrator Expenses allocated to that Underlying Loan will be paid to the Funding Pool;

B.    solely for Underlying Loans liquidated after the Effective Date, an amount equal to the Post-Effective Date Servicing Advances made for that Underlying Loan will be paid to the Funding Pool;

C.      for all Underlying Loans, Pre-Effective Date Servicing Advances made for that Underlying Loan will be paid to the Prepetition Agent Account; and

D.      for all Underlying Loans, Pre-Effective Date Servicing Fees for that Underlying Loan will be paid to the Prepetition Agent Account;

*provided*, *however*, that items (A) and (B) shall be paid before items (C) and (D) solely with respect to any Underlying Loan that is an Excluded Loan. Otherwise, (A), (B), (C) and (D) will be paid *pari passu*.

*Second*, for each Underlying Loan, the following amounts will be paid to the Funding Pool:

E.      An amount equal to the Pre-Effective Date Loan OpEx allocated to that Underlying Loan; and

F.      An amount equal to the Pre-Effective Date Loan Restructuring Costs allocated to that Underlying Loan.

*Third*, and solely for an Underlying Loan liquidated after the Effective Date, the following amounts will be paid to the Funding Pool:

G.      An amount equal to the product of (x) the sum of the amounts determined in clauses (A) and (B) *times* (y) the Financing Rate (such amount, the "**Post-Effective Date Financing Charge**");

H.      An amount equal to the product of (x) the sum of the amounts determined in clauses (E) and (F) *times* (y) the Financing Rate (such amount, the "**Pre-Effective Date Financing Charge**" and, together with the Post-Effective Date Financing Charge, the "**Financing Charges**");

*Fourth*, for each Underlying Loan, the following amounts will be paid to the Funding Pool:

I.      An amount equal to the product of (x) the prevailing Holdback Percentage at the time *times* (y) the amount that otherwise would be distributed on account of such Underlying Loan.  A corresponding amount of Funding Pool Units will be issued, as set forth in Section 2.5, and subsequently distributed, as set forth in Article IV.

*Fifth*, the balance of the proceeds of the applicable Underlying Loans, if any, remaining after the funding of items (A) through (I) above (such amounts, the "**Waterfall**") shall be made available to the Plan Administrator on account of the Underlying Loan and subsequently distributed in accordance with Article IV; *provided*, *however*, that to the extent such remaining proceeds are not distributed, directly or indirectly, to holders of RWN Claims, MPDN Claims or PDN Claims or on account of the OppFund Loan, such

- 37 -

proceeds shall be used by the Plan Administrator, at the direction of the Advisory Committee, to satisfy Post-Effective Date Loan Administration Costs.  In no instance may the Waterfall for any Underlying Loan be modified without the express consent of the Advisory Committee and (to the extent Pre-Effective Date Servicing Fees or Pre-Effective Date Servicing Advances are outstanding for the affected Underlying Loan) the Prepetition Agent.  For the avoidance of doubt, amounts made available to Holders of MPDN Claims may exceed the principal amount of the Holder's MPDN as a result of the distribution of interest, default interest, REO sales proceeds and other amounts received with respect to Underlying Loans through the Waterfall.

Notwithstanding the foregoing, if a Loan Asset has collected proceeds as of the Effective Date, such amounts shall be applied first to Clauses C and D, to the extent applicable, and thereafter in accordance with the Waterfall; *provided*, *however*, that all proceeds of Loan Assets collected after the Effective Date shall be applied in accordance with the Waterfall.

Notwithstanding the foregoing, clause (I) above shall not apply to any Underlying Loan sold or participated to Warehouse I, Warehouse II or PS Portfolio that was liquidated as of the Effective Date.

As part of the Plan, PSFI will amend its agreements with PSFLLC, Warehouse I and PS Portfolio, effective as of the Petition Date, to provide for the following:

- Pre-Effective Date Servicing Advances will be recovered from the proceeds of each Underlying Loan for which such advances were made;

- Pre-Effective Date Servicing Fees for that Underlying Loan will be recovered from each Underlying Loan for which such amounts are payable;

- Pre-Effective Date Loan OpEx will be charged to each Underlying Loan, including any associated Financing Charges, as described herein;

- Pre-Effective Date Loan Restructuring Costs will be charged to each Underlying Loan, including any associated Financing Charges, as described herein;

- Post-Effective Date Loan Administration Costs will be charged to each Loan Asset as described herein, including any associated Financing Charges, as described herein;

- Post-Effective Date Servicing Advances will be recovered from the proceeds of each Loan Asset for which such advances were made, including any associated Financing Charges, as described herein.

The amended agreements will include such other terms and provisions as are necessary to be consistent with the Plan and the Plan Supplement, including the Asset Management Agreement included in the Plan Supplement.

**2.7    Post-Effective Date Usage of the Peer Street Platform**

Peer Street has historically operated through an online platform (the Peer Street Platform) that allowed investors to maintain uninvested cash in the FBO Account and to receive direct deposits of the proceeds from their investments into the FBO Account. The Debtors intend to continue to utilize the Peer Street Platform and FBO Account for a period following the Effective Date (estimated not to exceed six months), and the costs of continuing the Peer Street Platform and FBO Accounts after the Effective Date will be deemed "Plan Administrator Expenses" and paid from the Wind-Down Reserve.

**2.8    Administration of OppFund Loan and Associated Mortgage Interests**

On the Effective Date, the Liquidated Loan Assets related to the Underlying Loans pledged to secure the OppFund Loan, net of the amounts paid through the Waterfall (Clauses (A) through (I), as applicable), shall be transferred to OppFund and made available as part of the OppFund Distribution. Following the Effective Date, the proceeds of any Loan Asset pledged to secure the OppFund Loan, net of the amounts paid through the Waterfall (Clauses (A) through (I), as applicable), shall be transferred to OppFund and held for distribution in accordance with Article IV. Any Funding Pool Units or Funding Pool Incremental Units received on account of such Underlying Loans shall be held by OppFund, and the Cash proceeds of such units shall be distributed in accordance with Article IV. Notwithstanding anything herein to the contrary, the OppFund Loan shall remain in place solely for purposes of effectuating the distributions provided to the Holders of OppFund Interests under Article IV.

**2.9    Implementation of Exit Facility, if Applicable.**

The Debtors, with the consent of the Committee, may determine to enter into an Exit Facility. If they do so, such an election will be disclosed in the Plan Supplement. The terms and conditions of any Exit Facility are subject to definitive documentation.

_Authorization of Exit Facility and Exit Facility Documents_. On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Facility Documents without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the Holders of Claims or Interests. The Exit Facility Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan, or the Confirmation Order. The financial accommodations to be extended pursuant to the Exit Facility Documents (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

Confirmation of the Plan shall be deemed approval of the Exit Facility and the Exit Facility Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into, execute, and deliver the Exit Facility

Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facility.

*Authorization, Grant, and Perfection of Liens*.  On the Effective Date, all liens and security interests granted pursuant to the Exit Facility Documents shall be (i) valid, binding, perfected, and enforceable liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted liens and security interests under the Exit Facility Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

*Modification to Waterfall*.  To the extent that the Debtors elect to enter into an Exit Facility, the Waterfall shall be modified to substitute the Exit Facility for the Funding Pool.

## ARTICLE  III
## NON-LOAN ASSET WIND-DOWN; OTHER PLAN IMPLEMENTATION TERMS

### 3.1    Plan Administrator.

The Debtors and the Committee interviewed four experienced restructuring professionals to serve as Plan Administrator.  The Debtors and Committee then selected Elizabeth A. LaPuma as their nominee to serve as Plan Administrator.  Ms. LaPuma's resume is attached as Exhibit C. The terms of Ms. LaPuma's compensation will be disclosed in the Plan Supplement.

On the Effective Date, a Plan Administrator will be appointed for each of the Debtors.  The Plan Administrator will serve as the sole officer and director of each Debtor.  On the Effective Date, each of the Debtors' directors, officers, members, and managers shall be terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.  On the Effective Date, the Corporate Debtor Reserve and Wind-Down Reserve shall be established and funded with amounts sufficient to enable the Plan Administrator to discharge his or her duties under the Plan.

The Plan Administrator and all of his or her respective designees, employees, agents, representatives or professionals shall not be liable for the act or omission of any other designees, employees, agents, representatives or professionals of the Plan Administrator, nor shall they be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omission resulting from willful misconduct, gross negligence, or fraud.  The Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities, and privileges

- 40 -

applicable to a chapter 7 trustee.  The Plan Administrator may, in connection with the performance of its functions, consult with attorneys, accountants, financial advisors and agents, which consultation may act as a defense for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons.  Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and its determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence, or fraud.  The Debtors shall indemnify and hold harmless the Plan Administrator and its designees, employees, agents, representatives or professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; *provided*, *however*, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

The Plan Supplement will contain an agreement setting forth the duties, responsibilities, obligations and authority of the Plan Administrator and will specify what actions will require the consent of the Advisory Committee, the Prepetition Agent, or either of them, but for the avoidance of doubt, it shall reflect the consent and consultation obligations set forth herein.

**3.2    Disposition of Non-Loan Assets.**

The Plan Administrator shall be responsible for the collection and liquidation of all of the Debtors' Non-Loan Assets.  These assets include, without limitation, certain intellectual property assets and certain receivables.

The Plan Administrator shall be authorized to dispose of any of the Non-Loan Assets of the Debtors through sale, license or otherwise, with or without Court order, and such transfer shall be free and clear of any liens, claims or encumbrances; *provided*, *however*, that the Plan Administrator shall obtain the consent of the Prepetition Agent where a transaction (or series of transactions) results in a purchase price in excess of $500,000 for Non-Loan Assets; *provided*, *further*, that disposition of Loan Assets shall be subject to the consent and consultation provisions set forth in Section 2.2 of the Plan.

The Plan Administrator shall be authorized to abandon any Non-Loan Asset of the Debtors to the extent that the Plan Administrator determines, in its reasonable discretion, that such Non-Loan Assets are not likely to result in proceeds greater than a *de minimis* value.  The Plan Administrator shall provide the Prepetition Agent five (5) business days' (or such shorter period agreed to by the Prepetition Agent) notice and opportunity to object prior to the effective date of abandonment of any such asset, and the Plan Administrator shall file a notice of such abandonment on the docket for the Chapter 11 Cases.

The Plan Administrator shall provide a monthly report to the Prepetition Agent and the Advisory Committee describing the proceeds of Non-Loan Assets, Corporate Loans, Pre-Effective Date Servicing Fees and Pre-Effective Date Servicing Advances collected in the prior month, any Non-Loan Assets or Underlying Loans (and associated Pre-Effective Date Servicing Fees and Pre-

Effective Date Servicing Advances) abandoned in the prior month, the Non-Loan Assets that still need to be liquidated and status of doing so, a description and reconciliation to budget for the Plan Administrator Expenses paid from the Corporate Debtor Reserve or Wind-Down Reserve, any increase projected to be made to the Corporate Debtor Reserve or Wind-Down Reserve, updated budget and explanation for such increase with respect to the Corporate Debtor Reserve (which the Prepetition Agent shall have ten (10) business days to object before such increase and new budget may be implemented), and any other matter the Plan Administrator deems appropriate to include; *provided*, that if the Prepetition Agent and the Plan Administrator cannot agree on an appropriate Corporate Debtor Reserve, then the Plan Administrator may abandon all remaining Non-Loan Assets to the Prepetition Agent (other than the books and records required to complete the liquidation of the Loan Assets).

For the avoidance of doubt the Loan Assets shall be disposed of in accordance with Article II hereof; *provided*, *however*, that on the Effective Date, the Debtors' interest in the Pre-Effective Date Servicing Advances and Pre-Effective Date Servicing Fees shall be conveyed, transferred, and assigned to the Prepetition Agent or its designee.

**3.3    Resolution and Settlement of Intercompany Claims and Disputes over Participation Interests.**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Claim Holder or an Interest Holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest, including pursuant to the transactions set forth herein.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Interests, and is fair, equitable, and is within the range of reasonableness.  Subject to the provisions of this Plan governing distributions, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

Under the Plan, all intercompany loans and advances made after the Petition Date shall be repaid on or prior to the Effective Date, as set forth in Article IV, including the allocations of OpEx and Restructuring Costs described in Section 2.4 and the true-up of such amounts on the Effective Date.  Other than such repayment, but subject to the distributions and true-ups provided for in Article IV, there shall be no cash payments on account of contractual claims or other claims for money advanced or borrowed between Debtors, and such amounts will be cancelled and released or extinguished on the Effective Date.  This includes the cancellation and release of the contractual claims that PSFLLC has against PSFI for its guarantee of each of the Warehouse Loans.  In connection with these releases, each of the Warehouse entities and PSFLLC will receive releases from PSFI for any claims and Causes of Action that may be asserted against them in connection with the Warehouse Loans.  Notwithstanding the foregoing, the contractual claims that OppFund has against PSI for its guarantee of the OppFund Loan shall not be released.

As part of the compromises set forth in the Plan, Warehouse I will relinquish and return to PSFI its participation interests in any Underlying Loans, to the extent such Underlying Loans have not been liquidated and reduced to cash as of the Effective Date and the value of such interests shall be deemed a contribution towards the obligation of Warehouse I to fund Restructuring Costs under the Plan.  As of December 31, 2023, the unpaid principal balance of such Underlying Loans is $308,191.

Consistent with the Debtors' prior practices and the terms of the Debtors' participation agreements, the proceeds of all REO property will be provided to the Plan Administrator and treated in accordance with the Waterfall set forth in Section 2.6.  With respect to any REO property, the Asset Manager shall pay any unpaid costs and expenses of maintaining the property, including (i) any Priority Tax Claims associated with the applicable REO and (ii) General Unsecured Claims against the REO Debtors that would otherwise constitute Servicing Advances if paid in the ordinary course of business (such as utility services, insurance, repairs and maintenance, legal fees and expenses, procured by the Debtors for such REO and such other compulsory amounts imposed on the REO property, such as HOA fees), and shall be reimbursed for such amounts as Post-Effective Date Servicing Advances.

The Debtors and Committee believe that the mutual releases exchanged by each of the Debtors, as well as the allocation of OpEx and Restructuring Costs embodied herein, the resolution of intercompany claims related to the expenses payable and REO assets under the various intercompany participation agreements, and potential claims by PSFLLC and PS Portfolio to withhold amounts otherwise payable related to the Note Claims, provide fair, reasonable, and adequate consideration for the settlement, compromise and resolution of all Intercompany Claims and Causes of Action among the Debtors.

The Plan also constitutes a resolution and settlement of the objections raised by the Pacific Creditors and the Committee to the Loan Sale Motion, as well as any other party and other disputes, over whether the Notes issued by the Debtors constitute "participations."  The consideration for such settlement is the treatment of the Underlying Loans set forth in Article II and the distributions provided for in Article IV of the Plan.

## 3.4    Corporate Action.

On the Effective Date, all matters expressly provided for under this Plan that would otherwise require approval of the equity holders or directors of one or more of the Debtors, including but not limited to, the dissolution or merger of any of the Debtors, shall be deemed to have occurred and shall be in effect upon the Effective Date pursuant to the applicable organizational or entity law of the states in which the Debtors are incorporated without any requirement of action by the equity holders or directors of the Debtors.

## 3.5    Retention, Abandonment, Disposal, and Destruction of Records; Privileges.

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Plan Administrator, who shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently

in the Debtors' possession, custody, or control.  The Plan Administrator shall succeed to all privileges of the Debtors, including but not limited to the attorney-client privilege.

The Plan Administrator shall be authorized pursuant to Bankruptcy Code section 554, in its reasonable discretion, without any further notice to any party or action, order or approval of the Bankruptcy Court, to abandon, dispose of, or destroy in any commercially reasonable manner all originals and/or copies of any documents, books and records, including any electronic records, of the Debtors and which the Plan Administrator reasonably concludes are burdensome or of inconsequential value and benefit; *provided*, *however*, that the Plan Administrator (i) must consult with the Asset Manager, and obtain the consent of the Advisory Committee, prior to abandoning, disposing of or destroying the foregoing to the extent related to the Underlying Loans, and (ii) obtain the consent of the Prepetition Agent, prior to abandoning, disposing of or destroying the foregoing to the extent related to the Non-Loan Assets.

## 3.6    Continued Corporate Existence; Effectuating Documents; Corporate Action; Restructuring Transactions.

(a)    Except as otherwise provided in the Plan or the Plan Supplement documents, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the respective certificate of incorporation or bylaws (or other analogous formation documents) in effect before the Effective Date or the new corporate governance documents, as applicable, except to the extent such certificate of incorporation or bylaws (or other analogous formation, constituent, or governance documents) are amended by the Plan or otherwise, and to the extent any such document is amended, such document is deemed to be amended pursuant to the Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).  New organizational documents for the Debtors, if any, shall be included in the Plan Supplement.

(b)    Notwithstanding anything herein to the contrary, on or about the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, may enter into any transaction and may take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan.

(c)    The Interests of the Reorganized Debtors, including the Reorganized Parent, shall be transferred free and clear of all liens, liabilities, and encumbrances to the Plan Administrator, who shall hold the Interests for the benefit of the Holders of all Allowed Claims.

(d)    All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors or by any other stakeholder, and with like effect as though such action had been taken unanimously

by the stockholders, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors.

(e)    Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including, if applicable, (i) the entry into or execution of the Exit Facility Documents, including definitive documentation related thereto, and (ii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.

(f)    The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

(g)    The Plan Administrator shall be authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

## ARTICLE  IV
## CLASSIFICATION OF CLAIMS AND INTERESTS, TREATMENT AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**4.1    Joint Plan; Non-Consolidation; Separate Classes.**

The Plan is a joint plan for each of the Debtors and does not provide for the substantive consolidation of the Debtors.  The Distributions to be made to Holders of Claims against a particular Debtor shall be made from the assets of that Debtor.

For administrative convenience purposes certain Classes are presented once, but such Class is intended to be a separate class for each applicable Debtor against which such a Claim is asserted. For Classes 1, 2, and 5, such Classes exist at each Debtor, to the extent of Allowed Claims in such class.  For Class 3, such Classes exist at PSFI, PSI and PSLI only.  For Class 4, such Classes exist at all Debtors other than the REO Debtors.  For Class 6, such Classes exist at PSI, PSFI, PSFLLC, PS Portfolio and OppFund only.  However, each of these Classes is intended to represent a unique class for each Debtor and is entitled to vote on the Plan as a single separate Class for each of the Debtors.

**4.2    Classification Generally**.

All Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

All Claims and Interests, except Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims (including Professional Fee Claims), and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below in Article IX of the Plan.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

**4.3    Classification and Treatment**.

Unless the Holder of an Allowed Claim and the Debtors or the Plan Administrator, as applicable, agree to a different treatment, each Holder of an Allowed Claim shall receive the following Distributions in accordance with Article X of the Plan:[6]

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[7] | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 1**: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Non-Tax Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other less favorable treatment which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | *Estimated to be zero* | Unimpaired/ Deemed to accept Plan | 100% |

---

[6]     Unclassified Claims are addressed in Article IX.

[7]     The amounts set forth in this chart reflect the Debtors' estimate of the ultimate amount of Allowed Claims.  For Classes 10 through 11-1, the amount of claims represents the estimated par note amount in each Class as of January 31, 2024.

