**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al*.,[1] | Case No. 23-10815 (LSS) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. 1048 |

**DECLARATION OF DAVID M. DUNN IN SUPPORT OF ENTRY OF ORDER
CONFIRMING COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11
PLAN FOR PEER STREET, INC., AND ITS AFFILIATED DEBTORS**

I, David M. Dunn, do hereby declare, under penalty of perjury, that:

1.      I am the Chief Restructuring Officer of each of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**").  In that capacity, I am familiar with the business and financial affairs of the Debtors and have been actively involved in these Chapter 11 Cases.  I submit this declaration in support of confirmation of the *Amended Combined Disclosure Statement and Joint Chapter 11 Plan for Peer Street, Inc., and its Affiliated Debtors* [D.I. 1048] (as may be amended, supplemented, or modified from time to time, the "**Combined Disclosure Statement and Plan**" or the "**Plan**").[2]

---

1   The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485).  The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn:  David Dunn, Chief Restructuring Officer.

2   Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Combined Disclosure Statement and Plan.

2.      Except as otherwise noted, all matters set forth herein are based on (a) my personal knowledge and belief, (b) my review of the relevant documents, including the Combined Disclosure Statement and Plan, (c) information supplied to me by other representatives of the Debtors, including the Debtors' professional advisors, (d) my view, based on my personal and professional experience and knowledge of the Debtors' business affairs and financial condition, or (e) for my understanding of the requirements for confirmation of the Combined Disclosure Statement and Plan under the Bankruptcy Code, discussions with the Debtors' bankruptcy counsel.  If called to testify, I could and would testify to the facts set forth herein.

## THE COMBINED DISCLOSURE STATEMENT AND PLAN

3.      I have reviewed and am generally familiar with the terms and provisions of the Combined Disclosure Statement and Plan.  With the Debtors' bankruptcy counsel, I was personally involved in the development of and discussions regarding the terms of the Combined Disclosure Statement and Plan.  The Combined Disclosure Statement and Plan is the result of extensive, arm's-length and good faith negotiations among the Debtors and other interested parties, including the Committee, Magnetar (as Prepetition Agent), and the Pacific Creditors and Colchis.  Among other things, the Plan effectuates a settlement and compromise of disputes concerning the rights and treatment of the Underlying Loans and Mortgage Interests held by the Debtors and investors' rights in those assets, as well as an allocation of the ultimate costs of reducing those assets to cash and distributing those proceeds to the Debtors' investors, Magnetar, and other creditors.

4.      Under the Plan, I will be succeeded by a Plan Administrator, who will report to an Advisory Committee of three investors.  The Plan Administrator will oversee the liquidation of the Debtors' remaining assets, including oversight of the Asset Manager, make Distributions in

accordance with the Plan, and otherwise wind down the Debtors' affairs and the Estates in a timely and efficient manner.

5.      To the best of my knowledge, information, and belief, the Debtors, with the assistance of the Claims Agent, complied with the solicitation and noticing procedures approved through the Solicitation Procedures Order and the Court's order authorizing electronic service on the Debtors' customers [D.I. 294], as well as the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, as evidenced by the affidavit of service filed by the Claims Agent on March 29, 2024 [D.I. 978] and the voting report and declaration filed by the Claims Agent contemporaneous herewith.

6.      Among other things, individuals working under my direction and supervision, and in consultation with the Debtors' counsel, assisted the Claims Agent in determining what claims appearing on the official claims register should be placed in the Voting Classes based on the Plan's classification of claims and interests, and for the claims in the Voting Classes, determining which claims were eligible to vote and determining the amounts such claims were entitled to vote, based on the voting parameters established in the Solicitation Procedures Order.

## SATISFACTION OF PLAN CONFIRMATION REQUIREMENTS

7.      I have been advised by the Debtors' legal advisors and believe, based on my review of the Combined Disclosure Statement and Plan and my discussions with those advisors, that the Combined Disclosure Statement and Plan satisfies all applicable provisions of the Bankruptcy Code and should be confirmed.

### *Sections 1129(a)(1) and (2) and Sections 1122 and 1123*

8.      I believe that the Debtors, as proponents of the Combined Disclosure Statement and Plan, have complied with the applicable provisions of the Bankruptcy Code, as required by section 1129(a)(1) and 1129(a)(2) of the Bankruptcy Code, respectively.

