## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Peer Street, Inc., *et al.*,[1] | Case No. 23-10815 (LSS) |
| Debtors. | (Jointly Administered) |

## MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN FOR PEER STREET, INC., AND ITS AFFILIATED DEBTORS

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph Barry (Del. Bar No. 4221)
Ryan M. Bartley (Del. Bar No. 4985)
S. Alexander Faris (Del. Bar No. 6278)
Shella Borovinskaya (Del. Bar No. 6758)
Carol E. Cox (Del. Bar No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
P. Bradley O'Neill (admitted *pro hac vice*)
Caroline Gange (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9511
Facsimile: (212) 715-8000

*Co-Counsel to the Debtors and Debtors in Possession*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Peer Street, Inc. (8584); PS Funding, Inc. (3268); PeerStreet Licensing, Inc. (9435); Peer Street Opportunity Fund GP, LLC (8491); Peer Street Funding LLC (9485); PSF REO LLC (1013); PS Options LLC (8584); PS Warehouse, LLC (5663); PS Warehouse II, LLC (9252); Peer Street Opportunity Investors II, LP (1586); PS Portfolio-ST1, LLC (1868); PSF Ohio, LLC (9485); PSF TX 1, LLC (9485); PSF TX 2, LLC (2415); PSF TX 4 LLC (9485). The Debtors' service address is c/o Province, LLC 2360 Corporate Circle, Suite 340, Henderson, NV 89074, Attn: David Dunn, Chief Restructuring Officer.

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND AND OVERVIEW OF THE COMBINED DISCLOSURE
        STATEMENT AND PLAN...................................................................................2

III.    OBJECTIONS TO THE COMBINED DISCLOSURE STATEMENT AND PLAN.......11

IV.     PLAN SOLICITATION AND VOTING .........................................................12

V.      THE COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD BE
        APPROVED AS ADEQUATE ON A FINAL BASIS UNDER BANKRUPTCY
        CODE SECTION 1125........................................................................................15

VI.     THE PLAN SHOULD BE CONFIRMED BECAUSE IT COMPLIES WITH THE
        REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129.................................15

        A.      The Plan Complies with All Applicable Provisions of the Bankruptcy
                Code
                —11 U.S.C. § 1129(a)(1).........................................................................16

                1.      The Classification of Claims and Interests in the Plan Satisfies the
                        Requirements of Bankruptcy Code Section 1122.....................................17

                2.      The Plan Satisfies the Requirements of Bankruptcy Code Section
                        1123(a). ...................................................................................18

                        a.      The Asset Management Agreement and Exit Financing are
                                Appropriate ...................................................................19

                3.      The Combined Disclosure Statement and Plan Complies with the
                        Requirements of Bankruptcy Code Section 1123(b). ..............................22

                        a.      The Plan Discretionary Provisions are Consistent with Section
                                1123(b)..........................................................................22

                        b.      The Allocation, Participation, and Intercompany Claim and
                                Interest Settlements in the Plan are Appropriate............................23

                        c.      The Releases, Exculpation, and Injunction Should Be
                                Approved........................................................................32

        B.      The Debtors Have Complied with the Applicable Provisions of the
                Bankruptcy Code—11 U.S.C. § 1129(a)(2)............................................40

        C.      The Combined Disclosure Statement and Plan Has Been Proposed in
                Good Faith and Not by Any Means Forbidden by Law—11 U.S.C.
                § 1129(a)(3). ......................................................................................40

        D.      The Combined Disclosure Statement and Plan Provides that Payments
                Made  by the Debtors for Services or Costs and  Expenses are Subject to
                Approval —11 U.S.C. § 1129(a)(4).........................................................41

E.       The Debtors Have Disclosed the Identity of Directors and Officers and the Nature of Compensation of Insiders—11 U.S.C. § 1129(a)(5). ............................42

F.       The Combined Disclosure Statement and Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission—11 U.S.C. § 1129(a)(6). ....................................................................43

G.       The Combined Disclosure Statement and Plan is in the Best Interests of Creditors —11 U.S.C. § 1129(a)(7)..........................................................................44

H.       The Combined Disclosure Statement and Plan Has Been Accepted by an Impaired Voting Class—11 U.S.C. § 1129(a)(8). ..................................................46

I.        The Combined Disclosure Statement and Plan Provides for Payment in Full of All Allowed Priority Claims—11 U.S.C. § 1129(a)(9). ............................47

J.        At Least One Impaired, Non-Insider Class Has Accepted the Plan—11 U.S.C. § 1129(a)(10)................................................................................................47

K.       The Plan is Feasible—11 U.S.C. § 1129(a)(11). ...................................................48

L.       All Statutory Fees Have or Will Be Paid—11 U.S.C. § 1129(a)(12). ..................49

M.      The Combined Disclosure Statement and Plan Appropriately Treats Retiree Benefits—11 U.S.C. § 1129(a)(13).........................................................49

N.       Bankruptcy Code Sections 1129(a)(14)–(16) are Inapplicable. ...........................50

O.       The Plan Satisfies the "Cramdown" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes.........................................................50

        1.       The Combined Disclosure Statement and Plan is Fair and Equitable for the Rejected Classes. ...............................................................51

        2.       The Plan Does Not Unfairly Discriminate With Respect to Any Class. ...52

P.       The Combined Disclosure Statement and Plan Is Not an Attempt to Avoid Tax Obligations—11 U.S.C. § 1129(d). ...............................................................53

VII.    MR. BALL'S REQUEST FOR ADDITIONAL PLAN CLASSES SHOULD BE DENIED....................................................................................................................54

VIII.   CONCLUSION.............................................................................................................55

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Alta+Cast, LLC,*
No. 02-12982 (MFW), 2004 Bankr. LEXIS 219 (Bankr. D. Del. Mar. 2, 2004) ...................15

*In re Armstrong World Indus., Inc.,*
432 F.3d 507 (3d Cir. 2005)...............................................................................................51

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
526 U.S. 434 (1999)...........................................................................................................44

*In re Buttonwood Partners, Ltd.,*
111 B.R. 57 (Bankr. S.D.N.Y. 1990) .................................................................................54

*Cohen v. TIC Fin. Sys. (In re Ampace Corp.),*
279 B.R. 145 (Bankr. D. Del. 2002) ..................................................................................22

*In re Coram Healthcare Corp.,*
271 B.R. 228 (Bankr. D. Del. 2001) ..................................................................................41

*In re Coram Healthcare Corp.,*
315 B.R. 321 (Bankr. D. Del. 2004) ..................................................................................16

*In re Elsinore Shore Assocs.,*
91 B.R. 238 (Bankr. D.N.J. 1988) .....................................................................................40

*In re Exide Tech.,*
303 B.R. (Bankr. D. Del. 2003) ...........................................................................22, 38, 39

*Gruen Mktg. Corp. v. Asia Commercial Co., Ltd. (In re Jewelcor Inc.),*
150 B.R. 580 (Bankr. M.D. Pa. 1992) ...............................................................................23

*Heartland Fed'n Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters., Ltd., II),*
994 F.2d 1160 (5th Cir. 1993) ...........................................................................................15

*In re Indianapolis Downs, LLC, LLC,*
486 B.R. 286 (Bankr. D. Del. 2013) ............................................................................34, 38

*In re Jersey City Med. Ctr.,*
817 F.2d 1055 (3d Cir. 1987)............................................................................................16

*In re Jersey City Med. Ctr.,*
817 F.2d at 1060–61 ..........................................................................................................17

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other
  grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, In re Johns-Manville Corp.*, 843
  F.2d 636 (2d Cir. 1988) ............................................................................................ 53

*In re Key3Media Grp., Inc.*,
  336 B.R. 87 (Bankr. D. Del. 2005) ........................................................................... 23

*Kurak v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.)*,
  379 B.R. 257 (Bankr. D. Del. 2007) .......................................................................... 51

*In re Lernout & Hauspie Speech Prods., N.V.*,
  301 B.R. 651 (D. Del. 2003) ............................................................................... 51, 53

*Lisanti v. Lubetkin (In re Lisanti Foods, Inc.)*,
  329 B.R. 491 (D.N.J. 2005) ...................................................................................... 42

*Myers v. Martin (In re Martin)*,
  91 F.3d 389 (3d Cir. 1996) ......................................................................... 23, 24, 31

*In re NII Holdings, Inc.*,
  288 B.R. 356 (Bankr. D. Del. 2002) .......................................................................... 41

*In re Nutritional Sourcing Corp.*,
  398 B.R. 816 (Bankr. D. Del. 2008) .......................................................................... 16

*In re PWS Holding Corp.*,
  228 F.3d at 248 .................................................................................................. 40, 41

*In re Resorts Int'l Inc.*,
  145 B.R. 412 (Bankr. D.N.J. 1990) ..................................................................... 40, 42

*In re Rubicon U.S. REIT, Inc.*,
  434 B.R. 168 (Bankr. D. Del. 2010) .......................................................................... 52

*In re Sea Launch Co., L.L.C.*,
  No. 09-12153 (BLS), 2010 Bankr. LEXIS 5283 (Bankr. D. Del. July 30,
  2010) ..................................................................................................................... 50

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ..................................................................... 15, 35

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co., Spansion, Inc. (In re Spansion,
  Inc.)*,
  426 B.R. 114 (Bankr. D. Del. 2010) ..................................................................... 33, 37

*In re W.R. Grace*,
  446 B.R. 96 (Bankr. D. Del. 2011) ............................................................................ 36

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................34, 38

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ...............................................................34, 35, 38

## STATUTES

11 U.S.C. 1129(b)(1) ...............................................................................................52

11 U.S.C. § 506(c) ...................................................................................................28

11 U.S.C. § 523(a)(2)(A) .........................................................................................55

11 U.S.C. § 1121(b) .................................................................................................55

11 U.S.C. § 1123 ............................................................................................. *passim*

11 U.S.C. § 1129 ............................................................................................. *passim*

28 U.S.C. § 1930 ......................................................................................................49

11 U.S.C. § 105 ........................................................................................................14

11 U.S.C. § 507(a) ...................................................................................................47

11 U.S.C. § 510 ........................................................................................................30

11 U.S.C. § 523 ........................................................................................................55

11 U.S.C. § 1122 ............................................................................................. *passim*

11 U.S.C. §§ 1125 and 1126 ....................................................................................40

Securities Act of 1933 Section 5 .............................................................................54

U.C.C. § 9-309(3) ....................................................................................................28

## RULES

Bankr. Rule 2002 .....................................................................................................13

Bankr. Rule 3017 .....................................................................................................14

Bankr. Rule 9019 ................................................................................23, 32, 33, 37

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977)...................................................................................40

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ..........................................16

S. Rep. No. 95-989 (1978) ...........................................................................................................40

31565170.5

## I.    INTRODUCTION

1.      These Chapter 11 Cases are extremely complex and have involved substantial engagement, and at times substantial dissent, from the Debtors' creditors.  On March 15, 2024, the Debtors filed the Plan,[2] which provided for a run-off of the Debtors' loan portfolio consistent with the collective view expressed during these Chapter 11 Cases by the Debtors' investors, and thereafter commenced solicitation. In the Plan, the Debtors have resolved complicated issues raised in these Chapter 11 Cases concerning who has what rights with respect to the Debtors' loan portfolio and how to allocate the costs of reducing that portfolio (and the Debtors' other assets) to cash and distributing that cash to investors and other creditors.  The Debtors have done so through the treatment provided in the Plan, including the claims of the Debtors' investors and other creditors, appointing Colchis to manage the loan portfolio to the completion of its run-off, and the resolution of intercompany claims concerning, among other things, funding of the Debtors' efforts to wind-up their affairs through these Chapter 11 Cases and the conduct of their businesses during that period.

2.      Having completed solicitation, the Debtors' investors and other creditors have overwhelmingly shown their support for the manner in which the Debtors have resolved the controversies raised in these Chapter 11 Cases and the Debtors' proposal, arrived at through negotiations with the Committee, their largest Notes creditor (the Pacific Creditors), and their secured lender (Magnetar), for bringing these Chapter 11 Cases to a conclusion.  In fact, more than 98.5% of the ballots (3,411 out of 3,462) validly cast on the Plan accepted it, and more than

---

[2]     *See* Combined Disclosure Statement and Joint Chapter 11 Plan for Peer Street, Inc., and its Affiliated Debtors [D.I. 952] and as amended on April 24, 2024 [D.I. 1048] (as the same may be further amended, supplemented, or modified, the "**Combined Disclosure Statement and Plan**" or "**Plan**").

96.6% of the dollars represented by those ballots (more than $163 million)[3] accepted the Plan. And each class—save one—has overwhelmingly accepted the Plan both in number of creditors or interest holders voting and dollars voted.  The one Voting Class that has rejected the Plan turned on the vote of a single creditor who asserts a large, heavily disputed, but wholly unliquidated, litigation Claim and rejected the Plan.  Further, only two alleged creditors submitted opposition to the Plan, but neither objection is well-founded that warrant denial of confirmation, particularly in light of the otherwise overwhelming acceptance by the Debtors' other investors.  Instead, for the reasons set forth in this memorandum of law and the accompanying declarations[4] submitted in support of confirmation, the Court should confirm the Plan.

