## **EXHIBIT H**

**Exit Facility - Credit Agreement**

Draft April 30, 2024

[1]**CREDIT AGREEMENT**

Dated as of [May] [___], 2024

by and among

**PS FUNDING, INC.,**
as the Borrower,

**PEER STREET FUNDING, LLC, PEER STREET OPPORTUNITY FUND, GP, LLC, PS WAREHOUSE, LLC, PS WAREHOUSE II, LLC, PS PORTFOLIO-ST1, LLC, PS OPTIONS LLC, PSF REO LLC, PSF OHIO, LLC, PSF TX 1, LLC, PSF TX 2, LLC and PSF TX 4, LLC**

as Guarantors, and

**[COLCHIS [___]],**
as Lender

---

[1] Subject to review, revision and comment in all respects.

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS; CERTAIN TERMS .................................................... 1
    Section 1.01    Definitions ................................................................. 1
    Section 1.02    Terms Generally ...................................................... 10
    Section 1.03    Time References ...................................................... 10
    Section 1.04    Divisions ................................................................. 10

ARTICLE II THE TERM LOAN ........................................................................ 10
    Section 2.01    Term Loan; Interest Reserve Amount Deposit ............ 10
    Section 2.02    Repayment of Term Loan; Evidence of Debt ............ 11
    Section 2.03    Interest ..................................................................... 11
    Section 2.04    Prepayment of Loans and Mandatory Amortization Amounts;
                Payments .................................................................. 12
    Section 2.05    Fees and Minimum Interest ...................................... 13

ARTICLE III [reserved] .................................................................................. 13

ARTICLE IV CONDITIONS TO LOANS .......................................................... 13
    Section 4.01    Conditions Precedent to Effectiveness ..................... 13

ARTICLE V REPRESENTATIONS AND WARRANTIES ................................. 15
    Section 5.01    Representations and Warranties ............................... 15

ARTICLE VI COVENANTS OF THE LOAN PARTIES ..................................... 15
    Section 6.01    Affirmative Covenants ............................................. 15
    Section 6.02    Negative Covenants ................................................. 17

ARTICLE VII CASH MANAGEMENT AND OTHER COLLATERAL
              MATTERS .................................................................. 18
    Section 7.01    Cash Management Arrangements ............................. 18

ARTICLE VIII EVENTS OF DEFAULT ............................................................. 19
    Section 8.01    Events of Default ...................................................... 19

ARTICLE IX GUARANTY ................................................................................ 21
    Section 9.01    Guaranty ................................................................... 21
    Section 9.02    Guaranty Absolute ................................................... 22
    Section 9.03    Waiver ...................................................................... 23
    Section 9.04    Continuing Guaranty; Assignments .......................... 23
    Section 9.05    Subrogation .............................................................. 23

ARTICLE X MISCELLANEOUS ...................................................................... 24
    Section 10.01    Notices, Etc ............................................................. 24
    Section 10.02    Amendments, Etc ..................................................... 24

| | | |
|---|---|---|
| Section 10.03 | No Waiver; Remedies, Etc | 24 |
| Section 10.04 | Expenses; Attorneys' Fees | 24 |
| Section 10.05 | Right of Set-off | 25 |
| Section 10.06 | Severability | 25 |
| Section 10.07 | Assignments and Participations | 26 |
| Section 10.08 | Counterparts and Execution | 26 |
| Section 10.09 | GOVERNING LAW | 26 |
| Section 10.10 | CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE | 26 |
| Section 10.11 | WAIVER OF JURY TRIAL, ETC | 27 |
| Section 10.12 | No Party Deemed Drafter | 27 |
| Section 10.13 | Reinstatement; Certain Payments | 27 |
| Section 10.14 | Indemnification | 28 |
| Section 10.15 | Interest | 29 |
| Section 10.16 | Integration | 29 |

# CREDIT AGREEMENT

Credit Agreement, dated as of [May] [__], 2024 (this "<u>Agreement</u>"), by and among PS Funding, Inc., a [Delaware] corporation (the "<u>Borrower</u>" or "<u>PSFI</u>"), Peer Street Funding, LLC, a [Delaware] limited liability company (the "<u>PSFLLC</u>"), and each other Person listed as a "Guarantor" on the signature pages hereto (together with PSFLLC, each a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>"), [Colchis [__]] and/or its designee (as a "<u>Lender</u>") and acknowledged by the Chapter 11 Plan Administrator.

## RECITALS

In consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS; CERTAIN TERMS

Section 1.01    <u>Definitions</u>.  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"<u>Account Control Agreement</u>" means a deposit account control agreement, a commodities account control agreement or securities account control agreement, in each case in form and substance reasonably satisfactory to the Lender, by and among the applicable Loan Party, the Lender and the applicable Cash Management Bank and/or securities intermediary.

"<u>Advisory Committee</u>" means the "Advisory Committee" as defined in the Chapter 11 Plan.

"<u>Affiliate</u>" means, respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "controlling" and "controlled" have meanings correlative to the foregoing.  Notwithstanding anything herein to the contrary, in no event shall the Lender be considered an "Affiliate" of any Loan Party, the Chapter 11 Plan Administrator or the Advisory Committee.

"<u>Agreement</u>" has the meaning specified therefor in the preamble hereto.

"<u>Asset Manager</u>" means Colchis Capital Management LP or its designees.

"<u>Asset Management Agreement</u>" means the agreement between the applicable Loan Parties and the Asset Manager setting forth the terms on which the Asset Manager will manage the Loan Assets after the Chapter 11 Plan Effective Date, along with any ancillary documents related thereto.

"<u>Authorized Officer</u>" means, with respect to any Person, the chief executive officer, chief financial officer, treasurer or other financial officer, including, with respect to the Loan Parties, the Chapter 11 Plan Administrator, performing similar functions, secretary, president, executive vice president, or vice president of such Person, or any other officer of such Person designated as an "Authorized Officer" by any of the foregoing officers in a writing delivered to the Lender.

31572793.3

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Business Day" means, any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"Cash Management Bank" has the meaning specified therefor in Section 7.01(a).

"Cash Proceeds" means, the aggregate amount of cash and cash equivalents received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration but only as and when received) by or on behalf of such Person or such Subsidiary, in connection therewith.

"Change of Control" means each occurrence of any of the following: (a) Parent, PSFLLC or Borrower shall cease to own directly or indirectly one hundred percent (100%) of the issued and outstanding Equity Interests of each other Loan Party; (b) Chapter 11 Plan Administrator shall cease to implement the Chapter 11 Plan and/or manage the Loan Parties after the Closing Date, in each case, as provided for in the Chapter 11 Plan, the Chapter 11 Plan Confirmation Order and the Chapter 11 Plan Administrator Engagement Letter; (c) as a result of a termination without cause, the Asset Manager shall cease to be the Asset Manager of the Loan Parties and their assets pursuant to the terms of the Asset Management Agreement; (d) after the Closing Date, greater than 10% of the UPB of the Underlying Loans are designated as an Excluded Loans without the prior written consent of the Lender; or (e) any Chapter 11 Case is dismissed or is converted into a case under chapter 7 of the Bankruptcy Code without the Lender's prior written consent, not to be unreasonably withheld.

"Chapter 11 Cash Collateral Order" means the "Cash Collateral Order" as defined in the Chapter 11 Plan.

"Chapter 11 Plan" means the Combined Disclosure Statement and Joint Chapter 11 Plan of Reorganization for Parent and the Loan Parties, as was approved by the Bankruptcy Court on [April] [29], 2024 in accordance with section 1129 of the Bankruptcy Code.

"Chapter 11 Plan Administrator" means the "Plan Administrator" as defined in the Chapter 11 Plan.

