# EXHIBIT I

**Exit Facility - Security Agreement**

Draft April 30, 2024

## SECURITY AGREEMENT

SECURITY AND PAYING AGENCY AGREEMENT, dated as of [May] [__], 2024 made by each of the Grantors (defined below) and the Chapter 11 Plan Administrator (as defined in the Credit Agreement (defined below)) in its capacity as such, in favor of [Colchis [__]] ("Colchis").

W I T N E S S E T H:

WHEREAS, PS Funding, Inc. (the "Borrower"), Peer Street Funding, LLC, a [Delaware] limited liability company, Peer Street Opportunity Fund, GP, LLC, PS Warehouse, LLC, PS Warehouse II, LLC, PS Portfolio-ST1, LLC, PS Options LLC, PSF REO LLC, PSF Ohio, LLC, PSF TX 1, LLC, PSF TX 2, LLC and PSF TX 4, LLC (collectively, each a "Guarantor" and collectively, the "Guarantors") and [Colchis [__]] and/or its Affiliates or designees (the "Lender") are parties to that certain Credit Agreement, dated as of the date hereof (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "Credit Agreement"), which is acknowledged by the Chapter 11 Plan Administrator;

WHEREAS, it is a condition precedent to the Lender making the Term Loan to the Borrower pursuant to the Credit Agreement that the Borrower and each Guarantor (such Persons, each a "Grantor" and collectively, the "Grantors") and the Chapter 11 Plan Administrator shall have executed and delivered this Security Agreement (as defined below) to the Lender;

WHEREAS, the execution, delivery, and performance of this Security Agreement by the Grantors and the Chapter 11 Plan Administrator is authorized by the Bankruptcy Court pursuant to the Chapter 11 Plan and the Chapter 11 Confirmation Order and is in the best interests of the Debtors and their Estates (each, as defined in the Chapter 11 Plan);

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Lender to make and maintain the Loans to the Borrower pursuant to the Credit Agreement, the Grantors hereby jointly and severally agree and the Chapter 11 Plan Administrator agrees with the Lender, as follows:

SECTION 1.  Definitions.

(a) Reference is hereby made to the Credit Agreement for a statement of the terms thereof. All capitalized terms used in this Security Agreement and the recitals hereto which are defined in the Credit Agreement, the Chapter 11 Plan or in Article 8 or 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Code") and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Lender and the Grantors may otherwise agree.

(b) The following terms, whether or not capitalized, shall have the respective meanings provided for in the Code: "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Security Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper".

(c) As used in this Security Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"Collateral" has the meaning specified therefor in Section 2 hereof.

"Copyright Licenses" means all licenses, contracts or other agreements naming any Grantor as licensee or licensor and providing for the grant of any right to use or sell any works covered by any Copyright.

"Copyrights" means (a) all copyright rights in any work subject to the copyright laws of the United States or any other country, whether as author, assignee, transferee or otherwise; (b) all registrations and applications for registration of any such Copyright in the United States or any other country, including registrations, supplemental registrations and pending applications for registration in the United States Copyright Office and/or any other equivalent intellectual property agency or office in any foreign country and the right to obtain all renewals, extensions, supplements, reversions, reissues and continuations thereof; (c) all claims for, and rights to sue or otherwise recover for, past, present or future infringements or other violations of any of the foregoing; and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past, present or future infringement or other violations thereof.

"Distributable Lender Paydown Amount" means, with respect to each Loan Asset (including any related REO), an amount equal to the sum of (a) the Plan Administrator Expenses *plus* (b) the Post-Effective Date Loan Administration Costs *plus* (c) the Post-Effective Date Servicing Advances, in each case, (a) that are allocated to such Loan Asset, and (b) calculated as if then outstanding, regardless of whether such amounts have been funded from any source.

"Distributable Lender Prepayment Amount" means, with respect to each Loan Asset (including any related REO), an amount equal to the then Lender Prepayment Amount.

"Distributable Prepetition Agent Paydown Amount" means, with respect to each Loan Asset (including any related REO), an amount equal to the sum of (a) the Pre-Effective Date Servicing Advances *plus* (b) the Pre-Effective Date Servicing Fees, in each case, (a) that are allocated to such Loan Asset, and (b) calculated as if then outstanding, regardless of whether such amounts have been funded from any source. Schedule 1 attached hereto set forth the Pre-Effective Date Servicing Advance and the Pre-Effective Date Servicing Fees for each Loan Asset as of the Effective Date of the Chapter 11 Plan.

"Excluded Loans" means the "Excluded Loans" as defined in the Chapter 11 Plan.

"Existing Issuer" has the meaning specified therefor in the definition of the term "Pledged Shares."

"Intellectual Property" means all intellectual property and similar proprietary rights of every kind and nature throughout the world of any Grantor, whether now owned or hereafter acquired by any Grantor, including, inventions, designs, Patents, Copyrights, Trademarks, Patent Licenses, Copyright Licenses, Trademark Licenses, trade secrets, domain names, confidential or proprietary technical and business information, know-how, show-how or other data or information and all related documentation.

"Lender Prepayment Amount" means the amount that will be paid to the Lender for application as a mandatory prepayment under Section 2.04 of the Credit Agreement, which amount is equal to thirty seven and one-half percent (37.5%) of the Loan Asset Proceeds that are received or are available

with respect to each Loan Asset, or if the LTV Ratio exceeds fifty percent (50%), such higher amount as is required to bring the LTV Ratio to below fifty percent (50%).

"Loan Asset Proceeds" means, the aggregate amount of cash and Cash Equivalents that is actually received from time to time (whether as initial consideration or through the payment or disposition of deferred consideration but only as and when received) by or on behalf of any Grantor (and/or Parent) on account of any Loan Asset (including any associated REO), including any Extraordinary Receipts and Other Available Funds.

"LTV" has the meaning specified therefor in the Credit Agreement.

"Other Available Funds" means, cash proceeds of any Collateral other than from a Loan Asset.

"Patent Licenses" means any written agreement, now or hereafter in effect, granting to any Grantor any right to make, use or sell any invention covered by a Patent now or hereafter owned by any third party (including any such rights that such Loan Party has the right to license), together with any amendments, modifications, renewals, extensions and supplements thereof.

"Patents" means (a) all patents of the United States or the equivalent thereof in any other country or jurisdiction, and all applications for patents of the United States or the equivalent thereof in any other country or jurisdiction, (b) all provisionals, reissues, extensions, continuations, divisions, continuations-in-part, reexaminations or revisions thereof, and the inventions, discoveries, improvements and designs disclosed or claimed therein, including the right to make, use, import and/or sell the inventions disclosed or claimed therein, (c) all claims for, and rights to sue or otherwise recover for, past, present or future infringements or other violations of any of the foregoing and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past, present or future infringement or other violation thereof.

"Payment Date" means the last Business Day of each calendar month, commencing with the first full calendar month following the Closing Date.

"Plan Administrator Expenses" means the "Plan Administrator Expenses" as defined in the Chapter 11 Plan

"Pledged Interests" means, collectively, the Pledged Shares and all security entitlements in any and all of the foregoing.

"Pledged Issuer" has the meaning specified therefor in the definition of the term "Pledged Shares."

"Pledged Shares" means (a) the Equity Interests issued by the PSF REO Subsidiary Entities, whether or not evidenced or represented by any stock certificate, certificated security or other Instrument (the "Existing Issuers"), (b) the Equity Interests of any new Subsidiary at any time and from time to time acquired by a Grantor that holds title to REO properties (such Persons, together with the Existing Issuers, being hereinafter referred to collectively as the "Pledged Issuers" and each individually as a "Pledged Issuer"), whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, (c) the certificates representing such shares of Equity Interests, all options and other rights, contractual or otherwise, in respect thereof and all dividends, distributions, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and all other property (including, without limitation, any stock dividend and any distribution in connection with a stock split)

from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests and (d) without affecting the obligations of any Grantor under any provision prohibiting such action under this Security Agreement, the Credit Agreement or any other Loan Document, in the event of any consolidation or merger involving any Pledged Issuer and in which such Pledged Issuer is not the surviving entity or any division of any Pledged Issuer, all Equity Interests of the successor entity formed by or resulting from such consolidation, merger or division.

"Post-Effective Date Loan Administration Costs" means the "Post-Effective Date Loan Administration Costs" as defined in the Chapter 11 Plan

"Post-Effective Date Servicing Advances" means the "Post-Effective Date Servicing Advances" as defined in the Chapter 11 Plan.

"Pre-Effective Date Servicing Advances" means the "Pre-Effective Date Servicing Advances" as defined in the Chapter 11 Plan.

"Pre-Effective Date Servicing Fees" means the "Pre-Effective Date Servicing Advances" as defined in the Chapter 11 Plan.

"Trademark Licenses" means any written agreement, now or hereafter in effect, granting to any Grantor any right to use any Trademark now or hereafter owned by any third party (including any such rights that such Loan Party has the right to license), together with any amendments, modifications, renewals, extensions and supplements thereof.

"Trademarks" means (a) all trademarks, service marks, certification marks, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, internet domain names, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations thereof (if any), and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any other country or any political subdivision thereof, and all renewals thereof, (b) all goodwill associated with or symbolized by the foregoing, (c) all claims for, and rights to sue or otherwise recover for, past, present or future infringements, dilutions or other violations of any of the foregoing or unfair competition therewith and (d) all income, royalties, damages and payments now or hereafter due and payable with respect to any of the foregoing, including damages and payments for past, present or future infringement, dilutions or other violations thereof or unfair competition therewith.

SECTION 2.  <u>Grant of Security Interest</u>.  As collateral security for the payment, performance and observance of all of the Obligations, each Grantor hereby pledges and assigns to the Lender (and its agents and designees), and grants to the Lender (and its agents and designees), a continuing security interest in the following property (collectively referred to herein as the "<u>Collateral</u>"):

(a)     all Loan Assets (including all REO properties owned by any Grantor), including those listed on Schedule 3 hereto;

(b)     all Pledged Interests;

(c)     the Collections Account, the Interest Reserve Account and the Loan Proceeds Account;

(d)     the Custodial Agreement;

(e) each Subservicer Agreement;

(f) to the extent not covered under the foregoing clause (a), any and all servicing records, servicing rights, custodial agreements and any other collateral pledged or otherwise relating to the Loan Assets, including related to any Underlying Mortgage, Underlying Note and Underlying Property, together with all files, documents, instruments, surveys, certificates, correspondence, appraisals, computer programs, computer storage media, accounting records and other books and records relating thereto;

(g) solely to the extent related to clauses, (a), (c), (d), (e) and (f) above,

(i) all Accounts;

(ii) all Chattel Paper (whether tangible or electronic);

(iii) all Commercial Tort Claims;

(iv) all Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of any Agent or any Lender or any affiliate, representative or agent of any Agent or any Lender;

(v) all Documents;

(vi) all General Intangibles (including, without limitation, all Payment Intangibles, Intellectual Property and Licenses);

(vii) all Goods, including, without limitation, all Equipment, Fixtures and Inventory;

(viii) all Instruments (including, without limitation, Promissory Notes);

(ix) all Investment Property;

(x) all Letter-of-Credit Rights;

(xi) all Supporting Obligations;

(xii) all other tangible and intangible personal property of such Grantor (whether or not subject to the Code); and

(xiii) all replacements, substitutions, distributions on or Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral and, including, any and all proceeds with respect to the Loan Assets; in each case, howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

SECTION 3. <u>Security for Obligations</u>.  The security interest created hereby in the Collateral constitutes continuing collateral security for all of the Obligations.

SECTION 4. <u>Remedies Upon Default</u>.  If any Event of Default shall have occurred and

be continuing:

(a) The Lender may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and any Law.

(b) Each Grantor hereby acknowledges that if the Lender complies with any applicable Requirements of Law in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

SECTION 5.  [Reserved].

SECTION 6.  Deposit of Loan Asset Proceeds. The Chapter 11 Plan Administrator and the Grantors shall exercise commercially reasonable efforts to deposit (and to cause the Subservicer, the Asset Manager, and any other party that may receive Loan Asset Proceeds, subject to the terms of any contractual arrangements with such parties to deposit) all Loan Asset Proceeds promptly into the Collections Account. The Chapter 11 Plan Administrator acknowledges that the Lender has a first priority security interest in the Collections Account and all deposits at any time contained therein and the proceeds thereof.

SECTION 7.  Distribution of Loan Asset Proceeds.

(a) So long as no Event of Default under the Credit Agreement and the other Loan Documents has occurred or is continuing, the Loan Asset Proceeds with respect to each Loan Asset shall be distributed, as follows:

(i) First, (x) to the Lender, the Distributable Lender Paydown Amount with respect to such Loan Asset, and (y) to the Prepetition Agent, the Distributable Prepetition Agent Paydown Amount with respect to such Loan Asset; *provided* that, in the event the Loan Asset Proceeds with respect to such Loan Asset are insufficient to make the payments required by this clause (i) in full, then (A) if the Loan Asset is not an Excluded Loan, such amounts shall be distributed between sub-clauses (x) and (y) on a pro rata basis, and (B) if the Loan Asset is an Excluded Loan, such amounts shall be distributed first on account of sub-clause (x) until paid in full, and second on account of sub-clause (y) until paid in full;

(ii) Second, to the Lender, the Distributable Lender Prepayment Amount (net of any amounts paid to the Lender under Section 7(a)(i)(x)) with respect to such Loan Asset; and

(iii) Third, to the Chapter 11 Plan Administrator, with such proceeds to be (A) deposited into an account that is not owned by a Loan Party or a Grantor and that is not subject to the liens of the Prepetition Agent or the Lender, and (B) applied in accordance with the Chapter 11 Plan and the Chapter 11 Confirmation Order.

For the avoidance of doubt, with respect to each Loan Asset, (X) no payment under a category shall be made until the prior category has received payment in full in cash of amounts required to be received by it (for example, "second" would not receive any payment until amounts due under "first" have been paid in full) on account of such Loan Asset, and (Y) no payment with respect to a Loan Asset shall be made unless such Loan Asset is fully liquidated and all amounts that can be collected from or with respect to such Loan Asset are collected.

For the avoidance of doubt, after a Loan Asset is fully liquidated and distributions that are required to have been made under clauses (i) – (ii) above with respect to such Loan Asset have been made, all amounts paid to the Chapter 11 Plan Administrator on account of such Loan Asset shall not be Collateral.

(b) If an Event of Default under the Credit Agreement and the other Loan Documents has occurred and is continuing, the Loan Asset Proceeds with respect to each Loan Asset shall be distributed, as follows:

(i) First, (x) to the Lender, the Distributable Lender Paydown Amount with respect to such Loan Asset, and (y) to the Prepetition Agent, the Distributable Prepetition Agent Paydown Amount with respect to such Loan Asset; *provided* that, in the event the Loan Asset Proceeds with respect to such Loan Asset are insufficient to make the payments required by this clause (i) in full, then (A) if the Loan Asset is not an Excluded Loan, such amounts shall be distributed between sub-clauses (x) and (y) on a pro rata basis, and (B) if the Loan Asset is an Excluded Loan, such amounts shall be distributed first on account of sub-clause (x) until paid in full, and second on account of sub-clause (y) until paid in full;

(ii) Second, to the Lender, to pay all then due Obligations under the Credit Agreement and the other Loan Documents, until paid in full; and

(iii) Third, to the Chapter 11 Plan Administrator to be applied in accordance with the Chapter 11 Plan and the Chapter 11 Confirmation Order.

For the avoidance of doubt, with respect to each Loan Asset, (X) no payment under a category shall be made until the prior category has received payment in full in cash of amounts required to be received by it (for example, "second" would not receive any payment until amounts due under "first" have been paid in full) on account of such Loan Asset, and (Y) no payment with respect to a Loan Asset shall be made unless such Loan Asset is fully liquidated and all amounts that can be collected from or with respect to such Loan Asset are collected.

SECTION 8.   [Reserved].

SECTION 9.   Miscellaneous.

(a) No amendment of any provision of this Security Agreement (other than any Schedule attached hereto) shall be effective unless it is in writing and signed by each Grantor affected thereby and the Lender, and no waiver of any provision of this Security Agreement, and no consent to any departure by any Grantor therefrom, shall be effective unless it is in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b) This Security Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect, until the date on which all of the Obligations (other than unasserted contingent indemnification obligations as to which no claim has been made) have been paid in full in cash.

(c) **THIS SECURITY AGREEMENT SHALL BE GOVERNED BY, CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE**

**SECURITY INTEREST CREATED HEREBY, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

(d) In addition to and without limitation of any of the foregoing, this Security Agreement shall be deemed to be a Loan Document and shall otherwise be subject to all of terms and conditions contained in the Credit Agreement, *mutatis mutandi*.

(e) The Lender may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for their actions except for the gross negligence or willful misconduct (in each case as determined in a final non-appealable judgment by a court of competent jurisdiction) of any such agents or attorneys-in-fact selected by the Lender in good faith.

(f) In the case of a conflict between this Security Agreement and any mortgage or deed of trust (if any) with respect to Collateral that is real property (including fixtures), such mortgage or deed of trust shall govern. In all other conflicts between this Security Agreement and any mortgage or deed of trust, this Security Agreement shall govern.

(g) For purposes of this Security Agreement, all references to Schedules attached hereto or to the Credit Agreement shall be deemed to refer to each such Schedule as updated from time to time in accordance with the terms of this Security Agreement.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Draft April 30, 2024

IN WITNESS WHEREOF, each Grantor has caused this Security Agreement to be executed and delivered by its officer thereunto duly authorized, as of the date first above written.

**GRANTORS:**

**PEER STREET FUNDING, LLC**

By: _____
Name:
Title:

**PS FUNDING, INC.**

By: _____
Name:
Title:

**PEER STREET OPPORTUNITY FUND, GP, LLC**

By: _____
Name:
Title:

**PS WAREHOUSE, LLC**

By: _____
Name:
Title:

**PS WAREHOUSE II, LLC**

By: _____
Name:
Title:

**PS PORTFOLIO-ST1, LLC**

By: _____
Name:
Title:

**PS OPTIONS LLC**

By: _____
    Name:
    Title:

**PSF REO LLC**

By: _____
    Name:
    Title:

**CHAPTER 11 PLAN ADMINISTRATOR:**

_____
Elizabeth A. LaPuma, solely in her capacity as such

ACCEPTED AND AGREED

**[COLCHIS]**
as the Lender

By: _____
    Name:
    Title: