```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE


                                 .  Chapter 11
    IN RE:                       .
                                 .  Case No. 23-10815(LSS)
    PEER STREET, INC., et al,    .
                                 .
                                 .  824 Market Street
                                 .  Wilmington, Delaware 19801
                    Debtors.  .
    . . . . . . . . . . . . . . .  Wednesday, October 22, 2025
```

```
                      TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
                 UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

| For the Plan Administrator: | Siena B. Cerra, Esq. |
| | MORRIS JAMES, LLP |
| | 3205 Avenue North Blvd. |
| | Suite 100 |
| | Wilmington, Delaware 19803 |

Nicholas A. Marten, Esq.
Patrick Feeney, Esq.
ARENTFOX SCHIFF, LLP
1301 Avenue of the Americas
42nd Floor
New York, New York 10019

Jackson David Toof, Esq.
ARENTFOX SCHIFF, LLP
1717 K Street NW
Washington, D.C. 20006


(Appearances Continued)

| Audio Operator: | Electronically Recorded |
| | by Brandon J. McCarthy, ECRO |

| Transcription Company: | Reliable |
| | 1007 N. Orange Street |
| | Wilmington, Delaware 19801 |
| | (302)654-8080 |
| | Email:  gmatthews@reliable-co.com |


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

For the Advisory
Committee:                    Juan Martinez, Esq.
                              BENESCH, FRIEDLANDER, COPLAN
                               & ARONOFF, LLP
                              1313 North Market Street
                              Suite 1201
                              Wilmington, Delaware 19801

APPEARANCES VIA ZOOM:  (On the Record)

Also Appearing:               Tieron Mackinnon, *Pro Se*

<u>INDEX</u>

|  | <u>PAGE</u> |
|---|---|
| Plan Administrator's Objection to Claims of Tieron Mackinnon [Docket No. 1647] | 5 |
| Statement by Mr. Mackinnon | 16 |
| Colloquy and Argument Re:  Mr. Mackinnon's Motions | 36 |
| Court Decision | 38 |

| <u>WITNESS</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>FOR THE PLAN ADMINISTRATOR</u> | | | | |
| WARREN GREEN | * | 7 | | |

*Via Declaration

| <u>EXHIBIT</u> | <u>EVID.</u> |
|---|---|
| Green Declaration | 7 |

1        (Proceedings commence at 2:37 p.m.)

2        (Call to order of the Court)

3            THE COURT:  Please be seated.

4            MR. FEENEY:  Good morning, Your Honor.  May it

5    please the Court, my name is Patrick Feeney of the ArentFox

6    Schiff law firm, representing the plan administrator in the

7    Peer Street Chapter 11 cases.

8            I'm joined here today by my colleagues Nicholas

9    Marten and my partner Jackson Toof and our friend Sienna

10   Cerra at Morris James and Warren Green, who has joined us

11   from California for this hearing.

12           Before we get to the agenda items, Your Honor, I

13   would like to start with a brief status update on where

14   things stand in the cases.

15           Earlier this month, the plan administrator

16   effectuated a second interim distribution to holders of

17   investment claims.  Distributions were made to investors on

18   October 8th and 9th through the Peer's retail platform.  In

19   those distributions, about $30.8 million was distributed to

20   MPDN holders, 9.8 million was distributed to Pocket One Month

21   holders, $676,000 was distributed to Pocket Three Month

22   holders, $4.9 million was distributed to Op Fund 2 claims

23   holders, and $905,000 was transferred to PDN claim holders;

24   in total about $47 million was sent out on those two days.

25           Additionally, the ongoing process of liquidating

1    the loans that Peer Street held is continuing.  As of most

2    recently, 61 loans remain outstanding for a liquidation of

3    158 previously.  So that process is still ongoing.

4            Your Honor, do you have any questions regarding

5    that?

6            THE COURT:  I do not.

7            MR. FEENEY:  Thank you, Your Honor.

8            So the only items on the agenda for today are the

9    plan administrator's to Tieron Mackinnon's claims, and then

10   Mr. Mackinnon's series of motions that were filed on the

11   docket.

12           We propose to start first with the -- Mr.

13   Mackinnon's claims and then to proceed on to the motions, so

14   we will start with the claims objection.

15           In connection with the claims objection, Your

16   Honor, there is the declaration of Warren Green.  We have Mr.

17   Green here today.  And we would like to move that declaration

18   into evidence.

19           THE COURT:  So any objection?  I see Mr. Mackinnon

20   on Zoom.  I will say up front that we didn't give Mr.

21   Mackinnon permission to appear by Zoom.  But in the interest

22   of moving these matters along, I'm going to permit it.

23           So, Mr. Mackinnon, do you have any objection to Mr.

24   Green's declaration coming into evidence?

25           MR. MACKINNON:  (Indiscernible) good afternoon,

1    Your Honor.  And no.

2            THE COURT:  Okay.  Then that declaration -- thank

3    you -- is admitted.

4            Are you going to have any questions for Mr. Green?

5            MR. MACKINNON:  Yes.

6            THE COURT:  Okay.  Then we're going to put Mr.

7    Green on the stand.

8            MR. FEENEY:  Thank you, Your Honor.

9            For that, we will bring Mr. Toof up to do

10   questioning, Your Honor.

11           THE COURT:  Okay.  And Mr. Green, if you could

12   please take the stand.

13           THE ECRO:  Please raise your right hand.

14   WARREN GREEN, WITNESS FOR THE PLAN ADMINISTRATOR, AFFIRMED

15           THE ECRO:  Please state your full name and spell

16   your last name for the record.

17           THE WITNESS:  Warren Green, G-r-e-e-n.

18           THE ECRO:  Thank you.  You may have a seat.

19           THE COURT:  Mr. Toof, before cross-examination, do

20   you have any additional questions for Mr. Green?

21           MR. TOOF:  No, Your Honor.  We'd like to have his

22   declaration serve as his direct testimony.

23           THE COURT:  Very good.  Okay.  Thank you.

24           Mr. Mackinnon, this is your chance to ask your

25   questions of Mr. Green.  And his declaration has been

1    admitted.

2         (Green Declaration received in evidence)

3                        CROSS-EXAMINATION

4    BY MR. MACKINNON:

5    Q    How you doing, Mr. Green?  I would like to know when was

6    you notified that you would appear today?

7    A    I'm sorry.  I don't understand.  Who did I notify?

8    Q    When was you notified that you was -- that you would

9    appear at this hearing today?

10   A    I was notified that I had to appear last week.

11                  THE COURT:  Okay.

12   Q    Could you give me a date, if you don't mind?

13   A    October 17th, 2025.

14   Q    And could you also tell me what is your specific title

15   and role with Peer Street?

16   A    I am the Senior Asset Manager of PS Funding and PSF RAO,

17   LLC.

18   Q    To the best of your knowledge, are you the designated

19   corporate representative for Peer Street, testifying on its

20   behalf today?

21   A    Yes.

22                  MR. TOOF:  Objection, Your Honor, only to the

23   extent that he's here as a fact witness who gave a

24   declaration.  I just want to make sure there's no confusion,

25   Your Honor, in terms of corporate representative.

1    THE COURT:  Okay.

2    BY MR. MACKINNON:

3    Q    Are you testifying -- apologies.

4    THE COURT:  No.  Go ahead.

5    Q    Are you test -- are you testifying today based on your

6    personal knowledge of the events we will discuss?

7    A    Yes.

8    Q    As a part of your duties, are you responsible for

9    understanding the financial transactions related to the loans

10   Peer Streets owes all servicers?

11   A    Yes.

12   Q    Did you prepare for this deposition or hearing by

13   reviewing relevant documents about the loan in question?

14   A    Yes.

15   Q    Did you bring with you today a complete financial and

16   transfer of record of the loan in question or did you review

17   the documents?

18   A    I don't understand what you're asking for.

19   Q    Did you bring a copy of the -- of the documents that --

20   that we're speaking about, or did you provide counsel with

21   documents?

22   A    I believe counsel has all of the relevant documents.

23   Q    Are you familiar with the loan and agreement and note

24   for 2200 Mount Holly Street, originated between Tieron

25   Mackinnon and PS Funding, Inc.?

1    A    Yes.

2    Q    Are you aware that PS Funding sold the loan to

3    Invigorate Finance, LLC (phonetic), in December of 2021?

4    A    Yes.

5    Q    Did you personally sign, authorize, or review the

6    documents that affected the sale of this loan to Invigorate?

7    A    I did not.

8    Q    Have you reviewed a sale or assignment agreement in

9    reference to the -- the sale of the loan to Invigorate?

10    A    I did not.

11    Q    I -- I couldn't hear you.

12    A    Oh, I'm sorry.  I have not.

13    Q    Do you have knowledge of the price of the sale to

14    Invigorate?

15    A    I do not know what that is.

16    Q    The sale price, meaning they -- they said they sold the

17    loan to Invigorate.  Do you have knowledge of the sale price?

18    A    I know what the unpaid principal balance was.

19    Q    Do you know how the sale price was recorded on Peer

20    Street financial statement and books?

21    A    Only in our system of record that it took place.

22    Q    So that's a yes?

23    A    Yes.

24    Q    At the moment of that sale, did Peer Street internal

25    records reflect that they no longer owned the legal right to

1   enforce the loan?

2   A   At that time, yes.

3   Q   Do you know who at Peer Street was responsible for

4   ensuring the physical note was transferred to Invigorate upon

5   the sale?

6   A   I do not know the individual.

7   Q   Can you describe the process for how the loan's

8   electronic records were updated to show Invigorate as the new

9   owner in December 2021?

10  A   Well, there would be an agreement of sale in between the

11  two companies.

12  Q   After the sale to Invigorate, did Peer Street continue

13  to receive any economic benefit from this loan, such as

14  servicing fees or percentages of payments?

15  A   Not when we were not the owner of the property or the

16  loan.

17  Q   Was Barclays Bank, PLC involved in any way as an

18  investor or otherwise in the December 2021 sale to

19  Invigorate?

20  A   I don't know.

21  Q   Are you aware that PS Funding repurchased the loan from

22  Invigorate in July of 2022?

23  A   Yes.

24  Q   Have you ever seen a copy of the repurchase or

25  reassignment agreement?

1    A    Yes, it would be in our electronic file.

2    Q    Did you also view the buyback price of the sale of the

3    loan to Invigorate?

4    A    I did not.

5    Q    What was the business reason for selling the loan in

6    December of 2020 [sic] and repurchasing -- repurchasing it

7    just seven months later?

8    A    I don't know.

9    Q    Did Peer Street or its agents conduct a new audit of the

10   loan's payment history and escrow accounts upon repurchasing

11   it -- repurchasing it from Invigorate?

12   A    I don't know.

13   Q    Were there any commissions or fees paid to any parties,

14   including Peer Street employees, in connection with having a

15   sale and repurchase of the loan?

16   A    I do not believe so.

17   Q    Are you familiar with the affidavit certifying ownership

18   of the debt instrument you signed?  Did you sign that

19   document with a pen or digital signature?

20   A    I signed with a pen.

21   Q    This affidavit states you are an authorized signatory

22   for PS Funding.  Who specifically authorized you to sign

23   affidavits on behalf of the company?

24   A    The board of directors -- directors via a corporate

25   resolution.

1    Q    This affidavit was executed on September 21st, 2022,

2    correct?

3    A    Correct.

4    Q    At the time you signed the -- signed the affidavit on

5    September 21st, 2022, were you aware that PS Funding had sold

6    this loan seven months prior and had only repurchased it two

7    months prior to you signing?

8    A    Yes.

9    Q    When you swore in the affidavit that PS Funding was the

10    owner of the debt instrument, did you consider the period

11    where Invigorate was the legal owner?

12    A    I guess I don't understand the question there.

13    Q    Okay.  I'll move on.

14    Did you review the -- did you review the complete chain

15    of title documents, including the Invigorate sale and

16    repurchase agreement, before swearing out this affidavit as

17    to PS Funding's ownership?

18    A    Yes.

19    Q    In your Green Declaration filed with this Court, you

20    state you were authorized to sign these documents because the

21    authorization included swearing to the facts without

22    verifying underlying financial transactions that define legal

23    ownership?

24    A    I'm not sure I understand your question there.  I'm an

25    authorized signatory on behalf of the company.

1    Q    I'll move on.

2         Is it part of your standard practice to sign affidavits

3    concerning loan ownership while reviewing the (indiscernible)

4    assignment documents that prove ownership?

5    A    No.  I review documents before I sign affidavits.

6    Q    Did you disclose the sale and repurchase history of this

7    loan to the attorneys who prepared the foreclosing affidavits

8    for your signature?

9              MR. TOOF:  Objection.  Relevance.

10             THE COURT:  What is the relevance of that question?

11             MR. MACKINNON:  I was asking does the -- did he

12   make the attorneys in the state proceeding aware of the sale

13   to Invigorate.  It's along the same lines as -- as them

14   disclosing the sale.  They disclosed it.  So I was just

15   asking did he notify counsel in the state action of the sale.

16             THE WITNESS:  No, I did not.

17             MR. MACKINNON:  Thank you.

18   BY MR. MACKINNON:

19   Q    Do you believe an affidavit claiming ownership of a debt

20   is accurate and complete if it omits the fact that the debt

21   was sold and repurchased within the year preceding the

22   affidavit?

23   A    Yes.

24   Q    Counsel filed a Fay Servicing letter dated April 19,

25   2021, which state Barclays Bank is the current lender.  Can

1    you explain the capacity in which Barclays Bank was involved

2    with this loan prior to the sale to Invigorate?  And can

3    counsel allow him to view this document if he hasn't seen it?

4    A    No, I was not an employee of Fay Servicing.

5    Q    No, I didn't ask you was you an employee of Fay

6    Servicing.  My apologies.  I can read the question one more

7    time.

8         Counsel filed a Fay Servicing letter dated April 19th,

9    2021, which states Barclays Bank, PLC is the current lender.

10   Can you explain the capacity in which Barclays Bank was

11   involved with this loan prior to the sale to Invigorate?

12   A    No, I have no idea.

13   Q    Are you familiar with Barclays Bank?

14   A    As an institution, yes.

15   Q    Dealing with -- with your company.  My apologies.

16   A    Oh, no.

17   Q    Given that Fay Servicing was acting as Peer Street's

18   loan servicer, were the funds they collected, including funds

19   from the title companies, ultimately remitted to Peer

20   Street's accounts?  Would you agree that those funds are

21   electronic bank transfers?

22   A    I don't know what Fay Servicing did with -- with those

23   funds.

24        MR. MACKINNON:  Okay.  Thank you.  And that will

25   conclude my questioning.

1           THE COURT:  Thank you.

2           Any redirect?

3           MR. TOOF:  Your Honor, no redirect.

4           THE COURT:  Okay.  Thank you, Mr. Green.  You may

5   step down.

6        (Witness excused)

7           MR. FEENEY:  Thank you, Your Honor.  Patrick

8   Feeney, appearing again on behalf of the Plan Administrator

9   for Peer Street.

10           I am going to address, first and foremost, Mr.

11   Mackinnon's deemed proof of claim.  As Your Honor recalls --

12           THE COURT:  Well, let's -- before we do that, let's

13   make sure the evidence is complete.

14           MR. FEENEY:  Okay.

15           THE COURT:  So does the trustee have any further

16   evidence that it wants to present?

17           MR. FEENEY:  No.

18           THE COURT:  Okay.  Mr. Mackinnon, do you have any

19   evidence you would like to present in support of your claim?

20           MR. MACKINNON:  I have a statement that I have

21   written that I would like to read into the record.

22           THE COURT:  Okay.  I will let that serve as your

23   direct, and then you will be subject to cross-examination.

24   Okay.

25           MR. MACKINNON:  This is to back up my last filed

1    motion, not -- not as like how they just submitted the

2    Green's declaration.  It's not the same thing.

3              THE COURT:  I -- say that again.

4              MR. MACKINNON:  This is to support the -- my last

5    filed motion, not the same as how they just submitted the

6    Green's declaration.

7              THE COURT:  Okay.  Well, I will let you make your

8    statement in support of your motions and in opposition to the

9    claim objection that was filed.

10             MR. MACKINNON:  Yes.  Thank you.

11             THE COURT:  Okay.  And you can read that when

12   you're ready.

13             MR. MACKINNON:  Oh, okay.  My apologies.

14             Your Honor, we now see that all of counsel now

15   disagrees and I'd like for me to be denied for following

16   proper procedure, as the law allows, for these -- from their

17   personal opinion and false financial standpoint.  I will

18   always remain unapologetic when my family has lost our home.

19             For the right information that I'm seeking to

20   uphold my right to request financial and assessment

21   information, as this information should be readily available

22   via the books and records, I want to be extremely clear that

23   out of the multitude of questions that I have asked since

24   January of '24 of counsel and plan administrator in these

25   proceedings, I have been provided with one key component:  My

1    claims against PS Funding estate, which involves my personal

2    estate, for the point of clarity, while understanding the

3    factual history of the proceedings of the loan and the

4    certain sale of the loan.

5         But for those that don't know, in my particular

6    situation, $34,411.54 is missing.  I do know what happened to

7    a portion of those funds without my consent via the servicer

8    actions.  Therefore, as I have learned, the servicer job is

9    to report to PS Funding and disburse funds to PS Funding,

10   which their books and records should reflects these

11   transactions.

12        And now that everybody is listening, can you all

13   collectively help locate the financial reports and assignment

14   disclosures in this circumstance?  As the plan administrator

15   stated in her objection, Document 1698, Page 3, she reviewed

16   the books and records, so we could see if these funds were

17   properly recorded and disbursed.

18        Also the loan assignment activity, as I continue to

19   expose evidence of the breach of contract, from its inception

20   with PS Funding and its associates.  From the plan

21   administrator very first objection, there was no mention of a

22   loan being sold.  I was told that PS Funding could not speak

23   for the servicer and how they handle escrow funds because

24   they are not a part of these proceedings.

25        But as I read -- as I read, vicarious liability can

1   still hold a commercial loan owner accountable for servicing

2   actions and, as we have all heard, the books and records will

3   reveal the truth.

4          I understand that PS Funding is not on trial.  But

5   as for the Chapter 11, their books and records needed to be

6   corrected.  And a situation as of mine's can and will be

7   corrected, and there is no better time than now.

8          I've been told it's a process by Your Honor and

9   counsel, when it comes to submitting motions in this court.

10  But as I reviewed the record, counsel submitted a motion to

11  appear *pro hac vice* on 8/20, and it was granted and signed on

12  8/20/2025, via the process.

13         So let me call memory to aid.  On June 11th,

14  counsel acknowledged Document 1588, motion to compel, and

15  even put Your Honor on notice that the document was filed and

16  they had a copy.  And counsel stated briefly that they read

17  contents, but needed more time to respond, which the

18  transcript of the hearing will reflect this conversation of

19  the process.

20         Yes, I have asked a multitude of questions.  And as

21  a result, I've received very good answer, which lead me to

22  why I have the privilege to see all information pertaining to

23  my particular situation, especially when this information has

24  been hidden throughout my presence in this matter.  And it

25  now appears that the plan administrator is throwing stones

1    and hiding her hand because she has seen the inconsistencies

2    in the books and records and acts as if I don't have a legit

3    claim to raise questions.

4         The bankruptcy begins with the concept of honest

5    debtors.  So I must ask:  How can this Court determine if PS

6    Funding qualifies as an honest debtor when they concealed the

7    sale of the loan of Invigorate for over a year in these

8    proceedings?

9         Also the same record, via my pleadings and

10   counsel's objections, showed the same thing, which Barclays

11   Bank owned the loan in April.  So myself and this Court would

12   like to be inclined to know when that sale or assignment

13   occurred.

14        When the plan administrator states she reviewed the

15   books and records, does her definition of "review" include

16   examining the document two thousand eight hundred twelve

17   hours and seven cent [sic] payment from a title company that

18   Fay Servicing acknowledged receiving, but never accounting

19   for in any financial disclosures to me.

20        The plan administrator -- the plan administrator

21   has asked us to audit that -- those records because she

22   explained the PS Funding bankruptcy schedule could clearly

23   disclose this, the December 2021 sale and the July 2022

24   repurchase of the loan as discrete financial events affecting

25   their estate or assets, given that the bankruptcy exists to

1  provide honest relief to honest debtors.  How could PS

2  Funding claim this protection while, simultaneously,

3  concealing the fundament financial time line of the loan in

4  question.

5         When the plan administrator reviewed my file, did

6  she notice that the certified (indiscernible) court documents

7  PS Funding submitted actually contained a Fay Servicing

8  letter identifying Barclays Bank as the current lender,

9  creating three different ownerships claims they never

10  explained to date.

11         As a creditor seeking to perfect my client, I'm

12  entitled to see the debtor's accounting.  So why has the plan

13  administrator refused to provide Form 410(a), despite my

14  request?  Essentially preventing me from properly

15  substantiating my claims.  The Bankruptcy Code requires full

16  financial disclosure.  So how does the plan administrator

17  justify objection to my claim by simultaneously refusing to

18  provide the escrow analysis of the loan.

19         And PS Funding cancel -- counsel admit in Docket

20  Number 1647 that they sold and repurchased the loan.  But

21  they also disclosed to the plan administrator how much profit

22  or loss they realized on these transactions that they

23  directly affected the estate financial position.

24         Your Honor, we now have judicial admission of

25  Invigorate's assignment, so I must ask:  Where is the actual

1  assignment documents that (indiscernible) for the loan from

2  Peer Street/PS Funding to Invigorate in December 2021.

3       If Peer Street claims they repurchased the loan in

4  2022, where is the bill or sale or assignment documentation

5  showing they legally reacquired it from Invigorate.  How can

6  the plan administrator claim she properly reviewed this file

7  when the fundamental documents (indiscernible) title, the

8  assignment have never been produced to me or apparently to

9  this Court?

10       When Fay Servicing stated in the Barclays -- that

11  Barclays Bank was the current lender, did Peer Street ever

12  disclose this third-party interest to the bankruptcy estate

13  as a potential competing claim against the assets?  The plan

14  administrator has access to all corporate records.  Did she

15  produce the board resolution or corporate authorization

16  showing which Peer Street employees have authorize --

17  authority to execute the (indiscernible) sale and repurchase

18  transaction?  When the plan administrator reviewed the file,

19  did she verify whether Peer Street disclosed the Invigorate

20  sale in the initial bankruptcy schedule, or whether this

21  critical financial transaction was concealed until forced

22  into admission.

23       If the assignment to and from Invigorate is this,

24  why has Peer Street counsel refused to produce them in

25  response to my motion to compel that specially requests

1    proofs of assignment?  Does the plan administrator review of

2    my file include an examination of why Peer Street never

3    provided the assignment documents I required -- I requested

4    in January of 2024 motion?  Meaning, did they conceal this

5    evidence for over 20 months?

6           Your Honor, the thirty-two-thousand-dollar water

7    bill escrow was paid without my authorization.  Has the plan

8    administrator reviewed the documents showing who authorized

9    this disbursement and what they compelled with the escrow

10   agreement in turns.

11          When the plan administrator states she reviewed the

12   file, does that include examining why the two thousand eight

13   hundred and twelve dollars and seven cent made to the company

14   with -- was never accounted for in the loan balance present

15   to this court -- presented to this court?  How can I possibly

16   perfect my client without the escrow analysis Fay Servicing

17   promised, but never delivered, the same analysis that will

18   show the disposition of the funds and payments that I know

19   the records could otherwise show more explicit information.

20          How can a plan administrator claim to have properly

21   evaluated my claim without obtaining the complete service and

22   transfer of records between Peer Street and Invigorate, Fay

23   Service, and FCI that will show who controlled the funds when

24   or did counsel obtain these records?  How can I calculate the

25   true amount of my claim without payment application, records

showing how the 34,000 unauthorized escrow disbursement was
applied to the loan balance.

Your Honor, how could any creditor perfect a claim
against an estate that systematically conceals the
fundamental financial transactions that define the debt.
When the plan administrator states she reviewed my file, but
hasn't provided Form 410 -- 410(a), isn't she essentially
admitting that she expects me to perfect my claim without the
basic tools bankruptcy law provides to creditors?  How can I
determine whether I qualify for a discharge or a setoff
without the complete financial accounting that Peer Street
has systematically concealed.

Given the -- given the new evidence of the
Invigorate assignment, it is less than 45 days old, how can
the plan administrator claim I had sufficient opportunity to
perfect my claim when the foundation of that claim just
emerged?  When the plan administrator reviewed my file, did
she consider that, without the assignment documentation and
financial accounting, I'm essentially being asked to fight a
battle with my hands tied behind my back.

If the plan administrator has truly reviewed the
file, why hasn't she determined or demanded that Peer Street
produce the assignment documentation that will prove their
right to include this loan in the estate.  When Peer Street
concealed the Invigorate assignment for over a year, doesn't

that pattern of concealment itself constitute evidence that

my claim has merit?  How can the plan administrator claim to

represent the estate interest by simultaneously ignoring the

systematic financial concealment that prevents creditors from

perfecting their claim?

Given that the bankruptcy is meant to be a

transparent process, how does plan administrator justify

objecting to my claim while Peer Street continues to conceal

the financial records?  I need to substantiate my claim.

When I filed my motion to compel I used the formal discovery

method available to every creditor.  So why has the plan

administrator chosen to ignore these discovery requests,

rather than ensure the estate complies with them?

Your Honor, the fundamental question remains:  How

can any creditor in a bankruptcy case perfect their claim

when a debtor conceals the assignment and documents of

financial record that confirm the very nature of the debt?

Your Honor, I cannot simply take counsel's word on the

financial matters.  I need to find the -- I need to follow

the documentary money trail.

While the plan administrator commit today to

produce the -- will the plan administrator or counsel commit

today to produce the master servicing agreement between Peer

Street and Fay Servicing, which will define their financial

reporting obligations and prove who controlled the funds?

Has the plan administrator reviewed the year in tax forms

like the 1098 (indiscernible) interest statement, which I've

referenced in previous motions, to verify that the interest

Peer Street reported to the IRS matches the interest actually

collected by Fay Servicing on their behalf, which will reveal

accounting discrepancies.

I have witnessing -- I have witnessed opposing

counsel file Document 1691 on 10/7/2025, Page 3, Line 8 and 9

states the following:

"Prior to the Petition Date, certain of the Debtors

commenced litigation" --

On a property.

"-- (the "Texas Action"), against Shellpoint.  The

Texas Action relates to ... lien priority of

certain loans extended to property ...

"For more than three (3) years, the Parties

diligently prosecuted the Texas Action, filed

various motions, participated in discovery, and

began settlement conversations.  The Parties had

scheduled a mediation [in] May [of] 2024.  However,

on April 4, 2024, debtor PS Funding ... filed a

suggestion of bankruptcy, staying the Texas

Action."

This is a critical tool for triggered the automatic

stay, which immediately halts collection actions and legal

1    proceedings, which I was not privileged to, even though I

2    presented the same fact of the bankruptcy in the Maryland

3    action.  I was ignored.

4         Now, knowing the complexity of particular

5    situation, ultimately, my goal is the truth.  Your Honor, the

6    bankruptcy is the one place where complete financial truth

7    must be revealed.  And I hear counsel's defense, but my claim

8    is based on facts, not on unverified statements of counsel's

9    parties that has already concealed critical information.

10        I stand for justice and to not be silenced because

11   of my situation does not meet the -- their agenda.  My civil

12   rights have been violated along with everything else I have

13   filed with this court.  And my recent motions speak loud and

14   clear and should be granted from a legal standpoint.  Also,

15   for the good nature of my presentments here today, I reserve

16   all rights for appeal purposes.  Thank you.

17        THE COURT:  Thank you.

18        Mr. Toof, do you have any question of Mr.

19   Mackinnon.

20        MR. TOOF:  Your Honor, could I ask for a five-

21   minute recess to confer with my co-counsel?

22        THE COURT:  Yes.  We'll take five minutes and then

23   we'll be back.  Mr. Mackinnon, five minutes, and then we'll

24   start up again.

25        MR. MACKINNON:  Thank you.

1          THE COURT:  Thank you.

2      (Recess taken at 3:14 p.m.)

3      (Proceedings resume at 3:23 p.m.)

4      (Call to order of the Court)

5          THE COURT:  Thank you.  Please be seated.

6          MR. TOOF:  Your Honor, Jackson Toof from ArentFox

7   Schiff on behalf of the plan administrator.

8          THE COURT:  Yes.

9          MR. TOOF:  Your Honor, we understand the Court

10   accepted Mr. Mackinnon's statement as, you know, his direct

11   testimony.  It's our position that there was nothing factual

12   that was testified to; it was filled with questions and

13   comments and argument.  And so, based on our view of his

14   direct testimony, we don't have any questions for Mr.

15   Mackinnon.

16          THE COURT:  Okay.  Thank you.

17      Okay.  Okay.  Then that will close the evidentiary

18   record, and we will go to argument.

19          MR. FEENEY:  Thank you, Your Honor. Patrick Feeney

20   of ArentFox Schiff on behalf of the plan administrator.

21      There is one clarifying point we wanted to make

22   before we get to our claims objection, which is a fact that

23   we have discovered very -- today, actually, just regarding

24   the $2,812 in escrow.

25          We previously have reported to the Court that this

1    was a month that was held by Fay.  And we just want to

2    clarify that we have found in the records that, at the time

3    that the loan was purchased back by Peer Street, about

4    $1,223.25 of escrow was transferred to FCI during the

5    servicing of the loan.  Our understanding is that amount was

6    used to pay advances down on Mr. Mackinnon's defaulted loan.

7    So we want to provide that clarification from --

8            THE COURT:  Well, I don't know what to do with

9    that.  If -- okay?  I don't know what to do with that.  And

10   I'm not -- the $208,000 is from what?

11           MR. FEENEY:  No, my apologies, Your Honor.  Two

12   thousand, eight hundred and twelve dollars of escrow that was

13   held by Fay Servicing when it was servicing the loan, at the

14   time that the loan was purchased back by Peer Street, one

15   thousand, two hundred and twenty-three dollars and twenty-

16   five cents of that escrow remained that was transferred to

17   FCI for the servicing of the loan.

18           THE COURT:  Okay.  I don't know what to do with

19   that.  That's not evidence because you didn't put it in the

20   evidentiary record.  It's not a clarification of anything.

21   It just actually raises questions for me that I don't think I

22   had.  So I'm not sure what to do with that.

23           MR. FEENEY:  Your Honor, we will -- I mean, what we

24   will note is that we discovered this today and we are still

25   uncovering info -- we're looking into it.  We can provide a

1    report to Your Honor to, you know, explain what exactly

2    happened to those escrow funds.  But we wanted to let Your

3    Honor know, for the sake of full disclosure, that we

4    discovered this today.

5            THE COURT:  Well, does Mr. Mackinnon have a claim

6    for some escrow funds?  I don't know what that means.  I

7    don't know what that means.

8            MR. FEENEY:  Your Honor, what we will do is if --

9    what we would propose is we can provide a -- we will look

10   into the issue.  We can provide a report back.  And we can

11   proceed -- we'll provide a report back and we can -- if it

12   can be resolved -- results in an issue where Mr. Mackinnon

13   may have a claim with regard to that $1,200 we can discuss

14   that at that time.

15           THE COURT:  Well, I think you're going to have to

16   provide some documentation to Mr. Mackinnon.

17           MR. FEENEY:  Understood, Your Honor.

18           THE COURT:  Okay?  Because I don't know.  And I

19   appreciate that the debtor is reporting on something that

20   they just learned about.  But I find it -- not the debtor,

21   the trustee, recognizing that the trustee wasn't around when

22   all of this happened, I recognize that.  But nonetheless, the

23   trustee objected to Mr. Mackinnon's claim.  And now I'm

24   hearing there's some issue that's arisen today that the

25   trustee is not sure about, and I don't know what to do with

1    that.

2              MR. FEENEY:  Understood, Your Honor.  And I'll just

3    restate, you know, our understanding is that amount was

4    applied to outstanding servicing advances, but we understand

5    that that is an open -- you know, a new item that has come up

6    that is not matching what we have previously discussed, so --

7              THE COURT:  Well, what happened to the other

8    $1,800?

9              MR. FEENEY:  The other 1,800 was not returned to --

10   was not sent to FCI as part of the escrow; that remained with

11   Fay Servicing, is our understanding.

12             THE COURT:  Okay.

13        (Pause in proceedings)

14             MR. FEENEY:  Your Honor, we will -- what we propose

15   is we will reserve on the issue of the $1,200.  We can --

16   again, we will provide a, you know, further explanation of

17   that amount.  What we would propose is that we move forward

18   with the rest of the claims objection with a reservation for

19   the twelve-hundred-dollar amount.

20             THE COURT:  I'll hear the objection and then I'll

21   figure out what I'm going to do.

22             MR. FEENEY:  Thank you, Your Honor.

23             So, Your Honor, as I -- you know, as Your Honor is

24   aware, on June 13th, Your Honor entered an order that stated

25   that Mr. Mackinnon's pleadings at Dockets Number 800, 1064,

1    1065, and 1120 constituted an informal proof of claim and

2    gave the plan administrator 60 days to file an objection.

3         Mr. Mackinnon has stated during these proceedings

4    that he is no re-litigating the foreclosure action.  However,

5    the basis of his various claims for significant and

6    unsubstantiated damages, with a reservation for the point we

7    just discussed, all demand a re-litigation of the state court

8    foreclosure action.  They require that the Court go back to

9    that foreclosure action, reexamine it to determine that there

10   were -- that it was wrongful.

11        As this Court has held under Rooker-Feldman

12   doctrine, under *res judicata*, under collateral estoppel

13   grounds, this Court is not able to re-litigate the

14   foreclosure action.  So it is inappropriate to consider --

15   you know, re-litigate the foreclosure action for purposes of

16   Mr. Mackinnon's claims.

17        Regardless, the claims that Mr. Mackinnon does

18   assert in his pleadings do not allege cognizable claims.

19        First, in regard to the amount of damages, Mr.

20   Mackinnon asserts damages of about $2 million per member of

21   his family, plus $2 million punitive damages, and later

22   asserts a two-hundred-and-fifty-thousand-dollar fraud

23   penalty.  He provides no precedent, no exhibit, or no record

24   justifying those numbers.  So, from the get-go, the numbers

25   that Mr. Mackinnon provides are unsupported and there's no

1    basis for them.

2          Then, going into the specific causes of action Mr.

3    Mackinnon asserts, none of them are sufficiently asserted

4    under applicable Maryland law.  I will just -- and they also

5    play back into the issue that this is servicing as a re-

6    litigation of the foreclosure action.

7          For example, the primary claim Mr. Mackinnon brings

8    is a claim for fraud, based on an allegation that Peer Street

9    filed false, misleading, and deceptive communications in the

10   state foreclosure action.  Mr. Mackinnon doesn't specify how

11   these documents were false, misleading, or deceptive.  There

12   are two documents that Mr. Mackinnon identifies as forged,

13   these are the two exhibits that were attached to the plan

14   administrator's claim objection -- not claim objection -- the

15   initial objection the plan administrator filed to Mr.

16   Mackinnon's motions, Exhibit A-4, the affidavit certifying

17   ownership of debt instrument with copy of debt instrument;

18   and Exhibit A-5, affidavit pursuant to Section

19   7105(1)(e)(1)(2) concerning default and notice of intent to

20   foreclosure.  As Your Honor heard with Mr. Green testifying

21   and in his declaration, Mr. Green attests to having signed

22   these documents.

23         Additionally, Your Honor, we sent a court runner to

24   the Baltimore Court to obtain the public docket for this

25   foreclosure action, and they retrieved certified copies of

1    the affidavits that were filed in the foreclosure action,

2    with the stamp of the Clerk of Court on them.

3         So there is no question, there's no room for

4    question that the affidavits were signed by Warren Green and

5    were filed in the foreclosure action, despite Mr. Mackinnon's

6    arguments.  So, with regard to his fraud claims, there's no

7    basis.

8         And with regard to Mr. Mackinnon's intentional

9    infliction of emotional distress claims, this goes also to

10   the issue of re-litigating the foreclosure action.  If the

11   foreclosure action is valid, Mr. Mackinnon is essentially

12   asking for emotional damages for a valid and ratified court

13   procedure.  He's not entitled to that.

14        Under Maryland law, generally, intentional

15   infliction of emotional distress claims are rarely viable and

16   used sparingly.  There's at least one decision that holds

17   that emotional damages are not appropriate in the wake of a

18   foreclosure action.  So Mr. Mackinnon's intentional

19   infliction of emotion distress claim is -- should be

20   disallowed.

21        Your Honor, there are also other arguments that Mr.

22   Mackinnon makes, specifically, with regard to the MCDCA and

23   the FDCPA.  I apologize.  I don't have those acronyms in

24   front of me.  As well as constitutional violations and

25   federal regulatory violations.  Those are set forth in our

1    objection.  So, if Your Honor has any questions with regard

2    to those.

3            I want to finish on one more point with regard to

4    the claims objection, and this ties in with Mr. Mackinnon's

5    various motions.  In his motion to amend, he asserts what

6    comes out to be two new claims:  A claim for $172,000, 500 --

7    $172,582.99 as a secured claim, which appears to be based on

8    an affidavit filed in the foreclosure action, signed by

9    Warren Green, that goes to the outstanding amounts Mr.

10   Mackinnon owed to Peer Street on account of his defaulted

11   loan, not amounts that Peer Street owed to Mr. Mackinnon.

12           Additionally, with regard to his pro se document

13   preparation fees for $187,400, Mr. Mackinnon doesn't provide

14   support for these numbers, other than stating an estimate of

15   how many hours were worked and a going rate for the hours

16   worked.  He doesn't provide any record or evidence that he --

17   that any of that work was performed.

18           Regardless, Mr. Mackinnon doesn't provide any

19   material, any precedent in -- supporting payment of his pro

20   se document preparation fees.  And from the plan

21   administrator's review of case law, the plan administrator is

22   unaware of any cases that would allow for such payment.

23           So, in conclusion, Your Honor, with the reservation

24   that I noted at the beginning of this argument, we would

25   argue that the Court should disallow and expunge Mr.

1     Mackinnon's claim in its entirety.

2              THE COURT:  Okay.  Thank you.

3              Okay.  Mr. Mackinnon, I heard your statement, which

4     may have had some facts in it, but was largely argument.  Do

5     you have anything you want to add in response to what you

6     just heard by way of argument from counsel?

7          (No verbal response)

8              THE COURT:  Mr. Mackinnon, you're muted.

9              MR. MACKINNON:  My apologies.  Yes, I would like to

10    add information.

11             As I previously has documented via my motions, it's

12    -- it's always something new.  As Your Honor just witnessed,

13    these undisclosed funds, as counsel just stated, was -- was

14    used to pay down the default.  We still have no knowledge of

15    these type of situations, which further solidify everything I

16    was saying thus far.  Every -- every time we turn around,

17    there's something new.  If they just found this out, no

18    documentation was provided, just -- just a verbal statement.

19             As Your Honor can see, as I've been submitting my

20    motions, I properly wait the allotted time to be heard, as in

21    like my motion for default judgment, as the law allows,

22    should be granted, regardless of the opinion of counsel.

23    It's just an opinion.  But I put nothing but facts inside of

24    my motions.

25             And this is more ground to stand on as to the facts

1    I've been made -- that I have made in my previous pleadings.

2    So, therefore, I feel as if my motion should be granted

3    because counsel has, once again, you know, given this court a

4    different outlook on them concealing information.  Their

5    statements say that they have previously reviewed the -- the

6    books and records.  So to find out this today, within five

7    minutes, to me, is unheard of.  And I would just like to --

8    for Your Honor to take all of that in consideration.

9              THE COURT:  Thank you.

10             Okay.  Do you have -- Mr. Feeney, do you have any

11   evidence or anything that you're going to put on with respect

12   to Mr. Mackinnon's motions?

13             MR. FEENEY:  With regard to Mr. Mackinnon's

14   motions, I would like to, you know, admit into evidence the

15   attachments that were provided to our objection to Mr.

16   Mackinnon's various motions, the pleadings that were filed

17   with the foreclosure action.

18             THE COURT:  Okay.

19             MR. FEENEY:  And Your Honor, if I may, I do have

20   the original certified copies.  If you -- if I may present

21   them to Your Honor?

22             THE COURT:  Yes.

23          (Pause in proceedings)

24             MR. FEENEY:  Your Honor, may I approach the bench?

25             THE COURT:  You may.

1          MR. FEENEY:  Thank you, Your Honor.

2          The first document is the order to docket that was

3    -- one second.  This was Exhibit 4 on the exhibit list.

4          This next one is Exhibit 5.  This is the affidavit

5    certifying ownership, as well as other documents, that was

6    filed as Docket Number 3 in the foreclosure action.

7          And Exhibit Number 6, which is the plan -- the

8    return of service that was filed at Docket Number 6 in the

9    foreclosure action.

10         THE COURT:  Mr. Mackinnon, do you have any

11   additional evidence, other than your statement you've already

12   made with respect to your particular motions?  I think your

13   statement covered the relief you requested in your motions.

14   But if you have anything else?

15         MR. MACKINNON:  Not necessarily.  I just ask that

16   Your Honor take a look at the letter from Fay Servicing

17   within that document that he just provided you from the State

18   Court.  And it's going to state the information and reference

19   the Barclays Bank.

20         And also, if I never would have spoke on the

21   $2,800, once again, Peer Street still would have left this

22   out of the entire conversation.

23         THE COURT:  Okay.  Thank you.

24         MR. FEENEY:  Your Honor, we also have to just make

25   sure that we have to -- not responded with regard to the

1    motions that Mr. Mackinnon has filed.  So should we address

2    that (indiscernible) now?

3                 THE COURT:  Yes.  Well, as I understand it, there

4    were several motions that were filed that were not noticed

5    out.

6                 MR. FEENEY:  Right, correct.

7                 THE COURT:  And so there was no particular time to

8    have to file a response, and that is the proper procedure.

9                 A *pro hac vice* motion, Mr. Mackinnon, is very

10   different.  That's a motion that --

11                MR. MACKINNON:  Okay.

12                THE COURT:  -- that gets -- it's pretty as of

13   course.  It doesn't require a notice, it doesn't require an

14   objection deadline or a hearing.  It's a different type of

15   motion.  So I'm not going to enter a default judgment for the

16   lack of response to a motion that hasn't been noticed out.

17                But in any event, even if it had been and they

18   missed it, the Third Circuit looks -- doesn't look kindly

19   upon defaults.  And it would not be the type of relief I

20   would grant, absent some circumstances that are not present

21   here.  So I will not grant a default.  So the motion for

22   default judgment that's at 1602, I will not grant.

23                The emergency motion to rule on pending motions and

24   enter default judgment, again, I'm not entering the default

25   judgment.

1        There was a motion for -- to compel answers to

2    material questions.  This wasn't noticed out, and it was set

3    for a hearing today.  And there's also a motion for

4    sanctions.  So there are multiple motions in front of me.

5        I am -- I'm not going to grant the default

6    judgment, I'm not going to grant sanctions under these

7    circumstances, again, with the idea that sanctions are an

8    extreme remedy that should be used only in extraordinary

9    circumstances.

10        (Pause in proceedings)

11        THE COURT:  And what I am going to require -- and I

12    want -- I'll take a look at these documents.  But what I am

13    going to require is an accounting of the payments and

14    disbursements on Mr. Mackinnon's loan.  There seems to be

15    some issue with respect to the escrow.  I would like a full

16    accounting.  And to the extent that that was requested in Mr.

17    Mackinnon's motion to compel answers to material questions, I

18    grant that part of the motion.

19        Now, having done that, please recognize Mr.

20    Mackinnon, as I said before and as I ruled before, the

21    foreclosure happened in the Maryland State Court system.  And

22    as I was preparing for this hearing and looking at what's

23    been filed, the foreclosure action was filed pre-bankruptcy,

24    the foreclosure sale was pre-bankruptcy, and the Baltimore

25    Court denied a motion to dismiss pre-bankruptcy.

1          The ratification of the sale by the Appellate Court

2    did happen amount a month after the bankruptcy filing.  But

3    all of those other actions occurred pre-bankruptcy.  The

4    bankruptcy did not stay, the automatic stay does not stay

5    actions that the debtor has taken, commenced pre-bankruptcy.

6    And the foreclosure action is an action the debtor commenced

7    pre-bankruptcy, so it wasn't stayed, and the Maryland Court

8    could properly ratify the sale, that the bankruptcy didn't

9    stop it from doing that.  That sale has happened.

10          And as I previously entered an order that said you

11   are permitted to go the Maryland Court to get whatever relief

12   you can get from the Maryland Court with respect to the

13   foreclosure, I cannot revisit that.

14          You can also take any actions you want against Fay

15   Servicing, and I have said that previously in an order.

16          So, while I think an accounting in these

17   circumstances is appropriate, I don't, Mr. Mackinnon, want

18   you to be under the mistaken belief that I'm going to somehow

19   undo the foreclosure action or provide damages because of the

20   foreclosure action.  This loan was foreclosed upon prior to

21   the bankruptcy, so that loan was not even an asset of this

22   estate at that point in time.  Even if it were, the servicing

23   happened outside of the purview of this court in the ordinary

24   course of the debtors' business and in a proper state court.

25          So I'm -- again, I can't undo anything.  The

1   testimony I had today -- and I know you had concerns about

2   the forgeries on documents submitted in the foreclosure

3   action.  Mr. Green has testified credibly that he signed the

4   documents that contain his signature that were filed in the

5   Maryland foreclosure action.

6          He also testified that, at the time of that

7   transaction, at the time of the foreclosure action, the

8   debtor owned the loan, it had repurchased it for whatever

9   reason it had repurchased the loan.  And again, that would

10   have been an issue to be taken up with the Maryland Judge,

11   if, in fact, Peer Street didn't own the loan that it was

12   foreclosing on.  That would be some kind of defense in the

13   foreclosure action.  Again, I cannot revisit that.

14          So, while I am requiring an accounting, and to the

15   extent that the trustee has the documents related to the

16   purchase and sale to Invigorate --

17          MR. FEENEY:  Invigorate.

18          THE COURT:  -- Invigorate, those should be produced

19   to Mr. Mackinnon.  They may be useful in Maryland or they may

20   be useful in something he brings against the servicer.

21          MR. FEENEY:  Understood, Your Honor.

22          THE COURT:  Okay.  So I'll enter some order.  But

23   I'm -- at this point, I want that exchange to happen before I

24   enter anything with respect to his proof of claim and the

25   objection to the proof of claim.  So we may need to meet

1       again for a status conference on his claim, once that

2       information is provided to Mr. Mackinnon.

3              MR. FEENEY:  Understood, Your Honor.  We will

4       produce that information.

5              THE COURT:  Okay.  And I will get orders entered,

6       to the extent I can, on the other ones.

7              MR. MARTEN:  Your Honor, if I may, with respect to

8       the accounting, would you like that filed on the docket or

9       given to Mr. Mackinnon and then a statement filed?

10             THE COURT:  Mr. Mackinnon, this is your

11      information.  I -- if you don't mind it being put on the

12      docket, that would fine; if you would rather it not be, but

13      just provided to you, that's fine, too.

14             MR. MACKINNON:  It could be -- I'm not opposed to

15      it being on the docket.

16             I also would like to ask Your Honor for any

17      information that they have on the assignment to Barclays

18      Bank, as well, as they submitted into evidence today.

19             THE COURT:  Where is Barclays mentioned in these --

20             MR. FEENEY:  Your Honor --

21             THE COURT:  -- in these papers?

22             MR. FEENEY:  -- Barclays is mentioned in the letter

23      of April, I want to say 19th, 2022, from Fay Servicing to Mr.

24      Mackinnon.

25             Now, because this was a letter from Fay Servicing,

1   we believe the -- you know, the nature of Barclays is

2   relationship to the loans, irrelevant for purposes of Mr.

3   Mackinnon's motions because these were -- this letter was

4   delivered at a time when Invigorate had purchased the loan

5   from Peer Street, before Peer Street purchased the loan back.

6           We might not have -- we might not have the

7   documents that show any transfer between Invigorate and

8   Barclays.

9           THE COURT:  Right.  If you have them, please

10  provide them.  If you don't have them, then we don't have

11  them.  If they're not in the file.  Okay?  Look in the file.

12          MR. MARTEN:  Your Honor, with respect to the

13  accounting, we could file it under seal.

14          THE COURT:  Why don't you do that?  That's what I

15  was thinking.  Thank you.  We're going to file it on the

16  docket, but we're going to put it under seal, so nobody else

17  can see it.  And you'll get --

18          MR. MACKINNON:  Thank --

19          THE COURT:  Mr. Mackinnon, you will get a copy of

20  it.

21          MR. MACKINNON:  Thank you.

22          THE COURT:  And let me also say that, in terms of,

23  you know, a proof of claim for -- a claim for multiple

24  millions of dollars based on fraud or deceptive documents or

25  intentional infliction of emotional distress, I am not going

1    to be allowing those claims.  We're dealing with whether

2    there's any money owed to Mr. Mackinnon, that's what we're --

3    that's what we're looking at.

4           And while I recognize that could be inconsistent

5    with the foreclosure based on what I recently heard, I don't

6    know.  So let's get that accounting and we'll figure out if

7    there's anything owed to Mr. Mackinnon, if he has a claim.

8           MR. FEENEY:  Understood, Your Honor.  We will

9    investigate it and we will report back.

10          THE COURT:  Thank you very much.

11          Okay.  That concludes our hearing for today.

12          MR. FEENEY:  That's correct, Your Honor.

13          THE COURT:  So we're adjourned.  Thank you,

14   everyone.

15          PARTICIPANTS:  Thank you, Your Honor.  Thank you,

16   Your Honor.

17       (Proceedings concluded at 3:54 p.m.)

18                         ****

19

20

21

22

23

24

25

1                        CERTIFICATION

2              I certify that the foregoing is a correct

3        transcript from the electronic sound recording of the

4        proceedings in the above-entitled matter to the best of my

5        knowledge and ability.

6

7

8

9

10       _____        October 27, 2025

11       Coleen Rand, AAERT Cert. No. 341

12       Certified Court Transcriptionist

13       For Reliable

14

15

16

17

18

19

20

21

22

23

24

25