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[7] | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 2:** Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Other Secured Claim either: (A) return of the collateral securing such Allowed Other Secured Claim; (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other less favorable treatment which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing. | *Estimated to be zero* | Unimpaired/ Deemed to accept Plan | 100% |
| **Class 3:** Prepetition Loan Claims against PSI, PSFI and PSLI only. | Unless the Holder agrees to a different treatment, as soon as practicable after the Effective Date, each Holder of a Prepetition Loan Claim shall receive (a) all Available Cash Collateral, (b) a conveyance, transfer and assignment of the Debtors' interest in the Pre-Effective Date Servicing Advances and Pre-Effective Date Servicing Fees, (c) the proceeds of the Prepetition Agent's collateral received after the Effective Date, subject to funding of the Corporate Debtor Reserve, as applicable, and (d) a *pro rata* share of the Distributable Cash of each Obligor Debtor, which shall be *pari passu* with Class 4 at the respective Obligor Debtor. | $27,356,034.45, as of the Petition Date | Impaired/ Entitled to vote | 100% |
| **Class 4:** General Unsecured Claims against all Debtors other than REO Debtors | Holders of General Unsecured Claims against a Debtor shall receive their *pro rata* share of that Debtor's Distributable Cash, if any. | *Approximately $18 million non-customer claims have been filed against all Debtors in the Aggregate*<br><br>*The Debtors estimate approximately $7.7 million of claims at PSI and $5.5 million of claims at PSFI and de minimis amounts for the other Debtors* | Impaired/ Entitled to vote | PSI: ~0-26%<br><br>PSFI: ~0-16%<br><br>Other Debtors: ~0% |

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[7] | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 5:** Intercompany Claims and Interests | Each Intercompany Claim and Intercompany Interest (other than OppFund Interests) shall be either reinstated or released and cancelled, in each case, as necessary to facilitate the implementation of the Plan, the payments and distributions contemplated thereunder, and the wind-down of the Debtors corporate structure; *provided*, that postpetition Intercompany Claims shall be repaid as of or on the Effective Date.<br><br>As co-proponents of the Plan, each Debtor is deemed to accept the treatment of its Intercompany Claims and, therefore, will not vote on the Plan. | N/A | Impaired/ Deemed to accept the Plan | N/A |
| **Class 6:** Securities Law Claims against **PSI, PSFI, PSFLLC, PS Portfolio and OppFund** | Holders of Securities Law Claims shall receive no Distribution on account of their Securities Law Claims. | *To be determined* | Impaired/ Deemed to reject Plan | 0% |
| **Debtor "1" –Peer Street, Inc,** | | | | |
| **Class 7:** Parent Interests | On the Effective Date, all Parent Interests shall be extinguished as of the Effective Date, and owners thereof shall receive no Distribution on account of such Interests. | N/A | Impaired/ Deemed to reject Plan | 0% |
| **Debtor "5" –Peer Street Funding, LLC** | | | | |
| **Class 8:** Pocket 1 Month Claims | Holders of Pocket 1 Month Claims shall receive a Cash payment on the Effective Date equal to their *pro rata* share of the Warehouse I Distribution and subsequent to the Effective Date, a *pro rata* share of any Forfeited Distributions made on account of Class 8 Claims, in each case until all Allowed Pocket 1 Month Claims are paid in full. | $40,189,395 | Impaired/ Entitled to vote | ~83-87% |
| **Class 9:** Pocket 3 Month Claims | Holders of Pocket 3 Month Claims shall receive a Cash payment on the Effective Date equal to their *pro rata* share of the Warehouse II Distribution and subsequent to the Effective Date, a *pro rata* share of any Forfeited Distributions made on account of Class 9 Claims, in each case until all Allowed Pocket 3 Month Claims are paid in full. | $1,340,159 | Impaired/ Entitled to vote | ~90-93% |

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[7] | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 10**: Liquidated MPDN Claims | Holders of MPDN Claims with respect to an Underlying Loan that has been liquidated as of the Effective Date shall receive on or as soon as reasonably practicable after the Effective Date:<br><br>(i) a Cash payment equal to their pro rata share of the difference of (y) the proceeds of such Underlying Loan _minus_ (z) the amounts in Clauses (A) through (I) of the Waterfall, which are described in Section 2.6 above, and<br><br>(ii) a number of Funding Pool Units, valued at one dollar each, equal to the amount held back and contributed by the Plan Administrator to the Funding Pool in accordance with Clause (I) of the Waterfall. | $75,190,352 | Impaired/ Entitled to vote | ~85-90%[8] |
| **Class 10-1**: Convenience Liquidated MPDN Claims | Class 10-1 shall consist of all MPDN Claims with respect to an Underlying Loan that has been liquidated as of the Effective Date that are held by Convenience Holders.<br><br>On account of such Claims, Convenience Holders shall receive on or as soon as reasonably practicable after the Effective Date:<br><br>(i) a Cash payment equal to their pro rata share of the _difference_ of (y) the proceeds of such Underlying Loan _minus_ (z) the amounts in Clauses (A) through (I) of the Waterfall, which are described in Section 2.6 above, and<br><br>(ii) a number of Funding Pool Units, valued at one dollar each, equal to the amount held back and contributed by the Plan Administrator to the Funding Pool in accordance with Clause (I) of the Waterfall.<br><br>(iii) the right to elect the immediate redemption of the Funding Pool Units upon their issuance in accordance with Section 4.4 hereof. | $1,815,532 | Impaired/ Entitled to vote | ~75-90%[9] |

---

[8]    This recovery percentage assumes that an Underlying Loan associated with a Class 10 Claim has fully performed and been repaid. The Debtors believe that substantially all of the Underlying Loans associated with Class 10 Claims satisfy this assumption.

[9]    This recovery percentage assumes that an Underlying Loan associated with a Class 10-1 Claim has fully performed and been repaid. The Debtors believe that substantially all of the Underlying Loans associated with Class 10-1 Claims satisfy this assumption. The difference in recoveries for Class 10 and Class 10-1 Claims is attributed to the Convenience Holder election in Class 10-1.

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[7] | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 11**: Unliquidated MPDN Claims | Holders of MPDN Claims with respect to an Underlying Loan that has not been liquidated as of the Effective Date shall receive on or as soon as reasonably practicable after the applicable Loan Realization Date for such Underlying Loan:<br><br>(i) a Cash payment equal to their pro rata share of the difference of (y) the proceeds of such Underlying Loan _minus_ (z) the amounts in Clauses (A) through (I) of the Waterfall, which are described in Section 2.6 above, and<br><br>(ii) a number of Funding Pool Units, valued at one dollar each, equal to the amount held back and contributed by the Plan Administrator to the Funding Pool in accordance with Clause (I) of the Waterfall. | $119,720,875 | Impaired/ Entitled to vote | ~0-90%[10] |
| **Class 11-1**: Convenience Unliquidated MPDN Claims | Class 11-1 shall consist of all MPDN Claims with respect to an Underlying Loan that has not been liquidated as of the Effective Date that are held by Convenience Holders.<br><br>On account of such Claims, Convenience Holders shall receive on or as soon as reasonably practicable after the applicable Loan Realization Date for such Underlying Loan:<br><br>(i) a Cash payment equal to their pro rata share of the difference of (y) the proceeds of such Underlying Loan _minus_ (z) the amounts in Clauses (A) through (I) of the Waterfall, which are described in Section 2.6 above, and<br><br>(ii) a number of Funding Pool Units, valued at one dollar each, equal to the amount held back and contributed by the Plan Administrator to the Funding Pool in accordance with Clause (I) of the Waterfall.<br><br>(iii) the right to elect the immediate redemption of the Funding Pool Units upon their issuance in accordance with Section 4.4 hereof. | $4,239,210 | Impaired/ Entitled to vote | ~0-90%[11] |

---

[10]    The high end of this recovery percentage assumes that an Underlying Loan associated with a Class 11 Claim has fully performed and been repaid. The low end assumes that there is no recovery on the Underlying Loan. The Debtors believe that substantially all of the Underlying Loans associated with Class 11 Claims will realize material value through the run-off process being implemented under the Plan but have no assurances of the ultimate outcome.

[11]    The high end of this recovery percentage assumes that an Underlying Loan associated with a Class 11-1 Claim has fully performed and been repaid. The low end assumes that there is no recovery on the Underlying Loan. The Debtors believe that substantially all of the Underlying Loans associated with Class 11-1 Claims will realize material value through the run-off process being implemented under the Plan but have no assurances of the ultimate outcome.

| Class/ Designation | Plan Treatment | Estimated Amount of Claims[7] | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 12:** FBO Account Claims | Holders of Allowed FBO Account Claims shall receive, subject to Section 10.13:<br><br>(i) to the extent not already withdrawn, a Cash payment equal to 95% of their FBO Account Claim, which shall be made available for withdrawal in the FBO Account consistent with the FBO Order, subject to Section 10.7; and<br><br>(ii) for the remaining 5% of their FBO Account Claim, a *pro rata* share of any amounts in the FBO Account as of the Petition Date following the Debtors' reconciliation with respect to such account; and<br><br>(iii) a *pro rata* share of any Forfeited Distributions related to clauses (i) and (ii), in each case until all Allowed FBO Account Claims are paid in full. | $31,260,028.55, *as of the Petition Date* | Impaired/ Entitled to Vote | 95-100% |
| **Debtor "6" – PS Portfolio – ST1, LLC** | | | | |
| **Class 13:** PDN Claims | Holders of PDN Claims shall receive a Cash payment on the Effective Date equal to their *pro rata* share of the Portfolio Distribution, and subsequent to the Effective Date, a *pro rata* share of any Forfeited Distributions made on account of Class 13 Claims, in each case until Allowed PDN Claims are paid in full. | $2,089,157 | Impaired/ Entitled to vote | ~85-95% |
| **Debtor "8" – Peer Street Opportunity Investors II, LP** | | | | |
| **Class 14:** OppFund LP Interest | Holders of OppFund LP Interests shall receive:<br><br>(i) a Cash payment on the Effective Date equal to their *pro rata* share of the OppFund Distribution.<br><br>(ii) their *pro rata* share of the proceeds of the OppFund Loan to be distributed no less frequently than once per calendar quarter. | N/A | Impaired/ Entitled to Vote | 75-90%[12] |
| **Debtors "11" through "15" – PSF REO LLC; PSF Ohio, LLC; PSF TX 1, LLC; PSF TX 2, LLC; PSF TX 4 LLC** | | | | |
| **Class 15:** General Unsecured Claims Against REO Debtors | Holders of General Unsecured Claims against the REO Debtors shall receive payment in full on the latest of the Effective Date, the date on which such claim would have been paid by the Debtors in the ordinary course of business, and the date such claim is Allowed. | *De minimis* | Unimpaired/ Deemed to Accept the Plan | 100% |

## 4.4    Convenience Holder Redemption Election.

Convenience Holders shall be holders of MPDN Claims that do not exceed a principal amount as of the Petition Date of $5,000.00. Convenience Holders shall have the right to elect the immediate "cash-out" redemption of their Funding Pool Units at a discount. The election must be

---

[12]    This recovery percentage shows recoveries as a percentage of investment amount, as reflected on the Debtors' *Second Supplemental List of Limited Partners of Peer Street Opportunity Investors II, LP* [D.I. 760].

exercised on the Convenience Holder's Ballot. If a Convenience Holder exercises the election, their Funding Pool Units will be repurchased, using amounts in the Funding Pool, at a purchase price equal to the dollar amount of their Funding Pool Units *minus* 10% of their *pro rata* share of the UPB of the Underlying Loan associated with the MPDN. Any election made by a Convenience Holder under this Section 4.4 must be made on a Class-by-Class basis.

By way of illustration, a Convenience Holder holds a $1,000 MPDN, and the Underlying Loan Associated with that MPDN has a UPB of $500,000. As a result, the Convenience Holder's pro rata share of that Underlying Loan is 2%. On the Loan Realization Date, the Underlying Loan liquidates for $500,000 and PSFLLC receives $300,000 in Cash after payment of all amounts in Clauses (A) through (I) in the Waterfall and receives $150,000 in Funding Pool Units. Pursuant to Article IV of the Plan, the Convenience Holder would receive $600 of cash and $300 of Funding Pool Units. If the Convenience Holder makes the Convenience Holder election, it will receive an immediate $200 payment from the Funding Pool (*i.e.*, $300 in Funding Pool Units *minus* 10% of $1,000, or $100) to fully redeem its Funding Pool Units, resulting in an $800 total payment on its MPDN Claim and the Holder will receive no further Distributions.

**4.5    Reservation of Rights**.

Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**4.6    Limitations**.

The information in the table above is provided for illustrative purposes only and is subject to material change based on certain contingencies, including related to the Claims reconciliation and asset liquidation processes. Actual recoveries may widely vary within these ranges, and any deviations from any of the assumptions underlying these amounts could result in material impacts to recovery estimates provided herein and/or the actual distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only. In addition to the cautionary notes contained elsewhere herein, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

**ARTICLE  V**
**CONFIRMATION PROCEDURES AND REQUIREMENTS**

**5.1    Confirmation Procedure.**

The Solicitation Procedures Order, among other things, approves the combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for **April 26, 2024, at 10:00 a.m. (prevailing Eastern Time)** at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom 2 Wilmington, Delaware 19801 to consider confirmation of the Plan pursuant to

Bankruptcy Code section 1129.  The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

**5.2     Procedure for Objections**.

Any objection to final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to Bankruptcy Code section 1125 or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court by no later than **April 16, 2024, at 5:00 p.m. (prevailing Eastern Time)**.

- co-counsel to the Debtors, (i) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Joseph M. Barry, Esq. (jbarry@ycst.com), Ryan M. Bartley, Esq. (rbartley@ycst.com) and S. Alexander Faris, Esq. (afaris@ycst.com); and (ii) Kramer Levin Naftalis & Levin LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: P. Bradley O'Neill, Esq. (boneill@kramerlevin.com);

- the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Joseph Cudia, Esq. (joseph.cudia@usdoj.gov);

- counsel to the Prepetition Agent, (i) Royer Cooper Cohen Braunfeld LLC, 1120 Avenue of the Americas, 4th Floor, New York, NY 10036, Attn: Marc E. Hirschfield mhirschfield@rccblaw.com); and (ii) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Russell C. Silberglied (Silberglied@rlf.com); and

- co-counsel to the Official Committee of Unsecured Creditors, (i) Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Lorenzo Marinuzzi, Esq. (lmarinuzzi@mofo.com), Benjamin Butterfield, Esq. (bbutterfield@mofo.com), and Raff Ferraioli, Esq. (rferraioli@mofo.com); and (ii) Benesch, Friedlander, Coplan & Aronoff LLP, 1313 North Market Street, Suite 1201, Wilmington, DE 19801, Attn: Jennifer R. Hoover, Esq. (jhoover@beneschlaw.com), Kevin M. Capuzzi, Esq. (kcapuzzi@beneschlaw.com), and John C. Gentile, Esq. (jgentile@beneschlaw.com).

Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**5.3     Requirements for Confirmation.**

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129.  Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and

Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

**5.4    Classification of Claims and Interests**

Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Bankruptcy Code section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to Bankruptcy Code section 1123(a)(1) need not be and have not been classified). The Debtors also are required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122 and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims

that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

## 5.5    Impaired Claims or Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in Bankruptcy Code section 1124) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under Bankruptcy Code section 1126(g) and, therefore, such holders are not entitled to vote on such plan.

Article IV identifies which Classes are impaired or left unimpaired by the Plan and Articles IV and VI describe which Classes are entitled to vote to accept or reject the Plan and which Classes are not.

## 5.6    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b). Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 6 and 7 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in Bankruptcy Code section 1129(b). The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 6 and 7 (for all Debtors) is entitled to receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the non-accepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any. The Debtors also do not believe that the Plan allows any Class of Claims or Interests to receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

*(a)* <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

*(b)* <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*(c)* <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

## 5.7    Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

With respect to the duties of the Plan Administrator, the Debtors believe that the Cash made available to the Plan Administrator through the Wind-Down Reserve will be sufficient to allow the Plan Administrator to make distributions to Holders of Allowed Claims, and to complete the wind-down and dissolution of the Debtors.

With respect to the wind-down of the Debtors' servicing business, the Debtors believe that the Funding Pool or Exit Facility, if applicable, will provide adequate working capital to allow the Asset Manager to timely complete the runoff or other disposition of the Loan Assets.

The Debtors have analyzed the ability of the Plan Administrator and Asset Manager to meet its obligations under the Plan. Based on the Debtors' analysis, the Plan Administrator and Asset Manager will have sufficient assets to accomplish their tasks under the Plan. Therefore, the Debtors believe that the liquidation of the Loan Assets and Non-Loan Assets pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## 5.8    Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Debtors believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with Bankruptcy Code section 1129(a)(7). A liquidation analysis supporting the Debtors' conclusions is attached hereto as **Exhibit A**.

**ARTICLE VI**
**VOTING TO ACCEPT OR REJECT THE PLAN**

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR**

**YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AGENT (I) BY TELEPHONE AT: (833) 702-1320 (TOLL-FREE), (949) 541-9932 (INTERNATIONAL), OR (II) BY EMAIL AT: PeerStreetInquiries@stretto.com. THE CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**HOLDERS OF CLAIMS THAT DO NOT WISH TO PROVIDE THE RELEASES SET FORTH IN SECTION 14.1(c) HEREIN MUST AFFIRMATIVELY INDICATE SO BY CHECKING THE "OPT-OUT" BOX ON THEIR BALLOT OR FILING AN OBJECTION INDICATING THAT THEY DO NOT CONSENT TO SUCH RELEASE.**

**PLEASE BE ADVISED THAT ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES THAT DO NOT AFFIRMATIVELY MAKE AN OPT-OUT ELECTION, EITHER ON THEIR BALLOT OR BY FILING AN OBJECTION, SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN SECTION 14.1(c) HEREIN.**

**6.1    Class Entitled to Vote.**

The following classes are the Voting Classes entitled to vote on the Plan:  Classes 3 (with respect to PSI, PSFI and PLI), 4 (with respect to each Debtor other than the REO Debtors), 8-12 (with respect to PSFLLC), 13 (with respect to PS Portfolio), and 14 (with respect to OppFund).

Because Claims in the Voting Classes are Impaired and Holders thereof may receive or retain property or an interest in property under the Plan, only Holders of Claims in the Voting Classes shall be entitled to vote to accept or reject the Plan.

**6.2    Manner of Voting on the Plan**

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order.

**6.3    Acceptance by Impaired Classes of Claims or Interests.**

In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with Bankruptcy Code section 1126(d) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**6.4    Presumed Acceptance by Unimpaired Classes.**

Because Claims in Classes 1 and 2 (with respect to each Debtor) are Unimpaired pursuant to Bankruptcy Code section 1126(f), Holders of Claims in Classes 1, 2 and 15 are deemed to have

accepted the Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Plan.

**6.5    Presumed Rejections by Impaired Classes.**

Because Holders of Claims or Interests in Classes 6 and 7 (with respect to each applicable Debtor) are not entitled to receive or retain any property under the Plan, pursuant to Bankruptcy Code section 1126(g), such Holders of Claims or Interests are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

Class 5 is also not receiving any property under the Plan on account of pre-Petition Date claims among the Debtors but, as co-proponents of the Plan, any Debtors holding claims in Class 5 against another Debtor are deemed to accept the Plan.

**6.6    Confirmation Pursuant to Bankruptcy Code Section 1129(b).**

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b).  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

**6.7    Controversy Concerning Impairment.**

If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**6.8    Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

**ARTICLE  VII**
**BACKGROUND AND DISCLOSURES**

**7.1    General Background**

*(a)    The Debtors' Business*

Founded in 2013, the Debtors (or "**Peer Street**") operated a platform for online investing in real-estate debt.  Peer Street's was headquartered in El Segundo, California.  Peer Street enabled accredited investors, funds, and institutions to access certain real estate-related debt investments

that were historically difficult to invest in, and permitted lenders and borrowers to access capital that has been historically difficult for them to access.

Peer Street introduced the first and largest two-sided online marketplace for investing in real estate debt. On one side, Peer Street provided individual investors with access to an asset class that was previously inaccessible through sourcing loans from its nationwide network of private lenders and brokers (covering over 45 states). On the other side, Peer Street aggregated, services, and manages those loans for individual and institutional investors. Through Peer Street's online investing platform (the "**Peer Street Platform**"), investors could browse and select from investments offering different yields, terms, and loan-to-value ratios, across either residential or multifamily properties that are non-owner occupied, and elect to invest in various real estate-related debt investments through the Peer Street Platform. Peer Street, in some cases, structured proprietary investment vehicles that pool underlying investments. In other cases, real estate securities offered through the Peer Street Platform tracked a single underlying investment.

Peer Street offered four principal investment products: (a) its "Retail" investment program through its MPDNs; (b) the OppFund; (c) its "Portfolio" investment program through its PDNs; and (d) its "Pocket" investment program through its RWNs. These programs are described below.

### (b)     *The Debtors' Equity Ownership and Capital Structure*

#### i.     Corporate Structure

Peer Street, Inc. (or PSI) is the ultimate parent in the Debtors' corporate structure and is privately owned. PSI employs all of the employees, performs payroll and accounting functions, capital raising, and general management. PSI owns the Debtors' patents and intellectual property rights and owns and operates Peer Street's technology, including the Peer Street Platform. PSI owns 100% of Debtors PSFI, PSFLLC, OppFund GP, and PSLI.

PSI established PSFLLC in July 2014, and PSFI in May 2015. PSFLLC is a securities-issuing entity. As part of Peer Street's Retail product, PSFLLC purchases participations in the underlying loans and issues corresponding MPDNs to fractional/retail investors. PSFLLC also issues RWNs to investors as part of Peer Street's Pocket product offerings. As of the Petition Date, approximately $29.5 million in cash was held in an omnibus FBO Account managed by PSFLLC for the benefit of Peer Street investors. PSFLLC also owns a 100% equity interest in the various REO Debtors, which hold or held title to real estate that previously secured non-performing mortgage loans owned by PSFI, which were acquired through foreclosure or other exercise of rights in the relevant mortgages.

PSFI is a California licensed mortgage lender and servicer under the California Financing Law. PSFI (i) purchases previously funded mortgage loans from 3rd party lenders pursuant to master loan sale agreements ("**MLSAs**"), (ii) table-funds mortgage loans for 3rd party lenders or brokers pursuant to master loan origination agreements ("**MLOAs**"), (iii) originates its own mortgage loans, (iv) sells mortgage loans to 3rd party institutional buyers pursuant to master loan purchase agreements, and (v) services mortgage loans it owns and services certain loans it has sold to 3rd party institutional buyers pursuant to master loan servicing agreements with institutional loan purchasers. It holds legal title to substantially all of the Debtors' Mortgage Interests. PSFI owns 100% of the equity interests in Warehouse I, Warehouse II, and PS Portfolio and PS Options.

In December 2015, PSI established OppFund GP as a wholly owned subsidiary of PSI. On May 25, 2018, OppFund GP became the general partner of OppFund. OppFund was created to make approved investments in various real-estate securities and other securities and financial instruments of the United States, but primarily provides funds to PSFI through the OppFund Loan to originate or purchase mortgage loans. OppFund has forty-three (43) limited partners and is administered by Crestbridge Fund Services US, LLC.

PSLI was formed to manage technology licensing opportunities but never engaged in any business activity.

      ii.    <u>Capital Structure</u>

      (A)    Prepetition Credit Agreement

PSI, PFSI and PSLI are the obligors that are parties to the Prepetition Credit Agreement with the Prepetition Agent and Prepetition Lenders. The Prepetition Credit Agreement provides for convertible secured term loans in an aggregate principal amount not to exceed $30 million dollars.

The obligations under the Prepetition Credit Agreement are secured by a lien on substantially all of the assets of PSI, PSFI and PSLI assets, including all cash held at PSI, but expressly excluding, among other things, any asset of PSFLLC, and any assets of an obligor encumbered by a lien securing a permitted debt facility or otherwise supporting investments from third-parties in accordance with the obligors' ordinary course of business.

Including accrued PIK interest at a rate of 6%, as of the Petition Date, $27,356,034.45 was outstanding under the Prepetition Credit Agreement.

      (B)    OppFund Loans

Under that certain Loan and Security Agreement dated as of October 1, 2019, OppFund is a lender, PSFI is a borrower and PSI is a guarantor. The advances made under that agreement (*i.e.*, the OppFund Loans) were funded by OppFund to PSFI for purposes of PSFI acquiring, including through direct funding, certain Mortgage Interests. PSFI granted a security interest in the Mortgage Interests acquired with the proceeds of the OppFund Loans to secure their repayment. PSI has guaranteed the repayment of the OppFund Loans.

As of the Petition Date, approximately $19.0 million in OppFund Loans was outstanding.

      (C)    Warehouse I Loans associated with Pocket 1-Month

Pursuant to a Participation Agreement between PSFI and Warehouse I dated as of February 1, 2021, PSFI and Warehouse I agreed to purchase certain Mortgage Interests with PSFI holding the Mortgage Interests in its name but with Warehouse I funding and owning a 100% interest in the Mortgage Interests. Warehouse I was able to fund these purchases using the proceeds of the Warehouse I Loans.

Under that certain Loan and Security Agreement dated as of February 1, 2021, PSFLLC is a lender, Warehouse I is a borrower and PSFI is a guarantor. The advances made under this agreement (*i.e.*, the Warehouse I Loans) were used by Warehouse I to purchase the participations

in Mortgage Interests under the Participation Agreement between Warehouse I and PSFI.  The Warehouse I Loans are secured by such participations in Mortgage Interests.  In addition, PSFI pledged its ownership of Warehouse I to secure its guarantee obligations.

PSFLLC obtained the capital to make the Warehouse I Loans by issuing RWNs under the Pocket 1 Month program, described below.

As of the Petition Date, the balance of the Warehouse I Loans was approximately $39.9 million.

(D)    Warehouse II Loans associated with Pocket 3-Month

Pursuant to a Participation Agreement between PSFI and Warehouse II dated as of October 10, 2022, PSFI and Warehouse II agreed to purchase certain Mortgage Interests with PSFI holding the Mortgage Interests in its name but with Warehouse II funding and owning a 100% interest in the Mortgage Interests.  Warehouse II was able to fund these purchases using the proceeds of the Warehouse II Loans.

Under that certain Loan and Security Agreement dated as of October 10, 2022, PSFLLC is a lender, Warehouse II is a borrower and PSFI is a guarantor.  The advances made under this agreement *(i.e.*, the Warehouse II Loans) were used by Warehouse II to purchase the participations in Mortgage Interests under the Participation Agreement between Warehouse II and PSFI.  The Warehouse II Loans were secured by such participations in Mortgage Interests.  In addition, PSFI pledged its ownership of Warehouse II to secure its guarantee obligations.

PSFLLC obtained the capital to make the Warehouse II Loans by issuing RWNs under the Pocket 3 Month program, described below.

As of the Petition Date, the balance of the Warehouse II Loans was approximately $1.3 million.

(E)    RWNs

PSFLLC raised funds from external investors in the form of Redeemable Warehouse Notes (or RWNs) that allowed the holders of those notes to receive a return based on the interest that PSFLLC earned either on the (i) Warehouse I Loans, which was referred to as the Pocket 1-Month program, or (ii) Warehouse II Loans, which was referred to as the Pocket 3-Month program.  Interest that accrues on the RWNs is not paid in cash but is instead capitalized into the outstanding principal amount of the RWNs.  No cash payments were made on account of the RWNs unless (i) an RWN reached the maturity date (i.e., December 31, 2029), or (ii) a timely redemption request was made by the holder of an RWN, in which case payments may be made on the first day of the month following the end of the most-recent redemption period.  The primary difference in the two RWN investment products was the length of the redemption period (either 1 month or 3 months).

The RWNs are not tied to the performance of individual underlying Mortgage Interests; instead, they are tied to the overall recovery on the Warehouse I Loans and Warehouse II Loans.  The RWNs are unsecured obligations of PSFLLC.

On January 31, 2022, PSFLLC exercised a "Liquidation Trigger" based on its good faith determination to halt redemptions to allow for an orderly liquidation of both the Pocket 1- Month and Pocket 3-Month programs. Following the Liquidation Trigger, Warehouse I and Warehouse II may not use proceeds of the Warehouse I Loans or Warehouse II Loans to fund additional loans or purchase any Mortgage Interests.

As of the Petition Date, there were RWNs with an aggregate face amount (including capitalized prepetition interest) of $40,189,395 issued and outstanding related to the Pocket 1- Month/Warehouse I program and $1,340,159 issued and outstanding related to the Pocket 3- Month/Warehouse II program.

### (F)    MPDNs

PSFLLC raised funds from external investors in the form of Mortgage-Payment-Dependent Notes (or MPDNs) that allowed the holders of those notes to invest in specified Mortgage Interests using the Peer Street Platform. The most significant feature of the MPDNs is that the notes are limited recourse, and the holder of each note is entitled to payment only to the extent of the amount collected by PSFLLC (which is net of certain expenses) on the underlying Mortgage Interests associated with that note. The MPDNs are unsecured obligations of PSFLLC.

To facilitate these investments, PSFI and PSFLLC are parties to an Amended and Restated Participation Agreement dated as of November 1, 2019. Under that Participation Agreement, PSFI and PSFLLC agreed to purchase certain Mortgage Interests with PSFI holding the Mortgage Interests in its name but with PSFLLC funding and owning a 100% interest in the Mortgage Interests.

As of the Petition Date, there were MPDNs with an aggregate face amount of $200,965,970 issued and outstanding.

### (G)    PDNs

PS Portfolio raised funds from external investors in the form of Payment-Dependent Promissory Notes (or PDNs) that allowed the holders of those notes to invest in a portfolio of Mortgage Interests that met specified credit guidelines. Like the MPDNs, the PDNs are limited recourse, and the holder of each note is entitled to payment only to the extent of the amount collected by PS Portfolio (which is net of certain expenses) on the portfolio of underlying Mortgage Interests. Unlike the MPDNs, the PDNs are not tied to the performance of specific underlying Mortgage Interests; instead, they are tied to the overall recovery on the portfolio of Mortgage Interests in which PS Portfolio has invested. The PDNs are unsecured obligations of PS Portfolio.

To facilitate these investments, PSFI and PS Portfolio are parties to a Master Loan Sale Agreement and a Participation Agreement dated as of September 21, 2022. Under the Master Loan Sale Agreement, PSFI agreed to sell to PS Portfolio either entire loans or participations in loans, from time to time. Under the Participation Agreement, PSFI and PS Portfolio agreed to purchase certain Mortgage Interests with PSFI holding the Mortgage Interests in its name but with PS Portfolio acquiring a percentage interest in each participated Mortgage Interests.

As of the Petition Date, there were PDNs with an aggregate face amount of $2,089,156 issued and outstanding.

(H)    PPP Loan

On May 2, 2020, PSI received a loan (the "**PPP Loan**") from a private lender as part of the U.S. Small Business Administration's (the "**SBA**") Paycheck Protection Program (the "**PPP**").  As of the Petition Date, approximately $3.7 million was outstanding under the PPP Loan, which accrued interest at an annual rate of 1%. PSI used the proceeds of the PPP Loan for the purposes contemplated by the PPP and the Coronavirus Aid, Relief, and Economic Security Act.  Thereafter, PSI applied for forgiveness of the balance of the PPP Loan.  The SBA, however, denied this application.  PSI first unsuccessfully appealed, and has since moved for reconsideration of the SBA determination.  On June 8, 2023, the SBA Office of Hearings and Appeals issued an initial decision denying the motion for reconsideration, which was set to become final 30 days after service.  No payments were due on the loan until the SBA's ruling became final.

## 7.2    Events Leading to Chapter 11

### (a)    Macroeconomic Issues

Since late 2021, the mortgage lending industry has faced adverse market conditions, including historical market-rate volatility.  Following years of historically low interest rates and inflation before the COVID-19 pandemic, the markets experienced sharp rate increases as part of the Federal Reserve's effort to curb inflation and control price growth.  Mortgage rates have increased from an average of 3.222% in January 2022 to an average of over 6.5% as of the Petition Date—and they have since gone higher.  The precipitous increase in prevailing mortgage rates caused demand for the type of mortgages that Peer Street originated or purchased to drop significantly.  In addition, institutional buyers have largely halted purchases of below current market rate loans.  Mortgage originations dropped significantly during the first quarter of 2022 from record highs in 2021, and ended the year roughly 50% lower than they had been in the fourth quarter of 2021.

These market conditions severely impacted Peer Street's business.  Before 2022, Peer Street originated and sold a significant volume of whole mortgage loans to third party institutional purchasers, earning substantial premiums on these transactions.  After 2021, the volume of these originations dropped precipitously.  In 2021, Peer Street originated approximately $685.9 million in mortgages.  In 2022, originations fell to $389 million.  In 2023, Peer Street originated only $7.1 million in such mortgages.  As described above, this decline has significantly reduced the revenues Peer Street received from this line of business.

In addition, in 2022, one of Peer Street's historic sources of funding – venture capital – declined markedly.  As a result, Peer Street was not able to access material funding to mitigate the loss of revenue caused by market conditions.

### (b)    Cost Saving and Restructuring Efforts

Beginning in the Spring of 2022, the Debtors implemented a series of staff reductions. Through a series of furloughs and layoffs, in May, July, and October of 2022 and February of

2023, a staff that had totaled 281 at the beginning of May 2022 was reduced to 28 on the Petition Date.

The Debtors also reviewed their vendors and other business relationships, aggressively seeking to renegotiate or cancel contracts to reflect the reductions in staff and reductions in operating requirements.

In August 2022, Peer Street informed the Prepetition Agent of certain potential events of default (the "**Events of Default**") under the Prepetition Credit Agreement. On August 17, 2022, Peer Street and the Prepetition Agent entered into that certain Waiver Letter Agreement (the "**Waiver**") pursuant to which the Prepetition Agent agreed to waive the Events of Default through August 24, 2022. The Waiver was extended 33 times.

During the period of the Waiver, the Debtors and the Prepetition Agent engaged in good faith negotiations to address the Events of Default and evaluate an array of potential strategic alternatives in an effort to avoid the need to commence these Chapter 11 Cases, exchanging formal and informal proposals. Ultimately, however, these discussions did not produce a long-term solution to the Debtors' business and financial issues.

At the same time, Peer Street sought to attract additional capital from third party investors to, among other things, continue Servicing Advances with respect to loans it holds. Despite identifying multiple potential sources of capital, as of the Petition Date, the Debtors had not received any viable proposals for new financing leaving the Debtors with no alternative to these Chapter 11 Cases.

### (c)    *Prepetition Advisors and Independent Fiduciaries*

Peer Street first sought restructuring advice in July 2022, with their retention of Kramer Levin Naftalis & Frankel ("**Kramer Levin**"). Peer Street added Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") as co-restructuring counsel in March 2023.

In mid-April 2023, Peer Street engaged Province LLC ("**Province**") to provide a Chief Restructuring Officer and supporting advisory personnel. David M. Dunn, a Principal of Province, was designated Chief Restructuring Officer ("**CRO**").

Finally, in the months leading up to the Chapter 11 Cases, Peer Street appointed three directors to their board of directors who had extensive restructuring experience: Ivona Smith of Drivetrain, LLC; M. Freddie Reiss, formerly a member of the restructuring practices at FTI Consulting and PricewaterhouseCoopers International Limited (PwC); and David Eaton, formerly a partner in the restructuring practice at Kirkland & Ellis LLP. These three independent directors constitute a majority of the Debtors' board of directors.

**7.3    The Chapter 11 Cases**[13]

*(a)    Generally*

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under Bankruptcy Code section 362, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors.

The Debtors' initial strategy for the Chapter 11 Cases was to take advantage of still-favorable conditions in the secondary-market for bulk mortgage loans to promptly sell off their mortgage portfolio and distribute those proceeds through a plan.  However, as described below, the Debtors pivoted to the strategy described in Article II hereof after considering the views expressed by their creditor body in response to the proposed sale process, as well as extensive discussions with the Committee.

*(b)    "First Day" and "Second Day" Motions and Related Applications*

Commencing on the Petition Date, the Debtors filed the following "first-day" and "second day" motions and applications designed to ease the Debtors' transition into chapter 11, preserve and maximize the value of their assets, and minimize the effects of the commencement of the Chapter 11 Cases:

    i.    *Debtors' Motion for an Order Pursuant to Bankruptcy Rule 1005 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 4];

    ii.    *Debtors' Application for the Retention and Employment of Stretto, Inc. as Claims and Noticing Agent* [D.I. 5];

    iii.    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (A) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, (B) Authorizing Banks to Honor and Process*

---

[13]    Copies of the various pleadings filed on the docket in the Chapter 11 Cases (referenced as in this Section 7.3 as "[D.I. ____]") are available at:  https://cases.stretto.com/peerstreet/court-docket/.

*Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling A Final Hearing* [D.I. 6];

iv.    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1108 of the Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling A Final Hearing* [D.I. 7] (the "**Taxes Motion**");

v.    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Companies Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (D) Setting A Final Hearing Related Thereto* [D.I. 8];

vi.    *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Wages, Salaries, and Other Compensation, (II) Authorizing Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (IV) Granting Related Relief* [D.I. 9]

vii.    *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief* [D.I. 10];

viii.    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 345, 363, 364, 503(b), 1107(a) And 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (A) Authorizing and Approving Continued Use of Cash Management System, (B)Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Authorizing Continued Performance f Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims and Intercompany Loans, (D) Waiving the Requirements of Section 345(b) on an Interim Basis, and (E) Granting Certain Related Relief* [D.I. 11] (the "**Cash Management Motion**");

ix.    *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors' Use of Cash Collateral; (B) Granting Adequate Protection to the Prepetition Secured Parties; (C) Scheduling A Final Hearing; and (D) Granting Related Relief* [D.I. 12];

x.    *Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a), 365(a), and 554 of the Bankruptcy Code, Authorizing the Debtors to Reject a Certain Unexpired Lease of Nonresidential Property Effective as of the Petition Date and Abandon Personal Property* [D.I. 14];

xi.    *Debtors' Motion for Entry of an Order (A)Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Individual Retail Customers, (B) Authorizing the Debtors to Provide Individual Retail Customers with Electronic Service, and (C) Granting Certain Related Relief* [D.I. 28];

xii.   *Debtors' Motion for Entry of an Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 61]; and

xiii.  *Debtors' Motion for an Order Authorizing (A) the Debtors to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business Effective as of the Petition Date and (B) Waiving Certain Information Requirements of Local Rule 2016-2* [D.I. 62].

The Bankruptcy Court has entered final orders approving each of these motions, other than the Cash Management Motion, which remains governed by an interim order approving it, *see* [D.I. 31].

### (c)    *Debtors' Retention of Professional Advisors and CRO*

During the Chapter 11 Cases, the Debtors retained various professionals:  Kramer Levin and Young Conaway, as co-restructuring counsel; Piper Sandler Loan Strategies, LLC ("**Piper Sandler**"), as broker for the Debtors' Mortgage Interests; and Stretto, Inc., as Claims Agent and administrative advisor.  The Debtors were also authorized to continue to retain Mr. Dunn as their CRO and to retain Province to provide additional personnel to assist the CRO.

### (d)    *Formation of the Committee and Retention of Professional Advisors*

On July 10, 2023, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed a 7 member Official Committee of Unsecured Creditors, comprised of: (1) Aristides Family Trust (2002); (2) Michael Corbett; (3) Fixed Income Fund of the Carolinas, LLC; (4) Gregory Ricks; (5) IBI SBL Investments, LP; (6) Yi Wang; and (7) Lihua Zhai.

The Creditors Committee retained Morrison & Foerster LLP and Benesch, Friedlander, Coplan & Aronoff LLP, as their counsel.  The Committee also retained IslandDundon LLC as financial advisor, whose members are Dundon Advisors LLC and Island Capital Group Advisor LLC.

### (e)    *The Mortgage Interests Sales Process*

As noted above, the Debtors commenced the Chapter 11 Cases with a plan to sell their loan portfolio and seek to distribute the proceeds to their creditors, while retaining the flexibility to pursue alternative transactions.  To that end, shortly after the Petition Date, the Debtors filed a motion [D.I. 18] (the "**Loan Sale Motion**") to establish procedures for the sale of the loan portfolio, except for a small number of loans that the Debtors' management elected to exclude from the sale process after consultation with Piper Sandler.

The Loan Sale Motion was objected to by various creditors.  The Pacific Creditors were among the objectors, *see* [D.I. 169, 297], and the Pacific Creditors argued that the Debtors could

not sell the Underlying Loans because they had been participated to the holders of MPDNs and, thus, were not property of the estate (the "**Ownership Dispute**").  At the same time, the Pacific Creditors objected to approval of the Cash Management Motion on a final basis and the Debtors' proposed means for funding the Chapter 11 Cases.  The Debtors vigorously opposed the Pacific Creditors' position in the Ownership Dispute, arguing that the Underlying Loans were both owned by the Debtors and, regardless of who owned them, could be sold free and clear of the MPDNs based on the terms agreed to between the Debtors and the MPDN holders, as well as the Pacific Creditors' objection to the Cash Management Motion.  *See* [D.I. 257].  The Committee filed a statement concerning the Ownership Dispute, stating that the Pacific Creditors' arguments were "persuasive" as to the "participation" question but agreeing with the Debtors as to the "sale" question, and supported approval of bidding procedures, while reserving the right to object to a sale if—after evaluating the results of the sale process—the Committee determined that a run off would result in higher recoveries for Peer Street investors.  *See* [D.I. 266].  The Committee supported approval of the Cash Management Motion on a final basis.  *See id.*  Myriad *pro se* parties, purporting to be holders of Notes, objected to the Loan Sale Motion, many joining the Pacific Creditors' position in the Ownership Dispute and others asserting that they held secured claims.  Other parties, primarily mortgagors or parties asserting interests in the real estate associated with the Underlying Loans, objected to the Loan Sale Motion on more parochial grounds related to specific pieces of real estate or loans.

The Bankruptcy Court has not yet been called on to resolve the Ownership Dispute, nor any of the other issues raised by the objections to the Loan Sale Motion and final approval of the Cash Management Motion.  Instead, the Debtors, Committee, Prepetition Agent, and the Pacific Creditors agreed to adjourn the would-be contested hearing on the establishment of bidding procedures under the Loan Sale Motion and the objections to the Cash Management Motion to consider and evaluate an alternative proposal put forth by the Committee.  *See* [D.I. 402].  That proposal has ultimately been incorporated into the Plan, and the objections raised by the Pacific Creditors have been resolved hereby, subject to the completion of definitive documentation.

### (f)       *Other Sales Processes*

During the Chapter 11 Cases, the Debtors pursued sales of various other non-loan Assets under section 363 of the Bankruptcy Code.  To that end, on October 24, 2023, the Debtors filed a motion seeking approval of procedures governing the sale of certain *de minimis* assets and, in connection therewith, approval of the sale of certain laptops [D.I. 540] (the "**De Minimis Asset Sale Motion**").  As described in the De Minimis Asset Sale Motion, the purchase price for the laptops was $45,279.00.  On November 29, 2023, the Bankruptcy Court entered an order approving the De Minimis Asset Sale Motion [D.I. 647].

Additionally, in July 2023, the Debtors launched a sale and marketing process to monetize certain aspects of their technology platform and related intellectual property.  On November 21, 2023, the Debtors filed a motion [D.I. 631] (the "**Customer List Sale Motion**") seeking approval of five (5) non-exclusive sales of their customer list to five parties, one of whom would also purchase a non-exclusive license of the Debtors' technology platform assets.  At a hearing on December 12, 2023, the Bankruptcy Court ruled that it would not approve the sale of the customer lists as the Debtors had not demonstrated compliance with federal privacy laws, nor had they satisfied the Bankruptcy Court that an exception excused their compliance with such laws.  The

Debtors are continuing to explore a sale of the assets discussed in the Customer List Sale Motion in a manner that addresses the concerns raised by the Bankruptcy Court. Any such sale would be subject to the Bankruptcy Court's approval.

      *(g)*     **Schedules and Bar Dates**

On September 6, 2023, the Debtors filed their Schedules.

On January 16, 2024, the Bankruptcy Court entered the Bar Date Order. Under the Bar Date Order, February 22, 2024, was established as the General Bar Date and Government Bar Date. As of the date hereof, over 3200 proofs of claim have been filed.

The projected recoveries set forth in the Plan are based on certain assumptions, including the Debtors' estimates of the Claims that will eventually be Allowed in various Classes. There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the Debtors' estimates. The Debtors or the Plan Administrator, as applicable, and their professionals will investigate Claims filed against the Debtors to determine the validity of such Claims. The Debtors or the Plan Administrator, as applicable, may file objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

      *(h)*     **Servicing-related Motions**

On October 24, 2024, the Debtors filed a motion to authorize the payment of certain prepetition claims of parties providing services in connection with the Debtors' servicing business [D.I. 535], which was subsequently approved by the Court [D.I. 576].

On November 21, 2023, the Debtors filed a motion to terminate the servicing of certain loans owned by third-parties that were not associated with the Debtors' various investment products [D.I. 627], which was subsequently approved by the Court [D.I. 681]. This motion allowed the Debtors to begin the process of winding-down their servicing operation, resulting in the recovery of the outstanding servicing fees and advances and termination or servicing of 2 loans. The Debtors continue to service 3 loans that are not associated with the Debtors' various investment products.

On December 15, 2023, the Debtors filed a motion to increase the cap set in connection with the Taxes Motion [D.I. 701]. This relief was necessary because the amount of taxes the Debtors may need to pay associated with the Underlying Loans and real-estate owned assets are greater than was forecasted as of the Petition Date. An order approving this motion was entered on January 5, 2024 [D.I. 730]

On January 31, 2024, the Debtors filed a motion to approve a settlement between PSFI and MFA Financial, Inc. ("**MFA**"), a party that the Debtors previously sold loans to and acted as servicer for [D.I. 809]. PSFI asserted that MFA owed it approximately $2.2 million in servicing advances, and MFA asserted that PSFI owed it approximately $661,000 for indemnification obligations arising out of prior loan sales. Under the settlement, MFA has agreed to pay the Debtors, $1.725,000 and set-off the remaining amounts owed to PSFI for servicing advances

against the amounts its assets PSFI owes it for indemnity; the parties also agreed to mutual releases. The Bankruptcy Court approved the settlement on February 21, 2024. [D.I. 882].

    *(i)*    ***Disbursement of Funds in the FBO Account***

As described in the FBO Motion, as of the Petition Date, the FBO Account contained approximately $29.5 million owed to approximately 5,410 of the Debtors' customers. Following the Petition Date, the Debtors undertook a reconciliation of the funds residing in the FBO Account with the Debtors' business records relating to the amount of funds the Debtors believe is owed to the customers. This reconciliation revealed that while the FBO Account contains approximately $29.5 million, the Debtors' records showed that the amounts credited to the retail customers' accounts total approximately $31,260,028.55, representing a shortfall of approximately $1,759,031.38.

Upon discovering this discrepancy, the Debtors immediately undertook a detailed account reconciliation project. The account reconciliation process undertaken by the Debtors has consumed hundreds of hours and involved reviewing tens of thousands of individual account transactions. Since inception, approximately 9,711,541 transactions have been processed through the Peer Street online platform totaling approximately $18,046,155,906.00 in transactions. Notwithstanding the Debtors' particular account controls and treasury functions, given this sheer volume of transactions, certain discrepancies occurred.

As of the filing of the FBO Motion in September 2023, of the approximately $1.7 million shortfall, the Debtors were able to identify and reconcile a specific transaction totaling $400,903.16 accounting towards the shortfall. As described in the FBO Motion, that specific transaction was identified (the "**Corrected Transaction**") and, through the FBO Motion, the $400,903.16 was re-deposited into the FBO Account for distribution to customers. As reported to the Court at the October 17, 2023, hearing, the Debtors believed at that time that the remaining approximately $1.36 million shortfall was likely the result of under- or non-payment by Debtor PSI of certain promotional programs tied to the MPDNs as described more fully below (the "Promotional Programs").

As of December 31, 2023, the Debtors had not been able to identify and reconcile any further specific transactions similar to the Corrected Transactions that account for the shortfalls in the FBO Account. The remaining approximately $1,358,128.22 (the "**FBO Shortfall**") – or roughly 0.0075% of the dollar value transactions on the Peer Street Platform over time – has not been reconciled on a specific transaction-by-transaction basis. Given that this specific transaction-by-transaction reconciliation process involves hundreds of thousands of transactions, the Debtors may never be able to complete a full reconciliation of each and every transaction through the FBO Account. And there is no assurance that the reconciliation process will yield a full and complete reconciliation of all funds pertaining to the FBO Account.

However, and as previously disclosed at the October 17, 2023, hearing, the Debtors believe the FBO Shortfall is likely traceable to the Promotional Programs. The Promotional Programs involve two (2) specific promotional, customer-facing programs. Under the first program, the Debtors would offer MPDN holders a promotional interest rate "bump" available to them on their first MPDN investment after their birthday (information provided by customers as part of their

Peer Street online portal profile).  Under this program, customers would receive an e-mail from the Debtors on their birthday notifying them that as a "birthday gift," they would receive an interest rate "bump" on their next MPDN investment.  So if a specific MPDN customer product was offering customers an interest rate of return of (by way of example only), 8%, and a customer received this promotional e-mail on their birthday offering them a birthday promotional rate "bump" of one-half percent, then that customer could invest in that same MPDN product, but receive an enhanced 8.5% rate of return (referred to at the October 17th hearing as "birthday bucks").  Under the second program, the Debtors would offer to reimburse customers who invested on the Peer Street online platform through a self-directed IRA any fees and costs incurred by their IRA administrator for setting that self-directed IRA up on the Peer Street online platform.  These Promotional Programs were designed as marketing programs intended to be paid for as marketing expenses by Debtor PSI.  So, as customers took advantage of the Promotional Programs, Debtor PSI would accrue the costs associated therewith as a marketing cost.  It was intended that PSI would then pay Debtors PSFLLC such accrued amounts and PSFLLC would deposit them in the FBO Account.  As of the Petition Date, an approximately $1.5 million accrued payable was due from PSI to PSFLLC on account of these Promotional Programs.  However, as of the Petition Date, Debtor PSI had not paid Debtor PSFLLC those amounts, thus (the Debtors believe) accounting for the $1.36 million FBO Shortfall.  On October 18, 2023, the Court entered the FBO Order authorizing the Debtors to allow each customer with funds in the FBO Account to withdraw up to 95% of the amount the Debtors' records reflected were owed to each such customer.  As of the date hereof, a total of $26,603,128.66 has been withdrawn and the balance of the cash on deposit in the FBO Account was $3,298,771.65.

### (j)    The Wind-down of the Debtors' Loan Portfolio and their Estates

The Debtors will focus principally on efficiently winding down their businesses and preserving Cash held in the Estates.  At the same time, the Asset Manager will take-over the administration of the Loan Assets and complete the wind-down of the Debtors' loan portfolio.  The Plan provides for these assets, to the extent not already liquidated to Cash on the Effective Date, to be liquidated over time and the proceeds thereof to be distributed to holders of Allowed Claims in accordance with the terms of the Plan and the treatment of Allowed Claims described more fully herein.  The Plan Administrator will affect such liquidation and distributions.

## ARTICLE VIII
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**8.1    The Plan May Not Be Accepted**

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

**8.2    The Plan May Not Be Confirmed**

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determined that the combined Disclosure Statement and  Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met.  Moreover, there can be no assurance that modifications to the combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether an alternative chapter 11 plan for the Debtors' assets could be implemented and what distribution the holders of Allowed Claims would receive.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

**8.3    Outcomes if the Plan is not Confirmed**

If the Plan is not accepted by sufficient Classes of creditors and OppFund Interests Holders, ultimate distributions to creditors will be delayed.  This delay will include the period of time that the Debtors and the Committee will use to determine if an alternative chapter 11 strategy can be implemented.  An alternative plan that may be less favorable to one or more classes of creditors may be proposed.  It may also be concluded that a conversion to chapter 7 is the only viable alternative to the Plan.  This delay, regardless of the path selected, will be accompanied by further administrative expenses that will come ahead of pre-petition creditors at the Debtors where such costs are allocated, including the Note Claims.

If the Plan is not confirmed, the Debtors or a chapter 7 trustee, if appointed, may seek resolution of the Ownership Dispute.  If the Court concludes that the MPDNs (and, possibly, other types of Notes) are participation interests and the Debtors' estates do not have an ownership interests in the Underlying Loans, it is possible, if not likely, the Debtors or chapter 7 trustee will seek to abandon the Mortgage Interests that the Debtors do not have a beneficial interest in.  If that occurs, there is no party in place to take over the servicing of the Underlying Loans or even a

collective action or proceeding to coordinate such a take-over on the scale that would be required in light of the Debtors' loan portfolio.

On the other hand, if the Ownership Dispute is litigated and it is concluded that the Debtors beneficially own the various Mortgage Interests, holders of MPDNs and RWNs may have to share recoveries from the Underlying Loans associated with their investments with other Noteholders.

If a chapter 7 trustee is appointed, it likely will not continue the servicing functions and business that the Debtors have historically operated, because chapter 7 trustees are typically not authorized to operate a debtor's business for any prolonged period. A chapter 7 trustee will likely pursue a sale of the loan portfolio on an expedited basis, consistent with its mandate to promptly reduce the estate's assets to cash and its limited role and authority in continuing the Debtors' business.

Even where assets have been reduced to cash, such as the Liquidated Loan Asset, the Debtors and Committee anticipate that a chapter 7 trustee would take many months, if not a year (or even more), to analyze and resolve matters concerning ownership of the Underlying Loans, secured/unsecured status of the various claims against the Debtors, and intercompany claims and causes of action, as well as any number of other issues, before the trustee would begin to distribute cash proceeds—even those held as of the time of conversion.

## 8.4    Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed, post-Petition Date (including post-Effective Date) costs and expenses, the funds available for Distribution, including the proceeds ultimately realized for Underlying Loans. Given that a substantial amount of the remaining Underlying Loans are considered "non-performing" loans, the actual proceeds to be recovered from those Underlying Loans is uncertain. There can be no assurances that the estimates of proceeds on which recoveries have been projected in this combined Disclosure Statement and Plan will be realized. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the Allowed amount of Unclassified Claims and the funds available for distribution to such Class may differ from the Debtors' estimates. If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

## 8.5    Objections to treatment of Notes, Note Claims, Underlying Loans and Allocations

The Debtors believe that the Plan's treatment of the Notes and the Underlying Loans and the proposed allocation of the administrative expenses of the Chapter 11 Cases and future management and the funding of the same through the Funding Pool are appropriate and permissible.

However, Holders of Notes may object to the treatment of the Notes and the treatment of the Underlying Loans and proceeds thereof, including by arguing that the Notes are participations and the Plan's treatments are inconsistent with the terms of their participation interests.

Creditors may object to the Plan and argue that one or more of the participation agreements that the Debtors have recognized through the Plan are invalid and that the proceeds of the Underlying Loans should be made available to Holders of General Unsecured Claims against one or more Debtors.  Further, those objections could assert various claw-back actions surrounding payment made among the Debtors related to the Underlying Loans arising out of the alleged invalidity of the participation agreements or other inter-company financing activity.

Holders may also object to the manner in which costs have been and will be allocated to the Underlying Loans and the Funding Pool.  These objections could argue either that the amounts allocated are too low or too high.

If the Court does not authorize the Plan's treatment of the Notes and Underlying Loans, the proposed allocation and the proposed Funding Pool, the Plan is not feasible, and the Debtors may not be able to confirm a chapter 11 plan at all.

## 8.6    Objections to Classification of Claims

Bankruptcy Code section 1122 requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the

requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

**8.7    Failure to Consummate the Plan**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Bankruptcy Court will confirm the Plan.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

**8.8    Plan Releases May Not Be Approved**

There can be no assurance that the releases, as provided in Article XIV of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan that differs from the Plan, or the Plan not being confirmed.

**8.9    Reductions to Estimated Creditor Recoveries**

The Allowed amount of Claims in any Class or the Allowed amount of Unclassified Claims could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially.  The amount of cash realized from the liquidation of the Loan Assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

**8.10    Certain Tax Considerations**

*(a)    **General**.*

A description of the United States federal income tax consequences of the Plan is provided below.  This description is based on the IRC, Treasury Regulations promulgated thereunder, judicial decisions and IRS and administrative determinations, all as in effect on the date of this Combined Disclosure Statement and Plan and all subject to change, possibly with retroactive effect.  Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below.

The United States federal income tax consequences of the Plan are complex and in important respects uncertain.  No ruling has been requested from the IRS; no opinion has been requested from the Debtors' or Committee's counsel concerning any tax consequence of the Plan; and no tax opinion is given by this Combined Disclosure Statement and Plan.

The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or Holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in

securities, life insurance companies, financial institutions, tax exempt organizations, and non-U.S. taxpayers nor does this Combined Disclosure Statement and Plan address tax consequences to Holders of Interests in the Debtors.  In addition, the description does not discuss state, local, or non-U.S. tax consequences.

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of a Claim or Interest.  Holders of Claims or Interests are urged to consult with their own tax advisors regarding the federal, state, local, and non-U.S. tax consequences of the Plan.

(b)  **_United States Federal Income Tax Consequences of Payment of Allowed Claims Pursuant to Plan._**

The United States federal income tax consequences of Plan implementation to the Holders of Allowed Claims will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives distributions under the Plan in more than one taxable year, whether the Holder's claim is Allowed or Disputed at the Effective Date, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such Holder's Claim.

     i.    <u>Recognition of Gain or Loss</u>

     (A)    In General:

In general, a Holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of the Holder's Claim less the Holder's basis in the Claim.  Any gain or loss recognized in the exchange may be long term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount.  If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation.  The Holder's aggregate tax basis for any property received under the Plan generally will equal the amount realized.  The Holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the Holder under the Plan on the Effective Date or subsequent distribution date, less the amount, if any, allocable to Claims for interest, as discussed below.

     (B)    Post-Effective Date Cash Distributions:

Because certain Holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the IRC may apply to treat a portion of the subsequent distributions as imputed interest.  Additionally, because Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred.  All Holders of Allowed Claims are urged to consult such Holders' tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to such Holder's claims.

     (C)    Bad Debt and Worthless Securities Deduction:

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Holder's Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction to extent of all or a portion of the amount by which the Holder's tax basis is greater than the amount received in respect of the Holder's Claim under § 166(a) of the IRC or a worthless securities deduction under § 165(g) of the IRC. The rules governing the character, timing, and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

ii.    <u>Payments.</u>

If any payment is to be made from the Plan Administrator, such payment will not be deemed to have been made to any recipient until, and to the extent that, the amount to which the payee is entitled has been determined and distributed. Any income realized by Reorganized Debtors prior to such time will be reported by the Plan Administrator as income of and taxable to Reorganized Debtors.

**(c)    Certain Other Tax Consequences for Holders of Claims**

i.    <u>Receipt of Pre-Effective Date Interest.</u>

In general, a Holder of a Claim that was not previously required to include in such Holder's taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Holder of a Claim that was previously required to include in such Holder's taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. The Plan provides that all distributions to a Holder of an Allowed Claim will be deemed to apply first to the principal amount of such Claim until such principal amount is paid in full, and then the remaining portion of such distributions, if any, will be deemed to apply to any prepetition accrued interest included in such Claim. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to Holders of Allowed Claims is properly allocable to prepetition interest. Each such Holder is urged to consult such Holder's tax advisor regarding the tax treatment of such Holder's distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purposes.

ii.    <u>Installment Method.</u>

A Holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than such Claim's face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of § 453B of the IRC.

iii.    <u>Market Discount.</u>

A Holder of a Claim that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the

market discount that accrued during the period the Claim was held by the Holder and that was not previously included in income by the Holder.

### iv.    Information Reporting and Withholding.

Under the IRC's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### v.    Certain Disclosure Requirements.

Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and would require such disclosure.

### (d)    Tax Consequences of the Plan to the Debtors.

### i.    Taxable Income.

The Debtors believe that there may be net operating losses ("**NOLs**") available from prior taxable years. For NOLs arising prior to 2018, such NOLs can generally be carried forward for 20 years to offset taxable income. As a result of the enactment Tax Cuts and Jobs Act of 2017, NOLs arising in 2018 and thereafter can be carried forward indefinitely, but can only offset 80% of taxable income for a taxable year. The Debtors have not done an analysis of the amount of pre-2018 NOLs and NOLs arising in 2018 and thereafter to determine if any taxable income arising from implementation of the Plan can be offset with prior NOLs. To the extent current year losses and NOLs and other tax deductions are not available to offset any of Debtors' gain or income, Debtors will owe tax on such gains. The Debtors do not expect to incur a substantial tax liability as a result of implementation of the Plan. It is noted, however, that the Debtors may incur tax liability with respect to taxable "excess inclusion income" arising out of certain Debtors holding residual interests in real estate mortgage investment conduits ("**REMICs**"). Debtors that are characterized as REITs for federal income taxes may also have tax exposure for excess inclusion income as a result of characterization of the REIT or any part of the REIT as a taxable mortgage pool. Under the provisions of the IRC applicable to the calculation and taxation of excess inclusion income, NOLs cannot be used to offset excess inclusion income. The Debtors are continuing to analyze the extent to which they will be subject to income tax exposure for excess inclusion income arising as a result of holding residual interests in REMICs or as a result of any Debtor's characterization as a REIT or qualified REIT subsidiary.

### ii.    Cancellation of Indebtedness and Reduction of Tax Attributes.

For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("**COD**").  In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to the Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to Holders of the debt.  Various statutory or judicial exceptions limit the incurrence of COD income (such as where payment of the cancelled debt would have given rise to a tax deduction).  COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge.  An exception to the recognition of COD income applies to a debtor in a chapter 11 bankruptcy proceeding.  Bankrupt debtors generally do not include COD in taxable income, but must instead reduce certain tax attributes (such as NOLs, capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception.  Tax benefits are reduced after the tax is determined for the year of discharge.  To the extent available, existing NOLs will be available to offset gains on asset sales and other income in the year of the discharge regardless of the amount by which NOLs are reduced due to COD income.

 *(e)*  **Importance of Obtaining Professional Tax Assistance.**

   *The foregoing discussion is intended only as a summary of certain U.S. Federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional.  The above discussion is for information purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances.  Accordingly, Holders are strongly urged to consult with their tax advisors about federal, state, local, and non-U.S. tax consequences to the Plan.*

## ARTICLE  IX
## TREATMENT OF UNCLASSIFIED CLAIMS

**9.1** **Administrative Claims.**  Except as otherwise set forth in this Article IX, or as soon as practicable after the Administrative Claim Bar Date, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim: (i) Cash equal to the amount of such Allowed Administrative Claim; or (ii) such other less favorable treatment as to which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

  *(a)*  **Administrative Claim Bar Date**.  Unless an earlier date has been set by an Order of the Bankruptcy Court, holders of Administrative Claims, other than Professional Fee Claims, shall file with the Claims Agent and serve on the Debtors or the Plan Administrator, as applicable, requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Administrative Claim Bar Date.  The Effective Date Notice shall set forth the Administrative Claim Bar Date with respect to Administrative Claims that arose after January 16, 2024, and shall constitute notice of such Bar Date.  Absent further Court order, any Administrative Claim not filed by the Administrative Claim Bar Date shall be deemed waived and the Holder of such Administrative Claim shall be forever barred from receiving payment on account thereof.

*(b)* **Objections by the Plan Administrator**.  Objections to requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline.

*(c)* **Professional Fee Claims**.  All applications for allowance and payment of Professional Fee Claims shall be Filed on or before the Professional Fee Claims Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The Effective Date Notice shall set forth the Professional Fee Claims Bar Date and shall constitute notice of such Bar Date.  Objections to any Professional Fee Claims must be Filed and served on the Plan Administrator and the requesting party by no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims.  Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court upon the earlier of (i) the Effective Date or (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, and in each case, as soon as reasonably practicable.

On the Effective Date, the Debtors shall transfer funds to the Professional Fee Reserve (as defined in the Cash Collateral Order) to ensure that the Professional Fee Reserve contains amounts sufficient to pay all Professional Fee Claims incurred but not yet paid as of the Effective Date, as estimated by the Debtors in good faith after consultation with the Professionals.

The Debtors may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan (including applications for allowance and payment of Professional Fee Claims) incurred by the Debtors and/or the Committee on and after the Effective Date.  Following the Effective Date, no professional employed or retained by the Debtors or the Committee shall be required to comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after the Effective Date.

*(d)* **U.S. Trustee Fees**.  All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors, the Reorganized Debtors and the Plan Administrator shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Plan Administrator and each of the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Reorganized Debtors and the Plan Administrator shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

**9.2    Priority Tax Claims.**  Within the time period provided in Article X of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (i) Cash equal to the amount of such Allowed Priority Tax Claim; or (ii) such other less favorable treatment as to which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

**ARTICLE X**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**10.1    Distributions for Allowed Claims**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders as of the applicable distribution date shall be made on or as soon as practicable after the applicable distribution date.  Distributions on account of Claims that first become Allowed Claims after the applicable distribution date shall be made pursuant to the terms of this Plan and on the day selected by the Plan Administrator.

Consistent with the Plan and the orderly administration of the Underlying Loans, the Plan Administrator, with the prior approval of the Advisory Committee, may accelerate any Distribution date with respect to Distributions other than the initial distribution date if the facts and circumstances so warrant and to the extent not inconsistent with the Plan.

Distributions made as soon as reasonably practicable, under the prevailing circumstances, after the Effective Date or such other date set forth herein shall be deemed to have been made on such date.

**10.2    Interest on Claims.**

Except to the extent provided in Bankruptcy Code section 506(b), the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.  For the avoidance of doubt, the Allowed Prepetition Loan Claims shall include interest, at the default rate, from and after the Petition Date to the extent that the proceeds received from the collateral securing such claims exceeds the value of such claims.

Notwithstanding the foregoing and for the avoidance of doubt, all amounts paid with respect to an Underlying Loan (including interest and default interest) shall be available to Holders of Note Claims pursuant to the Waterfall in Section 2.6, even if such amounts would result in the holder of a Note Claim receiving a recovery in excess of the principal amount of the Note and any pre-petition accrued interest.

**10.3    Distributions by Plan Administrator as Disbursement Agent.**

From and after the Effective Date, the Plan Administrator shall serve as the Disbursement Agent under the Plan with respect to Distributions to Holders of Allowed Claims (provided that the Plan Administrator may hire professionals or consultants to assist with making disbursements or to act as the Disbursement Agent).  The Plan Administrator shall cause to be made all

Distributions required to be made to such Holders of Allowed Claims pursuant to the Plan. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of the Plan Administrator's duties as Disbursement Agent unless otherwise ordered by the Bankruptcy Court.

**10.4    Means of Cash Payment.**

Cash payments under the Plan shall be made, at the option, and in the sole discretion, of the Plan Administrator, by wire, check, or such other method as the Plan Administrator deems appropriate under the circumstances. For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

Solely with respect to the MPDN Claims, RWN Claims, PDN Claims, and FBO Account Claims, the Debtors may elect to make Distribution electronically using the Peer Street Platform and the FBO Account, so long as the Peer Street Platform is operating, consistent with the Debtors' pre-Petition Date practices. At the Plan Administrator's election, this may include causing the direct deposit of funds (i.e., "pushing out" the funds) held in the FBO Account on behalf of or for the benefit of a Holder into the bank account identified by the Holder and maintained in the Debtors' records. Holders are encouraged to ensure that all bank account information provided to the Debtors is up-to-date.

Notwithstanding the foregoing, any amount payable on account of the Prepetition Loan Claims shall be deposited into the Prepetition Agent Account for withdrawal by the Prepetition Agent. Such distribution shall be deemed made when deposited in the Prepetition Agent Account.

**10.5    Fractional Distributions.**

Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**10.6    *De Minimis* Distributions.**

Notwithstanding anything to the contrary contained in the Plan, but subject to the last sentence of this Paragraph: (i) the Plan Administrator shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $100, and (ii) any Holder of an Allowed Claim on account of which the aggregate amount of Cash or other property to be distributed is less than $100 shall be forever barred from asserting such Claim against the Debtors or their assets. This paragraph shall not apply to Note Claims and FBO Account Claims to the extent that the FBO Account remains open.

**10.7    Delivery of Distributions; Unclaimed Distributions.**

Solely with respect to the MPDN Claims, RWN Claims, PDN Claims and FBO Account Claims, the Debtors may elect to make Distribution electronically using the Peer Street Platform and the FBO Account, consistent with the Debtors' pre-Petition Date practices. If the Debtors elect to close the FBO Account, any amounts distributed to, or made available through, the FBO Account and not withdrawn or direct deposited by the Plan Administrator will be distributed as otherwise set forth in this Section 10.7.

Subject to the foregoing, all Distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the claims register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Plan Administrator) or, in the absence of a Filed proof of Claim or Interest, the Schedules. The responsibility to provide the Plan Administrator a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Plan Administrator have any obligation to determine a Holder's current address. Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim.

Amounts in respect of Distributions made by the Plan Administrator pursuant to the prior paragraph shall be held in trust on behalf of the Holder of the Claim to which they are payable until the earlier of the date that such Distribution is claimed by such Holder and the date that is one hundred twenty (120) days after making the Distribution. Following the expiration of one hundred twenty (120) days after making a Distribution by check, the amounts in respect of such Distribution shall be declared "undeliverable" and subject to the forfeiture provisions of Section 10.13 (each an "**Undeliverable Distribution**").

## 10.8    Application of Distribution Record Date.

At the close of business on the Distribution Record Date, the Debtors' claims registers shall be closed, and there shall be no further changes in the record holders of Claims or Interests. Claims shall be non-transferable except upon death of the Holder or by operation of law; *provided*, however, nothing herein shall prevent the transferability of the Prepetition Loan Claims. Except as provided herein, the Plan Administrator and the Plan Administrator's respective agents, successors, and assigns shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Entities or the date of such Distributions.

## 10.9    Withholding, Payment and Reporting Requirements With Respect to Distributions.

All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements. The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. The Plan Administrator may require, in the Plan Administrator's reasonable discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim

complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9, as applicable to each Holder.  Such requirement shall become a condition for distribution and evidenced by the issuance of a request for the appropriate Form W-8 or Form W-9, as applicable, from a Holder, which Form must be returned within one hundred twenty (120) days of such request.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed in connection with such Distribution.

### 10.10   Setoffs.

The Plan Administrator may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Plan Administrator of any such claim that it may have against such Holder.

### 10.11   No Distribution in Excess of Allowed Amounts.

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.  Notwithstanding the foregoing and for the avoidance of doubt, all amounts paid with respect to an Underlying Loan (including interest and default interest) shall be available to Holders of Note Claims pursuant to the Waterfall in Section 2.6, even if such amounts would result in the holder of a Note Claim receiving a recovery in excess of the principal amount of the Note and any pre-petition accrued interest.

### 10.12   Allocation of Distributions.

The Plan Administrator may, in the Plan Administrator's reasonable discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Plan Administrator has determined to have, an interest in such Claim; *provided, however*, that the Plan Administrator shall provide notice of such Distribution to any Holder of a Claim or other Entity that has asserted an interest in such Claim.

### 10.13   Allocation of Consideration

To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and, accrued but unpaid interest thereon, the consideration distributed to the holder of such Allowed Claim shall be treated as first satisfying the principal amount of such Claim (as

determined for federal income tax purposes), and any remaining consideration shall be treated as satisfying accrued but unpaid interest.

**10.14   Forfeiture of Distributions.**

If the Holder of a Claim fails to claim an Undeliverable Distribution within the time limit set forth in Section 10.7, or fails to complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9 within one hundred twenty (120) days of the request by the Plan Administrator for the completion and return to it of the appropriate form pursuant to Section 10.9, then such Holder shall be deemed to have forfeited the Undeliverable Distribution if any and its right to any reserved and future Distributions on account of such Claim (the "**Forfeited Distributions**"), and such Claim shall no longer be Allowed, shall be Disallowed and shall be deemed cancelled and forever barred.  Forfeited Distributions for MPDN Claims shall be applied by the Plan Administrator in satisfaction of Post-Effective Date Loan Administration Costs; _provided_ that any Forfeited Distributions on account of FBO Account Claims shall first remain in the FBO Account for distribution to other holders of Allowed FBO Account Claims until all Allowed FBO Account Claims have been paid in full and any Forfeited Distributions on account of RWN Claims or PDN Claims shall be distributed as set forth in Article IV.

**10.15   Suspension of Distributions to Holders Receiving Avoidable Transfers**

If the Holder of a Claim is an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, 550, or 553 or that is a transferee of a transfer avoidable under Bankruptcy Code sections 522, 544, 545, 547, 548, 549, or 724(a), and the Debtors or Plan Administrator has Filed an Objection or adversary proceeding seeking such relief, such Entity or transferee shall not be entitled to a Distribution on account of any Claim, unless such Entity has paid the amount, or turned over any such Property, for which such Entity or transferee is or is alleged to be liable under Bankruptcy Code section 522, 542, 543, 550, or 553, or such Objection or adversary proceeding has been determined in favor of the Entity pursuant to a Final Order.

**10.16   Special Provisions for Holders where Investments were made through Self-Directed IRAs.**

If any Holder's Claim has been made using a self-directed individual retirement account (an "**SDIRA**"), the Debtors will direct the distribution to the custodian of record for such SDIRA instead of directly to the Holder.  If the Holder does not wish to have its distributions made to the custodian of record for the SDIRA, it must provide written instructions to the Debtors prior to the Effective Date indicating that the distribution should not be made to the SDIRA and, instead, should be made directly to the Holder.

Holders who have invested in Peer Street products through an SDIRA are encouraged to make sure that they have provided the Debtors with up-to-date information for custodian for their SDIRA.

**ARTICLE  XI**
**PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS**

**11.1   Claims Administration Responsibility.**

Except as otherwise specifically provided in the Plan, after the Effective Date, subject to the review and oversight of the Advisory Committee, the Plan Administrator shall have the sole authority (a) to file, withdraw, or litigate to judgment objections to Claims, (b) to settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Subject to the review and oversight of the Advisory Committee, any agreement entered into by the Plan Administrator with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**11.2    Claims or Interests Objections**.

All objections to Claims or Interests shall be Filed by the Plan Administrator on or before the Claims Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion filed by the Plan Administrator on or before the Claims Objection Deadline with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the filing of such motion.

**11.3    Estimation of Contingent or Unliquidated Claims**.

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, which estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claim objections, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.4    Distributions on Account of Disputed Claims**.

Distributions may be made on account of an undisputed portion of a Disputed Claim.  The Plan Administrator shall, on the applicable distribution date, make Distributions on account of any Disputed Claim (or portion thereof) that has become an Allowed Claim.  Where the Plan Administrator is making distribution to claims in a Class where one or more Claims is Disputed, the Plan Administrator shall deposit into the Disputed Claim Reserve the Amount that would have been paid on account of such Disputed Claim had it been Allowed in the amount asserted, or determined based on such other amount as ordered by the Court or stipulated with the Holder.

**11.5    Amendments to Claims**.

On or after the Effective Date, a Claim may not be filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Plan Administrator and any such new or amended Claim filed without prior authorization shall be deemed Disallowed in full without any further action.

**11.6    Claims Paid and Payable by Third Parties.**

A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors.  Distributions under the Plan shall be made on account of any Allowed Claim that is payable pursuant to one of the Debtors' insurance policies solely up to the amount of the portion of such Allowed Claim that is (i) within the self-insured retention under such policy and/or (ii) in excess of any aggregate limits under such policy.  No Entity shall have any other recourse against the Debtors, the Estates, the Plan Administrator, or any of their respective properties or assets on account of a self-insured retention under an insurance policy; *provided*, *however*, that, except as otherwise required under the applicable insurance policy *and* applicable non-bankruptcy law, an Insurer shall not be obligated to pay amounts within any self-insured retention or other self-insured layer.

**11.7    Adjustment to Claims Without Objection.**

Any Claim that has been paid or otherwise satisfied may be designated on the Claims Register as such at the direction of the Plan Administrator by the Filing of a Notice of Satisfaction by the Plan Administrator, and without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE  XII**
**EXECUTORY CONTRACTS**

All Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of Bankruptcy Code sections 365 and 1123, except to the extent: (a) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract, or (b) prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and Bankruptcy Code sections 365(a) and 1123.

**ARTICLE  XIII**
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

**13.1    Conditions Precedent to the Effective Date.**

Each of the following is a condition precedent to the occurrence of the Effective Date:

*(a)*      the Confirmation Order shall have been entered by the Bankruptcy Court and not subject stay;

*(b)*      no governmental entity or federal or state court of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any law or order (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Plan or any of the other transactions contemplated hereby and no

governmental entity shall have instituted any action or proceeding (which remains pending at what would otherwise be the Effective Date) seeking to enjoin, restrain or otherwise prohibit consummation of the transactions contemplated by the Plan;

*(c)* all documents and agreements necessary to implement the Plan, including the Asset Management Agreement and any other documents included in the Plan Supplement, shall have (i) been tendered for delivery and (ii) been effectuated or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements;

*(d)* the Plan Administrator shall have accepted its appointment;

*(e)* all post-petition intercompany loans and advances made pursuant to the Cash Management Order shall have been repaid;

*(f)* the Funding Pool or Exit Facility (if applicable) shall have been funded as provided for herein;

*(g)* the Corporate Debtor Reserve and Wind-Down Reserve shall have been funded in the amount set forth in the Plan Supplement; and

*(h)* the Effective Date shall occur simultaneously for all Debtors.

## 13.2    Notice of Effective Date.

On or before five (5) Business Days after the Effective Date, the Plan Administrator shall mail or cause to be mailed to all Holders of Claims a notice that informs such Entities of (a) the occurrence of the Effective Date, (b) notice of the Administrative Claim Bar Date and Professional Fee Claim Bar Date, and (c) such other matters as the Plan Administrator deems appropriate or as may be ordered by the Bankruptcy Court.

## 13.3    Waiver of Conditions Precedent to the Effective Date.

The Debtors may at any time, with the consent of the Committee and Prepetition Agent (not to be unreasonably withheld), without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article (other than entry of the Confirmation Order), whereupon the Effective Date shall occur without further action by any Entity.  The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date.

## 13.4    Effect of Non-Occurrence of Effective Date.

If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within thirty (30) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors, the Committee and Prepetition Agent), then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the

Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn.  Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

## ARTICLE XIV
## EFFECTS OF CONFIRMATION

**14.1    Exculpation, Releases, and Injunctions.**

The exculpations, releases, and injunctions provided for in Section 14.1 of the Plan shall be effective upon the Effective Date.

*(a)    **Exculpation and Limitation of Liability.**  Notwithstanding any other provision of the Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or Affiliates, or any of their successors or assigns, for any act or omission relating to, in any way, or arising, on or after the Petition Date through the Effective Date, from (i) the Chapter 11 Cases, (ii) formulating, negotiating or implementing the combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the combined Disclosure Statement and Plan; (iii) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring, sale or liquidation of the Debtors; (iv) the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan or (v) the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence, fraud, or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability.  The Confirmation Order shall serve as a permanent injunction against any Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to Section 14.1(a) of the Plan.*

*(b)    **Releases by the Debtors.**  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, completely and forever release, waive, void, and extinguish unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies*

- 90 -

*and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, or the Chapter 11 Cases, that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties (other than the rights of Holders of Allowed Claims to enforce the obligations under the Confirmation Order and the Plan); provided, however, that nothing in this section shall operate as a release or waiver of (i) any amounts for borrowed money or other indebtedness owed to the Debtors or (ii) any causes of action arising out of gross negligence, willful misconduct, fraud, or criminal acts of any such Released Party as determined by a Final Order.*

*(c)      Consensual Releases by Certain Parties.   On the Effective Date, for good and valuable consideration, the Releasing Parties shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, or the Chapter 11 Cases; provided, however, that nothing in this section shall operate as a release, or waiver of (i) any amounts for borrowed money or other indebtedness owed to a Releasing Party or (ii) any causes of action arising out of gross negligence, willful misconduct, fraud, or criminal acts of any such Released Party as determined by a Final Order.*

*(d)      Non-Discharge of the Debtors; Injunction.   In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.   Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.   As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan.   All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.*

*Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest, from:*

> *(1)*     *commencing or continuing in any manner any action or other proceeding of any kind against any of the Debtors, their Estates, the Plan Administrator, the Asset Manager, their successors and assigns, and any of their assets and properties;*
>
> *(2)*     *enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any of the Debtors, their Estates, the Plan Administrator, the Asset Manager, their successors and assigns, and any of their assets and properties;*
>
> *(3)*     *creating, perfecting or enforcing any encumbrance of any kind against any of the Debtors, their Estates, the Plan Administrator, the Asset Manager, their successors and assigns, and any of their assets and properties;*
>
> *(4)*     *asserting any right of setoff or subrogation of any kind against any obligation due from any of the Debtors, their Estates, the Plan Administrator, the Asset Manager, their successors and assigns, and any of their assets and properties except for setoffs exercised prior to the Petition Date; or*
>
> *(5)*     *commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XVI of the Plan.*

*Any Entity injured by any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.*

**14.2    Term of Bankruptcy Injunction or Stays.**

*All injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.*

**14.3    Discussion of Releases**

Over the course of their engagement, the Debtors' advisors at Kramer Levin, Young Conaway, and Province, along with the Chief Restructuring Officer, undertook a detailed review of various aspects of the Debtors' prepetition business activities. This review included, among other things, a detailed legal, financial and/or historical review of (a) the Debtors' intercompany business transactions, (b) detailed analysis of the Debtors' various product offerings, including a detailed review of the Underlying Loan documents, PPMs, investor agreements, PPM supplements and public-facing communications, (c) the Debtors' pre-petition accounting practices and treasury functions, (d) key liabilities, including indebtedness under the Debtors' Covid-era "PPP" loan, (e) any transfers to or payment made for the benefit of any of the Debtors' officers or directors that are receiving releases under the Plan, (f) the financing arrangements put in place pre-petition with Magnetar, including any potential lien or other challenges or other claims the estate may have against Magnetar, (g) the Debtors' overall pre-petition business practices, (h) communications

among the Debtors' board and management regarding various issues, and (i) any non-ordinary course transactions by and among the Debtors and/or any member of their management and the board. This review included an extremely detailed legal and forensic review of the Debtors' establishment of the FBO Account and a detailed account reconciliation of thousands of transactions related to that account, as well as a detailed review of the Debtors' banking practices generally across all of its bank accounts. The Debtors' advisors also reviewed thousands of pages of documents regarding the Debtors' prepetition business practices, board activity, board minutes, board presentations, communications with former insiders and other materials predating the involvement of the CRO. During this comprehensive review, the Debtors have not uncovered any actionable estate claim against any party that would be released under the Plan. Indeed, the factors that led to the Debtors' bankruptcy proceedings appear to have been market driven forces that were incompatible with the Debtors' business model—in sum, the Debtors' primary source of revenue, loan originations and the resulting servicing fees, dramatically curtailed with changes in the U.S. economy and, as a result, the Debtors were unable to sustain their business operations based on the revenue streams available to them and, at the same time, the Debtors no longer had access to additional capital, historically raised through equity financing, to fill the hole.

In addition to the Debtors' efforts, the Committee undertook its own independent investigation conducted by its legal counsel and financial advisors. The Debtors fully cooperated with the Committee in conducting its investigation, which included the Debtors' production of more than one-thousand pages of documents requested by counsel for the Committee. Over the course of its investigation, the Committee reviewed the contracts that underpin the Debtors' business, the disclosures made by the Debtors on their websites and in other consumer-facing documents, board minutes and presentations, and the perfection status of the liens securing the Debtors' secured debt and interviewed current and former employees of the Debtors. Based on that investigation, the Committee believes that the Debtors' financial woes relate primarily to the fact that, as is the case with many failed "startups," the Debtors' underlying business model was based on future growth projections that represented reasonable business judgment but ultimately failed to materialize. While the Debtors anticipated that their business would operate a loss for some initial period, they did not intend to sustain those losses indefinitely. When the losses continued for significantly longer than projected (due to, among other things, a significant increase in interest rates), the Debtors made the reasonable decision to file for bankruptcy. The Committee believes that the bankruptcy filing was in the best interest of investors, because the Debtors' portfolio required (and would lose significant value without) a servicer and the Debtors did not have the resources to retain a third-party servicer as an alternative to maintaining the Debtors' servicing function through a chapter 11 filing. To date, the Committee's investigation has not uncovered any colorable estate claim that would be released under the Plan. It is worth noting that, to the extent colorable claims exist relating to a specific loan, the Committee believes the costs (and risk of loss) associated with pursuing such claims are appropriately borne by the investors in that specific loan, and not by investors generally. The Committee is working with the Debtors to ensure that the release of estate claims contemplated by the Plan does not impair the ability of third parties to pursue any third party claims that have not been waived or released under the terms of the Plan.

While no actionable estate claims against Released Parties under the Plan have been uncovered to date, investigation is ongoing and the Debtors will remain responsive to any potential claims that are identified and will undertake appropriate investigation to ensure that valuable estate

causes of action are not released for inadequate consideration. Further, the Debtors believe that through the consensus built through the Plan, the Debtors will bring the chapter 11 cases to a conclusion. The Released Parties have all contributed to building the consensus arrived at the Plan, providing a basis for granting releases to them. Certain of the parties, the Debtors' director and officers (including the CRO) and the Prepetition Agent and Prepetition Lenders, also have rights of indemnity against the Debtors. The proposed releases will obviate burdens on the Debtors and their estates by reducing the scope of potential indemnification claims, particularly as they relate to potential defense costs for claims that will be release under the Plan.

   *(a)*    **Who are the "Released Parties"?**

The Released Parties include, but may not be limited to, the following parties (and each of their Related Parties):

**<u>Debtor Parties</u>**

Brewster Johnson, Director and Chief Executive Officer
David Eaton, Independent Director
Ivona Smith, Independent Director
Freddie Reiss, Independent Director
Ellen Coleman, Chief Financial Officer
A. Portela, Employee Experience Manager
A. Pizarro, Senior Director of Servicing
B. Thao, Director, Transaction Management
B. McGilvray, Senior Investor Relationship Manager
B. Chi, Controller
C. Luong, Senior Loan Servicing Specialist
C. Corcoran, Total Rewards Manager
D. Quan, Corporate Accountant
E. Molchan, Accounting Manager
E. Petrie, Staff Engineer
G. Vigil, DevOps Staff Engineer
G. Escober, Post Closing Manager
K. Staples, Foreclosure Specialist
M. Kim, Loan Servicing Manager
M. Thomas, Head of Portfolio Management
M. Ronas, Post Closing
M. Black, Deputy General Counsel
T. Travnikova, Senior Accountant
R. Lasam, Loan Servicing Manager
S. Frindel, Director of IT Operations
S. Matsutsuyu, Senior Capital Markets Analyst
S. Porter, Investor Relations Manager
T. Mullen, Lead System Architect
T. Wetzel, Director of Asset Management
T. Shar, Analytics Engineer
W. Green, Senior Asset Manager

**Legal Advisors to the Debtors**
Young Conaway Stargatt & Taylor, LLP
Kramer Levin
Adams and Reese
Bailey Cavalieri
Cannon Law, LLC
Dentons US LLP
Ford & Paulekas, LLP
Fox Rothschild
Friedman Vartolo LLP
Sandberg Phoenix
Trenam Law
Burr  & Forman
Latimer LeVay Fyock LLC
Law Offices of Tae H. Whang, LLC
McMichael Taylor Gray, LLC
Snell & Wilmer LLP
Chartwell Law Offices

**Other Advisors to the Debtors**
Province
Piper Sandler
Houlihan Lokey Financial Advisors, Inc.
Stoll Keenan Ogdon
Armanino LLP

**Special Members of PSF LLC**
CT Corporation Staffing, Inc.
Ricardo Beausoleil, Special Member
Christine M. Wilson, Special Member

**Committee Parties**
Official Committee of Unsecured Creditors
Aristides Family Trust (2002)
C. Aristides
M. Corbett
Fixed Income Fund of the Carolinas, LLC
D. Venegoni
G. Ricks
IBI SBL Investments, LP
D. Sagron
Y. Wang
L. Zhai
Morrison & Foerster LLP
Benesch, Friedlander, Coplan & Aronoff LLP

Island Dundon

**Prepetition Agent and Prepetition Lenders**
Magnetar Financial, LLC
Magnetar Structured Credit Fund, LP
Magnetar Longhorn Fund, LP
Purpose Alternative Credit Fund - F LLC
Purpose Alternative Credit Fund - T LLC
Magnetar Lake Credit Fund, LLC
Royer Cooper Cohen Braunfeld LLC
Richards, Layton & Finger, P.A.
B. Riley

**Asset Manager and Pacific Creditors**
Colchis Capital Management LP and its Affiliates
Pacific Funding Trust 1002
Pacific RBLF Funding Trust

**Plan Administrator**
Elizabeth LaPuma

## ARTICLE XV
## RETENTION OF JURISDICTION

Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

*(a)*      allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

*(b)*      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

*(c)*      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and

consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action;

*(d)*        determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party, including any motions to assume or assume and assign that are pending as of the Effective Date or have been resolved where such order is not a Final Order, or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

*(e)*        ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

*(f)*        construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with Bankruptcy Code sections 524 and 1141 following the occurrence of the Effective Date;

*(g)*        determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

*(h)*        modify the Plan or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

*(i)*        issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

*(j)*        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

*(k)*      determine any other matters that may arise in connection with or relating to the Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order;

*(l)*      determine such other matters and for such other purposes as may be provided in the Confirmation Order;

*(m)*      hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

*(n)*      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

*(o)*      determine and resolve controversies related to the Estates, the Debtors, or their assets from and after the Effective Date;

*(p)*      hear and determine any other matter relating to the Plan; and

*(q)*      enter a final decree closing any or all the Chapter 11 Cases.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1    Modification of the Plan.**

The Debtors may alter, amend, or modify the Plan or any exhibits or schedules hereto under Bankruptcy Code section 1127(a) at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Plan with the consent of the Committee and Prepetition Agent (not to be unreasonably withheld), and in the case of Section 2.2, the Asset Manager (not to be unreasonably withheld); *provided*, *however*, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan. Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder; *provided*, that, for the avoidance of doubt, the Prepetition Agent and the Asset Manager reserve their rights with respect to alteration, amendment, or modification of the Plan that affects their Post-Effective rights and obligations.

**16.2    Revocation, Withdrawal, or Non-Confirmation of the Plan.**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Hearing. If the Plan is revoked or withdrawn prior to the Confirmation Hearing, or if the Plan is not confirmed by the Bankruptcy Court, then:

*(a)*      the Plan shall be null and void in all respects, and

*(b)*      nothing contained herein shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner

the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**16.3    Binding Effect.**

Except as otherwise provided in Bankruptcy Code section 1141(d)(3) and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

**16.4    Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan or any Plan Supplement document, on the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all liens, Claims, charges, or other interests or encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.

For the avoidance of doubt and notwithstanding anything herein to the contrary, the liens and security interests securing the Prepetition Loan Claim shall not be discharged or extinguished on the Effective Date and shall continue in full force and effect until the Allowed Prepetition Loan Claims are Paid in Full.

**16.5    Cancellation of Notes, Instruments, Certificates, and Other Documents**

Except for the purpose of evidencing a right to and allowing Holders of Allowed Claims and OppFund Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, including, without limitation, with respect to the Interests in the Debtors to be held by the Plan Administrator for the benefit of Holders of Allowed Claims as set forth in Section 3.6(c), the Confirmation Order, the Asset Management Agreement, or Plan Supplement document, on the Effective Date, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors or their assets, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors, including the MPDNs, PDNs, RWNs and OppFund Interests, shall be deemed cancelled and unenforceable, without any need for a Holder to take further action with respect thereto.

**16.6    Subordination Rights.**

The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, Bankruptcy Code section 510(b) Code or otherwise.  All subordination rights that a Holder of a

Claim may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently. The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Plan Administrator on behalf of the Estates after the occurrence of the Effective Date. Without limitation hereunder, the Plan Administrator, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under Bankruptcy Code section 510, which rights remain and are preserved, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.7    Severability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.8    Payment of Statutory Fees; Filing of Quarterly Reports.**

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors, the Reorganized Debtors and the Plan Administrator shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Plan Administrator and each of the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Reorganized Debtors and the Plan Administrator shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

**16.9    Dissolution of the Committee.**

The Committee shall dissolve on the Effective Date and the members of the Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of, any applications for Professional Fee Claims or expense reimbursements for members of the Committee or any appeals of the Confirmation Order. The Professionals retained by the Committee shall not be entitled to assert

any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the foregoing.

**16.10    Exemption from Section 1146.**

Pursuant to Bankruptcy Code section 1146(a), under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other Interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.  To the extent that the Debtors or Plan Administrator, as the case may be, elect to sell any property prior to or after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with Bankruptcy Code section 1146(c).  All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of the Plan.

**16.11    Closing of Chapter 11 Cases; Caption Change**.

As of the Effective Date, the Plan Administrator may file a motion with the Bankruptcy Court seeking to close the Chapter 11 Cases of all of the Debtors except for Debtor Peer Street, Inc. and changing the caption of the Chapter 11 Cases accordingly.  Nothing in the Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered.  Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing.  Upon the Filing of a motion to close the Chapter 11 Case of Peer Street, Inc., the Plan Administrator shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

**16.12    Filing of Additional Documents.**

On or before the Effective Date, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan.

**16.13    Treatment of Insurance Policies; Director and Officer Indemnities.**

Confirmation of the Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were insured parties.  Each insurance company is prohibited from, and ***the Confirmation Order shall constitute an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation for insured Claims set out within the Plan***.

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively,

against any Claims or Causes of Action that arose prior to the Effective Date under any indemnification provisions or applicable law, including any tail policies (whether in the by-laws, certificates of incorporation of formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise), in each case that may exist, shall (a) survive on the Effective Date on terms no less favorable to such individuals than the indemnification provisions in place prior to the Effective Date, (b) be deemed and treated as an Executory Contract that has been assumed the applicable Debtor on behalf of the applicable Debtor, (c) and remain in effect, intact, and irrevocable after the Effective Date; provided that, notwithstanding anything herein to the contrary, any such obligation of a Debtor to indemnify, defend, reimburse, or limit liability shall be limited to the extent of coverage available to it to satisfy such obligation under any applicable insurance policy originally issued to or for the benefit of it; provided, further, that the foregoing proviso shall not in any way limit or diminish the scope of exculpation or protection available under Section 14.1(a). Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, no proof of Claim, Administrative Claim, or Cure Claim need be Filed with respect to any such indemnification obligation.

**16.14  Successors and Assigns.**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.15  Governing Law.**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.

**16.16  Exhibits and Schedules.**

All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of the Plan as if set forth in full herein. Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors. Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours. The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. To the extent any exhibit or schedule annexed hereto is inconsistent with the Plan, the contents of the Plan shall control.

**16.17   Reservation of Rights.**

The Filing of the combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.  Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127, Bankruptcy Rule 3019, and in this combined Disclosure Statement and Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, or any part thereof, at any time, including prior to its substantial consummation.

Dated:  March 15, 2024

**Peer Street, Inc., *et al.***

*/s/ David M. Dunn*

Name:  David M. Dunn
Title:  Chief Restructuring Officer

**Exhibit A**

**LIQUIDATION ANALYSIS**

The Debtors[1] believe that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and that Holders of Allowed Claims that are in impaired Classes under the Plan will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the applicable Debtor liquidated under chapter 7 of the Bankruptcy Code. This liquidation analysis (this "**Liquidation Analysis**") and the conclusions set forth herein represent the Debtors' best judgment regarding the results of such a liquidation. This Liquidation Analysis is for PSI, PSFI, PSFLLC, PS Portfolio, and OppFund only. With respect to the REO Debtors, the Debtors do not believe that there will be any Allowed Claims in Classes that are impaired under the Plan. With respect to OppFund GP, PS Options, PSLI, Warehouse I, and Warehouse II, the Debtors believe there will be *de minimis*, if any, Allowed Claims against these Debtors in classes that are impaired under the Plan (other than Intercompany Claims and Interests in Class 5, which are deemed to accept the Plan in any event).

This Liquidation Analysis was prepared for the sole purpose of assisting the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code and should not be used for any other purpose. Nothing contained in this Liquidation Analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical chapter 7 liquidation analysis for purposes of meeting the requirements of section 1129(a)(7) of the Bankruptcy Code.

The material assumptions underlying this Liquidation Analysis are set forth herein. Various estimates and assumptions underlie this Liquidation Analysis that, while believed to be reasonable, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Independent accountants have not examined or reviewed this Liquidation Analysis. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF ANY DEBTOR WAS, IN FACT, TO LIQUIDATE UNDER CHAPTER 7.

The Liquidation Analysis contains an estimate of the value of Claims that ultimately will become Allowed Claims. The Debtors have not completed a final evaluation of, nor has the Bankruptcy Court determined, the amount of each such Claim. Accordingly, the final amount of Allowed Claims may differ from the Claim amounts presented in this Liquidation Analysis.

Upon information and belief, the Debtors do not believe that any variance between the estimates contained herein and the final Allowed Claims and proceeds realized would have a material effect on the liquidation analysis that would cause the Combined Disclosure Statement and Plan not to satisfy section 1129(a)(7) of the Bankruptcy Code.

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Combined Disclosure Statement and Plan.

**Material Assumptions**

**A.      Assumptions Concerning Operations and Treatment of Investment Products**

*Chapter 11 Scenario*:    Under this scenario, it is assumed the Debtors implement the Combined Disclosure Statement and Plan, including the run-off of the loan portfolio under the supervision of the Asset Manager.

*Chapter 7 Scenario A*:    Under this scenario, it is assumed that a determination is made, either by the Chapter 7 Trustee or the Bankruptcy Court, that the RWNs and MPDNs are participation interests and that no Debtor has any beneficial interest in the proceeds to be realized from the Underlying Loans and Warehouse Loans.    As a result, the Chapter 7 Trustee abandons any Underlying Loans that have not been liquidated shortly after the determination date, and does not retain any party to service the Underlying Loan portfolio.    The Trustee then distributes the proceeds of the Underlying Loans and the Warehouse Loans by investment product, as opposed to on a *pro rata* basis among all RWN and MPDN Holders.

*Chapter 7 Scenario B*:    Under this scenario, it is assumed that a determination is made, either by the Chapter 7 Trustee or the Bankruptcy Court, that the RWNs and MPDNs represent claims against the Debtors, and not participation interests.    As a result, the Chapter 7 Trustee pursues a sale of the Underlying Loans over a 90 day period, and retains the Debtors' employees that are necessary to service the loans in that period.    The Trustee then distributes the proceeds of the Underlying Loans and the Warehouse Loans on a *pro rata* basis among all RWN and MPDN Holders, rather than by investment product, consistent with the treatment of such investments as general unsecured claims.

*Treatment of Loan Transactions among Debtors*:    In all scenarios, this Liquidation Analysis assumes that the various participations, sales, and pledges between and among the Debtors will be respected and not subject to avoidance or re-characterization.

*Collection of fees, costs and expenses from proceeds of Mortgage Interests*:    The Debtors believe that the fees, costs and expenses incurred with respect to, or attributable to, individual mortgage loans may be recovered from the proceeds realized from those mortgage loans.    This includes both OpEx and Restructuring Costs, as defined in the Plan.    The Liquidation Analysis assumes that the Chapter 7 trustee will similarly seek to recoup the costs incurred during the administration of the chapter 11 case and the chapter 7 cases directly from the proceeds of the mortgage loans, to the extent attributable thereto.    The Debtors have assumed that a chapter 7 trustee will adopt the same allocation methodology for OpEx and Restructuring Costs (i.e., allocation on a UPB-basis) as set forth in the Plan.    In a chapter 7, as well, the recoupment of these costs would become property of the estate of PSFI and not necessarily directed to the repayment of post-petition intercompany advances that were used to pay OpEx and Restructuring Costs in the first instance.

**B.      Assumptions Concerning Assets**

*Prepetition Agent Collateral*:    The Prepetition Agent asserts, and the Debtors have stipulated, that it holds a lien on substantially all of the assets of PSI and PSFI.    No challenge to

the Debtors' stipulations was timely made.[2]  As a result, this Liquidation Analysis assumes in all scenarios that the cash of PSI and PSFI in the DACA Accounts (which represents substantially all of PSI's and PSFI's cash), all Servicing Advances, other servicing-related fees and other receivables owed to PSFI (other than post-petition Intercompany Claims), and PSI's intellectual property and proceeds thereof, will be used to satisfy the Allowed Prepetition Loan Claims, until such claims are paid in full; *provided*, *however*, that the Liquidation Analysis also provides that such cash shall also be used to pay the "Carve-Out" as defined in and to the extent provided for under the Cash Collateral Order.  To the extent that the Prepetition Loan Claim is projected to be paid in full from the proceeds of the Prepetition Agent's collateral, the Liquidation Analysis assumes that the collateral owned by PSI and PSFI will be used ratably to satisfy the Prepetition Loan Claims.

*Other Assets*:  As set forth in the Combined Disclosure Statement and Plan, the Prepetition Agent does not have a lien on the Underlying Loans or the proceeds thereof, other than amounts payable from those proceeds to PSFI in its capacity as servicer; in all scenarios, the Liquidation Analysis does not assume that such proceeds would be used to satisfy the Prepetition Loan Claims. Further, in all scenarios, the Liquidation Analysis assumes that amounts that PSFI recovers from Underlying Loans in respect of OpEx, Restructuring Costs, the costs of implementing the Combined Disclosure Statement and Plan, and any expenses incurred in a Chapter 7 cases are not encumbered by the Prepetition Agent's lien and, thus, available to satisfy administrative and priority claims and then general unsecured claims (including any unsecured portion of the Prepetition Loan Claims).

*Liquidated Loans*:  In all scenarios, the Debtors believe that Underlying Loans that are liquidated as of the Effective Date ("**Liquidated Loans**") will recover, on average, at par.  While certain Liquidated Loans may recover more or less than par, recoveries above or below par are anticipated to be consistent and have the same effect across the scenarios.  The Liquidation Analysis assumes, in all scenarios, that amounts collected on Liquidated Loans are distributed to the Debtor who owns the Liquidated Loans or participation interest in the Liquidated Loans, net of amounts allocated or otherwise withheld from the Loan by PSFI as Servicer, the Asset Manager, the Plan Administrator or the Chapter 7 Trustee, as described herein or in the Waterfall.

*Unliquidated Loans*:  In the Chapter 11 Scenario, the Debtors have assumed that Underlying Loans that are not liquidated as of the Effective Date ("**Unliquidated Loans**") will recover, on average, between 85% to 90% of the par amount of the loan, after the repayment of servicing advances.  In the Chapter 7 Scenario B, the Debtors believe that Unliquidated Loans will recover, on average, 50% of the par amount of the loan, after repayment of servicing advances. While certain Unliquidated Loans may recover more or less than these amounts, these directional changes in recoveries are anticipated to be consistent across scenarios and to have a similar directional impact to recoveries achieved across scenarios.  The Liquidation Analysis assumes, in these three scenarios, that amounts collected on Unliquidated Loans are distributed to the Debtor who owns the Unliquidated Loans or participation interest in the Unliquidated Loans, net of

---

[2]    As set forth in the Combined Disclosure Statement and Plan, the Prepetition Agent has acknowledged that its security interests in bank accounts is limited to the DACA Accounts.

amounts allocated or otherwise withheld from the Loan by PSFI as Servicer, the Asset Manager, the Plan Administrator or the Chapter 7 Trustee, as described herein or in the Waterfall.

In Chapter 7 Scenario A, the Debtors show no recovery for Unliquidated Loans since the loans will be abandoned.  It is possible that creditors realize value from the Unliquidated Loans following abandonment, but the Debtors believe such amounts would not be greater than forecasted in Chapter 7 Scenario B.

*Allocation of "Servicer Level" Expenses*:  In all scenarios, it is anticipated that expenses allocated to the operations of PSFI and the activities undertaken with respect to the Underlying Loans during the Chapter 11 case, as well as amounts incurred by the Chapter 7 Trustee at PSFI attributable to the maintenance and liquidation of the Underlying Loans, will be deducted from proceeds realized on the Underlying Loans prior to PSFI remitting the proceeds to the Debtor's estate that is the participant or owner of the Underlying Loan.  The Debtors have used the same allocation methodology adopted in the Combined Disclosure Statement and Plan for all scenarios.  In all scenarios, the amounts recovered by PSFI from the Underlying Loans are treated as unencumbered assets that are available to satisfy post-petition claims, subject to the provisions of section 507(a)(1)(C) of the Bankruptcy Code, followed by priority claims and then unsecured claims.

In Chapter 7 Scenario A, in light of the abandonment of the Unliquidated Loans, the Liquidation Analysis assumes PSFI does not recover the foregoing  amounts that are allocated to Unliquidated Loans.

*Servicing Advances and Fees*:  In the Chapter 11 Scenario, servicing advances and other fees and amounts owed to PSFI as servicer (and the Asset Manager) are anticipated to be paid substantially in full.  In the Chapter 7 Scenario B, given the manner in which the loans will be liquidated, the Debtors anticipate that only 90% of these amounts will be collected.

In the Chapter 7 Scenario A, the Debtors do not anticipate that any of these amounts will be collected, as they all relate to Unliquidated Loans that will be abandoned.  It is possible that the Prepetition Agent may subsequently realize value from the servicing advances and other fees and amounts owed to PSFI that are its collateral post-abandonment, but the Debtors do not anticipate that it would be in excess of the value that would be realized in the orderly run-off implemented under the Combined Disclosure Statement and Plan or the liquidation sale of the loans in Chapter 7 Scenario B.

**C.     *Assumptions Concerning Claims***

*Allowed Prepetition Loan Claims*:  In all scenarios, the Allowed amount of the Prepetition Loan Claim is in the principal amount of $27,356,034.45, and will also accrue interest at the default rate up to the value of the Prepetition Agent's interest in its collateral, consistent with Section 506(b) of the Bankruptcy Code.

*Professional Fee Claims*:  In all scenarios, Professional Fee Claims will be paid, first, from the "Professional Fee Reserve" as provided for and defined in the Cash Collateral Order, and second, to the extent any amounts remain unpaid, on a *pari passu* basis with other administrative expense claims as provided for in Sections 503 and 507 of the Bankruptcy Code.  The Liquidation

Analysis assumes that all Allowed Professional Fee Claims can be satisfied in full from the Professional Fee Reserve.

*Trustee and Chapter 7 Fees and Expenses*:  In all Chapter 7 Scenarios, all fees owed to the trustee and fees, costs and expenses of administering the Debtors' cases following conversion to chapter 7 will be paid prior to fees, costs and expenses of administering the Debtors' chapter 11 cases, except as described herein with respect to Professional Fee Claims and the Professional Fee Reserve.

*Post-Petition Intercompany Claims*:  In all scenarios, Intercompany Claims arising from advances made on a post-petition basis shall be paid on a *pari passu* basis with other administrative expense claims as provided for in Sections 503 and 507 of the Bankruptcy Code, except as described herein with respect to Professional Fee Claims and the Professional Fee Reserve.

*RWN Claims (i.e., Classes 8 and 9)*:  In the Chapter 11 Scenario and Chapter 7 Scenario A, holders of RWNs receive the proceeds that would be paid to PSFLLC in respect of the applicable Warehouse Loan.  In the Chapter 7 Scenario B, holders of RWNs receive a *pro rata* distribution of cash at PSFLLC realized from the Warehouse Loans and all Underlying Loans.

*MPDN Claims related to Liquidated Loans (i.e., Class 10 and 10-1)*:  In the Chapter 11 Scenario and Chapter 7 Scenario A, Holders of MPDNs related to Liquidated Loans receive the proceeds of Liquidated Loans available under the Waterfall (or similar mechanism for deducting allocated expenses).  In the Chapter 7 Scenario B, Holders of MPDNs related to Liquidated Loans receive a *pro rata* distribution of cash at PSFLLC realized from the Warehouse Loans and all Underlying Loans.  The Liquidation Analysis does not reflect any holder making the Convenience Holder Redemption Election provided for in Section 4.5 of the Plan; such an election may reduce the amount that would ultimately be realized on account of a Class 10-1 Claim.

*MPDN Claims related to Unliquidated Loans (i.e., Class 11 and 11-1)*:  In the Chapter 11 Scenario, Holders of MPDNs related to Unliquidated Loans receive the proceeds available under the Waterfall (or similar mechanism for deducting allocated expenses).  In the Chapter 7 Scenario B, Holders of MPDNs related to Unliquidated Loans receive a *pro rata* distribution of cash at PSFLLC realized from the Warehouse Loans and all Underlying Loans.  The Liquidation Analysis does not reflect any holder making the Convenience Holder Redemption Election provided for in Section 4.5 of the Plan; such an election may reduce the amount that would ultimately be realized on account of a Class 11-1 Claim.

In the Chapter 7 Scenario A, Holders of MPDNs associated with Unliquidated Loans are not expected to receive a recovery as a result of the abandonment of the Unliquidated Loans.  It is possible these Holders may subsequently realize value from Unliquidated Loans post-abandonment, but the Debtors do not anticipate that it would be in excess of the value that would be realized in the orderly run-off under the Combined Disclosure Statement and Plan or the liquidation sale of the loans in Chapter 7 Scenario B.

*FBO Account Claims (i.e., Class 12)*:  In all scenarios, Holders of FBO Account Claims receive a payment equal to 95%+ of the amount of their FBO Account balance, based on the funds

on deposit in the FBO Account.  It is not anticipated that additional funds are available beyond the 95% recovery.

*PDN Claims (i.e., Class 13)*.    In all scenarios, Holders of PDNs receive a *pro rata* distribution of the Distributable Cash available at PS Portfolio.

*OppFund Interests (i.e., Class 14)*.    In all scenarios, Holders of OppFund Interest receive their *pro rata* share of Distributable Cash at OppFund plus the proceeds of the Underlying Loans pledged to secure the OppFund Loan.

**PeerStreet Inc., et al.**
Liquidation Analysis
*$MMs*

| | | Peer Street, Inc. | | | | |
|---|---|---|---|---|---|---|
| | **Ch. 7 Scenario A** | | **Ch. 7 Scenario B** | | **Ch. 11** | |
| | **$** | **%** | **$** | **%** | **$** | **%** |
| **Prepetition Secured Lender Collateral** | | | | | | |
| **Encumbered Assets** | | | | | | |
| Cash | $ 6.5 | n/a | $ 6.5 | n/a | $ 6.5 | n/a |
| Estimated Technology & Other Asset Sale Proceeds | 2.0 | n/a | 2.0 | n/a | 2.0 | n/a |
| **Total Encumbered Assets** | $ 8.5 | n/a | $ 8.5 | n/a | $ 8.5 | n/a |
| | *Claim Amount* | | | *Estimated Recovery* | | |
| **Class 3: Prepetition Loan Claims** | $ 29.7 | $ 8.5 | 29% | $ 8.4 | 28% | $ 8.0 | 27% |
| **Unencumbered Assets** | | | | | | |
| **Unencumbered Assets** | | | | | | |
| Mortgage Loan Collateral | $ 1.4 | n/a | $ 1.3 | n/a | $ 1.9 | n/a |
| Excess Proceeds from Prepetition Secured Lender Collateral | - | n/a | 0.1 | n/a | 0.5 | n/a |
| **Gross Liquidation Proceeds** | $ 1.4 | n/a | $ 1.4 | n/a | $ 2.4 | n/a |
| **Administrative & Priority Tax Claims** | *Claim Amount* | | | *Estimated Recovery* | | |
| Chapter 7 Trustee & Professional Fees | n/a | 0.6 | 100% | 0.6 | 100% | - | n/a |
| Chapter 11 Professional Fees Outstanding | n/a | 0.1 | 100% | 0.1 | 100% | 0.1 | 100% |
| Chapter 11 Plan Administrative Costs | n/a | - | n/a | - | n/a | 0.3 | 100% |
| Estimated Administrative Claims | - | - | n/a | - | n/a | - | n/a |
| Estimated Priority Tax Claims | - | - | n/a | - | n/a | - | n/a |
| **Total Administrative & Priority Tax Claims** | n/a | $ 0.7 | 100% | $ 0.7 | 100% | $ 0.4 | 100% |
| Net Proceeds Available | n/a | 0.7 | | 0.7 | | 2.0 | |
| **Class 1: Priority Non-Tax Claims** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |
| Net Proceeds Available | n/a | 0.7 | | 0.7 | | 2.0 | |
| **Class 2: Other Secured Claims** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |
| Net Proceeds Available | n/a | 0.7 | | 0.7 | | 2.0 | |
| **Class 4: General Unsecured Claims** | $ 7.7 | $ 0.1 | 1% | $ 0.1 | 1% | $ 2.0 | 26% |
| Net Proceeds Available | n/a | 0.6 | | 0.6 | | - | |
| **Class 5: Intercompany Claims and Interests** | $ 57.0 | $ 0.6 | 1% | $ 0.6 | 1% | $ - | n/a |
| Net Proceeds Available | n/a | - | | - | | - | |
| **Class 6: Securities Law Claims** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |
| Net Proceeds Available | n/a | - | | - | | - | |
| **Class 7: Parent Interests** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |

**PeerStreet Inc., et al.**
Liquidation Analysis
*$MMs*

| | | PS Funding, Inc. | | | | | |
| | | Ch. 7 Scenario A | | Ch. 7 Scenario B | | Ch. 11 | |
| | | $ | % | $ | % | $ | % |
|---|---|---|---|---|---|---|---|
| **Prepetition Secured Lender Collateral** | | | | | | | |
| **Encumbered Assets** | | | | | | | |
| Cash | | $ 8.1 | n/a | $ 8.1 | n/a | $ 8.1 | n/a |
| Servicing Advances & Fees Receivable | | - | n/a | 13.4 | n/a | 14.9 | n/a |
| **Total Encumbered Assets** | | $ 8.1 | n/a | $ 21.5 | n/a | $ 23.0 | n/a |
| | Claim Amount | | | Estimated Recovery | | | |
| **Class 3: Prepetition Loan Claims** | $ 29.7 | $ 8.1 | 27% | $ 21.3 | 72% | $ 21.7 | 73% |
| | | | | | | | |
| **Unencumbered Assets and Claims** | | | | | | | |
| **Unencumbered Assets** | | | | | | | |
| Total Excess Proceeds from Prepetition Secured Lender Collateral | | $ - | n/a | $ 0.3 | n/a | $ 1.4 | n/a |
| Other Unencumbered Value | | 0.6 | n/a | 0.6 | n/a | - | n/a |
| **Total Value Available for Unsecured Creditors** | | $ 0.6 | n/a | $ 0.9 | n/a | $ 1.4 | n/a |
| **Administrative & Priority Tax Claims** | Claim Amount | | | Estimated Recovery | | | |
| Chapter 7 Trustee & Professional Fees | n/a | 0.3 | 100% | 0.6 | 100% | - | n/a |
| Chapter 11 Professional Fees Outstanding | n/a | 0.3 | 100% | 0.3 | 100% | 0.3 | 100% |
| Chapter 11 Plan Administrative Costs | n/a | - | n/a | - | n/a | 0.2 | 100% |
| Estimated Administrative Claims | - | - | n/a | - | n/a | - | n/a |
| Estimated Priority Tax Claims | - | - | n/a | - | n/a | - | n/a |
| **Total Administrative & Priority Tax Claims** | n/a | $ 0.6 | 100% | $ 0.9 | 100% | $ 0.5 | 100% |
| Net Proceeds Available | n/a | - | n/a | - | n/a | 0.9 | n/a |
| **Class 1: Priority Non-Tax Claims** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |
| Net Proceeds Available | n/a | - | n/a | - | n/a | 0.9 | n/a |
| **Class 2: Other Secured Claims** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |
| Net Proceeds Available | n/a | - | n/a | - | n/a | 0.9 | n/a |
| **Class 4: General Unsecured Claims** | $ 5.2 | $ - | 0% | $ - | 0% | 0.9 | 16% |
| Net Proceeds Available | n/a | - | n/a | - | n/a | - | n/a |
| **Class 5: Intercompany Claims and Interests** | $ 3.9 | $ - | 0% | $ - | 0% | $ - | n/a |
| Net Proceeds Available | n/a | - | n/a | - | n/a | - | n/a |
| **Class 6: Securities Law Claims** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |
| Net Proceeds Available | n/a | - | n/a | - | n/a | - | n/a |
| **Class 7: Parent Interests** | $ - | $ - | n/a | $ - | n/a | $ - | n/a |
| | | | | | | | |
| **Memo: Mortgage Loan Assets** | | | | | | | |
| **Mortgage Loan Assets** | | | | | | | |
| Liquidated Mortgage Loans | | $ 86.8 | n/a | $ 86.8 | n/a | $ 86.8 | n/a |
| Unliquidated Mortgage Loans | | 1.0 | n/a | 64.3 | n/a | 114.8 | n/a |
| **Gross Mortgage Loan Proceeds** | | $ 87.8 | n/a | $ 151.1 | n/a | $ 201.6 | n/a |
| **Administrative & Priority Tax Claims** | Claim Amount | | | Estimated Recovery | | | |
| Chapter 7 Trustee & Professional Fees | n/a | 0.6 | 100% | 2.1 | 100% | - | n/a |
| Chapter 11 Professional Fees Outstanding | 2.3 | 2.3 | 100% | 2.3 | 100% | 2.3 | 100% |
| Post-Effective Wind-Down Administrative Costs | n/a | - | n/a | - | n/a | 1.0 | 100% |
| Post-Effective Wind-Down Servicing Costs | n/a | - | n/a | 0.8 | 100% | 4.1 | 100% |
| Post-Effective Wind-Down Professional Fees | n/a | - | n/a | - | n/a | 1.4 | 100% |
| Estimated Administrative Claims | - | - | n/a | - | n/a | - | n/a |
| Estimated Priority Tax Claims | - | - | n/a | - | n/a | - | n/a |
| Post-Petition Intercompany Claims for Cost Allocation | 18.2 | 7.5 | 41% | 18.2 | 100% | 18.2 | 100% |
| Mortgage Loan Proceeds to Peer Street Funding LLC | - | 70.7 | n/a | 117.6 | n/a | 162.1 | n/a |
| Mortgage Loan Proceeds to PS Warehouse, LLC | - | 0.0 | n/a | 0.1 | n/a | 0.3 | n/a |
| Mortgage Loan Proceeds to Peer Street Opportunity Investors II, LP | - | 5.2 | n/a | 8.6 | n/a | 10.2 | n/a |
| Mortgage Loan Proceeds to PS Portfolio-ST1, LLC | - | 0.1 | n/a | 0.1 | n/a | 0.1 | n/a |
| Mortgage Loan Proceeds to Peer Street, Inc. | - | 1.4 | n/a | 1.3 | n/a | 1.9 | n/a |
| **Total Administrative & Priority Tax Claims** | n/a | $ 87.8 | n/a | $ 151.1 | n/a | $ 201.6 | n/a |
| **Net Proceeds Available** | | $ - | n/a | $ - | n/a | $ - | n/a |

**PeerStreet Inc., et al.**
Liquidation Analysis
*$MMs*

| | | Peer Street Funding LLC | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Ch. 7 Scenario A | | Ch. 7 Scenario B | | Ch. 11 | |
| | | $ | % | $ | % | $ | % |
| **Class 8: Pocket 1-Month** | | | | | | | |
| *Pocket 1-Month Assets* | | | | | | | |
| Cash and Net Mortgage Loan Proceeds from WH1 | | $ 22.5 | n/a | $ 25.3 | n/a | $ 34.3 | n/a |
| *Administrative & Priority Tax Claims* | *Claim Amount* | | | *Estimated Recovery* | | | |
| Chapter 7 Trustee & Professional Fees | n/a | 0.7 | 100% | 0.8 | 100% | - | |
| **Net Value Available for Class 8 Claims** | n/a | $ 21.7 | n/a | $ 24.5 | n/a | $ 34.3 | n/a |
| **Class 8: Pocket 1 Month Claims** | $ 40.2 | $ 21.7 | 54% | $ 24.5 | 61% | $ 34.3 | 85% |
| | | | | | | | |
| **Class 9: Pocket 3-Month** | | | | | | | |
| *Pocket 3-Month Assets* | | | | | | | |
| Cash and Net Mortgage Loan Proceeds from WH2 | | $ 1.2 | n/a | $ 0.8 | n/a | $ 1.2 | n/a |
| *Administrative & Priority Tax Claims* | *Claim Amount* | | | *Estimated Recovery* | | | |
| Chapter 7 Trustee & Professional Fees | | 0.0 | 100% | 0.0 | 100% | - | n/a |
| **Net Value Available for Class 9 Claims** | n/a | $ 1.1 | n/a | $ 0.8 | n/a | $ 1.2 | n/a |
| **Class 9: Pocket 3 Month Claims** | $ 1.3 | $ 1.1 | 83% | $ 0.8 | 61% | $ 1.2 | 91% |
| | | | | | | | |
| **Classes 10 and 10-1: MPDNs** | | | | | | | |
| *Class 10: Liquidated MPDN Mortgage Loan Assets* | | | | | | | |
| Net Mortgage Loan Proceeds from PSFI | | $ 69.4 | n/a | 53.1 | n/a | $ 74.5 | n/a |
| *Administrative & Priority Tax Claims* | *Claim Amount* | | | *Estimated Recovery* | | | |
| Chapter 7 Trustee & Professional Fees | n/a | 2.2 | 100% | 1.7 | 100% | - | n/a |
| **Net Value Available for Class 10 and Class 10-1 Claims** | | $ 67.1 | n/a | $ 51.4 | n/a | $ 74.5 | n/a |
| **Class 10: Liquidated MPDN Claims** | $ 82.1 | $ 65.5 | 80% | $ 50.1 | 61% | $ 72.7 | 89% |
| **Class 10-1: Convenience Liquidated MPDN Claims** | $ 2.0 | $ 1.6 | 80% | $ 1.2 | 61% | $ 1.8 | 89% |
| | | | | | | | |
| **Classes 11 and 11-1: MPDNs** | | | | | | | |
| *Class 11: Unliquidated MPDN Mortgage Loan Assets* | | | | | | | |
| Net Mortgage Loan Proceeds from PSFI | | $ 1.4 | n/a | 73.6 | n/a | $ 87.6 | n/a |
| *Administrative & Priority Tax Claims* | *Claim Amount* | | | *Estimated Recovery* | | | |
| Chapter 7 Trustee & Professional Fees | n/a | 0.0 | 100% | 2.3 | 100% | - | n/a |
| **Net Value Available for Class 11 and Class 11-1 Claims** | n/a | $ 1.3 | n/a | $ 71.3 | n/a | $ 87.6 | n/a |
| **Class 11: Unliquidated MPDN Claims** | $ 112.8 | $ 1.3 | 1% | $ 68.9 | 61% | $ 84.6 | 75% |
| **Class 11-1: Convenience Unliquidated MPDN Claims** | $ 4.0 | $ 0.0 | 1% | $ 2.5 | 61% | $ 3.0 | 75% |
| | | | | | | | |
| **Class 12: FBO Account Claims** | | | | | | | |
| | *Claim Amount* | | | *Estimated Recovery* | | | |
| **Class 12: FBO Account Claims** | $ 31.3 | $ 29.7 | 95% | $ 29.7 | 95% | $ 29.7 | 95% |

**PeerStreet Inc., et al.**
Liquidation Analysis
*$MMs*

| | | PS Portfolio-ST1, LLC | | | | |
|---|---|---|---|---|---|---|
| | | Ch. 7 Scenario A | | Ch. 7 Scenario B | | Ch. 11 |
| | | $ | % | $ | % | $ | % |
| **Class 13: PDNs** | | | | | | | |
| *PDN Holder Assets* | | | | | | | |
| Cash | | $ 2.0 | n/a | $ 2.0 | n/a | $ 2.0 | n/a |
| Net Mortgage Loan Value from PSFI | | 0.1 | n/a | 0.1 | n/a | 0.1 | n/a |
| **Gross Liquidation Proceeds** | | $ 2.1 | n/a | $ 2.1 | n/a | $ 2.1 | n/a |
| *Administrative & Priority Tax Claims* | *Claim Amount* | | | *Estimated Recovery* | | | |
| Chapter 7 Trustee & Professional Fees | n/a | 0.1 | 100% | 0.1 | 100% | - | n/a |
| Chapter 11 Professional Fees | 0.1 | 0.1 | 100% | 0.1 | 100% | 0.1 | 100% |
| Estimated Administrative Claims | - | - | n/a | - | n/a | - | n/a |
| Estimated Priority Tax Claims | - | - | n/a | - | n/a | - | n/a |
| Post-Petition Intercompany Claims for Cost Allocation | 0.1 | 0.1 | 100% | 0.1 | 100% | 0.1 | 100% |
| **Total Administrative & Priority Tax Claims** | n/a | $ 0.3 | 100% | $ 0.3 | 100% | $ 0.2 | 100% |
| **Net Proceeds Available** | | $ 1.8 | n/a | $ 1.8 | n/a | $ 1.9 | n/a |
| **Class 13: PDN Claims** | $ 2.1 | $ 1.8 | 87% | $ 1.8 | 87% | $ 1.9 | 90% |

**PeerStreet Inc., et al.**
Liquidation Analysis
*$MMs*

| | | Peer Street Opportunity Investors II, LP | | | | | |
|---|---|---|---|---|---|---|---|
| | | **Ch. 7 Scenario A** | | **Ch. 7 Scenario B** | | **Ch. 11** | |
| | | **$** | **%** | **$** | **%** | **$** | **%** |
| **Class 14: Opp Fund LP** | | | | | | | |
| *Opp Fund LP Assets* | | | | | | | |
| Cash | | $ 10.7 | n/a | $ 10.7 | n/a | $ 10.7 | n/a |
| Net Mortgage Loan Value from PSFI | | 5.2 | n/a | 8.6 | n/a | 10.2 | n/a |
| **Gross Liquidation Proceeds** | | **$ 15.9** | **n/a** | **$ 19.3** | **n/a** | **$ 21.0** | **n/a** |
| *Administrative & Priority Tax Claims* | *Claim Amount* | | | *Estimated Recovery* | | | |
| Chapter 7 Trustee & Professional Fees | n/a | 0.6 | 100% | 0.7 | 100% | - | n/a |
| Chapter 11 Professional Fees | 0.1 | 0.1 | 100% | 0.1 | 100% | 0.1 | 100% |
| Estimated Administrative Claims | - | - | n/a | - | n/a | - | n/a |
| Estimated Priority Tax Claims | - | - | n/a | - | n/a | - | n/a |
| Post-Petition Intercompany Claims for Cost Allocation | 0.6 | 0.6 | 100% | 0.6 | 100% | 0.6 | 100% |
| **Total Administrative & Priority Tax Claims** | **n/a** | **$ 1.3** | **100%** | **$ 1.4** | **100%** | **$ 0.7** | **100%** |
| **Net Proceeds Available** | | **$ 14.6** | **n/a** | **$ 17.9** | **n/a** | **$ 20.2** | **n/a** |
| **Class 14: Opp Fund LP Interests** | **$ 24.3** | **$ 14.6** | **60%** | **$ 17.9** | **74%** | **$ 20.2** | **83%** |

**EXHIBIT B**

**Peer Street Spread Calculations**

**Deferred PeerStreet Spread Forecast**

*Deferred Fees as of:*        5/1/2024

| ID | Current Status | Paid to Date | Days Outstanding | UPB / Current Investment ($) | PS Spread | Deferred PS Spread Forecast ($) |
|---|---|---|---|---|---|---|
| 9543 | Active | 2/1/2024 | Current | 384,988 | 0.5% | - |
| 5135 | Active | 2/1/2024 | Current | 210,000 | 2.3% | - |
| 3651 | Active | 2/1/2024 | Current | 188,016 | 2.3% | - |
| 5641 | Active | 2/1/2024 | Current | 498,750 | 0.8% | - |
| 5935 | Active | 2/1/2024 | Current | 161,000 | 2.0% | - |
| 3659 | Active | 2/1/2024 | Current | 494,000 | 0.5% | - |
| 4346 | Active | 2/1/2024 | Current | 241,800 | 0.8% | - |
| 7346 | Active | 2/1/2024 | Current | 160,274 | 1.1% | - |
| 9354 | Active | 2/1/2024 | Current | 154,500 | 0.4% | - |
| 9264 | Active | 2/1/2024 | Current | 308,000 | 0.1% | - |
| 9426 | Active | 2/1/2024 | Current | 91,362 | 0.1% | - |
| 3454 | Active | 2/1/2024 | Current | 144,000 | 0.1% | - |
| 3650 | Active | 2/1/2024 | Current | 308,750 | 0.1% | - |
| 5133 | Active | 2/1/2024 | Current | 180,000 | 2.0% | - |
| 5033 | Active | 2/1/2024 | Current | 692,011 | 0.6% | - |
| 5489 | Active | 3/1/2024 | Current | 174,790 | 0.5% | - |
| 5232 | Active | 3/1/2024 | Current | 881,250 | - | - |
| 5531 | Non/SubPerf | 1/1/2024 | 120 | 533,000 | 2.8% | 4,886 |
| 2549 | Non/SubPerf | 3/1/2018 | 2,220 | 942,000 | 1.0% | 58,090 |
| 1883 | Non/SubPerf | 2/1/2019 | 1,890 | 396,500 | 1.0% | 20,816 |
| 5452 | Non/SubPerf | 2/1/2019 | 1,890 | 100,100 | 1.0% | 5,255 |
| 4835 | Non/SubPerf | 3/1/2019 | 1,860 | 211,250 | 1.0% | 10,915 |
| 9438 | Non/SubPerf | 4/1/2019 | 1,830 | 1,912,500 | 1.0% | 97,219 |
| 6413 | Non/SubPerf | 4/1/2019 | 1,830 | 1,430,000 | 1.0% | 72,692 |
| 6425 | Non/SubPerf | 6/1/2019 | 1,770 | 1,505,000 | 1.0% | 73,996 |
| 4436 | Non/SubPerf | 7/1/2019 | 1,740 | 975,000 | 1.0% | 47,125 |
| 4466 | Non/SubPerf | 7/1/2019 | 1,740 | 724,400 | 1.0% | 35,013 |
| 5532 | Non/SubPerf | 8/1/2019 | 1,710 | 227,500 | 1.0% | 10,806 |
| 7438 | Non/SubPerf | 8/1/2019 | 1,710 | 2,122,500 | 0.8% | 75,614 |
| 2524 | Non/SubPerf | 8/1/2019 | 1,710 | 1,657,500 | 1.0% | 78,731 |
| 9435 | Non/SubPerf | 9/1/2019 | 1,680 | 734,000 | 0.8% | 25,690 |
| 6943 | Non/SubPerf | 9/1/2019 | 1,680 | 396,500 | 1.0% | 18,503 |
| 7325 | Non/SubPerf | 11/1/2019 | 1,620 | 122,971 | 1% | 5,534 |
| 3486 | Non/SubPerf | 11/1/2019 | 1,620 | 404,100 | 0.8% | 13,638 |
| 4521 | Non/SubPerf | 2/1/2020 | 1,530 | 574,503 | 1.0% | 24,416 |
| 2054 | Non/SubPerf | 2/1/2020 | 1,530 | 537,500 | 1.0% | 22,844 |
| 2501 | Non/SubPerf | 2/1/2020 | 1,530 | 368,225 | 1.0% | 15,650 |
| 5375 | Non/SubPerf | 2/1/2020 | 1,530 | 1,995,000 | 1.0% | 84,788 |
| 5913 | Non/SubPerf | 2/1/2020 | 1,530 | 1,500,000 | 1.0% | 63,750 |
| 0713 | Non/SubPerf | 2/1/2020 | 1,530 | 1,200,000 | 1.0% | 51,000 |
| 4161 | Non/SubPerf | 2/1/2020 | 1,530 | 503,750 | 1.0% | 21,195 |
| 4663 | Non/SubPerf | 4/1/2020 | 1,470 | 400,000 | 1.0% | 16,333 |
| 1463 | Non/SubPerf | 4/1/2020 | 1,470 | 381,500 | 1.0% | 15,578 |
| 7426 | Non/SubPerf | 5/1/2020 | 1,440 | 1,942,500 | 1.0% | 77,700 |
| 7054 | Non/SubPerf | 5/1/2020 | 1,440 | 1,120,000 | 0.8% | 33,600 |
| 7436 | Non/SubPerf | 6/1/2020 | 1,410 | 2,700,000 | 1.0% | 105,750 |
| 4161 | Non/SubPerf | 6/1/2020 | 1,410 | 195,000 | 1.3% | 9,547 |
| 5033 | Non/SubPerf | 6/1/2020 | 1,410 | 1,200,000 | 1.0% | 47,000 |
| 4666 | Non/SubPerf | 8/1/2020 | 1,350 | 543,750 | 1.0% | 20,391 |
| 6635 | Non/SubPerf | 8/1/2020 | 1,350 | 652,500 | 0.9% | 21,410 |
| 3437 | Non/SubPerf | 9/1/2020 | 1,320 | 3,601,668 | 1.0% | 132,061 |
| 3135 | Non/SubPerf | 10/1/2020 | 1,290 | 2,850,000 | 1.0% | 102,125 |
| 4662 | Non/SubPerf | 10/1/2020 | 1,290 | 1,267,500 | 1.0% | 45,419 |
| 4113 | Non/SubPerf | 10/1/2020 | 1,290 | 499,000 | 1.0% | 17,881 |
| 7913 | Non/SubPerf | 10/1/2020 | 1,290 | 116,682 | - | - |
| 7249 | Non/SubPerf | 10/1/2020 | 1,290 | 195,000 | - | - |
| 7346 | Non/SubPerf | 11/1/2020 | 1,260 | 1,800,000 | 1.0% | 63,000 |
| 3541 | Non/SubPerf | 11/1/2020 | 1,260 | 70,534 | 1.0% | 2,469 |
| 5326 | Non/SubPerf | 12/1/2020 | 1,230 | 100,000 | 1.0% | 3,417 |
| 2346 | Non/SubPerf | 1/1/2021 | 1,200 | 850,000 | 0.8% | 21,250 |
| 3651 | Non/SubPerf | 2/1/2021 | 1,170 | 1,140,000 | 0.9% | 32,419 |
| 3513 | Non/SubPerf | 4/1/2021 | 1,110 | 75,229 | 1.0% | 2,320 |
| 4262 | Non/SubPerf | 5/1/2021 | 1,080 | 516,414 | 1.0% | 15,492 |
| 5376 | Non/SubPerf | 6/1/2021 | 1,050 | 372,750 | 1.0% | 10,872 |
| 5413 | Non/SubPerf | 8/1/2021 | 990 | 215,000 | 1.0% | 5,913 |

**Deferred PeerStreet Spread Forecast**
*Deferred Fees as of:*        5/1/2024

| ID | Current Status | Paid to Date | Days Outstanding | UPB / Current Investment ($) | PS Spread | Deferred PS Spread Forecast ($) |
|---|---|---|---|---|---|---|
| 6054 | Non/SubPerf | 9/1/2021 | 960 | 94,500 | 1.0% | 2,520 |
| 4266 | Non/SubPerf | 11/1/2021 | 900 | 3,147,100 | 0.5% | 39,339 |
| 3954 | Non/SubPerf | 1/1/2022 | 840 | 270,000 | 1.0% | 6,300 |
| 6346 | Non/SubPerf | 4/1/2022 | 750 | 280,000 | 1.0% | 5,833 |
| 3549 | Non/SubPerf | 7/1/2022 | 660 | 552,000 | 1.0% | 10,120 |
| 4436 | Non/SubPerf | 8/1/2022 | 630 | 637,482 | 0.5% | 5,578 |
| 5466 | Non/SubPerf | 9/1/2022 | 600 | 290,500 | 1.0% | 4,842 |
| 3657 | Non/SubPerf | 10/1/2022 | 570 | 86,562 | 1.3% | 1,713 |
| 9169 | Non/SubPerf | 10/1/2022 | 570 | 400,000 | 0.9% | 5,542 |
| 1953 | Non/SubPerf | 10/1/2022 | 570 | 900,000 | 0.6% | 8,906 |
| 5530 | Non/SubPerf | 11/1/2022 | 540 | 80,000 | 0.8% | 900 |
| 5449 | Non/SubPerf | 11/1/2022 | 540 | 99,000 | 0.9% | 1,299 |
| 4433 | Non/SubPerf | 12/1/2022 | 510 | 625,809 | 0.5% | 4,433 |
| 4346 | Non/SubPerf | 12/1/2022 | 510 | 513,000 | 0.9% | 6,359 |
| 7426 | Non/SubPerf | 12/1/2022 | 510 | 260,015 | 0.8% | 2,763 |
| 0898 | Non/SubPerf | 12/1/2022 | 510 | 435,000 | 0.8% | 4,622 |
| 5419 | Non/SubPerf | 12/1/2022 | 510 | 337,500 | 1.0% | 4,781 |
| 4346 | Non/SubPerf | 1/1/2023 | 480 | 150,000 | 1.3% | 2,500 |
| 2456 | Non/SubPerf | 1/1/2023 | 480 | 179,725 | 0.4% | 899 |
| 7313 | Non/SubPerf | 1/1/2023 | 480 | 588,000 | 0.1% | 980 |
| 5931 | Non/SubPerf | 1/1/2023 | 480 | 352,500 | 3.3% | 15,275 |
| 3479 | Non/SubPerf | 1/1/2023 | 480 | 394,500 | 2.3% | 11,835 |
| 3454 | Non/SubPerf | 1/1/2023 | 480 | 307,500 | 1.3% | 5,125 |
| 5313 | Non/SubPerf | 1/1/2023 | 480 | 10,638 | - | - |
| 1346 | Non/SubPerf | 2/1/2023 | 450 | 100,000 | 2.3% | 2,813 |
| 8346 | Non/SubPerf | 2/1/2023 | 450 | 107,250 | 2.3% | 3,016 |
| 3435 | Non/SubPerf | 2/1/2023 | 450 | 352,500 | 1.3% | 5,508 |
| 7435 | Non/SubPerf | 2/1/2023 | 450 | 438,750 | 1.8% | 9,598 |
| 6413 | Non/SubPerf | 2/1/2023 | 450 | 665,000 | 1.8% | 14,547 |
| 5441 | Non/SubPerf | 2/1/2023 | 450 | 213,750 | 1.3% | 3,340 |
| 4761 | Non/SubPerf | 3/1/2023 | 420 | 1,035,910 | 0.8% | 9,064 |
| 9434 | Non/SubPerf | 3/1/2023 | 420 | 92,000 | 2.3% | 2,415 |
| 1913 | Non/SubPerf | 3/1/2023 | 420 | 324,000 | 0.9% | 3,308 |
| 3413 | Non/SubPerf | 4/1/2023 | 390 | 123,550 | 2.0% | 2,677 |
| 4364 | Non/SubPerf | 5/1/2023 | 360 | 174,375 | 2.0% | 3,488 |
| 5493 | Non/SubPerf | 5/1/2023 | 360 | 235,735 | 2.3% | 5,304 |
| 5741 | Non/SubPerf | 5/1/2023 | 360 | 910,000 | 2.5% | 22,750 |
| 3659 | Non/SubPerf | 5/1/2023 | 360 | 352,500 | 3.3% | 11,456 |
| 7346 | Non/SubPerf | 6/1/2023 | 330 | 1,404,813 | - | - |
| 3913 | Non/SubPerf | 6/1/2023 | 330 | 304,067 | - | - |
| 1473 | Non/SubPerf | 6/1/2023 | 330 | 163,000 | 2.3% | 3,362 |
| 5431 | Non/SubPerf | 7/1/2023 | 300 | 170,000 | 2.3% | 3,188 |
| 5941 | Non/SubPerf | 7/1/2023 | 300 | 320,250 | - | - |
| 5841 | Non/SubPerf | 8/1/2023 | 270 | 105,000 | 1.5% | 1,181 |
| 4392 | Non/SubPerf | 8/1/2023 | 270 | 1,492,960 | 0.8% | 8,398 |
| 3499 | Non/SubPerf | 8/1/2023 | 270 | 161,000 | 1.0% | 1,208 |
| 9949 | Non/SubPerf | 8/1/2023 | 270 | 700,000 | 1.0% | 5,250 |
| 6346 | Non/SubPerf | 9/1/2023 | 240 | 156,505 | 2.0% | 2,087 |
| 5346 | Non/SubPerf | 9/1/2023 | 240 | 1,699,010 | 2.0% | 22,653 |
| 3413 | Non/SubPerf | 9/1/2023 | 240 | 261,250 | 2.3% | 3,919 |
| 5635 | Non/SubPerf | 9/1/2023 | 240 | 190,300 | 2.3% | 2,855 |
| 1813 | Non/SubPerf | 9/1/2023 | 240 | 720,000 | 1.1% | 5,400 |
| 5434 | Non/SubPerf | 9/1/2023 | 240 | 395,500 | 2.3% | 5,933 |
| 8346 | Non/SubPerf | 10/1/2023 | 210 | 575,000 | 2.3% | 7,547 |
| 3113 | Non/SubPerf | 10/1/2023 | 210 | 154,000 | 2.3% | 2,021 |
| 3954 | Non/SubPerf | 10/1/2023 | 210 | 424,500 | 2.3% | 5,572 |
| 2511 | Non/SubPerf | 10/1/2023 | 210 | 299,963 | 2.0% | 3,500 |
| 4446 | Non/SubPerf | 10/1/2023 | 210 | 873,250 | 2.3% | 11,461 |
| 9554 | Non/SubPerf | 10/1/2023 | 210 | 477,750 | 0.3% | 697 |
| 3054 | Non/SubPerf | 10/1/2023 | 210 | 1,500,000 | 0.3% | 2,188 |
| 3454 | Non/SubPerf | 11/1/2023 | 180 | 80,500 | 2.3% | 906 |
| 9644 | Non/SubPerf | 11/1/2023 | 180 | 1,080,000 | 0.8% | 4,050 |
| 5479 | Non/SubPerf | 12/1/2023 | 150 | 222,258 | 1.0% | 926 |
| 3541 | Non/SubPerf | 12/1/2023 | 150 | 297,750 | 2.0% | 2,481 |
| 4531 | Non/SubPerf | 12/1/2023 | 150 | 160,000 | 2.0% | 1,333 |

**Deferred PeerStreet Spread Forecast**
*Deferred Fees as of:*        5/1/2024

| ID | Current Status | Paid to Date | Days Outstanding | UPB / Current Investment ($) | PS Spread | Deferred PS Spread Forecast ($) |
|---|---|---|---|---|---|---|
| 0235 | Non/SubPerf | 12/1/2023 | 150 | 297,500 | 0.8% | 930 |
| 3454 | Non/SubPerf | 12/1/2023 | 150 | 330,000 | 1.3% | 1,719 |
| 4361 | Non/SubPerf | 12/1/2023 | 150 | 225,000 | 2.3% | 2,109 |
| 9843 | Non/SubPerf | 1/1/2024 | 120 | 175,000 | 0.6% | 365 |
| 3019 | Non/SubPerf | 1/1/2024 | 120 | 384,515 | - | - |
| 3754 | Non/SubPerf | 1/1/2024 | 120 | 412,500 | - | - |
| 3560 | Non/SubPerf | 1/1/2024 | 120 | 262,500 | 2.3% | 1,969 |
| 3754 | Non/SubPerf | 1/1/2024 | 120 | 311,500 | 1.0% | 1,038 |
| 5439 | Non/SubPerf | 2/1/2024 | 90 | 114,000 | 0.8% | 214 |
| 1683 | REO | 2/1/2018 | 2,250 | 397,500 | 1.0% | 24,844 |
| 5537 | REO | 9/1/2018 | 2,040 | 130,395 | 1.0% | 7,389 |
| 5636 | REO | 10/1/2018 | 2,010 | 2,168,869 | 1.0% | 121,095 |
| 1693 | REO | 3/1/2019 | 1,860 | 472,500 | 1.0% | 24,413 |
| 9437 | REO | 6/1/2019 | 1,770 | 937,500 | 1.0% | 46,094 |
| 3612 | REO | 7/1/2019 | 1,740 | 600,000 | 1.0% | 29,000 |
| 4456 | REO | 12/1/2019 | 1,590 | 1,436,250 | 1.0% | 63,434 |
| 1633 | REO | 12/1/2019 | 1,590 | 146,250 | 1.0% | 6,459 |
| 7135 | REO | 1/1/2020 | 1,560 | 843,750 | 1.0% | 36,563 |
| 2365 | REO | 2/1/2020 | 1,530 | 822,000 | 1.0% | 34,935 |
| 3313 | REO | 2/1/2020 | 1,530 | 1,880,000 | 0.5% | 39,950 |
| 4161 | REO | 2/1/2020 | 1,530 | 1,235,000 | 1.0% | 52,488 |
| 5436 | REO | 2/1/2020 | 1,530 | 1,575,000 | 1.0% | 66,938 |
| 3216 | REO | 3/1/2020 | 1,500 | 1,999,170 | 1.0% | 83,299 |
| 3654 | REO | 3/1/2020 | 1,500 | 363,000 | 1.0% | 15,125 |
| 5731 | REO | 5/1/2020 | 1,440 | 4,440,000 | 1.0% | 177,600 |
| 1713 | REO | 6/1/2020 | 1,410 | 2,275,000 | 1.0% | 89,104 |
| 4373 | REO | 6/1/2020 | 1,410 | 759,200 | - | - |
| 5346 | REO | 6/1/2020 | 1,410 | 78,000 | 1.0% | 3,055 |
| 7496 | REO | 6/1/2020 | 1,410 | 415,275 | 1.0% | 16,265 |
| 6653 | REO | 7/1/2020 | 1,380 | 1,818,750 | 1.0% | 69,719 |
| 1368 | REO | 9/1/2020 | 1,320 | 651,000 | 1.0% | 23,870 |
| 1853 | REO | 9/1/2020 | 1,320 | 327,000 | 1.0% | 11,990 |
| 3554 | REO | 9/1/2020 | 1,320 | 975,000 | 1.0% | 35,750 |
| 6547 | REO | 12/1/2020 | 1,230 | 639,710 | 1.0% | 21,857 |
| 5456 | REO | 12/1/2020 | 1,230 | 728,900 | 1.0% | 24,904 |
| 4663 | REO | 12/1/2020 | 1,230 | 104,000 | 1.0% | 3,553 |
| 2501 | REO | 11/1/2021 | 900 | 3,650,000 | 1.0% | 91,250 |
| 5466 | REO | 12/1/2021 | 870 | 458,000 | 1.0% | 11,068 |
| 6113 | REO | 1/1/2022 | 840 | 647,000 | 1.4% | 20,758 |
| 8635 | REO | 3/1/2022 | 780 | 320,000 | 1.3% | 8,667 |
| 9846 | REO | 5/1/2022 | 720 | 176,250 | 0.6% | 2,203 |
| 1935 | REO | 5/1/2022 | 720 | 239,636 | 0.5% | 2,396 |
| 5030 | REO | 5/1/2022 | 720 | 258,216 | 0.5% | 2,582 |
| 9425 | REO | 7/1/2022 | 660 | 216,500 | 1.0% | 3,969 |
| 2395 | REO | 8/1/2022 | 630 | 262,500 | 1.0% | 4,594 |
| 5497 | REO | 11/1/2022 | 540 | 276,000 | 0.5% | 2,070 |
| 1473 | REO | 12/1/2022 | 510 | 225,000 | 1.0% | 3,188 |
| 9091 | REO | 2/1/2023 | 450 | 165,050 | 0.6% | 1,289 |

**EXHIBIT C**

**Proposed Plan Administrator's Resume**

# ELIZABETH A. LAPUMA

+1 (917) 855-5745    elizabeth.lapuma@gmail.com

## SUMMARY

Extensive financial advisory and board experience across a wide variety of industries. Over 20 years of experience originating and structuring complex financial transactions, including restructurings, securities offerings and mergers and acquisitions. Outstanding personal relationships with the most senior business leaders.

---

**CURRENT/RECENT BOARD ROLES:** Have worked with and on boards across industries including:
· WeWork-public, workspace provider, Chairman of the Audit, Compensation and Governance Committees
· Digital Media Services-pubic, technology enabled advertising, Chairman of the Audit, Finance and Compensation Committees
· Round Hill Capital Partners-private, real estate investment firm     · OTG Management, private, hospitality company
· Enterra Solutions-private, artificial intelligence     · Ebix Inc-public, software as a service for financial institutions
· Ventura Capital, private equity fund     · Surgalign-public, healthcare
· Advising on $800mm recap and other non-public engagements

**UBS**                                                                                    NEW YORK, NY
**MANAGING DIRECTOR, HEAD OF BALANCE SHEET ADVISORY**                  JANUARY 2020 – AUGUST 2023
· Lead UBS' Balance Sheet advisory practice providing a full spectrum of services to stressed companies and creditors in refinancings, exchange offers, consent solicitations, amendments, out-of-court restructurings, and Chapter 11 filings. Accountable for growth of the practice and being a fact witness for/ leading/ participating in debtor-in-possession and exit financings.
· Originated and provided fact and/or expert testimony in the five largest restructurings since the beginning of the pandemic including Hertz, LATAM Airlines, Frontier Communications, Argentina and Ecuador, as well other matters.
· Run sales processes for distressed mergers and acquisitions and represented sellers and buyers in several major cases.

**ALVAREZ & MARSAL**                                                          NEW YORK, NY
**MANAGING DIRECTOR, ASSET MANAGEMENT SERVICES**                          JULY 2013 – JANUARY 2020
· Founded group advising financial institutions/governments to address non-core assets employing investor-based workout strategies.
· Built, managed and provided expert testimony in litigation for a $2.5bn portfolio of debt and equity positions predominately in U.S. industrial companies (Zohar Funds), a $1.3bn portfolio of non-performing industrial pan-European credits, and a $1.4bn portfolio of international assets previously managed in the Middle East (Abraaj Funds).
· Originated large advisory assignment and was a fact witness for the Government of Puerto Rico.
· Structured joint ventures for Italian banks' non-core assets, and largest Greek banks to address distressed assets.
· Developed and implemented restructuring plan for six Spanish banks to address troubled assets and raise new capital.
· Advised global investment bank to monetize portfolio of over $50bn of non-performing loans through restructurings and sales.

**BLACKROCK**                                                                NEW YORK, NY
**DIRECTOR, FINANCIAL MARKETS ADVISORY GROUP**                            APRIL 2010 – JUNE 2013
· Developed client coverage model and was primarily responsible for over 30 major financial institutions and agencies. Generated more new revenue than all other Managing Director coverage officers in 2011, 2012 and 2013 for new advisory assignments.
· Led team assessing portfolios of the largest Greek banks on behalf of IMF, ECB, EU and Greek government with primary responsibility for client coverage of the largest banks, including analyzing data and presentation of key findings.
· Advised and testified for group of 15 financial institutions in claims against a monoline insurer as part of multi-year restructuring.
· Analyzed $150bn portfolio of securities on behalf of the FDIC and Federal Reserve on asset dispositions (Maiden Lanes).
· Won mandates from large institutions like GE and Walter Investments to create analysis to support acquisitions and divestitures.

**LAZARD FRÈRES & CO. LLC**                                                  NEW YORK, NY
**VICE PRESIDENT, FINANCIAL INSTITUTIONS AND RESTRUCTURING GROUPS**       APRIL 2008 – FEBRUARY 2010
· Led teams in three of the ten largest bankruptcies in 2008-2009, as well as other in- and out-of-court resolutions.
· Involved in key roles for landmark financial institution restructurings during the Great Financial crisis including AIG, Bear Sterns, CIFG, Capmark, FGIC, Lehman Brothers and MUFG investment in Morgan Stanley.

**CREDIT SUISSE, SAGENT ADVISORS INC. AND PERELLA WEINBERG PARTNERS L.P.**        NEW YORK, NY
**DIRECTOR, VICE PRESIDENT AND ASSOCIATE, INVESTMENT BANKING DIVISION**           MAY 2002 – APRIL 2008

---

**THE WHARTON SCHOOL**, University of Pennsylvania.
Master of Business Administration in Finance, Palmer Scholar (Top 5% of Class), May 2002.  INSEAD exchange.
**THE WHARTON SCHOOL AND THE SCHOOL OF ARTS AND SCIENCES**, University of Pennsylvania.
Dual Degree: Bachelor of Science, concentration in Finance; Bachelor of Arts in International Relations, May 2001. *Magna Cum Laude* with Distinction; Benjamin Franklin Scholar; Dean's List.
**NOTABLE FACTS:** Have traveled to over 180 countries. Graduated from The Lawrenceville School.