9.      ***Classes of Claims.***  I believe that each Class under the Combined Disclosure Statement and Plan only contains Claims that are substantially similar to other Claims within the Class, and that the Classes under the Combined Disclosure Statement and Plan were not prepared for purposes of affecting the votes on the Combined Disclosure Statement and Plan or for any other inappropriate purposes.

10.      In particular, the Plan includes separate classes for each of the Debtors' various investment products (MPDNs, RWNs, PDNs, and OppFund LP Interests) reflecting both the different Debtors who issued those products, as well as the differing legal and contractual entitlements of each investment product.  The MPDNs were further separated into four (4) different classes, with Claims put into those classes based on two characteristics:  first, whether the underlying MPDN is liquidated or not; and second, whether the Holder held MPDNs greater than $5,000 or not (the latter being designated as Convenience Holders under the Plan).

11.      The Debtors determined to separately classify MPDNs based on whether the Underlying Loan was liquidated because the liquidated status of an MPDN dictates whether the costs allocated to the Underlying Loan must be "borrowed" and repaid from future liquidation proceeds (in the case of unliquidated loans) or can be paid from liquidation proceeds on hand (in the case of liquidated loans).  Further, classification based on liquidated vs. unliquidated status was relevant because, under the Funding Pool and Exit Facility options contemplated by the Plan, the holdback that the loans may be subject to are different (including no holdback for liquidated loans if an Exit Facility would have been implemented).

12.      Next, separating the MPDN classes by whether the Holder of an MPDN Claim was a Convenience Holder was in furtherance of the Debtors' goal to offer the Funding Pool cash-out election in Section 4.4 of the Plan, which provides smaller Holders an opportunity for

earlier access to liquidity, in exchange for a discount on their recovery, while providing the Debtors an administrative benefit by reducing the number of participants in the Funding Pool.

13. The Plan provides for the same treatment of each Claim within a Class.

14. ***Means of Implementation.*** I believe that the Combined Disclosure Statement and Plan provides for adequate means for implementation of the Combined Disclosure Statement and Plan, including by appointing the Plan Administrator and Asset Manager and providing mechanisms for the Reorganized Debtors to liquidate and monetize the Loan and Non-Loan Assets and distribute the proceeds thereof as provided for in the Combined Disclosure Statement and Plan, and ultimately dissolve.

15. ***Asset Management Agreement/Compensation***. The Debtors and Committee selected Colchis to act as Asset Manager, after it was determined to install a third-party to manage the loan portfolio after the Effective Date and a process was conducted to identify such a party. Colchis is an experienced asset manager, and the Debtors and Committee believe Colchis can fulfill the duties set forth in the Asset Management Agreement.

16. The compensation to be provided to the Asset Manager is fair, reasonable, and appropriate under the circumstances of these cases. The Asset Manager's compensation was subject to a market-test and the nominal fee amounts of 1.5% for Asset Management Fee and 2% of collections for the Performance Fee is in-line with the compensation requested by the other candidate that was considered for the role. However, Colchis agreed to crediting of the fees and to net out Specified Expenses, making its proposal superior. On a per-loan basis, the fees and costs paid to service a particular loan likely will not exceed 3.0% of UPB, after taking into account the Asset Management Fee, Performance Fee, Specified Expenses, and Structuring Fee, and the various crediting mechanics in the Asset Management Agreement. I have reviewed Mr.

Ball's objection to the Asset Manager's compensation, and I believe he likely has failed to give effect to the crediting of the Asset Management Fee to the Performance Fee and the netting of Specified Expenses from the Asset Manager's fees, resulting in a double counting of certain amounts to arrive at his 4% calculation.

17.     As acknowledged by Mr. Ball, Peer Street's servicing fees were as high as 2.25% on the Platform—but those fees Peer Street charged were set in contemplation of servicing a portfolio of performing loans and not loans that were distressed from the outset.  Where loans were distressed, Peer Street historically had the ability to charge an incremental asset management fee above its baseline servicing fee, but typically only did so when it was unable to collect default interests on the underlying loan.  Here, much of the remaining loans in the Debtors' loan portfolio that Colchis will take over managing are non-performing.  Firms who are tasked with managing distressed loan portfolios typically command a premium in fees, over fees that would be paid to manage a non-distressed portfolio.

18.     ***Plan Funding***.  The Plan contained two alternatives for financing the wind-down of the Debtors.  The Debtors are proceeding with the Funding Pool alternative, notwithstanding their prior, now withdrawn election (jointly with the Committee) in the Plan Supplement to attempt to obtain an Exit Facilty

19.     At the commencement of solicitation, the Debtors were prepared to utilize the Funding Pool option.  The Funding Pool is built into the Combined Disclosure Statement and Plan and provides the means for funding the wind-down.  As part of the Funding Pool, amounts are held back from liquidated loans and used, initially, to pay or establish reserves for all costs allocated or required to be paid with respect to the unliquidated loans.  As future loans liquidate, those loans are subject to their own holdback, and the amounts held back are used to partially

repay holdbacks associated with earlier liquidated loans.  The expectation is that this holdback will be around 20% initially and will decline over time, as more loans liquidate.

20.    Under the Funding Pool, there is a slight re-allocation of value, in the form of the Financing Charges and Incremental Funding Pool Units, which effectively serve as a proxy for payment and receipt of interest on advances from and contributions into the Funding Pool.  The Financing Charge and return from the Incremental Funding Pool Units provide for a "financing rate" that approximates the borrowing costs that the Debtors believed they would pay under an Exit Facility and, thus, was intended to deliver a market-rate return/borrowing cost for the Funding Pool.

21.    The Plan also provided for the possibility that the Debtors and Committee could jointly elect to proceed with the Exit Facility.  In the Plan Supplement, the Debtors and the Committee disclosed that they were making such an election, and included the principal economic terms of an Exit Facility that were subject to the negotiation of definitive documentation acceptable to the Debtors and Committee and Bankruptcy Court approval at the Confirmation Hearing.  However, the Plan Supplement included the important conditions that the proposed Exit Facility would be subject to the negotiation of definitive documentation acceptable to the Debtors and Committee and Bankruptcy Court approval at the Confirmation Hearing.

22.    Despite good faith efforts to negotiate definitive documents, among the Debtors, Committee and Colchis, the parties were unable to arrive at acceptable definitive documentation for the Exit Facility.  Accordingly, the Debtors and Committee are no longer seeking to put in place an Exit Facility.

23.    As discussed further below, the Funding Pool allows for the Plan to be feasible.

24. ***Treatment of Contracts and Leases***.  Article XII of the Plan provides for the rejection of executory contracts and unexpired leases that have not been previously assumed or rejected under section 365 of the Bankruptcy Code or the subject of a request to do so filed by the Effective Date.  The Debtors have reviewed, and will continue to do so in advance of the Effective Date, their executory contracts and unexpired leases to determine which executory contracts and unexpired leases must be assumed in connection with their wind-down.  The Debtors have exercised, and will continue to exercise, sound business judgment in identifying the executory contracts and unexpired leases to be assumed, and leave for rejection those contracts that are unnecessary, burdensome or both.

25. ***Settlement of Allocation and Participation Issues and Intercompany Claims***.  After extensive good faith and arms-length negotiations, the Debtors, the Committee, and the Pacific Creditors reached the compromises and settlement proposed in the Combined Disclosure Statement and Plan, which proposes to resolve the disputes regarding potential intercompany claims, cost allocations and burdens, ownership rights in the Underlying Loans and Mortgage Interests, and the factual and legal issues raised by the Pacific Creditors, the Committee and other parties in opposing the Loan Sale Motion and the Debtors' cash management motion (or aspects thereof) in an efficient, consensual, and cost-effective manner.

26. First, the Plan provides for an allocation of expenses (OpEx and Restructuring Costs) that the Debtors believe fairly apportions the cost and value of certain services to the assets/stakeholders that benefitted from the services.  The Debtors' allocation methodology is primarily an exercise in allocating costs to the Estates, and then allocating the costs at each Estate to the various asset pools within the Estate based on the value of those assets.

27.     For purposes of these allocations, PSFI is treated as the "owner" of loans, since PSFI is the party responsible for managing the loans.  The Debtors believe this is the most appropriate approach because much of the work done by PSFI is in service to the loan portfolio but, in light of the various intercompany loan and participation agreements, the value of the loan portfolio is distributed to other Debtors and then to their creditors.  An alternative placement of ownership of the Loan Assets outside of PSFI would potentially impede the Debtors' ability to fairly allocate to those assets the costs PSFI incurs in service, and for their benefit, of the Loan Assets.  Moreover, substantially all the Debtors' business activities (primarily at the PSFI level) involved administering the loan portfolio, following the Petition Date.

28.     The Debtors also determined to value loans based on the UPB of the loans.  The Debtors believe this is appropriate for a few reasons:  it approximates the relative claim value of the Debtors' creditors that made investments related to those loans; the work performed to service a particular loan is not necessarily correlated to whether a par recovery is (or is likely to be) received; and the liquidated value of many loans is not likely to be known for some time.

29.     For Restructuring Costs, the Debtors have apportioned these ratably to each Estate based on the value of their assets. The Debtors believe this is appropriate because the Restructuring Costs are largely non-operational and are focused, overall, on liquidating and distributed the cash proceeds of the assets in each Estate.

30.     For OpEx, the Debtors have apportioned these only to PSI and PSFI based on the Debtors' historic practices.  This practice was based on a pre-petition time-study conducted by an outside accounting firm that focused on what resources were employed by each Debtor-entity. While OpEx is not allocated to other Debtors, which are largely holding companies or pass-through entities, those Debtors and their creditors still bear a share of the OpEx since a part of

their assets and recoveries are the loans that PSFI is servicing, and the proceeds of those loans will be subject to deduction for costs allocated at PSFI before remitting the loan proceeds to the other Debtors.

31.     Second, the Plan respects the intercompany loan and participation agreements that PSFI has with the various other Debtors which result in the proceeds of loans (net of allocated cost and expenses) being made available to the creditors of those Debtors that were investor facing (PSFLLC, PS Portfolio, and OppFund).   Other than implementing the flow of loan proceeds, the Plan resolves with no cash distribution all other intercompany claims and interests, except that PSI's guarantee of the OppFund Loan remains in place.

32.     Third, the treatment provided to Noteholders and Holders of OppFund LP Interests in the Plan allows them to receive the proceeds of the respective assets to which they agreed to limit their recourse prepetition, after payment of allocated expenses, and does not give them recourse to other assets.   Conversely, where assets were available only to certain creditors prepetition, the Plan does not expand the body of creditors who have recourse to such assets. Thus, Noteholder and holders of OppFund LP Interests are able to recover exactly from, and only from, the pool of assets in which they invested and was their sole recourse pre-petition.   For instance, the Holder of an MPDN recovers its pro rata share of its investment in a series of MPDN from the proceeds of the Underlying Loan related to that series of MPDN.   And creditors of other Debtors and Estates, do not share in the pool of assets available to Noteholders. Limiting recourse in this manner best respects the entity separateness of the Debtors, the contractual and ownership rights among the Debtors, the legal rights of creditors of the same Debtors, and is fair and appropriate.

33.     In particular, these compromises and settlements: (i) reflect a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes, and allowing the Debtors to liquidate and distribute their Assets and wind down the Chapter 11 Cases, in a timely and efficient manner, on the other hand; (b) preserve value in the Debtors' Estates, favorably resolves and avoids potential litigation, and enables the prompt and efficient wind-down of the Debtors' Estates; (c) are the product of extensive arm's-length and good faith negotiations between sophisticated parties represented by counsel; and (d) are in the best interests of the Debtors, their Estates, holders of Claims and Interests, and other parties-in-interest, and is fair, equitable, and reasonable.  For these reasons, I believe that confirmation of the Plan as it pertains to these compromises and settlements is necessary and appropriate.

34.     ***Release and Exculpation Provisions.*** The Combined Disclosure Statement and Plan includes certain release, exculpation, and limitation of liability provisions.  I believe that the Released Parties and Exculpated Parties (who are encompassed within the Released Parties) have provided many valuable contributions to the progress of the Chapter 11 Cases, including assisting in stewarding the Debtors through the bankruptcy process, negotiating and supporting the compromises and settlements in the Combined Disclosure Statement and Plan, pursuing Confirmation of the Combined Disclosure Statement and Plan, and otherwise preserving the Debtors' assets for the benefit of all stakeholders.

35.     Based on my participation in the negotiations regarding the Plan, I am not aware of any valid Causes of Action that might be asserted against any of the Released Parties or Exculpated Parties by the Debtors.  I have seen the many generalized complaints from investors and borrowers about the Debtors' business and its failure submitted to the Court, but no claim

has been reasonably articulated against a specific Released Party for misconduct or liability. Also, it is my understanding that the Committee's legal and other advisors investigated potential claims and causes of action against the Released Parties and following that investigation, the Committee supports the proposed Debtor Releases.  Pursuit of litigation over such claims by an estate representative does not seem like a prudent exercise and use of estate resources, and certain of the Released Parties are entitled to indemnity from the Debtors which would increase the claims pool, diminish estate resources or some combination of the two.

36.     ***Exculpation.***     Section 14.1(a) of the Plan provides for exculpation of the Exculpated Parties.  Each party exculpated under the Combined Disclosure Statement and Plan is a fiduciary of the Debtors' estates, and I believe that the protection from liability that the exculpation clause provides to these parties is appropriate given their efforts in the Chapter 11 Cases, including with respect to the Combined Disclosure Statement and Plan process, and their fiduciary relationship with the Debtors and their Estates.  Notably, exculpation under the Plan is limited to those parties serving in a fiduciary role at the Debtors or the Committee and does not exculpate any party for gross negligence, fraud or willful misconduct.  The exculpation provisions of the Plan are important in that they remove the threat of litigation from the Estates and the Exculpated Parties.  I also believe the Exculpated Parties played critical roles in, and made significant contributions to, the Chapter 11 Cases and that such contributions represent good and valuable consideration to the Debtors, their Estates, and creditors.

37.     ***Debtor Releases.***  Section 14.1(b) of the Plan (the "**Debtor Releases**") provides for certain releases of Claims and Causes of Action held by the Debtors against the Released Parties but excludes from the release acts or liability arising from gross negligence, fraud or willful misconduct.  The Debtor Releases were part of the initial Plan discussions and were

included in every stage of plan negotiation, and I believe an integral part of the Plan.  The Plan itself is the result of, among other things, extensive arm's-length and good faith negotiations among the Debtors, the Committee, the Prepetition Agent and Lender, and the Pacific Creditors, who have all supported the Plan and its releases.

38.     Many of the Released Parties, including a number of officers, directors and estate professionals, have served the Debtors or the Estate (in the case of the Committee and its members) during the Chapter 11 Cases, and I believe that they have worked diligently to maximize value for the benefit of all stakeholders.  Other of the Released Parties are the Debtors largest creditors and stakeholders whose support for the Plan (or, importantly, lack of opposition to it) is critical for the Debtors to meet their confirmation requirements.  Based on my participation in the negotiations regarding the Plan and based on my consideration of the information provided to me by the Debtors' legal and other advisors, I believe that the Debtor Releases are essential components of the Combined Disclosure Statement and Plan.

39.     ***Third-Party Releases***.  Section 14.1(c) of the Plan provides for releases by the Releasing Parties (the "**Third-Party Releases**") of claims and causes of action against the Released Parties but excludes from the release acts or liability arising from gross negligence, fraud or willful misconduct.  The Debtors believe that, for the same reasons that consideration exists for the Released Parties to be released by the Debtors, consideration exists for creditors and OppFund LP Interest holders to grant releases to the Released Parties.  However, the Debtors' intent in proposing the Third-Party Releases was that such releases be consensual in nature, including by affording affected creditors the opportunity to opt-out or object to inclusion in the Third-Party Release.

40.     Based on my participation in the negotiations regarding the Combined Disclosure Statement and Plan, I believe that the Third-Party Releases are an integral component of the Combined Disclosure Statement and Plan and, like the Debtor Release, were included at every stage of negotiation over the Plan.  I further believe that without the Third-Party Releases, the Debtors and their stakeholders may neither have been able to secure the substantial benefits provided by the Combined Disclosure Statement and Plan, including the settlements and compromises that lead to the treatment of creditor claims, and the other benefits noted above, nor build consensus around the Plan.  Accordingly, the Third-Party Releases are fair and necessary to the implementation of the Combined Disclosure Statement and Plan and should be approved.

41.     ***Injunction Provisions***.  I believe that the injunction provisions of Article XIV are critical to the implementation of the Plan, including the releases.  With respect to the protections afforded to the Debtors, their assets and the parties implementing the wind-down of the Debtors, the injunction will ensure that the Plan can be implemented and that the Plan Administrator and Asset Manager will not be burdened by collection actions and litigation that would interfere with the timely resolution of the Chapter 11 Cases.  These protections, however, will cease once the Debtors' wind-down has concluded and distributions completed.

42.     With respect to parties receiving releases in the Plan, the Plan's injunction provisions serve to implement and enforce the releases, thus ensuring that they receive the benefit of the releases and provide protection from parties who may not respect the releases approved in the Confirmation Order.  Thus, I believe the injunction provisions provided for in Article XIV of the Plan are necessary to implementation of the Plan.

*Section 1129(a)(3)*

43.     ***The Combined Disclosure Statement and Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law.***   The Debtors have proposed the Combined Disclosure Statement and Plan in good faith, with the legitimate and honest purpose of liquidating the Debtors' assets and winding down the Debtors' business affairs in an orderly fashion and maximizing the value of the Debtors and the recoveries of all creditors under the circumstances of the Chapter 11 Cases.   Indeed, the Plan is the means to accomplish what the Debtors set out to do when they commenced these Chapter 11 Cases—establish a process to liquidate the Debtors' assets, ensure adequate access to capital to pay for the costs of that process, and ensure a fair allocation and burden for those costs, in light of the Debtors' liquidity constraints and the respective rights held and asserted against the Debtors' assets.

44.     Indeed, the Combined Disclosure Statement and Plan is the product of extensive, arm's-length negotiations among the Debtors' key stakeholders and is supported by the Committee, the Prepetition Lenders, and the Pacific Creditors.

*Section 1129(a)(4)*

45.     ***The Combined Disclosure Statement and Plan Provides that Payments Made by the Debtors for Services or Costs and Expenses are Subject to Approval***.   Any payments made or to be made for professional services or for costs and expenses incurred in connection with the Chapter 11 Cases are subject to the Court's approval.   The Debtors will only pay such amounts in accordance with the various retention orders for the professionals and the orders, Bankruptcy Rules and Local Rules applicable to professional compensation.

*Section 1129(a)(5)*

46.     ***Post-Effective Date Service as an Insider.***    The Plan Supplement identifies Elizabeth LaPuma as the proposed Plan Administrator and her proposed compensation.  Ms. LaPuma was selected jointly by the Debtors and Committee, as part of a process whereby the Debtors and Committee considered four candidates.  Ms. LaPuma is not an insider, creditor or equity holder of the Debtors.

47.     The responsibilities of the Plan Administrator will include:  (1) effectuating the transactions beneficial and necessary to wind down the Debtors in accordance with the Combined Disclosure Statement and Plan, (2) the administration of, and distributions with respect to, the claims asserted against and interests in the Debtors, (3) liquidating or abandoning the Debtors' remaining assets, subject to the delegation in the Asset Management Agreement for the Loan Assets, (4) overseeing the Asset Manager in the run-off of the Loan Assets, including the sale of any Loan Assets, to the extent set forth in the Plan and the Plan Administrator Agreement, and (5) determining whether to pursue and so pursuing Causes of Action belonging to the Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan, and (6) exercising such other powers as may be vested in it pursuant to an order of the Bankruptcy Court or pursuant to the Combined Disclosure Statement and Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Combined Disclosure Statement and Plan.  The Plan Administrator shall be vested with the rights, powers, and duties as is provided for in the Combined Disclosure Statement and Plan, the Plan Supplement, and the Plan Administrator Agreement.  For certain material actions, she will require the consent of the Advisory Committee, which is comprised of three large Holders of the Debtors' investment products.

48.     Ms. LaPuma is a seasoned restructuring professional and I believe she can discharge the role of Plan Administrator.  I believe Ms. LaPuma's proposed compensation is reasonable, appropriate and in line with what other professionals receive for fulfilling comparable roles in other complex chapter 11 cases.  I believe that the appointment of the Plan Administrator is in the interests of creditors and consistent with public policy.

*Section 1129(a)(6)*

49.     ***The Combined Disclosure Statement and Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission.*** The Debtors' business does not involve the establishment of rates subject to approval of any governmental regulatory commission, and, as a result, the Combined Disclosure Statement and Plan does not propose the change of any such rates.

*Section 1129(a)(7)*

50.     ***The Combined Disclosure Statement and Plan is in the Best Interests of Creditors***. As described in Section 5.8 of the Combined Disclosure Statement and Plan and the accompanying Liquidation Analysis[3], the Debtors believe that holders of Allowed Claims would receive less than anticipated under the Combined Disclosure Statement and Plan if the Chapter 11 Cases were converted to chapter 7 cases.  I am familiar with the Liquidation Analysis, and I believe that it fairly and reasonably presents either of two likely outcomes in a chapter 7.  Specifically, I believe that these scenarios reasonably reflect how a chapter 7 trustee would act in the face of a conclusion that the MPDNs are "sub-participations" (Scenario A) or are not "sub-participations" (Scenario B).

---

[3]     The Liquidation Analysis was attached as Exhibit A to the Plan and was updated by Exhibit C to the Plan Supplement.

51.     In either Chapter 7 scenario, I believe, as demonstrated in the Liquidation Analysis, that recoveries on assets and intercompany claims would be impaired versus what is provided under the Plan.   As noted in the Liquidation Analysis, this is the case even if assumptions or contingencies prove not to be true and values (and recoveries) prove to be lower than expected in a Chapter 11, because those downside impacts on asset value (and recoveries) will be the same (or potentially magnified) in a chapter 7.  Each of the two chapter 7 scenarios presents risks to claim holders.  In Scenario A, Holders of MPDNs related to unliquidated loans will have their assets abandoned and receive no recovery from the Estates.  In Scenario B, holders of MPDNs related to liquidated loans and RWNs will see reduced recoveries because the assets that they receive a recovery from under the Plan will be pooled and shared with the holders of MPDNs related to unliquidated loans, and the unliquidated loans are expected to recover lower portions of their UPB than the loans related to other products.  I also understand and believe that liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee, and these amounts would further dilute creditor recoveries.  These three factors result in worse recoveries for every class of creditors in a Chapter 7, and in many instances materially worse, versus what can reasonably be expected under the Plan.

52.     Finally, I believe that conversion would significantly delay the liquidation and distribution process, further burdening creditors in these Chapter 11 Cases, in which the Debtors are poised to distribute more than $100 million to creditors on the Effective Date.

53.     Accordingly, it is my belief that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and

therefore, the classification and treatment of Claims and Interests in the Plan complies with Bankruptcy Code section 1129(a)(7).

*Sections 1129(a)(8), 1129(a)(10), and 1129(b)*

54.    ***The Combined Disclosure Statement and Plan Has Been Accepted by an Impaired Voting Class and Satisfies the "Cramdown" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes.***    The Plan has garnered overwhelming creditor support.  I understand that Classes 1, 2, and 15 are deemed to accept in accordance with the Combined Disclosure Statement and Plan.  I understand that the following impaired Classes voted to accept the Combined Disclosure Statement and Plan:  Class 3 at PSI, PSFI and PSLI (the only Debtors where those Classes exist); Class 4 at PSFI, PSFLLC, PS Portfolio, OppFund, and OppFund GP; and Classes 8, 9, 10, 10-1, 11, 11-1, 12, 13, and 14 at the applicable Debtors.

55.    Based on a review of the official claims register by individuals working under my direction and supervision, and consultation with counsel, the Debtors do not believe there are General Unsecured Claims against PSLI, PS Options, Warehouse I and Warehouse II, after giving effect to the various pending objections.

56.    Based on a review of the official claims register by individuals working under my direction and supervision, and consultation with counsel, the Debtors have not identified any claim that would constitute a Securities Law Claim against any of PSI, PSFI, PS Portfolio or OppFund.  At this time, the Debtors are not prepared to concede that no Claim asserted against PSFLLC contains assertions that would result in such claim being classified as a Securities Law Claim and are proceeding with Confirmation as if such Class remains extant.

57.    Therefore, I understand that Class 4 at PSI only, Class 6 at PSFLLC only (to the extent claims exist in such Class) and Class 7 (which is only at PSI) (the "**Rejecting Classes**")

are treated as rejecting the Combined Disclosure Statement and Plan. As such, I am advised that the Combined Disclosure Statement and Plan does not meet the requirements of section 1129(a)(8) of the Bankruptcy Code for PSI and PSFLLC. I believe that the Combined Disclosure Statement and Plan can still be confirmed because the Combined Disclosure Statement and Plan satisfies the "cram down" provisions of 1129(b) of the Bankruptcy Code at PSI and PSFLLC.

58. At PSI, the only class junior to Class 4 (General Unsecured Claims) is Class 7. Class 7 represents the equity interests in PSI, the Debtors' ultimate parent, there are no classes junior to it, and it is not receiving any distributions under the Plan.

59. At PSFLLC, the only class junior to Class 6 in statutory priority are the intercompany interests in PSFLLC (which are in Class 5), and such interests are not receiving a distribution under the Plan.

60. Furthermore, as evidenced by the estimated recoveries set forth in the Combined Disclosure Statement and Plan, no Class of Claims or Interests are receiving more than full payment on account of their Claims, nor do I believe or have an understanding that the Plan provides for creditors to receive more than what they are entitled to on account of their Claims. This is so because I understand that Section 10.11 of the Plan provides for distribution of the proceeds of a particular Underlying Loans to follow the Debtors' prepetition practice of distributing proceeds in excess of the par amount and accrued interest on MPDNs to the holders of such MPDNs.

61. Additionally, I do not believe the Combined Disclosure Statement and Plan unfairly discriminates against the Rejecting Classes. At PSI, there is only a single class of

unsecured creditors (Class 4) and, thus, no other class against which Class 4 could be discriminated against. The same is true for the Parent Interests in Class 7 at PSI.

62. At PSFLLC, Class 6 is the only rejecting Class and my understanding is that the claims in that class, Securities Law Claims, are subject to subordination to the other creditors at PSFLLC by operation of Bankruptcy Code section 510. The claims to which Class 6 are subordinated will not be paid in full. Therefore, I do not believe it to be unfair or discriminatory for Class 6 to receive no distribution under the Plan, to the extent there are any claims in it.

*Section 1129(a)(11)*

63. ***The Combined Disclosure Statement and Plan is Feasible.*** The Plan provides for all the Debtors' remaining assets to be liquidated and distributed to Holders of Allowed Claims pursuant to the terms of the Plans. Thus, there is not likely to be a need for further reorganization or liquidation beyond that which is provided for under the Plan.

64. The Plan originally contemplated one of two funding sources—the Funding Pool or a potential Exit Facility. As disused above, the Debtors are proceeding with the Funding Pool. The Plan Supplement includes the proposed Wind-Down Budget, which I believe is a fair and reasonable reflection of the amounts that will be required to complete the wind-down of the Debtors, including the run-off of the loan portfolio. I believe that there are more than ample proceeds from the loans that will be liquidated as of the Effective Date to provide the monies needed to fund the Funding Pool. I also believe that the loans that will not be liquidated as of the Effective Date, which will be the source of repayment for the Funding Pool, have values that are several multiple of what would be contributed to the Funding Pool and, thus, the amounts withheld for contribution to the Funding Pool would be repaid and that there would be an incremental return to parties contributing to the Funding Pool, if it is implemented.

65.     Thus, I believe the Plan is feasible.

*Section 1129(a)(12)*

66.     ***All Statutory Fees Have or Will be Paid.***   The Combined Disclosure Statement and Plan provides that all fees required under 28 U.S.C. § 1930 will be paid on or before the Effective Date, or when such fees come due in the ordinary course, and I believe the Debtors or the Reorganized Debtors, as applicable, have adequate means to make such payments.

*Section 1129(a)(13)*

67.     ***The Combined Disclosure Statement and Plan Appropriately Treats Retiree Benefits***.   The Debtors do not have any retiree benefit programs within the meaning of section 1114 of the Bankruptcy Code.

*Section 1129(c)*

68.     The Combined Disclosure Statement and Plan is the only chapter 11 plan that has been proposed in the Chapter 11 Cases.

*Section 1129(d)*

69.     The Combined Disclosure Statement and Plan is a means for liquidating the Debtors' assets and fairly and equitably distributing those proceeds to the Debtors' creditors.  Its principal purpose is not the avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933.

## **CONCLUSION**

70.     I believe, in my business judgment, that the Combined Disclosure Statement and Plan will enable the Holders of Allowed Claims to realize the highest possible recoveries under the circumstances of the Chapter 11 Cases.  I therefore conclude, in my business judgment, that the Combined Disclosure Statement and Plan is in the best interests of all creditors, and

respectfully request that the Court enter an order confirming the Combined Disclosure Statement and Plan.

I certify under penalty of perjury that, based upon my knowledge, information, and belief as set forth in this Declaration, the foregoing is true and correct.


Dated: April 24, 2024                                    /s/ *David M. Dunn*
                                                         David M. Dunn
                                                         Chief Restructuring Officer
                                                         Peer Street, Inc. *et al.*