## II.    BACKGROUND AND OVERVIEW OF THE COMBINED DISCLOSURE STATEMENT AND PLAN

3.    Pre-petition, the Debtors' businesses consisted of raising funds from investors (through issuance of notes or limited partnership interests) that would be used to originate or purchase mortgages or participation interests in mortgages.  The Debtors would then service those mortgages until repayment of the mortgage, sale of the mortgage, or realization on the underlying property (or REO) that secured the mortgage.  The proceeds of those mortgages (both

---

[3]    This dollar amount only includes Magnetar's claim once even though it holds the same claim against three Debtors.

[4]    Contemporaneous herewith, the Debtors have field the *Declaration of David Dunn in Support of Confirmation of the Combined Disclosure Statement and Joint Chapter 11 Plan for Peer Street, Inc., and Its Affiliated* Debtors the "**Dunn Declaration**") and the *Declaration of Jason Dombar on behalf of Stretto, Inc. Regarding Solicitation and Tabulation of Votes on the Combined Disclosure Statement and Joint Chapter 11 Plan for Peer Street, Inc. and its Affiliated Debtors* (the "**Voting Declaration**").  The Debtors also rely on the *Declaration of David M. Dunn in Support of the Chapter 11 Filing and First Day Pleadings* [D.I. 3] (the "**First Day Declaration**").

2

principal and interest) would be used to make payments to the Debtors' note and limited partnership investors.  Depending on the product, the Debtors' investors looked to specific individual mortgage assets (specifically, the MPDNs/Fractional Loan product) or pools of specific mortgage assets (specifically, the RWN/Pocket product, PDN/Portfolio product and OppFund) to provide the return on their investment.  Macroeconomic factors created headwinds for the Debtors' business, and they ultimately ceased the origination-side of their business, and the size of their portfolio and UPB under management began to decrease.  As a result, the Debtors did not have sufficient revenue from their loan portfolio to meet the contractually mandated returns on their investment products and at the same time pay the costs of servicing the portfolio.  Nor did the Debtors have access to capital to sustain the servicing and run-off of their portfolio under the ordinary course business terms on which they operated.

4.       Facing these cash shortfalls, the Debtors commenced these Chapter 11 Cases to pursue an orderly liquidation of their remaining assets (both mortgage and non-mortgage) and to proceed with an equitable distribution of those proceeds to their investor and non-investor creditors in a manner as closely aligned to the expectations of their creditors as possible under the circumstances.  Key to that goal was fairly addressing the capital requirements of liquidating their assets (including the costs attendant to an in-court proceeding) and the lack of revenue available to do so.  From the outset of these Chapter 11 Cases, the Debtors intended for such costs to be fairly allocated and borne by the assets liquidated and the creditors receiving those proceeds.

5.       Initially, the Debtors set out to liquidate their assets through a bulk-sale process but pivoted away from that process in the face of investor opposition to it.  The Debtors then focused on the orderly run-off of their loan portfolio.  That run-off is embodied in the Plan, and

3

will be managed by Colchis, an asset management firm whose affiliates, the Pacific Creditors, are far and away the Debtors' largest creditor.[5]

6.          While the Debtors were pursuing the bulk-sale process, various factual and legal issues concerning the nature of the Debtors' interests in the Underlying Loans and Mortgage Interests were raised by parties opposing the sale, most prominently, the Pacific Creditors and the Committee.   The Pacific Creditors also raised concerns over the manner by which the Debtors would pay for the costs of liquidating their assets and distributing funds to creditors. Other creditors joined in those concerns and voiced other complaints about the Debtors' chapter 11 filing in dozens of letters to the Court.

7.          The Plan resolves those disputes by (i) fixing an allocation of the costs incurred (or to be incurred) by the Debtors as they pursue the wind-down of their business through the Chapter 11 Cases on a by-entity and by-asset basis (distinguishing between loan assets and their proceeds that are not Magnetar's collateral and the Debtors' remaining assets that are Magnetar's collateral), and (ii) providing for the distribution of the Debtors' assets to their creditors, after deducting the costs allocated to the liquidation of those assets, consistent with creditor expectations of what assets would be available to pay their claims and (importantly) not available to pay the claims of other creditors.   For example, proceeds of Underlying Loans associated with MPDNs are not made available to make payments to Magnetar,[6] holders of RWNs, or any other creditor.   And, as another example, proceeds of servicing advances and fees earned prior to the

---

[5]    While Colchis is a small equity investor in the Debtors, it does not meet the statutory definition of an insider, nor does it hold any governance or appointment rights.

[6]    The exception is that to the extent any Pre-Effective Date Servicing Advances or Pre-Effective Date Servicing Fees are extant for a particular loan, those amounts get repaid to PSFI as servicer and are not available to MPDN Holders under the applicable documents.

31565170.5

Effective Date, which were historically collected from proceeds of Underlying Loans but not available to holders of MPDNs and RWNs prepetition because, among other reasons, they are Magnetar's collateral, will be paid to Magnetar, rather than being paid to Holders of MPDNs and RWNs.  This treatment, and in particular that related to the Underlying Loans and their proceeds, reflects a settlement of the question of whether the MPDNs represented a general unsecured claim against the issuing Debtor or a participation (or sub-participation) interest in the Underlying Loans and is integral to the Combined Disclosure Statement and Plan and the Debtors' efforts to wind down the Chapter 11 Cases in a timely and efficient manner.

8.    In addition to resolving the allocation, and providing for the payment of the fees, costs and expenses incurred by the Debtors as they pursue their bankruptcy and wind-down, the Plan also includes mechanisms for the payment of such costs to be incurred in the future.  The Debtors will finance their exit from the Chapter 11 Cases using the Funding Pool that was incorporated into the Combined Disclosure Statement and Plan.[7]  Under the Waterfall included in the Plan, costs incurred through the Effective Date will be allocated to each Underlying Loan (determined as a percentage of UPB).  The Funding Pool will be established and funded through a holdback of proceeds of loans as they are liquidated (including loans already liquidated on the Effective Date), with the proceeds not subject to such holdback (or used to pay the cost allocated

---

Those amounts (or rights to be repaid such amounts) will be conveyed to Magnetar under the Plan.

[7]    The Committee expressed a preference to implement an Exit Facility, and the Debtors and Committee jointly elected to pursue an Exit Facility, as disclosed in the initial Plan Supplement, based on a term sheet with Colchis setting forth material economic terms of a facility that remained subject to the negotiation of definitive documentation acceptable to the parties and this Court's approval.  *See* initial Plan Supplement [D.I. 1021], Ex. G.  The parties were not able to arrive at definitive documentation acceptable to the Debtors and Committee, and the Debtors and Committee amended the Exit Facility election in the Plan Supplement.  *See* Amendment to Plan Supplement [D.I. 1046], Ex. G.

31565170.5

to the liquidated loans themselves)[8] available for ultimate distribution to holders of MPDNs and OppFund Interests.  Those held-back proceeds will be used to pay all costs allocated to Underlying Loans that are not liquidated as of the Effective Date and, for holdbacks taken after the Effective Date, a portion will be used to repay parties for funds held-back at earlier dates.

9.      In addition to liquidating the loan portfolio, the Plan provides for Magnetar to be repaid through the turn-over of the cash proceeds of Magnetar's collateral on-hand as of the Effective Date, conveyance, transfer and assignment of the Debtors' interest in the Pre-Effective Date Servicing Advances and Pre-Effective Date Servicing Fees, and payment to Magnetar of any proceeds from liquidation of its other collateral after the Effective Date.[9]  In addition to the payment of OpEx and Restructuring Costs from Cash Collateral prior to the Effective Date, a portion of the Cash Collateral will be contributed to the Corporate Debtor Reserve to pay Magnetar's share of post-Effective Date expenses, including those designated as Restructuring Costs in the Plan Supplement.

10.     The Plan provides for the payment in full of allowed administrative and priority claims, the payment in full of secured claims (or return of collateral in lieu of payment), and for unsecured claims to be paid from the proceeds, if any, of unencumbered collateral.

---

[8]    If a loan is liquidated as of the Effective Date, the costs allocated to that loan will be paid from its own liquidation proceeds and such amounts permanently reduce the amounts available for distributions to investors with respect to that loan.

[9]    In connection with submitting its vote on the Plan, Magnetar asserted that its liens and security interests attached to the Corporate Loans, which are Underlying Loans that PSI owns the ultimate beneficial interest in and are not otherwise associated with the Debtors' investment products.  The Combined Disclosure Statement and Plan reflected the Debtors' belief that the loans were not encumbered.  *See* Combined Disclosure Statement and Plan § 2.1 and Exhibit A (Liquidation Analysis).  The Debtors will work with Magnetar in advance of Confirmation to obtain an appropriate preservation or resolution of this dispute.  Magnetar has purported to condition its vote on the outcome of this dispute and reserved its

31565170.5

11.     All of this will be overseen by the Plan Administrator who is charged with liquidating (or overseeing the liquidation of) the Debtors' assets, making distribution to creditors and otherwise winding-up the corporate affairs of the Debtors.

12.     The Plan is a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors.  However, the Plan does not involve the consolidation of any Debtors so each Class exists on a Debtor-by-Debtor basis, and distributions made to Holders of Claims against a particular Debtor shall be made only from the assets of that Debtor.  Article IV of the Plan classifies fifteen (15) Classes of Claims against and Interests in the various Debtors:  Class 1 (Priority Non-Tax Claims); Class 2 (Other Secured Claims); Class 3 (Prepetition Loan Claims); Class 4 (General Unsecured Claims); Class 5 (Intercompany Claims and Interests); Class 6 (Securities Law Claims); Class 7 (Parent Interests); Class 8 (Pocket 1 Month Claims); Class 9 (Pocket 3 Month Claims); Class 10 (Liquidated MPDN Claims); Class 10-1 (Convenience Liquidated MPDN Claims); Class 11 (Unliquidated MPDN Claims); Class 11-1 (Convenience Unliquidated MPDN Claims); Class 12 (FBO Account Claims); Class 13 (PDN Claims); Class 14 (OppFund LP Interests); and Class 15 (General Unsecured Claims Against REO Debtors).  Section 6.8 of the Plan provides that if a Class against a Debtor does not have any claims in it as of the Confirmation Hearing, it is deemed eliminated from the Plan.

13.     Below is a summary of the Classes that exist at each Debtor as of the date hereof and whether they accepted the Plan or not.  Following that summary, is the explanation for why particular classes were eliminated from the Plan.

| Debtor Name | Classes (and results of voting) | Vacant and Eliminated Classes |
|---|---|---|
| PSI | • Class 1 (Deemed to Accept) | • Class 6 |

rights.  The Debtors reserve their rights with respect to the dispute and any purported conditionality of Magnetar's vote.

| | | |
|---|---|---|
| | • Class 2 (Deemed to Accept)<br>• Class 3 (Accepted)<br>• Class 4 (Rejected)<br>• Class 5 (Deemed to Accept)<br>• Class 7 (Rejected) | |
| PSFI | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 3 (Accepted)<br>• Class 4 (Accepted)<br>• Class 5 (Deemed to Accept) | • Class 6 |
| Warehouse I | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 5 (Deemed to Accept) | • Class 4 |
| Warehouse II | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 5 (Deemed to Accept) | • Class 4 |
| PSFLLC | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 4 (Accepted)<br>• Class 5 (Deemed to Accept)<br>• Class 6 (No votes)<br>• Class 8 (Accepted)<br>• Class 9 (Accepted)<br>• Class 10 (Accepted)<br>• Class 10-1 (Accepted)<br>• Class 11 (Accepted)<br>• Class 11-1 (Accepted)<br>• Class 12 (Accepted) | • None |
| PS Portfolio | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 4 (Accepted)<br>• Class 5 (Deemed to Accept)<br>• Class 13 (Accepted) | • Class 6 |
| OppFund GP | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 4 (Accepted)<br>• Class 5 (Deemed to Accept) | • None |
| OppFund | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 4 (Accepted)<br>• Class 5 (Deemed to Accept)<br>• Class 14 (Accepted) | • Class 6 |
| PS Options | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept) | • Class 4 |

| | • Class 5 (Deemed to Accept) | |
|---|---|---|
| PSLI | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 3 (Accepted)<br>• Class 5 (Deemed to Accept) | • Class 4 |
| PSF REO LLC | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 5 (Deemed to Accept)<br>• Class 15 (Deemed to Accept) | • None |
| PSF Ohio, LLC | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 5 (Deemed to Accept)<br>• Class 15 (Deemed to Accept) | • None |
| PSF TX 1, LLC | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 5 (Deemed to Accept)<br>• Class 15 (Deemed to Accept) | • None |
| PSF TX 2, LLC | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 5 (Deemed to Accept) | • Class 15 |
| PSF TX 4 LLC | • Class 1 (Deemed to Accept)<br>• Class 2 (Deemed to Accept)<br>• Class 5 (Deemed to Accept) | • Class 15 |

14. The Debtors are still conducting their analysis of whether claims asserting priority or secured status are, in fact, entitled to such status. As a result, the Debtors believe it is premature to determine if Classes 1 or 2 are vacant at any Debtor. It is possible that these Classes are vacant for one or more Debtors.

15. Class 3 only exists at PSI, PSFI and PSLI, and each of these Debtors has a claim against it in Class 3.

16. The Plan contemplated that Class 4 may exist at each of the Debtors other than the REO Debtors. PSI, PSFI, OppFund, OppFund GP, PSFLLC, and PS Portfolio have filed or scheduled General Unsecured Claims against them. Class 4 is vacant at PSLI and PS Options. The Debtors also believe that Class 4 is vacant at the remaining Debtors for the following reasons:

- Warehouse I:  No General Unsecured Claims were scheduled for this entity.  There are three filed proofs of claim on the official claims against this entity.  Each is subject to a pending, unopposed objection to move the claims other entities. *See* POC No. 101 and D.I. 954; POC No. 347 and D.I. 954; POC No. 1437 and D.I. 956.

- Warehouse II:  No General Unsecured Claims were scheduled for this entity.  There are two filed proofs of claim on the official claims against this entity, but neither assert claims against Warehouse II.  One is subject to a pending, unopposed objection to move the claim to PSFLLC, *see* POC No. 1020 and D.I. 959.  The other claim, *see* POC No. 1040, was filed by a creditor who filed three later proofs of claim indicating that she was amending her claim against Warehouse II to assert the claim against PSFLLC, *see* POC Nos. 1082, 1110, 1321.  As a result of these amendments to Claim No. 1040, the creditor no longer asserts a claim against Warehouse II.

For each of these two Debtors, no ballots were issued for General Unsecured Claims in Class 4 and no party moved to have their claim allowed in that Class.

17.     Class 5 consists of all Intercompany Claim and Interests and exists at each Debtor.

18.     The Plan contemplated that Class 6 may exist at PSI, PSFI, PSFLLC, PS Portfolio and OppFund.  Based on the Debtors' review of the proofs of claim filed against each of the Debtors other than PSFLLC, the Debtors do not believe that any Securities Law Claims have been asserted against those Debtors.  Accordingly, the Debtors believe that Class 6 is vacant and should be eliminated from the Plan as to all Debtors other than PSFLLC.  With respect to PSFLLC, the Debtors are still conducting their analysis of filed proofs of claim and believe it is premature to conclude whether Class 6 is vacant.

19.     As set forth in the Plan, Class 7 only exists at PSI; Classes 8 through 12 only exist at PSFLLC; Class 13 only exists at PS Portfolio; and Class 14 only exists at OppFund.  Myriad interests (in the case of Classes 7 and 14) and claims (in the case of the other Classes) have been filed or scheduled in these Classes against the applicable Debtors.

20.     The Plan contemplated that Class 15 may exist at each of the REO Debtors.  As of the date hereof, only PSF Ohio, LLC, PSF REO, LLC and PSF TX 1, LLC have filed or

scheduled General Unsecured Claims against them.  Thus, Class 15 is vacant, and eliminated under the terms of the Plan, for Debtors PSF TX 2, LLC and PSF TX 4, LLC.

## III.    OBJECTIONS TO THE COMBINED DISCLOSURE STATEMENT AND PLAN

21.    There are two persons/groups opposing the Combined Disclosure Statement and Plan:  Michael Ball, *see* Docket No. 904 and 1023,[10] and Rivka and Ahron Braun, *see* Docket No. 1027.  Each of these objections raises issues concerning confirmation of the Plan only.

22.    Mr. Ball is an investor who holds approximately $45,000 of MPDNs and rejected the Plan.  In Mr. Ball's objections (styled as motions to amend the Combined Disclosure Statement and Plan or a motion to appoint a "subclass" of investors), he appears to raise the following issues:  (i) PSFLLC should not have filed bankruptcy; (ii) it is improper to allocate costs of the Chapter 11 Cases to holders of MPDNs/pay such costs from proceeds of loans related to MPDNs; (iii) less costs should be allocated to MPDNs and the associated loans versus the Debtors' other investment products and associated assets; and (iv) the fees payable to the Asset Manager are too high.

23.    The Brauns purport to own a property that was previously encumbered by a mortgage that Peer Street at one time owned.  Ms. Braun voted a $900,000 claim against PSI to reject the Plan (the sole rejecting vote in that Class).  Mr. Braun filed a $950,000 claim against PSI that he asserts was entitled to priority status and, thus, not in a Voting Class.  The Braun's claims are disputed.[11]  In their objection, the Brauns appear to object to the Plan's treatment of

---

[10]    D.I. 904 is referred to herein as the "**First Ball Objection**," and D.I. 1023 is referred to herein as the "**Second Ball Objection**."

[11]    The Debtors deny any liability to the Brauns.  Their two claims are duplicative, and Mr. Braun's claim has no valid entitlement to priority.  Their claims will be litigated at a future date and not at the Confirmation Hearing.  Whether the Debtors have any liability to the Brauns has no bearing on confirmation.

31565170.5

the proceeds of mortgage loans and, specifically, the fact that the Plan respects the participation interests that each Debtor holds and provides for the proceeds of loans nominally held by PSFI to be distributed to other Debtors for further distribution by those Debtors.

24.     Each of these issued are addressed below, and for the reasons discussed herein, Mr. Ball's and the Brauns' objections should be overruled.

## IV.    PLAN SOLICITATION AND VOTING

25.     On March 13, 2024, the Court entered the Solicitation Procedures Order [D.I. 943], pursuant to which the Court, among other things, (i) established procedures for the solicitation and tabulation of votes to accept or reject the Combined Disclosure Statement and Plan, (ii) approved the forms for each Ballot and solicitation materials, (iii) approved, on an interim basis, the Disclosure Statement, and (iv) scheduled the Confirmation Hearing and established related deadlines.

26.     In accordance with the Solicitation Procedures Order, on March 19, 2024, the Claims Agent (Stretto) transmitted the Confirmation Hearing Notice to the following parties: (a) all persons or entities that have filed, or are deemed to have filed a proof of Claim or request for allowance of Claim as of the Record Date; (b) all persons or entities listed on the Schedules as holding a Claim or potential Claim; (c) the Securities and Exchange Commission and any regulatory agencies with oversight authority of the Debtors; (d) the Internal Revenue Service; (e) the United States Attorney's office for the District of Delaware; (f) other known Holders of Claims (or potential Claims) and Interests; (g) all entities known to the Debtors to hold or assert a lien or other interest in the Debtors' property; (h) all parties listed on the Debtors' creditor matrix; and (i) any other parties that have requested notice pursuant to Bankruptcy Rule 2002.

27.     On March 20, 2024, the Debtors, through Stretto, commenced the solicitation of votes to accept or reject the Plan from Holders of Claims in Classes 3, 4, and 8 through 14,

which are the only Classes entitled to vote on the Plan. Stretto transmitted to Holders of Claims in the Voting Classes that were entitled to vote on the Plan under the Solicitation Procedures Order the following materials (collectively, the "**Solicitation Packages**"): (i) the Combined Disclosure Statement and Plan; (ii) notice of entry of the Solicitation Procedures Order and the confirmation hearing (the "**Confirmation Hearing Notice**"); (iii) the applicable Ballots; (iv) the presentation of the Official Committee of Unsecured Creditors regarding the Combined Disclosure Statement and Plan (the "**Committee Presentation**"); (v) the Liquidation Analysis; and (vi) a pre-paid, pre-addressed return envelope (if via first class mail). The deadline to submit ballots was 5:00 p.m. April 18, which was extended until April 19, 2024 for Armanino LLP, until April 22, 2024 for Cole-Frieman & Mallon LLP, and until April 23, 2024 for Magnetar.

28.     On March 29, 2024, Stretto executed an affidavit of service [D.I. 978] (the "**Solicitation Affidavit**") regarding the mailing of the Confirmation Hearing Notice and the Solicitation Packages thereby evidencing service in accordance with the terms of the Solicitation Procedures Order.

29.     As attested to in the Voting Declaration, the Plan was accepted by all Voting Classes, other than Class 4 at PSI. A summary of the voting results is below:

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Share Voted) | NUMBER (% of Number voted) | AMOUNT (% of Amount/Share Voted) | NUMBER (% of Number Voted) |
| Class 3 – Prepetition Loan Claims against PSI only | $27,239,166.74 (100.00%) | 1 (100.00%) | $0 (0.00%) | 0 (0.00%) |
| Class 3 – Prepetition Loan Claims against PSFI only | $27,239,166.74 (100.00%) | 1 (100.00%) | $0 (0.00%) | 0 (0.00%) |

31565170.5

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Share Voted) | NUMBER (% of Number voted) | AMOUNT (% of Amount/Share Voted) | NUMBER (% of Number Voted) |
| Class 3 – Prepetition Loan Claims against PSLI only | $27,239,166.74 (100.00%) | 1 (100.00%) | $0 (0.00%) | 0 (0.00%) |
| Class 4 – General Unsecured Claims against all Debtors other than REO Debtors – PSI | $151,651.37 (14.42%) | 11 (91.67%) | $900,000.00 (85.58%) | 1 (8.33%) |
| Class 4 – General Unsecured Claims against all Debtors other than REO Debtors – PSFI | $568,220.29 (100.00%) | 16 (100.00%) | $0 (0.00%) | 0 (0.00%) |
| Class 4 – General Unsecured Claims against all Debtors other than REO Debtors – PSFLLC | $1,533,377.99 (99.73%) | 73 (97.33%) | $4,147.92 (0.27%) | 2 (2.74%) |
| Class 4 – General Unsecured Claims against all Debtors other than REO Debtors – PS Portfolio-ST1, LLC | $1,995.40 (100.00%) | 1 (100.00%) | $0 (0.00%) | 0 (0.00%) |
| Class 4 – General Unsecured Claims against all Debtors other than REO Debtors – OppFund GP | $31,394.00 (100.00%) | 2 (100.00%) | $0 (0.00%) | 0 (0.00%) |
| Class 4 – General Unsecured Claims against all Debtors other than REO Debtors – OppFund | $850.00 (100.00%) | 1 (100.00%) | $0 (0.00%) | 0 (0.00%) |
| Class 8 - Pocket 1 Month Claims | $17,936,118.06 (80.29%) | 359 (98.36%) | $4,402,811.31 (19.71%) | 6 (1.64%) |
| Class 9 - Pocket 3 Month Claims | $1,159,386.82 (99.66%) | 22 (95.65%) | $3,915.23 (0.34%) | 1 (4.35%) |
| Class 10 - Liquidated MPDN Claims | $44,327,820.73 (99.63%) | 859 (98.85%) | $166,531.00 (0.37%) | 10 (1.15%) |
| Class 10-1 - Convenience Liquidated MPDN Claims | $327,396.00 (98.05%) | 169 (98.26%) | $6,500.00 (1.95%) | 3 (1.74%) |
| Class 11 - Unliquidated MPDN Claims | $57,696,657.91 (99.76%) | 843 (99.06%) | $140,082.00 (0.24%) | 8 (0.94%) |

31565170.5

| CLASS | TOTAL BALLOTS RECEIVED | | | |
| --- | --- | --- | --- | --- |
| | Accept | | Reject | |
| | AMOUNT (% of Amount/Share Voted) | NUMBER (% of Number voted) | AMOUNT (% of Amount/Share Voted) | NUMBER (% of Number Voted) |
| Class 11-1 - Convenience Unliquidated MPDN Claims | $435,143.00 (97.06%) | 207 (96.28%) | $13,167.00 (2.94%) | 8 (3.72%) |
| Class 12 - FBO Account Claims | $1,794,267.04 (99.75%) | 798 (98.52%) | $4,557.05 (0.25%) | 12 (1.48%) |
| Class 13 - PDN Claims | $394,635.51 (100.00%) | 31 (100.00%) | $0 (0.00%) | 0 (0.00%) |
| Class 14 - OppFund LP Interest | $9,567,557.00 (100.00%) | 16 (100.00%) | $0 (0.00%) | 0 (0.00%) |

## V.    THE COMBINED DISCLOSURE STATEMENT AND PLAN SHOULD BE APPROVED AS ADEQUATE ON A FINAL BASIS UNDER BANKRUPTCY CODE SECTION 1125

30.    By the Solicitation Procedures Order, the Court approved the Combined Disclosure Statement and Plan on an interim basis for solicitation purposes under Bankruptcy Code sections 105 and 1125 and Bankruptcy Rule 3017.

31.    No party has raised objections regarding the adequacy of the disclosures in the Combined Disclosure Statement and Plan.  For the reasons set forth in the Debtors' motion seeking interim approval of the Combined Disclosure Statement and Plan, *see* [D.I. 815], which is incorporated herein by reference, the Combined Disclosure Statement and Plan contains adequate information and should be approved on a final basis.

## VI.    THE PLAN SHOULD BE CONFIRMED BECAUSE IT COMPLIES WITH THE REQUIREMENTS OF BANKRUPTCY CODE SECTION 1129.

32.    Bankruptcy Code section 1129 governs confirmation of a chapter 11 plan and sets forth the requirements that must be satisfied for a plan to be confirmed.  The Debtors bear

31565170.5

the burden of establishing that all elements necessary for confirmation of the Plan under Bankruptcy Code section 1129(a) have been met by a preponderance of the evidence.[12]    This Memorandum, the Dunn Declaration, and the Voting Declaration demonstrate that, by a preponderance of the evidence, the Plan complies with the requirements of Bankruptcy Code section 1129(a) with respect to all Classes of Claims and Interests and that no meritorious objections to confirmation have been asserted.  Accordingly, the Plan should be confirmed.

### A.    The Plan Complies with All Applicable Provisions of the Bankruptcy Code—11 U.S.C. § 1129(a)(1).

33.    Bankruptcy Code section 1129(a)(1) provides that a court may confirm a chapter 11 plan only if such plan complies with applicable provisions of the Bankruptcy Code.[13]  A principal objective of section 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan. Accordingly, the determination of whether the Plan complies with section 1129(a)(1) requires an analysis of its compliance with Bankruptcy Code sections 1122 and 1123.[14]  As set forth below, the Plan complies with these sections of the Bankruptcy Code.

---

[12]    *See In re Tribune Co.*, 464 B.R. 126, 151–52 (Bankr. D. Del. 2011) (explaining that the plan proponent bears the burden of establishing the plan's compliance with Bankruptcy Code section 1129(a) (*citing In re Exide Tech.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003))); *Heartland Fed'n Sav. & Loan Ass'n v. Briscoe Enters. Ltd., II (In re Briscoe Enters., Ltd., II*), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that the bankruptcy court must find that the debtor has satisfied the provisions of section 1129 by a preponderance of the evidence); *In re Alta+Cast, LLC*, No. 02-12982 (MFW), 2004 Bankr. LEXIS 219, at *5 (Bankr. D. Del. Mar. 2, 2004) (same).

[13]    *See* 11 U.S.C. § 1129(a)(1)

[14]    The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123, which govern the classification of claims under the plan and the contents of the plan, respectively.  *See* H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963; *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

### 1.   The Classification of Claims and Interests in the Plan Satisfies the Requirements of Bankruptcy Code Section 1122.

34.   Bankruptcy Code section 1122(a) provides that the claims or interests within a given class must be "substantially similar."[15]   Section 1122(a), however, does not mandate that "substantially similar" claims be classified together.[16]   Bankruptcy Code section 1122 provides plan proponents with a great degree of flexibility in classifying claims and interests, and courts are offered broad discretion in approving a proponent's classification scheme and to properly consider the specific facts of each case before rendering a decision.[17]

35.   In accordance with Bankruptcy Code section 1122(a), each Class of Claims against and Interests in the Debtors contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.   For instance, each of the Debtors' investment products has been placed in its own Class reflective of the unique characteristic, limitations and legal entitlements of each investment product.   The MPDN Claims have been further segregated into four Classes based on whether the MPDN relates to a liquidated or unliquidated loan and whether the Holder of the Claim has small ($5,000 or less) or larger MPDN holdings.   The separate MPDN Claim classifications were done to facilitate the efficient administration of the Plan and post-Effective Date funding mechanics, as detailed in the Dunn Declaration.

---

15   *See* 11 U.S.C. § 1122(a).

16   *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (agreeing that section 1122 permits the grouping of similar claims in different classes); *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004) (noting that "section 1122 . . . provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes").

17   *See In re Jersey City Med. Ctr.*, 817 F.2d at 1060–61 ("Congress intended to afford bankruptcy judges broad discretion [under section 1122] to decide the propriety of plans in light of the facts of each case").

31565170.5

36.     Here, the Plan's classification scheme satisfies the requirements of Bankruptcy Code section 1122, because the Claims and Interests in each Class differ from the Claims and Interests in each other Class in legal or factual nature or are based upon other relevant criteria. In addition, valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims against and Interests in the Debtors under the Plan.  Based upon the foregoing, the Debtors submit that the Plan satisfies the requirements of Bankruptcy Code section 1122.

### 2.    The Plan Satisfies the Requirements of Bankruptcy Code Section 1123(a).

37.     The Plan also complies with Bankruptcy Code section 1123(a), which sets forth seven (7) requirements for every chapter 11 plan.[18]  As demonstrated below, the Plan complies with each such requirement:

i.    Section 1123(a)(1).  Article IV of the Plan properly designates all Claims and Interests that require classification, as required by Bankruptcy Code section 1123(a)(1).

ii.    Section 1123(a)(2)–(3).  Articles IV and VI of the Plan specify whether each Class of Claims or Interests is Impaired under the Plan and the treatment of each Impaired Class, as required by Bankruptcy Code section 1123(a)(2)–(3).

iii.    Section 1123(a)(4).  In accordance with Bankruptcy Code section 1123(a)(4), Article IV of the Plan provides the same treatment for each Claim or Interest in a given Class unless the Holder of such Claim or Interest agrees to less favorable treatment, including by making the election in Section 4.4 of the Plan to "cash-out" of the Funding Pool at a discount to expected recovery.

iv.    Section 1123(a)(5).  In accordance with Bankruptcy Code section 1123(a)(5), Articles II and III of the Plan provides adequate means for the Plan's implementation.  For example, the Plan will be implemented by, among other things, the appointment of the Plan Administrator as the sole officer and director of Reorganized Debtors as of the Effective Date, the run-off of the loan portfolio by the Asset Manager, the liquidation of non-loan assets, and the making of Distributions to Holders of Allowed Claims from the Debtors' assets.  All property of the Estate will vest in the Estates or Reorganized Debtors, free and clear of all Claims, liens, charges, other encumbrances and Interests.

---

[18]    *See* 11 U.S.C. § 1123(a).

v.  <u>Section 1123(a)(6)</u>.  There are no equity securities being issued under the Plan (other than for administrative convenience), and no charters being modified or approved as part of the Plan.  Therefore, Bankruptcy Code section 1123(a)(6) is inapplicable to the Plan.

vi.  <u>Section 1123(a)(7)</u>.  Section 3.1 of the Plan provides that the Plan Administrator shall act as the sole officer and director of the Reorganized Debtors as of the Effective Date, in accordance with Bankruptcy Code section 1123(a)(7).

    a.  <u>The Asset Management Agreement and Exit Financing are Appropriate.</u>

38.  ***Asset Management Agreement.***  Under the Plan, the Debtors will transition the management of their loan portfolio to Colchis.  No one has objected to the selection of Colchis as Asset Manager.  As detailed in the Dunn Declaration and Combined Disclosure Statement and Plan, Colchis is capable of performing those services.

39.  The Debtors also submit that the compensation payable to Colchis is fair, reasonable, and appropriate under the circumstances.  The fees charged by Colchis match the fees the alternative provider the Debtors and Committee considered retaining; however, Colchis agreed to credit its Asset Management Fee against the Performance Fee and to net Specified Expenses against the Asset Management Fee, reflecting improvements over its competitor's fee structure.  Colchis will, in general, receive fees greater than those historically charged by the Debtors as a servicing fee (which often times was only 1% of UPB).  While the Debtors' servicing fee did not distinguish between distressed and non-distressed loans, in certain instances, the Debtors were permitted to charge incremental asset management fees on distressed loans where they were not able to recover default interest.  Thus, PSFI, as servicer, was able to be compensated at higher rates when loans were in distress.  That is not unlike other servicers and asset managers that often get paid greater fees for managing distressed loan assets.  And the Debtors' remaining loan portfolio has a high concentration of distressed loans.  Thus, the fee

structure provided to Colchis is more in-line with market realities than the Debtors' historic fees were.

40.     Mr. Ball objects to Colchis's fee structure.  *See* First Ball Obj. [D.I. 904], ¶¶ 33-37.  For several reasons, Mr. Ball's objection should be overruled.  First, Mr. Ball is the only party objecting to Colchis's fee structure, and he holds 0.02% of the MPDN Claims in Class 11 and 11-1 as of the Record Date.[19]  In other words, more than 99.98% of the MPDN Claims in Classes 11 and 11-1 that will be burdened by Colchis's fee structure have no objection to it.

41.     Second, Colchis' fees are better than those offered by the alternative candidate that was considered for the Asset Manager role.  And the Debtors' existing fee structure was not targeted to a distressed loan portfolio, which is what Colchis is taking over management of, and distressed loan management routinely warrants higher fees.  Third, Mr. Ball's analysis appears to double-count the Asset Management Fee and the Performance Fee (the latter of which is reduced by the former).  The aggregate fees paid to Colchis for a given loan are 1.5% of UPB *per annum* of loans or REO that are not liquidated as of the Effective Date; a Performance Fee of 2% of collections (which is reduced by the Asset Management Fee and Specified Expenses); and an up-front Structuring Fee of 0.5% of UPB of loans or REO that are not liquidated as of the Effective Date.  In the end, the aggregate fees to be paid to Colchis likely will not exceed 3% of UPB on any given loan, not 4%.  And Mr. Ball himself concedes that the Debtors' per loan fees sometimes were as large as 2.25% and that a fee of 2% would be "fair and reasonable."  *Id.* ¶ 37. Thus, the discrepancy is not as large as Mr. Ball submits, and, Mr. Ball ignores the fact that the

---

[19]   There were approximately $106 million MPDN Claims in Classes 11 and 11-1 as of the Record Date.  Mr. Ball's Class 11 ballot reflected a claim in the amount of $18,000, meaning that the costs burden for Colchis's fees will be only hundreds of dollars.  It is possible that the loans he invested in resolve prior to the Effective Date, further reducing the amount of his claim that will be subject to Colchis's fee structure.

31565170.5

fee structure the Debtors employed proved to be inadequate to fund their operations and contributed to the cash flow issues that led the Debtors to these Chapter 11 Cases. Because the Colchis fee structure is reasonable and not objectionable to any other creditor that will be burdened by it (99.97% of whom voted to accept the Plan), the Court should overrule Mr. Ball's objection on these grounds.

42.     ***Exit Financing***.  The Debtors intend to finance their exit from the Chapter 11 Cases using the Funding Pool.  No party has objected to implementation of the Funding Pool, and 99.6% of MPDN Holders that voted accepted the Plan, which disclosed that the Funding Pool was an option (and was always at least a fallback option).  As described above, the Funding Pool will hold back amounts from loans that are liquidated to pay the costs associated with and expected to be incurred for loans that are not yet liquidated.  Under the Funding Pool, such "borrowings" would be subject to an interest charge that approximates the prevailing interest rate determined from the Exit Facility solicitation process.  And parties contributing to the Funding Pool would have the opportunity to receive compensation for their "lending" to other creditors at a similar rate of return, subject to recovery of all advances from the Funding Pool.

43.     As disclosed in the Combined Disclosure Statement and Plan, an Exit Facility was the Committee's preferred option, and the Debtors and Committee elected to proceed down that path, with the Funding Pool serving as a fallback, as disclosed in the initial Plan Supplement.[20]   However, the Debtors and Committee were not ultimately able to reach documentation acceptable to them for the Exit Facility and determined to withdraw their election to proceed with it.

---

[20]   *See* Plan Supplement [D.I. 1021, Ex. G].  Among other things, the Combined Disclosure Statement and Plan provided that if an Exit Facility was implemented it would be substituted for the Funding Pool in the Waterfall.  *See* Combined Disclosure Statement and Plan § 2.9.

44.     The Debtors submit that each of these funding options are appropriate, fair, and reasonable, reflect economics that have been tested in the market, and are necessary to ensure implementation and success for the Plan.

### 3.     The Combined Disclosure Statement and Plan Complies with the Requirements of Bankruptcy Code Section 1123(b).

#### a.     The Plan Discretionary Provisions are Consistent with Section 1123(b).

45.     Bankruptcy Code section 1123(b) contains various discretionary provisions that may be included in a chapter 11 plan.[21]  For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases.  A plan also may include the settlement or adjustment of any claim or interest held by the debtor or the debtor's estate, or provide for the debtor's retention and enforcement of any such claim or interest.[22]  Likewise, a plan may modify the rights of secured creditors or unsecured creditors, or leave unaffected the rights of creditors in any class of claims.[23]  Finally, a plan may contain "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[24]

46.     In accordance with the Bankruptcy Code section 1123(b), the Combined Disclosure Statement and Plan employs various discretionary provisions, including the following:

---

[21]  *See* 11 U.S.C. § 1123(b).

[22]  *See* 11 U.S.C. § 1123(b)(3)(A), (B); *see, e.g., In re Exide Tech.*, 303 B.R. at 67 (Bankr. D. Del. 2003) (noting that 11 U.S.C. § 1123(b)(3)(A) permits settlements to be incorporated into a plan of reorganization); *Cohen v. TIC Fin. Sys. (In re Ampace Corp.),* 279 B.R. 145, 158–59 (Bankr. D. Del. 2002) (noting that 11 U.S.C. § 1123(b)(3)(B) permits a plan to retain causes of action by the debtor or representatives).

[23]  11 U.S.C. § 1123(b)(5).

[24]  11 U.S.C. § 1123(b)(6).

i.  The Plan resolves the issues litigated at the outset of the case concerning the asserted characterization of the MPDNs as loan participations and how the costs of running the Debtors' business and implementing its wind-up would be allocated and paid for through, among other things, the allocations established in Section 2.4 of the Plan, implementation of the Waterfall in Section 2.6, and the treatment of Claims (including MPDN Claims) in Section 4.3 of the Plan;

ii.  Article IV provides that certain Classes are Unimpaired and others are Impaired;

iii.  Articles X and XI, establish procedures for the mechanics for distribution and settlement of Claims and with respect to Allowed Claims;

iv.  Article XII provides for the rejection of all of the Debtors' executory contracts and leases that are not assumed or assumed and assigned or subject to a motion to do so filed by the Effective Date;

v.  Article XV provides that the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Combined Disclosure Statement and Plan, except as otherwise specifically stated therein;[25] and

vi.  Article XIV, as further discussed below, provides for: (a) an exculpation and limitation of liability (the "**Exculpation**"); (b) a release by the Debtors of certain parties (the "**Debtor Release**"); (c) a release by certain third-parties (the "**Third-Party Release**," and together with the Debtor Release, the "**Releases**"); and (d) certain injunction provisions prohibiting parties from pursuing Claims or Causes of Action exculpated or released under the Combined Disclosure Statement and Plan or to enforce Claims against the Debtors (the "**Injunction**").

47.  The Debtors submit that the discretionary provisions contained in the Combined Disclosure Statement and Plan are reasonable and appropriate in light of the circumstances of the Chapter 11 Cases and permissible under Bankruptcy Code section 1123(b).

b.  <u>The Allocation, Participation and Intercompany Claim and Interest Settlements in the Plan are Appropriate.</u>

48.  The Plan reflects and incorporates certain settlements and compromises as permitted by section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

---

[25]  *See Gruen Mktg. Corp. v. Asia Commercial Co., Ltd.* (*In re Jewelcor Inc.*), 150 B.R. 580, 582 (Bankr. M.D. Pa. 1992) ("There is no doubt that the bankruptcy court's jurisdiction

Compromises are favored in bankruptcy because they minimize the costs of litigation and further the parties' interests in expediting administration of a bankruptcy estate.[26]  In deciding whether to approve a compromise under Bankruptcy Rule 9019, the Bankruptcy Court must determine if the settlement is fair, reasonable, and in the interests of the estate.[27]  Additionally, the Third Circuit applies a four-factor balancing test for considering motions to approve settlements under Bankruptcy Rule 9019, weighing:

a)  the probability of success in litigation;

b)  the likely difficulties in collection;

c)  the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

d)  the paramount interest of the creditors.[28]

49.     Through the Plan the Debtors have proposed a settlement of various interrelated issues that were litigated at the outset of these cases.  First, the Plan provides for the allocation and payment of OpEx and Restructuring Costs incurred while the Debtors have been winding down their business operations and loan portfolio.  Issues with such allocation and payment were raised by the Pacific Creditors in their omnibus objection to the Loan Sale Motion and cash management motion, as well as many other letters to the Court.

50.     The methodology for allocating these expenses is fair, reasonable, and proportional.  With respect to Restructuring Costs, the Debtors allocated such amounts based on the relative value of the assets owned by the Debtors (using UPB as a proxy with respect to loan

---

continues post-confirmation to 'protect its confirmation decree, to prevent interference with the execution of the plan and to aid otherwise in its operation.'" (citations omitted)).

[26]  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

[27]  *See, e.g.*, *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) (citation omitted)).

[28]  *In re Martin*, 91 F.3d at 393.

assets). The Debtors believe that such an allocation is appropriate because the purpose of these Chapter 11 Cases is to ultimately reduce assets to cash and distribute those assets to their creditors.

51.     With respect to OpEx, the Debtors allocated those costs between PSI and PSFI based on a prior time study performed by the Debtors and used historically to allocate the value and costs of intercompany transactions. Not only is the allocation reflective of historic practice, but it is reasonable when considered in light of the fact that these are the two "operating" entities, and the remaining legal entities in the Debtors' corporate family are largely pass-through or holding companies with little, if any, operations, particularly in the post-petition period when the Debtors were unable to make distributions to creditors through these holding companies.

52.     The OpEx and Restructuring Costs allocated at PSI were paid entirely using Cash Collateral. The OpEx and Restructuring Costs allocated at PSFI have been allocated to the loan assets PSFI holds and services (down to the loan level), and PSFI will recoup those costs from the proceeds of loans as they liquidate before transferring those proceeds to other Debtors under the terms of the various intercompany loan or participation agreements. The Debtors who are the participants or lenders under these agreements with PSFI have consented to that recovery from the loan proceeds; the Plan otherwise provides for those loan proceeds to be transferred in accordance with the intercompany agreements.

53.     Certain of the costs allocated to PSFI have been paid (or will be paid) from Cash Collateral and not from loan proceeds, as set forth in the Cash Collateral Budget. The amount of costs allocated to PSFI and paid from Cash Collateral reflect the relative value of the assets owned by PSFI that will be used to provide Magnetar its recovery under the Plan, such as servicing fees and advances and other receivables.

54. The Debtors believe that this is the fairest way to allocate OpEx and Restructuring Costs. The Committee has agreed, and the Debtors understand that the Committee reached this agreement after exploring other potential allocation methodologies.

55. Second, the Plan resolves the disputes over the nature of the MPDNs as general unsecured claims against the issuing Debtor or participation interests in the underlying loans through its proposed distribution scheme. The Waterfall set forth in Section 2.6 of the Plan provides for the loan proceeds to be applied to the costs of servicing, repayment of advances, allocated OpEx and Restructuring Costs, plus any amounts reflecting post-Effective Date borrowing costs for such amounts; once those amounts are paid, the Plan provides that the remaining proceeds will be made available to MPDN holders (including for contribution to the Funding Pool). This is, in effect, the same manner in which MPDNs were handled pre-bankruptcy, albeit with a higher cost structure and some (compensated) deferral of payment. The same mechanic works for payment of loan proceeds to PS Portfolio and then to PDNs. Likewise for Warehouse I and Warehouse II, PSFI will pay any loan proceeds to those entities under their participation agreements, Warehouse I and Warehouse II will then repay the loans made to them by PSFLLC, and PSFLLC will then use those proceeds to pay the Pocket 1 Month or Pocket 3 Month RWNs. And for OppFund, loan proceeds that are collateral for the OppFund Loan will be paid to OppFund to make distributions to its creditors and interest holders. Importantly, the proceeds of the loans associated with MPDNs are not being used to pay other Notes claims or PSFI and PSI's creditors. The same is true for the proceeds of loans associated with RWNs, PDNs, and the OppFund Loan/OppFund LP Interests. Nor are PSI or PSFI's assets being distributed to Noteholders.

56.     Finally, the Plan compromises historical intercompany claims, subject to preservation of the OppFund Loan and security interest and PSI's guarantee of the OppFund Loan, without payment other than the repayment or other true-up of OpEx and Restructuring Costs.

57.     Mr. Ball objects to the Debtors' proposal to fund OpEx and Restructuring Costs under the Plan, but those objections should be overruled.[29]

58.     Mr. Ball argues in his objection that the amounts allocated to PSFI that dilute MPDN recoveries are inappropriate based on the "credit risk" that other investors agreed to bear versus MPDN holders.  *See* First Ball Obj. [D.I. 904], ¶¶ 27-32.  However, the Debtors submit that the appropriate allocation for the OpEx and Restructuring Costs should be rooted in what assets or creditors received the value of the services from which the OpEx and Restructuring Costs derive.  Focusing on the level of credit risk parties agreed to bear ignores the foundational question of why services were rendered in the first place and for whose benefit.  PSFI could have simply shutdown or at least ceased servicing the loans that serve as the source of repayment of the MPDNs.  At this stage of the Debtors' existence (including in the run-up to and throughout the Chapter 11 Cases), substantially all the Debtors' business activities involved administering the loan portfolio.  Giving effect to this reality totally refutes the suggestion by Mr. Ball that the costs of the Debtors' bankruptcies, which were commenced to liquidate the loan portfolio, wind-down the Platform, and provide recoveries to investors in Peer Street's products (the overwhelming amount of which are dollars invested in MPDNs), are being inappropriately borne by Holders of MPDNs.  When considered in light of the activities

---

[29]   Based on his $44,000 of MPDN claims, the amount of OpEx and Restructuring Costs borne by Mr. Ball is likely to be about $4,700 based on the Debtors' estimates.

in these Chapter 11 Cases, Mr. Ball's suggestion that every creditor except MPDN holders bear these costs is particularly inequitable.

59.     Nor is Mr. Ball's objection to subjecting MPDN holders to any cost burden well-founded.  *See* First Ball Obj. [D.I. 904], ¶¶ 21-25.  First, Mr. Ball (who holds less than 0.01% of all MPDNs) stands alone in raising this objection. That is so despite substantial MPDN holder engagement with the Plan.  The Debtors received more than 2100 ballots across the four MPDN Claim classes.  Over 98% of the ballots validly cast by MPDN holders accepted the Plan and those ballots represented more than 99.6% of the more[30] than $103 million of the MPDNs that voted on the Plan.  Mr. Ball is receiving the same treatment for his MPDNs as all his fellow MPDN Claim Holders in Classes 10 and 11.  That is exactly what the Bankruptcy Code requires for his Claims.

60.     Second, Mr. Ball's repeated invocation of the "bankruptcy remote" nature of PSFLLC misses the mark.  He ignores that the treatment under the Plan is entirely consistent with treating PSFLLC as "bankruptcy remote"—the proceeds of the loan portfolio, and specifically the portion of the portfolio associated with the MPDNs, are not being distributed to investors in, for example, RWNs or PDNs or creditors other than MPDN holders.  After the deduction of allocated expenses, those amounts will be paid to the MPDN Claim Holders.

61.     Further, the Bankruptcy Code expressly contemplates that when a trustee or debtor in possession incurs costs to preserve the value of assets, those costs can be recovered from those assets before making distributions to creditors.[31]  It is well within the Court's power to allow PSFI to "recover from [the loans it services] the reasonable, necessary costs and

---

[30]   *See* 11 U.S.C. § 1123(a)(4).

[31]   11 U.S.C. § 506(c).

expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of" the holders of participation interests[32] in those loans.[33]

62.     Here, in any event, the primary participation holder (PSFLLC) consents to the allocation of expenses and payment of such expenses from the loans that it has a participation interest in.  Nothing in the documents related to the MPDNs prohibits PSFLLC and PSFI from reaching such an agreement.  So even if the MPDNs were participation interests, at most, those interests extend only to the funds PSFLLC receives from PSFI on account of its participation interests.  For the MDPNs and the Underlying Loans associated with the MPDNs, the Plan proposes to distribute all the proceeds PSFLLC receives from PSFI (after PSFI deducts the costs allocated to the loans) and to distribute such amounts to MPDN Holders, thus it functionally complies with the terms of the MPDNs in any event.

63.     The Brauns object to the Plan on grounds that are the polar opposite of Mr. Ball.  Instead of arguing that the proceeds of the loan portfolio should be entirely distributed to PSFLLC, the Brauns argue that none of the proceeds from the loan portfolio should go to PSFLLC.  They argue that the Plan "diverts and transfers assets [from PSFI] to other Debtors, who are in reality unsecured creditors of [PSFI]," Brauns Obj. [D.I. 1027] ¶ 28, and "the assets of [PSFI] are being distributed to other debtors who are subordinate as an insider to the claims of real Creditors."  *Id.* ¶ 29.

---

[32]  To the extent that participations interests are valid, which the Debtors conceded is at least the case for the intercompany participations, the participations give rise to secured claims under the uniform commercial code, making Bankruptcy Code section 506(c) applicable to them. U.C.C. § 9-309(3).

[33]  11 U.S.C. § 506(c); *see also* 11 U.S.C. § 1123(b)(5) (allowing modification of the rights of secured and unsecured creditors under a chapter 11 plan).

64.     First, the Debtors have long maintained, and no party (until the Brauns) has challenged, the validity of the participation interests that the other Debtors have in loans nominally owned by PSFI.  Each of PSFI and its Debtor counterpart concedes the validity of the participation interests, which are memorialized in name and substance in various participation agreements between them.  *See* [D.I. 257], Ex. 6 (participation agreement with Warehouse I), Ex. 7 (participation agreement with Warehouse II) Ex. 8 (participation agreement with PSFLLC), Ex. 9 (participation agreement with PS Portfolio), Ex. 33 (participation agreement with OppFund).  There is simply no basis to assert that the intercompany participations are anything other than what they state they are.  Tellingly, no other creditor of PSFI or its Debtor counterparts has raised the objection to the treatment of the loan portfolio under the Plan vis a vis PSFI.

65.     Second, the Brauns have provided no authority for the generalized proposition that claims or property interests held by one debtor against another are subject to subordination solely on the grounds that the Debtors are insiders of each other.  Bankruptcy Code section 510, which governs subordination of claims, contains no such direction that insider claims must be subordinated.[34]  Nor does the Brauns' citation to an article describing the policy behind insider preference claims provide any support for their request that the Debtors (and this Court) not respect the participation interest between PSFI and the other Debtors.  The Brauns' suggestion that such relief should be issued here should be denied.

66.     Here, after netting its costs against proceeds from the Underlying Loans, PSFI will distribute the Underlying Loan proceeds to the necessary co-Debtor—pursuant to the applicable participation agreement—for distribution to the Debtors' investors.  The proposed

---

[34]  *Cf* 11 U.S.C. § 510.

allocation of costs is reasonable and there can be no argument that they were not incurred in service of preserving the loan portfolio and establishing the means for distributing the proceeds thereof to creditors.  Likewise, the Plan's treatment of the intercompany participations and subsequent distributions to outside investors is appropriate under the circumstances of these case and accepted by the affected classes (*i.e.*, the creditors and outside equity holders of PSFI, PSFLLC, PS Portfolio and OppFund) in overwhelming amounts.  Thus, the settlement of the treatment of these intercompany claims and property interests embodied in the Plan are reasonable and appropriate.

67.     Moreover, the *Martin* test strongly favors approving the settlements set forth in the Plan.  After extensive good faith and arm's-length negotiations, the Debtors, the Committee, and the Pacific Creditors reached the settlement embodied in the Combined Disclosure Statement and Plan, which resolves outstanding issues, eliminates the potential for litigation, ensures a recovery to noteholders that is closely aligned to their original investment expectations, and paved the way for a successful Chapter 11 Plan versus a chapter 7 conversion.  These settlements were the product of good-faith and arm's-length negotiations between the parties.  These settlements resolve the disputes regarding potential intercompany claims, the factual and legal issues raised by the Pacific Creditors, the objections raised to the Loan Sale Motion by the Committee and the Pacific Creditors' objection to the Debtors' cash management motion, and the objections of other creditors who joined them, in an efficient, consensual, and cost-effective manner that will avoid litigation and the uncertainty it involves.

68.     In addition, the settlements of these matters: (a) reflect a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes, and

allowing the Debtors to liquidate and distribute their Assets and wind down the Chapter 11 Cases, in a timely and efficient manner, on the other hand; (b) ensure the costs of these Chapter 11 Cases are paid for in a fair manner, favorably resolves and avoids potential litigation, and enables the prompt and efficient wind-down of the Debtors' Estates; (c) are the product of extensive arm's-length and good faith negotiations between sophisticated parties represented by counsel; and (d) are in the best interests of the Debtors, their Estates, holders of Claims and Interests, and other parties-in-interest, and are fair, equitable, and reasonable, as attested to in the Dunn Declaration, and demonstrated by the overwhelming support of the Plan.  The Court should thus approve the Settlement under section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019.

c.   <u>The Releases, Exculpation, and Injunction Should Be Approved.</u>

69.   The Releases, Exculpation, and Injunction are proper because, among other things, they are the product of arms' length negotiations and have been critical to obtaining the support of the various constituencies for the Combined Disclosure Statement and Plan.  Such provisions are fair and equitable, are given for valuable consideration, and are in the best interests of the Debtors and their creditors.  Neither the Releases, the Exculpation, nor the Injunction is inconsistent with the Bankruptcy Code and, as a result, the requirements of Bankruptcy Code section 1123(b) have been satisfied.

70.   The principal terms of the Releases, Exculpation, and Injunction, as well as the basis for approval of these Plan provisions, are described below.  The Debtors submit that, based upon the circumstances and record of the Chapter 11 Cases, and the paramount interest of creditors and other parties-in-interest, the Releases, the Exculpation, and the Injunction should be approved.

<em>(i)   Debtor Release (Plan § 14.1(b))</em>

31565170.5

71.     Pursuant to the Plan and the Confirmation Order, the Debtors (on their own behalf and as a representative of their respective Estates) will release certain entities from Claims, Causes of Action, and other liabilities as and to the extent set forth in the Plan, but excluding acts of willful misconduct, gross negligence, or fraud.

72.     Each of the parties to be released by the Debtors are stakeholders or critical participants in the Chapter 11 Cases and the Combined Disclosure Statement and Plan process. Specifically, the Released Parties are, solely in their capacity as such:

> (a) the Debtors' officers, directors, agents, attorneys, advisors, employees, and professionals; (b) the members of the Committee and the Committee's attorneys, advisors, and professionals; (c) the Prepetition Agent and Prepetition Lenders; (d) the Plan Administrator; (e) the Asset Manager and Pacific Creditors; and (f) with respect to (b) through (e), their Related Parties, *provided*, *however*, that Released Parties shall exclude (i) any of the foregoing parties that makes a Release Opt-Out Election and (ii) any individual that was an officer or director of the Debtors but did not hold that position on or after the Petition Date.

73.     Section 14.1(b) of the Plan represents a valid settlement (as and to the extent provided for in the Combined Plan and Disclosure Statement) pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019 of whatever Claims any Debtor may have against the Released Parties. The Debtors have proposed these releases based on their sound business judgment.[35]  Indeed, the Debtors believe that, under the circumstances, retaining claims against the Released Parties for future pursuit would not be in the best interest of the Debtors' various stakeholders, the Debtors are not aware any such claims exist, and the costs involved would likely outweigh any potential benefit to the Estates from pursuing such claims.

---

[35]  *See U.S. Bank Nat'l Ass'n v. Wilmington Trust Co., Spansion, Inc. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate.").

31565170.5

74.     Moreover, the efforts of the Released Parties were integral to the development of the Combined Disclosure Statement and Plan, and the timely and efficient resolution of these Chapter 11 Cases.  The Plan (including the releases) is the product of extensive arm's length and good faith negotiations, and the Releases have been an aspect of the Plan from the inception of negotiations over it.  Indeed, the Pacific Creditors and the Committee agreed to support the Plan including, but not limited to, the Releases and Exculpation set forth in Article XIV of the Plan, and the Debtors believe that their support is both an essential element of garnering the tremendous creditor support for the Plan but also telling as to the propriety of the releases.  Indeed, there are no objections to the Releases at all.

75.     Bankruptcy courts typically consider the *Master Mortgage* factors to determine whether a release by a debtor should be approved:  (a) whether there is an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (b) whether the non-debtor has made a substantial contribution; (c) the essential nature of the release to the extent that, without the release, there is little likelihood of success; (d) an agreement by a substantial majority of creditors to support the release, specifically if the impacted class or classes "overwhelmingly" vote to accept the plan; and (e) whether there is a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the release.[36]  Importantly, a court need not find that all of these factors apply to approve a debtor's release of claims.[37]

---

[36]  *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

[37]  *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).

31565170.5

Rather, such factors are "helpful in weighing the equities of the particular case after a fact-specific review."[38]

76.    *First*, there is an identity of interest between the Debtors and the Released Parties because such parties all "share the common goal" of confirming and implementing the Plan.[39] The Plan is the result of efforts by the Debtors and extensive arm's length and good faith negotiations among the Committee, Magnetar, the Pacific Creditors, and the Released Parties resulting in their support of the Plan.  Each of the Released Parties, as a critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed, and ensuring that the Chapter 11 Cases can be wound down in a timely and efficient manner.  Like the Debtors, these parties seek to confirm the Plan and implement the transactions contemplated thereunder.[40]  Further, certain of the Released Parties are entitled to indemnity from the Debtors, such as their officers and directors, and pursuit of litigation against those parties would give rise to duties to defend and claims for indemnity that would increase claims against the Estates, reduce assets of the Estates, or both.

77.    *Second*, the Released Parties are providing necessary contributions in exchange for the Debtor Releases, including by contributing value necessary to consummate the Plan, agreeing to compromise or otherwise waive substantive rights to effectuate a settlement, and providing other material support to the Debtors' overall chapter 11 efforts, including the

---

[38]    *In re Indianapolis Downs, LLC, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013).

[39]    *See In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding an identity of interest existed between the debtors and the released parties because they "share[d] the common goal of confirming" the plan and implementing the global settlement).

[40]    *See Zenith Elecs.*, 241 B.R. at 110 (concluding that certain releases who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed").

Debtors' Plan efforts.[41]  Among other things, the released officers and directors have continued to operate and manage the Debtors' business and financial affairs throughout the Chapter 11 Cases, helped to develop and implement the Debtors' chapter 11 strategy, and otherwise navigated the Debtors through the chapter 11 process.  Additionally, the Committee and the Pacific Creditors have staunchly advocated the views of the investor-body during the Chapter 11 Cases and helped to formulate and negotiate the terms of the Combined Disclosure Statement and Plan and run-off of the loan portfolio, as well as the transactions that will implement it, such as the Asset Management Agreement and the Funding Pool.  Accordingly, the value contributed by the Released Parties is more than sufficient to support the Debtor Release.

78.     *Third*, the Debtor Release is an essential component of the Plan and constitutes a sound exercise of the Debtors' business judgment.  The Debtor Release is a material inducement to the concessions and contributions received by the Debtors and their Estates under the Plan, including the support of Magnetar and the Pacific Creditors, whose opposition to alternative chapter 11 plans that did not release claims against them likely would have scuttled confirmation given their positions in the Debtors' capital structure.  Absent Confirmation of the Plan and the Debtor Release, parties in interest could end back up in extensive, costly, and protracted litigation that the Plan is supposed to resolve.  The results of that litigation could potentially be that only minimal recoveries, if any, or substantially diminished recoveries would be available for many parties in interest that, otherwise, are forecasted to see material recoveries under the Plan—much like the risks to recoveries that are presented in the Liquidation Analysis.  Critically, if the Plan is not approved, distributions to the Debtors' creditors—which are expected to be over $100 million on or about the Plan's Effective Date—will be significantly delayed for an

---

[41]    *See In re W.R. Grace*, 446 B.R. 96, 138 (Bankr. D. Del. 2011).

31565170.5

indefinite period. Accordingly, the Debtor Release is essential to Plan consummation and to preserving and maximizing the value of the Debtors' Estates for the benefit of stakeholders.

79.     *Fourth*, as evidenced by the Voting Report and noted above, the Debtors' stakeholders overwhelmingly support the Plan – more than 98% of creditors that voted accepted the Plan.  No creditor has filed an objection to the Plan on the basis of the Debtor Releases (or even the Third-Party Releases).  This degree of consensus evidences the Debtors' stakeholders' acknowledgment of the propriety of the Debtor Release and the Plan.

80.     *Fifth*, the Debtors project substantial recoveries to the super-majority of their creditors—their investors—under the Plan.  Noteholder and OppFund LP Interest recoveries range from 76% to 91% under the Debtors' Liquidation Analysis.  And while General Unsecured Claims are not projected to receive as sizeable recoveries, the Liquidation Analysis still shows that the Plan provides General Unsecured Creditors the ability to receive materially higher recoveries in a chapter 11 versus recoveries in a chapter 7 (which are *de minimis*).

81.     The Debtor Release represents a valid settlement (as and to the extent provided for in the Combined Plan and Disclosure Statement) of any claims the Debtors and their Estates may have against the Released Parties, pursuant to section 1123(b)(3)(A) and Bankruptcy Rule 9019.  The Debtors, in consultation with the Committee and other constituencies, have proposed the Debtor Release based on their sound business judgment.[42]  For these reasons, the Debtor Release is justified, in the best interests of the Debtors and their Estates, and an integral part of the Plan, and, therefore, should be approved.

---

[42]    *See In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) ("[A] debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate").

### (ii)    Third-Party Releases (Plan § 14.1(c))

82.    Section 14.1(c) of the Plan also provides for consensual releases by the Releasing Parties.  Such consensual releases are fully consistent with governing law.  As the Court has recognized, "[c]ourts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."[43] Releasing Parties excludes any party that makes a Release Opt-Out Election.[44]  As a result, the Releasing Parties have consented to the Third-Party Releases because such parties had the opportunity to affirmatively opt out of the releases, but did not make a Release Opt-Out Election. The Ballots and Confirmation Hearing Notice provided clear notice of the Third-Party Release, and clearly stated that parties would be deemed to have consented to the Third-Party Release if they did not make a Release Opt-Out Election.  The Ballots and Confirmation Hearing Notice further provided instructions on how to make a Release Opt-Out Election—people who made that election are not subject to the Third Party Release.  The Third-Party Release, therefore, has been consented to by each of the Releasing Parties, and, therefore, is appropriate and should be approved.

83.    Even were the Court to consider the *Master Mortgage* factors in the context of the Third-Party Release,[45] they are amply met as noted above.  Indeed, 3,462 creditors validly

---

[43]    *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013); *see also In re Exide Tech.*, 303 B.R. 47, 74 (Bankr. D. Del. 2003) ("The 'Releases by Holders of Claims' provision applies to release both prepetition and postpetition claims against the Releases, but it binds only those creditors and equity holders who accept the terms of the Plan.  Because it is consensual, there is no need to consider the *Zenith* factors."); *In re Wash. Mut., Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011).

[44]    *See* Plan § 1.104.

[45]    *Cf. Exide Tech.*, note 43, *supra*.

cast ballots on the Plan and 3,411 accepted it; only 485 creditors opted out of the Third-Party Release (and as a result will not be bound by it).

(iii)    *Exculpation and Limitation of Liability (Plan § 14.1(a)).*

84.    The Exculpation is narrowly tailored to protect Estate fiduciaries for their actions taken in furtherance of the Chapter 11 Cases.  The Exculpated Parties have participated in the Chapter 11 Cases in good faith, and the Exculpation is necessary to protect those Estate fiduciaries who have contributed to the Debtors' plan efforts from collateral attacks related to their good-faith acts or omissions.  Further, the scope of the Exculpation is targeted, and has no effect on liability that is determined to have constituted bad faith, gross negligence or willful misconduct.  Accordingly, the Court should approve the Exculpation.

(iv)    *Injunction (Plan § 14.1(d))*

85.    Section 14.1(d) of the Plan generally provides that all Entities holding Claims or Interests are permanently enjoined from commencing or continuing in any matter, action or proceeding relating to any Claim or Interest that has been discharged, released, or exculpated pursuant to the Plan or from in any way attempting to enforce, collect, or recover anything (including assertions of any right of setoff, subrogation, or recoupment) on account of such Claims or Interests.[46]    The injunction is necessary to preserve and enforce the Releases and Exculpation, and is appropriately tailored to achieve that purpose.  Accordingly, the Court should approve the injunction as set forth in the Plan.

---

[46]    *See* Plan § 14.1(d).

**B.      The Debtors Have Complied with the Applicable
Provisions of the Bankruptcy Code—11 U.S.C. § 1129(a)(2).**

86.      Bankruptcy Code section 1129(a)(2) requires that the "proponent of the plan complies with the applicable provisions of this title."[47]   The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under Bankruptcy Code sections 1125 and 1126.[48]   In determining whether a plan proponent has complied with this section, courts focus on whether the proponent has adhered to the disclosure and solicitation requirements of sections 1125 and 1126.[49]

87.      The Debtors have complied with all requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order governing notice, disclosure, and solicitation in connection with the Combined Disclosure Statement and Plan.   Accordingly, the requirements of section 1129(a)(2) have been satisfied.

**C.      The Combined Disclosure Statement and Plan Has Been Proposed in Good
Faith and Not by Any Means Forbidden by Law—11 U.S.C. § 1129(a)(3).**

88.      Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[50]   "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'"[51]   In

---

[47]   11 U.S.C. § 1129(a)(2).

[48]   *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure"); *see also In re Resorts Int'l Inc.*, 145 B.R. 412, 468–69 (Bankr. D.N.J. 1990); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 258 (Bankr. D.N.J. 1988).

[49]   *See In re PWS Holding Corp.*, 228 F.3d at 248.

[50]   *See* 11 U.S.C. § 1129(a)(3).

[51]   *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (citations omitted).

31565170.5

determining whether a plan has been proposed in good faith, courts have recognized that they should avoid applying any hard and inflexible rules, but should instead evaluate each case on its own merits.[52]

89.     The Debtors have proposed the Combined Disclosure Statement and Plan in good faith and not by any means forbidden by law.  The Combined Disclosure Statement and Plan is the culmination of significant arm's length and good faith negotiations among the Debtors, the Committee, the Prepetition Lenders, Colchis and the Pacific Creditors, and other significant parties in interest, and reflects the results of these negotiations.  The Debtors submit that the Combined Disclosure Statement and Plan is fundamentally fair to all stakeholders and has been proposed with the legitimate purpose of liquidating and winding down the affairs of the Debtors in a timely and efficient manner.  Accordingly, the Combined Disclosure Statement and Plan has been filed in good faith and satisfies the requirements of Bankruptcy Code section 1129(a)(3).

> **D.     The Combined Disclosure Statement and Plan Provides that Payments Made by the Debtors for Services or Costs and Expenses are Subject to Approval—11 U.S.C. § 1129(a)(4).**

90.     Bankruptcy Code section 1129(a)(4) provides that a bankruptcy court shall confirm a plan only if "payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."[53] Section 1129(a)(4) has been construed to require that all payments of professional fees paid from

---

[52]  *See, e.g.*, *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002); *Century Glove*, 1993 WL 239489, at *4 (stating good faith should be evaluated in light of the totality of the circumstances surrounding confirmation); *In re PWS Holdings Corp.*, 228 F.3d at 243 (finding that plan was proposed in good faith).

estate assets be subject to review and approval by the bankruptcy court as to the reasonableness of such fees.[54]

91.      In accordance with Bankruptcy Code section 1129(a)(4), no payment for services or costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Combined Disclosure Statement and Plan and incidental to the Chapter 11 Cases, including Professional Fee Claims, has been or will be made by the Debtors other than payments that have been authorized by order of the Court.   Further Section 9.1(c) of the Combined Disclosure Statement and Plan provides that Professional Fee Claims are subject to Court approval and the standards of the Bankruptcy Code.   Accordingly, the provisions of the Combined Disclosure Statement and Plan comply with Bankruptcy Code section 1129(a)(4).

### E.        The Debtors Have Disclosed the Identity of Directors and Officers and the Nature of Compensation of Insiders—11 U.S.C. § 1129(a)(5).

92.      Bankruptcy Code section 1129(a)(5)(A) requires the proponent of any plan to disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan," and requires a finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy."[55] Additionally, section 1129(a)(5)(B) requires the proponent of a plan to disclose the "identity of

---

[53]   11 U.S.C. § 1129(a)(4).

[54]   *See, e.g.*, Lisanti v. Lubetkin (*In re Lisanti Foods, Inc.*), 329 B.R. 491, 503 (D.N.J. 2005); *In re Resorts Int'l, Inc.*, 145 B.R. at 476.

[55]   *See* 11 U.S.C. § 1129(a)(5)(A)(i)–(ii).

any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."[56]

93.     The Debtors have provided the information required under section 1129(a)(5) by identifying Elizabeth A. LaPuma as the proposed Plan Administrator and her proposed compensation as part of the Plan Administrator Agreement included in the Plan Supplement. The appointment of the Plan Administrator will be approved in the Confirmation Order.  Ms. LaPuma was jointly selected by the Debtors and Committee, after an interview process in which three other candidates were considered.  She is an experienced restructuring professional and the Debtors and Committee believe she is capable of discharging the duties of Plan Administrator. As a result, the Debtors submit that her selection is consistent with the interests of the creditors she will be serving as Plan Administrator.

94.     Further, Section 3.1 of the Plan provides that the Plan Administrator shall be deemed to be the sole officer, director, and manager of each Debtor, and all of the Debtors' existing officers, directors and managers will be deemed to have resigned on the Effective Date. Thus, Ms. LaPuma is the only person to which Bankruptcy Code Section 1129(a)(5) applies. Based upon the foregoing, the Combined Disclosure Statement and Plan satisfies the requirements of Bankruptcy Code section 1129(a)(5).

F.    **The Combined Disclosure Statement and Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission—11 U.S.C. § 1129(a)(6).**

95.     Bankruptcy Code section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its

---

[56] *See* 11 U.S.C. § 1129(a)(5)(B).

31565170.5

business approve any rate change under the plan.[57]  The Combined Disclosure Statement and Plan does not provide for any rate changes subject to the jurisdiction of any governmental regulatory commission.   Accordingly, the Debtors submit that Bankruptcy Code section 1129(a)(6) is inapplicable to the Combined Disclosure Statement and Plan.

### G.    The Combined Disclosure Statement and Plan is in the Best Interests of Creditors —11 U.S.C. § 1129(a)(7).

96.     Bankruptcy Code section 1129(a)(7) requires that a plan be in the best interests of creditors and equity holders.[58]  This "best interests" test focuses on individual dissenting creditors rather than classes of claims.[59]  The best interests test requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.[60]

97.     Under the Combined Disclosure Statement and Plan, Classes 3 through 14 are Impaired.   The test, therefore, requires that each Holder of a Claim or Interest in Classes 3 through 14 either accept the Combined Disclosure Statement and Plan, or receive or retain under the Plan property having a present value, as of the effective date of the Plan, not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

---

[57]   *See* 11 U.S.C. § 1129(a)(6).

[58]   *See* 11 U.S.C. § 1129(a)(7).

[59]   *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

[60]   *See* 11 U.S.C. § 1129(a)(7).

98.     Here, the Liquidation Analysis in the Plan Supplement demonstrates that each Class fares better under the Plan than in either of the two scenarios that might follow a chapter 7 conversion and demonstrates that the Debtors have satisfied section 1129(a)(7).

99.     The Plan provides for the continued management of the Loan Assets consistent with the Debtors' current practice instead of a forced liquidation sale of the loan portfolio, which would be the likely outcome of a chapter 7 case.  As set forth in the Dunn Declaration, the Debtors believe that the orderly run-off of the Loan Assets instead of a forced liquidation sale will yield materially higher proceeds for the Loan Assets, and therefore, higher recoveries for creditors than would be received in a chapter 7 case.

100.    A chapter 7 also poses additional uncertainties that will likely cause recoveries to be lower.  That is because a chapter 7 trustee is unlikely to continue to administer assets that the estate does not have an equitable interest in.  If the Court or chapter 7 trustee determine that the MPDNs are participations, the trustee is likely to abandon those loans, thus impairing their value and providing no recovery on them for MPDN holders in a chapter 7 case.  And if it is determined that they are not participations, it is likely that the proceeds of all assets will be pooled and distributed ratably to noteholders, thus diluting the recoveries of most of the RWN holders and potentially MPDN holders who have invested in performing loans.

101.    Additionally, a chapter 7 liquidation would likely result in an increase in Administrative Claims because there would be an additional tier of Administrative Claims by the chapter 7 trustee and his or her professionals.  The chapter 7 trustee's professionals, including legal counsel and accountants, would add administrative expenses that would be entitled to be paid ahead of Allowed Claims against, or Allowed Interests in, the Debtors.  The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors and the Committee during

31565170.5

the Chapter 11 Cases, which would continue to be allowed in the chapter 7 case as well and ultimately, Magnetar may need to consent to the usage of its cash collateral to fund such a chapter 7 process, and there is no guarantee that it would do so.  If such consent was required and not forthcoming, a conversion to chapter 7 would serve only to increase the number of claims against the Debtors that would not be paid—both in terms of currently incurred and unpaid administrative and priority claims, as well as any costs incurred in administering the chapter 7 cases.

102.    For the reasons set forth above, the Debtors believe that the Plan clearly provides recovery greater than the recovery in a chapter 7 for Holders of Allowed Claims, and, therefore, the Plan complies with Bankruptcy Code section 1129(a)(7) and meets the requirements of the "best interests" test.

### H.    The Combined Disclosure Statement and Plan Has Been Accepted by an Impaired Voting Class—11 U.S.C. § 1129(a)(8).

103.    Bankruptcy Code section 1129(a)(8) requires that each class of claims and interests either has accepted or is not impaired under a chapter 11 plan.[61]

104.    As discussed above, the REO Debtors, PS Options, Warehouse I, and Warehouse II do not have Claims against them that are in impaired classes under the Plan.  So, Bankruptcy Code section 1129(a)(8) has been satisfied for those Debtors.

105.    All of the Classes of Claims that are impaired under the Plan at PSFI, PSLI, PS Portfolio, OppFund, and OppFund GP have accepted the Plan.  So, Bankruptcy Code section 1129(a)(8) has been satisfied for those Debtors.

---

[61]    *See* 11 U.S.C. § 1129(a)(8).

106.    However, at PSI, Class 4 voted to reject the Plan.  At PSFLLC, no votes in Class 6 were cast on the Plan.  For these two Debtors, Bankruptcy Code section 1129(a)(8) has not been satisfied.  The Plan may nonetheless be approved for these two Debtors through the "cram-down" provision of Bankruptcy Code section 1129(b).

**I.    The Combined Disclosure Statement and Plan Provides for Payment in Full of All Allowed Priority Claims—11 U.S.C. § 1129(a)(9).**

107.    Bankruptcy Code section 1129(a)(9) requires that all claims entitled to priority pursuant to Bankruptcy Code section 507(a) be paid in full in cash unless the holders thereof agree to a different treatment.[62]  As required by Bankruptcy Code section 1129(a)(9), Articles IV and IX of the Plan provide for full payment to all Holders of Administrative Claims, Other Secured Claims, Priority Claims, and Priority Non-Tax Claims.

108.    Accordingly, the Debtors submit that the Combined Disclosure Statement and Plan complies with Bankruptcy Code section 1129(a)(9).

**J.    At Least One Impaired, Non-Insider Class Has Accepted the Plan—11 U.S.C. § 1129(a)(10).**

109.    Bankruptcy Code section 1129(a)(10) requires that if a plan has one or more classes of claims that are impaired, at least one impaired class of claims must accept the plan, excluding the votes of insiders.[63]  As described above, the following Debtors have at least one Class of claims that are impaired and remain in the Plan, making section 1129(a)(10) applicable to such Debtors, and at least one Impaired Class of Claims against such Debtors has accepted the Plan (with the accepting classes identified in parentheses:  PSI (Class 3), PSFI (Classes 3 and 4),

---

[62]    *See* 11 U.S.C. § 1129(a)(9).

[63]    *See* 11 U.S.C. § 1129(a)(10).

PSFLLC (Classes 4 and 8 through 12), PS Portfolio (Class 4 and 13), OppFund GP (Class 4), OppFund (Class 4) and PSLI (Class 3).[64]

110.     Accordingly, the Combined Disclosure Statement and Plan satisfies the requirements of Bankruptcy Code section 1129(a)(10) for those Debtors where it is applicable.

**K.**     **The Plan is Feasible—11 U.S.C. § 1129(a)(11).**

111.     Pursuant to Bankruptcy Code section 1129(a)(11), a chapter 11 plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[65]  Pursuant to Bankruptcy Code section 1129(a)(11), the Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under Plan (unless such liquidation or reorganization is proposed in the Plan).  These conditions are referred to as the "feasibility" of the Plan.

112.     The Plan provides for all of the Debtors' remaining assets to be liquidated and distributed to Holders of Allowed Claims pursuant to the terms of the Plan, and the Debtors to be ultimately wind-down and dissolved or cancelled.  Thus, there is no opportunity or need for further reorganization or liquidation.

113.     Further, as demonstrated in the Dunn Declaration, the Plan provides for adequate funding for its implementation through the Funding Pool.  The Debtors have developed a Wind-Down Budget that they believe is reasonable and will allow the Debtors to complete the

---

[64]   Section 1129(a)(10) is not applicable to the REO Debtors, PS Options, Warehouse I, and Warehouse II.

liquidation of the Debtors' Loan and Non-Loan Assets.  The funding available under the Funding Pool and the proceeds that will be available as the Debtors' remaining assets are liquated will be sufficient to fund the Wind-Down Budget, as well as repay the Funding Pool.

114.    For these reasons, the Plan is feasible.

**L.    All Statutory Fees Have or Will Be Paid—11 U.S.C. § 1129(a)(12).**

115.    Bankruptcy Code section 1129(a)(12) provides that a court may confirm a chapter 11 plan only if "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[66]  Section 6.1(d) of the Combined Disclosure Statement and Plan provides for the payment, on or before the Effective Date, of any fees due pursuant to section 1930 of title 28 of the United States Code or other statutory requirement.  Therefore, the Combined Disclosure Statement and Plan meets the requirements of Bankruptcy Code section 1129(a)(12).

**M.    The Combined Disclosure Statement and Plan Appropriately Treats Retiree Benefits—11 U.S.C. § 1129(a)(13).**

116.    Bankruptcy Code section 1129(a)(13) requires that a chapter 11 plan provide for the continued payment of certain retiree benefits "for the duration of the period that the debtor has obligated itself to provide such benefits."[67]  The Debtors have no obligations to provide any such retiree benefits, and, accordingly, Bankruptcy Code section 1129(a)(13) is inapplicable to the Combined Disclosure Statement and Plan.

---

[65]   11 U.S.C. § 1129(a)(11).

[66]   11 U.S.C. § 1129(a)(12).

[67]   11 U.S.C. § 1129(a)(13).

### N.    Bankruptcy Code Sections 1129(a)(14)–(16) are Inapplicable.

117.    None of the Debtors are (a) required to pay any domestic support obligations, (b) individuals, or (c) nonprofit corporations or trusts.  Accordingly, Bankruptcy Code sections 1129(a)(14) through (16) is not applicable.[68]

### O.    The Plan Satisfies the "Cramdown" Requirements under
### Bankruptcy Code Section 1129(b) for Non-Accepting Classes.

118.    Bankruptcy Code section 1129(a)(8) requires that each class of claims and interests either accept a plan or be unimpaired under the plan.[69]  Bankruptcy Code section 1129(b) provides that if all applicable requirements of section 1129(a) are met—notwithstanding a failure to comply with section 1129(a)(8)—a plan may be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.

119.    Therefore, to confirm a plan that has not been accepted by all impaired classes, the plan proponent must show that the plan does not "discriminate unfairly" against and is "fair and equitable" with respect to, the non-accepting impaired classes.[70]

120.    The only Classes to which cram down is relevant are Class 4 (General Unsecure Claims) and Class 7 (Parent Interests) at PSI, and Class 6 (Securities Law Claims, which may yet be empty) at PSFLLC.

---

[68]    *See In re Sea Launch Co., L.L.C.*, No. 09-12153 (BLS), 2010 Bankr. LEXIS 5283, at *41 (Bankr. D. Del. July 30, 2010) ("Section 1129(a)(16) by its terms applies only to corporations and trusts that are *not* moneyed, business, or commercial.").

[69]    *See* 11 U.S.C. § 1129(a)(8).

[70]    *See, e.g., John Hancock Mut. Life Ins. Co.,* 987 F.2d at 157 n.5; *see also In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005); *Kurak v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.)*, 379 B.R. 257, 271–72 (Bankr. D. Del. 2007); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (D. Del. 2003).

121.     As discussed below, the Plan may be confirmed as to each of these Classes pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

### 1. The Combined Disclosure Statement and Plan is Fair and Equitable for the Rejected Classes.

122.     Bankruptcy Code section 1129(b)(2) provides that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if, under the plan, no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest.[71]     Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the rule of absolute priority.

123.     At PSI, the only class junior to Class 4 (General Unsecured Claims) is Class 7 (Parent Interests).  Class 7 represents the equity interests in PSI, the Debtors' ultimate parent, there are no classes junior to it, and it is not receiving any distributions under the Plan.

124.     At PSFLLC, the only class junior to Class 6 in statutory priority are the intercompany interests in PSFLLC (which are in Class 5), and such interests are not receiving a distribution under the Plan.

125.     Furthermore, as evidenced by the estimated recoveries set forth in the Combined Disclosure Statement and Plan, no Class of Claims or Interests are receiving more than full payment on account of their Claims, nor do I believe or have an understanding that the Plan provide for creditors to receive more than what they are entitled to on account of their Claims. This is so because section 10.11 of the Plan provides for distribution of the proceeds of a particular Underlying Loans to follow the Debtors' prepetition practice of distributing proceeds in excess of the par amount and accrued interest on MPDNs to the holders of such MPDNs.  In

---

[71]    *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

other words, parties are being treated based on their prepetition course of dealing with the Debtors.

126.    Accordingly, the Plan is "fair and equitable" and, therefore, consistent with the requirements of Bankruptcy Code section 1129(b) for Class 4 and 7 at PSI and Class 6 at PSFLLC.

### 2.    The Plan Does Not Unfairly Discriminate With Respect to Any Class.

127.    Bankruptcy Code section 1129(b)(1) prohibits unfair discrimination with respect to any impaired class of claims or interests that has not accepted the plan.[72]   A plan unfairly discriminates in violation of Bankruptcy Code section 1129(b)(1) only if similar classes are treated differently without a reasonable basis for the disparate treatment.[73]   As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests,[74] or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[75]

128.    The Combined Disclosure Statement and Plan does not "discriminate unfairly" with respect to Classes 4 and 7 at PSI or Class 6 as PSFLLC.

---

[72]   *See* 11 U.S.C. 1129(b)(1)

[73]   *See, e.g., In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 175 (Bankr. D. Del. 2010) (noting that courts generally look to whether "[v]alid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan"); *In re Lernout & Hauspie Speech Prods.*, 301 B.R. at 660 ("The hallmarks of the various [unfair discrimination] tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination").

[74]   *See, e.g., In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part*, *rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, *In re Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[75]   *See, e.g., In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

31565170.5

129.     At PSI, Class 4 is the only class of non-priority prepetition unsecured claims and Class 7 is the only class of equity.  Therefore, there are no other classes of similarly situated claims or interests, respectively, at PSI for which discrimination (let alone unfair discrimination) could be alleged or proven.

130.     At PSFLLC, Class 6 consists of Securities Law Claims, if any exist, that are subordinated by statute.  Thus, treating these claims as subordinated (and not providing them a recovery) is not unfair in light of that statutory treatment.  In any event, it is not expected that assets exist at PSFLLC to make distributions outside of those contemplated to be made to RWN Claims, MPDN Claims, and FBO Account Claims.  But each of those three types of claims have different legal and factual reasons for their treatment.  The various classes of Note Claims (8 through 11-1) are afforded treatment based on the asserted contractual entitlement that such holders allege in specific assets—an issue being settled and compromised by the Plan—that are legally distinct from the other Classes at PSFLLC.  Likewise, the FBO Account Claims have differing entitlements to specific assets (money held in trust for the benefit of those creditors) than the other creditors at PSFLLC.  Classes 8-12, which are getting some recovery under the Plan, are not only "dissimilar" to the other classes at PSFLLC, but there is a reasonable basis for the treatment afforded to those Classes that are not afforded to the other non-priority, non-secured claims at PSFLLC.

131.     Therefore, the Plan does not unfairly discriminate with respect to Class 4 and 7 at PSI and Class 6 at PSFLLC that did not accept the Plan.

**P.     The Combined Disclosure Statement and Plan Is Not an Attempt to Avoid Tax Obligations—11 U.S.C. § 1129(d).**

132.     Bankruptcy Code section 1129(d) provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities

53

Act of 1933 (the "**Securities Act**").[76]  The principal purpose of the Combined Disclosure Statement and Plan is to effectuate the orderly run-off of the Debtors' loan portfolio and liquidation of their other assets.  It is not the avoidance of taxes or the avoidance of the application of the Securities Act.  No party has alleged such an improper purpose.  Accordingly, the Combined Disclosure Statement and Plan satisfies the requirements of Bankruptcy Code section 1129(d).

## VII.    MR. BALL'S REQUEST FOR ADDITIONAL PLAN CLASSES SHOULD BE DENIED.

133.    Mr. Ball's second motion, seeking the creation of a class of "priority secured claims against [PSFLLC], entitled to 100% unimpaired recovery as an exclusion from the Plan waterfall, pursuant to 11 U.S.C. § 523(a)(2)(A)," Second Ball. Obj. [D.I. 1023] ¶ 11, should be denied.

134.    First, the Debtors retain exclusivity to propose and pursue confirmation of a chapter 11 plan,[77] and Mr. Ball should not be permitted to invade that exclusivity.  The Plan is otherwise confirmable as set forth herein.

135.    Second, an exemption from the discharge under Bankruptcy Code section 523 does not entitle creditors to a different treatment under a chapter 11 plan.  Since the treatment Mr. Ball is requesting is not mandated by the Bankruptcy Code,[78] there is no basis to impose it here.  Indeed, the Debtors submit that section 523 is irrelevant in a case where the Debtor are not receiving a discharge at all.  And that is exactly the result here.  *See* Plan § 14.1(d).

---

[76]  *See* 11 U.S.C. § 1129(d).

[77]  *See*  11 U.S.C. § 1121(b); [D.I. 823] (extending the Debtors' exclusive plan filing period to May 22, 2024).

[78]  *See* Section VI(A), *supra*.

31565170.5

136.     Finally, the treatment Mr. Ball proposes would likely require both resoliciting the Plan, a timely and costly process that would also likely require parties to identify themselves as members of this newly created class, but it could also result in the type of unfair discrimination that would be prohibited in a cram-down scenario.[79]

137.     For these reasons, the Second Ball Objection should be denied and overruled as an objection to confirmation of the Plan.

## VIII.   CONCLUSION

138.     For the reasons set forth in this Memorandum, the Debtors respectfully request that the Court enter an order confirming the Combined Disclosure Statement and Plan, in substantially the form of the proposed Confirmation Order the Debtors have filed concurrently herewith.

*[Signature Page Follows]*

---

[79]  *See* Section VI(O)(2), *supra*.

Dated: April 24, 2024

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Ryan M. Bartley
Joseph Barry (Del. Bar No. 4221)
Ryan M. Bartley (Del. Bar No. 4985)
S. Alexander Faris (Del. Bar No. 6278)
Shella Borovinskaya (Del. Bar No. 6758)
Carol E. Cox (Del. Bar No. 6936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  jbarry@ycst.com
        rbartley@ycst.com
        afaris@ycst.com
        sborovinskaya@ycst.com
        ccox@ycst.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

P. Bradley O'Neill (admitted *pro hac vice*)
Caroline Gange (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 715-9511
Facsimile:  (212) 715-8000
Email:  boneill@kramerlevin.com
        cgange@kramerlevin.com

*Co-Counsel to the Debtors and Debtors in Possession*

31565170.5