"Chapter 11 Plan Administrator Engagement Letter" means the "engagement letter" for the Chapter 11 Plan Administrator.

"Chapter 11 Plan Confirmation Order" means the "Confirmation Order" as defined in the Chapter 11 Plan.

"Chapter 11 Plan Effective Date" means the "Effective Date" as defined in the Chapter 11 Plan.

"Chapter 11 Cases" means the chapter 11 cases of Parent and the Loan Parties referred to as In re Peer Street, Inc., et al., Case No. 23-10815 (LSS), which is pending in the Bankruptcy Court.

"Closing Date" means [May] [___], 2024.

"Collateral" has a meaning specified therefor in the Security Agreement.

"Collections Account" means a deposit account of the Borrower at [_____] that is subject to a "springing" Account Control Agreement in favor of the Lender.

"Custodian" means U.S. Bank National Association, First American Mortgage Solutions, LLC or another Person reasonably acceptable to the Lender.

"Custodial Agreement" means the Custodial Agreement among and between the relevant Loan Parties, the Chapter 11 Plan Administrator, the Custodian and the Lender for custody and safekeeping (and to act as agent for perfection for the Lender) by the Custodian of all relevant files and documentation with respect to the Loan Assets and the Wind-Down Loan Assets.

"Debtor Relief Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"Default" means an event which, with the giving of notice or the lapse of time to cure any such default or both, would constitute an Event of Default.

"Equity Interest" means (a) with respect to any Person that is a corporation, any and all shares of capital stock, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, and (b) with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

"Event of Default" means any of the events set forth in Section 8.01.

"Excluded Loans" means the "Excluded Loans" as defined in the Chapter 11 Plan; *provided* that no Wind-Down Loan Assets shall be designated as Excluded Loans after the Closing Date without the prior written consent of the Lender (and consistent with the applicable provisions of the Chapter 11 Plan and Chapter 11 Confirmation Order), not to be unreasonably withheld. A list of Excluded Loans as of the Closing Date is annexed hereto as Schedule 1.01.

"Extension Fee" means an amount equal to one (1.0%) percent of the aggregate outstanding amount of the Term Loan (*plus* any then unpaid interest, fees and costs) on April 30, 2026.

"Extraordinary Receipts" means any cash received by the Loan Parties or any of their Subsidiaries (including in connection with the Chapter 11 Plan for events arising during or prior to the Chapter 11 Cases) in connection with the following (but, in each case, to the extent such cash relates to Collateral): (a) foreign, United States, state or local tax refunds, (b) [reserved], (c) proceeds of insurance and insurance claim refunds, including any representations and warranty insurance, (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation

awards (and payments in lieu thereof), (f) indemnity payments or (g) any purchase price adjustments received, in each case, to the extent the amount received.

"Fee Cap" means, $300,000 (or an uncapped amount if incurred in connection with the enforcement of the Loan Documents upon the occurrence and during the continuance of any Default and/or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violation of the Chapter 11 Plan by a Loan Party).

"Final Maturity Date" means the earliest of (i) May [__], 2026 or such other date as shall be two (2) years from the Closing Date (or, so long as no Default or Event of Default shall have occurred or result therefrom, May [__], 2027 or such other date as shall be three (3) years from the Closing Date, but, only so long, as the Lender consents to such extension in writing (including with respect to conditions for such extension) on the date that is 30-days prior to April [__], 2026 and the Lender shall have received, in cash, the Extension Fee on or prior to April [__], 2026), (ii) the date on which the Term Loan shall become due and payable in accordance with the terms of this Agreement, and (iii) the payment in full of all Obligations (other than contingent indemnification obligations as to which no claim has been made).

"Fiscal Year" means the fiscal year of the Loan Parties ending on [December 31] of each year.

"Flow of Funds Authorization" means a funding authorization letter, dated the Closing Date, made by the Borrower in favor of the Lender, and the funds flow memorandum attached thereto describing the sources and uses of all cash payments in connection with the Transactions.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis.

"Governmental Authority" means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity acting within its legal authority and exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, the Securities and Exchange Commission, any supra-national bodies such as the European Union or the European Central Bank or any arbitral tribunal (public or private)).

"Guaranteed Obligations" has the meaning specified therefor in Section 9.01.

"Guarantor" has the meaning specified therefor in the preamble hereto.

"Guaranty" means the guaranty of each Guarantor party hereto contained in ARTICLE IX hereof.

"Indebtedness" means, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses or other accounts payable incurred in the ordinary course of such Person's business and (i) which not outstanding for more than 30 days after the date such payable was due or (ii) which are being contested in good faith by appropriate proceedings and for which adequate reserves (under GAAP) have been established); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or

acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property, (e) all capitalized lease obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities other than obligations and liabilities that are cash collateralized on terms reasonably satisfactory to the Lender; (g) all net obligations and liabilities of such Person under hedging agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all contingent obligations and (j) all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, *provided, however* that if recourse in respect of any Indebtedness of the foregoing is limited to specific assets, then such Indebtedness shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the asset encumbered thereby as determined by such Person in good faith.  The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer, so long as, in the case of a joint venture, such Indebtedness is recourse to any Loan Party.  For the avoidance of doubt, "Indebtedness" shall exclude operating leases.

"Indemnified Matters" has the meaning specified therefor in Section 10.14(a).

"Indemnitees" has the meaning specified therefor in Section 10.14(a).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intercompany Subordination Agreement" means an Intercompany Subordination Agreement made by the Loan Parties in favor of the Lender, in form and substance reasonably satisfactory to the Lender.

"Interest Payment Date" means the last Business Day of each calendar month and the Final Maturity Date.

"Interest Reserve" has the meaning specified therefor in Section 2.01(b).

"Interest Reserve Account" means a deposit account of the Borrower at [____] that is subject to a "full block" Account Control Agreement in favor of the Lender.

"Interest Reserve Amount" has the meaning specified therefor in Section 2.01(b).

"Law" means any federal, state, or local law (including the common law), statute, ordinance, rule, regulation, judgment, judicial decision, code, order, injunction, arbitration award, writ, decree, agency requirement, license or permit of any Governmental Authority.

"Lender" has the meaning specified therefor in the preamble hereto.

"Lender Expenses" means any and all fees, costs and expenses due to Lender pursuant to this Agreement and the other Loan Documents, whether incurred before or after the Closing Date; provided, that the term "Lender Expenses" shall not include interest (including any Minimum Interest) or the Structuring Fee.

31572793.3

"Lien" means any mortgage, deed of trust, deed to secure debt, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any right of reclamation, any capitalized lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security, but not including the interest of a lessor under a lease that is an operating lease.

"Liquidated Loan Assets" means the "Liquidated Loan Assets" as defined in the Chapter 11 Plan.

"Loan Assets" means the "Loan Assets" as defined in the Chapter 11 Plan (and, for the avoidance of doubt, include any associated REO).

"Loan Document" means this Agreement, any Security Document, the Flow of Funds Authorization, the Intercompany Subordination Agreement, any intercreditor or subordination agreement entered into from time to time in respect of the Obligations or Liens securing the Obligations, any collateral access agreement, any landlord subordination or waiver agreement and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing the Term Loan or any other Obligation.

"Loan Party" "Loan Parties" means the Borrower and the Guarantors (and shall not include the Parent).

"Loan Proceeds Account" means a deposit account of the Borrower at [＿＿] that is subject to a "springing" Account Control Agreement in favor of the Lender.

"LTV" means, with respect to a Loan Asset (or any related REO) an amount equal to the sum of: (a) 90% of the lowest of (i) the broker price opinion, (ii) the appraised fair market value and (iii) the list price, in each case, of such Loan Asset (or any related REO) minus (b) the sum of (i) the Pre-Effective Date Servicing Advances plus (ii) the Pre-Effective Date Servicing Fees; provided, that if a Loan Asset (or any related REO) has been liquidated, the LTV for such Loan Asset (or related REO) shall be an amount equal to the sum of (x) the net cash proceeds thereof minus (y) the sum of (1) the Pre-Effective Date Servicing Advances plus (2) the Pre-Effective Date Servicing Fees, in each case with respect to such Loan Asset.

"LTV Ratio" means, on any date of determination, a number expressed as a percentage which is the product of (a) the then outstanding amount of the Term Loan divided by (b) the then LTV of each Loan Asset, taken in the aggregate, other than, in each case, any Excluded Loan and Loan Assets listed on Schedule [＿＿] (as such schedule maybe modified from time to time by agreement between the Lender and the Chapter 11 Plan Administrator in consultation with the Asset Manager) to this Agreement (in each case, solely to the extent not liquidated on behalf of the estates).

"Mandatory Amortization Amounts" shall have the meaning as that term is defined in Section 2.04(b).

"Material Adverse Effect" means a material adverse change in or a material adverse effect on (a) the business, assets, liabilities, operations, financial condition or operating results of the Loan Parties taken as a whole, (b) the ability of the Loan Parties, taken as a whole, to perform any of their material obligations under the Loan Documents to which they are parties, and (c) (i) the rights and remedies of or benefits available to the Lender under any Loan Document, (ii) the validity, binding effect or enforceability

31572793.3

of any Loan Document, and (iii) the attachment, perfection or priority of any Lien of the Lender under the Security Documents on a material portion of the Collateral.

"<u>Minimum Interest</u>" means two million four hundred thousand dollars ($2,400,000.00); provided, for the purposes of calculating the "Minimum Interest" at any time, the foregoing amount shall be reduced dollar-for dollar by the amount of interest (at the non-default rate) previously received by the Lender.

"<u>Obligations</u>" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Lender arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in <u>Section 8.01</u>. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal of the Term Loan and any other amounts hereunder, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that the Lender (in its sole discretion) may elect to pay or advance on behalf of such Person and (c) premiums, including any applicable Minimum Interest, upfront fee or any other amounts payable under any Loan Document; provided that Lender Expenses shall be subject to the Fee Cap.

"<u>Parent</u>" means, Peer Street, Inc., a Delaware corporation.

"<u>Permitted Indebtedness</u>" means (a) any Indebtedness owing to the Lender under this Agreement and the other Loan Documents (including any guarantees hereof or thereof); (b) Indebtedness in respect of guarantees by a Loan Party in respect of Indebtedness of any other Loan Party permitted hereunder; (c) Indebtedness owed by one Loan Party to another Loan Party; (d) Indebtedness incurred in the ordinary course of business in connection with cash pooling, netting and cash management arrangements consisting of overdrafts or similar arrangements with respect to the Loan Parties' bank accounts; (e) to the extent constituting Indebtedness, deferred compensation to employees of the Loan Parties incurred in the ordinary course of business; (f) Indebtedness owed to the Prepetition Agent as provided under the Chapter 11 Plan and (g) ordinary course Indebtedness of the Loan Parties incurred in connection with the implementation of the Chapter 11 Plan (including the wind-down and run-off of the unliquidated loan portfolio and REO properties thereunder).

"<u>Permitted Liens</u>" means: (a) Liens securing the Obligations; (b) Liens for Taxes that (i) accrue and become due after the Closing Date (and do not related to the Chapter 11 Cases or period prior to the filing of the Chapter 11 Cases), assessments and governmental charges the payment of which is not yet delinquent or which are being contested in good faith by proper proceedings which stay the imposition of any penalty, fine or enforcement of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP, or (ii) are *ad valorem* Taxes assessed on REO property; (c) Liens of the Prepetition Agent on the Prepetition Agent Collateral [and the Prepetition Agent Collections Account][2]; *provided*, that no such Lien shall at any time be extended to cover any other property; (d) solely with respect to REO properties, carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 60 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person; (e) solely with respect to REO properties, easements,

---

[2] NTD:  to be deleted if the Prepetition Agent Collections Account is in the name of the Prepetition Agent.

rights-of-way, restrictions and other similar encumbrances affecting real property that, in the aggregate, are not substantial in amount, and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person, and any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries; (f) deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; (g) Liens securing judgments for the payment of money not constituting an Event of Default under Section 9.01(j); (h) Liens securing Permitted Indebtedness (except that Prepetition Agent's Lien shall only extend to the Prepetition Collateral); (i) Liens in the ordinary course of business (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, or (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) that are customary in the banking industry; (j) any interest or title of a lessor, sublessor, licensor or sublicensor under leases or licenses permitted by this Agreement that are entered into in the ordinary course of business; and (k) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business that do not (i) interfere in any material respect with the ordinary conduct of the business of the Borrower and its Subsidiaries, or (ii) secure any Indebtedness.

Notwithstanding anything to the contrary, and except as forth in clauses (b)(ii), (d), (e), and (h) above, the term "Permitted Lien" shall not include any Liens that extends to any REO or equity interest of any PSF REO Subsidiary Entities other than Liens securing the Obligations. With respect to the Interest Reserve Account, Loan Proceeds Account and the Collections Accounts, other than Liens of the Lender, no Lien which is for a debt for borrowed money shall extend to such accounts.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"PSF REO Subsidiary Entities" means, collectively, PSF REO, LLC, PSF Ohio, LLC, PSF TX 1, LLC, PSF TX 2, LLC and PSF TX 4, LLC.

"Post-Default Rate" means fifteen percent (15.0%).

"Prepetition Agent" means the "Prepetition Agent" as defined in the Chapter 11 Plan.

"Prepetition Agent Collateral" means assets and properties and the proceeds thereof of Parent, Borrower and Peer Street Licensing, Inc. (in each case, other than Loan Assets and the Underlying Loans) that secure the Prepetition Agent's liens on a first priority perfected basis as provided in the Prepetition Loan Agreements and the Chapter 11 Cash Collateral Order.

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the direct and indirect holders of Equity Interests, partners, directors, officers, employees, agents, consultants, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"REO" means "REO" as defined in the Chapter 11 Plan.

"<u>Requirements of Law</u>" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or legally binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Run-Off Budget</u>" means, the budget agreed to between the Loan Parties, the Plan Administrator and the Lender to complete the "run-off" of the Underlying Loans and administration of the Chapter 11 Cases after the Closing Date.

"<u>Security Agreement</u>" means the Security and Paying Agency Agreement, dated as of the Closing Date, among the Loan Parties, the Chapter 11 Plan Administrator and the Lender, securing the Obligations.

"<u>Security Document</u>" shall mean collectively, the Security Agreement, any mortgage, collateral access agreement, each other document, instrument or agreement pursuant to which any Person grants a Lien or encumbrance on Collateral that is executed and delivered pursuant to this Agreement or any other Loan Documents or otherwise in connection with the transactions contemplated hereby or thereby and each notice, document, instrument or agreement to be delivered to any Person or Governmental Authority in connection with the foregoing, in order to confer a first priority security interest in the Collateral.

"<u>Structuring Fee</u>" means the $250,000 fee contemplated by <u>Section 2.05(b)</u> of this Agreement.

"<u>Subservicer</u>" means FCI Lender Services, Inc. or another person elected by the Asset Manager in consultation with the Lender, with the consent of the Advisory Committee (not to be unreasonably withheld), to act as a "Subservicer".

"<u>Subservices Agreement</u>" means, individually and collectively, each Loan Servicing Agreement for each Underlying Loan and Loan Asset among and between one or more of the relevant Loan Parties and the Subservicer.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Loan</u>" means, the loan made by the Lender to the Borrower pursuant to <u>ARTICLE II</u> hereof.

"<u>Term Loan Amount</u>" means twenty million dollars ($20,000,000.00).

"<u>Transactions</u>" means, collectively, the transactions to occur on or about the Closing Date pursuant to the Loan Documents, including (a) the Chapter 11 Plan Effective Date, and (b) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"<u>Transaction Documents</u>" means, collectively, each document or agreement in connection with the Transactions, including, without limitation, documents and agreements required to be delivered under <u>Section 4.01</u>.

"Underlying Loans" means the "Underlying Loans" as defined in the Chapter 11 Plan.

"Uniform Commercial Code" means Uniform Commercial Code as in effect from time to time in the State of New York.

"UPB" means the "UPB" as defined in the Chapter 11 Plan

"Wind-Down Loan Assets" means the "Wind-Down Loan Assets" as defined in the Chapter 11 Plan.

Section 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03    Time References.  Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern Daylight Saving Time, as in effect in New York on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; *provided, however*, that with respect to a computation of fees or interest payable to the Lender, such period shall in any event consist of at least one full day.

Section 1.04    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law and/or Nevada law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II

## THE TERM LOAN

Section 2.01    Term Loan; Interest Reserve Amount Deposit.

(a)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, the Lender agrees to make the $20,000,000 Term Loan to the Borrower on the Closing Date by depositing the Term Loan Amount (net of amounts payable to the Lender on the Closing Date) of the Term Loan in the Loan Proceeds Account.

31572793.3

(b)    On the Closing Date, the Borrower shall deposit into the Interest Reserve Account $2,400,000 (the "Interest Reserve Amount") as a reserve for the payment of interest (the "Interest Reserve"). From and after the date that is the ten (10) month anniversary of the Closing Date, the Loan Parties shall ensure that the Interest Reserve is an evergreen reserve that holds required interest payment in an amount equal to the lesser of (i) interest payments for the next three (3) months and (ii) remaining life of the Term Loan to the Final Maturity Date, in each case of clauses (i) and (ii), on the remaining amount of the Term Loan and, then such amount shall be deemed to be the Interest Reserve Amount. The Interest Reserve Account shall be under the sole dominion and control of the Lender. Neither any Loan Party nor the Chapter 11 Plan Administrator shall in any way alter or modify the Interest Reserve Account. The Lender shall have the sole right to make withdrawals from the Interest Reserve Account and all costs and expenses for establishing and maintaining the Interest Reserve Account shall be paid by the Loan Parties but shall be deemed Lender Expenses.

Section 2.02    Repayment of Term Loan; Evidence of Debt.

(a)    The outstanding unpaid principal of the Term Loan and all accrued and unpaid interest thereon shall be due and payable in full on the Final Maturity Date.

(b)    The Lender may request that the Term Loan made by it be evidenced by a note. In such event, the Borrower shall execute and deliver to the Lender a note payable to the Lender (and its registered assigns).

Section 2.03    Interest.

(a)    Term Loan.    The Term Loan or any portion thereof shall bear interest on the principal amount thereof from time to time outstanding, from the date of making such Term Loan until repaid, at a rate per annum equal to twelve percent (12.00%) per annum (in each case, subject to the imposition of the Post-Default Rate); *provided* that for the first 12 months after the Closing Date (or, if earlier, the Final Maturity Date) interest shall accrue at the Term Loan Amount instead of the outstanding principal amount. For the avoidance of doubt, the Minimum Interest is reduced dollar-for-dollar by the amount of interest received by the Lender. Accrued and unpaid interest shall be payable in arrears on each Interest Payment Date. Upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, the Term Loan, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate and shall be payable on demand.

(b)    General.    All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed. All interest hereunder on the Term Loan shall be computed on a daily basis based upon the outstanding principal amount of the Term Loan as of the applicable date of determination.

(c)    At any time during the continuance of an Event of Default, the Lender shall have the right, but not the obligation, in its sole and absolute discretion, to apply any funds in the Interest Reserve to the payment of interest or to any other Obligations, in such order and in such manner as the Lender shall determine.

31572793.3

Section 2.04    Prepayment of Loans and Mandatory Amortization Amounts; Payments.

(a)    Optional Prepayment.  The Borrower may, at any time and from time to time, upon three (3) Business Days' prior written notice to the Lender, prepay the principal of the Term Loan, in whole or in part.  Each such notice shall specify the date and amount of such prepayment.  Each prepayment made pursuant to this clause (a) shall be irrevocable (except that such notice may be conditional) and shall be accompanied by the payment of, without duplication, (A) accrued interest to the date of such payment on the amount prepaid, (B) the Minimum Interest, if any, payable in connection with such prepayment of the Term Loan and (C) if such prepayment would reduce the outstanding principal amount of the Term Loan to zero, all fees and other amounts which have accrued or otherwise become payable as of such date.  Each such prepayment shall be applied to the Term Loan until paid in full.

(b)    Mandatory Amortization Amounts.  As used in this Credit Agreement, the term "Mandatory Amortization Amounts" shall mean the obligation of the Loan Parties to amortize or prepay (as the case may be) the Term Loan, as follows:

(i)    following the receipt of Cash Proceeds of Extraordinary Receipts, the Borrower shall repay and/or prepay the outstanding principal amount of the Term Loan from such Cash Proceeds in accordance with the Security Agreement.

(ii)    the Borrower shall repay and/or prepay the outstanding principal amount of the Term Loan in accordance with the Security Agreement.

(iii)    Application of Payments.  Each prepayment pursuant to subsections (b)(i) and (b)(ii), above shall be applied to the Term Loan, until paid in full.

(c)    [Reserved].

(d)    Cumulative Prepayments.  Payments with respect to any subsection of this Section 2.04 are without duplication of payments made or required to be made under any other subsection of this Section 2.04.

(e)    The Borrower will make each payment under this Agreement not later than 1:00 p.m. (New York time) on the day when due, in lawful money of the United States of America and in immediately available funds the Lender after 1:00 p.m. (New York time) on any Business Day shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  All computations of fees shall be made by the Lender on the basis of a year of 360 days for the actual number of days occurring in the period for which such fees are payable.

(f)    After the occurrence and during the continuance of an Event of Default, the Lender may (or in the case of an acceleration of the Obligations, the Lender shall), apply all proceeds of the Collateral and all amounts received by the Lender on account of the Obligations (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Lender until paid in full; (ii) second, ratably to pay the Obligations in respect of any fees (other than any Minimum Interest) and indemnities then due and payable to the Lender until paid in full; (iii) third, ratably to pay interest then due and payable in respect of the Term Loan until paid in full; (iv) fourth, ratably to pay principal of the Term Loan until paid in full; (v) fifth, ratably to pay the Obligations in respect of any Minimum Interest then due and payable to the Lender until paid in full; and (vi) sixth, to the ratable payment of all other Obligations then due and payable.

(g)    The term "paid in full" means payment in cash of all amounts owing under the Loan Documents, including all principal, loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, Minimum Interest and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

Section 2.05    Fees and Minimum Interest.

(a)    Minimum Interest.  To the extent not already paid on or before the one (1) year anniversary of the Closing Date or, if earlier, the Final Maturity Date, an amount equal to the Minimum Interest, if any, shall be due and payable on such date.

(b)    Structuring Fee; Waiver of Administrative Claims.  On the Closing Date, the Borrower shall pay, or cause to be paid, to the Lender in an aggregate amount equal to $250,000, and, in exchange, the Lender shall, and shall cause Pacific Funding Trust 1002 and Pacific RBLF Funding Trust and each of the Lender's other Affiliates to, completely and forever release, acquit and discharge the Debtors and the Reorganized Debtors (each, as defined in the Chapter 11 Plan as of the Effective date) from any and all administrative expense claims (including any "substantial contribution" claims), whether known or unknown, fixed or contingent, accrued or not yet accrued, matured or not yet matured, liquidated or unliquidated, anticipated or unanticipated, asserted or unasserted, including the administrative claims filed in the Chapter 11 Cases at Docket Nos. 888 and 889, that, in each case, relates to matters solely occurring on or prior to the Closing Date; provided, that this paragraph shall not prejudice the rights of the Lender under this Agreement or the rights of Pacific Funding Trust 1002 and Pacific RBLF Funding Trust to receive distributions on account of their MPDN Claims (as defined in the Chapter 11 Plan) in accordance with the Chapter 11 Plan.

(c)    Lender Expenses; Fee Cap.  On the Closing Date, the Borrower shall pay, or cause to be paid, to the Lender $250,000 in respect of Lender Expenses incurred prior to the Closing Date, with such amount to be counted towards the Fee Cap.  All other Lender Expenses incurred prior to the Closing Date shall deemed be waived pursuant to Section 2.05(b).  On and after the Closing Date, all Lender Expenses paid by the Loan Parties shall be counted towards the Fee Cap.  Notwithstanding anything to the contrary herein, the Loan Parties shall not be required to pay any Lender Expenses that would, when combined with all other Lender Expenses paid by the Loan Parties, exceed the Fee Cap.

## ARTICLE III

## [reserved]

## ARTICLE IV

## CONDITIONS TO LOANS

Section 4.01    Conditions Precedent to Effectiveness.  This Agreement shall become effective as of the Closing Date when each of the following conditions precedent shall have been satisfied (or waived) in a manner satisfactory to the Lender:

(a)    Payment of Fees, Etc.  The Borrower shall have paid on or before the date of this Agreement all fees, costs and expenses then due and payable pursuant to Section 2.05, which shall, with respect to amounts that are due on the Closing Date, be funded from the proceeds of the Term Loan.

31572793.3

(b)    <u>Delivery of Documents</u>.  The Lender shall have received on or before the Closing Date the following, each in form and substance satisfactory to the Lender and, unless indicated otherwise, dated as of the Closing Date:

(i)    this Agreement, duly executed by the parties hereto;

(ii)    the Security Agreement, duly executed by each of the parties thereto;

(iii)    [reserved];

(iv)    the Intercompany Subordination Agreement, duly executed by each of the parties thereto;

(v)    the Flow of Funds Authorization, duly executed by each of the parties thereto;

(vi)    [reserved];

(vii)    the Run-Off Budget;

(viii)    a copy of the Chapter 11 Plan Confirmation Order confirming the Chapter 11 Plan, and such order shall not have been amended, modified, vacated, stayed or reversed;

(ix)    a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date not more than 30 days prior to the Closing Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction;

(x)    certificate of status with respect to each Loan Party, as of a recent date not more than 10 days prior to the Closing Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Loan Party, which certificate shall indicate that such Loan Party is in good standing in such jurisdiction; and

(xi)    the list of Excluded Loans as of the Closing Date annexed hereto as <u>Schedule 1.01</u> is acceptable to the Lender in its reasonable discretion.

(c)    Chapter 11 Plan Effective Date shall have occurred or occur simultaneously with the Closing Date.

(d)    The Loan Parties shall have filed a motion to assume (i) each Subservices Agreement, (ii) the Custodial Agreement, and (iii) to the extent identified in writing to the Loan Parties by the Asset Manager or Lenders on or prior to May 3, 2024, any other contracts and agreements with respect to Loan Assets (including any REOs) that are required to manage and liquidate the Loan Assets (including any REOs).

(e)    There shall be no adversary proceeding pending in the Bankruptcy Court, or litigation commenced outside of the bankruptcy proceedings that is not stayed pursuant to section 362 of the Bankruptcy Code, seeking to enjoin or prevent the financing or the transactions contemplated hereby.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

Section 5.01    Representations and Warranties.  Each Loan Party hereby represents and warrants to the Lender:

(a)    Organization, Good Standing, Etc.  Each Loan Party (i) is a corporation, limited liability company or limited partnership duly formed or organized, as applicable, validly existing under the laws of the state or jurisdiction of its formation or organization, as applicable, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, (iii) in the case of the Borrower, has all requisite power and authority to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the Transactions contemplated thereby, (iv) has all requisite power and authority to own the Loan Assets and the Wind-Down Loan Assets and (v) is duly qualified to do business and is in good standing in its state or jurisdiction of its formation or organization, and except as could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(b)    Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of the Term Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the applicable requirements of Regulation T, U and X.

(c)    [RESERVED]

(d)    Investment Company Act.  None of the Loan Parties is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

## ARTICLE VI

## COVENANTS OF THE LOAN PARTIES

Section 6.01    Affirmative Covenants.  So long as any principal of or interest on the Term Loan or any other Obligation (whether or not due, but excluding contingent Obligations for which no claim is outstanding) shall remain unpaid, each Loan Party will, unless the Lender shall otherwise consent in writing (not to be unreasonably withheld):

(a)    Reporting Requirements.  Furnish to the Lender:

(i)    as soon as reasonably practicable after the end of each calendar month, copies of the monthly bank statements of the Borrower and the Guarantors if not otherwise available to the Lender;

(ii)    as soon as reasonably practicable, all reporting provided by the Plan Administrator to the Advisory Committee or the Prepetition Lender if such reporting is not filed with the Bankruptcy Court or otherwise available to the Lender;

(iii)    as soon as reasonably practicable, after submission by any Loan Party or the Chapter 11 Plan Administrator to any United States Trustee for the Bankruptcy Court, copies of any such written information, notices and reports that are not filed with the Bankruptcy Court;

(iv)    as soon as reasonably practicable, after submission to any Governmental Authority, notice of such submission, and, upon request of the Lender, all material documents and material information furnished to such Governmental Authority that are not filed with the Bankruptcy Court;

(v)    promptly after the commencement thereof but in any event not later than ten (10) Business Days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of the commencement of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator; and

(vi)    promptly following reasonable request, such other information concerning the condition or operations, financial or otherwise of any Loan Party as the Lender may from time to time may reasonably request.

(b)    Use of Proceeds.    Use the proceeds of the Term Loan (i) to fund the Interest Reserve Account, (ii) to pay fees and expenses in connection with the Transactions contemplated hereby and the Loan Documents and (iii) the balance shall be used as provided in the Run-Off Budget and/or to make payments that are contemplated under the Chapter 11 Plan.  Except with respect to sale or other disposition of Excluded Loans, and subject to the options and terms set forth in the Plan, no part of the proceeds of the Term Loan will be used by any Loan Party to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(c)    Compliance with Laws, Etc.    Comply with all applicable Requirements of Law, judgments and awards, except to the extent the failure to so comply could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(d)    Further Assurances.    Take such action and execute, acknowledge and deliver, such agreements, instruments, mortgages or other documents as the Lender may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, to the extent contemplated by the other Loan Documents, (ii) to subject to valid and perfected first priority Liens (subject to Permitted Liens) the Collateral or any other property of any Loan Party, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, collaterally assign, transfer and confirm unto the Lender the rights, in each case, now or hereafter intended to be granted to it under this Agreement or any other Loan Document.  All costs, fees, or expenses related to the foregoing shall be "Lender Expenses" and shall be subject to the Fee Cap (and the Loan Parties shall not be required to incur any costs, fees, or expenses in connection with the foregoing to the extent such amounts would exceed the Fee Cap); provided, in the event the Fee Cap has been reached, the Lender may agree to fund any costs, fees, and expenses that would exceed the Fee Cap and, upon such agreement, the Loan Parties shall take commercially reasonable efforts to provide the foregoing assurances.

(e)    Excluded Loans.    Take such actions as may be reasonably necessary upon the Lender's reasonable request to designate a Loan Asset as an Excluded Loan if, in the reasonable discretion of the Plan Administrator (subject to any applicable consultation or consent rights set forth in the Plan, including any such rights of the Asset Manager or the Prepetition Agent), such designation is appropriate.  If the Plan Administrator disagrees with the Lender's request to designate a Loan Asset as

31572793.3

16

an Excluded Loan, then the Plan Administrator and the Prepetition Agent, as applicable, shall engage in good faith discussions with the Lender regarding the Lender's concerns with respect to such Loan Asset.

(f)    Post-Closing Obligation.  The Loan Parties shall make commercially reasonable efforts to deliver Account Control Agreements to the Lender for each of the Collections Account, Loan Proceeds Account and Interest Reserve Account as soon as is reasonably practicable following the Closing Date.

Section 6.02    Negative Covenants.  So long as any principal of or interest on the Term Loan, or any other Obligation (whether or not due, but excluding contingent Obligations for which no claim is outstanding) shall remain unpaid hereunder, each Loan Party shall not, unless the Lender shall otherwise consent (not to be unreasonably withheld) in writing:

(a)    Liens, Etc.  From and after the Closing Date, create, incur, or assume any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired, other than Permitted Liens.

(b)    Indebtedness.  From and after the Closing Date, create, incur, assume, or guarantee, or otherwise become liable with respect to any Indebtedness, other than Permitted Indebtedness.

(c)    Fundamental Changes.  Other than as contemplated by the Chapter 11 Plan and the Chapter 11 Plan Confirmation Order, wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, including by means of a "plan of division" under the relevant limited liability company statute of any state or any comparable transaction under any similar law, or convey, sell, lease or sublease, transfer or otherwise dispose of, whether in one transaction or a series of related transactions, all or any part of its business, property or assets, whether now owned or hereafter acquired.

(d)    Federal Reserve Regulations.  Permit the Term Loan or the proceeds of the Term Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under and in a manner that violates the provisions of Regulation T, U or X of the Board.

(e)    Modifications.  Materially amend, modify or otherwise change or seek to amend, modify or otherwise change or permit (to the extent within the Loan Party's control) any material amendment, modification or change to any of the Chapter 11 Plan, the Chapter 11 Confirmation Order, any agreement or arrangement with the Prepetition Agent, the Asset Management Agreement, the Custodial Agreement or the Subservices Agreement in a manner that is materially adverse to the Lender.

(f)    Investment Company Act of 1940.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to be required to register under the Investment Company Act of 1940, as amended, by virtue of being an "investment company" not entitled to an exemption within the meaning of such Act.

(g)    Operational Covenant.  Loan Parties shall not engage (a) in any business or activity other than as contemplated in the Chapter 11 Plan and the Chapter 11 Confirmation Order, (b) directly, or through a Subsidiary (other than PSF REO Subsidiary Entities), acquire or hold title to any real property without the consent of the Lender (not to be unreasonably withheld) or (c) transfer any Loan Asset (other than Excluded Loans) to any Person other than as contemplated in the Chapter 11 Plan and the Chapter 11 Confirmation Order.

31572793.3

# ARTICLE VII

# CASH MANAGEMENT AND OTHER COLLATERAL MATTERS

Section 7.01    <u>Cash Management Arrangements</u>.

(a)    On or prior to the Closing Date, the Loan Parties shall establish and maintain the Collections Account, the Interest Reserve Account and the Loan Proceeds Account on terms reasonably satisfactory to the Lender at one or more of the banks (each a "<u>Cash Management Bank</u>") reasonably acceptable to the Lender.  Except with respect to the Collections Account, the Interest Reserve Account and the Loan Proceeds Account, neither the Loan Parties nor the Chapter 11 Plan Administrator (on behalf of the Loan Parties) may, without the prior written consent of the Lender, maintain any other bank account, commodities account or securities account other than accounts currently in place or those necessary to make payments to the Prepetition Agent or distributions by the Plan Administrator under and in accordance with the Chapter 11 Plan.

(b)    Subject to <u>Section 6.01(f)</u>, the Loan Parties shall with respect to the Collections Account and the Loan Proceeds Account, deliver to the Lender a shifting (or "springing") Account Control Agreement.  Subject to <u>Section 6.01(f)</u>, the Loan Parties hereby grant to the Lender a first priority security interest in the Collections Account and the Loan Proceeds Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of the Lender a perfected first priority security interest in the Collections Account and the Loan Proceeds Account.  At all times prior to the occurrence of an Event of Default, the Loan Parties shall have full access to the cash on deposit in the Collections Account and the Loan Proceeds Account, and the Lender agrees not to deliver a control notice or take any other action to control the Collections Account and the Loan Proceeds Account unless and until an Event of Default has occurred and is continuing.  The Lender further agrees that if an Event of Default is waived by the Lender, the Lender shall provide notice to the Cash Management Bank and take all other commercially reasonable actions necessary to revert control of the Collections Account and the Loan Proceeds Account to the Loan Parties.

(c)    Subject to <u>Section 6.01(f)</u>, the Loan Parties shall with respect to the Interest Reserve Account, deliver to the Lender a "blocked" Account Control Agreement.  The Interest Reserve Account shall be under the sole dominion and control of the Lender.  The Borrower hereby grants to the Lender a first priority security interest in the Interest Reserve Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of the Lender a perfected first priority security interest in the Interest Reserve Account.  Neither any Loan Party nor the Chapter 11 Plan Administrator shall in any way alter or modify the Interest Reserve Account.  The Lender shall have the sole right to make (or direct) withdrawals from the Interest Reserve Account.

(d)    Upon the terms and subject to the conditions set forth in an Account Control Agreement (and clauses (b) and (c) above), with respect to the Collections Account, the Interest Reserve Account and the Loan Proceeds Account from and after occurrence of an Event of Default all amounts received in such accounts shall at the Lender's direction be wired each Business Day into the Lender.  So long as an Event of Default is not continuing, the Lender agrees on each Interest Payment Date to withdraw funds from the Interest Reserve Account and apply such funds to satisfy the interest that is required to be paid by the Borrower under this Agreement and, when funds are withdrawn from the Interest Reserve Account and applied for such purpose, the Lender shall provide prompt notice to Borrower of the same; *provided* that if the funds in the Interest Reserve are insufficient to make the required interest payment then the Borrower must make such payment to the Lender.

31572793.3

(e)    The Loan Parties and the Chapter 11 Plan Administrator shall cause all Extraordinary Receipts and proceeds of the Collateral to be deposited into the Collections Account and such amounts shall be applied in accordance with the Security Agreement.

## ARTICLE VIII

## EVENTS OF DEFAULT

Section 8.01    Events of Default.  If any of the following Events of Default shall occur and be continuing:

(a)    any Loan Party shall fail to pay (i) any principal of the Term Loan when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), or (ii) any interest on the Term Loan or any fee, indemnity or other amount payable under this Agreement or any other Loan Document when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure to pay any amount described in clause (ii) shall continue unremedied for a period of five (5) or more Business Days after notice from the Lender;

(b)    any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered to the Lender pursuant to any Loan Document, which representation or warranty is subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any respect when made or deemed made; or any representation or warranty made by any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any report, certificate or other document delivered to the Lender pursuant to any Loan Document, which representation or warranty is not subject to a materiality or a Material Adverse Effect qualification, shall have been incorrect in any material respect when made;

(c)    any Loan Party shall fail to perform or comply with (i) any covenant or agreement contained in ARTICLE II or any covenant or agreement contained in Section 6.01(f), Section 6.02, or ARTICLE VII, in each case, at any time or (ii) any covenant or agreement contained in Section 6.0, and such failure, if capable of being remedied, shall remain unremedied for a period of fifteen (15) days after the occurrence of such failure;

(d)    any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 8.01, such failure, if capable of being remedied, shall remain unremedied for thirty (30) days;

(e)    following the Closing Date, any Loan Party shall fail to pay any of its Indebtedness (excluding Indebtedness evidenced by this Agreement or resolved by the Chapter 11 Plan) having an aggregate principal amount outstanding in excess of $500,000 (plus any applicable interest and legal costs and expenses incurred in connection therewith), or any payment of principal, interest or premium thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace or cure period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem,

31572793.3

purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)     following the Closing Date, any Loan Party (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally (in each case, other than debts that existed prior to the Closing Date that are resolved by the Chapter 11 Plan), (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

(g)     following the Closing Date, any proceeding shall be instituted against any Loan Party seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of sixty (60) days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)     any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any Loan Party that is a party thereto, or a proceeding shall be commenced by any such Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)     if the then LTV Ratio is greater than 80.0%;

(j)     if the then LTV Ratio is greater than 70.0%, any Security Document, after delivery thereof pursuant hereto, shall for any reason (other than release by the Lender pursuant to the terms hereof or thereof) fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Lender on any Collateral (other than the Loan Assets that are listed on Schedule [____] hereto (as such schedule maybe modified from time to time by agreement between the Lender and the Chapter 11 Plan Administrator in consultation with the Asset Manager)) with a fair market value of more than $500,000 in the aggregate purported to be covered thereby;

(k)     one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could without further action by any court result in a judgment, order or award) for the payment of money exceeding $500,000 in the aggregate, shall be rendered against any Loan Party and remain unpaid, undischarged or unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement, (ii) there shall be a period of sixty (60) consecutive days after entry thereof during which a stay of enforcement of any such judgment, order, award or settlement, by reason of a pending appeal or otherwise, shall not be in effect, or (iii) at any time during which a stay of enforcement of any such judgment, order, award

or settlement, by reason of a pending appeal or otherwise, is in effect, such judgment, order, award or settlement is not bonded in the full amount of such judgment, order, award or settlement; *provided, however*, that any such judgment, order, award or settlement shall not give rise to an Event of Default under this subsection (k) if and for so long as (A) the amount of such judgment, order, award or settlement is covered by a valid and binding policy of insurance between the defendant and the insurer covering full payment thereof (other than any deductible) or an amount sufficient to lower the exposure below $500,000 and (B) such insurer has been notified, and has not disputed the claim made for payment, of the amount of such judgment, order, award or settlement;

(l)    any Loan Party is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of its business other than as contemplated in the Chapter 11 Plan and the Chapter 11 Confirmation Order for more than ninety (90) consecutive days;

(m)    other than pledges in favor of the Prepetition Agent that exist prior to the filing of the Chapter 11 Cases, any Person (other than the Lender) obtains or is granted a pledge over the Equity Interest of any Loan Party (each a "third-party pledge") unless on or prior to the date of such third-party pledge, the Lender receives a pledge over the Equity Interest of any such Loan Party that is senior in priority to any such third-party pledge; or

(n)    a Change of Control shall have occurred,

then, and in any such event and anytime thereafter during the continuance of such event, the Lender may, by notice to the Borrower, (i) declare all or any portion of the Term Loan then outstanding to be accelerated and due and payable, whereupon all or such portion of the aggregate principal of the Term Loan, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, together with the payment of the Minimum Interest, if any, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (ii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents; *provided, however*, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 9.01 with respect to any Loan Party, without any notice to any Loan Party or any other Person or any act by the Lender, the Term Loan then outstanding, together with all accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents, together with the payment of the Minimum Interest, if any, shall become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Loan Party. The Loan Parties expressly waive the provisions of any present or future statute of or law that prohibits or may prohibit the collection of the foregoing Minimum Interest, if any, in connection with any acceleration.

## ARTICLE IX

## GUARANTY

Section 9.01    Guaranty.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrower, being the

31572793.3

"Guaranteed Obligations"), and agrees to pay (without duplication of any amounts payable under Section 10.04) any and all reasonable and documented out-of-pocket expenses (including reasonable and documented out-of-pocket fees and expenses of one outside counsel and one local counsel in each relevant jurisdiction) incurred by the Lender in enforcing any rights under the guaranty set forth in this ARTICLE XI. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the Lender under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower. In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any bankruptcy, insolvency or other similar law.

Section 9.02    Guaranty Absolute. Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Lender with respect thereto. Each Guarantor agrees that this ARTICLE IX constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by the Lender to any Collateral. The obligations of each Guarantor under this ARTICLE IX are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions. The liability of each Guarantor under this ARTICLE IX shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, the Lender;

(e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)    any other circumstance (other than the defense of payment, but including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Lender that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This ARTICLE IX shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Lender or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

31572793.3

Section 9.03    <u>Waiver</u>.  Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this ARTICLE IX and any requirement that the Lender exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct the Lender to seek payment or recovery of any amounts owed under this ARTICLE IX from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that the Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor.  Each Guarantor agrees that the Lender shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations.  Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this <u>Section 9.03</u> is knowingly made in contemplation of such benefits.  Each Guarantor hereby waives any right to revoke this ARTICLE IX, and acknowledges that this ARTICLE IX is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 9.04    <u>Continuing Guaranty; Assignments</u>.  This ARTICLE IX is a continuing guaranty and shall (a) remain in full force and effect until the later of the payment in full of the Guaranteed Obligations (other than unasserted contingent indemnification Obligations) and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Lender, and its successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), the Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, its Term Loan owing to it) to any other Person to the extent otherwise permitted hereunder, and such other Person shall thereupon become vested with all the benefits in respect thereof granted the Lender herein or otherwise, in each case as provided in <u>Section 10.07</u>.

Section 9.05    <u>Subrogation</u>.  No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this ARTICLE IX, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Lender against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than unasserted contingent indemnification Obligations) shall have been paid in full and the Final Maturity Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full of the Guaranteed Obligations (other than unasserted contingent indemnification Obligations) and the Final Maturity Date, such amount shall (A) to the extent Guaranteed Obligations are outstanding, be held in trust for the benefit of the Lender, as applicable, and shall forthwith be paid to the Lender, as applicable, to be credited and applied to such Guaranteed Obligations, in accordance with the terms of this Agreement or (B) promptly be returned to the party which paid such amount.  If (i) any Guarantor shall make payment to the Lender of all or any part of the Guaranteed Obligations (other than unasserted contingent indemnification Obligations), (ii) all of the Guaranteed Obligations (other than unasserted contingent indemnification Obligations) shall be paid in full and (iii) the Final Maturity Date shall have occurred, the Lender will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

31572793.3

# ARTICLE X

# MISCELLANEOUS

Section 10.01    Notices, Etc.

(a)    Notices Generally.  All notices and other communications provided for hereunder shall be in writing and shall be mailed (certified mail, postage prepaid and return receipt requested), emailed, or delivered by hand, Federal Express or other reputable overnight courier, if to any Loan Party, at the following address:

> [      ]
> Attention:
> Email: [      ]

> if to the Lender, to it at the following address:

> [Colchis]
> [      ]
> Attention:
> Email: [      ]

All such notices and other communications shall be effective, (i) if mailed (certified mail, postage prepaid and return receipt requested), when received or three (3) days after deposited in the mails, whichever occurs first, (ii) if emailed, shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient or (iii) if delivered by hand, Federal Express or other reputable overnight courier, upon delivery.

(b)    Electronic Communications.  Each party hereto may, in its discretion, by written notice to the other parties hereto decline to accept any or all notices and other communications to it hereunder by electronic communications.

Section 10.02    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by each Loan Party and the Lender.

Section 10.03    No Waiver; Remedies, Etc.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Lender provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Lender under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Lender to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 10.04    Expenses; Attorneys' Fees.  Subject to Section 2.05(c) hereof and the Fee Cap, the Borrower shall pay promptly, and in any event within ten (10) Business Days of delivery of an invoice, all reasonable and documented out-of-pocket costs and expenses incurred by or on behalf of the Lender, regardless of whether the transactions contemplated hereby are consummated, including, without

limitation, reasonable and documented out-of-pocket fees, costs and expenses of counsel and other professional, including, without limitation:  (a) the negotiation, preparation, execution and delivery of this Agreement and the other Loan Documents, and (b) (i) the preservation and protection of the Lender's rights under this Agreement or the other Loan Documents, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violations of the Chapter 11 Plan, (ii) the defense of any claim or action asserted or brought against the Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Lender's claims against any Loan Party under the Loan Documents, or any and all matters in connection therewith, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violations of the Chapter 11 Plan, (iii) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violations of the Chapter 11 Plan, (iv) the filing of any petition, complaint, answer, motion or other pleading by the Lender, or the taking of any action in respect of the Collateral, in connection with this Agreement or any other Loan Document, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violations of the Chapter 11 Plan, (v) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violations of the Chapter 11 Plan, (vi) any attempt to enforce any Lien or security interest in any Collateral in connection with this Agreement or any other Loan Document, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violations of the Chapter 11 Plan, (vii) any attempt to collect from any Loan Party or Guarantor under the Loan Documents, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents, including in connection with workouts or restructurings and any material violations of the Chapter 11 Plan, (viii) all liabilities and costs arising from or in connection with the past, present or future operations of any Loan Party involving any damage to real or personal property or natural resources, including, in connection with the enforcement of the Loan Documents, and Default or Event of Default under the Loan Documents in connection with workouts or restructurings and any material violations of the Chapter 11 Plan.  The Lender agrees to notify the Borrower promptly after any such setoff and application.  The obligations of the Borrower under this Section 10.04 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 10.05    Right of Set-off.  Upon the occurrence and during the continuance of any Event of Default, the Lender may, and is hereby authorized to, at any time and from time to time, and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by the Lender to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not the Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured.  The rights of the Lender under this Section 10.05 are in addition to the other rights and remedies (including other rights of set-off) which the Lender may have under this Agreement or any other Loan Documents of law or otherwise.

Section 10.06    Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such

prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 10.07    Assignments and Participations.

This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and the Lender and their respective successors and assigns; *provided, however*, that neither the Lender nor the Loan Parties may assign or transfer any of its rights and/or obligations hereunder or under the other Loan Documents without the prior written consent of the other Party and any such assignment without the other Party's prior written consent shall be null and void.

Section 10.08    Counterparts and Execution.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  The words "execution," "signed," "signature," and words of like import in this Agreement and the other Loan Documents shall be deemed to include electronic signatures or electronic records each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signature in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.09    GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 10.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.

(a)    ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) MUST BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT ACCEPT JURISDICTION OVER SUCH ACTION OR PROCEEDING, THEN SUCH ACTION OR PROCEEDING MUST BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.01 AND TO THE SECRETARY OF STATE OF THE STATE OF NEW YORK, SUCH SERVICE TO BECOME EFFECTIVE THREE (3) DAYS AFTER SUCH MAILING.  THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE

31572793.3

JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE LENDER TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR, IF THE BANKRUPTCY COURT DOES NOT ACCEPT JURISDICTION OVER ANY ACTION OR PROCEEDING, TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT AS SET FORTH ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)    Each Loan Party irrevocably and unconditionally agrees that it will not commence any action or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court and, if the Bankruptcy Court does not accept jurisdiction over such action or proceeding, the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof.

Section 10.11    <u>WAIVER OF JURY TRIAL, ETC</u>. EACH LOAN PARTY, THE LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER ENTERING INTO THIS AGREEMENT.

Section 10.12    <u>No Party Deemed Drafter</u>. Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement. This Agreement and the other Loan Documents are the result of negotiations among the parties hereto and thereto and have been reviewed by counsel to each of the parties hereto and thereto and are the products of all parties; accordingly, they shall not be construed against the Lender or the Loan Parties.

Section 10.13    <u>Reinstatement; Certain Payments</u>. If any claim is ever made upon the Lender for repayment or recovery of any amount or amounts received by the Lender in payment or on account of any of the Obligations, the Lender shall give prompt notice of such claim to the Borrower, and if the Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Lender or any of its property, or (ii) any good faith

31572793.3

settlement or compromise of any such claim effected by the Lender with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to the Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Lender.

Section 10.14    Indemnification

(a)    General Indemnity.  Subject to Section 2.05(c) hereof and the Fee Cap, in addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless the Lender and all of its respective Related Parties (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable and documented out-of-pocket costs and expenses (including, without limitation, reasonable and documented out-of-pocket costs and expenses of counsel) incurred by such Indemnitees, whether prior to or from and after the Closing Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) the Lender's furnishing of funds to the Borrower under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrower's use of the proceeds thereof, (iii) the Lender relying on any instructions of the Borrower or the handling of the Collateral as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); *provided, however*, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee (as determined by a final non-appealable judgment of a court of competent jurisdiction) that do not involve an act or omission by any Loan Party or any Subsidiary or Affiliate thereof.

(b)    No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)    The indemnities set forth in this Section 10.14 shall survive the repayment of the Obligations, termination of the Loan Documents and discharge of any Liens granted under the Loan Documents.

; provided that the amounts payable by the Loan Parties pursuant to this Section 10.14 will count towards the Fee Cap unless incurred in connection with the enforcement of the Loan Documents upon the occurrence and during the continuance of any Default and/or Event of Default under the Loan Documents, including

in connection with workouts or restructurings and any material violation of the Chapter 11 Plan by a Loan Party.

Section 10.15    Interest.    Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to Term Loan, together with all fees, charges and other amounts which are treated as interest on the Term Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding the Term Loan in accordance with applicable law, the rate of interest payable in respect of the Term Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Term Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lender shall be increased (but not above the Maximum Rate therefor) until such cumulated amount shall have been received by such Lender.

Section 10.16    Integration.    This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[*Remainder of page intentionally left blank.*]

31572793.3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

**PS FUNDING, INC.**

By: _____
       Name:
       Title:

**GUARANTORS:**

**PEER STREET FUNDING, LLC**

By: _____
       Name:
       Title:

**PEER STREET OPPORTUNITY FUND, GP, LLC**

By: _____
       Name:
       Title:

Signature page to Credit Agreement

**PS WAREHOUSE, LLC**

By: _____
       Name:
       Title:

**PS WAREHOUSE II, LLC**

By: _____
       Name:
       Title:

**PS PORTFOLIO-ST1, LLC**

31572793.3

By: _____
        Name:
        Title:

**PS OPTIONS LLC**

By: _____
        Name:
        Title:

**PSF REO LLC**

By: _____
        Name:
        Title:

**PSF OHIO, LLC**

By: _____
        Name:
        Title:

Signature page to Credit Agreement

**PSF TX 1, LLC**

By: _____
        Name:
        Title:

**PSF TX 2, LLC**

By: _____
        Name:
        Title:

**PSF TX 4, LLC**

By: _____
Name:
Title:

[Other Names]

The undersigned Chapter 11 Plan Administrator hereby consents to the execution, delivery and performance by the Loan Parties' of this Agreement, and by signature hereby as an Authorized Officer shall undertake in her capacity as the Chapter 11 Plan Administrator (but not in her individual capacity) to perform all such obligations of the Loan Parties:

_____
Elizabeth A. LaPuma

Signature page to Credit Agreement

**<u>LENDER</u>:**

[Colchis [__]]

By: _____
    Name:
    Title: